# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

**Kristopher Justinboyer Ervin, et. al,**

**Appellants,**

**v.**

                         **No. 23-13062**

**United States of America**

**Appellee.**

_____


## APPEAL OF A CRIMINAL CASE FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA DISTRICT COURT NASE NO. 3:21-CR-00022

---

## APPENDIX OF INITIAL BRIEF OF APPELLANT MATTHEW RAYMOND HOOVER, VOL. 1

---

Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant Matthew Raymond Hoover*

## INDEX OF APPENDIX FOR APPELLANT MATTHEW RAYMOND HOOVER, VOL. 1

DOCKET/TAB

**Volume 1**

DOCKET SHEET ............................................................................ A

TRANSCRIPT OF MOTION HEARING ...................................... 48

SECOND SUPERSEDING INDICTMENT ................................... 57

SUPPLEMENT TO MOTION TO DISMISS .............................. 101

MOTION TO DISMISS ................................................................ 132

REQ. FOR JUD. NOTICE ......................................................... 132-1

SECOND MOTION TO DISMISS .............................................. 133

ORDER DENYING MOTION TO DISMISS ............................. 141

FOURTH SUPERSEDING INDICTMENT ............................... 204

FINAL JURY INSTRUCTIONS .................................................. 254

TRANSCRIPT OF YOUTUBE VIDEO .................................... 259-2

TRANSCRIPT OF YOUTUBE VIDEO ................................... 259-12

GOVERNMENT EXHIBIT-DREMEL ................................... 259-172

GOVERNMENT EXHIBIT-CUT AKCS ............................... 259-173

MOTION FOR JUDGMENT OF ACQUITTAL ......................... 274

TRIAL TRANSCRIPT VOL. 1 ..................................................... 277

TRIAL TRANSCRIPT VOL 2 ...................................................... 278

TRIAL TRANSCRIPT VOL 4 ...................................................... 280

TRIAL TRANSCRIPT VOL 6 ...................................................... 282

TRIAL TRANSCRIPT VOL 7 ...................................................... 283

TRIAL TRANSCRIPT VOL 8 ...................................................... 284

CERTIFICATE OF SERVICE............................................................ B

**Volume 2**

ORDER DENYING MOTION FOR
JUDGMENT OF ACQUITTAL....................................................310

JUDGMENT ................................................................................327

CERTIFICATE OF SERVICE........................................................... C

A

DOCKET SHEET

APPEAL,BOND,CLOSED,SL DOC,TRLSET

## U.S. District Court
## Middle District of Florida (Jacksonville)
## CRIMINAL DOCKET FOR CASE #: 3:21–cr–00022–MMH–MCR–2

Case title: USA v. Ervin

Date Filed: 03/11/2021

Date Terminated: 09/14/2023

Assigned to: Judge Marcia
Morales Howard
Referred to: Magistrate Judge
Monte C. Richardson

Appeals court case number:
23–13062–D USCA

**Defendant (2)**

| | | |
|---|---|---|
| **Matthew Raymond Hoover** | represented by | **Matthew Raymond Hoover** |
| *BOND* | | 401 Chilewski Drive |
| *TERMINATED: 09/14/2023* | | Coloma, WI 54930 |
| | | PRO SE |

**Zachary Z. Zermay**
Zermay Law
1762 Windward Way
Sanibel, FL 33957
239–699–3107
Email: zach@zermaylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Alex King**
First Coast Criminal Defense
1805 Copeland St.
Jacksonville, FL 32204
904–355–7777
Fax: 904–720–2886
Email: Alex@MonroeKingLaw.com

**Matthew Larosiere**
6964 Houlton Circle
Lake Worth, FL 33467
561–452–7575
Email: larosieremm@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One |

(2ss) | through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00

UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION
(3ss)

Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00

UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION
(5ss)

Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00

UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION
(7ss)

Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1s) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2–7) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2s–8s) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (4ss) | |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (6ss) | |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (8ss) | |

**Highest Offense Level**
**(Terminated)**

Felony

**Complaints**                                                      **Disposition**

None

---

**Movant**

**John Crump**                          represented by    **Eric J. Friday**
                                                          Kingry & Friday, Esq.
                                                          1919 Atlantic Blvd.
                                                          Jacksonville, FL 32207
                                                          (904) 722−3333
                                                          Email: efriday@kingryfriday.com
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

                                                          **James D Phillips , Jr**
                                                          Katz & Phillips, PA
                                                          509 W Colonial Dr
                                                          Orlando, FL 32804
                                                          321/332−6864
                                                          Fax: 407/657−1526
                                                          Email: jphillips@kplegalteam.com
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

                                                          **Robert J Olson**
                                                          William J. Olson, P.C.
                                                          370 Maple Ave W
                                                          Suite 4
                                                          Vienna, VA 22180
                                                          703−356−5070
                                                          Fax: 703−356−5085
                                                          Email: rob@wjopc.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

                                                          **Ronald J. Shook , II**
                                                          The Law Offices of Ronald J. Shook
                                                          121 E. Main Ave.
                                                          Gastonia, NC 28052
                                                          (704) 671−2390
                                                          Fax: (704) 671−4431
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

                                                          **Stephen D Stamboulieh**
                                                          Stamboulieh Law, PLLC
                                                          P.O. Box 428
                                                          Olive Branch, MS 38654
                                                          601−852−3440
                                                          Email: stephen@sdslaw.us
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*

**Plaintiff**

**USA**                                                 represented by **David B. Mesrobian**
US Attorney's Office – FLM
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904/301–6300
Fax: 904/301–6310
Email: david.mesrobian@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Laura Cofer Taylor**
US Attorney's Office – FLM*
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904–301–6249
Email: Laura.C.Taylor@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jennifer Michele Harrington**
United States Attorney's Office
400 W. Washington Street, Suite 3100
Orlando, FL 32801
407–648–7651
Fax: 407–648–7643
Email: Jennifer.harrington2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mai Tran**
United States Attorney's Office
Suite 700
300 N. Hogan Street
Jacksonville, FL 32202
904–301–6300
Fax: 904–301–6310
Email: mai.tran2@usdoj.gov
*TERMINATED: 11/16/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2022 | 57 | SECOND SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ss, 2ss–7ss, 8ss–14ss, 15ss–17ss, Matthew Raymond Hoover (2) count(s) 1, 2–7. (BGR) (Additional attachment(s) added on 1/27/2022: # 1 Restricted Unredacted Indictment) (BGR). Modified on 3/16/2023 to edit text (AET). (Entered: 01/27/2022) |
| 01/26/2022 | 58 | MOTION for Arrest Warrant by USA as to Matthew Raymond Hoover. (BGR) (Entered: 01/27/2022) |
| 01/26/2022 | 59 | **ORDER granting 58 Motion for Arrest Warrant as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 1/26/2022. (BGR)** (Entered: 01/27/2022) |
| 01/27/2022 | 63 | Arrest Warrant Returned Executed on 1/27/2022 as to Matthew Raymond Hoover. (BGR) (Entered: 01/27/2022) |

| 01/31/2022 | 66 | **ORDER as to Matthew Raymond Hoover: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (BGR)** (Entered: 01/31/2022) |
|---|---|---|
| 01/31/2022 | 68 | Rule 5(c)(3) documents received from the Eastern District of Wisconsin as to Matthew Raymond Hoover which includes: Docket Sheet, Initial Appearance Minutes, Waiver of Rule 5 or 32.1 Hearings, Order of Detention, Order Setting Conditions of Release. (Attachments: # 1 Initial Appearance, # 2 Waiver of Rule 5 Hearings, # 3 Order of Temporary Detention and Order Scheduling a Detention Hearing, # 4 Detention Hearing, # 5 Order Setting Conditions of Release)(RH) (Entered: 02/01/2022) |
| 02/02/2022 | 70 | NOTICE OF HEARING as to Matthew Raymond Hoover: Initial Appearance and Arraignment set for 2/22/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 02/02/2022) |
| 02/11/2022 | | Set/Reset Deadlines/Hearings as to Matthew Raymond Hoover: Initial Appearance set for 2/22/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (LRB) (Entered: 02/11/2022) |
| 02/22/2022 | 73 | NOTICE OF ATTORNEY APPEARANCE: Zachary Z. Zermay appearing for Matthew Raymond Hoover (Zermay, Zachary) (Entered: 02/22/2022) |
| 02/22/2022 | | Arrest of Matthew Raymond Hoover on 1/27/2022 (SHS) (Entered: 02/22/2022) |
| 02/22/2022 | 74 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Initial Appearance and ARRAIGNMENT as to Matthew Raymond Hoover (2) Count 1, 2–7 held on 2/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 02/22/2022) |
| 02/22/2022 | 75 | ORAL NOTICE OF ATTORNEY APPEARANCE: Zachary Z. Zermay and Matthew Larosiere appearing for Matthew Raymond Hoover (SHS) (Entered: 02/22/2022) |
| 02/22/2022 | 76 | NOTICE of acceptance of general discovery (FILED IN OPEN COURT) by Matthew Raymond Hoover (SHS) (Entered: 02/22/2022) |
| 02/22/2022 | 77 | **SCHEDULING ORDER as to Matthew Raymond Hoover Status Conference set for 4/18/2022 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard Jury Trial set for trial term commencing 5/2/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Discovery motions due by 3/8/2022 Dispositive motions due by 3/22/2022 Signed by Magistrate Judge Monte C. Richardson on 2/22/2022. (SHS)** (Entered: 02/22/2022) |
| 03/04/2022 | 78 | JOINT MOTION to Hold Motions Deadlines in Abeyance and For a Status Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Modified on 3/4/2022, to edit text) (BGR). (Entered: 03/04/2022) |
| 03/07/2022 | 79 | **ORDER granting 78 Joint Motion to Hold Motions Deadlines in Abeyance and for a Status Hearing. The parties are relieved of the obligation of complying with the motions deadlines. The hearing scheduled for March 21, 2022, at 1:30 p.m. is cancelled. A status conference as to all parties is set for March 23, 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 3/7/2022. (JW)** (Entered: 03/07/2022) |
| 03/21/2022 | 80 | MOTION for Zachary Z. Zermay and Matthew Larosiere *at the Status Conference of March 23, 2022* by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/21/2022) |
| 03/21/2022 | 81 | **ENDORSED ORDER granting 80 Motion to Appear Telephonically. Zachary Zermay and Matthew Larosiere are permitted to appear telephonically at the status conference set for March 23, 2022, at 1:30 p.m. The Courtroom Deputy Clerk will separately provide counsel with the call–in information for the hearing. Signed by Judge Marcia Morales Howard on 3/21/2022. (JW)** (Entered: 03/21/2022) |

| 03/23/2022 | 82 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin and Matthew Raymond Hoover. (JW) (Entered: 03/23/2022) |
|---|---|---|
| 03/23/2022 | 83 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 3/23/2022; granting 82 Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1) and Matthew Raymond Hoover (2). Special Status Conference set for 6/27/2022 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 7/5/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Shannon Bishop (JW) (Entered: 03/23/2022) |
| 03/25/2022 | 84 | NOTICE OF ATTORNEY APPEARANCE David B. Mesrobian appearing for USA. (Mesrobian, David) (Entered: 03/25/2022) |
| 03/25/2022 | 85 | TRANSCRIPT of Digitally recorded arraignment and detention hearing as to Kristopher Justinboyer Ervin held on 3/15/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, Telephone number (904) 301–6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/15/2022 Redacted Transcript Deadline set for 4/25/2022 Release of Transcript Restriction set for 6/23/2022. (KMH) (Entered: 03/25/2022) |
| 06/21/2022 | 95 | MOTION to Dismiss by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Request for Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | 96 | MOTION to Change Venue / Transfer Case by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Zachary Z. Zermay, # 3 Request for an Evidentiary Hearing and Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | 97 | MOTION to Sever Trial by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Oral Argument)(Zermay, Zachary) (Modified on 6/22/2022, to edit text) (BGR). (Entered: 06/21/2022) |
| 06/27/2022 | 98 | NOTICE of filing supplemental authority by Kristopher Justinboyer Ervin, Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 06/27/2022) |
| 06/27/2022 | 99 | JOINT ORAL MOTION to Continue Trial as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (CKS) (Entered: 06/28/2022) |
| 06/27/2022 | 100 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 6/27/2022; granting 99 Joint Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover(2). Jury Trial set for the November 2022 trial term, scheduled to commence on 11/1/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Katharine Healey (CKS) (Entered: 06/29/2022) |
| 07/01/2022 | 101 | SUPPLEMENT re 95 MOTION TO DISMISS & to Declare Unconstitutional the National Firearms Act of 1934 by Matthew Raymond Hoover (Zermay, Zachary) Modified on 7/7/2022 to edit text (AET). (Entered: 07/01/2022) |
| 07/12/2022 | 102 | NOTICE *Regarding Expert Disclosure* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 07/12/2022) |
| 07/20/2022 | 103 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 95 MOTION to Dismiss *and Supplement to Motion to Dismiss & To Declare Unconstitutional the National Firearms Act of 1934 (Doc. 101)* (Taylor, Laura) (Entered: 07/20/2022) |
| 07/20/2022 | 104 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 96 MOTION to Change Venue / Transfer Case (Taylor, Laura) (Entered: 07/20/2022) |

| 07/20/2022 | 105 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 97 MOTION to Sever Defendant *Matthew Raymond Hoover* (Taylor, Laura) (Entered: 07/20/2022) |
|---|---|---|
| 08/01/2022 | 106 | NOTICE *REGARDING JURY SELECTION* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/01/2022) |
| 08/02/2022 | 107 | NOTICE *REGARDING EXPERT DISCLOSURE* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/02/2022) |
| 08/03/2022 | 108 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover: Motion Hearing/Status Conference set for 10/11/2022 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendants are required to be present. (JW) (Entered: 08/03/2022) |
| 08/04/2022 | 109 | **ENDORSED ORDER regarding 107 Defendant Hoover's Notice Regarding Expert Disclosure, which, in this instance, the Court will construe as a motion for extension of time. The motion is granted only to the extent that Defendant Hoover must disclose his experts by August 12, 2022. Signed by Judge Marcia Morales Howard on 8/4/2022. (JW)** (Entered: 08/04/2022) |
| 08/04/2022 | 110 | MOTION for Leave to File Reply to 103 Response in Opposition by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 111 | MOTION for Leave to File Reply to 105 Response in Opposition to Sever Defendant by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 112 | MOTION for Leave to File Reply to 104 Response in Opposition to Change Venue/Transfer Case by Matthew Raymond Hoover. Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 113 | NOTICE of filing supplemental authority by Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) Modified on 8/5/2022 to edit text and to confirm with counsel page 3 is intentionally blank (AET). (Entered: 08/04/2022) |
| 08/05/2022 |  | Set/Reset Deadlines as to Matthew Raymond Hoover: Expert Witness List due by 8/12/2022. (AET) (Entered: 08/05/2022) |
| 08/05/2022 | 114 | NOTICE OF RESCHEDULING HEARING: The Motion Hearing/Status Conference previously scheduled for October 11, 2022, at 10:00 a.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing date and time: Motion Hearing/Status Conference set for 10/12/2022 at 2:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/05/2022) |
| 08/05/2022 | 115 | **ORDER denying 110 Motion for Leave to File Reply to Opposition to Motion to Dismiss. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF)** (Entered: 08/05/2022) |
| 08/05/2022 | 116 | **ORDER denying 112 Motion for Leave to File Reply to Opposition to Motion to Transfer Venue. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF)** (Entered: 08/05/2022) |
| 08/05/2022 | 117 | **ORDER denying 111 Motion for Leave to File Reply to Opposition to Motion to Sever Trial. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF)** (Entered: 08/05/2022) |
| 08/23/2022 | 118 | MOTION in Limine by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 56 Notice of Disclosure of Summary Expert Testimony in compliance with Fed. R. Crim. P. 16(b)(1)(C) and 107 Notice Regarding Expert Disclosure. (Attachments: # 1 Exhibit A, video on disk filed separately, # 2 Exhibit B, # 3 Exhibit C)(AET) (Entered: 08/24/2022) |
| 08/30/2022 | 119 | JOINT UNOPPOSED MOTION to Continue trial by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 9/2/2022 to edit text (AET). (Entered: 08/30/2022) |

| 08/31/2022 | 120 | THIRD SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1sss, 2sss–8sss, 9sss–15sss, 16sss–18sss, Matthew Raymond Hoover (2) count(s) 1s, 2s–8s. (Attachments: # 1 Restricted Unredacted Indictment) (AET) Modified on 3/16/2023 to edit text (AET). (Entered: 08/31/2022) |
|---|---|---|
| 08/31/2022 | 123 | NOTICE OF HEARING ON 119 Joint and Unopposed Motion to Continue Trial. Motion Hearing set for September 6, 2022, at 3:00 p.m. before Judge Marcia Morales Howard. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. (JW) (Entered: 08/31/2022) |
| 09/02/2022 | 125 | **ORDER denying 96 Motion to Transfer Venue and 97 Motion to Sever. Signed by Judge Marcia Morales Howard on 9/2/2022. (TMF)** (Entered: 09/02/2022) |
| 09/07/2022 | 126 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 9/7/2022; granting 119 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2); denying, without prejudice, as moot 95 Defendant Hoover's Motion to Dismiss. Hoover's renewed motion to dismiss due September 22, 2022. Response due October 7, 2022. Motion hearing set for December 9, 2022, at 10:00 a.m. Jury Trial set for 1/9/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Katharine Healey (JW) (Entered: 09/12/2022) |
| 09/13/2022 | 127 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 120 Third Superseding Indictment,. Arraignment set for 9/22/2022 at 11:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 09/13/2022) |
| 09/14/2022 | 128 | UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 9/15/2022 (AET). (Entered: 09/14/2022) |
| 09/16/2022 | 129 | **ENDORSED ORDER granting 128 UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 9/15/2022. (SHS)** (Entered: 09/16/2022) |
| 09/16/2022 | 130 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover as to Matthew Raymond Hoover (Zermay, Zachary) Modified on 9/19/2022 to edit text (AET). (Entered: 09/16/2022) |
| 09/22/2022 | 131 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Third Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s–7s, 1ss, 1sss, 2ss–7ss, 2sss–8sss, 8s, 8ss–14ss, 9s–14s, 9sss–15sss, 15ss–17ss, 16sss–18sss, and Matthew Raymond Hoover (2) Count 1, 1s, 2–7, 2s–8s, held on 9/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 09/22/2022) |
| 09/22/2022 | 132 | MOTION to Dismiss by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice)(Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/22/2022 | 133 | Second MOTION to Dismiss for First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934 by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/28/2022 | 136 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 09/28/2022) |
| 10/07/2022 | 137 | MOTION for Hearing by USA as to Matthew Raymond Hoover. (Mesrobian, David) (Entered: 10/07/2022) |
| 10/07/2022 | 138 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 133 Second MOTION to Dismiss *First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934*, 132 MOTION to Dismiss |

| | | (Taylor, Laura) Modified on 10/11/2022 to edit text (AET). (Entered: 10/07/2022) |
|---|---|---|
| 10/07/2022 | 139 | Unopposed MOTION to Continue Daubert Motion Deadline by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 10/07/2022) |
| 10/11/2022 | 140 | **ENDORSED ORDER granting 139 Unopposed Motion to Continue Daubert Deadline. Defendants shall have up to and including October 21, 2022, to file Daubert motions. The United States shall have up to and including November 7, 2022, to file responses. Signed by Judge Marcia Morales Howard on 10/11/2022. (JW)** (Entered: 10/11/2022) |
| 10/18/2022 | 141 | **ORDER denying 132 Motion to Dismiss as to Matthew Raymond Hoover (2); denying 133 Motion to Dismiss as to Matthew Raymond Hoover (2). Signed by Judge Marcia Morales Howard on 10/18/2022. (JW)** (Entered: 10/18/2022) |
| 10/27/2022 | 143 | Unopposed MOTION to Continue Motion in Limine Deadline by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 10/28/2022, to edit text) (BGR). (Entered: 10/27/2022) |
| 10/28/2022 | 144 | UNOPPOSED MOTION for Zachary Z Zermay, Matthew Larosiere, and Matthew Raymond Hoover to appear telephonically at the Garcia Hearing by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 10/31/2022 (AET). (Entered: 10/28/2022) |
| 10/28/2022 | 145 | **ORDER granting 143 Motion to Continue Motion in Limine Deadline. Motions in limine due 11/10/2022. Responses due 11/28/2022. Signed by Judge Marcia Morales Howard on 10/28/2022. (JCM)** (Entered: 10/28/2022) |
| 10/31/2022 | 146 | TRANSCRIPT of Digitally Recorded Initial Appearance and Arraignment Proceedings as to Matthew Raymond Hoover held on 02/22/2022 before Judge Monte C. Richardson. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR–C, Telephone number (904) 301–6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/21/2022 Redacted Transcript Deadline set for 12/1/2022 Release of Transcript Restriction set for 1/30/2023. (KMH) (Entered: 10/31/2022) |
| 10/31/2022 | 147 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT (02/22/2022 Digitally Recorded Initial Appearance and Arraignment of Matthew Raymond Hoover). The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Matthew Raymond Hoover. Court Reporter: Katharine Healey (KMH) (Entered: 10/31/2022) |
| 11/01/2022 | 148 | **ENDORSED ORDER granting 144 Unopposed Motion for Zachary Z. Zermany; Matthew Larosiere and Defendant Matthew Raymond Hoover to appear at the Garcia hearing telephonically as to Matthew Raymond Hoover. (2) Signed by Magistrate Judge Monte C. Richardson on 11/1/2022. (MDH)** (Entered: 11/01/2022) |
| 11/07/2022 | 149 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 142 MOTION in Limine *to Exclude Trial Testimony of Government's Purported Expert Witnesses* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Taylor, Laura) (Entered: 11/07/2022) |
| 11/08/2022 | 150 | **ENDORSED ORDER granting 137 Motion for Hearing as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 11/8/2022. (SHS)** (Entered: 11/08/2022) |
| 11/08/2022 | 151 | NOTICE OF HEARING as to Matthew Raymond Hoover: Garcia Hearing set for 11/17/2022 at 02:00 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 11/08/2022) |

| | | |
|---|---|---|
| 11/10/2022 | 152 | Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) (Entered: 11/10/2022) |
| 11/10/2022 | 153 | RESPONSE to Motion re 152 Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 11/10/2022) |
| 11/10/2022 | 154 | **ENDORSED ORDER granting 152 Joint Emergency Motion for Extension of Time of Filing Deadline and Request for Status Conference. Motions in limine must be filed on or before November 18, 2022. A telephonic status conference is set for Thursday, November 17, 2022, at 1:00 p.m. The Courtroom Deputy Clerk will separately send participants the call–in information for the hearing. Absent a continuance of the trial, no further extensions of time will be granted. Signed by Judge Marcia Morales Howard on 11/10/2022. (JW)** (Entered: 11/10/2022) |
| 11/16/2022 | 155 | RESPONSE in Opposition by Matthew Raymond Hoover re 137 MOTION for Hearing (Zermay, Zachary) Modified on 11/17/2022 to redact and replace PDF due to personal identifiers (AET). (Entered: 11/16/2022) |
| 11/17/2022 | 156 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Garcia hearing held on 11/17/2022 as to Matthew Raymond Hoover. (Digital) (SHS) (Entered: 11/18/2022) |
| 11/17/2022 | 158 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 11/21/2022) |
| 11/17/2022 | 159 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 11/17/2022; terminating 136 Government's Motion in Limine; granting 158 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). A Daubert hearing will be held on February 7, 2023. The time will be set at a later date. Jury Trial set for 4/10/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for deadlines. The Court emphasized its expectation that the deadlines would be met and that the trial date is firm and will not change. Order Scheduling Trial to enter. Court Reporter: Katharine Healey (JW) (Entered: 11/21/2022) |
| 11/18/2022 | 157 | NOTICE OF HEARING as to Matthew Raymond Hoover: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel set for 11/29/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 11/18/2022) |
| 11/21/2022 | 160 | **ORDER appointing Jeremy Lasnetski, Esq. as to Erica Ibe Hoover. Signed by Magistrate Judge Monte C. Richardson on 11/21/2022. (SHS)** (Entered: 11/21/2022) |
| 11/29/2022 | 161 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel held on 11/29/2022 as to Matthew Raymond Hoover. (Shelli Kozachenko/Digital) (SHS) (Entered: 11/29/2022) |
| 11/29/2022 | 162 | ORAL MOTION to Continue Hearing as to Erica Ibe Hoover by Jeremy Lasnetksi. (SHS) (Entered: 11/29/2022) |
| 11/29/2022 | 163 | **ORAL ORDER granting 162 Motion to Continue as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 11/29/2022. (SHS)** (Entered: 11/29/2022) |
| 11/29/2022 | 164 | NOTICE OF HEARING as to Matthew Raymond Hoover: Hearing regarding informed consent and waiver of right to attorney/client privilege as to Mrs. Erica Ibe Hoover set for 12/13/2022 at 02:00 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. Defendant, Mrs. Hoover and defense counsel will appear via Zoom. The Courtroom Deputy will email Zoom information to parties. (SHS) (Entered: 11/29/2022) |

| 12/13/2022 | 166 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel as to Matthew Raymond Hoover held on 12/13/2022. Court Reporter: Katharine Healey (Digital) (SHS) (Entered: 12/13/2022) |
|---|---|---|
| 12/16/2022 | 167 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover (Zermay, Zachary) Modified on 12/19/2022 to edit text (AET). (Entered: 12/16/2022) |
| 12/22/2022 | 168 | **ORDER on Conflict of Interest re. Counsel for Matthew Raymond Hoover. Signed by Magistrate Judge Monte C. Richardson on 12/21/2022. (MDH)** (Entered: 12/22/2022) |
| 01/03/2023 | 169 | **ORDER SCHEDULING TRIAL. As previously directed, Daubert motions are due January 4, 2023, and responses are due January 18, 2023. A Daubert hearing is set for February 7, 2023, at 10:00 a.m. in Courtroom 10B. Motions in limine shall be filed by February 24, 2023, and responses are due March 10, 2023. Jury selection and trial shall commence on April 10, 2023, at 9:00 a.m. Trial documents due no later than April 3, 2023. Signed by Judge Marcia Morales Howard on 1/3/2023. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW)** (Entered: 01/03/2023) |
| 01/04/2023 | | Set/Reset Deadlines as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Exhibit List due by 4/10/2023. (AET) (Entered: 01/04/2023) |
| 01/04/2023 | 170 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 01/04/2023) |
| 01/18/2023 | 172 | RESPONSE in Opposition by Matthew Raymond Hoover re 170 MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* (Zermay, Zachary) (Entered: 01/18/2023) |
| 01/20/2023 | 173 | JOINT MOTION for Status Conference by USA as to Matthew Raymond Hoover. (Taylor, Laura) Modified on 1/23/2023 (AET). (Entered: 01/20/2023) |
| 01/20/2023 | 174 | **ENDORSED ORDER granting 173 Joint Motion for Status Conference as to Matthew Raymond Hoover (2). A status conference is set for Tuesday, January 24, 2023, at 3:00 p.m. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. Signed by Judge Marcia Morales Howard on 1/20/2023. (JW)** (Entered: 01/20/2023) |
| 01/24/2023 | 175 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Matthew Raymond Hoover held on 1/24/2023. On or before January 31, 2023, the parties shall either file the proposed stipulation of facts or a notice advising the Court of how they wish to proceed. Court Reporter: Katharine Healey (JW) (Entered: 01/25/2023) |
| 01/31/2023 | 176 | NOTICE to the Court by Matthew Raymond Hoover (Zermay, Zachary) Modified on 2/1/2023 to edit text (AET). (Entered: 01/31/2023) |
| 02/01/2023 | 177 | **ORDER directing the parties to file a written proffer of each proposed expert witness's opinions by 12:00 noon on Monday, February 6, 2023. Signed by Judge Marcia Morales Howard on 2/1/2023. (JCM)** (Entered: 02/01/2023) |
| 02/03/2023 | 179 | NOTICE of Withdrawal; re 167 Notice of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 2/6/2023, to edit text) (BGR). (Entered: 02/03/2023) |
| 02/06/2023 | 180 | NOTICE *of Filing Written Proffer of Testimony by Ernest Lintner in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |
| 02/06/2023 | 181 | NOTICE *of Filing Written Proffer of Opinions of Cody Toy in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |

| 02/06/2023 | 183 | NOTICE *OF PROFFER* by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 02/06/2023) |
|---|---|---|
| 02/07/2023 | 184 | NOTICE *of Filing* by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A)(King, Alex) (Entered: 02/07/2023) |
| 02/07/2023 | 185 | NOTICE *of supplemental authority* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Attachment 1)(Mesrobian, David) (Entered: 02/07/2023) |
| 02/07/2023 | 186 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 2/7/2023; terminating as moot 118 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witness; denying without prejudice 142 Defendants' Motion In Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses; denying as moot, in part, and withdrawing, in part, 170 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses. Proposed limiting instruction(s) due February 24, 2023. Court Reporter: Katharine Healey (JW) (Entered: 02/08/2023) |
| 02/23/2023 | 187 | JOINT EMERGENCY MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/24/2023 to edit text (AET). (Entered: 02/23/2023) |
| 02/23/2023 | 188 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 187 Emergency MOTION to Extend Time to Filing Deadline – – *Joint* (Mesrobian, David) (Entered: 02/23/2023) |
| 02/24/2023 | 189 | MOTION in Limine for Jury Instruction by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 190 | MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 191 | **ORDER granting in part and denying in part 187 Emergency Joint Motion for Extension of Filing Deadline. Motions in Limine due no later than 1:00 p.m. on Monday, February 27, 2023. See Order for details. Signed by Judge Marcia Morales Howard on 2/24/2023. (JCM)** (Entered: 02/24/2023) |
| 02/24/2023 | 192 | Proposed Jury Instructions by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 02/24/2023) |
| 02/27/2023 | 193 | FIRST MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 194 | SECOND MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 195 | THIRD MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 196 | FOURTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibit A)(King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 197 | FIFTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 198 | FIRST MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 199 | SECOND MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |

| 02/27/2023 | 200 | THIRD MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
|---|---|---|
| 02/27/2023 | 201 | FOURTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 202 | FIFTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 203 | SIXTH MOTION in Limine by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 03/06/2023 | 204 | FOURTH SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ssss, 2ssss–8ssss, 9ssss, 10ssss–12ssss, Matthew Raymond Hoover (2) count(s) 1ss, 2ss–8ss. (Attachments: # 1 Restricted Unredacted Indictment) (BD) Modified on 3/16/2023 to edit text (AET). (Entered: 03/06/2023) |
| 03/08/2023 | 205 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 204 Fourth Superseding Indictment. Arraignment set for 3/14/2023 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 03/08/2023) |
| 03/09/2023 | 206 | UNOPPOSED MOTION to appear telephonically by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 3/10/2023 to edit text (AET). (Entered: 03/09/2023) |
| 03/10/2023 | 207 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 198 FIRST MOTION in Limine , 193 FIRST MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 208 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 199 SECOND MOTION in Limine , 194 SECOND MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 209 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 200 THIRD MOTION in Limine , 195 THIRD MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 210 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 201 FOURTH MOTION in Limine , 196 FOURTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 211 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 197 FIFTH MOTION in Limine , 202 FIFTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 212 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 203 SIXTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 215 | RESPONSE in Opposition by Matthew Raymond Hoover re 190 MOTION in Limine to exclude argument and evidence at trial that is contrary to the law, 189 MOTION in Limine for Jury Instruction (Zermay, Zachary) (Entered: 03/10/2023) |
| 03/13/2023 | 216 | **ENDORSED ORDER granting 206 Unopposed Motion to appear telephonically. The Courtroom Deputy will separately provide counsel with the call–in information for the hearing. Signed by Magistrate Judge Monte C. Richardson on 3/13/2023. (SHS) (Entered: 03/13/2023)** |
| 03/14/2023 | 217 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Fourth Superseding Indictment as to Kristopher Justinboyer Ervin (1) Counts 1ssss through 12ssss and Matthew Raymond Hoover (2) Counts 1ss through 8ss, held on 3/14/2023 Defendant(s) pled not guilty. (Digital) (SHS) Modified on 3/16/2023 to edit text (AET). (Entered: 03/15/2023) |

| 03/20/2023 | 218 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 02/07/2023 before Judge Marcia Morales Howard. Court Reporter: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.

NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/10/2023. Redacted Transcript Deadline set for 4/20/2023. Release of Transcript Restriction set for 6/20/2023. (KMH) (Entered: 03/20/2023) |
|---|---|---|
| 03/28/2023 | 220 | MOTION for Bill of Particulars by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/28/2023) |
| 03/29/2023 | 221 | **ENDORSED ORDER directing USA to respond to 220 MOTION for Bill of Particulars as to Matthew Raymond Hoover. Responses due by 4/5/2023 Signed by Magistrate Judge Monte C. Richardson on 3/29/2023. (SHS)** (Entered: 03/29/2023) |
| 03/30/2023 | 223 | **ORDER granting in part and denying in part 189 Government's Motion in Limine for Jury Instruction; granting in part and denying in part 190 Government's Motion in Limine to Exclude Argument and Evidence; denying 193 Defendants' First Motion in Limine; denying 194 Defendants' Second Motion in Limine; denying 195 Defendants' Third Motion in Limine; denying 196 Defendants' Fourth Motion in Limine; denying 197 Defendants' Fifth Motion in Limine; denying 198 Defendants' First Motion in Limine; denying 199 Defendants' Second Motion in Limine; denying 200 Defendants' Third Motion in Limine; denying 201 Defendants' Fourth Motion in Limine; denying 202 Defendants' Fifth Motion in Limine; denying 203 Defendant Hoover's Sixth Motion in Limine. Signed by Judge Marcia Morales Howard on 3/30/2023. (JCM)** (Entered: 03/30/2023) |
| 04/03/2023 | 225 | Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 226 | STATEMENT of the case for trial by USA. (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 227 | PROPOSED verdict form filed by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 228 | PROPOSED Voir Dire by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 233 | PROPOSED Voir Dire by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/03/2023) |
| 04/03/2023 | 234 | Proposed Jury Instructions by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/03/2023) |
| 04/03/2023 | 235 | NOTICE of Adoption of 230 Statement of the Case for Trial and 231 Proposed Verdict Form by Matthew Raymond Hoover (Zermay, Zachary) Modified on 4/4/2023 to edit text (AET). (Entered: 04/03/2023) |
| 04/05/2023 | 236 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 220 MOTION for Bill of Particulars (Taylor, Laura) (Entered: 04/05/2023) |
| 04/06/2023 | 237 | **ORDER denying 220 Motion for Bill of Particulars as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 4/6/2023. (SHS)** (Entered: 04/06/2023) |
| 04/06/2023 | 238 | Unopposed MOTION to Allow Electronic Equipment, specifically by Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 04/06/2023) |

| 04/07/2023 | 239 | **ORDER granting 238 Unopposed Motion for Assistant to Attend Trial With Electronic Equipment. Signed by Judge Marcia Morales Howard on 4/7/2023. (JW)** (Entered: 04/07/2023) |
| --- | --- | --- |
| 04/08/2023 | 240 | WITNESS LIST by Kristopher Justinboyer Ervin. (King, Alex) Modified on 4/10/2023 to edit text (AET). (Entered: 04/08/2023) |
| 04/10/2023 | 242 | WITNESS LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 243 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 244 | EXHIBIT LIST by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/10/2023) |
| 04/10/2023 | 246 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY SELECTION AND TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/10/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/11/2023) |
| 04/11/2023 | 247 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/11/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/12/2023) |
| 04/12/2023 | 248 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/13/2023) |
| 04/13/2023 | 249 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/2023. Court Reporter: Shelli Kozachenko (JW) (Entered: 04/14/2023) |
| 04/14/2023 | 251 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/17/2023) |
| 04/17/2023 | 252 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/18/2023) |
| 04/18/2023 | 253 | SUPPLEMENT re 225 Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/18/2023) |
| 04/19/2023 | 254 | COURT'S FINAL JURY INSTRUCTIONS as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/19/2023) |
| 04/19/2023 | 256 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/21/2023) |
| 04/20/2023 | 255 | **PARTIAL SEQUESTRATION ORDER. Signed by Judge Marcia Morales Howard on 4/20/2023. (JW)** (Entered: 04/20/2023) |
| 04/20/2023 | 257 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 258 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023. Court Reporter: Katharine Healey (Attachments: # 1 Government's Exhibit 1 Regarding Remand, # 2 Government's Exhibit 2 Regarding Remand) (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 259 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Additional attachment(s) added on 4/26/2023: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 2, # 4 Exhibit 2A, # 5 Exhibit 3, # 6 Exhibit 3A, # 7 Exhibit 4, # 8 Exhibit 4A, # 9 Exhibit 5, # 10 Exhibit 5A, # 11 Exhibit 6, # 12 Exhibit 6A, # 13 Exhibit 7, # 14 Exhibit 7A, # 15 Exhibit 8, # 16 Exhibit 8A, # 17 Exhibit 9, # 18 Exhibit 9A, # 19 Exhibit 10, # 20 Exhibit 10A, # 21 |

Exhibit 11, # <u>22</u> Exhibit 11A, # <u>23</u> Exhibit 12, # <u>24</u> Exhibit 12A, # <u>25</u> Exhibit 14, # <u>26</u> Exhibit 14A, # <u>27</u> Exhibit 15, # <u>28</u> Exhibit 15A, # <u>29</u> Exhibit 16, # <u>30</u> Exhibit 16A, # <u>31</u> Exhibit 17.1, # <u>32</u> Exhibit 17.1A, # <u>33</u> Exhibit 17.2, # <u>34</u> Exhibit 17.2A, # <u>35</u> Exhibit 17.3, # <u>36</u> Exhibit 17.3A, # <u>37</u> Exhibit 18, # <u>38</u> Exhibit 19, # <u>39</u> Exhibit 20, # <u>40</u> Exhibit 20A, # <u>41</u> Exhibit 21, # <u>42</u> Exhibit 22, # <u>43</u> Exhibit 23, # <u>44</u> Exhibit 24, # <u>45</u> Exhibit 25, # <u>46</u> Exhibit 25A, # <u>47</u> Exhibit 25B, # <u>48</u> Exhibit 26) (JW). (Additional attachment(s) added on 4/26/2023: # <u>49</u> Exhibit 27A, # <u>50</u> Exhibit 27B, # <u>51</u> Exhibit 28, # <u>52</u> Exhibit 29, # <u>53</u> Exhibit 30, # <u>54</u> Exhibit 30A, # <u>55</u> Exhibit 30B, # <u>56</u> Exhibit 30C, # <u>57</u> Exhibit 30D, # <u>58</u> Exhibit 30E, # <u>59</u> Exhibit 30F, # <u>60</u> Exhibit 30G, # <u>61</u> Exhibit 30H, # <u>62</u> Exhibit 30I, # <u>63</u> Exhibit 30J, # <u>64</u> Exhibit 30K, # <u>65</u> Exhibit 30L, # <u>66</u> Exhibit 30M, # <u>67</u> Exhibit 30N, # <u>68</u> Exhibit 30O, # <u>69</u> Exhibit 30P, # <u>70</u> Exhibit 30Q, # <u>71</u> Exhibit 30R, # <u>72</u> Exhibit 30S, # <u>73</u> Exhibit 30T, # <u>74</u> Exhibit 30U, # <u>75</u> Exhibit 30V, # <u>76</u> Exhibit 31, # <u>77</u> Exhibit 32) (JW). (Additional attachment(s) added on 4/26/2023: # <u>78</u> Exhibit 33, # <u>79</u> Exhibit 33A, # <u>80</u> Exhibit 33B, # <u>81</u> Exhibit 33C, # <u>82</u> Exhibit 33D, # <u>83</u> Exhibit 33E, # <u>84</u> Exhibit 33F, # <u>85</u> Exhibit 33G, # <u>86</u> Exhibit 33H, # <u>87</u> Exhibit 33I, # <u>88</u> Exhibit 33J, # <u>89</u> Exhibit 33K, # <u>90</u> Exhibit 33L, # <u>91</u> Exhibit 33M, # <u>92</u> Exhibit 33N, # <u>93</u> Exhibit 33O, # <u>94</u> Exhibit 33P, # <u>95</u> Exhibit 33Q, # <u>96</u> Exhibit 33R, # <u>97</u> Exhibit 33S, # <u>98</u> Exhibit 33T, # <u>99</u> Exhibit 33U, # <u>100</u> Exhibit 33V, # <u>101</u> Exhibit 33W, # <u>102</u> Exhibit 33X, # <u>103</u> Exhibit 33Y, # <u>104</u> Exhibit 33Z, # <u>105</u> Exhibit 34, # <u>106</u> Exhibit 35, # <u>107</u> Exhibit 36, # <u>108</u> Exhibit 37, # <u>109</u> Exhibit 38, # <u>110</u> Exhibit 39, # <u>111</u> Exhibit 40, # <u>112</u> Exhibit 41, # <u>113</u> Exhibit 42, # <u>114</u> Exhibit 43, # <u>115</u> Exhibit 44, # <u>116</u> Exhibit 45, # <u>117</u> Exhibit 46, # <u>118</u> Exhibit 47, # <u>119</u> Exhibit 48, # <u>120</u> Exhibit 49) (JW). (Additional attachment(s) added on 4/26/2023: # <u>121</u> Exhibit 49A, # <u>122</u> Exhibit 49B, # <u>123</u> Exhibit 49C, # <u>124</u> Exhibit 49D, # <u>125</u> Exhibit 49E, # <u>126</u> Exhibit 49F, # <u>127</u> Exhibit 49G, # <u>128</u> Exhibit 49H, # <u>129</u> Exhibit 49I, # <u>130</u> Exhibit 49J, # <u>131</u> Exhibit 49K, # <u>132</u> Exhibit 49L, # <u>133</u> Exhibit 49M, # <u>134</u> Exhibit 49N, # <u>135</u> Exhibit 49O, # <u>136</u> Exhibit 49P, # <u>137</u> Exhibit 49Q, # <u>138</u> Exhibit 50A, # <u>139</u> Exhibit 50B, # <u>140</u> Exhibit 50C, # <u>141</u> Exhibit 50D, # <u>142</u> Exhibit 50E, # <u>143</u> Exhibit 50F, # <u>144</u> Exhibit 50G, # <u>145</u> Exhibit 50H, # <u>146</u> Exhibit 50I, # <u>147</u> Exhibit 50J, # <u>148</u> Exhibit 50K, # <u>149</u> Exhibit 50L, # <u>150</u> Exhibit 50M, # <u>151</u> Exhibit 50N, # <u>152</u> Exhibit 50O, # <u>153</u> Exhibit 50P, # <u>154</u> Exhibit 51, # <u>155</u> Exhibit 52, # <u>156</u> Exhibit 53, # <u>157</u> Exhibit 54, # <u>158</u> Exhibit 55, # <u>159</u> Exhibit 56) (JW). (Additional attachment(s) added on 4/26/2023: # <u>160</u> Exhibit 57A, # <u>161</u> Exhibit 57B, # <u>162</u> Exhibit 57C, # <u>163</u> Exhibit 58A, # <u>164</u> Exhibit 58B, # <u>165</u> Exhibit 58C, # <u>166</u> Exhibit 58D, # <u>167</u> Exhibit 59, # <u>168</u> Exhibit 60, # <u>169</u> Exhibit 61, # <u>170</u> Exhibit 63, # <u>171</u> Exhibit 64, # <u>172</u> Exhibit 65, # <u>173</u> Exhibit 66, # <u>174</u> Exhibit 67, # <u>175</u> Exhibit 67A, # <u>176</u> Exhibit 67B, # <u>177</u> Exhibit 67C, # <u>178</u> Exhibit 67D, # <u>179</u> Exhibit 67E, # <u>180</u> Exhibit 67F, # <u>181</u> Exhibit 67G, # <u>182</u> Exhibit 67H, # <u>183</u> Exhibit 67I, # <u>184</u> Exhibit 67J, # <u>185</u> Exhibit 67K, # <u>186</u> Exhibit 67L, # <u>187</u> Exhibit 67M, # <u>188</u> Exhibit 67N, # <u>189</u> Exhibit 67O, # <u>190</u> Exhibit 67P, # <u>191</u> Exhibit 67Q, # <u>192</u> Exhibit 67R, # <u>193</u> Exhibit 67S, # <u>194</u> Exhibit 67T, # <u>195</u> Exhibit 67U, # <u>196</u> Exhibit 67V, # <u>197</u> Exhibit 67W, # <u>198</u> Exhibit 67X, # <u>199</u> Exhibit 67Y, # <u>200</u> Exhibit 67Z) (JW). (Additional attachment(s) added on 4/26/2023: # <u>201</u> Exhibit 67AA, # <u>202</u> Exhibit 67BB, # <u>203</u> Exhibit 67CC, # <u>204</u> Exhibit 67DD, # <u>205</u> Exhibit 67EE, # <u>206</u> Exhibit 67FF, # <u>207</u> Exhibit 67GG, # <u>208</u> Exhibit 67HH, # <u>209</u> Exhibit 67II, # <u>210</u> Exhibit 67JJ, # <u>211</u> Exhibit 67KK, # <u>212</u> Exhibit 67LL, # <u>213</u> Exhibit 67MM, # <u>214</u> Exhibit 67NN, # <u>215</u> Exhibit 67OO, # <u>216</u> Exhibit 67PP, # <u>217</u> Exhibit 67QQ, # <u>218</u> Exhibit 67RR, # <u>219</u> Exhibit 67SS, # <u>220</u> Exhibit 67TT, # <u>221</u> Exhibit 67UU, # <u>222</u> Exhibit 67VV, # <u>223</u> Exhibit 67WW, # <u>224</u> Exhibit 67XX, # <u>225</u> Exhibit 67YY, # <u>226</u> Exhibit 67ZZ, # <u>227</u> Exhibit 67AAA, # <u>228</u> Exhibit 67BBB, # <u>229</u> Exhibit 67CCC, # <u>230</u> Exhibit 68, # <u>231</u> Exhibit 69, # <u>232</u> Exhibit 70, # <u>233</u> Exhibit 71, # <u>234</u> Exhibit 72, # <u>235</u> Exhibit 73, # <u>236</u> Exhibit 74, # <u>237</u> Exhibit 75, # <u>238</u> Exhibit 76, # <u>239</u> Exhibit 77, # <u>240</u> Exhibit 78, # <u>241</u> Exhibit 79, # <u>242</u> Exhibit 80, # <u>243</u> Exhibit 81, # <u>244</u> Exhibit 82, # <u>245</u> Exhibit 83, # <u>246</u> Exhibit 84, # <u>247</u> Exhibit 85, # <u>248</u> Exhibit 86, # <u>249</u> Exhibit 87, # <u>250</u> Exhibit 88, # <u>251</u> Exhibit 89) (JW). (Additional attachment(s) added on 4/26/2023: # <u>252</u> Exhibit 89A, # <u>253</u> Exhibit 89B, # <u>254</u> Exhibit 89C, # <u>255</u> Exhibit 89D, # <u>256</u> Exhibit 89E, # <u>257</u> Exhibit 89F, # <u>258</u> Exhibit 89G, # <u>259</u> Exhibit 89H, # <u>260</u> Exhibit 89I, # <u>261</u> Exhibit 90, # <u>262</u> Exhibit 90A, # <u>263</u> Exhibit 90B, # <u>264</u> Exhibit 90C, # <u>265</u> Exhibit 90D, # <u>266</u> Exhibit 90E, # <u>267</u> Exhibit 90F, # <u>268</u> Exhibit 90G, # <u>269</u> Exhibit 90H, # <u>270</u> Exhibit 91) (JW). (Additional attachment(s) added on 4/26/2023: # <u>271</u> Exhibit 91A, # <u>272</u> Exhibit 91B, # <u>273</u> Exhibit 91C, # <u>274</u> Exhibit 91D, # <u>275</u> Exhibit 91E, # <u>276</u> Exhibit 91F, # <u>277</u> Exhibit 91G, # <u>278</u> Exhibit 91H, # <u>279</u> Exhibit 91I, # <u>280</u> Exhibit 91J, # <u>281</u> Exhibit 91K, # <u>282</u> Exhibit 91L, # <u>283</u> Exhibit 91M, # <u>284</u> Exhibit 91N, # <u>285</u> Exhibit 92, #

|  |  |  |
|---|---|---|
|  |  | 286 Exhibit 92A, # 287 Exhibit 92B, # 288 Exhibit 92C, # 289 Exhibit 92D, # 290 Exhibit 92E, # 291 Exhibit 92F, # 292 Exhibit 92G, # 293 Exhibit 92H, # 294 Exhibit 92I, # 295 Exhibit 92J, # 296 Exhibit 92K, # 297 Exhibit 93, # 298 Exhibit 94, # 299 Exhibit 95, # 300 Exhibit 95A, # 301 Exhibit 95B, # 302 Exhibit 95C, # 303 Exhibit 95D, # 304 Exhibit 95E) (JW). (Additional attachment(s) added on 4/26/2023: # 305 Exhibit 96, # 306 Exhibit 97, # 307 Exhibit 97A, # 308 Exhibit 97B, # 309 Exhibit 97C, # 310 Exhibit 97D, # 311 Exhibit 98, # 312 Exhibit 98A, # 313 Exhibit 98B, # 314 Exhibit 98C, # 315 Exhibit 98D, # 316 Exhibit 98E, # 317 Exhibit 99, # 318 Exhibit 99A, # 319 Exhibit 99B, # 320 Exhibit 99C, # 321 Exhibit 99D, # 322 Exhibit 100, # 323 Exhibit 101, # 324 Exhibit 101A) (JW). (Additional attachment(s) added on 4/26/2023: # 325 Exhibit 102, # 326 Exhibit 103, # 327 Exhibit 103A, # 328 Exhibit 104, # 329 Exhibit 105, # 330 Exhibit 105A, # 331 Exhibit 108, # 332 Exhibit 109A, # 333 Exhibit 109B, # 334 Exhibit 109C, # 335 Exhibit 109D, # 336 Exhibit 110) (JW). (Additional attachment(s) added on 4/27/2023: # 337 Exhibit 111, # 338 Exhibit 112, # 339 Exhibit 114, # 340 Exhibit 115, # 341 Exhibit 116A, # 342 Exhibit 116B, # 343 Exhibit 116C, # 344 Exhibit 116D, # 345 Exhibit 117, # 346 Exhibit 118, # 347 Exhibit 119, # 348 Exhibit 120, # 349 Exhibit 120A, # 350 Exhibit 120B, # 351 Exhibit 120C, # 352 Exhibit 120D, # 353 Exhibit 123, # 354 Exhibit 124, # 355 Exhibit 124.1, # 356 Exhibit 124.1A, # 357 Exhibit 124.2, # 358 Exhibit 124.3, # 359 Exhibit 124.3A, # 360 Exhibit 125, # 361 Exhibit 125A, # 362 Exhibit 126) (JW). (Entered: 04/24/2023) |
| 04/21/2023 | 261 | Court's Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 262 | Court's Revised Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 264 | JURY VERDICT as to Matthew Raymond Hoover (2) (FILED IN OPEN COURT). (Attachments: # 1 Restricted Unredacted Jury Verdict)(JW) (Entered: 04/24/2023) |
| 04/21/2023 | 266 | Court Exhibits as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/24/2023) |
| 04/24/2023 | 267 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Sentencing set for July 31, 2023, at 9:30 a.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 04/24/2023) |
| 04/27/2023 |  | Remark: The flash drives containing the closing argument PowerPoint presentations by all counsel are stored with the exhibits in the trial exhibit storage room in the Clerk's Office. (JW) (Entered: 04/27/2023) |
| 04/28/2023 | 268 | Unopposed MOTION to Continue Deadline to File Motion for Judgment of Acquittal, and for Leave of Court to File a Motion in Excess of Twenty−Five Pages by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 4/28/2023, to edit text) (BGR). (Entered: 04/28/2023) |
| 05/01/2023 | 269 | **ORDER granting 268 Unopposed Motion to Continue Deadline to File Motion for Judgment of Acquittal, and for Leave of Court to File a Motion in Excess of Twenty−Five Pages. Motion due May 19, 2023, and may not exceed 35 pages. Signed by Judge Marcia Morales Howard on 5/1/2023. (JW)** (Entered: 05/01/2023) |
| 05/05/2023 | 272 | TRANSCRIPT of Excerpt of Jury Trial Proceedings (remand arguments as to Hoover) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR−C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301−6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/26/2023. Redacted Transcript Deadline set for 6/5/2023. Release of Transcript Restriction set for 8/3/2023. (KMH) (Entered: 05/05/2023) |

| 05/19/2023 | 274 | MOTION for Judgment of Acquittal by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) |
| 05/25/2023 | 275 | MOTION to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 05/25/2023) |
| 05/26/2023 | 276 | **ENDORSED ORDER granting 275 Motion to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal. The United States shall have up to and including June 16, 2023, to file its responses to Defendants' Motions for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 5/26/2023. (JW)** (Entered: 05/26/2023) |
| 06/06/2023 | 277 | TRANSCRIPT of Jury Selection and Trial (Volume 1 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/10/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/06/2023) |
| 06/06/2023 | 278 | TRANSCRIPT of Jury Trial (Volume 2 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 279 | TRANSCRIPT of Jury Trial (Volume 3 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 280 | TRANSCRIPT of Jury Trial (Volume 4 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/23 before Judge Howard. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is |

| | | |
|---|---|---|
| | | filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (SMK) (Entered: 06/06/2023) |
| 06/07/2023 | 281 | TRANSCRIPT of Jury Trial (Volume 5 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843. <br><br> NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 282 | TRANSCRIPT of Jury Trial (Volume 6 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843. <br><br> NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 283 | TRANSCRIPT of Jury Trial (Volume 7 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/23 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: 9043016843. <br><br> NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 284 | TRANSCRIPT of Jury Trial (Volume 8 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843. <br><br> NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 285 | TRANSCRIPT of Jury Trial (Volume 9 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/12/2023 | 286 | MOTION to Continue Sentencing Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 06/12/2023) |
| 06/13/2023 | 288 | **ENDORSED ORDER as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover regarding 286 United States' Motion to Continue Sentencing Hearing. Defendants shall have up to and including June 20, 2023, to file responses to this motion. Signed by Judge Marcia Morales Howard on 6/13/2023. (JW)** (Entered: 06/13/2023) |
| 06/16/2023 | 289 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 274 MOTION for Judgment of Acquittal (Taylor, Laura) (Entered: 06/16/2023) |
| 06/16/2023 | 290 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 273 MOTION for Judgment of Acquittal (Taylor, Laura) (Modified on 6/20/2023, to edit text) (BGR). (Entered: 06/16/2023) |
| 06/20/2023 | 291 | RESPONSE 286 MOTION to Continue Sentencing Hearing by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (King, Alex) (Entered: 06/20/2023) |
| 06/20/2023 | 292 | NOTICE of Adoption by Matthew Raymond Hoover re 291 Response (Zermay, Zachary) (Modified on 6/21/2023, to edit text) (BGR). (Entered: 06/20/2023) |
| 06/21/2023 | 293 | **ORDER granting 286 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). Sentencing hearing continued to September 6, 2023, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 6/21/2023. (JW)** (Entered: 06/21/2023) |
| 08/01/2023 | 294 | RULE 32(e)(2) INITIAL PRESENTENCE INVESTIGATION REPORT as to Matthew Raymond Hoover. E–copies made available to selected parties.(MF) (Entered: 08/01/2023) |
| 08/07/2023 | 296 | MOTION for Miscellaneous Relief, specifically Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 08/07/2023) |
| 08/08/2023 | 297 | **ORDER taking under advisement 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. An IN PERSON hearing on the motion is set for Friday, August 11, 2023, at 2:00 p.m. in Courtroom 10B. Defendants and all counsel of record are required to be present. Signed by Judge Marcia Morales Howard on 8/8/2023. (JW)** (Entered: 08/08/2023) |
| 08/09/2023 | 298 | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Motion Hearing previously scheduled for August 11, 2023, at 2:00 p.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing time: Motion Hearing set for August 11, 2023, at 1:30 p.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/09/2023) |

| 08/09/2023 | 299 | JOHN CRUMP'S EMERGENCY MOTION to Intervene for the Limited Purpose of Responding to the United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (MDC) (Entered: 08/09/2023) |
|---|---|---|
| 08/09/2023 | 300 | First MOTION for Stephen D. Stamboulieh to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC–21130611 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 301 | First MOTION for Robert J. Olson to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC–21130715 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 302 | SUPPLEMENT to 296 Motion for Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibits not scanned, filed separately)(MDC) (Entered: 08/09/2023) |
| 08/10/2023 | 303 | **ENDORSED ORDER granting 300 Motion for Special Admission by Stephen D. Stambouliah, Esq. If Mr. Stambouliah has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)** Modified on 8/10/2023 (SHS). (Entered: 08/10/2023) |
| 08/10/2023 | 304 | **ENDORSED ORDER granting 301 Motion for Special Admission by Robert J. Olson, Esq. If Mr. Olson has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)** (Entered: 08/10/2023) |
| 08/10/2023 | 305 | **ENDORSED ORDER taking under advisement 299 John Crump's Emergency Motion to Intervene. The Court intends to resolve the Motion at the August 11, 2023 Hearing. Signed by Judge Marcia Morales Howard on 8/10/2023. (MHM)** (Entered: 08/10/2023) |
| 08/10/2023 | 306 | MOTION for Leave to File Amicus Curiae Brief and Brief Amicus Curiae of Eric Blandford, et al. in Support of 299 Emergency Motion by Eric J. Friday as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (BGR) (Entered: 08/11/2023) |
| 08/11/2023 | 307 | **ORDER permitting members of the press to enter the courthouse with laptop computers, tablets, and/or cell phones to attend the hearing set for today, August 11, 2023, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 8/11/2023. (JW)** (Entered: 08/11/2023) |
| 08/11/2023 | 308 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 8/11/2023; denying as moot 299 John Crump's Emergency Motion to Intervene; denying as moot 306 Motion for Leave to File Amicus Curiae Brief; withdrawing, in part, and denying, in part, 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. Court Reporter: Katharine Healey (JW) (Entered: 08/14/2023) |
| 08/14/2023 | 309 | TRANSCRIPT of Motion as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 08/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843.<br><br>NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/14/2023. Release of Transcript Restriction set for 11/13/2023. |

| | | |
|---|---|---|
| | | (KMH) (Entered: 08/14/2023) |
| 08/23/2023 | 310 | **ORDER denying 273 Ervin's Motion for Judgment of Acquittal; denying 274 Hoover's Motion for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 8/23/2023. (JCM)** (Entered: 08/23/2023) |
| 08/30/2023 | 313 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 08/30/2023) |
| 08/30/2023 | 314 | RULE 32(g) FINAL PRESENTENCE INVESTIGATION REPORT as to Matthew Raymond Hoover. E−copies made available to selected parties.(MW) (Entered: 08/30/2023) |
| 09/01/2023 | 318 | SENTENCING MEMORANDUM by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 09/01/2023) |
| 09/01/2023 | 319 | SENTENCING MEMORANDUM by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A, # 2 Exhibit B)(King, Alex) (Entered: 09/01/2023) |
| 09/02/2023 | 320 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 09/02/2023) |
| 09/06/2023 | 322 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/6/2023. Defendant's Motion for Leave to File Letters in Support of Defendant Hoover Under Seal (Dkt. No. 317) is STRICKEN, and the Clerk of the Court is directed to remove this document from the Court record. The Court will consider the letters attached to the motion. The Court heard argument from counsel regarding the objections to the Presentence Investigation Report, resolved the objections, and announced the guidelines on the record. The parties made their presentations, and the Court heard from Defendants and their mitigation witnesses. The Court will pronounce sentence on September 7, 2023, at 11:30 a.m. Court Reporter: Katharine Healey (JW) (Entered: 09/08/2023) |
| 09/07/2023 | 326 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/7/2023 for Matthew Raymond Hoover (2), Counts 1, 1s, 2−7, 2s−8s, Dismissed on Government's Motion; Counts 1ss, 2ss, 3ss, 5ss, 7ss, Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00. Court Reporter: Katharine Healey (JW) (Entered: 09/14/2023) |
| 09/14/2023 | 327 | **JUDGMENT as to Matthew Raymond Hoover (2), Counts 1, 1s, 2−7, 2s−8s, Dismissed on Government's Motion; Counts 1ss, 2ss, 3ss, 5ss, 7ss, Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 Signed by Judge Marcia Morales Howard on 9/14/2023. (JW)** (Entered: 09/14/2023) |
| 09/14/2023 | 328 | STATEMENT OF REASONS as to Matthew Raymond Hoover. E−copies made available to selected parties. (JW) (Entered: 09/14/2023) |
| 09/14/2023 | 329 | TRANSCRIPT of Sentencing (Volume 1 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/06/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR−C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301−6843. NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript |

|  |  | Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
|---|---|---|
| 09/14/2023 | 330 | TRANSCRIPT of Sentencing (Volume 2 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/07/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR–C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301–6843. |
|  |  | NOTICE TO THE PARTIES – The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
| 09/20/2023 | 333 | NOTICE OF APPEAL by Matthew Raymond Hoover re 310 Order on Motion for Judgment of Acquittal, 237 Order on Motion for Bill of Particulars, 141 Order on Motion to Dismiss, 327 Judgment 223 Order on Motion in Limine, 125 Order on Motion to Change Venue / Transfer Case, Order on Motion to Sever Defendant, 59 Order on Motion for Warrant. Filing fee paid $ 505, receipt number AFLMDC–21273895. (Larosiere, Matthew) (Entered: 09/20/2023) |
| 09/25/2023 | 334 | TRANSMITTAL of initial appeal package as to Matthew Raymond Hoover to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 333 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (BCB) (Entered: 09/25/2023) |
| 09/27/2023 |  | USCA Case Number as to Matthew Raymond Hoover. USCA Number: 23–13062–D for 333 Notice of Appeal, filed by Matthew Raymond Hoover. (SJW) (Entered: 09/27/2023) |
| 10/10/2023 | 336 | TRANSCRIPT information form filed by Matthew Raymond Hoover re 333 Notice of Appeal. USCA number: 23–13062. No transcript(s) requested. (Larosiere, Matthew) (Entered: 10/10/2023) |
| 11/16/2023 | 341 | Notice of substitution of AUSA. Jennifer Michele Harrington substituting for Mai Tran. (Harrington, Jennifer) (Entered: 11/16/2023) |

Doc. 48

TRANSCRIPT OF MOTION HEARING RE: ERVIN'S MOTION TO DISMISS

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 3 of 22 PageID 137
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 29 of 242

3

1        THE COURT:  All right.  So we're set for a hearing on

2   the motion that was filed by Mr. Ervin's previous counsel.

3   It's Document No. 30.  And Mr. Ervin's current counsel has

4   adopted the motion.

5        Ms. Taylor, I was a little confused.  You had

6   indicated previously your belief that we needed a hearing and

7   that you would be calling Agent Hooker to testify.

8        Can you help me understand what I need evidence for

9   to resolve this motion?

10        MS. TAYLOR:  Your Honor, I think actually what I

11   stated at the status was that I did not expect to present any

12   witnesses and believed that this was a legal motion where we

13   would not be presenting evidence beyond what was in my written

14   response.

15        THE COURT:  Okay.  That -- that makes a little bit

16   more sense to me.

17        All right.  So, Madam Deputy, may I see you one

18   moment.

19     (Pause in proceedings.)

20        THE COURT:  All right.  So, Mr. King, you opted to

21   adopt the motion.

22        I guess my question to you is, why isn't -- I mean,

23   Mr. Ervin's argument appears to me to be a challenge to the

24   sufficiency of the evidence.  And if it's a challenge to the

25   sufficiency of the evidence, isn't it foreclosed by

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 4 of 22 PageID 138
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 30 of 242

4

 1   Eleventh Circuit precedent?

 2          MR. KING:  Your Honor, I think because the essential

 3   factual issue is not in dispute, it's -- in terms of what was

 4   actually the part.  Because of that, it does bring a First

 5   Amendment issue in terms of, you know, whether or not this can

 6   be resolved by the Court.

 7          And essentially the reason -- for reasons of judicial

 8   economy as well, you know, considering that there really is no

 9   factual dispute, you know, we believe a motion to dismiss would

10   be appropriate, understanding that there -- you know, if there

11   were factual disputes in terms of the actual item, then this

12   Court would be foreclosed and that would be for a motion for

13   judgment of acquittal at the time of the trial.  But because

14   there really is no factual dispute, I think it would be

15   appropriate for the Court to review the underlying statute,

16   and, you know, how it applies to Mr. Ervin and the First

17   Amendment issue to make a resolution, you know, short of

18   testimony.

19          THE COURT:  To the extent it does raise a First

20   Amendment issue, isn't there, in fact, a factual dispute, in

21   that wouldn't a jury have to determine whether this is art or

22   whether this is an actual item of utility?

23          MR. KING:  I would think that because of the nature

24   of what's on there -- and I think it could be a legal issue,

25   because it's -- the information is placed on a piece of metal.

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 5 of 22 PageID 139
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 31 of 242

5

```
1    It's not -- in terms of whether or not it would be a factual

2    issue -- whether or not something is protected speech is a

3    legal determination for a court to make, not for a jury.

4              THE COURT:  Can you point me to any authority that

5    suggests that I can do that on a motion to dismiss in a

6    criminal case?

7              MR. KING:  I have not been able to find any, no.  I

8    have looked quite extensively.

9              THE COURT:  I'm confident of that, because I can't.

10             So I guess -- so Mr. Ervin is charged in Counts One

11   through Seven with unlawful structuring of monetary

12   transactions to avoid reporting requirements while committing

13   another violation of law.

14             And so in the motion to dismiss, Mr. Ervin argues

15   that Counts Eight through Fourteen should be dismissed because

16   the item that he manufactured, possessed, and arguably

17   transported is not a machine gun under the law.

18             It's not a firearm because it doesn't fall within the

19   definition of machine gun in 26 U.S.C. 5845; right?

20             That's his argument, Mr. King?

21             MR. KING:  Yes, Your Honor.

22             THE COURT:  And Mr. Ervin argues that the superseding

23   indictment doesn't include a sufficient statement of facts and

24   circumstances to inform Mr. Ervin of the offense that's

25   charged.
```

1          And I think the truth of the matter is, looking at

2     the indictment, nothing could be further from accurate.

3          The indictment in this case gives far more detail

4     than is often given.  And to the extent -- well, I guess, let's

5     address two different things.  I think I'll start first with

6     whether it gives him enough information.

7          Rule 7(c)(1) of *The Federal Rules of Criminal*

8     *Procedure* requires that an indictment be a plain, concise, and

9     definite written statement of the essential facts constituting

10    the offense charged.

11          And the Eleventh Circuit Court of Appeals has given

12    us a three-part test to determine the sufficiency of an

13    indictment.

14          It's sufficient if it presents the essential elements

15    of the charged offense; if it notifies the accused of the

16    charges to be defended against; and if it enables the accused

17    to rely upon a judgment under the indictment as a bar against

18    double jeopardy for any subsequent prosecution.

19          The Eleventh Circuit and the Supreme Court have

20    instructed fairly unequivocally that:  An indictment is

21    sufficient if it sets forth the offense in the words of the

22    statute -- which with regard to all 14 of the counts, this

23    indictment does -- as long as those words address all of the

24    elements of the offense.

25          And so what the Eleventh Circuit says is:  If it

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 7 of 22 PageID 141
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 33 of 242

7

 1   tracks the language of the statute, it's sufficient as long as

 2   the language sets forth the essential elements of the crime.

 3           And so looking at the indictment with regard to --

 4   well, it's true, all three sets of charges -- I'm not going to

 5   go through them individually, but with regard to each of the

 6   charges, the indictment charges the offense in the language of

 7   the statute.  And then with -- and addresses each of the

 8   elements of the charges.

 9           And in addition to that, the indictment alleges the

10   factual underpinning of the charges.

11           So if we look at Counts One through Seven, the

12   indictment charges that Mr. Ervin, knowingly and for the

13   purpose of evading the reporting requirements of federal law,

14   31 U.S.C. § 5313, structured money transactions while he was

15   violating another law of the United States; and Counts Eight

16   through Fourteen charge the underlying other law violation.

17           Right, Ms. Taylor?

18           MS. TAYLOR:  That's correct, Your Honor.

19           THE COURT:  The indictment goes on to identify the

20   specific date of the transaction, the amount of each

21   transaction, and the financial institution at which the

22   transaction was made.

23           If there were anything lacking from Count One, it

24   would only be the identification of what other law of the

25   United States was being violated, but I think that's addressed

1  in Counts Eight through Fourteen, and also addressed by

2  Ms. Taylor here today.

3       As to Count Eight, the indictment alleges a violation

4  of 26 U.S.C. 5861(j).  And it alleges the offense in the

5  language of the statute, but it doesn't just refer to

6  delivering a firearm, it specifies what portion of the firearm

7  definition is implicated, that is, the machine gun conversion

8  device, constituting a machine gun.

9       So it not only alleges that it's a firearm, it

10  alleges how it is a firearm.  And it alleges how what --

11  alleges the interstate commerce nexus by alleging that the

12  offense -- that the materials were sent throughout the U.S.

13  mail, and that they were not registered in the National

14  Firearms Registration and Transfer Record as required, and it

15  cites the statute there.

16       It goes on, having alleged the elements of the

17  offense, to explain or to allege with specificity the date on

18  which the knowing transportation or delivery of firearms is

19  alleged to have occurred, and the number of mailings on each

20  date.  And that goes over the course of three pages.

21       And then lastly, in Counts Nine through Fourteen,

22  Mr. Ervin is charged with possession of a firearm, specifically

23  a machine-gun conversion device, constituting a machine gun, as

24  that object is defined under 26 U.S.C. § 5845(a) and 5845(b),

25  alleges that it was not then registered in the National

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 9 of 22 PageID 143
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 35 of 242

9

1    Firearms Registration and Transfer Record as required.

2            So the -- there's no question that the indictment is

3    sufficient in terms of satisfying the requirements that the

4    Eleventh Circuit articulated, and that is it presents -- as to

5    each of the charges, it presents the essential elements of the

6    charged offense; it notifies Mr. Ervin of the charges to be

7    defended against; and particularly in light of the specificity

8    in this indictment, there's no question that it would enable

9    him to rely upon a judgment under the indictment as a bar

10   against double jeopardy.

11           So Mr. Ervin's argument seems to be that the Court

12   should rule, as a matter of law, that the item isn't a firearm.

13   And my -- I guess what I would say to you, Mr. King, is why

14   isn't that a sufficiency of the evidence argument that is

15   foreclosed by Eleventh Circuit precedent?

16           MR. KING:  May I just have a moment, Your Honor?

17           THE COURT:  Sure.

18           MR. KING:  And, Your Honor, I understand the question

19   you previously asked me about the case law that I have to

20   support the position, and I don't have a dearth of information

21   as it goes there.

22           The argument is essentially that, as a matter of law,

23   because this is essentially not a factual issue; we're not

24   asking the Court to resolve a factual issue.  We're asking the

25   Court to resolve a legal issue, which is, as a matter of law,

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 10 of 22 PageID 144
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 36 of 242

10

1   is this a firearm or not.  Essentially, that was what we would

2   be asking the Court to do, understanding that the Court may

3   view that as a factual issue rather than a legal issue, and

4   would then be precluded from making that determination until

5   judgment -- motion for judgment of acquittal.

6              THE COURT:  All right.  Ms. Taylor, you want to

7   respond?

8              MS. TAYLOR:  Your Honor, it's, of course, a mixed

9   question of fact and law, and the facts simply aren't before

10  this Court, and this is not the way in which things are

11  intended to be decided.

12             The United States has to be allowed the opportunity

13  to present all of its evidence.

14             I would anticipate this being a trial that would take

15  several days for us to present all of the evidence that we

16  would have, including from an expert witness about what his

17  experience was with using the item as a machine gun, testimony

18  from -- from witnesses about Mr. Ervin's intentions, the

19  presentation of documentary evidence about what his intentions

20  were for the use of the item, and then, at the end of that, to

21  allow a jury to decide this issue, which is the appropriate

22  procedure.

23             And it would not be appropriate for this Court to

24  make a ruling, not having the facts in front of it, about

25  whether factually an item meets the definition of a machine gun

1    before the United States has had an opportunity to present its

2    evidence in this case.

3          THE COURT:  So I want to make sure I address all the

4    different arguments that Mr. Ervin has raised.

5          Mr. Ervin has argued that the item that he produced

6    is essentially a raw material, and that the agent had to make

7    significant efforts in order to convert it into a device that

8    would render a rifle into an either machine gun or an automatic

9    weapon.

10          And Mr. Ervin's argument -- and I'm going to quote

11    for it.  Mr. Ervin argues the agent essentially -- the agent

12    treated the autokeycard as a raw material and made it into

13    something different, apparently expecting that with a little

14    gunsmithing, he could convert his rifle into a machine gun.

15    Predictably, however, mutilating the metal card and sticking

16    the mangled pieces of it inside the rifle simply caused the

17    weapon to malfunction.

18          Tests of the Frankensteinian rifle revealed that the

19    agent's crude alterations made the weapon fire erratically and

20    at times fire more than once per single trigger.

21          And relying on -- on those arguments, Mr. Ervin asks

22    the Court to determine that as a matter of law the object that

23    he was transmitting through the mail and that he possessed

24    doesn't fall within the definition of a firearm.

25          26 U.S. Code § 5845 defines a firearm and it also

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 12 of 22 PageID 146
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 38 of 242

12

1    defines a machine gun.  And the definition of a machine gun
2    includes the frame or receiver of any such weapon, any part
3    designed and intended solely and exclusively, or combination of
4    parts designed and intended for use in converting a weapon into
5    a machine gun.

6           And so, in my view, the question of whether this
7    keycard is a part that was designed and intended, whether
8    exclusively or combined with other parts, to convert a weapon
9    into a machine gun is a question that only the jury can decide.
10   It is not a question that the Court can decide.

11          And there are a couple of problems with Mr. Ervin's
12   argument to the contrary.

13          The first problem is that even if the facts were
14   undisputed, The *Federal Rules of Criminal Procedure* do not
15   provide any sort of summary-judgment type of remedy.

16          Unlike civil cases where you can say:  Judge, the
17   facts are undisputed; who wins, who loses?

18          The Eleventh Circuit has firmly said there is no
19   summary judgment procedure in criminal cases, nor do the rules
20   provide for a pretrial determination of the sufficiency of the
21   evidence.

22          And the Eleventh Circuit has said that in the *United*
23   *States versus Salman*, S-a-l-m-a-n, 378 F.3d 1266 at 1268, and
24   also in *United States versus Critzer*, C-r-i-t-z-e-r, 951 F.2d
25   306 at 307.

Doc. 57
SECOND SUPERSEDING INDICTMENT

FILED IN OPEN COURT

*1·26·22*

CLERK, U S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

KRISTOPHER JUSTINBOYER ERVIN
and MATTHEW RAYMOND HOOVER

CASE NO. 3:21-cr-22(S2)-MMH-MCR
18 U.S.C. § 371
26 U.S.C. § 5861(e)
31 U.S.C. § 5324(a)(1)
31 U.S.C. § 5324(a)(3)
26 U.S.C. § 5861(d)

### INDICTMENT

The Grand Jury charges:

### COUNT ONE
(Conspiracy)

A.  Introduction

At all times material to this Indictment:

1.      KRISTOPHER JUSTINBOYER ERVIN was a resident of Clay

County, Florida, within the Middle District of Florida.  Free Speech Industries LLC

was a Florida Limited Liability Company incorporated by ERVIN on or about

January 26, 2021.  ERVIN operated the web domains www.autokeycard.com and

www.autokeycards.com on which he advertised for sale products that he referred to

as Auto Key Cards.

2.      MATTHEW RAYMOND HOOVER was a resident of Coloma,

Wisconsin, and operated a retail store in Coloma called Coloma Resale.  Coloma

Resale was a federally licensed firearms dealer and held a special occupation tax

license.  HOOVER also operated a content channel on YouTube called CRS Firearms.

3.    Auto sears were a category of machinegun conversion devices that may be installed into an otherwise semi-automatic AR-15 type rifle and function to convert the AR-15 type rifle to fire more than one shot by a single function of the trigger.  A lightning link was a particular design of auto sear.

4.    The Auto Key Cards designed and sold by ERVIN consisted of cards machined from stainless steel, into which were etched the design for machinegun conversion devices known as lightning links, which constituted machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b).

### B.  The Conspiracy

5.    Beginning in or about October 2020, and continuing through in or about July 2021, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly and willfully combine, conspire, confederate, and agree with each other and others, both known and unknown to the grand jury, to commit offenses against the United States, specifically, to transfer firearms, that is, machinegun conversion devices constituting machineguns, as defined in 26 U.S.C. § 5845(a) and 5845(b), which firearms were not then registered in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841, in violation of 26 U.S.C. §§ 5861(e) & 5871.

2

Doc. 101

SUPPLEMENT TO MOTION TO DISMISS

The Government may attempt to argue that machineguns are beyond the scope of the Second Amendment by attempting to characterize them as "dangerous and unusual," as it has in other cases, but this is not the test. The court's invocation of "dangerous and unusual" weapons in *Heller* and subsequently *Bruen* was for the purpose of discussion of what *might be* a constitutionally acceptable law, rather than the endorsement of any particular extant policy. *Bruen*, 597 U.S. at *12 (Clarifying that the Court was not undertaking "an exhaustive historical analysis...of the full scope of the Second Amendment") (quoting *Heller*, 554 U.S. at 627). Rather, the only way a court may conclude Defendant's conduct falls outside the scope of the Second Amendment's unqualified command remains clear: the Government must prove the particular regime in question is consistent with the history and tradition of the United States. *Id* at *15. Furthermore, the question of whether a weapon is "in common use at the time," necessarily pins the analysis to the time *before the prohibition*. To consider otherwise would incentivize the Government to legislate wantonly and aggressively, seizing arms, then later evade constitutional scrutiny by suggesting that the arms cannot be in common use, because the Government prohibited them. Such circular logic would be inconsistent with any fundamental rights jurisprudence. Thus, the Government has the burden to prove that the regime in question is consistent

Doc. 132

MOTION TO DISMISS

### i. DEFINITION OF A MACHINEGUN CONVERSION PART: "PLUS FACTOR" & INTENT NEEDED

The Eleventh Circuit, in interpreting the definition of destructive device under 26 USCS § 5845(f), stated that: "[a]lthough the statute does define a 'destructive device' to include explosive devices, such as [appellee's], it also explicitly excludes from coverage any explosive device not designed for use as a weapon. 26 U.S.C. § 5845(f). Thus, a device that explodes is not covered by the statute merely because it explodes. Statutory coverage depends upon proof that a device is an explosive plus proof that it was designed as a weapon. No explosive can constitute a destructive device within the meaning of the statute unless it has this 'plus' factor." *United States v. Hammond*, 371 F.3d 776, 780 (11th Cir. 2004) (holding that to qualify as a destructive device under the National Firearms Act, the Government must show a "plus" factor to show that it was *designed* as a weapon.).

This is relevant because 26 USCS § 5845(b) defines "machinegun," in relevant part, as "any part designed and ***intended solely and exclusively***, or combination of parts ***designed and intended***, for use in converting a weapon into a machine gun[.]"

Accordingly, for a part to be a "machinegun" under 26 USCS § 5845(b), must: (1) be a part or combination of parts, (2) designed—which can be demonstrated by the "plus" factor—and intended, and in the case of a "part,"

solely and exclusively for use in converting a weapon into a machine gun. "Machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."

As pled, the indictment runs aggressively astray of the statute. It refers to individual Auto Key Cards as "cards machined from stainless steel, into which were etched the design for machinegun conversion devices…which constituted machineguns…in that they are a combination of parts designed and intended for use in converting a weapon into a machinegun." ECF 120 at 2. As will be explained more thoroughly *infra*, the Government is here trying to "have it both ways." It seeks to treat a single card with a design scrawled thereupon as a "combination of parts," a wildly expansive and constitutionally problematic way to read a statute with severe criminal penalties.

### b. VAGUENESS & LENITY: THE NFA IS DESIGNED TO GO AFTER "CRIME WEAPONS," NOT TCHOTCHKES

The vagueness doctrine requires that a criminal statute "clearly define the conduct it proscribes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment); *accord Johnson v. United States*, 576 U.S. 591, 596 (2015) (Fifth Amendment guarantees that every criminal law provides "ordinary people fair notice of the conduct it punishes" and is not "so standardless that it invites arbitrary enforcement"). In *United States v. Lanier*, 520 U.S. 259 (1997), the Supreme Court described

Doc. 132-1

ATTACHMENT TO REQUEST FOR JUDICIAL NOTICE



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Firearms Technology Industry Services Branch*

Martinsburg, WV
www.atf.gov

DEC 1 7 2018

907010:GSS
3311/309334



This refers to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB), which accompanied your submitted sample of one repair fixture. Specifically, you request an evaluation and classification of the submitted sample under the Gun Control Act of 1968 (GCA) and National Firearms Act of 1934.

As you may know, the GCA, **18 U.S.C. § 921(a)(3)**, defines **"firearm"** to include "...*(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or silencer; or (D) any destructive device....*"

The NFA, **26 U.S.C. § 5845(a)**, defines the term **"firearm"** as:

"...*(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in 18 U.S.C § 921); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the...[Attorney General]...finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and is not likely to be used as a weapon.*"

The sample you have submitted is a milling fixture. In your correspondence you refer to the sample as a "DIAS Repair Jig". A *drop in auto sear* (DIAS) is designed to replicate the function

-2-

of an M16 machinegun automatic sear. The DIAS generally does not require machining of the receiver for installation; with minor adjustment to the mounting body it simply fits into the rear, internal area of the receiver, where the M16 machinegun automatic sear would be installed. The sear mounting body and sear together serve no other functional purpose and together are a combination of parts designed and intended solely and exclusively, to convert a semiautomatic AR-15 type firearm into a *machinegun*. Therefore, the sear mounting body and sear together are a *machinegun* as defined.

 

 

**Submitted Sample**

The submitted sample is a machining fixture which can be utilized to repair or manufacture a DIAS. While your stated intent demonstrates that you have designed the submitted sample solely for use in repairing a registered DIAS, there is no substantive difference between a repair fixture and a manufacturing fixture.

As stated above, a DIAS consists of two main parts identified as the sear and the sear mounting body. The submitted sample is designed to manufacture or repair each of these parts of a DIAS.

Please be aware that a part becomes a part ostensibly when it can be recognized as that part. A part need not be capable of functioning nor of being completely finished in order to be recognized. ATF has long held that indexing the location of a hole or feature is equivalent to completing the actual hole or critical feature. ATF has recognized that possessing a sear and sear mounting body, where each has been manufactured to a point where they are identifiable as the intended part, constitutes possession of a DIAS, a *machinegun* as defined.

-3-

Regardless of the date of manufacture of a DIAS, the possession or transfer of an unregistered DIAS (a machinegun as defined) is prohibited by the NFA 26 U.S.C. § 5861, and the GCA, 18 U.S.C. § 922(o).

The submitted sample is a fixture designed to repair and/or manufacture the parts of a DIAS. Being only a fixture for use in manufacturing or repairing a *machinegun*, the submitted sample is not regulated under the GCA or the NFA.

To facilitate the return of the submitted sample, please provide FTISB with a pre-paid shipping label or an appropriate FedEx account number within 60 days of the receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Doc. 133

SECOND MOTION TO DISMISS

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE №: 3:21-cr22(S2)-MMH-MCR

UNITED STATES OF AMERICA,

v.

MATTHEW RAYMOND HOOVER,

_____/

## MOTION TO DISMISS FOR FIRST AND SECOND AMENDMENT VIOLATIONS & TO DECLARE UNCONSTITUTIONAL THE <u>NATIONAL FIREARMS ACT OF 1934</u>

Defendant Matthew Raymond Hoover ("Defendant"), in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Assn., et al. v. Bruen*, 597 U.S. __ (slip op., 2022), respectfully moves to Dismiss Counts 1 – 8 of the Indictment (ECF 120) against him. This Motion is based on the Supreme Court's recent decision; and the text of the Constitution, as informed by the history and tradition of the United States. In support of this Motion, Defendant hereby states:

### I.    FIRST AMENDMENT VIOLATIONS:

As has been stated by Defendants before, but bears repeating, this case stems from ATF's decision to treat a metal card with information drawn on it as a "combination of parts designed and intended" for converting a weapon into a machinegun. This alone poses more than enough First Amendment concerns for a single case, but goes on to seek to treat Defendant's *talking about* such

1

drawings as feloniously conspiratorial. The First Amendment implications here are severe.

### a. FACIAL AND AS-APPLIED UNCONSTITUTIONAL CONTENT-BASED SPEECH RESTRICTIONS: OVERBROAD AND UNDER INCLUSIVE

Content based restrictions on speech must survive strict scrutiny. The Government's charges against Mr. Hoover relate to alleged YouTube videos discussing an etched piece of metal and raising money for Mr. Ervin. It is clear that both Mr. Hoover's videos and the cards themselves are expressive conduct, especially in that the cards present mere etched information. As to arbitrariness, overbreadth, and under inclusivity "[t]he Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *Morales*, 527 U.S. at 60 (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L. Ed. 563 (1876)). Heightened judicial scrutiny is applied to specific, content-based restrictions on protected expression. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). To survive strict scrutiny, the government must demonstrate that the law is "justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).

### b. CONTENT-BASED SPEECH RESTRICTIONS ON HOOVER'S YOUTUBE VIDEOS, SOLICITATION FOR LEGAL FUNDS, AND DESIGNS ON METAL CARDS

Facially and as applied, 26 USCS § 5845(b) is a content-based restriction that is simultaneously overbroad and under inclusive. Accordingly, it is not narrowly tailored to serve a compelling government interest. To be a machinegun, an item MUST: (1) be a part or combination of parts, (2) designed—which can be demonstrated by the "plus" factor—and intended, and in the case of a "part," solely and exclusively for use in converting a weapon into a machine gun. As to overbreadth, under inclusivity, and the risk of arbitrary enforcement, "[t]he Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts [or United States Attorneys Office] to step inside and say who could be rightfully detained, and who should be set at large." *Morales*, 527 U.S. at 60 (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L. Ed. 563 (1876)). If a statute entrusts lawmaking "to the moment-to-moment judgment of the policeman on his beat. . .it furnishes a convenient tool for harsh and discriminatory enforcement by [] prosecuting officials, against particular groups deemed to merit their displeasure and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Kolender*, 461 U.S. at 360.

Heightened judicial scrutiny is applied to specific, content-based restrictions on protected expression. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803,

818 (2000). To survive strict scrutiny, the government must demonstrate that the law is "justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).

26 USCS § 5845(b) is simultaneously over and under inclusive. For an item to violate § 5845(b) , it must: (1) be a part, (2) designed—which can be demonstrated by the "plus" factor—and intended solely and exclusively for use in converting a weapon into a machine gun. The broad sweep of the § 5845(b), as wielded here, violates "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358. There are no such guidelines in the law or regulations. Any item, including shoelaces, may constitute a "machinegun." *See* Conversion kits, Firearms Law Deskbook § 6:10 (*citing* Letter from Richard Vasquez, acting Chief, ATF Firearms Technology Branch, June 25, 2007, to Brian A. Blakely, 903050:JPV, 3311/2007-615). For these reasons, § 5845(b) is overbroad. If this Court were to allow the Indictment to stand, it matters not whether the reason that a YouTuber makes a video about the Auto Key Card was to spur a discussion about firearms laws, to advocate for gun control, or to raise money for Mr. Ervin's legal defense. *See* Indictment at ¶ 6(y).

Furthermore, if it applies to the cards at issue as the government alleges, § 5845(b) is under inclusive. To wit, if it applied here and not, for example, to

4

an electronic massage gun with the same schematic drawn on it that could help relax muscles (or rapidly engage a semiautomatic rifle's trigger). Given this result, it "necessarily [and impermissibly] entrusts lawmaking [regarding this content-based restriction or otherwise] to the moment-to-moment judgment of the policeman on his beat." *See City of Chi. v. Morales*, 527 U.S. 41, 60 (1999). The law is not narrowly tailored to serve a compelling government interest.

## II. THE SUPREME COURT'S LANDMARK *BRUEN* DECISION FUNDAMENTALLY CHANGES THE INSTANT MATTER
### a. THE *BRUEN* DECISION AND ITS LEGAL STANDARD

*Bruen* held as unconstitutional New York's 1911 Sullivan Act, requiring a license and demonstration of "proper cause" for the possession and carrying of a concealable firearm. *Bruen*, 597 U.S. __ at *2. What makes *Bruen* particularly germane to the instant matter is the announcement of a clear legal standard for the evaluation of acts regulating the peaceable keeping and bearing of arms. *Bruen* identified the Court of Appeals "coalesce[ing] around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-ends scrutiny", the Court correctly identified this as "one step too many[.]" *Id.* *9-10. Those previous decisions at the various Courts of Appeal manifested deference to the Government in a manner unlike any other fundamental right, and the inexplicable consideration of regulations clearly contemplating the keeping and bearing of arms as beyond the scope of the Second Amendment. *Id.* *14 (reading case law to "necessarily reject[]"

5

intermediate scrutiny in the Second Amendment context, further positing that a "constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.") (quoting *Heller v. District of Colombia*, 554 U.S. 570 at 634 (2008)).

Finally, though, we have a standard which clearly articulates the burdens in a case involving restrictions on the right to keep and bear arms. It is, as artfully penned by the Court, "when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct. The Government **must** *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. **Only then** may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" (cleaned up) (emphasis added).

To summarize: any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. CONST., Amend. II, can **only** be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. *Bruen*, 597 U.S. at *29.

### b. THE STATUTES HERE AT ISSUE AFFECT CONDUCT COVERED BY THE SECOND AMENDMENT'S "UNQUALIFIED COMMAND"

Defendant is charged under 18 U.S.C. 5861 and 5871, as well as conspiracy to commit those offenses. The charged statutes deal with the taxation and transfer of machineguns, and other weapons. The Government alleges the tchotchkes at issue—the "auto key cards"—to be machineguns. What's more, actions subsequent to the passage of the charged firearm statutes render it impossible to comply with the taxing provisions, thus leaving the statutes a bizarre, vestigial area of law passed pursuant to the taxing power which—in dubious constitutionality—is used by the Government as an independent effective prohibition on the sale, transfer, or possession of any controlled devices not registered by 1986.

The Government may attempt to argue that machineguns are beyond the scope of the Second Amendment by attempting to characterize them as "dangerous and unusual," as it has in other cases, but this is not the test. The court's oft-misunderstood invocation of "dangerous and unusual" weapons— itself a reference to the statute of Northampton, which merely forbid the *carrying* of such weapons *in a particular manner*—in *Heller* and subsequently *Bruen* was for the purpose of discussion of what *might be* a constitutionally acceptable law, rather than the endorsement of any particular extant policy. *Bruen*, 597 U.S. at *12 (Clarifying that the Court was not undertaking "an exhaustive historical analysis…of the full scope of the Second Amendment") (quoting *Heller*, 554 U.S. at 627). Rather, the only way a court may conclude

Defendant's conduct falls outside the scope of the Second Amendment's unqualified command remains clear: the Government must prove the particular regime in question is consistent with the history and tradition of the United States. *Id* at *15. Furthermore, the question of whether a weapon is "in common use at the time," necessarily pins the analysis to the time *before the prohibition*. To consider otherwise would incentivize the Government to legislate wantonly and aggressively, seizing arms, then later evade constitutional scrutiny by suggesting that the arms cannot be in common use, because the Government prohibited them. Such circular logic would be inconsistent with any fundamental rights jurisprudence. Thus, the Government has the burden to prove that the regime in question is consistent with the history and tradition of firearms regulation in this country around the founding era.

Previously, the Government failed to demonstrate that there was an analogous federal restriction deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. *Bruen*, 597 U.S. at *29. While it has pointed to *State v. Langford*, 3 Hawks 381, 383 (NC 1824), it is important to note that *Langford*, which is a vestige of the statute of Northampton (as was thoroughly discussed in *Bruen*: (1) pertains to a state law as opposed to federal, (2) is temporally irrelevant, and (3) concerns the **carrying** of dangerous and unusual weapons, **in such a**

8

**manner** as will naturally cause a terror to the people—not the wholesale prohibition of such alleged arms. Further, Defendant submits that the Government's failure to produce any authority to meet its burden to demonstrate that the National Firearms Act of 1934 is constitutional by way of citing analogous authority to show that the law is deeply rooted in American history as evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791 shows that it is unable to do so. *Bruen*, 597 U.S. at *29.

### c. THE LAWS HERE AT ISSUE ARE FACIALLY UNCONSTITUTIONAL UNDER *BRUEN*

It is no great secret that no federal regulation of firearms existed before the enactment of the laws here at issue. In addition to the previously raised Constitutional questions, nothing in the applicable history and tradition of the United States supports the categorical ban of machineguns, much less the item here at issue—a tchotchke the Government alleges might possibly, with transformative labor, one day become a machinegun. Further, the ATF's decision that the tchotchke at issue—a stainless steel card with some lines lightly thereupon engraved—was a machinegun came completely by administrative fiat, absent even notice and comment. Our Nation's history and tradition does not, and cannot, support a finding that an alleged drawing of a part is that part merely because an unelected bureaucrat unilaterally willed it to be. To hold otherwise would be to grant the Bureau more power than

Congress could have ever granted it, and make innumerable items potentially illegal. *See Bruen*, 597 U.S. at *19-20 ("Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearms regulation requires a determination of whether the two regulations are "relatively similar." . . . "Even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (cleaned up) (internal citations removed).

As *Bruen* explained, historical analogues to a regulation can be helpful, but Defendant here proffers more modern evidence that a categorical ban on machineguns, as the Government here seeks to enforce against a bespoke trinket, would be unconstitutional. We present the testimony of then-Attorney General Cummings at a 1934 hearing on the National Firearms Act.

MR. LEWIS: I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

ATTORNEY GENERAL CUMMINGS: Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some

10

constitutional question involved. *But* when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.

MR. LEWIS: In other words, it does not amount to prohibition, but allows of regulation.

ATTORNEY GENERAL CUMMINGS: That is the idea. We have studied that very carefully.

National Firearms Act: Hearings before the Committee on Ways and Means, House of Representatives on H.R. 9066, 73 Cong. 2d Sess. (1934). Defendant posits that the then-Attorney General, advancing the very law whose constitutionality was even then dubious, admitting that a categorical ban on machineguns would present constitutional problems, is instructive that there is no historical basis for the current regime—essentially reflecting what Mr. Cummings describes as problematic—consistent with the Second Amendment.

### d.  THE LAWS HERE AT ISSUE ARE UNCONSTITUTIONAL AS APPLIED TO DEFENDANT UNDER *BRUEN*

In the alternative to that advanced above, the application of §5861 and §5871 is unconstitutional as it applies to Defendant. Even if the Government could somehow prove to the Court that the wholesale felonization of the peaceable possession of an entire category of arms to be consistent, this case presents something far more peculiar: an administrative agency's unilateral

11

declaration that an alleged drawing of a component—a component the possession of which subjects the holder to lengthy prison terms—is the component itself. There can be no historical justification, consistent with the "unqualified command" of the Second Amendment, plus the clear metes of the First, that could justify such a prosecution. Should any exist, the Government bears the burden to prove it. *Bruen* at \*15 ("Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"); *id.* at \*20 ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry.) (cleaned up) (quoting *McDonald v. Chicago*, 561 U.S. 742 at 767 (2010)).

### III.  CONCLUSION

The command of the First and Second Amendments are clear. Under *Bruen*, consistent with the text of the Constitution and the history and tradition of our Great Nation, it stands to reason that any regulation affecting the peaceable possession of arms—or in this case, something from which the Government alleges an arm may one day be made from—warrants meaningful review. The underlying laws have evaded meaningful scrutiny despite being unprecedented in their severity, and the application thereof to Defendant Hoover—a patriotic American and father who stands accused of talking about

a piece of metal with lines drawn on it and faces the complete destruction of his life and livelihood therefrom—demonstrates the severity with which this matter warrants meaningful constitutional review. The standard announced in *Bruen* gives this Court the tools it needs to do so.

**WHEREFORE** Defendant Matthew Raymond Hoover respectfully moves this Honorable Court to dismiss the Indictment (ECF 120) against him in its entity with prejudice, to declare the National Firearms Act facially unconstitutional, or, in the alternative, unconstitutional as applied to Defendant, and for any further relief that this Court deems just and proper.

DATED: September 22, 2022

Zachary Z. Zermay, Esq.
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 239-699-3107
*Lead Counsel for Defendant*

/s/Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on  September 22, 2022 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Zachary Z. Zermay, Esq.

Doc. 141

ORDER DENYING MOTION TO DISMISS

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

                            Case No. 3:21-cr-22(S3)-MMH-MCR

v.

MATTHEW RAYMOND HOOVER

---

# O R D E R

**THIS CAUSE** is before the Court on two motions to dismiss filed by

Defendant Matthew Raymond Hoover:[1] (1) the Motion to Dismiss (Doc. 132;

First Motion)[2] and (2) the Motion to Dismiss for First and Second Amendment

Violations and to Declare Unconstitutional the National Firearms Act of 1934

---

[1]     Notably, rather than ask the Court for permission to exceed the page limit for filing a motion to dismiss under Rule 3.01(a), Local Rules, United States District Court, Middle District of Florida (Local Rule(s)), counsel for Hoover filed two motions to dismiss.  This is improper.  Counsel for Hoover similarly evaded requesting the Court for the appropriate relief in filing Hoover's Notice Regarding Expert Disclosure (Doc. 107), which the Court construed, in that instance, as a motion for extension of time, see Endorsed Order (Doc. 109).  Here, the Court will permit Hoover to exceed the page limits, but cautions counsel for Hoover that going forward, the Court will strike filings that do not comply with the Federal Rules of Criminal Procedure or the Local Rules of this Court.

[2]     Attached to the First Motion, citing Rule 201 of the Federal Rules of Evidence, Hoover includes a request that the Court take judicial notice of the Federal Register as well as a letter from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in which the agency opines that a device, different than that at issue in the instant case, is not regulated under the National Firearms Act.  See Request for Judicial Notice in Support of Defendant's Motion to Dismiss (Doc. 132-1).  With regard to his reference to the Federal Register, "[Federal Courts] take judicial notice of documents published in the Federal Register."  Longo v. Seminole Indian Casino-Immokalee, 813 F.3d 1348, 1350 n. 2 (11th Cir. 2016) (citing 44 U.S.C. § 1507).  As to the letter, however, the Court finds it is not relevant to whether the device at issue in the instant action is regulated by the National Firearms Act.  As such, it is not an adjudicative fact of which this Court need take judicial notice.  See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1204 (11th Cir. 2004) ("Adjudicative facts are facts that are relevant to a determination of the claims presented in a case.").

(Doc. 133; Second Motion), both of which were filed on September 22, 2022 (collectively, the "Motions").[3]   The Government filed a response to Hoover's Motions on October 7, 2022.   <u>See</u> United States' Omnibus Response in Opposition to Defendant's Motions to Dismiss (Doc. 138; Response). Accordingly, the Motions are ripe for resolution.

## I.   Relevant Background

The government initiated the instant criminal proceeding on March 3, 2021, by filing a Criminal Complaint (Doc. 1) against Defendant Kristopher Justinboyer Ervin charging that, on or around February 22, 2021, Ervin

> did knowingly possess a firearm as defined under Title 26, United States Code, Section 5845(a) and (b), that is, a machine gun conversion device, that was not then registered to the defendant in the National Firearms Registration and Transfer Record,

in violation of Title 26, United States Code, Sections 5861(d) and 5871.

<u>See</u> Criminal Complaint at 1.   Eight days later, on March 11, 2021, a grand jury returned a one-count indictment charging Ervin with the same offense.   <u>See</u> Indictment (Doc. 17).   On April 1, 2021, the grand jury returned a superseding indictment charging Ervin with causing a financial institution to fail to file a Currency Transaction Report (CTR) in violation of 31 U.S.C. § 5324(a)(1) (Count

---

[3]      Hoover first filed a Motion to Dismiss on June 21, 2022.   <u>See</u> Motion to Dismiss (Doc. 95).   However, the grand jury returned a Third Superseding Indictment (Doc. 120) on August 31, 2022, and the Court denied the motion to dismiss as moot.   <u>See</u> Minute Entry (Doc. 126).

One), structuring a transaction at a federally-insured financial institution while violating another law of the United States in violation of 31 U.S.C. § 5324(a)(3) (Counts Two through Seven), transporting or causing to be transported unregistered firearms in interstate commerce in violation of 26 U.S.C. §§ 5861(j) & 5871 (Count Eight), and possessing unregistered machinegun conversion devices in violation of 26 U.S.C. §§ 5861(d) & 5871 (Counts Nine through Fourteen). See Indictment (Doc. 25; First Superseding Indictment).

Ervin filed a motion to dismiss the First Superseding Indictment, see Motion to Dismiss Superseding Indictment and Memorandum of Law (Doc. 30), which the Court denied on July 8, 2021. See Transcript (Doc. 48). On January 22, 2022, the grand jury returned a Second Superseding Indictment which in addition to charging Ervin, charged Defendant Matthew Raymond Hoover with committing federal crimes. See Indictment (Doc. 57; Second Superseding Indictment). On August 31, 2022, the grand jury returned a Third Superseding Indictment in which it modified several of the allegations in the Second Superseding Indictment and included an additional count of transferring, and aiding and abetting the transferring, of unregistered machinegun conversion devices via the U.S. mail as to both defendants. See Indictment (Doc. 120; Third Superseding Indictment). In all, the Third Superseding Indictment now alleges eighteen separate crimes. In Count One, Hoover and Ervin are charged with conspiring to transfer unregistered machinegun conversion devices in violation

of 18 U.S.C. § 371.  Id. at 1-10.  In Counts Two through Eight, Hoover and Ervin are charged with substantive counts of transferring, and aiding and abetting the transferring, of unregistered machinegun conversion devices via the U.S. mail to various individuals, in violation of 26 U.S.C. §§ 5861(e) & 5871.  Id. at 10-14.  The remaining counts of the Third Superseding Indictment pertain only to Ervin and again charge him with causing a financial institution to fail to file a CTR (Count Nine), structuring transactions at a federally-insured financial institution to evade reporting requirements (Counts Ten through Fifteen), and possessing unregistered machinegun conversion devices (Counts Sixteen to Eighteen).  Id. at 14-17.  The Third Superseding Indictment also contains various forfeiture allegations which relate to each count.  See id. at 16-19.

The Court summarizes the factual basis for the charges against Hoover in the Third Superseding Indictment here.  The Government alleges that beginning in or about October 2020, and continuing through around July 2021, Defendants Ervin and Hoover conspired to transport unregistered machinegun conversion devices through Ervin's Auto Key Card business.  See Third Superseding Indictment at 2-3.  The Auto Key Cards, which Ervin allegedly designed and sold,

> consisted of cards machined from stainless steel, into which were
> etched the design for machinegun conversion devices known as
> lightning links, which constituted machineguns as defined in 26
> U.S.C. § 5845(a) and 5845(b) in that they are a combination of parts

designed and intended for use in converting a weapon into a machinegun.

Id. at 2.  The Government explains "[a] lightning link was a particular design of auto sear," which is

> a category of machinegun conversion devices that may be installed into an otherwise semi-automatic AR-15 type rifle and function to convert the AR-15 type rifle to fire more than one shot by a single function of the trigger.

Id.  As part of the conspiracy, Hoover created and posted various videos to his YouTube Channel, CRS Firearms, in which he "promoted the sale of [Ervin's] Auto Key Cards."  Id. at 3.  For example:

> b.   On or about November 4, 2020, a video created by Hoover was posted on the YouTube channel CRS Firearms.  In the video, titled "Is this An ATF Trap And How Does It Work," Hoover described how to order an Auto Key Card and further described how to cut the lightning link from the Auto Key Card and install it into an AR-15 style rifle, thus converting the AR-15 style rifle into a machinegun.

> . . .

> l.   On or about January 8, 2021, a video created by Hoover was posted to the YouTube channel CRS Firearms.  In the video, titled "This Makes an illegal Machine gun," Hoover described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

Id. at 4, 7.  Shortly after Hoover would post videos identifying autokeycard.com as a sponsor and promoting the sale of Auto Key Cards, Ervin would mail Hoover cash or items of value such as a Louis Vuitton bag or video production equipment.  See generally id. at 4-10.

As further part of the conspiracy, less than three weeks after the grand jury returned the First Superseding Indictment in this case, Ervin, Hoover, and another individual "participated in a phone call in which they discussed plans to continue selling Auto Key Cards and create additional videos promoting Ervin and his Auto Key Card business." Id. at 10. Around this same time in March 2021, and up until July 2021, Hoover and the other individual raised funds to use, in part, to obtain Ervin's release so he and Hoover "could continue to pursue their conspiratorial goals." Id. at 10. Hoover now seeks dismissal of Counts One through Eight of the Third Superseding Indictment.

## II.   Summary of the Arguments

In the First Motion, Hoover asserts that the Government has "failed to state a crime" against him. First Motion at 9. Hoover contends that in order for a device to qualify as a machinegun under 26 U.S.C. § 5845(b), "it must (1) be a part or combination of parts; (2) which is designed and intended – and in the case of a single 'part' – solely and exclusively for use in converting a weapon into a machine gun." Id. at 10. Hoover argues that the Government has failed to sufficiently allege that the Auto Key Card was designed for use in converting a weapon into a machinegun. Id. In addition, Hoover argues that

> the Indictment is facially defective because there is no "plus" factor alleged to sustain the legal conclusion that these cards are designed and intended solely for use as a weapon, as required by the statute. They are mere stainless-steel cards, into which a design was lightly etched.

6

Id. at 11.  Similarly, Hoover asserts that as pled, the Auto Key Card is not a "combination of parts" or a "part" under the statute, it is merely a drawing on a single card.  Id. at 12-14.  For the same reasons, Hoover maintains that the Government has "failed to state sufficient ultimate facts to sustain [the aiding and abetting] allegations."  Id. at 15.

Hoover next raises various constitutional challenges to several of the charges in the Third Superseding Indictment.  First, Hoover contends

> [a]s applied against Mr. Hoover 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2 are unconstitutionally vague under the Fifth Amendment. Mr. Hoover had no reason to believe, at any point, that he would be engaging in criminal conduct if—as alleged—he entered into an agreement with a tchotchke salesman to discuss stainless steel cards with a design on them on his YouTube channel.

Id. at 15-16.  Hoover also contends that "the government is acting outside the limits of the taxing and spending clause" because it "will not accept the payment of the tax required by the charged statute, and yet nonpayment presents serious criminal consequences and permanent deprivations of liberty."  Id. at 21-22.

In the Second Motion, Hoover argues that "[f]acially and as applied, 26 § U.S.C. 5845(b) is a content-based restriction that is simultaneously overbroad and under inclusive."  Second Motion at 3.  According to Hoover, it is overbroad to the extent that

> the broad sweep of the § 5845(b), as wielded here, violates "the requirement that a legislature establish minimal guidelines to

govern law enforcement." <u>Kolender</u>, 461 U.S. at 358.[4] There are no such guidelines in the law or regulations. Any item, including shoelaces, may constitute a "machinegun."

<u>Id.</u> at 4.  As it applies here, Hoover also maintains the statute is under inclusive:

> To wit, if it applied here and not, for example, to an electronic massage gun with the same schematic drawn on it that could help relax muscles (or rapidly engage a semiautomatic rifle's trigger). Given this result, it "necessarily [and impermissibly] entrusts lawmaking [regarding this content-based restriction or otherwise] to the moment-to-moment judgment of the policeman on his beat." <u>See</u> <u>City of Chi. v. Morales</u>, 527 U.S. 41, 60 (1999).

<u>Id.</u> at 4-5.  In addition, Hoover contends that under the United States Supreme Court's recent decision in <u>Bruen</u>,[5]

> the only way a court may conclude Defendant's conduct falls outside the scope of the Second Amendment's unqualified command remains clear: the Government must prove the particular regime in question is consistent with the history and tradition of the United States.

Second Motion at 7-8.  Hoover further asserts that "the Government has the burden to prove the regime in question is consistent with the history and tradition of firearms regulations in this country <u>around the founding era</u>." <u>Id.</u> at 8 (emphasis added).   Hoover concludes that the history and tradition of the United States does not support a categorical ban of machineguns and that it certainly does not support banning Auto Key Cards,

> a tchotchke the Government alleges might possibly, with transformative labor, one day become a machinegun.  Further,

---

[4]   <u>Kolender v. Lawson</u>, 461 U.S. 352, 358 (1983).

[5]   <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111 (2022).

> ATF's decision that the tchotchke at issue – a stainless steel card with some lines lightly thereupon engraved – was a machinegun came completely by administrative fiat, absent even notice and comment.

Id. at 9.  In the alternative, Hoover contends that the application of § 5861 and § 5871 is unconstitutional as applied to him because there is no historical justification for

> an administrative agency's unilateral declaration that an alleged drawing of a component – a component the possession of which subjects the holder to lengthy prison terms – is the component itself.

Id. at 11-12.

In its Response, the Government largely relies on the Court's rulings on Ervin's previous motion to dismiss and its arguments in response to that motion. See Response at 2-5.  As to Hoover's argument that the Government was required to allege a "plus factor," the Government contends that Hoover improperly relies on authority addressing "a separate and differently worded subsection of the statute."  Id. at 7-8.  To the extent Hoover relies on the language, "any part designed and intended solely and exclusively [to convert a weapon into a machinegun]," to support his argument that proof of a "plus factor" is required, the Government notes that Hoover ignores that a machinegun also encompasses any "combination of parts designed and intended[ ] for use in converting a weapon into a machinegun."  Id. at 8 (citing 26 § U.S.C. 5845(b)) (emphasis added).  According to the Government, "the Third

Superseding Indictment makes clear that the government is proceeding on a theory that Auto Key Cards are a combination of parts, and thus the 'solely and exclusively' language has no role in this case." Id.  The Government further maintains that the Third Superseding Indictment lays out the charged offenses in the language of the relevant statutes and provides sufficient facts regarding each Defendant's role in the alleged conspiracy. See id. at 9-10.

As to Hoover's arguments under Bruen, the Government asserts that Hoover "misconstrues ATF's role in determining whether an item meets the statutory definition of a machinegun in Section 5845(b)." Id. at 11.  In addition, the Government contends that the Supreme Court's decision in Bruen does not overrule binding precedent that holds the National Firearms Act, 26 U.S.C. §§ 1132—1132q (NFA) constitutional under the Second Amendment.  Id.  The Government notes that the definition set forth in § 5845(b) was promulgated by Congress, and although it "intends to present evidence at trial in the form of testimony from an ATF expert regarding his opinion as to the classification of Auto Key Cards as machineguns under Section 5845(b)," the ultimate determination is for the trier of fact. Id. at 11-12.  Finally, the Government asserts that the NFA's restrictions on machineguns are supported by the Supreme Court's decision in District of Columbia v. Heller, which recognized the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. at 12-13 (quoting 554 U.S. 570, 627 (2008)).

### III.    Legal Standard

Under Rule 7(c)(1), Federal Rules of Criminal Procedure (Rule(s)), an indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"  The Eleventh Circuit Court of Appeals has articulated a three part test to determine the sufficiency of an indictment:

> An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.

United States v. Steele, 178 F.3d 1230, 1233-34 (11th Cir. 1999) (internal citation and quotation omitted).  An indictment is generally sufficient "if it sets forth the offense in the words of the statute."  Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Adkinson, 135 F.3d 1363, 1375 n.37 (11th Cir. 1998) (noting that an indictment need do little more than track the language of the statute).  Indeed, the Eleventh Circuit has explained that an indictment that tracks the language of the statute is sufficient "as long as the language sets forth the essential elements of the crime."  United States v. Yonn, 702 F.2d 1341, 1348 (11th Cir. 1983).  However, an indictment that follows the statute is nevertheless insufficient if it fails to adequately apprise the defendant of the charged offense.  United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006).  Thus, if an indictment tracks the language of the criminal statute, it

must include enough facts and circumstances to inform the defendant of the specific offense being charged. United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003). This is necessary "not only to give the defendant notice as guaranteed by the [S]ixth [A]mendment, but also to inform the court of the facts alleged to enable it to determine whether the facts are sufficient in law to support a conviction." See Belt v. United States, 868 F.2d 1208, 1211 (11th Cir. 1989). An indictment does not, however, have to "allege in detail the factual proof that will be relied upon to support the charges." United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978).[6] Additionally,

> [i]n ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes. It is well-settled that a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.

Sharpe, 438 F.3d at 1263 (internal citation and quotation omitted). Notably, "[t]here is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992). However, "[i]t is perfectly proper, and in fact mandated, that [a] district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense." United States v. Coia, 719 F.2d 1120, 1123 (11th Cir. 1983).

---

[6]      In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

## IV. Discussion

### a. Failure to State an Offense

As his argument that the Government has "failed to state sufficient ultimate facts to allege a crime," Hoover recites allegations from the Third Superseding Indictment and the language of relevant statutes and then concludes, "[a]s pled, the Government has failed to state a crime against Mr. Hoover with its scattershot allegations." <u>See</u> First Motion at 8-9.[7]  It is unclear what Hoover means by the Government's "scattershot allegations" or on what legal basis he contends the Third Superseding Indictment fails "to state a crime."  Hoover cites <u>Ocasio v. United States</u>, 578 U.S. 282, 292 (2016), and contends that the case supports the proposition that "the Government is <u>required to plead</u> sufficient facts to allege that each conspirator must have 'specifically intended that some conspirator commit each element of the substantive offense.'"  First Motion at 8 (emphasis added).  But he provides no

---

[7]     Throughout the First Motion Hoover repeatedly objects that the Third Superseding Indictment fails to present "sufficient ultimate facts," is conclusory, and "fail[s] to state a crime."  <u>See generally</u> First Motion.  These arguments suggest that Hoover is attempting to invoke the civil pleading standards adopted in <u>Bell Atlantic v. Twombly</u>, 550 U.S. 554 (2007) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) to this criminal case.  Civil pleading standards simply are not applicable to assess the sufficiency of an indictment returned by a grand jury.  <u>United States v. Vaughn</u>, 722 F.3d 918, 926, 928-29 (7th Cir. 2013); <u>United States v. Coley</u>, No. CR415-187, 2016 WL 743432, at *1 (S.D. Ga. Feb. 23, 2016), <u>report and recommendation adopted by</u> 2016 WL 1032876 (S.D. Ga. Mar. 14, 2016).  Also Hoover's discussion in footnote 2 of the First Motion arguing that the Court may take judicial notice of certain facts in ruling on a motion to dismiss without converting the motion to one for summary judgment similarly appears to confuse the applicability of the Federal Rules of <u>Civil</u> Procedure with the rules that apply here, the Federal Rules of <u>Criminal</u> Procedure.

discussion of this proposition or its application to the specific circumstances here. Id. In Ocasio, the Supreme Court addressed a defendant's challenge to his conspiracy conviction, and in doing so described what the Government must prove at trial, not what it must plead in an indictment. Ocasio, 578 U.S. at 292. The Court determined that "[a] defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he reached an agreement with the owner of the property in question to obtain that property under color of official right," id. at 300, a proposition with no apparent applicability here. Indeed, it appears that Ocasio involves not only a different procedural posture than that of this case, but also addresses circumstances and charges not presented here. Because Hoover does not articulate the basis or import of his contention that the Third Superseding Indictment contains "scattershot allegations," present legal authority supporting dismissal on those grounds, or cite factually or procedurally similar case law, the Court finds his argument to be entirely without merit.

Next, Hoover contends that the Government only alleges that the Auto Key Card was designed for use in converting a weapon into a machinegun once and merely recites the statute. First Motion at 9-10. According to Hoover, this is "insufficient as a matter of law." Id. at 10. However, Hoover's suggestion that the Government was required to plead the specific facts supporting its contention that the Auto Key Cards at issue fall within the definition of a

14

machinegun is inaccurate.  Here, Hoover is charged with violating 26 U.S.C. § 5861(e) which makes it a federal offense to transfer a firearm that is not registered in the National Firearms Registration and Transfer Record.  The relevant inquiry on a motion to dismiss an indictment is whether the indictment "presents the elements of the charged offense."  See Steele, 178 F.3d at 1233-34.  Thus, the question is whether the Government has alleged the elements of a violation of 26 U.S.C. § 5861(e).  While § 5845(b) provides the definition of what constitutes a machinegun, which in turn, falls within the definition of a firearm for purposes of § 5861, that does not transform factual allegations of how the object at issue falls within the definition of a machinegun into an additional element necessary to charge a violation of § 5861.  Indeed, Hoover cites no authority supporting his argument that factual allegations satisfying this definitional section are required to be included in an indictment.  Notably, another district judge in this circuit has rejected such a contention.  See United States v. Hassoun, 477 F. Supp. 2d 1210, 1227 n. 9 (S.D. Fla. 2007)[8] ("Failure to specifically cite to, or include the text of a definitional provision in an Indictment's count does not render it insufficient.") (citing United States v. Pennington, 168 F.3d 1060, 1065 (8th Cir. 1999)).  The Third Superseding

---

[8]     The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority.  See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Indictment in this case alleges the elements of the offense in the language of the statute and alleges that the Auto Key Cards

> into which were etched the design for machinegun conversion devices . . . constituted machineguns as defined in 26 U.S.C. § 5845(a) and § 5845(b) in that they are a combination of parts designed and intended for use in converting a weapon into a machinegun.

See Third Superseding Indictment at 2. This is sufficient.

Hoover's "plus factor" argument is equally unavailing. The Eleventh Circuit's decision in United States v. Hammond, 371 F.3d 776, 780 (11th Cir. 2004), on which Hoover relies in support of this argument, is inapplicable here for two reasons.

First, the procedural posture of Hammond makes its holding inapposite. In Hammond, the Eleventh Circuit reviewed a trial court's post-trial decision to grant a defendant's motion for judgment of acquittal after the jury convicted him of both making and possessing a firearm in violation of 26 U.S.C. §§ 5845, 5822, 5861(f). Id. at 777. In affirming the trial court's decision, the Eleventh Circuit determined that "[t]he evidence was insufficient to permit the jury to find beyond a reasonable doubt that Hammond's device was designed as a weapon" such that it fell within the definition of a firearm. Id. at 782. This determination that the evidence produced at trial was insufficient to support the defendant's conviction, lends no support for Hoover's request to dismiss the Third Superseding Indictment at this pre-trial stage of the proceedings. See

16

United States v. Baxter, 579 F. App'x 703, 705 (11th Cir. 2014)[9] ("[There is] no summary judgment procedure in criminal case. Nor do the rules provide for a pre-trial determination of the sufficiency of the evidence." (quoting Critzer, 951 F. 2d at 307)).

Second, the Eleventh Circuit's determination that to sustain a conviction in Hammond the government was required to present proof that the device made and possessed by Hammond was an "explosive plus proof that it was designed as a weapon," id. at 780, simply has no application here.  Hammond was charged with "making and possessing of a 'firearm' without first registering, paying tax on, and obtaining approval to make and possess the firearm" in violation of 26 U.S.C. § 5822, 5861(f).  Id. at 779-80.  The "firearm in question" was an explosive device, specifically

> a cardboard tube, approximately thirteen inches long and one-and-one half inches in diameter. The circular wall of this tube was made of ten layers of industrial grade cardboard and was approximately three-eighths of an inch thick. The inside of the tube was filled with a mixture of approximately nine ounces of pyrodex, an explosive powder, ground pyrodex, and smokeless gunpowder. The ends of the cardboard tube were crimped and dipped in liquid candle wax. The whole device was re-enforced with three layers of different types of tape. A green fuse, wrapped in aluminum foil, was placed through one of the ends and ran to the center of the device.

---

[9]     The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point.  See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Id. at 778.  As relevant to the charges against Hammond, the term "firearm" includes a destructive device, which in turn is defined as, among other things, any explosive device.  Id. at 780.  However, the definition of a "destructive device" specifically excludes any explosive device "which is neither designed nor redesigned for use as a weapon."  See id.; see also 26 U.S.C. § 5845(f).  The Government's theory in Hammond was that the cardboard tube was a destructive device that constituted a firearm.  371 F.3d at 780.  Although the government presented evidence that the object was an explosive device, it failed to present evidence that it was designed for use as a weapon.  Id.  The Eleventh Circuit explained that because the definition of a destructive device excluded from coverage "any explosive device not designed for use as a weapon," a device would not fall under the statutory framework regulating firearms merely because it explodes.  Id.  Instead, "[s]tatutory coverage depends upon proof that a device is an explosive plus proof that it was designed as a weapon."  Id.  As such, the Eleventh Circuit concluded that "[n]o explosive can constitute a destructive device within the meaning of the statute unless it has this 'plus' factor."  Id. (emphasis added).

The Government's theory here is not that Hoover transferred an unregistered "destructive device" as defined in 26 U.S.C § 5845(f) but instead an unregistered "machinegun" as defined in 26 U.S.C. § 5845(b).  See Third Superseding Indictment at 2.  Thus, Hammond's "plus factor" analysis has no

applicability.  Moreover, to be a machinegun under the statute, an object must be a "weapon."  26 U.S.C. § 5845(b) ("The term 'machinegun' means <u>any weapon</u> . . .") (emphasis added).  Proof that a device is a "machinegun" – i.e. a "weapon" renders additional proof that it would be unnecessary and entirely redundant.  Hoover's attempt to extend the Eleventh Circuit's holding in <u>Hammond</u> to apply to devices which constitute a firearm because they fall within the definition of a machinegun is unavailing.  The Government is not required to allege or prove a "plus factor" to support a conviction here.

The Court next turns to Hoover's contention that the Government has "conclusively demonstrated that the Auto Key Cards are not machinegun conversion devices as a matter of law because as pled in the Indictment, the Auto Key Card is not a 'part' or 'combination of parts.'"  First Motion at 12-13.  Hoover maintains that "[t]o embrace the Government's position that a card with a design on it is a 'part' – or even more absurdly, that a single card is a 'combination of parts' – under § 5845 (b) would be to ignore the plain and ordinary language of the word."  <u>Id.</u> at 14.  This argument, of course, is really a challenge to the sufficiency of the evidence in support of the charge which is improper at this stage of the proceeding.  This is so because the Rules provide no such summary judgment type remedy.  <u>See</u> <u>United States v. Salman</u>, 378 F.3d 1266, 1268 (11th Cir. 2004) ("There is no summary judgment procedure in criminal cases.") (quoting <u>Critzer</u>, 951 F.2d at 307).

Notably, in <u>Salman</u>, the Eleventh Circuit reversed a district court's decision to dismiss an indictment based on a similar challenge to merits of the charges. <u>See</u> 378 F.3d at 1267. In that case, the defendant was charged under a statute that required proof he was "illegally or unlawfully in the United States." <u>Id.</u> The defendant "filed a motion to dismiss the indictment, maintaining that he was not 'illegally or unlawfully' in the United States, as a matter of law, at the time of his arrest." <u>Id.</u> Based on the undisputed facts, the district court agreed and dismissed the indictment. <u>Id.</u> On appeal, the Eleventh Circuit reversed the district court's decision and instructed that "[b]y looking beyond the face of the indictment and ruling on the merits of the charges against [the defendant], the district court in effect granted summary judgment in favor of the defendant." <u>Id.</u> (citations omitted). The court explained that

> the government is entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases because there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure.

<u>Id.</u>; <u>see also</u> <u>United States v. Ershova</u>, 791 F. App'x 158, 162 (11th Cir. 2019). ("Although [the defendant] argues her conduct did not constitute a violation of § 1542 in that her notarization was not a 'statement,' that argument is outside the scope of a motion to dismiss.").

Here, Hoover argues that his conduct did not constitute a violation of § 5861 because his product was not a machinegun "part" or "combination of parts" as a matter of law. See First Motion at 12-14. This argument does not go to the sufficiency of the allegations of the Third Superseding Indictment but rather the sufficiency of the charge. See Ershova, 791 F. App'x at 162. The Court declines, on a motion to dismiss, to determine whether the facts as presented meet the definition of a machinegun part under 26 U.S.C. § 5845(b) as a matter of law. As Salman instructs, the "sufficiency of a criminal indictment is determined from its face. The indictment is sufficient if it charges in the language of the statute." Id. Here, as discussed above, the Third Superseding Indictment does just that. It is sufficient on its face and Hoover's contention otherwise is unavailing.

To the extent Hoover argues that the aiding and abetting charges pursuant to 18 U.S.C. § 2 should be dismissed because the substantive charges are insufficient, his argument fails because the Court finds that the Third Superseding Indictment is sufficient as to the substantive charges.

**b. Vagueness**

The Court turns next to Hoover's constitutional challenges. Hoover contends that as applied to him, 26 U.S.C. §§ 5861(e) and 5871, and 18 U.S.C. § 2, are unconstitutionally vague. First Motion at 15. In support, Hoover seems

to focus his challenge on the definition of "machinegun" found in 26 U.S.C. § 5845(b) as applied to the facts of his case.  See id. at 15-21.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  United States v. Fisher, 289 F.3d 1329, 1333 (11th Cir. 2002) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).  "The first step in a vagueness inquiry is to examine the plain language of the statute.  The touchstone of the inquiry is the meaning of the statute in light of common understanding and practice."  United States v. Wayerski, 624 F.3d 1342, 1347 (11th Cir. 2010) (internal quotations omitted and citation omitted).  However, Hoover does not address any particular language in the statute. Instead, he simply asserts that "[i]n no event would a reasonably intelligent person foresee that the conduct charged in this case – talking about a card with a drawing on it – would be deemed criminal."  First Motion at 15.[10]

---

[10]      Notably, Hoover fails to cite or apply authority regarding the void for vagueness doctrine and instead cites to cases addressing ambiguity.  "[V]agueness and ambiguity are different legal concepts."  See Rafferty v. Denny's, Inc., 13 F.4th 1166, 1199 (11th Cir. 2021) (Luck, C. J., concurring). It is also worth noting that many circuit courts that have addressed vagueness challenges to the language in § 5845(b) have found the statute to be constitutional. See Akins v. United States, 312 F. App'x 197, 200 (11th Cir. 2009) ("Section 5845(b) also is not unconstitutionally vague . . . [u]se of the word 'function' instead of 'pull' to reference the action taken by a gunman to commence the firing process is not so confusing that a man of common intelligence would have to guess at its meaning."); see also United States v. Campbell, 427 F.2d 892, 893 (5th Cir. 1970) (finding the language "any combination of parts designed and intended for use in converting a weapon into a machine gun" is not unconstitutionally vague); see also United States v. Carter, 465 F.3d 658, 664 (6th Cir. 2006) (holding § 5845(b) does not

Absent explanation regarding how the ordinary meaning of the language in the statute failed to put Hoover on notice that his conduct was prohibited, Hoover's statutory vagueness argument fails.

This argument also fails for a second reason. Hoover's challenge to whether the conduct he engaged in constitutes a crime more accurately raises an issue of fact for resolution by the jury – whether the device at issue constitutes a machinegun under § 5845(b). See United States v. Jimenez, 191 F. Supp. 3d 1038, 1040 (N.D. Cal. 2016). In Jimenez, the defendant was similarly charged under statutes that incorporate the definition of machinegun found in § 5845(b). See id. at 1040. As relevant here, the defendant moved to dismiss the charges arguing, amongst other things, that the laws were unconstitutionally vague as applied to him specifically with regard to the meaning of the term "machinegun." Id. at 1045. The court rejected his argument finding that while the defendant framed his attack as a vagueness challenge, what he really raised was a question of fact. Id. at 1045-46. The court found that such issues of fact were not suitable for resolution on a motion to dismiss the indictment. Id. In doing so, the court first noted that it could not

_____

present risk that "ordinary people cannot understand what is prohibited or if it encourages arbitrary or discriminatory enforcement."); United States v. Olofson, 563 F.3d 652, 660 (7th Cir. 2009) ("To the extent Olofson contends that the statutes are fatally vague due to the way "automatically" is used in the incorporated definition of "machinegun" from § 5845(b), we disagree."); see also United States v. McCauley, 601 F.2d 336, 340 (8th Cir. 1979).

conclude on the record before it that the term "machinegun" was vague as applied to the defendant where if he had read § 5845(b) prior to purchasing the receiver he would have been "on notice that his conduct could be proscribed because what he was about to purchase could be a 'part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun.'" Id. at 1046.  Next, the court concluded that "[w]hether the evidence ultimately shows that the lower receiver he bought fits that definition is a question that the Court cannot answer on a motion to dismiss.  That is for the trier of fact to decide."  Id. (internal citation omitted); see also United States v. Was, 684 F. Supp. 350, 354 (D. Conn. 1988), aff'd, 869 F.2d 34 (2d Cir. 1989) ("Whether the auto sears allegedly sold by defendants are in fact 'designed and intended for use in converting a weapon into a machinegun' is, therefore, a question for proof at trial and cannot be decided as a matter of law.").

Like the Jimenez defendant, Hoover also improperly characterizes his argument as a vagueness challenge.  He contends that

> [a]s pled in the Indictment, the Government defined Auto Key
> Cards as "cards machined from stainless steel, into which were
> etched the design for machinegun conversion devices."  Even
> looking at the Government's vague and conclusory pleading
> liberally, the Auto Key Card would require significant
> transformative labor and machining of the card to cause it to fit into
> the rear internal area of the receiver, where the machinegun
> automatic sear would be installed.

First Motion at 20-21.  His argument is not that the statute is vague but that his object does not fall within the statutory definition.  In so arguing, however, he ignores that the Government alleges that Hoover knew that a lightning link was capable of being cut from the design on the Auto Key Cards and placed into an AR-15 style rifle to convert it into a machinegun.  <u>See</u> Third Superseding Indictment at 4-5 ("In the video, titled 'Is this An ATF Trap And How Does It Work,' Hoover described how to order an Auto Key Card and further described how to cut the lightning link from the Auto Key Card and install it into an AR-15 style rifle, thus converting the AR-15 style rifle into a machinegun.").  As with the receiver in <u>Jimenez</u>, whether the Auto Key Cards sold by Ervin constitute a "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun," is a question of fact for the jury, not a question to be resolved by the Court on a motion to dismiss.

Perplexingly, in the First Motion, Hoover discusses <u>Chevron</u> deference at some length, suggesting a fundamental misunderstanding of either the charges at issue here or the applicability of <u>Chevron</u> deference.  <u>See</u> First Motion at 15-20.  As the Eleventh Circuit Court of Appeals has explained, "<u>Chevron</u> deference applies only when 'Congress delegated authority to the agency generally to make rules carrying the force of law, <u>and</u> the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  <u>CSX Corp. v.</u>

United States, 18 F. 4th 672, 685 (11th Cir. 2021). Here, the Government does not charge or allege that the Auto Key Cards at issue fall within the definition of the term firearm – such that they must be registered – based on a regulation promulgated by the ATF or any other government agency. Rather, the government charges that the Auto Key Cards at issue fall within the definition of the term "machinegun" under § 5845(b) and for that reason are firearms that must be registered. Third Superseding Indictment at 2. Section 5845 is a federal statute enacted by Congress, not a regulation promulgated by an agency.[11] Hoover's reliance on the Supreme Court's recent decision in W. Virginia v. Env't Prot. Agency, 142 S. Ct. 2587 (2022), which addressed whether the Environmental Protection Agency's issuance of a new rule that required existing coal fired power plants to "reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources," was within the power granted to it by the Clean Air Act, see 142 S. Ct. at 2599, is similarly misplaced. Because the definition at issue here was not based on a regulation promulgated by a government agency, authority addressing an

---

[11]    Equally concerning is Hoover's argument about Chevron deference in which he cites Gun Owners of America, Inc. v. Garland, 19 F. 4th 890, 901 (6th Cir. 2021) for the proposition that "Chevron does not displace the rule of lenity." First Motion at 18. What the court actually said in Gun Owners was "the rule of lenity does not displace Chevron simply because an agency has interpreted a statute carrying criminal penalties." Counsel is reminded of the duty of candor to the Court and the importance of accurately reciting the holdings of a case in court filings.

agency's promulgation of rules is not relevant to the charges brought against Hoover or the resolution of his Motions to Dismiss.

Even if Hoover raised a true vagueness challenge to § 5845, the Eleventh Circuit has suggested that a vagueness challenge presented in a motion to dismiss is premature.  See United States v. Ferguson, 142 F. Supp. 2d 1350, 1355 (S.D. Fla. 2000) (citing United States v. Baker, 19 F.3d 605 (11th Cir. 1994)) ("The Eleventh Circuit looked to the particular evidence adduced at trial in assessing whether or not § 1957 was constitutionally void due to vagueness as applied.  Thus, Defendant's vagueness challenge should properly be raised through a Rule 29 motion for judgment of acquittal, when the Court can assess whether a reasonable person would have understood that the conduct adduced to prove the offenses was prohibited by § 1957.").  As such the Court declines to address it here.  For all these reasons, the Court finds that Hoover's purported vagueness challenge provides no basis for the dismissal he seeks.

### c. Taxing and Spending Clause

Hoover next argues that § 5845, enacted pursuant to Congress' authority under the Taxing and Spending Clause, "is unconstitutional as applied" to him.  First Motion at 22 (emphasis added).  "An as-applied challenge addresses whether a statute is unconstitutional on the facts of a particular case." United States v. Madison, 337 F. Supp. 3d 1186, 1194–95 (M.D. Fla. 2018) (citing United States v. Vickers, 578 F.2d 1057, 1058 (5th Cir. 1978)).  However,

Hoover's argument that "the government is acting outside the limits of the taxing and spending clause" is not tied to any fact-specific discussion.  See First Motion at 21-22.  Moreover,

> [a]n as-applied challenge to the constitutionality of a statute generally cannot be raised in a pretrial motion to dismiss, since it necessary [sic] involves an examination of the facts of the case.  See United States v. Pope, 613 F.3d 1255, 1260-61 (10th Cir. 2010) (ruling that district court was unable to properly resolve defendant's pretrial motion to dismiss indictment where defendant claimed that his charge under 18 U.S.C. § 922(g)(9) was unconstitutional under Second Amendment because he possessed guns only for defense of self, family, and property).

United States v. Thomas, No. 1:18-CR-141-MLB-AJB, 2021 WL 3674123, at *18 (N.D. Ga. May 17, 2021), report and recommendation adopted, No. 1:18-CR-141-MLB, 2021 WL 2886015 (N.D. Ga. July 9, 2021).

To the extent Hoover appears to argue that the statute is unconstitutional as applied because the machineguns are unlawful and cannot be taxed, see First Motion at 22, this argument is precluded by Eleventh Circuit precedent.  See United States v. Spoerke, 568 F.3d 1236, 1245-46 (11th Cir. 2009) ("A statute does not cease to be a valid tax measure because it deters the activity taxed, because the revenue obtained is negligible, or because the activity is otherwise illegal.").    In Spoerke, the Eleventh Circuit determined that the constitutionality of the NFA as applied to the defendant did not depend on whether he could legally possess the pipe bombs at issue.  Id.  Thus, Hoover's as-applied challenge under the Taxing and Spending Clause is due to be denied.

Insofar as Hoover's argument is actually a facial challenge to the "charged statute," this too fails.  "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself."  See United States v. Frandsen, 212 F.3d 1231, 1235 (11th Cir. 2000) (citing Jacobs v. Florida Bar, 50 F.3d 901, 905–06 (11th Cir. 1995)).   The Eleventh Circuit has determined that "[t]he National Firearms Act is facially constitutional," pursuant to Congress' taxing power.  Spoerke, 568 F.3d at 1245 ("Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons.") (quoting United States v. Ross, 458 F.2d 1144, 1145 (5th Cir. 1972)); see also United States v. Bolatete, 977 F.3d 1022, 1030 (11th Cir. 2020).  Accordingly, the First Motion is due to be denied to the extent Hoover argues the NFA exceeds Congress' Taxing and Spending power.[12]

---

[12]   Hoover's argument that "the government will not accept the payment of the tax required by the charged statute, and yet nonpayment presents serious criminal consequences and permanent deprivations of liberty," see First Motion at 22, appears to present a due process challenge similar to that presented in United States v. Dalton, 960 F.2d 121, 123 (10th Cir. 1992).  In Dalton,

> John Dalton, an attorney, accepted a firearm as a fee from a client, who was a licensed firearms dealer and who had converted the weapon into a machinegun in 1989. Dalton was found guilty of possessing and transferring an unregistered firearm in violation of the National Firearms Act, I.R.C. §§ 5861(d), (e) (NFA). A separate criminal statute prohibits the possession of any machinegun made after that statute's effective date in 1986. 18 U.S.C. § 922(o) (1988). It is undisputed that the government will not permit the registration of machineguns covered by section 922(o), and will not accept the tax which would otherwise be required by the registration requirements of the National Firearms Act. Dalton contends that due process bars his conviction under a statute which punishes his failure to register when that registration is precluded by law.

### d. Overbroad and Underinclusive

In the Second Motion, Hoover additionally argues that "[f]acially and as applied, 26 U.S.C.[ ] § 5845(b) is a content-based restriction that is simultaneously over broad and underinclusive." Second Motion at 3. Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." United States v. Williams, 553 U.S. 285, 292 (2008). On the other hand, "[u]nderinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." Williams-Yulee v. Fla. Bar, 575 U.S. 433, 451 (2015). Both doctrines address statutes that regulate protected speech, implicating the First Amendment. The Court finds that the statute at issue here does not implicate the First Amendment and these doctrines are inapplicable.

The statute which Hoover is charged with violating, conspiring to violate, and aiding and abetting the violation of, 26 U.S.C. § 5861(e), prohibits the

---

Id. at 122. The Tenth Circuit agreed and vacated Dalton's conviction and remanded the case with instruction to dismiss the indictment. However, the Eleventh Circuit has declined to follow the Tenth Circuit's holding in Dalton and recognized that other circuits have rejected the court's reasoning in Dalton as well. See United States v. Rivera, 58 F.3d 600, 602 (11th Cir. 1995) ("Moreover, the Fourth, Fifth, and Seventh Circuits have rejected the reasoning of Dalton, even in cases involving machine guns. All three circuits have upheld convictions under § 5861(d) for possession of machine guns, notwithstanding that 18 U.S.C. § 922(o) makes registration of machine guns impossible.").

transfer of unregistered machineguns. This statute contains no speaker-focused or content-based restrictions on speech. See Otto v. City of Boca Raton, Fla., 981 F.3d 854, 861 (11th Cir. 2020) (regulation of non-expressive conduct rather than speech does "not implicate the First Amendment at all."). Section 5861 prohibits the act of transferring an unregistered firearm and § 5845 defines the term firearm. Included amongst the items which falls within the definition of the term "firearm" is a machinegun which is defined in § 5845(b). The terms of § 5861 stand in stark contrast to Florida's Firearm Owners' Privacy Act, Chapter 2011–112, Laws of Florida (codified at Fla. Stat. §§ 790.338, 456.072, 395.1055, & 381.026) (FOPA) which was found to implicate the First Amendment. See Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1302–03 (11th Cir. 2017). The FOPA contained the following provisions:

> The record-keeping provision, § 790.338(1), states that a doctor or medical professional "may not intentionally enter any disclosed information concerning firearm ownership into [a] patient's medical record" if he or she "knows that such information is not relevant to the patient's medical care or safety, or the safety of others." The inquiry provision, § 790.338(2), states that a doctor or medical professional "should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home" unless he or she in "good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others[.]" The anti-discrimination provision, § 790.338(5), states that a doctor or medical professional "may not discriminate against a patient based solely" on the patient's ownership and possession of a firearm. The anti-harassment provision, § 790.338(6), states that a doctor or medical professional "should refrain from unnecessarily harassing

a patient about firearm ownership during an examination."

<u>Id.</u> at 1302–03.  In evaluating that statute, the Eleventh Circuit held "that the record-keeping, inquiry, and anti-harassment provisions of FOPA constitute speaker-focused and content-based restrictions on speech."  <u>Id.</u> at 1307. Specifically, "[t]he record-keeping and inquiry provisions expressly limit the ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message."  <u>Id.</u>  The court found,

> [t]he anti-harassment provision also limits speech on the basis of its content. Although it is certainly possible to harass through conduct, <u>see</u>, <u>e.g.</u>, Black's Law Dictionary 831 (10th ed. 2014), we think the limiting text of the anti-harassment provision ("during an examination") is more normally read in this medical setting to refer to questions or advice to patients concerning the subject of firearm ownership.

<u>Id.</u>  The relevant statutes here are not "content-based restrictions" as Hoover suggests, and as such, Hoover's arguments that they are overbroad and under inclusive are without merit.

**e.  <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>**

According to Hoover, in light of the Supreme Court's recent decision in <u>Bruen</u>, "the Government has the burden to prove that the regime in question is consistent with the history and tradition of firearms regulation in this country around the founding era."  Second Motion at 8.  In <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, the Supreme Court held that "the Second and Fourteenth

Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. 2111, 2122 (2022). Because the State of New York only issued public-carry licenses when an applicant demonstrated a special need for self-defense, the Supreme Court found "the State's licensing regime violates the Constitution." Id. In doing so, the Supreme Court reiterated the standard for applying the Second Amendment stating:

> [w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 2129-30. As the Government points out, the Supreme Court's holding in Bruen did not overturn D.C. v. Heller, in which the Court recognized the importance of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. 570, 627 (2008) (citations omitted). The Heller Court struck down a law prohibiting handgun possession, but in doing so noted that the Second Amendment "only protects the right to own certain weapons, and it 'does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'" United States v. Henry, 688 F. 3d 637, 639-40 (9th Cir. 2012) (quoting Heller, 554 U.S. at 625). The Court "did not specify the types of weapons that qualify as 'dangerous and unusual,' but the Court suggested that it would be 'startling' for the Second Amendment to protect

33

machineguns." Id. at 640 (citing Heller, 554 U.S. at 624). Notably, "[s]ince Heller was decided, every circuit court to address the issue has held that there is no Second Amendment right to possess a machine gun." Id. (citing United States v. Allen, 630 F.3d 762, 766 (8th Cir. 2011); United States v. Marzzarella, 614 F.3d 85, 94–95 (3d Cir. 2010); Hamblen v. United States, 591 F.3d 471, 472, 474 (6th Cir. 2009); United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008), cert. denied, 555 U.S. 1174, 129 S.Ct. 1369, 173 L.Ed.2d 591 (2009)); see also United States v. Zaleski, 489 F. App'x 474, 475 (2d Cir. 2012) (relying on Heller to find that "the Second Amendment does not protect [the defendant's personal possession of machine guns."); see also Hollis v. Lynch, 827 F.3d 436, 448-41 (5th Cir. 2016) ("Machine guns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection . . ."). Hoover provides no basis for concluding that the Supreme Court's decision in Bruen would undermine this line of authority. Thus, to the extent Hoover contends "nothing in the applicable history and tradition of the United States supports the categorical ban of machineguns," see Second Motion at 9, his argument is unavailing.

In sum, the Court finds that the Government's allegations in the Third Superseding Indictment present the essential elements of the charged offenses, notify Hoover of the charges to be defended against, and enable him to rely upon a judgment under the Third Superseding Indictment as a bar against double

jeopardy.  See Steele, 178 F.3d at 1233-34.  To the extent Hoover presents a vagueness challenge, his argument raises factual issues to be resolved by the jury.  The Court further finds Hoover's Taxing and Spending Clause argument to be foreclosed by Eleventh Circuit precedent and his First Amendment challenges to be misplaced.  Finally, Hoover's contention that the Supreme Court's holding in Bruen suggests that the statutes at issue violate the Second Amendment is unsupported by the relevant authority.  Accordingly, the Motions are due to be denied.

In light of the foregoing, it is

**ORDERED:**

Defendant Matthew Raymond Hoover's Motion to Dismiss (Doc. 132) and Motion to Dismiss for First and Second Amendment Violations & To Declare Unconstitutional the National Firearms Act of 1934 (Doc. 133) are **DENIED.**

**DONE AND ORDERED** in Jacksonville, Florida, this 18th day of October, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc28

Copies to:
Counsel of Record

Doc. 204

FOURTH SUPERSEDING INDICTMENT

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2023 MAR -6  AM 10: 30

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

UNITED STATES OF AMERICA

v.

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

CASE NO.  3:21-cr-22(S4)-MMH-MCR
18 U.S.C. § 371
26 U.S.C. § 5861(e)
31 U.S.C. § 5324(a)(1)
31 U.S.C. § 5324(a)(3)
26 U.S.C. § 5861(d)

## INDICTMENT

The Grand Jury charges:

## COUNT ONE
(Conspiracy)

### A.  Introduction

At all times material to this Indictment:

1.    KRISTOPHER JUSTINBOYER ERVIN was a resident of Clay

County, Florida, within the Middle District of Florida.  Free Speech Industries LLC

was a Florida Limited Liability Company incorporated by ERVIN on or about

January 26, 2021.  ERVIN operated the web domains www.autokeycard.com and

www.autokeycards.com on which he advertised for sale products that he referred to

as Auto Key Cards.

2.    MATTHEW RAYMOND HOOVER was a resident of Coloma,

Wisconsin, and operated a retail store in Coloma called Coloma Resale.  Coloma

Resale was a federally licensed firearms dealer and held a special occupation tax

license.  HOOVER also operated a content channel on YouTube called CRS
Firearms.

3.      Auto sears were a category of machinegun conversion devices that may
be installed into an otherwise semi-automatic AR-15 type rifle and function to
convert the AR-15 type rifle to fire more than one shot by a single function of the
trigger.  A lightning link was a particular design of auto sear.

4.      The Auto Key Cards designed and sold by ERVIN consisted of cards
machined from stainless steel, into which were etched the design for machinegun
conversion devices known as lightning links, which constituted machineguns as
defined in 26 U.S.C. § 5845(a) and 5845(b) in that they are a combination of parts
designed and intended for use in converting a weapon into a machinegun.

## B.  The Conspiracy

5.      Beginning in or about October 2020, and continuing through at least
July 2021, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly and willfully combine, conspire, confederate, and agree with each
other and others, both known and unknown to the grand jury, to commit offenses
against the United States, specifically, to transfer firearms, that is, machinegun
conversion devices each consisting of a combination of parts designed and intended
for use in converting a weapon into a machinegun, constituting machineguns as
defined in 26 U.S.C. § 5845(a) and 5845(b), which firearms were not then registered

2

in the National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841, in violation of 26 U.S.C. §§ 5861(e) & 5871.

### C.  Manner and Means

6.     The manner and means by which the conspirators carried out the

conspiracy included, among other things:

a.     It was part of the conspiracy that ERVIN would and did operate

the websites www.autokeycard.com and www.autokeycards.com, which were e-

commerce portals on which ERVIN advertised Auto Key Cards for sale.

b.     It was further part of the conspiracy that ERVIN, and others

assisting him with his Auto Key Cards business, would and did receive orders for

Auto Key Cards directly from the websites www.autokeycard.com and

www.autokeycards.com as well as through a mail-in order form that was available

on those websites.

c.     It was further part of the conspiracy that ERVIN, and others

assisting him with his Auto Key Cards business, would and did fulfill orders for Auto

Key Cards by shipping those items via the U.S. Mail from the Middle District of

Florida, resulting in the transfer of Auto Key Cards to ERVIN's customers.

d.     It was further part of the conspiracy that HOOVER would and

did create videos posted to the CRS Firearms YouTube channel in which HOOVER

promoted the sale of Auto Key Cards.

     e.     It was further part of the conspiracy that sales of ERVIN's Auto Key Cards would and did increase substantially as a result of HOOVER's promotion of the sale of Auto Key Cards.

     f.     It was further part of the conspiracy that ERVIN would and did compensate HOOVER for his promotion and sponsorship of Auto Key Cards on HOOVER's CRS Firearms YouTube channel by shipping U.S. currency and other items of value to HOOVER and HOOVER's designees.

     g.     It was further part of the conspiracy that the conspirators would and did engage in acts and make statements to promote and achieve the objects of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof.

### D. Overt Acts

7.     In furtherance of the conspiracy and to effect the objects thereof, the defendants and other conspirators committed the following overt acts, among others, in the Middle District of Florida and elsewhere:

     a.     Beginning in or about October 2020, ERVIN retained a machine shop in Orange Park, Florida, to manufacture approximately 300 prototype Auto Key Cards.

     b.     On or about November 4, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "Is this An ATF Trap And How Does It Work," HOOVER described how to order an Auto Key Card and further described

4

how to cut the lightning link from the Auto Key Card and install
it into an AR-15 style rifle, thus converting the AR-15 style rifle
into a machinegun.

c.    On or about November 11, 2020, a video created by HOOVER
was posted to the YouTube channel CRS Firearms.  In the video,
titled "The Parts The ATF Wishes Never Existed," HOOVER
discussed various methods for manufacturing a machinegun or
silencer, including the Auto Key Card, which HOOVER
described as the sponsor of his video.

d.    On or about November 30, 2020, ERVIN would and did conduct
a withdrawal in the amount of $5000 in U.S. currency, consisting
of proceeds of sales of Auto Key Cards, at Community First
Credit Union in Orange Park, Florida, within the Middle District
of Florida.

e.    On or about November 30, 2020, ERVIN ordered approximately
1400 Auto Key Cards from the Orange Park machine shop, for
which he paid approximately $3230 using U.S. currency.

f.    On or about November 30, 2020, ERVIN purchased a Louis
Vuitton brand handbag and keychain using approximately $1958
in U.S. currency, which he provided to HOOVER and
HOOVER's designee as compensation for HOOVER's

5

promotion of Auto Key Cards on the CRS Firearms YouTube channel.

g.   On or about December 4, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "How to Make Body Armor Fail," HOOVER described autokeycards.com as the sponsor of his video and promoted sales of Auto Key Cards.

h.   On or about December 9, 2020, ERVIN purchased approximately $841 of video production equipment, which ERVIN had shipped to the residence of HOOVER and E.I. as compensation for HOOVER's promotion of Auto Key Cards on the CRS Firearms YouTube channel.

i.   On or about December 15, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "How To Buy A Truly Untraceable Firearm," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

j.   On or about December 28, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "This Is A Strange Turn Of Events," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

6

k.    On or about December 30, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "The Real Difference Between The Two Platforms," HOOVER described autokeycards.com as the sponsor of his video and promoted sales of Auto Key Cards.

l.    On or about January 8, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "This Makes an illegal Machine gun," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

m.    On or about January 12, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "The Great Purge," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

n.    On or about January 15, 2021, ERVIN ordered approximately 1200 Auto Key Cards from the Orange Park machine shop, for which he paid approximately $3600.

o.    In or about a date in February 2021, ERVIN ordered approximately 2400 Auto Key Cards from the Orange Park machine shop, for which he made a down payment of approximately $5000.

7

p.     On or about February 6, 2021, ERVIN withdrew $5000, representing sales proceeds from Auto Key Cards, at Community First Credit Union in Orange Park, Florida, within the Middle District of Florida.

q.     On or about February 7, 2021, ERVIN shipped a package via UPS Next Day Air to the residence of HOOVER, which package contained U.S. currency and other items of value to compensate HOOVER for his promotion of Auto Key Cards on the CRS Firearms YouTube channel.

r.     On or about February 16, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Important Development," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

s.     On or about February 17, 2021, ERVIN shipped a package via FedEx Priority Overnight to the residence of HOOVER, which package contained U.S. currency and other items of value to compensate HOOVER for his promotion of Auto Key Cards on the CRS Firearms YouTube channel.

t.     On or about February 18, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Leveling The Scope To The Rifle Is A Waste Of Time,"

HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

u.   On or about February 23, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "Unexpected Ammunition Problems," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

v.   On or about February 25, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "ATF Reclassification On H&K Clones," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

w.   On or about the dates specified in the chart below, each of which constitutes a separate overt act, ERVIN, and others assisting him with his Auto Key Cards business, fulfilled orders for Auto Key Cards by shipping and transferring Auto Key Cards from the Middle District of Florida to purchasers via the U.S. Mail:

| OVERT ACT | DATE | INITIALS OF PURCHASER |
|---|---|---|
| w1 | November 14, 2020 | D.S. |
| w2 | November 30, 2020 | J.M. |
| w3 | December 12, 2020 | R.D. |
| w4 | December 16, 2020 | S.D. |
| w5 | December 23, 2020 | J.A. |
| w6 | January 17, 2021 | R.W. |

| OVERT ACT | DATE | INITIALS OF PURCHASER |
|---|---|---|
| w7 | February 1, 2021 | A.O. |

x.   On or about March 30, 2021, ERVIN, HOOVER, and E.I. participated in a phone call in which they discussed plans to continue selling Auto Key Cards and create additional videos promoting ERVIN and his Auto Key Cards business.

y.   Beginning in late March 2021, and continuing through at least July 2021, HOOVER and E.I. operated a GoFundMe fundraiser to benefit ERVIN with the intention that funds raised would be used, in part, to obtain the release of ERVIN so that ERVIN and HOOVER could continue to pursue their conspiratorial goals.

All in violation of 18 U.S.C. § 371.

## COUNT TWO

On or about November 14, 2020, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one or more machinegun conversion devices each consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun, constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S. Mail to a person with the initials D.S., which firearms were not then registered in the

10

National Firearms Registration and Transfer Record as required by 26 U.S.C.
§ 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT THREE

On or about November 30, 2020, in the Middle District of Florida, and
elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one
or more machinegun conversion devices each consisting of a combination of parts
designed and intended for use in converting a weapon into a machinegun,
constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.
Mail to a person with the initials J.M., which firearms were not then registered in the
National Firearms Registration and Transfer Record as required by 26 U.S.C.
§ 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT FOUR

On or about December 12, 2020, in the Middle District of Florida, and
elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one
or more machinegun conversion devices each consisting of a combination of parts

11

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials R.D., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

     In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

### COUNT FIVE

     On or about December 16, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials S.D., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

     In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

### COUNT SIX

     On or about December 23, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials J.A., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C. §

5841.

     In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT SEVEN

     On or about January 17, 2021, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials R.W., which firearms were not then registered in

the National Firearms Registration and Transfer Record as required by 26 U.S.C. §

5841.

     In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

13

## COUNT EIGHT

On or about February 1, 2021, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one or more machinegun conversion devices each consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun, constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S. Mail to a person with the initials A.O., which firearms were not then registered in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT NINE

On the dates listed below, in the Middle District of Florida, the defendant,

KRISTOPHER JUSTINBOYER ERVIN,

knowingly and for the purpose of evading the reporting requirements of 31 U.S.C. § 5313, and the regulations promulgated pursuant thereunder with respect to currency transactions in excess of $10,000, structured, and attempted to structure, the following transactions, each being a cash withdrawal at a federally-insured financial institution:

14

| DATE | AMOUNT | CREDIT UNION |
|---|---|---|
| December 28, 2020 | $9000 | Community First (Orange Park) |
| December 28, 2020 | $5000 | Community First (Fleming Island) |
| December 29, 2020 | $9000 | Community First (Orange Park) |
| December 30, 2020 | $9000 | Community First (Orange Park) |
| December 31, 2020 | $9000 | Community First (Orange Park) |
| January 2, 2021 | $9000 | Community First (Orange Park) |
| January 5, 2021 | $9000 | Community First (Orange Park) |
| January 6, 2021 | $9000 | Community First (Orange Park) |

In violation of 31 U.S.C. § 5324(a)(3) and (d)(1).

## COUNT TEN

On or about February 22, 2021, in the Middle District of Florida, the

defendant,

### KRISTOPHER JUSTINBOYER ERVIN,

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

## COUNT ELEVEN

On or about February 24, 2021, in the Middle District of Florida, the

defendant,

### KRISTOPHER JUSTINBOYER ERVIN,

15

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

## COUNT TWELVE

On or about March 2, 2021, in the Middle District of Florida, the defendant,

### KRISTOPHER JUSTINBOYER ERVIN,

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

## FORFEITURE

1.      The allegations contained in Counts One through Eight and Counts

Ten through Twelve, as well as Count Nine are incorporated by reference for the

purpose of alleging forfeiture pursuant to 26 U.S.C. § 5872, 26 U.S.C. § 7302, 28

U.S.C. § 2461(c), and 49 U.S.C. § 80303, and 31 U.S.C. § 5317(c)(1)(A),
respectively.

2.      Upon conviction of a conspiracy to violate 26 U.S.C. § 5861(e), in
violation of 18 U.S.C. § 371, the defendants, KRISTOPHER JUSTINBOYER
ERVIN and MATTHEW RAYMOND HOOVER, shall forfeit to the United States,
pursuant to 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c), any firearms involved in the
violation, pursuant to 26 U.S.C. § 7302, any property intended for use or that has
been used in committing the violation, and, pursuant to 49 U.S.C. § 80303 and 28
U.S.C. § 2461(c), any aircraft, vehicle, or vessel used to facilitate the transportation,
concealment, receipt, possession, purchase, sale, exchange, or giving away of such
firearm.

3.      Upon conviction of a violation 26 U.S.C. § 5861, the defendants,
KRISTOPHER JUSTINBOYER ERVIN and MATTHEW RAYMOND
HOOVER, shall forfeit to the United States, pursuant to 26 U.S.C. § 5872 and 28
U.S.C. § 2461(c), any firearms involved in the violation, pursuant to 26 U.S.C.
§ 7302, any property intended for use or that has been used in committing the
violation, and, pursuant to 49 U.S.C. § 80303 and 28 U.S.C. § 2461(c), any aircraft,
vehicle, or vessel used to facilitate the transportation, concealment, receipt,
possession, purchase, sale, exchange, or giving away of such firearm.

4.      Upon conviction of a violation of 31 U.S.C. § 5324, the defendant,
KRISTOPHER JUSTINBOYER ERVIN, shall forfeit to the United States, pursuant

to 31 U.S.C. § 5317(c)(1)(A), all property, real or personal, involved in the offense and any property traceable to such property.

5.    Upon conviction of a violation of 26 U.S.C. § 5861, the defendant, KRISTOPHER JUSTINBOYER ERVIN, shall forfeit to the United States, pursuant to 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c), any firearms involved in the violation, and, pursuant to 49 U.S.C. § 80303 and 28 U.S.C. § 2461(c), any aircraft, vehicle, or vessel used to facilitate the transportation, concealment, receipt, possession, purchase, sale, exchange, or giving away of such firearm.

6.    The property to be forfeited includes, but is not limited to approximately $68,000.00, representing the amount of funds involved in the structuring offense charged in Count Nine.

7.    If any of the property described above, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c),

18

including, but not limited to the $3,700 seized from KRISTOPHER JUSTINBOYER

ERVIN on March 2, 2021.

A TRUE BILL,

Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
LAURA COFER TAYLOR
Assistant United States Attorney

By: _____
SARA SWEENEY
First Assistant United States Attorney

19

FORM OBD-34
3/6/23 Revised

No.

USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 121 of 242

### UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

#### THE UNITED STATES OF AMERICA

vs.

#### KRISTOPHER JUSTINBOYER ERVIN
#### MATTHEW RAYMOND HOOVER

#### INDICTMENT

Violations: 18 U.S.C. § 371, 26 U.S.C. §§ 5861(e) & 5871, 2, 31 U.S.C. § 5324(a)(3) & (d)(1), & 26 U.S.C.§ 5861(d)

A true bill,

███████████████████

Foreperson

Filed in open court this __6th__ day

of March, 2023.

_Maee S. Reudll_

Clerk

Bail  $_____

Doc. 254

COURT'S FINAL JURY INSTRUCTIONS

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                      Case No.  3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER
_____

## **JURY INSTRUCTION NO. 1**

Members of the Jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case.  After I have completed these instructions, you will hear the closing arguments of the attorneys and then you will go to the jury room and begin your discussions – what we call your deliberations.

You must decide whether the Government has proved the specific facts necessary to find each Defendant guilty beyond a reasonable doubt.

## **JURY INSTRUCTION NO. 2**

Your decision must be based only on the evidence presented during the trial.  You must not be influenced in any way by either sympathy for or prejudice against any Defendant or the Government.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole.  You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against a Defendant is not evidence of guilt.  The law presumes every Defendant is innocent.  A Defendant does not have to prove his innocence or produce any evidence at all.  A Defendant does not have to testify, and if either Defendant chose not to testify, you cannot consider that in any way while making your decision.  The Government must prove guilt beyond a reasonable doubt.  If it fails to do so as to any Defendant on any charge, you must find that Defendant not guilty on that charge.

## JURY INSTRUCTION NO. 3

The Government's burden of proof is heavy, but it does not have to prove a Defendant's guilt beyond all <u>possible</u> doubt. The Government's proof only has to exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you have carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs. If you are convinced that a Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

## JURY INSTRUCTION NO. 4

As I said before, you must consider only the evidence that I have admitted in the case.  Evidence includes the testimony of witnesses and the exhibits admitted.  But, anything the lawyers say is not evidence and is not binding on you.

You should not assume from anything I have said that I have any opinion about any factual issue in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions.  You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.  There is no legal

difference in the weight you may give to either direct or circumstantial evidence.

## JURY INSTRUCTION NO. 5

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome of the case?

- Did the witness seem to have a good memory?

- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

- Did the witness appear to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from other testimony or other evidence?

## **JURY INSTRUCTION NO. 6**

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact.  And ask whether there was evidence that at some other time a witness said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it.  People naturally tend to forget some things or remember them inaccurately.  So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

## JURY INSTRUCTION NO. 7

You must consider the testimony of some witnesses with more caution than others.

For example, a witness who has been promised immunity from prosecution or a witness who hopes to gain more favorable treatment in his own case may have a reason to make a false statement in order to strike a good bargain with the Government.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

## JURY INSTRUCTION NO. 8

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

## JURY INSTRUCTION NO. 9

The Government has presented agents of the United States who have testified as to the meaning of certain terms, laws, and regulations pertaining to firearms. In addition, witnesses may have referred to items as "firearms" or "machinegun conversion devices." As with any evidence, you may give this testimony as much or as little weight and credit as you determine it deserves.

Remember you must follow my instructions on the law and decide for yourselves based on the evidence in this case and my instructions whether the Auto Key Card is a machinegun subject to firearm laws and regulations.

## JURY INSTRUCTION NO. 10

You will recall that a number of exhibits were identified as typewritten transcripts of the oral conversations heard on audio and video recordings that were received in evidence. The transcripts also purport to identify the speakers engaged in the conversations.

I admitted the transcripts for the limited and secondary purpose of helping you follow the content of the conversations as you listen to the recordings, and also to help you identify the speakers.

But you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based on your own evaluation of any testimony you heard about the preparation of the transcripts, and from your own examination of the transcripts in relation to hearing and viewing the recordings themselves as the primary evidence of their own contents.

If you determine that any transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

## JURY INSTRUCTION NO. 11

You have been permitted to take notes during the trial.  Most of you – perhaps all of you – have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence.  And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

## JURY INSTRUCTION NO. 12

The indictment in this case charges the Defendants with committing a number of crimes which are set forth separately in what we refer to as "counts." Each count has a number. You will be given a copy of the indictment to refer to during your deliberations. I remind you that the indictment is <u>not</u> evidence of anything. It is simply the formal document that sets forth the charges.

In Count One of the indictment, the Defendants are not charged with committing a substantive offense. Instead, they are charged with conspiring to commit a substantive offense. Specifically, the Defendants are charged with knowingly and willfully conspiring to transfer unregistered machinegun conversion devices.

In the remaining Counts of the indictment, each Defendant is charged with committing certain "substantive offenses." Specifically, in Counts Two through Eight, Mr. Ervin and Mr. Hoover are each charged with knowingly transferring, and aiding and abetting the transfer of, unregistered machinegun conversion devices. In Count Nine, Mr. Ervin is charged with structuring cash withdrawals for the purpose of evading currency-transaction reporting requirements. And in Counts Ten, Eleven,

and Twelve, Mr. Ervin is charged with possessing unregistered machinegun conversion devices on three separate dates. I will explain the law governing those substantive offenses in a moment.

But first note that the Defendants are not charged in Count One with committing a substantive offense – they are charged with <u>conspiring</u> to commit a particular offense. I will now give you specific instructions on the conspiracy charge.

## JURY INSTRUCTION NO. 13

As I previously stated, Count One charges the Defendants with conspiring to transfer machinegun conversion devices that were not registered in the National Firearms Registration and Transfer Record. It is a separate Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out.

A "conspiracy" is an agreement by two or more people to commit an unlawful act. In other words, it is a kind of "partnership" for criminal purposes. Every member of a conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement.

The Government does not have to prove that the members planned together all the details of the plan or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

The heart of a conspiracy is the making of the unlawful plan itself followed by the commission of any overt act. The Government does not have to prove that the conspirators succeeded in carrying out the plan.

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt as to him:

(1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

(2) the Defendant knew the unlawful purpose of the plan and willfully joined in it;

(3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

(4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An "overt act" is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If a Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in

the plan on at least one occasion, that is sufficient for you to find that Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests does not establish proof of a conspiracy. A person who does not know about a conspiracy but happens to act in a way that advances some purpose of one does not automatically become a conspirator.

## JURY INSTRUCTION NO. 14

Counts Two through Eight charge the Defendants with transferring, and aiding and abetting the transfer of, machinegun conversion devices that were not registered in the National Firearms Registration and Transfer Record. It is a Federal crime for anyone to transfer certain kinds of firearms that are not properly registered to him in the National Firearms Registration and Transfer Record.

A "firearm" includes a machinegun. Under the law, a machinegun includes a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. A machinegun must be properly registered in the National Firearms Registration and Transfer Record.

To "transfer" a firearm means to deliver it to someone else.

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly transferred, or aided and abetted the transfer of, a firearm, specifically, a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger;

(2) the firearm was not registered in the National Firearms Registration and Transfer Record; and

(3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration under the National Firearms Registration and Transfer Record.

The Government does not have to prove that the Defendant knew the item described in the indictment was a firearm that must be legally registered or that any purchaser successfully converted a firearm into a machinegun. The Government only has to prove beyond a reasonable doubt that the Defendant knew about the specific characteristics or features of the firearm that made it subject to registration, namely, that it was a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

## JURY INSTRUCTION NO. 15

During a conspiracy, if a conspirator commits a crime to advance the conspiracy toward its goals, then in some cases a coconspirator may be guilty of the crime even though the coconspirator did not participate directly in the crime.

So regarding Counts Two through Eight, if you have first found the Defendants guilty of the conspiracy charged in Count One, you may also find a Defendant guilty of any of the crimes charged in Counts Two through Eight even though the Defendant did not personally participate in the crime.  To do so, you must find beyond a reasonable doubt that:

(1) during the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose;

(2) the Defendant was a knowing and willful member of the conspiracy when the crime was committed; and

(3) it was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy.

## JURY INSTRUCTION NO. 16

You will note that, in Counts Two through Eight, the Defendants are also charged with aiding and abetting the commission of the alleged crimes. It is possible to prove a Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person, or "agent." Or it may be done by acting with or under the direction of others.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime.

A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person. A Defendant is also responsible if he willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

## JURY INSTRUCTION NO. 17

Count Nine charges Mr. Ervin with structuring cash withdrawals for the purpose of evading currency-transaction reporting requirements. It is a Federal crime under certain circumstances for anyone to knowingly evade a currency-transaction reporting requirement.

Domestic financial institutions and banks (with specific exceptions) must file currency-transaction reports with the Government. They must list all deposits, withdrawals, transfers, or payments involving more than $10,000 in cash or currency.

Mr. Ervin can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly structured or helped to structure a currency transaction;

(2) the purpose of the structured transaction was to evade the transaction-reporting requirements; and

(3) the structured transaction involved one or more domestic financial institutions.

To "structure" a transaction means to deposit, withdraw, or otherwise participate in transferring a total of more than $10,000 in cash or currency using a financial institution or bank by intentionally setting up or arranging a series of separate transactions, each one involving

$10,000 or less, in order to evade the currency-reporting requirement that would have applied if fewer transactions had been made.

## JURY INSTRUCTION NO. 18

Counts Ten, Eleven, and Twelve charge Defendant Ervin with possessing unregistered machinegun conversion devices. It is a Federal crime for anyone to possess certain kinds of firearms that are not properly registered to him in the National Firearms Registration and Transfer Record.

A "firearm" includes a machinegun. Under the law, a machinegun includes a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. A machinegun must be properly registered in the National Firearms Registration and Transfer Record.

Defendant Ervin can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly possessed a firearm, specifically, a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger;

(2) the firearm was not registered to the Defendant in the National Firearms Registration and Transfer Record; and

(3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration under the National Firearms Registration and Transfer Record.

The Government does not have to prove that the Defendant knew the item described in the indictment was a firearm that must be legally registered or that any purchaser successfully converted a firearm into a machinegun. The Government only has to prove beyond a reasonable doubt that the Defendant knew about the specific characteristics or features of the firearm that made it subject to registration, namely, that it was a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

## JURY INSTRUCTION NO. 19

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

"Actual possession" of a thing occurs if a person knowingly has direct physical control of it.

"Constructive possession" of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it later.

"Sole possession" of a thing occurs if a person is the only one to possess it.

"Joint possession" of a thing occurs if two or more people share possession of it.

The term "possession" includes actual, constructive, sole, and joint possession.

## JURY INSTRUCTION NO. 20

You will see that the indictment charges that a crime was committed "on or about" a certain date.  The Government does not have to prove that the crime occurred on an exact date.  The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law.  While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

## **JURY INSTRUCTION NO. 21**

Where a statute specifies multiple alternative ways in which an offense may be committed, the <u>indictment</u> may allege the multiple ways in the conjunctive, that is, by using the word "and."  If only <u>one</u> of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously as to that alternative.

## JURY INSTRUCTION NO. 22

Each count of the indictment charges a separate crime against one or both of the Defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each Defendant separately and individually. If you find a Defendant guilty of one crime, that must not affect your verdict for any other crime or any other Defendant.

I caution you that each Defendant is on trial <u>only</u> for the specific crimes charged in the indictment. You are here to determine from the evidence in this case whether each Defendant is guilty or not guilty of each of those specific crimes.

You must never consider punishment in any way to decide whether a Defendant is guilty. If you find a Defendant guilty, the punishment is for the Judge alone to decide later.

## JURY INSTRUCTION NO. 23

Your verdict, whether guilty or not guilty, must be unanimous – in other words, you must all agree. Your deliberations are secret, and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

## JURY INSTRUCTION NO. 24

When you get to the jury room, choose one of your members to act as foreperson.  The foreperson will direct your deliberations and will speak for you in court.

A verdict form has been prepared for your convenience for each Defendant.

[Explain verdict]

Take the verdict forms with you to the jury room.  When you have all agreed on the verdict for each Defendant, your foreperson must fill in the verdict forms, sign them, date them, and carry them.  Then you will return the verdict forms to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer.  The court security officer will bring it to me and I will respond as promptly as possible – either in writing or by talking to you in the courtroom.  But I caution you not to tell me how many jurors have voted one way or the other in any note you may send me.

Doc. 259-2

TRANSCRIPT OF YOUTUBE VIDEO

Case 3:21-cr-00022-MMH-MCR   Document 259-2   Filed 04/21/23   Page 4 of 9 PageID 2201
USCA11 Case: 23-13062   Document: 27-1   Date Filed: 01/21/2024   Page: 156 of 242

4

1   see a huge spike in price because a bunch of people will go to my other

2   video, learn how to do it, and make their own.

3   Go rent a machine gun. That's not a bad option if you live by a place

4   that rents it. So we're talking about living somewhere probably by

5   Texas, or Nevada, something like that. I was kind of skimming over the

6   prices to get a feel for it. If you live there, there's no travel expense.

7   Nothing like that. You can go in, and you can get two mags for about

8   $65. That's not too bad.

9   Now, if you live like say where I do, and you've got to fly there, you'd be

10   into it for probably like 1,500 bucks for two magazines. So that kind of

11   sucks, but it's a great option if you live by a machine gun rental place.

12   Eventually, I'm getting the property next to this, and I'm gonna have a

13   machine gun rental place right there, but that – that's a couple of years

14   down the road.

15   All right, number 6.  Zero [donkey noise] given. This would apply to a

16   prohibited person because a prohibited person – when they say you

17   can't have gun rights anymore, that doesn't mean you can't have guns.

18   What that means is your chains have been broken. You can do

19   whatever the hell you want with a gun. You can drill your third hole. Do

20   whatever you want 'cause it doesn't matter. If you get caught with the

21   gun anyway, you're already screwed. So why not do whatever you want

22   with it. You make a machine gun. The next person that this would

23   classify to is any single male under the age of 30.

24   So these are an excellent conversation piece. They're cool. It's just –

25   it's a novelty item. It's awesome to have. This particular one is actually

1       a beer opener that has the designs on it. And to see – especially this

2       one where they didn't cut those two little parts – an ATF agent walk into

3       a courtroom and argue that this piece of metal with a drawing on it is a

4       machine gun. Yes, they probably will do that at some point in time. It's

5       just ridiculous. But these are so incredibly affordable, it doesn't really

6       matter. Like I said, I bought a pile of them for stocking stuffers.

7       Now when I purchased them, what I did is I called them. I had them fax

8       – fax an order form to my library, got a money order, put it in there, and

9       I sent it out. But now I was just checking out their website before I made

10      this video, and it does look like you can just print off a mail-in order

11      form. So then, if you're still super paranoid that the ATF are gonna

12      come shoot your dog, well, it don't matter. You print off this order form,

13      put in a money order. None of that's traceable. Send it to the company.

14      You have the address that ships to as one of your anti-gun relatives.

15      You inform them, "Hey, I ordered a package from –" what's this

16      company called again? "Auto Key Card, uh, they're basically – well, it

17      doesn't really matter what it is. The point is, somehow your address

18      accidentally got on my order form. A package is gonna be showing up

19      from Auto Key Card. When it does, let me know so I can come pick it

20      up. That'd be awesome. I'll give you like 20 bucks or something." So

21      that it's not related to you at all. And they make different models. So

22      again, you can just get the one with the drawing on it or the one that's

23      cut out.

24      So the options if you're going under the number six qualification,

25      depending on what bolt carrier you have, because there's several

Doc. 259-12

TRANSCRIPT OF YOUTUBE VIDEO

1

1    TRANSCRIPT OF "The Real Difference Between The Two Platforms"
2    Posted to CRS Firearms YouTube Channel on December 30, 2020

3    (The following may contain unintelligible or misunderstood words due to the
4    recording quality.)
5
6        MH = MATTHEW RAYMOND HOOVER

7    MH:   All right.  So I just dropped my last video talking about this particular

8          project right here, the Prophet.  And one of the heated comments was

9          that cannot be a sniper rifle, and there's some truth behind this.  And I

10         should probably start out this video by saying, one, I've never been a

11         sniper.  Two, I'm not trained to be a sniper.  And God willing, three, I will

12         never be a sniper.

13         But the whole concept behind this project is to make a real sniper rifle.

14         And they were arguing, no, that would be called a precision rifle unless

15         it was actually used as a sniper rifle, and that's not true.  For example, if

16         I built a racecar that never set foot on a racetrack, would it still be a

17         racecar?  It can't be drove on the street.  It can only be drove on the

18         racetrack.  You're gonna have to be the judge of that.  If I buy a hunting

19         knife that has never cleaned an animal, is it truly a hunting knife or is it

20         just a knife?

21         And the sponsor for today's video is autokeycards.com.  They are a

22         talking piece.  That's it, just a little design on a piece of metal.  This way

23         you could show it to your friends and be like, "Hey, at one point in time,

24         it used to be legal for me to cut this out."  That's how far we went down

25         the freedom hill.  And if you're worried about getting on some sort of

26         FBI watch list, like, "Oh my God, they're gonna come and kick in my

27         door," you can also order the AutoKeyCards through discreet mailing

36329

Doc. 259-172

GOVERNMENT EXHIBIT

Tools used for cutting Lightning Link



767060-21-0017  2021-207-CJT

Doc. 259-173

GOVERNMENT EXHIBIT



Exhibit 3



First device assembled

Cut through the side

767060-20-0017  2021-332-CIT

Cutting of the second device



Second device installed on NFC rifle



767060-20-0017  2021-332-CIT

Doc. 274

MOTION FOR JUDGMENT OF ACQUITTAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE №: 3:21-cr-00022-MMH-MCR

UNITED STATES OF AMERICA,

v.

MATTHEW RAYMOND HOOVER.

_____/

**MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant Matthew Raymond Hoover ("Defendant") respectfully submits this Post-Verdict Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. In support of this Motion, Defendant hereby states:

## I.    INTRODUCTION

Defendant requests this honorable Court to grant a judgment of acquittal on all charges against him on the grounds that the evidence presented by the prosecution is insufficient to support a conviction. Pursuant to Rule 29, a judgment of acquittal is warranted if the evidence, when viewed in the light most favorable to the prosecution, is insufficient for any rational trier of fact to find guilt beyond a reasonable doubt.

As has been the theme for much of the motion practice in the instant matter, the question of whether the Auto Key Card can be considered a

1

"combination of parts" lies near the core.[1] That question is underlined with concerns about whether an item all evidence demonstrated was a homogenous piece of steel that had to be "materially altered" can be considered a "combination of parts" beyond a reasonable doubt, further whether requisite scienter could have been proven in that instance.

It is further essential that "we are mindful that the Supreme Court recently cautioned against federal criminal statutes being read too expansively." *United States v. David McLean*, No. 14-10061 (11th Cir. Sept. 24, 2015) (citing *Yates v. United States*, 135 S. Ct. 1074 (2015) (concluding the term "tangible object" within the Sarbanes-Oxley Act not to apply to an undersized red grouper thrown overboard by a commercial fishing vessel's captain) in upholding a judgment of acquittal). This case presents a similar issue to the ones discussed in *Yates* and *McLean*: an aggressive, novel application of a federal criminal statute. Even more problematic here, though, is the way the government proceeded with this case. This is not a matter of a broad word like "tangible object," as was the case in *Yates*, but a specific sub-definition of "machinegun" under federal law, referring to a "combination of parts designed and intended" for use in converting a firearm into a machinegun, where the law contained another definition for a singular "part." Like in *Yates*, the

---

[1] Defendant also moved to dismiss the indictment on constitutional grounds, which were never adequately addressed, and the required *Bruen* analysis was not conducted by this Honorable Court. *See* ECF 132 – 133; 141; 246.

government could have proceeded under different parts of the statute, but instead pursued an "aggressive" interpretation. *Yates*, 135 S.Ct. at 1080, 1087 (Rejecting the government's "aggressive interpretation" after employing traditional tools of statutory interpretation to examine markers of congressional intent.). The government, be it for tactical reasons or otherwise, chose to prosecute the Defendant for conspiracy and substantive acts relating to what it proved to be a homogenous piece of steel as a "combination of parts" rather than a "part." Quite simply, no reasonable trier of fact could have found the items here at issue to be a "combination of parts," much less a "combination of parts" beyond a reasonable doubt.

## II.   LEGAL STANDARDS

The standards for a judgment of acquittal are governed by Rule 29 of the Federal Rules of Criminal Procedure and established caselaw. The court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. While this is a stringent standard, it is not *carte blanche* to approve any finding of any jury where any evidence was presented. Rather, it is an essential check on the government's burden to prove all essential elements beyond a reasonable doubt, thereby having provided sufficient evidence to support the jury's verdict.

In evaluating the sufficiency of the evidence, the court should consider the totality of the circumstances. While the jury's inferences are due some deference, that deference is *provided* that the ultimate conclusions are *reasonable* and *supported by the evidence*.

### III.   INSUFFICIENCY OF THE GOVERNMENT'S EVIDENCE

For the reasons detailed *infra*, the government has failed to prove the essential elements against Defendant beyond a reasonable doubt. As against Defendant Hoover, the counts and essential elements are:

a. **COUNT ONE: CONSPIRACY TO TRANSFER UNREGISTERED MACHINEGUN CONVERSION DEVICES**

   i. Two or more persons in some way agreed to try to accomplish a shared and **unlawful plan**;

   ii. the Defendant **knew the unlawful purpose of the plan** and **willfully** joined in it;

   iii. during the **conspiracy**, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

   iv. the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

## b. COUNTS TWO, THREE, FIVE, AND SEVEN: SUBSTANTIVE COUNTS

  **i.** The Defendant **knowingly** transferred, or aided and abetted the transfer of, a firearm, specifically a **combination of parts** designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger

  **ii.** the **firearm** was not registered in the National Firearms Registration and Transfer Record; and

  **iii.** the Defendant **knew of the specific characteristics or features of the firearm** that made it subject to registration under the National Firearms Registration and Transfer Record.

## c. DISCUSSION OF THE GOVERNMENT'S INSUFFICIENT EVIDENCE

As pled in the indictment, if no parts were transferred, then there was no crime. The government proceeded under a theory that each Auto Key Card constituted a combination of parts designed and intended to convert a weapon into a machinegun. At trial, the government and its agents demonstrated that Defendant advertised a homogenous piece of steel called the Auto Key Card on his YouTube channel. But when it came time to prove up its case, the

government's physical evidence and testimony demonstrated that, as transferred (and at best) each Auto Key Card was a singular, homogenous piece of stainless steel into which a design was lightly etched *i.e.*, Defendant advertised, and Mr. Ervin sold, a drawing that was on a piece of metal.

The testimony and evidence elicited from the employees of Orange Park Machine & Fab. demonstrated that Mr. Ervin contracted with them to engrave a design that was provided to the shop by way of a Drawing Exchange Format file ("DXF File"). Testimony showed that the DXF File necessarily contained a two-dimensional image, *i.e.*, a drawing (the "Drawing"). Mr. Ervin requested that the Drawing be copied onto single, homogenous pieces of stainless steel by way of a laser *only to the extent that* the image could not be wiped off of it. Much to the consternation of the machine shop, and against its advice, he refused to allow them to manufacture the Auto Key Cards in such a manner as to be cut out into multiple parts. His intent was clear, and the evidence is what it is. The stainless steel was a canvas for the Drawing and the laser was the medium. Agents of the government even admitted that they could construe shoelaces and a paperclip as a machinegun, but that "templates" and "drawings" were not.

The testimony of the government's own witnesses supports the conclusion that, as transferred, the Auto Key Card was not "a combination of

parts." Special Agent Jesse Hooker admitted that the government had to "materially alter" the Auto Key Card to become what it alleges in the indictment is a "combination of parts" that are "designed and intended to convert a weapon into a machinegun." The testimony of Mr. Toy buttressed the conclusion that the Auto Key Cards only became contraband only after he performed about an hour of transformative labor upon the Auto Key Card. Transformative labor that fundamentally changed—materially altered—it from a homogenous piece of steel with a constitutionally protected Drawing on it to contraband, *i.e.*, an unregistered combination of parts designed and intended to convert a weapon into a machinegun.

The government's theory bears emphasis: that each drawing on the piece of steel constituted a "part." This reading is so inconsistent with the statute as charged that the government even attempted to invert the statute at closing arguments by arguing that the law proscribed something "designed and intended" to *become* a "combination of parts," which is just manifestly not the case. Even more, the government never once provided evidence that the Auto Key Card was a combination of parts. It forcefully fought against all attempts to delineate what "parts" were "in" the Auto Key Card, instead simply waxing over the critical statutory distinction between a "part" and "combination of parts" and telling the jury, quite literally, not to "worry" about it.

Even if the government's assertion that a drawing on a homogenous piece of steel equates to "parts"—an assertion that is patently absurd—such could only logically extend to the contours of the drawing. However, the government provided no evidence that an Auto Key Card, if cut along the lines, would convert a firearm to fire automatically. One of the government's substantive act witnesses—who claimed to work at a tool and die shop— testified that when cut precisely to the lines, he could not get the resulting parts to function. On the other hand, ATF's Mr. Toy sliced and diced multiple Auto Key Cards apart with a Dremel. He kept at it, and his testimony, and the government's evidence, showed that only after cutting *outside* the Drawing by re-contouring a piece he described as a "flap" did he manufacture a combination of parts from a single piece of stainless steel into a "combination of parts" he re-designed to induce a malfunction in the weapon which resulted in its firing more than one shot. A malfunction, it bears emphasis, Mr. Toy testified that did not reflect how a "lightning link"—the type of machinegun conversion device the government asserted the Auto Key Card to be—would have functioned. Further, Mr. Toy testified that there would be no meaningful distinction in result were the design drawn with laser or marker. So, in fewer words: the government *proved* that each Auto Key Card was a homogenous piece of steel, *proved* that if that homogenous piece of steel was cut precisely to the lines, was not designed and intended to convert a weapon to fire

automatically, and *proved* that the only way its own expert could induce a weapon to fire more than one shot using the Auto Key Card was to *ignore the lines thereupon engraved* to spend substantial time manufacturing a combination of parts which *did not even function as the type of machinegun conversion device the government alleged it to be.*

Indeed, at no point in the trial did the government attempt to remedy that its witnesses and physical evidence exclusively referred to each Auto Key Card as a homogenous piece of steel and the parts the government manufactured from it as being "materially altered." There was not a shred of evidence that the Auto Key Card, as sold, met *even a single element* of the charged definition. This honorable Court even grappled with this issue during debate over jury instructions, when the Court expressed hesitation that it did not want to assert that a single "object" could not be "multiple parts." Turning to traditional tools of statutory interpretation, it is clear that an "object", such as a music box, can consist of multiple parts, as this Court noted, but that a *homogenous piece*, such as an unmodified Auto Key Card, cannot.

### d. ARGUMENT: THE JURY'S VERDICT IS NOT ONLY UNSUPPORTED BY EVIDENCE, BUT SIMPLY UNSUPPORTABLE

We stress these points of statutory interpretation and settled law as essentially related to the insufficiency of the government's evidence. Clearly,

while there could have been a less provocative canvas to copy the Drawing onto, during closing arguments, the government asked the rhetorical question of where we draw the proverbial line while displaying the sliced-up remnants of an Auto Key Card as a table sculpture. And therein lies one of many problems with the government's case: It is not for the jury to decide where the line is drawn—that is Congress's role alone. The jury does not, and cannot serve as a legislative sub-assembly to define terms of law. The jury's role is to decide if an otherwise clear and validly drawn line has been crossed. The essential lines here, which the government provided no evidence of are: was the subject article a combination of parts, did the Defendant **know** the article had features subjecting it to NFA requirements, and did Defendant **know** and **intend** to be part of an unlawful plan. Not only did the government fail to prove the essential elements, the government **proved** their absence.

In *Staples v. United States*, the Supreme Court held that the government **must** prove that a Defendant has actual knowledge that an item is a machinegun in order to sustain a conviction. 511 U.S. 600 (1994). The government played hours of videos from Defendant's YouTube channel where it is manifest that Defendant believed the Auto Key Card to be completely lawful unless cut out and manufactured into a machinegun.

This prosecution reflects concerns addressed by the Eleventh Circuit in other multi-defendant conspiracy prosecutions—"that individuals who are not

actually members of the group will be swept into the conspiratorial net. Because the government is permitted broad prosecutorial discretion to prove the conspiracy, the likelihood exists that those who associate with conspirators will be found guilty of a crime they **have not intended to commit**[.]" *U.S. v. Chandler*, 388 F.3d 796 (11th Cir. 2004); *see also Dennis v. United States*, 384 U.S. 855, 860 (1966). Numerous statements of Mr. Ervin, and a video generated by Mr. Ervin inexplicably involving a fish, were slip-shoddily presented to the jury with no evidence Defendant knew or processed the information at all, substantially prejudicing Defendant.

Like in *Chandler*, this case reflects the compounded danger "when the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory. This roaming theory of the prosecution can produce trial error of constitutional proportions." *Chandler*, 388 F.3d at 798; *see also* Russel v. United States, 369 U.S. 749, 768 (1962) (ill-defined charges leave "the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal"). The government originally indicted Defendant using the "part" definition, but over the course of several superseding indictments, shifted strategy to a "combination of parts."

Even more like *Chandler*, "the defendants focused on whether the allegations of the indictment were sufficient to state a crime. Under federal

conspiracy law, the government must allege and prove that the defendants *knowingly* entered into an *agreement* to commit an *unlawful act*., 839 F.2d 1473 (11th Cir. 1988)." 388 F.3d at 799-800. *Chandler* dealt, quite interestingly, with counterfeit McDonalds game pieces, and the *Chandler* indictment "did allege an unlawful act in the embezzlement of the game stamps. Nowhere, however, did the indictment allege that any of these defendants *knew* that the game stamps they redeemed had been stolen. The defendants moved to dismiss the indictment, alleging that it was fatally defective in its failure to allege an essential element of the crime of conspiracy — knowing agreement to commit the illegal act." *Id*. In *Chandler*, the motion to dismiss the indictment was denied, as it was here, and the case proceeded to a multi-week trial, as it did here, where the government put on voluminous evidence of seemingly *everything but* the essential elements of the charged offenses, as it did here, and the jury returned an unsupportable verdict, as it did here.

To prove an illegal attempt, the government must show that the defendant had the specific intent to engage in criminal conduct and that he took a substantial step toward commission of the offense. *United States v. Collins*, 779 F.2d 1520, 1527 (11th Cir. 1986); *U.S. v. Baptista-Rodriguez*, 17 F.3d 1354, 1369 (11th Cir. 1994). Here, not only was no evidence of knowledge offered, but the government put up hours of exculpatory evidence in the form

of Defendant's YouTube videos where he very manifestly—and reasonably—processes that the Auto Key Card is "just a drawing" unless manufactured into something else.

The government, at trial, referred to the provocative and tongue-in-cheek nature of Defendant's videos *ad nauseum*. That Defendant is a political provocateur with a more than a healthy distrust of the government is not evidence of criminal intent, nor is the fact that Defendant may be a conspiracy *theorist* evidence that he is a criminal conspirator.

The vagueness doctrine requires that a criminal statute "clearly define the conduct it proscribes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment); *accord Johnson v. United States*, 576 U.S. 591, 596 (2015) (Fifth Amendment guarantees that every criminal law provides "ordinary people fair notice of the conduct it punishes" and is not "so standardless that it invites arbitrary enforcement"). In *United States v. Lanier*, 520 U.S. 259 (1997), the Supreme Court described three aspects of the requirement that criminal statutes give "fair warning" of what is outlawed. First, "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* at 266. Second, any ambiguity in a criminal statute must be resolved in favor of applying the statute only to conduct which is **clearly**

13

**covered**. *Id.* Third, although clarity may be applied by judicial gloss, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.; see also United States v. Denmark*, 779 F.2d 1559 (11th Cir. 1986). Central to each inquiry is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. It should not be controversial to state that a statute proscribing a "combination of parts" gives no notice that a drawing, or even a drawing that could *become* a combination of parts through transformative labor, be covered.

"A penal statute maybe void for vagueness 'for either of two independent reasons.'" *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). First, a statute may be unconstitutionally vague if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A statute may also be unconstitutionally vague if it "fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *Lim*, 444 F.3d at 915 (citing *Karlin v. Foust*, 188 F.3d 446, 458-59 (7th Cir. 1999)). As observed by the United States Supreme Court, the requirement that a penal statute provide minimal guidelines to discourage arbitrary enforcement is "perhaps the most meaningful aspect of the vagueness

doctrine." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Without these minimal enforcement guidelines, "policemen, prosecutors, and juries are allowed to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

"Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct." *Geudes v. ATF*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement respecting denial of writ of certiorari). The rules of statutory construction require that all words be given effect. "[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which were allegedly etched a design. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006).

A regulation may "provide such inadequate notice of potential liability so as to offend the rule of lenity." *Gun Owners of Am., Inc.*, 19 F.4th at 901. "The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to Chapter 44 of Title 18 and Chapter 53 of Title 26. 28 C.F.R. § 0.130(a)." *Gun Owners of Am., Inc.*, 19 F.4th at 897. Unlike the widely publicized situation of bump stocks, suppressors, and other items, ATF has issued no guidance—and has no congressional authority—relating to drawings. In fact, ATF recently rescinded *all* guidance in the context of what is and is not a "firearm" when it comes to incomplete or "partially finished" articles. *See Definition of "Frame or Receiver"*

*and Identification of Firearms*, 87 F.R. 24652 at 24672 ("Any such classifications, to include weapon or frame or receiver parts kits, would need to be resubmitted for evaluation.").

As the Supreme Court wrote in *Babbitt*:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present.

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).

Where there is ambiguity in a criminal statute—or regulation interpreting that statute—doubts are resolved in favor of the defendant. *See Yates v. United States*, 574 U.S. 528 (2015); *Skilling v. United States*, 561 U.S. 358 (2010); *United States v. Santos*, 553 U.S. 507 (2008); *Jones v. United States*, 529 U.S. 848 (2000); *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013); *United States v. Trout*, 68 F.3d 1276 (11th Cir. 1995). In addition to these circuit decisions, the Navy-Marine Corps Court of Criminal Appeals considered the bump stock Final Rule in the context of a criminal prosecution for possession of a machinegun. *See United States v. Alkazahg*, 81 M.J. 764, 780–81 (N–M. Ct. Crim. App. 2021). That court determined that, under the best reading of the statutory language, a bump stock is not a machinegun. But it ultimately found that the statute is ambiguous and applied the rule of lenity to construe the statute against imposing criminal liability. It dismissed the

16

charge for possession of a machinegun. Here, similarly, there is no regulation on point.

The Supreme Court in *Yates* explained that if the statute "leaves any doubt" about the application of the statute to the facts to which the government seeks to have the statute apply, the rule of lenity precludes such application. *I.e.*, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U. S. 12, 25 (2000); *see also Liparota v. United States*, 471 U. S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). In determining the meaning of "machinegun" under the National Firearms Act, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Yates*, 574 U.S. at 548, (quoting *Cleveland*, 531 U.S. at 25, and *United States v. Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952)); *see also Jones v. United States*, 529 U. S. 848, 858–859 (2000). *Santos* explained that the rule of lenity "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best

induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Santos*, 553 U.S. at 514.

As pled in the Indictment, the Government defined Auto Key Cards as "cards machined from stainless steel, into which were etched the design for machinegun conversion devices." As was proven by the government, the Auto Key Card would require significant transformative labor and machining of the card to cause it to fit into the rear internal area of the receiver, where the machinegun automatic sear would be installed. Further torturing the language of the Indictment to the Government's benefit for the purposes of argument, the Auto Key Card could, at most, constitute a trinket from which the parts of a DIAS could possibly be made. Such tchotchkes are not regulated under the Gun Control Act or the National Firearms Act. *See also United States v. Prince*, No. 09-10008-JTM, 2009 WL 1875709, at *3 (D. Kan. June 26, 2009), rev'd on other grounds, 593 F.3d 1178 (10th Cir. 2010) ("However, the court simply does not believe that a flat piece of metal with laser perforations and holes constitutes a 'receiver,' *i.e.*, a 'firearm.' Rather, the flat piece of metal is somewhat akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an airplane until it is properly folded. Until that time, it is a patterned piece of paper.").

18

The rule of lenity "is premised on two ideas: First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed'; second, 'legislatures and not courts should define criminal activity." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18, 115 S. Ct. 2407, 2416 (1995). If the DXF File of the Drawing and instructions how to break the law, like the Anarchist Cookbook, are constitutionally protected speech, is the Drawing with oil-based paint on piece of stainless steel, okay? What about military grade plastic with the etching— is that Kosher? While the government pawned off on the jury the question of where to draw the line, that is not—and cannot—be their job, and the government cannot be allowed to unload its failure to prove its case on the jury. For penal statutes, Congress must decide where the line is, and then looking at all the evidence, the jury decides whether the government has shown beyond a reasonable doubt that the line has been crossed.

For reasons stated *supra*, the Government has failed to plead, much less prove sufficient facts which demonstrate the Auto Key Card is a combination of parts designed and intended as a machinegun conversion device. However, it has conclusively demonstrated that the Auto Key Cards are not machinegun conversions devices as a matter of law because as pled in the Indictment, the

Auto Key Card cannot possibly even be a "part," much less "parts" beyond a reasonable doubt.

The Government pled that the Auto Key Cards are "cards . . . into which were etched the design for machinegun conversion devices known as lightning links[.]" It then, in a conclusory manner, declares that such cards are "machineguns as defined in 26 U.S.C. §[§] 5845(a) and 5845(b)." To embrace the Government's position that a card with design on it is a "combination of parts" under § 5845(b) would be to ignore the plain and ordinary language of the word. The term "part" is undefined in the statute, but "[i]f possible, every word and every provision is to be given effect." *Geico Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1141 (11th Cir. 2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 26, at 174 (2012); The ordinary meaning of a "part" in the context of machinery like a firearm is "a constituent member of a machine or other apparatus." *See* Webster's Dictionary, Part, https://www.merriam-webster.com/dictionary/part#:~:text=1%20%3A%20one%20of%20the%20sections,My%20dog%20is%20part%20husky. (last retrieved on June 7, 2022); *See also Johnson v. United States*, 559 U.S. 133, 134 (2010) (where a word is undefined, the court must give it its ordinary meaning.). The statute does not refer to something that may one day become a part, nor does it refer to

20

drawings or schematics for parts. It refers, quite simply, to something that *is* a *combination of parts*.

In no event would a reasonably intelligent person foresee that the conduct charged in this case—talking about a card with a drawing on it—would be deemed criminal, much less that a homogenous piece of steel with a drawing on it would be deemed a combination of parts. As applied against Mr. Hoover, 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2 are unconstitutionally vague under the Fifth Amendment as applied. Mr. Hoover had no reason to believe, at any point, that he would be engaging in criminal conduct if—as alleged—he entered into an agreement with a tchotchke salesman to discuss stainless steel cards with a design on them on his YouTube channel. The government provided no evidence, and no evidence could likely even exist, to prove the requisite knowledge and intent here beyond a reasonable doubt.

It is worth emphasizing that no court has ever applied the National Firearms Act to a fact pattern like this one. The conduct at issue certainly isn't in the heartland of machinegun cases. Despite ample opportunity to do so, the Government did not allege that a consumer was able to convert a firearm into a machinegun using the alleged design scratched into a stainless-steel card.

### e. COUNTS 2 – 8: THE SAME ANALYSIS *SUPRA* APPLIES TO 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2

While aiding and abetting might commonly be thought of as an offense in and of itself, it is not an independent crime under 18 U.S.C. § 2. That statute provides no penalty, and only collapses common law notions of "principal" and "accessory." *United States v. Kegler*, 724 F.2d 190, 200 (D.C. Cir. 1983). Under it, the acts of the perpetrator become the acts of the aider and abettor and the latter can be charged with having done the acts himself. *Id.* at 200-01. An individual may be indicted as a principal for commission of a substantive crime and convicted by proof showing him to be an aider and abettor. *Id.* Accordingly, the indictment need not specifically charge a violation of 18 U.S.C. § 2.

The Government has charged Mr. Hoover with violating 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2 in Counts 2 – 8 of the Indictment. And for reasons thoroughly stated *supra*, the Government has failed to state, much less prove, sufficient ultimate facts to support a conviction.

### IV.   CONCLUSION

In light of the insufficiency of evidence presented by the prosecution, the Defendant respectfully requests this Honorable Court to enter a judgment of acquittal on all charges. The evidence presented is legally insufficient to sustain a conviction, and no reasonable trier of fact could find the Defendant

guilty beyond a reasonable doubt. Granting the motion is necessary to preserve Defendant's constitutional rights to due process and a fair trial.

**WHEREFORE** Defendant Matthew Raymond Hoover respectfully moves this Honorable Court to enter a judgment of acquittal on all counts in which he was convicted, and for any further relief that this Court deems just and proper.

DATED:  May 19, 2023

Zachary Z. Zermay, Esq.
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 239-699-3107
*Lead Counsel for Defendant*

/s/Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on  May 19, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Zachary Z. Zermay, Esq.

Doc. 277

TRIAL TRANSCRIPT VOL. 1

 1          MS. TAYLOR:  Not at this moment -- oh, the only

 2    thing, I guess, I don't think we have the list of the jurors

 3    yet.

 4          COURTROOM DEPUTY:  I just got it, Your Honor.  And

 5    I'll hand those out as the jury is coming up.

 6          MS. TAYLOR:  Thank you.

 7          THE COURT:  All right.  Mr. King, anything further

 8    for Mr. Ervin?

 9          MR. KING:  Your Honor, just as a housekeeping matter.

10    It occurs there was another superseding indictment.  It would

11    be incumbent upon me for appellate purposes to renew our motion

12    to dismiss as well as our adoption of Mr. Hoover's --

13          COURT REPORTER:  I'm sorry --

14          THE COURT:  You've got to slow down, Mr. King.  This

15    is going to be a really long trial if you keep doing that.

16          COURT REPORTER:  "Incumbent upon me . . ."

17          MR. KING:  To just renew those with the understanding

18    that the government's position and the Court's ruling, there's

19    nothing to change those.

20          THE COURT:  Okay.  And I assume that you do so as

21    well, Mr. Zermay, or --

22          MR. LAROSIERE:  Your Honor, Mr. Larosiere for

23    defendant Hoover.

24          Again, given the nature of the fourth superseding

25    indictment, we would like to orally renew our motions to

1  dismiss.  Again, as Mr. King stated, it's for appellate reasons

2  and otherwise.  And I would just like to state for the record

3  it is our position that Bruen requires an application and

4  finding of historically analogous laws.  And I will leave that

5  there.

6          Thank you, Your Honor.

7          THE COURT:  All right.

8          Ms. Taylor, you simply renew your responses?

9          MS. TAYLOR:  Yes, Your Honor.

10         THE COURT:  All right.  So to the extent that the

11 defendants have renewed their motions to dismiss raising all of

12 the same arguments that the Court previously addressed in a

13 written order and the government renews its responses to those,

14 the Court adopts its prior rulings and denies any supplemental

15 motion to dismiss at this time.

16         All right.  Anything else, Mr. King, before we bring

17 the jury up?

18         MR. KING:  No, Your Honor.

19         THE COURT:  Mr. Zermay, anything else?

20         MR. ZERMAY:  No, Your Honor.

21         THE COURT:  And Mr. Zermay, just so that I recognize

22 the right person, will you be doing the opening when we get

23 there?

24         MR. ZERMAY:  Yes, Your Honor.

25         THE COURT:  Okay.  All right.  Let me . . .

Doc. 278

TRIAL TRANSCRIPT VOL. 2

1   A.   This is one of the types of forms that I purchased.

2   Q.   Is this a fair and accurate representation of the types of

3   auto key cards that you received during the course of your

4   undercover purchasing of them?

5   A.   This is one type that I purchased.  I purchased different

6   types.

7   Q.   Is this a fair and accurate representation of one of the

8   types of auto key cards you purchased during the course of your

9   investigation?

10  A.   Yes.

11  Q.   Thank you.

12       We had -- let's see.

13       So after you received them, you didn't immediately

14  try to put them into a firearm, correct?

15  A.   I took photographs and placed them into evidence.

16  Q.   Respectfully, sir, that wasn't my question.

17       You didn't take this and try to put it into a gun,

18  right?

19  A.   I did not.

20  Q.   Instead, you sent them to Agent Toy to machine or

21  otherwise alter this flat piece of stainless steel, correct?

22  A.   I sent them to Cody Toy for examination.

23  Q.   Did you understand that Mr. Toy was going to materially

24  alter these cards?

25  A.   Yes.

Doc. 280

TRIAL TRANSCRIPT VOL. 4

1  production work.

2  Q.   And this was not a big moneymaker for you; is that fair?

3  A.   Yes, ma'am.

4  Q.   Did you ever -- did Mr. Ervin seem excited about how his

5  business was going during your conversations with him?

6  A.   Yes.  Yes.  He seemed to be doing very well and -- and

7  happy about it.

8  Q.   Did you ever have any conversations with him about whether

9  you could just cut out the pieces all the way rather than

10  etching them into the surface?

11  A.   Yes, ma'am.

12  Q.   And what was his response to that?

13  A.   He didn't want the cards fully cut out.

14  Q.   Did he say why?

15  A.   He just said that's not what his customers were looking

16  for.

17  Q.   And why would -- why did you want -- why would you have

18  preferred to cut out those pieces all the way?

19  A.   It's quicker from our standpoint.  It's easier to -- it's

20  faster to cut -- cut the parts completely out than to etch.

21       And it's just a little bit unusual, so we were just

22  kind of curious why -- why he wouldn't want to cut them all the

23  way out.

24       MS. TAYLOR:  Ms. Ganoe, if we could please have

25  Exhibit 48, page 22.

 1                MR. LAROSIERE:  Yes, Your Honor.

 2                THE COURT:  Go ahead.

 3                MR. LAROSIERE:  May it please the Court?

 4                THE COURT:  Go ahead.

 5                          CROSS-EXAMINATION

 6   BY MR. LAROSIERE:

 7   Q.   Hey, Mr. Clarkson.

 8   A.   Hey.

 9   Q.   I won't take a bunch of your time.

10        So Mr. Ervin gave you a DXF file, right?

11   A.   Yes.

12   Q.   Drawing Exchange Format, right?

13   A.   Yes, sir.

14   Q.   And that's just a two-dimensional series of lines --

15   A.   Yes, sir.

16   Q.   -- right?

17   A.   Yes, sir.

18   Q.   Okay.  So from just a DXF, you wouldn't be able to know

19   how thick something should be, right?

20   A.   No.

21   Q.   That's incorrect?

22   A.   That is correct.  We wouldn't -- it doesn't have the

23   thickness in there.

24   Q.   Right.

25   A.   Just a -- just a sketch on a sheet of paper.

 1  Q.   Exactly.

 2       Oh, so a DXF is like you're saying.  It's a digital

 3  sketch, basically.

 4  A.   Digital sketch.

 5  Q.   All right.  Cool.

 6       So tell me, what's the model of the laser you used

 7  for this?  It's a large fiber laser, correct?

 8  A.   Yes, sir.  It's an Amada 3 kilowatt Ensis fiber laser.

 9  Q.   3 kilowatts, so that's -- so that's a lot of wattage.

10  A.   A lot of wattage.

11  Q.   Right.  And do you advertise that you can do etchings?

12  A.   No.

13  Q.   But you generally represented, at least to this

14  individual, that you can etch?

15  A.   We can etch, yes.

16  Q.   Right.  And so the reason the etching was hard was because

17  of how different the laser parameters are between etching and

18  cutting, right?

19  A.   You're just -- we're turning down -- we're turning down

20  the -- you know, the power of the laser so it's not cutting

21  through the material.

22  Q.   Turning it down substantially, right?

23  A.   Yes, substantially.

24  Q.   And adjusting, perhaps, the frequency?

25  A.   Yes, sure.

1    Q.   Okay.  So it's possible -- would you say that sometimes

2    when you etch metal, it's difficult to even feel where it is?

3    A.   We can do a couple different types of etching.  We can do

4    a deep etch, or we can do just basically an oxidation burn over

5    the material that you could -- you could potentially smudge off

6    or wipe off.

7    Q.   Right.

8    A.   We use that mostly when we assemble parts.  We can wipe

9    them down afterwards and remove the -- the part number code is

10   essentially what we typically etch.

11   Q.   All right.  Great.

12        So when you etch something onto a piece of steel,

13   assuming it's 18 gauge or thicker, you're not going to be able

14   to sit there with your thumbs and pop it out, right?

15   A.   No.

16   Q.   No.  It's effectively drawing?

17   A.   We're not -- the integrity of the overall part isn't

18   changing much.

19   Q.   Unchanged.

20   A.   (Nods head up and down.)

21   Q.   Okay.  Awesome.  Thank you so much for that.

22        So --

23             MS. TAYLOR:  Your Honor, can I have sidebar?

24             THE COURT:  Yes.

25        (At sidebar, out of the hearing of the jury:)

Doc. 282

TRIAL TRANSCRIPT VOL. 6

1  Q.    Did you register the auto key card with the ATF pursuant

2  to the NFA?

3  A.    Oh, no.  I didn't know you had to.

4          MR. MESROBIAN:  Okay.  No further questions, Your

5  Honor.

6          THE COURT:  Mr. Larosiere.

7                    CROSS-EXAMINATION

8  BY MR. LAROSIERE:

9  Q.    Good morning, Mr. Roberts.  So is it accurate that you

10  work in tool and die?

11  A.    Yes.  I've been in the injection mold building for

12  50 years.

13  Q.    That's a pretty high precision industry, injection

14  molding, right?

15  A.    Yes, it is.

16  Q.    So when you looked at the auto key card, the single piece

17  of steel, that line on there is pretty wide, right?  Maybe

18  40-thou?

19  A.    Yes.

20  Q.    That's thousandths of an inch?

21  A.    Yeah.

22          Your hair's about three-thousandths of an inch.

23  Q.    Right.  So it's like a -- in terms of thickness, that

24  would be like about an eighth inch, so like a Sharpie line,

25  something like that?

 1  A.    No.  40-thousandths is less than a 16th of an inch.  16th

 2  of an inch is .062.

 3  Q.    So just in terms of like a common thing, would you say

 4  it's like a Sharpie line?

 5  A.    Yeah.  A light one, yeah.

 6  Q.    So when you said you did it exactly to the line, did you

 7  mean the outer edge of the line, the inner edge of the line,

 8  the dead center?

 9  A.    Well, I took what was there first and brought it to the

10  outside.  Some of them they had already cut past that, but I

11  took it to the outside.  That didn't work.  So then I tried to

12  the inside to get rid of the laser line -- I think it's

13  lasered -- and it still didn't work.

14  Q.    So it's fair to say you didn't know which dimension would

15  have been the right one, right, whether it be outside, inside,

16  or center?

17  A.    No, sir.

18  Q.    And when ATF agents came to talk to you, is it fair to say

19  they focused pretty heavily on whether you had cut out the

20  device?

21  A.    I don't know.  They had a lot of questions and I tried

22  answering everything.

23  Q.    But they did ask you if you had cut it out?

24  A.    Yes, sir.

25  Q.    And just, again, trying on the outside of the line or on

1    A.    Yes.

2    Q.    And who is that?

3    A.    I'm sorry?

4    Q.    Is that you?

5    A.    Oh, yes.

6    Q.    And at some point did you receive an auto key card in the

7    mail?

8    A.    Yes.

9          MS. TAYLOR:  Ms. Ganoe, if we could have the next

10   section down.

11   BY MS. TAYLOR:

12   Q.    This reflects the particular item that you ordered under

13   Order Summary, correct?

14   A.    Yes.

15   Q.    It was one Auto Key Card 2 in 1?

16   A.    Correct.

17   Q.    And what did you understand "2 in 1" to refer to?

18   A.    The auto key card was a single piece of metal that had

19   four single individual pieces that were like etched in a

20   diagram form.

21   Q.    So it had four etchings on the single piece of metal?

22   A.    Correct.

23   Q.    And so when it says "2 in 1," why -- what did you

24   understand "2 in 1" to mean?

25   A.    That it's two lightning links.

1  Q.   And is that the manufacturer?

2  A.   Yes.

3  Q.   And can a Class 2 SOT manufacture a machine gun?

4  A.   Yes.

5  Q.   For what purpose?

6  A.   Anticipated sales to authorized recipients.

7  Q.   Can they do so for any purpose, or for that specific

8  purpose?

9  A.   That's supposed to be the purpose that they're building

10  them for.

11  Q.   And if an SOT manufactures a machine gun for that purpose,

12  what do they have to do with respect to the ATF and the

13  registry?

14  A.   They would submit the ATF Form 2 to report the manufacture

15  of any given firearm.

16  Q.   Could an SOT outsource the manufacturing of a machine gun

17  to someone else who is not an SOT?

18  A.   No.

19  Q.   Mr. Lintner, we were just discussing machine guns, but

20  what all is encompassed under the definition of "machine gun"

21  in the NFA?

22  A.   Machine gun would be what you would maybe normally think

23  of as a complete functioning firearm.  It also includes the

24  frame or receiver of a machine gun, or a part or a combination

25  of parts that are designed to convert a weapon into a machine

 1    gun.

 2    Q.     So are you familiar with the term --

 3                MR. KING:  Your Honor, I apologize.  Can we approach?

 4                THE COURT:  You may.

 5          (Proceedings at sidebar:)

 6                THE COURT:  Yes.

 7                MR. KING:  Your Honor, I'm going to object to the

 8    definition that's been provided, particularly in the context of

 9    how it's been charged.  He has I think improperly lumped "part"

10    and "combination of parts" into one definition without the

11    complete definition, which is "a part solely and intended."

12    And I think it's inappropriate for him to be providing half

13    definitions, particularly when that's going to, I imagine, be a

14    big issue when we get to our jury instructions as well as the

15    motions in limine that we have.

16                THE COURT:  Go ahead, Mr. Mesrobian.

17                MR. MESROBIAN:  Your Honor, my next question was to

18    ask about the specific language as alleged in the indictment,

19    the "combination of parts" language, and clarify that.  I think

20    if they would like to cross-examine about, "Can it also be a

21    part, you know, exclusively" -- or whatever the terminology is

22    in the rest of the statute, that's fine.  But I am planning on

23    clarifying about "combination of parts."  But I don't think he

24    inaccurately described the various ways -- the various

25    definitions underneath "machine gun" in the NFA.

 1  A.    Correct.

 2  Q.    And it's safe to say one wouldn't, generally speaking,

 3  register a design or a drawing of any type with the ATF, right?

 4         MR. MESROBIAN:  Objection, Your Honor.  Speculation.

 5         THE COURT:  I'm going to sustain the objection -- I'm

 6  sorry, I'm going to overrule the objection.  You can ask the

 7  question.

 8         Sorry.  Confused myself.

 9  BY MR. MESROBIAN:

10  Q.    It's safe to say that one would not, generally speaking,

11  be able to register a drawing or a design with the ATF on the

12  NFRTR, right?

13  A.    Correct.

14  Q.    And, in fact, specific to America, and specifically

15  between Americans, isn't it totally legal to share information

16  when it comes to firearms?

17         MR. MESROBIAN:  Objection, Your Honor.  Relevance.

18         THE COURT:  Overruled.

19  BY MR. LAROSIERE:

20  Q.    Would you like me to ask again?

21  A.    Please do, sir.

22  Q.    Specifying in America, and between Americans, it's totally

23  legal to share technical information when it comes to firearms,

24  right?

25  A.    As far as I'm aware, and generally speaking.  We could get

1   into things that are outside the scope of my purview, defense

2   contractors, classified information, things like that, but --

3   Q.   Right.

4   A.   -- yeah, to just share information, yes, it's fine.

5   Q.   And so your concern there is like ITAR, wild stuff,

6   international.

7        So no, specifically understanding between Americans,

8   ordinary people in America, you can share blueprints, correct?

9   A.   Yes.

10  Q.   Drawings, correct?

11  A.   To the best of my knowledge, yes.

12  Q.   Stencils?

13  A.   Yes.

14  Q.   G code files for a CNC machine?

15  A.   If I knew what that was.

16  Q.   Sorry.

17        THE COURT:  Next question.

18        MR. LAROSIERE:  Right.

19  BY MR. LAROSIERE:

20  Q.   Is it fair to say that information on how to manufacture

21  firearms is not secret, and sharing it in America between

22  Americans is not illegal in any way?

23        MR. MESROBIAN:  Objection, Your Honor.  Compound and

24  confusing.

25        THE COURT:  I'll sustain the objection.

1          You'll need to rephrase that.

2          MR. LAROSIERE:  I'm so sorry.

3     BY MR. LAROSIERE:

4     Q.   Again, prefacing, in America, between Americans, is it

5     fair to say that information regarding how to make firearms,

6     including machine guns, is not a big secret?  Is that fair to

7     say?

8     A.   I believe so, yes.

9     Q.   Is it fair to say that exchange of that information,

10    again, between Americans, is not illegal in any way?

11    A.   I may be overthinking this, but I always -- I revert back

12    to is there something proprietary, is it -- generally speaking,

13    yes, not -- it's not a problem.

14    Q.   So, for example, a drawing of a lightning link, would that

15    be, in your experience, legal to share?

16    A.   Yes.

17    Q.   So we've also talked -- we touched on the laws as they

18    relate to machine guns.  And you said that started with NFA of

19    1934, right?

20    A.   Yes.

21    Q.   Was that amended by the GCA of '68?

22    A.   It was.

23    Q.   And then you had mentioned 922(o).  That was about, what,

24    '80- --

25    A.   '86.

1  Q.    '86.  So aside from that -- I'll withdraw that question.

2        Has the definition of a machine gun under the law

3  changed?

4  A.    Could you be more specific, sir?  Are you talking from the

5  inception?

6  Q.    Since 1968.

7  A.    I'm not certain, but I don't believe it has since 1968.

8  Q.    And you talked about a couple different types of machine

9  guns.  Would you agree that the definition of a machine gun is

10 a multi-part one?

11 A.    Yes.

12 Q.    And are these different parts of the machine gun

13 definition -- they apply to different situations, right?  Like

14 one for a whole gun, one for a drop-in piece, and another for

15 something else?

16 A.    Yes.

17 Q.    So would you agree the core function of the machine gun

18 definition to be a weapon which shoots, is designed to shoot,

19 or can readily be restored to shoot automatically more than one

20 shot, without manual reloading, by a single function of the

21 trigger?

22 A.    That would be one, yes.

23 Q.    And all the others relate back to that, right?

24 A.    Could you rephrase that?  Or repeat.

25 Q.    The further definitions relate back to that main

1  definition, correct?

2  A.   In some way, yes.

3  Q.   Okay.  So would you agree the term would include the frame

4  or receiver of any such weapon?

5  A.   Yes.

6  Q.   And that's one definition?

7  A.   Yes.

8  Q.   Okay.  Would you agree the term would include any part

9  designed and intended solely and exclusively for use in

10  converting a weapon into a machine gun?  Going back to the

11  front.

12  A.   Yes.

13  Q.   So that's another individual one, the part?

14  A.   Yes.

15  Q.   And so in that "part" definition, that part must be

16  designed and intended solely and exclusively for that machine

17  gun purpose, right?

18          MR. MESROBIAN:  Objection, Your Honor.

19          THE COURT:  You can address that on redirect.

20          Go ahead.

21  BY MR. LAROSIERE:

22  Q.   Would you agree?

23  A.   Yes.

24  Q.   And then we've got "a combination of parts."  Does that

25  sound right?

1    A.    Yes.

2    Q.    "Parts" plural?

3    A.    Yes.

4    Q.    So more than one?

5    A.    Yes.

6    Q.    Designed and intended for use in converting a weapon to

7    machine gun?

8    A.    Yes.

9    Q.    What would be an example of the single "part" definition?

10   A.    It could take a lot of different forms.  However, if you

11   had -- like, for example -- I've never seen this done -- I've

12   heard from people in the industry that you can utilize a

13   paperclip to make an effective conversion device.  Never

14   witnessed it, but if that truly is done, then the paperclip

15   would become the conversion device.

16   Q.    What about a shoelace?  Have you heard about a shoelace

17   being considered a machine gun?

18   A.    I have.

19   Q.    So those are the only parts I think are really worth

20   bearing on right now.

21         Do you agree that Congress has not modified this law

22   in any way -- in any material way since 1968?

23   A.    I believe so, yes.

24   Q.    So ATF -- does ATF serve a regulatory function as well as

25   law enforcement function?

Doc. 283

TRIAL TRANSCRIPT VOL. 7

1    to registration, namely, that it was a combination of parts

2    designed and intended for use in converting a weapon to shoot

3    automatically more than one shot, without manual reloading, by

4    a single function of the trigger."

5         So that sentence already says that the government has

6    to prove beyond a reasonable doubt that the defendant knew the

7    item was a combination of parts designed and intended for use,

8    et cetera.

9         So that's what I'm inclined to do with regard to the

10   supplement.  If that had been timely submitted, that's what I

11   would have selected from that to include.

12        Ms. Taylor.

13        MS. TAYLOR:  Your Honor, we agree with the Court's

14   suggestion.  And I apologize for how late yesterday that was

15   submitted.  That's -- frankly, we didn't start discussing the

16   possibility of an additional instruction in this regard until

17   sometime I think late yesterday morning, and I didn't get back

18   to the office until in the afternoon, and so it's entirely due

19   to me that it didn't get filed until late and we are very sorry

20   about that.

21        I think the concern that we had was just whether

22   there would be arguments at closing that could potentially be

23   confusing to the jury to the extent that they may leave the

24   jury under the impression that it was required that the

25   purchaser -- or any purchaser actually had a firearm that was

1   configured in the right way for the -- for the lightning link

2   to work with it.  And I think the case law that we cited would

3   support that that -- that's not required.  What's required is

4   just that the lightning link be a conversion device designed

5   and intended for converting a firearm into a machine gun.

6          THE COURT:  Well, I think one thing that concerned me

7   about the proposed language that you-all suggest -- that

8   you-all gave me is that it suggests that there doesn't have to

9   be any proof -- any proof that the part the defendant -- that

10  the defendants conspired to transfer would ever have been

11  objectively capable of accomplishing fully automatic fire.  And

12  your instruction suggests that there doesn't have to be any

13  proof of that at all.  I'm not sure that the case law you cited

14  supports that, but I also don't think in the context of this

15  case that that's necessary because you're going to have the

16  agent testify that he was able to successfully do it.  So

17  that's why I limited the instruction to it doesn't have to show

18  that a purchaser successfully did it.

19         I don't know that I -- well, I'm not inclined to go

20  any further than that because I think that might -- I'm not

21  convinced that that would be a legally correct instruction if I

22  went further than that.

23         MS. TAYLOR:  And Your Honor, it was not our intention

24  to suggest that we didn't have any burden of proof with regard

25  to showing that it could work.  And as the Court noted, we are

1    intending to present that proof.

2           So to that regard, we are -- we are good with the

3    Court's suggestion.  And again, I think my concern was that

4    there could be arguments at closing like, you know, "This

5    person didn't even have an SP1 bolt carrier in their AR-15; how

6    could you say that this is a machine gun conversion device?"

7    And I think that would be an incorrect argument to make at

8    closing.

9           THE COURT:  But then also further, though, to the

10   extent you're telling me to specifically advise counsel not to

11   make -- I'm not going to tell them what they can and can't

12   argue.  Obviously you can't make an argument that's not

13   supported by the law, and I also don't think that the evidence

14   would support that you couldn't get the bolt -- that SP bolt

15   carrier, because there's contrary evidence.  So I think it

16   would be unwise to make an argument unsupported by the

17   evidence, but I'm going to rely on counsel to make arguments

18   that are consistent with the Court's instructions and supported

19   by the law.

20          With my addition to the last paragraph of Court's

21   Instruction No. 14, does the United States have any objection

22   to No. 14?

23          MS. TAYLOR:  No, Your Honor.

24          THE COURT:  Mr. King?

25          MR. KING:  Your Honor, if I could have a brief moment

1    with for counsel for Mr. Hoover.  Just to let the Court know, I

2    may be asking something a little additional to what the Court

3    said, and I want to work on that language with them, if you

4    could --

5             THE COURT:  Okay.

6             MR. KING:  Thank you.

7        (Defense counsel confer.)

8             MR. KING:  Your Honor, thank you for the indulgence

9    there.

10            Your Honor, in terms of the instruction the Court's

11   prepared to give, I believe that that is an accurate statement

12   of the law in terms of the language the Court has proposed to

13   add.  However, given the addition, we would request an

14   additional sentence after that one, and I'll go slowly so

15   everybody can get this down.  And that sentence would be,

16   "However, the government must prove beyond a reasonable doubt

17   that the item described in the indictment is capable of

18   converting a firearm into a machine gun."

19            And, Your Honor, I think the reason for that language

20   is to clarify that it does not have to -- because I think it's

21   accurate that it would not have to work with a particular set

22   purchaser, but it does -- it would have to objectively work.

23   And, you know, I know the government plans on putting on the

24   testimony of Agent Toy, and I believe they think that will be

25   uncontroverted.  I don't think the testimony will come out that

 1   way if our cross-examination is successful, so -- in terms

 2   of -- you know, in terms of it needing to actually be capable

 3   of functioning.  So that's why we would request that language.

 4          I have other issues with regard to this instruction,

 5   but specifically as to the modification --

 6          THE COURT:  Let me hear what your other issues are

 7   first.

 8          MR. KING:  Your Honor, the other issue is -- you

 9   know, I think we raised this and the Court ruled on it in doc

10   223 in terms of the requests that we've made.

11          In our proposed instructions we had a request that,

12   "Specifically, however, if you find that the defendant

13   transferred a singular part rather than a combination of parts,

14   you should find the defendant not guilty."

15          This instruction is important for several reasons.

16   One is the definition in the National Firearms Act is

17   disjunctive.  As we discussed in the motions, it can be one or

18   the other.  There's three definitions, or if you break "part"

19   and "parts" into two separate, it would be four different

20   definitions.

21          The concern is -- well, the government has made a

22   tactical decision to not proceed generally with all four

23   definitions in the disjunctive, but to proceed specifically

24   under one subsection of the "part/parts."

25          I certainly respect and understand the Court's ruling

 1    in terms of the "solely and exclusively."  However, there's a

 2    concern that this is now misleading; that a jury could read

 3    this and not understand that a singular part under the

 4    government's theory would lead to a defendant being found not

 5    guilty and that the only way to clarify that it's the

 6    government's tactical choice would be to make it clear that if

 7    it is a singular part, then the defendant must be found not

 8    guilty, because that's not been alleged.  And if it is a

 9    singular part, the law is clear they must be found not guilty

10    because all the "solely and exclusively" language has been

11    taken out.

12          To put it another way, this is a tactical decision by

13    the government.  I don't know if I'd make the same one, but I

14    understand why they made it.  But without that clarification,

15    there's a big concern from Mr. Ervin that that's misleading.

16          And, you know, to some extent you live by the sword,

17    you die by the sword.  The reason that the "solely and

18    exclusively" language is out rather than the government

19    explaining to the jury why it would only apply to a "part" as

20    opposed to "parts" based on the Court's ruling is based on the

21    tactical choice they made when they amended the indictment and

22    took out the singular part language.

23          But it's very clear that based on how the indictment

24    was modified, I think it was either the second or third

25    superseding indictment, that the government -- if the jury were

1   to determine that this was a singular part rather than parts,

2   they must find these defendants not guilty because of the way

3   that it was alleged.  And to not include some sort of language

4   explaining "parts" means plural, we believe it is misleading to

5   the jury.

6          And again, this is solely a tactical decision by the

7   government to get rid of that language.  I --

8          THE COURT:  Okay.  You're now repeating yourself a

9   whole lot.

10         MR. KING:  I'm a little circular.

11         THE COURT:  I get the gist of your argument.

12         MR. KING:  Thank you, Your Honor.

13         THE COURT:  And I assume Mr. Hoover joins in that

14  request?  Because you did include similar language in your

15  proposed instructions, Mr. Zermay.

16         MR. ZERMAY:  Yes, Your Honor, we also join in that

17  request.

18         THE COURT:  All right.

19         Ms. Taylor, as to the request that the Court include

20  language that -- instructing the jury that if the defendants

21  transferred only a singular part or no parts, you should find

22  the defendants not guilty, what's the government's response?

23         MS. TAYLOR:  Your Honor, I --

24         THE COURT:  And then we'll talk about the other

25  request he has, but this --

1          MS. TAYLOR:  I think the language is entirely

2     unnecessary.  I think that the definition that's in the Court's

3     instruction as is it now that specifically states it has to be

4     a combination of parts designed and intended for use in

5     converting -- I mean, I think they can make their arguments

6     based upon that language that it's not a combination of parts

7     and that in their view it's a single part.

8          And the jury should understand from the fact that

9     "parts" has an "s" at the end of it that they have to find

10    it's -- and that it says "combination of parts" that they have

11    to make a finding that it is a combination of parts.

12         And I think that the additional language

13    overemphasizes that point and also could be confusing to the

14    jury with regard to -- so, you know, if we find it's a

15    combination of parts but it's on a single part of -- piece of

16    metal, does that mean we have to find him not guilty?  Which I

17    think is the argument that they want to make.

18         But again, I don't think that language is necessary.

19    I think that the definition and what they have to find is clear

20    on its face and leaves open the opportunity for the defendants

21    to make that argument based upon the language that's already in

22    here.

23         THE COURT:  So Mr. King, the reason I didn't include

24    that language that both you and Mr. Zermay proposed was

25    twofold.  One, I thought it was redundant of the definition

1   because the definition says it has to be a combination of

2   parts.  So it didn't seem necessary for you-all to argue to the

3   jury that if -- it did not seem necessary to include that

4   because simply from the definition that we're giving you could

5   argue that it was not a combination of parts.

6          The other thing that concerned me was the way it's

7   phrased -- and when I'm talking about the way it's phrased,

8   right now I'm reading I think from -- I think I'm reading from

9   Mr. Hoover's.  Yeah, I am.

10         But both -- so Mr. Hoover's on page 31 of

11  document 234 and Mr. Ervin at document 232 page 28, the

12  language you're requesting is, "However, if you find that the

13  defendant transferred a singular part rather than a combination

14  of parts" -- that's Mr. Ervin's language.  And Mr. Hoover's is,

15  "If you find the defendant transferred only a single part

16  rather than a combination of parts, you should find the

17  defendant not" -- "the defendant or defendants not guilty."

18         The problem I have with that is I find it to be

19  confusing because the defendants can have transferred a

20  singular item, that is, the metal card, that's what they

21  physically transferred.  It's still up to the jury to decide

22  whether that singular item that was transferred constitutes a

23  combination of parts.  So I think that the language that you're

24  giving me -- that you're asking me to provide to them, which

25  suggests that it has to be one or the other, is misleading.

 1          MR. KING:  And, Your Honor, if I could address those

 2     a little bit in reverse order with the one we just addressed.

 3          The Court rephrased our proposed instruction while we

 4     were discussing it, and frankly I think the -- and I'm not sure

 5     if it was just kind of ad hoc, but the proposal the Court made

 6     in terms of whether it was a, you know, singular part or no

 7     parts -- I can't remember the exact language -- I think more

 8     accurately would state our position because I understand --

 9          THE COURT:  Well, just for clarification, I'm not

10     rephrasing.  That was in Mr. Hoover's.

11          MR. KING:  Before we got to that, when we were having

12     the conversation.  I should have written it down.  You know,

13     the Court's concern with that language is understandable.  And

14     I think the -- and let me put it this way.  The confusion is

15     we've heard testimony from Agent Lintner already that, you

16     know, a singular part can be a machine gun.  That was brought

17     out on direct.  And the government has not traveled under that

18     theory.

19          The concern is if, you know, the defense is required

20     to go through and say it's a combination of parts, but "parts"

21     has an "s" in it and it's not really a singular part, that

22     looks as if we are quibbling and being technical.  It's also

23     misleading in light of the testimony we've heard from Agent

24     Lintner.

25          I don't disagree that there may be a better way to

1    draft what we're trying to get at, but essentially it's, "If it

2    is a singular part rather than a combination of parts or it's

3    no part at all" --

4            THE COURT:  But that's my problem, Mr. King.  You're

5    suggesting that it has to be one or the other.  And it's -- and

6    again, it's in the way you-all are phrasing it.  What the

7    defendant transferred can both be a singular part and a

8    combination -- and ultimately a combination of parts.  I mean,

9    if that's what the jury finds.  I don't know if the jury is

10   going to find that because you can cut it out and use it,

11   that's a combination of parts.  That's why we're here for

12   trial.  If any of us knew what the answer to that would be,

13   there wouldn't be a trial.

14           But your -- the language suggests that if what was

15   transferred is only a singular -- a singular item, then it

16   cannot be a combination of parts.  And I just -- I'm not

17   convinced that that's accurate.

18           MR. KING:  And Your Honor, if I could address one of

19   the Court's concerns.  The Court is saying it has to be one or

20   the other, and normally it would not have to be.  The NFA has

21   four definitions under what a machine gun could be.  The reason

22   it has to be one or the other is because of the charging

23   decision the government made to narrow out one subsection of

24   that sentence.  And the concern we have is that it's misleading

25   to the jury, and --

1            THE COURT:  You're missing my point; that is, it is

2      true that if -- that the government says it has to be a

3      combination of parts.  That doesn't mean -- well, I don't know

4      whether that means that if they transferred one object that the

5      jury cannot still find that object to constitute a combination

6      of parts.  Do you see what I'm saying?

7            MR. KING:  I see exactly what you're saying.

8            THE COURT:  And your language lends itself to the

9      argument that all they transferred was one piece of metal.  And

10     it suggests that that cannot at the same time be a combination

11     of parts.  And that's exactly what this trial is all about, is

12     whether that piece of metal with those etchings is capable of

13     being a combination of parts.

14            MR. KING:  Yes, Your Honor.  On the same token, you

15     know, the language is if it is a singular part, then the

16     "solely and exclusively" language kicks in.

17            If I could make a suggestion.  I understand the

18     Court's concern now, and I think what -- it's the Court's

19     concern, but I do think it has merit.  If we could have a brief

20     moment for counsel for Mr. Hoover and I to get together and

21     propose an instruction that addresses the Court's concern as

22     well as our concern, because I think it's a very big issue.  I

23     think it's misleading to suggest that "part" and "parts" can be

24     used interchangeably because if it is a singular part --

25            THE COURT:  They can't be used interchangeably.  It

 1   has to be a combination of parts.  It cannot be a single part.

 2   And you can certainly argue that, but to instruct the jury

 3   that, "If you find that the defendants transferred only a

 4   singular part" -- maybe I can try and rephrase that in some

 5   way, but I think that is misleading as it's written.

 6           MR. KING:  And Your Honor, in light of the Court's

 7   concern, I see what Your Honor is saying.  I don't entirely

 8   disagree.  I think we could draft it a little more artfully if

 9   we could have a moment to make some effort.

10           THE COURT:  Okay.

11           MR. KING:  And Your Honor, the other thing that may

12   make sense is to address it in the body where "combination of

13   parts listed" -- where it says "combination of parts," it may

14   be better to parse out that it's not a singular part there.

15           If I could have a moment, though, with counsel for

16   Mr. Hoover.

17           THE COURT:  Go ahead.

18       (Defense counsel confer.)

19           THE COURT:  Mr. King.

20           MR. KING:  Your Honor, I -- counsel for Mr. Hoover is

21   preparing a standalone instruction.  I had a modification

22   within the body of the Court's instruction that I've discussed

23   with Mr. Ervin.  I believe they're about done with their

24   proposed instruction, which would be separate from our proposal

25   based on our conversation.

1        THE COURT:  All right.  I can't pretend that I

2   understand what you just said, but let me hear from --

3   Mr. Zermay is standing, so what is it that you're suggesting,

4   Mr. Zermay?

5        MR. ZERMAY:  Yes, Your Honor.  A standalone sentence

6   stating, "To convict, you must find that the" -- or "that each

7   item alleged in the indictment was a combination of parts

8   rather than a single part."

9        THE COURT:  I think that has the same problem that

10  Mr. King's instruction has, and that is, what -- we're not

11  giving the jury a definition of what a "part" is.  And so your

12  suggestion is that something can only be either a combination

13  of parts or a single part, it can't be both.

14        But what you're going to argue, then, is this card is

15  just a single thing; therefore, it can't be a combination of

16  parts.  I think you can argue that to the jury in argument, but

17  ultimately, that distinction of whether the card is a single

18  part or a combination of parts, that's what the jury has to

19  decide.  And because there's not a definition of what a "part"

20  is, that instruction, I think, is misleading because it

21  suggests that something can only be one or the other.  But a

22  single ob- -- but this jury has to decide whether that single

23  object, the auto key card that was transferred, whether that

24  single object is a -- whether it is a combination of parts or

25  whether it is a single part.

1          So I -- let me think for just a moment.  Just a

2    minute.

3          Yeah, I think that that is confusing.  I've tried a

4    couple ways to sketch out something better and I'm not coming

5    up with something better.  I think that what we have is a

6    definition in the instruction that says, "A machine gun

7    conversion device has to be a combination of parts designed and

8    intended for converting a weapon to shoot automatically more

9    than one shot."

10         And I think you're free to argue that the auto key

11   card is not a combination of parts.  "Here, look at it, it's

12   one flat piece of steel.  Our argument is one flat piece of

13   steel cannot be a combination of parts."

14         And the government is going to argue that this one

15   flat piece of steel, with these etchings in it, is, in fact, a

16   combination of parts.  That's jury argument.  That's what

17   you-all -- and ultimately the jury is going to go back in the

18   jury room and they are going to decide whether they think one

19   flat piece of steel with lines on it can be a combination of

20   parts or whether they believe that it is just a single -- a

21   single part.  And if it's just a single part, then it is not a

22   combination of parts designed and intended.

23         But I think trying to say, "If you find that it's a

24   single part rather than a combination of parts," without more,

25   is misleading.  We would have to explain that the mere fact

1  rapid fire in the audio of it?

2  A.   It did.

3  Q.   And yet at the bottom of this part of the video, while

4  it's showing a man with two AK-47s and rapid fire noises, it

5  says "great novelty and conversation piece only"?

6  A.   It did.

7           MS. TAYLOR:  If we could go back to maybe five

8  seconds into the video, Ms. Ganoe.

9  BY MS. TAYLOR:

10  Q.   Here, five seconds into the video, does it appear to be

11  the same man holding the fish that was in the previous exhibit?

12  A.   It does.

13  Q.   And transposed over that are some words.  What does it

14  say?

15  A.   "Get one.  AR related.  And save it.  Do not cut."

16  Q.   And this is the same fish that's firing rapid fire --

17  appears to be rapid firing?

18  A.   It does.

19           MS. TAYLOR:  And Ms. Ganoe, could we now advance back

20  to the 20-second portion and play the rest of the video.

21       (Video played.)

22       (Video stopped.)

23  BY MS. TAYLOR:

24  Q.   And right before the very end of that video it displayed

25  an auto key card; is that correct?

1   Q.    And so then what holds the hammer back after the trigger

2   is released?

3   A.    The trigger does.

4   Q.    Would you say the trigger sear, right here?

5   A.    Yes.

6   Q.    If one removes the disconnector, what would happen?

7   A.    You would have a hammer follow situation, and it could

8   possibly, and most likely, fire automatically.

9   Q.    Is it difficult to remove the disconnector in an AR-15?

10  A.    No, it is not.

11  Q.    About how long would it take to remove the disconnector in

12  an AR-15?

13  A.    Depending on skill level, a matter of minutes.  Maybe five

14  minutes.

15  Q.    And would it be accurate to say that removal of the

16  disconnector would require drifting one pin?

17  A.    Correct.

18  Q.    And again, that situation, which would be called -- which

19  could be caused by either no or an absent disconnector, is

20  called hammer follow?

21  A.    That's what we refer to it as typically, yes.

22  Q.    And this is so called because the hammer will follow the

23  bolt home, correct?

24  A.    Right, yes.

25  Q.    And that's potentially unsafe, correct?

```
 1   Honor.
 2           THE COURT:  We'll see how it plays out.  Go ahead.
 3       (Proceedings in open court:)
 4   BY MR. LAROSIERE:
 5   Q.   Mr. Toy, in your original report you report that the parts
 6   were precisely indexed --
 7           THE COURT:  Mr. Larosiere, that's not the way we
 8   talked about the question being asked.
 9   BY MR. LAROSIERE:
10   Q.   As you recall, before you cut out any devices from the
11   card, were the parts precisely indexed in the correct size to
12   fit AR-15 firearms without further modification?
13   A.   They were to the size that would work in AR-15s.  Again,
14   because of different manufacturers having different tolerances,
15   not every single one is going to work in every single platform.
16   But yes, they were of the size to do that, yes.
17   Q.   The correct size to fit AR-15-type firearms without
18   further modification?
19           Yes or no?
20   A.   They were of the size that they would be able to go into
21   them without hand fitting, maybe not, but we're talking minor
22   tweaks to the dimensions.
23   Q.   And after you cut along the lines, the rifle would not
24   function as a machine gun because the paddle was too long,
25   correct?
```

1   A.   That is correct.

2   Q.   And so you ground down the paddle?

3   A.   Yes.

4   Q.   You testified to that just now; is that right?

5   A.   That is correct.

6   Q.   Did you delete that information from your subsequent

7   report?

8   A.   I don't remember what the modification between the two

9   reports was.

10   Q.   Would it refresh your recollection if I brought them to

11   you?

12   A.   Yes.

13        (Pause in proceedings.)

14        (Mr. Larosiere confers with Ms. Taylor).

15             THE COURT:   What's your question?

16   BY MR. LAROSIERE:

17   Q.   Did you delete your reference to the rifle not functioning

18   because the paddle was too long in your second report?

19   A.   I'm not sure why the information was deleted.  I do

20   remember that Chief Stimmell had come back to me and asked me

21   to change some verbiage in the report, and so I just took his

22   edits for it.  Nobody was intentionally trying to prevent that

23   information from being out there, especially considering the

24   report was already out there that had the modification to it.

25   And I've already stated that conversion devices, no matter what

1    Q.    What is this shape here?  And I'm pointing at the back of

2    the -- what generally looks like a silhouette cutout on 25A.

3    A.    That is a portion where I cut into the body of the device

4    whenever I was cutting it out.  I believe that might have

5    happened with a drill press, possibly, on that hole.

6              MR. LAROSIERE:  No more need for the ELMO, thank you.

7    BY MR. LAROSIERE:

8    Q.    Now, Mr. Toy, I know you've made it very clear that you're

9    not a machinist, right?

10   A.    (Nods head.)

11   Q.    But as an armorer, you're fairly familiar with tools,

12   correct?

13   A.    Right.

14   Q.    If an individual drew with a Sharpie marker these same

15   lines on a piece of metal, would you be able to cut out a

16   lightning link?

17   A.    More than likely, yes, as long as it's the correct

18   dimensions and the thickness is appropriate for a lightning

19   link use.

20   Q.    If an individual used a stencil, perhaps --

21             MS. TAYLOR:  Your Honor, may we have sidebar?

22             THE COURT:  You may.

23        (Proceedings at sidebar:)

24             THE COURT:  Yes.

25             MS. TAYLOR:  My concern is I don't think any of this

1    Q.    So did you cut along the outside edge of the line, dead

2    center on the line, or ensuring that the line was completely

3    removed?

4    A.    I did my best to cut right along the line, not removing

5    any more material than what was required.

6    Q.    So leaving the etch or obliterating the etch?

7    A.    I believe in some circumstances most of the etching was

8    removed.  I can't say for certain that every tiny little bit of

9    it was, but to the best of my abilities, I traced the line.

10   Q.    And how did you know where to make that cut?

11   A.    Because there was a line there, sir.

12   Q.    How did you know whether to cut outside, on, or within the

13   line?

14   A.    I just followed the line.  I just cut the line out because

15   that's where it was at.  And it's a template to be cut out, and

16   so that's what I did, I cut the template out.

17   Q.    So you didn't have any particular instruction to cut,

18   again, on the outside of the edge of the line or over the line

19   itself?

20   A.    No, sir.

21          MR. LAROSIERE:  Thank you, Mr. Toy.

22          THE COURT:  Mr. King.

23          MR. KING:  May it please the Court.

24          THE COURT:  Go ahead.

25                        CROSS-EXAMINATION

1  A.  Yes, sir.

2  Q.  And when Mr. Larosiere was talking -- and it looked -- and

3  I can't remember the name y'all used, but it looked like a

4  little -- I can't remember the name you used.

5  A.  The disconnector?

6  Q.  No, sir.  There was the little piece at the top of the

7  SP1, but there was one below where it was a little bigger, and

8  then the M16 had a bigger one.

9  A.  The trip service.

10  Q.  The trip service.  How does that process work?

11  A.  So the M16 is designed with that additional surface so

12  that when you insert the automatic sear in an M16, when the

13  bolt's in the battery, it trips right at that particular

14  moment, allowing the hammer to be released.

15       The semiautomatic doesn't need to trip that surface,

16  so it's even further back.

17       And then the SP1, the design on that was to make it

18  even smaller, or shorter.

19       So those are just the differences between them.

20  Q.  And the -- the M16, if I'm not mistaken, is a -- and the

21  things we're talking about, the M16 itself is a fully automatic

22  assault rifle, military weapon?

23  A.  That is correct, sir.

24  Q.  And the M16 bolt carrier, you referred to that as a

25  machine gun bolt carrier?

1    A.    Correct.

2    Q.    And you said it worked with the M16 but it did not work as

3    designed, is that correct, because there was something called

4    hammer follow?

5    A.    Correct.

6    Q.    And what -- and hammer follow is not -- is something

7    different than a lightning link working as designed.  Is that

8    fair to say?

9    A.    Yes, it is.

10   Q.    My understanding is you were given two of these devices by

11   Agent Hooker through the mail.  He didn't drive it up or

12   anything like that?

13   A.    No, no, he did not hand deliver them.

14   Q.    And did you get any other devices that you were asked to

15   test?

16   A.    There was another one that came in.  There was, I believe,

17   three different submissions total.

18   Q.    Okay.  And the ones with Agent Hooker, those are the ones

19   that you cut out?

20   A.    Correct.

21   Q.    And you said it took about somewhere between I think

22   37 minutes on the short end to a little under an hour on the

23   long end?

24   A.    That's -- yeah, I believe so.

25   Q.    And certainly if I say something and I get some of my --

Doc. 284

TRIAL TRANSCRIPT VOL 8

1    different?  He tells his customers, "Get one and save it."

2          There was a lot of testimony elicited that Ervin was

3    a prepper.  But intending to cut it out at some point in the

4    future is not a defense.  The fact remains that the auto key

5    card was designed and intended to be a combination of parts

6    used to convert an AR-15 into a machine gun, whether you do it

7    now or you save it for later.

8          After Mr. Ervin's arrest, Mr. Hoover again describes

9    the auto key card as a great SOT resource where you could get

10   machine gun parts.  In other words, he knew it was designed and

11   intended to be used for parts for lightning links.

12         After Mr. Ervin's arrest, Mr. Hoover also posted a

13   video explaining his views on the virtues of noncompliance with

14   the law.  This is the video titled "The Meaning of This Very

15   Romantic Statement."

16         He talks about -- openly, in front of everyone --

17   breaking the law, and then he discusses how Ervin -- he

18   discusses Mr. Ervin, the key card guy, and how Mr. Hoover put

19   public support behind Mr. Ervin.  And Mr. Hoover is saying here

20   that he knew Mr. Ervin was openly breaking the law and that

21   Mr. Hoover supported Mr. Ervin in doing that.

22         You can also think of -- consider the fact that the

23   defendants were using deception and secretiveness in carrying

24   out their plan.

25         There was a lot of emphasis put on the fact that

1   that you have heard about whether it was or wasn't a machine

2   gun conversion device.  Mr. King made some very forceful

3   arguments that it had to be -- it had to be a machine gun

4   conversion device -- essentially a completed machine gun

5   conversion device when it was sent out.  And that -- that's

6   not -- he says it doesn't mean after material -- materially

7   altered.  You won't see any language about that in the jury

8   instructions.

9          Judge Howard told you what the standard is that you

10  have to apply, and that is was the item that was transferred

11  designed and intended to be a combination of parts that would

12  convert a weapon into a machine gun.

13          MR. KING:  Your Honor, can we approach sidebar?

14          THE COURT:  You may.

15      (Proceedings at sidebar:)

16          MR. KING:  Your Honor, that's a misstatement of law.

17  It doesn't have to be designed and intended to be a combination

18  of parts.  It's a combination of parts designed and intended.

19  The meaning is dramatically different.  And I'd ask the Court

20  to instruct the jury --

21          THE COURT:  I -- Ms. Taylor, you need to just go back

22  and rephrase that.

23          MS. TAYLOR:  Yes, Your Honor.

24          THE COURT:  Go ahead.  Ms. Taylor, you just need to

25  say that you misspoke.

 1    phone that had the mechanical drawing of the designs on it.

 2    And that's a drawing.  That's the digital drawing that is what

 3    led to this physical thing, the auto key card.

 4            No person draws -- no normal person would call

 5    etching a line into a piece of stainless steel, or, moreover,

 6    having a machine shop do it for you on mass scale, a drawing.

 7    That's not what this is.

 8            There's a lot of emphasis placed, too, on, "Oh, it's

 9    just a flat piece of metal.  I mean, how could it be anything

10    if it's just a flat piece of metal?"

11            Well, these are the two pieces of the lightning link

12    that Officer Toy cut out.  They're just flat pieces of metal.

13    I mean, I could stick the paddle through the body.  I'm going

14    to put it right here on the edge of this lectern, and it's a

15    table sculpture.  It's not.  It's still a machine gun

16    conversion device.

17            There's no requirement that it have been a complex

18    design, that it have been easy or difficult to cut out.

19    There's no requirement, frankly, that it even be durable or

20    cause a firearm to fire automatically more than once, or even

21    that it require a firearm -- or that it allow a firearm to fire

22    more than two shots.  The only thing that's required in these

23    jury instructions is that it's a combination of parts designed

24    and intended to at least one time convert a weapon to shoot

25    more than one shot with a single function of the trigger.

B

CERTIFICATE OF SERVICE

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was sent by CM/ECF on January 21, 2024, and notice of this filing was electronically served on all parties there registered for service, including:

VALARIE LINNEN, ESQ.
*Counsel for Kristopher Ervin*

SEAN SIEKKINEN,
*Assistant United States Attorney*


I further certify that two hard copies of the foregoing appendix are being furnished to the Clerk of this Court by mail.


<u>/s/ Matthew Larosiere</u>
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant Matthew Raymond Hoover*