Nos. 23-13062, 23-13106

# In the United States Court of Appeals for the Eleventh Circuit

KRISTOPHER JUSTINBOYER ERVIN,
MATTHEW RAYMOND HOOVER,

*Defendants-Appellants*,

v.

UNITED STATES OF AMERICA,

*Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida, Hon. Marcia Howard
No. 3:21-cr-00022-MMH-MCR-2

**BRIEF FOR *AMICI CURIAE* FIREARMS POLICY COALITION
AND FPC ACTION FOUNDATION SUPPORTING
APPELLANT MATTHEW HOOVER AND REVERSAL**

Erik S. Jaffe
 *Counsel of Record*
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amici Curiae*

No. 23-13062,
*United States of America v. Kristopher Ervin*
No. 23-13106,
*United States of America v. Matthew Hoover*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, and in addition to those persons and entities identified by the Appellants, the Firearms Policy Coalition and the FPC Action Foundation identify all additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

1.    Firearms Policy Coalition, *Amici Curiae*

2.    FPC Action Foundation, *Amici Curiae*

3.    Jaffe, Erik S., *Counsel for Amici Curiae*

4.    SCHAERR | JAFFE, LLP, *Counsel for Amici Curiae*

5.    Sherrill, Miranda Cherkas*, Counsel for Amici Curiae*

*Amici* are both nonprofit organizations, no *amicus* has a parent corporation, and no publicly held corporation owns 10% or more of either *amicus*. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Fed. R. of App. P. 26.1; 11th Cir. R. 26.1.

## TABLE OF CONTENTS

ISSUES PRESENTED ................................................................. 1

STATEMENT OF IDENTITY AND  INTEREST OF *AMICI CURIAE* ....................................................................... 1

SUMMARY OF ARGUMENT ................................................... 3

ARGUMENT ............................................................................ 4

I.    A METAL CARD DOES NOT MEET THE STATUTORY DEFINITION OF AN ILLEGAL MACHINEGUN. ................ 4

    A.    Understanding Firearm Mechanics Shows Why the Auto Key Card Is Not an Illegal Machinegun Part. ................................................................. 5

    B.    The Common Public Understanding of Machinegun Part Must Be a Complete Part, Not Something that Can Be Modified to Become a Machinegun Part........................................................ 12

II.    THE RULE OF LENITY REQUIRES THAT REASONABLE DOUBT THAT THE AUTO KEY CARD WAS AN ILLEGAL MACHINEGUN MUST BE RESOLVED IN APPELLANTS' FAVOR ............................. 18

CERTIFICATE OF COMPLIANCE ....................................... 23

# TABLE OF AUTHORITIES

**Case**                                                                    **Page(s)**

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023)...................................................... 11, 19, 20

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................. 18

*Garland v. Cargill*,
   144 S. Ct. 374 (Nov. 3, 2023)...................................................... 21

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   140 S. Ct. 789 (2020) ........................................................... 19, 21

*Harrison v. Vose*,
   50 U.S. (9 How.) 372 (1850). ....................................................... 17

*Liparota v. United States*,
   471 U.S. 419 (1985) .................................................................. 18

*McNally v. United States*,
   483 U.S. 350 (1987) .................................................................. 17

*S.W. Daniel, Inc. v. United States*,
   831 F.2d 253 (11th Cir. 1987) ...................................................... 12

*See Staples v. United States*,
   511 U.S. 600 (1994) .................................................................. 13

*United States v. Aguilar-Espinosa*,
   57 F. Supp. 2d 1359 (M.D. Fla. 1999) ............................................ 13

*United States v. Apel*,
   571 U.S. 359 ........................................................................... 19

*United States v. Cardiff*,
  344 U.S. 174 (1952) ............................................................... 19

*United States v. Kozminski*,
  487 U.S. 931 (1988) ................................................................ 4

*United States v. Phifer*,
  909 F.3d 372 (11th Cir. 2018) ............................................. 19

*United States v. Universal C. I. T. Credit Corp.*,
  344 U.S. 218 (1952) ............................................................... 18

*United States v. Wiltberger*,
  18 U.S. 76 (1820) .................................................................. 18

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................. 17

## Statutes

26 U.S.C. § 5845(b) .................................................... 4, 11, 13, 14, 16, 20

## Other Authorities

1 William Blackstone, COMMENTARIES 88 (4th ed. 1770) ...................... 18

Antonin Scalia & Bryan A. Garner, READING LAW:
  THE INTERPRETATION OF LEGAL TEXTS 343 (2012) .............................. 18

*AR-15 Drop-in Conversions "Swift" Link* .................................... 6

ATF Ruling 81–4 ........................................................... 5

Bureau of Alcohol, Tobacco, Firearms & Explosives,
  Intelligence Bulletin 21-01 (Jan. 21, 2021) .......................... 6

*Image of AR-15 Trigger Mechanism* ........................................ 6

iii

Mike Searson, *Turning Your AR-15 Into An M-16,*
 Recoil Mag. (June 5, 2019)....................................................................6

Press Release, U.S. Atty's Off., M.D. Fla, *Jacksonville Man Sentenced
 To Five Years In Federal Prison For Selling  Machinegun
 Conversion Device To Undercover Agent* (Dec. 2, 2022).......................6

Scott Devine & Curt Devine, *A device that can turn a
 semi-automatic weapon into a machine gun in moments is
 wreaking havoc on American Streets,*
 CNN (Aug. 30, 2022 9:05 P.M.) ..........................................................6

**Treatises**

SECOND TREATISE OF CIVIL GOVERNMENT § 22 .......................................19

## ISSUES PRESENTED

I.    Whether the district court erred in denying the Appellant's motion for judgment of acquittal and to set aside the indictment on charges of conspiring to transfer and transferring unregistered "combination[s] of parts designed and intended for use in converting a weapon into a machinegun" where the purported "combination of parts" was a homogenous piece of steel with an inaccurate drawing etched upon it and the possession or transfer of which thus did not constitute a chargeable actus rea.

. . .

IV. Whether applying 26 U.S.C. §§ 5861(e), 5871, and 18 U.S.C. § 2 to an individual who advertised a drawing on a homogenous piece of stainless steel violated the Second and Fourteenth Amendments.

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

**Firearms Policy Coalition (FPC)** is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual

right to keep and bear arms. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. FPC's legislative and grassroots advocacy programs promote constitutionally based public policy. Its historical research aims to discover the Constitution's original meaning. And its legal research and advocacy aim to ensure that constitutionally protected rights maintain their original scope.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to inform the public about the importance of constitutional rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms guaranteed by the Constitution are secured for future generations.

Counsel for Appellant Hoover and the United States have consented to the filing of this brief. No counsel for any party authored any part of this brief. No party or party's counsel contributed money intended to fund the preparation of submission of this brief, nor did any person other than *Amici Curiae*, their members, and their counsel.

## SUMMARY OF ARGUMENT

1. *Amici* agree with Appellant Hoover's opening brief and write separately here to expand upon two points. First, they provide additional information on the nature of an auto sear to highlight the district court's error in calling the product that Appellants had an illegal machinegun. At most, that product is a potential precursor to a machinegun part, which is not enough to satisfy the statutory definition. The simple truth is that items, even if they may one day be modified to become weapons (or parts thereof), are not weapons (or parts) until so modified. An unformed and unmachined piece of metal is just that—even if it might one day be transformed into a machine gun part. It is not yet such a part and is not capable of or intended for "use" in any weapon, much less capable of converting any weapon into a machinegun. To suggest that Congress intended, much less clearly stated that the meaning of machinegun includes a 2.5" x. 3.5" metal card, which could not be combined with any firearm and whose only utility as a weapon would be as a blunt object, is a grossly overbroad reading of the statutory language.

2. Second, *Amici* explain how the rule of lenity dictates reversal. If it were ambiguous whether potential precursors to what might

eventually be future machinegun "parts" qualify as illegal machineguns, courts must resolve that conflict in favor of Defendants under the rule of lenity. That "time-honored" rule satisfies core constitutional requirements "to promote fair notice, . . . to minimize the risk of selective or arbitrary enforcement, and to maintain [the separation of powers]." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). The attempt to prosecute possession of unformed and unmachined materials that *might* one day be converted into a functional and complete auto sear extends the scope of the statutory definition of machinegun into far broader and more uncertain realms. The district court's reasoning should be rejected, and the decision below should be reversed.

## ARGUMENT

## I.  A METAL CARD DOES NOT MEET THE STATUTORY DEFINITION OF AN ILLEGAL MACHINEGUN.

The definition of "machinegun" in 26 U.S.C. § 5845(b) includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled." If Appellants had transferred and possessed an actual auto sear without a license, that would be illegal. But Appellants did not

have an auto sear. They had metal cards that fit into a wallet, some with bottle openers cut out, with incomplete and inaccurate tracings of a potential auto sear. Such metal cards are not a "part" of a weapon at all. At most, the Auto Key Card can be considered a precursor to an auto sear. But more likely just a bottle opener or curiosity with an aspirational artistic rendering of what possessors wish they could lawfully possess. The mere potential for potential precursor material to be converted into an actual part of a weapon is not enough to meet the statutory definition of a machinegun. Any number of household items potentially could be converted into an auto sear, such as a metal wall hook or a wire clothes hanger. To be a machinegun or machinegun part, an item needs to be a complete part that could actually be combined with a weapon, or else the list of "parts" would grow exponentially.

### A.    Understanding Firearm Mechanics Shows Why the Auto Key Card Is Not an Illegal Machinegun Part.

A "drop-in auto sear" or simply "auto sear" can allow a semiautomatic weapon to become an automatic weapon. Auto sears became popular in the 1970s among firearms experts, but in 1981, ATF deemed them machinegun parts. ATF Ruling 81–4, http://tinyurl.com/yhvetacc.

Auto sears take different shapes and forms. For example, an auto sear for the Colt SP-1 and a handful of early-civilian-made AR-15s was sold in the 1980s as a Lightning Link Auto Connector with a two-piece design.[1] One for use with an M-16 bolt carrier, called a Swift Link, resembles a lowercase cursive "r."[2] Similarly, an auto sear for a Glock pistol, called a switch, is shaped like a metal nail stuck in a small metal box.[3] These and similar devices, when inserted into the firing mechanism of compatible firearms, effectively automate the timing and release of the hammer so that the firearm continues to fire without having to release and pull the trigger for each subsequent shot.

---

[1] Mike Searson, *Turning Your AR-15 Into An M-16,* Recoil Mag. (June 5, 2019), https://www.recoilweb.com/turning-your-ar-15-into-an-m-16-150631.html.

[2] *AR-15 Drop-in Conversions "Swift Link,"* https://www.ar15.com/media/mediafiles/224641/CaptureS-640575.JPG (showing a swift link); Bureau of Alcohol, Tobacco, Firearms & Explosives, Intelligence Bulletin 21-01 (Jan. 21, 2021), https://gunowners.com/images/FOIA_Requests/Intelligence-Bulletin-21-01-swift-link.pdf.

[3] *See* Press Release, U.S. Atty's Off., M.D. Fla, *Jacksonville Man Sentenced To Five Years In Federal Prison For Selling Machinegun Conversion Device To Undercover Agent* (Dec. 2, 2022), https://www.justice.gov/usao-mdfl/pr/jacksonville-man-sentenced-five-years-federal-prison-selling-machinegun-conversion; Scott Devine & Curt Devine, *A device that can turn a semi-automatic weapon into a machine gun in moments is wreaking havoc on American Streets* CNN (Aug. 30, 2022 9:05 P.M.), https://www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html.

The trigger mechanism of a semiautomatic firearm, as shown in Image 1 below, consists of a trigger, hammer, and disconnector.[4] The hammer is spring-loaded, storing energy as it moves rearward into the "cocked" position in preparation for firing. The trigger keeps the hammer in the "cocked" position by way of its "sear," a geometric plane that locks the trigger and hammer together where neither can budge until the trigger is pulled. Image 2.




---

[4] The process of triggering can be viewed at Firearms Policy Coalition, *Image of AR-15 Trigger Mechanism*, http://publicfiles.firearmspolicy.org/ar15.gif. (last visited Jan. 24, 2024).

At the core of a semiautomatic rifle is the bolt. The bolt ensures that an ammunition shell stays firmly in place so that sufficient energy pushes the bullet down the barrel, rather than simply pushing the bolt backward. Inside the bolt is the firing pin. When the trigger is depressed, the trigger sear slides out of the way of the hammer, allowing the hammer to swing and strike the firing pin. Image 3. The hammer then strikes the firing pin, which in turn strikes and ignites the primer and results in a single round being discharged. Image 4.



In a semiautomatic firearm, once a shot is fired, energy from the gunpowder causes the bolt to return to its starting position, and in doing so, the bolt re-cocks the hammer. By the time the bolt reciprocates, the operator may still have the trigger depressed. This is where the "disconnector" comes into play. When the trigger is depressed, the disconnector moves into its active state. Image 5. When the weapon fires, the bolt travels rearward, pushing the hammer to the rear. The disconnector captures the hammer near its rearmost position. Image 6.

As the operator releases the trigger, the hammer slips off the disconnector and back onto the trigger's sear, where it is ready to be fired again.



The timing of this process is sensitive. Were it not for the disconnector, upon firing, the bolt would push the hammer rearward. But as the bolt returned forward under spring pressure, the hammer would "follow" the bolt as it returns to battery, failing to re-cock the hammer or to strike the firing pin with sufficient force to discharge a subsequent round. Absent extraordinary circumstances, this creates a need to manually re-cock the hammer. Accordingly, a typical semiautomatic firearm would not become a "machinegun" even absent a disconnector.

A weapon failing to fire a subsequent shot because the hammer was not re-cocked experiences what is known as a "hammer follow" malfunction. For a true machinegun, the "hammer follow" problem is one of precise timing. If the hammer is released too early, the hammer will follow the bolt and the firearm will not fire, needing to be manually re-cocked. If released too late, the bolt will lose forward travel before tripping the mechanism. This issue of timing is handled in machineguns by an "auto sear." Image 7.



The "auto sear" is a carefully shaped weapon part designed to hold the hammer in the "cocked" position until the firearm's bolt has returned all the way forward to battery, solving the "hammer follow" problem. Images 9-11. The auto sear then releases the hammer and discharges the weapon again. Image 12. No additional input is needed from the weapon's operator. With an auto sear mechanism, if the trigger is depressed, the weapon will fire continuously and (fairly) consistently until ammunition is depleted.





**B.    The Common Public Understanding of Machinegun Part Must Be a Complete Part, Not Something that Can Be Modified to Become a Machinegun Part.**

Possessing an auto sear is legally the same as possessing a machinegun. *Cargill v. Garland*, 57 F.4th 447, 454 (5th Cir. 2023), *cert. granted,* 144 S. Ct. 374 (Nov. 3, 2023) (No 22-976). But possessing the Auto Key Card is not. "Congress has defined machinegun to mean 'any weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger,' or any accessory that allows a firearm to shoot in that manner." 26 U.S.C. § 5845(b). A machinegun also includes

> "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

A plain reading of the statute means that the Auto Key Card does not qualify. The Auto Key Card is not a "part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun" because it is not a "part" of a weapon at all. It does not fit into a firearm without material alteration by someone with expertise in both firearms and a non-basic level of manufacturing. It also was not "solely and exclusively" "designed and intended . . . for use" in converting

a semiautomatic firearm into an automatic one. It was meant to be provocative—a conversation piece. Its value is in not being transformed into an auto sear. At a minimum, that expressive purpose vitiates any notion that it was "solely" intended for further use in a weapon. Nor is the Auto Key Card a "combination of parts, designed and intended for use in converting a weapon into a machinegun" or from which a machinegun can be assembled. At a minimum, the card is not a part at all, and furthermore, the defendants did not possess any other "parts" that, even combined with the unformed metal card, could collectively be added to a weapon to convert it into a machinegun.

To manufacture the Auto Key Card into a functional auto sear, one would need to first machine smaller shapes out of the metal plate and then shave off indeterminate chunks to make the cut-outs fit into a particular firearm. Not an easy process. To be sure, "the frequency or likelihood of" an expert converting a potential or theoretical precursor into an actual part "is irrelevant." *S.W. Daniel, Inc. v. United States*, 831 F.2d 253, 254 n.2 (11th Cir. 1987). Rather, the line between a hypothetical precursor or a potential part needs to be clear. Too much needs to be done to the Auto Key Card for it to become "a part." The

statute, at a minimum, implies that materials will not be deemed parts or combinations of parts if something more is required than "a less than arduous" transformation from someone who is "not necessarily [an] expert or artistic worker," with only "common[]" tools, but not "the resources available to a master machinist with a modern and well-equipped lathe." *United States v. Aguilar-Espinosa*, 57 F. Supp. 2d 1359, 1362 (M.D. Fla. 1999) (considering § 5845(b)). Rather, the part needs to be "for use." § 5845(b). Reading the statute to require further steps to advance a potential precursor to a part into an actual and functional part "avoid[s] inadvertently ensnaring the innocent" and instead "capture[s] the guilty." *See Staples v. United States*, 511 U.S. 600, 615 (1994) (government must prove *mens rea* to possess a machinegun beyond a reasonable doubt to protect those who have not acted upon the intent to possess a machinegun). Absent those additional manufacturing steps, there is no actual "part" at all.

Indeed, the same steps needed to machine the Auto Key Card into an auto sear could do the same thing with almost any piece of scrap metal. There are countless images of lightning links on the internet that could be laid over a thin piece of metal, like a metal credit card, hacksaw

blade, shovel, or a piece of shelving, and then traced. The district court's interpretation of 26 U.S.C. § 5845(b) would mean any number of household items that *could* be transformed into an auto sear would be criminal. Wall hooks and clothes hangers already have been converted into auto sears, for example. In fact, a simple Google search of a "coat hanger auto sear" provides numerous how-to hits that, under the district court's logic, would mean every metal coat hanger in the United States is actually a machinegun part merely waiting to be cut and bent according to universally available information on the internet.

There is nothing magic about having the tracing already on the metal of an Auto Key Card. For instance, a precursor "AK-47 flat"—a piece of metal with laser perforations that could allegedly be folded to become part of a firearm—is not a firearm part. *United States v. Prince*, No. 09-10008-JTM, 2009 WL 1875709, at *3 (D. Kan. June 26, 2009), *overruled on other grounds by* 593 F.3d 1178 (10th Cir. 2010) (government did not appeal relevant holding). Tracings make no difference: "the flat piece of metal is somewhat akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an

15

airplane until it is properly folded." *Id.* "Until that time, it is a patterned piece of paper." *Id.* "It may become part of a firearm at some point, but not until further work has been accomplished to allow it to secure the stock, chamber, barrel and other parts." *Id.* Until that time, it is not even a true component of a firearm, only a potential component of a firearm. The statute, as written, does not extend that far." *Id.*

The only magic of the tracing on the piece of metal is for the product's intended purpose—to be provocative. Furthermore, even if the tracing suggests a purported intent for the metal eventually to become a part, it still would not be a "part" intended to produce a machinegun. To hold otherwise allows infinite regression where mere intent to produce something via multiple subsequent transformations, without the requisite acts consummating such supposed intent, would cycle backwards to produce an ever-expanding and uncertain range of criminal precursor "parts," all the way back to basic raw materials.

The district court acknowledged that one needed to "materially alter" the Auto Key Card to produce an actual auto sear but did not fully understand how much and why the need for alteration is significant. Doc. 2-4 at 9-10. Not only did the government have to cut the etchings out of

16

an Auto Key Card, but once cut out the etched pieces still needed to be altered to fit the firearm ATF chose. *Id.* Those multiple modifications are the difference between criminal and not. ATF's expert had to remove "some of the material" off the paddle because it was "a little bit too tall." Doc 1-3 at 9. This makes sense because auto sears are not a one-size-fits-all component. Rather, auto sears are designed for specific firearm makes and models. But the mechanics of a firearm require such precision that if an auto sear is not the right length or width or does not fit in at the right angle, then it will have no ability to make a semiautomatic firearm fire automatically. A potential or hypothetical precursor to a "part" that could convert a weapon into a machinegun is just not enough to be an illegal machinegun part itself. The depiction's inaccuracy makes it more like Picasso or Keith Haring than a blueprint. Until someone makes the hypothetical precursor functional, it is not a "part" of a weapon under 26 U.S.C. § 5845(b), and hence not a "machinegun."

## II.    THE RULE OF LENITY REQUIRES THAT REASONABLE DOUBT THAT THE AUTO KEY CARD WAS AN ILLEGAL MACHINEGUN MUST BE RESOLVED IN APPELLANTS' FAVOR.

To the extent that the meaning of machinegun "part" is ambiguous, "all reasonable doubts concerning [the] meaning [of a penal statute] . . . operate in favor of [Appellants]." *Harrison v. Vose*, 50 U.S. (9 How.) 372, 378 (1850). After "having exhausted the applicable semantic and contextual canons of construction," the rule of lenity is "a traditional interpretive tiebreaker" that requires any remaining "meaningful doubt" "about the application of a criminal statute" to "be resolved in the defendant's favor." *United States v. Caniff*, 955 F.3d 1183, 1191 (11th Cir. 2020). So even if the statute does not clearly exclude nonfunctional potential precursors, the court below should have "invoke[d] the rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Yates v. United States*, 574 U.S. 528, 547-48 (2015) (citation omitted).

The rule of lenity is a basic principle of statutory interpretation requiring courts to construe any unclear or ambiguous criminal laws narrowly. *McNally v. United States*, 483 U.S. 350, 359-60 (1987). "[W]hen a choice has to be made between two readings of what conduct Congress

18

has made a crime, it is appropriate . . . to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221–22 (1952).

The "rule . . . provides a time-honored interpretive guideline." *Liparota v. United States*, 471 U.S. 419, 427 (1985). As Chief Justice Marshall noted, its role in American legal tradition antedates the Constitution. *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). *See also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 343 (2012) (the rule of lenity "reflect[s] the spirit of the common law"). William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *District of Columbia v. Heller*, 554 U.S. 570, 593–94 (2008) (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)), agreed that "[p]enal statutes must be construed strictly," 1 William Blackstone, COMMENTARIES 88 (4th ed. 1770). "Where the statute acts upon the offender, and inflicts a penalty, as the pillory or a fine, it is then to be taken strictly." *Id.* John Locke believed that "[f]reedom of men under government is, to have a standing rule to live by . . . made by the legislative power erected in it . . . and not to be subject to the inconstant, uncertain, unknown, arbitrary will of

another man." John Locke, SECOND TREATISE OF CIVIL GOVERNMENT § 22, at 13 (J. Gough ed. 1947). Indeed, "[w]ords which are vague and fluid may be as much of a trap for the innocent as the ancient laws of Caligula." *United States v. Cardiff*, 344 U.S. 174, 176 (1952) (citation omitted).

Underlying the rule of lenity are two principles: "fair warning . . . in language that the common world will understand," and "the separation-of-powers doctrine." *United States v. Phifer*, 909 F.3d 372, 383 (11th Cir. 2018) (quoting *United States v. Bass*, 404 U.S. 336, 348 (1971)). Thus, courts may not interpret the "purpose" of a criminal statute to make it "say something it doesn't, or ignor[e] an ambiguity." *Caniff*, 955 F.3d at 1192.[5]

---

[5] Because of the rule's roots in fair warning and leaving the enactment of criminal prohibitions to the legislature, ATF's interpretation is not entitled to deference from this Court. *Phifer*, 909 F.3d at 384; *see United States v. Apel*, 571 U.S. 359, 369 (2014) (Court has "never held that the Government's reading of a criminal statute is entitled to any deference."); *Cargill*, 57 F.4th at 466. The statute does not unambiguously include potential precursors to parts that are not themselves actual "parts," and even if the statute were ambiguous, deference still would not be due. "Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct. A 'reasonable' prosecutor's say-so" like that of ATF, "is cold comfort in comparison." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement concerning the denial of certiorari).

Applying the rule of lenity, this Court should reverse. The district court at best wrongly "ignor[ed] an ambiguity" in the statute and at worst deferred to the ATF's authority-expanding and agenda-driven prosecution. *See Caniff*, 955 F.3d at 1192. Reasonable minds can have meaningful doubt that the statute includes mere incomplete and hypothetical precursors of parts not actually fit "for use" in machineguns. *See* 26 U.S.C. § 5845(b). Appellants' statements evidence that an ordinary person would think a part needed to be functional to be illegal. Doc 1-3 at 13-14 (Ervin commented that a 95% complete part would be a "no-no"; Hoover explained that the "portable wall hanger" was not a machinegun because "modification needs to happen"). Yet the district court district court erroneously claimed to resolve the ambiguity by interpreting these same statements as evidence that Appellants knew the Auto Key Card was illegal. *Id.*

Instead, the court should have relied on the time-honored rule of lenity. The Fifth Circuit recently relied on the rule of lenity in its bump stock case, reasoning that just in case it was incorrect in its interpretation of the same statute at issue here, 26 U.S.C. § 5845(b), the statute was "at the very least ambiguous." *Cargill*, 57 F.4th at 469–70.

21

That case is now before the U.S. Supreme Court, *Garland v. Cargill*, 144 S. Ct. 374 (Nov. 3, 2023), and its lenity rulings for the same statute at issue here are more than likely to be affirmed, *see Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 140 S. Ct. 789, 791 (2020) (Gorsuch, J., statement concerning the denial of certiorari). Likewise, the applicable part of the statute here is ambiguous such that the rule of lenity favors Appellants and reversal.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and instruct the district court to enter judgment for Appellants.

Dated: January 25, 2024

Respectfully submitted,

*/s/ Erik S. Jaffe*
Erik S. Jaffe
  *Counsel of Record*
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 4,144 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)(A) and 32(a)(6), and 11th Cir. R. 32-4, because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: January 25, 2024

*/s/ Erik S. Jaffe*
Erik S. Jaffe