THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

BRIEF FOR APPELLANT

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................1

TABLE OF AUTHORITIES .................................................................2

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES...5

STATEMENT OF JURISDICTION.........................................................6

STATEMENT REGARDING ORAL ARGUMENT .............................................6

STATEMENT OF THE ISSUES...........................................................7

CERTIFICATE OF INTERESTED PERSONS .......................................8

STATEMENT OF THE CASE ..............................................................9

SUMMARY OF THE ARGUMENT.....................................................23

ARGUMENT ...................................................................................26

I.      Under the Fifth Amendment, the district court reversibly erred by denying the motion to dismiss and/or motion for judgment of acquittal for the firearms-related charges on the basis of statutory vagueness. .....................................26

II.     Under Rule 29, Federal Rules of Criminal Procedure (2023), the district court reversibly erred by denying the motion for judgment of acquittal on the basis that the Auto Key Card does not fall within the statutory definition of machinegun within the meaning of Section 5845(b). ...................................34

III.    Under Rule 29, Federal Rules of Criminal Procedure (2023), the district court reversibly erred by denying the judgment of acquittal as there was insufficient evidence that Mr. Ervin structured bank withdrawals for the purpose of evading the reporting requirement. ..............................................40

IV.     Under the Fifth Amendment, the district court deprived Mr. Ervin of Due Process of Law by failing to orally pronounce at sentencing all discretionary "standard conditions" of probation. ..............................................47

CONCLUSION .................................................................................54

CERTIFICATE OF SERVICE.............................................................55

CERTIFICATE OF TYPEFACE COMPLIANCE ...............................................55

# TABLE OF AUTHORITIES

U.S. Const. amend. V ........................................................................passim

18 U.S.C. § 2 (2021) ........................................................................passim

18 U.S.C. § 371 (2021) ........................................................................passim

18 U.S.C. § 3583 (2023) ........................................................................passim

26 U.S.C. § 5861 (2021) ........................................................................passim

26 U.S.C. § 5871 (2021) ........................................................................passim

31 U.S.C. § 5313 (2020) ........................................................................passim

31 U.S.C. § 5324 (2021) ........................................................................passim

U.S.S.G. § 5D1.3 (2024) ........................................................................51

Cargill v. Garland, 57 F.4th 337, 471 (5th Cir. 2003),

    cert. granted 144 S. Ct. 374 (Nov. 3, 2023) ........................................31

City of Chicago v. Morales, 527 U.S. 41 (1999) ....................................30

Dickerson v. New Banner Inst., Inc., 460 U.S. 103 (1983).....................28

Geudes v. ATF, 140 S. Ct. 789 (2020).....................................................29

Henley v. Heritage, 337 F.2d 847 (5th Cir. 1964) ..................................48

Johnson v. United States, 576 U.S. 591 (2015).......................................29

Kolender v. Lawson, 461 U.S. 352 (1983)...............................................31

McNally v. United States, 483 U.S. 350 (1987) ......................................29

Skilling v. United States, 561 U.S. 358 (2010)........................................29

Smith v. Goguen, 415 U.S. 566 (1974) .................................................30

S.W. Daniel, Inc. v. United States, 831 F.2d 253 (11th Cir. 1987).......................37

United States v. Anstice, 930 F.3d 907 (7th Cir. 2019) ...................................50, 54

United States v. Bass, 404 U.S. 336 (1971) .............................................28

United States v. Bates, 213 F.3d 1336 (11th Cir. 2000) ..........................................48

United States v. Campos-Serrano, 404 U.S. 293 (1971).........................................28

United States v. Carpenter, 702 F.3d 882 (6th Cir. 2012)........................................48

United States v. Chavez, 204 F.3d 1305 (11th Cir. 2000) ...................................48

United States v. DeVeteger, 198 F.3d 1324 (11th Cir. 1999) ................................27

United States v. Enmons, 410 U.S. 396 (1973)........................................28

United States v. Frazier, 26 F.3d 110 (11th Cir. 1994) ...........................................48

United States v. Geddes, 71 F.4th 1206 (10th Cir. 2023) .......................................49

United States v. Lanier, 520 U.S. 259 (1997) .......................................29, 30, 32, 33

United States v. Matthews, 54 F.4th 1 (D.C. Cir. 2022) .......................50, 51, 53, 54

United States v. Montoya, 82 F.4th 640 (9th Cir. 2023)...................................49, 54

United States v. Rodriguez, 75 F.4th 1231 (11th Cir. 2023)...................................52

United States v. Rogers, 961 F.3d 291 (4th Cir. 2020) .........................49, 50, 52, 53

United States v. Universal C.I.T. Credit Corp., 344 U.S. 218 (1952)...............29, 32

United States v. Williams, 390 F.3d 1319 (11th Cir. 2004)............................passim

Wooden v. United States, 142 S. Ct. 1063 (2022) ...................................31

<u>Yates v. United States</u>, 574 U.S. 528 (2015)..........................................................31

Fed. R. Crim. P. 12 (2023) ...................................................................27

Fed. R. Crim. P. 29 (2023) ...........................................................passim

Fed. R. Crim. P. 43 (2023) ...................................................................50

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

Pursuant to 11th Cir. Rule 28-1(f), Mr. Ervin adopts all arguments made by *Amici Curiae* Firearms Policy Coalition and FPC Action Foundation, including but not limited to the arguments that the metal card does not meet the statutory definition of a machinegun (Argument I) and that the rule of lenity be applied to this case (Argument II).

Mr. Ervin also adopts all arguments made by Mr. Hoover, including but not limited to the arguments regarding the motion for judgment of acquittal (Argument III), the First Amendment violation (Argument IV), and the Second Amendment violation (Argument V).

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this federal criminal action pursuant to Title 18, Section 3231, United States Code (2023).  This Court has appellate jurisdiction to review the final sentence pursuant to Title 18, Section 3742, United States Code (2024).

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument to assist this Court in deciding these important matters of constitutional law.

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether the district court erred by denying the motion to dismiss and/or motion for judgment of acquittal on the basis of statutory vagueness.

II.     Whether the district court reversibly erred by denying the motion for judgment of acquittal on the basis that the Auto Key Card does not fall within the statutory definition of machinegun under Section 5845(b).

III.    Whether the district court erred by denying the judgment of acquittal on the basis that there was insufficient evidence Mr. Ervin structured bank withdrawals for the purpose of evading the reporting requirement.

IV.     Whether the district court deprived Mr. Ervin of Due Process of Law by failing to orally pronounce at sentencing all discretionary "standard conditions" of probation.

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellant, KRISTOPHER JUSTINBOYER ERVIN, by and through the counsel, hereby certifies the following as Interested Persons:

1) BARKSDALE, Patricia D. – U.S. Magistrate Judge

2) CALL, Lisa – Assistant Public Defender

3) CORRIGAN, Timothy J. – U.S. District Judge

4) ERVIN, Kristopher Justinboyer – Defendant / Appellant

5) HARRINGTON, Jennifer Michelle – Assistant U.S. Attorney

6) HOOVER, Matthew Raymond – Co-Defendant

7) HOWARD, Marcia Morales – U.S. District Judge

8) KING, Alex – Trial Defense Counsel

9) KLINDT, James R. – U.S. Magistrate Judge

10) LINNEN, Valarie – Appellate Counsel for Mr. Thomas

11) MESROBIAN, David B. – Assistant U.S. Attorney

12) MONROE, Daniel Scott – Former Defense Counsel

13) RICHARDSON, Monte C. – U.S. Magistrate Judge

14) SIEKKINAN, Sean – Assistant U.S. Attorney

15) TAYLOR, Lisa Cofer – Assistant U.S. Attorney

16) TRAN, Mia – Assistant U.S. Attorney

## STATEMENT OF THE CASE

This appeal arises from the *Judgment* and sentence in which the district court, following a jury trial, adjudicated guilty Appellant, KRISTOPHER JUSTINBOYER ERVIN, of twelve counts of criminal conduct and sentenced him to a total of sixty-eight (68) months imprisonment followed by three years of supervised release. (Dkt.331, citing Dkt.324)

## Superseding Indictment – Fourth (Dkt.204)

Previously, a grand jury indicted Mr. Ervin on twelve (12) counts of criminal conduct:

- Count One: Conspiracy to Defraud the United States (18 U.S.C. § 371);

- Count Two: Unlawful Transfer of Firearms on November 14, 2020 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Three: Unlawful Transfer of Firearms on November 30, 2020 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Four:  Unlawful Transfer of Firearms December 12, 2020 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Five:  Unlawful Transfer of Firearms December 23, 2020 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Six: Unlawful Transfer of Firearms December 23, 2020 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Seven: Unlawful Transfer of Firearms January 17, 2021 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Eight:  Unlawful Transfer of Firearms February 1, 2021, 2021 (18 U.S.C. § 2, 26 U.S.C. §§ 5861(e) & 5871 (2020));

- Count Nine:  Structuring Bank Transactions (31 U.S.C. § 5324(a)(3) and (d)(1) (2021));

- Count Ten:  Possession of Unregistered Firearm on February 22, 2021 (machine gun conversion devices) (26 U.S.C. §§ 5861(d) and 5871 (2021));

- Count Eleven: Possession of Unregistered Firearm on February 24, 2021 (machine gun conversion devices) (26 U.S.C. §§ 5861(d) and 5871 (2021));

- Count Twelve: Possession of Unregistered Firearm on March 2, 2021 (machine gun conversion devices) (26 U.S.C. §§ 5861(d) and 5871 (2021)).

(Dkt.204). Mr. Ervin pled not guilty.

## Government's Statement of the Case (Dkt.226)

Beginning in October 2020 and continuing through July 2021, the government alleged that Mr. Ervin conspired with co-defendant Matthew Raymond Hoover to transfer unregistered machine gun devices (known as "lightening links" or auto sears) through Mr. Ervin's Auto Key Card business.  (Dkt.223)  The government alleged that the Auto Key Cards:

consisted of cards machined from stainless steel, into which were etched the design for machinegun conversion devices known as lightning links, which constituted machineguns … in that they are a combination of parts designed and intended for use in converting a weapon into a machinegun.

(Id., citing Dkt.204, p.2). According to the government, these Auto Key Cards were designed to convert a semi-automatic AR-15 style rifle by firing more than one round with a single squeeze of the trigger. (Dkt.223 p.4). Essentially, the government alleged that the Auto Key Cards converted a semi-automatic rifle into a fully automatic machine gun. (Dkt.310 p.4)

The evidence at trial showed that Ervin's Auto Key Cards are stainless steel cards into which the designs of "lightning links," a type of machinegun conversion device, were etched on to the surface. (Dkt.310 p.4)

Mr. Hoover posted YouTube videos to promote the sale of the key cards, identify AutoKeyCard.com as a sponsor, and then Mr. Ervin would mail Mr. Hoover cash or items of value (such as a Louis Vutton bag or video production equipment). (Dkt.310 at 4)

The government also charged Mr. Ervin with substantive counts of transferring unregistered machine gun devices. (Dkt.226).

Additionally, the government alleged that Mr. Ervin structured bank withdrawals and deposits under the $10,000 limit to evade IRS reporting requirements. (Dkt.226)

## <u>Mr. Ervin's Motion to Dismiss Indictment (Dkt.30)</u>

Prior to trial, Mr. Ervin moved to dismiss the indictment. (Dkt.30, adopted by Dkt.42). He raised four grounds in support thereof:

- Failure to state on offense;

- Unconstitutional Vagueness;

- First Amendment Violations; and

- Exceeding Congress' Powers under the Tax and Spend Clause.

(Dkt.30)

**Failure to State on Offense:** As to the firearms counts, Mr. Ervin argued that the Indictment failed to state an offense because the laser-etched images on the metal card did not fall within the definition of firearms and machine guns within the definition of 26 U.S.C. § 5845 (2021). (Dkt.30 p.2). "The object described by the government does not constitute a machine gun conversion device under § 5845." (Dkt.30 p.4). Moreover, he argued that any ambiguity must be resolved in favor of lenity. Simply put, Mr. Ervin argued that "[t]he ATF agent's use of a Dremel for thirty-seven minutes to create something new out of the metal card is not the same as using a 'part' to convert a weapon into a machine gun." (Dkt.30 p.6)

He further argued, "To the degree that the agent's kludgy weapon can be called a machine gun, making it required the agent to fabricate a part, using the

autokeycard as raw material. The statutory scheme does not restrict raw materials or card-sized sheets of metal." (Dkt.30 p.6)

The district court denied the motion on the record:

And the definition of a machine gun includes the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended for use in converting a weapon into a machine gun.

And so, in my view, the question of whether this keycard is a part that was designed and intended, whether exclusively or combined with other parts, to convert a weapon into a machine gun is a question that only the jury can decide. It is not a question that the Court can decide.

(Dkt.48 p.12)

**Void for Vagueness:** As for the vagueness argument, the district court cited existing precedent in the Eleventh Circuit holding that the same statute was not unconstitutionally vague. (Dkt.48 p.15).

**First Amendment:** As for the First Amendment argument, the district court ruled that it was a factual issue for the jury to decide whether the metal cards were artistic expressions or whether the cards were parts designed and intended for use in converting a semiautomatic rifle into a fully automatic machine gun. (Dkt.48 p.15)

# JURY TRIAL

**JESSE HOOKER:**  ATF Special Agent Hooker testified his investigation began after a credit union advised him about unusual activity on a bank account belonging to Mr. Ervin.  (Dkt.277 p.242).  The unusual activity consisted of large withdrawals from the bank account and unusual deposits that appeared to be business related.  (Dkt.277 p.242).  Specifically, a bank investigator located a website connected with Mr. Erving that sold items allegedly used to convert an AR-15 rifle into a machine gun.  (Dkt.277 p.242)

Hooker stated that he accessed the website at AutoKeyCards.com.  (Dkt.277 p.243). The website appeared to sell "lightening link" key cards.  He testified that a "lightening link" is a "two-part machine gun conversion device."  Made of metal, he stated that the auto key cards shown on the website "depict three complete lightening link machine gun conversion devices consisting of a larger, longer piece as well as a small piece that would fit in – there's a little slot that it would fit in."  (Dkt.277 p.244-245)

From the website, Hooker identified an address in Orange Park, Florida, associated with Mr. Ervin.  (Dkt.277 p.246)

Hooker obtained approval from ATF to obtain and test one of the auto key cards sold on the website.  He purchased a total of three Auto Key Cards using

fictitious names, email addresses, and post offices boxes. (Dkt.277. p.247-248, 259-262)

According to Hooker, the form used to for the order directed the money order be made payable to "J. Ervin" at the Orange Park address. (Dkt.277 p.263). This money order was later deposited into an account at Community First Credit Union of Florida. (Dkt.277 p.265)

As part of the investigation, Hooker obtained surveillance camera footage from the credit union and the bank records of Mr. Ervin. (Dkt.277 p.266). Hooker identified Mr. Ervin on the surveillance camera video footage at the credit union. (Dkt.277 p.271)

Hooker then testified that he worked with postal investigator Keith Hannon to make an undercover purchase. According to Hooker, Hannon made the purchase under the name of Richard Carter in the amount of $230 and had the items mailed to a post office box in Savannah, Georgia. (Dkt.278 p.9). According to bank records, the money order in the amount of $230 was deposited into an account at Community First Credit Union on February 3, 2021. (Dkt.278 p.9)

Hooker participated in the execution of a search warrant at Mr. Ervin's residence on March 2, 2021. (Dkt.278 p.14). Agents discovered a stack of Auto Key Cards on a work bench in a detached garage. (Dkt.278 p.17). In total, Hoover

testified that agents discovered a total of 1,550 auto key cards at the residence. (Dkt.278 p.24)

**RICHARD ROBERTS:**  Richard Roberts testified that he bought an auto key card online.  In an email to Mr. Ervin, Roberts stated that he owns a tooling shop, that he cut out the auto key card on the lines, but stated that inserting those pieces into his rifle would not allow him to fire more than one round at a time. (Dkt.282 p.111)[1]

**OFFICER CODY JAMES TOY:**  Officer Toy testified that he used a "Dremel tool" with a rotary bit to trace the lines on the key card and remove the item from the card.  (Dkt.283 p.148)  He then used a hand file to remove some of the remaining sharp edges from the piece.  (Dkt.283 p.150).  However, Toy testified that he had to grind down the item because it was too tall to insert into the firearm:  "I do believe I had to remove some of the material off of the paddle.  And I think I used a belt sander or a grinding wheel to remove some of the material because it was just a

---

[1] At sentencing, the district court noted that none of the witnesses presented by the government who actually purchased the Auto Key Card testified were able to successfully cut out pieces in order to make a semiautomatic rifle fire automatically:  "But in terms of the level of danger of these particular devices, I think the evidence at trial was that the only person who successfully converted it was the agent."  (Dkt.329 p.73)

little bit too tall." (Dkt.283 p.151-152). Specifically, Toy testified that he had to custom fit the pieces to the specific model of rifle:

> Different AR-type firearms from different manufacturers have different tolerances, and so they're not all the same. So what would work in one firearm might not work in another one. It would have to be what we refer to as hand fitting to make sure it works.

(Dkt.283 p.151-152)

As for the first function test of the cut out pieces, Toy testified that the item inserted into an AR-15-style rifle did not work properly: "…it wasn't reliably functioning the way it was supposed to…". (Dkt.283 p.154). Toy had to remove the standard bolt from the semiautomatic rifle and insert the bolt from an M-16 machine gun in order for the cut out pieces to work:

> This device [the cut out pieces] is typically used with a semiautomatic bolt carrier. But whenever I used a semiautomatic bolt carrier, it wasn't reliably functioning the way it was supposed to, so I attempted to use a machine gun – an M16 – bolt carrier. And the machine gun bolt carrier actually worked better than the semiautomatic one did.

(Dkt.283 p.154)

As for a second round of cut outs, Toy testified that the cut out pieces did not cause the semiautomatic rifle to fire automatically. (Dkt.283 p.161)

Toy tried cutting out pieces from an Auto Key Card a third time. This time, he testified that it took him 53 minutes to cut out the two pieces. (Dkt.283 p.162). When he inserted these pieces into a semiautomatic rifle, he testified that the pieces caused the rifle to fire automatically. (DKt.283 p.161-162, 163)

In total, it took Agent Toy three attempts at cutting out the Auto Key Cards, using a Dremel took a belt sander or grinding wheel, a drill press, and a hand file in order to machine pieces from the Auto Key Card that actually caused a semiautomatic rifle to fire automatically.  (Dkt.283 p.150-163)

**ANDREA USECHE:**  Andrea Useche testified that she investigates fraud for Community First Credit Union.  (Dkt.279 p.133).  She testified that the following suspicious cash withdrawals were made from Mr. Ervin's business bank account:

- 12/28/2021 - $9,000
- 12/28/2021 - $5,000
- 12/29/2021 - $9,000
- 12/30/2021 - $9,000
- 12/31/2021 - $9,000
- 01/02/2022 - $9,000
- 01/05/2022 - $9,000
- 01/06/2022 - $9,000

(Dkt.279 p.148-150) Useche testified that regular cash withdrawals under the $10,000 reporting amount generally triggers a red flag for investigation.  (Dkt.279 p.151)

Based upon information provided to her, Useche contacted ATF believed that Mr. Ervin might be involved in illegal firearms activity connected with the bank account.  (Dkt.279 p.152)

**AMY SARKESE:** Former assistant branch manager for Community First Credit Union Amy Sarkese testified that Mr. Ervin told her he was "making metal business cards." (Dkt.279 p.160). She stated that Mr. Ervin specifically asked her how much money he could withdraw without it being reported. (Dkt.279 p.162) However, Sarkese did not answer his question:

> Q: Do you recall ever having a discussion with Mr. Ervin about what the threshold was to – that the bank would report cash?
>
> A: Yes.
>
> Q: Could you tell the grand jury – the jury about that.
>
> A: So it was asked to me at one point what that dollar amount is as far as reporting goes. **And obviously I didn't give that information because we're not allowed to.** But it was asked at one point, "Well, how much can I take out so it's not reported?"

(Dkt.279 p.162) Later, Sarkese testified about a subsequent interaction as follows:

> Q: So I'd like to direct you now to December 28th, 2020. Do you recall a visit by Mr. Erving to your branch that day?
>
> A: Yes.
>
> Q: What business did Mr. Erving initially have with your branch on that date?
>
> A: He wanted to deposit a $100 money order, but it was payable to "Auto Key Card," which was a product that he told us that he sells. When we told him we couldn't take the check the way it was payable – because he was trying to put it into a personal account and we don't allow that – he got upset again, said that we wouldn't be getting his business account, mortgages, loans, et cetera, and that he wanted to take all of his money out in cash.

We told him it would need to be a special order because of the amount and it wouldn't be available until the end of the next week because we don't order every singled ay.

And then continued to change the dollar amount what we could give him. I told him initially, you know, "We can give you 10,000."

He said "okay" and then said, "No, give me 9,000 and I'll just come back every day or try other branches until I get all of my money."

I told him there's no guarantee at the other branches that they will have it available.

(Dkt.279 p.170-171)

As for the December 28, 2021 withdrawal, Sarkese testified that Mr. Ervin became upset when the bank would not allow him to withdraw all of his funds from his business account that day (approximately $60,000). Sarkese claimed she told Mr. Ervin that she could only give him $10,000 that day. In response, Sarkese testified that Mr. Ervin replied, "No, give me 9,000 and I'll just come back every day or try other branches until I get all my money." (Dkt.279 p.171)

## Motion for Judgment of Acquittal

At the close of evidence, defense counsel moved for a judgment of acquittal. First, Mr. Ervin argued that the government failed to establish a prima facie case that the auto key card is a "machine gun" as defined by the National Firearms Act. (Dkt.283 p.232-233). Specifically, he argued that the government failed to prove that the Auto Key Card was designed and intended to act as a machine gun under the

Gun Control Act or National Firearms Act. He also argued that the government failed to prove that the auto key card was a combination of parts designed and intended to make a semiautomatic rifle fire as a fully automated machine gun within the definition of both Acts. (Dkt.283 p.233)

Mr. Ervin renewed the motion post-judgment and argued that there was insufficient evidence that Mr. Ervin withdrew funds from his personal bank account for the purpose of evading the reporting requirement. (Dkt.273)

The court denied the motion for judgment of acquittal and the post-judgment motion as well. (Dkt.285 p.20; Dkt.310)

## SENTENCING

At sentencing, the district court determined the guidelines range sentence to be 121-151-months imprisonment. However, the court stated that the guidelines range was greater than necessary for the purpose of the offense. (Dkt.329 p.62). Ultimately, the district court departed downward and sentenced Mr. Ervin to 68-months imprisonment followed by three years of supervised release. (Dkt.330 p.31)

As for supervised release, the district court pronounced that Mr. Ervin will be "required to comply with the standard conditions of release adopted in the Middle District of Florida as well as certain special conditions." (Dkt.330 p.32). However,

the district court did not orally pronounce all eleven "Standard Conditions" of supervised release.  (Compare Dkt.330 p.32-33 to Dkt.324 p.6-7)

This direct appeal of judgment and sentence now follows.  (Dkt.331)

Mr. Ervin is currently incarcerated at FCI Jesup.

# SUMMARY OF THE ARGUMENT

First, the district court reversibly erred by denying the motion to dismiss and/or motion for judgment of acquittal for the firearms-related charges on the basis of statutory vagueness. All existing precedent treats the ambiguity as a question of law for the district court to decide – not a finding of fact for the jury. Moreover, **it** is not reasonably clear that a drawing on a piece for metal is considered a combination of parts, or even a drawing that could eventually become a combination of parts after substantial manipulation with a motorized tool and a change of firearm bolts, is considered a "combination of parts" under Section 5845(b). An ordinary reasonable person would think that a "combination of parts" would have to be functional to be illegal. A drawing on a piece of metal that must be substantially machine and manipulated with a plethora of motorized tools is not clearly covered under Section 5845(b). As a laser-etched metal card does not meet the definition of a machinegun under Section 5845(b), the rule of lenity demands that the ambiguity be resolved in Mr. Ervin's favor.

Second, the district court reversibly erred by denying the motion for judgment of acquittal on the basis that the Auto Key Card does not fall within the statutory definition of machinegun within the meaning of Section 5845(b): it is not a "part" without further machining, manufacturing, filing, sanding, and custom fitting; the metal card cannot be directly inserted into a weapon "for use" as a machine gun; and

the metal card with a tracing and a bottle opener is not designed "solely and exclusively" to cause a weapon to fire automatically.

Third, the district court reversibly erred by denying the judgment of acquittal as there was insufficient evidence that Mr. Ervin structured bank withdrawals for the purpose of evading the reporting requirement. The bank manager never told Mr. Ervin that amount that would trigger the reporting requirement. The only record evidence as to why Mr. Ervin withdrew under $10,000 on the date in question is because the bank prohibited him from withdrawing any more than that amount. There is no record evidence that Mr. Ervin knew what the threshold reporting requirement was and no evidence that he withdrew that amount to evade the requirement.

Fourth, the district court deprived Mr. Ervin of Due Process of Law by failing to orally pronounce at sentencing all discretionary "standard conditions" of probation. The undersigned counsel recognizes this Court's recent decision in Rodriguez but argues that simply referencing a "standing order" – without actually providing the standard conditions to the defendant in advance of sentence and without including it in the PSR – is insufficient to satisfy the Due Process Requirement. Further, simply referencing a standing order does not satisfy the requirement that the district court make making an individualized assessment of whether they are reasonably related to normal sentencing factors, 18 U.S.C. §

3583(d)(1), and whether they involve no greater deprivation of liberty than is reasonably necessary under the circumstances.

Finally, Mr. Ervin adopts all other arguments made by co-Appellant Matthew Hoover and *Amici Curiae* Firearms Policy Coalition.

## ARGUMENT

**I. Under the Fifth Amendment, the district court reversibly erred by denying the motion to dismiss and/or motion for judgment of acquittal for the firearms-related charges on the basis of statutory vagueness.**

In the pretrial *Motion to Dismiss*, Mr. Erving asked the district court to dismiss the firearms charges against him on the basis of void for vagueness. Specifically, he argued that the statutory definition of machine gun does not include the laser-etched images and thus was unconstitutionally vague as applied to Mr. Ervin under the Fifth Amendment. (Dkt.30 p.8-10)

The district court cited a 54-year-old case from the Fifth Circuit holding that the same statute was not unconstitutionally vague. (Dkt.48 p.15, citing <u>United States v. Campbell</u>, 427 F.2d 892 (5th Cir. 1970)).

Following trial, Mr. Ervin adopted the arguments raised by co-defendant Hoover which asked the district court to enter a judgment of acquittal on the basis that the charges were void for vagueness under the Fifth Amendment. (Dkt.273 p.2, citing Dkt.274 p.14-21)

The district court again denied relief on this ground. First, the court held that the language of the statute "sets forth plainly perceived boundaries" and that the language of the statute was "clear and definite." (Dkt.310 p.18-19). The court went on to write:

> Whether Defendants transferred a 'combination of parts' may not have been obvious in this particular case. But the law itself provides a

meaningful standard. Applying that standard to Defendants' real-world conduct, the jury found that Defendants went too far and, rather than transferring mere art, they were, in fact, transferring a combination of machine gun parts. Resolving that factual question was well-within the province of the jury.

(Dkt.310 p.22)

However, the district court reversibly erred by denying the both the motion to dismiss the indictment and the motion for judgment of acquittal because the statutory language does not unambiguously include potential precursors to parts, that are not themselves actual "parts", and thus not capable of "use" or intended for "use" in any weapon, much less capable of converting a semiautomatic rifle into a fully automatic machine gun.

## **Standard of Review**

This Court reviews the dismissal of an indictment de novo. <u>United States v. DeVeteger</u>, 198 F.3d 1324, 1326 (11th Cir. 1999); Fed. R. Crim. P. 12(b)(3)(B) (2023). Rule 12(b)(3)(B) provides that at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense. In reviewing a district court's decision regarding dismissal of an indictment, an appellate court's focus is on the facts as alleged in the indictment, which it views in favor of the government and assume to be true for purposes of the appeal. An appellate court will affirm a Rule 12(b)(3)(B) dismissal if it concludes that the factual allegations in the indictment, when viewed in the light

most favorable to the government, were not sufficient to charge the offense as a matter of law.

This Court reviews a denial of a motion for judgment of acquittal de novo. United States v. Williams, 390 F.3d 1319 (11th Cir. 2004). In deciding a Rule 29 post-trial motion for judgment of acquittal, a district court must determine, viewing the evidence in a light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. Id.

## Law

"In determining the scope of a statute, one is to look first at its language. If the language is unambiguous, … it is to be regarded as conclusive unless there is a clearly expressed legislative intent to the contrary." Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 110 (1983) (citations and quotation marks omitted). Moreover, it is well settled that criminal laws are to be strictly construed. United States v. Enmons, 410 U.S. 396, 411 (1973); United States v. Campos-Serrano, 404 U.S. 293, 297 (1971); United States v. Bass, 404 U.S. 336, 347 (1971).

"But when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and

definite. We should not derive criminal outlawry from some ambiguous implication." United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222 (1952); see also Geudes v. ATF, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement respecting denial of writ of certiorari) ("Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct.")

The rule of lenity is a basic principle of statutory interpretation requiring courts to construe any unclear or ambiguous criminal laws narrowly. McNally v. United States, 483 U.S. 350, 359-60 (1987).

The vagueness doctrine requires that a criminal statute "clearly define the conduct it proscribes." Skilling v. United States, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment); accord Johnson v. United States, 576 U.S. 591, 596 (2015) (Fifth Amendment guarantees that every criminal law provides "ordinary people fair notice of the conduct it punishes" and is not "so standardless that it invites arbitrary enforcement").

In United States v. Lanier, 520 U.S. 259 (1997), the Supreme Court described three aspects of the requirement that criminal statutes give "fair warning" of what is outlawed.

- First, "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of

common intelligence must necessarily guess at its meaning and differ as to its application." Id. at 266.

- Second, any ambiguity in a criminal statute must be resolved in favor of applying the statute only to conduct which is **clearly covered**. Id.

- "Third, although clarity may be applied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope…" Id. (Internal citations omitted.)

Central to each inquiry is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Lanier, 520 U.S. at 267.

A criminal statute may be void for vagueness if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

Most importantly, the requirement that a penal statute provide minimal guidelines to discourage arbitrary enforcement is "perhaps the most meaningful aspect of the vagueness doctrine." Smith v. Goguen, 415 U.S. 566, 574 (1974). Without these minimal enforcement guidelines, "policemen, prosecutors, and juries

are allowed to pursue their personal predilections." Kolender v. Lawson, 461 U.S. 352, 358 (1983).

Where there is ambiguity in a criminal statute—or regulation interpreting that statute—doubts are resolved in favor of the defendant. See Yates v. United States, 574 U.S. 528 (2015).

But the Supreme Court has never determined the correct standard for applying the rule of lenity. See Wooden v. United States, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J. concurring) (arguing in favor of the grievous-ambiguity standard); id. at 1084 (Gorsuch, J., concurring in judgment) (arguing in favor of the reasonable doubt standard).

The Fifth Circuit applied the "grievous-ambiguity" standard in applying the rule of lenity to determine that the definition of machinegun under Section 5845(b) does not unambiguously include a non-mechanical bump stock and "in turn conclude that a non-mechanical bump stock is not a machinegun for purposes of the National Firearms and Gun Control Act." Cargill v. Garland, 57 F.4th 337, 471 (5th Cir. 2003), **cert. granted 144 S. Ct. 374 (Nov. 3, 2023).**

## Argument

For the firearms-related counts, the district court reversibly erred by both denying the motion to dismiss the indictment and the motion for judgment of acquittal on the basis of statutory vagueness.

First, all existing precedent treats the ambiguity as a question of law for the district court to decide – not a finding of fact for the jury.

Second, the inquiry was not whether the statutory definition was clear to the district court, but whether there are "two readings of what conduct Congress has made a crime". See Universal C.I.T. Credit Corp., 344 U.S. at 221-222. Indeed, the district court demonstrated the ambiguity of the statute when it contorted the definition of machinegun to fit the facts of the case in denying the motion for judgment of acquittal:

> With the second Auto Key Card that Toy received, he used a Dremel tool and a drill press. Id. at 159–61. It took him 53 minutes to successfully cut out the parts of a lightning link from that card. Id. at 162. Once Toy installed these parts into his rifle, the rifle fired automatically. Id. at 163. Based on Toy's testimony, a reasonable jury could find that, **while Toy had to "materially alter" the Auto Key Card to access the parts of a lightning link, he did not have to materially alter the parts themselves.** Toy merely had to remove the parts from the surrounding metal in order to use them to convert a semiautomatic rifle into a machinegun.

See Dkt.310 p.10. This is the sort of "judicial gloss" that the Supreme Court warned against in Lanier when statutes are ambiguous:

> **[A]lthough clarity may be applied by judicial gloss on an otherwise uncertain statute**, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope…

See 520 U.S. at 266.

It is not "reasonably clear" that a drawing on a piece for metal is considered a "combination of parts", or even a drawing that could eventually become a "combination of parts" after substantial manipulation with a motorized tool and a change of firearm bolts, is considered a "combination of parts" under Section 5845(b).  See Lanier, 520 U.S. at 267.  An ordinary reasonable person would think that a "combination of parts" would have to be functional to be illegal.  A drawing on a piece of metal that must be substantially manipulated, machined, manufactured, filed, sanded, and custom fitted with a motorized tool is not clearly covered under Section 5845(b).  See Lanier, 520 U.S. at 267.  As a laser-etched metal card does not meet the definition of a machinegun under Section 5845(b), the rule of lenity demands that the ambiguity be resolved in Mr. Ervin's favor.

Accordingly, the district court reversibly erred by denying both the motion dismiss the indictment and the motion for judgment of acquittal on this ground.

II. **Under Rule 29, Federal Rules of Criminal Procedure (2023), the district court reversibly erred by denying the motion for judgment of acquittal on the basis that the Auto Key Card does not fall within the statutory definition of machinegun within the meaning of Section 5845(b).**

The evidence at trial established that Mr. Ervin sold metal key cards with artwork etched on the face which the government claimed could have been cut out to form "lightening links" or "auto sears" – metal pieces which convert a semi-automatic rifle into a fully automatic machine gun. But when the government firearms expert actually cut out the pieces, the pieces did not cause a semi-automatic rifle to fire automatically. The government firearms expert had to modify the design and then substitute the bolt in an AR-15 for the bolt from a machine gun: only after the firearms expert made these substantial modifications did the metal pieces actually cause the rifle to fire automatically.

At the close of evidence, Mr. Ervin moved for a motion for judgment of acquittal. (Dkt.283 p.232-233) He also moved for a post-verdict motion for judgment of acquittal and adopted the arguments presented by Mr. Hoover in his motion as well. (Dkt.273 p.2)

As for the firearms counts, Mr. Ervin argued that the government failed to establish a prima facie case that the auto key card is a "machine gun" as defined by the National Firearms Act. (Dkt.283 p.232-233). Specifically, he argued that the government failed to prove that the auto key card was designed and intended to act

as a machine gun under the Gun Control Act or National Firearms Act. He also argued that the government failed to prove that the Auto Key Card was a combination of parts designed and intended to make a semiautomatic rifle fire as a fully automated machine gun within the definition of both Acts. (Dkt.283 p.233).

The district court denied the motion for judgment of acquittal. (Dkt.285 p.20; Dkt.310 p.16-17). As for the arguments that the Auto Key Card did not constitute a "combination of parts designed and intended" to convert a semi-automatic rifle into a machine gun, the district court found as follows:

> Based on Toy's [the firearm expert] testimony, a reasonable jury could find that, while Toy had to 'materially alter' the Auto Key Card to access the parts of a lightening link, he did not have to materially alter the parts themselves. Toy merely had to remove the parts from the surrounding metal in order to use them to convert a semiautomatic rifle into a machine gun.

(Dkt.310 p.11)

### Standard of Review

This Court reviews a denial of a motion for judgment of acquittal de novo. United States v. Williams, 390 F.3d 1319 (11th Cir. 2004). In deciding a Rule 29 post-trial motion for judgment of acquittal, a district court must determine, viewing the evidence in a light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. Id.

**Law**

"Congress has defined machinegun to mean 'any weapon which shoots…automatically more than one shot…by a single function of the trigger,' or any accessory that allows a firearm to shoot in that manner." 26 U.S.C. § 5845(b) (2021). A machinegun also includes "the frame or receiver of any such weapon, any **part** designed and intended **solely and exclusively**, or **combination of parts** designed and intended, **for use** in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Id.

**Argument**

Under Rule 29, the district court reversibly erred by denying the motion for judgment of acquittal on the basis that the Auto Key Card does not fall within the statutory definition of machinegun within the meaning of Section 5845(b).

An Auto Key Card is not a "part" of a weapon. It does not fit into a rifle without material alteration by someone skilled in manufacturing, machining, and firearms custom fitting. Stated differently, the metal business card could not be inserted into a weapon causing the weapon to "shoot…automatically more than one shot…". See 26 § U.S.C. 5845(b).

To be sure, the average person would not have the skill or tools necessary to use belt sanders, grinding wheels, drill presses, and a hand files capable to machining

metal needed to remove the pieces from the Auto Key Card as Agent Toy did. The average person would not have the firearms knowledge to hand file "some of the material" off of the metal key card parts needed to custom fit or "hand fit" the metal pieces into a firearm as Agent Toy did. Simply put, the Auto Key Card would have to be further manufactured by a skilled professional. While it is true that "the frequency or likelihood of" an expert converting a potential or theoretical precursor into an actual part "is irrelevant," see S.W. Daniel, Inc. v. United States, 831 F.2d 253, 254 n.2 (11th Cir. 1987), the amount of work that has to be done to an Auto Key Card before it will actually cause a semi-automatic weapon to fire automatically demonstrates just how far removed the Auto Key Card is from being an actual "part or combination of parts". These additional manufacturing, machining, and fitting requirements removes not only removes the Auto Key Card from the "part" or "combination of parts" requirement, but also removes it from "for use" requirement of the statutory definition.

In actuality, the Auto Key Card was just a metal business card (similar to the Apple Titanium Card) that fit into a wallet, some with bottle openers cut out from the card, with an incomplete and inaccurate tracing of an out-of-date auto sear etched onto the metal card. The Auto Key Card was simply "just a bottle opener or curiosity with an aspirational artistic rendering of what possessors with they could lawfully possess." See Amicus Brief p.5. This "conversation piece" removes the Auto Key

Card from the "solely and exclusively" requirement under the statute. <u>See</u> 26 U.S.C. § 5845(b).

At best, the Auto Key Card was a mere precursor to an auto sear or lightening link. But a potential precursor to an auto sear or "lightening link" does not meet the statutory definition under Section 5845(b). As the amicus brief points out, simple household items such as a metal wall hook or wire coat hanger could ***potentially*** be converted into an auto sear. But to meet the statutory definition of "part or combination of parts", the item as issue must be complete and actually cause the weapon to fire automatically without material alterations. To hold otherwise would allow the list of metal items that constitute a machine gun to "grow exponentially." <u>See</u> Amicus Brief p.5.

In sum, a metal card with a tracing of a general generalized auto sear (unspecific to any make or model of firearm) does not meet the statutory definition of a machine gun under Section 5845(b): it is not a "part" without further machining, manufacturing, filing, and custom fitting; the metal card cannot be directly inserted into a weapon "for use" as a machine gun; and the metal card with a tracing and a bottle opener is not designed "solely and exclusively" to cause a weapon to fire automatically. Accordingly, Mr. Ervin asks this Court to reversed his convictions on the firearms counts (Counts One – Eight and Ten – Twelve) and direct the district court to enter a judgment of acquittal.

Mr. Ervin adopts Mr. Hoover's arguments regarding the government's failure to prove that Mr. Ervin had the mens rea requirement to be convicted of transferring unregistered machine guns.

**III.    Under Rule 29, Federal Rules of Criminal Procedure (2023), the district court reversibly erred by denying the judgment of acquittal as there was insufficient evidence that Mr. Ervin structured bank withdrawals for the purpose of evading the reporting requirement.**

In Count Nine of the *Indictment*, the government charged Mr. Ervin with one count of structuring bank transactions for the purpose of evading the currency transaction reporting requirement in violation of 31 U.S.C. § 5324(a)(3) and (d)(10) (2021).

At trial, a bank fraud investigator testified that the following suspicious cash withdrawals were made from Mr. Ervin's bank account:

- 12/28/2021 - $9,000
- 12/28/2021 - **$5,000**
- 12/29/2021 - $9,000
- 12/30/2021 - $9,000
- 12/31/2021 - $9,000
- 01/02/2022 - $9,000
- 01/05/2022 - $9,000
- 01/06/2022 - $9,000

(Dkt.279 p.148-150)   She testified that regular cash withdrawals under the $10,000 reporting amount generally trigger a red flag for investigation.  (Dkt.279 p.151)

Based upon information provided to her, the investigator contacted ATF believed that Mr. Ervin might be involved in illegal firearms activity connected with the bank account.  (Dkt.279 p.152)

At some point prior to the transactions in question, a former assistant branch manager testified that Mr. Ervin told her he was "making metal business cards."

(Dkt.279 p.160). She stated that Mr. Ervin specifically asked her how much money he could withdraw without it being reported. (Dkt.279 p.162) However, Sarkese did not answer his question and did not provide Mr. Ervin with a dollar amount:

> Q: Do you recall ever having a discussion with Mr. Ervin about what the threshold was to – that the bank would report cash?
>
> A: Yes.
>
> Q: Could you tell the grand jury – the jury about that.
>
> A: So it was asked to me at one point what that dollar amount is as far as reporting goes. **And obviously I didn't give that information because we're not allowed to.** But it was asked at one point, "Well, how much can I take out so it's not reported?"

(Dkt.279 p.162) Thereafter, Sarkese testified about a interaction occurring at a later date as follows:

> Q: So I'd like to direct you now to December 28th, 2020. Do you recall a visit by Mr. Erving to your branch that day?
>
> A: Yes.
>
> Q: What business did Mr. Erving initially have with your branch on that date?
>
> A: He wanted to deposit a $100 money order, but it was payable to "Auto Key Card," which was a product that he told us that he sells. When we told him we couldn't take the check the way it was payable – because he was trying to put it into a personal account and we don't allow that – he got upset again, said that we wouldn't be getting his business account, mortgages, loans, et cetera, and that he wanted to take all of his money out in cash.
>
> We told him it would need to be a special order because of the amount and it wouldn't be available until the end of the next week because we don't order every single day.

> And then continued to change the dollar amount what we could give him.  I told him initially, you know, "We can give you 10,000."
>
> He said "okay" and then said, "No, give me 9,000 and I'll just come back every day or try other branches until I get all of my money."
>
> I told him there's no guarantee at the other branches that they will have it available.

(Dkt.279 p.170-171)

As for the December 28, 2021 withdrawal, Sarkese testified that Mr. Ervin became upset when the bank would not allow him to withdraw all of his funds from his business account that day (approximately $60,000).  Sarkese claimed she told Mr. Ervin that she could only give him $10,000 that day.  In response, Sarkese testified that Mr. Ervin replied, "No, give me 9,000 and I'll just come back every day or try other branches until I get all my money."  (Dkt.279 p.171)  Mr. Ervin never asked any questions about how much he could withdraw without triggering the reporting requirement.

During closing argument, the government admitted that it presented no direct evidence of any intent to evade the reporting requirement, simply that Mr. Ervin made repeated withdrawals of $9,000: "What could possibly be the reason for that other than he hoped to avoid a Currency Transaction Report?"  (Dkt.284 p.61)

Based on this testimony, the jury convicted Mr. Ervin on Count Nine of structuring bank transactions for the purpose of evading the reporting requirement.

Mr. Erving moved for a post-verdict judgment of acquittal. Specifically, he argued that "there is no record evidence that Mr. Ervin was attempting to avoid the reporting requirement, but merely to retrieve his money from a bank with which he was having a dispute." (Dkt.273 p.5)

The district court denied the motion on this basis. But in denying relief, the district court acknowledged that did not inquire about the reporting requirement on the date in question, that Mr. Ervin attempted to withdraw the entirety of his funds from the bank (approximately $60,000), and that Mr. Ervin asked to withdraw $9,000 only after the former bank manager informed him that he could only withdraw $10,000. (Dkt.310 p.24-25). "Based on this testimony, the jury could reasonable infer that Ervin heard '$10,000', became concerned about the reporting threshold, and requested a lower amount to avoid triggering the reporting requirement." (Dkt.310 p.25)

## Standard of Review

This Court reviews a denial of a motion for judgment of acquittal de novo. United States v. Williams, 390 F.3d 1319 (11th Cir. 2004). In deciding a Rule 29 post-trial motion for judgment of acquittal, a district court must determine, viewing the evidence in a light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.

_Id._  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," but a conviction must be reversed if the record reveals a lack of substantial evidence from which a factfinder could find guilt beyond a reasonable doubt.  United States v. Brown, 40 F.3d 1218, 1221-20 (11th Cir. 1994) (citations omitted) (quotation marks omitted).

**Law**

Title 31 U.S.C. § 5313 establishes a bank's duty to file a CTR (Currency Transaction Report) when there is a deposit or withdrawal in an amount exceeding $10,000.  Section 5324(a)(3) provides that, for the purpose of evading bank reporting requirements, no person shall cause or attempt to cause a bank to fail to file a CTR report or to structure any transaction with a bank as to evade the CTR requirement. 31 U.S.C. 5324(a)(3) (2020).

**Argument**

The record reveals a lack of substantial evidence from which a factfinder could find Mr. Ervin guilty beyond a reasonable doubt of structuring bank transacti0ons for the purpose of evading the CTR requirement.  See generally Brown, 40 F.3d at 1221-20.

The evidence established that Mr. Ervin asked about the reporting threshold at some unknown date well before the alleged December 28, 2020 withdrawal in

question.  Indeed, no one testified that Mr. Ervin asked about the reporting requirement on the date of the withdrawals.  **More importantly, the bank manager never told Mr. Ervin the threshold dollar amount to trigger the reporting requirement.**  There was no other evidence presented that Mr. Ervin knew that $10,001 would trigger the bank's requirement to report the withdrawal or that Mr. Ervin even knew what that amount was.

Instead, the evidence established that Mr. Ervin withdrew under $10,000 because the bank manager prohibited him from withdrawing anything more than that amount.  The bank manager testified:

> When we told him we couldn't take the check the way it was payable – because he was trying to put it into a personal account and we don't allow that – he got upset again, said that we wouldn't be getting his business account, mortgages, loans, et cetera, and that he wanted to take all of his money out in cash.

> We told him it would need to be a special order because of the amount and it wouldn't be available until the end of the next week because we don't order every single day.

> **And then continued to change the dollar amount what we could give him.  I told him initially, you know, "We can give you 10,000."**

> He said "okay" and then said, "No, give me 9,000 and I'll just come back every day or try other branches until I get all of my money."

See Dkt.279 p.170-171.  (Emphasis added.)

The only record evidence as to why Mr. Ervin withdrew under $10,000 on the date in question is because the bank prohibited him from withdrawing any more than

that amount.  There was zero evidence presented that Mr. Ervin was aware of what amount would trigger the reporting requirement and no record evidence that Mr. Ervin withdrew that amount to evade the requirement.

Because the record reveals **a lack of substantial evidence** from which a factfinder could find Mr. Ervin guilty beyond a reasonable doubt of structuring bank transacti0ons for the purpose of evading the CTR requirement, his conviction and sentence for Count Nine must be reversed.  See generally Brown, 40 F.3d at 1221-20.

**IV. Under the Fifth Amendment, the district court deprived Mr. Ervin of Due Process of Law by failing to orally pronounce at sentencing all discretionary "standard conditions" of probation.**

At sentencing, the district court determined the guidelines range sentence to be 121-151-months imprisonment.  However, the court stated that the guidelines range was greater than necessary for the purpose of the offense.  (Dkt.329 p.62). Ultimately, the district court departed downward and sentenced Mr. Ervin to 68-months imprisonment followed by three years of supervised release.

As for supervised release, the district court pronounced that Mr. Ervin will be "required to comply with the standard conditions of release adopted in the Middle District of Florida as well as certain special conditions."  (Dkt.330 p.32). The court orally pronounced one of the standard "standard conditions" of supervised release: that Mr. Ervin may not possess a firearm (Condition 10).  However, the district court did not orally pronounce the other twelve "Standard Conditions" of supervised release.  (Compare Dkt.330 p.32-33 to Dkt.324 p.6-7)

Meanwhile, the Presentence Investigation Report was silent as to any potential conditions of supervised release, the district court's standing order was not attached to the PSR, and there is no other record evidence that Mr. Ervin was provided with the standing order in advance of sentencing.

## Standard of Review

A district court's orders on supervised release are reviewed for abuse of discretion. United States v. Frazier, 26 F.3d 110 (11th Cir. 1994). But because Mrs. Ervin did not have an opportunity to object to this error, whether the district court erred in failing to orally pronounce the discretionary "standard conditions" of supervised release is reviewed de novo. See United States v. Carpenter, 702 F.3d 882, 884 (6th Cir. 2012); Fed. R. Crim. P. 51(b) (2022).

## Law

Defendants are entitled to "be present when sentence is announced by the court." Henley v. Heritage, 337 F.2d 847, 848 (5th Cir. 1964). The sentence is then reduced to a written judgment. See id. It follows that "[w]hen a sentence pronounced orally and unambiguously conflicts with the written order of judgment, the oral pronouncement governs." United States v. Bates, 213 F.3d 1336, 1340 (11th Cir. 2000). Where an orally pronounced sentence and the written judgment conflict, the case must be remanded with instructions for the district court to amend the judgment to conform to the earlier pronouncement in the defendant's presence. United States v. Chavez, 204 F.3d 1305, 1316 (11th Cir. 2000).

With the exception of the statutorily mandated conditions of supervised release listed in 18 U.S.C. § 3583(g), the district court has wide discretion in imposing conditions of supervised release. Indeed, Section 3583(d) permits the

district court to impose "further conditions of supervised release to the extent that such condition" is (1) reasonably related to the Section 3553(a) factors, (2) involves no greater deprivation of liberty than is reasonably necessary, and (3) is consistent with any pertinent policy statement issued by the Sentencing Commission.

Among the discretionary sentencing options that a district court has is the imposition of thirteen "standard" conditions of supervised release listed in the Sentencing Guidelines as a "Policy Statement." See U.S.S.G. § 5D1.3(c).

The Fourth, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits have held that all discretionary "standard conditions" of supervised release must be pronounced at sentencing. See United States v. Montoya, 82 F.4th 640 (9th Cir. 2023) (holding that a district court is required to orally pronounce all discretionary conditions of supervised release, including those referred to as standard in Section 5D1.2(c)), in order to protect a defendant's due process right to be present at sentencing); United States v. Geddes, 71 F.4th 1206, 1215 (10th Cir. 2023); United States v. Diggles, 957 F.3d 551, 558–559 (5th Cir.) (en banc) (pronouncement is part of defendant's Fifth Amendment due process right to be present at sentencing based on the right to mount a defense, thus pronouncement is required for discretionary conditions), cert. denied, 141 S. Ct. 825 (2020); United States v. Rogers, 961 F.3d 291, 296–297 (4th Cir. 2020) ("When it comes to mandatory conditions . . . the circuit courts and the parties are in agreement: A district court need not orally pronounce mandatory

conditions at sentencing . . . Discretionary conditions are different"); <u>United States v. Anstice</u>, 930 F.3d 907, 909 (7th Cir. 2019); <u>United States v. Matthews</u>, 54 F.4th 1 (D.C. Cir. 2022) (a defendant's Fifth Amendment Due Process rights requires a district court to orally pronounce all conditions of supervised release that are not statutorily classified as mandatory).

This obligation flows from "a defendant's right to be present at sentencing," as guaranteed by Rule 43 and the Fifth Amendment. <u>Diggles</u>, 957 F.3d at 560; <u>see also</u> <u>Rogers</u>, 961 F.3d at 296 ("This conclusion flows naturally from a fundamental precept. A defendant has the right to be present when he is sentenced.") (citing Fed. R. Crim. P. 43(a)(3)).

Pronouncement of discretionary "standard conditions" is required because "[i]ncluding a sentence in the written judgment that the judge never mentioned when the defendant was in the courtroom is tantamount to sentencing the defendant *in absentia*." <u>Diggles</u>, 957 F.3d at 557 (internal citation and quotation marks omitted). Discretionary conditions of supervised release, such as the "standard conditions" listed in the Guidelines may only be imposed "after an individualized assessment indicates that they are justified in light of the statutory factors." <u>Rogers</u>, 961 F.3d at 297. Accordingly, pronouncement of the conditions ensures that the defendant has an opportunity to speak as to the conditions and that they are appropriately imposed. <u>See id.</u> ("We therefore cannot assume that any set of discretionary conditions—even

those categorized as 'standard' by the Guidelines—will be applied to every defendant placed on supervised release, regardless of conduct or circumstances.").

Recently, the D.C. Circuit addressed the need to orally pronounce the thirteen "standard" conditions of supervised release listed in the Sentencing Guidelines as a "Policy Statement" in Section 5D1.3(c):

> For one thing, no matter how commonsensical the standard conditions may seem, the governing statute classifies them as discretionary, as does the policy statement itself. See 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(c). And courts may impose discretionary conditions only after making an individualized assessment of whether they are 'reasonably related' to normal sentencing factors, 18 U.S.C. § 3583(d)(1), and whether they involve 'no greater deprivation of liberty than is reasonably necessary' under the circumstances, id. § 3583(d)(2). Moreover, even the most pedestrian of the conditions contains a level of detail that cannot plausibly be characterized as implicit in supervised release itself—for example, the requirement to report to the probation office within 72 hours of release rather than, say, within 48 hours or 96 hours. U.S.S.G. § 5D1.3(c)(1). And some of the standard conditions are quite intrusive—for example, the requirements to live somewhere approved by the probation officer, id. § 5D1.3(c)(5), and to work full time unless excused by the probation officer, id. § 5D1.3(c)(7). For these reasons, the standard conditions cannot be treated as legally or practically compelled by the imposition of any term of supervised release. Instead, as three other circuits have held, the district court must consider whether they are warranted in the circumstances of each case, must allow the defendant an opportunity to contest them, and must orally pronounce them at sentencing.

Matthews, 54 F.4th at 5.

However, this Court recently held that a district court satisfies this Due Process requirement by referencing a written list of supervised release conditions "by referencing a written list of supervised release conditions," such as those "in the

defendant's PS[I] or in a standing administrative order." <u>United States v. Rodriguez</u>, 75 F.4th 1231, 1247 (11th Cir.2023). In this way, the court "affords any defendant who is unfamiliar with the conditions the opportunity to inquire about and challenge them" and thus satisfies due process. <u>Id.</u>

### Argument

The undersigned counsel recognizes this Court's recent decision in <u>Rodriguez</u> but argues that simply referencing a "standing order" – without actually providing the standard conditions to the defendant in advance of sentence and without including it in the PSR – is insufficient to satisfy the Due Process Requirement. Further, simply referencing a standing order does not satisfy the requirement that the district court make "making an individualized assessment of whether they are 'reasonably related' to normal sentencing factors, 18 U.S.C. § 3583(d)(1), and whether they involve 'no greater deprivation of liberty than is reasonably necessary' under the circumstances, <u>id.</u> § 3583(d)(2)." <u>See</u> <u>Mathews</u>, 54 F.4th at 5.

Here, the district court procedurally erred by failing to orally pronounce all the discretionary "standard conditions" of probation. This failure deprived Mr. Ervin of his Fifth Amendment right to Due Process of Law: an opportunity to object to and contest those conditions, to mount a defense, and to make any argument as to whether the conditions were related to or necessary to achieve the sentencing objectives. <u>See</u> <u>Rogers</u>, 961 F.3d at 297. To sentence Mr. Ervin without announcing

these discretionary "standard conditions" was tantamount to sentencing him *in abstentia*. See Diggles, 957 F.3d at 557; Fed. R. Crim. P. 43; U.S. Const. amend. V.

The district court also erred by failing to make an individualized assessment as to whether those conditions were reasonably related to the sentencing factors and involved no greater deprivation of liberty than is reasonably necessary under the circumstances. See U.S. Const. amend V.; Fed. R. Crim. P. 43; 18 U.S.C. § 3583(d)(1)-(2).

By failing to make an individualized assessment, the district court failed to consider whether such intrusive conditions such as requiring Mr. Ervin to live at a place approved by his probation officer and requiring him to work, amongst other conditions, were "reasonably related" to normal sentencing factors and whether they involve "no greater deprivation of liberty than is reasonably necessary" under the circumstances. See 18 U.S.C. § 3583(d)(1)-(2); Matthews, 54 F.4th at 5. This Court cannot assume that any set of discretionary "standard conditions"—even those categorized as "standard" by the Guidelines in a "Policy Statement"—should be applied to Mr. Ervin and every defendant placed on supervised release, regardless of conduct or circumstances. See Rogers, 961 F.3d at 297.

By failing to orally pronounce these discretionary conditions, the district court procedurally erred and deprived Mr. Ervin of Due Process of law: an opportunity to object to and contest those conditions, to mount a defense, and to make any argument

as to whether the conditions were related to or necessary to achieve the sentencing objectives. See Matthews, 54 F.4th at 5; Diggles, 957 F.3d at 558–559; Rogers, 961 F.3d 291, 296–297; Montoya, 82 F.4th 640; Anstice, 930 F.3d at 910.

Because the district court failed to orally pronounce the thirteen "standard conditions" of probation and failed to make an individualized assessment as to whether those conditions were reasonably related to achieving sentencing objectives, the district court procedurally erred and deprived Mr. Ervin of his Fifth Amendment right to Due Process of Law. Accordingly, Mr. Ervin asks this Court to vacate the *Judgment* and remand for resentencing.

## CONCLUSION

For the aforementioned reasons, Mr. Ervin asks this Court to vacate and/or reverse the judgment and sentence imposed in this case.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 13th day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for Firearms

Policy Coalition & FPC Action Foundation


## CERTIFICATE OF TYPEFACE COMPLIANCE

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 9,875 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
(888) 608-8814 Tel.
vlinnen@live.com
Attorney for Appellant
