THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

---

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

---

**APPENDIX III**

---

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

1

## TABLE OF APPENDICES

**Appendix I**

Docket .................................................................................................. D

Motion to Dismiss ............................................................................. 30

Transcripts – Hearing on Motion to Dismiss ...................................... 48

Indictment Superseding - Fourth ...................................................... 204

USA Statement of the Case ............................................................... 226

Mr. Ervin's Statement of the Case .................................................... 230

Gov't Exhibit 33 – 3-in-1 Auto Key Card ..................................... 259-33

Motion for Judgment of Acquittal .................................................... 273

Motion for Judgment of Acquittal – Mr. Hoover ............................. 274

Order Denying Motions for Judgment of Acquittal ........................... 310

Sentencing Memorandum ................................................................. 319

Judgment .......................................................................................... 324

Statement of Reasons ....................................................................... 325

**Appendix II**

Direct Testimony of Agent Hooker .................................................... 277

Direct Testimony of Agent Hooker, Andrea Useche, Amy Sarkese ..... 278

Direct Testimony of Richard Roberts ................................................ 282

Direct Testimony of Agent Toy ......................................................... 283

**Appendix III**

Transcript – Sentencing I ......................................................................329

Transcript – Sentencing II .....................................................................330

**SEALED**

Presentence Investigation Report FINAL ...............................................311

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 22ND day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for

Firearms Policy Coalition & FPC Action Foundation

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888-608-8814
vlinnen@live.com
Attorney for Appellant

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Case No. 3:21-cr-22(S4)-MMH-MCR

          Plaintiff,             Wednesday, September 6, 2023

v.                               9:45 a.m. - 3:05 p.m.

KRISTOPHER JUSTINBOYER ERVIN     Courtroom 10B
and MATTHEW RAYMOND HOOVER,

          Defendants.
_____


**SENTENCING**
**(VOLUME 1 of 2)**


BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE


OFFICIAL COURT REPORTER:

  Katharine M. Healey, RMR, CRR, FPR-C
  PO Box 56814
  Jacksonville, FL 32241
  Telephone: (904) 301-6843
  KatharineHealey@bellsouth.net


                         (Proceedings reported by stenography;
                         transcript produced by computer.)

A P P E A R A N C E S

COUNSEL FOR THE GOVERNMENT:

  **LAURA C. TAYLOR, ESQUIRE**
  **DAVID MESROBIAN, ESQUIRE**
  United States Attorney's Office
  300 North Hogan Street, Suite 700
  Jacksonville, FL 32202


COUNSEL FOR DEFENDANT ERVIN:

  **ALEX KING, ESQUIRE**
  Monroe & King, P.A.
  1805 Copeland Street
  Jacksonville, FL 32204


COUNSEL FOR DEFENDANT HOOVER:

  **ZACHARY Z. ZERMAY, ESQUIRE**
  Zermay Law
  1762 Windward Way
  Sanibel, FL 33957

- A N D -

  **MATTHEW LAROSIERE, ESQUIRE**
  6964 Houlton Circle
  Lake Worth, FL 33467

I N D E X

PAGE

INITIAL MATTERS.......................................................... 4

DEFENDANT ERVIN'S GUIDELINES OBJECTIONS...................... 7

DEFENDANT HOOVER'S GUIDELINES OBJECTIONS.................... 13

GOVERNMENT'S OBJECTIONS TO FACTUAL STATEMENTS IN PSR........ 19

DEFENDANT ERVIN'S ARGUMENTS.................................... 21

GOVERNMENT'S RESPONSE TO DEFENDANTS' OBJECTIONS............. 22

DEFENDANT ERVIN'S RESPONSE TO GOVERNMENT'S OBJECTIONS....... 37

DEFENDANT HOOVER'S RESPONSE TO GOVERNMENT'S OBJECTIONS...... 42

COURT'S RULING ON GUIDELINES OBJECTIONS...................... 48

GOVERNMENT'S PROFFER BY MS. TAYLOR............................ 63

STATEMENT BY KRIS ERVIN ON BEHALF OF DEFENDANT ERVIN........ 89

STATEMENT BY DEFENDANT ERVIN................................... 94

DEFENDANT ERVIN'S PROFFER BY MR. KING........................ 105

STATEMENT BY DEFENDANT HOOVER................................ 113

STATEMENT BY MICHAEL HOOVER ON BEHALF OF DEFENDANT HOOVER.. 118

STATEMENT BY RICHARD HUGHES ON BEHALF OF DEFENDANT HOOVER.. 119

DEFENDANT HOOVER'S PROFFER BY MR. LAROSIERE................. 123

GOVERNMENT'S REBUTTAL ARGUMENTS BY MS. TAYLOR.............. 135

<u>P R O C E E D I N G S</u>

September 6, 2023                                    9:45 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Marcia Morales Howard presiding.

Please be seated.

THE COURT:  Give me one moment.

All right.  This is Case No. 3:21-cr-22(S4)-MMH-MCR, the United States of America vs. Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

Ms. Taylor and Mr. Mesrobian are here on behalf of the United States.  And Ms. Taylor, if you could please introduce the case agent for the record.

MS. TAYLOR:  Yes, Your Honor.  At the front table is Special Agent Jesse Hooker of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and at the back table is Special Agent Jason Slosson, also with ATF.

Your Honor, just as a preliminary matter, if it's okay with the Court today, our intention is for Mr. Mesrobian to handle guidelines and for me to handle 3553.

THE COURT:  Okay.

All right.  And Mr. King is here on behalf of Mr. Ervin.  And Ms. Hall, his paralegal, is here with us as well.

Mr. Zermay and Mr. Larosiere are here for Mr. Hoover. Mr. Hoover is here.  And Ms. Katzenberger is here as well.

All right.  So we have our appearances.  And we're scheduled for sentencings in these cases.

Mr. Mesrobian and Ms. Taylor, are you prepared to proceed?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  All right.

Mr. King?

MR. KING:  Yes, Your Honor.

THE COURT:  And I don't know who will -- Mr. Zermay and Mr. Larosiere, am I hearing from both of you or just one of you today?

MR. LAROSIERE:  Just Mr. Larosiere, Your Honor, and we're ready.

THE COURT:  Okay.  All right.  So we'll start with Mr. Ervin.

Mr. Ervin, on April 21st of 2023 the jury found you guilty of a number of charges in the Fourth Superseding Indictment, including Counts One, Two, Three, Four, Five, Six, Seven, Eight, each of which charged -- well, Count One charged you with conspiracy to transfer unregistered machine gun conversion devices, in violation of Title 26, United States Code, Sections 5861(e) and 5871, and 18 U.S.C., Section 371.

Counts Two through Eight charged you with

transferring unregistered machine gun conversion devices, in violation of Title 26, United States Code, Sections 5861(e) and 5871, as well as 18 U.S.C., Section 2.

And the jury also found you guilty in Counts Nine, Ten, Eleven, and Twelve of structuring and attempting to structure currency transactions for the purpose of evading Currency Transaction Reporting requirements, in violation of Sections 5324(a)(3) and (d)(1).  Pardon me, that was Count Nine.

Counts Ten, Eleven, and Twelve charged you with possessing unregistered machine gun devices, in violation of Title 26, 5861(d).

The jury, as I said, convicted you of those -- each of those counts, and so we're at the stage of the proceedings where the Court needs to determine an appropriate sentence.

There's a process that we follow for that in federal court, and it begins with the preparation of a presentence report.  And the next thing that's supposed to happen is that you're supposed to review that presentence report with your attorney, Mr. King.

Did you have a chance to do that, Mr. Ervin?

DEFENDANT ERVIN:  Yes, ma'am.  I got it right here.

THE COURT:  Okay.  And did Mr. King answer any questions that you had about the presentence report?

DEFENDANT ERVIN:  Yes, ma'am, he did.

THE COURT:  Okay.  All right.

Mr. King, does Mr. Ervin have any objections to the factual statements set forth in the guidelines -- in the -- I'm sorry, in the presentence report?

MR. KING:  No, Your Honor.

THE COURT:  All right.  So then let me hear from you as to any guideline objections that Mr. Ervin has.

MR. KING:  Your Honor, the only objection Mr. Ervin has outstanding is -- if you'll -- I apologize.

THE COURT:  As to the structuring?

MR. KING:  Yes, Your Honor.  It's as to the structuring.  It's the two-level enhancement.  I'm trying to find the paragraph.  It is --

THE COURT:  I think 59, maybe?

MR. KING:  I believe 59.  I'm having trouble finding it in my papers.

Yes, Your Honor, it is 59.

THE COURT:  And let me hear your argument on that.

MR. KING:  Your Honor, essentially the argument is that the specific offense characteristics applies where the defendant knew or believed that the funds were proceeds of unlawful activity.

In this case Mr. Ervin had no belief or knowledge at the time he committed those transactions that they were proceeds of unlawful activity.  He believed the activity that

he was being -- that he was conducting was lawful at the time that he engaged in these transactions.  The jury made clear by their verdict that they disagree.

However, the guideline here does not say that if the proceeds are, in fact, proceeds of illegal activity, which would clearly apply, you know, whether the defendant subjectively believed it or not, but at the time he believed it -- at the time that the guideline was -- I'm sorry, at the time of the activity that leads to the conviction in Count Nine, Mr. Ervin believed that his business was lawful.

You know, the -- I won't belabor the -- too much in terms of what was before the jury, but Mr. Ervin was advertising this.  He was using his name.  He -- you know, he did actually commit -- fill out a CTR with Community First that very first day when he went to the second bank, not the bank that he normally went to, but when he went to the second bank to have that second transaction that triggered the CTR, and he told them he worked for Auto Key Card.

I was not able to find any case law for or against the application of this guideline or anything that I thought was a good metaphor to kind of explain this, but, you know, Mr. Ervin's position is that if it was the intention of the guidelines to punish the mere fact that, you know, it was later determined that the funds were proceeds of illegal activity, then that's what the guideline would say, as opposed to this

knowledge and belief of the defendant.

And it makes sense to an extent.  You want to punish individuals who are engaged in these types of structuring offenses to try to hide the proceeds of illegal activity differently than you would punish individuals that just don't want to make a report, don't trust the government, like Mr. Ervin does not trust.

And that's why we believe this two-level enhancement would not be applicable here, because at the time he actually committed those offenses -- those transactions, he strongly believed that the activity that he was conducting was lawful, and he's maintained that that activity was lawful since then.

THE COURT:  Mr. King, in order to find Mr. Ervin guilty as to Count One of the indictment, the jury had to find, amongst other things -- and that's the conspiracy count, obviously.  But amongst other things, the jury had to find that the defendant knew the unlawful purpose of the plan and willfully joined in it.  So would that not -- would that finding not show that he knew the funds were the proceeds of unlawful activity?

MR. KING:  Your Honor, I do think that that is a -- is a problem for the argument.

You know, I believe Mr. Ervin's -- and this gets into kind of subjective and objective intent.  The jury clearly believed he objectively believed that what he was doing was

unlawful at the time.  You know, our submission is that Mr. Ervin subjectively did not believe that what he was doing was unlawful and therefore that that two-level enhancement should not be applicable because of, you know, what his subjective belief was, but understanding that the jury's verdict does undermine that to some pretty significant extent given that they determined that he did so knowingly.

THE COURT:  All right.  Any other guideline objections on behalf of Mr. Ervin?

MR. KING:  No, Your Honor.

DEFENDANT ERVIN:  (Raises hand.)

THE COURT:  All right.

DEFENDANT ERVIN:  Your Honor --

MR. KING:  No, no.

THE COURT:  Mr. Ervin, I'm going to hear from your lawyer.  If you want to speak to him, you may.

MR. KING:  Your Honor, could I have a moment with Mr. Ervin?

THE COURT:  Of course.

(Mr. King confers with Defendant Ervin.)

MR. KING:  Your Honor, if I can just address one more matter?

THE COURT:  Certainly.

MR. KING:  Mr. Ervin has asked me to object to paragraph 52, the base offense level.

I've reviewed that.  I've discussed it with him.  I don't believe I have a legal basis to make that objection.

THE COURT:  Let me hear what Mr. Ervin's objection would be.

MR. KING:  Mr. Ervin's objection would be that based on -- and I suspect when we get to the government's objections, that whether machine gun conversion devices are firearms for certain purposes in the guidelines, that because he believes they're not firearms for other purposes, that it would not apply to this base offense level.

However, the base offense level specifically cites to the statute that Mr. Ervin is convicted of violating, so I don't believe there's a legal basis for that objection.

THE COURT:  All right.  Thank you, Mr. King.

MR. KING:  Yes, Your Honor.

THE COURT:  And let me just go ahead and address that.

Mr. Ervin was convicted by the jury of violating Title 26, United States Code, Section 5861.  For purposes of that statute, there is a definition of a firearm in Section 5845.  The jury was instructed as to that definition of a firearm and found that the machine gun conversion devices that were being manufactured by Mr. Ervin, and that the jury determined he conspired to transfer with Mr. Hoover, fell within that definition.  That's the jury's finding.

Case 3:21-cr-00022-MMH-MCR Document 329 Filed 09/14/23 Page 12 of 144 PageID 6759
USCA11 Case: 23-13062 Document: 37-3 Date Filed: 02/22/2024 Page: 15 of 188

VOL 1 - PG 12

The appendix to the guidelines tells us that for a conviction of -- under 26, United States Code, Section 5861, the Court looks to the guideline at 2K2.1.

2K2.1 addresses the unlawful receipt, possession, or transportation of firearms. And under that there are various different base offense levels.

The base offense level for a firearm described in 26, United States Code, Section 5845, which is what the jury found in this case, is a level 18. So at a minimum, the correct offense level is a level 18. And so I don't think there is a basis to object to that.

I understand that Mr. Hoover's counsel may make a similar argument. And I won't pretermit your argument and I'll hear it, but to the extent that Mr. Ervin is seeking to raise that argument, I don't think it's well placed. And I can understand why Mr. King has expressed the view that there's not a legal basis for it.

Turning now to Mr. Hoover. Mr. Hoover, on that same date, April 21st of 2023, a jury found you guilty of Count One of the Fourth Superseding Indictment, which charged you with conspiracy to transfer unregistered machine gun conversion devices, in violation of 26, United States Code, Sections 5861(e) and 5871, as well as 18, United States Code, Section 2.

And the jury also found you guilty of Counts Two, Three, Five, and Seven, which charged you with transferring

unregistered machine gun conversion devices to individuals, in violation of Title 26, United States Code, Sections 5861(e) and 5871 and Section 2.  And the Court has adjudicated you of those offenses.  The conspiracy charge was also in violation of 18, United States Code, Section 371.  The Court has adjudicated you guilty on those offenses based upon the jury verdict.

And we have a presentence report that's been prepared by the probation office with respect to you.

Did you have an opportunity to review that presentence report with your attorneys?

DEFENDANT HOOVER:  Yes, ma'am.

THE COURT:  Did they answer any questions you had about the presentence report?

DEFENDANT HOOVER:  Yes, ma'am.

THE COURT:  All right.  Mr. Larosiere, did you have sufficient opportunity to review the PSR with Mr. Hoover?

MR. LAROSIERE:  Yes, Your Honor.

THE COURT:  Does he have any outstanding objections to the factual statements?

MR. LAROSIERE:  Not to the factual statements, Your Honor.

THE COURT:  Let me hear your guideline objections.

MR. LAROSIERE:  So, Your Honor, we object to the use of 2K2.1(a)(5) as the base level in this specific instance.

Understanding what this Court has said, every word of

the guidelines is very intentionally written.  And, in fact, the definition of "firearms" in the guidelines -- because -- let me just stop for a second.

"Firearms" as a term, I think we understand from going through this case, needs a definition.  There's multiple divergent definitions of "firearm" in federal law.  And just in 2K2.1, divergent definitions are used.

There is one definition of "firearm" in 2K2.1, which is 921(a)(3).  And 921(a)(3), which is under Title 18, refers to things that we would ordinarily think of as firearms, you know, explosive, bullet comes out, et cetera, plus silencers.

In (a)(5) it refers to a firearm described in -- not defined in -- Title 26, 5845(a).  5845(a) contains items that are 921(a)(3) firearms and are not 921(a)(3) firearms.

And it seems clear to Defendant Hoover, Your Honor, that there is an intention in 2K2.1 to more severely punish those weapons which cause harm directly and those individuals which have directly caused -- caused harm or caused harm -- forced delivery instruments to be delivered, as we can see in 2K2.1(b)(2), which refers to a six-point reduction in firearms that were not used for an unlawful purpose.  And naturally the counterargument there would be, well, if the firearms are legal, there's not an unlawful purpose.  Well, if they're being sentenced under 2K2.1, naturally there was something unlawful about the firearms.

So it seems -- we agree with the probation office, which says that later on in the statute --

THE COURT:  You agree with the probation office to the extent that they say that under -- for special offense characteristics under (b)(1) it's not a firearm, but you disagree with them with respect to it being a firearm for purposes of (a)(5)?

MR. LAROSIERE:  Yes.  So we would follow their same logic.  Following the same logic, Your Honor, we believe that the base level is 12 because it is not a 921(a)(3) firearm.  It may be an item which is described in 5845(a), but it is a non-921(a)(3) firearm.  So it is not a firearm as defined by 2K2.1 described in 5845(a).  And that seems clear.

In fact, it's clear from the cases that both Defendant Hoover and the government cited.  I think it was the Bixley case.  And there's not much case law on this because ordinarily, in all of the other case law that was cited, there is a -- what I would call colloquially an actual machine gun -- you know, one that spits out bullets -- involved, thus setting the base level is pretty easily calculable.  I think here it's a little bit different.

THE COURT:  Why isn't the machine gun conversion device a firearm described under 5845(a) given the fact that 5845(a) has a definition of "firearm," the definition of "firearm" includes a machine gun, and the definition of

"machine gun" includes a machine gun conversion device?

MR. LAROSIERE:  So, Your Honor, again, it's in the context of 2K2.1.

2K2.1 defines the term "firearm" universally throughout that section as a 921(a)(3) firearm --

THE COURT:  Well --

MR. LAROSIERE:  -- so --

THE COURT:  -- that's in the commentary.

MR. LAROSIERE:  So, yes.  And I think that it's important to look to the commentary because the word "firearm" on its own is ambiguous, which I think we're evidencing right here by having this confusion over whether or not it is a firearm.  And I think certainly colloquially it's not, right.

THE COURT:  Well, colloquially, the frame of a firearm isn't one, nor is a muffler nor a silencer, but under the law, they're all firearms.

MR. LAROSIERE:  In 921(a)(3), Your Honor, I agree, differentially defined such.

Also, later on in 2K2.1 it refers to specific 5845(a) firearms as offense enhancement.  And I think that holding otherwise would be to rewrite the guidelines to say "a firearm as defined by 5845(a)."

In reality, what the guidelines are saying, if we look at them strictly, is "a 921(a)(3) firearm described in 5845(a)."  And that fits with the purposes of the guideline.

It fits with the nature and spirit of the guideline. And it is the only way that every single provision within 2K2.1 could make sense.

THE COURT: So in your view, a level 18 applies to basically everything in Section 5845(a) other than a machine gun conversion device?

MR. LAROSIERE: Machine gun conversion devices, the frame or receiver of a suppressor, and a couple other distinct areas that are not covered, because 921(a)(3) is divergent and it also includes destructive devices, whereas 5845(a) goes into more specific granularity.

And it's more just machine gun kits, right. There's the single parts; there's the combination of parts. There's several areas of 5845 which, for example, we can look back to the trial, where we learned that sometimes shoelaces can be 5845(a) firearms.

And so I think it's natural for the guidelines, which target harmful conduct -- you know, projection of force -- and discount conduct that is not itself harmful, that a shoelace does not fit under 2K2.1(a)(5).

THE COURT: If you're saying that the guidelines target more harmful conduct and discount conduct that's less dangerous, how would you account for the fact that the frame of a firearm is subject to the number-of-firearms enhancement but the machine gun conversion device wouldn't be?

MR. LAROSIERE:  Well, Your Honor, I would look to the legislative history there, where that was added ex post facto because it had become practice to separate the receivers from firearms.

THE COURT:  I don't think that's what "ex post facto" means, but go ahead.

MR. LAROSIERE:  Well, it was added after, right.  It was added after the original drafts were passed to cure that hole, and thus, again, that comports nicely as well.

If you've got a, you know, gunrunner who's running guns, the type of stuff that I think we all agree the ATF should be enforcing, like running guns to Mexico, we wouldn't want them to be able to avoid that by separating the upper from the lower.

But in this instance there's no firearm.  There's no forced-projection instrument.  There is a -- you know, we may respectfully disagree, but it's -- what the jury found to be a combination of parts, and what we allege to be a homogenous piece of steel with a drawing on it, I think that's closer to shoelaces.  And I think the guidelines fit with that idea, that a shoelace could be found by a jury to be a 5845(a) machine gun, but I don't think it's a 921(a)(3) firearm, and thus it would have the lower base offense level.  And it logically follows.

THE COURT:  All right.  What are Mr. -- does

Mr. Hoover have any other objections to the guideline calculations before I hear from the government?

MR. LAROSIERE:  Your Honor, may I talk with my client for a moment?

THE COURT:  Sure.

MR. LAROSIERE:  Thank you.

(Mr. Larosiere and Mr. Zermay confer with Defendant Hoover.)

MR. LAROSIERE:  No, Your Honor.  Thank you so much.

THE COURT:  All right.

Mr. Mesrobian, does the United States have any objections to the factual statements set forth in the presentence report?

MR. MESROBIAN:  Your Honor, the only additional fact we would submit might be relevant here is Mr. Ervin's firearms that were present at his home during the execution of the search warrant.  Our understanding is that part of perhaps the distinction the probation office was drawing was that in other cases where they have scored or applied the specific offense characteristics to cases where the individual possessed auto -- auto sears is because they were in close proximity to the firearms they could be installed in, as we heard testimony at trial from a number of witnesses that Mr. Ervin had AR-15s in his home and those were located during the execution of the search warrant.  Obviously that was not an issue, you know,

relevant to the criminal conduct that he engaged in in this case so it wasn't dwelled on in front of the jury, but it is in the record.  And to the extent that that is somehow a distinguishing factor -- I don't know why that would be, but for the probation office's purposes, if that were a distinguishing factor, that may be a fact that would be relevant to add to Mr. Ervin's presentence report.

THE COURT:  Do you want to remind me of what the weapons were that were found in the home and where they were in relation to the auto sears?

MR. MESROBIAN:  Well, Your Honor, several of the witnesses, Mr. Ervin's father -- at his trial -- trial transcript -- actually, all of these are trial transcript Volume 4.  Mr. Ervin's father, Ms. Wolfe, and Mr. Ervin's sister all testified that to their knowledge, he owned an AR-15.

There was testimony regarding the execution of the search warrant.  I don't believe we entered the pictures into evidence, but there were pictures taken of a number of AR-15s hanging, basically, on the shelving that was discussed during the trial testimony where Mr. Ervin had his preparation supplies, the food and other items, and there were a number of firearms, including several AR-15s.  According to the record from ATF when they executed the warrant, it was six complete AR-15-style rifles, one complete AK-47-style rifle, and seven

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 21 of 144 PageID 6768
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 24 of 188

VOL 1 - PG 21

AR-15 lower receivers.

And the testimony at trial as well was that the auto key cards were located all over the house:  in the kitchen, in the living room area, by the computer, and so forth.

THE COURT:  Mr. King, does Mr. Ervin dispute the accuracy of that recitation of facts presented at trial?

MR. KING:  Your Honor, I think a clarification would be important.  You know, one of the big issues is the device only works with very specific bolt carriers.

And had this been raised earlier I could have researched it in the transcript.  But my recollection of the testimony was that there were no auto key cards cut out, converted, and that none of the AR-15s that were in Mr. Ervin's home had SP1 bolt carriers or would otherwise be able to operate or work with an auto key card if correctly cut out.

I believe -- it's been since April, so I'm relying on my memory here, but I believe that was Agent Hooker's testimony on cross-examination, if my memory serves me.  But again, I've not had an opportunity -- because that wasn't raised, I've not had a chance to review a transcript of it.

And Your Honor, I apologize, otherwise, I think that is an accurate recitation of the firearms that were in the house.  And there were -- based on the photographs that were both placed into evidence and that I've reviewed, there were auto key cards throughout the home.

THE COURT: All right.

Mr. Mesrobian.

MR. MESROBIAN: I agree with Mr. King. I don't think there was any testimony, or I'm not aware of an analysis of which bolt carriers were in the AR-15s in Mr. Ervin's home.

However, I do disagree about the testimony at trial, because the testimony was -- at trial was that the auto key card worked in converting a -- an AR-15, both using the M16 machine gun bolt carrier as well as the SP1 bolt carriers. So there were multiple types of bolt carriers that worked with it.

THE COURT: And that was in Agent Hooker's -- whose testimony was that in?

MR. MESROBIAN: That was in Officer Toy's testimony regarding the testing of the device both at the facility in West Virginia as well as when he came to Jacksonville to do the test here.

THE COURT: All right. Let me hear your -- I think your response to the -- well, start with your response to Mr. Ervin's objection to 59, and then I think in your response to Mr. Hoover's objection you'll probably -- that will also be your argument with regard to the government's objections.

MR. MESROBIAN: And forgive me, Your Honor, with respect to paragraph 59, is that the structuring?

THE COURT: It is.

MR. MESROBIAN: Okay. So beginning there, Your

Honor, the Court presaged what my response would be, which is that the evidence at trial showed that the funds that Mr. Ervin structured were the funds that he earned through the conspiracy to distribute the auto key cards.

I understand that Mr. Ervin is persisting in his assertion that he did not believe his conduct was unlawful, but that was not the evidence at trial and that was not the jury's conclusion in finding him guilty beyond a reasonable doubt of Counts One through Eight.

They found that he knowingly and willfully entered into the criminal conspiracy and made a number of substantive transfers of the auto key cards.  And from the government's perspective, that pretty much ends the inquiry, because if he was found guilty of those offenses, then the transitive property is that he knew he was structuring the proceeds of an unlawful activity.

THE COURT:  All right.  Go ahead with your argument regarding the firearms guidelines.

MR. MESROBIAN:  Your Honor, much of this was covered in our response to the initial PSR and in our memorandum for the Court.  I don't want to belabor it too much, but I'm happy to hit the high points and then respond to some of the arguments today.

THE COURT:  Well, let me ask you this.  In the *Hixson* case, the government -- an AUSA in your position -- took the

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 24 of 144 PageID 6771
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 27 of 188

VOL 1 - PG 24

position that the machine gun conversion devices were not firearms for purposes of the specific offense characteristics and argued, instead, that the Court should depart upward under 5K2.0, or vary upward.

I guess I'm interested in understanding why the position of the United States would be different on a black-and-white guideline calculation.

MR. MESROBIAN:  Well, I can't speak to necessarily what that office's calculations were in terms of making their argument, however, what I can say is that --

THE COURT:  I just read their sentencing memorandum, and their sentencing memorandum says that.

MR. MESROBIAN:  I understand, Your Honor.  What I meant was that in terms of the legal landscape in their district, I don't know where their office is in terms of making these determinations on their arguments.  However, what I do know is that district is not governed by *Dupree*.  And that is sort of one of the instructive parts of our argument and in our memorandum.

But, Your Honor, from our perspective, the text of the guideline is not ambiguous in terms of whether or not 5845(a) firearms are firearms for the purposes of both the base offense level and the specific offense characteristics.

And respectfully, I'm not aware of another guideline where the probation -- where we would take the position -- or

the probation office would take the position that a term means one thing in the first subsection of a guideline and then means something different in another, because when we read -- in the specific offense characteristics, because, I mean, we have to start with the fact that for recent history, as we showed in the supplemental memorandum we provided, probation has been applying the specific offense characteristics to auto sears in all of these cases.  And that's as recently as April 2023, this year, in the James King case, it's Case Number 6:22-cr-51, where probation applied the specific offense characteristics in an auto sear case, counting each one individually as a firearm, none of which, based on the factual recitation, were installed or near an AR-15.  And nobody objected and Judge Berger agreed.  And that's been the consistent application.

THE COURT:  And I inquired of the probation office about that this morning.  And my understanding is that both *Hixson* and further consultation with the Sentencing Commission convinced them that that probably had not been the best reading of the guidelines that they were applying previously.

MR. MESROBIAN:  I -- that's an interesting position for them to take.  I, however, think it's, frankly, incorrect.  And that's based on a plain-language reading of the guideline and also the fact that *Hixson* is a non-binding case from a district where the circuit court of appeals law is different.

We are governed by *Dupree* here and we have to start

with the plain language of 2K2.1.

I think the apparent premise, I guess now, from the probation office, is that this very large category of firearms -- machine gun conversion devices -- was excluded accidentally, I suppose, by the Sentencing Commission in the drafting of 2K2.1.  I think perhaps the defendants believe that it was an intentional exclusion.  That exclusion would purportedly exist because, as the Court noted -- it exists despite the fact, as the Court has already noted, those firearms, including machine gun conversion devices, are notated specifically in the base offense levels in 5845(a).

The problem that I think this interpretation of 2K2.1 has is that it ignores the fact that it's scoring the base offense level based on different criteria.  It assigns a 26 level, a 24, 22, depending on different criteria, and that includes the criminal history of the defendant or the type of firearm.

And there are two different types or subsets of firearms which cause an elevated base offense level here:  a firearm as described in 5845(a), or a semiautomatic firearm capable of accepting a large-capacity magazine.  And those categories are referenced together in several places:  2K2.1(a)(1), (a)(3), and (a)(4)(B), sub B.

The problem is, how are we supposed to read the plain text of 2K2.1 and conclude that these categories are not

firearms later on in the exact same guideline?

THE COURT:  Well, but what their argument is is that it's a -- it has to be -- in order to apply the enhancement in (a)(1), (a)(3) and (4)(B), as well as (a)(5), it has to be both a 921(a)(3) firearm and a Section 5845(a) firearm.  So an actual machine gun, or the frame or receiver of an actual machine gun, but not just the machine gun conversion device.  That's their contention.

MR. MESROBIAN:  That's Mr. Hoover's contention.

THE COURT:  That is correct, yes.

MR. MESROBIAN:  And I don't think that holds water for a couple reasons.  The first is exactly what the Court pointed to, which is that to the extent that Mr. Hoover is arguing that this is logical because the guidelines and Congress intended to punish -- it only applies to things where -- I think "projection of force" was the phrase that we heard a lot today, and not punish things that potentially could become or potentially could be installed into a 921(a)(3) firearm, that's a quote from their memorandum, and the rationale, I guess, is that an item that can't project force or cause harm on its own is less serious.  That would obviously be very convenient for him in calculating the PSR here, but there are two flaws.

The first is that, as the Court pointed out, 921(a)(3) specifically includes things that potentially could

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 28 of 144 PageID 6775
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 31 of 188

VOL 1 - PG 28

become or be installed because 921(a)(3) includes frames and receivers.

THE COURT:  Right.  But, I mean, his point is those are 921(a)(3) firearms, but the machine gun conversion device isn't.

MR. MESROBIAN:  But when you read the actual guideline and it talks about 5845(a) firearms, that -- they specifically reference the statute that includes machine gun conversion devices.

And it's hard to understand -- when looking at the case -- the second part of this is that looking at the case that Mr. Ervin cited in his memorandum, Judge Merryday's case, that's the *Aguilar-Espinosa* case, 57 F.Supp.2d 1359, there, I think Mr. Ervin was citing to that case as -- for the proposition that auto key cards are, quote, only statutory machine guns, and that therefore somehow resorting to the commentary is appropriate.

However, that is not -- and I haven't even addressed *Dupree* yet, we'll get there in a moment, but that's not the rule in *Dupree*.

In that case, *Aguilar-Espinosa* was not about the guidelines, it was about the level of evidence of proof of knowledge required to find someone guilty for possessing, in that case, an auto sear.

What Judge Merryday was getting at was that under

*Staples*, there has to be evidence that the person knew the nature of the thing that they possessed.  It was not a guidelines calculation case.

However, there is a lot of interesting language in that opinion regarding the purpose of the statute and what Congress was trying to regulate here.

You know, at one point the judge wrote, beginning on page 1363, that "Congress obviously intended to regulate possession of even an incipient machine gun; that is, a device the possession of which is either tantamount to possessing a machine gun or the distinctive precursor of the automatic operation of a weapon."

He then went on to say in reference to the same 5845 statute that is at issue in the guideline, "The second sentence of section 5845(b) suggests definitively that Congress intended to the extent feasible to statutorily govern disbursement of the capacity to discharge weapons automatically.  The capacity to initiate automatic weapons fire, although a capacity that is often subtly dispensed and inconspicuously harbored, is a brutally lethal capacity, the possession of which imminently threatens the public, whether appearing in the form of a shiny, newly manufactured, and complete weapon or in the form of one of those finely constructed and not widely understood parts that contribute decisively to the onset of automatic firing. Congress decided that the possessor of hardware bearing the

capacity to enable automatic fire also possesses the hardware and a considerable risk of criminal liability if the possessor knows the endangering nature of the goods possessed."

That case -- it's hard to read the well-reasoned analysis in that case and think that, well, the Sentencing Commission clearly meant to omit those devices from the ambit of 2K2.1 for the base offense level or the specific offense characteristics.

And this change in the probation office's position in reading 2K2.1 is hinging solely on the line in the commentary regarding, you know, the definition of a firearm is -- under -- is -- has the meaning given that term in 18 U.S.C. 921(a)(3).

THE COURT:  Well, I mean, the probation office routinely and regularly and correctly goes -- looks to the application notes for definitions of terms used in the guidelines, right?

MR. MESROBIAN:  Correct, where they're unambiguous and where -- I believe what the probation office said in their response to our objections was that a reference to a statute in the guideline makes it ambiguous.  And I -- respectfully, I don't understand what that means.

There are any number of references to statutory definitions and guidelines, and those make the guidelines less ambiguous, not more.  It's pretty common.  And 2A3.4 sets the base offense level based on whether the offense involved

conduct described in 18 U.S.C. 2241(a) or (b) versus conduct described in 18 U.S.C. 2242.

That's repeated, similarly, in 2G2.1.

In 2B1.1 it refers to conduct described in 18 U.S.C. 670.

Those references are not meant to create ambiguity. They define terms.  They define the conduct that is governed by that particular guideline.

In those situations there is no need to resort to the commentary.

And that's, again, exactly the problem that we have here.  The guidelines refer -- the guideline here, 2K2.1, refers specifically to a firearm that is described in 26 U.S.C. 5845(a).

THE COURT:  Mr. Mesrobian, is it your position -- because I don't think this is right -- is that -- is it your position that you only look to commentary or that the Sentencing Commission should only provide commentary where there's ambiguity?  I don't think that that's accurate.

Now, I think what you're saying is that under *Dupree*, if the guideline is not ambiguous, you can't look to commentary that contradicts the guidelines.  But is it your position that there's only -- that commentary is only appropriate when there's ambiguity in the guidelines?

MR. MESROBIAN:  Well, that is what *Dupree* essentially

says.  I mean, the first principle is that the commentary cannot expand the interpretation of an otherwise unambiguous guideline.

THE COURT:  Right.

MR. MESROBIAN:  I think when we're dealing with this situation here, what's good for the goose is good for the gander.  And it cannot contract an otherwise unambiguous guideline either.

If the meaning of the guideline is in doubt, as the Court noted, the Court can consider the commentary.  But even then what *Dupree* says -- and that's citing to *Seminole Rock* -- is that the Court cannot give controlling weight to the commentary if it is plainly erroneous or inconsistent with the guideline.

And that is with -- when we're talking about this reference to 921(a)(3) in the commentary, that's what we have.  It's an unambiguous guideline, in our view, we submit, with respect to what types of firearms are regulated by 2K2.1.  And there is no need to look further to the commentary to limit that unambiguous definition.

But even if you did, that definition is plainly erroneous and inconsistent with the reference to 5845(a) above.

THE COURT:  Didn't the Court reject that plainly erroneous and incon- -- I thought that was a higher standard than had to be shown.

MR. MESROBIAN:  That was the reference when -- when it refers to *Seminole Rock* and it's talking about the reference to regulations and whether or not you can -- has that been since -- or that's the reference in *Dupree*.  And I can provide the case number, or the page number.

I think this is in the passage where it's discussing *Seminole Rock* and *Stinson* and whether or not -- *Stinson* was being careful to note that the analogy was not precise.  And I'm looking at page 1295 of *Dupree*, I think.

THE COURT:  Hold on, let me --

MR. MESROBIAN:  "Congress has a role in promulgating the guidelines."

"That's why *Stinson* gave more deference to the guidelines commentary than *Seminole Rock* gave to an agency's interpretation of its own regulations."

But again, when it -- the -- the analysis here is very clear in referring to Congress's role in promulgating the sentencing guidelines.  And we run, again, into Judge Merryday's case, that Congress intended to regulate machine gun conversion devices because of the inherent danger of automatic fire, but then sought to exclude them or approved the exclusion of them from 2K2.1?  It simply doesn't comport.  The more logical conclusion here is that the language of 2K2.1 is unambiguous in its reference to 5845(a) firearms.

And to the extent that there is a need under *Dupree*

to resort to the commentary for further information, that definition just simply does not align with the specific reference to 5845 in the guideline.

THE COURT:  Give me a moment.

(Pause in proceedings.)

THE COURT:  So, Mr. Mesrobian, let's say, hypothetically, this was a mistake by the Sentencing Commission.  What is the Court supposed to do with that in terms of -- I mean, the definition proposed by counsel for Mr. Hoover, that is, that it has to be a 921 -- it has to be both a 921(a)(3) firearm and a 5845 firearm, why can't the Court accept that definition if that's what the Sentencing Commission approved?  Even if they may change it later.

MR. MESROBIAN:  Well, firstly, in the commentary, that line, with respect to the definition of "firearm," it does not say "firearm" has only the meaning ascribed to it in 921(a)(3).

And I think that's important to read that in conjunction with the, again, specific reference to firearms in 5845(a).  There is no specific exclusion in either the guideline or the commentary to find that machine gun conversion devices were intentionally excluded from this guideline.

But I think what the Court would do here, in the government's recommendation, is to find that the guideline refers -- 2K2.1 applies to machine gun conversion devices

because they are firearms as described in 5845(a) and apply both the level-18 base offense level and the specific offense characteristics.

However, I think the alternative here is what the Court did in *Hixson*, which is, in their view, in a world without *Dupree*, in terms of, you know, the prescription of how the Court should read the guideline in conjunction with the commentary, the Court upwardly departed under 5K2.0(a)(1)(A) to account for, again, in their view, a perceived hole in the guidelines.

2K2.1 itself is structured to increase the offense level when defendants traffic in firearms and to account for the volume at which they engage in that activity.

By accounting for that -- well, by not accounting for that here under this interpretation of 2K2.1, that would clearly create an aggravating circumstance that the Sentencing Commission did not adequately take into account.

Essentially that would be -- and what -- the Court in *Hixson* essentially was throwing the issue onto the Sentencing Commission by saying that they mistakenly created this gap for auto sears, even though, you know, for years people have been reading this guideline and not seeing that this gap existed.

The solution, however, is baked into section 5K of the guidelines, and that's the upward departure. And as we said in our memo, our recommendation is 20 levels of an upward

departure to account for the trafficking and the extremely large number of NFA firearms involved in this case.

So our recommendation to the Court would be to find that these -- that the machine gun conversion devices are firearms under 5845(a) as set forth in 2K2.1 and calculate the guidelines accordingly. But if that were to be an incorrect conclusion -- incorrect interpretation of the guidelines, there would be cause to upwardly depart in the absence of the application of those levels, offense levels.

THE COURT: All right. So the government's objections are to the failure to include the special offense characteristics for the number of firearms and the failure to include the special offense characteristics for trafficking?

MR. MESROBIAN: Correct, Your Honor.

THE COURT: All right. And Mr. -- all right. Anything else, Mr. Mesrobian?

MR. MESROBIAN: May I have one moment, Your Honor?

THE COURT: Sure.

(Mr. Mesrobian and Ms. Taylor confer.)

MR. MESROBIAN: One final point with respect to I guess what is the defendants' argument and not the probation office's argument with respect to the guidelines is that there is a distinction if one is going to look at the commentary guideline definition of "firearm," that there is only ambiguity in the guideline in the specific offense characteristics if one

wants to take that view.

There's a specific reference to 5845(a) firearms in the base offense level in sub (1), (3), (4), (5).  There is only a reference to "firearm" in specific offense characteristics, and that is giving credit to the argument here that that is -- that there is ambiguity in the guideline.  However, there is no need to resort to the definition in the commentary for "firearm" for the base offense level section.

That would be a distinction we would draw, and I think that is probably the distinction that the probation office is drawing as well.

THE COURT:  All right.

MR. MESROBIAN:  Thank you, Your Honor.

THE COURT:  Mr. King, do you want to be heard as to any of those arguments?

MR. KING:  Yes, Your Honor, just briefly.

THE COURT:  All right.  Go ahead, Mr. King.

MR. KING:  You know, the reason for -- you know, when talking about *Dupree*, the reason, you know, we cited to Judge Merryday's opinion was not for any of the legal holdings, but I think he did a very good job of explaining that statutory firearms are not firearms as they are regularly understood in terms of what would be ambiguous or not to a court.

So if you took an auto key card to a thousand people, probably excluding the individuals in this courtroom and maybe

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 38 of 144 PageID 6785
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 41 of 188

VOL 1 - PG 38

the 7th and 8th floors of this building and showed it to them, a thousand people would tell you that that's not a firearm.

THE COURT:  Except the 12 jurors.

MR. KING:  Except -- well, after given the instructions of the Court and the law.  And, you know, to that extent, without those instructions of the Court and the law, if we had asked the 12 jurors "is this a firearm?" at the beginning of the trial before the Court's instructions, I strongly suspect all 12 of them would have said "no."  That's why the specific definitions are important.

One of the things I'd like to turn the Court's attention to is Section 1B1.1, which is the application instructions.  And looking at it, in terms of the application notes --

THE COURT:  It has the same definition as 921.

MR. KING:  It does.  And it starts off by saying, "The following are definitions of terms that are frequently used in the guidelines and are of general applicability, except to the extent expressly modified in respect to a particular guideline or policy statement."

So the base offense level is the exception because it specifically cites to a different statute.  But yeah, Subsection H provides that definition of a firearm as well.

THE COURT:  But so the -- how do you get around the fact that the jury convicted these individuals of a violation

of 5861?  5861 governs the transfer of firearms, and it defines -- and it incorporates the definition of "firearm" from 5845.  5845 specifically includes these as a firearm.  So the machine gun conversion devices are unequivocally -- under duly-enacted statute by Congress they are machine guns and they are, therefore, firearms.  And if you look at the guidelines, the guidelines say:  If you violate 5861, you turn -- you go to 2K2.1.

How can you -- and 2K2.1 presumes that the item that we're dealing with is a firearm.  So how do you then exclude it from the definition?  It starts out being within the definition of a firearm.  How do you then exclude it from the definition of a firearm and use a different definition for "firearm" when you get to the special offense characteristics?

MR. KING:  And that's what -- that's exactly what 1B1.1 deals with, is unless it is expressly modified by citing to a specific statute, which is done to determine the base offense level, then this is what defines a firearm.  And then it also has that in the application notes.

So firearms are defined differently, you know.  What was a firearm under the -- I'm sorry.

THE COURT:  Under the argument that you're making right now, this firearm, it -- this machine gun conversion device wouldn't -- if it doesn't fall within the definition of a firearm at all, then how would it be covered by 2K2.1?  If

you're saying it has to fall within the 1B1.1 definition, how would it ever qualify under any base offense level?

MR. KING:  Because the base offense level specifically cites firearms as defined -- as described in 26 U.S.C. 5845.

THE COURT:  So you're not -- but Mr. Hoover's argument is that a machine gun conversion device doesn't fall within that definition.

MR. KING:  For determining the base offense level.

THE COURT:  Right.

MR. KING:  Correct.

THE COURT:  So where would it -- where would it fall within the base offense level under --

MR. KING:  I'm afraid I'm not following you, Your Honor.  I know this is a -- it's a little --

THE COURT:  Well, but -- I think probably because the argument is circular, but I'm trying to follow it.

If "firearm" has to have the definition in 1B1.1, where would -- how could a machine gun conversion device fall within the ambit of any of the offense levels in 2K2.1?

MR. KING:  So -- Your Honor, if I could just have a moment --

THE COURT:  Sure.

MR. KING:  -- because I think I also turned myself into a little bit of a twist here.

Your Honor, the base offense level uses a more specific definition than "firearm" as it is used throughout the guidelines.  And by using a more specific definition, looking to 2B1.1, that's when you apply more specific or different definitions.  So that is modified, and that is how the rules are supposed to be interpreted according to the application notes there.

So generally, it should be defined as Subsection H in 2B1.1, which is the same as it is defined in 921(a)(3), but the -- anytime that there needs to be a different definition, that has to specifically cite to a statute or provide a different definition.

So for the specific offense characteristics -- I'm sorry, for the base level offense, it applies a definition that is different than is used throughout the rest of the guidelines to determine that base offense level.

But the rest of that guideline doesn't say if -- you know, if -- you know, does not change the definition of "firearm" as it's applied throughout the rest of the guidelines.  And if it did so, it would specifically say so, and it does not.

THE COURT:  Okay.  Anything else, Mr. King?

MR. KING:  No, Your Honor.  Just, you know, briefly, you know, in this -- you know, turning to the government's supplemental sentencing memorandum, of the three cases cited in

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 42 of 144 PageID 6789
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 45 of 188

VOL 1 - PG 42

the Jacksonville Division, I was the attorney on two of those. And, you know, I know this is -- you know, I can tell the Court this is just not an issue we addressed.

I know in terms of Mr. Blocker, my understanding, which is the first one they cited, that those were -- that he was a heroin and methamphetamine addict who had guns sitting out in his house.  My understanding was the guns that were calculated for that were the actual firearms that he had in his home, and that the Glock switches that they originally came for, because ultimately that's what he pled to, was the possession while an unlawful user of drugs.

And in terms of Mr. Schade, you know, I know he had a probationary sentence and that's been terminated.

But that's just not an issue that we came up with or addressed.  You know, had I been as familiar with this issue, I think we would have probably handled it differently, I can say that.  But, you know, it wasn't objected to because it was just not an issue that I had seen raised before or was familiar with.

THE COURT:  All right.  Thank you.

MR. KING:  Thank you, Your Honor.

THE COURT:  Mr. Larosiere.

MR. LAROSIERE:  Yes, Your Honor.  Just one moment.

Thank you, Your Honor.

Just very briefly.  To agree with the position of the

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 43 of 144 PageID 6790
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 46 of 188

VOL 1 - PG 43

government we'd have to agree that this is unambiguously in every way a machine gun.  It's ambiguous factually, legally.  This is ambiguous every which way.

And again, I'm not contesting that my client was convicted.  He was.  The question is:  How do the guidelines handle this?

We talked about the cases earlier.  The government pointed out, there was no objection.  Those arguments were waived, so they're not precedential here.

And to deal with the suggestion that the guidelines simply forgot or excluded, that's not true.  There's a catchall in 2K2.1.  That's (a)(7).  And I think it flows perfectly logically that something that -- and again, the guidelines say: Violative of this statute, convicted of this statute, proceed to 2K2.1.

You would have people whose convictions involved everything from rocket launchers, for which there's a specific sub application, to an AK-47 machine gun, which was unambiguously a machine gun, which would fall under (a)(5), and then there's got to be everything else for (a)(7).

THE COURT:  Well, doesn't (a)(7) deal with a pistol or a silencer, a frame, a receiver?

MR. LAROSIERE:  Well, Your Honor, it just -- it's silent.  It just says "in all other," I believe is the word.

THE COURT:  No, it's "except as provided below," 12.

MR. LAROSIERE:  Right.  And so that is the base-base level.  And I think that in -- in the case of something like a homogenous piece of steel with a drawing on it that the jury convicted somebody as a machine gun, you know, it makes sense for that to fall under the catchall.

And it's not as if this is not punished.  That's 12 points.  That's not a slap on the wrist.  It's clearly very seriously regulated conduct.  And our reading is the only way every single subsection means something.

THE COURT:  Well, isn't it only if you look to the definition of "firearm" in the application note that there's ambiguity?  Because otherwise -- otherwise, I'm told to go to 2K2.1, which deals with the punishment of receipt, possession, or transportation of firearms.  And it provides punishments based on the character of the firearm or the character of the individual possessing the firearm.

It only becomes ambiguous if you turn -- because a jury has already found this to be a firearm.  That's the offense of conviction.  So don't you start with 2K2.1 with the presumption that the object at issue is a firearm, and then the question is:  Does it fall within one of these special categories that enhances the penalty?

The penalty's enhanced if it's a semiautomatic firearm that's capable of accepting a large magazine, or the penalty is enhanced if it's a firearm that's described in 5845,

which in this case it is.

You only get to a -- and when you get to the specific offense characteristics, again, a jury has determined that the item is a firearm.  I'm not aware of anywhere else in the guidelines that the guidelines would identify something that is statutorily defined to be a thing and then the guidelines say, "Oh, but for sentencing it's not a thing."

How is it, then, that the ambiguity isn't created by the commentary?

MR. LAROSIERE:  Your Honor, with unbelievable respect, I think that there's no way a simple, bare reference to "firearm" is not ambiguous.

This would be a very different case if the guidelines said under (a)(5), "Firearm as defined in."  And we know the guidelines drafters knew how to do that.

THE COURT:  What's the difference -- you said that earlier and I'm not sure I caught the import of the difference between the word "defined" or "described."

MR. LAROSIERE:  Right, Your Honor.

So "firearm" -- the word "firearm," the noun, is defined in 2K2.1.  Again, we've already gotten there from 1.1, so now we're at 2.1.  And the word "firearm" takes on that meaning because it's ambiguous.  And I think it's ambiguous in every possible way.  And it is given a meaning that causes all of the pieces to fall into place.  921(a)(3).

So if it is a 921(a)(3) firearm, which I would submit is the most federally colloquial definition of "firearm" that we have --

THE COURT:  But it's not what they were convicted of. I mean, Congress passed a separate statute.  Congress said, "These are also firearms."  And they're convicted of that firearm offense.

Can you give me any other example of a place in the guidelines where the guidelines remove from consideration for sentencing purposes the very item that the individual was convicted of dealing with?

MR. LAROSIERE:  Well, I cannot, Your Honor, and that is because there are no other areas in the federal law that deal with such a wide range of divergent articles as 5845 does. And the only way that the relative seriousness of those articles makes sense is if we give 2K2.1 the meaning that the commentary says it has, which, again, is that a firearm under 2K2.1 is a 921(a)(3) firearm, that being a real firearm or -- and a silencer.  I would say that that was the most, you know, odd thing there, but the public and Congress believed that silencers, on their own, had a unique propensity to do whatever it is they believed they did.

It just fits.  It, frankly, just comports.  And our reading is that a shoelace -- which, as we know, can sustain a 5845-related conviction -- would fall under (a)(7) and be at

12 points.  And I think that fits compared to an AK-47.

I think that when the statute covers this broad range between shoelace and literally rocket launcher, it makes sense that they would be punished slightly differently.

THE COURT:  All right.

MR. LAROSIERE:  Thank you, Your Honor.

THE COURT:  Mr. Mesrobian, was there something you wanted to add?

MR. MESROBIAN:  Just very briefly, Your Honor, just to clarify the record.

Mr. King, when he was talking about Mr. Blocker, in his PSR he was held accountable for 69 firearms.  That included 67 non-antique firearms and two Glock switches, which were not installed.  So he was -- those were individually counted in his PSR as firearms.

THE COURT:  Of course, they would have made no difference between -- because the difference between 67 and 69 makes no impact in the guidelines.

MR. MESROBIAN:  Correct, just reciting the probation office's analysis in there.

And, Your Honor, just one final thing.  The only -- as the Court noted, I think the only ambiguity here is created by the commentary.  This item is a firearm.  They were prosecuted for transferring these items as firearms and found guilty.

Judge Merryday's opinion lays out exactly Congress's intent and thought process behind regulating these items.  To think that they and the Sentencing Commission then excluded them from 2K2.1, what would be the reason?  There is not one. No one's talked about why the reason that would be for them to do that.  They meant to regulate these.

The Court is right.  This is the correct guideline to apply here.  These items are specifically referenced in the subsection of the base offense level, and that's our position.

THE COURT:  All right.  I think the difficulty here is that -- well, let me take a step back.

First of all, the definition of "firearm" in 1B1.1 and the definition of "firearm" that we're talking about here in 2K2.1, both of those definitions are found in the commentary, not in guidelines themselves.

And the probation office correctly relies on the commentary.  And I think the probation office, reading the guideline and applying the commentary, scores the guidelines consistent with what's written in black and white in the guideline manual.  And so I credit the probation office for that determination.

The problem, though, I think we have, is that *Dupree* makes clear that you can't defer to the commentary in the guidelines if -- to the commentary to the guidelines if the guideline itself is not ambiguous.  And so the Court has to

start with the question of determining whether the meaning of the guideline itself is in doubt.

And if it's genuinely ambiguous, then the Court applies deference. But if it's not ambiguous, then the Court can't apply deference. And it certainly can't apply deference if the commentary is inconsistent with the guideline.

And *Dupree* looked at that issue, and *Dupree* also relied on *Kisor*, which instructs that in determining whether there's ambiguity, you have to look at the text, the structure, the history, and the purpose of the regulations. And again, *Kisor* says you don't give deference unless there's ambiguity.

And I'm just not convinced that when you look at the text, the structure, the history, and the purpose of the regulation that there's ambiguity in what a firearm is when you're applying these guidelines.

As I said earlier, you start with the premise that the individual who's being sentenced through the application of 2K2.1 is an individual who has been convicted of an offense involving a firearm. If it wasn't a firearm, we wouldn't be at 2K2.1 at all.

And then 2K2.1 proceeds to apply different offense levels based upon the character of the firearm or based upon the criminal history of the individual that possessed or engaged with the firearm.

And, for example, as Mr. Larosiere notes, paragraph

(a)(7) just says it's a level 12, "except as provided below." So what -- it doesn't have to be -- it doesn't say it has to be a firearm, it just -- it presumes that it's a firearm because the individual is being sentenced for a firearm offense.  And so it seems inconsistent to me that whatever the item would be would be a firearm but not be a firearm when you get to the specific offense characteristics.

And as I noted earlier, you're only applying 2K2.1 because the guidelines instruct you to apply that if the individual is convicted under 26 U.S. Code, Section 5861.

So it is a firearm for the offense of conviction, so it has to be a firearm, then, for the base offense level as well, because if it's not a firearm, it wouldn't even apply under (a)(7).

And then for it not -- looking at the text, for it not to then -- for the definition of "firearm" to then change for the specific offense characteristics simply doesn't make sense.

The structure of 2K2.1 also suggests that the ambiguity comes not from the structure or the language of the guideline itself, but, rather, from the limiting definition of "firearm" in the commentary.

At each level of 2K2.1, the guidelines provide an increased penalty for a semiautomatic weapon and for a firearm as described in 5845.

And so the structure of the guidelines evidences the Sentencing Commission's intention to treat certain types of firearms -- the semiautomatic firearms capable of accepting large magazines and the firearms as described in 5845 -- more seriously than other firearms.

But if you exclude firearms that don't fall in the definition of 921 from the specific offense characteristic, it would lead to the anomalous result that an individual who possesses, let's say, 25 silencers is going to end up with a higher offense level -- a significantly higher offense level than an individual who possesses the same number of machine gun conversion devices or 250 machine gun conversion devices, because there would be no enhancement for the number of machine gun conversion devices.

It also means that an individual who possesses a silencer or just the frame or just the receiver would be subject to an enhancement under paragraph (a)(6) if they were transferring that item out of the country or if they had reason to know that it would be used in connection with another felony offense.  But an individual with a machine gun conversion device wouldn't be subject to an enhancement under (a)(6).

And that interpretation is just not internally consistent with the structure of the guideline at all.  And it's contrary to the statute itself that defines what constitutes a firearm for purposes of the National Firearm Act.

And the jury convicted the defendants and determined that the items they were conspiring to transfer were firearms.

So the interpretation that is -- the definition that is in the commentary seems to me to be what creates the ambiguity, because if you don't look to that, you start with the premise that it was a firearm, because that's what the jury said it was, and then you apply the various application notes assuming that the item is a firearm.

And then you look at the history of the regulation, and there's nothing in the history of the regulation that evidences any intention to remove or protect or treat less harshly machine gun conversion devices.

Up until 1991, the guidelines specifically said if you're dealing with a firearm as defined under 921, you use the 921 definition; if you're dealing with a firearm under 5845(a), you use the 5845(a) definition.

They changed it in 1991, but nothing in that history reflects that they were trying to alter the treatment of the machine gun conversion devices, and nothing in the history of the changes in 2003 suggests an intention to treat machine gun conversion devices differently than other items that aren't in and of themselves operable as a firearm; again, such as a muffler or a silencer.

And when you look at the purpose of the regulations, it's apparent throughout 2K2.1 that there was an intention to

treat Section 5845 weapons more severely in recognition of, as Mr. Larosiere acknowledged, the increased danger that they are believed to pose to public safety, and to punish the firearms offenses in a manner commensurate with the danger of the weapon possessed or the danger of the person possessing the weapon.

And excluding the machine gun conversion device from that definition of "firearm," that creates the ambiguity, and it's inconsistent with the overall purpose of the guidelines.

And so I don't think I can give deference to the limited definition of "firearm" that is found in the commentary to 2K2.1 at Application Note 1.  I think it's inconsistent with the guideline itself.  It's inconsistent with the offense of conviction.  And I don't think that the guidelines become ambiguous until you read in that application note.

And so to the extent -- to the extent that either Mr. Ervin or Mr. Hoover object to the base offense level of 18, I have to overrule the objection because *Dupree* -- I'm bound by *Dupree*, and *Dupree* says I can't give deference if it's inconsistent or if the guideline is not ambiguous.

And one other thing I'll note in terms of the history and whether the history of the guidelines suggests that this is an intentional deletion -- just a moment, let me find it.

Recently the Sentencing Commission has put out for public comment additional questions about various guidelines. One of those reads as follows:

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 54 of 144 PageID 6801
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 57 of 188

VOL 1 - PG 54

"The general definition of firearm in 2K2.1 at Application Note 1 is drawn from 18 U.S.C., Section 921(a)(3). However, 2K2.1 applies a higher base offense level to offenses involving firearms described in 26 U.S.C., Section 5845(a). Although Section 5845(a) generally defines a more limited class of firearms than Section 921(a)(3), there are a limited number of devices, such as those designed and intended solely and exclusively for use in converting a weapon into a machine gun, which are firearms under 5845, but not Section 921(a)(3). Thus, such devices are firearms for purposes of the increased base offense levels in 2K2.1(a)(1), (3), (4)(B)(i)(II), and (6), but not for purposes of the specific offense characteristics referring to firearms such as 2K2.1(b)(1), which is the number of firearms.  The Commission seeks comment on whether it should amend the definition of 'firearms' in application note 2K2.1 to include devices which are firearms under Section 5845(a) but not Section 921."

That reflects that this was not an intentional change by the Sentencing Commission.  And in fact, if anything, the Sentencing Commission is considering whether to close the gap identified by the Court in *Hixson*.

And I'll note that the Sentencing Commission clearly thinks that a machine gun conversion device, under the guidelines, would start out at a level 18 because it specifically says so.  It's only that if -- they are currently

excluded under the special offense characteristics.  And so those comments also support a conclusion that the history of the guidelines doesn't indicate that that limiting definition should be applied if inconsistent with the statute and inconsistent with the guidelines themselves.

So for purposes of the guidelines, the objection to the offense level of 18 is overruled.  And then it would seem that the defendants would be subject to the enhancements, so there would be the special offense characteristic -- paragraph 53 would add a special offense characteristic for the number of the firearms, which would be 10, and the special offense characteristic under (a)(5) for trafficking, which would increase by four levels.  So we would be at a level 30- -- paragraph 57 would be level 32.  And I'm looking at Mr. Ervin's presentence report.

I need to confer with the probation officer about the grouping.  So it's -- why don't I -- have I addressed all the guideline objections at this point, Mr. King?

MR. KING:  Your Honor, the one on Count Nine, the structuring, I don't think you've ruled, but I . . .

THE COURT:  But you suspected my ruling from my question earlier, yeah.

The problem with the argument, and I understand the argument, but the jury did find beyond a reasonable doubt that Mr. Ervin knew the unlawful purpose of the conspiracy.  And the

funds that he had were generated from the conspiracy.  And so I think the jury rejected the idea that he had a subjective belief that what he was doing was lawful, and so for that reason I have to overrule the objection to 59.  So it's preserved, certainly, for purposes of review.

Any other guideline objections that I need to address for Mr. Hoover?

MR. LAROSIERE:  Your Honor, just for purposes of the record, Hoover would also object to the special offense characteristics enhancements as well as the base level offense, just for the record.

THE COURT:  Certainly.

Mr. Mesrobian, I'm not going to deal with the 5K2.0 departure issue at this time.

MR. MESROBIAN:  Understood, Your Honor.  And I think Ms. Taylor will address that in the 3553 factors in terms of the appropriate sentence in this case and the factors.

THE COURT:  Okay.  Then let me take -- let's take about -- it's 11:20 and we've been going for a couple hours.  We'll take about a 20-minute recess and then we'll reconvene.

COURT SECURITY OFFICER:  All rise.

(Recess, 11:20 a.m. to 11:39 a.m.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

THE COURT:  All right.  So what we need to do is determine the guidelines based upon the Court's rulings on the objections.

And so looking at Mr. Ervin's presentence report, at page 12, there would be two specific offense characteristics. I think earlier I said (a)(1) and (a)(5).  I meant to say (b)(1) and (b)(5).  But there's a 10-level increase for (b)(1) for the more than 200 firearms, and there's a 4-level enhancement -- special offense characteristic enhancement under (b)(5), which yields a total offense level of 32.  That takes us down to paragraph 64 for the grouping.

Count Nine no longer receives any additional units because it's more than ten levels below the offense in Count One.  And so there's one unit for Count One.  Under 3D1.4, where there's only one unit, there is no increase.  So the Total Offense Level simply remains at 32.

And paragraph 66, then, would be stricken.

And I think we would also strike 67.

Ms. Anderson, is that right?  Do you want to look at mine?

PROBATION OFFICER:  Well --

THE COURT:  Come up to sidebar.

(The judge and the probation officer confer at sidebar.)

THE COURT:  So the probation officer's suggestion is rather than striking 67, we just indicate that there was no --

there was no increase, which is what we have done.

So the Total Offense Level in paragraph 70 for Mr. Hoover -- I'm sorry, Mr. Ervin, becomes 32, with a Criminal History Category of I.  That yields a guideline term of imprisonment of 121 to 151 months.

So in paragraph -- paragraph 106 needs to change to reflect the offense level of 32 and the guideline.

And the fine range -- the maximum fine in 113 remains the same.  The guideline provision in 115 increases to 35,000 to 250,000.

Ms. Anderson, are there any other places that we need to make corrections -- or changes to the PSR to be consistent with the Court's rulings?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  Okay.

Turning to Mr. Hoover, at page 13 we would add special offense characteristic of (b)(1)(E), which increases ten levels; special offense characteristic of (b)(5) increases four levels.  Paragraph 60 becomes 32 instead of 18.  His Criminal History Category is also I.

So when we go to paragraph 96 we correct the offense level and we correct the guideline range to 121 to 151.

And the fines in paragraph 105 increase to 35,000 to 250,000.

So then with respect -- oh, any other changes I need

to make to the Hoover PSR, Ms. Anderson?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  So then with respect to -- based on the Court's determinations of the applicable guideline range for both Mr. Hoover and Mr. Ervin, Total Offense Level is 32, Criminal History Category is I, which yields a guideline term of imprisonment of 121 to 151 months, supervised release of 1 to 3 years for each count.  There's no restitution.  The fines range from $35,000 to $250,000.  Mr. Hoover has special assessments of $500.  Mr. Ervin has special assessments of $1,200.

Mr. King, preserving all of your objections to the Court's rulings, is my calculation of the guidelines consistent with my rulings?

MR. KING:  Yes, Your Honor, in light of the Court's rulings.

THE COURT:  All right.  Mr. Larosiere, preserving all of your objections as well, is my calculation of the guidelines consistent with your understanding of the guidelines as to Mr. Hoover?

MR. LAROSIERE:  Your Honor, with the added objection that the -- assuming it wasn't already covered by my previous objection, the enhancement for the number of firearms ought not be applicable to Hoover.  Aside from that, no, Your Honor, it's consistent with your rulings.

So if you -- if my previous objections include that -- because I said object to the application.  So I guess I would just like to incorporate into my previous objection not just the definitional issues, but the quantity issues.

THE COURT:  How would the -- if he was convicted of the conspiracy, why wouldn't the conspiracy have included 200 or more machine gun conversion devices based on the jury's finding?

MR. LAROSIERE:  I'm not sure if the jury's finding could support that quantity, Your Honor.

THE COURT:  Can you tell me why not?

MR. LAROSIERE:  It's not clear that any of this -- of the cards transferred, aside from those substantive acts which were actually convicted, are attributable to Hoover.  And in fact, the fact that certain substantive acts Hoover was not convicted of I think underlies that objection.

THE COURT:  Wasn't the evidence presented at trial the significant spike in sales after each of the CRS Firearms videos?

MR. LAROSIERE:  I don't think that's a particular factual finding that was relevant to the jury's conclusions, Your Honor, or necessary for the jury's conclusion.

THE COURT:  Well, but the Court -- in determining whether there was more than 200 -- whether the offense involved more than 200 firearms, the Court makes that determination

based on a preponderance of the evidence, relying on the evidence presented at trial.  Wouldn't that support the finding?

I won't make you answer that.

MR. LAROSIERE:  Thank you, Your Honor.

THE COURT:  Mr. Mesrobian, would you like to address that issue?

MR. MESROBIAN:  No, Your Honor, other than to say that I believe the Court is correct based on the charged conspiracy and the date range therein.  In combination with the evidence at trial, I think that, by a preponderance of the evidence, that shows that the conspiracy involved more than 200 auto key cards.

And if the next question was if the United States agrees with the calculation as ruled by the -- based on the rulings by the Court, we do.

THE COURT:  Okay.  All right.  So then we have determined the guidelines, and the next step in the process is to determine the appropriate sentence.

And I'm aware that Mr. Mesrobian had suggested that there should be a 5K2.0 upward departure of 20 levels if the Court did not accept the government's position with regard to the guideline calculations.  And I suspect that there's going to be an argument that there should be either still an upward departure or a variance upward because the number of firearms

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 62 of 144 PageID 6809
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 65 of 188

VOL 1 - PG 62

scored, which is 200, is substantially less than the 6,600 firearms at issue.

I think I need to just say out loud that, if anything, at this point I think the guidelines are greater than necessary for purposes of this offense.  And I'll say it's highly unlikely that I would be convinced to even impose a sentence within the guideline range, much less above it.  I'm just putting that out there so that the government is aware.

I've calculated the guidelines in the manner that I think is required under the law, but I think it drives a sentence that is greater than necessary when one considers the history and characteristics and the actual offense conduct.

And so that -- and I will say that, at the same time, if I had accepted the defendants' contentions and the guidelines were what the defendants argued for the way the probation office scored them, I likely would have applied a 5K2.0 upward departure because I think that not including any special offense characteristics for the number of firearms and the significant nature of the activity of the defendants, that would be inadequate.

And so I think the guidelines on either end probably are not quite right.  And I'll address that in my final findings, but I just put that out there so that you-all know kind of where I'm starting from.  Having ruled on the guidelines in the manner that I think the law requires me to

rule, I do think that they result in a higher-than-necessary guideline range.

With that, Ms. Taylor, I think the floor is yours. If you'll just let me find my notepad.

Go ahead.

MS. TAYLOR:  Yes, Your Honor.

Your Honor, understanding the Court's current viewpoint about whether any sort of further upward departure would be warranted, the United States does submit --

THE COURT:  Yeah.  And let me just say for the record, I'm not pretermiting your ability to make your record and to make the argument.  I just wanted to give you a heads-up on which way I was leaning on that.  But you're certainly -- just as the defendants, you will make your argument.  I'm not suggesting that you can't make that argument, Ms. Taylor.

MS. TAYLOR:  Yes, Your Honor.

And so based upon the Court's ruling on the guidelines objections, what the government is asking for is an upward departure of six levels to account for the inadequacy of the guidelines with regard to the number of firearms.  I believe that we've already outlined this argument in our memo. And also to account for the fact that all of those firearms were machine gun conversion devices, which, as Mr. Mesrobian has previously argued, pose an especially dangerous characteristic to the public.

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 64 of 144 PageID 6811
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 67 of 188

VOL 1 - PG 64

And with that, Your Honor, I'll just proceed with my sentencing argument under 3553.

This case involves two men who conspired together for an extended period of time to sell what they knew to be illegal machine gun conversion devices.  They have never accepted responsibility for what they did.  In fact, they explicitly continue to reject any sort of responsibility or any suggestion that what they did was illegal.

So it's -- there's no contrition here.  There's only continued assertions that -- for example, in Mr. Hoover's sentencing memo, that he stands convicted of talking about laser etchings on a homogenous piece of steel.  So the minimization of what he did is readily apparent.  That's not what he stands convicted of.  There's no statute that says you can't talk about laser etchings on a homogenous piece of steel.

What he's convicted of, and what the evidence overwhelmingly showed and what the jury decided, was that what Mr. Hoover did was conspire to transfer machine gun conversion devices that were thinly veiled as conversation pieces, or bottle openers, to his viewers on YouTube.

As the Court heard during the trial, his viewership on YouTube at various times reached upwards of almost 200,000 viewers.  So he had a substantial audience of people to sell these items to.

And the Court just moments ago referenced the chart

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 65 of 144 PageID 6812
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 68 of 188

VOL 1 - PG 65

that was presented at the trial as well which had the correlation between the numbers of Mr. Ervin's sales of auto key cards and when Mr. Hoover starting releasing his videos, which clearly demonstrate Mr. Hoover's extreme -- or critical role in getting Mr. Ervin's business off the ground.

When I think about which of them is the more culpable in this scenario, I have a difficult time determining that one or the other of them is more culpable.  Initially you could say it's Mr. Ervin because he's the one that came up with this idea.  He's the one that got -- you know, tricked the machine shop, essentially, into manufacturing them for him by being -- by lying about what they really were and saying they were a construction tool.  And he obviously was endeavoring to sell these things -- sell the auto key cards before he ever came into contact with Mr. Hoover.

But it's also abundantly clear that Mr. Ervin never would have reached the audience that he did or achieved the level of success that he did without Mr. Hoover saying, "Yes, I'm" -- "I'm ready to go and tell people on my YouTube videos exactly what this thing is and how they can turn it" -- "use it to turn their AR-15 into a machine gun."

Mr. Ervin seemed to want to blanket himself under the idea that, well, if I don't tell people how to do it, if I just send them emails saying, you know, "Just Google these search terms and then you'll find the instructions," that that

protected him or veiled him from any sort of responsibility for what he was doing.

He made other comments in his messages to Ms. Wolfe that were presented at the trial along the lines of, "I can't help what people do with it once it's out of my hands."

And -- but -- but what he did, then, was he got Mr. Hoover to say those things for him.  He got Mr. Hoover to say the quiet part out loud to his audience of over a hundred thousand viewers and tell them exactly what it was, exactly what you could do with it, exactly how you needed to configure your firearm, and how to put the piece together inside of your firearm to cause it to fire fully automatically.

And moreover, Mr. Hoover didn't just give those instructions, but he explicitly advocated for prohibited persons to obtain these devices.  One of the things that he said in one of his first videos was, "Once you are prohibited, that doesn't mean you can't have firearms anymore."  And I'm paraphrasing, but he said, "That doesn't mean you can't have firearms anymore, what that means is your chains have been broken.  You can do whatever you want with a firearm, so why not make a machine gun?"

And that sort of advocacy of lawlessness, which Mr. Hoover clearly was engaging in, was click-bait, I'm sure, to get him more views to his videos, but also led to an enormous increase in the sales of the auto key card.  It led to

Case 3:21-cr-00022-MMH-MCR  Document 329  Filed 09/14/23  Page 67 of 144 PageID 6814
USCA11 Case: 23-13062  Document: 37-3  Date Filed: 02/22/2024  Page: 70 of 188

VOL 1 - PG 67

Mr. Ervin reaping enormous profits on the auto key card, which he paid approximately 2 to $3 for each one to get it manufactured and then was charging between 60 to about $150 for each one that he sold.  So this was enormously profitable to Mr. Ervin.

Mr. Ervin, again, continuing to try to conceal what he was doing and conceal himself from law enforcement, made efforts to hide what he was doing with his bank as well by structuring these cash withdrawals.

THE COURT:  How was that trying to hide what he was doing from his bank?

MS. TAYLOR:  Because he was not -- well, I guess to be more accurate, I think he was trying to hide what he was doing from the government by making the money untraceable and refusing to engage in any sort of transaction; for example, the bank check that was offered by the bank that he could have taken and deposited in another bank, or doing an electronic transfer or something like that to take his money out of the bank.

And he also concealed his activities from the government by paying Mr. Hoover in cash; sending money through the mail to Mr. Hoover rather than what an ordinary person would do in sending Venmo or Zelle or PayPal or any of the number of other electronic payment -- instant payments that could be sent for essentially no fee whatsoever.  Instead, he

was FedExing cash to Mr. Hoover.

THE COURT:  Or people like me that still write hard-copy checks.

MS. TAYLOR:  Still slightly different than FedExing cash, Your Honor.

But Mr. Ervin's intent in making these things was not, as he said, free speech.  And that was clear from the messaging that he put out, in particular, before he hooked up with Mr. Hoover in this conspiracy.

He sent messages where he told his potential purchasers, you know, "It's designed to be legal as-is, but certain individuals may choose to use it in an illegal way in the future under certain dire circumstances."

There was testimony at the trial about Mr. Ervin being a prepper.  And it appears that his engagement in this auto key cards conspiracy was part of that mindset that he had, that the government is imminently going to fall and that once that -- I guess at some point in that process that everybody's going to be able to cut these things out and convert their weapons into machine guns because there would be complete and utter lawlessness.

But again, Mr. Ervin himself was telling his customers, "You can choose to use it in a different way" -- in other words, an illegal way, in other words, to use it to convert your weapon into a machine gun -- "in the future."

Your Honor, there was a lot of argument about -- well, there's a lot of argument in particular in Mr. Hoover's sentencing memo about this case being outside the heartland of cases contemplated by the guidelines.  It's not clear exactly what Mr. Hoover means by that except that he repeatedly suggests that this case that he cites, I believe at least three times in his sentencing memo, the *Vest* case, stated that the NFA is intended to go after crime weapons and not tchotchkes. The *Vest* case doesn't ever say the word "tchotchkes."  It doesn't have anything to do with tchotchkes.

What the *Vest* case is about is a police officer who apparently believed that he was lawfully purchasing a machine gun under the authority of his police department and was prosecuted for possessing an unregistered -- or an NFA weapon that was not registered to him.

And so what the Court in *Vest* was saying was this statute was not intended to go after law enforcement weapons. That's actually what it says.  It's not minimizing that tchotchkes are not really that important or in any way suggesting that machine gun conversion devices are tchotchkes. That's not part of the case.

But to the extent that this case is outside the heartland or different from other cases that have been prosecuted in this district, first off, it's clear from the supplemental memo that the government filed that violations of

Section 5845 or Section 5861 relating to conversion devices are happening in this district fairly regularly.  And they only seem to be on the increase with 3D printing and Glock switches, which are sort of the fad right now.  But there's really no argument to be made that this is something that the government ordinarily just turns a blind eye to and doesn't pursue.

The only way in which this case is outside the heartland or different from those cases is the massive scale at which Mr. Ervin and Mr. Hoover conducted their criminal activity.  The other cases that are discussed in this supplemental sentencing memorandum involved maybe up to dozens of machine gun conversion devices.  Nothing where two men got together, agreed to engage in illegal conduct over a term of months, engaged an unwitting manufacturer to make the machine gun conversion devices, and then advertised them on YouTube to an audience of at least tens of thousands, leading to the sale of, in this case, what the Court has credited -- and it -- the fact in the PSR was not objected to, that the offense involved at least 6,600 auto sears, which may be, actually, an undercount, because as shown at the trial, there's at least one other manufacturer that made the auto key card for Mr. Ervin before he finally started working with Orange Park Machine.  But the amounts of those key cards that were manufactured at that point is unknown at least to the government.

So the only way in which this case is outside of the

heartland or distinguishable from those other cases is that this case involved a massive scale.  It involved the massive online marketing of these things as exactly what they were, which was machine gun conversion devices, and the encouragement of purchasers to use them to convert their firearms into machine guns.

As the government argued in its sentencing memo and as Judge Merryday's opinion in *Aguilar-Espinosa* makes clear, machine gun conversion devices are dangerous.  And that's so -- I mean, really whether or not we're looking at bump stocks, which are -- Mr. Larosiere I think referred to at one point, or maybe it's in their sentencing memo, that firearms regulations are in flux.  Well, that -- the law about bump stocks certainly is in flux, but the law about these is not.  Machine gun conversion devices have been part of the NFA for decades.

And the definition that was used in this case by the government to prosecute, that was presented to the jury in the jury instructions, comes straight out of the statute.

There's nothing about the ATF doing rulemaking or, you know, trying to slip something past the public that nobody knew about in this case.  Not that I'm saying that happens in other cases, but it's just that -- those arguments are completely irrelevant to what happened in this case because the device is a machine gun as defined under the statute, and that's what the jury's verdict reflected.

Case 3:21-cr-00022-MMH-MCR Document 329 Filed 09/14/23 Page 72 of 144 PageID 6819
USCA11 Case: 23-13062 Document: 37-3 Date Filed: 02/22/2024 Page: 75 of 188

VOL 1 - PG 72

Your Honor, Mr. Hoover argues that -- for one thing, he argues that it serves 5K2.0's purpose to point out that firearms law is in an incredible state of flux and a reasonable person could be confused as to whether these things were illegal. Well, again, the law as to machine gun conversion devices is not in flux. It's not in question. And it's also clear that Mr. Hoover and Mr. Ervin both understood exactly what the items were and what function they performed. So whether some other reasonable person could, perhaps, be confused about whether or not they were firearms is really beside the point.

But regardless of whether something is a hundred percent within the statutory definition of a firearm, as the auto key card was, or whether it's something like a bump stock, which courts -- circuit courts are currently in disagreement over whether it meets the definition or not, the point that the government was making in its sentencing memo, and the point that I make to you today, is that any kind of device that causes the rapid fire of a firearm enables mass destruction. It doesn't matter whether that thing -- whether it's a bump stock that, again, courts can reasonably disagree about whether or not it meets the definition of a machine gun or whether it's the auto key card, which clearly does. Either way, those are both devices that are meant to convert a rifle to fire rapidly. And it's that rapid firing that is what gives the auto key

card, any kind of auto sear, or a bump stock its destructive power.

That's exactly what Judge Merryday was describing when he described "brutally lethal capacity, the possession of which imminently threatens the public" when describing auto sears.

THE COURT:  I guess, Ms. Taylor, the concern I have about the government's reliance on that -- and there's no doubt that a machine gun is capable of mass destruction.  But in terms of the level of danger of these particular devices, I think the evidence at trial was that the only person who successfully converted it was the agent.

But if these items are so very dangerous -- and they absolutely fall within the definition of a machine gun based on the jury's verdict.  But if they're so dangerous -- the government certainly didn't prosecute any of the individual purchasers, but the government also hasn't -- based on the testimony at trial, hasn't made any effort to go get them off the street.

And so I have a hard time reconciling in my mind how these devices are so dangerous, yet the government has in its possession names and addresses of over a thousand purchasers. But unless it's changed since trial, there hasn't been -- and I'm not suggesting that every purchaser should be prosecuted, but a knock on the door to take back the device, similar to

what was done with the other individual purchasers, would seem to be more reflective of this "brutally lethal capacity" that you're arguing that I should enhance their sentences for, but yet there's no effort to take them off the street.  I'm struggling with that.

MS. TAYLOR:  Your Honor, what I would say in response to that is with regard to the argument that I anticipate the defendants likely will make, that no one else successfully converted one of these things into -- or actually, you know, cut it out and successfully installed it in a weapon, first off, was what I was referencing earlier with regard to Mr. Ervin's instructions to -- or intentions for how they be used, you know:  Keep this and use it later, when essentially, you know, the government falls and everything is in disarray.

So to the extent that that's how he was marketing, we heard from Mr. Moya, he was one of the purchasers that testified at trial, that he purchased four of them and put them away, to have them for later, because he also believed that the United States is about to devolve into chaos and lawlessness, and that was when he intended to use them, at that later time.

So that's one potential reason why we haven't seen somebody else successfully convert one.

Another reason why is, frankly, I believe there was testimony about this at trial as well, but not all of the names in that database are the names of the real person.

THE COURT: Right.

MS. TAYLOR: Some -- Mr. Hoover explicitly instructed his viewers to "send it to your anti-gun relative." And we know that at least of our sample size that Mr. Osso and Mr. Alderson did that in order to conceal who was really possessing it.

And moreover, in large part, we're relying on what people tell us when they say, "Oh, I cut it up into little pieces and threw it in a ditch." I don't have any way to verify that that's true. That was Mr. Roberts's testimony.

We had a sidebar at one point during the trial about -- where it was suggested that we should have gotten a search warrant and gone and searched the houses of every single purchaser, and it was the Court's ruling that that was something that we would obviously have staleness issues on.

So unless the people who purchased an auto key card are willing to come to their door when ATF knocks, which is a question unto itself, if they don't come to the door, ATF's probably leaving a card there and asking them to call back. And then when they do, all they have to do is just lie about it and say, "No, I don't" -- "I never got that" or "I don't know what you're talking about" or "I destroyed it" or "I threw it away" or "I gave it to my friend Goose," which is what one of the purchasers told the agent, which was a lie.

So ATF would be reliant upon thousands of people who

Case 3:21-cr-00022-MMH-MCR  Document 329  Filed 09/14/23  Page 76 of 144 PageID 6823
USCA11 Case: 23-13062  Document: 37-3  Date Filed: 02/22/2024  Page: 79 of 188

VOL 1 - PG 76

are viewers of Mr. Hoover and have been told by Mr. Hoover not to talk to the ATF and that if ATF comes to the door they're going to kill your dog.  So we're relying on these people to be compliant with ATF coming and telling the truth to ATF, which certainly was not our experience of what happened in the couple of -- I think it was a couple of dozen purchasers that were approached in the Jacksonville area as part of this investigation.

So for all of those reasons, it is unfortunately unrealistic that ATF is going to be able to achieve the goal of doing a nationwide recovery of thousands of auto key cards in this case and is also the reason that -- I think it assumes a lot to say that nobody else has been able to use one to convert their gun because there are maybe people out there who haven't gotten around to cutting it yet.

There are probably -- we know from our interviews that there are people out there who had it, intended to cut it in the future, and then watched Mr. Hoover's videos about the takedown and decided to get rid of it before they got the chance to cut it.  I believe that included Mr. Alderson.  And Mr. Stennes as well.  He had talked about trying to cut it.  He had bought auto key cards and solvent traps.  He had tried to cut the auto key cards, but it was making too many sparks so he hid it in various places around his house -- or, sorry, I'm thinking about Mr. -- I apologize, Your Honor, I have to go

back and look through the names.

But that was the testimony of one of the purchasers, that he had been unable to cut it and then was keeping it stored for later, when he might -- I guess might try again. And then when ATF knocked on his door, he destroyed his auto key cards and the solvent traps, presumably knowing that he could get in trouble for having them.

So again, there's unfortunately no way for us to know -- oh, sorry, that was Mr. Duty.

There's unfortunately not a good way for us to know who did and did not successfully cut it out and use it to convert a weapon.

Mr. Roberts also had testified at the trial that he had heard automatic fire in the woods when he was out near his home and went up and talked to the strange men in the woods who had a cut-out auto key card. And that was his testimony. Again, I --

THE COURT: We don't know that that was from Mr. Ervin's, right? I didn't think there was any evidence about where that had come from.

MS. TAYLOR: I don't believe that he would have been able to say for sure whether that was from Mr. Ervin or somebody else that might have been making a similar product.

So for all of those reasons, Your Honor, unfortunately it's unrealistic for us to either know decisively

Case 3:21-cr-00022-MMH-MCR Document 329 Filed 09/14/23 Page 78 of 144 PageID 6825
USCA11 Case: 23-13062 Document: 37-3 Date Filed: 02/22/2024 Page: 81 of 188

VOL 1 - PG 78

who -- whether anybody has or has not, and to the extent that people have cut it out and used it to convert their weapons, how many.

Again, there are people who may have it and still be planning to use it later. There are people who likely had it and were intending to cut it out but then destroyed it or discarded it because they did not want to get into trouble.

And furthermore, our problem here is the lack of cooperation and truthfulness that ATF encountered when trying to interview purchasers and recover the auto key cards, which, in part, is due to the messaging that Mr. Hoover put out after Mr. Ervin was arrested where he told people, "If ATF knocks on your door," you know, "don't talk to them," and, frankly, scared the -- many purchasers, or at least some of the purchasers who testified, into believing that ATF was going to kick down your door and shoot their dog if they came to your house.

So obviously ATF is dealing with a portion of the population that have been indoctrinated to believing these things about the ATF, are hostile to the ATF, and are also fearful of prosecution if they were to be truthful about having purchased it and possessing it and/or what they did with it.

Your Honor, another point that I wanted to touch on is with regard to Mr. Ervin. It's apparent from his sentencing memorandum that he's been an unlawful user of marijuana all

throughout the time of this conspiracy and apparently for the last 20 years. So he, additionally, is a prohibited person.

The investigation in this case revealed that all of those ARs that Mr. Ervin purchased -- all or almost all of them were purchased with the proceeds of this conspiracy. And they were purchased during the time frame of the conspiracy, which means that Mr. Ervin was also lying on ATF 4473 forms about whether he was an unlawful user when he made each of those purchases.

I'm not -- the government's not seeking to enhance his guidelines range based on those factors. I personally do not seek to hold people accountable for things that they disclose to probation in terms of enhancing their guidelines, but certainly it's been highlighted as being part of his history and characteristics that he's been an unlawful user of marijuana for 20 years.

And clearly he has committed other federal crimes in the course of purchasing and possessing all of the firearms that he was purchasing and possessing during the time frame of the conspiracy as well.

Your Honor, I also want to touch on what Mr. Hoover said in his sentencing memo and what was -- and I guess before I get there, there were letters that were submitted on his behalf to the Court. I spoke with Mr. Larosiere before this hearing today. We had not received the letters until right

before court today.  They did provide me with a copy of them and explain that they were trying to file them under seal and that the motion hadn't been ruled on yet.

And I did get a chance to read them after I was provided with them in court today.  And I spoke to Mr. Larosiere about what I understood to be the ordinary procedures, which is that letters of support are filed on the public docket.  And so I just want -- I don't want to talk about anything that's potentially under seal before I move into this topic, but there is information in the letters that should be redacted.

THE COURT:  There is information in the letters that would need to be redacted if it was on the public docket.  The truth is that letters come to the Court in a lot of different ways.  Some people write to me directly; some people provide them to the probation office and they're appended to the PSR so they're not on the public docket; and then sometimes they are filed on the public docket, though I don't think there's a requirement that it be on the public docket.  There are certainly names and dates of births of minors and some personal information about Mrs. Hoover that probably doesn't belong on the public docket.

So I don't know that those items need to be filed on the public docket, but I also don't think that prohibits you from talking about any matters that you think were relevant

from the letters.

MS. TAYLOR:  Yes, Your Honor.

And the point that I particularly want to talk about is referenced separately in Mr. Hoover's sentencing memorandum, which is this idea that's just thrown into the sentencing memo that Mr. Hoover called the ATF and, you know, got the ATF to tell him that the auto key card was legal.  And that's a -- that's something that is repeated in Mr. Hoover's father's letter of support as well.  There is no record evidence that that happened, Your Honor.  None at all.

Mr. Hoover apparently began making this claim shortly after he was arrested.  And I know this because there was a request to depose this -- this ATF employee, who is not an agent.  He is a -- essentially an inspector for FFLs in Wisconsin.  There was a request by Mr. Hoover's attorneys that we allow that man to be deposed.  That's Mr. Ruiz.  Of course, depositions are not ordinarily done in federal criminal cases.

And I -- but -- but Agent Hooker and I did investigate this claim based on its *Brady* potential.  And we interviewed Mr. Ruiz.  And in sum, Mr. Ruiz denied knowing Mr. Hoover.  Stated that he had looked through his records and saw that he had conducted a -- an inspection of Coloma Resale, which was Mr. Hoover's shop -- Mr. Hoover's father's shop, really -- and that he had conducted that inspection in 2015, which is five years before this conspiracy commenced.  And he

did not remember anything about that interview.  And he would only really remember it because -- if something remarkable had happened.

Mr. Ruiz stated that he watched some of Mr. Hoover's videos and he did not recognize Mr. Hoover, that he had never -- did not recall ever having talked to Mr. Hoover.  And he stated that if someone asked him a question about something like a lightning link or auto sear or machine gun, he would always refer that person to the proper authorities within ATF that are responsible for those items, including the NFA branch or the Firearms and Ammunition Technology Branch, which I believe has been renamed, but essentially is where Officer Toy works.  And stated that he -- Mr. Ruiz stated he's very cautious about any items that may have a dimple, have been drilled or have been cut, because it could be indicative of an item that's been converted and may not be legal.

He stated that he viewed one of Mr. Hoover's videos -- this was after we had requested the interview -- that he viewed one of Mr. Hoover's videos with the auto key card in it.  He could see that it had been cut in places and appeared to have a lightning link drawn or etched on it.  And he felt that the auto key card was a blueprint for making a lightning link, and he would never suggest that something like that might be legal.  And again, did not recall ever having discussed auto key cards or lightning links with Mr. Hoover.

So we also had a year of phone records of Mr. Hoover's and of his wife's cell phones.  Ms. Butler performed a search of those records to see if there were any records of phone calls between either of those numbers and Mr. Ruiz, and there were not.

We had Mr. Ruiz search his ATF email account for search terms "Matthew Hoover," "Hoover," "Coloma Resale," an email address that was associated I believe with the FFL, and an email address for Mr. Hoover, and he did not find any emails from the period of 2018 to the time of the interview that referred to any of those things.

He also reached out to the other industry operations people in his office asking if anyone had had any prior contact with Mr. Hoover and no one had.

In short, Your Honor, we investigated this claim.  Special Agent Hooker wrote a report about it.  I produced it in discovery.  Mr. Hoover could have asked for a subpoena from Mr. Ruiz in the trial if this had really happened.  Mr. Hoover had the right to testify at trial and say that this happened. His attorneys could have presented any other documentary evidence that this happened.  But none of that happened because there is no evidence that this ever happened except that Mr. Hoover says it happened.

So even assuming that he did at some point have a conversation with somebody at ATF about this, it's clear from

how he has described it, including up and through his sentencing memo, that he wouldn't have said, "It's a piece of metal with a lightning link etched on it and I'm going to tell people that they should cut it out and use it to make a machine gun. Is that okay?"

Even now, he and his attorneys, in the sentencing memo, are still saying he's convicted of talking about etchings on a homogenous piece of steel. They just refuse to describe it in any sort of accurate way.

So, again, you know, if this were equivalent to like an advice-of-counsel defense, he would have been required to fully disclose all of the pertinent details of what he was planning to do in order to rely on an opinion that he got. So even assuming that he did get an opinion -- and again, there's no evidence of that -- we have no idea what he said to whoever he may have talked to about what this thing was and what he was planning on doing with it. And all of the evidence in this case suggests that he likely would have minimized what it was, not described it accurately, in an attempt to veil its true purpose.

And Your Honor, I just would ask the Court, frankly, unless there's going to be some evidence that this happened and what the conversation was and that he actually got an opinion from ATF, that the Court should disregard these assertions in coming up with an appropriate sentence because they're

certainly not proof to a preponderance.  There's not even probable cause at this point that this happened.

Your Honor, the auto key card was determined by a jury to be a machine gun conversion device, that it was a combination of parts designed and intended to convert a weapon into a machine gun.  They heard testimony from Officer Toy, who was able to -- his testimony was he had never cut one of these things out before.  He was using ordinary tools that are accessible to anyone.  He cut along the line.  And the pieces that he cut out, he had to shave less than a millimeter off the end of the paddle piece to get the firearm to close, but that they functioned to convert the weapon into a machine gun. That's what the jury credited.  That's what all of the evidence in this case showed.

The evidence in this case also showed that the purpose of these defendants in engaging in this conspiracy was explicitly to subvert the laws of this country.  They knew what they were doing.  They knew what the auto key card was.  They knew what they were intending it to be used for.  And they sold them at a massive scale to -- instructing buyers, you know, to hide their purpose, to hide who they really are, and, of course, not instructing anybody that it needs to be registered on the National Firearms Registration and Transfer Record, which Congress has determined is necessary for machine gun conversion devices to be legally possessed.

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 86 of 144 PageID 6833
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 89 of 188

VOL 1 - PG 86

Had these items been registered, then, of course, it would be much easier for ATF to go knock on the doors of the legally registered owner of the item and ask them questions. But that's not what happened.  Instead, this was all done under a veil of secrecy and misdirection in order to engage in large-scale criminal conduct.

Your Honor, again, it's the government's request that the Court should depart upward and/or vary upward because the number-of-firearms enhancement that's in the guidelines is vastly lower at its top end than the number of firearms that were actually trafficked by Mr. Ervin and Mr. Hoover.  It is necessary in this case to apply a sentence that reflects the seriousness of this offense, that provides for deterrence, which has not been provided for yet.

Again, the defendants, both of them, still entirely reject any sort of responsibility for what they did; entirely reject that what they did was criminal.

There's no indication that they have been deterred in any way, shape, or form from engaging in this kind of conduct.

Your Honor, for all of those reasons the government submits that there really is very little mitigation here. Mr. Hoover talks about his family.  And as this Court knows, it's a sad reality that a large portion of the defendants that come before this Court have families that care for them, families that depend on them, small children that need them.

Frankly, Mr. Ervin, you know, doesn't have small children depending on him, really doesn't have anybody depending on him.  He does have a family that loves him.  But it would be -- it would be unjust to give Mr. Hoover a lighter sentence based on the fact that he has a wife and children who are financially dependent on him and Mr. Ervin does not.  That would not -- that would not be appropriate in this case, Your Honor.  And the guidelines instruct that a departure based on family circumstances is only warranted in exceptional cases. And this case, sadly, is not exceptional.

Your Honor, I would reserve any other comments that I would have for rebuttal, but at this time there's very little in the way of mitigation and little basis, the government submits, for imposing a sentence that's below the guidelines.

And that's our request, Your Honor.

THE COURT:  Below the guidelines as departed upward.

MS. TAYLOR:  Our request is for the upward departure. But assuming that the Court stays with what it was inclined to do and does not issue a further upward departure, again, we would be asking for an upward variance.  If the Court declines that, then our third step would be the sentence should be within the guidelines as the Court has previously ruled on them earlier today.

THE COURT:  Thank you, Ms. Taylor.

It's a little after 12:30 and I suspect that we've

got a good bit left.  I don't think I should starve everybody, so I think we'll take about an hour.  I'll ask us to be back at 1:30 to continue with the presentations.  I'll start with you, Mr. King.

Mr. Ervin, I'm going to give you an opportunity to speak if you wish to speak --

DEFENDANT ERVIN:  Yes, ma'am, I do.

THE COURT:  -- but you don't have to.  Okay.  That's your right, and I'll hear from you then.

And then, Mr. Larosiere, I'll hear from you.

And Mr. Hoover, I'll give you an opportunity to speak as well.

And if there are any witnesses either of you -- Mr. King or Mr. Larosiere, that you-all want to present, I'll hear from them this afternoon.

MR. KING:  And Your Honor, just for the Court's planning purposes, we have one witness to read a letter, but otherwise we don't have any witnesses.

THE COURT:  Okay.  Mr. Larosiere, are you anticipating calling any additional witnesses other than perhaps Mr. Hoover?

MR. LAROSIERE:  Your Honor, should we take it that our motion to file the letters under seal is granted and that the Court has taken them into consideration?

THE COURT:  I think what I'm going to do is just

strike the letters from the docket and treat them as if you had submitted them directly to me.

MR. LAROSIERE:  Okay.  In that case, it would be a maximum of two witnesses, Your Honor.

THE COURT:  Okay.  Can you go ahead and let us know who those witnesses would be?

MR. LAROSIERE:  It would be Mr. Hoover's father and Mr. Hughes.

THE COURT:  And Mr. King, who are we going to hear from?

MR. KING:  Mr. Ervin, Mr. Ervin's father.

THE COURT:  Okay.  We're in recess till 1:30.

COURT SECURITY OFFICER:  All rise.

(Lunch recess, 12:35 p.m. to 1:34 p.m.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

THE COURT:  All right, Mr. King.

MR. KING:  Your Honor, Mr. Ervin, Sr. has a statement he'd like to read to the Court.

MR. KRIS ERVIN:  Right here?

MR. KING:  Yes, sir.

THE COURT:  Sir, I'm going to ask you to start by telling my court reporter your full name, please.

MR. KRIS ERVIN:  Sure.  I'm Kris Anderson Ervin, and

I'm the father of Justin, who goes by "Justin."

THE COURT:  Go ahead, sir.

MR. KRIS ERVIN:  First of all, thank you for the lunch break.  We were all very hungry.

I just thank you for the opportunity to talk with you today and provide you some additional information about my son, Justin.  And hopefully that will help you in your decision in sentencing him.

I've got a great deal of respect for you, your job, the things you've done.  You seem nothing but fair and professional.  I've been in the court for a long time with you, and I appreciate that.

Justin is good, hard-working, and passionate about the things he believes in.  My wife and I raised all three of my children with those attributes.  They're all strong children.  Unfortunately, my wife passed away in 2017.

Your Honor, the last time I was in your courtroom, you spoke of having respect for the rule of law.  And as you're aware, in Justin's 40-plus years, he has been respectful of authority and the law.  He's never been arrested prior to this case that I know of.  He does cherish the rule of law, fairness, our country, and the Constitution.

His grandfather, my dad, was in World War II, was severely wounded in the Pacific.  His great uncle was shot down in a B-17 bomber and killed while defending our freedom.  So

patriotism actually runs in his DNA.

Since you've heard so many unfavorable things that were presented to you by the government, I thought it might be helpful if I could bring up a couple of good things that Justin has done.

He stayed at home with his mother while she was sick when she became ill.  And what that did is that allowed me to work and travel in my job to support my family.  And he did that up until the time she passed away.

He provided mechanical services on his mother's car. He provided it on his aunt, he provided it on neighbors and anybody else that was in need.  At no charge.  That was merely out of the kindness of his heart.

When our neighbor became blind, Justin took it upon himself to take him to his appointments, doctor's appointments, errands, all at no charge.  Just, once again, being very helpful, as he has all of his life.

He worked on base at Naval Air Station on the Navy Marine Corps internet project, which required him to pass their background check, which was quite stringent.  He worked on IT projects for Wounded Warrior.

And recently he helped a fellow inmate pass his GED test with an A.  This inmate had failed the test several times and Justin kind of took him under his wing, encouraged him to do the best he can, became his teacher, and he was able to pass

his GED test.

And there are many, many other examples of Justin doing good things for people.

A lady at the -- at Publix, her son was very sick and Justin helped her.  She works behind the deli.  And Justin helped her out with that.  Once again, just out of kindness.

I assure you Justin is a danger to no one.  Over the course of his life there have been no victims, no acts of violence, theft, harm in any way, no one's been hurt, no restraining orders, no domestic violence, nothing.  And that's how I raised my children.

He has had a concealed weapons permit for over 15 years with no issues.

I can also assure you he did not wake up one day and decide to be a criminal.  And a very bad one at that. Everything Justin did was in the light of day.  No concealment. And that may have been something that kind of fooled all of us into thinking this was just legitimate, because there was no dark web, no meetings of the night.  Going straight to the bank, the post office.  Everything was natural as you would be running a business.

I -- Ms. Taylor brought up "knocks at the door."  I said I wish I had been told about that, that we did receive in January a knock at the door and a card at the door to say "call me," because what would have happened, it would have stopped

this, and the items that were shipped from January to March would never have been out in the public.

I feel very badly that I didn't recognize the severity of this. It bothers me as a father very, very badly. And it bothers my daughter and my son because had we -- any of us recognized that, we would not be here today.

As a parent I was proud of him during that time because he was so excited about this idea. And to me, it was just -- to me, it was kind of like the pet rock. He found an internet niche and it was going to blossom and then die away. He was so excited. And it was the first time I'd seen a spark in him since his mother passed away.

He bought land with the money. Sure, he bought some firearms, but he bought land. He put a well on that land. He bulldozed that land. He improved it. He bought a bus to convert to an RV with plans to park it out there until he could get his home built. He was working to build a good home and a good life for himself.

My family has suffered greatly, Your Honor. I have suffered greatly. This has taken a toll on my health. And I know how much Justin has suffered being in jail two and a half years. I talk to him every night.

I'm nearly 70 years old. I ask for your compassion and leniency. Any sentence given to Justin may become a life sentence for me. Please allow my son to come home at the

earliest possible moment.  We'll make sure he follows all of your rules and he shall never return here again.

Thank you.  And thank you for your consideration.  And if you have any questions, I'll be glad to answer them.

THE COURT:  I don't have any questions, sir.  Thank you very much for taking the time to speak today.

MR. KRIS ERVIN:  Thank you for hearing me.

MR. KING:  And Your Honor, at this time Mr. Ervin would like to address the Court.  And Your Honor, we had a prepared statement, but Mr. Ervin said he wanted to speak from the heart, so he's going to be . . .

DEFENDANT ERVIN:  I'm going to need a second, Your Honor.

THE COURT:  Sure, of course.  You want to --

DEFENDANT ERVIN:  Get a drink of water?

THE COURT:  Yes, a good idea.

DEFENDANT ERVIN:  I love my dad very much, and my family, all of them.

Thank you, sir.

THE COURT:  Take your time, sir.

It's okay.  I understand.

DEFENDANT ERVIN:  Your Honor, can you hear me?

THE COURT:  Yes, sir.

DEFENDANT ERVIN:  All right.  I remember ever since I was young loving this country.  I remember being in elementary

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 95 of 144 PageID 6842
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 98 of 188

VOL 1 - PG 95

school and saying "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one nation under God, indivisible with liberty and justice for all."  And I meant it in my heart.  No one can question how much I love this nation and how much I respect the rule of law.  I mean, I love all my fellow Americans.  I love everyone in this courtroom and I want a future for everyone.

And this whole thing has hurt me very much.  It has broken my heart.  And this is very difficult for me because as much as I love this nation, and to think the government wants to hurt me and my family, I mean, it -- I mean, it's turned into a nightmare.  I've -- I mean, I can't even think of everything I needed to say, but I'm going to do the best I can here today.

But I remember being at the Naval Air Station Jacksonville.  I've been to every air show for 20 years since I was little until about age 20.  I remember seeing the Blue Angels flying over Jacksonville, all around here.  And I was just so proud of my country.  And I love the United States so much.

And I love artwork, I love the First Amendment, I love the Second Amendment, I love the U.S. Constitution.  I know that miracles do not cluster in history.

And the founding of this nation is a miracle.  And we can't let it go quietly into the night.

And it really made my heart feel good where -- one little stitch to bring my heart back together, when at the hearing, the last Friday ago, I heard you say that the First Amendment, the Second Amendment, the U.S. Constitution is the supreme law of the land and should be upheld.  I mean, that really, really was a bright point in the last two and a half years.

And I've been put under a lot of pressure, both by these proceedings and by everything that I've been exposed to being in detention.  I mean, I've seen people overdose; I've seen people die; I've seen people get beat up.  I've been exposed to all kinds of horrors, but I've focused on the positive.

So I helped people learn how to read that couldn't read.  I helped them write letters to their attorneys to help them communicate their wishes.  I tried to turn a bad situation into the best possible to show who I am, because you can put me under pressure, you can try to make me break, but I'm still going to be who I am and stand up for what is right.

And there are certain things that I can't stand by and watch.  There's a couple gangs that had a war while I was in there and they went to try to beat up the Mexican-Spanish guys.  And there's only three of them in there.  In the other dorm I was in I seen it happen before and I stopped it.  And they said, "Nobody stands up to that guy, but you did."  You

know, because I couldn't stand there and watch someone else get beat up again or their food stolen.  I mean, it's just horrible what I've seen.

And a lot of those guys that are hardened and gang members and stuff like that, I would teach them the message of freedom and liberty and teach them how important the country is and its values and standing up and doing the right thing.  And some of them changed.  Other drug addicts turned back and went home to their families.  A couple of them started businesses and they're doing really good.  Another one stopped doing drugs.  I told him he has a good family, go home to them.  Like, I have a good family, I want to go home to them, and you can.  So I've sat there for so long it seems like, and everyone gets to go home but me.  And some of them come back, and it's a travesty.

And I've been put under great pressure.  And I'm dressed like an orange today in this big orange suit, like an adult baby.  And I don't like it.  But when you put an orange under pressure, orange juice comes out.  So I've been put under horrendous pressure, but my good has come out.  I've helped many people.

I'm on a first-name basis with most of the guards there.  I mean, my brother is a Jacksonville Sheriff's officer, a sergeant.  I've been on police ride-alongs for citizen oversight in everywhere you can see out here with JSO before

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 98 of 144 PageID 6845
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 101 of 188

VOL 1 - PG 98

this.

I love the Second Amendment.  All my firearms are legal.  There's no issues with my firearms collection, my ammunition, or my body armor.  I mean, I go shooting with my family on Thanksgiving.  And many of my friends are police officers too that I played baseball with through high school and college.

I'm a born champion and have a champion inside me. And I was a champion in baseball, a district champion, and I was a champion in swimming.  And I actually went to state.  In 1998 I was the twentieth fastest in the state of Florida.

I work hard.  I'm a serial entrepreneur.  And not all my businesses succeed forever.  Some of them died.  Some of them went on.  But I still continued to endure and go forward.

And failure is an event, it is not a person.  The important thing about failure is that you learn from it so that you can deal with what's coming in the future.  And with the additional challenges, it takes courage to get up every single day for me.  It takes courage to continue.  It takes courage to admit when you've failed.

And my whole life I've enjoyed the First Amendment. Whenever I started Auto Key Card -- I had a dream when I was ten years old, and it was to cause debate in the public square. A lot of this debate has occurred here today.  And I intended it as a conversation piece.

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 99 of 144 PageID 6846
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 102 of 188

VOL 1 - PG 99

And there was a year or two -- there's many years I thought about it and I watched what was going on.  And I wanted to cause a nationwide debate at a serious time in American history because very few of us get to come to the defense of the First Amendment when it is being extinguished across the land.  And I enjoyed being a part of that process.

And you've seen the YouTube videos.  You've seen the millions of Americans that me and Mr. Hoover represent.  And we have great support from the people.  So it just -- it hurts my heart so much everything that has happened.  And it is also a great success, the amount of debate that has occurred.

And I don't seek to cause problems.  I don't seek to destroy people or have -- be a danger.  I've never been a danger.  I've saved over 30 people in my whole life, from drowning, getting beat to death.  One guy almost got beat to death by -- a bunch of guys were chasing him down the road with a baseball bat and golf clubs and they cornered him on the porch of this house, where he was boxed in.  And I got out of my car, run up there, said, "Hey, man, what are y'all doing?"

"It was the guy that ran there."

And I didn't even know what was going on, okay.

And they said, "oh, okay," and they ran off.  And that guy told me, "Thank you so much, sir.  I appreciate it.  I thought they were going to kill me."

I said, "No problem, man," and I got in the car and

left because I don't need any glory.

I don't need to be known.  I don't seek to be known. I help people and I don't need to say, "Hey, well, I saved that person's life.  I saved them from drowning," you know, "I did the right thing."

I don't need the recognition, but I do the right thing no matter what.  And I believe I was sent here by God to do the right thing.

And before I started my business, I had a card that I made myself and I engraved myself.  And I went around to gun shows talking to people and gun ranges talking to people.  And there were people that said, "That's very interesting, like I want one of those."

This is the market-research stage of my business.  I talked to attorneys, I talked to law enforcement.  And everybody said, "I don't even think you can be in trouble for a picture."

And so I acted in good faith.  I even -- I even -- I remember talking to -- they had a booth at the gun shows of the ATF.  I remember talking to them, and they just laughed it off and thought I was some stupid guy.  It was no big deal.  And no one tried to arrest me.  I sold over 15 different unique pieces of artwork with unique designs.  I mean, are 10 a crime?  Is 5 a crime?  Is it 3?  I mean, there was ways to mitigate and prevent all of this from occurring and I never got the

opportunity to.

And I understand what the jury has decided.  I do not agree with it.  I still maintain my innocence, not in -- against this Court and not in accepting responsibility for my actions.  I accept responsibility for my actions, I just do not believe that -- that -- that I committed a crime.  And I don't want you to get mad and I don't want you to -- don't want you to be angry at me maintaining my innocence.

And I don't want you to punish Mr. Hoover for me telling him about my due diligence.  And we talked on the phone and have text messages between us.  And my phone erased itself and his disappeared?  Like, it's very disconcerting to me.  And I don't know everything that occurred with it, but I think there is a better way that all of this could have been handled.

And I have great faith.  And I'm willing to endure whatever it takes to make it through this hard time, because there's a great future ahead.

I am a very capable individual.  I am very good at all kinds of internet things, computer software.  I've built data centers.  I've worked for the U.S. military.  I mean, everybody that comes in contact with me, most of the time, is better off by me coming in contact with them.

There's times whenever I might have had an argument or something, but we're all only human and I never hurt nobody.  And I don't seek to hurt anybody.  I don't seek the will to

dominate over anyone.

So with me being like an orange and under all this pressure, love came out. And I love my family. I love my friend Matt Hoover and his family.

I have my father and my six-year-old -- or, I'm sorry, my five-year-old nephew at the time I was arrested is eight now. And I was a very, very integral part to his life. And now it's -- to him it's like aliens came and abducted me and I've disappeared. And there are core developmental years left that I need to be there for him. My father, I need to be there for him. I'm willing to do whatever it takes to take care of them in the future.

So this all has been very difficult for me, but the only thing I can ask for is mercy, because it's the only way out for any of us.

And I look behind you and see the great seal of the United States District Court, and it has a symbol of freedom and liberty and of justice. And I am thirsty for justice. And I feel that if I was to say that that was a bald eagle and it was a violation of the Endangered Species Act, that would be disingenuous.

But I respect the rule of law, I just don't agree with what has happened. But I don't want to be extra punished or hurt for doing the right thing, because I will always do the right thing and I strive to do the right thing. It's the moral

high ground.

You see, Archimedes said:  Give me a place to stand and a lever long enough and I will move the world.

The world has been changed by people talking about the auto key card.  But everybody focuses on the lever, the second part, about leverage over someone.  What can you do to them?  I focus on the first part, the most important, the place to stand, because that's the moral high ground.  And that's what was in my heart the whole time that I was running my business.

And my little business is destroyed, you know.  I made a hundred-some-thousand dollars, not even that much.  I mean, it's gone.  Okay.  Fine.

Like, please, please have mercy, because a government that has no mercy is not one that I want to be a part of.  And it's a scary thing in the history of the world.

I love history.  There's a reason for the First Amendment, because once they get rid of what you can say, then they can take the weapons and they can -- and there's a great history of genocide throughout all governments in the history of the world, which is why the American Constitution, the Second Amendment, and the First Amendment are so important.  And it made me feel so good when you said that those are important.

And I don't seek to cause problems.  I want to be

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 104 of 144 PageID 6851
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 107 of 188

VOL 1 - PG 104

part of the solution in the future, for freedom and liberty for all, so that we can have prosperity, because if we don't have freedom and liberty and prosperity, we have no future.

And there are many, many Americans that feel the same way I do.  And they're my friends and they're my supporters.  They've donated money so I could have an attorney.  Otherwise, I would be defenseless.  And they donated money so that Mr. Hoover could have attorneys, so that we could have a chance.  So we have great support among the American people.

And freedom of speech was my intention the entire time.  But it just seems like that the auto key card is a mirror, and it just shows who everybody is.  And I do the best I can.

So I don't know what else to say, Your Honor, but I did not seek to cause any problems or issues with this Court, with anyone, any danger, or nothing at all.

And I've been through hell and back.  I mean, these bags under my eyes, I never had this in my life.  I look at myself in the mirror, I don't even recognize myself in the morning.

And there's just an unending sea of the worst humans that flow into that jail and just antagonize, you know, a good person like me.  And I don't -- I have nothing against them.  I have great hope for them.  I hope that they get their lives together.

But that's what I was trying to do.  I wanted to build a house.  I wanted to have a future.  I wanted to have a business.  And I love everything that's American.

So that's pretty much it, Your Honor.  Thank you so much for letting me speak.

I know I went a little extra on time, but I just want to tell everyone here, I appreciate all of y'all, everyone, and I love everybody.  And I only want a future for all of us.

Thank you very much.

THE COURT:  Thank you, Mr. Ervin.

Mr. King.

MR. KING:  Your Honor, we don't have any additional witnesses or evidence.  I'm not sure if you'd like me to proceed to argument or --

THE COURT:  Go ahead.

MR. KING:  Your Honor, could I have a moment?

THE COURT:  Sure.

(Pause in proceedings.)

THE COURT:  Go ahead.

MR. KING:  Thank you, Your Honor.

You know, the Court's in a unique position to have sat through a lengthy trial and heard about some of the conduct.  And what I'd like to address today is some of the things that were not before the Court and some of Mr. Ervin's background.

During the course of this case I've gotten to know Mr. Ervin's family very well. And I can honestly say his father is probably one of the nicest human beings I've ever met. His sister is fantastic. His brother has worked with a lot of people I know at the Jacksonville Sheriff's Office. They're a really good family. And for this to happen to Mr. Ervin, for him to find himself in this position, I don't think is a reflection on them or their character.

And one of the things that I look for in situations like this is: How did we get here?

And in talking to Mr. Ervin's family and in talking to Mr. Ervin, in 2017, but the two years prior, his mother was suffering from alcoholism and wound up essentially drinking herself to medical issues and having other medical issues. And because of where they were in their family, Justin Ervin was the one who was there to take care of it and to watch it unfold over the course of years. It wasn't a sudden dramatic or traumatic thing; it was something that built up over time.

In talking to them, it's very clear that the person that he was before that happened and the person he was after that happened were very different.

The probation interview I did with Ms. Anderson was probably one of the most emotional ones -- it is, by far, the most emotional one I've ever participated in.

It's clear that there is a lot of trauma that has not

been addressed with Mr. Ervin as a result of his mother's death and living through that.  And, you know, one of the things that's recommended, certainly, is mental health treatment as part of the probation sentence.  I think that's needed.

One of the things that has happened is he started abusing marijuana right after his mother's death.  Thankfully he stopped using to that extent during the course of the times alleged in the indictment, but he was -- he was struggling with mental health and not getting the correct treatment.  And unfortunately, what he turned to was the internet and individuals who -- you know, he's certainly not blameless in this, but individuals who put ideas in his head and individuals that he put ideas in their head, and he was kind of off to the races.

And unfortunately, he finds himself in a situation where, you know, during the course of our conversations, I think you heard some of that today, he truly believes that he was making political statements and, you know, it was art and protest and things like that.  I don't doubt his sincerity, but I view that as a symptom of kind of where he is and what has happened to him.

The 40-plus years that he lived on this earth before getting into this situation he was law-abiding, he was responsible, he worked, he took care of family, he took care of friends.

I have little doubt that the specific deterrence for him, you know, addressing the 3553 factors, is necessary.  I have no concerns that he is going to re-offend or commit offenses once he has completed his sentence here.  I don't fear for the public for anything that he would do.

The rehabilitation part is a lot tougher because I think a lot of the issues, you know, incarceration doesn't address.  And one of the things I did want to address with the Court is he's spent over two and a half years in the Baker County Jail.  And time at the Baker County Jail is very different from time spent at the Bureau of Prisons.  And I would ask the Court to consider the difficulty of that time in determining a fair and reasonable sentence because of the conditions.

You know, he shared with me there was an inmate who was overdosing and none of the guards in the area knew CPR, but he did.  He tried to administer CPR and was pulled back and put in a cell where he watched that individual pass away because they did not get the life- -- you know, life-saving measures that were needed.  And he's talked about that with me a lot.

One of the difficulties here is you have somebody who's, you know, never been in trouble before, misguidedly but genuinely believed that they were acting lawfully, but then you have promotion for respect for the law.  And understanding that that factor, you know, it's going to require an incarcerative

sentence of Mr. Ervin, you know.  Obviously whether you think a political protest is important to you, there's ways to do it and there's ways to not do it.  And this is clearly a way not to do it.

THE COURT:  Well, I -- Mr. King, I don't think there was anything about the evidence that was presented in this case that supports that this was a -- simply a political protest, that this was simply freedom-of-speech activity.

The evidence shows that Mr. Ervin was manufacturing these devices that would convert an item into a firearm, that he was selling them with videos and other propaganda that told people exactly that.

So this case is not about the First Amendment.  This case is not about political debate.  And respectfully, Mr. Ervin, it's not about creating a forum for debate.  It's about manufacturing devices that were put in the hands of other people who could then use them to convert their firearm into an exceedingly dangerous weapon.

So let's keep the arguments grounded in what this case is actually about.  It really -- it's not about the First Amendment.

MR. KING:  Your Honor, I agree with you.  And I think my point, which I think I failed to make, is this is where Mr. Ervin's head was at.  Because I agree with you, this is not about the First Amendment, this is about somebody distributing

dangerous items.

And where he mentally went after his mother's death was a sincere belief that -- you know, I think the Court is right in everything you've said, but a sincere belief that this was how people protest. And it's not. It's the wrong way to handle things.

So in terms of promoting respect for the law, the Court has to address that. And, you know, like I said, I have very little concern that Mr. Ervin is going to re-offend.

You know, I think a recommendation to RDAP would be appropriate given that he has had in the past issues with needing to -- self-medicating with illegal drugs. And given his mental health issues, I think that would be an appropriate thing.

The -- you know, looking at the guidelines, the -- you know, one of the questions the Court had of the government was, you know, why were these things not collected. I think part of the answer is these were bad auto sears to some extent. They were very difficult to work with and manufacture.

You know, I've been involved in cases with Glock switches. I fired a firearm I think once in my life. And those Glock switches, I could -- I could probably watch a ten-minute YouTube video and do those.

These were inartfully done, you know. And that doesn't mitigate the danger that they create. But I think

that's a big part of it, is these were -- you know, to some extent these were poorly done. They were not something that would -- somebody would be easily or readily able to convert. And as that ties to the guidelines, you know, certainly given the number of items, it's a very large number. And it went out to I think every state in this country, at least one of those items. You know, that's not lost upon me or Mr. Ervin.

But the actual dangerousness of the item -- you know, again, the templates of these things are something freely publicly available. You can get them online. Metal is readily available. Individuals who want to do this have shown time and time again they can do this. It's not like the Glock switches.

Again, not to say that it's not serious, but in terms of relative seriousness of machine gun conversion devices, these were, to some extent, very poor machine gun conversion devices, very difficult for any of the individuals to use. And I think Officer Toy's testimony kind of bears that out, the difficulty that he had in actually getting it to work with various parts and how long it took him.

At the end of the day, you know, in order to promote respect for the law, obviously this Court has a difficult task ahead. I know Mr. Ervin was very misguided in his beliefs in terms of the political stance that he thought he was taking. There's -- the Court is completely accurate that this is not a political protest and that's not what it's really about, but in

Mr. Ervin's head it has been.

And so in terms of looking at the 3553 factors, this is somebody who up until this point, who got this idea in his head based on where his mental health was, has a great family who's been -- like I said, his father is a wonderful person, his brother and sister are truly wonderful people who are very productive, very good individuals in our society.

And I'm hoping that the help that Mr. Ervin will get through services and supervision after he's served his incarcerative period will help him get to the point where he realizes the gravity of the situation.  And based on that, and my conversations with him, I don't think he's a danger to commit new offenses or continue on this conduct once his sentence has been completed.

May I just have a moment?

THE COURT:  Yes.

(Pause in proceedings.)

MR. KING:  Your Honor, I want to thank you for the time and attention you've paid not only in this sentencing hearing, but the trial as well.  And on behalf of Mr. Ervin, thank you.

THE COURT:  All right.  Thank you, Mr. King.

Let me -- I'll give you an opportunity to respond after I have heard from counsel for both defendants, Ms. Taylor.

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Mr. Larosiere.  And you can proceed in whatever order you choose.

MR. LAROSIERE:  Thank you, Your Honor.  And may it please the Court.  We'd like to have my client, Mr. Hoover, speak first.

THE COURT:  Okay.

DEFENDANT HOOVER:  Good afternoon, Your Honor.  Sorry.

MR. LAROSIERE:  Volume down.

DEFENDANT HOOVER:  I just talk loud because I have excessive hearing damage.

THE COURT:  Okay.  Go ahead.

DEFENDANT HOOVER:  I apologize.

THE COURT:  That's okay.

DEFENDANT HOOVER:  Anyway, the only thing I'm really hoping you take into consideration with this whole trial and like how everything is going and my sentencing, I'm really hoping you take into consideration like the chain of events that led me right up to this point.

And it all started off with the COVID lockdowns.  My truck-driving job got cut by about 30 or 40 percent.  Needless to say, it got to the point where I wasn't going to be able to make my bills.

Now, I believe in God.  I'm not saying, like, I'm the

perfect Christian.  I definitely swear too much and I should probably go to some more church, I'm just saying that.  But when I feel God's compelling me in a certain way, I go that way, because I've read the story of Jonah and the whale.  That's just what I do.  And I've went through it personally.  Like I've been compelled to do something before, like help this person out or something like that, and I didn't, and I wind up getting forced to do that in a much more undesirable way.

Anyway, my truck-driving job got cut by like 30, 40 percent, as I was saying, and I'm freaking out.  I'm like, you know, I don't know what to do.

THE COURT:  Mr. Hoover, my court reporter is giving me the look that she gives me when --

DEFENDANT HOOVER:  I apologize.

THE COURT:  -- you're talking way too fast.

DEFENDANT HOOVER:  Let me know when I can go on.

THE COURT:  Just try to slow down a bit, okay?

DEFENDANT HOOVER:  Okay.

MR. LAROSIERE:  Breathe.

DEFENDANT HOOVER:  So I did some praying and I did some crying, and a little bit more praying, because I thought I was going to lose my house that we had just got, and then by like the sleight of a hand, the flick of a switch, all of a sudden I get this email from Mr. Ervin, "Hey, I'd like to sponsor your channel.  I have this website called Auto Key Card

and I sell various products."

And I went to the website and I contact him back, I'm like, "Everything looks good.  Nowhere in the NFA does it say anything about the potential for" --

COURT REPORTER:  I'm sorry.  It's too fast.

MS. TAYLOR:  Your Honor, I'm going to object at this point to the extent that Mr. Hoover is essentially testifying as part of his allocution.  I think if he wants to testify about things that are not in the record, then he needs to go on the witness stand and be subject to cross-examination.

THE COURT:  Mr. Larosiere, can we maybe narrow the scope of Mr. Hoover's --

MR. LAROSIERE:  Your Honor, can I have an aside with my client for a --

THE COURT:  You may, of course.

(Mr. Larosiere confers with Defendant Hoover.)

THE COURT:  Go ahead, sir.

DEFENDANT HOOVER:  So essentially I was approached with the contract.  And I was like, I need to do my due diligence.  I'm a newly licensed machine gun manufacturer and I'm on YouTube.  So I called up Miguel.  I'm like, "Hey, Miguel, does" --

MS. TAYLOR:  Your Honor, I object to this.

DEFENDANT HOOVER:  I'm just making the point that I truly believed in my heart what I was doing was lawful.  I

talked to the ATF. They even cited opinion letters that I've referenced --

THE COURT: Mr. Larosiere, I'm a little concerned about the comments about having talked to the ATF. Unless Mr. Hoover wants to go ahead and speak to that under oath, I am a little -- to the extent that he's trying to mitigate by saying that he was told these were lawful, I think arguably that could be problematic under an obstruction consideration. I don't think that's the path we want to tread down.

MR. LAROSIERE: So I do think that the point is made that he believed -- I think his belief is relevant and I -- would it be okay if we just moved beyond this particular point?

And I guess, Hoover, all you have to say is this was your honest belief. And I will actually address the things you were talking about when I take argument.

DEFENDANT HOOVER: So, yeah, it was my honest belief. And I feel responsibile for Mr. Ervin, too, because he came to me in good faith talking to a machine gun manufacturer, that if there was some sort of problem, I would have instructed him. And he had already done his due diligence, blah, blah, blah, blah, blah. I know if I would have been like, "Hey, there's questions here in the law, like I'm not really sure about this," he wouldn't have done it and I wouldn't have taken the contract. So I apologize for all the problems I caused.

I'm not saying, like, the jury did something wrong or

anything like that. I totally accept responsibility for everything and I'm just --

MR. LAROSIERE: Slow.

DEFENDANT HOOVER: I'm just really hoping you'll take into consideration, like, I truly didn't believe I was breaking the law. Like, I really didn't.

And it sucks because I'm probably going to go away for a long time and miss big parts of my little girls' -- anyway, Babe, I'm sorry that you're having to go through this.

I apologize.

THE COURT: Take your time. That's okay. I understand.

DEFENDANT HOOVER: Because you've been through so much and you don't deserve it.

I'm not trying to stall, I'm just a little emotional.

THE COURT: It's understandable.

DEFENDANT HOOVER: Not, like, trying to guilt-trip you into a lesser sentence or anything like that, just please take all that stuff into consideration. Thank you.

THE COURT: All right, sir.

DEFENDANT HOOVER: Thank you for your time, too.

MR. LAROSIERE: I would now like to hear some words from Mr. Hoover's father, Mr. Hoover, Sr.

THE COURT: Sir, I'm going to ask you to --

MR. MICHAEL HOOVER: I'm not good at talking in front

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 118 of 144 PageID 6865
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 121 of 188

VOL 1 - PG 118

of a crowd.

THE COURT:  Okay.  Let me ask you before you start just to tell my court reporter your first and last name.

MR. MICHAEL HOOVER:  Michael Hoover.  Michael J. Hoover.

THE COURT:  And take your time, sir.

MR. MICHAEL HOOVER:  Matt's always been there for me. He drove a truck for me for nine years hauling U.S. mail.  And, yeah, our hours got cut, so he had to do something different. He started helping me in the store.  And I also have a store.

And he's always tried to do everything right.  Even with my trucking, if I wasn't sure about rules, he'd research it for me and always get back to me on it.

If he would have known that this thing was not legal, he wouldn't have done it.

He -- I know it's been said it didn't happen, but he did call the ATF and talk to the agent and describe what it was and --

MS. TAYLOR:  Your Honor --

MR. MICHAEL HOOVER:  I know I --

THE COURT:  So --

MR. MICHAEL HOOVER:  Sorry.

THE COURT:  -- here's the thing.  Mr. Ervin and Mr. Hoover went to trial and the evidence was presented.

MR. MICHAEL HOOVER:  Yeah.

THE COURT:  And the jury concluded that they did know that this was -- that what they were doing was unlawful.  And I have to sentence them based on that evidence that was presented to the jury.

So you go --

MR. MICHAEL HOOVER:  I'm just asking for you to be lenient or mercy or whatever.  And thank you for your time.

THE COURT:  Thank you, sir.  I know this is difficult.

MR. MICHAEL HOOVER:  Okay.

MR. LAROSIERE:  Mr. Richard Hughes.

MR. HUGHES:  Your Honor, thank you for your time.

THE COURT:  Can you just give my court reporter your full name -- your name, sir.

MR. HUGHES:  Sure.  Richard Hughes, Palm Beach, Florida.

Judge, I've watched you through this.  You've been very thoughtful, justice-seeking, and I admire your attention to detail.

I became friends with Erica and Matt.  I do YouTube videos.  And Matt and Erica, they reached out to help me with, you know, thumbnails, titles, camera position, settings.  And they've helped other YouTubers.

I'm just here to tell you that he's a good guy.  He reaches out to people.  I've talked to Matt about, you know,

life issues.  We kind of have different paradigms.  He -- his whole goal in life was just to do videos on YouTube, make money, and be with his family, so that he could by noon be done with all of his YouTube work and hang out with his wife and kids.

He loves being a dad.  He loves his wife.  He would get up in the morning, drive his daughter to school.  And his whole life philosophy was just keeping his expenses low and just being able to pay for everything by basically working half a day doing YouTube and being a dad the rest of the time.

As far as YouTube goes and what this case has meant to people like myself, like Matt, that do YouTube videos in the firearms space, it really is a shot across the bow.  People in our community have been paying very careful attention to this case.  It's a very sobering and very chilling fact that we make money by taking sponsorships for products, to advertise products.  Myself not so much.  I have a regular day job that this is just kind of a fun thing for me to do.  My day job, I'm a cloud engineer, and I'm doing okay so I don't need to take sponsorships.

The -- what's happened recently in the YouTube space is we're more self-policing.  If I see somebody going in a direction that's not -- that's going to actually end up like Matt, I'm like, "Hey, you better look at what's going on.  You don't want to even go in that direction."

So if the prosecution's case is like, "Hey, we need to make an example," they already did.  It's well known.

I just really wanted to tell you that I have really high regard for Matt.  Matt doesn't have a formal education.  He doesn't have a college degree.  I actually have an associate's from a community college, but I do cloud engineering, pretty much self-taught.

Matt's a brilliant guy.  His analytical ability, the way he figures things out, you know, he would call me up, he's like, "Hey, I did a new thumbnail for you.  You got the wrong colors."

THE COURT:  I don't know what you mean when you're talking about thumbnails.

MR. HUGHES:  So for a YouTube video, what you see is a thumbnail.  And he knew the analytics on what colors worked right, how to do the titling.  And he would, you know, freely share.  I know other YouTubers in the same space and they've never said boo to me about how to improve yourself, how to be better at the YouTube space.

I'm sorry, I skipped a page here because I've been taking notes in the court.

And I think -- I know Matt.  We've talked about the situation, and I know Matt honestly didn't believe he was doing anything wrong.

And we -- a couple of things were mentioned earlier

by the prosecution.  There's a joke in the YouTube 2A community about shooting your dog because of Ruby Ridge, and there's other incidents where the ATF has shot people's dogs.  So that's kind of a common cliché.  I don't think that means a whole lot.

The other thing about this is as much as YouTube is kind of reality TV in your basement, there's a little bit of the TV effect to it.  So, you know, you can't share your whole personal life.  That's not a good thing.

The other thing is you may exaggerate some things to, like, make something interesting, like a product to be more marketable.  I've often said that if ABC, NBC, CBS were held to the same standard in regards to something like Fen-Phen that caused a bunch of deaths, we'd have a bunch of CEOs in jail right now.

I'm just shocked personally that engaging in advertising has ended up in somebody behind bars.  I think this all could have been settled with a cease-and-desist letter early on and both of the men involved would have just walked away.

And thank you for your time.

THE COURT:  Thank you, sir.

Just a moment.

(Pause in proceedings.)

THE COURT:  Go ahead.

MR. LAROSIERE:  Your Honor, I'd just like to spend a short moment talking about Matt Hoover, the man I know, and then I will hard transition into the 3553 factors.

It might sometimes be looked at as a bad word in this courtroom from earlier proceedings, but I will admit on the record:  I am a YouTuber.

I met Matt Hoover --

THE COURT:  I wasn't the one that was offended by being a YouTuber, it was Mr. --

MR. LAROSIERE:  Crump.

THE COURT:  -- Crump's lawyer that seemed -- I said I didn't think it was a negative word.

MR. LAROSIERE:  I agree.

THE COURT:  But go ahead.

MR. LAROSIERE:  I met Matt Hoover because he was responding to videos that I was making that he was concerned were making fun of him.  And for the first time, I'm going to tell y'all:  Matt, I lied.  I was making fun of you.

DEFENDANT HOOVER:  I knew you were.

MR. LAROSIERE:  But I reached out to Matt and said, "Hey, I don't want to have beef."  Which was true, I didn't want to have arguments, I just wanted to get away with making fun of him.

And he was the kindest salt-of-the-earth person I had ever interacted with.

This was an individual who knew I was making fun of him in public, and the moment I indicated I wanted a relationship with him, I'll echo what Mr. Hughes said, he fixed my thumbnails.

In effect, throughout the trial, Mr. Hoover, apropos of nothing, would generate thumbnails for my videos because he wanted to see me succeed.  He wants to see everyone he interacts with succeed.

His entire family has this intensely nurturing instinct about all of them.  The moment Mr. Hoover met my fiancée he wanted to know her favorite color, he wanted to know everything about her.  And he remembers these things.  It's a -- you know, sometimes you meet people and you feel it's fake because you've read, you know, *How to Make Friends and Influence People,* but given some of the other stuff that's on the record, I'm aware Mr. Hoover didn't read that.  I'm aware it all comes from his incredibly good and kind heart.

So let's talk about these factors.

The government said a lot of things, and it probably won't surprise you that I'm going to quibble with them.  We need to be a little careful here when we talk about certain statements and conflate them with the actual convicted conduct. So we need to be careful.

There is a lot of First-Amendment-protected conduct in the overall underlying -- I don't want to say the charged

conduct, but you know what I'm saying, the entire course of events.  There was a lot of obviously First-Amendment-protected conduct excluding the auto key cards.

THE COURT:  Sure.  But what they're being sentenced for is not First-Amendment conduct.

MR. LAROSIERE:  I'm concerned that the First-Amendment-protected conduct that the government is pointing to could improperly be used to exacerbate what is a conviction under 5861, but is assuredly a fringe conviction. That's not to say that -- it's not to doubt the finding. That's to say:  we couldn't be further from the heartland.

THE COURT:  And what First-Amendment-protected conduct is it that you think is being misused?

MR. LAROSIERE:  Anything Mr. Hoover said about his trust for the government or what -- how individuals should interact with government agents is certainly First-Amendment-protected conduct.  The opinion "don't talk to the cops" is often stated and is certainly First-Amendment protected.

THE COURT:  All right.  Go on.

MR. LAROSIERE:  Insofar as our distance from the heartland, of course -- and I understand the Court was not doubting the conviction or doubting any of the underlying -- I'm not relitigating that.  But this Court observed that whether defendants transferred a combination of parts may not

have been obvious in this particular case.  It's an edge case at best, and certainly aberrant behavior under 5K2.20.

So let's talk about the nature and circumstances. Yes, we have repeatedly said Mr. Hoover was convicted of talking about this product, which in the brief we described as lines on a piece of steel.  That doesn't mean that it wasn't what the jury said it was.  It can both be lines on a homogenous piece of steel and something that sustained a conviction under 5861 because, well, that's where we are.  We may make -- I expect to say very different things on appeal, but that is where we are right now.  It is certainly relevant to the underlying conduct.

As far as promoting respect for the rule of law, as Mr. Hughes said, this has made waves.

And as far as the just punishment, Mr. Hoover's entire source of income was as a firearms presenter.  Since 1992, that is something that cannot be recovered now.  There is no way to federally restore your right to possess firearms since 1992.  So he has a lifelong prohibition from touching or even possessing the things that were the basis of his entire livelihood.  I think that has to be taken into consideration.

In terms of adequate deterrence, I think it's very well served.  People -- people are terrified.  Guideline sentence.  This Court has already observed that if we follow the guidelines as calculated, it's quite extreme relative to

the conduct, especially with respect to Mr. Hoover, who, as he just indicated, had a -- the most tenuous connection to what was being sent out and calculated behind the scenes.

The need to avoid unwarranted sentence disparities. Well, these types of sentences are rare.  We don't see many sentences where there are actual machine guns.  And I think any disparities in this instant case would be warranted between the defendants.  So I don't think we have an issue of unwarranted sentence disparities.

As far as restitution, of course, there's no victim. There's no identifiable victim.  And that should -- you know, that factor should be very important in considering the overall nature of the case.

The government, again, on its own, cited some parallel litigation and said nothing about the ATF rulemaking, that basically this case was not about ATF rulemaking or the ATF sneaking something under the nose of the public. Respectfully, I disagree.  The law is absolutely in flux with respect to the very concern we have here.  And we'll --

THE COURT:  Mr. Larosiere, the definition of "machine gun" has been in the statute for quite some time.  That's the definition of "machine gun."  This isn't about ATF rulemaking.

MR. LAROSIERE:  I know, Your Honor.  If I may, because the government brought up a parallel point, the bump stock point, I would like to bring up a parallel point.  And

specifically --

THE COURT:  This case isn't about bump stocks.  I'll let you make your record, but I'm deciding this case based on the facts of this case and the law applicable to this case. I'm not interested in what's going on with bump stocks and that litigation.  Fortunately for me, I'm not one of the judges that has one of those cases.

MR. LAROSIERE:  Right.

THE COURT:  I just said that, and tomorrow I'll get one.  But for the moment, I'm trying to decide this case based on what these gentlemen actually did, who each of them is as a person, because I'm required to consider their history and characteristics, the circumstances of their offense, the law applicable to it.

MR. LAROSIERE:  Right.

THE COURT:  So you can go ahead, but at the end of the day, bump stocks aren't going to carry me anywhere.

MR. LAROSIERE:  You'll be elated to know I'm not talking about bump stocks.

The point was raised very early on in this litigation that the definitions the government was using and did use and are in the record as to why this item was a machine gun tracked with -- and again, because the question is when does it become a machine gun.  I think that's fair to say.  The jury said it's become a machine gun.  That's fine.

The point is, relevant to 5K2.20, right before Mr. Hoover was arrested, ATF had put in a rule specifically relevant to this, which was:  When does a firearm cross that threshold?  The language was the same as that -- and I had brought this up earlier on.  The language was the same as that invoked by the government.  That rule, using that language, was just voided as unconstitutional.

So the only point I'm making is just to rebut the government's saying it is absolutely not in flux.  It's absolutely in flux.  The definition of when something does or does not become a regulable firearm is a hundred percent in flux.

And the danger here isn't subjective.  As Your Honor was grappling with the government over how much danger these actually pose, the government was speaking as though the danger matters to what the individual had in their mind.  An individual could think an acorn is a thermonuclear weapon, but if it's not a thermonuclear weapon, I don't think they'd be charged under that particular part of -- actually, the same statute we're talking about.

THE COURT:  I don't think that argument is -- that's --

MR. LAROSIERE:  Well, for the purposes of sentencing, we have to take a look at the factual record.  The factual record was no one aside from the ATF agent got it to cause a

firearm to fire automatically.  And when he did -- this is in the record, and I understand -- he did not cut along the line. It's relevant in some way.  It's relevant as to why the government didn't go around collecting them because Agent Slosson testified that if this was an AK-47, you would have no doubt that the ATF would go knocking on every single door, just to rebut that point.

The nationwide -- an attempted nationwide recovery would have shown that this is serious, but that didn't happen. The evidence we have shows that it was just a couple guys from the Jacksonville Field Office flying around to get a couple of cards.  And even where they claimed that "oh, the obfuscation," the "send the order form somewhere else," they still brought people here to court who had done that exact thing.

Finally, the government, interestingly, as we've gone back and forth in this question of whether or not there was a conversation with someone who claimed to be or was at the ATF or was an IOI, the government brought up the evidence of that when trying to suggest that Mr. Hoover's speech showed some kind of bad intent.  They said that he had released a video indicating that people should cut these up or whatever.

Well, that's not what he actually said.  If we review that evidence, what Hoover said in that video was that -- you know, he basically said to the extent -- to the -- to the effect of, "Hey, guys.  Information I previously had suggested

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 131 of 144 PageID 6878
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 134 of 188

VOL 1 - PG 131

this was legal, but now something has changed.  That is not the case."

MS. TAYLOR:  Your Honor, can I just -- I have -- I have no idea what Mr. Larosiere is referring to, like which video.  I don't -- this isn't sounding familiar to me.

MR. LAROSIERE:  The video -- sorry.

THE COURT:  Why don't you confer with Ms. Taylor and see if you can identify it.

(Mr. Larosiere and Ms. Taylor confer.)

MR. LAROSIERE:  The point is there's certainly support for a preponderance that he at least believed that the conversation happened.  And to use his suggesting to the audience, "Hey, this is no longer legal, get rid of it," I think that looks more like a subsequent remedial measure than anything else.

It seems more to me as, "Hey, guys.  I communicated something to you.  I now know it's wrong," and he's trying to fix it.  I think it would be -- we ought not punish him for that, but it's --

THE COURT:  Mr. Larosiere, the jury concluded that he did know it was unlawful.  That's what the jury verdict shows.

MR. LAROSIERE:  Yes.

THE COURT:  Arguing evidence contrary to the jury verdict at sentencing isn't helpful because I'm going to -- I have to impose a sentence based upon the jury's conclusion that

he -- knowing the unlawful purpose of the plan, that was, the unlawful nature of machine gun conversion devices, that he willfully joined in that conspiracy.

MR. LAROSIERE:  Right.

THE COURT:  So continuing to argue to me that there is evidence that he didn't know or that he thought it was legal when he was doing it, that's contrary to the jury's verdict. And I'm not going to sentence him on a version of the facts that is contrary to the jury's verdict.  That's not how this works.

MR. LAROSIERE:  Fully understood, Your Honor, and fully respected.  What I'm trying to communicate is the state of flux in this area, how chaotic and wildly inequitable it is. It does not require overturning any jury finding.  I'm simply requesting that it be taken into account and explaining how some statements that the government brought up in furtherance of an upward departure might actually support a downward departure or variance.  And I think that all of the -- all of the 3553 factors counsel towards downward -- a downward departure or a variance because they're -- frankly, the guidelines would be far more than is necessary.

It seems to counsel that the permanent effects that the conviction alone will have on Mr. Hoover and his family are more than adequate to serve the purposes of the law.

THE COURT:  Mr. Larosiere, I understand your variance

request.  I want to make sure I know what specific guideline you're relying upon for a downward departure.

MR. LAROSIERE:  I would stand on the memorandum for that.

THE COURT:  Just a moment, because --

MR. LAROSIERE:  I believe the majority of the departure is the heartland analysis.  The heartland factor alone can justify a downward departure.

MS. TAYLOR:  Your Honor, may I have a moment?

THE COURT:  Go ahead.

(Ms. Taylor and Mr. Larosiere confer.)

MR. LAROSIERE:  It would be 5K2.0, Your Honor.

THE COURT:  Okay.  Just a moment.  I'm just looking back here.

I see a reference to 5H1.6 for family responsibilities.  I see a reference to 5K2.1 [verbatim] based on aberrant behavior.  I think those are the only two.

MR. LAROSIERE:  Page five, we have 2.0.

THE COURT:  I said that.  I said 5K2.0 and 5H1.6 are the only two I see referenced.

MR. LAROSIERE:  Yes, Your Honor.

THE COURT:  Is that correct?

MR. LAROSIERE:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. LAROSIERE:  Your Honor, we -- we believe that all

of the purposes of the laws have been satisfied, again, by the time that Mr. Hoover has spent in this county detention facility, which somebody really ought to do something about, and the lifelong disabilities that he's going to suffer.  I think there's no indication that Hoover would ever recommit, and certainly not in the same way, unlike what happened in the *Bixley* or *Hixley* case, where --

THE COURT:  *Hixson*, or --

MR. LAROSIERE:  *Hixson*, where it was, you know, quite extreme.  The guy was on probation and was selling machine guns.  That's kind of night-and-day from what we're dealing with now.

THE COURT:  Of course, that involved only nine of them and not several thousand.

MR. LAROSIERE:  And he was on probation, which is a point of fact.  And also, as Mr. King brought up -- careful to craft this in a way not to -- much more transparently machine guns there, and in some cases, actual -- which I understand this Court believes there is no distinction, but in some cases they are actual whole machine guns, so . . .

I believe that is all I have.  Thank you so much for your time, Your Honor.

THE COURT:  Thank you, Mr. Larosiere.

Ms. Taylor.

MS. TAYLOR:  Your Honor, I'm going to endeavor to be

as succinct as possible.

THE COURT:  That would be appreciated.

MS. TAYLOR:  So when listening to Mr. Ervin's allocution -- Kristopher Justinboyer Ervin, just to distinguish him from his father -- it was clear that he views himself as a victim of this prosecution.

One of the first things he says was that he thinks "the government wants to hurt me and my family."  He talked about being put under pressure in these proceedings.  And he also talked about being sent here by God to do the right thing and that he does not believe that he committed a crime.

He also suggested that there was some sort of evidence tampering when discussing his phone, that the testimony at trial was that it erased itself.

And he stated he's thirsty for justice.  And I don't think I have the exact quote here because I couldn't keep up with him, but something to the effect of that he respects the rule of law, but he just doesn't agree with either this case or this prosecution or how the law has been applied in this case.  And that he's taking the moral high ground.

And also suggested that he wouldn't have had an attorney had his friends and family not contributed money, which, of course, is not correct.  He had a public defender that was appointed to him at the very outset of this case.  And he has a right to an attorney under the Constitution, and so of

course he would have been represented.

Your Honor, he talked a lot about the First Amendment and that that's what his purpose was.  I know the Court already addressed that in part, but I also just want to bring this back to the point that was made in trial and that I made earlier, that Mr. Ervin, if he genuinely were interested in just spurring conversation about the auto key card, he -- or about lightning links and the NFA and his apparent disagreement with it, he had a million different ways that he could have done that that didn't involve making not-quite-finished auto sears and then selling them in bulk at enormous profits.  Again, he was paying 2 to $3 per card and selling them for about 60 to $150 each.  His profit margins on these things was huge.

He also had available on his website gear, T-shirts and beanie caps.  I believe he had at least a T-shirt that had an image of the auto key card on it.  If really his goal was to get people talking about this, why not just make the T-shirt?  And then somebody is walking around with your idea on it.  And maybe that actually would spark a conversation, as opposed to selling a device that Mr. Hoover then goes on YouTube and tells people, you know, "Don't go on YouTube showing yourself using this" and "use your anti-gun relative's address to get it sent to so that the government doesn't know what you're doing."

So the idea that this was about freedom of speech or a political protest is completely undermined by the actual

evidence in this case, which also includes one of Mr. Ervin's text messages where he was talking about, "I just talked to a YouTuber" who's going to advertise his cards, and relates that the YouTuber said, "We're going to make a metric f-u-c-k ton of money."  It was about the money.

And of course, you know, there's nothing wrong with wanting to make a living.  There's nothing wrong with that.  But when you're making a living by thumbing your nose at the law and essentially -- and Mr. Hoover articulated this in one of the videos that was played at trial.  It's the video where he talked about the Stamp Act and his desire to support Ervin.  And what Mr. Hoover says in that video was that Mr. Ervin was the flag carrier or something, the flag bearer, I think, that he was out there purposefully disobeying the NFA so that he could foment mass resistance to the law.  And it appears that the ultimate goal was they believed that they would undermine the NFA to such an extent that the government was forced not to enforce it any longer.  So that's what this case was about.

There was also a suggestion that these were bad firearms.  Mr. King said he's only ever fired a gun one time but represented that he believed that he could install a Glock switch based upon watching a ten-minute video.  I mean, I don't know where -- what that's based on.

And he also talked about templates being available online for this.  And that's true, they are.  And those are not

illegal.  Templates are also available, and 3D and printing instructions, for other kinds of auto sears online.  Not necessarily illegal, but that's not what we were dealing with here.  We're dealing with somebody who was having these manufactured at mass scale and selling them, and selling them with a person who was advocating for his viewers to use them for a particular purpose, and that purpose was to make a machine gun.

And there was a suggestion made that -- I think it was suggested that the facts proving that Mr. Hoover talked to the ATF were that he said he believed it was legal.  Those two things don't necessarily have anything to do with each other.  And in any event, Mr. Hoover clearly knew that it was not legal when he made those videos.  He made a laundry list of statements reflecting that he knew exactly what the auto key card was and that he believed that at some point in the future there would be prosecutions based upon the auto key card and that ATF would view it as an NFA item.

And these things are not in dispute.  They were right in black and white, shown to the jury at the trial.  The Court has heard them.  We all heard them.  We all watched the same videos.

And Your Honor, my goal here is just to refocus on what the actual evidence was.

And finally, Your Honor, one thing that I wrote down

that you said a few minutes ago was that you're not going to sentence the defendants based upon a version of facts that's contrary to the jury's verdict.  Well, the jury's verdict in this case included a finding that each of the auto key cards that was transferred as-is in the conspiracy, that those things were machine gun conversion devices under the law.

I personally have not ever seen someone come into court and say that they were less culpable for illegally possessing a firearm because it was a crummy, low-quality, rusty pistol instead of a nice, shiny, new, high-quality pistol.

THE COURT:  Then you didn't sit through Judge Corrigan's chickenhawk case --

MS. TAYLOR:  I did not.

THE COURT:  -- because I think that was precisely the defense.

MS. TAYLOR:  Well, in any event, it's a firearm. It's a firearm, it's a firearm, it's a firearm.  That's what the jury's verdict was, and that's what we're asking the Court to sentence the defendants based upon.

It's undisputed that 6,600 of these auto key cards, which the jury determined were firearms and machine guns under federal law, were transferred in this case.  And that is what we're asking the Court to sentence these men on, is their personal history and characteristics, which reflect, based on

their statements today, that they do not accept responsibility for what they did.  They don't even accept -- the don't accept the jury's verdict.  They don't accept that what they did was wrong.

Mr. Hoover certainly -- he appears remorseful, or at least tearful, in the sense that I am confident that he truly does not want to be separated from his family and does not want to go to prison, but that's not the same thing as accepting responsibility.

And Your Honor, for all of those reasons, the United States submits that a guideline sentence is the appropriate sentence in this case, and that's what we're asking you to impose.

THE COURT:  Thank you.

Give me a moment.

(Pause in proceedings.)

THE COURT:  Ms. Wiles, may I see you.

(The judge and the courtroom deputy confer.)

THE COURT:  Ms. Wiles and I are just looking at a calendar because I'm -- I want to take some time to consider the arguments that have been made.  And as the lawyers who are here know, once the Court announces a sentence, there's no opportunity for buyer's remorse.  You can't change your mind once you say it out loud.  And so I want to make sure that I have fully considered all of the positions of the parties, and

so I'm -- what I'd like to do is take the evening and reconvene tomorrow to announce my sentence.

Mr. King, you and I are together in another case tomorrow morning, but we could do this perhaps after that at 11:30. I understand that before that 10 o'clock hearing would be problematic for you. Is there any reason why we couldn't reconvene at 11:30, with the understanding that my intention would be at 11:30 tomorrow to simply pronounce sentence? There would be no further argument as I have now -- I think I've heard everything that anybody could possibly want to say at this point. Would 11:30 work?

MR. KING: Yes, Your Honor. And I was going to say, the only thing in terms of what we did not discuss is we would prefer a Coleman designation.

THE COURT: Okay. Mr. Larosiere, is there any reason why we can't reconvene at 11:30 tomorrow?

MR. LAROSIERE: No, Your Honor.

THE COURT: All right.

Ms. Taylor?

MS. TAYLOR: That works for Mr. Mesrobian and I, Your Honor.

THE COURT: Okay. Then I'm going to -- I'm going to just make a -- do a couple things so that the record is clear and then we're going to recess and we'll reconvene at 11:30, with the understanding that at 11:30 it will simply be the

imposition of sentence.

Mr. King, is there any bar to sentencing at this time with respect to Mr. Hoover -- Ervin?

MR. KING:  No, Your Honor.

THE COURT:  Mr. Larosiere, is there any bar to sentencing as to Mr. Hoover?

MR. LAROSIERE:  No, Your Honor.

THE COURT:  Ms. Taylor, any bar to sentencing as the either of these gentlemen?

MS. TAYLOR:  No, Your Honor.

THE COURT:  All right.  Then with that, the arguments are completed.  And I will take the parties's respective positions under advisement and we will reconvene at 11:30 tomorrow morning.

And I apologize for those of you that traveled.  I know that that's probably inconvenient, and I'm sorry about that, but it is more important that I have the opportunity to fully consider everybody's arguments than it is that I try to move too quickly.  That is definitely one thing I've learned in this job.  So I apologize to the extent that I'm inconveniencing anybody, but I really do think I need the additional time.

Mr. King, Mr. Ervin wants to say something.

DEFENDANT ERVIN:  Thank you for your diligence, Your Honor.  I appreciate you.  I just wanted to tell you I

appreciate you for taking this seriously.

THE COURT:  All right.  We're in recess.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 3:05 p.m., to be continued on Thursday, September 7, 2023, at 11:30 a.m.)

-    -    -

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 144 of 144 PageID 6891
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 147 of 188

VOL 1 - PG 144

                    CERTIFICATE OF OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )


     I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


     DATED this 14th day of September, 2023.


                         /s/ Katharine M. Healey
                         Katharine M. Healey, RMR, CRR, FPR-C
                         Official Court Reporter

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Case No. 3:21-cr-22(S4)-MMH-MCR

        Plaintiff,               Thursday, September 7, 2023

v.                               11:37 a.m. - 12:44 p.m.

KRISTOPHER JUSTINBOYER ERVIN     Courtroom 10B
and MATTHEW RAYMOND HOOVER,

        Defendants.
_____


**SENTENCING**
**(VOLUME 2 of 2)**


BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE


OFFICIAL COURT REPORTER:

  Katharine M. Healey, RMR, CRR, FPR-C
  PO Box 56814
  Jacksonville, FL 32241
  Telephone: (904) 301-6843
  KatharineHealey@bellsouth.net


                    (Proceedings reported by stenography;
                    transcript produced by computer.)

<u>A P P E A R A N C E S</u>

COUNSEL FOR THE GOVERNMENT:

  **LAURA C. TAYLOR**, **ESQUIRE**
  **DAVID MESROBIAN**, **ESQUIRE**
  United States Attorney's Office
  300 North Hogan Street, Suite 700
  Jacksonville, FL 32202


COUNSEL FOR DEFENDANT ERVIN:

  **ALEX KING**, **ESQUIRE**
  Monroe & King, P.A.
  1805 Copeland Street
  Jacksonville, FL 32204


COUNSEL FOR DEFENDANT HOOVER:

  **ZACHARY Z. ZERMAY**, **ESQUIRE**
  Zermay Law
  1762 Windward Way
  Sanibel, FL 33957

- A N D -

  **MATTHEW LAROSIERE**, **ESQUIRE**
  6964 Houlton Circle
  Lake Worth, FL 33467

P R O C E E D I N G S

September 7, 2023                                    11:37 a.m.

                    -  -  -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Marcia Morales Howard presiding.

Please be seated.

THE COURT:  We are back on the record in Case Number 3:21-cr-22-MMH-MCR, United States of America vs. Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

Ms. Taylor and Mr. Mesrobian are here on behalf of the United States, and returning with them here today are Agent Hooker and Agent Slosson.

Mr. King is here with Mr. Ervin.

Mr. Larosiere and Mr. Zermay are here with Mr. Hoover and with Ms. Katzenberger.

We're scheduled for the imposition of sentence, having heard all of the arguments of the attorneys and having heard from Mr. Hoover and Mr. Ervin, as well as individuals speaking on their behalf yesterday.  And I appreciate everyone's indulgence of giving me the evening to consider all of those arguments.

And I'm going to do this a little bit backwards.  I'm going to explain the reasons for my sentence and what it is going to be, and then at the conclusion of the hearing I'll ask

Mr. Hoover and Mr. Ervin to come up to the podium and I will formally impose the sentence.

In sentencing, the Court's obligation, and what the Court is charged with, is fashioning a sentence that is sufficient, but not greater than necessary, to serve -- to satisfy the statutory purposes of sentencing.

And in determining what sentence is sufficient, but not greater than necessary, to do that, the Court is advised by the sentencing guidelines and has to consider the guidelines, which as we all know, at this time the Court has determined are 121 to 151 months of incarceration.

And the Court has to look at the nature and the circumstances of the offense and the history and characteristics of the defendant, and then has to consider what sentence will satisfy those statutory purposes of sentencing, which include the need to promote respect for the law, the need to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence not just for Mr. Ervin and Mr. Hoover, but adequate deterrence for others who would consider engaging in similar unlawful conduct. The sentence has to protect the public from further crimes. And the Court has to consider what sentences are available and also has to endeavor to avoid any unwarranted sentencing disparity.

And so those -- it's kind of a lot of moving parts,

but that's the backdrop and that's what the Court is required to do.

Now, as I said, the guidelines in this case are 121 to 151 months.  But if the Court had rejected the government's arguments and had accepted the calculation submitted by the probation office, which was consistent with what the guidelines would instruct if you rely on the commentary, then Mr. Ervin's guidelines would have been 33 to 41 months and Mr. Hoover's guidelines would have been 27 to 33 months.

Had the Court accepted that, then the government argued that the Court should depart upward under 5K2.0(a)(2) or (a)(3).

(a)(2) authorizes an upward departure where there exists an aggravating circumstance not adequately taken into consideration by the guidelines.  Specifically here, the absence of an increase for the number of NFA devices.

(a)(3) provides for an upward departure for circumstances that are taken into consideration under the guidelines but the circumstance is present in the offense to a degree substantially in excess of that ordinarily involved. And the argument there, I think, being that even if there was an enhancement for 200 firearms, 200 is a fraction of the 6,600 that were possessed.

And last, they argued under 2K2.1, Note 11, that the -- that recognizes that it would be appropriate to depart

if the offense involved multiple NFA weapons.  And I note that that says NFA "weapons," it doesn't say "firearms."

And I think if the guidelines -- if I had determined that the guidelines were 33 to 41 for Mr. Ervin and 27 to 33 for Mr. Hoover, then an upward departure on any one of those three grounds would have been appropriate; would have been appropriate because the guidelines, as calculated, do not reflect the sheer magnitude and scope of the defendants' proliferation of the machine gun conversion devices.  That simply is not accounted for in the guideline range, a guideline range that is calculated with no increase at all for the number of dangerous devices that the defendants conspired to transfer without registering.

So the guidelines, as scored, strictly under the black-and-white of what's in the guideline manual, would be wholly inadequate.  And an upward departure would have been warranted under any one of those three bases because they all really account for the same thing in order to truly reflect the seriousness of the offense conduct.  And we need to consider the offense conduct.

Through the conspiracy the defendants filled over 1,500 orders for machine gun conversion devices.  I think it's actually over 1,700; but conservatively over 1,500.  Many, if not most, of those orders were for multiple devices.  And the evidence showed the defendants conspired to sell these items,

Case 3:21-cr-00022-MMH-MCR   Document 330   Filed 09/14/23   Page 7 of 41 PageID 6898
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 154 of 188

VOL 2 - PG 7

knowing what they were, knowing how they could be used.

One really only has to look as far as Mr. Ervin's machine gun fish video that we saw -- too many times during the trial -- and it shows that Mr. Ervin knew what the devices could be used for and what he was selling them to be used for. And his other videos and his statements showed that.  And his cagey responses to his customers's emails showed his knowledge as well.

They showed Mr. Ervin carefully trying to walk a fine line of selling and encouraging the purchase of devices, knowing full well what he was selling them to be, but not overtly acknowledging their use and purpose.  And the jury saw through that.  The jury concluded that Mr. Ervin knew full well what he was selling, even if he tried not to directly answer the questions from his customers.

And the defendants sold these devices quite recklessly, with no regard for who they might be selling the devices to.  In fact, one of Mr. Hoover's videos specifically encouraged prohibited persons, including convicted felons, to purchase these illegal devices.  That's very serious offense conduct.  It is offense conduct that is extremely dangerous, placing these devices that have brutally lethal capacity in the hands of hundreds of people without any regard for what those people would use those devices for.

And again, I'll note that what we're talking about is

over 1,500 sales, and then the possession of over 6,000 of these devices that would have been placed in commerce but for the arrest.  And that is just not accounted for at all in the guideline, which is calculated without regard to the number of weapons.

But as I indicated, following the dictates of *Dupree*, I determined that I wasn't permitted to rely on the commentary definition of "firearm" because it was inconsistent with the unambiguous guideline in 2K2.1.  And so I determined that the guidelines are actually 121 to 151.

Mr. Hoover argues for a downward departure based on his family circumstances under 5H1.6 and under 5K2.0, arguing that his offense conduct reflects aberrant behavior.

The reality is that Mr. Hoover's family responsibilities, while certainly very important, and while his absence in the family home without question causes hardship, that is not a circumstance that is present to an unusual degree in this case.  It's not present in any way different than almost every other individual who has a family that is here for sentencing.  And so 5H1.6 would not authorize a downward variance -- or a downward departure on that basis.

And a departure for aberrant conduct is warranted where something is inconsistent with an individual's personality.  It's a lapse of judgment.  It's a momentary thing.

That's not what this conduct was.  This conduct that Mr. Hoover engaged in was not aberrant, it was him expressing his true beliefs.  And he doubled down even after Mr. Ervin's arrest, indicating his belief in proceeding in the manner that he did.  So it can't be described as aberrant.

And so to the extent Mr. Hoover requests a downward departure on the basis of either 5H1.6 or 5K2.0, the Court finds that no downward departure is appropriate, that is, no downward guideline departure.  But I will consider the arguments presented there with respect to a variance from the guidelines.

Even with the guidelines at 121 to 151, the government argues for an upward departure of six levels because of the number of devices.  That would drive the guidelines from 121 to 151 to 235 to 293 months.  And I think that that sentence would be far, far, far, greater than necessary.  And I don't think that the upward departure is necessary or warranted.  The guidelines of 121 to 151 months are more than sufficient, in my mind, to capture the seriousness of the offense conduct.

I recognize that the jury verdict means that each and every one of the devices that were in those cards can theoretically convert a firearm to a machine gun.  That's what the jury reflects, and the Court accepts and respects the jury's verdict.  But I don't think that a guideline that

assumes -- that treats each and every one of those as an actual firearm is appropriate.  I don't know that if one had asked the jury that they would have concluded that each one of those cards would have successfully achieved conversion to a machine gun or that they were even convinced that each purchaser really would have tried.

Do the defendants get a pass because they made marginally good machine gun conversion devices or because they didn't make great machine gun conversion devices?  No, I don't think they get a pass for that.  But I also don't think they should be held accountable as if every item sold would and truly could be used in the manner for which they were advertised.  And I just -- I don't think that the evidence presented and the facts of this case warrant treating them in that way, and so I decline to depart upward.  I just don't think it's necessary.

I think that to the extent the guidelines have to take into consideration the actual offense conduct, I don't see that an upward departure is necessary.  The aggravating circumstances of the offense conduct I think are fully accounted for with the guidelines as they are calculated.

So those, I think -- I think that addresses all of the departure motions under the guidelines because the Court, of course, has to start with the guidelines.  So we're back to the guidelines are 121 to 151.

And as I indicated yesterday, I am still convinced that a guideline sentence is more than what is necessary in this case.  And I recognize that the government strongly disagrees with that position, and I respect that, but I'm firmly convinced that a guideline sentence is too high.

The difficult question, of course, then becomes: What is an appropriate sentence?  What sentence will reflect the seriousness of the offense?  And I've explained already that I think this is a very serious offense.  And what sentence will promote respect for the law?  What will accomplish just punishment?  What will deter others from trying to find a unique way to manufacture these devices and proliferate them but avoid liability themselves?  Because that's what Mr. Ervin and Mr. Hoover were doing.  That's the difficult question that the Court has to answer.

In answering it, we have to remember what the case is about and what the case is not about.  I said yesterday that this case is not about the First Amendment.  Neither of these defendants is charged or before the Court based upon their speech.

I want to talk about a few of the things that Mr. Ervin said yesterday.  Mr. Ervin, this case is not --

DEFENDANT ERVIN:  Your Honor, I was emotional after watching my father speak.  I would like to communicate that --

THE COURT:  I understand.

DEFENDANT ERVIN: -- just from my heart.

THE COURT: No, I understand. And please don't -- please don't --

DEFENDANT ERVIN: I just didn't want you to punish me for being emotional because of my father --

THE COURT: I'm not. And I'm --

DEFENDANT ERVIN: -- because I love him very much.

THE COURT: Of course you do.

DEFENDANT ERVIN: So I just wanted to say that I --

THE COURT: And he loves you very much.

DEFENDANT ERVIN: -- was worked up a little bit and I just -- I -- I understand. I just wanted you to know that --

THE COURT: Okay.

DEFENDANT ERVIN: -- that was the situation.

THE COURT: I understand. And I just want to talk to you about some of the --

DEFENDANT ERVIN: Yes, ma'am.

THE COURT: -- beliefs that you expressed, because I want -- I don't want you to misunderstand --

DEFENDANT ERVIN: I don't want to leave something out that needs to be known either.

THE COURT: Okay. Mr. Ervin, I'm going to stop, okay.

DEFENDANT ERVIN: I understand. I'm not trying to interrupt you or stop you, I'm just saying, my emotional state

and my concern was that maybe I didn't say something that you needed to know.  That was my concern, why I wanted to tell you about me being worked up.

THE COURT:  Okay.

MR. KING:  Your Honor, I apologize.  Could I have a moment with Mr. Ervin?

THE COURT:  Sure.

(Mr. King confers with Defendant Ervin.)

MR. KING:  Thank you, Your Honor.

THE COURT:  You talked yesterday about your passion to cause debate in a public square, and that's great.  But this case isn't about causing debate in a public square, and it's not about wanting to initiate a nationwide debate.  You can tell yourself that that's what this case is about, but it's not.

The truth is that you don't need to manufacture a functional, durable, metal auto sear that can actually be converted -- that can actually be used to convert a firearm into a machine gun to cause public debate on whether such an item should be lawful.  You can print it on a T-shirt, you can print it on a hat.  You can do all sorts of things, which I know you did, but you don't -- what you don't have to do is create a machine gun conversion device and sell it to over 1,700 people.  That's --

DEFENDANT ERVIN:  Your Honor --

Case 3:21-cr-00022-MMH-MCR   Document 330   Filed 09/14/23   Page 14 of 41 PageID 6905
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 161 of 188

VOL 2 - PG 14

THE COURT:  No, Mr. Ervin.  At this point you're just going to have to listen, please.

DEFENDANT ERVIN:  Ms. Taylor said it was a picture yesterday.  That's all it was.

THE COURT:  Mr. Ervin, it's not a picture.

DEFENDANT ERVIN:  I understand how you feel, but I disagree.

THE COURT:  Mr. Ervin, no, this isn't how I feel, this is what the law says.

DEFENDANT ERVIN:  I understand.

THE COURT:  Mr. Ervin, I'm going to have to ask you to stop.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  I'm going to have to ask you to listen.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  And you told me just a moment ago that you didn't not want to say something that I would need to hear.

What would be helpful for you is if you could acknowledge that perhaps you made a mistake and that what you did was unlawful.  But you very clearly don't believe that, which is one of the concerns that I have in imposing a sentence at this time.

Don't talk, Mr. Ervin.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  Okay.  As I was saying, you don't have to

make a machine gun in order to initiate public debate about whether one should be legal, just like you don't have to go out and buy fentanyl to argue about its illegality.  And you don't have to use any other illegal drug in order to promote that drugs should be legal.  You don't have to break the law in order to encourage a public debate on the law.  You can debate. That's what words are for.

And as I said, you certainly don't have to sell over 1,500 of them without any regard to who is buying them and what they might do with them to cause debate in the public square.

I understand that you may choose to rationalize your actions by stating that that was your intention, but nothing, and I mean nothing, in the evidence suggests that you were fighting for the legitimacy of the auto sear.

To the contrary, you tried to distance yourself from it.  You tried not to allow yourself to be convict- -- to be connected to telling your clients or your customers how to actually convert it to the auto sear.  That's a far cry from suggesting that what you're doing was simply trying to cause public debate.

You said yesterday that the government wants to hurt you and your family.  This case is not about the government wanting to hurt you or your lovely family.  They didn't go out and pull Kristopher Ervin's -- Justin Ervin's name out of a hat.  They didn't go on the internet and find you and think:

Oh, we need to find something to charge him with. That's not what happened here.

The reason that the government brought the charges is to hold you accountable for the decision you made for your actions. Now, does that hurt your family? And does it hurt your family, Mr. Hoover? Yes, it does. And I'm sorry. I often say when I'm imposing sentence that the hardest thing that a federal judge does is sentence people, because when you sentence an individual, you're not just sentencing that person, you're sentencing their mother, their father, their children, their friends, everyone. And that's very difficult.

But it's not the government's fault that the sentence has to be imposed. It is the individual who made the decision to break the law that causes there to have to be a sentence. And the sentence is a consequence of the actions.

You told me yesterday that you don't want to be in trouble for a picture. But you didn't just sell a picture. It wasn't a picture. It wasn't art. It wasn't a drawing. And your own statements reflect that you knew that the strong metal card that you were selling had a purpose; that your customers might want some day, you said perhaps only under dire circumstances -- of course, there was nothing prohibiting people from using it for any reason. But it was sold for and built for a purpose. And that purpose was to convert a firearm to a machine gun. It wasn't a picture. It wasn't a piece of

art.

You said yesterday that there were ways to mitigate this and that you never had a chance. And I think one of the other witnesses expressed the view that there were better ways for this to be handled. And I assume that's a reference to sending a stop-and-desist letter instead of arresting Mr. Ervin and Mr. Hoover. But the way to mitigate this was not to engage in the criminal conduct to begin with.

I am quite certain that any number of defendants who are charged with crimes in federal and state court would have preferred that law enforcement just approach them and say, "Hey, dude, cut it out." I'm sure. But that doesn't change the fact that you had already made the decision to commit federal crimes and had been doing so for a period of time. And there are consequences for that.

I heard from Mr. Ervin's father yesterday. And sir, thank you for speaking. I know that was hard. And I just wanted to say that you can't blame yourself. As parents, we always want to take responsibility for our children's actions. We can't help it. We love them. And of course you love your son. And nothing about this changes the fact that you love him. But you're not responsible for his decisions or for his actions. And Mr. Ervin, he chose his actions. And you weren't in a position to stop him. And it's not your fault that you did not see the flaw in his plan.

You said that Mr. Ervin didn't wake up and decide to become a criminal.  And I'm sure that that is absolutely true.  But at some point he did decide that he would manufacture and sell devices that could convert a firearm into a machine gun.  He just thought he found a way that he could do it where he wouldn't get caught or he wouldn't be shown to be breaking the law, even if his purchasers were clearly breaking the law.  And he talked about that in one of his conversations.

I think, if my memory serves, it might have been in text messages with Ms. Wolfe, where an acquaintance of hers had asked about Mr. Ervin's responsibility if somebody did something bad with the items.  And the evidence in this case, Mr. Ervin's response was quite cavalier in his dismissal of anybody's ability to prove his responsibility and his cavalier attitude of what somebody might do or use his device for.

So Mr. Ervin didn't wake up and decide to be a criminal, but he did decide to engage in criminal activity.  He just thought he'd come up with a way to make a profit of it and not be held responsible.

And Mr. Ervin, it was apparent yesterday, and even more apparent here today, that you still don't believe that you committed a crime.  You have expressed really no contrition whatsoever.  You say that you don't want to be punished or hurt for doing the right thing.  And you say that you will always do the right thing, but you did not do the right thing here.  You

did not do the right thing when you mislead the folks at Orange Park Machine to manufacture these devices for you.  And you saw them testify.  They were quite terrified that that family business was going to go out of business because you had tricked them into manufacturing machine gun conversion devices. I can't remember -- they testified about how many employees they had.  But that wasn't doing the right thing, to trick them into making these devices.

You weren't doing the right thing when you advertised to sell these devices, when you advertised their capability to fire bullets automatically.  You didn't do the right thing when you told the people where to go on the internet to figure out how to illegally use your device, how to make it work.  And you didn't do the right thing when you sold these devices with no regard to who the purchasers were or what they might be used for.

None of that was you doing the right thing.  It was you doing what you wanted to do to make money by doing something you knew should not be done, but -- because you thought you were clever enough to come up with a workaround so that you wouldn't get in trouble, and that is a far cry from doing the right thing.

You talked yesterday about having the moral high ground.  And if there's one thing that you really need to understand, sir, is that you do not have the moral high ground.

Not remotely.  What you did was illegal.

Mr. Hoover, a lot of what I have just said to Mr. Ervin -- not the Orange Park Machine thing because you had nothing to do with his decisions in that, but much of what I have just said about Mr. Hoover's choices -- sorry, Mr. Ervin's choices are equally applicable.  Your own videos clearly reflect that you knew what you were doing was unlawful, yet you chose to do it.

And again, to the extent that you continue to be of the view that this case is about First Amendment rights and political speech, it just isn't.  That's not what you were charged with.

And the jury listened to the evidence very, very carefully.  We had a jury that was -- they paid close attention throughout the trial.  And those 12 fellow citizens concluded that you knew what you were doing was unlawful.  And they made that conclusion largely based on the words that came out of your mouth that they saw on the videos, that those -- your statements there and all of the suggestions that you use a money order and send your -- use the address of your anti-gun relative and all -- and the potential that the FBI would -- or ATF would be in a courtroom arguing that these are firearms or machine gun conversion devices, all of that evidence, and more, convinced the jury beyond and to the exclusion of any reasonable doubt that you knew that the actions you were

engaging in were unlawful.

Mr. Hughes spoke on your behalf yesterday, and Mr. Hughes expressed his sadness that an individual engaging in advertising ended up in jail.

And Mr. Hughes, I would simply say to that, again, that Mr. Hoover is not going to jail because he was advertising.  Mr. Hoover is being sentenced because he was convicted of conspiring to transfer machine gun conversion devices, in violation of the National Firearms Act.

You can't advertise the sale or purchase of an unlawful firearm any more than you can advertise for help to commit a robbery or a burglary or a murder-for-hire.

This isn't about holding somebody responsible for advertising or for accepting a sponsorship, it's for what was being advertised and what was being sponsored, and that is, illegal firearms under the law.  That's what the jury found.

And I would simply note, Mr. Hughes, that I recognize that Mr. Hoover is your friend.  And you are a good friend to him.  You stand by him, and you should.  That's what friends do for each other.  I fully recognize that.

But I don't think you do him or anybody else any favors, and certainly not your listening population, who I think respect you as a source of knowledge, I don't think you do any of them any favors when you suggest that this prosecution was improper because there wasn't a

Case 3:21-cr-00022-MMH-MCR   Document 330   Filed 09/14/23   Page 22 of 41 PageID 6913
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 169 of 188

VOL 2 - PG 22

cease-and-desist letter or because the First Amendment protected his actions, because neither of those arguments will prevail in the future any more than they prevailed here. And I fear that that will cause others to make the same mistake that Mr. Ervin and Mr. Hoover did; that is, to skirt the edge of the law to try to find some way to engage in similar conduct.

I need to address what was hinted at and what was suggested, and that is that Mr. Hoover spoke to the ATF and was told that the actions that he and Mr. Ervin would engage in were not unlawful. And there was also a statement, I think Mr. Ervin may have said, that people said this couldn't be illegal. And I simply reject the contention that either Mr. Ervin or Mr. Hoover spoke to anyone with the ATF, and that after having been given an accurate description of what the defendants intended to manufacture and sell, that any ATF agent would have told them that that was okay. There is just nothing at all that supports that contention. It's a good narrative. I get that. It's a good narrative to say "I was told these were legal," but it's just not true. And Mr. Hoover's own videos show that that wasn't what he thought. And certainly Mr. Ervin's actions show that that was not what he thought.

And so the case is not about the First Amendment. It's not about public debate. It's not about advertising or sponsorship. And it's not about a good-faith belief that an individual was operating within the law. It's about what the

jury was asked to consider and what the jury found beyond a reasonable doubt, and that is that both defendants conspired to transfer machine gun conversion devices, that Mr. Ervin possessed such devices, and that he engaged in structuring of financial transactions.  And the Court has to determine an appropriate sentence for that crime, not the other things that people may want to say this case is about.  People don't get -- well, that's what this case is about.

With regard to the firearms, I have thought hard about the relative culpability of Mr. Ervin and Mr. Hoover. Initially I thought Mr. Ervin was far more culpable because Mr. Hoover would never have ended up in this courtroom but for meeting Mr. Ervin.  It was Mr. Ervin's idea.  Mr. Ervin manufactured these items.

But as Mr. Ervin said, Mr. Hoover, you're quite a salesman.  And you really set things on fire.  And but for your involvement, there is no way Mr. Ervin would have been able to sell 1,700 of these items.  There's no way he would have made all the money that he made.  And there's no way that as many people would have known about the devices.  They would not have been proliferated to the extent that they were but for your involvement.

And the chart that -- the graph, bar graph that was shown in the trial shows that before your involvement, Mr. Ervin was -- you know, had small numbers of sales, and then

Case 3:21-cr-00022-MMH-MCR   Document 330   Filed 09/14/23   Page 24 of 41 PageID 6915
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 171 of 188

VOL 2 - PG 24

when you would post a video, sales would skyrocket.

And so ultimately I think I became -- or I have become convinced that you-all are largely equally culpable, but Mr. Ervin slightly more, for two reasons:  one, for his actions with regard to the manufacturing of the devices and his conduct with Orange Park Machine, and his conviction for the structuring offenses in addition to the firearms offense.

As I said, one of the things that the Court is required to consider is the Court has to avoid any unnecessary -- any unwarranted, pardon me, sentencing disparity.  And so I considered the sentences that have been imposed in similar cases in the Middle District of Florida. And many of those ranged between 30 and 36 months' imprisonment.  But in all of those cases the defendants pled guilty, and so their guidelines were reduced because they received a reduction for acceptance of responsibility.  And two of those individuals -- in addition to a downward adjustment for acceptance of responsibility, two of those individuals cooperated with law enforcement and received the benefit of a 5K1 motion for downward departure.

I'll also note that all of them had substantially -- and if I were writing this, I would have to underline the word "substantially" -- fewer firearms.  One had 69.  Well, sorry. There was one with 69 cases, the others had 24.  And there was one other; that one had I think a couple hundred.  His sentence

was 60 months, though.  He wasn't one of the ones that ended up in a 30 to 36 months.

And I also noted that while the court in *Hixson* found that the guidelines didn't increase the offense level due to the number of devices because the devices did not fall within the commentary's definition of a firearm, the judge in *Hixson* varied upward to impose a sentence that was double the guideline range, a significant upward variance, imposing a sentence of 66 months to account for the seriousness of the offense conduct.

So here I've considered the guidelines.  I've considered the purposes of sentencing.  I've considered the sentences imposed in other cases.  I am convinced that the conduct of the defendants in this case is clearly unlawful, dangerous, reckless, certainly posed a great potential danger to public safety, but I'm not convinced that the evidence presented warrants treating the sale of each and every device with such severity as a guideline sentence would reflect.

And when I look at the overall history and characteristics of the defendants, they paint a different picture.  We don't see a history of disregard or disrespect for the law.  Up to now, Mr. Ervin and Mr. Hoover have been law-abiding citizens, except perhaps with the marijuana use, but we won't talk about that.  They are loving members of their family.  They take care of their family.  They are respected in

their communities.

It does appear that this foray into this business endeavor was their brush with criminal activity.  And if you look at it, it was a bad idea.  It was a terrible idea.  But I'm not convinced that it reflects their true character.

One thing that if I didn't know it before, I've certainly seen it time and again in the 17 years or so that I've been doing this, and that is that good people make mistakes all the time.  And we'll talk a little bit about that later, but I think when one looks -- I hope that at some point Mr. Ervin will look back on this and realize that it was a mistake.  I hope that Mr. Hoover will as well.  I think more likely Mr. Hoover will than Mr. Ervin, at least based on his statements here today, but that will remain to be seen.

With no criminal history, with no suggestion of any anti-social history at all, considering the history and characteristics of the defendants, the sentences in other cases involving similar devices, the seriousness of the offense conduct, I'm convinced that a term of imprisonment of 60 months for Mr. Hoover is necessary and a sentence of 68 months for Mr. Ervin is necessary.  I think that sentence is sufficient to satisfy all of those statutory purposes of sentencing.  And so I'm varying downward from the guidelines to those sentences.

I'll note that these are two individuals who have never been to prison before, and so a sentence of five years,

or five years plus, is a very significant sentence.  And I don't think it can be discounted.  And I don't think it can be described as a slap on the wrist or as a light sentence.  I think it's a very serious sentence.  And I think it reflects the seriousness of their offense conduct.  I think it accomplishes just punishment.  And I think it accomplishes deterrence.  If five years in federal prison isn't going to deter someone, I am really challenged to believe that seven years or ten years will.  I don't think someone is going to look at this and say, "Oh, well, if I get caught, I'm only going to get five years."  So I think that that sentence is sufficient to accomplish the purposes of sentencing.

To Mr. Hoover and Mr. Ervin's family and friends, I appreciate your presence here.  You love Mr. Hoover and Mr. Ervin.  You have every right to.  As I said, good people make mistakes all the time.  The mistakes don't define them.  It doesn't make them a bad person.

What does define an individual, though, is what they do after they've made the mistake.  And that's what will remain to be seen.  Whether Mr. Ervin and Mr. Hoover will accept responsibility for the unlawfulness of their conducts and change their behavior or not, that's what will ultimately define them.

Mr. Hoover, you're a family man.  You love your wife, you love your children, but you can't be there for them if you

Case 3:21-cr-00022-MMH-MCR   Document 330   Filed 09/14/23   Page 28 of 41 PageID 6919
USCA11 Case: 23-13062   Document: 37-3   Date Filed: 02/22/2024   Page: 175 of 188

VOL 2 - PG 28

break the law.  It's just a reality.  So you're going to complete this term of imprisonment, and I see no reason why you should ever have any future untoward encounter with law enforcement.

I recognize you've lost the right to possess firearms and that will be difficult for you, but that is a consequence of the offense.  But you will complete your term of imprisonment and you will go back to being the loving husband and father that you -- that you were, you just won't be able to have guns.

And Mr. Ervin, you are a young man.  You're an entrepreneur.  You have a lot you can do with your future.  But you're going to have to recognize that it was what you did, that it was choices that you made, that caused this prosecution, because what you did was illegal and you knew it when you were doing it.  And if you continue throughout your term of imprisonment to deny that it was your actions that brought you here, then I fear that you will go down a very dark road.  And I don't think that's what any person in this room wants for you.

As I said earlier, nobody targeted you.  Nobody sought to hurt your family or your friends.  The evidence showed that you came before this Court because of your actions, and that's -- and your knowledge of the illegality of your actions was evident in your desire to distance yourself from

the devices. It was a gamble. It failed. But your incarceration is a consequence of that failed gamble.

As I said, viewed through the best lens, this was a mistake, but it was a very serious mistake. A mistake that may well have consequences well into the future because we don't know where 1,700 of these items are. And that -- I hope we never will know, because the only way we'll know is if something terribly bad happens.

But my only hope is that you choose to accept that this was a mistake, that it was wrong, that it was against the law, and that you learn from it. But that will be up to you.

For purposes of the record, before I impose sentence, I'm going to make clear what I've done.

I had a guideline range of 121 to 151 months. I denied the government's motion for an upward departure from that guideline range. I denied Mr. Hoover's request for a downward departure from that guideline range.

I varied downward based upon the history and circumstances of these individuals and based upon my view that a sentence of 121 to 151 months is simply more than necessary. The guidelines in this case, I think, are greater than necessary to accomplish the statutory purposes of sentencing. And so I varied downward to a sentence of 60 months for Mr. Hoover and 68 months for Mr. Ervin because in my view, that term of imprisonment, which is a significant term of

imprisonment, accounts for their conduct, holds them responsible, reflects the seriousness of the offense and promotes respect for the law and accomplishes deterrence and is certainly sufficient to protect the public.  And it also takes into account similar sentences to individuals engaging in similar conduct.

To the extent that the guidelines had been 33 to 41 for Mr. Hoover and 27 to 33 for -- sorry, 33 to 41 for Mr. Ervin and 27 to 33 for Mr. Hoover, if those had been the guidelines, if I had accepted the presentence report, then I would have departed upward for the reasons stated earlier, or, alternatively, varied upward to the same sentence that I'm imposing today because the 33 to 41 months or 27 to 33 simply did not take into account the seriousness of the offense conduct, the sheer magnitude and scope of the proliferation of the machine gun conversion devices that occurred in this case, and doesn't differentiate Mr. Ervin and Mr. Hoover from other individuals who received sentences in that range for offense conduct that was significantly, significantly less egregious.

And so for purposes of the record, I'll just note that if I was in error in determining that *Dupree* required me to disregard the commentary guideline definition, I would have arrived at the same sentence either based on the guideline-authorized departures that I discussed earlier or an upward variance for the same reasons.

So in sum, I have determined that the sentence that I intend to impose here today is an appropriate sentence when I look at these two human beings, when I look at their personal history and characteristics, when I look at the circumstances of their offense.  I am convinced that the sentences of 68 and 60 months are sufficient, but not greater than necessary.  I am firmly convinced that any lesser sentence would be inadequate.  And so for those reasons, that is the sentence that I intend to impose at this time.

At this time, Mr. Hoover and Mr. Ervin, if you will please come up to the podium, along with your attorneys.

The Court has asked why judgment should not be pronounced; I've been given no cause.  I've heard from counsel and from the defendants and family and friends.  I've reviewed the sentencing memoranda and the presentence report and all of the materials that were presented.

Pursuant to Title 18, United States Code, Sections 3551 and 3553, it is the judgment of the Court that the defendant Kristopher Justinboyer Ervin is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 68 months.  That term of imprisonment will consist of the following:

A term of imprisonment of 60 months as to Count One, a term of imprisonment of 68 months for Counts Two through Twelve, with all such terms of imprisonment to run

concurrently.

Mr. Hoover, pursuant to Title 18, United States Code, Sections 3551 and 3553, it is the judgment of the Court that Matthew Raymond Hoover is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months. And that term of imprisonment consists of 60 months as to Counts One through Three, Five, and Seven, with all such terms to run concurrently.

Upon release from imprisonment both Mr. Ervin and Mr. Hoover will be required to serve a term of supervised release of three years.  During the term of that supervised release you will be required to comply with the standard conditions of release adopted in the Middle District of Florida as well as certain special conditions.

Mr. Hoover, you'll have to participate -- pardon me. Mr. Ervin, you will have to participate in a substance abuse treatment program and submit to drug testing.

Both Mr. Ervin and Mr. Hoover will be required to participate in a mental health treatment program.

Because these are firearms offenses, both Mr. Ervin and Mr. Hoover will be required to submit to a search of their person, their place of business, their residence, any vehicles or storage units under their control.  You will have to advise anyone with whom you share any of those items that you're subject to that search condition.  And a refusal to submit to

the search would be a violation of the terms of your supervised release.

You will also have to provide the probation officers with any requested financial information.

Because you've been convicted of qualifying felony offenses, you will have to submit to the collection of DNA.

You're ordered to refrain from any unlawful use of a controlled substance.  And you'll have to submit to one drug test within 15 days of beginning your supervised release and then periodic drug tests thereafter.

Based on the financial circumstances of these individuals, the Court waives the imposition of any fine.

And Ms. Taylor, I assume there's no forfeiture that I have to consider at this point?

MS. TAYLOR:  Right, Your Honor.  We just request that you mention the previously filed preliminary order of forfeiture, but nothing beyond that, Your Honor.

THE COURT:  The Court incorporates the preliminary order of forfeiture, Docket Number 316, into the judgment.

Mr. Ervin, because you were convicted on 12 separate counts, there's a mandatory special assessment of $100 as to each of them, so the Court is required to impose a $1,200 special assessment.

Mr. Hoover, you were convicted of five counts, so the Court is required to impose a $500 special assessment.

(Courtroom deputy confers with the judge.)

THE COURT:  Ms. Wiles reminds me that for purposes of the term of supervised release, for Mr. Ervin, that's a term of supervised release of three years for each count, Counts One through Twelve, to run concurrently.

For Mr. Hoover it is a term of three years for each count, Counts One through Three, Five, and Seven, with all such terms of supervised release to run concurrently.

Thank you, Ms. Wiles.

Ms. Taylor, does the government move to dismiss all prior indictments at this time?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  The Court will dismiss all of the previous indictments, that is, the original indictment, the superseding indictment, and the second and third superseding indictments on the motion of the government.

Mr. Ervin and Mr. Hoover will be remanded to the custody of the marshal to await designation.

The Court will recommend designation for Mr. Ervin to the facility closest to Jacksonville, Florida.  And the Court will recommendation -- will recommend designation for Mr. Hoover to the facility closest to Coloma, Washington.

DEFENDANT HOOVER:  Wisconsin.

THE COURT:  Sorry.  My apologies.  Coloma, Wisconsin. I had "W" in my brain.

DEFENDANT HOOVER:  Sorry, I didn't want to go to Washington.

THE COURT:  No.  Thank you, sir.  That was my error.

(Audio distortion.)

THE COURT:  The microphone really likes you, Mr. Hoover.

DEFENDANT HOOVER:  They all do.

THE COURT:  Coloma, Wisconsin.

The Court will recommend that both of these individuals be permitted to participate in any mental health treatment at the facility of designation as well as any vocational programming available at the facility of designation.

Mr. King, are there any additional recommendations you would ask me to consider for Mr. Ervin?

MR. KING:  No, Your Honor.

THE COURT:  Mr. Larosiere, anything else you would ask me to consider for Mr. Hoover?

MR. LAROSIERE:  No, Your Honor.

THE COURT:  All right.  Gentlemen, you both have the right to appeal the judgment of conviction as well as the Court's sentence.  And if you wish to pursue an appeal, you have to file a Notice of Appeal within 14 days.  The government also has the right to appeal.

You are entitled to be represented by an attorney in

any appeal that's taken, and if you can't afford one, the Court will appoint one to represent you at no cost to you.

And if you wish to pursue an appeal and you can't afford the filing fee, that's fine, you just submit the notice and the Court will accept it without prepayment.

Mr. Ervin, do you understand what I've just explained?

DEFENDANT ERVIN:  Yes, ma'am.  I'm very knowledgeable about this.

THE COURT:  Okay.

Mr. Hoover, do you understand what I just explained?

DEFENDANT HOOVER:  To a point.  After we recess, can you have it so I can talk to my lawyers for a little bit before we get out of here?

THE COURT:  Yes.

Can they meet with them downstairs before they --

U.S. MARSHAL:  Yes.

THE COURT:  Okay.  Yes.

MR. LAROSIERE:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Ervin, do you have any questions for me at this time, sir?

DEFENDANT ERVIN:  No, ma'am, not at all.  I want to really tell you thank you for doing the best you could.  But I --

MR. KING:  Stop.

DEFENDANT ERVIN:  Thank you.

THE COURT:  All right.

Mr. Hoover, any questions, sir?

DEFENDANT HOOVER:  No, thank you.

THE COURT:  Mr. King --

MR. KING:  Yes, Your Honor.

THE COURT:  -- any objections to the sentence or the manner in which it was imposed?

MR. KING:  Other than the previous objections that the Court's already ruled on, no, Your Honor.

THE COURT:  And I understand the substantive objections.

Let me just clarify.  Do you have any objection to the procedure -- any procedural objections to the sentence?

MR. KING:  No, Your Honor.  I apologize.  I phrased that poorly.

THE COURT:  Mr. Larosiere, any objections?

MR. LAROSIERE:  In addition to -- one in addition to those previously raised is that it is the position of Hoover that the character of the items were not accurately considered in the sentence itself.

THE COURT:  Okay.  Well, I think that actually goes to the judgment, but regardless, that objection is noted.

DEFENDANT ERVIN:  Your Honor, we would join that too, just so you know.  I plan on appealing it.

THE COURT:  I fully expect that.

DEFENDANT ERVIN:  I don't want to get in the way of anything for that.  That's --

THE COURT:  No, that objection is preserved.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  That has very clearly been the position of the parties throughout this case.  And I suspect that everybody's going to appeal and that nobody is really satisfied with what I've done today.  But I can promise every one of you that I've tried to do what I think is right in this case.

Ms. -- I don't -- I guess it was -- I don't know who's handling -- as to Mr. Ervin, any objection -- any objection to the Court's sentence?

MS. TAYLOR:  Your Honor, as to both defendants, the government objects to the substantive reasonableness of the sentences.

THE COURT:  That objection is noted.  Ms. Taylor, does the government have any procedural objections to the manner in which sentence was imposed?

MS. TAYLOR:  No, Your Honor.

THE COURT:  All right.  I think that concludes this -- oh, wait.

(Probation officer confers with the judge.)

THE COURT:  I need to correct my sentence as to Mr. Ervin because the statutory maximum on Count Nine is

60 months.  So it's 60 months -- I couldn't read my own writing, clearly -- 60 months as to Counts One and Count Nine for Mr. Ervin because the structuring count is a statutory max of five years and 68 months for Counts Two through Eight and Ten through Twelve.

Ms. Taylor, any disagreement with that correction?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Mr. King, not agreeing with the sentence, but any disagreement with my correcting that mistake on my part?

MR. KING:  No, Your Honor.

DEFENDANT ERVIN:  Your Honor, has something changed or it's still the same amount of time?

THE COURT:  It's the same amount of time.

DEFENDANT ERVIN:  Okay.  I just wanted to make sure.

THE COURT:  Your total sentence is 68 months.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  And you've already served the majority of that, is the good news for you.

DEFENDANT ERVIN:  Yes, ma'am.

THE COURT:  And your total sentence, Mr. Hoover, is 60 months.  And the way it works in the federal prison -- in the federal system is that as long as you behave while you're incarcerated, which I fully expect that both of you will, you'll serve 85 percent of that and then you'll be able to go

home to your families and start your term of supervised release.

And I probably won't see either one of you again, so I wish you both good luck.

And I thank you all for being here.

We're in recess.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 12:44 p.m.)

-    -    -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )

     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

     DATED this 14th day of September, 2023.

                         /s/ Katharine M. Healey
                         Katharine M. Healey, RMR, CRR, FPR-C
                         Official Court Reporter