## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**UNITED STATES OF AMERICA,**
     **Appellees,**          **Case: 23-13062-D**
**v.**                   **DC:  3:21-cr-22-MMH-MCR-1**

**KRISTOPHER JUSTINBOYER ERVIN,**
     **Appellant.**

---

## MOTION TO FILE APPENDIX OUT OF TIME

Pursuant to the notation of the clerk's office entered on February 29, 2024, Appellant, KRISTOPHER JUSTINBOYER ERVIN, by and through the undersigned counsel, moves to file Appellant's Appendix out of time.

WHEREFORE, the undersigned counsel asks this Court to permit the second filing of Appellant's Appendix out of time, requests that the Court accept the three-part Appendix, and requests that this Court award Mr. Ervin any and all further relief to which he is entitled.

Submitted on this 29th day of February 2024.

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL 32207
(888) 608-8814
vlinnen@live.com
Attorney for Appellant

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellant, KRISTOPHER JUSTINBOYER ERVIN, by and through the counsel, hereby files this Certificate of Interested Persons:

1) BARKSDALE, Patricia D. – U.S. Magistrate Judge
2) CALL, Lisa – Assistant Public Defender
3) CORRIGAN, Timothy J. – U.S. District Judge
4) ERVIN, Kristopher Justinboyer – Defendant / Appellant
5) HARRINGTON, Jennifer Michelle – Assistant U.S. Attorney
6) HOOVER, Matthew Raymond – Co-Defendant
7) HOWARD, Marcia Morales – U.S. District Judge
8) KING, Alex – Trial Defense Counsel
9) KLINDT, James R. – U.S. Magistrate Judge
10) LINNEN, Valarie – Appellate Counsel for Mr. Thomas
11) MESROBIAN, David B. – Assistant U.S. Attorney
12) MONROE, Daniel Scott – Former Defense Counsel
13) RICHARDSON, Monte C. – U.S. Magistrate Judge
14) SIEKKINAN, Sean – Assistant U.S. Attorney
15) TAYLOR, Lisa Cofer – Assistant U.S. Attorney
16) TRAN, Mia – Assistant U.S. Attorney

No publicly traded company or corporation has an interest in the outcome of this appeal.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 29th day of February 2024:

Sean Siekkinen, AUSA, [Sean.Siekkinen@usdoj.gov](mailto:Sean.Siekkinen@usdoj.gov)


## **CERTIFICATE OF TYPEFACE COMPLIANCE**

Pursuant to Rule 32(g), this motion complies with the type-volume limitation of Fed.R.App.P. 27(d) because this motion contains 83 words, excluding the parts exempted by Fed.R.App.P. 32(f).


**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291

THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

**APPENDIX I**

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

1

# TABLE OF APPENDICES

## Appendix I

Docket ................................................................................................... D

Motion to Dismiss ................................................................................ 30

Transcripts – Hearing on Motion to Dismiss ........................................ 48

Indictment Superseding - Fourth ......................................................... 204

USA Statement of the Case .................................................................. 226

Mr. Ervin's Statement of the Case ...................................................... 230

Gov't Exhibit 33 – 3-in-1 Auto Key Card ......................................... 259-33

Motion for Judgment of Acquittal....................................................... 273

Motion for Judgment of Acquittal – Mr. Hoover ............................... 274

Order Denying Motions for Judgment of Acquittal ............................ 310

Sentencing Memorandum .................................................................... 319

Judgment .............................................................................................. 324

Statement of Reasons .......................................................................... 325

## Appendix II

Direct Testimony of Agent Hooker...................................................... 277

Direct Testimony of Agent Hooker, Andrea Useche, Amy Sarkese.... 278

Direct Testimony of Richard Roberts .................................................. 282

Direct Testimony of Agent Toy ........................................................... 283

**Appendix III**

Transcript – Sentencing I ........................................................329

Transcript – Sentencing II .......................................................330

**SEALED**

Presentence Investigation Report FINAL ............................................311

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 22ND day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for

Firearms Policy Coalition & FPC Action Foundation

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888-608-8814
vlinnen@live.com
Attorney for Appellant

3

# U.S. District Court
# Middle District of Florida (Jacksonville)
# CRIMINAL DOCKET FOR CASE #: 3:21-cr-00022-MMH-MCR-1

Case title: USA v. Ervin

Magistrate judge case number: 3:21-mj-01127-PDB

Date Filed: 03/11/2021

Date Terminated: 09/14/2023

---

Assigned to: Judge Marcia Morales
Howard
Referred to: Magistrate Judge Monte C.
Richardson

Appeals court case numbers: 22-12005-E
USCA, 23-13062 USCA

## Defendant (1)

**Kristopher Justinboyer Ervin**
*Custody*
*TERMINATED: 09/14/2023*

represented by **Alex King**
First Coast Criminal Defense
1805 Copeland St.
Jacksonville, FL 32204
904-355-7777
Fax: 904-720-2886
Email: Alex@MonroeKingLaw.com
*TERMINATED: 11/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Lisa Call**
Federal Public Defender's Office
Suite 1240
200 W Forsyth St
Jacksonville, FL 32202
904/232-3039
Fax: 904/232-1937
Email: Lisa_Call@fd.org
*TERMINATED: 06/04/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

**Daniel Scott Monroe**
Scott Monroe Law, P.A.

200 E. Forsyth St.
Jacksonville, FL 32202
904/891-7362
Fax: 904-353-5801
Email: scott@monroekinglaw.com
*TERMINATED: 11/29/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Valarie Linnen**
Valarie Linnen, ESQ.
841 Prudential Drive
12th Floor
Jacksonville, FL 32207
888-608-8814
Email: vlinnen@live.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2ssss-8ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (9ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE |

UNLAWFUL TO RECEIVE A FIREARM
NOT REGISTERED
(10ssss-12ssss)

(3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00

Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (1) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (1s-7s) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1ss) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1sss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2ss-7ss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2sss-8sss) | Dismissed on Government's Motion |
| TRANSP./DELIVER/RECEIVE IN INTERSTATE COMMERCE- UNREGISTERED (8s) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (8ss-14ss) | Dismissed on Government's Motion |

UNLAWFUL TO RECEIVE A FIREARM
NOT REGISTERED                                    Dismissed on Government's Motion
(9s-14s)

STRUCTURING TRANSACTIONS TO
EVADE REPORTING REQUIREMENTS                      Dismissed on Government's Motion
(9sss-15sss)

UNLAWFUL TO RECEIVE A FIREARM
NOT REGISTERED                                    Dismissed on Government's Motion
(15ss-17ss)

UNLAWFUL TO RECEIVE A FIREARM
NOT REGISTERED                                    Dismissed on Government's Motion
(16sss-18sss)

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                    **Disposition**

26:5861D.F UNLAWFUL TO RECEIVE
A FIREARM NOT REGISTERED

---

**Movant**

**John Crump**                        represented by  **Eric J. Friday**
                                                      Kingry & Friday, Esq.
                                                      1919 Atlantic Blvd.
                                                      Jacksonville, FL 32207
                                                      (904) 722-3333
                                                      Email: efriday@kingryfriday.com
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **James D Phillips , Jr**
                                                      Katz & Phillips, PA
                                                      509 W Colonial Dr
                                                      Orlando, FL 32804
                                                      321/332-6864
                                                      Fax: 407/657-1526
                                                      Email: jphillips@kplegalteam.com
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **Robert J Olson**
                                                      William J. Olson, P.C.
                                                      370 Maple Ave W
                                                      Suite 4
                                                      Vienna, VA 22180
                                                      703-356-5070

Fax: 703-356-5085
Email: rob@wjopc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ronald J. Shook , II**
The Law Offices of Ronald J. Shook
121 E. Main Ave.
Gastonia, NC 28052
(704) 671-2390
Fax: (704) 671-4431
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stephen D Stamboulieh**
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440
Email: stephen@sdslaw.us
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**

**USA**                              represented by    **David B. Mesrobian**
US Attorney's Office - FLM
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904/301-6300
Fax: 904/301-6310
Email: david.mesrobian@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Laura Cofer Taylor**
US Attorney's Office - FLM*
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904-301-6249
Email: Laura.C.Taylor@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Michele Harrington**
United States Attorney's Office
400 W. Washington Street, Suite 3100
Orlando, FL 32801
407-648-7651
Fax: 407-648-7643
Email: Jennifer.harrington2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mai Tran**
United States Attorney's Office
Suite 700
300 N. Hogan Street
Jacksonville, FL 32202
904-301-6300
Fax: 904-301-6310
Email: mai.tran2@usdoj.gov
*TERMINATED: 11/16/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2021 | 1 | COMPLAINT as to Kristopher Justinboyer Ervin (filed in open court). (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) |
| 03/03/2021 | | ARREST of Kristopher Justinboyer Ervin on 3/3/2021 (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) |
| 03/03/2021 | 3 | MINUTE entry for in person proceedings held before Magistrate Judge Patricia D. Barksdale: initial appearance held on 3/3/2021. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 4 | ORAL MOTION for detention by USA. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 5 | JOINT MOTION to continue the detention hearing. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 6 | **ORDER OF TEMPORARY DETENTION granting 5 the joint oral motion to continue the detention hearing and scheduling the detention hearing for 3/5/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge Patricia D. Barksdale on 3/3/2021. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021)** |
| 03/03/2021 | 7 | NOTICE OF HEARING: The preliminary hearing is scheduled for 3/17/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/05/2021 | 8 | MINUTE entry for the in person status-of-counsel and detention hearings held on |

| | | 3/5/2021 before Magistrate Judge Patricia D. Barksdale: The defendant moved for appointment of counsel and to continue the detention hearing. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
|---|---|---|
| 03/05/2021 | 9 | ORAL MOTION to appoint counsel by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 10 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 11 | **ORDER granting 9 the defendant's oral motion to appoint counsel and appointing the Federal Defender's Office to represent him in this case. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 12 | **ORDER OF TEMPORARY DETENTION granting 10 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/9/2021 at 02:30 PM in Jacksonville Courtroom 5D before Magistrate Judge James R. Klindt. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/08/2021 | 13 | **STANDING ORDER as to Kristopher Justinboyer Ervin: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (KEM)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/09/2021 | 14 | MINUTE entry for the in person detention hearing held on 3/9/2021 before Magistrate Judge James R. Klindt: The defendant moved to continue the detention hearing. Judge Klindt granted the motion and scheduled the detention hearing for 3/15/21 at 2:00 p.m. before Magistrate Judge Patricia Barksdale. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/09/2021 | 15 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/09/2021 | 16 | **ORDER OF TEMPORARY DETENTION granting 15 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/15/2021 at 02:00 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge James R. Klindt on 3/9/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/11/2021 | 17 | INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1. (BGR) (Entered: 03/12/2021) |
| 03/15/2021 | 20 | **ORDER allowing a credentialed member of the press to bring a laptop computer or tablet to the 3/15/2021 detention hearing. Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL)** (Entered: 03/15/2021) |
| 03/15/2021 | 21 | MINUTE entry for the in person arraignment and detention hearings held on 3/15/2021 before Magistrate Judge Patricia D. Barksdale: The defendant entered a plea of not guilty to count one of the indictment and was remanded to the custody of |

the Attorney General to await trial. (Digital) (ASL) (Entered: 03/16/2021)

USCA11 Case: 23-13062    Document: 39    Date Filed: 02/29/2024    Page: 14 of 563

| 03/15/2021 | 22 | NOTICE of acceptance of general discovery by Kristopher Justinboyer Ervin (filed in open court). (ASL) (Entered: 03/16/2021) |
| 03/25/2021 | 23 | **ORDER OF DETENTION PENDING TRIAL as to Kristopher Justinboyer Ervin Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL)** (Entered: 03/25/2021) |
| 03/25/2021 | 24 | **SCHEDULING ORDER as to Kristopher Justinboyer Ervin: A status conference is scheduled for 4/19/2021 at 03:00 PM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; the jury trial is scheduled for 5/3/2021 at 09:00 AM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; discovery, dispositive, and suppression motions are due by 4/12/2021. Signed by Deputy Clerk on 3/25/2021. (ASL)** (Entered: 03/25/2021) |
| 04/01/2021 | 25 | SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1s-7s, 8s, 9s-14s. (RH) Modified on 3/16/2023 to edit text (AET). (Entered: 04/01/2021) |
| 04/02/2021 | 27 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Superseding Indictment set for 4/7/2021 at 10:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 04/02/2021) |
| 04/05/2021 | 28 | MOTION to Withdraw as Attorney *and Memorandum of Law* by Lisa Call and Office of the Federal Public Defender. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 04/05/2021) |
| 04/07/2021 | 29 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: denying 28 Motion to Withdraw as Attorney as to Kristopher Justinboyer Ervin (1); MOTION hearing as to Kristopher Justinboyer Ervin held on 4/7/2021 re 28 MOTION to Withdraw as Attorney *and Memorandum of Law* by Lisa Call and Office of the Federal Public Defender. filed by Kristopher Justinboyer Ervin ; ARRAIGNMENT as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 8s, 9s-14s held on 4/7/2021 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 04/07/2021) |
| 04/12/2021 | 30 | MOTION to Dismiss *Superseding Indictment* by Kristopher Justinboyer Ervin. (Call, Lisa) (Entered: 04/12/2021) |
| 04/13/2021 | 31 | MOTION to Extend Time to Respond to Defendant's Motion to Dismiss by USA as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 04/13/2021) |
| 04/15/2021 | 32 | NOTICE: The status conference set for April 19, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 04/15/2021) |
| 04/16/2021 | 33 | **ENDORSED ORDER granting 31 Government's Motion to Extend Time to Respond to Defendant's Motion to Dismiss. Counsel for the United States shall have up to and including May 7, 2021, to respond to Defendant's Motion to Dismiss. Signed by Judge Marcia Morales Howard on 4/16/2021. (JW)** (Entered: 04/16/2021) |
| 04/19/2021 | 34 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 4/19/2021. Status conference set for May 24, 2021, at 3:00 p.m. Jury trial set for trial term commencing |

| | | on June 7, 2021, at 9:00 a.m. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 04/21/2021) |
|---|---|---|
| 04/22/2021 | | Set/Reset Deadlines/Hearings as to Kristopher Justinboyer Ervin: Jury Trial set for trial term commencing on 6/7/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Status Conference set for 5/24/2021 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard (RH) (Entered: 04/22/2021) |
| 05/07/2021 | 35 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 30 MOTION to Dismiss *Superseding Indictment* (Taylor, Laura) (Entered: 05/07/2021) |
| 05/19/2021 | 36 | NOTICE: The status conference set for May 24, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 05/19/2021) |
| 05/24/2021 | 37 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 5/24/2021. Status conference set for July 19, 2021, at 3:00 p.m. Jury trial set for trial term commencing on August 2, 2021, at 9:00 a.m. A hearing on the Motion to Dismiss will be set for July 7, 2021, at 2:00 p.m. or July 8, 2021, at 2:00 p.m., depending upon the availability of the case agent. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 05/25/2021) |
| 05/25/2021 | 38 | NOTICE OF HEARING ON 30 Motion to Dismiss Superseding Indictment. Motion Hearing set for 7/8/2021 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 05/25/2021) |
| 06/02/2021 | 39 | MOTION to Withdraw as Attorney by Lisa Call. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 06/02/2021) |
| 06/04/2021 | 40 | NOTICE OF ATTORNEY APPEARANCE: Alex King appearing for Kristopher Justinboyer Ervin (King, Alex) (Entered: 06/04/2021) |
| 06/04/2021 | 41 | **ORDER granting 39 Motion to Withdraw as Attorney Lisa Call withdrawn from case. as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/4/2021. (SHS)** (Entered: 06/04/2021) |
| 07/01/2021 | 42 | MOTION for Miscellaneous Relief, specifically to Adopt Motion to Dismiss (Doc. 30) re 30 MOTION to Dismiss *Superseding Indictment* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 07/01/2021) |
| 07/02/2021 | 43 | **ENDORSED ORDER granting 42 Motion to Adopt Motion to Dismiss Superseding Indictment. Signed by Judge Marcia Morales Howard on 7/2/2021. (JW)** (Entered: 07/02/2021) |
| 07/08/2021 | 44 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 07/08/2021) |
| 07/08/2021 | 45 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin held on 7/8/2021; denying 30 Motion to Dismiss as to Kristopher Justinboyer Ervin (1); granting 44 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference set for 9/20/2021 at 09:30 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. |

| | | |
|---|---|---|
| | | Defendant is required to be present. Jury Trial set for trial term commencing on 10/4/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Plea deadline is September 27, 2021. The United States is directed to file a Bill of Particulars no later than July 16, 2021. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 07/08/2021) |
| 07/16/2021 | 46 | BILL of particulars as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 07/16/2021) |
| 08/10/2021 | 47 | NOTICE OF ATTORNEY APPEARANCE Mai Tran appearing for USA. (Tran, Mai) (Entered: 08/10/2021) |
| 08/12/2021 | 48 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin held on July 8, 2021 before Judge Marcia Morales Howard. Court Reporter/Transcriber Cindy Packevicz Jarriel, Telephone number 904-301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/2/2021 Redacted Transcript Deadline set for 9/13/2021 Release of Transcript Restriction set for 11/10/2021. (CLP) (Entered: 08/12/2021) |
| 08/12/2021 | 49 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Cindy Packevicz Jarriel; cindyrprfcrr@gmail.com (CLP) (Entered: 08/12/2021) |
| 09/20/2021 | 50 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 09/20/2021) |
| 09/20/2021 | 51 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 9/20/2021; granting 50 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Special Status Conference set for 11/22/2021 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendant is required to be present. Jury Trial set for trial term commencing on 12/6/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 09/20/2021) |
| 11/22/2021 | 52 | ORAL MOTION to Continue Trial by USA and Kristopher Justinboyer Ervin. (JW) (Entered: 11/23/2021) |
| 11/22/2021 | 53 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 11/22/2021; granting 52 Joint Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference and Motion Hearing set for 3/21/2022 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 4/4/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. The Court requests that the parties hold the weeks of April 11, April 18, and April 25, 2022 for trial. See Minutes for additional deadlines. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 11/23/2021) |

| | | |
|---|---|---|
| 12/15/2021 | 54 | **ORDER SCHEDULING TRIAL. Jury selection shall commence on April 11, 2022, at 9:00 a.m. Opening statements and evidence will begin on April 12, 2022, at 9:00 a.m. Jury instructions, proposed Voir Dire, proposed brief statement of the case, and proposed verdict form due no later than February 18, 2022. Signed by Judge Marcia Morales Howard on 12/15/2021. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW)** (Entered: 12/15/2021) |
| 12/21/2021 | 55 | NOTICE *of Disclosure of Summary of Expert Testimony in Compliance with Fed. R. Crim. P. 16(a)(1)(G)* by USA as to Kristopher Justinboyer Ervin (Taylor, Laura) (Entered: 12/21/2021) |
| 01/13/2022 | 56 | NOTICE *of Disclosure of Summary Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C)* by Kristopher Justinboyer Ervin (Attachments: # 1 Exhibit A) (King, Alex) (Entered: 01/13/2022) |
| 01/26/2022 | 57 | SECOND SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ss, 2ss-7ss, 8ss-14ss, 15ss-17ss, Matthew Raymond Hoover (2) count(s) 1, 2-7. (BGR) (Additional attachment(s) added on 1/27/2022: # 1 Restricted Unredacted Indictment) (BGR). Modified on 3/16/2023 to edit text (AET). (Entered: 01/27/2022) |
| 01/28/2022 | 64 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Initial Appearance on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) |
| 01/28/2022 | 65 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) |
| 02/02/2022 | 69 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Second Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 2ss-7ss, 8s, 8ss-14ss, 9s-14s, 15ss-17ss held on 2/2/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 02/02/2022) |
| 02/07/2022 | 71 | Consent MOTION for Miscellaneous Relief, specifically to Hold in Abeyance Previously Ordered Motion Deadline by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 02/07/2022) |
| 02/08/2022 | 72 | **ORDER granting 71 Defendant Ervin's Consent Motion to Hold in Abeyance Previously Ordered Motion Deadline. The parties are relieved of the obligation of complying with the motions deadline of February 11, 2022, and the responses deadline of February 25, 2022. The hearing scheduled for March 21, 2022, at 1:30 p.m. remains set. Signed by Judge Marcia Morales Howard on 2/8/2022. (JW)** (Entered: 02/08/2022) |
| 03/04/2022 | 78 | JOINT MOTION to Hold Motions Deadlines in Abeyance and For a Status Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Modified on 3/4/2022, to edit text) (BGR). (Entered: 03/04/2022) |
| 03/07/2022 | 79 | **ORDER granting 78 Joint Motion to Hold Motions Deadlines in Abeyance and** |

| | | |
|---|---|---|
| | | **for a Status Hearing. The parties are relieved of the obligation of complying with the motions deadlines. The hearing scheduled for March 21, 2022, at 1:30 p.m. is cancelled. A status conference as to all parties is set for March 23, 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 3/7/2022. (JW) (Entered: 03/07/2022)** |
| 03/21/2022 | 81 | **ENDORSED ORDER granting 80 Motion to Appear Telephonically. Zachary Zermay and Matthew Larosiere are permitted to appear telephonically at the status conference set for March 23, 2022, at 1:30 p.m. The Courtroom Deputy Clerk will separately provide counsel with the call-in information for the hearing. Signed by Judge Marcia Morales Howard on 3/21/2022. (JW) (Entered: 03/21/2022)** |
| 03/23/2022 | 82 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin and Matthew Raymond Hoover. (JW) (Entered: 03/23/2022) |
| 03/23/2022 | 83 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 3/23/2022; granting 82 Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1) and Matthew Raymond Hoover (2). Special Status Conference set for 6/27/2022 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 7/5/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Shannon Bishop (JW) (Entered: 03/23/2022) |
| 03/25/2022 | 84 | NOTICE OF ATTORNEY APPEARANCE David B. Mesrobian appearing for USA. (Mesrobian, David) (Entered: 03/25/2022) |
| 03/25/2022 | 85 | TRANSCRIPT of Digitally recorded arraignment and detention hearing as to Kristopher Justinboyer Ervin held on 3/15/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/15/2022 Redacted Transcript Deadline set for 4/25/2022 Release of Transcript Restriction set for 6/23/2022. (KMH) (Entered: 03/25/2022) |
| 03/25/2022 | 86 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Katharine Healey (904) 301-6843 (KMH) (Entered: 03/25/2022) |
| 04/27/2022 | 87 | MOTION for Reconsideration re 23 Order of Detention by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 04/27/2022) |
| 05/02/2022 | 88 | **ENDORSED ORDER directing to respond to 87 MOTION for Reconsideration re 23 Order of Detention as to Kristopher Justinboyer Ervin. Responses due by 5/13/2022 Signed by Magistrate Judge Monte C. Richardson on 5/2/2022. (SHS)** Modified on 5/2/2022 (SHS). (Entered: 05/02/2022) |

| | | |
|---|---|---|
| 05/12/2022 | 89 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 87 MOTION for Reconsideration re 23 Order of Detention (Taylor, Laura) (Entered: 05/12/2022) |
| 05/24/2022 | 90 | MOTION for Leave to File Document *to Government's Response in Opposition to Defendant's Motion to Reconsider Detention of Defendant* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/24/2022) |
| 06/01/2022 | 91 | **ORDER denying 87 Motion for Reconsideration re 23 Order of Detention filed by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/1/2022. (SHS)** (Entered: 06/01/2022) |
| 06/02/2022 | 92 | **ENDORSED ORDER denying 90 Motion for Leave to File as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/2/2022. (SHS)** (Entered: 06/02/2022) |
| 06/15/2022 | 93 | NOTICE of APPEAL by Kristopher Justinboyer Ervin re 91 Order on Motion for Reconsideration / Clarification. Filing fee paid $ 505, receipt number AFLMDC-19679305. (King, Alex) . (Entered: 06/15/2022) |
| 06/16/2022 | 94 | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of notice of appeal, order/judgment being appealed, and motion, if applicable to USCA re 93 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # 1 Notice of appeal, # 2 Order)(SJW) (Entered: 06/16/2022) |
| 06/21/2022 | 95 | MOTION to Dismiss by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Request for Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | 96 | MOTION to Change Venue / Transfer Case by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Zachary Z. Zermay, # 3 Request for an Evidentiary Hearing and Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | 97 | MOTION to Sever Trial by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Oral Argument) (Zermay, Zachary) (Modified on 6/22/2022, to edit text) (BGR). (Entered: 06/21/2022) |
| 06/21/2022 | | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 22-12005-E for 93 Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 06/22/2022) |
| 06/27/2022 | 98 | NOTICE of filing supplemental authority by Kristopher Justinboyer Ervin, Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 06/27/2022) |
| 06/27/2022 | 99 | JOINT ORAL MOTION to Continue Trial as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (CKS) (Entered: 06/28/2022) |
| 06/27/2022 | 100 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 6/27/2022; granting 99 Joint Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover(2). Jury Trial set for the November 2022 trial term, scheduled to commence on 11/1/2022 at 09:00 AM in Jacksonville |

| | | Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Katharine Healey (CKS) (Entered: 06/29/2022) |
|---|---|---|
| 07/01/2022 | 101 | SUPPLEMENT re 95 MOTION TO DISMISS & to Declare Unconstitutional the National Firearms Act of 1934 by Matthew Raymond Hoover (Zermay, Zachary) Modified on 7/7/2022 to edit text (AET). (Entered: 07/01/2022) |
| 07/12/2022 | 102 | NOTICE *Regarding Expert Disclosure* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 07/12/2022) |
| 08/01/2022 | 106 | NOTICE *REGARDING JURY SELECTION* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/01/2022) |
| 08/02/2022 | 107 | NOTICE *REGARDING EXPERT DISCLOSURE* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/02/2022) |
| 08/03/2022 | 108 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover: Motion Hearing/Status Conference set for 10/11/2022 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendants are required to be present. (JW) (Entered: 08/03/2022) |
| 08/04/2022 | 110 | MOTION for Leave to File Reply to 103 Response in Opposition by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 111 | MOTION for Leave to File Reply to 105 Response in Opposition to Sever Defendant by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 112 | MOTION for Leave to File Reply to 104 Response in Opposition to Change Venue/Transfer Case by Matthew Raymond Hoover. Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 113 | NOTICE of filing supplemental authority by Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) Modified on 8/5/2022 to edit text and to confirm with counsel page 3 is intentionally blank (AET). (Entered: 08/04/2022) |
| 08/05/2022 | 114 | NOTICE OF RESCHEDULING HEARING: The Motion Hearing/Status Conference previously scheduled for October 11, 2022, at 10:00 a.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing date and time: Motion Hearing/Status Conference set for 10/12/2022 at 2:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/05/2022) |
| 08/23/2022 | 118 | MOTION in Limine by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 56 Notice of Disclosure of Summary Expert Testimony in compliance with Fed. R. Crim. P. 16(b)(1)(C) and 107 Notice Regarding Expert Disclosure. (Attachments: # 1 Exhibit A, video on disk filed separately, # 2 Exhibit B, # 3 Exhibit C)(AET) (Entered: 08/24/2022) |
| 08/30/2022 | 119 | JOINT UNOPPOSED MOTION to Continue trial by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 9/2/2022 to edit text (AET). (Entered: 08/30/2022) |

| | | |
|---|---|---|
| 08/31/2022 | 120 | THIRD SUPERSEDING INDICTMENT returned in open court as to Kristopher Raymond Ervin (1) count(s) 1sss, 2sss-8sss, 9sss-15sss, 16sss-18sss, Matthew Raymond Hoover (2) count(s) 1s, 2s-8s. (Attachments: # 1 Restricted Unredacted Indictment) (AET) Modified on 3/16/2023 to edit text (AET). (Entered: 08/31/2022) |
| 08/31/2022 | 123 | NOTICE OF HEARING ON 119 Joint and Unopposed Motion to Continue Trial. Motion Hearing set for September 6, 2022, at 3:00 p.m. before Judge Marcia Morales Howard. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. (JW) (Entered: 08/31/2022) |
| 09/01/2022 | 124 | USCA Order Dismissed as to Kristopher Justinboyer Ervin re 93 Notice of Appeal USCA number: 22-12005. Issued as mandate on 8/30/22. (SJW) (Entered: 09/01/2022) |
| 09/07/2022 | 126 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 9/7/2022; granting 119 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2); denying, without prejudice, as moot 95 Defendant Hoover's Motion to Dismiss. Hoover's renewed motion to dismiss due September 22, 2022. Response due October 7, 2022. Motion hearing set for December 9, 2022, at 10:00 a.m. Jury Trial set for 1/9/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Katharine Healey (JW) (Entered: 09/12/2022) |
| 09/13/2022 | 127 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 120 Third Superseding Indictment,. Arraignment set for 9/22/2022 at 11:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 09/13/2022) |
| 09/14/2022 | 128 | UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 9/15/2022 (AET). (Entered: 09/14/2022) |
| 09/16/2022 | 130 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover as to Matthew Raymond Hoover (Zermay, Zachary) Modified on 9/19/2022 to edit text (AET). (Entered: 09/16/2022) |
| 09/22/2022 | 131 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Third Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15ss, 15ss-17ss, 16sss-18sss, and Matthew Raymond Hoover (2) Count 1, 1s, 2-7, 2s-8s, held on 9/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 09/22/2022) |
| 09/22/2022 | 132 | MOTION to Dismiss by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice)(Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/22/2022 | 133 | Second MOTION to Dismiss for First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934 by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/28/2022 | 134 | MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin. (King, |

| 09/28/2022 | 135 | **ENDORSED ORDER granting 134 Defendant Ervin's Motion for Extension of Time of Filing Deadline. Defendant Ervin shall have up to and including October 7, 2022, to file his Daubert motion. The United States shall have up to and including October 24, 2022, to file a response. Signed by Judge Marcia Morales Howard on 9/28/2022. (JW) (Entered: 09/28/2022)** |
|---|---|---|
| 09/28/2022 | 136 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 09/28/2022) |
| 10/07/2022 | 139 | Unopposed MOTION to Continue Daubert Motion Deadline by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 10/07/2022) |
| 10/11/2022 | 140 | **ENDORSED ORDER granting 139 Unopposed Motion to Continue Daubert Deadline. Defendants shall have up to and including October 21, 2022, to file Daubert motions. The United States shall have up to and including November 7, 2022, to file responses. Signed by Judge Marcia Morales Howard on 10/11/2022. (JW) (Entered: 10/11/2022)** |
| 10/21/2022 | 142 | MOTION in Limine *to Exclude Trial Testimony of Government's Purported Expert Witnesses* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 10/21/2022) |
| 10/28/2022 | 145 | **ORDER granting 143 Motion to Continue Motion in Limine Deadline. Motions in limine due 11/10/2022. Responses due 11/28/2022. Signed by Judge Marcia Morales Howard on 10/28/2022. (JCM) (Entered: 10/28/2022)** |
| 10/31/2022 | 146 | TRANSCRIPT of Digitally Recorded Initial Appearance and Arraignment Proceedings as to Matthew Raymond Hoover held on 02/22/2022 before Judge Monte C. Richardson. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/21/2022 Redacted Transcript Deadline set for 12/1/2022 Release of Transcript Restriction set for 1/30/2023. (KMH) (Entered: 10/31/2022) |
| 10/31/2022 | 147 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT (02/22/2022 Digitally Recorded Initial Appearance and Arraignment of Matthew Raymond Hoover). The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Matthew Raymond Hoover. Court Reporter: Katharine Healey (KMH) (Entered: 10/31/2022) |
| 11/07/2022 | 149 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 142 MOTION in Limine *to Exclude Trial Testimony of Government's Purported Expert Witnesses* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Taylor, Laura) (Entered: 11/07/2022) |

| | | |
|---|---|---|
| 11/10/2022 | 152 | Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) (Entered: 11/10/2022) |
| 11/10/2022 | 153 | RESPONSE to Motion re 152 Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 11/10/2022) |
| 11/10/2022 | 154 | **ENDORSED ORDER granting 152 Joint Emergency Motion for Extension of Time of Filing Deadline and Request for Status Conference. Motions in limine must be filed on or before November 18, 2022. A telephonic status conference is set for Thursday, November 17, 2022, at 1:00 p.m. The Courtroom Deputy Clerk will separately send participants the call-in information for the hearing. Absent a continuance of the trial, no further extensions of time will be granted. Signed by Judge Marcia Morales Howard on 11/10/2022. (JW) (Entered: 11/10/2022)** |
| 11/17/2022 | 158 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 11/21/2022) |
| 11/17/2022 | 159 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 11/17/2022; terminating 136 Government's Motion in Limine; granting 158 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). A Daubert hearing will be held on February 7, 2023. The time will be set at a later date. Jury Trial set for 4/10/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for deadlines. The Court emphasized its expectation that the deadlines would be met and that the trial date is firm and will not change. Order Scheduling Trial to enter. Court Reporter: Katharine Healey (JW) (Entered: 11/21/2022) |
| 12/09/2022 | 165 | NOTICE *Amended of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) Testimony* by Kristopher Justinboyer Ervin (King, Alex) (Entered: 12/09/2022) |
| 01/03/2023 | 169 | **ORDER SCHEDULING TRIAL. As previously directed, Daubert motions are due January 4, 2023, and responses are due January 18, 2023. A Daubert hearing is set for February 7, 2023, at 10:00 a.m. in Courtroom 10B. Motions in limine shall be filed by February 24, 2023, and responses are due March 10, 2023. Jury selection and trial shall commence on April 10, 2023, at 9:00 a.m. Trial documents due no later than April 3, 2023. Signed by Judge Marcia Morales Howard on 1/3/2023. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW) (Entered: 01/03/2023)** |
| 01/04/2023 | | Set/Reset Deadlines as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Exhibit List due by 4/10/2023. (AET) (Entered: 01/04/2023) |
| 01/04/2023 | 170 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 01/04/2023) |
| 01/18/2023 | 171 | RESPONSE to Motion re 170 MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 01/18/2023) |

| | | |
|---|---|---|
| 02/01/2023 | 177 | **ORDER directing the parties to file a written proffer of each proposed expert witness's opinions by 12:00 noon on Monday, February 6, 2023. Signed by Judge Marcia Morales Howard on 2/1/2023. (JCM)** (Entered: 02/01/2023) |
| 02/03/2023 | 178 | NOTICE *of Withdrawal of Notice of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) and Request for Relief from this Court's February 1, 2023 Order* by Kristopher Justinboyer Ervin re 165 Notice (Other), 177 Order. (King, Alex) (Entered: 02/03/2023) |
| 02/06/2023 | 180 | NOTICE *of Filing Written Proffer of Testimony by Ernest Lintner in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |
| 02/06/2023 | 181 | NOTICE *of Filing Written Proffer of Opinions of Cody Toy in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |
| 02/06/2023 | 182 | NOTICE *of Written Proffer of Testimony by Daniel O'Kelly in Anticipation of Trial* by Kristopher Justinboyer Ervin re 177 Order. (King, Alex) (Entered: 02/06/2023) |
| 02/07/2023 | 184 | NOTICE *of Filing* by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A)(King, Alex) (Entered: 02/07/2023) |
| 02/07/2023 | 185 | NOTICE *of supplemental authority* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Attachment 1)(Mesrobian, David) (Entered: 02/07/2023) |
| 02/07/2023 | 186 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 2/7/2023; terminating as moot 118 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witness; denying without prejudice 142 Defendants' Motion In Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses; denying as moot, in part, and withdrawing, in part, 170 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses. Proposed limiting instruction(s) due February 24, 2023. Court Reporter: Katharine Healey (JW) (Entered: 02/08/2023) |
| 02/23/2023 | 187 | JOINT EMERGENCY MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/24/2023 to edit text (AET). (Entered: 02/23/2023) |
| 02/23/2023 | 188 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 187 Emergency MOTION to Extend Time to Filing Deadline -- *Joint* (Mesrobian, David) (Entered: 02/23/2023) |
| 02/24/2023 | 189 | MOTION in Limine for Jury Instruction by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 190 | MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 191 | **ORDER granting in part and denying in part 187 Emergency Joint Motion for** |

| | | Extension of Filing Deadline. Motions in Limine due no later than 1:00 p.m. on Monday, February 27, 2023. See Order for details. Signed by Judge Marcia Morales Howard on 2/24/2023. (JCM) (Entered: 02/24/2023) |
|---|---|---|
| 02/27/2023 | 193 | FIRST MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 194 | SECOND MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 195 | THIRD MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 196 | FOURTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibit A)(King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 197 | FIFTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 198 | FIRST MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 199 | SECOND MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 200 | THIRD MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 201 | FOURTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | 202 | FIFTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 03/06/2023 | 204 | FOURTH SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Matthew Raymond Hoover (2) count(s) 1ss, 2ss-8ss. (Attachments: # 1 Restricted Unredacted Indictment) (BD) Modified on 3/16/2023 to edit text (AET). (Entered: 03/06/2023) |
| 03/08/2023 | 205 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 204 Fourth Superseding Indictment. Arraignment set for 3/14/2023 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 03/08/2023) |
| 03/10/2023 | 207 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 198 FIRST MOTION in Limine , 193 FIRST MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 208 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 199 SECOND MOTION in Limine , 194 SECOND MOTION in |

| 03/10/2023 | 209 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 200 THIRD MOTION in Limine , 195 THIRD MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| --- | --- | --- |
| 03/10/2023 | 210 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 201 FOURTH MOTION in Limine , 196 FOURTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 211 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 197 FIFTH MOTION in Limine , 202 FIFTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 212 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 203 SIXTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 213 | RESPONSE 189 MOTION in Limine for Jury Instruction by Kristopher Justinboyer Ervin (King, Alex) (Entered: 03/10/2023) |
| 03/10/2023 | 214 | RESPONSE 190 MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by Kristopher Justinboyer Ervin (King, Alex) (Entered: 03/10/2023) |
| 03/14/2023 | 217 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Fourth Superseding Indictment as to Kristopher Justinboyer Ervin (1) Counts 1ssss through 12ssss and Matthew Raymond Hoover (2) Counts 1ss through 8ss, held on 3/14/2023 Defendant(s) pled not guilty. (Digital) (SHS) Modified on 3/16/2023 to edit text (AET). (Entered: 03/15/2023) |
| 03/20/2023 | 218 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 02/07/2023 before Judge Marcia Morales Howard. Court Reporter: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.

NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/10/2023. Redacted Transcript Deadline set for 4/20/2023. Release of Transcript Restriction set for 6/20/2023. (KMH) (Entered: 03/20/2023) |
| 03/22/2023 | 219 | TRIAL BRIEF by USA as to Kristopher Justinboyer Ervin (Tran, Mai) (Entered: 03/22/2023) |
| 03/30/2023 | 222 | Unopposed MOTION to Allow Electronic Equipment, specifically cell phone and laptop by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 03/30/2023) |
| 03/30/2023 | 223 | **ORDER granting in part and denying in part 189 Government's Motion in Limine for Jury Instruction; granting in part and denying in part 190 Government's Motion in Limine to Exclude Argument and Evidence; denying** |

| | | |
|---|---|---|
| | | **193** Defendants' First Motion in Limine; denying **194** Defendants' Second Motion in Limine; denying **195** Defendants' Third Motion in Limine; denying **196** Defendants' Fourth Motion in Limine; denying **197** Defendants' Fifth Motion in Limine; denying **198** Defendants' First Motion in Limine; denying **199** Defendants' Second Motion in Limine; denying **200** Defendants' Third Motion in Limine; denying **201** Defendants' Fourth Motion in Limine; denying **202** Defendants' Fifth Motion in Limine; denying 203 Defendant Hoover's Sixth Motion in Limine. Signed by Judge Marcia Morales Howard on 3/30/2023. (JCM) (Entered: 03/30/2023) |
| 03/31/2023 | 224 | **ORDER granting 222 Motion to Allow Electronic Equipment as to Kristopher Justinboyer Ervin (1). Signed by Judge Marcia Morales Howard on 3/31/2023. (JW)** (Entered: 03/31/2023) |
| 04/03/2023 | 225 | Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 226 | STATEMENT of the case for trial by USA. (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 227 | PROPOSED verdict form filed by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 228 | PROPOSED Voir Dire by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 229 | PROPOSED Voir Dire by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 230 | STATEMENT of the case for trial (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 231 | PROPOSED verdict form filed by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 232 | Proposed Jury Instructions by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/08/2023 | 240 | WITNESS LIST by Kristopher Justinboyer Ervin. (King, Alex) Modified on 4/10/2023 to edit text (AET). (Entered: 04/08/2023) |
| 04/10/2023 | 241 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) Modified on 4/11/2023 See Docket Entry 245 for corrected Exhibit List (AET). (Entered: 04/10/2023) |
| 04/10/2023 | 242 | WITNESS LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 243 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 244 | EXHIBIT LIST by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/10/2023) |
| 04/10/2023 | 245 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/10/2023) |
| 04/10/2023 | 246 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY SELECTION AND TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/10/2023. Court Reporter: Katharine Healey (JW) |

| 04/11/2023 | 247 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/11/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/12/2023) |
| --- | --- | --- |
| 04/12/2023 | 248 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/13/2023) |
| 04/13/2023 | 249 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/2023. Court Reporter: Shelli Kozachenko (JW) (Entered: 04/14/2023) |
| 04/14/2023 | 251 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/17/2023) |
| 04/17/2023 | 250 | REQUEST for Judicial Notice by Kristopher Justinboyer Ervin (Attachments: # 1 Exhibit A)(King, Alex) Modified on 4/18/2023 to edit text (AET). (Entered: 04/17/2023) |
| 04/17/2023 | 252 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/18/2023) |
| 04/18/2023 | 253 | SUPPLEMENT re 225 Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/18/2023) |
| 04/19/2023 | 254 | COURT'S FINAL JURY INSTRUCTIONS as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/19/2023) |
| 04/19/2023 | 256 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/21/2023) |
| 04/20/2023 | 255 | **PARTIAL SEQUESTRATION ORDER. Signed by Judge Marcia Morales Howard on 4/20/2023. (JW)** (Entered: 04/20/2023) |
| 04/20/2023 | 257 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 258 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023. Court Reporter: Katharine Healey (Attachments: # 1 Government's Exhibit 1 Regarding Remand, # 2 Government's Exhibit 2 Regarding Remand) (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 259 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Additional attachment(s) added on 4/26/2023: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 2, # 4 Exhibit 2A, # 5 Exhibit 3, # 6 Exhibit 3A, # 7 Exhibit 4, # 8 Exhibit 4A, # 9 Exhibit 5, # 10 Exhibit 5A, # 11 Exhibit 6, # 12 Exhibit 6A, # 13 Exhibit 7, # 14 Exhibit 7A, # 15 Exhibit 8, # 16 Exhibit 8A, # 17 Exhibit 9, # 18 Exhibit 9A, # 19 Exhibit 10, # 20 Exhibit 10A, # 21 Exhibit 11, # 22 Exhibit 11A, # 23 Exhibit 12, # 24 Exhibit 12A, # 25 Exhibit 14, # 26 |

Exhibit 14A, # 27 Exhibit 15, # 28 Exhibit 15A , # 29 Exhibit 16, # 30 Exhibit 16A, # 31 Exhibit 17.1, # 32 Exhibit 17.1A, # 33 Exhibit 17.2, # 34 Exhibit 17.2A, # 35 Exhibit 17.3, # 36 Exhibit 17.3A, # 37 Exhibit 18, # 38 Exhibit 19, # 39 Exhibit 20, # 40 Exhibit 20A, # 41 Exhibit 21, # 42 Exhibit 22, # 43 Exhibit 23, # 44 Exhibit 24, # 45 Exhibit 25, # 46 Exhibit 25A, # 47 Exhibit 25B, # 48 Exhibit 26) (JW). (Additional attachment(s) added on 4/26/2023: # 49 Exhibit 27A, # 50 Exhibit 27B, # 51 Exhibit 28, # 52 Exhibit 29, # 53 Exhibit 30, # 54 Exhibit 30A, # 55 Exhibit 30B, # 56 Exhibit 30C, # 57 Exhibit 30D, # 58 Exhibit 30E, # 59 Exhibit 30F, # 60 Exhibit 30G, # 61 Exhibit 30H, # 62 Exhibit 30I, # 63 Exhibit 30J, # 64 Exhibit 30K, # 65 Exhibit 30L, # 66 Exhibit 30M, # 67 Exhibit 30N, # 68 Exhibit 30O, # 69 Exhibit 30P, # 70 Exhibit 30Q, # 71 Exhibit 30R, # 72 Exhibit 30S, # 73 Exhibit 30T, # 74 Exhibit 30U, # 75 Exhibit 30V, # 76 Exhibit 31, # 77 Exhibit 32) (JW). (Additional attachment(s) added on 4/26/2023: # 78 Exhibit 33, # 79 Exhibit 33A, # 80 Exhibit 33B, # 81 Exhibit 33C, # 82 Exhibit 33D, # 83 Exhibit 33E, # 84 Exhibit 33F, # 85 Exhibit 33G, # 86 Exhibit 33H, # 87 Exhibit 33I, # 88 Exhibit 33J, # 89 Exhibit 33K, # 90 Exhibit 33L, # 91 Exhibit 33M, # 92 Exhibit 33N, # 93 Exhibit 33O, # 94 Exhibit 33P, # 95 Exhibit 33Q, # 96 Exhibit 33R, # 97 Exhibit 33S, # 98 Exhibit 33T, # 99 Exhibit 33U, # 100 Exhibit 33V, # 101 Exhibit 33W, # 102 Exhibit 33X, # 103 Exhibit 33Y, # 104 Exhibit 33Z, # 105 Exhibit 34, # 106 Exhibit 35, # 107 Exhibit 36, # 108 Exhibit 37, # 109 Exhibit 38, # 110 Exhibit 39, # 111 Exhibit 40, # 112 Exhibit 41, # 113 Exhibit 42, # 114 Exhibit 43, # 115 Exhibit 44, # 116 Exhibit 45, # 117 Exhibit 46, # 118 Exhibit 47, # 119 Exhibit 48, # 120 Exhibit 49) (JW). (Additional attachment(s) added on 4/26/2023: # 121 Exhibit 49A, # 122 Exhibit 49B, # 123 Exhibit 49C, # 124 Exhibit 49D, # 125 Exhibit 49E, # 126 Exhibit 49F, # 127 Exhibit 49G, # 128 Exhibit 49H, # 129 Exhibit 49I, # 130 Exhibit 49J, # 131 Exhibit 49K, # 132 Exhibit 49L, # 133 Exhibit 49M, # 134 Exhibit 49N, # 135 Exhibit 49O, # 136 Exhibit 49P, # 137 Exhibit 49Q, # 138 Exhibit 50A, # 139 Exhibit 50B, # 140 Exhibit 50C, # 141 Exhibit 50D, # 142 Exhibit 50E, # 143 Exhibit 50F, # 144 Exhibit 50G, # 145 Exhibit 50H, # 146 Exhibit 50I, # 147 Exhibit 50J, # 148 Exhibit 50K, # 149 Exhibit 50L, # 150 Exhibit 50M, # 151 Exhibit 50N, # 152 Exhibit 50O, # 153 Exhibit 50P, # 154 Exhibit 51, # 155 Exhibit 52, # 156 Exhibit 53, # 157 Exhibit 54, # 158 Exhibit 55, # 159 Exhibit 56) (JW). (Additional attachment(s) added on 4/26/2023: # 160 Exhibit 57A, # 161 Exhibit 57B, # 162 Exhibit 57C, # 163 Exhibit 58A, # 164 Exhibit 58B, # 165 Exhibit 58C, # 166 Exhibit 58D, # 167 Exhibit 59, # 168 Exhibit 60, # 169 Exhibit 61, # 170 Exhibit 63, # 171 Exhibit 64, # 172 Exhibit 65, # 173 Exhibit 66, # 174 Exhibit 67, # 175 Exhibit 67A, # 176 Exhibit 67B, # 177 Exhibit 67C, # 178 Exhibit 67D, # 179 Exhibit 67E, # 180 Exhibit 67F, # 181 Exhibit 67G, # 182 Exhibit 67H, # 183 Exhibit 67I, # 184 Exhibit 67J, # 185 Exhibit 67K, # 186 Exhibit 67L, # 187 Exhibit 67M, # 188 Exhibit 67N, # 189 Exhibit 67O, # 190 Exhibit 67P, # 191 Exhibit 67Q, # 192 Exhibit 67R, # 193 Exhibit 67S, # 194 Exhibit 67T, # 195 Exhibit 67U, # 196 Exhibit 67V, # 197 Exhibit 67W, # 198 Exhibit 67X, # 199 Exhibit 67Y, # 200 Exhibit 67Z) (JW). (Additional attachment(s) added on 4/26/2023: # 201 Exhibit 67AA, # 202 Exhibit 67BB, # 203 Exhibit 67CC, # 204 Exhibit 67DD, # 205 Exhibit 67EE, # 206 Exhibit 67FF, # 207 Exhibit 67GG, # 208 Exhibit 67HH, # 209 Exhibit 67II, # 210 Exhibit 67JJ, # 211 Exhibit 67KK, # 212 Exhibit 67LL, # 213 Exhibit 67MM, # 214 Exhibit 67NN, # 215 Exhibit 67OO, # 216 Exhibit 67PP, # 217 Exhibit 67QQ, # 218 Exhibit 67RR, # 219 Exhibit 67SS, # 220 Exhibit 67TT, # 221 Exhibit 67UU, # 222 Exhibit 67VV, # 223 Exhibit 67WW, # 224 Exhibit 67XX, # 225 Exhibit 67YY, # 226 Exhibit 67ZZ, # 227 Exhibit 67AAA, # 228 Exhibit 67BBB, # 229 Exhibit 67CCC, # 230 Exhibit 68, # 231 Exhibit 69, # 232 Exhibit 70, # 233 Exhibit 71, # 234 Exhibit

72, # 235 Exhibit 73, # 236 Exhibit 74, # 237 Exhibit 75, # 238 Exhibit 76, # 239 Exhibit 77, # 240 Exhibit 78, # 241 Exhibit 79, # 242 Exhibit 80, # 243 Exhibit 81, # 244 Exhibit 82, # 245 Exhibit 83, # 246 Exhibit 84, # 247 Exhibit 85, # 248 Exhibit 86, # 249 Exhibit 87, # 250 Exhibit 88, # 251 Exhibit 89) (JW). (Additional attachment(s) added on 4/26/2023: # 252 Exhibit 89A, # 253 Exhibit 89B, # 254 Exhibit 89C, # 255 Exhibit 89D, # 256 Exhibit 89E, # 257 Exhibit 89F, # 258 Exhibit 89G, # 259 Exhibit 89H, # 260 Exhibit 89I, # 261 Exhibit 90, # 262 Exhibit 90A, # 263 Exhibit 90B, # 264 Exhibit 90C, # 265 Exhibit 90D, # 266 Exhibit 90E, # 267 Exhibit 90F, # 268 Exhibit 90G, # 269 Exhibit 90H, # 270 Exhibit 91) (JW). (Additional attachment(s) added on 4/26/2023: # 271 Exhibit 91A, # 272 Exhibit 91B, # 273 Exhibit 91C, # 274 Exhibit 91D, # 275 Exhibit 91E, # 276 Exhibit 91F, # 277 Exhibit 91G, # 278 Exhibit 91H, # 279 Exhibit 91I, # 280 Exhibit 91J, # 281 Exhibit 91K, # 282 Exhibit 91L, # 283 Exhibit 91M, # 284 Exhibit 91N, # 285 Exhibit 92, # 286 Exhibit 92A, # 287 Exhibit 92B, # 288 Exhibit 92C, # 289 Exhibit 92D, # 290 Exhibit 92E, # 291 Exhibit 92F, # 292 Exhibit 92G, # 293 Exhibit 92H, # 294 Exhibit 92I, # 295 Exhibit 92J, # 296 Exhibit 92K, # 297 Exhibit 93, # 298 Exhibit 94, # 299 Exhibit 95, # 300 Exhibit 95A, # 302 Exhibit 95B, # 303 Exhibit 95D, # 304 Exhibit 95E) (JW). (Additional attachment(s) added on 4/26/2023: # 305 Exhibit 96, # 306 Exhibit 97, # 307 Exhibit 97A, # 308 Exhibit 97B, # 309 Exhibit 97C, # 310 Exhibit 97D, # 311 Exhibit 98, # 312 Exhibit 98A, # 313 Exhibit 98B, # 314 Exhibit 98C, # 315 Exhibit 98D, # 316 Exhibit 98E, # 317 Exhibit 99, # 318 Exhibit 99A, # 319 Exhibit 99B, # 320 Exhibit 99C, # 321 Exhibit 99D, # 322 Exhibit 100, # 323 Exhibit 101, # 324 Exhibit 101A) (JW). (Additional attachment(s) added on 4/26/2023: # 325 Exhibit 102, # 326 Exhibit 103, # 327 Exhibit 103A, # 328 Exhibit 104, # 329 Exhibit 105, # 330 Exhibit 105A, # 331 Exhibit 108, # 332 Exhibit 109A, # 333 Exhibit 109B, # 334 Exhibit 109C, # 335 Exhibit 109D, # 336 Exhibit 110) (JW). (Additional attachment(s) added on 4/27/2023: # 337 Exhibit 111, # 338 Exhibit 112, # 339 Exhibit 114, # 340 Exhibit 115, # 341 Exhibit 116A, # 342 Exhibit 116B, # 343 Exhibit 116C, # 344 Exhibit 116D, # 345 Exhibit 117, # 346 Exhibit 118, # 347 Exhibit 119, # 348 Exhibit 120, # 349 Exhibit 120A, # 350 Exhibit 120B, # 351 Exhibit 120C, # 352 Exhibit 120D, # 353 Exhibit 123, # 354 Exhibit 124, # 355 Exhibit 124.1, # 356 Exhibit 124.1A, # 357 Exhibit 124.2, # 358 Exhibit 124.3, # 359 Exhibit 124.3A, # 360 Exhibit 125, # 361 Exhibit 125A, # 362 Exhibit 126) (JW). (Entered: 04/24/2023)

| 04/21/2023 | 260 | EXHIBIT LIST by Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Defendant Ervin's Exhibit 8, # 2 Defendant Ervin's Exhibit 26)(JW) (Entered: 04/24/2023) |
| 04/21/2023 | 261 | Court's Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 262 | Court's Revised Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 263 | JURY VERDICT as to Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Restricted Unredacted Jury Verdict)(JW) (Entered: 04/24/2023) |
| 04/21/2023 | 266 | Court Exhibits as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/24/2023) |
| 04/24/2023 | 267 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Sentencing set for July 31, 2023, at 9:30 a.m. in Jacksonville Courtroom 10 B |

| | | before Judge Marcia Morales Howard. (JW) (Entered: 04/24/2023) |
|---|---|---|
| 04/27/2023 | | Remark: The flash drives containing the closing argument PowerPoint presentations by all counsel are stored with the exhibits in the trial exhibit storage room in the Clerk's Office. (JW) (Entered: 04/27/2023) |
| 05/03/2023 | 270 | Unopposed MOTION to Continue Deadline to File Motion for Judgment of Acquittal by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/03/2023) |
| 05/04/2023 | 271 | **ORDER granting 270 Unopposed Motion to Continue Deadline to File Motion for Judgment of Acquittal. Motion due May 19, 2023. Signed by Judge Marcia Morales Howard on 5/4/2023. (JW)** (Entered: 05/04/2023) |
| 05/05/2023 | 272 | TRANSCRIPT of Excerpt of Jury Trial Proceedings (remand arguments as to Hoover) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/26/2023. Redacted Transcript Deadline set for 6/5/2023. Release of Transcript Restriction set for 8/3/2023. (KMH) (Entered: 05/05/2023) |
| 05/19/2023 | 273 | POST-VERDICT MOTION for Judgment of Acquittal by Kristopher Justinboyer Ervin. (King, Alex) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) |
| 05/19/2023 | 274 | MOTION for Judgment of Acquittal by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) |
| 05/25/2023 | 275 | MOTION to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 05/25/2023) |
| 05/26/2023 | 276 | **ENDORSED ORDER granting 275 Motion to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal. The United States shall have up to and including June 16, 2023, to file its responses to Defendants' Motions for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 5/26/2023. (JW)** (Entered: 05/26/2023) |
| 06/06/2023 | 277 | TRANSCRIPT of Jury Selection and Trial (Volume 1 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/10/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is |

| | | |
|---|---|---|
| | | filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/06/2023) |
| 06/06/2023 | 278 | TRANSCRIPT of Jury Trial (Volume 2 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 279 | TRANSCRIPT of Jury Trial (Volume 3 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 280 | TRANSCRIPT of Jury Trial (Volume 4 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/23 before Judge Howard. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (SMK) (Entered: 06/06/2023) |

| | | |
|---|---|---|
| 06/07/2023 | | TRANSCRIPT of Jury Trial (Volume 5 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 282 | TRANSCRIPT of Jury Trial (Volume 6 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 283 | TRANSCRIPT of Jury Trial (Volume 7 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/23 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: 9043016843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 284 | TRANSCRIPT of Jury Trial (Volume 8 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the |

| | | |
|---|---|---|
| | | court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 285 | TRANSCRIPT of Jury Trial (Volume 9 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. <br><br> NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/12/2023 | 286 | MOTION to Continue Sentencing Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 06/12/2023) |
| 06/13/2023 | 287 | MOTION for Forfeiture of a Preliminary Order for Involved-In Property and Substitute Assets by USA as to Kristopher Justinboyer Ervin. (Tran, Mai) (Entered: 06/13/2023) |
| 06/13/2023 | 288 | **ENDORSED ORDER as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover regarding 286 United States' Motion to Continue Sentencing Hearing. Defendants shall have up to and including June 20, 2023, to file responses to this motion. Signed by Judge Marcia Morales Howard on 6/13/2023. (JW) (Entered: 06/13/2023)** |
| 06/16/2023 | 289 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 274 MOTION for Judgment of Acquittal (Taylor, Laura) (Entered: 06/16/2023) |
| 06/16/2023 | 290 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 273 MOTION for Judgment of Acquittal (Taylor, Laura) (Modified on 6/20/2023, to edit text) (BGR). (Entered: 06/16/2023) |
| 06/20/2023 | 291 | RESPONSE 286 MOTION to Continue Sentencing Hearing by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (King, Alex) (Entered: 06/20/2023) |
| 06/21/2023 | 293 | **ORDER granting 286 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). Sentencing hearing continued to September 6, 2023, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 6/21/2023. (JW) (Entered: 06/21/2023)** |

| 08/01/2023 | 295 | RULE 32(e)(2) INITIAL PRESENTENCE INVESTIGATION REPORT as to Kristopher Justinboyer Ervin. E-copies made available to selected parties.(TH) (Entered: 08/01/2023) |
|---|---|---|
| 08/07/2023 | 296 | MOTION for Miscellaneous Relief, specifically Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 08/07/2023) |
| 08/08/2023 | 297 | **ORDER taking under advisement 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. An IN PERSON hearing on the motion is set for Friday, August 11, 2023, at 2:00 p.m. in Courtroom 10B. Defendants and all counsel of record are required to be present. Signed by Judge Marcia Morales Howard on 8/8/2023. (JW)** (Entered: 08/08/2023) |
| 08/09/2023 | 298 | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Motion Hearing previously scheduled for August 11, 2023, at 2:00 p.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing time: Motion Hearing set for August 11, 2023, at 1:30 p.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/09/2023) |
| 08/09/2023 | 299 | JOHN CRUMP'S EMERGENCY MOTION to Intervene for the Limited Purpose of Responding to the United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (MDC) (Entered: 08/09/2023) |
| 08/09/2023 | 300 | First MOTION for Stephen D. Stramboulieh to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130611 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 301 | First MOTION for Robert J. Olson to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130715 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 302 | SUPPLEMENT to 296 Motion for Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibits not scanned, filed separately)(MDC) (Entered: 08/09/2023) |
| 08/10/2023 | 303 | **ENDORSED ORDER granting 300 Motion for Special Admission by Stephen D. Stramboulieh, Esq. If Mr. Stramboulieh has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)** Modified on 8/10/2023 (SHS). (Entered: 08/10/2023) |
| 08/10/2023 | 304 | **ENDORSED ORDER granting 301 Motion for Special Admission by Robert J. Olson, Esq. If Mr. Olson has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)** (Entered: 08/10/2023) |
| 08/10/2023 | 305 | **ENDORSED ORDER taking under advisement 299 John Crump's Emergency Motion to Intervene. The Court intends to resolve the Motion at the August 11,** |

| | | |
|---|---|---|
| | | **2023 Hearing. Signed by Judge Marcia Morales Howard on 8/10/2023. (MHM)** (Entered: 08/10/2023) |
| 08/10/2023 | 306 | MOTION for Leave to File Amicus Curiae Brief and Brief Amicus Curiae of Eric Blandford, et al. in Support of 299 Emergency Motion by Eric J. Friday as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (BGR) (Entered: 08/11/2023) |
| 08/11/2023 | 307 | **ORDER permitting members of the press to enter the courthouse with laptop computers, tablets, and/or cell phones to attend the hearing set for today, August 11, 2023, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 8/11/2023. (JW)** (Entered: 08/11/2023) |
| 08/11/2023 | 308 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 8/11/2023; denying as moot 299 John Crump's Emergency Motion to Intervene; denying as moot 306 Motion for Leave to File Amicus Curiae Brief; withdrawing, in part, and denying, in part, 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. Court Reporter: Katharine Healey (JW) (Entered: 08/14/2023) |
| 08/14/2023 | 309 | TRANSCRIPT of Motion as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 08/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/14/2023. Release of Transcript Restriction set for 11/13/2023. (KMH) (Entered: 08/14/2023) |
| 08/23/2023 | 310 | **ORDER denying 273 Ervin's Motion for Judgment of Acquittal; denying 274 Hoover's Motion for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 8/23/2023. (JCM)** (Entered: 08/23/2023) |
| 08/30/2023 | 311 | RULE 32(g) FINAL PRESENTENCE INVESTIGATION REPORT as to Kristopher Justinboyer Ervin. E-copies made available to selected parties.(MW) (Entered: 08/30/2023) |
| 08/30/2023 | 313 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 08/30/2023) |
| 08/31/2023 | 316 | **PRELIMINARY ORDER OF FORFEITURE (granting 287 Motion for Forfeiture of Property as to Kristopher Justinboyer Ervin (1)). Signed by Judge Marcia Morales Howard on 8/31/2023. (JW)** (Entered: 08/31/2023) |
| 09/01/2023 | 319 | SENTENCING MEMORANDUM by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A, # 2 Exhibit B)(King, Alex) (Entered: 09/01/2023) |

| | | |
|---|---|---|
| 09/02/2023 | [320](#) | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 09/02/2023) |
| 09/06/2023 | [321](#) | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/6/2023. The Court heard argument from counsel regarding the objections to the Presentence Investigation Report, resolved the objections, and announced the guidelines on the record. The parties made their presentations, and the Court heard from Defendants and their mitigation witnesses. The Court will pronounce sentence on September 7, 2023, at 11:30 a.m. Court Reporter: Katharine Healey (JW) (Entered: 09/08/2023) |
| 09/07/2023 | [323](#) | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/7/2023 for Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00. Court Reporter: Katharine Healey (JW) (Entered: 09/14/2023) |
| 09/14/2023 | [324](#) | **JUDGMENT as to Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 Signed by Judge Marcia Morales Howard on 9/14/2023. (JW) (Entered: 09/14/2023)** |
| 09/14/2023 | [325](#) | STATEMENT OF REASONS as to Kristopher Justinboyer Ervin. E-copies made available to selected parties. (JW) (Entered: 09/14/2023) |
| 09/14/2023 | [329](#) | TRANSCRIPT of Sentencing (Volume 1 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/06/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. <br><br> NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
| 09/14/2023 | [330](#) | TRANSCRIPT of Sentencing (Volume 2 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/07/2023 before Judge Marcia Morales Howard. |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
| 09/19/2023 | 331 | NOTICE OF APPEAL by Kristopher Justinboyer Ervin re 310 Order on Motion for Judgment of Acquittal, 324 Judgment. Filing fee paid $ 505, receipt number AFLMDC-21268505. (King, Alex) (Entered: 09/19/2023) |
| 09/20/2023 | 332 | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 331 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (CTR) (Entered: 09/20/2023) |
| 09/21/2023 | | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 23-13062 for 331 Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 09/22/2023) |
| 10/02/2023 | 335 | PROOF OF PUBLICATION as to Kristopher Justinboyer Ervin newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from September 2, 2023 through October 1, 2023. (Tran, Mai) (Entered: 10/02/2023) |
| 10/20/2023 | 337 | Judgment Returned Executed as to Kristopher Justinboyer Ervin on 9/29/2023. Institution: FCI Jesup. (BD) (Entered: 10/20/2023) |
| 10/25/2023 | 338 | MOTION to Withdraw as Attorney by Alex King., MOTION to Appoint Counsel , MOTION to Extend Time to appeal filings deadline by Kristopher Justinboyer Ervin. (King, Alex) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 10/25/2023) |
| 11/06/2023 | **339** | **ORDER Setting Hearing on Motion to Withdraw as Counsel and denying 338 Motion to Extend Time as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 11/6/2023. (SHS)** (Entered: 11/06/2023) |
| 11/06/2023 | 340 | Writ of Habeas Corpus ad Testificandum Issued for Kristopher Justinboyer Ervin for an in camera ex parte hearing to be held on 11/29/2023 at 11:00 a.m. as to Kristopher Justinboyer Ervin. Signed by Judge Magistrate Judge Monte C. Richardson. (SHS) (Entered: 11/06/2023) |
| 11/16/2023 | 341 | Notice of substitution of AUSA. Jennifer Michele Harrington substituting for Mai Tran. (Harrington, Jennifer) (Entered: 11/16/2023) |
| 11/29/2023 | 342 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. |

| | | |
|---|---|---|
| | | Richardson; granting [338](#) Motion to Withdraw as Attorney Alex King and Daniel Scott Monroe withdrawn from case. as to Kristopher Justinboyer Ervin (1); EX PARTE Hearing as to Kristopher Justinboyer Ervin held on 11/29/2023 re [338](#) MOTION to Withdraw as Attorney by Alex King. MOTION to Appoint Counsel MOTION to Extend Time to appeal filings deadline filed by Kristopher Justinboyer Ervin. (Digital) (SHS) (Entered: 11/29/2023) |
| 11/29/2023 | [343](#) | ***CJA 23 Financial Affidavit (FILED IN OPEN COURT) by Kristopher Justinboyer Ervin. (SHS) (Entered: 11/29/2023) |
| 12/01/2023 | [344](#) | **ORDER of Appointment of CJA Counsel as to Kristopher Justinboyer Ervin: Appointment of Attorney Valarie Linnen for Kristopher Justinboyer Ervin. Signed by Magistrate Judge Monte C. Richardson on 11/29/2023. (SHS)** (Entered: 12/01/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/05/2023 09:15:40 | | | |
| **PACER Login:** | vlinnen0063291 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cr-00022-MMH-MCR |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                     **Case number: 3:21-CR-22(S1)-MMH-MCR**

**KRISTOPHER JUSTINBOYER ERVIN**

---

## MOTION TO DISMISS SUPERSEDING INDICTMENT AND MEMORANDUM OF LAW

The Defendant, **KRISTOPHER JUSTINBOYER ERVIN**, by and through the undersigned attorney, moves to dismiss the Superseding Indictment (Doc 25). Particularly, the Defendant, Mr. Ervin, moves to dismiss Counts 1 through 7 in part, and Counts 8 through 14 in full, for (1) Failure to State an Offense; (2) Unconstitutional Vagueness; (3) First Amendment Violations; and (4) Exceeding Congress's Power under the Tax and Spend Clause.

As relevant to this Motion, the charges in the Superseding Indictment (Doc. 25) all relate (at least in part) to sales of artwork—laser-etched images on small, flat pieces of metal called "autokeycards"—which the government has alleged are machine gun conversion devices.

## I.    Factual Background

The relevant underlying factual allegations are relatively simple, and they can be found in the Complaint (Doc. 1). An ATF agent obtained at least one

autokeycard. Evidently something of a machinist, the agent used a dremel to drill the autokeycard metal into multiple pieces of different sizes and shapes, which took about thirty-seven minutes. Doc. 1 at 19. The agent then used some of those pieces to fabricate a "lightning link," which the agent "installed" in a semiautomatic rifle. *Id.* Essentially, the agent treated the autokeycard as a raw material and made it into something different, apparently expecting that, with a little gunsmithing, he could convert his rifle into a machine gun. Predictably, however, mutilating the metal card and sticking the mangled pieces of it inside the rifle simply caused the weapon to malfunction. "Tests" of the Frankensteinian rifle revealed that the agent's crude alterations made the weapon fire erratically, and, at times, fire more than once per single trigger pull.  Doc. 1 at 19.

## II.    Argument

First, 26 U.S.C. § 5845's definitions of firearms and machine guns do not reach laser-etched images or raw materials, so by charging Mr. Ervin for laser-etched images on metal, the government has failed to state an offense under §5861 or §5871. And, because the government alleges that Counts I-7 were committed while violating another United States law, those Counts fail to state an offense in part for the same reason. Second, assuming *arguendo* that § 5845's definitions could include a laser-etched image on a piece of metal, the

statutory scheme (1) violates the First Amendment as applied to Mr. Ervin, and (2) is void for vagueness as applied to Mr. Ervin. Finally, even if the statutory scheme is otherwise constitutional, it exceeds Congress's power under the Tax and Spend Clause of the United States Constitution.

## A. Counts 1-7 should be dismissed in part.

Mr. Ervin moves to dismiss Counts 1-7 in part, for the same reasons addressed below with respect to Counts 8-14, insofar as they allege that he engaged in various transactions "while violating another law of the United States." Doc. 25 at 1, 2. There is no sufficient allegation that Mr. Ervin violated "another law of the United States," as discussed below. To the extent that the laser-etched images at issue here could violate the law, those laws would be unconstitutional as applied for the same reasons discussed below.[1]

## B. Failure to State an Offense

The Superseding Indictment fails to state an offense as to Counts 8-14. This issue is properly resolved on a motion to dismiss, because "the infirmity in the prosecution is essentially one of law." *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974). Where, as here, "the indictment tracks the language of the

---

[1] If, alternatively, the government is alleging violation of an additional law not specified in the Superseding Indictment, the Superseding Indictment does not adequately put Mr. Ervin on notice of the charges against him. If this Court declines to partially dismiss Counts 1-7, Mr. Ervin moves for a bill of particulars.

statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). As an initial matter, the Superseding Indictment fails to do this, and Counts 8-14 should be dismissed for that reason alone. But even considering and taking as true the facts laid out in the Complaint, the Superseding Indictment fails as a matter of law. The object described by the government does not constitute a machine gun conversion device under § 5845.

It is clear from the face of the statute that machine gun conversion devices are not laser-etched images on what amounts to raw materials. And, any "ambiguity concerning the ambit of a criminal statute should be resolved in favor of lenity." *Huddleston v. United States*, 415 U.S. 814, 831 (1974). This is because "principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112 (1979). The statute defines "machinegun" (hereinafter "machine gun") as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use

4

in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (2019). The Superseding Indictment indicates that Mr. Ervin possessed "machinegun conversion devices," so the only potentially applicable part appears to be "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun."[2] *See* Doc. 25 at 3.

The Complaint alleged that Mr. Ervin's website was selling "auto sears or similar devices that convert weapons into machineguns."[3] Doc. 1 at 4. Initially, the Complaint implied that Mr. Ervin was selling metal cards with some kind of perforated design, such that an "auto sear" could be "punch[ed] out." Doc. 1 at 4. Later, however, it explained that

---

[2] Bizarrely, the Complaint states that, according to the FTCB report, the lightning link is "a 'combination of parts designed and intended, for use in converting a weapon to a machinegun' and is therefore a regulated firearm under the National Firearms Act." Doc. 1 at 18. However, the autokeycards are individual objects, not sets or combinations of objects. *Cf. United States v. Was*, 684 F. Supp. 350, 353 (D. Conn. 1988), *aff'd*, 869 F.2d 34 (2d Cir. 1989) (explaining that a finished auto sear fell within the "combination of parts" language of § 5845(b) because it was "physically made up of more than one part").

[3] Notably, the complaint's definition of "auto sear" is, at best, overly simplistic. It treats the terms "auto sear" and "lightning link" as interchangeable.

"lightning link"[4] machine gun-conversion devices were "laser etched" on a metal card. *Id.* at 17. The ATF agent's use of a dremel for thirty-seven minutes to create something new out of the metal card is not the same as using a "part" to convert a weapon into a machine gun. *See id.* at 19.

To the degree that the agent's kludgy weapon can be called a machine gun, making it required the agent to fabricate a part, using the autokeycard as raw material. The statutory scheme does not restrict raw materials or card-sized sheets of metal.

Previously, ATF had issued guidance stating that a shoestring with two loops tied in it was a "machine gun" under the statute. After the guidance was used to impeach expert witnesses, the ATF reversed its position, but still maintained that a shoestring added to a semiautomatic firearm would be a machine gun. *See* Conversion kits, Firearms Law Deskbook § 6:10 (citing Letter from Richard Vasquez,

---

[4] Allegedly, lightning link devices can "slip over the hook in the top of the disconnector in an AR-15 type receiver and be positioned in the receiver over the top of the selector and under the rear intake pin." Doc. 1 at 17. This can purportedly "replicate[ ] the function of an automatic-sear and convert[ ] a semi-automatic AR-15 type firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* at 17-18.

acting Chief, ATF Firearms Technology Branch, June 25, 2007, to Brian A. Blakely, 903050:JPV, 3311/2007-615).

Although the tied shoestring requires no modification whatsoever before being attached to the semiautomatic firearm, it is not a machine gun. And yet, the government claims that a piece of metal that needs to be drilled for thirty-seven minutes by a skilled firearms agent in order to be added to a gun that might then inconsistently shoot multiple times per trigger-pull is a machine gun. *Cf. Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 454 (5th Cir. 2016) (discussing "an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely" that "requires additional milling and other work to turn into a functional lower receiver"). An image on a metal card does not fit within the statutory definition of a "machine gun" any more than a shoestring does.

At least one district court has held that flat pieces of metal are not firearms under federal law—even if they have laser perforations:

> However, the court simply does not believe that a flat piece of metal with laser perforations and holes constitutes a "receiver," i.e., a "firearm." Rather, the flat piece of metal is somewhat akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an airplane until it is properly folded. Until that time, it is a patterned piece of paper. Simply put, this court

> has no evidentiary or legal basis for holding that a flat piece of
> metal with laser perforations and some holes constitutes,
> ultimately, a "firearm." It may become part of a firearm at some
> point, but not until further work has been accomplished to allow it
> to secure the stock, chamber, barrel and other parts. Until that
> time, it is not even a true component of a firearm, only a potential
> component of a firearm.

*United States v. Prince*, No. 09-10008-JTM, 2009 WL 1875709, at *3 (D.

Kan. June 26, 2009), *rev'd on other grounds*, 593 F.3d 1178 (10th Cir.

2010). Autokeycards are, unlike the flats in *Prince*, mere images etched

into metal. There is no legal basis for holding that they are machine

guns.

### C. The statutory scheme is unconstitutionally vague as applied to Mr. Ervin.

To the extent that the statutory definition of machine gun does include Mr.

Ervin's laser-etched image, the statute is unconstitutionally vague under the

Fifth Amendment as applied to Mr. Ervin.   The void-for-vagueness doctrine

requires that a criminal statute define an offense with sufficient clarity that

an ordinary person has fair notice of what conduct is prohibited and so as to

avoid arbitrary and discriminatory enforcement.  *See, e.g., Skilling v. United

States*, 561 U.S. 358, 402-03 (2010).

"The question of fair warning must begin with the language of the

statute itself." *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008).

The statute's restriction of a part designed solely and exclusively for use

in converting a weapon to a machine gun does not put on ordinary person on fair notice that a laser-etched image on a metal card is a machine gun.

There is nothing in the statutory scheme that appears to criminalize images, and whether or not the image appears on a piece of metal does not change the analysis. Many materials could be drilled into shapes that could cause certain firearms to fire more than once with a single pull of a trigger. That does not bring them all within the statute's reach, regardless of whether they could be manipulated or fabricated into a "conversion device."

Plastic is one such material, as in the recent case, *United States v. Watson*, No. 3:20-cr-00042-GMG-RWT (N.D. W. Va. 2020). In *Watson*, the government alleged that the defendant 3d printed coat hangers that could be used as auto sears; he did not merely draw pictures that looked like them. *See id.* A closer analogy to Mr. Ervin's case would be if that defendant had taken an ultra-fine-point permanent marker and drawn a picture that looked like a lightning link on a solid LEGO piece,[5] or on

---

[5] LEGO bricks and pieces are popular toys for children, and they are made out of ABS plastic. *See* "What are Lego bricks made of, and why is treading on them so painful?" Explorations of Everyday Chemical Compounds (April 9, 2018) *available at* https://www.compoundchem.com/2018/04/09/lego/ (last accessed March 30, 2021). ABS plastic is commonly used for 3D printing. *See* "The Free Beginner's Guide," 3D Printing Industry: The Authority on Additive

a PETG plastic[6] food container. Where, as here, the medium is not itself a firearm, no ordinary person would have fair warning that using a particular medium to draw an image would result in criminal machine gun charges.

### D.  The statutory scheme violates the First Amendment as applied to Mr. Ervin.

#### 1.  The autokeycard is protected expression.

To the extent that the statute does indeed criminalize a laser-etched image, it violates the First Amendment as applied. Ultimately, Mr. Ervin is before this Court because of a drawing of what the government says is a lightning link.  Artistic works, like drawings, are protected expression under the First Amendment.

It is clearly the design of the image, rather than the material itself, that the government is targeting. Similarly-sized pieces of metal are abundant on the consumer market, used as credit cards, pocket survival tools, and more. It cannot be that the law criminalizes any piece of metal that could be drilled into something that could be used to make a machine gun. What the government

---

Manufacturing, *available at* https://3dprintingindustry.com/3d-printing-basics-free-beginners-guide/ (last accessed April 8, 2021).

[6] The coat hangers in *Watson* were printed using PETG plastic. *Watson*, Doc. 1-1 at 15-16.

finds blameworthy here is not the metal. It is the drawing. That is the only thing that separates Mr. Ervin's autokeycard from the popular titanium Apple Card. Notably, Mr. Ervin printed the same autokeycard design on t-shirts and hats, which shows that the design itself was a form of expression.

### 2. The restriction on Mr. Ervin's expression is content-based and cannot survive strict scrutiny.

Because Mr. Ervin has been charged based on what his image depicts, it is a content-based restriction on his expression. Heightened judicial scrutiny is applied to specific, content-based restrictions on protected expression. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000). To survive strict scrutiny, the government must demonstrate that the law is "justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).

Criminalizing basic drawings of lightning links serves no compelling government interest. The definition at issue is part of the Internal Revenue Code. While increasing revenue through firearm taxes might be a substantial government interest, it is not compelling. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). There is no option for someone like Mr.

Ervin to pay a tax on the images. If the government is aiming to limit available information on lightning links, the statutory scheme does not accomplish that: blueprints for lightning links are freely available on the internet.[7] Artistic replicas and renderings of both legal and illegal gun parts are common forms of political speech used to show support of Second Amendment rights.[8] Restricting such artwork is not narrowly-tailored to any compelling government interest, and it cannot survive strict scrutiny.

### E. To the extent that the statute reaches Mr. Ervin's conduct, it exceeds Congress's power under the Tax and Spend Clause.

"Congress cannot punish felonies generally." *Cohens v. State of Virginia*, 19 U.S. 264, 428 (1821). Accordingly, every criminal penalty it enacts "must have some relation to the execution of a power of Congress" (*Bond*, 572 U.S. at 854), such as the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States," so long as they are "uniform throughout the United States." U.S. Const., Art. I, § 8, cl. 1.

---

[7] *See, e.g.*, Free Lightning Link Template, *available at* https://www.pinterest.com/pin/347973508706397446/ (last accessed March 31, 2021). The autokeycard image does not even rise to the level of a blueprint—it lacks any scale markings.

[8] *See, e.g.*, AR-15 Keychains, *available at* https://www.etsy.com/market/ar_15_keychain?ref=pagination&page=2 (last accessed March 31, 2021).

In *Nat'l Fed'n of Indep. Bus. v. Sebelius*, the Supreme Court upheld the Affordable Care Act's ("ACA") "penalty" as a "tax" properly within the scope of the Tax and Spend Clause. 567 U.S. 519, 561-75 (2012). *Sebelius* held that the ACA was not punitive because "[n]either the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS." *Id.* at 567-68. Those factors distinguished the ACA from "a mere penalty with the characteristics of regulation and punishment." *Id.* at 573 (citing *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 779 (1994); *Drexel Furniture*, 259 U.S. at 38) (internal quotations omitted).

Individuals who produce items like the autokeycard have no option to pay a tax. If they carve the wrong image into the wrong material, they face prosecution, regardless of their willingness to pay. That is not a tax; it is a mere penalty with the characteristics of regulation and punishment. The US Attorney's Manual acknowledges as much: " because it is impossible to comply with the registration and taxation provisions in the NFA, prosecutors should charge the unlawful possession or transfer of a machine gun made after May 19, 1986 under § 922(o)." *United States Justice Manual* 9-63.516, "Charging Machinegun Offenses Under 18 U.S.C. § 922(o), Instead of Under the National Firearms Act," 1999 WL 33219894, at *1. Accordingly, to the extent that the

statutory scheme criminalizes Mr. Ervin's conduct here, it exceeds Congress's power under the Tax and Spend Clause.

## III.   Prayer for Relief

For the foregoing reasons, Mr. Ervin respectfully requests that this Court (1) dismiss Counts 1-7 in part, to the extent they allege a violation of another United States law; (2) dismiss Counts 1-8 in full; or, in the alternative (3) direct the government to file a bill of particulars detailing any other violations of United States law it intends to rely on and describing the particular objects that it believes constitute "machine gun conversion devices."

Dated:    April 12, 2021.

> JAMES T. SKUTHAN
> ACTING FEDERAL PUBLIC DEFENDER
>
> s/ Lisa Call
> _____
> Lisa Call
> Assistant Federal Defender
> Florida Bar No. 0896144
> 200 West Forsyth Street, Suite 1240
> Jacksonville, FL 32202
> Telephone: (904) 232-3039
> Facsimile: (904) 232-1937
> Lisa_Call@fd.org

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic filing through the United States District Court to Cyrus Beatriz Zomorodian, US Attorney's Office, 300 North Hogan Street, 7th Floor, Jacksonville, FL 32202 on March 19, 2021.

s/ Lisa Call

_____

Lisa Call
Assistant Federal Defender

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 1 of 22 PageID 135
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 55 of 563

1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO:  3:21-cr-22(S1)-MMH-MCR

UNITED STATES OF AMERICA          Jacksonville, Florida

    -vs-                          Date:  July 8, 2021

KRISTOPHER JUSTINBOYER ERVIN,     Time:  2:03 p.m. - 2:39 p.m.

    Defendant.                    Courtroom:  10B

_____

**MOTION HEARING**
BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

COUNSEL FOR GOVERNMENT:

**LAURA TAYLOR, ESQ.**
U.S. Attorney's Office - FLM
300 N. Hogan Street, Suite 700
Jacksonville, FL  32202

COUNSEL FOR DEFENDANT:

**ALEX KING, ESQ.**
**FINLEY WILLIAMS, ESQ.**
Monroe & King, P.A.
200 East Forsyth Street
Jacksonville, FL  32202

OFFICIAL COURT REPORTER:

Cindy Packevicz Jarriel, RPR, FCRR
221 N. Hogan Street, #128
Jacksonville, FL  32202
Telephone:  904.301.6843
e-mail:  cindyrprfcrr@gmail.com
    (Proceedings reported by stenography; transcript
produced by computer.)

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 2 of 22 PageID 136
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 56 of 563

2

```
 1                    P R O C E E D I N G S

 2    July 8, 2021                                    2:03 p.m.

 3                         -   -   -

 4              COURT SECURITY OFFICER:  All rise.

 5              The United States District Court, in and for the

 6    Middle District of Florida, is now in session.  The Honorable

 7    Marcia Morales Howard presiding.

 8              Please be seated.

 9              THE COURT:  Give me one moment to get my computer

10    going.

11              All right.  This is Case No. 3:21-cr-MMH-MCR -- I

12    think it's 3:21-cr-22(S1)-MMH-MCR, United States of America

13    versus Kristopher Justinboyer Ervin.

14              Ms. Taylor is here on behalf of the United States.

15              And, Ms. Taylor, if you could introduce the case

16    agent, please.

17              MS. TAYLOR:  Your Honor, with me is Special Agent

18    Jesse Hooker of the Bureau of Alcohol, Tobacco, Firearms &

19    Explosives.

20              THE COURT:  Excuse me one second.

21              And Mr. King is here on behalf of Mr. Ervin.

22              Mr. Ervin is in the courtroom.

23              And who else do we have?

24              MR. KING:  Your Honor, this is Mr. Williams.  He's an

25    attorney with my firm.
```

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 3 of 22 PageID 137
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 57 of 563

3

1          THE COURT:  All right.  So we're set for a hearing on

2    the motion that was filed by Mr. Ervin's previous counsel.

3    It's Document No. 30.  And Mr. Ervin's current counsel has

4    adopted the motion.

5          Ms. Taylor, I was a little confused.  You had

6    indicated previously your belief that we needed a hearing and

7    that you would be calling Agent Hooker to testify.

8          Can you help me understand what I need evidence for

9    to resolve this motion?

10          MS. TAYLOR:  Your Honor, I think actually what I

11    stated at the status was that I did not expect to present any

12    witnesses and believed that this was a legal motion where we

13    would not be presenting evidence beyond what was in my written

14    response.

15          THE COURT:  Okay.  That -- that makes a little bit

16    more sense to me.

17          All right.  So, Madam Deputy, may I see you one

18    moment.

19       (Pause in proceedings.)

20          THE COURT:  All right.  So, Mr. King, you opted to

21    adopt the motion.

22          I guess my question to you is, why isn't -- I mean,

23    Mr. Ervin's argument appears to me to be a challenge to the

24    sufficiency of the evidence.  And if it's a challenge to the

25    sufficiency of the evidence, isn't it foreclosed by

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 4 of 22 PageID 138
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 58 of 563

4

1    Eleventh Circuit precedent?

2            MR. KING:  Your Honor, I think because the essential

3    factual issue is not in dispute, it's -- in terms of what was

4    actually the part.  Because of that, it does bring a First

5    Amendment issue in terms of, you know, whether or not this can

6    be resolved by the Court.

7            And essentially the reason -- for reasons of judicial

8    economy as well, you know, considering that there really is no

9    factual dispute, you know, we believe a motion to dismiss would

10   be appropriate, understanding that there -- you know, if there

11   were factual disputes in terms of the actual item, then this

12   Court would be foreclosed and that would be for a motion for

13   judgment of acquittal at the time of the trial.  But because

14   there really is no factual dispute, I think it would be

15   appropriate for the Court to review the underlying statute,

16   and, you know, how it applies to Mr. Ervin and the First

17   Amendment issue to make a resolution, you know, short of

18   testimony.

19           THE COURT:  To the extent it does raise a First

20   Amendment issue, isn't there, in fact, a factual dispute, in

21   that wouldn't a jury have to determine whether this is art or

22   whether this is an actual item of utility?

23           MR. KING:  I would think that because of the nature

24   of what's on there -- and I think it could be a legal issue,

25   because it's -- the information is placed on a piece of metal.

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 5 of 22 PageID 139
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 59 of 563

5

 1   It's not -- in terms of whether or not it would be a factual

 2   issue -- whether or not something is protected speech is a

 3   legal determination for a court to make, not for a jury.

 4           THE COURT:  Can you point me to any authority that

 5   suggests that I can do that on a motion to dismiss in a

 6   criminal case?

 7           MR. KING:  I have not been able to find any, no.  I

 8   have looked quite extensively.

 9           THE COURT:  I'm confident of that, because I can't.

10           So I guess -- so Mr. Ervin is charged in Counts One

11   through Seven with unlawful structuring of monetary

12   transactions to avoid reporting requirements while committing

13   another violation of law.

14           And so in the motion to dismiss, Mr. Ervin argues

15   that Counts Eight through Fourteen should be dismissed because

16   the item that he manufactured, possessed, and arguably

17   transported is not a machine gun under the law.

18           It's not a firearm because it doesn't fall within the

19   definition of machine gun in 26 U.S.C. 5845; right?

20           That's his argument, Mr. King?

21           MR. KING:  Yes, Your Honor.

22           THE COURT:  And Mr. Ervin argues that the superseding

23   indictment doesn't include a sufficient statement of facts and

24   circumstances to inform Mr. Ervin of the offense that's

25   charged.

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 6 of 22 PageID 140
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 60 of 563

6

 1          And I think the truth of the matter is, looking at

 2     the indictment, nothing could be further from accurate.

 3          The indictment in this case gives far more detail

 4     than is often given.  And to the extent -- well, I guess, let's

 5     address two different things.  I think I'll start first with

 6     whether it gives him enough information.

 7          Rule 7(c)(1) of *The Federal Rules of Criminal*

 8     *Procedure* requires that an indictment be a plain, concise, and

 9     definite written statement of the essential facts constituting

10     the offense charged.

11          And the Eleventh Circuit Court of Appeals has given

12     us a three-part test to determine the sufficiency of an

13     indictment.

14          It's sufficient if it presents the essential elements

15     of the charged offense; if it notifies the accused of the

16     charges to be defended against; and if it enables the accused

17     to rely upon a judgment under the indictment as a bar against

18     double jeopardy for any subsequent prosecution.

19          The Eleventh Circuit and the Supreme Court have

20     instructed fairly unequivocally that:  An indictment is

21     sufficient if it sets forth the offense in the words of the

22     statute -- which with regard to all 14 of the counts, this

23     indictment does -- as long as those words address all of the

24     elements of the offense.

25          And so what the Eleventh Circuit says is:  If it

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 7 of 22 PageID 141
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 61 of 563

7

1    tracks the language of the statute, it's sufficient as long as

2    the language sets forth the essential elements of the crime.

3           And so looking at the indictment with regard to --

4    well, it's true, all three sets of charges -- I'm not going to

5    go through them individually, but with regard to each of the

6    charges, the indictment charges the offense in the language of

7    the statute.  And then with -- and addresses each of the

8    elements of the charges.

9           And in addition to that, the indictment alleges the

10   factual underpinning of the charges.

11          So if we look at Counts One through Seven, the

12   indictment charges that Mr. Ervin, knowingly and for the

13   purpose of evading the reporting requirements of federal law,

14   31 U.S.C. § 5313, structured money transactions while he was

15   violating another law of the United States; and Counts Eight

16   through Fourteen charge the underlying other law violation.

17          Right, Ms. Taylor?

18          MS. TAYLOR:  That's correct, Your Honor.

19          THE COURT:  The indictment goes on to identify the

20   specific date of the transaction, the amount of each

21   transaction, and the financial institution at which the

22   transaction was made.

23          If there were anything lacking from Count One, it

24   would only be the identification of what other law of the

25   United States was being violated, but I think that's addressed

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 8 of 22 PageID 142
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 62 of 563

8

1    in Counts Eight through Fourteen, and also addressed by

2    Ms. Taylor here today.

3            As to Count Eight, the indictment alleges a violation

4    of 26 U.S.C. 5861(j).  And it alleges the offense in the

5    language of the statute, but it doesn't just refer to

6    delivering a firearm, it specifies what portion of the firearm

7    definition is implicated, that is, the machine gun conversion

8    device, constituting a machine gun.

9            So it not only alleges that it's a firearm, it

10   alleges how it is a firearm.  And it alleges how what --

11   alleges the interstate commerce nexus by alleging that the

12   offense -- that the materials were sent throughout the U.S.

13   mail, and that they were not registered in the National

14   Firearms Registration and Transfer Record as required, and it

15   cites the statute there.

16           It goes on, having alleged the elements of the

17   offense, to explain or to allege with specificity the date on

18   which the knowing transportation or delivery of firearms is

19   alleged to have occurred, and the number of mailings on each

20   date.  And that goes over the course of three pages.

21           And then lastly, in Counts Nine through Fourteen,

22   Mr. Ervin is charged with possession of a firearm, specifically

23   a machine-gun conversion device, constituting a machine gun, as

24   that object is defined under 26 U.S.C. § 5845(a) and 5845(b),

25   alleges that it was not then registered in the National

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 9 of 22 PageID 143
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 63 of 563

9

1   Firearms Registration and Transfer Record as required.

2          So the -- there's no question that the indictment is

3   sufficient in terms of satisfying the requirements that the

4   Eleventh Circuit articulated, and that is it presents -- as to

5   each of the charges, it presents the essential elements of the

6   charged offense; it notifies Mr. Ervin of the charges to be

7   defended against; and particularly in light of the specificity

8   in this indictment, there's no question that it would enable

9   him to rely upon a judgment under the indictment as a bar

10  against double jeopardy.

11         So Mr. Ervin's argument seems to be that the Court

12  should rule, as a matter of law, that the item isn't a firearm.

13  And my -- I guess what I would say to you, Mr. King, is why

14  isn't that a sufficiency of the evidence argument that is

15  foreclosed by Eleventh Circuit precedent?

16         MR. KING:  May I just have a moment, Your Honor?

17         THE COURT:  Sure.

18         MR. KING:  And, Your Honor, I understand the question

19  you previously asked me about the case law that I have to

20  support the position, and I don't have a dearth of information

21  as it goes there.

22         The argument is essentially that, as a matter of law,

23  because this is essentially not a factual issue; we're not

24  asking the Court to resolve a factual issue.  We're asking the

25  Court to resolve a legal issue, which is, as a matter of law,

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 10 of 22 PageID 144
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 64 of 563

10

1    is this a firearm or not.  Essentially, that was what we would

2    be asking the Court to do, understanding that the Court may

3    view that as a factual issue rather than a legal issue, and

4    would then be precluded from making that determination until

5    judgment -- motion for judgment of acquittal.

6              THE COURT:  All right.  Ms. Taylor, you want to

7    respond?

8              MS. TAYLOR:  Your Honor, it's, of course, a mixed

9    question of fact and law, and the facts simply aren't before

10   this Court, and this is not the way in which things are

11   intended to be decided.

12             The United States has to be allowed the opportunity

13   to present all of its evidence.

14             I would anticipate this being a trial that would take

15   several days for us to present all of the evidence that we

16   would have, including from an expert witness about what his

17   experience was with using the item as a machine gun, testimony

18   from -- from witnesses about Mr. Ervin's intentions, the

19   presentation of documentary evidence about what his intentions

20   were for the use of the item, and then, at the end of that, to

21   allow a jury to decide this issue, which is the appropriate

22   procedure.

23             And it would not be appropriate for this Court to

24   make a ruling, not having the facts in front of it, about

25   whether factually an item meets the definition of a machine gun

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 11 of 22 PageID 145
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 65 of 563

11

1    before the United States has had an opportunity to present its

2    evidence in this case.

3              THE COURT:  So I want to make sure I address all the

4    different arguments that Mr. Ervin has raised.

5              Mr. Ervin has argued that the item that he produced

6    is essentially a raw material, and that the agent had to make

7    significant efforts in order to convert it into a device that

8    would render a rifle into an either machine gun or an automatic

9    weapon.

10             And Mr. Ervin's argument -- and I'm going to quote

11   for it.  Mr. Ervin argues the agent essentially -- the agent

12   treated the autokeycard as a raw material and made it into

13   something different, apparently expecting that with a little

14   gunsmithing, he could convert his rifle into a machine gun.

15   Predictably, however, mutilating the metal card and sticking

16   the mangled pieces of it inside the rifle simply caused the

17   weapon to malfunction.

18             Tests of the Frankensteinian rifle revealed that the

19   agent's crude alterations made the weapon fire erratically and

20   at times fire more than once per single trigger.

21             And relying on -- on those arguments, Mr. Ervin asks

22   the Court to determine that as a matter of law the object that

23   he was transmitting through the mail and that he possessed

24   doesn't fall within the definition of a firearm.

25             26 U.S. Code § 5845 defines a firearm and it also

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 12 of 22 PageID 146
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 66 of 563

12

1    defines a machine gun.  And the definition of a machine gun
2    includes the frame or receiver of any such weapon, any part
3    designed and intended solely and exclusively, or combination of
4    parts designed and intended for use in converting a weapon into
5    a machine gun.
6            And so, in my view, the question of whether this
7    keycard is a part that was designed and intended, whether
8    exclusively or combined with other parts, to convert a weapon
9    into a machine gun is a question that only the jury can decide.
10   It is not a question that the Court can decide.
11           And there are a couple of problems with Mr. Ervin's
12   argument to the contrary.
13           The first problem is that even if the facts were
14   undisputed, The *Federal Rules of Criminal Procedure* do not
15   provide any sort of summary-judgment type of remedy.
16           Unlike civil cases where you can say:  Judge, the
17   facts are undisputed; who wins, who loses?
18           The Eleventh Circuit has firmly said there is no
19   summary judgment procedure in criminal cases, nor do the rules
20   provide for a pretrial determination of the sufficiency of the
21   evidence.
22           And the Eleventh Circuit has said that in the *United*
23   *States versus Salman*, S-a-l-m-a-n, 378 F.3d 1266 at 1268, and
24   also in *United States versus Critzer*, C-r-i-t-z-e-r, 951 F.2d
25   306 at 307.

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 13 of 22 PageID 147
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 67 of 563

13

```
 1              And the -- what Mr. Ervin is asking the Court to do
 2    is -- is to look at the keycard and decide that as a matter of
 3    law that that cannot constitute a firearm.
 4              In doing that, Mr. Ervin is asking the Court to do
 5    something the Court is prohibited from doing, and making the
 6    same mistake that was made in the *Salman* case where the -- on a
 7    motion to dismiss the indictment, the judge determined, as a
 8    matter of law, that the individual was not unlawfully in the
 9    United States and dismissed the indictment.  And it went to the
10    Eleventh Circuit; the Eleventh Circuit reversed.
11              And the Eleventh Circuit said:  By looking beyond the
12    face of the indictment and ruling on the merits of the charges
13    against the defendant, the district court, in effect, granted
14    summary judgment in favor of the defendant.  In doing so, the
15    court overlooked binding Eleventh Circuit precedent citing to
16    *Critzer*.
17              And the Eleventh Circuit said what Ms. Taylor just
18    argued, and that is that the Government is entitled to present
19    its evidence at trial and have its sufficiency tested by a
20    motion for judgment of acquittal.
21              So that -- so in my view, there are two problems with
22    the argument.  One is there is no summary judgment procedure at
23    all, so the Court can't view the -- judge the sufficiency of
24    the evidence.  But the other problem is that even if the Court
25    were to evaluate the evidence, Mr. Ervin is asking the Court to
```

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 14 of 22 PageID 148
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 68 of 563

14

1    evaluate the evidence based on his version of the evidence.

2    And when rule -- looking at the sufficiency of the indictment,

3    the Court is limited to the face of the indictment, limited to

4    the charges brought by the Government, and can't consider the

5    information that I read earlier about Mr. Ervin's version of

6    whether the keycard was intended to be used in the fashion that

7    the agent used it.

8              And so for all of those reasons, the indictment is

9    sufficient and Mr. Ervin's challenge to Counts Eight through

10   Fourteen are simply unavailing.

11             I'll say -- we didn't discuss it here today, but in

12   the pleading that was authored -- I know not by current counsel

13   but by the previous counsel, there was an argument that one

14   case has previously made a similar determination.  I'll just

15   note that reliance on that, the *Prince* case, which is at WL

16   1875709, is really not persuasive for a myriad of reasons.

17             One, it does require the Court to conduct that

18   pretrial sufficiency of the evidence review, which the

19   Eleventh Circuit does not permit.  It's for a jury to decide

20   whether the item constitutes a machine gun as that term is

21   defined under the statute.  But -- but also fails to recognize

22   that the Court in the *Prince* case was reviewing a statute with

23   a different definition, and so that's unavailing.

24             Mr. Ervin argued that the statute -- oh, I'm sorry, I

25   need to back up.  Because Mr. Ervin's challenge to Counts Eight

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 15 of 22 PageID 149
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 69 of 563

15

1   through Fourteen is due to be denied, his motion to dismiss

2   Counts One through Seven is also due to be denied, because it

3   depended entirely upon a finding that there was no violation of

4   another law of the United States.

5          Mr. Ervin also argues with regard to Counts Eight

6   through Fourteen that the statute is unconstitutionally vague

7   under the Fifth Amendment.  But the Fifth Circuit has rejected

8   that challenge in pre-1981 case law.

9          So in the *United States versus Campbell*, 427 F.2d

10  892, the defendant argued that the portion of the statute that

11  referred to any combination of parts designed and intended for

12  use in converting a weapon into a machine gun was

13  unconstitutionally vague, and the Fifth Circuit rejected that

14  decision.

15          So it's simply not a -- not a meritorious argument.

16          Mr. Ervin also argues that the statute violates his

17  First Amendment rights because it targets his artistic work,

18  and that it's a content-based restriction on his expression.

19          The first problem with that argument is, again, it

20  asks the Court to rule on facts that aren't in the indictment.

21          If Mr. Ervin wishes to defend against these charges

22  by presenting evidence that it's an artistic work, then a jury

23  may well find that it is not a part designed and intended

24  solely and exclusively for use in converting a weapon into a

25  machine gun, but that's a decision that the jury has to make.

16

| | |
|---|---|
| 1 | It's not a decision that the Court can make pretrial. |
| 2 | So Mr. Ervin's argument in that regard is unavailing. |
| 3 | Mr. Ervin also argues that the statute exceeds |
| 4 | Congress' taxing power.  But that argument, too, appears to be |
| 5 | foreclosed by Eleventh Circuit precedent. |
| 6 | The Eleventh Circuit has rejected that argument in -- |
| 7 | well, most recently in *United States versus Bolatete*, |
| 8 | B-o-l-a-t-e-t-e, 977 F.3d 1022 at 1032. |
| 9 | And also previously in *United States versus Ross*, and |
| 10 | *United States versus Spoerke*, S-p-o-e-r-k-e.  And the *Ross* and |
| 11 | *Bolatete* dealt with firearms -- dealt with the individuals who |
| 12 | received the firearm, but the *Spoerke* case is more similar to |
| 13 | Mr. Ervin's in that the individual there was the individual who |
| 14 | had created the item.  I think there was a pipe bomb, if I'm |
| 15 | not mistaken.  But in either event, the Eleventh Circuit has |
| 16 | rejected the challenge based on the statute exceeding Congress' |
| 17 | taxing power. |
| 18 | So for all those reasons, it seems to me that the |
| 19 | motion is due to be denied. |
| 20 | Mr. King, did I fail to address any argument that |
| 21 | Mr. Ervin's prior counsel had raised? |
| 22 | MR. KING:  No, Your Honor, I don't believe so. |
| 23 | The only -- the only issue is, you know, as the Court |
| 24 | said, for the Counts One through, I believe, Seven, dealing |
| 25 | with the structuring, you know, the request for a bill of |

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 17 of 22 PageID 151
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 71 of 563

17

1  particulars, and even if it's, you know, if the Government made

2  an oral assurance that that's based on the other counts, I

3  think that would be sufficient.

4          THE COURT:  Yeah.

5          Ms. Taylor, is there any reason why just -- since

6  there was -- that's probably the only ambiguity.  Any reason

7  that I shouldn't direct the Government to file a bill of

8  particulars identifying the other law of the United States that

9  is implicated in Counts One through Seven?

10          MS. TAYLOR:  I can do that, Your Honor.

11          THE COURT:  I think that would clear up any ambiguity

12  in the record.

13          So then Mr. -- yes, Mr. King?

14          MR. KING:  I was going to say, I'm sorry, that was

15  it.  Otherwise I think the Court's addressed everything.  I

16  wasn't sure if I'd said that.

17          THE COURT:  All right.  So then I think that -- so

18  that there's no further delay, and I -- and, Ms. Taylor, maybe

19  I misunderstood, because I probably could have ruled on this in

20  the papers, but it -- for some reason, I -- Madam Deputy and I

21  both understood that you had intended for Agent Hooker to

22  testify to something, and that's -- so there was probably some

23  miscommunication there.

24          MS. TAYLOR:  I apologize if that was on my part, Your

25  Honor.  But, of course, my position is that this is not -- not

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 18 of 22 PageID 152
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 72 of 563

18

1   something that would be appropriate for the Court to receive

2   evidence on, so I did not intend to present a witness.

3          THE COURT:  Yeah.  No, I agree with you.

4          I don't think I need to enter a written order.  I

5   think I've made -- made my findings here on the record.

6          I think that the bottom line is that the *United*

7   *States versus Salman* case, in which the Eleventh Circuit

8   reversed a district court for doing exactly what Mr. Ervin is

9   asking me to do now, and that is, make a pretrial determination

10  of the sufficiency of the evidence, simply -- simply forecloses

11  any relief.  And further, because all of his arguments would

12  also require the Court to consider evidence other than the face

13  of the indictment, for that reason, it would also be due to be

14  denied.

15         So the motion, which is Document No. 30, is denied.

16         Mr. -- I don't -- what trial term is Mr. Ervin

17  currently on, Mr. King, do you know?

18         MS. TAYLOR:  The August trial term, Your Honor.

19         THE COURT:  Okay.  And, Mr. King, were you -- do

20  you-all anticipate being ready for trial at that time?

21         MR. KING:  Your Honor, I don't anticipate being ready

22  for trial.

23         I spoke with Ms. Taylor earlier in the week.  I have

24  not had an opportunity to speak with Mr. Ervin about how much

25  time we would need, and potentially an expert witness for him,

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 19 of 22 PageID 153
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 73 of 563

19

1    and the amount of time that's going to take to prepare.

2          I spoke with -- I haven't shared this with Mr. Ervin

3    yet because we have not had an opportunity to speak, but I

4    would anticipate us filing a motion to continue probably at

5    least 60 days as we try to get an expert to respond to some of

6    the more technical aspects of this.

7          THE COURT:  Okay.  Well, to save you-all some time,

8    do you want to talk to Mr. Ervin now so that you don't have to

9    file a written motion?

10         MR. KING:  That would be --

11         THE COURT:  Sure.

12         MR. KING:  Thank you, Your Honor.

13         THE COURT:  Certainly.

14       (Pause in proceedings.)

15         MR. KING:  I have spoken with Mr. Ervin.  He has

16   authorized me to make an *ore tenus* motion to continue the trial

17   term for an additional 60 days.  I think that would take us to

18   the October trial term.

19         THE COURT:  Ms. Taylor, any objection?

20         MS. TAYLOR:  No, Your Honor.

21         THE COURT:  And, Mr. King, just so that I can make an

22   ends-of-justice finding, my understanding is that now that the

23   Court has ruled -- has denied the motion to dismiss, that you

24   need additional time in order to prepare for trial and

25   specifically to investigate whether you need an expert and to

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 20 of 22 PageID 154
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 74 of 563

20

```
 1   allow that expert sufficient time to consult with you and
 2   provide his or her assistance; is that correct?
 3           MR. KING:  That's correct, Your Honor.
 4           THE COURT:  All right.  Then the Court, without
 5   objection by the United States, will grant the motion, and for
 6   the reasons I've just stated will find that the ends of justice
 7   served by granting the motion outweigh the best interests of
 8   the public and the defendant in a speedy trial.
 9           We'll move the case 60 days to the October trial
10   term.
11           Madam Deputy, can you give me the information about
12   the October trial term, please.
13           COURTROOM DEPUTY:  October 4.  And the status -- do
14   you want to set a special status conference, Your Honor?
15           THE COURT:  Yeah, we should.
16           So since we'll be getting ready for trial likely
17   then, we'll set it for a special status.
18           That doesn't mean that if circumstances warranted
19   that you can't ask for another continuance, Mr. King.  As long
20   as you can show good cause, of course.
21           9:30, Monday, September 20th.
22           And the plea deadline for that trial term, Madam
23   Deputy?
24           COURTROOM DEPUTY:  September 27th.
25           THE COURT:  All right.  So it's on the October 4
```

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 21 of 22 PageID 155
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 75 of 563

21

 1   trial term.  We'll have a status at 9:30 on September 20th, and

 2   the plea deadline is September 27th.

 3             Oh, Ms. Taylor, can you file -- today is July 8th.

 4   Can you file your bill of particulars by July 16th?

 5             MS. TAYLOR:  Yes, Your Honor.

 6             THE COURT:  All right.  So the Government is directed

 7   to file a bill of particulars with regard to the other law of

 8   the United States as charged in Counts One through Seven no

 9   later than July 16th.

10             All right.  So, Mr. Ervin, your attorney filed a

11   motion to dismiss the charges.  I've now denied that motion.

12             Do you understand what happened here today?

13             THE DEFENDANT:  Yes, ma'am, I understand.

14             THE COURT:  Okay.  Anything further, Mr. King?

15             MR. KING:  No, Your Honor.  It's good seeing you.

16             THE COURT:  Good to see you, too.

17             Ms. Taylor, anything else?

18             MS. TAYLOR:  No, Your Honor.

19             THE COURT:  All right.  We're in recess.

20             COURT SECURITY OFFICER:  All rise.

21        (Proceedings concluded at 2:39 p.m.)

22                        -  -  -

23

24

25

Case 3:21-cr-00022-MMH-MCR   Document 48   Filed 08/12/21   Page 22 of 22 PageID 156
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 76 of 563

22

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

    I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.

            Dated this 11th day of August 2021.

                    /s/Cindy Packevicz Jarriel
                    Cindy Packevicz Jarriel, RPR, FCRR

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2023 MAR -6  AM 10: 30

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

UNITED STATES OF AMERICA

v.                                      CASE NO.  3:21-cr-22(S4)-MMH-MCR
                                                  18 U.S.C. § 371
KRISTOPHER JUSTINBOYER ERVIN                      26 U.S.C. § 5861(e)
MATTHEW RAYMOND HOOVER                            31 U.S.C. § 5324(a)(1)
                                                  31 U.S.C. § 5324(a)(3)
                                                  26 U.S.C. § 5861(d)

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**
(Conspiracy)

A.  Introduction

At all times material to this Indictment:

1.     KRISTOPHER JUSTINBOYER ERVIN was a resident of Clay
County, Florida, within the Middle District of Florida.  Free Speech Industries LLC
was a Florida Limited Liability Company incorporated by ERVIN on or about
January 26, 2021.  ERVIN operated the web domains www.autokeycard.com and
www.autokeycards.com on which he advertised for sale products that he referred to
as Auto Key Cards.

2.     MATTHEW RAYMOND HOOVER was a resident of Coloma,
Wisconsin, and operated a retail store in Coloma called Coloma Resale.  Coloma
Resale was a federally licensed firearms dealer and held a special occupation tax

license.  HOOVER also operated a content channel on YouTube called CRS Firearms.

3.      Auto sears were a category of machinegun conversion devices that may be installed into an otherwise semi-automatic AR-15 type rifle and function to convert the AR-15 type rifle to fire more than one shot by a single function of the trigger.  A lightning link was a particular design of auto sear.

4.      The Auto Key Cards designed and sold by ERVIN consisted of cards machined from stainless steel, into which were etched the design for machinegun conversion devices known as lightning links, which constituted machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b) in that they are a combination of parts designed and intended for use in converting a weapon into a machinegun.

<u>B.  The Conspiracy</u>

5.      Beginning in or about October 2020, and continuing through at least July 2021, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly and willfully combine, conspire, confederate, and agree with each other and others, both known and unknown to the grand jury, to commit offenses against the United States, specifically, to transfer firearms, that is, machinegun conversion devices each consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun, constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), which firearms were not then registered

2

in the National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841, in violation of 26 U.S.C. §§ 5861(e) & 5871.

<u>C. Manner and Means</u>

6.    The manner and means by which the conspirators carried out the

conspiracy included, among other things:

a.    It was part of the conspiracy that ERVIN would and did operate

the websites www.autokeycard.com and www.autokeycards.com, which were e-

commerce portals on which ERVIN advertised Auto Key Cards for sale.

b.    It was further part of the conspiracy that ERVIN, and others

assisting him with his Auto Key Cards business, would and did receive orders for

Auto Key Cards directly from the websites www.autokeycard.com and

www.autokeycards.com as well as through a mail-in order form that was available

on those websites.

c.    It was further part of the conspiracy that ERVIN, and others

assisting him with his Auto Key Cards business, would and did fulfill orders for Auto

Key Cards by shipping those items via the U.S. Mail from the Middle District of

Florida, resulting in the transfer of Auto Key Cards to ERVIN's customers.

d.    It was further part of the conspiracy that HOOVER would and

did create videos posted to the CRS Firearms YouTube channel in which HOOVER

promoted the sale of Auto Key Cards.

e.      It was further part of the conspiracy that sales of ERVIN's Auto Key Cards would and did increase substantially as a result of HOOVER's promotion of the sale of Auto Key Cards.

f.      It was further part of the conspiracy that ERVIN would and did compensate HOOVER for his promotion and sponsorship of Auto Key Cards on HOOVER's CRS Firearms YouTube channel by shipping U.S. currency and other items of value to HOOVER and HOOVER's designees.

g.      It was further part of the conspiracy that the conspirators would and did engage in acts and make statements to promote and achieve the objects of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof.

<u>D.  Overt Acts</u>

7.      In furtherance of the conspiracy and to effect the objects thereof, the defendants and other conspirators committed the following overt acts, among others, in the Middle District of Florida and elsewhere:

a.      Beginning in or about October 2020, ERVIN retained a machine shop in Orange Park, Florida, to manufacture approximately 300 prototype Auto Key Cards.

b.      On or about November 4, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Is this An ATF Trap And How Does It Work," HOOVER described how to order an Auto Key Card and further described

4

how to cut the lightning link from the Auto Key Card and install it into an AR-15 style rifle, thus converting the AR-15 style rifle into a machinegun.

c.      On or about November 11, 2020, a video created by HOOVER was posted to the YouTube channel CRS Firearms. In the video, titled "The Parts The ATF Wishes Never Existed," HOOVER discussed various methods for manufacturing a machinegun or silencer, including the Auto Key Card, which HOOVER described as the sponsor of his video.

d.      On or about November 30, 2020, ERVIN would and did conduct a withdrawal in the amount of $5000 in U.S. currency, consisting of proceeds of sales of Auto Key Cards, at Community First Credit Union in Orange Park, Florida, within the Middle District of Florida.

e.      On or about November 30, 2020, ERVIN ordered approximately 1400 Auto Key Cards from the Orange Park machine shop, for which he paid approximately $3230 using U.S. currency.

f.      On or about November 30, 2020, ERVIN purchased a Louis Vuitton brand handbag and keychain using approximately $1958 in U.S. currency, which he provided to HOOVER and HOOVER's designee as compensation for HOOVER's

5

promotion of Auto Key Cards on the CRS Firearms YouTube
channel.

g.　On or about December 4, 2020, a video created by HOOVER
was posted to the YouTube channel CRS Firearms.  In the video,
titled "How to Make Body Armor Fail," HOOVER described
autokeycards.com as the sponsor of his video and promoted sales
of Auto Key Cards.

h.　On or about December 9, 2020, ERVIN purchased
approximately $841 of video production equipment, which
ERVIN had shipped to the residence of HOOVER and E.I. as
compensation for HOOVER's promotion of Auto Key Cards on
the CRS Firearms YouTube channel.

i.　On or about December 15, 2020, a video created by HOOVER
was posted to the YouTube channel CRS Firearms.  In the video,
titled "How To Buy A Truly Untraceable Firearm," HOOVER
described autokeycard.com as the sponsor of his video and
promoted sales of Auto Key Cards.

j.　On or about December 28, 2020, a video created by HOOVER
was posted to the YouTube channel CRS Firearms.  In the video,
titled "This Is A Strange Turn Of Events," HOOVER described
autokeycard.com as the sponsor of his video and promoted sales
of Auto Key Cards.

6

k.  On or about December 30, 2020, a video created by HOOVER
was posted to the YouTube channel CRS Firearms. In the video,
titled "The Real Difference Between The Two Platforms,"
HOOVER described autokeycards.com as the sponsor of his
video and promoted sales of Auto Key Cards.

l.  On or about January 8, 2021, a video created by HOOVER was
posted to the YouTube channel CRS Firearms. In the video,
titled "This Makes an illegal Machine gun," HOOVER described
autokeycard.com as the sponsor of his video and promoted sales
of Auto Key Cards.

m.  On or about January 12, 2021, a video created by HOOVER was
posted to the YouTube channel CRS Firearms. In the video,
titled "The Great Purge," HOOVER described autokeycard.com
as the sponsor of his video and promoted sales of Auto Key
Cards.

n.  On or about January 15, 2021, ERVIN ordered approximately
1200 Auto Key Cards from the Orange Park machine shop, for
which he paid approximately $3600.

o.  In or about a date in February 2021, ERVIN ordered
approximately 2400 Auto Key Cards from the Orange Park
machine shop, for which he made a down payment of
approximately $5000.

7

p.    On or about February 6, 2021, ERVIN withdrew $5000, representing sales proceeds from Auto Key Cards, at Community First Credit Union in Orange Park, Florida, within the Middle District of Florida.

q.    On or about February 7, 2021, ERVIN shipped a package via UPS Next Day Air to the residence of HOOVER, which package contained U.S. currency and other items of value to compensate HOOVER for his promotion of Auto Key Cards on the CRS Firearms YouTube channel.

r.    On or about February 16, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Important Development," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

s.    On or about February 17, 2021, ERVIN shipped a package via FedEx Priority Overnight to the residence of HOOVER, which package contained U.S. currency and other items of value to compensate HOOVER for his promotion of Auto Key Cards on the CRS Firearms YouTube channel.

t.    On or about February 18, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Leveling The Scope To The Rifle Is A Waste Of Time,"

8

HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

u.   On or about February 23, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "Unexpected Ammunition Problems," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

v.   On or about February 25, 2021, a video created by HOOVER was posted to the YouTube channel CRS Firearms.  In the video, titled "ATF Reclassification On H&K Clones," HOOVER described autokeycard.com as the sponsor of his video and promoted sales of Auto Key Cards.

w.   On or about the dates specified in the chart below, each of which constitutes a separate overt act, ERVIN, and others assisting him with his Auto Key Cards business, fulfilled orders for Auto Key Cards by shipping and transferring Auto Key Cards from the Middle District of Florida to purchasers via the U.S. Mail:

| OVERT ACT | DATE | INITIALS OF PURCHASER |
|---|---|---|
| w1 | November 14, 2020 | D.S. |
| w2 | November 30, 2020 | J.M. |
| w3 | December 12, 2020 | R.D. |
| w4 | December 16, 2020 | S.D. |
| w5 | December 23, 2020 | J.A. |
| w6 | January 17, 2021 | R.W. |

| OVERT ACT | DATE | INITIALS OF PURCHASER |
|---|---|---|
| w7 | February 1, 2021 | A.O. |

x.    On or about March 30, 2021, ERVIN, HOOVER, and E.I. participated in a phone call in which they discussed plans to continue selling Auto Key Cards and create additional videos promoting ERVIN and his Auto Key Cards business.

y.    Beginning in late March 2021, and continuing through at least July 2021, HOOVER and E.I. operated a GoFundMe fundraiser to benefit ERVIN with the intention that funds raised would be used, in part, to obtain the release of ERVIN so that ERVIN and HOOVER could continue to pursue their conspiratorial goals.

All in violation of 18 U.S.C. § 371.

## COUNT TWO

On or about November 14, 2020, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one or more machinegun conversion devices each consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun, constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S. Mail to a person with the initials D.S., which firearms were not then registered in the

10

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

### COUNT THREE

On or about November 30, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials J.M., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

### COUNT FOUR

On or about December 12, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

11

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials R.D., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

    In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT FIVE

    On or about December 16, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials S.D., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

    In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT SIX

    On or about December 23, 2020, in the Middle District of Florida, and

elsewhere, the defendants,

12

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials J.A., which firearms were not then registered in the

National Firearms Registration and Transfer Record as required by 26 U.S.C. §

5841.

      In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

### **COUNT SEVEN**

      On or about January 17, 2021, in the Middle District of Florida, and

elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one

or more machinegun conversion devices each consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun,

constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S.

Mail to a person with the initials R.W., which firearms were not then registered in

the National Firearms Registration and Transfer Record as required by 26 U.S.C. §

5841.

      In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

13

## COUNT EIGHT

On or about February 1, 2021, in the Middle District of Florida, and elsewhere, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and
MATTHEW RAYMOND HOOVER,

did knowingly transfer firearms, and aid and abet the transfer of firearms, that is, one or more machinegun conversion devices each consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun, constituting machineguns as defined in 26 U.S.C. § 5845(a) and 5845(b), via the U.S. Mail to a person with the initials A.O., which firearms were not then registered in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841.

In violation of 26 U.S.C. §§ 5861(e) & 5871 and 18 U.S.C. § 2.

## COUNT NINE

On the dates listed below, in the Middle District of Florida, the defendant,

KRISTOPHER JUSTINBOYER ERVIN,

knowingly and for the purpose of evading the reporting requirements of 31 U.S.C. § 5313, and the regulations promulgated pursuant thereunder with respect to currency transactions in excess of $10,000, structured, and attempted to structure, the following transactions, each being a cash withdrawal at a federally-insured financial institution:

14

| DATE | AMOUNT | CREDIT UNION |
|------|--------|--------------|
| December 28, 2020 | $9000 | Community First (Orange Park) |
| December 28, 2020 | $5000 | Community First (Fleming Island) |
| December 29, 2020 | $9000 | Community First (Orange Park) |
| December 30, 2020 | $9000 | Community First (Orange Park) |
| December 31, 2020 | $9000 | Community First (Orange Park) |
| January 2, 2021 | $9000 | Community First (Orange Park) |
| January 5, 2021 | $9000 | Community First (Orange Park) |
| January 6, 2021 | $9000 | Community First (Orange Park) |

In violation of 31 U.S.C. § 5324(a)(3) and (d)(1).

## COUNT TEN

On or about February 22, 2021, in the Middle District of Florida, the

defendant,

### KRISTOPHER JUSTINBOYER ERVIN,

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

## COUNT ELEVEN

On or about February 24, 2021, in the Middle District of Florida, the

defendant,

### KRISTOPHER JUSTINBOYER ERVIN,

15

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

### COUNT TWELVE

On or about March 2, 2021, in the Middle District of Florida, the defendant,

KRISTOPHER JUSTINBOYER ERVIN,

did knowingly possess firearms, that is, machinegun conversion devices each

consisting of a combination of parts designed and intended for use in converting a

weapon into a machinegun, constituting machineguns as defined in 26 U.S.C.

§ 5845(a) and 5845(b), which were not then registered to the defendant in the

National Firearms Registration and Transfer Record as required by 26 U.S.C.

§ 5841.

In violation of 26 U.S.C. §§ 5861(d) & 5871.

### FORFEITURE

1.      The allegations contained in Counts One through Eight and Counts

Ten through Twelve, as well as Count Nine are incorporated by reference for the

purpose of alleging forfeiture pursuant to 26 U.S.C. § 5872, 26 U.S.C. § 7302, 28

U.S.C. § 2461(c), and 49 U.S.C. § 80303, and 31 U.S.C. § 5317(c)(1)(A),

respectively.

2.      Upon conviction of a conspiracy to violate 26 U.S.C. § 5861(e), in

violation of 18 U.S.C. § 371, the defendants, KRISTOPHER JUSTINBOYER

ERVIN and MATTHEW RAYMOND HOOVER, shall forfeit to the United States,

pursuant to 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c), any firearms involved in the

violation, pursuant to 26 U.S.C. § 7302, any property intended for use or that has

been used in committing the violation, and, pursuant to 49 U.S.C. § 80303 and 28

U.S.C. § 2461(c), any aircraft, vehicle, or vessel used to facilitate the transportation,

concealment, receipt, possession, purchase, sale, exchange, or giving away of such

firearm.

3.      Upon conviction of a violation 26 U.S.C. § 5861, the defendants,

KRISTOPHER JUSTINBOYER ERVIN and MATTHEW RAYMOND

HOOVER, shall forfeit to the United States, pursuant to 26 U.S.C. § 5872 and 28

U.S.C. § 2461(c), any firearms involved in the violation, pursuant to 26 U.S.C.

§ 7302, any property intended for use or that has been used in committing the

violation, and, pursuant to 49 U.S.C. § 80303 and 28 U.S.C. § 2461(c), any aircraft,

vehicle, or vessel used to facilitate the transportation, concealment, receipt,

possession, purchase, sale, exchange, or giving away of such firearm.

4.      Upon conviction of a violation of 31 U.S.C. § 5324, the defendant,

KRISTOPHER JUSTINBOYER ERVIN, shall forfeit to the United States, pursuant

to 31 U.S.C. § 5317(c)(1)(A), all property, real or personal, involved in the offense and any property traceable to such property.

5.    Upon conviction of a violation of 26 U.S.C. § 5861, the defendant, KRISTOPHER JUSTINBOYER ERVIN, shall forfeit to the United States, pursuant to 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c), any firearms involved in the violation, and, pursuant to 49 U.S.C. § 80303 and 28 U.S.C. § 2461(c), any aircraft, vehicle, or vessel used to facilitate the transportation, concealment, receipt, possession, purchase, sale, exchange, or giving away of such firearm.

6.    The property to be forfeited includes, but is not limited to approximately $68,000.00, representing the amount of funds involved in the structuring offense charged in Count Nine.

7.    If any of the property described above, as a result of any act or omission of the defendants:

       a.    cannot be located upon the exercise of due diligence;

       b.    has been transferred or sold to, or deposited with, a third party;

       c.    has been placed beyond the jurisdiction of the Court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c),

including, but not limited to the $3,700 seized from KRISTOPHER JUSTINBOYER

ERVIN on March 2, 2021.

A TRUE BILL,

_____
Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
LAURA COFER TAYLOR
Assistant United States Attorney

By: _____
SARA SWEENEY
First Assistant United States Attorney

Case 3:21-cr-00022-MMH-MCR    Document 204    Filed 03/06/23    Page 20 of 20 PageID 1564

FORM OBD-34
3/6/23 Revised

No. _____

UNITED STATES DISTRICT COURT
Middle District of Florida
Jacksonville Division

THE UNITED STATES OF AMERICA

vs.

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

INDICTMENT

Violations: 18 U.S.C. § 371, 26 U.S.C. §§ 5861(e) & 5871, 2, 31 U.S.C. § 5324(a)(3) & (d)(1),
& 26 U.S.C.§ 5861(d)

A true bill,



_____
Foreperson

Filed in open court this 6th day

of March, 2023.

_____
Clerk

Bail  $ _____

GPO 863 525

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

**UNITED STATES' BRIEF STATEMENT OF THE CASE**

The United States of America, through its undersigned Assistant United States Attorneys, submits the following brief statement of the case to be read at the beginning of jury selection:

Ladies and Gentlemen, in this case, the United States has charged the defendants, Kristopher Justinboyer Ervin and Matthew Raymond Hoover, with conspiring to transfer unregistered machinegun conversion devices in violation of federal law.   Additionally, Mr. Ervin and Mr. Hoover are charged with individual substantive counts of transferring unregistered machinegun conversion devices.   Mr. Ervin is also charged with several counts of possessing unregistered machinegun conversion devices and with structuring cash withdrawals from his bank account in order to evade currency transaction reporting requirements.

These offenses are alleged to have taken place beginning around October of

2020 and continuing through at least July of 2021.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:     /s/ Laura Cofer Taylor
        LAURA COFER TAYLOR
        Assistant United States Attorney
        USA No. 170
        E-mail: Laura.C.Taylor@usdoj.gov

        DAVID B. MESROBIAN
        Assistant United States Attorney
        USA No. 188
        E-mail: David.Mesrobian@usdoj.gov

        300 N. Hogan Street, Suite 700
        Jacksonville, Florida 32202
        Telephone:     (904) 301-6300
        Facsimile:     (904) 301-6310

2

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Alex King, Esq.
*Counsel for defendant KRISTOPHER JUSTINBOYER ERVIN*

Zachary Z. Zermay
Matthew Larosiere
*Counsel for defendant MATTHEW RAYMOND HOOVER*

*s/ Laura Cofer Taylor*
LAURA COFER TAYLOR
Assistant United States Attorney

3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No:      3:21-cr-00022-MMH-MCR

KRISTOPHER ERVIN

_____/

## DEFENDANT ERVIN'S PROPOSED STATEMENT OF THE CASE FOR THE VENIRE

The Indictment charges Kristopher Ervin and Matthew Hoover with various offenses related to an alleged conspiracy to transfer unregistered machinegun conversion devices, which are alleged to constitute machineguns, in that they are a combination of parts designed and intended for use in converting a weapon into a machinegun.  Mr. Ervin is further charged with possession of unregistered machinegun conversion devices on various dates.  Mr. Ervin and Mr. Hoover deny these allegations.  In addition, Mr. Ervin is charged with knowingly evading a currency transaction reporting requirement by structuring a transaction, alleging he knowingly and for the purpose of evading the reporting requirements, structured transactions by withdrawing funds from his bank account to intentionally avoid the reporting requirement.  Mr. Ervin denies these allegations.

Respectfully submitted,
**Monroe & King, P.A.**

  /s/ Alex King
Alex King, Esq.
Florida Bar No.: 0086034
Scott Monroe, Esq.
Florida Bar No.: 0086801
1805 Copeland Street
Jacksonville, Florida 32204
Tel: (904) 355-7777
E-mail: Admin@MonroeKingLaw.com
Attorneys for Defendant

### **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email to: (1) Laura C. Taylor, Esq., Office of the United States Attorney, Laura.C.Taylor@usdoj.gov, (2) Zachary Z. Zermay, Esq., zach@zermaylaw.com, and (3) Matthew Larosiere, Esq., larosieremm@gmail.com, this 3rd day of April, 2023.

                                     /s/ Alex King
                                     ATTORNEY









00048





UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                        Case No:        3:21-cr-00022-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER
_____/

## POST-VERDICT MOTION FOR
## JUDGMENT OF ACQUITTAL

COMES NOW the Defendant, Kristopher Ervin, by and through his undersigned counsel, pursuant to Rule 29(c), Fed. R. Crim. P., and hereby respectfully files his Post Verdict Motion for Judgment of Acquittal, and in support hereof, states as follows:

## PROCEDURAL HISTORY

1.      On March 3, 2021, Mr. Ervin was arrested, and a Criminal Complaint was filed against him alleging that he knowingly possessed a firearm as defined under Title 26, United States Code, Section 5845(a) and (b), that is, a machinegun conversion device, that was not then registered in the National Firearms Registration and Transfer Record, as well as a structuring count.  Doc. 1.

2.      On March 11, 2021, Mr. Ervin was indicted, charging him with the same counts alleged in the Criminal Complaint.  Doc. 17.

3.      On April 1, 2021, a Superseding Indictment was filed adding 13 additional counts. Doc. 25.

4.      On January 26, 2022, a Second Superseding Indictment was filed adding 17 additional counts.  Doc. 57. This Superseding Indictment not only contains new allegations but an additional co-defendant who was previously not charged but has been subsequently arrested.

5.      On August 31, 2022, a Third Superseding Indictment was filed against the Defendants. Doc. 120.

6.      On March 6, 2023, a month before trial was to commence, a Fourth Superseding Indictment was filed. Doc. 204.

7.      On April 21, 2023, after a two-week trial, a Jury Verdict was reached (Doc. 263), finding Mr. Ervin guilty on all counts.

8.      On May 4, 2023, the Court granted a continuance to file a motion for a judgment of acquittal on or before May 19, 2023.  Doc. 271.

## **ARGUMENT**

9.      Mr. Ervin adopts and incorporates by reference the legal and factual arguments made in Mr. Hoover's Motion for Judgment of Acquittal as to Counts One through Eight and Ten through Twelve of the Fourth Superseding Indictment.

10.      Although Mr. Hoover was acquitted of some of the substantive offense counts that Mr. Ervin was acquitted of, and Mr. Ervin was further convicted of possession offenses in Counts Ten through Twelve, Mr. Ervin requests this Honorable Court to consider the legal arguments as to the counts addressed by Mr. Hoover, as they address near identical issues of fact and law.

11.      Additionally, Mr. Ervin would supplement said argument with regard to Count Six and Count Nine.  Mr. Hoover was acquitted of Count Six, a substantive transfer offense, and not charged with Count Nine, which charged structuring of currency transactions to avoid a reporting requirement.

12.      Count Six alleged a transfer to an individual with the initials J.A.  Unlike all of the other substantive counts two through five, seven, and eight, no individual with the initials J.A.

testified at trial. Additionally, witnesses with initials consistent with those alleged in the aforementioned counts testified that they had both ordered and received an "Auto Key Card".

13. However, there is no record evidence that an individual with the initials J.A. actually ordered or received an "Auto Key Card". Furthermore, there is no record evidence that an individual with the initials J.A. who may have ordered an "Auto Key Card" actually existed, as the record was replete with examples of orders made under fictitious names, *nom de guerres,* and other aliases. For example, Government Exhibit 32 at page 1 is a mailing to an individual by the name "John Doe" and Government Exhibit 32 at page 4 is a mailing to an individual by the name "Ole Shoota".

14. There is insufficient record evidence, and no reasonable jury could find beyond a reasonable doubt that a machinegun conversion device was actually transferred to an individual with the initials J.A., as the record does not contain any testimony or documentary evidence that an individual with those initials actually existed or obtained a machine gun conversion device. Although the Government listed an individual by the name of James Acs (Doc. 242 at 2; enumerated paragraph 25), that individual was not called as a witness by either party. Although there is extra record evidence that suggests Mr. Acs was the alleged purchaser in Count Six, there was no evidence in the record that the jury had before it to make that determination. As such, the verdict as to Count Six is wholly unsupported by the record evidence and notwithstanding the other arguments in Mr. Hoover's Motion for Judgment of Acquittal, a Judgment of Acquittal should be entered as to Count Six of the Fourth Superseding Indictment.

15. With respect to Count Nine, Mr. Ervin was convicted of structuring a cash financial transaction to avoid the filing of a Currency Transaction Report pursuant to 31 U.S.C. §5313, in violation of 31 U.S.C. §5324(a)(3) and (d)(1).

16.     The evidence at trial is that on December 28, 2020, after getting into a dispute with his bank about the cashing of a money order for his "Auto Key Card" business, Mr. Ervin demanded to remove all of his money in cash.  Such a request would have been well in excess of the reporting requirements for a Currency Transaction Report.  Mr. Ervin's request was denied due to what the bank employees testified to, was an insufficient amount of United States Currency to fulfill the requested transaction.

17.     The bank employee, after denying Mr. Ervin's request, told him he could take out an amount under the Currency Transaction Report threshold, even though it was Mr. Ervin's stated desire to remove a greater amount of United States Currency than the Currency Transaction Report threshold.  According to the testimony regarding the account notes for Community First Credit Union, Mr. Ervin stated "I'll just come back everyday or try other branches until I get it".  Government Exhibit 95b.

18.     In fact, Mr. Ervin went to another Community First Credit Union branch on December 28 and attempted to withdraw a large sum of United States Currency (the individual who testified could not recall the exact amount and there are no known records regarding the exact amount requested).  Mr. Ervin was told that only $5000 was available to him, which he withdrew and a Currency Transaction Report was completed.  In the Fourth Superseding Indictment, it is alleged that both the $9000 dollars initially withdrawn on December 28, 2020 and the $5000 withdrawn later that day were structured transactions.  However, the record evidence is that Mr. Ervin attempted to withdraw more than $10,000, the amount that triggers the filing of a Currency Transaction Report pursuant to 31 U.S.C. §5313.  The only reason the December 28, 2020 transactions were under the reporting amounts was due to a lack of liquidity from the financial institution, not a desire to structure a transaction to avoid a reporting requirement.

19.     Although Mr. Ervin returned, as he stated he would, each day to withdraw more funds, there is no record evidence that Mr. Ervin was attempting to avoid the reporting requirement, but merely to retrieve his money from a bank with which he was having a dispute. He withdrew the same amount of money, the amount he had been allowed to withdraw on December 28, 2020, everyday the bank was open until he drew the account down, as he stated he would.

20.     There was testimony from Ms. Amy Sarkese that Mr. Ervin at one point inquired about the reporting requirement, she stated that she did not recall when it was. Ms. Sarkese further testified on cross examination that she would have noted a conversation about the reporting requirements in the bank system, as was her practice.  She further testified that the conversation must have occurred after the time period the withdrawals alleged to be structuring in Count Nine were to have taken place, as there were no notes about it in Government Exhibit 95b, which has a last note date of 02/02/2021, which is almost a full month after January 6, 2021, the last day an alleged structured transaction took place.

21.     The Government has argued that the fact Ms. Sarkese offered at all times to only provide a currency amount under the reporting amount is immaterial, as Mr. Ervin need not know the actual reporting requirement in order to commit a structuring offense.  However, the law does, in fact, require such knowledge, as the Supreme Court has stated an "intent to require for conviction proof that the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report."  *Ratzlaf v. United States*, 510 U.S. 135, 146–47 (1994).  In this case, a conviction is unsupported by the record and this Honorable Court should enter a Judgment of Acquittal as to Count 9.

WHEREFORE, it is respectfully requested that this Honorable Court grant this motion and acquit Mr. Ervin of all charges.

Respectfully submitted,

**Monroe & King, P.A.**

  /s/ Alex King
Alex King, Esq.
Florida Bar No.: 0086034
Scott Monroe, Esq.
Florida Bar No.: 0086801
1805 Copeland Street
Jacksonville, Florida 32204
Tel: (904) 355-7777
E-mail: Admin@MonroeKingLaw.com
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email to: Laura Cofer Taylor, Esq., Office of the United States Attorney, Laura.C.Taylor@usdoj.gov, this 19th day of May, 2023.

  /s/ Alex King
ATTORNEY

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE №: 3:21-cr-00022-MMH-MCR

UNITED STATES OF AMERICA,

v.

MATTHEW RAYMOND HOOVER.

_____/

## MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Matthew Raymond Hoover ("Defendant") respectfully submits this Post-Verdict Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. In support of this Motion, Defendant hereby states:

## I.    INTRODUCTION

Defendant requests this honorable Court to grant a judgment of acquittal on all charges against him on the grounds that the evidence presented by the prosecution is insufficient to support a conviction. Pursuant to Rule 29, a judgment of acquittal is warranted if the evidence, when viewed in the light most favorable to the prosecution, is insufficient for any rational trier of fact to find guilt beyond a reasonable doubt.

As has been the theme for much of the motion practice in the instant matter, the question of whether the Auto Key Card can be considered a

"combination of parts" lies near the core.[1] That question is underlined with concerns about whether an item all evidence demonstrated was a homogenous piece of steel that had to be "materially altered" can be considered a "combination of parts" beyond a reasonable doubt, further whether requisite scienter could have been proven in that instance.

It is further essential that "we are mindful that the Supreme Court recently cautioned against federal criminal statutes being read too expansively." *United States v. David McLean*, No. 14-10061 (11th Cir. Sept. 24, 2015) (citing *Yates v. United States*, 135 S. Ct. 1074 (2015) (concluding the term "tangible object" within the Sarbanes-Oxley Act not to apply to an undersized red grouper thrown overboard by a commercial fishing vessel's captain) in upholding a judgment of acquittal). This case presents a similar issue to the ones discussed in *Yates* and *McLean*: an aggressive, novel application of a federal criminal statute. Even more problematic here, though, is the way the government proceeded with this case. This is not a matter of a broad word like "tangible object," as was the case in *Yates*, but a specific sub-definition of "machinegun" under federal law, referring to a "combination of parts designed and intended" for use in converting a firearm into a machinegun, where the law contained another definition for a singular "part." Like in *Yates*, the

---

[1] Defendant also moved to dismiss the indictment on constitutional grounds, which were never adequately addressed, and the required *Bruen* analysis was not conducted by this Honorable Court. *See* ECF 132 – 133; 141; 246.

government could have proceeded under different parts of the statute, but instead pursued an "aggressive" interpretation. *Yates*, 135 S.Ct. at 1080, 1087 (Rejecting the government's "aggressive interpretation" after employing traditional tools of statutory interpretation to examine markers of congressional intent.). The government, be it for tactical reasons or otherwise, chose to prosecute the Defendant for conspiracy and substantive acts relating to what it proved to be a homogenous piece of steel as a "combination of parts" rather than a "part." Quite simply, no reasonable trier of fact could have found the items here at issue to be a "combination of parts," much less a "combination of parts" beyond a reasonable doubt.

## II.   LEGAL STANDARDS

The standards for a judgment of acquittal are governed by Rule 29 of the Federal Rules of Criminal Procedure and established caselaw. The court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. While this is a stringent standard, it is not *carte blanche* to approve any finding of any jury where any evidence was presented. Rather, it is an essential check on the government's burden to prove all essential elements beyond a reasonable doubt, thereby having provided sufficient evidence to support the jury's verdict.

In evaluating the sufficiency of the evidence, the court should consider the totality of the circumstances. While the jury's inferences are due some deference, that deference is *provided* that the ultimate conclusions are *reasonable* and *supported by the evidence*.

### III.   INSUFFICIENCY OF THE GOVERNMENT'S EVIDENCE

For the reasons detailed *infra*, the government has failed to prove the essential elements against Defendant beyond a reasonable doubt. As against Defendant Hoover, the counts and essential elements are:

a. **COUNT ONE: CONSPIRACY TO TRANSFER UNREGISTERED MACHINEGUN CONVERSION DEVICES**

   i. Two or more persons in some way agreed to try to accomplish a shared and **unlawful plan**;

   ii. the Defendant **knew the unlawful purpose of the plan** and **willfully** joined in it;

   iii. during the **conspiracy**, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

   iv. the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

**b. COUNTS   TWO,   THREE,   FIVE,   AND   SEVEN: SUBSTANTIVE COUNTS**

 **i.** The Defendant **knowingly** transferred, or aided and abetted the transfer of, a firearm, specifically a **combination of parts** designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger

 **ii.** the **firearm** was not registered in the National Firearms Registration and Transfer Record; and

 **iii.** the Defendant **knew of the specific characteristics or features of the firearm** that made it subject to registration under the National Firearms Registration and Transfer Record.

**c. DISCUSSION OF THE GOVERNMENT'S INSUFFICIENT EVIDENCE**

As pled in the indictment, if no parts were transferred, then there was no crime.  The government proceeded under a theory that each Auto Key Card constituted a combination of parts designed and intended to convert a weapon into a machinegun. At trial, the government and its agents demonstrated that Defendant advertised a homogenous piece of steel called the Auto Key Card on his YouTube channel. But when it came time to prove up its case, the

government's physical evidence and testimony demonstrated that, as transferred (and at best) each Auto Key Card was a singular, homogenous piece of stainless steel into which a design was lightly etched *i.e.*, Defendant advertised, and Mr. Ervin sold, a drawing that was on a piece of metal.

The testimony and evidence elicited from the employees of Orange Park Machine & Fab. demonstrated that Mr. Ervin contracted with them to engrave a design that was provided to the shop by way of a Drawing Exchange Format file ("DXF File"). Testimony showed that the DXF File necessarily contained a two-dimensional image, *i.e.*, a drawing (the "Drawing"). Mr. Ervin requested that the Drawing be copied onto single, homogenous pieces of stainless steel by way of a laser *only to the extent that* the image could not be wiped off of it. Much to the consternation of the machine shop, and against its advice, he refused to allow them to manufacture the Auto Key Cards in such a manner as to be cut out into multiple parts. His intent was clear, and the evidence is what it is. The stainless steel was a canvas for the Drawing and the laser was the medium. Agents of the government even admitted that they could construe shoelaces and a paperclip as a machinegun, but that "templates" and "drawings" were not.

The testimony of the government's own witnesses supports the conclusion that, as transferred, the Auto Key Card was not "a combination of

parts." Special Agent Jesse Hooker admitted that the government had to "materially alter" the Auto Key Card to become what it alleges in the indictment is a "combination of parts" that are "designed and intended to convert a weapon into a machinegun." The testimony of Mr. Toy buttressed the conclusion that the Auto Key Cards only became contraband only after he performed about an hour of transformative labor upon the Auto Key Card. Transformative labor that fundamentally changed—materially altered—it from a homogenous piece of steel with a constitutionally protected Drawing on it to contraband, *i.e.*, an unregistered combination of parts designed and intended to convert a weapon into a machinegun.

The government's theory bears emphasis: that each drawing on the piece of steel constituted a "part." This reading is so inconsistent with the statute as charged that the government even attempted to invert the statute at closing arguments by arguing that the law proscribed something "designed and intended" to *become* a "combination of parts," which is just manifestly not the case. Even more, the government never once provided evidence that the Auto Key Card was a combination of parts. It forcefully fought against all attempts to delineate what "parts" were "in" the Auto Key Card, instead simply waxing over the critical statutory distinction between a "part" and "combination of parts" and telling the jury, quite literally, not to "worry" about it.

7

Even if the government's assertion that a drawing on a homogenous piece of steel equates to "parts"—an assertion that is patently absurd—such could only logically extend to the contours of the drawing. However, the government provided no evidence that an Auto Key Card, if cut along the lines, would convert a firearm to fire automatically. One of the government's substantive act witnesses—who claimed to work at a tool and die shop— testified that when cut precisely to the lines, he could not get the resulting parts to function. On the other hand, ATF's Mr. Toy sliced and diced multiple Auto Key Cards apart with a Dremel. He kept at it, and his testimony, and the government's evidence, showed that only after cutting *outside* the Drawing by re-contouring a piece he described as a "flap" did he manufacture a combination of parts from a single piece of stainless steel into a "combination of parts" he re-designed to induce a malfunction in the weapon which resulted in its firing more than one shot. A malfunction, it bears emphasis, Mr. Toy testified that did not reflect how a "lightning link"—the type of machinegun conversion device the government asserted the Auto Key Card to be—would have functioned. Further, Mr. Toy testified that there would be no meaningful distinction in result were the design drawn with laser or marker. So, in fewer words: the government *proved* that each Auto Key Card was a homogenous piece of steel, *proved* that if that homogenous piece of steel was cut precisely to the lines, was not designed and intended to convert a weapon to fire

automatically, and *proved* that the only way its own expert could induce a weapon to fire more than one shot using the Auto Key Card was to *ignore the lines thereupon engraved* to spend substantial time manufacturing a combination of parts which *did not even function as the type of machinegun conversion device the government alleged it to be.*

Indeed, at no point in the trial did the government attempt to remedy that its witnesses and physical evidence exclusively referred to each Auto Key Card as a homogenous piece of steel and the parts the government manufactured from it as being "materially altered." There was not a shred of evidence that the Auto Key Card, as sold, met *even a single element* of the charged definition. This honorable Court even grappled with this issue during debate over jury instructions, when the Court expressed hesitation that it did not want to assert that a single "object" could not be "multiple parts." Turning to traditional tools of statutory interpretation, it is clear that an "object", such as a music box, can consist of multiple parts, as this Court noted, but that a *homogenous piece*, such as an unmodified Auto Key Card, cannot.

### d. ARGUMENT: THE JURY'S VERDICT IS NOT ONLY UNSUPPORTED BY EVIDENCE, BUT SIMPLY UNSUPPORTABLE

We stress these points of statutory interpretation and settled law as essentially related to the insufficiency of the government's evidence. Clearly,

while there could have been a less provocative canvas to copy the Drawing onto, during closing arguments, the government asked the rhetorical question of where we draw the proverbial line while displaying the sliced-up remnants of an Auto Key Card as a table sculpture. And therein lies one of many problems with the government's case: It is not for the jury to decide where the line is drawn—that is Congress's role alone. The jury does not, and cannot serve as a legislative sub-assembly to define terms of law. The jury's role is to decide if an otherwise clear and validly drawn line has been crossed. The essential lines here, which the government provided no evidence of are: was the subject article a combination of parts, did the Defendant **know** the article had features subjecting it to NFA requirements, and did Defendant **know** and **intend** to be part of an unlawful plan. Not only did the government fail to prove the essential elements, the government **proved** their absence.

In *Staples v. United States*, the Supreme Court held that the government **must** prove that a Defendant has actual knowledge that an item is a machinegun in order to sustain a conviction. 511 U.S. 600 (1994). The government played hours of videos from Defendant's YouTube channel where it is manifest that Defendant believed the Auto Key Card to be completely lawful unless cut out and manufactured into a machinegun.

This prosecution reflects concerns addressed by the Eleventh Circuit in other multi-defendant conspiracy prosecutions—"that individuals who are not

actually members of the group will be swept into the conspiratorial net. Because the government is permitted broad prosecutorial discretion to prove the conspiracy, the likelihood exists that those who associate with conspirators will be found guilty of a crime they **have not intended to commit**[.]" *U.S. v. Chandler*, 388 F.3d 796 (11th Cir. 2004); *see also Dennis v. United States*, 384 U.S. 855, 860 (1966). Numerous statements of Mr. Ervin, and a video generated by Mr. Ervin inexplicably involving a fish, were slip-shoddily presented to the jury with no evidence Defendant knew or processed the information at all, substantially prejudicing Defendant.

Like in *Chandler*, this case reflects the compounded danger "when the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory. This roaming theory of the prosecution can produce trial error of constitutional proportions." *Chandler*, 388 F.3d at 798; *see also* Russel v. United States, 369 U.S. 749, 768 (1962) (ill-defined charges leave "the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal"). The government originally indicted Defendant using the "part" definition, but over the course of several superseding indictments, shifted strategy to a "combination of parts."

Even more like *Chandler*, "the defendants focused on whether the allegations of the indictment were sufficient to state a crime. Under federal

conspiracy law, the government must allege and prove that the defendants *knowingly* entered into an *agreement* to commit an *unlawful act*., 839 F.2d 1473 (11th Cir. 1988)." 388 F.3d at 799-800. *Chandler* dealt, quite interestingly, with counterfeit McDonalds game pieces, and the *Chandler* indictment "did allege an unlawful act in the embezzlement of the game stamps. Nowhere, however, did the indictment allege that any of these defendants *knew* that the game stamps they redeemed had been stolen. The defendants moved to dismiss the indictment, alleging that it was fatally defective in its failure to allege an essential element of the crime of conspiracy — knowing agreement to commit the illegal act." *Id*. In *Chandler*, the motion to dismiss the indictment was denied, as it was here, and the case proceeded to a multi-week trial, as it did here, where the government put on voluminous evidence of seemingly *everything but* the essential elements of the charged offenses, as it did here, and the jury returned an unsupportable verdict, as it did here.

To prove an illegal attempt, the government must show that the defendant had the specific intent to engage in criminal conduct and that he took a substantial step toward commission of the offense. *United States v. Collins*, 779 F.2d 1520, 1527 (11th Cir. 1986); *U.S. v. Baptista-Rodriguez*, 17 F.3d 1354, 1369 (11th Cir. 1994). Here, not only was no evidence of knowledge offered, but the government put up hours of exculpatory evidence in the form

of Defendant's YouTube videos where he very manifestly—and reasonably—processes that the Auto Key Card is "just a drawing" unless manufactured into something else.

The government, at trial, referred to the provocative and tongue-in-cheek nature of Defendant's videos *ad nauseum*. That Defendant is a political provocateur with a more than a healthy distrust of the government is not evidence of criminal intent, nor is the fact that Defendant may be a conspiracy *theorist* evidence that he is a criminal conspirator.

The vagueness doctrine requires that a criminal statute "clearly define the conduct it proscribes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment); *accord Johnson v. United States*, 576 U.S. 591, 596 (2015) (Fifth Amendment guarantees that every criminal law provides "ordinary people fair notice of the conduct it punishes" and is not "so standardless that it invites arbitrary enforcement"). In *United States v. Lanier*, 520 U.S. 259 (1997), the Supreme Court described three aspects of the requirement that criminal statutes give "fair warning" of what is outlawed. First, "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* at 266. Second, any ambiguity in a criminal statute must be resolved in favor of applying the statute only to conduct which is **clearly**

**covered**. *Id.* Third, although clarity may be applied by judicial gloss, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.; see also United States v. Denmark*, 779 F.2d 1559 (11th Cir. 1986). Central to each inquiry is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. It should not be controversial to state that a statute proscribing a "combination of parts" gives no notice that a drawing, or even a drawing that could *become* a combination of parts through transformative labor, be covered.

"A penal statute maybe void for vagueness 'for either of two independent reasons.'" *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). First, a statute may be unconstitutionally vague if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A statute may also be unconstitutionally vague if it "fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *Lim*, 444 F.3d at 915 (citing *Karlin v. Foust*, 188 F.3d 446, 458-59 (7th Cir. 1999)). As observed by the United States Supreme Court, the requirement that a penal statute provide minimal guidelines to discourage arbitrary enforcement is "perhaps the most meaningful aspect of the vagueness

doctrine." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Without these minimal enforcement guidelines, "policemen, prosecutors, and juries are allowed to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

"Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct." *Geudes v. ATF*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement respecting denial of writ of certiorari). The rules of statutory construction require that all words be given effect. "[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which were allegedly etched a design. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006).

A regulation may "provide such inadequate notice of potential liability so as to offend the rule of lenity." *Gun Owners of Am., Inc.*, 19 F.4th at 901. "The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to Chapter 44 of Title 18 and Chapter 53 of Title 26. 28 C.F.R. § 0.130(a)." *Gun Owners of Am., Inc.*, 19 F.4th at 897. Unlike the widely publicized situation of bump stocks, suppressors, and other items, ATF has issued no guidance—and has no congressional authority—relating to drawings. In fact, ATF recently rescinded *all* guidance in the context of what is and is not a "firearm" when it comes to incomplete or "partially finished" articles. *See Definition of "Frame or Receiver"*

*and Identification of Firearms*, 87 F.R. 24652 at 24672 ("Any such classifications, to include weapon or frame or receiver parts kits, would need to be resubmitted for evaluation.").

As the Supreme Court wrote in *Babbitt*:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present.

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).

Where there is ambiguity in a criminal statute—or regulation interpreting that statute—doubts are resolved in favor of the defendant. *See Yates v. United States*, 574 U.S. 528 (2015); *Skilling v. United States*, 561 U.S. 358 (2010); *United States v. Santos*, 553 U.S. 507 (2008); *Jones v. United States*, 529 U.S. 848 (2000); *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013); *United States v. Trout*, 68 F.3d 1276 (11th Cir. 1995). In addition to these circuit decisions, the Navy-Marine Corps Court of Criminal Appeals considered the bump stock Final Rule in the context of a criminal prosecution for possession of a machinegun. *See United States v. Alkazahg*, 81 M.J. 764, 780–81 (N–M. Ct. Crim. App. 2021). That court determined that, under the best reading of the statutory language, a bump stock is not a machinegun. But it ultimately found that the statute is ambiguous and applied the rule of lenity to construe the statute against imposing criminal liability. It dismissed the

charge for possession of a machinegun. Here, similarly, there is no regulation on point.

The Supreme Court in *Yates* explained that if the statute "leaves any doubt" about the application of the statute to the facts to which the government seeks to have the statute apply, the rule of lenity precludes such application. *I.e.*, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U. S. 12, 25 (2000); *see also Liparota v. United States*, 471 U. S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). In determining the meaning of "machinegun" under the National Firearms Act, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Yates*, 574 U.S. at 548, (quoting *Cleveland*, 531 U.S. at 25, and *United States v. Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952)); *see also Jones v. United States*, 529 U. S. 848, 858–859 (2000). *Santos* explained that the rule of lenity "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best

induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Santos*, 553 U.S. at 514.

As pled in the Indictment, the Government defined Auto Key Cards as "cards machined from stainless steel, into which were etched the design for machinegun conversion devices." As was proven by the government, the Auto Key Card would require significant transformative labor and machining of the card to cause it to fit into the rear internal area of the receiver, where the machinegun automatic sear would be installed. Further torturing the language of the Indictment to the Government's benefit for the purposes of argument, the Auto Key Card could, at most, constitute a trinket from which the parts of a DIAS could possibly be made. Such tchotchkes are not regulated under the Gun Control Act or the National Firearms Act. *See also United States v. Prince*, No. 09-10008-JTM, 2009 WL 1875709, at *3 (D. Kan. June 26, 2009), rev'd on other grounds, 593 F.3d 1178 (10th Cir. 2010) ("However, the court simply does not believe that a flat piece of metal with laser perforations and holes constitutes a 'receiver,' *i.e.*, a 'firearm.' Rather, the flat piece of metal is somewhat akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an airplane until it is properly folded. Until that time, it is a patterned piece of paper.").

The rule of lenity "is premised on two ideas: First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed'; second, 'legislatures and not courts should define criminal activity." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18, 115 S. Ct. 2407, 2416 (1995). If the DXF File of the Drawing and instructions how to break the law, like the Anarchist Cookbook, are constitutionally protected speech, is the Drawing with oil-based paint on piece of stainless steel, okay? What about military grade plastic with the etching—is that Kosher? While the government pawned off on the jury the question of where to draw the line, that is not—and cannot—be their job, and the government cannot be allowed to unload its failure to prove its case on the jury. For penal statutes, Congress must decide where the line is, and then looking at all the evidence, the jury decides whether the government has shown beyond a reasonable doubt that the line has been crossed.

For reasons stated *supra*, the Government has failed to plead, much less prove sufficient facts which demonstrate the Auto Key Card is a combination of parts designed and intended as a machinegun conversion device. However, it has conclusively demonstrated that the Auto Key Cards are not machinegun conversions devices as a matter of law because as pled in the Indictment, the

Auto Key Card cannot possibly even be a "part," much less "parts" beyond a reasonable doubt.

The Government pled that the Auto Key Cards are "cards . . . into which were etched the design for machinegun conversion devices known as lightning links[.]" It then, in a conclusory manner, declares that such cards are "machineguns as defined in 26 U.S.C. §[§] 5845(a) and 5845(b)." To embrace the Government's position that a card with design on it is a "combination of parts" under § 5845(b) would be to ignore the plain and ordinary language of the word. The term "part" is undefined in the statute, but "[i]f possible, every word and every provision is to be given effect." *Geico Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1141 (11th Cir. 2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 26, at 174 (2012); The ordinary meaning of a "part" in the context of machinery like a firearm is "a constituent member of a machine or other apparatus." *See* Webster's Dictionary, Part, https://www.merriam-webster.com/dictionary/part#:~:text=1%20%3A%20one%20of%20the%20sections,My%20dog%20is%20part%20husky. (last retrieved on June 7, 2022); *See also Johnson v. United States*, 559 U.S. 133, 134 (2010) (where a word is undefined, the court must give it its ordinary meaning.). The statute does not refer to something that may one day become a part, nor does it refer to

drawings or schematics for parts. It refers, quite simply, to something that *is* a *combination of parts*.

In no event would a reasonably intelligent person foresee that the conduct charged in this case—talking about a card with a drawing on it—would be deemed criminal, much less that a homogenous piece of steel with a drawing on it would be deemed a combination of parts. As applied against Mr. Hoover, 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2 are unconstitutionally vague under the Fifth Amendment as applied. Mr. Hoover had no reason to believe, at any point, that he would be engaging in criminal conduct if—as alleged—he entered into an agreement with a tchotchke salesman to discuss stainless steel cards with a design on them on his YouTube channel. The government provided no evidence, and no evidence could likely even exist, to prove the requisite knowledge and intent here beyond a reasonable doubt.

It is worth emphasizing that no court has ever applied the National Firearms Act to a fact pattern like this one. The conduct at issue certainly isn't in the heartland of machinegun cases. Despite ample opportunity to do so, the Government did not allege that a consumer was able to convert a firearm into a machinegun using the alleged design scratched into a stainless-steel card.

### e. COUNTS 2 – 8: THE SAME ANALYSIS *SUPRA* APPLIES TO 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2

While aiding and abetting might commonly be thought of as an offense in and of itself, it is not an independent crime under 18 U.S.C. § 2. That statute provides no penalty, and only collapses common law notions of "principal" and "accessory." *United States v. Kegler*, 724 F.2d 190, 200 (D.C. Cir. 1983). Under it, the acts of the perpetrator become the acts of the aider and abettor and the latter can be charged with having done the acts himself. *Id.* at 200-01. An individual may be indicted as a principal for commission of a substantive crime and convicted by proof showing him to be an aider and abettor. *Id.* Accordingly, the indictment need not specifically charge a violation of 18 U.S.C. § 2.

The Government has charged Mr. Hoover with violating 26 §§ U.S.C. 5861(e) and 5871, and 18 U.S.C § 2 in Counts 2 – 8 of the Indictment. And for reasons thoroughly stated *supra*, the Government has failed to state, much less prove, sufficient ultimate facts to support a conviction.

### IV. CONCLUSION

In light of the insufficiency of evidence presented by the prosecution, the Defendant respectfully requests this Honorable Court to enter a judgment of acquittal on all charges. The evidence presented is legally insufficient to sustain a conviction, and no reasonable trier of fact could find the Defendant

guilty beyond a reasonable doubt. Granting the motion is necessary to preserve Defendant's constitutional rights to due process and a fair trial.

**WHEREFORE** Defendant Matthew Raymond Hoover respectfully moves this Honorable Court to enter a judgment of acquittal on all counts in which he was convicted, and for any further relief that this Court deems just and proper.

DATED:  May 19, 2023

Zachary Z. Zermay, Esq.
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 239-699-3107
*Lead Counsel for Defendant*

/s/Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on  May 19, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Zachary Z. Zermay, Esq.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                            Case No.  3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

_____

### O R D E R

**THIS CAUSE** is before the Court on Defendant Kristopher Justinboyer

Ervin's Post-Verdict Motion for Judgment of Acquittal (Doc. 273; Ervin's

Motion), filed May 19, 2023, and Defendant Matthew Raymond Hoover's Motion

for Judgment of Acquittal (Doc. 274; Hoover's Motion), filed May 19, 2023.

Following a nine-day jury trial, on April 21, 2023, the jury returned a verdict

finding Ervin guilty as to all twelve counts of the Fourth Superseding

Indictment (Doc. 204; Indictment) and a verdict finding Hoover guilty of five of

the eight counts charged against him.  See Verdict (Doc. 263; Ervin Verdict);

Verdict (Doc. 264; Hoover Verdict).  Specifically, the jury found Ervin guilty of

conspiring to transfer unregistered machinegun conversion devices in violation

of 18 U.S.C. § 371 (Count One); transferring unregistered machinegun

conversion devices in violation of the National Firearms Act (NFA), 26 U.S.C.

§§ 5861(e) and 5871 and 18 U.S.C. § 2 (Counts Two–Eight); structuring currency

transactions in violation of 31 U.S.C. § 5324(a)(3) and (d)(1) (Count Nine); and possessing unregistered machinegun conversion devices in violation of the NFA, 26 U.S.C. §§ 5861(d) and 5871 (Counts Ten–Twelve).  Ervin Verdict at 1–5; see also Indictment at 1–16.  As to Hoover, the jury returned guilty verdicts on the charges of conspiring to transfer unregistered machinegun conversion devices (Count One) and four counts of transferring unregistered machinegun conversion devices (Counts Two, Three, Five, and Seven).  Hoover Verdict at 1–3; see also Indictment at 1–14.  But the jury found Hoover not guilty of three counts of transferring unregistered machinegun conversion devices (Counts Four, Six, and Eight).  Hoover Verdict at 2–4.

In their motions, Defendants request that the Court enter judgments of acquittal as to all counts pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Rule(s)) because "the evidence presented by the prosecution is insufficient to support a conviction."  Hoover's Motion at 1; see Ervin's Motion at 1–2.  The Government filed responses to both motions on June 16, 2023.  See Government's Response in Opposition to Defendants' Motion for Judgment of Acquittal (Doc. 289); Government's Response in Opposition to Defendant Ervin's Post-Verdict Motion for Judgment of Acquittal (Doc. 290).  Accordingly, this matter is ripe for review.

## I.      Legal Standard

Rule 29 provides the Court with authority, where appropriate, to enter a judgment of acquittal following a guilty verdict.  See Rule 29(c)(2).  A motion for judgment of acquittal under Rule 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant."  United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994); see also United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999) ("In considering a motion for the entry of judgment of acquittal under [Rule 29(c)], a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction.").  In ruling on such a motion, "a district court must 'determine whether, viewing all the evidence in the light most favorable to the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'"  United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987)).

## II.     Discussion

Having carefully reviewed the record, the applicable law, and the parties' arguments, the Court finds that Ervin's Motion and Hoover's Motion are both due to be denied.

### A.      Firearms Charges (Counts One–Eight and Ten–Twelve)

The conspiracy charge in Count One and the firearms charges in Counts Two through Eight and Ten through Twelve arise from Ervin's "Auto Key Card"

business.  See generally Indictment.  The evidence at trial showed that Ervin's Auto Key Cards are stainless steel cards into which the designs of "lightning links," a type of machinegun conversion device, were etched.  See Jury Trial (Volume 1 of 9) (Doc. 277; Tr. Vol. 1) at 244–45; Gov't Ex. 64 (Doc. 259-171). Hoover partnered with Ervin to create several videos advertising the sale of the Auto Key Cards.  See, e.g., Gov't Ex. 2 (Doc. 259-3; Gov't Ex. 2); Gov't Ex. 2A (Doc. 259-4; Gov't Ex. 2A) at 3; Gov't Ex. 3 (Doc. 259-5); Gov't Ex. 3A (Doc. 259-6) at 2–3.  In its closing argument, the Government urged the jury to find that the Auto Key Card is "a combination of parts designed and intended for use in converting an AR-15 [rifle] into a machine gun."  Jury Trial (Volume 8 of 9) (Doc. 284; Tr. Vol. 8) at 35.  The Government contended that the Auto Key Card is "an NFA item disguised as something innocuous."  Id. at 36.  In contrast, Ervin and Hoover argued that the Auto Key Card is merely artwork and a novelty, not a machinegun conversion device.  See id. at 73 ("It's not a machine gun.  It's lines on a piece of steel."); id. at 155 (asserting that the Auto Key Card is a "conversation piece").  Apparently rejecting Defendants' theory of the case, the jury found Ervin guilty of each of the machinegun conversion device charges and Hoover guilty of Counts One, Two, Three, Five, and Seven.  See Ervin Verdict at 1–5; Hoover Verdict at 1–3.

In Hoover's Motion, Hoover presents several arguments as to why the Court should acquit him of the firearms-related charges.  See Hoover's Motion

at 5–23.  Ervin adopts Hoover's arguments to the extent that they are applicable to Ervin's convictions.  See Ervin's Motion at 2.  Ervin also raises a challenge specific to his conviction for Count Six.  See id. at 2–3.  The Court will address each argument in turn.

### 1. Sufficiency of the Evidence

Ervin and Hoover argue that there was insufficient evidence to support each element of the firearms-related offenses.  See Hoover's Motion at 1; Ervin's Motion at 2–3.  To find a Defendant guilty of a conspiracy to transfer unregistered machinegun conversion devices as charged in Count One, the jury had to find that the Government proved all of the following facts beyond a reasonable doubt:

> (1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan;
>
> (2) the Defendant knew the unlawful purpose of the plan and willfully joined in it;
>
> (3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and
>
> (4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

Court's Final Jury Instructions (Doc. 254; Jury Instructions) at 16.  To find Ervin and Hoover guilty of the substantive counts of transferring unregistered

machinegun conversion devices, the jury had to find the following facts to be

true beyond a reasonable doubt:

> (1) the Defendant knowingly transferred, or aided and abetted the transfer of, a firearm, specifically, a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger;
>
> (2) the firearm was not registered in the National Firearms Registration and Transfer Record; and
>
> (3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration under the National Firearms Registration and Transfer Record.

Id. at 18–19.  The jury had to find nearly identical elements to convict Ervin of

possessing unregistered machinegun conversion devices as charged in Counts

Ten through Twelve.  See id. at 25–26.

### a. Evidence that the Auto Key Card Is a "Combination of Parts Designed and Intended" for Use in Converting a Weapon into a Machinegun

Hoover argues that no evidence at trial proved that Ervin and Hoover

transferred a "combination of parts."  Hoover's Motion at 5–6.  According to

Hoover, the Government's evidence demonstrated that "each Auto Key Card

was a singular, homogenous piece of stainless steel into which a design was

lightly etched."  Id. at 6.  Hoover also maintains that no evidence showed that

the alleged parts would be functional if cut along the lines of the drawing.  Id.

at 8.  In support of this argument, Hoover contends that the Government's

expert witness, Firearms Enforcement Officer Cody Toy, had to materially alter the Auto Key Card to create parts that caused a malfunction leading to multiple rounds being fired.  Id. at 7–8.

The Court finds that the Government presented sufficient evidence from which a reasonable jury could conclude that Ervin and Hoover transferred, and Ervin possessed, a combination of parts designed and intended for use in converting a weapon into a machinegun.  First, the evidence at trial showed that the etchings on the Auto Key Card demarcate metal pieces that are the correct shape and size to be the parts of a machinegun conversion device.  Special Agent Jesse Hooker testified that the etchings on the Auto Key Card are recognizable as the two parts of a lightning link, a machinegun conversion device consisting of a longer piece with a slot and a smaller piece that fits in the slot.  Tr. Vol. 1, at 244–45.  Toy explained that the longer piece is called the "body," and the smaller piece is the "paddle" or "connector."  Jury Trial (Volume 7 of 9) (Doc. 283; Tr. Vol. 7) at 144.

Next, the Government introduced evidence that the pieces identified by the etchings on the Auto Key Card are the correct material to function as machinegun conversion devices.  Hooker testified that lightning links had to be made of metal to work in a rifle.  Tr. Vol. 1, at 245.  Indeed, Ervin advertised the Auto Key Card as "High strength stainless steel.  Durable" and "Full Auto

laser engraved to scale graphic design." Jury Trial (Volume 2 of 9) (Doc. 278; Tr. Vol. 2) at 119–120, 124 (emphasis added).

In addition, the jury heard evidence suggesting that the metal pieces demarcated by the etchings were meant to be removed from the surrounding metal. Two employees at the company that Ervin contracted to manufacture the Auto Key Cards thought that the etchings identified pieces of a tool to be cut out of the card because Ervin said the card was a tool. Transcript of Jury Trial (Volume 4 of 9) (Doc. 280; Tr. Vol. 4) at 27, 111–12. One employee testified that Ervin was concerned about the narrow spacing between two etchings on some of the Auto Key Cards. Id. at 85–87. The jury could reasonably infer that the spacing between the etchings mattered because a customer needed to be able to cut out both parts without damaging them. Moreover, Carolanne Wolfe testified that Ervin decided to include "1 in 1," "2 in 1," or "3 in 1" in the name of each Auto Key Card, even though those names did not describe the number of etchings on each card. Id. at 195. For example, the "3 in 1" Auto Key Card actually contained six separate etchings. Tr. Vol. 2, at 34. A reasonable jury could conclude that Ervin called the cards "3 in 1" because each card contained the parts for three lightning links.

Notably, the jury heard Hoover say that the Auto Key Cards contain firearm parts that can be removed from the surrounding metal. In his first video about the Auto Key Card, Hoover pointed to the different etchings on the

card and noted that a person could cut out "this piece right here" and fit the piece in the "slot right here."  Gov't Ex. 1 (Doc. 259-1; Gov't Ex. 1); Gov't Ex. 1A (Doc. 259-2; Gov't Ex. 1A) at 7–8.  Hoover explained how these pieces can interact with the other parts of an AR-15 rifle to produce automatic fire.  Gov't Ex. 1; Gov't Ex. 1A, at 7–8.  In another video, Hoover said that the Auto Key Card "was a great [Special Occupational Taxpayer] resource where you could get machine gun parts."  Gov't Ex. 14 (Doc. 259-25; Gov't Ex. 14); Gov't Ex. 14A (Doc. 259-26; Gov't Ex. 14A) at 2–3 (emphasis added).

Finally, the Government presented evidence from which the jury could reasonably conclude that the parts identified by the etchings in the Auto Key Card are reasonably accessible to an end user and actually function as a machinegun conversion device.  Using a commonly available Dremel tool and a hand file, Toy was able to cut out the parts of the lightning link from the first Auto Key Card that he received.  Tr. Vol. 7, at 148–50.  The whole process took him approximately 37 minutes.  See id. at 150.  Toy cut to the line on the Auto Key Card except that he removed "some of the material" off the paddle because it was "a little bit too tall."  Id. at 151–53.  Toy explained that "hand fitting" a part is not uncommon because firearms from different manufacturers have different tolerances.  Id. at 151–52.  Counsel for the Government placed the cut-out piece over the uncut etching on an Auto Key Card.  See id. at 153.  Toy agreed that it appeared to be a millimeter or less of a difference between the

dimensions of the piece he cut out and the etching on the card.  Id.  The jury could see for itself whether the pieces that Toy cut out conformed to the etchings on the Auto Key Card.  See id.; Gov't Ex. 20A (Doc. 259-40); Gov't Ex. 25A (Doc. 259-46); Tr. Vol. 1, at 256–57, 272–73.  Once Toy installed the pieces from that Auto Key Card, a formerly semiautomatic rifle fired more than one shot with a single function of the trigger.  Tr. Vol. 7, at 155–156.  Toy conducted an additional test fire in Jacksonville, Florida.  Id. at 167–168.  At that test, with the parts from this Auto Key Card installed, the weapon fired automatically with both a machine gun bolt carrier and with an SP1 bolt carrier.  Id. at 168.

With the second Auto Key Card that Toy received, he used a Dremel tool and a drill press.  Id. at 159–61.  It took him 53 minutes to successfully cut out the parts of a lightning link from that card.  Id. at 162.  Once Toy installed these parts into his rifle, the rifle fired automatically.  Id. at 163.  Based on Toy's testimony, a reasonable jury could find that, while Toy had to "materially alter" the Auto Key Card to access the parts of a lightning link, he did not have to materially alter the parts themselves.  Toy merely had to remove the parts from the surrounding metal in order to use them to convert a semiautomatic rifle into a machinegun.

Given all of this evidence, the jury could reasonably conclude that Ervin and Hoover transferred and possessed a combination of parts designed and intended for use in converting a weapon into a machinegun.

**b. Evidence that Defendants Knew the Specific Characteristics of the Firearm that Made It Subject to Registration**

Hoover argues that the Government did not prove that he had the <u>mens rea</u> required to be convicted of transferring unregistered machineguns.  <u>See</u> Hoover's Motion at 10 (citing <u>Staples v. United States</u>, 511 U.S. 600 (1994)).  In <u>Staples</u>, the Supreme Court expressed concern that a gun "may give no externally visible indication that it is fully automatic," leaving the gun's possessor with "absolute ignorance of the gun's firing capabilities."  511 U.S. at 615.  The Court concluded that Congress did not intend "to subject such law-abiding, well-intentioned citizens" to a lengthy prison sentence if "what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon.'"  <u>Id.</u> (alteration in original) (quoting <u>United States v. Anderson</u>, 885 F.2d 1248, 1254 (5th Cir. 1989) (en banc)).  Thus, the Court concluded that, to obtain a conviction, the Government must prove that a defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun."  <u>Id.</u> at 602, 619.[1]

---

[1] The Court did not hold that the Government must prove that the defendant knew his possession was <u>unlawful</u>.  In her concurrence, Justice Ginsburg noted that "[t]he <u>mens rea</u> presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'"  <u>Id.</u> at 622 n.3 (Ginsburg, J., concurring) (quoting <u>Cheek v. United States</u>, 498 U.S. 192, 199 (1991)).

Here, the jury could reasonably conclude that Ervin and Hoover knew of the characteristics or features that brought the Auto Key Card within the statutory definition of a machinegun.  Jonathan Monger testified that Ervin told him that the Auto Key Card is a "gray market item" that resembles the lightning link.  Tr. Vol. 4, at 266–67.  According to Monger, Ervin told him that, if the pieces of the Auto Key Card "were cut out correctly and formed in a certain way, it could make a certain model AR-15 fully auto."  Id. at 267–68.  In addition, in an advertisement video, Ervin interspersed videos and sounds suggesting automatic fire with images of the Auto Key Card.  Gov't Ex. 49A (Doc. 259-121).  Moreover, when a customer asked Ervin about the "proper use of the card," Ervin provided directions on how to find instructions for using the Auto Key Card as a machinegun conversion device.  Gov't Ex. 67E (Doc. 259-179; Gov't Ex. 67E); Tr. Vol. 2, at 115–16.  Ervin also told the customer,

> The auto key card is a conversation piece as sold and as with many legal products, illegal use can occur.  Think of brass knuckles sold as paperweights.  Please be smart and careful you don't get into trouble.  It is intended to stay in the sold as form.  Individuals may make the choice to use it in a different way under certain dire circumstances in the future.  Please share our product with others and friends that may need it someday.

Gov't Ex. 67E.  From this evidence, the jury could reasonably conclude that Ervin knew of the characteristics or features of the Auto Key Card that brought it within the scope of the NFA.

Similarly, the Government presented evidence from which a reasonable jury could find that Hoover knew that the Auto Key Card is a combination of parts designed and intended for use in converting a weapon to shoot automatically.  In one of his videos, Hoover instructed viewers how to get a functioning lightning link out of an Auto Key Card.  See Gov't Ex. 1; Gov't Ex. 1A, at 7–8.  Hoover explained that the Auto Key Card is "awesome" because it is "stupid cheap. You could drop it in your rifle – or, you know, if you're actually gonna do this legally, this is just the bottle opener."  Gov't Ex. 1; Gov't Ex. 1A, at 8–9.  And Hoover called the Auto Key Card a great resource "where you could get machine gun parts."  Gov't Ex. 14; Gov't Ex. 14A, at 2–3.  This evidence sufficiently supports the jury's finding that Hoover knew of the characteristics or features of the Auto Key Card that brought it within the scope of the NFA.

The jury also could reasonably conclude that Ervin and Hoover knew that parts could fall within the definition of "machinegun" even when the parts could not immediately be used.  Ervin told Wolfe that a lightning link that she found online was a "no-no" because it was "like 95 percent."  Tr. Vol. 4, at 227–29. Similarly, Hoover stated that the "old Lightning Links" caused problems because there were "just a couple of small pieces of metal holding them in the original piece.  All's you had to do was take your finger, pop it out.  Boom.  You have a machine gun."  Gov't Ex. 2; Gov't Ex. 2A, at 3.  Hoover described another conversion device called the "swift link" and mentioned how they were

"disguised as a little stick-on coat rack. You just snapped off the back of it." Gov't Ex. 1; Gov't Ex. 1A, at 6.  In the video "This Makes an Illegal Machine Gun," Hoover argued that the "portable wall hanger" is not a machinegun conversion device because "modification needs to happen."  Gov't Ex. 7 (Doc. 259-13; Gov't Ex. 7); Gov't Ex. 7A (Doc. 259-14; Gov't Ex. 7A) at 3.  He then admitted that the ATF "considered it" a machinegun conversion device "for whatever reason."  Gov't Ex. 7; Gov't Ex. 7A, at 3.  Finally, Hoover discussed drilling a third hole in a receiver and noted how "dimpling," or merely marking in the metal where the third hole would go, would mean that the ATF classified the receiver as a machinegun.  Gov't Ex. 1; Gov't Ex. 1A, at 7.  Based on this evidence, the jury could reasonably find that Ervin and Hoover knew that they were transferring and possessing a combination of parts designed and intended for use in converting a weapon into a machinegun, notwithstanding the extra material surrounding the parts in the Auto Key Card.

### c. Evidence that Ervin Transferred Machinegun Conversion Devices to J.A.

With regard to Count Six of the Indictment, the jury found Ervin guilty of transferring unregistered machinegun conversion devices to a person with the initials "J.A." See Ervin Verdict at 3.  Ervin argues that no evidence showed that an individual with the initials J.A. existed or ordered and received an Auto Key Card.  Ervin's Motion at 3.  However, the Court finds that the jury heard

sufficient evidence to conclude that Ervin transferred an Auto Key Card 2 in 1 Pen Holder Edition (containing two conversion devices) to a real individual named James Acs.  See Gov't Ex. 89E (Doc. 259-256); Jury Trial (Volume 3 of 9) (Doc. 279; Tr. Vol. 3) at 40; Tr. Vol. 2, at 164–65; Gov't Ex. 110 (Doc. 259-336). Therefore, Ervin's Motion is due to be denied as to Count Six.

### d. Evidence that Defendants Knew of the Conspiracy's Unlawful Purpose

As to Count One, Hoover argues that there was no evidence that he knew the unlawful purpose of the conspiracy.  See Hoover's Motion at 10–11.  Hoover's argument is unavailing because the Government presented sufficient evidence of each Defendant's knowledge and intent.  As discussed above, a reasonable jury could conclude that Ervin and Hoover knew that they were transferring parts subject to the NFA.  In addition, the evidence showed that Ervin set up, and Hoover advertised, discrete mail-in ordering for the Auto Key Card because they knew that customers would worry about their names being connected with the product.  Gov't Ex. 1; Gov't Ex. 1A, at 5; Gov't Ex. 2; Gov't Ex. 2A, at 3.  The evidence also revealed that Ervin explicitly discussed the possibility of prosecution and professed his belief that law enforcement could not prove his intent unless they got into his head.  Tr. Vol. 4, at 221.  Moreover, in a video, Hoover says that he told Ervin that "it's kind of an edgy product."  Gov't Ex. 14; Gov't Ex. 14A, at 1.  According to Hoover, the gist of what Ervin said in reply

is, "Look, if a drawing on a piece of metal that I have scribed in there is gonna be illegal, that's my line in the sand.  That's where I want to fight."  Gov't Ex. 14; Gov't Ex. 14A, at 1–2.   Hoover responded, "I got your back, man." Gov't Ex. 14; Gov't Ex. 14A, at 2.  In another video, Hoover said that it would be ridiculous for an ATF agent to argue in a courtroom that the Auto Key Card is a machinegun, but he acknowledged that "they probably will do that at some point in time. . . . But these are so incredibly affordable, it doesn't really matter." Gov't Ex. 1; Gov't Ex. 1A, at 4–5 (emphasis added).  In the video "The Parts the ATF Wishes Never Existed," Hoover discusses several products, including the Auto Key Card, and refers to them as "these parts that are currently legal – well, kind of legal."  Gov't Ex. 2; Gov't Ex. 2A, at 2 (emphasis added).  After speaking about cutting out the parts contained in the Auto Key Card, Hoover told his viewers, "Definitely don't go on the internet and upload videos with you using this."  Gov't Ex. 2; Gov't Ex. 2A, at 3.  Based on this evidence, the jury could reasonably conclude that each Defendant knew the unlawful purpose of their plan and willfully joined it.

In sum, the Court concludes that sufficient evidence supported each of the jury's guilty verdicts as to the conspiracy charge in Count One and the related firearms offenses in Counts Two through Eight and Ten through

Twelve.[2]  Therefore, Defendants' requests for judgments of acquittal are due to be denied.

### 2. Vagueness

Hoover argues that "[a]s applied against Mr. Hoover, 26 U.S.C. §§ 5861(e) and 5871, and 18 U.S.C § 2 are unconstitutionally vague under the Fifth Amendment."  Hoover's Motion at 21; see also id. at 13–15 (citing several cases that applied the vagueness doctrine).  He asserts, "In no event would a reasonably intelligent person foresee that the conduct charged in this case—talking about a card with a drawing on it—would be deemed criminal, much less that a homogenous piece of steel with a drawing on it would be deemed a combination of parts."  Id. at 21.

Challenging a statute for vagueness is an assertion that "criminal responsibility should not attach [because] one could not reasonably understand that his contemplated conduct is proscribed."  United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32–33 (1963).  A statute must "define the criminal

---

[2] Defendants raise several additional arguments based on evidence that they contend shows their innocence.  See Hoover's Motion at 6 (Ervin's instructions to Orange Park Machine & Fab.); id. (testimony that drawings and templates are not machineguns); id. at 8 (witness who failed to convert his rifle to fire automatically); id. at 10 (Hoover's statements about the legality of the Auto Key Card); id. at 21 (no evidence showing that a purchaser of the Auto Key Card successfully converted a weapon to shoot automatically).  However, to succeed on a motion for judgment of acquittal, "[t]he defendant must do more than 'put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'"  United States v. Toll, 804 F.3d 1344, 1354 (11th Cir. 2015) (quoting United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006)).

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Awan, 966 F.2d 1415, 1424 (11th Cir. 1992) (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)). If a vagueness challenge to a statute does not involve the First Amendment, then the analysis must be applied to the facts of the case.[3] United States v. Duran, 596 F.3d 1283, 1290 (11th Cir. 2010). Notably, the Supreme Court has instructed that there is a "strong presumption supporting the constitutionality of legislation." Nat'l Dairy Prods. Corp., 372 U.S. at 32. The Eleventh Circuit has instructed that "[i]n analyzing a vagueness claim, the first step in determining whether a statute provides fair warning is to begin with the language of the statute itself. Where the language alone sets forth plainly perceived boundaries, no further inquiry is necessary." Duran, 596 F.3d at 1291 (citation omitted).

Here, the language of the relevant statutory provisions sets forth plainly perceived boundaries. The NFA prohibits possessing or transferring unregistered machineguns. See 26 U.S.C. § 5861(d)–(e). The statute defines the term "machinegun" as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function

---

[3] Defendants do not argue that their vagueness challenge involves the First Amendment, and they specifically state that they are challenging the statutes "as applied." Hoover's Motion at 21.

of the trigger.  The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . . .

26 U.S.C. § 5845(b).  This language is clear and definite.  In the context of a prosecution for possessing and transferring machinegun conversion devices, the former Fifth Circuit rejected a defendant's argument that the statute is unconstitutionally vague.  See United States v. Campbell, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam).[4]  Notably, Hoover does not identify which portion of this definition is supposedly vague.  He does not explain how the statute fails to define the crime "with sufficient definiteness that ordinary people can understand what conduct is prohibited." Awan, 966 F.2d at 1424.  Nor does he explain how the statute encourages "arbitrary and discriminatory enforcement." Id.

Instead, Hoover emphasizes that the NFA does not give notice that drawings and tchotchkes are illegal.  For example, Hoover asserts, "[i]t should not be controversial to state that a statute proscribing a 'combination of parts' gives no notice that a drawing, or even a drawing that could become a

---

[4]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. However, because vagueness challenges are "as applied" and the court in Campbell faced somewhat different facts, the holding in Campbell likely is not controlling in this case.  It is nevertheless persuasive authority that the statutory language generally is sufficiently clear to put a person of reasonable intelligence on notice as to what is forbidden.

combination of parts through transformative labor, [is] covered." Hoover's Motion at 14; see also id. at 18 ("Such tchotchkes are not regulated under the Gun Control Act or the [NFA]."); id. at 20–21 ("The statute does not refer to something that may one day become a part, nor does it refer to drawings or schematics for parts. It refers, quite simply, to something that is a combination of parts."). However, the Government has never suggested that the NFA applies to mere drawings or novelties. And, the Court did not instruct the jury that it could convict based on the transfer of a mere tchotchke, drawing, or drawing that could become a combination of parts. Rather, the Court instructed the jury that it could only find Defendants guilty if the Government proved beyond a reasonable doubt that Defendants had possessed and transferred a "combination of parts designed and intended" for use in converting a weapon into a machinegun. Jury Instructions at 18, 25. Thus, Hoover's arguments about drawings and trinkets are unavailing.

Hoover also lists hypotheticals and asks whether they are prohibited by the statute. See Hoover's Motion at 19 ("If the DXF File of the Drawing and instructions how to break the law, like the Anarchist Cookbook, are constitutionally protected speech, is the Drawing with oil-based paint on [a] piece of stainless steel, okay? What about military grade plastic with the etching—is that Kosher?"). While those hypotheticals may identify difficult or

close cases, they do not explain what is vague about the statutory language itself.  The Eleventh Circuit has instructed,

> [Void for vagueness] does not mean that the statute must define every factual situation that may arise.  The existence of "marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."  Moreover, ignorance of the fact that one's conduct is a violation of the law is no defense to criminal prosecution.

United States v. Nelson, 712 F.3d 498, 508 (11th Cir. 2013) (citations omitted) (quoting United States v. Biro, 143 F.3d 1421, 1430 (11th Cir. 1998)); see also Johnson v. United States, 576 U.S. 591, 601 (2015) ("[E]ven clear laws produce close cases . . . .").  The Supreme Court also has noted, "As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'"  Johnson, 576 U.S. at 603–04 (alteration in original) (quoting Nash v. United States, 229 U.S. 373, 377 (1913)).  Whether Defendants transferred a "combination of parts" may not have been obvious in this particular case.  But the law itself provides a meaningful standard.  Applying that standard to Defendants' real-world conduct, the jury found that Defendants went too far and, rather than transferring mere art, they were, in

fact, transferring a combination of machinegun parts.  Resolving that factual question was well-within the province of the jury.[5]

In addition, "[b]ecause 'objections to vagueness under the Due Process Clause rest on the lack of notice,' an as-applied vagueness challenge 'may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'"  United States v. Edgar, 304 F.3d 1320, 1327 (11th Cir. 2002) (quoting Maynard v. Cartwright, 486 U.S. 356, 361 (1988)).  Here, the Court concludes that a reasonable person would know that selling an Auto Key Card would place him at risk.  In fact, as discussed above, the evidence showed that Ervin and Hoover knew their conduct was at risk.  See id. at 1328 (rejecting a vagueness challenge in light of the defendant's "knowledge and experience," which showed that he "[s]urely" knew his conduct was unlawful).  The Supreme Court has found that it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  Boyce Motor Lines v. United States, 342 U.S. 337, 340 (1952).  Ervin and Hoover acted deliberately to sell a product that they knew was

---

[5]  For the same reasons, Defendants' argument fails to the extent they rely on the rule of lenity.  See Hoover's Motion at 16–18.  The rule of lenity applies "where there is a 'grievous ambiguity or uncertainty' in the statute."  United States v. Izurieta, 710 F.3d 1176, 1182 (11th Cir. 2013) (quoting Chapman v. United States, 500 U.S. 453, 456 (1991)).  Defendants do not identify any ambiguity in 26 U.S.C. §§ 5845, 5861, and 5871.  Defendants wrongly equate uncertainty about a factual question (whether the items Defendants transferred were mere drawings or a combination of parts) with doubt about a legal question (the meaning of the statute itself).

"edgy," Gov't Ex. 14; Gov't Ex. 14A, at 1, and a "gray-market item," Tr. Vol. 4, at 266–67.  Having knowingly taken that risk, Defendants may not now complain that the statute provided them insufficient notice.  For all of these reasons, Defendants' vagueness challenge is unavailing.

### 3. Constructive Amendment of the Indictment

Hoover argues that the Government impermissibly shifted from prosecuting a "part" theory to prosecuting a "combination of parts" theory. Hoover's Motion at 11.  In support of this argument, Hoover cites United States v. Chandler for the proposition that it is error for the grand jury to indict on one theory of illegal conduct and the Government to prosecute the case on another, entirely different theory.  See 388 F.3d 796, 798 (11th Cir. 2004).  But no impermissible shift in the Government's theory occurred here.  In the operative Indictment, the Government charged that Defendants had transferred and possessed a "combination of parts designed and intended for use in converting a weapon into a machinegun." Indictment at 2, 10–16.  At trial, the Government presented proof and argued that the Auto Key Card is a combination of parts. See Tr. Vol. 8, at 35.  And, consistent with the language of the Indictment, the Court instructed the jury on the "combination of parts" portion of the definition of a machinegun.  Jury Instructions at 18, 25.  Because the Government did not impermissibly shift its theory of the case, Defendants' argument is unavailing.

## B.     Structuring Currency Transactions (Count Nine)

With regard to Count Nine of the Indictment, the jury found Ervin guilty of structuring, and attempting to structure, currency transactions for the purpose of evading currency transaction reporting requirements.  See Ervin Verdict at 4.  Ervin argues that "there is no record evidence that [he] was attempting to avoid the reporting requirement."[6]  Ervin's Motion at 5.

The Court finds that the record contains sufficient evidence from which the jury could reasonably conclude that Ervin acted with the purpose to evade the transaction-reporting requirements.  An employee of Ervin's bank Amy Sarkese testified that Ervin asked her what the threshold to trigger the reporting requirement was.  See Tr. Vol. 3, at 162 ("Well, how much can I take out so it's not reported?").  Sarkese stated that Ervin asked this question sometime before he started repeatedly withdrawing $9,000 in cash from his account.  See id. at 197.  On the day of the first structured transaction,

---

[6] Ervin also argues that the law requires the Government to prove that he knew of the "actual reporting requirement" and of his duty not to avoid triggering a transaction report. Ervin's Motion at 5 (citing Ratzlaf v. United States, 510 U.S. 135, 146–47 (1994)).  This argument misstates the law because Congress amended 31 U.S.C. § 5324 after the Supreme Court's decision in Ratzlaf.  See United States v. Vazquez, 53 F.3d 1216, 1218 n.2 (11th Cir. 1995).  "[T]he only mental state apparently required under the new penalty provision is a purpose to evade the filing requirement."  Id.; see United States v. Hernandez, 490 F. App'x 250, 253 (11th Cir. 2012) (per curiam).

In citing Hernandez, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

December 28, 2020, Ervin initially asked to withdraw all of the money in his account in cash. See id. at 170–71. According to Sarkese, she informed him that he could not withdraw all of the money in cash that day. See id. at 171. Sarkese instead offered to allow him to withdraw $10,000. See id. Although Ervin at first agreed to withdraw this amount, he changed his mind and asked to withdraw $9,000. See id. at 171–73. Based on this testimony, the jury could reasonably infer that Ervin heard "$10,000," became concerned about the reporting threshold, and requested a lower amount to avoid triggering the reporting requirement. In addition, Sarkese testified that Ervin had the option of withdrawing all of his money in cash at once through a special order that could have been available by the end of the following week. See id. at 171. Instead of requesting a special order and waiting less than two weeks to receive all of his money, Ervin returned to a branch of his bank on seven separate days over the course of a week and a half and withdrew $9,000 in cash each time. See Gov't Ex. 95C (Doc. 259-302) at 22–23, 26. This course of conduct readily supports an inference that Ervin was acting with the intent to evade the reporting requirement. See United States v. Vigil-Montanel, 753 F.2d 996, 999 (11th Cir. 1985) ("A defendant's intent can be inferred from his conduct and all the surrounding circumstances."). Therefore, the Court will deny Ervin's Motion as to Count Nine.

### III.   Conclusion

Viewing all of the evidence in the light most favorable to the jury's verdict, the Court finds that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt as to each conviction.   And Defendants' legal challenges are unavailing.   Accordingly, it is

**ORDERED:**

Defendant Kristopher Justinboyer Ervin's Post-Verdict Motion for Judgment of Acquittal (Doc. 273) and Defendant Matthew Raymond Hoover's Motion for Judgment of Acquittal (Doc. 274) are **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, on August 23, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

lc30
Copies to:

Counsel of Record

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                            Case No:        3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN

_____/

**SENTENCING MEMORANDUM**
**AND**
**INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Defendant, Kristopher J. Ervin, by and through his undersigned counsel, and hereby files this Sentencing Memorandum and Incorporated Memorandum of Law, and in support thereof, states as follows:

A.      Introduction – Background on Kristopher J. Ervin

1.      Family Background

Mr. Ervin is 43 years of age.  He was born in Jacksonville, Florida, and has resided in the Jacksonville area, all but three years of his life.  PSI at ¶78.  Mr. Ervin's parents are Kris and Karen Ervin.  His father resides in Orange Park and is employed as a project manager.  His mother died in 2017.  Prior to her passing, Mr. Ervin was her caretaker for approximately four years.  PSI at ¶79. Mr. Ervin's parents were married for 43 years before his mother's death. PSI at ¶81. Mr. Ervin had a good upbringing and was raised in a caring and loving family.

Mr. Ervin has one brother and one sister.  His brother, Jonathan Ervin, is employed with the Jacksonville Sheriff's Office.  His sister, Kristen Ervin, is a corporate trainer in Orange Park. PSI at ¶80.  Mr. Ervin has a healthy relationship with his father and siblings.

Mr. Ervin has never been married, nor has any children.  PSI at ¶82.

2.      Education

Mr. Ervin graduated from Orange Park High School in 1999.   Thereafter, he enrolled in Florida State College at Jacksonville, but did not complete classes to earn a degree.

3.     Employment

As noted above, from 2014 until 2018, when Mr. Ervin's mother was ill, Mr. Ervin was her primary caregiver until she passed.   PSI at ¶100.   Mr. Ervin has attempted to find his niche as an entrepreneur.   Between 2018 and 2019, Mr. Ervin operated an online store named Crazy Uncle Justin.   He sold toys (such as slime and mini drones) on Amazon.   PSI at ¶99.

4.     Medical

Mr. Ervin has a medical history that includes back pain and frequent sinus and ear infections.   Since his incarceration, Mr. Ervin has been treated for back pain, as well as sinus infections.   PSI at ¶86-87.

5.     Substance Abuse

Mr. Ervin reports a history of drug use, including smoking marijuana daily as a "coping mechanism."   PSI at 89.   As a result of his urine screening prior to his initial appearance, Mr. Ervin tested positive for the presence of marijuana.   *Id.*   Mr. Ervin reports daily marijuana use for the last 21 years.   *Id.*   Mr. Ervin recognizes he would greatly benefit from substance abuse treatment and requests the Court to consider ordering him into a RDAP.

6.     Criminal History

It is important to note that Mr. Ervin has no juvenile history, arrest history (other than this matter), or prior convictions.   In 2001, when Mr. Ervin was 21 years old, he was issued a citation for an open house party.   He received a withhold of adjudication and was ordered to pay court costs and fines.   Mr. Ervin does not score for his prior criminal history.   PSI at ¶71-75.

B.    <u>Character Letters</u>

Attached as Composite Exhibit A are four character letters from friends of family of Mr. Ervin.

The first letter is from Louis Bono, who has known the Ervin family for over 45 years. His son and Mr. Ervin were born within a year of each other, and spent a lot of family time together, canoeing, hiking and attending sporting events.   Mr. Bono states that Mr. Ervin "grew up in a good supportive family," and even through these tough times, "his family fully supports him."   Mr. Bono confirms how Mr. Ervin's father has been "devastated by all of this."   Mr. Bono has firsthand knowledge that he has never seen Mr. Ervin even remotely indicate a willingness to break the law, and, to the contrary, that "he [Mr. Ervin] has always avoided people and situations that may be questionable."

The second letter is from Dr. Charles Hudgins.   He has known the Ervin family over 30 years.   Upon learning of Mr. Ervin's arrest, Dr. Hudgins offered Mr. Ervin to live with him, although that option never materialized.   Dr. Hudgins spent a lot of time with Mr. Ervin, who also provided technical support for his dental practice. They shared stories about hiking the Appalachian trail and Mr. Ervin's love of nature.   Dr. Hudgins knows Mr. Ervin would "never willingly break the law," and opines this was "an error in judgement."

The third letter is from James Wucher, who is the stepfather of Mr. Ervin's sister-in-law. Mr. Wucher has known the Ervin family for over 30 years as well.   He is a retired U.S. Naval Aviator and is currently a pilot and Captain for a major U.S. airline. He speaks very highly of Mr. Ervin and refers to him as some who "has always been one to help and do the right thing." Mr. Wucher also comments on Mr. Ervin's relationship with his grandson, who is Mr. Ervin's

nephew.   Mr. Ervin adores his nephew and they miss each other terribly. Mr. Wucher's grandson is who inspired Mr. Ervin to begin his Amazon store, selling children's toys.   Mr. Wucher refers to the Ervin family as "top notch" and who "support each other fully." Similar to Dr. Hudgins, Mr. Wucher states how this has to be a "judgement situation," as he has "never known Justin to be in any type of trouble except this situation."

The fourth and final letter is from Darren Nichols, another over 30-year family friend of the Ervin family.   Mr. Nichols and Mr. Ervin's father were business associates, and Mr. Ervin's sister was an employee of his.   Over the course of the last 30 years, Mr. Nichols also grew to know Mr. Ervin and his brother.   Mr. Nichols refers to the Ervin family as "nothing but the type of American family that has made our country great."   He refers to Mr. Ervin as "very patriotic and [a] law-abiding citizen."   Mr. Nichols has "never known Mr. Ervin to be in any trouble or cause any type of trouble," and how Mr. Ervin thought was he was doing was legal.   In closing, Mr. Nichols states how Mr. Ervin is a "good solid person, always helpful and assists the less fortunate by helping where and when he has an opportunity."

All four of these letter state how Mr. Ervin is a proud American and law-abiding citizen, who would never do anything willfully or intentionally to break the law.  It is apparent by speaking with Mr. Ervin that the only thing he loves more than his patriotic beliefs, is his family.

C.    PSI Objections

The PSI (Doc. 311) was thoroughly prepared by the United States Probation Office and has been revised with the Defendant's minor factual revisions.   Mr. Ervin has one objection to the calculation of the guidelines and the Government has an objection as well.

1.      <u>Mr. Ervin's Objection</u>

The guidelines provide a two level enhancement for Mr. Ervin with regard to the structuring transaction Mr. Ervin was convicted of in Count 9 of the Second Superseding Indictment. The relevant guideline, U.S.S.G. §2S1.3(b)(1)(A), provides that "if the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels."  However, Mr. Ervin denies said knowledge or belief that the funds were proceeds of unlawful activity.   At the time the transactions were completed, Mr. Ervin subjectively did not know or believe that the money he was earning from the Auto Key Card business was unlawful.  Mr. Ervin has maintained his plea of not guilty through trial and subjectively did not believe or know that the proceeds of the business activities he was conducting were unlawful.   During this time and course of conduct, the record is clear that Mr. Ervin was conducting business open and notoriously, which belies any allegation that Mr. Ervin knew or believed his underlying conduct was unlawful.  Although the jury did not agree with the lawfulness of Mr. Ervin's conduct through their verdict, he believed it was lawful at the time.

The clear purpose of this enhancement is to punish individuals who engage in structuring to attempt to hide the proceeds of illicit activity.   Mr. Ervin, while maintaining his innocence as to this count, clearly, albeit erroneously, believed that his conduct selling Auto Key Cards was entirely lawful.   When actually providing information for a currency transaction report completed in the course of conduct Mr. Ervin was convicted of, Mr. Ervin said that his business was the Auto Key Card business.   Specifically, U.S.S.G. §2S1.3(b)(1)(A) only provides for an enhancement if Mr. Ervin "knew or believed that the funds were proceeds of unlawful activity." If the guideline was intended to capture conduct where a defendant engaged in a structuring

transaction while believing the underlying conduct was lawful, even incorrectly, the guideline would merely state "if the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels." The plain language of the guideline requires knowledge or belief of the illegality of the underlying conduct, rather than a mere determination as to its illegality.  If the intention of the enhancement was to punish any transaction that involved proceeds of illegal activity, the enhancement would say so.  As worded, the enhancement is intended to punish individuals who knowingly structure financial transactions to conceal evidence of a crime, not to punish individuals who erroneously believe their underlying conduct is lawful.  As such, we do not believe this guideline is appropriately applied in this situation.

2.     The Government's Objection

The Government provided a nine-page objection letter that undersigned counsel anticipates the Government will argue at sentencing, so counsel is providing a response to those arguments for the Court's consideration prior to sentencing.

The Government's specific objection is their position that it is their belief the Probation Office fails to apply the applicable Specific Offense Characteristics ("SOC") in USSG §2K2.1, specifically, §2K2.1(b)(1)(E) for the offense involving in excess of 200 firearms, and §2K2.1(b)(5) for the defendants being engaged in the trafficking of firearms.  It is the Government's position that failure to apply the SOCs contradicts the plain language of the Guidelines, that results in a massive undercalculation of the Defendants' respective Guideline ranges.

The PSI specifically addresses the Government's issue. The PSI states,

> The Defendant possessed approximately 6,600 auto-sears which according to 26 U.S.C. § 5861 are machineguns.  However, because auto-sears do not meet the definition of "firearm" pursuant

> to 18 U.S.C. § 921(a)(3), the specific offense characteristics at USSG § 2K2.1 for the number of firearms possessed is not applicable.  If auto-sears were considered firearms, 10-levels would have been added to Ervin's offense level, resulting in an advisory range of 97 months to 121 months.

PSI at ¶120.

At trial, it was a question for the jury if the Auto Key Card was a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.   Pursuant to 26 U.S.C. § 5845(a), the definition of "firearm" means "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."   26 U.S.C. § 5845(b).

The Government prevailed at trial, as the jury determined that the Auto Key Card was a combination of parts designed and intended for use in converting a weapon into a machinegun. As a result, the Defendant was convicted on all counts.   However, the Government fails to recognize the standard and application of the law for a jury to either convict or acquit a defendant of any similar charge, does not apply to the Sentencing Guidelines.

Attached as Exhibit B is a Memorandum Opinion and Order issued in *United v. Hixson*, 624 F. Supp. 3d 930 (N.D. Ill. 2022).   The district court found as follows:

> The Guidelines do *not* include machine guns–including devices that convert semiautomatic weapons into fully automatic weapons–in the definition of "firearms." *Compare* 18 U.S.C. §921(a)(23) (definition of

7

machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3)). Whether that void is intentional and whether the United States Sentencing Commission intends to fill that void now that it finally has a quorum is beyond the Court's knowledge. [*footnote omitted*]. But, in fashioning a just sentence, the Court can look to the Sentencing Guidelines when it considers the statutory factors identified in 18 U.S.C. § 3553(a). Counsel and the Court were unable to locate any reported decision on the issue raised in this case. It appears that only a few other judges have addressed the issue but not in a written decision. [*footnote omitted*]

Exhibit B at 1.

In *Hixson*, the court specifically addresses the distinction between definitions of "firearm" and "machinegun."

Section 921(a)(3) defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The definition of "machinegun" is stated elsewhere in Title 18. Section 921(a)(23) defines "machinegun" by referencing the National Firearms Act, so that the term "machinegun" "has the meaning given such term in section 5845(b) of the National Firearms Act." 18 U.S.C. § 921(a)(23). Section 5845(b) of the National Firearms Act defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts

from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845 (emphasis added).

In contrast, the Sentencing Guidelines define "firearm" as only having "the meaning given that term in 18 U.S.C. 921(a)(3)." § 2K2.1 Application Note 1. But there exist three references to the statutory definition of a machinegun in § 2K2.1. Specifically, in setting the base offense level, a base level of 26 is required, if the offense involved a machinegun and the defendant committed any part of the offense after receiving at least two felony convictions for either a crime of violence or a controlled substance offense. § 2K2.1(a)(1). Next, in setting the base offense level, a base level of 20 is required if the offense involved a machinegun and the defendant meets three other requirements. § 2K2.1(a)(4). Finally, in setting the base offense level, a base level of 18 is required if the offense simply involved a machinegun. § 2K2.1(a)(5). All specific offense characteristics ("enhancements" providing for an increase in the offense level) under § 2K2.1 refer to "firearm," including the enhancement when three or more "firearms" are involved, and the enhancement for "trafficking of firearms." § 2K2.1(b)(1); § 2K2.1(b)(5).   Exhibit B at 4.

Mr. Ervin believes the analysis by the United States Probation Office accurately reflects the correct application of the sentencing guidelines.   The Government contends that it is erroneous to look to the commentary to determine what a "firearm" is, because the definition is clear in the plain language of the Guidelines. *See generally United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023).   However, it is clear that the Auto Key Card does not fit any normal definition of a firearm, thus reference to the Application Notes is entirely appropriate.   Outside of any individual with specific knowledge of the requirements of the National Firearms Act and

expert level familiarity with the operation of semi-automatic weapons, nobody would believe the Auto Key Card is a firearm.   As Judge Merryday has held, devices like the Auto Key Card "are not necessarily readily recognizable as either a machine gun or a mischievous implement of any kind at all. They are only statutory machine guns. For example, a sere appears disarmingly innocent, but it is a statutory machine gun."   *United States v. Aguilar-Espinosa*, 57 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999).   As the Auto Key Card is not clearly a firearm under any plain definition or understanding of the word, it is entirely appropriate to look to the Application Notes for further guidance.   In doing so, it is clear that the items at issue in trial do not meet the definition in the Application Notes and therefore, as to that issue, the guidelines are correctly calculated.

The Government not only disagrees with the *Hixson* court's findings, but the Probation Office's PSI.   The Government is maintaining the position that if the Court decides that the commentary definition of "firearm" controls and that the number of firearms and trafficking enhancements do not apply, it should depart and/or vary upward to account for the large number of auto sears manufactured, marketed, and sold by Ervin and Hoover.   For all the reasons set forth in *Hixson*, and referenced herein, we ask the Court to not accept the Government's arguments in this regard.

D.   Conclusion

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory only, and the Court has discretion to impose a sentence below any guidelines range determined by the Court, as well as to consider a variance.   Thus, although the PSI and Mr. Ervin's Sentencing Memorandum has addressed grounds for departure, Mr. Ervin respectfully

requests the Court consider them not only as traditional grounds for departure, but as grounds supporting the Court's exercise of discretion, after ascertaining the guideline range.

Indeed, not only are the Guidelines merely advisory only, but any presumption that a sentence imposed within the Guidelines is "reasonable" – is in error. *Nelson v. United States*, 555 U.S. 350 (2009). *Nelson*, decided January 26, 2009, held that:

> The Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable.
>
> * * *
>
> Under our recent precedents, [applying a presumption of reasonableness to the Guidelines] constitutes error.

*Id.* at 351.

Thus, the Court is authorized, and indeed, respectfully, required, to impose, and Mr. Ervin is entitled to have imposed, a sentence that "is appropriate for the individual defendant in light of the statutory sentencing factors [of] 18 U.S.C. § 3553(a)." *Id.*

The Sentencing Commission has commented on "the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." Accordingly, the Commission has empowered judges to employ "downward departures" as a means for imposing sentencing below the guideline sentencing range. As the Supreme Court has confirmed, the Sentencing Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." *Koon v. United States*, 518 U.S. 81, 106 (1996).

In closing, Mr. Ervin is an upstanding citizen, with no prior convictions. He is a proud American citizen, who believes in the law and in the Constitution. Mr. Ervin is an appropriate

11

candidate for RDAP, and we ask this Honorable Court to consider all of the above mitigation and sentencing issues to determine an appropriate sentence for Mr. Ervin.

WHEREFORE, it is respectfully requested that this Honorable Court consider the personal characteristics of Mr. Ervin in fashioning a sentence that is sufficient, but not greater than necessary, in comportment with 18 U.S.C. §371, 18 U.S.C. §5871 and 18 U.S.C. §3424(d)(1).

**Respectfully submitted,**

**Monroe & King, P.A.**

_____/s/ Alex King_____
Alex King, Esq.
Florida Bar No:   86034
Monroe & King, P.A.
1805 Copeland Street
Jacksonville, Florida 32204
**Pleadings to**: admin@monroekinglaw.com
(904) 355-7777 Telephone
Attorneys for Defendant

Exhibits

A. Character Letters – Composite
B. Copy of Memorandum Opinion and Order issued in _United States v. Hixson_, 624 F. Supp. 3d 930 (N.D. Ill. 2022)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email to: Laura Cofer Taylor, Esq., Office of the United States Attorney, Laura.C.Taylor@usdoj.gov, this 1st day of September, 2023.

_____/s/ Alex King_____
ATTORNEY

# EXHIBIT A

Orange Park, FL 32065

September 6. 2023

Your Honorable Judge Howard,

I have been a lifelong friend of the Ervin family for over 45 years. My son and Justin were born within one year of each other and I have seen Justin, his brother and sister grow up. We went canoeing and hiking. attended sporting events, all of the normal activities. Justin grew up in a good supportive family. Even through these tough times, his family fully supports him. His father has been devastated by all of this.

During all of this time, I have never seen Justin even remotely indicate a willingness to break the law. He has always avoided people and situations that may be questionable. I am aware of the charges against Justin and truly find this outside of the Justin I have known for so many years. I am sure he did not intentionally break the law.

I am happy to provide this letter to the court in the hopes that the court will have leniency.

Sincerely,

Louis M. Bono

Dr. Charles Hudgins,

767 Blanding Blvd # 109,

Orange Park, FL 32065


September 6, 2023


Your Honorable Judge Howard,


I am Dr. Charles Hudgins, the Ervin's family dentist since the 1990's. My daughter and Kristen Ervin (Justin's sister) played softball together for many years and I came to know this family very well.

When Justin was arrested in March of 2021, I spoke with his father about, if Justin needed an option of an alternative place to stay my family would be open to the possibility. As you know that option did not materialize. However, I am aware of the charges against Justin Ervin and his upcoming sentencing date. It is my pleasure to provide this letter to the court in the hopes that the court will have leniency.

As stated, previously Justin and I spent time together watching softball games, he provided technical support for my dental practice, and we shared lots of stories about him hiking the Appalachian trail. He absolutely loves nature. This gave me the opportunity to really know Justin as a person, I cannot imagine this was anything more than an error in judgement. The Justin I know would never willingly break the law.

Your honor, please consider his outstanding character in your decision.


Sincerely,



Dr. Charles Hudgins

James Wucher

2292 Salt Myrtle Ln

Fleming Is FL 32003


September 6, 2023


Your Honorable Judge Howard,

I am James Wucher. My stepdaughter (Megan Ervin) is married to Johnathan Ervin (Justin's brother).

I have known the Ervin family since the 1990's, including Justin Ervin. Since Justin's arrest in March of 2021, I have kept up with the legal process and am aware of the charges against Justin Ervin and his upcoming sentencing date. I am happy to write this letter for Justin so the court may have a better insight into what Justin's character truly is.

A little about my background. I am a retired US Navy aviator and currently a pilot and captain for a major US airline. These positions require me to make solid judgements and I take this letter just as seriously. I would have liked to have spoken on Justin's behalf but my flight schedule prevented my attendance.

Justin has always been one to help and do the right thing. One example that comes to mind is when hurricane Irma hit Jacksonville, Justin brought over his generator, sandbags, and extension cords so we could have power and prevent flooding. He did this of his own good will.

His love for his nephew Cameron (my 8-year-old grandson) is unsurpassed. Cameron and Justin have long had a good relationship and Cameron misses him terribly. It is hard to hear an 8-year-old say his uncle is "in jail".

Justin and his family are top notch and support each other fully. I have never known Justin to be in any type of trouble except this situation. He has never expressed a desire to break the law or participate in any criminal activity. This has to be a one off, poor judgement situation.

Your honor, please give Justin as much leniency as possible.


Sincerely,


James Wucher

Orange Park, FL 32073

September 6, 2023

Your Honorable Judge Howard,

My name is Darren Nichols and I have been a friend of the Ervin family for over 30 years.
Mr. Ervin (Kris) and I were business associates in the early 90's, Kristen Ervin was an employee
of mine in the 90s for Clearwire Communications, and I know Justin and Jonathan very well.
Currently, I am Vice President of Sales for Cassia Networks.

I am very aware of the charges; the guilty verdict and the potential sentencing Justin Ervin is
facing.  It would have been my pleasure to speak in person on his behalf, however when the
sentencing date changed to September 6th, I unfortunately have an out of town Labor Day
family commitment. However, I wanted to express my support for Justin.

For as long as I have known Justin and his family, they have been nothing but the type of
American family that has made our country great. Justin is very patriotic and law-abiding
citizen. I have never known him to be in any trouble or cause any type of trouble. This situation
is so out of character that I can only surmise that he felt, right or wrong, that what he was
doing was legal. He never expressed, that know of, any other sentiment.  He is a good solid
person, always helpful and assists the less fortunate by helping where and when he has an
opportunity.

Hopefully Your Honor, our justice system can bestow appropriate leniency to Justin in this most
unique case.

Sincerely,

Darren M Nichols

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| v. | ) No. 21 CR 50016 |
| | ) Judge Iain D. Johnston |
| Javaughn A. Hixson. | ) |

## MEMORANDUM OPINION AND ORDER[1]

### ISSUE

The United States Sentencing Guidelines have a void.[2]  The Guidelines do *not* include machine guns—including devices that convert semiautomatic weapons into fully automatic weapons—in the definition of "firearms".  *Compare* 18 U.S.C. § 921(a)(23) (definition of machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3)).  Whether that void is intentional and whether the United States Sentencing Commission intends to fill that void now that it finally has a quorum is beyond the Court's knowledge.[3]  But, in fashioning a just sentence, the Court can look to the Sentencing Guidelines when it considers the statutory factors identified in 18 U.S.C. § 3553(a).  Counsel and the Court were unable to locate any reported decision on the issue raised in this case.  It appears that only a few other judges have addressed the issue but not in a written decision.[4]  With the proliferation of these devices and the ease by which they can be created using a 3-D printer, the Court anticipates many more sentences in the future.

---

[1] This memorandum opinion and order supplements the Court's statement of reasons.

[2] Nothing in this order should be read as disparaging the good people at the United States Sentencing Commission.  In the Court's experience, the Commission's staff is diligent, smart, knowledgeable, and helpful.  In addition to studying and reporting on sentencing issues, each year, the staff at the Commission fields countless calls from judges and attorneys, seeking input and guidance.  The Court commends them for their work.

[3] The Sentencing Guidelines explicitly recognize that they cannot anticipate every sentencing circumstance. § 5K2.0(a)(2).

[4] Judge David Godbey is likely the first judge to have addressed this issue. https://www.justice.gov/usao-ndtx/pr/man-sentenced-four-years-machinegun-crime.  Judge C.J. Williams appears to have followed shortly afterwards.  https://www.justice.gov/usao-ndia/pr/man-who-possessed-3d-printed-glock-switch-sentenced-federal-prison.  And Judge John A. Gibney recently sentenced a defendant who used a Glock switch during a shootout. https://www.justice.gov/usao-edva/pr/virginia-beach-man-sentenced-possessing-machine-gun-used-norfolk-shootout.

## FACTS

On May 4, 2022, Mr. Hixson pleaded guilty to two counts: (1) possession of a machinegun in violation of 18 U.S.C. § 922(o), and (2) unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).  The statutory maximum sentence and fine for both counts is the same—ten years' imprisonment and a $250,000 fine.

These charges result from Mr. Hixson's relevant conduct from October 2020 to January 2021. All of this relevant conduct occurred while he was on parole after a felony conviction.

On about October 22, 2020, Mr. Hixson exchanged Facebook messages with a confidential informant to sell a device that is a machinegun as defined by statute. As discussed in detail later, these devices are called auto sears, or more specifically in this case, Glock switches.  These devices are designed solely and exclusively to convert a semiautomatic weapon into a fully automatic weapon.  After Mr. Hixson communicated with the confidential informant, they met on the west side of Rockford, Illinois, so that Mr. Hixson could sell the switch.  During this transaction, Mr. Hixson obtained the switch from his source and then sold the switch to the confidential informant for $400.

On November 5, 2020, Mr. Hixson again communicated with the confidential informant to sell two additional Glock switches for $800.  The confidential informant told Mr. Hixson that he was going to sell the switches to a third party. Mr. Hixson and the confidential informant agreed to meet at a restaurant on the west side of Rockford for the sale.  When Mr. Hixson arrived at the restaurant, the confidential informant got into Mr. Hixson's vehicle, and they drove to meet Mr. Hixson's source.  The source arrived in a separate vehicle.  Mr. Hixson exited his vehicle, obtained two switches, and returned to his vehicle.  Mr. Hixson then sold the two switches for $800.

On November 16, 2020, Mr. Hixson exchanged messages with the confidential informant notifying him that Mr. Hixson had about six switches at that time.

On December 8, 2020, Mr. Hixson and the confidential informant engaged in a nearly identical transaction for the sale of another switch.  But this time the price was $350.

In total, Mr. Hixson sold four switches to the confidential informant—one on October 22, 2020, two on November 5, 2020, and one on December 8, 2020.  He also admitted to possession of about six switches on November 16, 2020.  Assuming the switch sold on December 8, 2020, was one of the switches mentioned on November 16, 2020, the evidence establishes possession of 9 switches.

Finally, at about 2:00 a.m. on January 4, 2021, a Rockford Police Department officer attempted to stop a vehicle.  Mr. Hixson was in the front passenger seat.  His cousin was driving.  But after the officer activated the squad's lights, the vehicle accelerated and did not stop.  According to Mr. Hixson, he told his cousin "to go."

Dkt. 48, at 7. Eventually, the cousin stopped the vehicle. Mr. Hixson then jumped out and ran but he slipped in the snow. Before the officer could reach Mr. Hixson, Mr. Hixson discarded a firearm in the snow a few feet from where he was caught. The firearm was a 9 mm Glock with an extended magazine, loaded with 28 rounds of ammunition. Dkt. 48, at 7.

## AUTO SEARS CONVERT SEMIAUTOMATIC WEAPONS INTO FULLY AUTOMATIC WEAPONS

It appears that as long as semiautomatic weapons have existed, humans have attempted to create devices to make those weapons fully automatic. Indeed, auto sears have existed for decades, if not longer. *See, e.g., United States v. Cash*, 149 F.3d 706 (7th Cir. 1998) (discussing ATF Ruling 81-4 addressing auto sears); *United States v. Bradley*, 892 F.2d 634 (7th Cir. 1990) (same). But what were once previously handcrafted metal pieces are now small plastic pieces created by a 3-D printer. Those devices are often referred to as "switches." Unsurprisingly, when installed in Glock handguns,[5] they are referred to as "Glock switches." *Internet Arms Trafficking*, https://www.atf.gov/our-history/internet-arms-trafficking. They are also referred to as Glock conversion devices, Glock conversion kits, and Glock auto sears. When a Glock switch is attached to a semiautomatic Glock, the firearm becomes a fully automatic weapon—essentially a machinegun. So, when the trigger of a Glock with an attached Glock switch is depressed, the firearm can empty a standard magazine in about a second or an extended magazine in about two seconds. The resulting weapon can be difficult to control and is extremely dangerous,[6] which can result in "pray and spray." *Moran v. Clark*, No. 1:08-cv-

---

[5] Glock semiautomatic handguns are the type of weapons often used by drug traffickers. *See United States v. Wren*, 528 F. App'x 500, 509 (6th Cir. 2013); *United States v. Williams*, 345 F. App'x 979, 980 (6th Cir. 2009). But Glocks are common firearms. *Houston v. State*, No. CA CR 06-1043, 2007 Ark. App. LEXIS 471, at *11 (Ct. App. Ark. June 13, 2007). Indeed, much of the law enforcement community is armed with Glocks. Just as the ubiquity of cell phones among drug dealers does not mean that all cell-phone users are drug dealers, so too is the fact that possessing a Glock does not necessarily make a person a criminal. In this case, because Mr. Hixon is a felon and knew he was a felon, his possession of the Glock was illegal. 18 U.S.C. § 922(g)(1).

[6] Media outlets as diverse as Vice News and FOX affiliates have reported on Glock switches, providing video of the weapon firing. *See, e.g.,* Alain Stephens, *Tiny "Glock Switches" Have Quietly Flooded the US With Deadly Machine Guns*, March 24, 2022, https://www.vice.com/en/article/pkp8p8/glock-switches-auto-sears; Dennis Shanahan, *What are auto sears and how are they becoming a rising issue?*, April 7, 2022 https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/. In fact, news outlets across the country have recently done stories on Glock switches. https://abc13.com/glock-switches-are-illegal-downtown-houston-officers-shot-hpd-shooting/11518379/; https://www.fox2detroit.com/news/man-charged-with-buying-glock-switches-that-turn-pistols-to-machine-guns; https://www.youtube.com/watch?v=vCzbQubIFhY.

01788, 2013 U.S. Dist. LEXIS 146300, at *18 (E.D. Cal. Oct. 9, 2013) ("pray and spray" shooting is a "method of shooting in which [the shooter] fire[s] off shots in a general direction without too much concern as to the specific location where the bullets [will] land). It has been reported that Glocks equipped with switches have been used in mass shootings. Dennis Shanahan, *What are auto sears and how are they becoming a rising issue?*, April 7, 2022 https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/. One can only imagine the surprise of a law enforcement officer—let alone the average person—who encounters a criminal armed with one of these machineguns.

## DEFINITIONS OF "FIREARM" AND "MACHINEGUN"

Section 921(a)(3) defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The definition of "machinegun" is stated elsewhere in Title 18. Section 921(a)(23) defines "machinegun" by referencing the National Firearms Act, so that the term "machinegun" "has the meaning given such term in section 5845(b) of the National Firearms Act." 18 U.S.C. § 921(a)(23). Section 5845(b) of the National Firearms Act defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845 (emphasis added).

In contrast, the Sentencing Guidelines define "firearm" as only having "the meaning given that term in 18 U.S.C. 921(a)(3)." § 2K2.1 Application Note 1. But there exist three references to the statutory definition of a machinegun in § 2K2.1. Specifically, in setting the base offense level, a base level of 26 is required, if the offense involved a machinegun and the defendant committed any part of the offense after receiving at least two felony convictions for either a crime of violence or a controlled substance offense. § 2K2.1(a)(1). Next, in setting the base offense level, a base level of 20 is required if the offense involved a machinegun and the defendant meets three other requirements. § 2K2.1(a)(4). Finally, in setting the base offense level, a base level of 18 is required if the offense simply involved a machinegun. § 2K2.1(a)(5). All specific offense characteristics ("enhancements" providing for an increase in the offense level) under § 2K2.1 refer to "firearm," including the enhancement when three or more "firearms" are involved, and the enhancement for "trafficking of firearms." § 2K2.1(b)(1); § 2K2.1(b)(5).

Assuming a sentencing court equated each Glock switch (which, again, is statutorily a machinegun) as a "firearm" under the Guidelines Manual, an offense

level would increase based on the number of switches involved over 3.  § 2K2.1(b)(1).
Likewise, assuming a sentencing court equated a Glock switch as a "firearm" under
the Guidelines Manual, the offense level would be increased by 2 levels if the switch
were stolen.  § 2K2.1(b)(4).  Similarly, using the same assumption, the offense level
would increase 4 levels if the defendant possessed a switch while leaving or
attempting to leave the United States or possessed or transferred the switch with
knowledge, intent, or reason to believe that the switch would be transported out of
the United States or if the switch was used in connection with another felony
offense or with the knowledge, intent, or reason to believe that the switch would be
used or possessed in connection with another felony offense.  § 2K2.1(b)(6).

## SENTENCING PROCEDURE IN THE SEVENTH CIRCUIT

For those judges who prefer the structure of a clear, mechanical sentencing
process like that articulated in § 1B1.1 of the Guidelines Manual, determining
whether the Seventh Circuit requires two, three, or four steps might be a little
vexing.  *See United States v. Settles*, No. 21-2780, __ F.4th __, 2022 U.S. App. LEXIS
22001, at*7 (7th Cir. Aug. 9, 2022) (four steps); *United States v. Loving*, 22 F.4th
630, 636 (7th Cir. 2022) (three steps); *United States v. Pankow*, 884 F.3d 785, 793
(7th Cir. 2018) (three steps); *United States v. Brown*, 732 F.3d 781, 786 (7th Cir.
2013).  But it shouldn't be.  *See United States v. Hite*, No. 3:11-CR-78, 2012 U.S.
Dist. LEXIS 132995, at *3-5 (N.D. Ind. Sept. 18, 2012) ("So long as it does not give
undue weight to 'departure' provisions at the expense of non-guideline factors under
§ 3553(a), and thereby put a thumb on the scale favoring the guidelines framework,
the Court sees no inconsistency between following the instructions in section 1B1.1
and the Seventh Circuit's treatment of 'departures.'").

Regardless of the number of steps, the sentencing process has two
fundamental requirements: (1) correctly calculating the guideline range, and (2)
applying § 3553(a).  *Brown*, 732 F.3d at 786.  In applying § 3553(a), the sentencing
court can take guidance from the Guidelines Manual, *Loving*, 22 F.4th at 636, and
must give due consideration to counsel's arguments, *United States v. Stephens*, 986
F.3d 1004, 1009 (7th Cir. 2021), as well as the defendant's allocution, *United States
v. Griffin*, 521 F.3d 727, 731 (7th Cir. 2008).  If that process results in a sentence
outside the guideline range, then the sentencing court must consider the extent of
the deviation and ensure that the justification is sufficiently compelling to support
the variance.  *Settles*, 2022 U.S. App. LEXIS 22001, at *7.  The sentencing court
must then show its work by explaining how and why it reached the sentence
imposed, during which it must address the defendant's main arguments.  *Pankow*,
884 F.3d at 793; *see also Stephens*, 986 F.3d at 1009.  The *Pankow* decision
succinctly stated the process: "A sentencing court is under no *duty*, however, to
follow rigidly the §1B1.1 construct.  The sentencing court's only *duty* is to calculate
the correct guidelines range, consider in the context of §3553(a) the factors the
parties have set before it, and respond to those considerations in a meaningful way."
884 F.3d at 794 (emphasis in original).

The Court addresses these requirements later. But, to avoid any possible confusion, the Court first makes a major detour to explain how it is *not* determining Mr. Hixson's sentence. The Court recognizes that it entered a Rule 32(h) order and notified the parties that it was considering a departure under § 5K2.0, and that after *Booker*, Rule 32(h) "has lost all utility" because departures are obsolete. *Brown*, 732 F.3d at 786; Dkt. 55. The Court also recognizes that the traditionally very precise and careful Assistant United States Attorney argued that adding two sets of enhancements—one under § 2K2.1(b)(1)(B) and one under § 2K2.1(b)(5)—would increase the offense level to an advisory guideline range of 70 – 87 months, which was also referred to as a "modified range of 70 – 87 months' imprisonment." Dkt. 50, at 4, 7; Dkt. 48, at 31-32. Based on these statements, the Presentence Investigation Report noted that "the government [was] requesting that the Court consider" the § 2K2.1(b)(1)(B) and § 2K2.1(b)(5) enhancements. Dkt. 48, at 8. The Assistant United States Attorney also stated this 70 – 87 month range would "tether" the sentence. The Court acknowledges that—at first blush—its Rule 32(h) order and the United States' position might appear to "come[] dangerously close to formal departure analysis." *Settles*, 2022 U.S. App. LEXIS 22001, at \*9. And an improper formal departure analysis might be inferred if "tether" means "anchor." *See United States v. Bravo*, 26 F.4th 387, 396-97 (7th Cir. 2022); *United States v. Davis*, No. 21-2114, 2022 U.S. App. LEXIS 13120, at \*6-7 (7th Cir. May 16, 2022) (if guideline range is erroneous, then procedural error occurs because the guideline range anchors the sentencing court's discretion).

But the Court entered the order to give notice to Mr. Hixson's counsel to be prepared to address the precise issue of Glock switches being statutorily defined machineguns but not "firearms" under the Guidelines Manual. The Court often enters orders before hearings, notifying counsel to be prepared to discuss issues that cause the Court concern. This seems not only just but also best practices. Moreover, a fair reading of the United States' official version and its sentencing memorandum shows that the position is more nuanced and consistent with the Court's analysis below. As the Court sees it, the United States' position is that considering the enhancements under § 2K2.1(b)(1)(B) and § 2K2.1(b)(5) allows the Court to sentence Mr. Hixson under a more accurate reflection of the nature and circumstances and severity of the offense using the § 3553(a) factors. Dkt. 50, at 3; Dkt. 48, at 32. The Assistant United States Attorney confirmed the Court's understanding at the sentencing hearing. And, as to the "tether" comment, the Assistant United States Attorney immediately renounced that term. Indeed, she did so in the very next sentence.

The Court is not simply considering the Guidelines Manual's void under § 5K2.0, equating each Glock switch with a "firearm," totaling up the number of switches, and applying § 2K2.1(b)(1)(B) to increase the offense level by 4 levels. Similarly, the Court is not simply equating each Glock switch as a "firearm" to find that Mr. Hixson engaged in firearm trafficking under § 2K2.1(b)(5) to increase the offense level another 4 on top of the § 2K2.1(b)(1)(B) enhancement, resulting in a new total offense level of 25 instead of 17. Engaging in that process might be a

mechanical departure analysis inconsistent with Seventh Circuit precedent. *Settles*, 2022 U.S. App. LEXIS 22001, at *10. Instead, as explained in more detail later, the Court is sentencing Mr. Hixson based on who he is and what he did, not whether an enhancement applies under the Guidelines Manual's definition of "firearm." *United States v. Price*, 16 F.4th 1263, 1266 (7th Cir. 2021) ("[A] judge is entitled to impose sentence based on what the defendant actually did, whether or not a particular enhancement applies.").

## APPLYING THE PROCEDURE TO FACTS OF THIS CASE

### Calculating Correct Guideline Range

The parties and the Court agree that the offense level for Mr. Hixson is 17. His base level is 20 under § 2K2.1(a)(4)(B) because the offense involved a semiautomatic firearm that was capable of accepting a large capacity magazine and Mr. Hixson was a prohibited person—a felon—at the time he committed the offense. Because Mr. Hixson clearly demonstrated acceptance of responsibility for the offense, the offense level is decreased two levels under § 3E1.1(a). Another decrease of one level applies because of his timely notification to authorities of his intention to plead guilty under § 3E1.1(b). (20 - 2 - 1 = 17)

It is also undisputed that Mr. Hixson's criminal history category is III. He had six criminal history points.[7]

So, the correct and undisputed 2021 Sentencing Guidelines Manual guideline range is 30 – 37 months. (The guideline range would have been identical under the 2018 Sentencing Guidelines Manual.)

The 9 Glock switches involved in this case have not been used to enhance the guideline range. How the Court has considered those switches in fashioning a just sentence is explained next.

---

[7] Most of Mr. Hixson's criminal history points are the result of his previous felony conviction for aggravated unlawful use of a weapon. Dkt. 48, at 11-12. This conviction involved a July 15, 2018, arrest, when Mr. Hixson was unemployed. (In fact, he's never held a legitimate job.) At almost 1:00 a.m., Mr. Hixon—who was then 19 years old—was at a liquor store. He then got into a friend's car. After they drove off, they were stopped by a Winnebago County Sheriff's deputy. During the stop, the deputy could smell "a strong order of cannabis coming from the vehicle." Dkt. 48, at 12. A search of the vehicle uncovered three bags of cannabis and two loaded firearms. A search of Mr. Hixson produced two cell phones and $256 in cash—mostly $5 and $20 bills. In a post-arrest interview, Mr. Hixson admitted that one of the loaded firearms—a Taurus Millennium PT111 G2—and one of the bags of cannabis—which contained 17.5 grams of cannabis—were his. He denied knowledge and possession of the other contraband. Mr. Hixson was sentenced to 30 months' probation for this conviction. Two petitions to revoke probation were filed for failing to comply with several conditions of probation. After the second revocation petition, Mr. Hixson's probation was revoked, and he was sentenced to 18 months' imprisonment in the Illinois Department of Corrections. This conviction resulted in three criminal history points.

### Applying §3553(a) Factors

Section 3553(a) states, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." 18 U.S.C. § 3553(a). The Court in determining the particular sentence to be imposed shall consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range; any pertinent Sentencing Commission policy statement; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victim of the offense. 18 U.S.C. § 3553(a).

Mr. Hixson is being sentenced for two offenses: possessing a machinegun (the Glock switches on November 5, 2020) and possessing a firearm as a felon on January 4, 2021.

### Nature and Circumstances of the Offenses / Seriousness of the Offenses

The nature and circumstances of both offenses are extremely serious.

Mr. Hixson's felon-in-possession conviction alone is very serious. While on parole for an aggravated unlawful use of a weapon felony conviction, Mr. Hixson was armed with a firearm with an extended magazine containing 28 rounds of ammunition. Instead of stopping when confronted by law enforcement, he instructed his cousin to flee. And when his cousin finally stopped the vehicle, Mr. Hixson bolted again. Mr. Hixson was only apprehended after he slipped in the snow, but not before he discarded his loaded firearm onto a sidewalk next to a brick building.

Not to minimize the felon-in-possession conviction, but the nature and circumstances of the possession of a machinegun conviction are even more serious. Unfortunately, the seriousness of this offense is not captured by the correctly calculated Sentencing Guidelines' range. The range completely ignores this offense, which simply does not result in a just punishment.

Formerly denominated "departures" and "offense characteristics" are relevant in the sentencing process and courts should give them conscientious consideration. *Pankow*, 884 F.3d at 794. In this case, there are at least one departure and two offense characteristics that the Court considers by way of analogy. *Id.* at 793. The

departure provision in § 5K2.0(a)(2)(B) recognizes that circumstances may be present that the Sentencing Guidelines may not have identified but are nevertheless "relevant to determining the appropriate sentence." And the offense characteristics in § 2K2.1(b) counsel that the total number of firearms involved is a relevant factor as is when firearms are being trafficked. So, the failure to incorporate machineguns—here, including Glock switches—into the definition of "firearms" is a void in the Sentencing Guidelines, but selling multiple machineguns is undoubtably "relevant in determining the appropriate sentence." By way of analogy and to use the language of the Sentencing Guidelines, the number of Glock switches involved in Mr. Hixson's offense and that he was essentially trafficking these devices is relevant conduct that must be considered. It is inconceivable that a court could not consider possessing and selling multiple devices that are statutorily defined as machineguns in determining a defendant's sentence. As a result, the Court has considered these facts in determining a sentence for Mr. Hixson.

The sole and exclusive purpose of Glock switches, which are easily manufactured, is to convert an already dangerous firearm into an extremely dangerous machinegun. The dangerousness manifests itself not only in the sheer number of bullets that can be emptied from the magazine in the blink of an eye but also in the resulting lack of control of the firearm when discharging it. The damage a machinegun can inflict is enormous. The damage—intended and unintended—a handheld machinegun can inflict is just as great. This offense involved 9 Glock switches, some of which Mr. Hixson sold believing they would be resold to others.

### History and Characteristics of Mr. Hixson

Mr. Hixson's history and characteristics are not positive. Obviously, he has a prior felony conviction, which occurred when he was only 19 years old. Like these offenses, the prior felony conviction involved a firearm. Aggravated unlawful use of a weapon is serious. But Mr. Hixson did not take that conviction seriously, as evidenced by his repeated probation violations resulting in the revocation of probation. Then within mere months of being released from the Illinois Department of Corrections, while on parole, he committed the offenses for which he is being sentenced. Mr. Hixson has no educational or employment background. Although he claims to want to obtain his general equivalency diploma, he has taken no steps in that direction. The Court is aware that the Winnebago County Jail has offered classes for the last several years and that some inmates have obtained their diplomas. Additionally, Mr. Hixson has never held legitimate employment, which leads to the question of how he survived. The answer to that question is provided by information surrounding his aggravated unlawful use of a weapon felony conviction. The evidence shows during that time Mr. Hixson was riding around in a vehicle containing multiple bags of cannabis and two loaded firearms in the wee hours of the morning. Police found two cell phones as well as $256 in cash, mostly $5 and $20 bills on Mr. Hixson. This evidence shows that more likely than not Mr. Hixson was selling cannabis.

### Promote Respect for the Law

The sentence imposed promotes respect for the law. At the time of both offenses, Mr. Hixson was on parole after his probation was revoked. And he was merely seven months removed from his release from the Illinois Department of Corrections when his criminal conduct restarted. Absent a significant sentence for these offenses, respect for the law is undermined.

### Provide Just Punishment

In considering all of these factors as well as the unique circumstances of the offenses and Mr. Hixson's individual history and characteristics, the Court has imposed a just punishment for the offenses. The sentence is sufficient but not greater than necessary to meet Congress' mandates.

### Afford Adequate Deterrence

Without doubt, general deterrence does not trump all other factors under § 3553(a). It is just one of many factors. But so long as the court provides individualized sentencing to a particular defendant, a court's sentence is allowed to send a message to the larger community. *See United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985) ("We do not find this desire to 'send a message' through sentencing inappropriate *per se*. Indeed, perhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others."). The Court is under no illusion that criminals peruse the Federal Supplements, the Chicago Daily Law Bulletin, or Law360. But, at the sentencing hearing, the Court informed Mr. Hixson and the multiple family members who were present that the possession and sale of Glock switches is an extremely serious offense requiring a serious sentence. The Court is confident that word of mouth—supplemented by social media, of course—is a common mode of communication among criminal defendants and their friends and family. Regardless of whether they are in state or federal custody, inmates housed at the Winnebago County Jail talk about the sentences they receive. In fact, they talk about their sentences among each other during the short ride from the Stanley J. Roszkowski United States Courthouse back to the Winnebago County Jail. Those engaged in the sale and distribution of Glock switches must be put on notice that doing so potentially subjects them to a significant sentence. The same is true for felons possessing firearms with extended magazines. This community is awash with people who are prohibited from possessing weapons possessing weapons.

### Protect the Public from Further Crimes By Mr. Hixson

In Mr. Hixson's brief lifetime, the evidence shows that he has a propensity for criminal conduct, often very serious criminal conduct. As his multiple probation

violations and revocation shows, his criminal behavior is not deterred when he is not incarcerated. He simply reoffends. The fact that these offenses occurred while Mr. Hixson was on parole also evidences that the public needs protection from his criminal behavior. Both of Mr. Hixson's offenses involve a complete lack of concern for the safety of others. In one offense, he fled law enforcement and threw a loaded weapon on a sidewalk next to a brick building. In the other offense, without hesitation, he sold Glock switches that he was told would be sold to others.

### Provide Mr. Hixson with Training, Medical Care, or Treatment

At the sentencing hearing, the Court asked Mr. Hixson and his counsel what types of programs would benefit Mr. Hixson during his incarceration in the Bureau of Prisons. The Court will recommend that Mr. Hixson be considered for these programs. Mr. Hixson's counsel requested that Mr. Hixson be enrolled in the Residential Drug Abuse Program. The Court agrees that this program would be beneficial and will recommend it. Mr. Hixson has no specific medical needs that need care.

### Kinds of Sentences Available

Although both offenses are statutorily eligible for probation, the advisory Sentencing Guidelines do not recommend probation. Moreover, a sentence of probation would be unreasonable as it would not adequately or properly take the other factors into account.

### Sentencing Range

The Court has correctly calculated the advisory Sentencing Guidelines range. But that sentencing range of 30 – 37 months woefully underrepresents the seriousness of the offenses. In particular, the range completely ignores the Glock switches, which Congress has defined as machineguns. Sentencing Mr. Hixson within the sentencing range does not account for the possession, sale, and distribution of the Glock switches.

### Sentencing Commission Policy Statements

The Court has considered the generally applicable Sentencing Commission Policy Statements. No applicable Sentencing Commission Policy Statements exist in § 2K2.1. Moreover, Mr. Hixson has not directed the Court to policy statements that it should consider.

## Avoid Unwarranted Sentencing Disparities

Through its research, the Court has attempted to address any unwarranted sentencing disparities. Because there are currently so few cases involving this situation, it is difficult to account for this factor. No nationwide sentencing information exists with the United States Sentencing Commission on this circumstance.

## Provide Restitution

Restitution is not applicable in this case for either offense.

## Mitigating Factors

At the sentencing hearing, the Court fully addressed Mr. Hixson's arguments in mitigation. For the sake of completeness, however, some are briefly reiterated here. The Court has considered the lack of much adult supervision in Mr. Hixson's life, particularly the absence of his father who was often incarcerated. Although, in the sentencing memorandum, it was represented that Mr. Hixson's mother believes his behavior will change, that belief is not supported by the evidence in the Presentence Investigation Report. In particular, Mr. Hixson's repeated violations of probation and then his nearly immediate return to criminal activity while on parole are strong evidence that his behavior has not and will not change absent significant intervention. Mr. Hixson's admission to the offenses and acceptance of responsibility have also been considered and are incorporated into the sentence, both during the offense level calculations and under the § 3553(a) factors. Although Mr. Hixson's age could be a mitigating factor, his young age also suggests he will likely reoffend, particularly for firearm offenses. *Recidivism of Federal Firearm Offenders Released in 2010*, p. 40, United States Sentencing Commission (November 2021). Finally, in the sentencing memorandum, Mr. Hixson expressed his desire to obtain his general equivalency diploma, but Mr. Hixson has never taken any steps either during his various incarcerations or while out of custody to obtain that diploma despite the opportunities.

## SENTENCE

In its discretion and after applying the § 3553(a) factors, the Court sentences Mr. Hixson to 66 months' imprisonment on each count to run concurrently.

No fine or restitution is imposed.

In addition to the 66 months' imprisonment, for each count, the Court also sentences Mr. Hixson to 3 years' supervised release with the conditions identified in open court. The terms of supervised release run concurrently.

Mr. Hixson will also pay a special assessment of $100 for each count, for a total of $200.

The Court will recommend the place of incarceration as well as the programs available in the Bureau of Prisons that were identified in court.

Counts 1 and 3 of the superseding indictment are dismissed under the plea agreement. And the original indictment is dismissed.

Entered: August 30, 2022                          By: _____

Iain D. Johnston
U.S. District Judge

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

KRISTOPHER JUSTINBOYER ERVIN

Case Number: 3:21-cr-22(S4)-MMH-MCR

USM Number: 32680-509

Alex King, Retained
1805 Copeland Street
Jacksonville, FL 32204

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty of Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve of the Fourth Superseding Indictment. The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 371 | Conspiracy to Transfer Unregistered Machinegun Conversion Devices | July 2021 | One |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials D.S. | November 2020 | Two |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials J.M. | November 2020 | Three |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials R.D. | December 2020 | Four |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials S.D. | December 2020 | Five |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials J.A. | December 2020 | Six |

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials R.W. | January 2021 | Seven |
| 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 | Transferring Unregistered Machinegun Conversion Devices to a Person with the Initials A.O. | February 2021 | Eight |
| 31 U.S.C. §§ 5324(a)(3) and (d)(1) | Structuring, and Attempting to Structure, Currency Transactions for the Purpose of Evading Currency Transaction Reporting Requirements | January 2021 | Nine |
| 26 U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2 | Possessing Unregistered Machinegun Conversion Devices on February 22, 2021 | February 2021 | Ten |
| 26 U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2 | Possessing Unregistered Machinegun Conversion Devices on February 24, 2021 | February 2021 | Eleven |
| 26 U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2 | Possessing Unregistered Machinegun Conversion Devices on March 2, 2021 | March 2021 | Twelve |

The defendant is sentenced as provided in pages 2 through 9 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The original Indictment, Superseding Indictment, Second Superseding Indictment, and Third Superseding Indictment are dismissed on the motion of the United States.

**IT IS ORDERED** that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

Date of Imposition of Sentence:
September 7, 2023

**MARCIA MORALES HOWARD**
**UNITED STATES DISTRICT JUDGE**

September _14th_, 2023

AO245B (Rev. 09/19) Judgment in a Criminal Case

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of **SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently.**

The Court makes the following recommendations to the Bureau of Prisons:

- Incarceration at a facility located as close as possible to Jacksonville, Florida.
- Defendant receive mental health treatment.
- Defendant enroll in any educational and vocational programs available.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By: _____
Deputy United States Marshal

AO245B (Rev. 09/19) Judgment in a Criminal Case

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of **THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
4. You must cooperate in the collection of DNA as directed by the probation officer.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchucks or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

12.    If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.

13.    You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature:_____          Date:_____

Page 8 of 9

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

## ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.  You shall participate in a substance abuse program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, you shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Substance Abuse Treatment Services. During and upon the completion of this program, you are directed to submit to random drug testing.

2.  You shall participate in a mental health treatment program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, you shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Mental Health Treatment Services.

3.  You shall provide the probation officer access to any requested financial information.

4.  You shall submit to a search of your person, residence, place of business, any storage units under your control, or vehicle, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. You shall inform any other residents that the premises may be subject to a search pursuant to this condition. Failure to submit to a search may be grounds for revocation.

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments set forth in the Schedule of Payments.

| | Assessment | AVAA Assessment[1] | JVTA Assessment[2] | Fine | Restitution |
|---|---|---|---|---|---|
| TOTALS | $1,200.00 | $0.00 | $0.00 | $0.00 | $0.00 |

---

[1] Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
[2] Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Kristopher Justinboyer Ervin
3:21-cr-22(S4)-MMH-MCR

## SCHEDULE OF PAYMENTS

The Special Assessment in the amount of **$1,200.00** is due in full and immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

## FORFEITURE

The defendant shall forfeit the defendant's interest in the following property to the United States:

See Preliminary Order of Forfeiture (Dkt. No. 16).

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO245B (Rev. 09/19) Judgment in a Criminal Case

AO 245 SOR   (Rev. 09/15) Judgment in a Criminal Case
Attachment (Page 1) — Statement of Reasons

| | |
|---|---|
| DEFENDANT: | Ervin, Kristopher Justinboyer |
| CASE NUMBER: | 3:21-cr-22(S4)-MMH-MCR |
| DISTRICT: | Middle District of Florida |

# STATEMENT OF REASONS
(Not for Public Disclosure)

*Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony and Class A misdemeanor cases.*

**I.   COURT FINDINGS ON PRESENCE INVESTIGATION REPORT**

A.  ☐  **The court adopts the presentence investigation report without change.**

B.  ☒  **The court adopts the presentence investigation report with the following changes:** *(Use Section VIII if necessary)*
   *(Check all that apply and specify court determination, findings, or comments, referencing paragraph numbers in the presentence report)*

   1.  ☒  **Chapter Two of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to base offense level, or specific offense characteristics)*
       The Court finds that 10 levels should be added pursuant to USSG §2K2.1(b)(1)(E), because Ervin is attributable with 6,600 firearms. Additionally, four levels should be added pursuant to USSG §2K2.1(b)(5), because Ervin engaged in trafficking firearms.

   2.  ☐  **Chapter Three of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to victim-related adjustments, role in the offense, obstruction of justice, multiple counts, or acceptance of responsibility)*

   3.  ☐  **Chapter Four of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to criminal history category or scores, career offender status, or criminal livelihood determinations)*

   4.  ☐  **Additional Comments or Findings:** *(include comments or factual findings concerning any information in the presentence report, including information that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation, or programming decisions; any other rulings on disputed portions of the presentence investigation report; identification of those portions of the report in dispute but for which a court determination is unnecessary because the matter will not affect sentencing or the court will not consider it)*

C.  ☐  **The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.**
   Applicable Sentencing Guideline: *(if more than one guideline applies, list the guideline producing the highest offense level)*

**II.  COURT FINDINGS ON MANDATORY MINIMUM SENTENCE** *(Check all that apply)*

A.  ☐  One or more counts of conviction carry a mandatory minimum term of imprisonment and the sentence imposed is at or above the applicable mandatory minimum term.

B.  ☐  One or more counts of conviction carry a mandatory minimum term of imprisonment, but the sentence imposed is below the mandatory minimum term because the court has determined that the mandatory minimum term does not apply based on:
   ☐  findings of fact in this case: *(Specify)*
   ☐  substantial assistance *(18 U.S.C. § 3553(e))*
   ☐  the statutory safety valve *(18 U.S.C. § 3553(f))*

C.  ☒  No count of conviction carries a mandatory minimum sentence.

**III.  COURT DETERMINATION OF GUIDELINE RANGE:** *(BEFORE DEPARTURES OR VARIANCES)*

Total Offense Level:   32
Criminal History Category:   I
Guideline Range: *(after application of §5G1.1 and §5G1.2)*   121 months-151 months
Supervised Release Range:   1 year-3 years per count
Fine Range: $   $35,000-$250,000

☒  Fine waived or below the guideline range because of inability to pay.

AO 245 SOR    (Rev. 09/15) Judgment in a Criminal Case
Attachment (Page 2) — Statement of Reasons

Not for Public Disclosure

DEFENDANT:    Ervin, Kristopher Justinboyer
CASE NUMBER:    3:21-cr-22(S4)-MMH-MCR
DISTRICT:    Middle District of Florida

# STATEMENT OF REASONS

**IV.**    **GUIDELINE SENTENCING DETERMINATION** *(Check all that apply)*

     A.   ☐   The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range does not exceed 24 months.

     B.   ☐   The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range exceeds 24 months, and the specific sentence is imposed for these reasons: *(Use Section VIII if necessary)*

     C.   ☐   The court departs from the guideline range for one or more reasons provided in the Guidelines Manual.
            *(Also complete Section V)*

     D.   ☒   The court imposed a sentence otherwise outside the sentencing guideline system (*i.e.*, a variance). *(Also complete Section VI)*

**V.**    **DEPARTURES PURSUANT TO THE GUIDELINES MANUAL** *(If applicable)*

     A.   **The sentence imposed departs:** *(Check only one)*
         ☐   above the guideline range
         ☐   below the guideline range

     B.   **Motion for departure before the court pursuant to:** *(Check all that apply and specify reason(s) in sections C and D)*
       1.   **Plea Agreement**
         ☐   binding plea agreement for departure accepted by the court
         ☐   plea agreement for departure, which the court finds to be reasonable
         ☐   plea agreement that states that the government will not oppose a defense departure motion
       2.   **Motion Not Addressed in a Plea Agreement**
         ☐   government motion for departure
         ☐   defense motion for departure to which the government did not object
         ☐   defense motion for departure to which the government objected
         ☐   joint motion by both parties
       3.   **Other**
         ☐   Other than a plea agreement or motion by the parties for departure

     C.   **Reasons for departure:** *(Check all that apply)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 4A1.3 | Criminal History Inadequacy | ☐ | 5K2.1 | Death | ☐ | 5K2.12 Coercion and Duress |
| ☐ | 5H1.1 | Age | ☐ | 5K2.2 | Physical Injury | ☐ | 5K2.13 Diminished Capacity |
| ☐ | 5H1.2 | Education and Vocational Skills | ☐ | 5K2.3 | Extreme Psychological Injury | ☐ | 5K2.14 Public Welfare |
| ☐ | 5H1.3 | Mental and Emotional Condition | ☐ | 5K2.4 | Abduction or Unlawful Restraint | ☐ | 5K2.16 Voluntary Disclosure of Offense |
| ☐ | 5H1.4 | Physical Condition | ☐ | 5K2.5 | Property Damage or Loss | ☐ | 5K2.17 High-Capacity Semiautomatic Weapon |
| ☐ | 5H1.5 | Employment Record | ☐ | 5K2.6 | Weapon | ☐ | 5K2.18 Violent Street Gang |
| ☐ | 5H1.6 | Family Ties and Responsibilities | ☐ | 5K2.7 | Disruption of Government Function | ☐ | 5K2.20 Aberrant Behavior |
| ☐ | 5H1.11 | Military Service | ☐ | 5K2.8 | Extreme Conduct | ☐ | 5K2.21 Dismissed and Uncharged Conduct |
| ☐ | 5H1.11 | Charitable Service/Good Works | ☐ | 5K2.9 | Criminal Purpose | ☐ | 5K2.22 Sex Offender Characteristics |
| ☐ | 5K1.1 | Substantial Assistance | ☐ | 5K2.10 | Victim's Conduct | ☐ | 5K2.23 Discharged Terms of Imprisonment |
| ☐ | 5K2.0 | Aggravating/Mitigating Circumstances | ☐ | 5K2.11 | Lesser Harm | ☐ | 5K2.24 Unauthorized Insignia |
| | | | | | | ☐ | 5K3.1 Early Disposition Program (EDP) |

    ☐   Other Guideline Reason(s) for Departure, to include departures pursuant to the commentary in the Guidelines Manual: *(see "List of Departure Provisions" following the Index in the Guidelines Manual.) (Please specify)*

     D.   **State the basis for the departure.** *(Use Section VIII if necessary)*

AO 245 SOR    (Rev. 09/15) Judgment in a Criminal Case                                    Not for Public Disclosure
              Attachment (Page 3) — Statement of Reasons

---

DEFENDANT:      Ervin, Kristopher Justinboyer
CASE NUMBER:    3:21-cr-22(S4)-MMH-MCR
DISTRICT:       Middle District of Florida

# STATEMENT OF REASONS

**VI.   COURT DETERMINATION FOR A VARIANCE** *(If applicable)*

   A.   **The sentence imposed is:** *(Check only one)*
   - ☐   above the guideline range
   - ☒   below the guideline range

   B.   **Motion for a variance before the court pursuant to:** *(Check all that apply and specify reason(s) in sections C and D)*

   1.   **Plea Agreement**
   - ☐   binding plea agreement for a variance accepted by the court
   - ☐   plea agreement for a variance, which the court finds to be reasonable
   - ☐   plea agreement that states that the government will not oppose a defense motion for a variance

   2.   **Motion Not Addressed in a Plea Agreement**
   - ☐   government motion for a variance
   - ☐   defense motion for a variance to which the government did not object
   - ☒   defense motion for a variance to which the government objected
   - ☐   joint motion by both parties

   3.   **Other**
   - ☐   Other than a plea agreement or motion by the parties for a variance

   C.   **18 U.S.C. § 3553(a) and other reason(s) for a variance** *(Check all that apply)*

   ☒   The nature and circumstances of the offense pursuant to 18 U.S.C. § 3553(a)(1):
   - ☐   Mens Rea            ☐   Extreme Conduct      ☐   Dismissed/Uncharged Conduct
   - ☐   Role in the Offense ☐   Victim Impact
   - ☒   General Aggravating or Mitigating Factors: *(Specify)*
         See sentencing transcript

   ☒   The history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1):
   - ☐   Aberrant Behavior        ☐   Lack of Youthful Guidance
   - ☐   Age                      ☐   Mental and Emotional Condition
   - ☐   Charitable Service/Good  ☐   Military Service
         Works
   - ☒   Community Ties           ☐   Non-Violent Offender
   - ☐   Diminished Capacity      ☐   Physical Condition
   - ☐   Drug or Alcohol Dependence ☐ Pre-sentence Rehabilitation
   - ☐   Employment Record        ☐   Remorse/Lack of Remorse
   - ☒   Family Ties and          ☐   Other: *(Specify)*
         Responsibilities
   - ☒   Issues with Criminal History: *(Specify)*   Lack of criminal history

   ☒   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
       *(18 U.S.C. § 3553(a)(2)(A))*

   ☒   To afford adequate deterrence to criminal conduct *(18 U.S.C. § 3553(a)(2)(B))*

   ☒   To protect the public from further crimes of the defendant *(18 U.S.C. § 3553(a)(2)(C))*

   ☐   To provide the defendant with needed educational or vocational training *(18 U.S.C. § 3553(a)(2)(D))*

   ☐   To provide the defendant with medical care *(18 U.S.C. § 3553(a)(2)(D))*

   ☐   To provide the defendant with other correctional treatment in the most effective manner *(18 U.S.C. § 3553(a)(2)(D))*

   ☒   To avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6)) *(Specify in section D)*

   ☐   To provide restitution to any victims of the offense *(18 U.S.C. § 3553(a)(7))*

   - ☐   Acceptance of Responsibility   ☐   Conduct Pre-trial/On Bond   ☐   Cooperation Without Government Motion for
                                                                             Departure
   - ☐   Early Plea Agreement           ☐   Global Plea Agreement
   - ☐   Time Served *(not counted in sentence)*   ☐   Waiver of Indictment   ☐   Waiver of Appeal
   - ☐   Policy Disagreement with the Guidelines *(Kimbrough v. U.S., 552 U.S. 85 (2007): (Specify)*

   - ☐   Other: *(Specify)*

   D.   **State the basis for a variance.** *(Use Section VIII if necessary)*

   See sentencing transcript.

AO 245 SOR          (Rev. 09/15) Judgment in a Criminal Case                                          Not for Public Disclosure
                    Attachment (Page 4) — Statement of Reasons

---

DEFENDANT:       Ervin, Kristopher Justinboyer
CASE NUMBER:     3:21-cr-22(S4)-MMH-MCR
DISTRICT:        Middle District of Florida

# STATEMENT OF REASONS

## VII.   COURT DETERMINATIONS OF RESTITUTION

A.   ☒   **Restitution not applicable.**

B.   **Total amount of restitution:**  $ _____

C.   **Restitution not ordered:** *(Check only one)*

    1.   ☐   For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

    2.   ☐   For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

    3.   ☐   For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

    4.   ☐   For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s)'(s) losses were not ascertainable (18 U.S.C. § 3664(d)(5)).

    5.   ☐   For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s) elected to not participate in any phase of determining the restitution order (18 U.S.C. § 3664(g)(1)).

    6.   ☐   Restitution is not ordered for other reasons: *(Explain)*

D.   ☐   **Partial restitution is ordered for these reasons:** *(18 U.S.C. § 3553(c))*

## VIII.   ADDITIONAL BASIS FOR THE SENTENCE IN THIS CASE *(If applicable)*

---

Defendant's Soc. Sec. No.:   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

Defendant's Date of Birth:   March 3, 1980

Defendant's Residence Address:   Baker County Jail
1 Sheriff's Office Drive
Macclenny, Florida  32063

Defendant's Mailing Address:   Baker County Jail
1 Sheriff's Office Drive
Macclenny, Florida  32063

Date of Imposition of Judgment:   September 7, 2023

*Signature of Judge*

Marcia Morales Howard
United States District Judge
Name and Title of Judge

Date:   Sept. 14, 2023

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              Case No:        3:21-cr-22-MMH-MCR

KRISTOPHER ERVIN

_____/

## NOTICE OF APPEAL

COMES NOW the Defendant, Kristopher Ervin, by and through the undersigned counsel,

pursuant to Rule 4(b), Fed. R. App. P., and hereby gives notice of his appeal of the (1) Order

Denying Motion for Judgment of Acquittal (Doc. 310), (2) September 8, 2023 sentenced imposed,

and (3) the subsequent September 14, 2023 Judgment in a Criminal Case (Doc. 324) issued by

United States District Court Judge Marcia Morales Howard.

Respectfully submitted,
**First Coast Criminal Defense**

  /s/ Alex King
Alex King, Esq.
Florida Bar No.: 0086034
1805 Copeland Street
Jacksonville, Florida 32204
Tel: (904) 355-7777
E-mail: Admin@MonroeKingLaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

email to: Laura Cofer Taylor, Esq., Office of the United States Attorney,

Laura.C.Taylor@usdoj.gov, this 19th day of September, 2023.

  /s/ Alex King
ATTORNEY

# U.S. District Court
## Middle District of Florida (Jacksonville)
## CRIMINAL DOCKET FOR CASE #: 3:21-cr-00022-MMH-MCR-1

Case title: USA v. Ervin

Date Filed: 03/11/2021

Magistrate judge case number: 3:21-mj-01127-PDB

Date Terminated: 09/14/2023

---

Assigned to: Judge Marcia Morales
Howard
Referred to: Magistrate Judge Monte C.
Richardson

Appeals court case numbers: 22-12005-E
USCA, 23-13062 USCA

## Defendant (1)

**Kristopher Justinboyer Ervin**
*Custody*
*TERMINATED: 09/14/2023*

represented by **Alex King**
First Coast Criminal Defense
1805 Copeland St.
Jacksonville, FL 32204
904-355-7777
Fax: 904-720-2886
Email: Alex@MonroeKingLaw.com
*TERMINATED: 11/29/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Lisa Call**
Federal Public Defender's Office
Suite 1240
200 W Forsyth St
Jacksonville, FL 32202
904/232-3039
Fax: 904/232-1937
Email: Lisa_Call@fd.org
*TERMINATED: 06/04/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

**Daniel Scott Monroe**
Scott Monroe Law, P.A.

200 E. Forsyth St.
Jacksonville, FL 32202
904/891-7362
Fax: 904-353-5801
Email: scott@monroekinglaw.com
*TERMINATED: 11/29/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Valarie Linnen**
Valarie Linnen, ESQ.
841 Prudential Drive
12th Floor
Jacksonville, FL 32207
888-608-8814
Email: vlinnen@live.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2ssss-8ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (9ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE |

UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (10ssss-12ssss)

(3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00

Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (1) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (1s-7s) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1ss) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1sss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2ss-7ss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION (2sss-8sss) | Dismissed on Government's Motion |
| TRANSP./DELIVER/RECEIVE IN INTERSTATE COMMERCE- UNREGISTERED (8s) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (8ss-14ss) | Dismissed on Government's Motion |

| | |
|---|---|
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (9s-14s) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS (9sss-15sss) | Dismissed on Government's Motion |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (15ss-17ss) | Dismissed on Government's Motion |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED (16sss-18sss) | Dismissed on Government's Motion |

**<u>Highest Offense Level (Terminated)</u>**

Felony

| **<u>Complaints</u>** | **<u>Disposition</u>** |
|---|---|
| 26:5861D.F UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED | |

---

**<u>Movant</u>**

**John Crump**                              represented by      **Eric J. Friday**
Kingry & Friday, Esq.
1919 Atlantic Blvd.
Jacksonville, FL 32207
(904) 722-3333
Email: efriday@kingryfriday.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**James D Phillips , Jr**
Katz & Phillips, PA
509 W Colonial Dr
Orlando, FL 32804
321/332-6864
Fax: 407/657-1526
Email: jphillips@kplegalteam.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert J Olson**
William J. Olson, P.C.
370 Maple Ave W
Suite 4
Vienna, VA 22180
703-356-5070

Fax: 703-356-5085
Email: rob@wjopc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ronald J. Shook , II**
The Law Offices of Ronald J. Shook
121 E. Main Ave.
Gastonia, NC 28052
(704) 671-2390
Fax: (704) 671-4431
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stephen D Stamboulieh**
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440
Email: stephen@sdslaw.us
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**

**USA**                                     represented by    **David B. Mesrobian**
US Attorney's Office - FLM
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904/301-6300
Fax: 904/301-6310
Email: david.mesrobian@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Laura Cofer Taylor**
US Attorney's Office - FLM*
Suite 700
300 N Hogan St
Jacksonville, FL 32202
904-301-6249
Email: Laura.C.Taylor@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Michele Harrington**
United States Attorney's Office
400 W. Washington Street, Suite 3100
Orlando, FL 32801
407-648-7651
Fax: 407-648-7643
Email: Jennifer.harrington2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mai Tran**
United States Attorney's Office
Suite 700
300 N. Hogan Street
Jacksonville, FL 32202
904-301-6300
Fax: 904-301-6310
Email: mai.tran2@usdoj.gov
*TERMINATED: 11/16/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2021 | 1 | COMPLAINT as to Kristopher Justinboyer Ervin (filed in open court). (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) |
| 03/03/2021 | | ARREST of Kristopher Justinboyer Ervin on 3/3/2021 (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) |
| 03/03/2021 | 3 | MINUTE entry for in person proceedings held before Magistrate Judge Patricia D. Barksdale: initial appearance held on 3/3/2021. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 4 | ORAL MOTION for detention by USA. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 5 | JOINT MOTION to continue the detention hearing. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 6 | **ORDER OF TEMPORARY DETENTION granting 5 the joint oral motion to continue the detention hearing and scheduling the detention hearing for 3/5/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge Patricia D. Barksdale on 3/3/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/03/2021 | 7 | NOTICE OF HEARING: The preliminary hearing is scheduled for 3/17/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) |
| 03/05/2021 | 8 | MINUTE entry for the in person status-of-counsel and detention hearings held on |

| | | |
|---|---|---|
| | | 3/5/2021 before Magistrate Judge Patricia D. Barksdale: The defendant moved for appointment of counsel and to continue the detention hearing. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 9 | ORAL MOTION to appoint counsel by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 10 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 11 | **ORDER granting 9 the defendant's oral motion to appoint counsel and appointing the Federal Defender's Office to represent him in this case. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/05/2021 | 12 | **ORDER OF TEMPORARY DETENTION granting 10 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/9/2021 at 02:30 PM in Jacksonville Courtroom 5D before Magistrate Judge James R. Klindt. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/08/2021 | 13 | **STANDING ORDER as to Kristopher Justinboyer Ervin: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (KEM)** [3:21-mj-01127-PDB] (Entered: 03/08/2021) |
| 03/09/2021 | 14 | MINUTE entry for the in person detention hearing held on 3/9/2021 before Magistrate Judge James R. Klindt: The defendant moved to continue the detention hearing. Judge Klindt granted the motion and scheduled the detention hearing for 3/15/21 at 2:00 p.m. before Magistrate Judge Patricia Barksdale. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/09/2021 | 15 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/09/2021 | 16 | **ORDER OF TEMPORARY DETENTION granting 15 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/15/2021 at 02:00 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge James R. Klindt on 3/9/2021. (ASL)** [3:21-mj-01127-PDB] (Entered: 03/10/2021) |
| 03/11/2021 | 17 | INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1. (BGR) (Entered: 03/12/2021) |
| 03/15/2021 | 20 | **ORDER allowing a credentialed member of the press to bring a laptop computer or tablet to the 3/15/2021 detention hearing. Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL)** (Entered: 03/15/2021) |
| 03/15/2021 | 21 | MINUTE entry for the in person arraignment and detention hearings held on 3/15/2021 before Magistrate Judge Patricia D. Barksdale: The defendant entered a plea of not guilty to count one of the indictment and was remanded to the custody of |

the Attorney General to await trial. (Digital) (ASL) (Entered: 03/16/2021)

USCA11 Case: 23-13062　　Document: 39　　Date Filed: 02/29/2024　　Page: 212 of 563

| 03/15/2021 | 22 | NOTICE of acceptance of general discovery by Kristopher Justinboyer Ervin (filed in open court). (ASL) (Entered: 03/16/2021) |
| 03/25/2021 | 23 | **ORDER OF DETENTION PENDING TRIAL as to Kristopher Justinboyer Ervin Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL)** (Entered: 03/25/2021) |
| 03/25/2021 | 24 | **SCHEDULING ORDER as to Kristopher Justinboyer Ervin: A status conference is scheduled for 4/19/2021 at 03:00 PM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; the jury trial is scheduled for 5/3/2021 at 09:00 AM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; discovery, dispositive, and suppression motions are due by 4/12/2021. Signed by Deputy Clerk on 3/25/2021. (ASL)** (Entered: 03/25/2021) |
| 04/01/2021 | 25 | SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1s-7s, 8s, 9s-14s. (RH) Modified on 3/16/2023 to edit text (AET). (Entered: 04/01/2021) |
| 04/02/2021 | 27 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Superseding Indictment set for 4/7/2021 at 10:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 04/02/2021) |
| 04/05/2021 | 28 | MOTION to Withdraw as Attorney *and Memorandum of Law* by Lisa Call and Office of the Federal Public Defender. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 04/05/2021) |
| 04/07/2021 | 29 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: denying 28 Motion to Withdraw as Attorney as to Kristopher Justinboyer Ervin (1); MOTION hearing as to Kristopher Justinboyer Ervin held on 4/7/2021 re 28 MOTION to Withdraw as Attorney *and Memorandum of Law* by Lisa Call and Office of the Federal Public Defender. filed by Kristopher Justinboyer Ervin ; ARRAIGNMENT as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 8s, 9s-14s held on 4/7/2021 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 04/07/2021) |
| 04/12/2021 | 30 | MOTION to Dismiss *Superseding Indictment* by Kristopher Justinboyer Ervin. (Call, Lisa) (Entered: 04/12/2021) |
| 04/13/2021 | 31 | MOTION to Extend Time to Respond to Defendant's Motion to Dismiss by USA as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 04/13/2021) |
| 04/15/2021 | 32 | NOTICE: The status conference set for April 19, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 04/15/2021) |
| 04/16/2021 | 33 | **ENDORSED ORDER granting 31 Government's Motion to Extend Time to Respond to Defendant's Motion to Dismiss. Counsel for the United States shall have up to and including May 7, 2021, to respond to Defendant's Motion to Dismiss. Signed by Judge Marcia Morales Howard on 4/16/2021. (JW)** (Entered: 04/16/2021) |
| 04/19/2021 | 34 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 4/19/2021. Status conference set for May 24, 2021, at 3:00 p.m. Jury trial set for trial term commencing |

on June 7, 2021 at 9:00 a.m. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 04/21/2021)

| | | |
|---|---|---|
| 04/22/2021 | | Set/Reset Deadlines/Hearings as to Kristopher Justinboyer Ervin: Jury Trial set for trial term commencing on 6/7/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Status Conference set for 5/24/2021 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard (RH) (Entered: 04/22/2021) |
| 05/07/2021 | 35 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 30 MOTION to Dismiss *Superseding Indictment* (Taylor, Laura) (Entered: 05/07/2021) |
| 05/19/2021 | 36 | NOTICE: The status conference set for May 24, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 05/19/2021) |
| 05/24/2021 | 37 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 5/24/2021. Status conference set for July 19, 2021, at 3:00 p.m. Jury trial set for trial term commencing on August 2, 2021, at 9:00 a.m. A hearing on the Motion to Dismiss will be set for July 7, 2021, at 2:00 p.m. or July 8, 2021, at 2:00 p.m., depending upon the availability of the case agent. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 05/25/2021) |
| 05/25/2021 | 38 | NOTICE OF HEARING ON 30 Motion to Dismiss Superseding Indictment. Motion Hearing set for 7/8/2021 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 05/25/2021) |
| 06/02/2021 | 39 | MOTION to Withdraw as Attorney by Lisa Call. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 06/02/2021) |
| 06/04/2021 | 40 | NOTICE OF ATTORNEY APPEARANCE: Alex King appearing for Kristopher Justinboyer Ervin (King, Alex) (Entered: 06/04/2021) |
| 06/04/2021 | 41 | **ORDER granting 39 Motion to Withdraw as Attorney Lisa Call withdrawn from case. as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/4/2021. (SHS)** (Entered: 06/04/2021) |
| 07/01/2021 | 42 | MOTION for Miscellaneous Relief, specifically to Adopt Motion to Dismiss (Doc. 30) re 30 MOTION to Dismiss *Superseding Indictment* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 07/01/2021) |
| 07/02/2021 | 43 | **ENDORSED ORDER granting 42 Motion to Adopt Motion to Dismiss Superseding Indictment. Signed by Judge Marcia Morales Howard on 7/2/2021. (JW)** (Entered: 07/02/2021) |
| 07/08/2021 | 44 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 07/08/2021) |
| 07/08/2021 | 45 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin held on 7/8/2021; denying 30 Motion to Dismiss as to Kristopher Justinboyer Ervin (1); granting 44 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference set for 9/20/2021 at 09:30 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. |

| | | |
|---|---|---|
| | | Defendant is required to be present. Jury Trial set for trial term commencing on 10/4/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Plea deadline is September 27, 2021. The United States is directed to file a Bill of Particulars no later than July 16, 2021. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 07/08/2021) |
| 07/16/2021 | 46 | BILL of particulars as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 07/16/2021) |
| 08/10/2021 | 47 | NOTICE OF ATTORNEY APPEARANCE Mai Tran appearing for USA. (Tran, Mai) (Entered: 08/10/2021) |
| 08/12/2021 | 48 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin held on July 8, 2021 before Judge Marcia Morales Howard. Court Reporter/Transcriber Cindy Packevicz Jarriel, Telephone number 904-301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/2/2021 Redacted Transcript Deadline set for 9/13/2021 Release of Transcript Restriction set for 11/10/2021. (CLP) (Entered: 08/12/2021) |
| 08/12/2021 | 49 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Cindy Packevicz Jarriel; cindyrprfcrr@gmail.com (CLP) (Entered: 08/12/2021) |
| 09/20/2021 | 50 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 09/20/2021) |
| 09/20/2021 | 51 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 9/20/2021; granting 50 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Special Status Conference set for 11/22/2021 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendant is required to be present. Jury Trial set for trial term commencing on 12/6/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 09/20/2021) |
| 11/22/2021 | 52 | ORAL MOTION to Continue Trial by USA and Kristopher Justinboyer Ervin. (JW) (Entered: 11/23/2021) |
| 11/22/2021 | 53 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 11/22/2021; granting 52 Joint Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference and Motion Hearing set for 3/21/2022 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 4/4/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. The Court requests that the parties hold the weeks of April 11, April 18, and April 25, 2022 for trial. See Minutes for additional deadlines. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 11/23/2021) |

| | | |
|---|---|---|
| 12/15/2021 | [54] | **ORDER SCHEDULING TRIAL. Jury selection shall commence on April 11, 2022, at 9:00 a.m. Opening statements and evidence will begin on April 12, 2022, at 9:00 a.m. Jury instructions, proposed Voir Dire, proposed brief statement of the case, and proposed verdict form due no later than February 18, 2022. Signed by Judge Marcia Morales Howard on 12/15/2021. (Attachments: # [1] Instructions Regarding Jury Selection, # [2] Instructions Regarding Premarking Exhibits)(JW)** (Entered: 12/15/2021) |
| 12/21/2021 | [55] | NOTICE *of Disclosure of Summary of Expert Testimony in Compliance with Fed. R. Crim. P. 16(a)(1)(G)* by USA as to Kristopher Justinboyer Ervin (Taylor, Laura) (Entered: 12/21/2021) |
| 01/13/2022 | [56] | NOTICE *of Disclosure of Summary Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C)* by Kristopher Justinboyer Ervin (Attachments: # [1] Exhibit A) (King, Alex) (Entered: 01/13/2022) |
| 01/26/2022 | [57] | SECOND SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ss, 2ss-7ss, 8ss-14ss, 15ss-17ss, Matthew Raymond Hoover (2) count(s) 1, 2-7. (BGR) (Additional attachment(s) added on 1/27/2022: # [1] Restricted Unredacted Indictment) (BGR). Modified on 3/16/2023 to edit text (AET). (Entered: 01/27/2022) |
| 01/28/2022 | 64 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Initial Appearance on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) |
| 01/28/2022 | 65 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) |
| 02/02/2022 | [69] | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Second Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 2ss-7ss, 8s, 8ss-14ss, 9s-14s, 15ss-17ss held on 2/2/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 02/02/2022) |
| 02/07/2022 | [71] | Consent MOTION for Miscellaneous Relief, specifically to Hold in Abeyance Previously Ordered Motion Deadline by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 02/07/2022) |
| 02/08/2022 | [72] | **ORDER granting [71] Defendant Ervin's Consent Motion to Hold in Abeyance Previously Ordered Motion Deadline. The parties are relieved of the obligation of complying with the motions deadline of February 11, 2022, and the responses deadline of February 25, 2022. The hearing scheduled for March 21, 2022, at 1:30 p.m. remains set. Signed by Judge Marcia Morales Howard on 2/8/2022. (JW)** (Entered: 02/08/2022) |
| 03/04/2022 | [78] | JOINT MOTION to Hold Motions Deadlines in Abeyance and For a Status Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Modified on 3/4/2022, to edit text) (BGR). (Entered: 03/04/2022) |
| 03/07/2022 | [79] | **ORDER granting [78] Joint Motion to Hold Motions Deadlines in Abeyance and** |

| | | |
|---|---|---|
| | | **for a Status Hearing. The parties are relieved of the obligation of complying with the motions deadlines. The hearing scheduled for March 21, 2022, at 1:30 p.m. is cancelled. A status conference as to all parties is set for March 23, 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 3/7/2022. (JW)** (Entered: 03/07/2022) |
| 03/21/2022 | 81 | **ENDORSED ORDER granting 80 Motion to Appear Telephonically. Zachary Zermay and Matthew Larosiere are permitted to appear telephonically at the status conference set for March 23, 2022, at 1:30 p.m. The Courtroom Deputy Clerk will separately provide counsel with the call-in information for the hearing. Signed by Judge Marcia Morales Howard on 3/21/2022. (JW)** (Entered: 03/21/2022) |
| 03/23/2022 | 82 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin and Matthew Raymond Hoover. (JW) (Entered: 03/23/2022) |
| 03/23/2022 | 83 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 3/23/2022; granting 82 Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1) and Matthew Raymond Hoover (2). Special Status Conference set for 6/27/2022 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 7/5/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Shannon Bishop (JW) (Entered: 03/23/2022) |
| 03/25/2022 | 84 | NOTICE OF ATTORNEY APPEARANCE David B. Mesrobian appearing for USA. (Mesrobian, David) (Entered: 03/25/2022) |
| 03/25/2022 | 85 | TRANSCRIPT of Digitally recorded arraignment and detention hearing as to Kristopher Justinboyer Ervin held on 3/15/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/15/2022 Redacted Transcript Deadline set for 4/25/2022 Release of Transcript Restriction set for 6/23/2022. (KMH) (Entered: 03/25/2022) |
| 03/25/2022 | 86 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Katharine Healey (904) 301-6843 (KMH) (Entered: 03/25/2022) |
| 04/27/2022 | 87 | MOTION for Reconsideration re 23 Order of Detention by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 04/27/2022) |
| 05/02/2022 | 88 | **ENDORSED ORDER directing to respond to 87 MOTION for Reconsideration re 23 Order of Detention as to Kristopher Justinboyer Ervin. Responses due by 5/13/2022 Signed by Magistrate Judge Monte C. Richardson on 5/2/2022. (SHS)** Modified on 5/2/2022 (SHS). (Entered: 05/02/2022) |

| | | |
|---|---|---|
| 05/12/2022 | [89](#) | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re [87](#) MOTION for Reconsideration re [23](#) Order of Detention (Taylor, Laura) (Entered: 05/12/2022) |
| 05/24/2022 | [90](#) | MOTION for Leave to File Document *to Government's Response in Opposition to Defendant's Motion to Reconsider Detention of Defendant* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/24/2022) |
| 06/01/2022 | [91](#) | **ORDER denying [87](#) Motion for Reconsideration re [23](#) Order of Detention filed by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/1/2022. (SHS)** (Entered: 06/01/2022) |
| 06/02/2022 | 92 | **ENDORSED ORDER denying [90](#) Motion for Leave to File as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/2/2022. (SHS)** (Entered: 06/02/2022) |
| 06/15/2022 | [93](#) | NOTICE of APPEAL by Kristopher Justinboyer Ervin re [91](#) Order on Motion for Reconsideration / Clarification. Filing fee paid $ 505, receipt number AFLMDC-19679305. (King, Alex) . (Entered: 06/15/2022) |
| 06/16/2022 | [94](#) | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of notice of appeal, order/judgment being appealed, and motion, if applicable to USCA re [93](#) Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # [1](#) Notice of appeal, # [2](#) Order)(SJW) (Entered: 06/16/2022) |
| 06/21/2022 | [95](#) | MOTION to Dismiss by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # [1](#) Request for Judicial Notice, # [2](#) Request for Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | [96](#) | MOTION to Change Venue / Transfer Case by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # [1](#) Request for Judicial Notice, # [2](#) Declaration of Zachary Z. Zermay, # [3](#) Request for an Evidentiary Hearing and Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) |
| 06/21/2022 | [97](#) | MOTION to Sever Trial by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # [1](#) Request for Oral Argument) (Zermay, Zachary) (Modified on 6/22/2022, to edit text) (BGR). (Entered: 06/21/2022) |
| 06/21/2022 | | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 22-12005-E for [93](#) Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 06/22/2022) |
| 06/27/2022 | [98](#) | NOTICE of filing supplemental authority by Kristopher Justinboyer Ervin, Matthew Raymond Hoover re: [95](#) MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 06/27/2022) |
| 06/27/2022 | 99 | JOINT ORAL MOTION to Continue Trial as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (CKS) (Entered: 06/28/2022) |
| 06/27/2022 | [100](#) | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 6/27/2022; granting 99 Joint Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover(2). Jury Trial set for the November 2022 trial term, scheduled to commence on 11/1/2022 at 09:00 AM in Jacksonville |

| | | Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Katharine Healey (CKS) (Entered: 06/29/2022) |
|---|---|---|
| 07/01/2022 | 101 | SUPPLEMENT re 95 MOTION TO DISMISS & to Declare Unconstitutional the National Firearms Act of 1934 by Matthew Raymond Hoover (Zermay, Zachary) Modified on 7/7/2022 to edit text (AET). (Entered: 07/01/2022) |
| 07/12/2022 | 102 | NOTICE *Regarding Expert Disclosure* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 07/12/2022) |
| 08/01/2022 | 106 | NOTICE *REGARDING JURY SELECTION* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/01/2022) |
| 08/02/2022 | 107 | NOTICE *REGARDING EXPERT DISCLOSURE* by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 08/02/2022) |
| 08/03/2022 | 108 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover: Motion Hearing/Status Conference set for 10/11/2022 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendants are required to be present. (JW) (Entered: 08/03/2022) |
| 08/04/2022 | 110 | MOTION for Leave to File Reply to 103 Response in Opposition by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 111 | MOTION for Leave to File Reply to 105 Response in Opposition to Sever Defendant by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 112 | MOTION for Leave to File Reply to 104 Response in Opposition to Change Venue/Transfer Case by Matthew Raymond Hoover. Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) |
| 08/04/2022 | 113 | NOTICE of filing supplemental authority by Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) Modified on 8/5/2022 to edit text and to confirm with counsel page 3 is intentionally blank (AET). (Entered: 08/04/2022) |
| 08/05/2022 | 114 | NOTICE OF RESCHEDULING HEARING: The Motion Hearing/Status Conference previously scheduled for October 11, 2022, at 10:00 a.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing date and time: Motion Hearing/Status Conference set for 10/12/2022 at 2:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/05/2022) |
| 08/23/2022 | 118 | MOTION in Limine by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 56 Notice of Disclosure of Summary Expert Testimony in compliance with Fed. R. Crim. P. 16(b)(1)(C) and 107 Notice Regarding Expert Disclosure. (Attachments: # 1 Exhibit A, video on disk filed separately, # 2 Exhibit B, # 3 Exhibit C)(AET) (Entered: 08/24/2022) |
| 08/30/2022 | 119 | JOINT UNOPPOSED MOTION to Continue trial by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 9/2/2022 to edit text (AET). (Entered: 08/30/2022) |

| 08/31/2022 | 120 | THIRD SUPERSEDING INDICTMENT returned in open court as to Kristopher Raymond Hoover (1) count(s) 1sss, 2sss-8sss, 9sss-15sss, 16sss-18sss, Matthew Raymond Hoover (2) count(s) 1s, 2s-8s. (Attachments: # 1 Restricted Unredacted Indictment) (AET) Modified on 3/16/2023 to edit text (AET). (Entered: 08/31/2022) |
|---|---|---|
| 08/31/2022 | 123 | NOTICE OF HEARING ON 119 Joint and Unopposed Motion to Continue Trial. Motion Hearing set for September 6, 2022, at 3:00 p.m. before Judge Marcia Morales Howard. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. (JW) (Entered: 08/31/2022) |
| 09/01/2022 | 124 | USCA Order Dismissed as to Kristopher Justinboyer Ervin re 93 Notice of Appeal USCA number: 22-12005. Issued as mandate on 8/30/22. (SJW) (Entered: 09/01/2022) |
| 09/07/2022 | 126 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 9/7/2022; granting 119 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2); denying, without prejudice, as moot 95 Defendant Hoover's Motion to Dismiss. Hoover's renewed motion to dismiss due September 22, 2022. Response due October 7, 2022. Motion hearing set for December 9, 2022, at 10:00 a.m. Jury Trial set for 1/9/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Katharine Healey (JW) (Entered: 09/12/2022) |
| 09/13/2022 | 127 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 120 Third Superseding Indictment,. Arraignment set for 9/22/2022 at 11:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 09/13/2022) |
| 09/14/2022 | 128 | UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 9/15/2022 (AET). (Entered: 09/14/2022) |
| 09/16/2022 | 130 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover as to Matthew Raymond Hoover (Zermay, Zachary) Modified on 9/19/2022 to edit text (AET). (Entered: 09/16/2022) |
| 09/22/2022 | 131 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Third Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, 15ss-17ss, 16sss-18sss, and Matthew Raymond Hoover (2) Count 1, 1s, 2-7, 2s-8s, held on 9/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 09/22/2022) |
| 09/22/2022 | 132 | MOTION to Dismiss by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice)(Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/22/2022 | 133 | Second MOTION to Dismiss for First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934 by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) |
| 09/28/2022 | 134 | MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin. (King, |

| | | Alex) (Entered: 09/28/2022) |
|---|---|---|
| 09/28/2022 | 135 | **ENDORSED ORDER granting 134 Defendant Ervin's Motion for Extension of Time of Filing Deadline. Defendant Ervin shall have up to and including October 7, 2022, to file his Daubert motion. The United States shall have up to and including October 24, 2022, to file a response. Signed by Judge Marcia Morales Howard on 9/28/2022. (JW)** (Entered: 09/28/2022) |
| 09/28/2022 | 136 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 09/28/2022) |
| 10/07/2022 | 139 | Unopposed MOTION to Continue Daubert Motion Deadline by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 10/07/2022) |
| 10/11/2022 | 140 | **ENDORSED ORDER granting 139 Unopposed Motion to Continue Daubert Deadline. Defendants shall have up to and including October 21, 2022, to file Daubert motions. The United States shall have up to and including November 7, 2022, to file responses. Signed by Judge Marcia Morales Howard on 10/11/2022. (JW)** (Entered: 10/11/2022) |
| 10/21/2022 | 142 | MOTION in Limine *to Exclude Trial Testimony of Government's Purported Expert Witnesses* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 10/21/2022) |
| 10/28/2022 | 145 | **ORDER granting 143 Motion to Continue Motion in Limine Deadline. Motions in limine due 11/10/2022. Responses due 11/28/2022. Signed by Judge Marcia Morales Howard on 10/28/2022. (JCM)** (Entered: 10/28/2022) |
| 10/31/2022 | 146 | TRANSCRIPT of Digitally Recorded Initial Appearance and Arraignment Proceedings as to Matthew Raymond Hoover held on 02/22/2022 before Judge Monte C. Richardson. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/21/2022 Redacted Transcript Deadline set for 12/1/2022 Release of Transcript Restriction set for 1/30/2023. (KMH) (Entered: 10/31/2022) |
| 10/31/2022 | 147 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT (02/22/2022 Digitally Recorded Initial Appearance and Arraignment of Matthew Raymond Hoover). The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Matthew Raymond Hoover. Court Reporter: Katharine Healey (KMH) (Entered: 10/31/2022) |
| 11/07/2022 | 149 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 142 MOTION in Limine *to Exclude Trial Testimony of Government's Purported Expert Witnesses* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Taylor, Laura) (Entered: 11/07/2022) |

| 11/10/2022 | 152 | Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) (Entered: 11/10/2022) |
| 11/10/2022 | 153 | RESPONSE to Motion re 152 Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 11/10/2022) |
| 11/10/2022 | 154 | **ENDORSED ORDER granting 152 Joint Emergency Motion for Extension of Time of Filing Deadline and Request for Status Conference. Motions in limine must be filed on or before November 18, 2022. A telephonic status conference is set for Thursday, November 17, 2022, at 1:00 p.m. The Courtroom Deputy Clerk will separately send participants the call-in information for the hearing. Absent a continuance of the trial, no further extensions of time will be granted. Signed by Judge Marcia Morales Howard on 11/10/2022. (JW) (Entered: 11/10/2022)** |
| 11/17/2022 | 158 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 11/21/2022) |
| 11/17/2022 | 159 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 11/17/2022; terminating 136 Government's Motion in Limine; granting 158 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). A Daubert hearing will be held on February 7, 2023. The time will be set at a later date. Jury Trial set for 4/10/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for deadlines. The Court emphasized its expectation that the deadlines would be met and that the trial date is firm and will not change. Order Scheduling Trial to enter. Court Reporter: Katharine Healey (JW) (Entered: 11/21/2022) |
| 12/09/2022 | 165 | NOTICE *Amended of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) Testimony* by Kristopher Justinboyer Ervin (King, Alex) (Entered: 12/09/2022) |
| 01/03/2023 | 169 | **ORDER SCHEDULING TRIAL. As previously directed, Daubert motions are due January 4, 2023, and responses are due January 18, 2023. A Daubert hearing is set for February 7, 2023, at 10:00 a.m. in Courtroom 10B. Motions in limine shall be filed by February 24, 2023, and responses are due March 10, 2023. Jury selection and trial shall commence on April 10, 2023, at 9:00 a.m. Trial documents due no later than April 3, 2023. Signed by Judge Marcia Morales Howard on 1/3/2023. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW) (Entered: 01/03/2023)** |
| 01/04/2023 |  | Set/Reset Deadlines as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Exhibit List due by 4/10/2023. (AET) (Entered: 01/04/2023) |
| 01/04/2023 | 170 | MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 01/04/2023) |
| 01/18/2023 | 171 | RESPONSE to Motion re 170 MOTION in Limine *to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses* by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 01/18/2023) |

| | | |
|---|---|---|
| 02/01/2023 | 177 | **ORDER directing the parties to file a written proffer of each proposed expert witness's opinions by 12:00 noon on Monday, February 6, 2023. Signed by Judge Marcia Morales Howard on 2/1/2023. (JCM)** (Entered: 02/01/2023) |
| 02/03/2023 | 178 | NOTICE *of Withdrawal of Notice of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) and Request for Relief from this Court's February 1, 2023 Order* by Kristopher Justinboyer Ervin re 165 Notice (Other), 177 Order. (King, Alex) (Entered: 02/03/2023) |
| 02/06/2023 | 180 | NOTICE *of Filing Written Proffer of Testimony by Ernest Lintner in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |
| 02/06/2023 | 181 | NOTICE *of Filing Written Proffer of Opinions of Cody Toy in Anticipation of Trial* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) |
| 02/06/2023 | 182 | NOTICE *of Written Proffer of Testimony by Daniel O'Kelly in Anticipation of Trial* by Kristopher Justinboyer Ervin re 177 Order. (King, Alex) (Entered: 02/06/2023) |
| 02/07/2023 | 184 | NOTICE *of Filing* by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A)(King, Alex) (Entered: 02/07/2023) |
| 02/07/2023 | 185 | NOTICE *of supplemental authority* by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Attachment 1)(Mesrobian, David) (Entered: 02/07/2023) |
| 02/07/2023 | 186 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 2/7/2023; terminating as moot 118 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witness; denying without prejudice 142 Defendants' Motion In Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses; denying as moot, in part, and withdrawing, in part, 170 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses. Proposed limiting instruction(s) due February 24, 2023. Court Reporter: Katharine Healey (JW) (Entered: 02/08/2023) |
| 02/23/2023 | 187 | JOINT EMERGENCY MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/24/2023 to edit text (AET). (Entered: 02/23/2023) |
| 02/23/2023 | 188 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 187 Emergency MOTION to Extend Time to Filing Deadline -- *Joint* (Mesrobian, David) (Entered: 02/23/2023) |
| 02/24/2023 | 189 | MOTION in Limine for Jury Instruction by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 190 | MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) |
| 02/24/2023 | 191 | **ORDER granting in part and denying in part 187 Emergency Joint Motion for** |

| | | **Extension of Filing Deadline. Motions in Limine due no later than 1:00 p.m. on Monday, February 27, 2023. See Order for details. Signed by Judge Marcia Morales Howard on 2/24/2023. (JCM)** (Entered: 02/24/2023) |
|---|---|---|
| 02/27/2023 | [193](#) | FIRST MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [194](#) | SECOND MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [195](#) | THIRD MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [196](#) | FOURTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # [1](#) Exhibit A)(King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [197](#) | FIFTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [198](#) | FIRST MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [199](#) | SECOND MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [200](#) | THIRD MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [201](#) | FOURTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 02/27/2023 | [202](#) | FIFTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) |
| 03/06/2023 | [204](#) | FOURTH SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Matthew Raymond Hoover (2) count(s) 1ss, 2ss-8ss. (Attachments: # [1](#) Restricted Unredacted Indictment) (BD) Modified on 3/16/2023 to edit text (AET). (Entered: 03/06/2023) |
| 03/08/2023 | 205 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: [204](#) Fourth Superseding Indictment. Arraignment set for 3/14/2023 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 03/08/2023) |
| 03/10/2023 | [207](#) | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re [198](#) FIRST MOTION in Limine , [193](#) FIRST MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | [208](#) | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re [199](#) SECOND MOTION in Limine , [194](#) SECOND MOTION in |

| 03/10/2023 | 209 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 200 THIRD MOTION in Limine , 195 THIRD MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 210 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 201 FOURTH MOTION in Limine , 196 FOURTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 211 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 197 FIFTH MOTION in Limine , 202 FIFTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 212 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 203 SIXTH MOTION in Limine (Taylor, Laura) (Entered: 03/10/2023) |
| 03/10/2023 | 213 | RESPONSE 189 MOTION in Limine for Jury Instruction by Kristopher Justinboyer Ervin (King, Alex) (Entered: 03/10/2023) |
| 03/10/2023 | 214 | RESPONSE 190 MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by Kristopher Justinboyer Ervin (King, Alex) (Entered: 03/10/2023) |
| 03/14/2023 | 217 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Fourth Superseding Indictment as to Kristopher Justinboyer Ervin (1) Counts 1ssss through 12ssss and Matthew Raymond Hoover (2) Counts 1ss through 8ss, held on 3/14/2023 Defendant(s) pled not guilty. (Digital) (SHS) Modified on 3/16/2023 to edit text (AET). (Entered: 03/15/2023) |
| 03/20/2023 | 218 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 02/07/2023 before Judge Marcia Morales Howard. Court Reporter: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.

NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/10/2023. Redacted Transcript Deadline set for 4/20/2023. Release of Transcript Restriction set for 6/20/2023. (KMH) (Entered: 03/20/2023) |
| 03/22/2023 | 219 | TRIAL BRIEF by USA as to Kristopher Justinboyer Ervin (Tran, Mai) (Entered: 03/22/2023) |
| 03/30/2023 | 222 | Unopposed MOTION to Allow Electronic Equipment, specifically cell phone and laptop by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 03/30/2023) |
| 03/30/2023 | 223 | **ORDER granting in part and denying in part 189 Government's Motion in Limine for Jury Instruction; granting in part and denying in part 190 Government's Motion in Limine to Exclude Argument and Evidence; denying** |

| | | |
|---|---|---|
| | | **193** Defendants' First Motion in Limine; denying **194** Defendants' Second Motion in Limine; denying **195** Defendants' Third Motion in Limine; denying **196** Defendants' Fourth Motion in Limine; denying **197** Defendants' Fifth Motion in Limine; denying **198** Defendants' First Motion in Limine; denying **199** Defendants' Second Motion in Limine; denying **200** Defendants' Third Motion in Limine; denying **201** Defendants' Fourth Motion in Limine; denying **202** Defendants' Fifth Motion in Limine; denying 203 Defendant Hoover's Sixth Motion in Limine. Signed by Judge Marcia Morales Howard on 3/30/2023. (JCM) (Entered: 03/30/2023) |
| 03/31/2023 | 224 | **ORDER granting 222 Motion to Allow Electronic Equipment as to Kristopher Justinboyer Ervin (1). Signed by Judge Marcia Morales Howard on 3/31/2023. (JW)** (Entered: 03/31/2023) |
| 04/03/2023 | 225 | Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 226 | STATEMENT of the case for trial by USA. (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 227 | PROPOSED verdict form filed by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 228 | PROPOSED Voir Dire by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) |
| 04/03/2023 | 229 | PROPOSED Voir Dire by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 230 | STATEMENT of the case for trial (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 231 | PROPOSED verdict form filed by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/03/2023 | 232 | Proposed Jury Instructions by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) |
| 04/08/2023 | 240 | WITNESS LIST by Kristopher Justinboyer Ervin. (King, Alex) Modified on 4/10/2023 to edit text (AET). (Entered: 04/08/2023) |
| 04/10/2023 | 241 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) Modified on 4/11/2023 See Docket Entry 245 for corrected Exhibit List (AET). (Entered: 04/10/2023) |
| 04/10/2023 | 242 | WITNESS LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 243 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) |
| 04/10/2023 | 244 | EXHIBIT LIST by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/10/2023) |
| 04/10/2023 | 245 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/10/2023) |
| 04/10/2023 | 246 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY SELECTION AND TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/10/2023. Court Reporter: Katharine Healey (JW) |

| 04/11/2023 | 247 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/11/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/12/2023) |
|---|---|---|
| 04/12/2023 | 248 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/13/2023) |
| 04/13/2023 | 249 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/2023. Court Reporter: Shelli Kozachenko (JW) (Entered: 04/14/2023) |
| 04/14/2023 | 251 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/17/2023) |
| 04/17/2023 | 250 | REQUEST for Judicial Notice by Kristopher Justinboyer Ervin (Attachments: # 1 Exhibit A)(King, Alex) Modified on 4/18/2023 to edit text (AET). (Entered: 04/17/2023) |
| 04/17/2023 | 252 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/18/2023) |
| 04/18/2023 | 253 | SUPPLEMENT re 225 Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/18/2023) |
| 04/19/2023 | 254 | COURT'S FINAL JURY INSTRUCTIONS as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/19/2023) |
| 04/19/2023 | 256 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/21/2023) |
| 04/20/2023 | 255 | **PARTIAL SEQUESTRATION ORDER. Signed by Judge Marcia Morales Howard on 4/20/2023. (JW)** (Entered: 04/20/2023) |
| 04/20/2023 | 257 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 258 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023. Court Reporter: Katharine Healey (Attachments: # 1 Government's Exhibit 1 Regarding Remand, # 2 Government's Exhibit 2 Regarding Remand) (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 259 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Additional attachment(s) added on 4/26/2023: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 2, # 4 Exhibit 2A, # 5 Exhibit 3, # 6 Exhibit 3A, # 7 Exhibit 4, # 8 Exhibit 4A, # 9 Exhibit 5, # 10 Exhibit 5A, # 11 Exhibit 6, # 12 Exhibit 6A, # 13 Exhibit 7, # 14 Exhibit 7A, # 15 Exhibit 8, # 16 Exhibit 8A, # 17 Exhibit 9, # 18 Exhibit 9A, # 19 Exhibit 10, # 20 Exhibit 10A, # 21 Exhibit 11, # 22 Exhibit 11A, # 23 Exhibit 12, # 24 Exhibit 12A, # 25 Exhibit 14, # 26 |

Exhibit 14A, # 27 Exhibit 15, # 28 Exhibit 15A, # 29 Exhibit 16, # 30 Exhibit 16A, # 31 Exhibit 17.1, # 32 Exhibit 17.1A, # 33 Exhibit 17.2, # 34 Exhibit 17.2A, # 35 Exhibit 17.3, # 36 Exhibit 17.3A, # 37 Exhibit 18, # 38 Exhibit 19, # 39 Exhibit 20, # 40 Exhibit 20A, # 41 Exhibit 21, # 42 Exhibit 22, # 43 Exhibit 23, # 44 Exhibit 24, # 45 Exhibit 25, # 46 Exhibit 25A, # 47 Exhibit 25B, # 48 Exhibit 26) (JW). (Additional attachment(s) added on 4/26/2023: # 49 Exhibit 27A, # 50 Exhibit 27B, # 51 Exhibit 28, # 52 Exhibit 29, # 53 Exhibit 30, # 54 Exhibit 30A, # 55 Exhibit 30B, # 56 Exhibit 30C, # 57 Exhibit 30D, # 58 Exhibit 30E, # 59 Exhibit 30F, # 60 Exhibit 30G, # 61 Exhibit 30H, # 62 Exhibit 30I, # 63 Exhibit 30J, # 64 Exhibit 30K, # 65 Exhibit 30L, # 66 Exhibit 30M, # 67 Exhibit 30N, # 68 Exhibit 30O, # 69 Exhibit 30P, # 70 Exhibit 30Q, # 71 Exhibit 30R, # 72 Exhibit 30S, # 73 Exhibit 30T, # 74 Exhibit 30U, # 75 Exhibit 30V, # 76 Exhibit 31, # 77 Exhibit 32) (JW). (Additional attachment(s) added on 4/26/2023: # 78 Exhibit 33, # 79 Exhibit 33A, # 80 Exhibit 33B, # 81 Exhibit 33C, # 82 Exhibit 33D, # 83 Exhibit 33E, # 84 Exhibit 33F, # 85 Exhibit 33G, # 86 Exhibit 33H, # 87 Exhibit 33I, # 88 Exhibit 33J, # 89 Exhibit 33K, # 90 Exhibit 33L, # 91 Exhibit 33M, # 92 Exhibit 33N, # 93 Exhibit 33O, # 94 Exhibit 33P, # 95 Exhibit 33Q, # 96 Exhibit 33R, # 97 Exhibit 33S, # 98 Exhibit 33T, # 99 Exhibit 33U, # 100 Exhibit 33V, # 101 Exhibit 33W, # 102 Exhibit 33X, # 103 Exhibit 33Y, # 104 Exhibit 33Z, # 105 Exhibit 34, # 106 Exhibit 35, # 107 Exhibit 36, # 108 Exhibit 37, # 109 Exhibit 38, # 110 Exhibit 39, # 111 Exhibit 40, # 112 Exhibit 41, # 113 Exhibit 42, # 114 Exhibit 43, # 115 Exhibit 44, # 116 Exhibit 45, # 117 Exhibit 46, # 118 Exhibit 47, # 119 Exhibit 48, # 120 Exhibit 49) (JW). (Additional attachment(s) added on 4/26/2023: # 121 Exhibit 49A, # 122 Exhibit 49B, # 123 Exhibit 49C, # 124 Exhibit 49D, # 125 Exhibit 49E, # 126 Exhibit 49F, # 127 Exhibit 49G, # 128 Exhibit 49H, # 129 Exhibit 49I, # 130 Exhibit 49J, # 131 Exhibit 49K, # 132 Exhibit 49L, # 133 Exhibit 49M, # 134 Exhibit 49N, # 135 Exhibit 49O, # 136 Exhibit 49P, # 137 Exhibit 49Q, # 138 Exhibit 50A, # 139 Exhibit 50B, # 140 Exhibit 50C, # 141 Exhibit 50D, # 142 Exhibit 50E, # 143 Exhibit 50F, # 144 Exhibit 50G, # 145 Exhibit 50H, # 146 Exhibit 50I, # 147 Exhibit 50J, # 148 Exhibit 50K, # 149 Exhibit 50L, # 150 Exhibit 50M, # 151 Exhibit 50N, # 152 Exhibit 50O, # 153 Exhibit 50P, # 154 Exhibit 51, # 155 Exhibit 52, # 156 Exhibit 53, # 157 Exhibit 54, # 158 Exhibit 55, # 159 Exhibit 56) (JW). (Additional attachment(s) added on 4/26/2023: # 160 Exhibit 57A, # 161 Exhibit 57B, # 162 Exhibit 57C, # 163 Exhibit 58A, # 164 Exhibit 58B, # 165 Exhibit 58C, # 166 Exhibit 58D, # 167 Exhibit 59, # 168 Exhibit 60, # 169 Exhibit 61, # 170 Exhibit 63, # 171 Exhibit 64, # 172 Exhibit 65, # 173 Exhibit 66, # 174 Exhibit 67, # 175 Exhibit 67A, # 176 Exhibit 67B, # 177 Exhibit 67C, # 178 Exhibit 67D, # 179 Exhibit 67E, # 180 Exhibit 67F, # 181 Exhibit 67G, # 182 Exhibit 67H, # 183 Exhibit 67I, # 184 Exhibit 67J, # 185 Exhibit 67K, # 186 Exhibit 67L, # 187 Exhibit 67M, # 188 Exhibit 67N, # 189 Exhibit 67O, # 190 Exhibit 67P, # 191 Exhibit 67Q, # 192 Exhibit 67R, # 193 Exhibit 67S, # 194 Exhibit 67T, # 195 Exhibit 67U, # 196 Exhibit 67V, # 197 Exhibit 67W, # 198 Exhibit 67X, # 199 Exhibit 67Y, # 200 Exhibit 67Z) (JW). (Additional attachment(s) added on 4/26/2023: # 201 Exhibit 67AA, # 202 Exhibit 67BB, # 203 Exhibit 67CC, # 204 Exhibit 67DD, # 205 Exhibit 67EE, # 206 Exhibit 67FF, # 207 Exhibit 67GG, # 208 Exhibit 67HH, # 209 Exhibit 67II, # 210 Exhibit 67JJ, # 211 Exhibit 67KK, # 212 Exhibit 67LL, # 213 Exhibit 67MM, # 214 Exhibit 67NN, # 215 Exhibit 67OO, # 216 Exhibit 67PP, # 217 Exhibit 67QQ, # 218 Exhibit 67RR, # 219 Exhibit 67SS, # 220 Exhibit 67TT, # 221 Exhibit 67UU, # 222 Exhibit 67VV, # 223 Exhibit 67WW, # 224 Exhibit 67XX, # 225 Exhibit 67YY, # 226 Exhibit 67ZZ, # 227 Exhibit 67AAA, # 228 Exhibit 67BBB, # 229 Exhibit 67CCC, # 230 Exhibit 68, # 231 Exhibit 69, # 232 Exhibit 70, # 233 Exhibit 71, # 234 Exhibit

| | | |
|---|---|---|
| | | 72, # 235 Exhibit 73, # 236 Exhibit 74, # 237 Exhibit 75, # 238 Exhibit 76, # 239 Exhibit 77, # 240 Exhibit 78, # 241 Exhibit 79, # 242 Exhibit 80, # 243 Exhibit 81, # 244 Exhibit 82, # 245 Exhibit 83, # 246 Exhibit 84, # 247 Exhibit 85, # 248 Exhibit 86, # 249 Exhibit 87, # 250 Exhibit 88, # 251 Exhibit 89) (JW). (Additional attachment(s) added on 4/26/2023: # 252 Exhibit 89A, # 253 Exhibit 89B, # 254 Exhibit 89C, # 255 Exhibit 89D, # 256 Exhibit 89E, # 257 Exhibit 89F, # 258 Exhibit 89G, # 259 Exhibit 89H, # 260 Exhibit 89I, # 261 Exhibit 90, # 262 Exhibit 90A, # 263 Exhibit 90B, # 264 Exhibit 90C, # 265 Exhibit 90D, # 266 Exhibit 90E, # 267 Exhibit 90F, # 268 Exhibit 90G, # 269 Exhibit 90H, # 270 Exhibit 91) (JW). (Additional attachment(s) added on 4/26/2023: # 271 Exhibit 91A, # 272 Exhibit 91B, # 273 Exhibit 91C, # 274 Exhibit 91D, # 275 Exhibit 91E, # 276 Exhibit 91F, # 277 Exhibit 91G, # 278 Exhibit 91H, # 279 Exhibit 91I, # 280 Exhibit 91J, # 281 Exhibit 91K, # 282 Exhibit 91L, # 283 Exhibit 91M, # 284 Exhibit 91N, # 285 Exhibit 92, # 286 Exhibit 92A, # 287 Exhibit 92B, # 288 Exhibit 92C, # 289 Exhibit 92D, # 290 Exhibit 92E, # 291 Exhibit 92F, # 292 Exhibit 92G, # 293 Exhibit 92H, # 294 Exhibit 92I, # 295 Exhibit 92J, # 296 Exhibit 92K, # 297 Exhibit 93, # 298 Exhibit 94, # 299 Exhibit 95, # 300 Exhibit 95A, # 301 Exhibit 95B, # 302 Exhibit 95C, # 303 Exhibit 95D, # 304 Exhibit 95E) (JW). (Additional attachment(s) added on 4/26/2023: # 305 Exhibit 96, # 306 Exhibit 97, # 307 Exhibit 97A, # 308 Exhibit 97B, # 309 Exhibit 97C, # 310 Exhibit 97D, # 311 Exhibit 98, # 312 Exhibit 98A, # 313 Exhibit 98B, # 314 Exhibit 98C, # 315 Exhibit 98D, # 316 Exhibit 98E, # 317 Exhibit 99, # 318 Exhibit 99A, # 319 Exhibit 99B, # 320 Exhibit 99C, # 321 Exhibit 99D, # 322 Exhibit 100, # 323 Exhibit 101, # 324 Exhibit 101A) (JW). (Additional attachment(s) added on 4/26/2023: # 325 Exhibit 102, # 326 Exhibit 103, # 327 Exhibit 103A, # 328 Exhibit 104, # 329 Exhibit 105, # 330 Exhibit 105A, # 331 Exhibit 108, # 332 Exhibit 109A, # 333 Exhibit 109B, # 334 Exhibit 109C, # 335 Exhibit 109D, # 336 Exhibit 110) (JW). (Additional attachment(s) added on 4/27/2023: # 337 Exhibit 111, # 338 Exhibit 112, # 339 Exhibit 114, # 340 Exhibit 115, # 341 Exhibit 116A, # 342 Exhibit 116B, # 343 Exhibit 116C, # 344 Exhibit 116D, # 345 Exhibit 117, # 346 Exhibit 118, # 347 Exhibit 119, # 348 Exhibit 120, # 349 Exhibit 120A, # 350 Exhibit 120B, # 351 Exhibit 120C, # 352 Exhibit 120D, # 353 Exhibit 123, # 354 Exhibit 124, # 355 Exhibit 124.1, # 356 Exhibit 124.1A, # 357 Exhibit 124.2, # 358 Exhibit 124.3, # 359 Exhibit 124.3A, # 360 Exhibit 125, # 361 Exhibit 125A, # 362 Exhibit 126) (JW). (Entered: 04/24/2023) |
| 04/21/2023 | 260 | EXHIBIT LIST by Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Defendant Ervin's Exhibit 8, # 2 Defendant Ervin's Exhibit 26)(JW) (Entered: 04/24/2023) |
| 04/21/2023 | 261 | Court's Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 262 | Court's Revised Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |
| 04/21/2023 | 263 | JURY VERDICT as to Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Restricted Unredacted Jury Verdict)(JW) (Entered: 04/24/2023) |
| 04/21/2023 | 266 | Court Exhibits as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/24/2023) |
| 04/24/2023 | 267 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Sentencing set for July 31, 2023, at 9:30 a.m. in Jacksonville Courtroom 10 B |

before Judge Marcia Morales Howard. (JW) (Entered: 04/24/2023)

USCA11 Case: 23-13062    Document: 39    Date Filed: 02/29/2024    Page: 229 of 563

| | | |
|---|---|---|
| 04/27/2023 | | Remark: The flash drives containing the closing argument PowerPoint presentations by all counsel are stored with the exhibits in the trial exhibit storage room in the Clerk's Office. (JW) (Entered: 04/27/2023) |
| 05/03/2023 | 270 | Unopposed MOTION to Continue Deadline to File Motion for Judgment of Acquittal by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/03/2023) |
| 05/04/2023 | 271 | **ORDER granting 270 Unopposed Motion to Continue Deadline to File Motion for Judgment of Acquittal. Motion due May 19, 2023. Signed by Judge Marcia Morales Howard on 5/4/2023. (JW)** (Entered: 05/04/2023) |
| 05/05/2023 | 272 | TRANSCRIPT of Excerpt of Jury Trial Proceedings (remand arguments as to Hoover) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/26/2023. Redacted Transcript Deadline set for 6/5/2023. Release of Transcript Restriction set for 8/3/2023. (KMH) (Entered: 05/05/2023) |
| 05/19/2023 | 273 | POST-VERDICT MOTION for Judgment of Acquittal by Kristopher Justinboyer Ervin. (King, Alex) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) |
| 05/19/2023 | 274 | MOTION for Judgment of Acquittal by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) |
| 05/25/2023 | 275 | MOTION to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 05/25/2023) |
| 05/26/2023 | 276 | **ENDORSED ORDER granting 275 Motion to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal. The United States shall have up to and including June 16, 2023, to file its responses to Defendants' Motions for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 5/26/2023. (JW)** (Entered: 05/26/2023) |
| 06/06/2023 | 277 | TRANSCRIPT of Jury Selection and Trial (Volume 1 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/10/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is |

filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/06/2023)

| | | |
|---|---|---|
| 06/06/2023 | 278 | TRANSCRIPT of Jury Trial (Volume 2 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 279 | TRANSCRIPT of Jury Trial (Volume 3 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |
| 06/06/2023 | 280 | TRANSCRIPT of Jury Trial (Volume 4 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/23 before Judge Howard. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (SMK) (Entered: 06/06/2023) |

| | | |
|---|---|---|
| 06/07/2023 | <u>281</u> | TRANSCRIPT of Jury Trial (Volume 5 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | <u>282</u> | TRANSCRIPT of Jury Trial (Volume 6 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | <u>283</u> | TRANSCRIPT of Jury Trial (Volume 7 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/23 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: 9043016843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | <u>284</u> | TRANSCRIPT of Jury Trial (Volume 8 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the |

| | | |
|---|---|---|
| | | court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/07/2023 | 285 | TRANSCRIPT of Jury Trial (Volume 9 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) |
| 06/12/2023 | 286 | MOTION to Continue Sentencing Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 06/12/2023) |
| 06/13/2023 | 287 | MOTION for Forfeiture of a Preliminary Order for Involved-In Property and Substitute Assets by USA as to Kristopher Justinboyer Ervin. (Tran, Mai) (Entered: 06/13/2023) |
| 06/13/2023 | 288 | **ENDORSED ORDER as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover regarding 286 United States' Motion to Continue Sentencing Hearing. Defendants shall have up to and including June 20, 2023, to file responses to this motion. Signed by Judge Marcia Morales Howard on 6/13/2023. (JW)** (Entered: 06/13/2023) |
| 06/16/2023 | 289 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 274 MOTION for Judgment of Acquittal (Taylor, Laura) (Entered: 06/16/2023) |
| 06/16/2023 | 290 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 273 MOTION for Judgment of Acquittal (Taylor, Laura) (Modified on 6/20/2023, to edit text) (BGR). (Entered: 06/16/2023) |
| 06/20/2023 | 291 | RESPONSE 286 MOTION to Continue Sentencing Hearing by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (King, Alex) (Entered: 06/20/2023) |
| 06/21/2023 | 293 | **ORDER granting 286 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). Sentencing hearing continued to September 6, 2023, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 6/21/2023. (JW)** (Entered: 06/21/2023) |

| | | |
|---|---|---|
| 08/01/2023 | 295 | RULE 32(e)(2) INITIAL PRESENTENCE INVESTIGATION REPORT as to Kristopher Justinboyer Ervin. E-copies made available to selected parties.(TH) (Entered: 08/01/2023) |
| 08/07/2023 | 296 | MOTION for Miscellaneous Relief, specifically Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 08/07/2023) |
| 08/08/2023 | 297 | **ORDER taking under advisement 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. An IN PERSON hearing on the motion is set for Friday, August 11, 2023, at 2:00 p.m. in Courtroom 10B. Defendants and all counsel of record are required to be present. Signed by Judge Marcia Morales Howard on 8/8/2023. (JW)** (Entered: 08/08/2023) |
| 08/09/2023 | 298 | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Motion Hearing previously scheduled for August 11, 2023, at 2:00 p.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing time: Motion Hearing set for August 11, 2023, at 1:30 p.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/09/2023) |
| 08/09/2023 | 299 | JOHN CRUMP'S EMERGENCY MOTION to Intervene for the Limited Purpose of Responding to the United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (MDC) (Entered: 08/09/2023) |
| 08/09/2023 | 300 | First MOTION for Stephen D. Stramboulieh to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130611 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 301 | First MOTION for Robert J. Olson to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130715 for $150 by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) |
| 08/09/2023 | 302 | SUPPLEMENT to 296 Motion for Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibits not scanned, filed separately)(MDC) (Entered: 08/09/2023) |
| 08/10/2023 | 303 | **ENDORSED ORDER granting 300 Motion for Special Admission by Stephen D. Stramboulieh, Esq. If Mr. Stramboulieh has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS) Modified on 8/10/2023 (SHS). (Entered: 08/10/2023)** |
| 08/10/2023 | 304 | **ENDORSED ORDER granting 301 Motion for Special Admission by Robert J. Olson, Esq. If Mr. Olson has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)** (Entered: 08/10/2023) |
| 08/10/2023 | 305 | **ENDORSED ORDER taking under advisement 299 John Crump's Emergency Motion to Intervene. The Court intends to resolve the Motion at the August 11,** |

| | | |
|---|---|---|
| | | **2023 Hearing. Signed by Judge Marcia Morales Howard on 8/10/2023. (MHM)** (Entered: 08/10/2023) |
| 08/10/2023 | 306 | MOTION for Leave to File Amicus Curiae Brief and Brief Amicus Curiae of Eric Blandford, et al. in Support of 299 Emergency Motion by Eric J. Friday as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (BGR) (Entered: 08/11/2023) |
| 08/11/2023 | 307 | **ORDER permitting members of the press to enter the courthouse with laptop computers, tablets, and/or cell phones to attend the hearing set for today, August 11, 2023, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 8/11/2023. (JW)** (Entered: 08/11/2023) |
| 08/11/2023 | 308 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 8/11/2023; denying as moot 299 John Crump's Emergency Motion to Intervene; denying as moot 306 Motion for Leave to File Amicus Curiae Brief; withdrawing, in part, and denying, in part, 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. Court Reporter: Katharine Healey (JW) (Entered: 08/14/2023) |
| 08/14/2023 | 309 | TRANSCRIPT of Motion as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 08/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/14/2023. Release of Transcript Restriction set for 11/13/2023. (KMH) (Entered: 08/14/2023) |
| 08/23/2023 | 310 | **ORDER denying 273 Ervin's Motion for Judgment of Acquittal; denying 274 Hoover's Motion for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 8/23/2023. (JCM)** (Entered: 08/23/2023) |
| 08/30/2023 | 311 | RULE 32(g) FINAL PRESENTENCE INVESTIGATION REPORT as to Kristopher Justinboyer Ervin. E-copies made available to selected parties.(MW) (Entered: 08/30/2023) |
| 08/30/2023 | 313 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 08/30/2023) |
| 08/31/2023 | 316 | **PRELIMINARY ORDER OF FORFEITURE (granting 287 Motion for Forfeiture of Property as to Kristopher Justinboyer Ervin (1)). Signed by Judge Marcia Morales Howard on 8/31/2023. (JW)** (Entered: 08/31/2023) |
| 09/01/2023 | 319 | SENTENCING MEMORANDUM by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A, # 2 Exhibit B)(King, Alex) (Entered: 09/01/2023) |

| | | |
|---|---|---|
| 09/02/2023 | 320 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 09/02/2023) |
| 09/06/2023 | 321 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/6/2023. The Court heard argument from counsel regarding the objections to the Presentence Investigation Report, resolved the objections, and announced the guidelines on the record. The parties made their presentations, and the Court heard from Defendants and their mitigation witnesses. The Court will pronounce sentence on September 7, 2023, at 11:30 a.m. Court Reporter: Katharine Healey (JW) (Entered: 09/08/2023) |
| 09/07/2023 | 323 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/7/2023 for Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00. Court Reporter: Katharine Healey (JW) (Entered: 09/14/2023) |
| 09/14/2023 | 324 | **JUDGMENT as to Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 Signed by Judge Marcia Morales Howard on 9/14/2023. (JW) (Entered: 09/14/2023)** |
| 09/14/2023 | 325 | STATEMENT OF REASONS as to Kristopher Justinboyer Ervin. E-copies made available to selected parties. (JW) (Entered: 09/14/2023) |
| 09/14/2023 | 329 | TRANSCRIPT of Sentencing (Volume 1 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/06/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
| 09/14/2023 | 330 | TRANSCRIPT of Sentencing (Volume 2 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/07/2023 before Judge Marcia Morales Howard. |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) |
| 09/19/2023 | 331 | NOTICE OF APPEAL by Kristopher Justinboyer Ervin re 310 Order on Motion for Judgment of Acquittal, 324 Judgment. Filing fee paid $ 505, receipt number AFLMDC-21268505. (King, Alex) (Entered: 09/19/2023) |
| 09/20/2023 | 332 | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 331 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (CTR) (Entered: 09/20/2023) |
| 09/21/2023 | | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 23-13062 for 331 Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 09/22/2023) |
| 10/02/2023 | 335 | PROOF OF PUBLICATION as to Kristopher Justinboyer Ervin newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from September 2, 2023 through October 1, 2023. (Tran, Mai) (Entered: 10/02/2023) |
| 10/20/2023 | 337 | Judgment Returned Executed as to Kristopher Justinboyer Ervin on 9/29/2023. Institution: FCI Jesup. (BD) (Entered: 10/20/2023) |
| 10/25/2023 | 338 | MOTION to Withdraw as Attorney by Alex King., MOTION to Appoint Counsel , MOTION to Extend Time to appeal filings deadline by Kristopher Justinboyer Ervin. (King, Alex) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 10/25/2023) |
| 11/06/2023 | **339** | **ORDER Setting Hearing on Motion to Withdraw as Counsel and denying 338 Motion to Extend Time as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 11/6/2023. (SHS)** (Entered: 11/06/2023) |
| 11/06/2023 | 340 | Writ of Habeas Corpus ad Testificandum Issued for Kristopher Justinboyer Ervin for an in camera ex parte hearing to be held on 11/29/2023 at 11:00 a.m. as to Kristopher Justinboyer Ervin. Signed by Judge Magistrate Judge Monte C. Richardson. (SHS) (Entered: 11/06/2023) |
| 11/16/2023 | 341 | Notice of substitution of AUSA. Jennifer Michele Harrington substituting for Mai Tran. (Harrington, Jennifer) (Entered: 11/16/2023) |
| 11/29/2023 | 342 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. |

| | | |
|---|---|---|
| | | Richardson; granting 338 Motion to Withdraw as Attorney Alex King and Daniel Scott Monroe withdrawn from case. as to Kristopher Justinboyer Ervin (1); EX PARTE Hearing as to Kristopher Justinboyer Ervin held on 11/29/2023 re 338 MOTION to Withdraw as Attorney by Alex King. MOTION to Appoint Counsel MOTION to Extend Time to appeal filings deadline filed by Kristopher Justinboyer Ervin. (Digital) (SHS) (Entered: 11/29/2023) |
| 11/29/2023 | 343 | ***CJA 23 Financial Affidavit (FILED IN OPEN COURT) by Kristopher Justinboyer Ervin. (SHS) (Entered: 11/29/2023) |
| 12/01/2023 | 344 | **ORDER of Appointment of CJA Counsel as to Kristopher Justinboyer Ervin: Appointment of Attorney Valarie Linnen for Kristopher Justinboyer Ervin. Signed by Magistrate Judge Monte C. Richardson on 11/29/2023. (SHS)** (Entered: 12/01/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/05/2023 09:15:40 | | | |
| **PACER Login:** | vlinnen0063291 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cr-00022-MMH-MCR |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

**APPENDIX II**

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

1

## <u>TABLE OF APPENDICES</u>

### <u>Appendix I</u>

Docket ...................................................................................................... D

Motion to Dismiss ..................................................................................... 30

Transcripts – Hearing on Motion to Dismiss ........................................... 48

Indictment Superseding - Fourth.............................................................. 204

USA Statement of the Case ...................................................................... 226

Mr. Ervin's Statement of the Case .......................................................... 230

Gov't Exhibit 33 – 3-in-1 Auto Key Card...................................... 259-33

Motion for Judgment of Acquittal............................................................ 273

Motion for Judgment of Acquittal – Mr. Hoover ................................... 274

Order Denying Motions for Judgment of Acquittal ............................... 310

Sentencing Memorandum ......................................................................... 319

Judgment ................................................................................................... 324

Statement of Reasons ............................................................................... 325

### <u>Appendix II</u>

Direct Testimony of Agent Hooker.......................................................... 277

Direct Testimony of Agent Hooker, Andrea Useche, Amy Sarkese..................... 278

Direct Testimony of Richard Roberts ..................................................... 282

Direct Testimony of Agent Toy .............................................................. 283

**Appendix III**

Transcript – Sentencing I ........................................................329

Transcript – Sentencing II .......................................................330

**SEALED**

Presentence Investigation Report FINAL ..............................311

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 22ND day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for

Firearms Policy Coalition & FPC Action Foundation

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888-608-8814
vlinnen@live.com
Attorney for Appellant

3

1          Ms. Wiles.

2          (The judge and the courtroom deputy confer.)

3     **SPECIAL AGENT JESSE HOOKER, GOVERNMENT WITNESS, SWORN,**

4                    DIRECT EXAMINATION

5   BY MS. TAYLOR:

6   Q.    Special Agent Hooker, if you could please start with

7   telling the jury your name and spell your last name for the

8   court reporter.

9   A.    Jesse Hooker, H-o-o-k-e-r.

10  Q.    And where do you work?

11  A.    I work for the Bureau of Alcohol, Tobacco, Firearms, and

12  Explosives.

13  Q.    What's your job responsibilities for ATF?

14  A.    I investigate violations of federal law pertaining to

15  arson, explosives, firearms, alcohol, tobacco, and narcotics.

16  Q.    And what's your title?

17  A.    Special Agent.

18  Q.    And what -- how long have you been an agent for ATF?

19  A.    A little over 21 years.

20  Q.    And did you have other law enforcement experience prior to

21  joining ATF?

22  A.    Yes.  I worked for the Immigration and Naturalization

23  Service for four years prior to joining ATF.

24  Q.    Did you receive any specialized training when you joined

25  Immigration and Naturalization Service?

1   A.    Yes.  I attended the Immigration Officers' Basic Training

2   Academy in Artesia, Mexico.

3   Q.    And when you became an ATF agent, did you receive

4   additional specialized training?

5   A.    I did.

6   Q.    And what was that?

7   A.    The Criminal Investigators' Training Program in Brunswick,

8   Georgia, as well as the ATF Agent Advanced Academy in

9   Brunswick, Georgia.

10  Q.    And are you -- let's talk about the investigation of

11  Mr. Ervin and Mr. Hoover.  What has been your role in that

12  investigation?

13  A.    I was the case agent.

14  Q.    And what is the role -- what does it mean to be the case

15  agent for a case?

16  A.    Typically the case agent is the agent that opens the

17  investigation and they have the primary responsibility for

18  conducting the entire investigation from the inception through

19  the judicial process.

20  Q.    And is there a reason -- are you still the case agent on

21  this case?

22  A.    I am not.

23  Q.    And what's the reason for that?

24  A.    I recently accepted another position within ATF that

25  required me to be absent from the area for training for a

 1  significant period of time.  And the case was transferred to a
 2  different agent.
 3  Q.    Could you also just tell us what your educational
 4  background is in terms of do you have a college degree?
 5  A.    Yes, ma'am.
 6  Q.    And what is your college degree in?
 7  A.    I have a master of science degree in criminal justice from
 8  the University of Central Florida.  I also have a graduate
 9  certificate in explosives and engineering technology from the
10  Missouri University of Science and Technology.
11  Q.    Now, can you tell the jury, how did you come to be
12  involved in the investigation of Mr. Ervin and Mr. Hoover?
13  A.    Yes.  On January 8th, 2021, I was contacted by a fraud
14  investigator who worked for Community First Credit Union in
15  Jacksonville, Florida.
16  Q.    And what was -- what was that initial contact regarding?
17  A.    The fraud investigator advised me that they had
18  information they wanted to refer to ATF regarding potential
19  criminal activity involving one of their customers.
20  Q.    And who was that customer?
21  A.    It was Kristopher Justinboyer Ervin.
22  Q.    And did they give you any information about what exactly
23  their concern was?
24  A.    They briefly discussed --
25            MR. KING:  Objection, hearsay.

1          MS. TAYLOR:  Your Honor, it's intended to explain the

2    steps that Special Agent Hooker took in beginning his

3    investigation.

4          THE COURT:  I'll allow it.  Go ahead.

5          THE WITNESS:  Yes, ma'am.

6    A.    They advised me about unusual activity in Mr. Ervin's bank

7    account.  They also -- specifically, unusual deposits into a

8    personal checking account that seemed to be business related.

9    They also advised me about large cash withdrawals that were

10   occurring from the account.

11   Q.    Is it normal for a bank to contact ATF about unusual

12   banking activity?

13   A.    No.

14   Q.    And why -- why were they contacting you in this particular

15   instance?

16   A.    The credit union had apparently located a website

17   associated with Mr. Ervin.  And the website was viewed by the

18   fraud investigator, and they were concerned that the website

19   was selling items that may be used to convert an AR-15 rifle

20   into a machine gun.

21   Q.    And after you received this initial information, did you

22   attempt to verify any of that?

23   A.    Yes, ma'am.

24   Q.    How did you -- how did you do that?

25   A.    I accessed the website that was provided to me.

 1   Q.   And what was that website?

 2   A.   Autokeycards.com.

 3            MS. TAYLOR:  Your Honor, may I approach the witness?

 4            THE COURT:  What number?

 5            MS. TAYLOR:  I'm going to -- right now I'm going to

 6   be talking about Exhibit 114, but I was also going to go ahead

 7   and give him 18, 19, 21, 22, 23, and 24.

 8            THE COURT:  All right.  Go ahead.

 9   BY MS. TAYLOR:

10   Q.   Special Agent Hooker, could you look at Exhibit 114 and

11   describe for the jury what that is.

12   A.   114 is screenshots of what I recognized when I viewed the

13   website Autokeycards.com.

14   Q.   And does this largely appear to be how the website looked

15   when you had viewed it as part of your investigation?

16   A.   Yes, ma'am.

17            MS. TAYLOR:  I would move for admission of

18   Exhibit 114 at this time.

19            MR. KING:  Without objection on behalf of Mr. Ervin.

20            MR. ZERMAY:  Without objection.

21            THE COURT:  114 is admitted and you may publish if

22   you wish.

23            MS. TAYLOR:  Yes, Your Honor.

24       (Government's Exhibit 114 admitted in evidence.)

25   BY MS. TAYLOR:

1    Q.   Looking at the --

2         MS. TAYLOR:  Ms. Ganoe, if you could focus on that

3    top part of the website.

4    BY MS. TAYLOR:

5    Q.   Is this -- this is the -- essentially the front page of

6    the website; is that correct?

7    A.   Yes, ma'am.

8    Q.   Looking at the top, what is depicted at the very top of

9    that website?

10   A.   The words "AutoKeyCard.com" and there are three -- three

11   drawings or diagrams of cards above it.

12        MS. TAYLOR:  Ms. Ganoe, could you focus specifically

13   on that part.

14   BY MS. TAYLOR:

15   Q.   And those three diagrams that you referred to, do those

16   look familiar from other parts of your investigation?

17   A.   Yes.

18   Q.   And what's depicted by those diagrams?

19   A.   Those are lightning link machine gun conversion devices.

20   Q.   So those outlines are?  Could you describe exactly what --

21   what would be part of the lightning link.

22   A.   It's a two-part machine gun conversion device.  These

23   particular cards depict -- each card depicts three complete

24   lightning link machine gun conversion devices consisting of a

25   larger, longer piece as well as a small piece that would fit

1  in -- there's a little slot that it would fit in.  I'm sorry, I

2  don't know how to describe it any better than that, but it is a

3  two-piece machine gun conversion device.

4  Q.    So if I -- I'm going to draw on one of them.  Is that one

5  of the pieces?

6  A.    Correct.

7  Q.    And it's the piece -- on the middle card it's the piece on

8  the top left?

9  A.    Yes, with the red mark.

10  Q.    And now if I -- well, I apparently drew some dots on

11  another piece.  Is that the second piece of the lightning link?

12  A.    Yes, with the two dots.

13  Q.    Okay.  And so -- so those two pieces combined together

14  create what?

15  A.    A lightning link machine gun conversion device.

16  Q.    And that's not made out of paper, correct?

17  A.    The device?

18  Q.    Right.

19  A.    No, it would need to be made out of some type of metal.

20  Q.    Okay.  But that's what's depicted in that diagram?

21  A.    Yes.

22  Q.    And that diagram also is generally what the auto key card

23  looked like?

24  A.    Correct.

25  Q.    Did you identify an address associated with Mr. Ervin?

1    A.    Yes.

2    Q.    And did you -- what was that address?

3    A.    2409 Kirkwall Court, Orange Park, Florida.

4    Q.    And did you attempt to identify who might be living at

5    that address?

6    A.    Yes.

7    Q.    And who was that?

8    A.    My investigation revealed that Mr. Ervin lived there as

9    well as his father.

10   Q.    Did you attempt to identify where -- where Mr. Ervin was

11   actually operating the business from?

12   A.    Yes.

13   Q.    And did you also contact anyone from ATF -- elsewhere in

14   ATF to get an opinion on whether you should open a full

15   investigation?

16   A.    I did.

17   Q.    Who was that?

18   A.    Cody Toy.

19   Q.    And who is Cody Toy?

20   A.    He is a firearms enforcement officer with ATF located in

21   Martinsburg, West Virginia.

22   Q.    And what's the reason why you consulted with Officer Toy?

23   A.    Our firearms experts are experts in identifying and

24   testing items such as machine guns and silencers.

25   Q.    And so you wanted his opinion?

1    A.    I did.

2    Q.    Based upon what Officer Toy told you, did you proceed with

3    opening a full investigation?

4    A.    I did.

5    Q.    And what did you need to do to get a more definitive idea

6    on whether the auto key card could actually be used to make a

7    machine gun?

8    A.    I needed to obtain one of the auto key cards and send it

9    in for testing.

10   Q.    And did you -- did you do that?

11   A.    Yes, I did.

12   Q.    And how did you go about obtaining an auto key card?

13   A.    On January 15th, 2021, I obtained an undercover laptop

14   computer as well as an undercover credit card.  I then drove to

15   an establishment that had free public wifi.  I accessed the

16   internet and went to the Auto Key Card's website.  I then

17   placed an order for one auto key card; specifically, a 3 in 1

18   Pen Holder Edition with Bottle Opener.

19   Q.    And did you receive an order confirmation?

20   A.    Yes.

21   Q.    If you could please look at Exhibit 18.  It should be in

22   front of you.

23   A.    Okay.

24   Q.    And describe what it is.

25   A.    This is an email to my email account from Autokeycards.com

 1  containing an order confirmation as well as a shipping

 2  confirmation.

 3  Q.   Is it addressed to you, Special Agent Hooker?

 4  A.   It is not.

 5  Q.   Who is it addressed to?

 6  A.   John O'Leary.

 7  Q.   And is that a name that you were using in your undercover

 8  capacity --

 9  A.   Yes.

10  Q.   -- at this time?

11       MS. TAYLOR:  At this time I would move for admission

12  of Exhibit 18.

13       MR. KING:  No objection.

14       MR. ZERMAY:  No objection.

15       THE COURT:  18 is admitted.  You may publish.

16    (Government's Exhibit 18 admitted in evidence.)

17       MS. TAYLOR:  And Ms. Ganoe has zoomed in on the top

18  part of that email.  I think you might need to zoom in a little

19  bit more.

20  BY MS. TAYLOR:

21  Q.   So you received an order confirmation number?

22  A.   Yes.

23  Q.   And what was that?

24  A.   2667.

25  Q.   And what was the address that -- or that sent this order

VOL 1 - PG 249

 1  confirmation?

 2  A.    Customerservice@autokeycards.com.

 3  Q.    And what is the date stamped at the top of that order

 4  confirmation?

 5  A.    January 15th, 2021.

 6          MS. TAYLOR:  And if we could go down to the next

 7  part, Ms. Ganoe.

 8  BY MS. TAYLOR:

 9  Q.    Now we're in the part that says Order Summary, correct?

10  A.    Yes.

11  Q.    And what does that reflect?

12  A.    It reflects an order number, the date it was placed, the

13  particular auto key card that I ordered, the cost, the shipping

14  cost, the sales tax, and that it was paid for with a credit

15  card.

16  Q.    And so was the price -- it was one item that you

17  purchased?

18  A.    Correct.

19  Q.    And was the price $139?

20  A.    Yes.

21  Q.    And with the sales tax, the total was $148.73?

22  A.    Correct.

23  Q.    Ms. Ganoe is going to -- there's a little icon next to the

24  item that you purchased, correct?  And we've zoomed in on it.

25  It's a little bit blurry, isn't it?

1    A.    Yes.

2    Q.    But what's depicted here?

3    A.    That is -- appears to be a Pen Holder Edition auto key

4    card.  I think it's going to be a 3 in 1.  I think there would

5    be three lightning links on that.

6    Q.    And how do you know it's a Pen Holder Edition?

7    A.    It has a pen going through it.

8          MS. TAYLOR:  If we could move to the next page,

9    Ms. Ganoe.

10   BY MS. TAYLOR:

11   Q.    The second page of your order indicated that it was

12   shipping to John O'Leary at an address in Jacksonville Beach,

13   correct?

14   A.    Yes.

15   Q.    And that address has been redacted off of this document,

16   correct?

17   A.    Yes.

18   Q.    But is that an address that you were able to obtain mail

19   from in an undercover capacity?

20   A.    Yes.

21   Q.    And at the very -- at the bottom of the part we're zoomed

22   in on it indicates Auto Key Cards and an address in Orange

23   Park, correct?

24   A.    Yes.

25   Q.    What's that address?

 1  A.   950 Blanding Boulevard, Suite 23, PMB 335, Orange Park,

 2  United States.

 3  Q.   You might be better off looking at the hard copy document.

 4  A.   336, excuse me.

 5  Q.   Okay.  And now did you receive a shipment confirmation at

 6  some point after you placed this order?

 7  A.   I did.

 8       MS. TAYLOR:  Could we go to page 3, Ms. Ganoe.

 9  BY MS. TAYLOR:

10  Q.   Is this the shipping confirmation that you received?

11  A.   Yes.

12  Q.   And what date -- did it provide a tracking number to you?

13  A.   It did.

14  Q.   And what date did you receive the shipping confirmation?

15  A.   On January 15th, 2021.

16  Q.   Was that the same date that you had placed the order?

17  A.   Yes.

18  Q.   And did you receive anything in the mail as a result of

19  this purchase?

20  A.   I did.

21  Q.   And could you please look at Exhibit 19.  Should be in

22  front of you.

23  A.   I have it.

24  Q.   Could you describe in general what's in Exhibit 19?

25  A.   It contains pictures of the envelope and a mailing label

1  that I received as well as additional pictures of the contents

2  of the mailing envelope, which consists of a plastic bag

3  containing an auto key card and a business card.

4  Q.   Are those the items that you received as a result of the

5  order that we've been discussing?

6  A.   Yes.

7           MS. TAYLOR:  I'd move for admission of Exhibit 19.

8           THE COURT:  Any objection?

9           MR. KING:  Without objection, Your Honor.

10          MR. ZERMAY:  Without objection, Your Honor.

11          THE COURT:  19 is admitted.  You may publish.

12       (Government's Exhibit 19 admitted in evidence.)

13          MS. TAYLOR:  Ms. Ganoe, if we could zoom in on that

14  top photo on page one.

15  BY MS. TAYLOR:

16  Q.   Special Agent Hooker, that first photo on page 1, what is

17  that photo?

18  A.   That is the packaging envelope that I received.

19  Q.   And is that how it looked when you received it?

20  A.   Correct.

21  Q.   Does it have that same tracking number that was in the

22  email that we were just talking about?

23  A.   I would have to look back to see if it matches, but I

24  believe it does.

25          Yes, it's the same tracking number.

VOL 1 - PG 253

```
 1  BY MS. TAYLOR:

 2  Q.   Did you open this package?

 3  A.   Yes, I did.

 4  Q.   Did you need a search warrant to do that?

 5  A.   I did not.

 6  Q.   Why did you not need a search warrant?

 7  A.   ATF purchased the item.

 8  Q.   And so it belonged to ATF at that point?

 9  A.   Correct.

10       MS. TAYLOR:  Moving to the next page, Ms. Ganoe.

11  BY MS. TAYLOR:

12  Q.   What is depicted in that top picture of this second page

13  of the exhibit?

14  A.   That's what I removed from the envelope consisting of a

15  plastic bag:  an auto key card and a business card.

16  Q.   And the business card, what does it say on it?

17  A.   It says -- it has an image of an auto -- of an automobile.

18  It says, "Please share on social media and tell your friends

19  about us.  Thank you!  Thank you for your support of our all

20  American freedom business.  Many more awesome products coming

21  soon."

22  Q.   And does it also say "automatic" over the vehicle at the

23  top of the card?

24  A.   Yes.

25  Q.   And looking at the next photo.
```

1          MS. TAYLOR:  Ms. Ganoe.

2     BY MS. TAYLOR:

3     Q.   What's -- what's the metal item that's depicted on this

4     page?

5     A.   That is the auto key card after I removed it from the

6     plastic envelope, or plastic packaging.

7     Q.   And could you describe -- Ms. Ganoe's zoomed in on that

8     metal item that you said was the auto key card.  Could you

9     describe what model this is?

10    A.   A 3 in 1 Pen Holder Edition with Bottle Opener.

11    Q.   What makes this a 3 in 1?

12    A.   It has three lightning links on the card.

13    Q.   So six total etched pieces, correct?

14    A.   Correct.

15    Q.   To combine together for three lightning links?

16    A.   Yes.

17    Q.   And then where's the bottle opener?

18    A.   Between the words "made in the U.S.A." and "patent

19    pending."

20    Q.   And why is it a Pen Holder Edition?

21    A.   On the website he -- you know, there's pens depicted going

22    through the cutouts on the card, and that's what it was called.

23    Q.   Were the ones that -- so which cutouts are you talking

24    about?

25    A.   The larger cutouts that's somewhat round.

```
 1   Q.   I'm going to draw -- are there three of them?
 2   A.   There are three of them, yes.
 3   Q.   Okay.  I'm drawing one, two, three?
 4   A.   Correct.
 5   Q.   Are they almost kind of like D shaped, a little tab on it?
 6   A.   Yes.
 7   Q.   And those are the cutouts that you're talking about?
 8   A.   Yes.
 9   Q.   And that's what makes it a Pen Holder Edition?
10   A.   Yes.
11   Q.   And there's three other little slits that are cut into
12   that piece too?
13   A.   Correct.
14   Q.   And were those fully cut out as well on this version?
15   A.   Yes.
16        MS. TAYLOR:  Your Honor, may I approach the witness
17   with Exhibits 20 and 20A?
18        THE COURT:  You may.
19   BY MS. TAYLOR:
20   Q.   Could you please describe what Exhibit 20 is?
21   A.   It is the packaging envelope I received from my order at
22   Autokeycard.com.
23   Q.   Is it the same one that's depicted in the photo that we
24   were just looking at?
25   A.   Yes.
```

```
 1   Q.    And what's Exhibit 20A?

 2   A.    20A is the auto key card 3 in 1 Pen Holder Edition that I

 3   ordered.

 4   Q.    And is it in the same condition as when you received it?

 5   A.    It is not.

 6   Q.    Does it look the same as it looks in those photos we were

 7   just looking at?

 8   A.    No.

 9   Q.    What happened to it subsequently that it looks different?

10   A.    One of the lightning links was cut out.

11   Q.    Did you do that?

12   A.    I did not.

13   Q.    Who did that?

14   A.    Cody Toy.

15   Q.    Then did you receive it back with all of the pieces

16   including the cutout bits?

17   A.    I did.

18   Q.    And did you place it back into evidence?

19   A.    I did.

20         MS. TAYLOR:  I would move for admission of Exhibits

21   20 and 20A.

22         MR. KING:  Can I take a look at it?

23         MS. TAYLOR:  Mr. King is asking to go look at the

24   exhibit.

25         THE COURT:  You may.
```

 1              Any objection?

 2              MR. KING:  No, Your Honor.

 3              THE COURT:  Mr. Zermay?

 4              MR. ZERMAY:  No, Your Honor.

 5              THE COURT:  20 and 20A are admitted.

 6         (Government's Exhibits 20 and 20A admitted in evidence.)

 7              MS. TAYLOR:  Your Honor, I'd ask to retrieve it now

 8    from Special Agent Hooker so I can put it on the projector.

 9              THE COURT:  Certainly.

10    BY MS. TAYLOR:

11    Q.   Okay.  So it's still in this bag here, right?

12    A.   Yes.

13    Q.   But -- but this is Exhibit 20A, correct?

14    A.   Yes.

15              THE COURT:  Can you pull that microphone a little

16    closer to you while you're standing -- there you go.  Thank

17    you.

18    BY MS. TAYLOR:

19    Q.   Okay.  These two pieces that are cut out, are -- those are

20    the two pieces that create a lightning link?

21    A.   Correct.

22    Q.   And then there's -- the remainder of it still has the

23    other four etchings intact?

24    A.   Yes.

25    Q.   Now, you stated that it was Officer Toy that cut these two

 1  pieces out of this exhibit?

 2  A.   Yes.

 3  Q.   And did he give you feedback on -- that was relevant to

 4  whether you continued your investigation?

 5  A.   Yes.

 6  Q.   And did you continue your investigation?

 7  A.   I did.

 8  Q.   Did you make another undercover purchase from Auto Key

 9  Cards?

10  A.   Yes.

11  Q.   And what was the date of that purchase?

12  A.   January 26, 2021.

13  Q.   And you should have in front of you Exhibit 21?

14  A.   I do.

15  Q.   Could you describe what Exhibit 21 is.

16  A.   Email correspondence between myself and

17  customerservice@autokeycard.com.

18  Q.   Was that from your undercover e-mail account?

19  A.   Yes.

20       MS. TAYLOR:  I'd move for admission of Exhibit 21.

21       THE COURT:  Any objection?

22       MR. KING:  No, Your Honor.

23       MR. ZERMAY:  No, Your Honor.

24       THE COURT:  21 is admitted.  You may publish.

25       (Government's Exhibit 21 admitted in evidence.)

1  BY MS. TAYLOR:

2  Q.   All right.  If we could -- so this is an email chain,

3  correct?

4  A.   Yes.

5  Q.   So let's move to the bottom of the email chain.  Why did

6  you begin emailing with the Auto Key Card's website?

7  A.   I wanted to purchase two particular auto key cards, and

8  the website, when I accessed it, indicated that both were out

9  of stock.

10  Q.   And so what did you write in your email?  Well, what was

11  the date of the email and what did you write?

12  A.   It was January 26th, 2021, at 1:57 p.m.

13  Q.   And what did you write?

14  A.   I wrote, "Hello.  I was wanting to buy a auto key card

15  1 in 1 or 2 in 1 Pen Holder Edition.  I wanted to do everything

16  by mail with a money order to pay with.  Your website says they

17  are sold out.  Will you be getting more in soon?  Should I just

18  send in my order form and money order now and then you will

19  ship it to me as soon as you get more?  I am just worried about

20  sending the money order and the thing never coming back in

21  stock.  Thanks."

22  Q.   And that email indicates that the sender was somebody

23  named John Holbrook, correct?

24  A.   Yes.

25  Q.   Previously you had been using the undercover name John

Case 3:21-cr-00022-MMH-MCR   Document 277   Filed 06/06/23   Page 260 of 285 PageID 4380
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 262 of 563

VOL 1 - PG 260

 1   O'Leary?

 2   A.   Yes.

 3   Q.   Who is John Holbrook?

 4   A.   Another undercover name.

 5   Q.   Another undercover name?

 6   A.   Yes.

 7   Q.   And you had control over this email account?

 8   A.   I do.

 9        MS. TAYLOR:   Ms. Ganoe, could you move to the next

10   email.

11   BY MS. TAYLOR:

12   Q.   Did you receive a response to that email?

13   A.   Yes.

14   Q.   And when was that?

15   A.   January 26th, 2021, at 2:09 p.m.

16   Q.   And what did Auto -- and what email address responded to

17   your email?

18   A.   Customerservice@autokeycard.com.

19   Q.   And what did you -- what was the email?

20   A.   "Thank you for contacting us.  We always hold a few items

21   back for mail-in order customers.  There is a mail-in order

22   form on our website.  Please print and fill it out, then mail

23   it to us.

24        "If you already know which products and the amount

25   you want, let us know and we can set those aside for you.  We

1   always take care of our great customers.

2           "Sincerely, Autokeycard.com."

3   BY MS. TAYLOR:

4   Q.   Did you respond again to this email?

5   A.   Yes.

6   Q.   And what did you indicate?

7   A.   I said, "Thank you for getting back to me.  I wanted to

8   get two different cards.  A AKC" -- which I abbreviated for

9   auto key card -- "2 in 1 for $80 and an AKC 2 in 1 Pen Holder

10  Edition" -- "Pen Holder for $110.  After the mail-in order fee

11  and taxes I came to a total of $214.  If you have those two

12  cards in stock and that is the right price, I will put the

13  money order in the mail by morning at the latest if you will

14  hold them back for me.  Thanks."

15  Q.   And did you then have some further correspondence that day

16  with the Auto Key Card email address related to your purchase?

17  A.   Yes.

18  Q.   Did you end up using a mail-in order form to complete this

19  purchase?

20  A.   Yes.

21  Q.   Could you please look at what's been marked as Exhibit 22

22  in front of you.

23  A.   I have it.

24  Q.   And describe what that is.

25  A.   It is a mail-in order form that I printed from the

1   Autokeycards.com website.

2          MS. TAYLOR:  I'll move for admission of Exhibit 22.

3          THE COURT:  Any objection?

4          MR. KING:  Without objection.

5          MR. ZERMAY:  No objection, Judge.

6          THE COURT:  22 is admitted.

7      (Government's Exhibit 22 admitted in evidence.)

8   BY MS. TAYLOR:

9   Q.   Okay.  So this is the mail-in order form that you used for

10  your second undercover purchase, correct?

11  A.   Yes.

12  Q.   And could you describe how you filled out the mail-in

13  order form and what pieces you were ordering.

14  A.   Yes.  I -- for quantity I requested one auto key card

15  Stainless Steel Business Card 2 in 1 for $80 as well as one

16  auto key card Stainless Style Business Card 2 in 1 Pen Holder

17  Edition for $110.

18  Q.   And looking -- and you have some math down kind of in the

19  middle of this form, correct, for a total of $214?

20  A.   Yes.

21          MS. TAYLOR:  And if we can keep scrolling, Ms. Ganoe,

22  to the bottom there.

23  By MS. TAYLOR:

24  Q.   You indicated that it was to be shipped to John Holbrook,

25  correct?

Case 3:21-cr-00022-MMH-MCR   Document 277   Filed 06/06/23   Page 263 of 285 PageID 4383
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 265 of 563

VOL 1 - PG 263

1   A.   Yes.

2   Q.   And was that using that same mailing address that your

3   first undercover order went to?

4   A.   It is.

5   Q.   And did it -- did the order form provide instructions for

6   how to make out your payment?

7   A.   Yes.

8   Q.   And what was that?

9   A.   At the bottom left of the form it says, "Money orders are

10  to be made payable to J. Ervin.  Mail completed accurate order

11  to AutoKeyCard, hyphen, J. Ervin, 950 Blanding Boulevard,

12  Suite 23, PMB, 336, Orange Park, Florida, 32065."

13  Q.   And is that how you made out your -- did you use the money

14  order?

15  A.   I did.

16  Q.   And is that who you made it out to?

17  A.   I did.

18  Q.   And could you please look at Exhibit 23 in front of you.

19  A.   Okay.

20  Q.   What is that?

21  A.   That is a copy of the money order I obtained from the U.S.

22  Postal Service.

23  Q.   So you took a photocopy of it before you put it in the

24  mail?

25  A.   Yes.

 1              MS. TAYLOR:  And move for admission of Exhibit 23.

 2              THE COURT:  Any objection?

 3              MR. KING:  No, Your Honor.

 4              MR. ZERMAY:  No, Your Honor.

 5              THE COURT:  23 is admitted.  You may publish.

 6         (Government's Exhibit 23 admitted in evidence.)

 7    BY MS. TAYLOR:

 8    Q.   And who did you make this money order out to?

 9    A.   J period Ervin.

10    Q.   And is that the same -- addressed to the same address at

11    950 Blanding Boulevard?

12    A.   Yes.

13    Q.   And to ship to John Holbrook?

14    A.   Yes.

15    Q.   Okay.  I want to ask you now to look at Exhibit 24.  Did

16    you receive any information about where that money order was

17    deposited?

18    A.   Yes, I did.

19    Q.   And could you look at Exhibit 24 and tell us what that is.

20    A.   It is a copy of the Postal Money Order after it has been

21    negotiated.

22    Q.   And where did it indicate --

23              MS. TAYLOR:  Well, I'll move for admission of

24    Exhibit 24 now.

25              THE COURT:  Any objection?

1          MR. KING:  Without -- no, Your Honor.

2          MR. ZERMAY:  No, Your Honor.

3          THE COURT:  All right.  24 is admitted.  You may

4    publish.

5      (Government's Exhibit 24 admitted in evidence.)

6    BY MS. TAYLOR:

7    Q.   And where did it -- so this was after the money order was

8    deposited into a bank?

9    A.   Yes.

10   Q.   And where did this document indicate that the money order

11   was deposited?

12   A.   At Community First Credit Union of Florida.

13   Q.   And how did you -- how did you get this particular

14   document?

15   A.   I was jointly working the investigation with a United

16   States Postal Inspector named Keith Hannon.  And I provided him

17   with a serial number of the Postal Money Order that I

18   purchased, and he was able to obtain this and provide me with a

19   copy.

20   Q.   And did you also -- as part of your investigation, you

21   mentioned that CFCU, Community First Credit Union, had

22   initially contacted ATF about Mr. Ervin, correct?

23   A.   Yes.

24   Q.   Did you receive banking records from Community First

25   Credit Union as part of your investigation?

1   A.   Yes, I did.

2          MS. TAYLOR:  Your Honor, may I approach with Exhibits

3   95, 95A, 95B, 95C, 95D, 95E, as well as 93 and 94?

4          THE COURT:  You may.  And . . .

5   BY MS. TAYLOR:

6   Q.   First, looking at Exhibit 93, that's a disk, correct?

7   A.   Yes.

8   Q.   Are you able to recognize that as a disk that you

9   previously reviewed the contents of?

10  A.   Yes.

11  Q.   How are you able to recognize it?

12  A.   I placed my initials on the outside of the compact disk.

13  Q.   And does that contain surveillance video footage that you

14  obtained from Community First Credit Union?

15  A.   It does.

16  Q.   And Exhibit 94, if you could look at that one as well.

17  A.   Okay.

18  Q.   Is that also a disk?

19  A.   Yes.

20  Q.   And how do you recognize it?

21  A.   My initials are also on this disk.

22  Q.   Did you review the contents of the disk before you

23  initialed it?

24  A.   I did.

25  Q.   And did it contain surveillance video footage also

 1  obtained from Community First Credit Union?

 2  A.   It did.

 3  Q.   And I would also ask you to look at Exhibits 95 and then

 4  all of the sub exhibits, I think it was A through E.  And are

 5  those banking records that you obtained from Community First

 6  Credit Union?

 7  A.   Yes.

 8          MS. TAYLOR:  Move for the admission of 93, 94, 95,

 9  and 95A through E.

10          THE COURT:  Any objection?

11          MR. KING:  No, Your Honor.

12          MR. ZERMAY:  No, Your Honor.

13          THE COURT:  All right.  93, 94, and 95A through E are

14  admitted and you may publish as you wish.

15      (Government's Exhibits 93, 94, 95, and 95A-95E admitted in

16  evidence.)

17          MS. TAYLOR:  Ms. Ganoe, would you please bring up

18  Exhibit 95A.

19  BY MS. TAYLOR:

20  Q.   Looking at page 56, this is part of the banking records,

21  correct?

22  A.   Yes.

23  Q.   And who's banking records are these?

24  A.   Kristopher Ervin.

25  Q.   And what's the date on this particular record --

VOL 1 - PG 268

1   A.   January --

2   Q.   -- or this page of the record?

3   A.   January 29th, 2021.

4   Q.   And does it have a time stamp on it?

5   A.   4:43 p.m.

6   Q.   And does it indicate that, "Check received, 214; check

7   received, 110"?

8   A.   Yes.

9   Q.   And then does it also indicate that cash was dispensed --

10  it says, "Cash dispense clearing 1," correct?

11  A.   Yes.

12  Q.   And then, "Cash dispense clearing minus 325"?

13  A.   Yes.

14       MS. TAYLOR:  If we could look at the next page,

15  Ms. Ganoe.

16       THE COURT:  And this is page?

17       MS. TAYLOR:  This is page 57, Your Honor.

18       The first two, please.

19  BY MS. TAYLOR:

20  Q.   We've zoomed in on the top two items, correct?

21  A.   Yes.

22  Q.   And the bottom one -- so I guess it's the middle one on

23  page 57, but what's that one that's on the bottom of the part

24  where we've zoomed in?

25  A.   That is the money order that I sent to Autokeycard.com.

 1    Q.    And the same one that we were talking about a moment ago?

 2    A.    Yes.

 3    Q.    For $214?

 4    A.    Yes.

 5    Q.    And confirming that it was deposited to Community First

 6    Credit Union?

 7    A.    Yes.

 8    Q.    And the date of the deposit is January 29th, 2021?

 9    A.    Yes.

10    Q.    And then another one that has the same date and time stamp

11    on it, correct?

12    A.    Correct.

13    Q.    For $110?

14    A.    Correct.

15    Q.    Did you attempt to obtain video -- did you obtain video

16    surveillance showing who was making transactions at Community

17    First Credit Union at that time?

18    A.    I did.

19          MS. TAYLOR:  Ms. Ganoe, could you please pull up

20    Exhibit 93.

21       (Video played.)

22    BY MS. TAYLOR:

23    Q.    And we're at the beginning of the video, correct?  Did a

24    vehicle just pull into the parking lot?

25    A.    Yes.

1    Q.    Can you describe it?

2    A.    It's a silver Honda SUV.

3    Q.    And did a man just get out of the vehicle?

4    A.    Yes.

5    Q.    And what is he doing?

6    A.    Walking towards the entrance.

7    Q.    The entrance of Community First Credit Union?

8    A.    Yes.

9    Q.    And what is he doing now?

10   A.    He just walked inside the lobby.

11   Q.    And now it's at 4:42 and 52.  What is he doing?

12   A.    Just approached a teller.

13   Q.    And now what is he doing?

14   A.    He appears to be signing two items.

15   Q.    And then what did he do with the two items?

16   A.    Handed them to the teller.

17   Q.    You've watched this entire video before, correct?

18   A.    Yes.

19   Q.    And are you able to recognize who that man is that's

20   handing the items to the teller?

21   A.    Yes.

22   Q.    Who is it?

23   A.    Mr. Ervin.

24         MS. TAYLOR:  And we can skip forward to -- or, yeah,

25   like maybe the last 30 seconds of the video.

```
 1        (Video played.)

 2   BY MS. TAYLOR:

 3   Q.   We skipped forward to 4 minutes and 45 -- sorry, 4:45 and

 4   08.  And what's he doing now?

 5   A.   Exiting the lobby.

 6   Q.   And at 4:45 and about 12 seconds did he walk close to a

 7   surveillance camera?

 8   A.   Yes.

 9   Q.   And could you clearly see his face?

10   A.   Yes.

11   Q.   And how are you able to recognize Mr. Ervin?

12   A.   Numerous ways.  During my investigation I conducted

13   numerous surveillances of Mr. Ervin in his residence.  I

14   obtained his Florida driver's license photograph.  I

15   transported him to his initial court appearance after his

16   arrest.  And I've attended numerous court hearings with him

17   present.

18   Q.   And so you had several personal face-to-face, or close to

19   it, interactions with Mr. Ervin?

20   A.   I have.

21   Q.   Did you also recognize that silver Honda that was in the

22   surveillance video?

23   A.   Yes, I did.

24   Q.   How do you recognize that vehicle?

25   A.   I've seen that vehicle numerous times at Mr. Ervin's
```

1  residence.  I've run the tag from that vehicle.  I've seen

2  Mr. Ervin in that vehicle on numerous surveillances.

3  Q.   So in other words, that's Mr. Ervin's vehicle?

4  A.   Yes.

5  Q.   After you made the second undercover purchase, did you

6  receive anything in the mail as a result of that purchase?

7  A.   Yes, I did.

8         MS. TAYLOR:  Your Honor, may I approach with Exhibits

9  25, 25A, and 25B?

10        THE COURT:  You may.

11  BY MS. TAYLOR:

12  Q.   Could you describe what Exhibit 25 is.

13  A.   Exhibit 25 is the packaging, the exterior packaging, a

14  white padded envelope.  It also contains two plastic

15  Ziploc-type bags and two business cards.

16  Q.   And what's 25A?

17  A.   25A is an auto key card.

18  Q.   And what's 25B?

19  A.   It is also an auto key card.

20  Q.   Do those two auto key cards look the same as when you

21  first received them?

22  A.   They do not.

23  Q.   And how are they different?

24  A.   They have been cut.

25  Q.   Both of them?

```
1    A.   Both of them, yes.

2    Q.   Who cut them?

3    A.   Cody Toy.

4    Q.   And then after Mr. Toy -- he did an examination of these

5    items?

6    A.   Yes.

7    Q.   And did you then receive them back from him?

8    A.   I did.

9    Q.   And did you put them back in ATF evidence?

10   A.   Yes.

11            MS. TAYLOR:  I'd move for admission of 25, 25A, and

12   25B at this time.

13            THE COURT:  Any objection to --

14            MR. KING:  Your Honor, if I could just approach.  I

15   don't have digital copies of the physical items.

16            THE COURT:  All right.

17            MR. ZERMAY:  Same request, Your Honor.

18            THE COURT:  Let's just inspect the evidence.

19            Any objection to 25, 25A, or 25B?

20            MR. KING:  No, Your Honor.

21            MR. ZERMAY:  No, Your Honor.

22            THE COURT:  Those are admitted.  You may publish.

23       (Government's Exhibits 25, 25A, and 25B admitted in

24   evidence.)

25            MS. TAYLOR:  Your Honor, may I approach Agent Hooker?
```

1           THE COURT:  Yes.

2    BY MS. TAYLOR:

3    Q.    Okay.  So I've put 25 on the projector.  And you mentioned

4    there are two little plastic baggies in here in addition to the

5    mailing envelope?

6    A.    Yes.

7    Q.    And with a green business card?

8    A.    Yes.

9    Q.    Is that the same kind of green business card that you got

10   with your first order?

11   A.    It is.

12   Q.    And then there's also the -- the bubble mailer, correct?

13   A.    Yes.

14   Q.    And is this the bubble mailer that you received the items

15   in?

16   A.    It is.

17   Q.    And it's addressed to ship to John Holbrook?

18   A.    Yes.

19   Q.    And what's the return address?

20   A.    AKeyCard, 950 Blanding Boulevard, Suite 23, PMB 336,

21   Orange Park, Florida, 32065.

22   Q.    Now, I'm going to put 25A on the projector.  And it's been

23   cut into a number of pieces, correct?

24   A.    Yes.

25   Q.    It looks like there's one that's kind of -- one piece

 1   that's a little bit torn up here?

 2   A.   Yes.

 3   Q.   And has a -- a spot where the link is broken?

 4   A.   Yes.

 5   Q.   And then another piece that's the main body of a link,

 6   correct?

 7   A.   Correct.

 8   Q.   As well as two of the smaller pieces?

 9   A.   Yes.

10   Q.   And then the rest of this is all just leftover material?

11   A.   Right, from the card.

12   Q.   Okay.  And looking at 25 -- this is 25B, correct?

13   A.   Yes.

14   Q.   And this was -- this would be a 2 in 1, correct?

15   A.   Yes.

16   Q.   Because it has etchings for two lightning links?

17   A.   Correct.

18   Q.   But four total etchings?

19   A.   Yes.

20   Q.   And is this a Pen Holder Edition or not?

21   A.   It is not.

22   Q.   Because this piece -- the kind of D-shaped piece is not

23   cut out on this one?

24   A.   Correct.

25   Q.   And then one of the two lightning links has been cut out

 1  of this card as well, correct?  Bear with me.

 2  A.    Yes.

 3          MS. TAYLOR:  Your Honor, I would suggest that this

 4  may be a good stopping point for today.

 5          THE COURT:  Yeah, I actually was going to suggest

 6  that we stop around 5:15 since the jury came in so early, so

 7  that's fine.

 8          Ladies and gentlemen, we're going to go ahead and

 9  stop for the afternoon.  I'll ask you, as I said, to be back

10  here at 9:45.  You'll leave your notepads only the chair.

11          COURTROOM DEPUTY:  Judge, sorry, you said 9:45.

12          THE COURT:  What is -- sorry about that.  No, you

13  don't get an extra hour of sleep.  8:45.  8:45.

14          Thank you, Ms. Wiles.

15          We'll plan hopefully -- if everybody can be here on

16  time, we'll plan to start no later than 9 a.m.

17          You'll leave your notepads on chairs.

18          I'll ask you to follow all of the instructions that I

19  gave you earlier, and that is you must not talk to one another,

20  your family, your friends, or anybody at all about the case.

21  You can tell them information about your -- when you have to be

22  at court and the fact that you've been selected as a juror, but

23  you must not discuss the case in any way with anyone at all.

24          If anybody speaks to you or in your presence about

25  the case, please stop them and notify the court security

 1    the evidence?

 2             THE WITNESS:  We did, Your Honor.

 3             MR. KING:  Yes, Your Honor.

 4             MR. ZERMAY:  Yes, Your Honor.

 5             MS. TAYLOR:  Your Honor, should I stay here or go to

 6    the podium?

 7             THE COURT:  You can go ahead, get yourself together

 8    at the podium.

 9             COURT SECURITY OFFICER:  All rise for the jurors.

10        (Jury enters, 9:10 a.m.)

11             COURT SECURITY OFFICER:  Please be seated.

12             THE COURT:  Good morning, ladies and gentlemen.  We

13    are continuing this morning with the evidence in

14    Case No. 3:21-cr-22(S4)-MMH-MCR.

15             Ms. Taylor, you may proceed.

16             MS. TAYLOR:  Yes, Your Honor.

17             Special Agent Hooker, you are still under oath.

18             THE COURT:  Pardon me.

19             You understand that you're still under oath, sir?

20             THE WITNESS:  Yes, ma'am.

21             THE COURT:  Go ahead.

22             MS. TAYLOR:  Thank you, Your Honor.

23           **SPECIAL AGENT JESSE HOOKER, GOVERNMENT WITNESS,**

24                        **PREVIOUSLY SWORN,**

25                  DIRECT EXAMINATION (CONTINUED)

1    BY MS. TAYLOR:

2    Q.    Yesterday we were talking about the second undercover

3    purchase that you had made in this case related to auto key

4    cards, correct?

5    A.    Yes.

6    Q.    And you also had mentioned that you were working with a

7    postal inspector.  And what was his name?

8    A.    Keith Hannon.

9    Q.    And do you know whether he made an undercover purchase?

10   A.    Yes, he did.

11   Q.    And do you know how he paid for that undercover purchase?

12   A.    With a Postal Money Order.

13         MS. TAYLOR:  Ms. Ganoe, if we could please have

14   Exhibit 95A, page 75.

15   BY MS. TAYLOR:

16   Q.    Do you know whether Inspector Hannon was using an alias or

17   an undercover name to make his purchase?

18   A.    Yes, he was.

19   Q.    And do you know what that name was?

20   A.    Richard Carter.

21         MS. TAYLOR:  Ms. Ganoe, could we zoom in on the top

22   part, top two.  Yes.

23   BY MS. TAYLOR:

24   Q.    And do you see anything on this page, which was

25   Exhibit 95A, page 75, related to Inspector Hannon's purchase?

1   A.   I see a Postal Money Order in the amount of $230.   And

2   it's a little blurry, but I think it says from R. Carter.

3   Q.   And does it have an address -- a shipping address in

4   Savannah, Georgia?

5   A.   It does.   It's a P.O. Box.

6   Q.   And is that R. Carter -- that's the name Inspector Hannon

7   was using?

8   A.   Yes.

9   Q.   And does it indicate that this Postal Money Order was

10  deposited at any particular place?

11  A.   Community First Credit Union of Florida.

12  Q.   And does it indicate the date that it was deposited?

13  A.   February 3rd, 2021.

14  Q.   And time?

15  A.   4:09 p.m.

16  Q.   You previously, yesterday, testified about Exhibit 94,

17  that that was a surveillance video that you had obtained from

18  Community First Bank.   Correct?

19  A.   Yes.

20         MS. TAYLOR:   And Ms. Ganoe, could we have Exhibit 94.

21      (Video played.)

22  BY MS. TAYLOR:

23  Q.   And we started with -- the video is playing from the

24  beginning.   Do you recognize any particular vehicle or person

25  that's in this first part of the video?

1  A.    A silver Honda SUV.  Mr. Ervin is exiting the vehicle,

2  walking towards the front door of the credit union.

3  Q.    And how do you recognize that as being Mr. Ervin?

4  A.    Based on my prior surveillances and interactions with him.

5  Q.    Did he have any particular item of attire that you

6  observed him wearing repeatedly during your investigation?

7  A.    He wore a pair of sunglasses, white in color.

8  Q.    Is he wearing them in this video?

9  A.    Yes.

10 Q.    Was he also wearing them in Exhibit 93, which was the

11 surveillance video from the deposit of your undercover money

12 order?

13 A.    I believe so, yes.

14        MS. TAYLOR:  And Ms. Ganoe, could you advance the

15 video to 1 minute, 53 seconds.

16     (Video played.)

17 MS. TAYLOR:

18 Q.    What's happening at this point in the video?

19 A.    Mr. Ervin is approaching a teller, removing items from his

20 pocket.

21 Q.    And then what does he do?

22 A.    Signs what appears to be two items.

23 Q.    Are they -- do they appear to be paper?

24 A.    Yes.

25 Q.    And then what does he do with the two items?

1    A.    He's going to slide them to the teller.

2          MS. TAYLOR:  And if we could advance the video to

3    3 minutes and 30 seconds.

4          (Video played.)

5    BY MS. TAYLOR:

6    Q.    What's happening at this part of the video?

7    A.    He's awaiting, I believe, U.S. currency being provided to

8    him by the teller.

9          MS. TAYLOR:  And if we can advance it to about

10   4 minutes.

11         (Video played.)

12   BY MS. TAYLOR:

13   Q.    What's happening at this point in the video?

14   A.    He's walking out of the lobby.

15   Q.    And what's the time stamp on the video now?

16   A.    4:40 and 54 seconds p.m.

17   Q.    And just before that time stamp, Mr. Ervin walked close to

18   a surveillance camera, correct?

19   A.    Yes.

20   Q.    And you were able to recognize him?

21   A.    Yes.

22   Q.    Do you recognize Mr. Ervin in the courtroom today?

23   A.    Yes.

24   Q.    Could you please describe him.

25   A.    He is wearing I think a blue suit jacket and blue tie.

1  Q.    And is he sitting at a particular table in the courtroom?

2  A.    He's sitting at the first table with his attorneys.

3          MS. TAYLOR:  Your Honor, I would ask that the record

4  reflect that Special Agent Hooker has identified Mr. Ervin.

5          MR. KING:  We would so stipulate, Your Honor.

6          THE COURT:  The record will so reflect.

7  BY MS. TAYLOR:

8  Q.    At some point in your investigation did you participate in

9  any surveillance of Mr. Ervin?

10 A.    Yes, I did.

11 Q.    And what day was that?

12 A.    February 22nd, 2021.

13 Q.    And what did you observe on your surveillance?

14 A.    I observed Mr. Ervin's silver Honda SUV parked in the

15 driveway of the 2409 Kirkwall Court residence.

16         Later in the surveillance I observed Mr. Ervin

17 driving to the U.S. Post Office in Orange Park, Florida.  I

18 observed him exit his vehicle with a cardboard box that

19 contained numerous white padded mailing mailers and walk into

20 the post office.

21 Q.    Were you able to tell whether those mailers appeared

22 consistent with the two that you had received as a result of

23 your undercover purchases?

24 A.    Yes, they appeared to the same type of envelope.

25 Q.    Why were you conducting surveillance of Mr. Ervin?

1  A.   We were trying to ascertain if he was manufacturing the

2  devices at his residence and if he was the person mailing the

3  devices.

4  Q.   And did there -- during the time that you were surveilling

5  him, you said that he took some items into the post office?

6  A.   Correct.

7  Q.   And did he -- did you observe him leave the post office?

8  A.   He did.

9  Q.   And did he go anywhere else that was pertinent to your

10  investigation?

11  A.   Yes.  Later in the day he drove to an area in Orange Park,

12  an industrial area.  The road was call Industrial Loop.  We

13  unfortunately lost surveillance of him in that area on that

14  day.

15  Q.   And during the time that you surveilled Mr. Ervin on

16  February 22nd, did it appear that anyone was assisting him?

17  A.   No.

18  Q.   Was there anyone who appeared to be with him?

19  A.   No.

20  Q.   You've mentioned that he -- he had departed from the 2409

21  Kirkwall Court address.  Did you obtain a warrant -- a federal

22  warrant to search that residence?

23  A.   Yes.

24  Q.   Did you also obtain a federal warrant to search

25  Mr. Ervin's vehicle?

1   A.   Yes.

2   Q.   Was that the same silver Honda SUV?

3   A.   Yes.

4   Q.   When were those warrants executed?

5   A.   On March 2nd, 2021.

6   Q.   And did you personally participate in any of those

7   searches?

8   A.   Yes.  I was present at the residential search warrant.

9   Q.   Now, you have -- when you are going to execute a search

10  warrant, you have an operational plan, correct?

11  A.   Yes, we do.

12  Q.   And did everything go according to what you expected in

13  your operational plan that day?

14  A.   No.

15  Q.   And what was different than what you expected?

16  A.   We had intended to execute the warrant in the morning.

17  And we had preoperational surveillance drive by Mr. Ervin's

18  residence, and we noticed that his Honda was not present at the

19  residence.  So it was our belief that he was not home.

20  Q.   And did -- what steps did you take next before executing

21  the warrant?

22  A.   We ultimately received intelligence indicating that

23  Mr. Ervin was on a rural piece of property in Lake City,

24  Florida, doing work on it.  So we coordinated with the Columbia

25  County Sheriff's Office and sent agents to that area.

1  Q.    And you did not personally go to that area in Columbia

2  County?

3  A.    I did not.

4  Q.    After Mr. Warrant -- sorry.

5        After Mr. Ervin was located in Columbia County, at

6  some point after that did you execute the warrant at his

7  residence?

8  A.    Yes.

9  Q.    And was anyone present at the residence at that time?

10  A.    No.

11  Q.    Did you find anything that was of evidentiary interest to

12  your investigation during that search of the residence?

13  A.    Yes, we did.

14  Q.    I'm going to --

15        MS. TAYLOR:  Your Honor, may I approach the witness?

16        THE COURT:  What numbers?

17        MS. TAYLOR:  Exhibit 48, Your Honor.

18        THE COURT:  Yes.

19  BY MS. TAYLOR:

20  Q.    Agent Hooker, could you please identify in general what is

21  in Exhibit 48.

22  A.    These are photographs that were taken during the execution

23  of the search warrant at Mr. Ervin's residence.

24        MS. TAYLOR:  I'd move for admission of Exhibit 48.

25        MR. KING:  Without objection, Your Honor.

```
 1              MR. ZERMAY:  Without objection.

 2              THE COURT:  48 is admitted.  You may publish.

 3         (Government's Exhibit 48 admitted in evidence.)

 4              MS. TAYLOR:  Ms. Ganoe, if you could --

 5    BY MS. TAYLOR:

 6    Q.   Okay.  We have the first page of Exhibit 48 on the screen

 7    now, correct?

 8    A.   Yes.

 9    Q.   Could you tell the jury what's in this page.

10    A.   That is the front exterior of Mr. Ervin's residence.

11    Q.   What was the weather like at the time the warrant was

12    executed?

13    A.   It was rainy.

14    Q.   Is that why there are white flecks all over the photo?

15    A.   Yes.

16              MS. TAYLOR:  Ms. Ganoe, page 2, please.

17    BY MS. TAYLOR:

18    Q.   This one's a little bit blurry, correct?

19    A.   Yes.

20    Q.   But what's depicted in this photo?

21    A.   There's the white bus that we had noticed on his -- at his

22    property.

23    Q.   At the residence?

24    A.   At the residence, yes.

25              MS. TAYLOR:  Ms. Ganoe, page 3, please.
```

```
 1   BY MS. TAYLOR:

 2   Q.   What's depicted in this photo?

 3   A.   This is a detached garage that is located in the back yard

 4   of Mr. Ervin's property.

 5            MS. TAYLOR:  Ms. Ganoe, page 4, please.

 6   BY MS. TAYLOR:

 7   Q.   What is this photo?

 8   A.   The interior contents of the detached garage.

 9            MS. TAYLOR:  And Ms. Ganoe, page 20, please.

10   BY MS. TAYLOR:

11   Q.   What's depicted in this photo?

12   A.   This is a work bench within the -- within the detached

13   garage.  It has different power tools on it as well as auto key

14   cards that are in stacks.

15            MS. TAYLOR:  Ms. Ganoe, page 21, please.

16   BY MS. TAYLOR:

17   Q.   Is this a close-up of some items on that work bench?

18   A.   Yes.  There's numerous auto key cards that are located on

19   the bench.

20   Q.   And Ms. Ganoe is zooming in on the middle part of that

21   photo.  Is that where you see the auto key cards?

22   A.   Yes.

23   Q.   And you mentioned that they are in stacks?

24   A.   Yes.

25            MS. TAYLOR:  Ms. Ganoe, if we could go to page 22,
```

1   please.

2   BY MS. TAYLOR:

3   Q.   What are these items that are on page 22?

4   A.   Belt sanders.

5   Q.   How were these pertinent to your investigation?

6   A.   We believed that these belt sanders were being utilized to

7   finish the auto key cards to put a high-gloss shine on them.

8   Q.   Prior to executing the search warrant, had you observed

9   any photos that you believed were depicting a part of the

10  manufacturing process for auto key cards?

11  A.   I have.

12  Q.   And what -- where did you observe those and what, in

13  particular, did you observe?

14  A.   I observed those on the Instagram account, the Auto Key

15  Card Instagram account.

16  Q.   Okay.  And what was depicted in the photos?

17  A.   There were numerous auto key cards that were laying or

18  sitting on what looked like a bath towel and they were wet.

19          MS. TAYLOR:  Ms. Ganoe, could we have page 5, please.

20  BY MS. TAYLOR:

21  Q.   What's depicted in this photo?

22  A.   This is the living room of the residence, and I think they

23  are specifically focusing on the computer that's on the table.

24  Q.   And so you're referring to there appear to be two monitors

25  with some green and black displayed on them?

Case 3:21-cr-00022-MMH-MCR   Document 278   Filed 06/06/23   Page 19 of 278 PageID 4424
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 291 of 563

VOL 2 - PG 19

1    A.    Yes.

2    Q.    And there's a tower the left of those monitors?

3    A.    Correct.

4    Q.    Was there anything else that was in this room that we're

5    going to talk about but that can't be seen in this particular

6    photo?

7    A.    Yes.  There were auto key cards located on the computer

8    desk and adjacent to it on a table.

9    Q.    Does there appear to be a mirror in the rear right corner?

10   A.    Yes.

11   Q.    Okay.  Is that where the -- generally where that table was

12   located?

13   A.    Correct.

14         MS. TAYLOR:  Okay.  Ms. Ganoe, if we could have page

15   6, please.

16   BY MS. TAYLOR:

17   Q.    Is this the whiteboard next to that computer?

18   A.    Yes.

19   Q.    Was there anything on the whiteboard that was of

20   particular interest to you?

21   A.    Yes.  There were numerous website addresses as well as

22   what appeared to be inventory of auto key cards that had been

23   written on the board.

24   Q.    Those -- we've zoomed in on part of this picture of a

25   whiteboard, correct?

1   A.   Yes.

2   Q.   There's one -- there's one URL that's got kind of a

3   squiggly blue line around it, correct?

4   A.   Yes.

5   Q.   And what's that URL?

6   A.   Not -- excuse me, notagunpart.com.

7   Q.   And is that a URL that came up anywhere else in your

8   investigation?

9   A.   Yes.

10  Q.   Where did that come up?

11  A.   It was provided to the owner of the company that

12  manufactured the auto key cards.

13  Q.   By Mr. Ervin?

14  A.   Correct.

15  Q.   Below that does it have some more URLs?

16  A.   Yes.

17  Q.   Could you read the first two?

18  A.   Could you zoom in, ma'am?

19       The first one appears to be notfullauto.com.

20  Q.   And then after that?

21  A.   NofullautoAR-15.com.

22  Q.   And there's another area just above where the

23  notagunpart.com URL was, correct?

24  A.   Yes.

25  Q.   And Ms. Ganoe has zoomed in on this now.  So the first one

 1   is getlitlightningunlimited.com, correct?

 2   A.   Correct.

 3   Q.   Getlitlightningnow.com?

 4   A.   Correct.

 5   Q.   Getlitlightningandmore.com?

 6   A.   Yes.

 7   Q.   And then I can't quite make out the next one in full, but

 8   it says getlitlightning, and then something that looks like

 9   "services," possibly, dot.com?

10   A.   Yes, possibly.

11   Q.   And then getlitlightningtoday.com?

12   A.   Yes.

13   Q.   Okay.  Ms. Ganoe has zoomed in on what looks like a table

14   with some figures on it, correct?

15   A.   Yes.

16   Q.   How is this pertinent to your investigation?

17   A.   I recognize the 1 in 1, 2 in 1, 3 in 1 as models of the

18   auto key card.  There appears to be numbers associated with it.

19   We were under the assumption this may be some type of inventory

20   of his current supplies.

21        MS. TAYLOR:  If I could have just a minute, Your

22   Honor.

23   BY MS. TAYLOR:

24   Q.   Were there -- in this -- on this whiteboard, were there

25   additional URLs that referenced "auto," "AR-15," "firearms" and

1    terms like that?

2    A.    I believe so.

3            MS. TAYLOR:  Ms. Ganoe, could we please have page 7.

4    BY MS. TAYLOR:

5    Q.    Is this a close-up of a computer desk?

6    A.    Yes.

7    Q.    And at this time it looks like maybe the computer's been

8    woken up because the two monitors are displaying a blue

9    graphic, correct?

10   A.    Yes.

11   Q.    And on this computer desk, did you locate anything that

12   was of interest?

13   A.    Yes, we did.

14   Q.    And what did that include?

15   A.    There were numerous auto key cards on the desk.  There

16   were -- I think there was a card that had -- in the monitor

17   that had the name Matt -- I think "Hoover" might have been

18   misspelled, but it had Matt Hoover and an email address on it.

19   Q.    Ms. Ganoe has zoomed in on the area that's just to the

20   right of the computer tower, correct?

21   A.    Yes.

22   Q.    And is there anything in this photo that you recognize as

23   being pertinent?

24   A.    There appear to be numerous stacks of auto key cards next

25   to the tower.

1          MS. TAYLOR:  And if we could have, please, page 8.

2    BY MS. TAYLOR:

3    Q.    What's shown in this picture?

4    A.    Two documents; two or three documents.

5    Q.    And were these -- were these documents that were on that

6    desk?

7    A.    Yes.

8    Q.    And does it have a document that says, "What is an auto

9    key card?"

10   A.    Yes.  I think the line above it said that.

11   Q.    Okay.  Can you read what this part of the document says?

12   A.    "What is my first product?  The auto key card.  What is my

13   intent in designing, marketing, and selling the product?

14          "From our terms of service, section 5, products or

15   services.

16          "Products are a political sculpture, for

17   conversation, a novelty, or as artwork only.  Products are not

18   designed or intended to increase any rate, just to increase the

19   rate at which people have conversations.  A form of creative,

20   artistic, peaceful protest along with other common-use

21   features, such as a bottle opener or a desktop pen holder.

22   They are not sold or intended to be altered in any way.  Our

23   products are a form of satire and 100 percent First Amendment

24   activity.

25          "Nothing like this has existed before, because we

1   drew the art, designed the piece, and made it to keep the

2   conversation going."

3   Q.   So on this page it states -- and you've seen these auto

4   key cards advertised as being Pen Holder Editions, correct?

5   A.   Yes.

6   Q.   And that was the version that has those internal cutouts

7   made?

8   A.   Correct.

9   Q.   And you recovered a lot of auto key cards from this home,

10  correct?

11  A.   Yes.

12  Q.   Approximately how many?

13  A.   We -- we recovered approximately 1,550 machine gun

14  conversion devices from the residence.

15  Q.   So when you say that, you mean that's the number of

16  etchings for lightning links that were on the cards that were

17  recovered?

18  A.   Correct.

19       THE COURT:  I'm sorry, sir, can you repeat the

20  number.

21       THE WITNESS:  1,550, approximately.

22  BY MS. TAYLOR:

23  Q.   Were any of those auto key cards being used to hold pens?

24  A.   No.

25  Q.   Not a single one?

1        THE COURT:  Go ahead, Mr. Mesrobian.

2        MR. MESROBIAN:  Thank you, Your Honor.

3        **AMY SARKESE, GOVERNMENT WITNESS, SWORN,**

4                    DIRECT EXAMINATION

5   BY MR. MESROBIAN:

6   Q.   Ma'am, where are you currently employed?

7   A.   JPMorgan Chase Bank.

8   Q.   And what is your current position?

9   A.   Mortgage processor.

10  Q.   How long have you been at Chase Bank?

11  A.   May of 2021.

12  Q.   Prior to Chase where were you employed?

13  A.   Community First Credit Union.

14  Q.   And how long did you work at CFCU?

15  A.   From 1996 to 2021.

16  Q.   And to your knowledge, is CFCU a federally insured

17  financial restitution?

18  A.   It is.

19  Q.   So could you describe for the jury the positions you held

20  at CFCU over that rather extended time there.

21  A.   Collections -- well, first was a teller, part-time teller,

22  then full-time teller, then collections representative, member

23  service representative, and then the last role was assistant

24  branch manager.

25  Q.   And when you were assistant branch manager did you work at

1  a particular branch?

2  A.   The Orange Park location, 625 Blanding.

3  Q.   So during the 2020 to 2021 time frame, were you then

4  working as the branch manager in Orange Park -- or assistant

5  branch manager in Orange Park?

6  A.   Yes.

7  Q.   What were your duties and responsibilities in that role?

8  A.   Assist with audits; help the teller line if they needed

9  assistance, if they were short staffed up there; help with the

10  vault; help balancing the daily activities at the end of the

11  day; waiting on customers or members; opening accounts; new

12  loans.

13        Kind of everything.

14  Q.   Through your employment at Community First, did you become

15  familiar with an individual named Kristopher Justinboyer Ervin?

16  A.   I did.

17  Q.   And was he a client of the credit union?

18  A.   Yes.

19  Q.   How many times -- did he come to your branch in Orange

20  Park?  I'm sorry, strike that.

21        Did he come to conduct business at your branch in

22  Orange Park?

23  A.   Yes.

24  Q.   Was he a regular customer?

25  A.   Yes.

1    Q.    How often, approximately, would you say?

2    A.    He was usually two to three times a week.

3    Q.    And Ms. Sarkese, do you recognize Mr. Ervin in the

4    courtroom today?

5    A.    Yes.

6    Q.    And could you identify him and an article of clothing he's

7    wearing?

8    A.    Blue suit, blue shirt.

9    Q.    And where is he seated?

10   A.    Over there on the right.

11         MR. MESROBIAN:  Your Honor, would the record reflect

12   that the witness identified Mr. Ervin?

13         MR. KING:  We so stipulate, Your Honor.

14         THE COURT:  The record will so reflect.

15   BY MR. MESROBIAN:

16   Q.    So I believe you said a moment ago that he was coming a

17   couple times a week into the branch in Orange Park?

18   A.    Correct.

19   Q.    And that was during the 2020 to 2021 time frame?

20   A.    Correct.

21   Q.    Do you recall ever discussing with him if he was in a

22   particular business?

23   A.    Yes.

24   Q.    And what did he say about that?

25   A.    At one point he said he was making metal business cards.

1  Q.   So I'd like to talk about cash transactions for a moment.

2  In terms of your role as a teller and an assistant bank manager

3  or branch manager, what were your obligations in terms of

4  tracking and reporting cash transactions?

5  A.   So I would handle, like, the cash orders, or if I was on

6  the teller line doing actual transactions for members, you

7  know, processing them, whether it be cash or checks into their

8  account, depending on the transaction limit, it could have us

9  do a form to report to the IRS.

10 Q.   So are you familiar with something called a Currency

11 Transaction Report, or CTR?

12 A.   Yes.

13 Q.   And what is that?

14 A.   It's a form that we have to fill out if there's a

15 withdrawal of a certain dollar amount or higher.

16      Do you want the dollar amount?

17 Q.   And what is that dollar amount?

18 A.   10,000 or more.

19 Q.   And is that true also with respect to cash deposits in

20 addition to withdrawals?

21 A.   Yes.  It's in or out, cash in or out.

22 Q.   So if you were working as a teller or if you were

23 supervising someone working as a teller, what were you supposed

24 to do if someone deposited or withdrew more than $10,000 in

25 cash?

1   A.   So we have to verify -- make a copy of their driver's

2   license, verify the information in the system is correct, name,

3   address, phone number, occupation, employment, or employer.  We

4   have to make sure all that's correct because we have to fill

5   that in on the form.

6   Q.   When you're doing that and gathering that information, do

7   you advise the customer that you are filing a Currency

8   Transaction Report?

9   A.   No.

10  Q.   And why don't you do that?

11  A.   It's not something that we are to disclose as a financial

12  institution.  So whenever we are gathering that information,

13  we're just basically letting them know, "Hey, we're updating

14  the system," and then that's basically the end of the

15  conversation.

16  Q.   Do you recall ever having a discussion with Mr. Ervin

17  about what the threshold was to -- that the bank would report

18  cash?

19  A.   Yes.

20  Q.   Could you tell the grand jury -- the jury about that.

21  A.   So it was asked to me at one point what that dollar amount

22  is as far as reporting goes.  And obviously I didn't give that

23  information because we're not allowed to.  But it was asked at

24  one point, "Well, how much can I take out so it's not

25  reported?"

1    Q.    Do you recall specifically when that conversation

2    occurred?

3    A.    No, I don't remember the exact date.

4    Q.    And we're going to talk about -- in a few minutes about a

5    series of -- or, rather, a cash withdrawal that occurred at

6    your branch, but was it at some point prior to that cash

7    withdrawal occurring?

8    A.    The withdrawal that we're going to talk about?

9    Q.    The $9,000 cash withdrawal.

10   A.    It was after that.

11   Q.    So first I'd like to direct you to July 20th, 2020.  Do

12   you recall a visit by Mr. Ervin to the bank that day to discuss

13   online banking access?

14   A.    I do.

15          MR. MESROBIAN:  So Your Honor, may we publish

16   Government Exhibit 95B, as in Bravo, page 2?

17          THE COURT:  You may.

18   BY MR. MESROBIAN:

19   Q.    First, do you recognize what this document is?

20   A.    Uh-hmm.

21   Q.    And what --

22          THE COURT:  I'm sorry, is that yes?

23          THE WITNESS:  Yes, I'm sorry.

24          MR. MESROBIAN:  Thank you, Your Honor.

25   BY MR. MESROBIAN:

1   Q.   And what is this document?

2   A.   It's our notes that we use in the -- it's called Symitar.

3   So like on the client's account or the members's accounts, if

4   we need to put notes, this is where it shows up and these are

5   how the notes will appear.

6   Q.   So these are notes created by bank employees entered into

7   the Symitar record of encounters --

8   A.   Correct.

9   Q.   -- with customers?

10  A.   Correct.

11  Q.   Here we see an account note dated July 20th, 2020, 9:58

12  a.m., and there's a user number there.  Whose user number is

13  that?

14  A.   That was mine at the time.

15  Q.   And would you read the note that you wrote here?

16       I take it if the user number is there, that means you

17  entered this note?

18  A.   Correct.

19  Q.   And what did this -- what did you enter here?

20  A.   "Member came in to get into his online banking and when

21  Taylor asked to verify his information with his ID and

22  update" --

23            THE COURT:  Excuse me.  Could you slow down?

24            THE WITNESS:  I'm sorry.

25            THE COURT:  Go ahead.

1  A.   "Member came in to get into his online banking and when

2  Taylor" -- which was our teller at the time -- "asked to verify

3  his info with his ID and update his employer, he lost" -- he

4  got upset -- "saying why did it matter and that he didn't want

5  to give that information to us to type in."

6         He told us to type in "strippers and cocaine" as his

7  occupation.

8         "He refused and just kept saying the same thing.  I

9  walked over to get the ID for him and he walked out stating he

10 was just going to call it a day and that we were always causing

11 problems.  Member stated he had a business account with us and

12 also stated that he plans on running business funds through his

13 personal account and that's why he wanted access to the online

14 banking."

15 Q.   "OLB"?

16 A.   Is online banking.

17 Q.   That stands for online banking?

18 A.   (Nods head.)

19 Q.   So do you recall this incident?

20 A.   I do.

21 Q.   And generally, does it accord with your notes reflecting

22 it?

23 A.   Yes.

24 Q.   And just to be clear, when Mr. Ervin -- Mr. Ervin advised

25 that he didn't want to provide his business, and what did he

1  ask you to write down or ask you --

2  A.   The occupation, it was -- he instructed us to put in

3  "strippers and cocaine" as his occupation.

4  Q.   And you did not do that, correct?

5  A.   Correct.

6  Q.   Ms. Sarkese, did Mr. Ervin, on the occasions when he came

7  into your branch, complain about CFCU or the way he was being

8  treated?

9  A.   Correct.

10 Q.   What would he say on those occasions?

11 A.   Basically that we weren't giving him -- we weren't

12 allowing him access to his money.

13 Q.   Generally, to your recollection, did he use his personal

14 account for transactions?

15 A.   For transactions . . .

16 Q.   When he came into the branch?

17 A.   Yes.

18 Q.   Do you recall him using a business account?

19 A.   At some point, yes, when it was opened.

20 Q.   So I'd like to move forward to Black Friday,

21 approximately, of 2020, the Thanksgiving time period of 2020.

22 Do you recall a visit by Mr. Ervin around that date?

23 A.   (Nods head.)

24 Q.   And what happened on that occasion?

25 A.   So we had denied his debit card.  Evidently it was trying

1  to be used at a Louis Vuitton for a purse purchase that we were

2  told he was using to -- he was going to buy a purse for his

3  boss's wife, and the debit card was declined.

4  Q.   So I'll stop you there.  Did Mr. Ervin come into the

5  branch that day?

6  A.   Yes.

7  Q.   And this was on or about November 27th, 2020?

8  A.   Right.

9  Q.   And do you recall it to be around Black Friday of that

10 year?

11 A.   Yes.

12 Q.   What did he say to you about a debit card transaction?

13 A.   He was upset that the debit card transaction had got

14 declined.

15 Q.   Did he say where he had been that day?

16 A.   Louis Vuitton.

17 Q.   And where is -- the Louis Vuitton store, do you mean?

18 A.   Yes.

19 Q.   And to your knowledge, where is the Louis Vuitton store?

20 A.   In Town Center in Jacksonville, the Town Center mall.

21 Q.   Did that strike you in any particular way, that he had

22 come to the Orange Park branch from the Town Center?

23 A.   Yes.  It's a good distance.

24 Q.   And what did he tell you about this particular transaction

25 he was trying to engage in?

Case 3:21-cr-00022-MMH-MCR   Document 279   Filed 06/06/23   Page 168 of 291 PageID 4851
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 307 of 563

VOL 3 - PG 168

1  A.   That it had been declined for the purchase, and so he was

2  upset and came in and said that, you know, why weren't we

3  giving him access to his money.  It was his money, he can do

4  what he wants to with it, that he was trying to purchase a

5  purse for his boss's wife.

6  Q.   Did he give a particular amount of money that he thought

7  this purse cost to your recollection?

8  A.   No, I don't -- he didn't say a specific amount at that

9  time.

10          MR. MESROBIAN:  And Ms. Ganoe, if we could publish

11 Exhibit 95 Bravo.  And go to the bottom, please.

12 BY MR. MESROBIAN:

13 Q.   Actually, first, the note on November 24 where it says,

14 "Removing JT from account," do you know what that refers to?

15 A.   It would -- it's not from me, but it removes -- it means

16 removing a joint person from the account.

17 Q.   So someone may have been a joint owner on this account and

18 then was removed?

19 A.   Correct.

20 Q.   So above that, on November 25th, 2020, this is not your

21 note, correct?

22 A.   Correct.

23 Q.   But what does this note indicate to you in terms of a card

24 transaction?

25 A.   So he called in and the person that took the call

1   authorized the primary caller, which was him -- advised that

2   they -- he advised that he had received an alert for his debit

3   card.  Advised they responded -- he responded yes, was able to

4   confirm that the purchase went through.  Advised the caller --

5   the employee advised the member that as long as they respond

6   "yes," their transaction will auto override, meaning you're

7   saying yes to the fraud alert.  Also verified card was not

8   blocked and will be able to use the limit of 6,000 for a

9   point-of-sale purchase.

10  Q.   And it was marked at the bottom "dash CS."  What does that

11  mean?

12  A.   That's the person's initials that took the call, the 2104.

13  Q.   And so this appears to be about two days before Mr. Ervin

14  came to the branch and talked about the Louis Vuitton purse?

15  A.   Right.

16        MR. MESROBIAN:  So Ms. Ganoe, if we can go up to the

17  next note, please, the small one.

18  BY MR. MESROBIAN:

19  Q.   So do you recognize this note as being from November 27th,

20  2020?

21  A.   Correct.

22  Q.   And there's a lot of abbreviations in here, so you might

23  have to translate this for the jury.  What does this signify?

24  A.   So it's -- again, it's a call-in.  He called in.

25  Primary -- which is the "pri" -- calls in -- "ci" -- regarding

1  denied debit card transaction.  And the employee of the credit

2  union, the user 1954, transferred the call to Fiserv, which is

3  the fraud department for Visa, the debit card.

4  Q.    So essentially, does this reflect another call regarding a

5  declined --

6  A.    Yes.

7  Q.    -- debit card transaction?

8  A.    Yes.

9  Q.    And transferring it to Fiserv.  What is Fiserv again?

10  A.    The fraud department that handles transactions for your

11  Visa debit card or credit cards.  So if you're disputing or

12  need your transaction to go through, that's who handles it.

13  Q.    To be clear, did you personally, or someone at your

14  branch, deny his debit card transactions?

15  A.    No.

16  Q.    So I'd like to direct you now to December 28th, 2020.  Do

17  you recall a visit by Mr. Ervin to your branch that day?

18  A.    Yes.

19  Q.    What business did Mr. Ervin initially have with your

20  branch on that date?

21  A.    He wanted to deposit a $100 money order, but it was

22  payable to "Auto Key Card," which was a product that he told us

23  that he sells.  When we told him we couldn't take the check the

24  way it was payable -- because he was trying to put it into a

25  personal account and we don't allow that -- he got upset again,

Case 3:21-cr-00022-MMH-MCR   Document 279   Filed 06/06/23   Page 171 of 291 PageID 4854
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 310 of 563

VOL 3 - PG 171

1  said that we wouldn't be getting his business account,

2  mortgages, loans, et cetera, and that he wanted to take all of

3  his money out in cash.

4       We told him it would need to be a special order

5  because of the amount and it wouldn't be available until the

6  end of next week because we don't order every single day.

7       And then he continued to change the dollar amount of

8  what we could give him.  I told him initially, you know, "We

9  can give you 10,000."

10      He said "okay" and then said, "No, give me 9,000 and

11 I'll just come back every day or try other branches until I get

12 all my money."

13      I told him there's no guarantee at other branches

14 that they will have it available.

15 Q.   And to be clear, user 310, that's your user number?

16 A.   Yes.

17 Q.   So break that down.  Mr. Ervin -- and you were interacting

18 with Mr. Ervin on this date, correct?

19 A.   Correct.

20 Q.   When he came in, he initially wanted to deposit a money

21 order payable to Auto Key Card?

22 A.   Correct.

23 Q.   And would the bank do that?

24 A.   No.

25 Q.   And why is that?

1  A.    Because at the time there was no business account.  It was

2  only a personal account.  So we don't allow business

3  transactions into a personal account.

4  Q.    Did Mr. Ervin become upset at that point?

5  A.    Yes.

6  Q.    Did he advise you that he wished to close his account or

7  withdraw his account balance in cash?

8  A.    Yes.

9  Q.    And is that possible, normally, to --

10 A.    I mean, you can, it just depends on the amount.  But the

11 amount at that time, we did not have.

12 Q.    Do you recall approximately how much cash was in his

13 account at that time?

14 A.    60,000.

15 Q.    So you were not able to give him $60,000 in cash?

16 A.    No.

17 Q.    Do you recall if you offered him an alternative way of

18 taking his money out?

19 A.    A certified check, cashier's check.

20 Q.    Did he accept that?

21 A.    No.

22 Q.    So what did you offer him first in terms of the cash you

23 did have available?

24 A.    The 10,000.  I told him, you know, "We can do 10,000."

25 Q.    And did he accept that?

1  A.   At first the answer was, "Sure, give me the 10,000," but

2  then changed his mind and said, "No, just give me 9."

3  Q.   And again, to be clear, what happens on the bank's side of

4  the transaction -- of a cash transaction that exceeds $10,000?

5  A.   We have to do the Currency Transaction Report, the CTR.

6  Q.   And you or a teller would enter Mr. Ervin's information

7  and then it would go to whom?

8  A.   The IRS.

9        MR. MESROBIAN:  Your Honor, may I have a moment,

10  please?

11        THE COURT:  Yes.

12     (Government's counsel confer.)

13  BY MR. MESROBIAN:

14  Q.   So Ms. Sarkese, do you recall Mr. Ervin coming in after

15  December 28th and making any other cash withdrawals?

16  A.   I don't recall, to be honest.

17  Q.   If he had made additional cash withdrawals every day, you

18  know, not in the same 24-hour period, would that trigger a CTR

19  if they exceeded $10,000?  Or -- I'll ask this another way.

20        If someone withdrew $9,000 every 24-hour period,

21  would that exceed the threshold for a CTR?

22  A.   No.  If it's over the 24 hours -- if it's past 24 hours,

23  no, it would not.  If it's within 24 hours, the same -- so like

24  10 a.m. to 10 a.m., then yes.

25        MR. MESROBIAN:  No further questions, Your Honor.

```
 1              THE COURT:  Mr. Mesrobian.

 2              MR. MESROBIAN:  United States calls Andrea Useche.

 3         (Witness enters the courtroom.)

 4              THE COURT:  If you'll come right up here and remain

 5    standing for just a moment.

 6              THE WITNESS:  Yes, ma'am.

 7              COURTROOM DEPUTY:  If you can please raise your right

 8    hand.  Do you solemnly swear that the testimony you're about to

 9    give before this Court will be the truth, the whole truth, and

10    nothing but the truth, so help you God?

11              THE WITNESS:  I do.

12              COURTROOM DEPUTY:  You may have a seat.

13              THE WITNESS:  Thank you.

14              COURTROOM DEPUTY:  And if you could please state your

15    name for the record and spell your last name.

16              THE WITNESS:  Andrea Useche, U-s-e-c-h-e.

17         ANDREA USECHE, GOVERNMENT WITNESS, SWORN,

18                         DIRECT EXAMINATION

19    BY MR. MESROBIAN:

20    Q.   Ma'am, where are you employed?

21    A.   Community First Credit Union.

22    Q.   And what is your position?

23    A.   I am a fraud investigator.

24    Q.   What office do you work out of?

25    A.   Oh, well, we have a headquarters, so I'm in the
```

1  headquarters.

2  Q.   And how long have you been a fraud investigator at

3  Community First?

4  A.   Just over three years.

5  Q.   And is Community First Credit Union also known as CFCU?

6  A.   Yes.

7  Q.   And is CFCU a federally insured credit union?

8  A.   Yes.

9  Q.   So Ms. Useche, where were you employed before CFCU?

10  A.   I was a fraud investigator for VyStar for about seven

11  months.

12  Q.   And prior to that were you in law enforcement?

13  A.   Yes, sir.

14  Q.   And could you tell the jury about your law enforcement

15  experience.

16  A.   I graduated the academy in 2003.  I worked for -- was

17  hired by the Lake City Police Department and I worked there

18  from 2003 until 2008, I believe.  I think it was '08 -- '07,

19  2007.  And then I left there and I went to the Columbia County

20  Sheriff's Office.  I didn't go too far, but I went from blue to

21  green.  And I was with the sheriff's office until 2019.

22  Q.   And what roles did you hold at the Columbia County

23  Sheriff's Office?

24  A.   I was in patrol.  I worked for about a little over --

25  about a year and a half in the courthouse, and then in 2012 I

1  became a detective.  That was what I set out to do, was become

2  a detective.

3  Q.   And what type of cases did you investigate as a detective?

4  A.   The first year was all cases.  Everything they gave me.

5  It was everything.  And then after that I decided to specialize

6  in fraud, so I sort of began working with fraud cases, and I

7  did that until I left.

8  Q.   Now, in your current role with CFCU, could you describe

9  your role and responsibilities as a fraud investigator?

10  A.   Sure.  What I do is I -- what I'm tasked with doing is I'm

11  protecting the credit union from financial loss and risk and I

12  also protect our members from financial loss and risk.  And

13  that's a balance that I do.

14       And I do that by looking at the transactions that

15  come in that might have been flagged by our system to look at

16  to do a manual review to see if there's fraud going on.

17       Also, we have members that call in and say, "Hey,

18  this check hit my account.  I didn't write it," and that begins

19  a fraud investigation.

20  Q.   And when law enforcement is seeking information relating

21  to one of their investigations, who at CFCU is usually the

22  point of contact?

23  A.   I am the law enforcement liaison because of my affiliation

24  with law enforcement.  So, yes, I am the one that -- I have all

25  contacts.  Everything would be funneled to me or through me

1  for -- to assist law enforcement.

2  Q.   And similarly, if -- in your role as a fraud investigator

3  or if someone else at CFCU detects something to be reported to

4  law enforcement, who handles that?

5  A.   That would be me, correct.  I would file -- I would look

6  at the case, and then if it needed to be filed with law

7  enforcement, I'm the one who would be filing.

8  Q.   Is there a team within your group at CFCU which is

9  responsible for potential Bank Secrecy Act violations?

10  A.   Yeah, we have a BSA team.  All financial institution are

11  required to have a BSA team, and we have one.

12  Q.   And what type of activities are covered or reviewed by

13  those investigators?

14  A.   So the BSA team is responsible for monitoring accounts for

15  any suspicious activity, such as money laundering or financial

16  terrorism.  That's what we look at, so . . .

17  Q.   And is that team also responsible for filing documents

18  with the government pursuant to the bank's obligations under

19  the BSA?

20  A.   Yes, sir, that's correct.

21  Q.   So I'd like to talk about a few of those types of

22  documents.

23        Are you familiar with something called a Currency

24  Transaction Report?

25  A.   Somewhat familiar, yes, sir.

1   Q.   And is that also known as a CTR?

2   A.   Yes, sir.

3   Q.   And are you aware, what is the CTR designed to report?

4   A.   If the transaction amount that is deposited or withdrawn,

5   or a combination, within a 24-hour period -- but it really

6   wouldn't be 24 hours because it would only be during business

7   hours -- but within that 24-hour period, if the combination is

8   over $10,000, then it has to be reported.

9   Q.   And that's a transaction in cash, correct?

10   A.   Correct.  That is correct.

11   Q.   Separately, are you familiar with something called a

12   Suspicious Activity Report?

13   A.   Yes, sir, I am.

14   Q.   And what is a Suspicious Activity Report?

15   A.   It's a report that our BSA team makes to FinCEN.  It's a

16   required report.  Anytime there's suspicious activity, we are

17   required to report that.

18   Q.   And is there a particular threshold for reporting

19   suspicious activity?

20   A.   There can be.  One instance where a report is required

21   would be is if the transactions that occur, fraudulent or

22   suspicious, is $5,000 or more and the person who is maybe the

23   suspicious actor is known -- in other words, their name, we

24   know who they are, they're able to be identified -- then that

25   report has to be made and that information has to be given.

1              If the actor is unknown then the threshold moves up

2    to 25,000.  So if it's $25,000 or more, then the report has to

3    be given over to FinCEN.

4    Q.    And FinCEN is a United States government organization?

5    A.    Yes, sir.

6    Q.    And to be clear, both the CTR, the Currency Transaction

7    Report, and the Suspicious Activity Report, the SAR, are both

8    legally required for banks to track and file?

9    A.    That's correct, yes, sir.

10   Q.    Separately, are you familiar with something called a

11   Suspicious Incident Report?

12   A.    Yes.

13   Q.    What is that?

14   A.    So a Suspicious Incident Report, or what we call a SIR,

15   would be generated by actually anybody within the credit union

16   who had a feeling that something untoward was going on or

17   suspicious activity.  And it could be anything.  It could be

18   the behavior of a member who forged, behavior of something

19   going on, it could be a physical problem with, you know,

20   "Somebody" -- "I think somebody maybe moved the camera."

21   Anything that is -- would, in your mind, create suspicion of a

22   potential problem can be reported as suspicious activity -- a

23   Suspicious Incident Report.

24             Those reports go to the BSA team.  The BSA team then

25   determines whether or not that rises to a level of a SAR, or a

1  Suspicious Activity Report, or if that report needs to go to

2  another department.

3  Q.   So that's -- the SIR is a way of people working in

4  branches, for example, to report something that could be

5  suspicious for the fraud team to look at?

6  A.   Correct.

7  Q.   Separately, does your team, the fraud investigation team,

8  and the BSA team use computer programs or algorithms to

9  evaluate activity in customer accounts?

10  A.   Correct, yes, we do.

11  Q.   And could you talk a little bit about that and what those

12  programs use for.

13  A.   Right.  So we use a system that is -- we purchased the

14  system, and it is a case management system where we keep all of

15  our cases.

16        But the other thing that it does is it looks at the

17  transactions and the patterns of your accounts, and it looks

18  for anything that is out of pattern, suspicious.  For example,

19  if you were to make a deposit that was well above what you

20  would normally do as a pattern, that computer program would

21  pick up on that and it would send an alert to our team for us

22  to manually review, to see:  Well, what's going on with that?

23        Again, that's a balance between the risk of the

24  credit union and the risk of our member being involved in fraud

25  or being victimized.

1    Q.   And to be clear, it could be both unusual deposits or

2    unusual withdrawals as a means of preventing loss to the

3    accountholder?

4    A.   That's correct.  I was just using deposits as an example,

5    but yes, sir.

6    Q.   Do you, as a fraud investigator, sometimes become involved

7    when a client attempts to close a bank account?

8    A.   Under certain circumstances, yes.

9    Q.   And what would those circumstances be?

10   A.   Well, if somebody comes in and they are wanting to make a

11   large withdrawal of most of their money or all of their money,

12   typically what happens is that they're not going to encounter

13   our department first, they're going to go to a branch.  And

14   then the branch personnel, staff, would ask them, "Okay, well,

15   what are the circumstances?"

16        And if there's anything that would trigger something,

17   a concern, such as -- I'll give you an example.  If an elderly

18   person came in with maybe a younger person and the elderly

19   person said, "I want to withdraw all of my money," and the

20   younger person with them was sort of guiding them and telling

21   them what to do, that would create a suspicion under which they

22   would call my department.

23   Q.   So Ms. Useche, through your work as a fraud investigator,

24   did you become aware of a CFCU accountholder named Kristopher

25   Justinboyer Ervin?

1   A.   Yes.

2   Q.   And was that in or around January 2021?

3   A.   That's correct.

4   Q.   Without going into what anyone may have said to you, did

5   you receive -- specifically receive a referral to investigate

6   Mr. Ervin and both his account activity and any business

7   activity he was engaged in?

8   A.   Yes, sir.

9   Q.   To be clear, you've never met Mr. Ervin, correct?

10   A.   I have not.

11   Q.   Now, first, with respect just to his account activity,

12   what steps did you take to look into this referral?

13   A.   So, of course, you know, we would look at the account

14   transactional history to see what's occurring, to see if it

15   matches the information that we got in.

16          We would also begin looking at transactions, in other

17   words, cash in or cash out, or automatic transfers or automatic

18   deposits, known as ACHs, which stands for automatic

19   clearinghouse.  I don't know why they named it that.  But it

20   would be something like if you get a direct deposit, that comes

21   into your account through ACH.

22          So we would begin looking at that transactional

23   history and activity to see whether or not the information we

24   have is jibing with what we're seeing.

25   Q.   And do you use a particular program available to you in

1  your role to engage in that type of investigation?

2  A.    Our Core system.  Yes.  We have a Core system.  The Core

3  system that we use, it would be a system that everybody in the

4  credit union uses to keep track of the accounts.  We can make

5  notes, you know.  We can see each other's notes, and we can see

6  that transactional history.

7  Q.    And do you also have a program called Verafin?

8  A.    Yes.

9  Q.    And what's that?

10 A.    That was something that I described earlier.  That would

11 be our case management program.  That's also the program that

12 looks every day at the transactions that come in and then

13 generates alerts based on what it thinks we might need to look

14 at and review manually.

15 Q.    So with respect to Mr. Ervin, did you review his account,

16 as we were just discussing, for any significant recent

17 deposits?

18 A.    Yes.

19 Q.    And as well for significant cash withdrawals?

20 A.    Yes.

21 Q.    And do you recall responding -- or assisting with the

22 response to a law enforcement subpoena regarding bank records

23 for Mr. Ervin?

24 A.    Yes, sir, correct.

25          MR. MESROBIAN:  And Your Honor, may we publish what

 1  is already in evidence as Government Exhibit 95D, as in delta?

 2          THE COURT:  Madam Deputy, do you have 95D?

 3          COURTROOM DEPUTY:  Yes, Your Honor.

 4          THE COURT:  Okay.  I missed it.

 5          Go ahead.

 6  BY MR. MESROBIAN:

 7  Q.   And Ms. Useche, do you recognize this to be an application

 8  for an account at Community First Bank?

 9  A.   Yes, I do, yes, sir.

10  Q.   And if you can look, we've zoomed in on the middle portion

11  underneath -- and the heading is Member Information.  Who is

12  the member or applicant here?

13  A.   Kristopher Justinboyer Ervin.

14  Q.   And the address provided is 2409 Kirkwall Court?

15  A.   Yes, sir.

16  Q.   And the cell phone provided is (904) 405-9878?

17  A.   Yes, sir.

18  Q.   And the email address provided is JustinErvin80@aol.com?

19  A.   Yes, sir.

20          MR. MESROBIAN:  And Ms. Ganoe, if you can go to the

21  bottom part.

22  BY MR. MESROBIAN:

23  Q.   Here, does this reflect that there's a joint owner in this

24  account?

25  A.   Yes, sir.  It says "joint with right of survivorship," and

1    the box is checked.

2    Q.   And the name of this individual is Kris A. Ervin?

3    A.   Yes, sir.

4         MR. MESROBIAN:  And Ms. Ganoe, could we go to page 3

5    of this exhibit.

6    BY MR. MESROBIAN:

7    Q.   So if you could take a look at this top part there

8    underneath "Subsequent Actions."  Is this a subsequent

9    adjustment to this account in the account documents produced?

10   A.   Yes, sir.

11   Q.   And here it says "remove"?

12   A.   It does.

13   Q.   Remove a joint owner?

14   A.   Correct.

15   Q.   And if we go down to the bottom where it says "Joint Owner

16   Number 1."  This reflects that Kris A. Ervin, that joint owner

17   we were just looking at, was removed as a joint owner of this

18   account?

19   A.   That's correct, yes, sir.

20        MR. MESROBIAN:  So now, Your Honor, may I publish

21   Government Exhibit 95C?

22        THE COURT:  You may.

23        MR. MESROBIAN:  And Ms. Ganoe, if we can go to page

24   17 and zoom in on the top.  Yeah, down -- from "Kristopher

25   Justinboyer Ervin" down.

1   BY MR. MESROBIAN:

2   Q.   So Ms. Useche, do you recognize this to be an account

3   statement provided by Community First?

4   A.   Yes, it is.

5   Q.   And is this an account statement for -- looks like the

6   middle name is short one letter, but it's Kristopher

7   "Justinboye" Ervin at that same address we just looked at?

8   A.   Yes, sir.

9   Q.   With an account number ending in 3009?

10  A.   That's correct.

11  Q.   And the statement period for this statement is

12  December 1st of 2020 through December 31st of 2020?

13  A.   Yes, sir.

14  Q.   So if we could go to next page.  I'd like to focus just on

15  the top half of the screen here.  So I'd like to talk first

16  about the deposits in this account.

17        Looking at December 1st -- and I'll make -- I'm going

18  to try to make marks as best I can next to them -- is there a

19  deposit that says "ACH Stripe" in the amount of $1,814.69?

20  A.   Yes, sir, that's correct.

21  Q.   The next day, December 2nd, is there a deposit, ACH

22  Stripe, for $6,717.02?

23  A.   Yes, sir.

24  Q.   Day after that, is there a deposit, ACH Stripe, in the

25  amount of $3,734.82?

1   A.   Yes, sir.

2   Q.   Moving down.  The day after the last one we just looked

3   at, this one is December 4th.  Is there a deposit line that

4   says "ACH Stripe, $2,247.58"?

5   A.   Yes, sir.

6   Q.   And then going down to the bottom here, December 7th,

7   deposit, ACH Stripe, in the amount of $1,463.05?

8   A.   Yes, sir.

9        MR. MESROBIAN:  And if we could go to the next page,

10  please, Ms. Ganoe.

11  BY MR. MESROBIAN:

12  Q.   The day after that, December 8th, it says "deposit, ACH

13  Stripe, $2,340.31"?

14  A.   Yes, sir.

15  Q.   December 9th, the next day, deposit, ACH Stripe,

16  $4,620.67?

17  A.   Yes, sir.

18  Q.   Then finally, the day after that, December 10th, deposit,

19  ACH Stripe, $902.31?

20  A.   Yes, sir.

21  Q.   So I'll stop here.

22       Are you familiar with what Stripe is?

23  A.   Somewhat familiar.

24  Q.   And what do you know it to be?

25  A.   I know it to be a payment platform, very similar to

1  Square.  I personally have never paid a purchase with Stripe,

2  but I've made a purchase with Square.  And I understand it to

3  be an online payment platform.

4  Q.   And specifically, do you understand it to be a payment

5  processor for various -- for a business, essentially?

6  A.   Yes, sir, yes.

7  Q.   Is it common to see proceeds from a business or proceeds

8  from Stripe going into personal accounts at CFCU?

9  A.   No, sir.

10 Q.   And in your role as a fraud investigator, or general

11 investigator of the bank, what does that signify to you?

12 A.   So at Community First we do not allow business

13 transactions to flow through a personal account.  You have to

14 have a business account.

15       So when we see business transactions flowing through

16 a personal account, we typically will reach out and let the

17 member know, "You have to stop."  And if they don't stop, then

18 we're probably going to exit the relationship, which is

19 basically closing their account.  We don't allow that.

20       MR. MESROBIAN:  So now, Ms. Ganoe, if we could go to

21 page 22.

22 BY MR. MESROBIAN:

23 Q.   So here we have -- we're still in this December account

24 statement on a subsequent page.  And now I'd like to focus on

25 the balance in the account and then some withdrawals.  If we go

1  down -- actually, I'm sorry.  You're right in the right place.

2          So I'd like to focus on what the account balance was

3  at the beginning of the day on December 28th.  So I guess

4  that's -- the last transaction on December 27th, after that

5  debit of $124 for Amazon, was the balance $59,683.06?

6  A.   Yes, sir.

7          MR. MESROBIAN:  And could we go down to the next

8  half, please.

9  BY MR. MESROBIAN:

10 Q.   So starting on that same day, December 28th, does the

11 account statement reflect a series of cash withdrawals?

12 A.   I do see a series of cash withdrawals on that day, yes,

13 sir.

14 Q.   And these are denoted by the description "withdrawal by

15 cash"?

16 A.   Correct.

17 Q.   So first, on December 28th, there's one for $9,000; is

18 that right?

19 A.   That is the first cash withdrawal, yes.

20 Q.   And immediately below that on the same day, December 28th,

21 there's a withdrawal for $5,000?

22 A.   Correct.

23 Q.   And towards the bottom of the screen, on December 29th, is

24 there another cash withdrawal for $9,000?

25 A.   Correct.

1          MR. MESROBIAN:  If we could go to the next -- or --

2    correct.  Right there.

3    BY MR. MESROBIAN:

4    Q.   And on the next page of this document, on December --

5    well, there's another deposit on December 30th from Stripe of

6    $6,083.71?

7    A.   Yes, sir.

8    Q.   And immediately below that, on December 30th there's

9    another cash withdrawal of $9,000?

10   A.   Yes, sir, correct.

11   Q.   And then the next day after that, there -- on

12   December 31st there is a deposit of Stripe -- from Stripe of

13   $2,445.40?

14   A.   Yes, sir.

15   Q.   And then a withdrawal in cash of, again, $9,000; is that

16   right?

17   A.   Yes, sir, correct.

18          MR. MESROBIAN:  And Ms. Ganoe, could we go to page

19   25.

20   BY MR. MESROBIAN:

21   Q.   And Ms. Useche, do you recognize this to be another

22   account statement relating to this same account belonging to

23   Kristopher Justinboyer Ervin?

24   A.   Yes, sir.  This is the January statement of 2021.

25          MR. MESROBIAN:  So if we could go further down to the

1   next page, please.

2   BY MR. MESROBIAN:

3   Q.   So the last transaction we saw was December 31st, New

4   Year's Eve, I guess.

5           On January 2nd there's a withdrawal by cash again of

6   $9,000, correct?

7   A.   Yes, sir.

8   Q.   And was there a -- does there appear to be a deposit by

9   check that same day into the account?

10  A.   Yes.  I would say $100 deposit by check.

11  Q.   Then on January 5th, a little further down the screen, is

12  there another cash withdrawal for $9,000?

13  A.   Yes, sir.

14  Q.   The day after that, on January 6th, is there another

15  withdrawal of $9,000?

16  A.   Yes, sir.

17  Q.   Other than the second withdrawal we looked at on

18  December 28th for $5,000, were all of these cash withdrawals we

19  just looked at in the amount of $9,000?

20  A.   I believe so.

21  Q.   And the threshold you mentioned earlier for reporting cash

22  transactions is $10,000; is that right?

23  A.   I believe it's $10,000 and one penny.

24  Q.   In your experience, are regular cash transactions just

25  under the reporting threshold a red flag?

 1  A.   If there's a series of them, if there's a -- potentially a

 2  statement made -- there's a couple of other things that go into

 3  it, but generally speaking, yes.

 4  Q.   And again, how is that activity monitored at the bank, or

 5  at the credit union?  Is it manual or is it -- is there an

 6  algorithm that looks for activity like that?

 7  A.   Actually, both.  So a Suspicious Incident Report could

 8  come through and -- to report, "Hey, this person has come in

 9  every day and is withdrawing $9,000," in this case.  Or it

10  could actually be an algorithm through oUr Verafin system and

11  come in as an alert.

12  Q.   So separately, ma'am, I believe you testified earlier that

13  you were also asked to look into the nature of Mr. Ervin's

14  business?

15  A.   Yes, sir.

16  Q.   And without getting into what other individuals may have

17  said to you, did you become concerned that Mr. Ervin was

18  involved in illegal activity?

19  A.   Yes, sir.

20  Q.   Subsequently, did you take any actions in terms of

21  contacting law enforcement?

22  A.   Yes, sir.

23  Q.   And was that also in January of 2021?

24  A.   Yes, sir, that is correct.

25  Q.   Who did you reach out to?

1   A.    I reached out to Jeff Massie with the ATF.

2   Q.    And why did you reach out to ATF particularly?  Did --

3   I'll strike that.

4         Did you reach out to ATF because you believed

5   Mr. Ervin was involved in some type of firearms activity?

6   A.    I wasn't a hundred percent sure, but I had a -- I had a

7   suspicion that that was the case and I needed confirmation.

8   And since I'm not -- even though I handled firearms for my

9   whole career, I'm by no means a firearms expert, so I wanted an

10  expert opinion.

11  Q.    So you reached out to Jeff Massie?

12  A.    Yes, sir.

13  Q.    And how did you know Jeff Massie?

14  A.    I worked with Jeff Massie through Columbia County for

15  years as a detective when I was a detective.  He would help us

16  out.  He would come in, we would work cases together.  I

17  personally have never worked a case with Jeff, but I knew him

18  from his -- our detective division is very small.  It's only

19  nine of us.  So whenever he would come in, I would know who he

20  was.  And I had a good rapport with Jeff.

21  Q.    And was he no longer in the Jacksonville area?

22  A.    Correct.  I didn't even know that.  He had been reassigned

23  to Texas.  And he let me know that he was no longer in Columbia

24  County, or in the North Florida area.  He had been reassigned

25  to Texas.  So he gave me a referral.

```
 1   Q.    And subsequently did you have contact with Special Agent
 2   Hooker from ATF about the investigation into Mr. Ervin?
 3   A.    Correct.
 4   Q.    After that, after that point, did you respond to ATF when
 5   it had requests for assistance from the bank?
 6   A.    Yes, sir.
 7   Q.    Did that include pulling surveillance video related to
 8   certain transactions at a physical bank location?
 9   A.    Yes, sir.
10   Q.    And finally, I'd like to talk about the date of
11   Mr. Ervin's arrest, March 2nd, 2021.  Were you in contact with
12   ATF on that date?
13   A.    Yes, sir.
14   Q.    And what was the substance of that contact?
15   A.    I had received a message from Agent Hooker asking me if
16   there had been any debit card activity.  And I looked into the
17   account and I did see there was debit card activity at the
18   Harbor Freight in Lake City, and I let him know that.
19   Q.    And was it your understanding that ATF was going to reach
20   out to Columbia County Sheriff's Office to verify Mr. Ervin's
21   location in Lake City?
22   A.    That's -- that's -- yes, he did communicate that with me,
23   yes, sir.
24              MR. MESROBIAN:  May I have one moment, Your Honor?
25              THE COURT:  You may.
```

 1          (Government's counsel confer.)

 2               MR. MESROBIAN:  No further questions at this time.

 3               THE COURT:  Mr. King.

 4               MR. KING:  May it please the Court.

 5               THE COURT:  Go ahead.

 6                         CROSS-EXAMINATION

 7    BY MR. KING:

 8    Q.    Good afternoon, Ms. Useche.

 9    A.    Hello.

10    Q.    I wanted to go over just to clarify a couple things from

11    you and make sure that I have an understanding.

12               There's the S-I-R-s, which is the SIR?

13    A.    Yes, sir, correct.

14    Q.    And that is -- is that something that's unique to

15    Community First or is that shared with the federal government?

16    A.    It's unique to Community First.

17    Q.    All right.  And then there's the SAR?

18    A.    Correct.

19    Q.    And your department is responsible for generating those?

20    A.    No, sir.  I actually work in the fraud department.  Our

21    BSA team, they are responsible for filing those.

22    Q.    And how familiar are you with the SARs?

23               How familiar are you with SARs?

24    A.    Well, that's kind of an in-depth question.  Can you be a

25    little bit --

 1              THE COURT:  All right.

 2              COURTROOM DEPUTY:  If you can please state your name

 3    for the record and spell your last name.

 4              THE WITNESS:  Richard Jerome Roberts, R-o-b-e-r-t-s.

 5              THE COURT:  Go ahead, Mr. Mesrobian.

 6              **RICHARD ROBERTS, GOVERNMENT WITNESS, SWORN,**

 7                          DIRECT EXAMINATION

 8    BY MR. MESROBIAN:

 9    Q.   Good morning, Mr. Roberts.

10    A.   Hi.

11    Q.   Could you tell the jury the city and state where you live.

12    A.   Quentin Township, Michigan.

13    Q.   And what do you do for a living?

14    A.   I'm into plastics.

15    Q.   And do you own your own company?

16    A.   Yes, I do.

17    Q.   And what type of work does your company do --

18    A.   Actually, the wife does --

19    Q.   -- in plastics?

20    A.   -- but we're in the plastics.

21    Q.   So Mr. Roberts, are you required to be here today pursuant

22    to a subpoena?

23    A.   Yes, sir.

24    Q.   And prior to your testimony today, did the government

25    provide you a letter setting forth terms of immunity?

1    A.   Yes, sir.

2    Q.   Did you -- well, you understand that you just took an oath

3    to tell the truth today?

4    A.   Yes.

5    Q.   Is that your intention to do so?

6    A.   Oh, of course.

7    Q.   Mr. Roberts, do you own any firearms?

8    A.   Yes.

9    Q.   Is hunting or shooting firearms a hobby of yours?

10   A.   Yes, it is.

11   Q.   And what type of activities do you generally engage in?

12   A.   Hunting 90 percent of the time, with grandkids and my

13   kids.

14   Q.   Are you familiar with an item called the auto key card?

15   A.   Yes.

16   Q.   How did you first hear about the auto key card?

17   A.   On a YouTube.

18   Q.   Do you recall the name of the video that you watched?

19   A.   No.  It's with a gentleman that's got a bunch of tattoos.

20   I don't know his name.

21   Q.   Had you watched videos made by this particular person

22   before?

23   A.   Before I --

24   Q.   Before you watched the one where you learned about the

25   auto key card.

1   A.    I don't think so.

2   Q.    How did it -- how did you come to watch that video?

3   A.    It was just on there.  It's, you know, like shooting.  I'm

4   always looking, because I reload, so I'm on there just to

5   improve, to learn more about reloading.  And that's where I,

6   you know, found it.

7   Q.    Do you recall the title of that video?

8   A.    No, sir, I don't.

9   Q.    During that video, do you recall the individual who made

10  the video suggesting what someone could do with the auto key

11  card?

12  A.    Yeah, it turns your gun into automatic.

13  Q.    And do you recall him using any particular terms with

14  respect to converting the AR-15 into a fully automatic gun?

15  A.    No, sir.

16  Q.    Do you recall the term "lightning link" being used?

17  A.    Yeah, but I couldn't -- I thought that was, like,

18  different than the auto key card.

19  Q.    Do you recall if he provided instructions in that video on

20  how to use the auto key card to convert your AR-15 into a

21  machine gun?

22  A.    Yeah, you cut it out and install it.

23  Q.    At the time you watched this video, did you own an

24  AR-15-type rifle?

25  A.    Yes, sir.

1   Q.   How many?

2   A.   Four.

3   Q.   And so after you watched this video, did you purchase an

4   auto key card?

5   A.   Yes.

6   Q.   Why did you buy it?

7   A.   Just to horse around.

8   Q.   And what --

9   A.   You know, just thought it would be neat just to --

10   Q.   And when you say "horse around," what do you mean?

11   A.   Shooting, you know.  In shooting, just --

12   Q.   Did you intend to use the auto key card to convert your --

13   an AR-15 to be fully automatic?

14   A.   Yes.

15   Q.   And horse around, as you said?

16   A.   And horse around, yes.

17   Q.   How did you make that purchase?

18   A.   I don't know.  I bought it off another gentleman's site,

19   whoever sells it.

20   Q.   Do you recall there being different types or models of

21   auto key cards to choose from?

22   A.   Yes.  I think there was like two or three different ones.

23   Q.   And do you recall which model you purchased?

24   A.   A can opener or something like that it's called.

25   Q.   Do you recall how many lightning links or conversion

1  devices were on the card that you bought?

2  A.   I think three.

3  Q.   And you understood that -- at the time that there were

4  three of these devices engraved into this card?

5  A.   Yes, sir.

6  Q.   So did you make that purchase on or about January 13th,

7  2021?

8  A.   I don't know.  I'd have to look.

9  Q.   Ultimately, did you receive the auto key card that you

10 purchased?

11 A.   Yes, sir.

12        MR. MESROBIAN:  And Your Honor, I'd like to publish

13 at this point what is already in evidence as Government's

14 Exhibit 67AAA.

15        THE COURT:  Go ahead.

16        MR. MESROBIAN:  And if we could go down to page 2.

17        THE WITNESS:  Oh, boy.

18        MR. MESROBIAN:  And we'll focus on . . .

19        THE WITNESS:  Oh, that helps.

20 BY MR. MESROBIAN:

21 Q.   So on page 2 --

22 A.   I'm sorry.

23 Q.   -- there's what appears to be an Order Summary; is that

24 right?

25 A.   Oh, "bottle opener" it says.  Sorry.

1  Q.   So underneath Order Summary it says "Auto Key Card 3 in 1

2  with Bottle Opener, $99"; is that right?

3  A.   Yes, sir.

4  Q.   And do you recall that to be the item that you purchased?

5  A.   Yes, sir.

6         MR. MESROBIAN:  If we could zoom out, Ms. Ganoe.

7  Actually . . .

8  BY MR. MESROBIAN:

9  Q.   And there, right beneath Order Summary, it says Order 2637

10 placed on January 13th, 2021.  Does that sound like

11 approximately the date that you ordered the auto key card?

12 A.   Yeah, if that's mine, that's -- that's it.

13        MR. MESROBIAN:  If we could go to page 1, please.

14 BY MR. MESROBIAN:

15 Q.   The heading of that email is an -- it's from

16 autokeycards.com and it's addressed to Rick Roberts on

17 January 13th, 2021; is that right?

18 A.   Yes, sir.

19        MR. MESROBIAN:  If we can go to the email above that.

20 BY MR. MESROBIAN:

21 Q.   And on February 8th, 2021, there's an email above that

22 where Rick Roberts wrote, "Hi.  Can you tell me when this was

23 delivered?  Rick."

24        Did I read that right?

25 A.   Yes, but I -- I use the name "Rick."

1   Q.   And so do you recall sending this email inquiring about

2   your delivery?

3   A.   I believe so, yeah.

4          MR. MESROBIAN:   Ms. Ganoe, could you go up to the

5   next email.

6   BY MR. MESROBIAN:

7   Q.   And also on February 8th, 2021,

8   customerservice@autokeycard replied to you, "Hi, Rick.   Thank

9   you for your purchase and for contacting us.   We are sorry to

10  hear you have not received your order yet.   I checked the

11  tracking for your order and USPS shows it as still in transit.

12  It seems your order is lost.   We will send you a replacement

13  order asap.   Thank you for your patience while we make this

14  right.   Sincerely, Autokeycard.com."

15         Did I read that correctly?

16  A.   Yeah, yes.

17  Q.   Did you ultimately receive --

18  A.   Yeah.

19  Q.   -- the auto key card?

20  A.   Yes, sir.

21  Q.   And I'll just ask that you wait until I finish the

22  question --

23  A.   Oh, I'm sorry.

24  Q.   -- just so the court reporter doesn't have any -- that's

25  fine.

1          You did receive an auto key card ultimately?

2   A.   Yes.

3          MR. MESROBIAN:  Ms. Ganoe, can we go to the top

4   email.

5   BY MR. MESROBIAN:

6   Q.   So this is an email reply from Rick Roberts, which is you;

7   is that right?

8   A.   Yes, sir.

9   Q.   To Customer Service on February 19th, 2021, at 1:35 p.m.,

10  correct?

11  A.   Yes.

12  Q.   And you wrote, "Hi.  I cut the part out of your, quote,

13  can opener, unquote, but it will not allow me to run automatic.

14  I own a tooling shop, so I cut it right to your line.  It will

15  allow me to shot [verbatim] one shell and it will load the next

16  but not fire unless I release the trigger.  I'm using a S&W

17  AR-15 Sport Two.  I tried it in two different AR-15s.  Am I

18  doing something wrong?"  And it's signed "Rick."

19          Do you recall sending that email?

20  A.   Yes.

21  Q.   What happened prior to your sending this email?

22  A.   Well, my brother lives up in the Thumb area and I was at

23  his place.  And guys were shooting automatic rifles down a

24  desolate road.  And I -- when I left, I thought, wow, that's

25  strange.  So I pulled in, talked to those guys about what they

1   were doing.  And they had what looked like the same thing and

2   he said it wouldn't --

3   Q.   When you say it "looked like the same thing," what did it

4   look like?

5   A.   That design, that cutout on that metal.

6   Q.   The lightning link on the auto key card?

7   A.   Yes.

8        So he said it wouldn't work in their guns and I could

9   have it.

10       So I took it back.  And even though I didn't cut his

11  out, I cut that out to match the line in that piece that I

12  bought from him, and it still wouldn't work.

13  Q.   So you wrote in the first sentence here, "I cut the part

14  out of your can opener but it will not allow me to run

15  automatic."

16       Are you talking about the lightning link inside the

17  auto key card?

18  A.   Yeah, that's where I got -- I messed up and said "can

19  opener."  Bottle opener or something.

20  Q.   And then you stated, "I own a tooling shop so I cut it

21  right to your line."

22       Did you cut it or did someone else cut it?

23  A.   No, it was already cut.  But then I thought, well, gee,

24  maybe it's just not right.  So I filed it to match the one

25  that's on that 3 in 1 or whatever you call it so that it

 1  matched the lines.

 2  Q.    And you then state a little bit later, "I'm using a S&W

 3  AR-15 Sport Two."

 4          What is that?

 5  A.    That's the AR-15.  A gun.

 6  Q.    Did you attempt to install the lightning link into the S&W

 7  AR-15 Sport Two?

 8  A.    Yes, sir.

 9  Q.    And did it work or did it not?

10  A.    No.

11  Q.    How familiar were you or are you now with the internal

12  parts of an AR-15?

13  A.    I'm not.

14  Q.    Do you know what an SP1 bolt carrier is?

15  A.    Not at all.

16  Q.    Do you know what a high shelf versus a low shelf is?

17  A.    No, not at all.

18  Q.    And to be clear, Mr. Roberts, did you ever cut a lightning

19  link out of the auto key card that you purchased?

20  A.    No.

21  Q.    What did you do with your auto key card?

22  A.    Well, when I didn't get any response back for help, I then

23  went back on the YouTube to see if I was doing something wrong,

24  and that's when I learned that they were illegal.

25  Q.    When you say you went to learn if you were doing something

1   wrong, what do you mean?

2   A.   Well, I didn't know -- like maybe you had to bend it or

3   round off a corner, sharpen an edge or something.

4   Q.   So you were looking for additional instructions --

5   A.   Sure, yeah.

6   Q.   -- on how to convert your AR-15?

7   A.   Yes.

8   Q.   So after you found out that the auto key card was

9   purportedly illegal, what did you do?

10  A.   Well, before that I had sent a couple emails saying,

11  "Could you help me," or like -- whatever, "Can you help me?"

12        When I got nothing, I went on YouTube.  That's when I

13  found out they were illegal.  That's when I sent him another

14  email that says, "Don't call me back," or email me, something

15  like that, "I found out they're illegal."  And I literally cut

16  it up --

17        JUROR:  (Sneezes.)

18        THE WITNESS:  God bless you.

19        JUROR:  Thank you.

20  A.   -- I literally cut it up and threw it out the window into

21  a county ditch in little pieces.

22  Q.   Subsequently ATF agents came to your house, correct?

23  A.   Yes.

24  Q.   And did they interview you about the auto key card that

25  you had purchased?

```
 1   A.    Yes.

 2   Q.    Did they take anything of yours when they left your house?

 3   A.    Yes.

 4   Q.    What was that?

 5   A.    My gun.

 6   Q.    Is that the AR-15 you attempted to convert?

 7   A.    Yes, sir.

 8         MR. MESROBIAN:  May I have one moment, Your Honor?

 9         THE COURT:  You may.

10   BY MR. MESROBIAN:

11   Q.    Mr. Roberts, are you familiar with the process of how to

12   register a firearm under the National Firearms Act?

13   A.    No.  Normally if I buy like a shotgun, you know, I buy it

14   from a dealer who's, you know, been there forever by me.  And

15   then we have to fill out the paperwork, he does background

16   checks.

17         And then the AR-15s I bought on a site -- I forget

18   the name of the site, but then it's got to go to an FFL, I

19   think they call them.

20   Q.    So I'm speaking specifically about an NFA firearm; as an

21   example, a silencer or a machine gun or a machine gun

22   conversion device.

23   A.    No, sir, I have no idea.

24   Q.    Have you ever owned one of those types of things?

25   A.    No, sir.
```

 1   Q.   Did you register the auto key card with the ATF pursuant

 2   to the NFA?

 3   A.   Oh, no.  I didn't know you had to.

 4        MR. MESROBIAN:  Okay.  No further questions, Your

 5   Honor.

 6        THE COURT:  Mr. Larosiere.

 7                        CROSS-EXAMINATION

 8   BY MR. LAROSIERE:

 9   Q.   Good morning, Mr. Roberts.  So is it accurate that you

10   work in tool and die?

11   A.   Yes.  I've been in the injection mold building for

12   50 years.

13   Q.   That's a pretty high precision industry, injection

14   molding, right?

15   A.   Yes, it is.

16   Q.   So when you looked at the auto key card, the single piece

17   of steel, that line on there is pretty wide, right?  Maybe

18   40-thou?

19   A.   Yes.

20   Q.   That's thousandths of an inch?

21   A.   Yeah.

22        Your hair's about three-thousandths of an inch.

23   Q.   Right.  So it's like a -- in terms of thickness, that

24   would be like about an eighth inch, so like a Sharpie line,

25   something like that?

 1  about to give before this Court will be the truth, the whole

 2  truth, and nothing but the truth, so help you God?

 3          THE WITNESS:  I do.

 4          COURTROOM DEPUTY:  You may have a seat.  If you could

 5  please state your name for the record and spell your last name.

 6          THE WITNESS:  My name is Cody James Toy, T-o-y.

 7          THE COURT:  Go ahead, Ms. Taylor.

 8          MS. TAYLOR:  Yes, Your Honor.

 9      **OFFICER CODY JAMES TOY, GOVERNMENT WITNESS, SWORN,**

10                    DIRECT EXAMINATION

11  BY MS. TAYLOR:

12  Q.   Officer Toy, could you please tell the jurors where you

13  work.

14  A.   I work for the Bureau of Alcohol, Tobacco, Firearms, and

15  Explosives.

16  Q.   And what's your -- in what capacity?

17  A.   I'm a Firearms Enforcement Officer.  I am currently the

18  Branch Chief of the Firearms Technology Criminal Branch.

19  Q.   And what does a Firearms Enforcement Officer do?

20  A.   We do multiple things in our office.  The two main things

21  that we focus on is criminal evidence evaluations and industry

22  evaluations.

23          Criminal evidence, we evaluate and classify evidence

24  that is sent to us by agents all over the country and classify

25  them -- the different items under federal law.

1          On the industry side, members of the industry, the

2     firearms industry, can send us samples of weapons or other

3     items that they intend to market and sell, and we can give them

4     a classification of what those items are.

5     Q.   And in general, as a Firearms Enforcement Officer, do you

6     personally review some of these items and evaluate them?

7     A.   Yes.

8     Q.   And is that for purposes of whether they may or may not be

9     governed by the National Firearms Act?

10    A.   That is correct, as well as the Gun Control Act.

11    Q.   And in particular, do you have responsibility for

12    evaluating items that may be machine guns?

13    A.   Yes, I do.

14    Q.   And what did you do -- how long have you been a Firearms

15    Enforcement Officer?

16    A.   I've been a Firearms Enforcement Officer for about seven

17    years now.

18    Q.   And what did you do prior to becoming a Firearms

19    Enforcement Officer?

20    A.   Before I worked for the ATF I worked as a contractor for

21    the FBI on the National Name Check Program, running backgrounds

22    on individuals trying to get status for either jobs with the

23    government or immigration status.  Before that I worked

24    security at that location, armed physical security, where I had

25    to maintain proficiency with a side arm on an annual basis.

1   And before that I was in the United States Marine Corps for

2   four years, in the infantry, where I was trained on anything

3   from a 9 millimeter pistol all the way up to heavy machine guns

4   and certain explosives.

5   Q.   And what kind of educational background do you have?

6   A.   I joined the Marine Corps straight out of high school.

7   And I've taken some classes in college.  But outside of that, I

8   have a lot of training in the firearms field; multiple classes

9   with different armorer groups, directly worked with

10  manufacturers, as well as outside individuals that provide

11  classes for certain types of weapons.  I have over ten

12  different certifications on particular firearm groups.  I also

13  have been to courses on silencer manufacturing, silencer design

14  principles.

15          Within the ATF, for our training to become a Firearms

16  Enforcement Officer we have over 800 hours of in-house

17  training.  That's an OJT-style of training.  We have the

18  National Reference Collection at our location, which houses

19  roughly 15,000 different firearms, from pistols and rifles to

20  machine guns, rocket-propelled grenades and things like that,

21  as well as an expansive library that has periodicals as well as

22  books that are written on firearms that we can go back to and

23  see design history and how things function.

24  Q.   And you mentioned armorers.  What is an armorer?

25  A.   So an armorer is basically somebody who is trained on a

1  particular platform of weapon to be able to diagnose issues

2  that that weapon is having as well as make repairs and change

3  parts and things like that.

4  Q.   Are you an armorer?

5  A.   As a profession, no.  I am a certified armorer in multiple

6  different weapons systems, but I am not an armorer.

7  Q.   Now, Officer Toy, at some point did Special Agent Hooker

8  contact you regarding an investigation of suspected lightning

9  links?

10  A.   Yes.

11  Q.   And around when was that?

12  A.   I believe that was January of 2021.

13  Q.   And did you have a conversation with Special Agent Hooker

14  with regard to obtaining a sample for testing?

15  A.   Yes.  The way our process works is the agents will send it

16  in to our office, we will get a workflow through the computer.

17  Once we get that workflow, we then go pick up that piece of

18  evidence from our evidence technician, make sure that the

19  workflow has the correct information on it that is actually

20  received with the package, and then we'll sign the evidence

21  tags to make sure that we have chain of custody.

22       MS. TAYLOR:  Your Honor, may I approach with

23  Government's -- already in evidence is Exhibit 20A, 25A, and

24  25B?

25       THE COURT:  Go ahead.

1          MS. TAYLOR:  And then I would also like to approach

2    with some exhibits that have not been admitted, which are

3    Number 63, 64, 65, and 66.

4          THE COURT:  Okay.

5    BY MS. TAYLOR:

6    Q.   First, Officer Toy, if you could look at Exhibit 20A

7    that's already in evidence.  Is that one of -- is that an item

8    that you received for examination?

9    A.   Yes, it is.

10   Q.   And is this an item that you received from Special Agent

11   Hooker?

12   A.   Yes, it is.

13   Q.   And did you take photos of it as it came into your

14   possession and as you tested it?

15   A.   Yes, I did.

16   Q.   Could you please look at Exhibit 64 and describe what is

17   in Exhibit 64.

18   A.   Exhibit 64 is a series of photographs that I took

19   throughout the process of examining the evidence and cutting it

20   and completing the device.

21   Q.   So the item that's in the photos in Exhibit 64, is that

22   item 20A -- Exhibit 20A?

23   A.   Yes, it is.

24          MS. TAYLOR:  I would move for admission of

25   Exhibit 64, Your Honor.

```
 1                 MR. KING:  Without objection.

 2                 MR. ZERMAY:  Without objection.

 3                 THE COURT:  54 is admitted.

 4                 MS. TAYLOR:  Sorry, it's 64, Your Honor.  May we

 5       publish Exhibit 64?

 6                 THE COURT:  You may.

 7              (Government's Exhibit 64 admitted in evidence.)

 8                 MS. TAYLOR:  If we could please have page 1.

 9       BY MS. TAYLOR:

10       Q.   So this is a photo that you took?

11       A.   Yes, it is.

12       Q.   And what's depicted in this photo?

13       A.   What's in this photo is the image of the evidence as I

14       received it in my office next to a ruler just to give it some

15       size comparison.

16                 MS. TAYLOR:  Could we have page 2, please.

17       BY MS. TAYLOR:

18       Q.   What's shown here?

19       A.   So this is a close-up view of what the actual device is:

20       The picture -- the image on the piece of metal, the two parts

21       that would be needed to make a lightning link.

22       Q.   So you said it's an image on the piece of metal.  Can you

23       describe what the image appeared to be to you when you received

24       this item.

25       A.   It appeared to me that this was a laser etching of a
```

Case 3:21-cr-00022-MMH-MCR   Document 283   Filed 06/07/23   Page 142 of 250 PageID 5846
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 354 of 563

VOL 7 - PG 142

1  lightning link, which is a machine gun conversion device.

2  Q.   And is the -- and so in this particular picture there's

3  two outlines visible, correct?

4  A.   That is correct.

5  Q.   And are those the two pieces that are required to make a

6  complete lightning link?

7  A.   That is correct.

8  Q.   And were you able to recognize the outlines as being

9  outlines for a lightning link when you received this item?

10  A.   Yes, I did.  We have multiple items like this in the

11  reference collection that I have seen and evaluated.

12  Q.   And you stated that it appeared that the outlines were

13  made using a laser?

14  A.   It appears that they might have been manufactured using a

15  laser etcher that would remove a small amount of material from

16  the surface of the device to show the outline of the device.

17  Q.   So the outline is actually at some depth into the material

18  as opposed to being on the surface of the material?

19  A.   That is correct.  The material has been removed or

20  displaced to create this image.

21  Q.   Now, how are you -- how are you able to recognize this as

22  being a potential lightning link?  Is that a new design or

23  something you had seen before?

24  A.   No.  This is definitely something that's been around

25  since, I believe, the early 1980s.  We have -- like I said, we

1    have some of these devices in our collection.  As well as part

2    of our training to become an FEO, we go through multiple

3    different machine gun conversion devices so that we can

4    identify them when we go on field assists and when we get them

5    into our office.

6    Q.    And I want to talk to you a little bit about how a

7    lightning link works.

8            MS. TAYLOR:  If we could please, Ms. Ganoe, have

9    Exhibit 2 at 4 minutes and 10 seconds.

10           We're good right here.  We're at 4 minutes and I

11   think that said 17 seconds.

12   BY MS. TAYLOR:

13   Q.    This is a still shot from a video, correct?

14   A.    Correct.

15   Q.    And there's a diagram in the corner of that still shot?

16   A.    That is correct.

17   Q.    And in this still shot, what is the -- what's visible in

18   the diagram?

19   A.    What you're looking at is the internal components of an

20   AR-15-type firearm.  With those components, there's also a

21   lightning link that is depicted in there.

22   Q.    I'm going to try to draw on this screen.

23           There's a flat line where I've indicated with a few

24   dots; is that correct?

25   A.    That is correct.

Case 3:21-cr-00022-MMH-MCR   Document 283   Filed 06/07/23   Page 144 of 250 PageID 5848
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 356 of 563

VOL 7 - PG 144

1  Q.   And what is that flat line?

2  A.   That is the larger portion in that -- the close-up picture

3  that I -- that you had up earlier of a lightning link.  We can

4  refer to it sometimes as the body, the main body of the device.

5  Q.   And is that the part that has the two cutouts?

6  A.   That is correct.

7  Q.   And then -- this is not cooperating with me, but towards

8  the right side of where the body is, is there another piece

9  that's sticking up?

10  A.   That is correct.  Right there, where you just were able to

11  get the line on there, that is the other device.  We sometimes

12  refer to it as the paddle or the connector.

13  Q.   And that's the small, kind of rectangular piece?

14  A.   That is correct.

15  Q.   And so is this image -- is this image accurately depicting

16  how a lightning link would fit into an AR-15?

17  A.   Yes, it is.

18  Q.   And can you tell the jurors a little bit about what the

19  other parts are that interact with a lightning link when it's

20  installed?

21  A.   So the big hook piece that you see on the image is the

22  hammer of the firearm.  The hammer is held in place by what is

23  referred to as the disconnector.  The disconnector is at the

24  very front of that main body, and it's also a little hook

25  shape.  The two hooks connect to each other.

1   Q.   This thing that I'm coloring on right now, which one is

2   that?

3   A.   That's the hammer.

4   Q.   All right.  And where is the disconnector?

5   A.   The disconnector is underneath of the hammer at the front

6   of the main body of the device.

7   Q.   Is it kind of shaped like a little wave?

8   A.   Yes.

9   Q.   And then what are the other key parts?

10  A.   So you also see the trigger, which is underneath the

11  disconnector.  And those are your main fire control components

12  of an AR.

13  Q.   So how does the lightning link work to cause automatic

14  firing?

15  A.   The lightning link basically is -- what it does is when

16  the bolt moves across the top of the paddle, it pushes the top

17  of it forward, which pulls the bottom of it backwards using the

18  lug, which is that little hole in front of the paddle that you

19  can see up there.  There will be a pin that goes across there,

20  and it uses that as a fulcrum to pull the bottom of that device

21  backwards, which in turns pulls the disconnector back and

22  releases the hammer to allow it to continue to strike the

23  firing pin.

24  Q.   All right.  And Ms. Ganoe is attempting to help me with a

25  laser pointer because my efforts at using the little drawing

```
 1  tool are not working out very well.

 2          But this area kind of along the top, is that where

 3  the bolt would be?

 4  A.   That is correct.

 5  Q.   And then this piece is what?

 6  A.   That would be the hammer.

 7  Q.   And this piece here, the little wavy shaped piece?

 8  A.   That's the disconnector.

 9  Q.   And then this piece down here?

10  A.   Would be your trigger.

11  Q.   And so the paddle is the part sticking straight up back

12  here?

13  A.   That is correct.

14  Q.   That's the part of the lightning link?

15  A.   Yes.

16  Q.   Okay.  And you said that part does what?

17  A.   So the hole that's right in front of that paddle is the

18  takedown pin for the device to -- or for the weapon to remove

19  the upper portion and the lower portion from each other.

20  Q.   Am I generally indicating the hole that you're talking

21  about?

22  A.   Yes, you are.

23  Q.   Okay.

24  A.   So the paddle then uses that as a fulcrum to press

25  against.  So when the bolt hits the top of the paddle, it
```

1  pushes it forward, pulling the bottom of the device backward,

2  or the body backwards, which pulls that hook, the disconnector,

3  off of the hammer, which allows the hammer to then hit the

4  firing pin.

5  Q.   And so when you pull -- if you pull the trigger with the

6  lightning link installed in a properly configured AR-15, what's

7  the result?

8  A.   If it's designed properly and everything works the way

9  it's supposed to, the weapon will fire automatically.

10  Q.   And what would cause that weapon to stop firing

11  automatically if it's working correctly?

12  A.   Run out of ammunition or a malfunction.

13  Q.   Or if you released the trigger, would it stop firing?

14  A.   Yes, and if you release the trigger, yes.

15  Q.   Could we go back to -- well, actually, first, let's talk

16  about what you did with Exhibit -- Exhibit 20A is the auto key

17  card that you received from Special Agent Hooker, correct?

18  A.   That is correct.

19  Q.   How did you proceed to test it?

20  A.   So I took it back to my work station.  And the first thing

21  that I do is take pictures of the device to make sure that we

22  accurately depict what it looks like when it comes to our

23  office.

24         Occasionally we get items in that are unsafe to fire

25  or that during the process of firing they become damaged, so we

1  want to make sure that we take our pictures first so that we

2  can see what they were.

3          With this particular device, we were requested to

4  remove one of the items from it to see if we could get it to

5  actually function in a weapon.

6          So we used -- or I used the most commonly available

7  tool that I had that would do the job, which was a Dremel tool,

8  and a rotary bit on there that is a cutoff wheel.  And then I

9  traced the lines on the device and removed it from the card.

10  Q.   And could you please look at Exhibit 65 and tell us what

11  that is.

12  A.   That is an image of my Dremel with the cutoff wheel and

13  the Exhibit 20A on my work bench.

14  Q.   And is that Dremel the exact tool that you used to cut

15  this lightning link out?

16  A.   Yes, it.

17          MS. TAYLOR:  I move for admission of Exhibit 65.

18          MR. KING:  Without objection.

19          MR. LAROSIERE:  Without objection.

20          THE COURT:  65 is admitted.

21      (Government's Exhibit 65 admitted in evidence.)

22  BY MS. TAYLOR:

23  Q.   And we're pulling up 65 on the screen.

24          MS. TAYLOR:  Ms. Ganoe, could you zoom in on the

25  picture.

1   BY MS. TAYLOR:

2   Q.   So tell me which part -- okay.  You -- was this a

3   standard, off-the-shelf Dremel tool?

4   A.   Yes, it is.

5   Q.   Did it have one accessory added to it?

6   A.   Yes.  I used an extension, which is the long cord off to

7   the left there.

8   Q.   Am I indicating that with a laser pointer?

9   A.   That is correct.

10  Q.   And so where is the cutoff wheel?

11  A.   The cutoff wheel is toward the center of the picture,

12  right there.

13  Q.   So it's sort of at the end of the smaller wand?

14  A.   That is correct.

15  Q.   And then -- and this Dremel, it's something that you could

16  buy at -- where?

17  A.   You could buy it at a hardware store, Walmart, anywhere

18  that sells tools such as this.  And they sell other ones, this

19  is just the brand name, is Dremel.

20  Q.   And Officer Toy, are you a machinist?

21  A.   I am not.

22  Q.   Had you ever cut out a lightning link from a metal card

23  like this before?

24  A.   I had never done that before.

25  Q.   This was the very first time?

1    A.    That is correct.

2    Q.    Do you have experience with metal working?

3    A.    The only experience I have in metal works was high school,

4    in a shop class, about a year of welding, and that was it.

5    Q.    You're not a Dremeling expert?

6    A.    I am not.

7    Q.    Now, were you able to cut one of the lightning links out

8    of Exhibit 20A?

9    A.    I was.

10   Q.    And how did you -- did you do that using the Dremel?

11   A.    I did.

12   Q.    Did you use any other tools?

13   A.    I used a hand file to clean up some of the burrs or little

14   pieces of sharp metal that were left to make sure that it fit

15   together properly.

16   Q.    And how long did it take you to cut that -- both pieces of

17   that first lightning link out of that card?

18   A.    I believe that took approximately 37 minutes.

19   Q.    And this first card, the first lightning link that you cut

20   out, did it have the internal cutouts already completed?

21   A.    The cutouts were already done, yes.

22   Q.    So you didn't -- did you do anything to modify those

23   internal cutouts?

24   A.    I did not.

25   Q.    And you stated you just -- you cut along the line of the

 1  outline?

 2  A.    That is correct.

 3          MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 64,

 4  page 3.

 5  BY MS. TAYLOR:

 6  Q.    And this is another photo that you took?

 7  A.    Yes.  That is a photo of the device after I had removed it

 8  from the card.

 9          MS. TAYLOR:  And could we have page 4, please.

10  BY MS. TAYLOR:

11  Q.    And what are we looking at here?

12  A.    That same device that I had removed from the card.

13  Q.    And the top part being the body and the bottom part being

14  what you're calling the paddle?

15  A.    That is correct.

16  Q.    Did the -- did you have to bend it?

17  A.    No.

18  Q.    Did you do any thinning of it, sanding it to make it

19  thinner?

20  A.    I do believe that I had to remove some of the material off

21  of the paddle.  And I think I used a belt sander or a grinding

22  wheel to remove some of the material because it was just a

23  little bit too tall.

24          Different AR-type firearms from different

25  manufacturers have different tolerances, and so they're not all

Case 3:21-cr-00022-MMH-MCR   Document 283   Filed 06/07/23   Page 152 of 250 PageID 5856
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 364 of 563

VOL 7 - PG 152

 1   the same.  So what would work in one firearm might not work in

 2   another one.  It would have to be what we refer to as hand

 3   fitting to make sure that it works.

 4            MS. TAYLOR:  Your Honor, may I --

 5   BY MS. TAYLOR:

 6   Q.   And did you have to bend it or anything like that?

 7   A.   No, I did not bend it.

 8            MS. TAYLOR:  Your Honor, may I approach and obtain

 9   back from Officer Toy Exhibit 20A?

10            THE COURT:  20A?

11            MS. TAYLOR:  Yes.

12            THE COURT:  Go ahead.

13   BY MS. TAYLOR:

14   Q.   Officer Toy, I was asking you questions about whether the

15   paddle piece fit through the precut hole.

16            MS. TAYLOR:  Could we have Exhibit 64, page 5,

17   please.

18   BY MS. TAYLOR:

19   Q.   What is shown here?

20   A.   That is the device assembled with the paddle through the

21   hole.

22            MS. TAYLOR:  And could we have page 6, please.

23   A.   That is it, just turned upside down to show that it did

24   fit through the hole.

25            MS. TAYLOR:  And if we could have the ELMO, please.

1  BY MS. TAYLOR:

2  Q.    I'm just going to line up the cutout pieces with one of --

3  so there's still two lightning links that you did not cut out

4  on this card, correct?

5  A.    That is correct.

6  Q.    So I'm just going to place the cutout pieces over the --

7  one of the not-cut-out lightning links.

8          And as you said, you cut to the line?

9  A.    That is correct.

10 Q.    I'm zooming in on the end of the paddle area.  Is there

11 a -- you mentioned that there was a small amount of material

12 that you removed from the end of the paddle?

13 A.    That is correct.

14 Q.    Does it appear to be about a millimeter or less?

15 A.    Yes, ma'am.

16 Q.    Otherwise, this cutout lightning link is to the line that

17 was engraved on the auto key card?

18 A.    That is correct.

19 Q.    After you cut out this lightning link, did you do any

20 testing of it to see whether it would function in a rifle?

21 A.    Yes.  I went to the National Reference Collection and I

22 pulled out an AR-type rifle, and I took it back to my work

23 station and installed the device and performed a function test.

24 Q.    What is a function test?

25 A.    A function test tells you how a firearm is functioning,

1  whether it's semiautomatic or fully automatic or if there is a

2  potential malfunction happening with the weapon.

3  Q.   Is that something you do with ammunition in the firearm?

4  A.   No, this would be without ammunition.

5  Q.   And so -- but can you -- do you pull the trigger during

6  the function test?

7  A.   Yes, you do, which is why we don't have ammunition in it.

8  Q.   Okay.  So did you learn anything from the function test

9  that you did?

10  A.   Yes.  This device is typically used with a semiautomatic

11  bolt carrier.  But whenever I used a semiautomatic bolt

12  carrier, it wasn't reliably functioning the way it was supposed

13  to, so I attempted to use a machine gun -- an M16 -- bolt

14  carrier.  And the machine gun bolt carrier actually worked

15  better than the semiautomatic one did.

16  Q.   And when you say "a semiautomatic bolt carrier," was it an

17  SP1 bolt carrier that you --

18  A.   Yes, it was.

19  Q.   And when you said it didn't work how it was supposed to,

20  what do you mean exactly?

21  A.   It wasn't causing the weapon to fire automatically

22  reliably.  Once or twice it would function test as a machine

23  gun, but I couldn't get it to do it consistently.  So at that

24  point I just attempted another bolt.  And that machine gun --

25  the M16 -- bolt carrier actually worked better and it was more

1  consistent, allowing the weapon to appear to be firing

2  automatically.

3  Q.   According to the function test?

4  A.   Correct.

5  Q.   And then did you also test fire the weapon -- and let's

6  talk a little bit about the rifle that you got.  Who owned that

7  rifle?

8  A.   That particular rifle was part of our collection at -- in

9  Martinsburg at the reference collection.

10  Q.   And is it an AR-15 rifle?

11  A.   It is an AR-15 variant, yes.

12  Q.   Is it semiautomatic?

13  A.   Yes, it is.

14  Q.   Without having the auto key card installed, would that

15  rifle fire automatically as a machine gun?

16  A.   No, it would not.

17  Q.   Did it have all off-the-shelf parts in it?

18  A.   Yes, it did.

19  Q.   And when you -- so you did test fire -- test fire the

20  rifle with the auto key card?

21  A.   I did.

22  Q.   And what was the result?

23  A.   I was able to get the rifle to fire automatically more

24  than once.  It wasn't perfect.  There was occasional times

25  where it wouldn't fire automatically, but it was consistently

 1  firing at least two to three rounds during the live fire.

 2  Q.   And I want to ask you about the M16 bolt carrier.  Is that

 3  something that's commonly available?

 4  A.   Yes, it is.

 5  Q.   Is that a part that is illegal to possess without

 6  registering it?

 7  A.   No, it is not.

 8  Q.   Can anyone possess an M16 bolt carrier?

 9  A.   Yes, they can.

10  Q.   Even a prohibited person?

11  A.   Yes.

12  Q.   And so just the design of the M16 bolt carrier for some

13  reason just worked better?

14  A.   Yes.

15  Q.   Now, do you know whether the trigger assembly in that --

16  in the rifle that you tested the auto key card with, was it

17  also a standard trigger assembly?

18  A.   Yes, it was a semiautomatic trigger assembly.

19  Q.   Semiautomatic?

20  A.   Uh-hmm.

21  Q.   Yes?

22  A.   Yes.

23  Q.   And do you know whether it had a high or low shelf?

24  A.   I believe it had a high shelf in it.

25  Q.   And what's the difference between a high shelf and a low

1  shelf?  What does that mean?

2  A.    In the rear of the receiver of AR-type firearms there's an

3  area that is either higher or lower that was used to prevent

4  certain conversion devices from being installed in that

5  firearm.  But there's no requirement for that.  And again, it's

6  all just dependent upon individual manufacturers, what the

7  depth is at that rear area.

8  Q.    Are there different kinds of conversion devices that work

9  better with a high shelf versus a low shelf?

10  A.    Yes.  So a lower shelf you could use something like a

11  drop-in auto sear, which is another machine gun conversion

12  device.  That particular type of conversion device requires

13  more parts to be changed out.  You'd have to use M16 fire

14  control components in that one.  So the hammer, trigger,

15  selector, and disconnector need to be machine gun parts.

16          Where something like the lightning link, the only

17  thing that you have to do is install it.  And typically a

18  semiautomatic bolt carrier will work, and sometimes a machine

19  gun bolt carrier will.

20  Q.    But to be clear, even with the drop-in auto sear, you said

21  that it requires more machine gun parts:  trigger assembly,

22  bolt carrier, et cetera?

23  A.    That is correct.

24  Q.    But the only thing that's the machine gun is the actual

25  drop-in auto sear?

1  A.   That is correct.

2  Q.   And all of those machine gun parts, the trigger assembly,

3  the bolt carrier, those are just available to anyone who wants

4  them?

5  A.   Yes, they are.

6  Q.   In general, not capable of causing automatic fire on their

7  own?

8  A.   If they're all installed on an AR firearm, there's a good

9  likelihood that it will cause it to fire automatically, which

10  is why the ATF doesn't suggest putting the machine gun

11  components in a semiautomatic.  But there's nothing to say that

12  somebody can't.  But once it does fire automatically, that

13  constitutes a machine gun at that point.

14  Q.   Which would need to be registered?

15  A.   That is correct.

16  Q.   Did Special Agent Hooker send you any additional exhibits

17  for examination?

18  A.   Yes.

19  Q.   Did he ask you to cut out one of the types of auto key

20  cards that did not have the internal cutouts already made?

21  A.   Yes, he did.

22  Q.   Could you please -- you have Exhibit 25A in front of you,

23  correct?

24  A.   Yes.

25  Q.   And do you recognize that as being another auto key card

```
 1  that you tested?

 2  A.   Yes, I do.

 3  Q.   And could you please look at Exhibit 66 and describe

 4  what's in Exhibit 66.

 5  A.   Exhibit 66 is more photographs that I took of Exhibit 25A.

 6            MS. TAYLOR:  I would move --

 7  BY MS. TAYLOR:

 8  Q.   And those were taken while you were conducting your

 9  examination?

10  A.   That is correct.

11            MS. TAYLOR:  I would move for admittance of

12  Exhibit 66.

13            MR. KING:  Without objection, Your Honor.

14            MR. LAROSIERE:  Without objection.

15            THE COURT:  66 is admitted.

16       (Government's Exhibit 66 admitted in evidence.)

17            MS. TAYLOR:  Could we please have the first page?

18            I think we need to switch over to the . . .

19  BY MS. TAYLOR:

20  Q.   So we're looking at the first page of Exhibit 66.  Is this

21  a photo that you took of the next item that you tested for

22  Special Agent Hooker?

23  A.   Yes, it is.

24  Q.   And this was -- no cutouts had been completed on this

25  particular card, correct?
```

1    A.    That is correct.

2    Q.    And did you -- did you attempt to cut out the lightning

3    links from this card?

4    A.    Yes, I did.

5    Q.    How did you go about doing that?

6    A.    I did it in the same manner as I did with the previous

7    card, by using a Dremel tool.

8    Q.    Did you -- how did you try to cut out the internal

9    cutouts?

10   A.    The internal cutouts I used a drill press to put roughly

11   four holes into the cutout areas, and then I connected the

12   holes by using the cutoff wheel.

13   Q.    Were you successful the first time you tried to cut out

14   one of these?

15   A.    No, I was not.

16   Q.    What happened?

17   A.    I ended up accidentally cutting the side of the main body,

18   putting a gap between the front of it.

19         MS. TAYLOR:  Could we have the next page.

20   BY MS. TAYLOR:

21   Q.    Is that what's shown in this second page of Exhibit 66?

22   A.    Yes, it is.

23         MS. TAYLOR:  And could we zoom in on that picture.

24   BY MS. TAYLOR:

25   Q.    So there's a little arrow pointing to the main body of the

1  lightning link, correct?

2  A.   Yes.

3  Q.   And so you accidentally nicked it there; is that what

4  happened?

5  A.   Yes, I did.

6  Q.   And did you test this particular device to see whether it

7  function tested as a fully automatic machine gun?

8  A.   I did attempt to, yes.

9  Q.   What happened when you function tested it?

10  A.   It function tested as if it was going to allow it to fire

11  automatically, so at that point I took it to the range and

12  attempted to actually live fire it.

13       But when I got to the range and put live ammo in, it

14  wouldn't function.  And I attributed that to that cut being

15  there and allowing it to flex.  So whenever the main body were

16  to pull back because of that cut, it allowed it to flex and

17  wouldn't pull the disconnector off the hammer.

18  Q.   And did you then attempt to cut out the second lightning

19  link from that card, Exhibit 25A?

20  A.   Yes, I did.

21  Q.   And were you successful that time?

22  A.   Yes, I was.

23  Q.   Did you go about that any differently?

24  A.   No.  I attempted to cut it out the exact same way as the

25  previous one.

1    Q.    How long did it take you to cut out this second one?

2    A.    The second one I believe took 53 minutes, I believe.

3    Q.    And including cutting out the interior cutouts?

4    A.    Correct.  I took a little more time on this one so I

5    didn't cut the side of it out, which is why it took longer.

6    Q.    And we're looking now at page 3 of Exhibit 66.  This is

7    a -- is this showing -- I guess you had partially cut it out at

8    that point?

9    A.    That is correct.

10          MS. TAYLOR:  And could we have the next page.

11   BY MS. TAYLOR:

12   Q.    This is page 4.  It's still only partially -- the main

13   body piece on the left is still only partially cut out,

14   correct?

15   A.    That is correct.

16   Q.    How did you -- did you cut out that -- along the entire --

17   I guess the entire material that was etched on this one?

18   A.    Yes, I did.

19   Q.    Initially did you cut the entire material?

20   A.    On this one I cut just a portion of it out on the --

21   actually, on the other one I cut a portion of it out that

22   didn't end up working out because it didn't allow the hammer to

23   go down far enough, and so I ended up having to cut the whole

24   area out.

25          But on this one, I believe I cut everything out on

1  this particular one.

2  Q.   And did you -- once you finished cutting out the second

3  lightning link from this particular auto key card, did you --

4  did you function test with it?

5  A.   I did.

6  Q.   And did it -- what was the result of the function test?

7  A.   The weapon fired automatically.

8  Q.   Sorry, it would or would not?

9  A.   It would, yes.

10  Q.   And then did you test fire it as well with ammunition?

11  A.   Yes.

12  Q.   And what was the result?

13  A.   It fired automatically.

14  Q.   And did it work perfectly or somewhat less than perfectly?

15  A.   It was occasional.  Just, again, because of tolerances and

16  hand fitting, sometimes they don't always work reliably.  And

17  because of using the machine gun bolt carrier, I was getting

18  some hammer follow, which is where the hammer is not retained

19  and it just follows the bolt back into the battery, which

20  caused some of the test fire not to work.

21  Q.   Did you later conduct an additional test fire of the

22  lightning link that you cut from Exhibit 20A?  That was the

23  first one.

24  A.   I'm sorry, what was that?

25  Q.   Did you later conduct an additional test fire of the first

THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

**APPENDIX III**

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

## TABLE OF APPENDICES

### Appendix I

Docket ................................................................................................ D

Motion to Dismiss ........................................................................... 30

Transcripts – Hearing on Motion to Dismiss ............................. 48

Indictment Superseding - Fourth .............................................. 204

USA Statement of the Case ......................................................... 226

Mr. Ervin's Statement of the Case ............................................. 230

Gov't Exhibit 33 – 3-in-1 Auto Key Card ............................... 259-33

Motion for Judgment of Acquittal .............................................. 273

Motion for Judgment of Acquittal – Mr. Hoover ..................... 274

Order Denying Motions for Judgment of Acquittal ................ 310

Sentencing Memorandum ............................................................ 319

Judgment ...................................................................................... 324

Statement of Reasons ................................................................. 325

### Appendix II

Direct Testimony of Agent Hooker ............................................ 277

Direct Testimony of Agent Hooker, Andrea Useche, Amy Sarkese ................... 278

Direct Testimony of Richard Roberts ........................................ 282

Direct Testimony of Agent Toy .................................................. 283

**Appendix III**

Transcript – Sentencing I ........................................................329

Transcript – Sentencing II .......................................................330

**SEALED**

Presentence Investigation Report FINAL ..............................311

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 22ND day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for

Firearms Policy Coalition & FPC Action Foundation

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.:  63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888-608-8814
vlinnen@live.com
Attorney for Appellant

3

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 1 of 144 PageID 6748
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 379 of 563

VOL 1 - PG 1

1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA

2                 JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA,     Case No. 3:21-cr-22(S4)-MMH-MCR

4      Plaintiff,         Wednesday, September 6, 2023

5  v.                  9:45 a.m. - 3:05 p.m.

6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
  and MATTHEW RAYMOND HOOVER,

7

      Defendants.

8  _____

9                    **SENTENCING**

10                 **(VOLUME 1 of 2)**

11

      BEFORE THE HONORABLE MARCIA MORALES HOWARD

12          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20    Katharine M. Healey, RMR, CRR, FPR-C
     PO Box 56814

21    Jacksonville, FL 32241
     Telephone: (904) 301-6843

22    KatharineHealey@bellsouth.net

23

24                    (Proceedings reported by stenography;
                      transcript produced by computer.)

25

1                        A P P E A R A N C E S

2

3    COUNSEL FOR THE GOVERNMENT:

4    **LAURA C. TAYLOR, ESQUIRE**
     **DAVID MESROBIAN, ESQUIRE**
5    United States Attorney's Office
     300 North Hogan Street, Suite 700
6    Jacksonville, FL 32202

7

8    COUNSEL FOR DEFENDANT ERVIN:

9    **ALEX KING, ESQUIRE**
     Monroe & King, P.A.
10   1805 Copeland Street
     Jacksonville, FL 32204
11

12
     COUNSEL FOR DEFENDANT HOOVER:
13
     **ZACHARY Z. ZERMAY, ESQUIRE**
14   Zermay Law
     1762 Windward Way
15   Sanibel, FL 33957

16   - A N D -

17   **MATTHEW LAROSIERE, ESQUIRE**
     6964 Houlton Circle
18   Lake Worth, FL 33467

19

20

21

22

23

24

25

1                                I N D E X

2                                                                 PAGE

3    INITIAL MATTERS............................................. 4

4    DEFENDANT ERVIN'S GUIDELINES OBJECTIONS..................... 7

5    DEFENDANT HOOVER'S GUIDELINES OBJECTIONS.................... 13

6    GOVERNMENT'S OBJECTIONS TO FACTUAL STATEMENTS IN PSR........ 19

7    DEFENDANT ERVIN'S ARGUMENTS................................. 21

8    GOVERNMENT'S RESPONSE TO DEFENDANTS' OBJECTIONS............. 22

9    DEFENDANT ERVIN'S RESPONSE TO GOVERNMENT'S OBJECTIONS....... 37

10   DEFENDANT HOOVER'S RESPONSE TO GOVERNMENT'S OBJECTIONS...... 42

11   COURT'S RULING ON GUIDELINES OBJECTIONS.................... 48

12   GOVERNMENT'S PROFFER BY MS. TAYLOR......................... 63

13   STATEMENT BY KRIS ERVIN ON BEHALF OF DEFENDANT ERVIN....... 89

14   STATEMENT BY DEFENDANT ERVIN............................... 94

15   DEFENDANT ERVIN'S PROFFER BY MR. KING...................... 105

16   STATEMENT BY DEFENDANT HOOVER.............................. 113

17   STATEMENT BY MICHAEL HOOVER ON BEHALF OF DEFENDANT HOOVER.. 118

18   STATEMENT BY RICHARD HUGHES ON BEHALF OF DEFENDANT HOOVER.. 119

19   DEFENDANT HOOVER'S PROFFER BY MR. LAROSIERE............... 123

20   GOVERNMENT'S REBUTTAL ARGUMENTS BY MS. TAYLOR............. 135

21

22

23

24

25

P R O C E E D I N G S

September 6, 2023                                        9:45 a.m.

                          -  -  -

1           COURT SECURITY OFFICER:  All rise.  The United States

2    District Court in and for the Middle District of Florida is now

3    in session.  The Honorable Marcia Morales Howard presiding.

4           Please be seated.

5           THE COURT:  Give me one moment.

6           All right.  This is Case No. 3:21-cr-22(S4)-MMH-MCR,

7    the United States of America vs. Kristopher Justinboyer Ervin

8    and Matthew Raymond Hoover.

9           Ms. Taylor and Mr. Mesrobian are here on behalf of

10   the United States.  And Ms. Taylor, if you could please

11   introduce the case agent for the record.

12          MS. TAYLOR:  Yes, Your Honor.  At the front table is

13   Special Agent Jesse Hooker of the Bureau of Alcohol, Tobacco,

14   Firearms, and Explosives, and at the back table is Special

15   Agent Jason Slosson, also with ATF.

16          Your Honor, just as a preliminary matter, if it's

17   okay with the Court today, our intention is for Mr. Mesrobian

18   to handle guidelines and for me to handle 3553.

19          THE COURT:  Okay.

20          All right.  And Mr. King is here on behalf of

21   Mr. Ervin.  And Ms. Hall, his paralegal, is here with us as

22   well.

1                       P R O C E E D I N G S

2    September 6, 2023                                     9:45 a.m.

3                             -  -  -

4           COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Marcia Morales Howard presiding.

7           Please be seated.

8           THE COURT:  Give me one moment.

9           All right.  This is Case No. 3:21-cr-22(S4)-MMH-MCR,

10   the United States of America vs. Kristopher Justinboyer Ervin

11   and Matthew Raymond Hoover.

12          Ms. Taylor and Mr. Mesrobian are here on behalf of

13   the United States.  And Ms. Taylor, if you could please

14   introduce the case agent for the record.

15          MS. TAYLOR:  Yes, Your Honor.  At the front table is

16   Special Agent Jesse Hooker of the Bureau of Alcohol, Tobacco,

17   Firearms, and Explosives, and at the back table is Special

18   Agent Jason Slosson, also with ATF.

19          Your Honor, just as a preliminary matter, if it's

20   okay with the Court today, our intention is for Mr. Mesrobian

21   to handle guidelines and for me to handle 3553.

22          THE COURT:  Okay.

23          All right.  And Mr. King is here on behalf of

24   Mr. Ervin.  And Ms. Hall, his paralegal, is here with us as

25   well.

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 5 of 144 PageID 6752
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 383 of 563

VOL 1 - PG 5

1          Mr. Zermay and Mr. Larosiere are here for Mr. Hoover.

2     Mr. Hoover is here.  And Ms. Katzenberger is here as well.

3          All right.  So we have our appearances.  And we're

4     scheduled for sentencings in these cases.

5          Mr. Mesrobian and Ms. Taylor, are you prepared to

6     proceed?

7          MS. TAYLOR:  Yes, Your Honor.

8          THE COURT:  All right.

9          Mr. King?

10         MR. KING:  Yes, Your Honor.

11         THE COURT:  And I don't know who will -- Mr. Zermay

12    and Mr. Larosiere, am I hearing from both of you or just one of

13    you today?

14         MR. LAROSIERE:  Just Mr. Larosiere, Your Honor, and

15    we're ready.

16         THE COURT:  Okay.  All right.  So we'll start with

17    Mr. Ervin.

18         Mr. Ervin, on April 21st of 2023 the jury found you

19    guilty of a number of charges in the Fourth Superseding

20    Indictment, including Counts One, Two, Three, Four, Five, Six,

21    Seven, Eight, each of which charged -- well, Count One charged

22    you with conspiracy to transfer unregistered machine gun

23    conversion devices, in violation of Title 26, United States

24    Code, Sections 5861(e) and 5871, and 18 U.S.C., Section 371.

25         Counts Two through Eight charged you with

1  transferring unregistered machine gun conversion devices, in

2  violation of Title 26, United States Code, Sections 5861(e) and

3  5871, as well as 18 U.S.C., Section 2.

4       And the jury also found you guilty in Counts Nine,

5  Ten, Eleven, and Twelve of structuring and attempting to

6  structure currency transactions for the purpose of evading

7  Currency Transaction Reporting requirements, in violation of

8  Sections 5324(a)(3) and (d)(1).  Pardon me, that was Count

9  Nine.

10      Counts Ten, Eleven, and Twelve charged you with

11  possessing unregistered machine gun devices, in violation of

12  Title 26, 5861(d).

13      The jury, as I said, convicted you of those -- each

14  of those counts, and so we're at the stage of the proceedings

15  where the Court needs to determine an appropriate sentence.

16      There's a process that we follow for that in federal

17  court, and it begins with the preparation of a presentence

18  report.  And the next thing that's supposed to happen is that

19  you're supposed to review that presentence report with your

20  attorney, Mr. King.

21      Did you have a chance to do that, Mr. Ervin?

22      DEFENDANT ERVIN:  Yes, ma'am.  I got it right here.

23      THE COURT:  Okay.  And did Mr. King answer any

24  questions that you had about the presentence report?

25      DEFENDANT ERVIN:  Yes, ma'am, he did.

 1              THE COURT:  Okay.  All right.

 2              Mr. King, does Mr. Ervin have any objections to the

 3    factual statements set forth in the guidelines -- in the -- I'm

 4    sorry, in the presentence report?

 5              MR. KING:  No, Your Honor.

 6              THE COURT:  All right.  So then let me hear from you

 7    as to any guideline objections that Mr. Ervin has.

 8              MR. KING:  Your Honor, the only objection Mr. Ervin

 9    has outstanding is -- if you'll -- I apologize.

10              THE COURT:  As to the structuring?

11              MR. KING:  Yes, Your Honor.  It's as to the

12    structuring.  It's the two-level enhancement.  I'm trying to

13    find the paragraph.  It is --

14              THE COURT:  I think 59, maybe?

15              MR. KING:  I believe 59.  I'm having trouble finding

16    it in my papers.

17              Yes, Your Honor, it is 59.

18              THE COURT:  And let me hear your argument on that.

19              MR. KING:  Your Honor, essentially the argument is

20    that the specific offense characteristics applies where the

21    defendant knew or believed that the funds were proceeds of

22    unlawful activity.

23              In this case Mr. Ervin had no belief or knowledge at

24    the time he committed those transactions that they were

25    proceeds of unlawful activity.  He believed the activity that

1    he was being -- that he was conducting was lawful at the time

2    that he engaged in these transactions.  The jury made clear by

3    their verdict that they disagree.

4          However, the guideline here does not say that if the

5    proceeds are, in fact, proceeds of illegal activity, which

6    would clearly apply, you know, whether the defendant

7    subjectively believed it or not, but at the time he believed

8    it -- at the time that the guideline was -- I'm sorry, at the

9    time of the activity that leads to the conviction in Count

10   Nine, Mr. Ervin believed that his business was lawful.

11         You know, the -- I won't belabor the -- too much in

12   terms of what was before the jury, but Mr. Ervin was

13   advertising this.  He was using his name.  He -- you know, he

14   did actually commit -- fill out a CTR with Community First that

15   very first day when he went to the second bank, not the bank

16   that he normally went to, but when he went to the second bank

17   to have that second transaction that triggered the CTR, and he

18   told them he worked for Auto Key Card.

19         I was not able to find any case law for or against

20   the application of this guideline or anything that I thought

21   was a good metaphor to kind of explain this, but, you know,

22   Mr. Ervin's position is that if it was the intention of the

23   guidelines to punish the mere fact that, you know, it was later

24   determined that the funds were proceeds of illegal activity,

25   then that's what the guideline would say, as opposed to this

1    knowledge and belief of the defendant.

2            And it makes sense to an extent.  You want to punish

3    individuals who are engaged in these types of structuring

4    offenses to try to hide the proceeds of illegal activity

5    differently than you would punish individuals that just don't

6    want to make a report, don't trust the government, like

7    Mr. Ervin does not trust.

8            And that's why we believe this two-level enhancement

9    would not be applicable here, because at the time he actually

10   committed those offenses -- those transactions, he strongly

11   believed that the activity that he was conducting was lawful,

12   and he's maintained that that activity was lawful since then.

13           THE COURT:  Mr. King, in order to find Mr. Ervin

14   guilty as to Count One of the indictment, the jury had to find,

15   amongst other things -- and that's the conspiracy count,

16   obviously.  But amongst other things, the jury had to find that

17   the defendant knew the unlawful purpose of the plan and

18   willfully joined in it.  So would that not -- would that

19   finding not show that he knew the funds were the proceeds of

20   unlawful activity?

21           MR. KING:  Your Honor, I do think that that is a --

22   is a problem for the argument.

23           You know, I believe Mr. Ervin's -- and this gets into

24   kind of subjective and objective intent.  The jury clearly

25   believed he objectively believed that what he was doing was

1   unlawful at the time.  You know, our submission is that

2   Mr. Ervin subjectively did not believe that what he was doing

3   was unlawful and therefore that that two-level enhancement

4   should not be applicable because of, you know, what his

5   subjective belief was, but understanding that the jury's

6   verdict does undermine that to some pretty significant extent

7   given that they determined that he did so knowingly.

8          THE COURT:  All right.  Any other guideline

9   objections on behalf of Mr. Ervin?

10         MR. KING:  No, Your Honor.

11         DEFENDANT ERVIN:  (Raises hand.)

12         THE COURT:  All right.

13         DEFENDANT ERVIN:  Your Honor --

14         MR. KING:  No, no.

15         THE COURT:  Mr. Ervin, I'm going to hear from your

16   lawyer.  If you want to speak to him, you may.

17         MR. KING:  Your Honor, could I have a moment with

18   Mr. Ervin?

19         THE COURT:  Of course.

20      (Mr. King confers with Defendant Ervin.)

21         MR. KING:  Your Honor, if I can just address one more

22   matter?

23         THE COURT:  Certainly.

24         MR. KING:  Mr. Ervin has asked me to object to

25   paragraph 52, the base offense level.

1          I've reviewed that.  I've discussed it with him.  I

2   don't believe I have a legal basis to make that objection.

3          THE COURT:  Let me hear what Mr. Ervin's objection

4   would be.

5          MR. KING:  Mr. Ervin's objection would be that based

6   on -- and I suspect when we get to the government's objections,

7   that whether machine gun conversion devices are firearms for

8   certain purposes in the guidelines, that because he believes

9   they're not firearms for other purposes, that it would not

10  apply to this base offense level.

11         However, the base offense level specifically cites to

12  the statute that Mr. Ervin is convicted of violating, so I

13  don't believe there's a legal basis for that objection.

14         THE COURT:  All right.  Thank you, Mr. King.

15         MR. KING:  Yes, Your Honor.

16         THE COURT:  And let me just go ahead and address

17  that.

18         Mr. Ervin was convicted by the jury of violating

19  Title 26, United States Code, Section 5861.  For purposes of

20  that statute, there is a definition of a firearm in Section

21  5845.  The jury was instructed as to that definition of a

22  firearm and found that the machine gun conversion devices that

23  were being manufactured by Mr. Ervin, and that the jury

24  determined he conspired to transfer with Mr. Hoover, fell

25  within that definition.  That's the jury's finding.

1          The appendix to the guidelines tells us that for a

2    conviction of -- under 26, United States Code, Section 5861,

3    the Court looks to the guideline at 2K2.1.

4          2K2.1 addresses the unlawful receipt, possession, or

5    transportation of firearms.  And under that there are various

6    different base offense levels.

7          The base offense level for a firearm described in 26,

8    United States Code, Section 5845, which is what the jury found

9    in this case, is a level 18.  So at a minimum, the correct

10   offense level is a level 18.  And so I don't think there is a

11   basis to object to that.

12         I understand that Mr. Hoover's counsel may make a

13   similar argument.  And I won't pretermit your argument and I'll

14   hear it, but to the extent that Mr. Ervin is seeking to raise

15   that argument, I don't think it's well placed.  And I can

16   understand why Mr. King has expressed the view that there's not

17   a legal basis for it.

18         Turning now to Mr. Hoover.  Mr. Hoover, on that same

19   date, April 21st of 2023, a jury found you guilty of Count One

20   of the Fourth Superseding Indictment, which charged you with

21   conspiracy to transfer unregistered machine gun conversion

22   devices, in violation of 26, United States Code, Sections

23   5861(e) and 5871, as well as 18, United States Code, Section 2.

24         And the jury also found you guilty of Counts Two,

25   Three, Five, and Seven, which charged you with transferring

1   unregistered machine gun conversion devices to individuals, in

2   violation of Title 26, United States Code, Sections 5861(e) and

3   5871 and Section 2.  And the Court has adjudicated you of those

4   offenses.  The conspiracy charge was also in violation of 18,

5   United States Code, Section 371.  The Court has adjudicated you

6   guilty on those offenses based upon the jury verdict.

7          And we have a presentence report that's been prepared

8   by the probation office with respect to you.

9          Did you have an opportunity to review that

10  presentence report with your attorneys?

11         DEFENDANT HOOVER:  Yes, ma'am.

12         THE COURT:  Did they answer any questions you had

13  about the presentence report?

14         DEFENDANT HOOVER:  Yes, ma'am.

15         THE COURT:  All right.  Mr. Larosiere, did you have

16  sufficient opportunity to review the PSR with Mr. Hoover?

17         MR. LAROSIERE:  Yes, Your Honor.

18         THE COURT:  Does he have any outstanding objections

19  to the factual statements?

20         MR. LAROSIERE:  Not to the factual statements, Your

21  Honor.

22         THE COURT:  Let me hear your guideline objections.

23         MR. LAROSIERE:  So, Your Honor, we object to the use

24  of 2K2.1(a)(5) as the base level in this specific instance.

25         Understanding what this Court has said, every word of

1   the guidelines is very intentionally written.  And, in fact,
2   the definition of "firearms" in the guidelines -- because --
3   let me just stop for a second.
4          "Firearms" as a term, I think we understand from
5   going through this case, needs a definition.  There's multiple
6   divergent definitions of "firearm" in federal law.  And just in
7   2K2.1, divergent definitions are used.
8          There is one definition of "firearm" in 2K2.1, which
9   is 921(a)(3).  And 921(a)(3), which is under Title 18, refers
10  to things that we would ordinarily think of as firearms, you
11  know, explosive, bullet comes out, et cetera, plus silencers.
12         In (a)(5) it refers to a firearm described in -- not
13  defined in -- Title 26, 5845(a).  5845(a) contains items that
14  are 921(a)(3) firearms and are not 921(a)(3) firearms.
15         And it seems clear to Defendant Hoover, Your Honor,
16  that there is an intention in 2K2.1 to more severely punish
17  those weapons which cause harm directly and those individuals
18  which have directly caused -- caused harm or caused harm --
19  forced delivery instruments to be delivered, as we can see in
20  2K2.1(b)(2), which refers to a six-point reduction in firearms
21  that were not used for an unlawful purpose.  And naturally the
22  counterargument there would be, well, if the firearms are
23  legal, there's not an unlawful purpose.  Well, if they're being
24  sentenced under 2K2.1, naturally there was something unlawful
25  about the firearms.

1        So it seems -- we agree with the probation office,

2   which says that later on in the statute --

3        THE COURT:  You agree with the probation office to

4   the extent that they say that under -- for special offense

5   characteristics under (b)(1) it's not a firearm, but you

6   disagree with them with respect to it being a firearm for

7   purposes of (a)(5)?

8        MR. LAROSIERE:  Yes.  So we would follow their same

9   logic.  Following the same logic, Your Honor, we believe that

10  the base level is 12 because it is not a 921(a)(3) firearm.  It

11  may be an item which is described in 5845(a), but it is a

12  non-921(a)(3) firearm.  So it is not a firearm as defined by

13  2K2.1 described in 5845(a).  And that seems clear.

14       In fact, it's clear from the cases that both

15  Defendant Hoover and the government cited.  I think it was the

16  Bixley case.  And there's not much case law on this because

17  ordinarily, in all of the other case law that was cited, there

18  is a -- what I would call colloquially an actual machine gun --

19  you know, one that spits out bullets -- involved, thus setting

20  the base level is pretty easily calculable.  I think here it's

21  a little bit different.

22       THE COURT:  Why isn't the machine gun conversion

23  device a firearm described under 5845(a) given the fact that

24  5845(a) has a definition of "firearm," the definition of

25  "firearm" includes a machine gun, and the definition of

1    "machine gun" includes a machine gun conversion device?

2          MR. LAROSIERE:  So, Your Honor, again, it's in the

3    context of 2K2.1.

4          2K2.1 defines the term "firearm" universally

5    throughout that section as a 921(a)(3) firearm --

6          THE COURT:  Well --

7          MR. LAROSIERE:  -- so --

8          THE COURT:  -- that's in the commentary.

9          MR. LAROSIERE:  So, yes.  And I think that it's

10   important to look to the commentary because the word "firearm"

11   on its own is ambiguous, which I think we're evidencing right

12   here by having this confusion over whether or not it is a

13   firearm.  And I think certainly colloquially it's not, right.

14         THE COURT:  Well, colloquially, the frame of a

15   firearm isn't one, nor is a muffler nor a silencer, but under

16   the law, they're all firearms.

17         MR. LAROSIERE:  In 921(a)(3), Your Honor, I agree,

18   differentially defined such.

19         Also, later on in 2K2.1 it refers to specific 5845(a)

20   firearms as offense enhancement.  And I think that holding

21   otherwise would be to rewrite the guidelines to say "a firearm

22   as defined by 5845(a)."

23         In reality, what the guidelines are saying, if we

24   look at them strictly, is "a 921(a)(3) firearm described in

25   5845(a)."  And that fits with the purposes of the guideline.

1    It fits with the nature and spirit of the guideline.  And it is

2    the only way that every single provision within 2K2.1 could

3    make sense.

4          THE COURT:  So in your view, a level 18 applies to

5    basically everything in Section 5845(a) other than a machine

6    gun conversion device?

7          MR. LAROSIERE:  Machine gun conversion devices, the

8    frame or receiver of a suppressor, and a couple other distinct

9    areas that are not covered, because 921(a)(3) is divergent and

10   it also includes destructive devices, whereas 5845(a) goes into

11   more specific granularity.

12         And it's more just machine gun kits, right.  There's

13   the single parts; there's the combination of parts.  There's

14   several areas of 5845 which, for example, we can look back to

15   the trial, where we learned that sometimes shoelaces can be

16   5845(a) firearms.

17         And so I think it's natural for the guidelines, which

18   target harmful conduct -- you know, projection of force -- and

19   discount conduct that is not itself harmful, that a shoelace

20   does not fit under 2K2.1(a)(5).

21         THE COURT:  If you're saying that the guidelines

22   target more harmful conduct and discount conduct that's less

23   dangerous, how would you account for the fact that the frame of

24   a firearm is subject to the number-of-firearms enhancement but

25   the machine gun conversion device wouldn't be?

 1          MR. LAROSIERE:  Well, Your Honor, I would look to the

 2   legislative history there, where that was added ex post facto

 3   because it had become practice to separate the receivers from

 4   firearms.

 5          THE COURT:  I don't think that's what "ex post facto"

 6   means, but go ahead.

 7          MR. LAROSIERE:  Well, it was added after, right.  It

 8   was added after the original drafts were passed to cure that

 9   hole, and thus, again, that comports nicely as well.

10          If you've got a, you know, gunrunner who's running

11   guns, the type of stuff that I think we all agree the ATF

12   should be enforcing, like running guns to Mexico, we wouldn't

13   want them to be able to avoid that by separating the upper from

14   the lower.

15          But in this instance there's no firearm.  There's no

16   forced-projection instrument.  There is a -- you know, we may

17   respectfully disagree, but it's -- what the jury found to be a

18   combination of parts, and what we allege to be a homogenous

19   piece of steel with a drawing on it, I think that's closer to

20   shoelaces.  And I think the guidelines fit with that idea, that

21   a shoelace could be found by a jury to be a 5845(a) machine

22   gun, but I don't think it's a 921(a)(3) firearm, and thus it

23   would have the lower base offense level.  And it logically

24   follows.

25          THE COURT:  All right.  What are Mr. -- does

1  Mr. Hoover have any other objections to the guideline

2  calculations before I hear from the government?

3           MR. LAROSIERE:  Your Honor, may I talk with my client

4  for a moment?

5           THE COURT:  Sure.

6           MR. LAROSIERE:  Thank you.

7      (Mr. Larosiere and Mr. Zermay confer with Defendant

8  Hoover.)

9           MR. LAROSIERE:  No, Your Honor.  Thank you so much.

10          THE COURT:  All right.

11          Mr. Mesrobian, does the United States have any

12  objections to the factual statements set forth in the

13  presentence report?

14          MR. MESROBIAN:  Your Honor, the only additional fact

15 we would submit might be relevant here is Mr. Ervin's firearms

16 that were present at his home during the execution of the

17 search warrant.  Our understanding is that part of perhaps the

18 distinction the probation office was drawing was that in other

19 cases where they have scored or applied the specific offense

20 characteristics to cases where the individual possessed auto --

21 auto sears is because they were in close proximity to the

22 firearms they could be installed in, as we heard testimony at

23 trial from a number of witnesses that Mr. Ervin had AR-15s in

24 his home and those were located during the execution of the

25 search warrant.  Obviously that was not an issue, you know,

 1  relevant to the criminal conduct that he engaged in in this

 2  case so it wasn't dwelled on in front of the jury, but it is in

 3  the record.  And to the extent that that is somehow a

 4  distinguishing factor -- I don't know why that would be, but

 5  for the probation office's purposes, if that were a

 6  distinguishing factor, that may be a fact that would be

 7  relevant to add to Mr. Ervin's presentence report.

 8          THE COURT:  Do you want to remind me of what the

 9  weapons were that were found in the home and where they were in

10  relation to the auto sears?

11          MR. MESROBIAN:  Well, Your Honor, several of the

12  witnesses, Mr. Ervin's father -- at his trial -- trial

13  transcript -- actually, all of these are trial transcript

14  Volume 4.  Mr. Ervin's father, Ms. Wolfe, and Mr. Ervin's

15  sister all testified that to their knowledge, he owned an

16  AR-15.

17          There was testimony regarding the execution of the

18  search warrant.  I don't believe we entered the pictures into

19  evidence, but there were pictures taken of a number of AR-15s

20  hanging, basically, on the shelving that was discussed during

21  the trial testimony where Mr. Ervin had his preparation

22  supplies, the food and other items, and there were a number of

23  firearms, including several AR-15s.  According to the record

24  from ATF when they executed the warrant, it was six complete

25  AR-15-style rifles, one complete AK-47-style rifle, and seven

 1    AR-15 lower receivers.

 2              And the testimony at trial as well was that the auto

 3    key cards were located all over the house:  in the kitchen, in

 4    the living room area, by the computer, and so forth.

 5              THE COURT:  Mr. King, does Mr. Ervin dispute the

 6    accuracy of that recitation of facts presented at trial?

 7              MR. KING:  Your Honor, I think a clarification would

 8    be important.  You know, one of the big issues is the device

 9    only works with very specific bolt carriers.

10              And had this been raised earlier I could have

11    researched it in the transcript.  But my recollection of the

12    testimony was that there were no auto key cards cut out,

13    converted, and that none of the AR-15s that were in Mr. Ervin's

14    home had SP1 bolt carriers or would otherwise be able to

15    operate or work with an auto key card if correctly cut out.

16              I believe -- it's been since April, so I'm relying on

17    my memory here, but I believe that was Agent Hooker's testimony

18    on cross-examination, if my memory serves me.  But again, I've

19    not had an opportunity -- because that wasn't raised, I've not

20    had a chance to review a transcript of it.

21              And Your Honor, I apologize, otherwise, I think that

22    is an accurate recitation of the firearms that were in the

23    house.  And there were -- based on the photographs that were

24    both placed into evidence and that I've reviewed, there were

25    auto key cards throughout the home.

1          THE COURT:  All right.

2          Mr. Mesrobian.

3          MR. MESROBIAN:  I agree with Mr. King.  I don't think

4   there was any testimony, or I'm not aware of an analysis of

5   which bolt carriers were in the AR-15s in Mr. Ervin's home.

6          However, I do disagree about the testimony at trial,

7   because the testimony was -- at trial was that the auto key

8   card worked in converting a -- an AR-15, both using the M16

9   machine gun bolt carrier as well as the SP1 bolt carriers.  So

10  there were multiple types of bolt carriers that worked with it.

11         THE COURT:  And that was in Agent Hooker's -- whose

12  testimony was that in?

13         MR. MESROBIAN:  That was in Officer Toy's testimony

14  regarding the testing of the device both at the facility in

15  West Virginia as well as when he came to Jacksonville to do the

16  test here.

17         THE COURT:  All right.  Let me hear your -- I think

18  your response to the -- well, start with your response to

19  Mr. Ervin's objection to 59, and then I think in your response

20  to Mr. Hoover's objection you'll probably -- that will also be

21  your argument with regard to the government's objections.

22         MR. MESROBIAN:  And forgive me, Your Honor, with

23  respect to paragraph 59, is that the structuring?

24         THE COURT:  It is.

25         MR. MESROBIAN:  Okay.  So beginning there, Your

1   Honor, the Court presaged what my response would be, which is

2   that the evidence at trial showed that the funds that Mr. Ervin

3   structured were the funds that he earned through the conspiracy

4   to distribute the auto key cards.

5        I understand that Mr. Ervin is persisting in his

6   assertion that he did not believe his conduct was unlawful, but

7   that was not the evidence at trial and that was not the jury's

8   conclusion in finding him guilty beyond a reasonable doubt of

9   Counts One through Eight.

10        They found that he knowingly and willfully entered

11   into the criminal conspiracy and made a number of substantive

12   transfers of the auto key cards.  And from the government's

13   perspective, that pretty much ends the inquiry, because if he

14   was found guilty of those offenses, then the transitive

15   property is that he knew he was structuring the proceeds of an

16   unlawful activity.

17        THE COURT:  All right.  Go ahead with your argument

18   regarding the firearms guidelines.

19        MR. MESROBIAN:  Your Honor, much of this was covered

20   in our response to the initial PSR and in our memorandum for

21   the Court.  I don't want to belabor it too much, but I'm happy

22   to hit the high points and then respond to some of the

23   arguments today.

24        THE COURT:  Well, let me ask you this.  In the *Hixson*

25   case, the government -- an AUSA in your position -- took the

1  position that the machine gun conversion devices were not

2  firearms for purposes of the specific offense characteristics

3  and argued, instead, that the Court should depart upward under

4  5K2.0, or vary upward.

5          I guess I'm interested in understanding why the

6  position of the United States would be different on a

7  black-and-white guideline calculation.

8          MR. MESROBIAN:  Well, I can't speak to necessarily

9  what that office's calculations were in terms of making their

10 argument, however, what I can say is that --

11         THE COURT:  I just read their sentencing memorandum,

12 and their sentencing memorandum says that.

13         MR. MESROBIAN:  I understand, Your Honor.  What I

14 meant was that in terms of the legal landscape in their

15 district, I don't know where their office is in terms of making

16 these determinations on their arguments.  However, what I do

17 know is that district is not governed by *Dupree*.  And that is

18 sort of one of the instructive parts of our argument and in our

19 memorandum.

20         But, Your Honor, from our perspective, the text of

21 the guideline is not ambiguous in terms of whether or not

22 5845(a) firearms are firearms for the purposes of both the base

23 offense level and the specific offense characteristics.

24         And respectfully, I'm not aware of another guideline

25 where the probation -- where we would take the position -- or

1   the probation office would take the position that a term means

2   one thing in the first subsection of a guideline and then means

3   something different in another, because when we read -- in the

4   specific offense characteristics, because, I mean, we have to

5   start with the fact that for recent history, as we showed in

6   the supplemental memorandum we provided, probation has been

7   applying the specific offense characteristics to auto sears in

8   all of these cases.  And that's as recently as April 2023, this

9   year, in the James King case, it's Case Number 6:22-cr-51,

10  where probation applied the specific offense characteristics in

11  an auto sear case, counting each one individually as a firearm,

12  none of which, based on the factual recitation, were installed

13  or near an AR-15.  And nobody objected and Judge Berger agreed.

14  And that's been the consistent application.

15      THE COURT:  And I inquired of the probation office

16  about that this morning.  And my understanding is that both

17  *Hixson* and further consultation with the Sentencing Commission

18  convinced them that that probably had not been the best reading

19  of the guidelines that they were applying previously.

20      MR. MESROBIAN:  I -- that's an interesting position

21  for them to take.  I, however, think it's, frankly, incorrect.

22  And that's based on a plain-language reading of the guideline

23  and also the fact that *Hixson* is a non-binding case from a

24  district where the circuit court of appeals law is different.

25      We are governed by *Dupree* here and we have to start

1    with the plain language of 2K2.1.

2         I think the apparent premise, I guess now, from the

3    probation office, is that this very large category of

4    firearms -- machine gun conversion devices -- was excluded

5    accidentally, I suppose, by the Sentencing Commission in the

6    drafting of 2K2.1.  I think perhaps the defendants believe that

7    it was an intentional exclusion.  That exclusion would

8    purportedly exist because, as the Court noted -- it exists

9    despite the fact, as the Court has already noted, those

10   firearms, including machine gun conversion devices, are notated

11   specifically in the base offense levels in 5845(a).

12        The problem that I think this interpretation of 2K2.1

13   has is that it ignores the fact that it's scoring the base

14   offense level based on different criteria.  It assigns a 26

15   level, a 24, 22, depending on different criteria, and that

16   includes the criminal history of the defendant or the type of

17   firearm.

18        And there are two different types or subsets of

19   firearms which cause an elevated base offense level here:  a

20   firearm as described in 5845(a), or a semiautomatic firearm

21   capable of accepting a large-capacity magazine.  And those

22   categories are referenced together in several places:

23   2K2.1(a)(1), (a)(3), and (a)(4)(B), sub B.

24        The problem is, how are we supposed to read the plain

25   text of 2K2.1 and conclude that these categories are not

 1   firearms later on in the exact same guideline?

 2         THE COURT:  Well, but what their argument is is that

 3   it's a -- it has to be -- in order to apply the enhancement in

 4   (a)(1), (a)(3) and (4)(B), as well as (a)(5), it has to be both

 5   a 921(a)(3) firearm and a Section 5845(a) firearm.  So an

 6   actual machine gun, or the frame or receiver of an actual

 7   machine gun, but not just the machine gun conversion device.

 8   That's their contention.

 9         MR. MESROBIAN:  That's Mr. Hoover's contention.

10         THE COURT:  That is correct, yes.

11         MR. MESROBIAN:  And I don't think that holds water

12   for a couple reasons.  The first is exactly what the Court

13   pointed to, which is that to the extent that Mr. Hoover is

14   arguing that this is logical because the guidelines and

15   Congress intended to punish -- it only applies to things

16   where -- I think "projection of force" was the phrase that we

17   heard a lot today, and not punish things that potentially could

18   become or potentially could be installed into a 921(a)(3)

19   firearm, that's a quote from their memorandum, and the

20   rationale, I guess, is that an item that can't project force or

21   cause harm on its own is less serious.  That would obviously be

22   very convenient for him in calculating the PSR here, but there

23   are two flaws.

24         The first is that, as the Court pointed out,

25   921(a)(3) specifically includes things that potentially could

1  become or be installed because 921(a)(3) includes frames and

2  receivers.

3          THE COURT:  Right.  But, I mean, his point is those

4  are 921(a)(3) firearms, but the machine gun conversion device

5  isn't.

6          MR. MESROBIAN:  But when you read the actual

7  guideline and it talks about 5845(a) firearms, that -- they

8  specifically reference the statute that includes machine gun

9  conversion devices.

10         And it's hard to understand -- when looking at the

11 case -- the second part of this is that looking at the case

12 that Mr. Ervin cited in his memorandum, Judge Merryday's case,

13 that's the *Aguilar-Espinosa* case, 57 F.Supp.2d 1359, there, I

14 think Mr. Ervin was citing to that case as -- for the

15 proposition that auto key cards are, quote, only statutory

16 machine guns, and that therefore somehow resorting to the

17 commentary is appropriate.

18         However, that is not -- and I haven't even addressed

19 *Dupree* yet, we'll get there in a moment, but that's not the

20 rule in *Dupree*.

21         In that case, *Aguilar-Espinosa* was not about the

22 guidelines, it was about the level of evidence of proof of

23 knowledge required to find someone guilty for possessing, in

24 that case, an auto sear.

25         What Judge Merryday was getting at was that under

1    *Staples*, there has to be evidence that the person knew the

2    nature of the thing that they possessed.  It was not a

3    guidelines calculation case.

4          However, there is a lot of interesting language in

5    that opinion regarding the purpose of the statute and what

6    Congress was trying to regulate here.

7          You know, at one point the judge wrote, beginning on

8    page 1363, that "Congress obviously intended to regulate

9    possession of even an incipient machine gun; that is, a device

10   the possession of which is either tantamount to possessing a

11   machine gun or the distinctive precursor of the automatic

12   operation of a weapon."

13         He then went on to say in reference to the same 5845

14   statute that is at issue in the guideline, "The second sentence

15   of section 5845(b) suggests definitively that Congress intended

16   to the extent feasible to statutorily govern disbursement of

17   the capacity to discharge weapons automatically.  The capacity

18   to initiate automatic weapons fire, although a capacity that is

19   often subtly dispensed and inconspicuously harbored, is a

20   brutally lethal capacity, the possession of which imminently

21   threatens the public, whether appearing in the form of a shiny,

22   newly manufactured, and complete weapon or in the form of one

23   of those finely constructed and not widely understood parts

24   that contribute decisively to the onset of automatic firing.

25   Congress decided that the possessor of hardware bearing the

1   capacity to enable automatic fire also possesses the hardware

2   and a considerable risk of criminal liability if the possessor

3   knows the endangering nature of the goods possessed."

4         That case -- it's hard to read the well-reasoned

5   analysis in that case and think that, well, the Sentencing

6   Commission clearly meant to omit those devices from the ambit

7   of 2K2.1 for the base offense level or the specific offense

8   characteristics.

9         And this change in the probation office's position in

10  reading 2K2.1 is hinging solely on the line in the commentary

11  regarding, you know, the definition of a firearm is -- under --

12  is -- has the meaning given that term in 18 U.S.C. 921(a)(3).

13        THE COURT:  Well, I mean, the probation office

14  routinely and regularly and correctly goes -- looks to the

15  application notes for definitions of terms used in the

16  guidelines, right?

17        MR. MESROBIAN:  Correct, where they're unambiguous

18  and where -- I believe what the probation office said in their

19  response to our objections was that a reference to a statute in

20  the guideline makes it ambiguous.  And I -- respectfully, I

21  don't understand what that means.

22        There are any number of references to statutory

23  definitions and guidelines, and those make the guidelines less

24  ambiguous, not more.  It's pretty common.  And 2A3.4 sets the

25  base offense level based on whether the offense involved

1  conduct described in 18 U.S.C. 2241(a) or (b) versus conduct

2  described in 18 U.S.C. 2242.

3        That's repeated, similarly, in 2G2.1.

4        In 2B1.1 it refers to conduct described in 18 U.S.C.

5  670.

6        Those references are not meant to create ambiguity.

7  They define terms.  They define the conduct that is governed by

8  that particular guideline.

9        In those situations there is no need to resort to the

10  commentary.

11        And that's, again, exactly the problem that we have

12  here.  The guidelines refer -- the guideline here, 2K2.1,

13  refers specifically to a firearm that is described in 26 U.S.C.

14  5845(a).

15        THE COURT:  Mr. Mesrobian, is it your position --

16  because I don't think this is right -- is that -- is it your

17  position that you only look to commentary or that the

18  Sentencing Commission should only provide commentary where

19  there's ambiguity?  I don't think that that's accurate.

20        Now, I think what you're saying is that under *Dupree*,

21  if the guideline is not ambiguous, you can't look to commentary

22  that contradicts the guidelines.  But is it your position that

23  there's only -- that commentary is only appropriate when

24  there's ambiguity in the guidelines?

25        MR. MESROBIAN:  Well, that is what *Dupree* essentially

1   says.  I mean, the first principle is that the commentary

2   cannot expand the interpretation of an otherwise unambiguous

3   guideline.

4           THE COURT:  Right.

5           MR. MESROBIAN:  I think when we're dealing with this

6   situation here, what's good for the goose is good for the

7   gander.  And it cannot contract an otherwise unambiguous

8   guideline either.

9           If the meaning of the guideline is in doubt, as the

10  Court noted, the Court can consider the commentary.  But even

11  then what *Dupree* says -- and that's citing to *Seminole Rock* --

12  is that the Court cannot give controlling weight to the

13  commentary if it is plainly erroneous or inconsistent with the

14  guideline.

15          And that is with -- when we're talking about this

16  reference to 921(a)(3) in the commentary, that's what we have.

17  It's an unambiguous guideline, in our view, we submit, with

18  respect to what types of firearms are regulated by 2K2.1.  And

19  there is no need to look further to the commentary to limit

20  that unambiguous definition.

21          But even if you did, that definition is plainly

22  erroneous and inconsistent with the reference to 5845(a) above.

23          THE COURT:  Didn't the Court reject that plainly

24  erroneous and incon- -- I thought that was a higher standard

25  than had to be shown.

1          MR. MESROBIAN:  That was the reference when -- when

2     it refers to *Seminole Rock* and it's talking about the reference

3     to regulations and whether or not you can -- has that been

4     since -- or that's the reference in *Dupree*.  And I can provide

5     the case number, or the page number.

6          I think this is in the passage where it's discussing

7     *Seminole Rock* and *Stinson* and whether or not -- *Stinson* was

8     being careful to note that the analogy was not precise.  And

9     I'm looking at page 1295 of *Dupree*, I think.

10          THE COURT:  Hold on, let me --

11          MR. MESROBIAN:  "Congress has a role in promulgating

12     the guidelines."

13          "That's why *Stinson* gave more deference to the

14     guidelines commentary than *Seminole Rock* gave to an agency's

15     interpretation of its own regulations."

16          But again, when it -- the -- the analysis here is

17     very clear in referring to Congress's role in promulgating the

18     sentencing guidelines.  And we run, again, into Judge

19     Merryday's case, that Congress intended to regulate machine gun

20     conversion devices because of the inherent danger of automatic

21     fire, but then sought to exclude them or approved the exclusion

22     of them from 2K2.1?  It simply doesn't comport.  The more

23     logical conclusion here is that the language of 2K2.1 is

24     unambiguous in its reference to 5845(a) firearms.

25          And to the extent that there is a need under *Dupree*

1  to resort to the commentary for further information, that

2  definition just simply does not align with the specific

3  reference to 5845 in the guideline.

4          THE COURT:  Give me a moment.

5      (Pause in proceedings.)

6          THE COURT:  So, Mr. Mesrobian, let's say,

7  hypothetically, this was a mistake by the Sentencing

8  Commission.  What is the Court supposed to do with that in

9  terms of -- I mean, the definition proposed by counsel for

10 Mr. Hoover, that is, that it has to be a 921 -- it has to be

11 both a 921(a)(3) firearm and a 5845 firearm, why can't the

12 Court accept that definition if that's what the Sentencing

13 Commission approved?  Even if they may change it later.

14         MR. MESROBIAN:  Well, firstly, in the commentary,

15 that line, with respect to the definition of "firearm," it does

16 not say "firearm" has only the meaning ascribed to it in

17 921(a)(3).

18         And I think that's important to read that in

19 conjunction with the, again, specific reference to firearms in

20 5845(a).  There is no specific exclusion in either the

21 guideline or the commentary to find that machine gun conversion

22 devices were intentionally excluded from this guideline.

23         But I think what the Court would do here, in the

24 government's recommendation, is to find that the guideline

25 refers -- 2K2.1 applies to machine gun conversion devices

1   because they are firearms as described in 5845(a) and apply

2   both the level-18 base offense level and the specific offense

3   characteristics.

4          However, I think the alternative here is what the

5   Court did in *Hixson*, which is, in their view, in a world

6   without *Dupree*, in terms of, you know, the prescription of how

7   the Court should read the guideline in conjunction with the

8   commentary, the Court upwardly departed under 5K2.0(a)(1)(A) to

9   account for, again, in their view, a perceived hole in the

10  guidelines.

11         2K2.1 itself is structured to increase the offense

12  level when defendants traffic in firearms and to account for

13  the volume at which they engage in that activity.

14         By accounting for that -- well, by not accounting for

15  that here under this interpretation of 2K2.1, that would

16  clearly create an aggravating circumstance that the Sentencing

17  Commission did not adequately take into account.

18         Essentially that would be -- and what -- the Court in

19  *Hixson* essentially was throwing the issue onto the Sentencing

20  Commission by saying that they mistakenly created this gap for

21  auto sears, even though, you know, for years people have been

22  reading this guideline and not seeing that this gap existed.

23         The solution, however, is baked into section 5K of

24  the guidelines, and that's the upward departure.  And as we

25  said in our memo, our recommendation is 20 levels of an upward

1    departure to account for the trafficking and the extremely

2    large number of NFA firearms involved in this case.

3         So our recommendation to the Court would be to find

4    that these -- that the machine gun conversion devices are

5    firearms under 5845(a) as set forth in 2K2.1 and calculate the

6    guidelines accordingly.  But if that were to be an incorrect

7    conclusion -- incorrect interpretation of the guidelines, there

8    would be cause to upwardly depart in the absence of the

9    application of those levels, offense levels.

10        THE COURT:  All right.  So the government's

11   objections are to the failure to include the special offense

12   characteristics for the number of firearms and the failure to

13   include the special offense characteristics for trafficking?

14        MR. MESROBIAN:  Correct, Your Honor.

15        THE COURT:  All right.  And Mr. -- all right.

16   Anything else, Mr. Mesrobian?

17        MR. MESROBIAN:  May I have one moment, Your Honor?

18        THE COURT:  Sure.

19     (Mr. Mesrobian and Ms. Taylor confer.)

20        MR. MESROBIAN:  One final point with respect to I

21   guess what is the defendants' argument and not the probation

22   office's argument with respect to the guidelines is that there

23   is a distinction if one is going to look at the commentary

24   guideline definition of "firearm," that there is only ambiguity

25   in the guideline in the specific offense characteristics if one

 1    wants to take that view.

 2              There's a specific reference to 5845(a) firearms in

 3    the base offense level in sub (1), (3), (4), (5).  There is

 4    only a reference to "firearm" in specific offense

 5    characteristics, and that is giving credit to the argument here

 6    that that is -- that there is ambiguity in the guideline.

 7    However, there is no need to resort to the definition in the

 8    commentary for "firearm" for the base offense level section.

 9              That would be a distinction we would draw, and I

10    think that is probably the distinction that the probation

11    office is drawing as well.

12              THE COURT:  All right.

13              MR. MESROBIAN:  Thank you, Your Honor.

14              THE COURT:  Mr. King, do you want to be heard as to

15    any of those arguments?

16              MR. KING:  Yes, Your Honor, just briefly.

17              THE COURT:  All right.  Go ahead, Mr. King.

18              MR. KING:  You know, the reason for -- you know, when

19    talking about *Dupree*, the reason, you know, we cited to Judge

20    Merryday's opinion was not for any of the legal holdings, but I

21    think he did a very good job of explaining that statutory

22    firearms are not firearms as they are regularly understood in

23    terms of what would be ambiguous or not to a court.

24              So if you took an auto key card to a thousand people,

25    probably excluding the individuals in this courtroom and maybe

1    the 7th and 8th floors of this building and showed it to them,

2    a thousand people would tell you that that's not a firearm.

3              THE COURT:  Except the 12 jurors.

4              MR. KING:  Except -- well, after given the

5    instructions of the Court and the law.  And, you know, to that

6    extent, without those instructions of the Court and the law, if

7    we had asked the 12 jurors "is this a firearm?" at the

8    beginning of the trial before the Court's instructions, I

9    strongly suspect all 12 of them would have said "no."  That's

10   why the specific definitions are important.

11             One of the things I'd like to turn the Court's

12   attention to is Section 1B1.1, which is the application

13   instructions.  And looking at it, in terms of the application

14   notes --

15             THE COURT:  It has the same definition as 921.

16             MR. KING:  It does.  And it starts off by saying,

17   "The following are definitions of terms that are frequently

18   used in the guidelines and are of general applicability, except

19   to the extent expressly modified in respect to a particular

20   guideline or policy statement."

21             So the base offense level is the exception because it

22   specifically cites to a different statute.  But yeah,

23   Subsection H provides that definition of a firearm as well.

24             THE COURT:  But so the -- how do you get around the

25   fact that the jury convicted these individuals of a violation

1    of 5861?  5861 governs the transfer of firearms, and it

2    defines -- and it incorporates the definition of "firearm" from

3    5845.  5845 specifically includes these as a firearm.  So the

4    machine gun conversion devices are unequivocally -- under

5    duly-enacted statute by Congress they are machine guns and they

6    are, therefore, firearms.  And if you look at the guidelines,

7    the guidelines say:  If you violate 5861, you turn -- you go to

8    2K2.1.

9          How can you -- and 2K2.1 presumes that the item that

10   we're dealing with is a firearm.  So how do you then exclude it

11   from the definition?  It starts out being within the definition

12   of a firearm.  How do you then exclude it from the definition

13   of a firearm and use a different definition for "firearm" when

14   you get to the special offense characteristics?

15         MR. KING:  And that's what -- that's exactly what

16   1B1.1 deals with, is unless it is expressly modified by citing

17   to a specific statute, which is done to determine the base

18   offense level, then this is what defines a firearm.  And then

19   it also has that in the application notes.

20         So firearms are defined differently, you know.  What

21   was a firearm under the -- I'm sorry.

22         THE COURT:  Under the argument that you're making

23   right now, this firearm, it -- this machine gun conversion

24   device wouldn't -- if it doesn't fall within the definition of

25   a firearm at all, then how would it be covered by 2K2.1?  If

1  you're saying it has to fall within the 1B1.1 definition, how

2  would it ever qualify under any base offense level?

3          MR. KING:  Because the base offense level

4  specifically cites firearms as defined -- as described in 26

5  U.S.C. 5845.

6          THE COURT:  So you're not -- but Mr. Hoover's

7  argument is that a machine gun conversion device doesn't fall

8  within that definition.

9          MR. KING:  For determining the base offense level.

10          THE COURT:  Right.

11          MR. KING:  Correct.

12          THE COURT:  So where would it -- where would it fall

13  within the base offense level under --

14          MR. KING:  I'm afraid I'm not following you, Your

15  Honor.  I know this is a -- it's a little --

16          THE COURT:  Well, but -- I think probably because the

17  argument is circular, but I'm trying to follow it.

18          If "firearm" has to have the definition in 1B1.1,

19  where would -- how could a machine gun conversion device fall

20  within the ambit of any of the offense levels in 2K2.1?

21          MR. KING:  So -- Your Honor, if I could just have a

22  moment --

23          THE COURT:  Sure.

24          MR. KING:  -- because I think I also turned myself

25  into a little bit of a twist here.

1          Your Honor, the base offense level uses a more

2   specific definition than "firearm" as it is used throughout the

3   guidelines.  And by using a more specific definition, looking

4   to 2B1.1, that's when you apply more specific or different

5   definitions.  So that is modified, and that is how the rules

6   are supposed to be interpreted according to the application

7   notes there.

8          So generally, it should be defined as Subsection H in

9   2B1.1, which is the same as it is defined in 921(a)(3), but

10  the -- anytime that there needs to be a different definition,

11  that has to specifically cite to a statute or provide a

12  different definition.

13         So for the specific offense characteristics -- I'm

14  sorry, for the base level offense, it applies a definition that

15  is different than is used throughout the rest of the guidelines

16  to determine that base offense level.

17         But the rest of that guideline doesn't say if -- you

18  know, if -- you know, does not change the definition of

19  "firearm" as it's applied throughout the rest of the

20  guidelines.  And if it did so, it would specifically say so,

21  and it does not.

22         THE COURT:  Okay.  Anything else, Mr. King?

23         MR. KING:  No, Your Honor.  Just, you know, briefly,

24  you know, in this -- you know, turning to the government's

25  supplemental sentencing memorandum, of the three cases cited in

1   the Jacksonville Division, I was the attorney on two of those.

2   And, you know, I know this is -- you know, I can tell the Court

3   this is just not an issue we addressed.

4        I know in terms of Mr. Blocker, my understanding,

5   which is the first one they cited, that those were -- that he

6   was a heroin and methamphetamine addict who had guns sitting

7   out in his house.  My understanding was the guns that were

8   calculated for that were the actual firearms that he had in his

9   home, and that the Glock switches that they originally came

10  for, because ultimately that's what he pled to, was the

11  possession while an unlawful user of drugs.

12       And in terms of Mr. Schade, you know, I know he had a

13  probationary sentence and that's been terminated.

14       But that's just not an issue that we came up with or

15  addressed.  You know, had I been as familiar with this issue, I

16  think we would have probably handled it differently, I can say

17  that.  But, you know, it wasn't objected to because it was just

18  not an issue that I had seen raised before or was familiar

19  with.

20            THE COURT:  All right.  Thank you.

21            MR. KING:  Thank you, Your Honor.

22            THE COURT:  Mr. Larosiere.

23            MR. LAROSIERE:  Yes, Your Honor.  Just one moment.

24            Thank you, Your Honor.

25            Just very briefly.  To agree with the position of the

1   government we'd have to agree that this is unambiguously in

2   every way a machine gun.  It's ambiguous factually, legally.

3   This is ambiguous every which way.

4        And again, I'm not contesting that my client was

5   convicted.  He was.  The question is:  How do the guidelines

6   handle this?

7        We talked about the cases earlier.  The government

8   pointed out, there was no objection.  Those arguments were

9   waived, so they're not precedential here.

10       And to deal with the suggestion that the guidelines

11  simply forgot or excluded, that's not true.  There's a catchall

12  in 2K2.1.  That's (a)(7).  And I think it flows perfectly

13  logically that something that -- and again, the guidelines say:

14  Violative of this statute, convicted of this statute, proceed

15  to 2K2.1.

16       You would have people whose convictions involved

17  everything from rocket launchers, for which there's a specific

18  sub application, to an AK-47 machine gun, which was

19  unambiguously a machine gun, which would fall under (a)(5), and

20  then there's got to be everything else for (a)(7).

21            THE COURT:  Well, doesn't (a)(7) deal with a pistol

22  or a silencer, a frame, a receiver?

23            MR. LAROSIERE:  Well, Your Honor, it just -- it's

24  silent.  It just says "in all other," I believe is the word.

25            THE COURT:  No, it's "except as provided below," 12.

1          MR. LAROSIERE:  Right.  And so that is the base-base

2     level.  And I think that in -- in the case of something like a

3     homogenous piece of steel with a drawing on it that the jury

4     convicted somebody as a machine gun, you know, it makes sense

5     for that to fall under the catchall.

6          And it's not as if this is not punished.  That's

7     12 points.  That's not a slap on the wrist.  It's clearly very

8     seriously regulated conduct.  And our reading is the only way

9     every single subsection means something.

10         THE COURT:  Well, isn't it only if you look to the

11    definition of "firearm" in the application note that there's

12    ambiguity?  Because otherwise -- otherwise, I'm told to go to

13    2K2.1, which deals with the punishment of receipt, possession,

14    or transportation of firearms.  And it provides punishments

15    based on the character of the firearm or the character of the

16    individual possessing the firearm.

17         It only becomes ambiguous if you turn -- because a

18    jury has already found this to be a firearm.  That's the

19    offense of conviction.  So don't you start with 2K2.1 with the

20    presumption that the object at issue is a firearm, and then the

21    question is:  Does it fall within one of these special

22    categories that enhances the penalty?

23         The penalty's enhanced if it's a semiautomatic

24    firearm that's capable of accepting a large magazine, or the

25    penalty is enhanced if it's a firearm that's described in 5845,

1    which in this case it is.

2         You only get to a -- and when you get to the specific

3    offense characteristics, again, a jury has determined that the

4    item is a firearm.  I'm not aware of anywhere else in the

5    guidelines that the guidelines would identify something that is

6    statutorily defined to be a thing and then the guidelines say,

7    "Oh, but for sentencing it's not a thing."

8         How is it, then, that the ambiguity isn't created by

9    the commentary?

10        MR. LAROSIERE:  Your Honor, with unbelievable

11   respect, I think that there's no way a simple, bare reference

12   to "firearm" is not ambiguous.

13        This would be a very different case if the guidelines

14   said under (a)(5), "Firearm as defined in."  And we know the

15   guidelines drafters knew how to do that.

16        THE COURT:  What's the difference -- you said that

17   earlier and I'm not sure I caught the import of the difference

18   between the word "defined" or "described."

19        MR. LAROSIERE:  Right, Your Honor.

20        So "firearm" -- the word "firearm," the noun, is

21   defined in 2K2.1.  Again, we've already gotten there from 1.1,

22   so now we're at 2.1.  And the word "firearm" takes on that

23   meaning because it's ambiguous.  And I think it's ambiguous in

24   every possible way.  And it is given a meaning that causes all

25   of the pieces to fall into place.  921(a)(3).

1    So if it is a 921(a)(3) firearm, which I would submit

2    is the most federally colloquial definition of "firearm" that

3    we have --

4        THE COURT:  But it's not what they were convicted of.

5    I mean, Congress passed a separate statute.  Congress said,

6    "These are also firearms."  And they're convicted of that

7    firearm offense.

8        Can you give me any other example of a place in the

9    guidelines where the guidelines remove from consideration for

10   sentencing purposes the very item that the individual was

11   convicted of dealing with?

12       MR. LAROSIERE:  Well, I cannot, Your Honor, and that

13   is because there are no other areas in the federal law that

14   deal with such a wide range of divergent articles as 5845 does.

15   And the only way that the relative seriousness of those

16   articles makes sense is if we give 2K2.1 the meaning that the

17   commentary says it has, which, again, is that a firearm under

18   2K2.1 is a 921(a)(3) firearm, that being a real firearm or --

19   and a silencer.  I would say that that was the most, you know,

20   odd thing there, but the public and Congress believed that

21   silencers, on their own, had a unique propensity to do whatever

22   it is they believed they did.

23       It just fits.  It, frankly, just comports.  And our

24   reading is that a shoelace -- which, as we know, can sustain a

25   5845-related conviction -- would fall under (a)(7) and be at

1    12 points.  And I think that fits compared to an AK-47.

2            I think that when the statute covers this broad range

3    between shoelace and literally rocket launcher, it makes sense

4    that they would be punished slightly differently.

5            THE COURT:  All right.

6            MR. LAROSIERE:  Thank you, Your Honor.

7            THE COURT:  Mr. Mesrobian, was there something you

8    wanted to add?

9            MR. MESROBIAN:  Just very briefly, Your Honor, just

10   to clarify the record.

11           Mr. King, when he was talking about Mr. Blocker, in

12   his PSR he was held accountable for 69 firearms.  That included

13   67 non-antique firearms and two Glock switches, which were not

14   installed.  So he was -- those were individually counted in his

15   PSR as firearms.

16           THE COURT:  Of course, they would have made no

17   difference between -- because the difference between 67 and 69

18   makes no impact in the guidelines.

19           MR. MESROBIAN:  Correct, just reciting the probation

20   office's analysis in there.

21           And, Your Honor, just one final thing.  The only --

22   as the Court noted, I think the only ambiguity here is created

23   by the commentary.  This item is a firearm.  They were

24   prosecuted for transferring these items as firearms and found

25   guilty.

1    Judge Merryday's opinion lays out exactly Congress's

2    intent and thought process behind regulating these items.  To

3    think that they and the Sentencing Commission then excluded

4    them from 2K2.1, what would be the reason?  There is not one.

5    No one's talked about why the reason that would be for them to

6    do that.  They meant to regulate these.

7    The Court is right.  This is the correct guideline to

8    apply here.  These items are specifically referenced in the

9    subsection of the base offense level, and that's our position.

10    THE COURT:  All right.  I think the difficulty here

11    is that -- well, let me take a step back.

12    First of all, the definition of "firearm" in 1B1.1

13    and the definition of "firearm" that we're talking about here

14    in 2K2.1, both of those definitions are found in the

15    commentary, not in guidelines themselves.

16    And the probation office correctly relies on the

17    commentary.  And I think the probation office, reading the

18    guideline and applying the commentary, scores the guidelines

19    consistent with what's written in black and white in the

20    guideline manual.  And so I credit the probation office for

21    that determination.

22    The problem, though, I think we have, is that *Dupree*

23    makes clear that you can't defer to the commentary in the

24    guidelines if -- to the commentary to the guidelines if the

25    guideline itself is not ambiguous.  And so the Court has to

1    start with the question of determining whether the meaning of

2    the guideline itself is in doubt.

3         And if it's genuinely ambiguous, then the Court

4    applies deference.  But if it's not ambiguous, then the Court

5    can't apply deference.  And it certainly can't apply deference

6    if the commentary is inconsistent with the guideline.

7         And *Dupree* looked at that issue, and *Dupree* also

8    relied on *Kisor*, which instructs that in determining whether

9    there's ambiguity, you have to look at the text, the structure,

10   the history, and the purpose of the regulations.  And again,

11   *Kisor* says you don't give deference unless there's ambiguity.

12        And I'm just not convinced that when you look at the

13   text, the structure, the history, and the purpose of the

14   regulation that there's ambiguity in what a firearm is when

15   you're applying these guidelines.

16        As I said earlier, you start with the premise that

17   the individual who's being sentenced through the application of

18   2K2.1 is an individual who has been convicted of an offense

19   involving a firearm.  If it wasn't a firearm, we wouldn't be at

20   2K2.1 at all.

21        And then 2K2.1 proceeds to apply different offense

22   levels based upon the character of the firearm or based upon

23   the criminal history of the individual that possessed or

24   engaged with the firearm.

25        And, for example, as Mr. Larosiere notes, paragraph

1  (a)(7) just says it's a level 12, "except as provided below."

2  So what -- it doesn't have to be -- it doesn't say it has to be

3  a firearm, it just -- it presumes that it's a firearm because

4  the individual is being sentenced for a firearm offense.  And

5  so it seems inconsistent to me that whatever the item would be

6  would be a firearm but not be a firearm when you get to the

7  specific offense characteristics.

8       And as I noted earlier, you're only applying 2K2.1

9  because the guidelines instruct you to apply that if the

10  individual is convicted under 26 U.S. Code, Section 5861.

11       So it is a firearm for the offense of conviction, so

12  it has to be a firearm, then, for the base offense level as

13  well, because if it's not a firearm, it wouldn't even apply

14  under (a)(7).

15       And then for it not -- looking at the text, for it

16  not to then -- for the definition of "firearm" to then change

17  for the specific offense characteristics simply doesn't make

18  sense.

19       The structure of 2K2.1 also suggests that the

20  ambiguity comes not from the structure or the language of the

21  guideline itself, but, rather, from the limiting definition of

22  "firearm" in the commentary.

23       At each level of 2K2.1, the guidelines provide an

24  increased penalty for a semiautomatic weapon and for a firearm

25  as described in 5845.

1        And so the structure of the guidelines evidences the

2   Sentencing Commission's intention to treat certain types of

3   firearms -- the semiautomatic firearms capable of accepting

4   large magazines and the firearms as described in 5845 -- more

5   seriously than other firearms.

6        But if you exclude firearms that don't fall in the

7   definition of 921 from the specific offense characteristic, it

8   would lead to the anomalous result that an individual who

9   possesses, let's say, 25 silencers is going to end up with a

10  higher offense level -- a significantly higher offense level

11  than an individual who possesses the same number of machine gun

12  conversion devices or 250 machine gun conversion devices,

13  because there would be no enhancement for the number of machine

14  gun conversion devices.

15       It also means that an individual who possesses a

16  silencer or just the frame or just the receiver would be

17  subject to an enhancement under paragraph (a)(6) if they were

18  transferring that item out of the country or if they had reason

19  to know that it would be used in connection with another felony

20  offense.  But an individual with a machine gun conversion

21  device wouldn't be subject to an enhancement under (a)(6).

22       And that interpretation is just not internally

23  consistent with the structure of the guideline at all.  And

24  it's contrary to the statute itself that defines what

25  constitutes a firearm for purposes of the National Firearm Act.

1    And the jury convicted the defendants and determined that the

2    items they were conspiring to transfer were firearms.

3            So the interpretation that is -- the definition that

4    is in the commentary seems to me to be what creates the

5    ambiguity, because if you don't look to that, you start with

6    the premise that it was a firearm, because that's what the jury

7    said it was, and then you apply the various application notes

8    assuming that the item is a firearm.

9            And then you look at the history of the regulation,

10   and there's nothing in the history of the regulation that

11   evidences any intention to remove or protect or treat less

12   harshly machine gun conversion devices.

13           Up until 1991, the guidelines specifically said if

14   you're dealing with a firearm as defined under 921, you use the

15   921 definition; if you're dealing with a firearm under 5845(a),

16   you use the 5845(a) definition.

17           They changed it in 1991, but nothing in that history

18   reflects that they were trying to alter the treatment of the

19   machine gun conversion devices, and nothing in the history of

20   the changes in 2003 suggests an intention to treat machine gun

21   conversion devices differently than other items that aren't in

22   and of themselves operable as a firearm; again, such as a

23   muffler or a silencer.

24           And when you look at the purpose of the regulations,

25   it's apparent throughout 2K2.1 that there was an intention to

1    treat Section 5845 weapons more severely in recognition of, as

2    Mr. Larosiere acknowledged, the increased danger that they are

3    believed to pose to public safety, and to punish the firearms

4    offenses in a manner commensurate with the danger of the weapon

5    possessed or the danger of the person possessing the weapon.

6           And excluding the machine gun conversion device from

7    that definition of "firearm," that creates the ambiguity, and

8    it's inconsistent with the overall purpose of the guidelines.

9           And so I don't think I can give deference to the

10   limited definition of "firearm" that is found in the commentary

11   to 2K2.1 at Application Note 1.  I think it's inconsistent with

12   the guideline itself.  It's inconsistent with the offense of

13   conviction.  And I don't think that the guidelines become

14   ambiguous until you read in that application note.

15          And so to the extent -- to the extent that either

16   Mr. Ervin or Mr. Hoover object to the base offense level of 18,

17   I have to overrule the objection because *Dupree* -- I'm bound by

18   *Dupree*, and *Dupree* says I can't give deference if it's

19   inconsistent or if the guideline is not ambiguous.

20          And one other thing I'll note in terms of the history

21   and whether the history of the guidelines suggests that this is

22   an intentional deletion -- just a moment, let me find it.

23          Recently the Sentencing Commission has put out for

24   public comment additional questions about various guidelines.

25   One of those reads as follows:

1   "The general definition of firearm in 2K2.1 at

2 Application Note 1 is drawn from 18 U.S.C., Section 921(a)(3).

3 However, 2K2.1 applies a higher base offense level to offenses

4 involving firearms described in 26 U.S.C., Section 5845(a).

5 Although Section 5845(a) generally defines a more limited class

6 of firearms than Section 921(a)(3), there are a limited number

7 of devices, such as those designed and intended solely and

8 exclusively for use in converting a weapon into a machine gun,

9 which are firearms under 5845, but not Section 921(a)(3).

10 Thus, such devices are firearms for purposes of the increased

11 base offense levels in 2K2.1(a)(1), (3), (4)(B)(i)(II), and

12 (6), but not for purposes of the specific offense

13 characteristics referring to firearms such as 2K2.1(b)(1),

14 which is the number of firearms.  The Commission seeks comment

15 on whether it should amend the definition of 'firearms' in

16 application note 2K2.1 to include devices which are firearms

17 under Section 5845(a) but not Section 921."

18   That reflects that this was not an intentional change

19 by the Sentencing Commission.  And in fact, if anything, the

20 Sentencing Commission is considering whether to close the gap

21 identified by the Court in *Hixson*.

22   And I'll note that the Sentencing Commission clearly

23 thinks that a machine gun conversion device, under the

24 guidelines, would start out at a level 18 because it

25 specifically says so.  It's only that if -- they are currently

1    excluded under the special offense characteristics.  And so

2    those comments also support a conclusion that the history of

3    the guidelines doesn't indicate that that limiting definition

4    should be applied if inconsistent with the statute and

5    inconsistent with the guidelines themselves.

6              So for purposes of the guidelines, the objection to

7    the offense level of 18 is overruled.  And then it would seem

8    that the defendants would be subject to the enhancements, so

9    there would be the special offense characteristic -- paragraph

10   53 would add a special offense characteristic for the number of

11   the firearms, which would be 10, and the special offense

12   characteristic under (a)(5) for trafficking, which would

13   increase by four levels.  So we would be at a level 30- --

14   paragraph 57 would be level 32.  And I'm looking at Mr. Ervin's

15   presentence report.

16             I need to confer with the probation officer about the

17   grouping.  So it's -- why don't I -- have I addressed all the

18   guideline objections at this point, Mr. King?

19             MR. KING:  Your Honor, the one on Count Nine, the

20   structuring, I don't think you've ruled, but I . . .

21             THE COURT:  But you suspected my ruling from my

22   question earlier, yeah.

23             The problem with the argument, and I understand the

24   argument, but the jury did find beyond a reasonable doubt that

25   Mr. Ervin knew the unlawful purpose of the conspiracy.  And the

1  funds that he had were generated from the conspiracy.  And so I

2  think the jury rejected the idea that he had a subjective

3  belief that what he was doing was lawful, and so for that

4  reason I have to overrule the objection to 59.  So it's

5  preserved, certainly, for purposes of review.

6          Any other guideline objections that I need to address

7  for Mr. Hoover?

8          MR. LAROSIERE:  Your Honor, just for purposes of the

9  record, Hoover would also object to the special offense

10  characteristics enhancements as well as the base level offense,

11  just for the record.

12          THE COURT:  Certainly.

13          Mr. Mesrobian, I'm not going to deal with the 5K2.0

14  departure issue at this time.

15          MR. MESROBIAN:  Understood, Your Honor.  And I think

16  Ms. Taylor will address that in the 3553 factors in terms of

17  the appropriate sentence in this case and the factors.

18          THE COURT:  Okay.  Then let me take -- let's take

19  about -- it's 11:20 and we've been going for a couple hours.

20  We'll take about a 20-minute recess and then we'll reconvene.

21          COURT SECURITY OFFICER:  All rise.

22      (Recess, 11:20 a.m. to 11:39 a.m.)

23          COURT SECURITY OFFICER:  All rise.  This Honorable

24  Court is back in session.

25          Please be seated.

1          THE COURT:  All right.  So what we need to do is

2     determine the guidelines based upon the Court's rulings on the

3     objections.

4          And so looking at Mr. Ervin's presentence report, at

5     page 12, there would be two specific offense characteristics.

6     I think earlier I said (a)(1) and (a)(5).  I meant to say

7     (b)(1) and (b)(5).  But there's a 10-level increase for (b)(1)

8     for the more than 200 firearms, and there's a 4-level

9     enhancement -- special offense characteristic enhancement under

10    (b)(5), which yields a total offense level of 32.  That takes

11    us down to paragraph 64 for the grouping.

12          Count Nine no longer receives any additional units

13    because it's more than ten levels below the offense in Count

14    One.  And so there's one unit for Count One.  Under 3D1.4,

15    where there's only one unit, there is no increase.  So the

16    Total Offense Level simply remains at 32.

17          And paragraph 66, then, would be stricken.

18          And I think we would also strike 67.

19          Ms. Anderson, is that right?  Do you want to look at

20    mine?

21          PROBATION OFFICER:  Well --

22          THE COURT:  Come up to sidebar.

23      (The judge and the probation officer confer at sidebar.)

24          THE COURT:  So the probation officer's suggestion is

25    rather than striking 67, we just indicate that there was no --

1   there was no increase, which is what we have done.

2          So the Total Offense Level in paragraph 70 for

3   Mr. Hoover -- I'm sorry, Mr. Ervin, becomes 32, with a Criminal

4   History Category of I.  That yields a guideline term of

5   imprisonment of 121 to 151 months.

6          So in paragraph -- paragraph 106 needs to change to

7   reflect the offense level of 32 and the guideline.

8          And the fine range -- the maximum fine in 113 remains

9   the same.  The guideline provision in 115 increases to 35,000

10  to 250,000.

11         Ms. Anderson, are there any other places that we need

12  to make corrections -- or changes to the PSR to be consistent

13  with the Court's rulings?

14         PROBATION OFFICER:  No, Your Honor.

15         THE COURT:  Okay.

16         Turning to Mr. Hoover, at page 13 we would add

17  special offense characteristic of (b)(1)(E), which increases

18  ten levels; special offense characteristic of (b)(5) increases

19  four levels.  Paragraph 60 becomes 32 instead of 18.  His

20  Criminal History Category is also I.

21         So when we go to paragraph 96 we correct the offense

22  level and we correct the guideline range to 121 to 151.

23         And the fines in paragraph 105 increase to 35,000 to

24  250,000.

25         So then with respect -- oh, any other changes I need

1    to make to the Hoover PSR, Ms. Anderson?

2             PROBATION OFFICER:  No, Your Honor.

3             THE COURT:  So then with respect to -- based on the

4    Court's determinations of the applicable guideline range for

5    both Mr. Hoover and Mr. Ervin, Total Offense Level is 32,

6    Criminal History Category is I, which yields a guideline term

7    of imprisonment of 121 to 151 months, supervised release of 1

8    to 3 years for each count.  There's no restitution.  The fines

9    range from $35,000 to $250,000.  Mr. Hoover has special

10   assessments of $500.  Mr. Ervin has special assessments of

11   $1,200.

12            Mr. King, preserving all of your objections to the

13   Court's rulings, is my calculation of the guidelines consistent

14   with my rulings?

15            MR. KING:  Yes, Your Honor, in light of the Court's

16   rulings.

17            THE COURT:  All right.  Mr. Larosiere, preserving all

18   of your objections as well, is my calculation of the guidelines

19   consistent with your understanding of the guidelines as to

20   Mr. Hoover?

21            MR. LAROSIERE:  Your Honor, with the added objection

22   that the -- assuming it wasn't already covered by my previous

23   objection, the enhancement for the number of firearms ought not

24   be applicable to Hoover.  Aside from that, no, Your Honor, it's

25   consistent with your rulings.

1         So if you -- if my previous objections include

2    that -- because I said object to the application.  So I guess I

3    would just like to incorporate into my previous objection not

4    just the definitional issues, but the quantity issues.

5         THE COURT:  How would the -- if he was convicted of

6    the conspiracy, why wouldn't the conspiracy have included 200

7    or more machine gun conversion devices based on the jury's

8    finding?

9         MR. LAROSIERE:  I'm not sure if the jury's finding

10   could support that quantity, Your Honor.

11        THE COURT:  Can you tell me why not?

12        MR. LAROSIERE:  It's not clear that any of this -- of

13   the cards transferred, aside from those substantive acts which

14   were actually convicted, are attributable to Hoover.  And in

15   fact, the fact that certain substantive acts Hoover was not

16   convicted of I think underlies that objection.

17        THE COURT:  Wasn't the evidence presented at trial

18   the significant spike in sales after each of the CRS Firearms

19   videos?

20        MR. LAROSIERE:  I don't think that's a particular

21   factual finding that was relevant to the jury's conclusions,

22   Your Honor, or necessary for the jury's conclusion.

23        THE COURT:  Well, but the Court -- in determining

24   whether there was more than 200 -- whether the offense involved

25   more than 200 firearms, the Court makes that determination

1   based on a preponderance of the evidence, relying on the

2   evidence presented at trial.  Wouldn't that support the

3   finding?

4          I won't make you answer that.

5          MR. LAROSIERE:  Thank you, Your Honor.

6          THE COURT:  Mr. Mesrobian, would you like to address

7   that issue?

8          MR. MESROBIAN:  No, Your Honor, other than to say

9   that I believe the Court is correct based on the charged

10   conspiracy and the date range therein.  In combination with the

11   evidence at trial, I think that, by a preponderance of the

12   evidence, that shows that the conspiracy involved more than 200

13   auto key cards.

14          And if the next question was if the United States

15   agrees with the calculation as ruled by the -- based on the

16   rulings by the Court, we do.

17          THE COURT:  Okay.  All right.  So then we have

18   determined the guidelines, and the next step in the process is

19   to determine the appropriate sentence.

20          And I'm aware that Mr. Mesrobian had suggested that

21   there should be a 5K2.0 upward departure of 20 levels if the

22   Court did not accept the government's position with regard to

23   the guideline calculations.  And I suspect that there's going

24   to be an argument that there should be either still an upward

25   departure or a variance upward because the number of firearms

1   scored, which is 200, is substantially less than the 6,600

2   firearms at issue.

3          I think I need to just say out loud that, if

4   anything, at this point I think the guidelines are greater than

5   necessary for purposes of this offense.  And I'll say it's

6   highly unlikely that I would be convinced to even impose a

7   sentence within the guideline range, much less above it.  I'm

8   just putting that out there so that the government is aware.

9          I've calculated the guidelines in the manner that I

10  think is required under the law, but I think it drives a

11  sentence that is greater than necessary when one considers the

12  history and characteristics and the actual offense conduct.

13         And so that -- and I will say that, at the same time,

14  if I had accepted the defendants' contentions and the

15  guidelines were what the defendants argued for the way the

16  probation office scored them, I likely would have applied a

17  5K2.0 upward departure because I think that not including any

18  special offense characteristics for the number of firearms and

19  the significant nature of the activity of the defendants, that

20  would be inadequate.

21         And so I think the guidelines on either end probably

22  are not quite right.  And I'll address that in my final

23  findings, but I just put that out there so that you-all know

24  kind of where I'm starting from.  Having ruled on the

25  guidelines in the manner that I think the law requires me to

1    rule, I do think that they result in a higher-than-necessary

2    guideline range.

3           With that, Ms. Taylor, I think the floor is yours.

4    If you'll just let me find my notepad.

5           Go ahead.

6           MS. TAYLOR:  Yes, Your Honor.

7           Your Honor, understanding the Court's current

8    viewpoint about whether any sort of further upward departure

9    would be warranted, the United States does submit --

10          THE COURT:  Yeah.  And let me just say for the

11   record, I'm not pretermiting your ability to make your record

12   and to make the argument.  I just wanted to give you a heads-up

13   on which way I was leaning on that.  But you're certainly --

14   just as the defendants, you will make your argument.  I'm not

15   suggesting that you can't make that argument, Ms. Taylor.

16          MS. TAYLOR:  Yes, Your Honor.

17          And so based upon the Court's ruling on the

18   guidelines objections, what the government is asking for is an

19   upward departure of six levels to account for the inadequacy of

20   the guidelines with regard to the number of firearms.  I

21   believe that we've already outlined this argument in our memo.

22   And also to account for the fact that all of those firearms

23   were machine gun conversion devices, which, as Mr. Mesrobian

24   has previously argued, pose an especially dangerous

25   characteristic to the public.

1          And with that, Your Honor, I'll just proceed with my

2    sentencing argument under 3553.

3          This case involves two men who conspired together for

4    an extended period of time to sell what they knew to be illegal

5    machine gun conversion devices.  They have never accepted

6    responsibility for what they did.  In fact, they explicitly

7    continue to reject any sort of responsibility or any suggestion

8    that what they did was illegal.

9          So it's -- there's no contrition here.  There's only

10   continued assertions that -- for example, in Mr. Hoover's

11   sentencing memo, that he stands convicted of talking about

12   laser etchings on a homogenous piece of steel.  So the

13   minimization of what he did is readily apparent.  That's not

14   what he stands convicted of.  There's no statute that says you

15   can't talk about laser etchings on a homogenous piece of steel.

16         What he's convicted of, and what the evidence

17   overwhelmingly showed and what the jury decided, was that what

18   Mr. Hoover did was conspire to transfer machine gun conversion

19   devices that were thinly veiled as conversation pieces, or

20   bottle openers, to his viewers on YouTube.

21         As the Court heard during the trial, his viewership

22   on YouTube at various times reached upwards of almost 200,000

23   viewers.  So he had a substantial audience of people to sell

24   these items to.

25         And the Court just moments ago referenced the chart

1  that was presented at the trial as well which had the

2  correlation between the numbers of Mr. Ervin's sales of auto

3  key cards and when Mr. Hoover starting releasing his videos,

4  which clearly demonstrate Mr. Hoover's extreme -- or critical

5  role in getting Mr. Ervin's business off the ground.

6          When I think about which of them is the more culpable

7  in this scenario, I have a difficult time determining that one

8  or the other of them is more culpable.  Initially you could say

9  it's Mr. Ervin because he's the one that came up with this

10  idea.  He's the one that got -- you know, tricked the machine

11  shop, essentially, into manufacturing them for him by being --

12  by lying about what they really were and saying they were a

13  construction tool.  And he obviously was endeavoring to sell

14  these things -- sell the auto key cards before he ever came

15  into contact with Mr. Hoover.

16          But it's also abundantly clear that Mr. Ervin never

17  would have reached the audience that he did or achieved the

18  level of success that he did without Mr. Hoover saying, "Yes,

19  I'm" -- "I'm ready to go and tell people on my YouTube videos

20  exactly what this thing is and how they can turn it" -- "use it

21  to turn their AR-15 into a machine gun."

22          Mr. Ervin seemed to want to blanket himself under the

23  idea that, well, if I don't tell people how to do it, if I just

24  send them emails saying, you know, "Just Google these search

25  terms and then you'll find the instructions," that that

1    protected him or veiled him from any sort of responsibility for

2    what he was doing.

3           He made other comments in his messages to Ms. Wolfe

4    that were presented at the trial along the lines of, "I can't

5    help what people do with it once it's out of my hands."

6           And -- but -- but what he did, then, was he got

7    Mr. Hoover to say those things for him.  He got Mr. Hoover to

8    say the quiet part out loud to his audience of over a hundred

9    thousand viewers and tell them exactly what it was, exactly

10   what you could do with it, exactly how you needed to configure

11   your firearm, and how to put the piece together inside of your

12   firearm to cause it to fire fully automatically.

13          And moreover, Mr. Hoover didn't just give those

14   instructions, but he explicitly advocated for prohibited

15   persons to obtain these devices.  One of the things that he

16   said in one of his first videos was, "Once you are prohibited,

17   that doesn't mean you can't have firearms anymore."  And I'm

18   paraphrasing, but he said, "That doesn't mean you can't have

19   firearms anymore, what that means is your chains have been

20   broken.  You can do whatever you want with a firearm, so why

21   not make a machine gun?"

22          And that sort of advocacy of lawlessness, which

23   Mr. Hoover clearly was engaging in, was click-bait, I'm sure,

24   to get him more views to his videos, but also led to an

25   enormous increase in the sales of the auto key card.  It led to

1  Mr. Ervin reaping enormous profits on the auto key card, which

2  he paid approximately 2 to $3 for each one to get it

3  manufactured and then was charging between 60 to about $150 for

4  each one that he sold.  So this was enormously profitable to

5  Mr. Ervin.

6          Mr. Ervin, again, continuing to try to conceal what

7  he was doing and conceal himself from law enforcement, made

8  efforts to hide what he was doing with his bank as well by

9  structuring these cash withdrawals.

10         THE COURT:  How was that trying to hide what he was

11  doing from his bank?

12         MS. TAYLOR:  Because he was not -- well, I guess to

13  be more accurate, I think he was trying to hide what he was

14  doing from the government by making the money untraceable and

15  refusing to engage in any sort of transaction; for example, the

16  bank check that was offered by the bank that he could have

17  taken and deposited in another bank, or doing an electronic

18  transfer or something like that to take his money out of the

19  bank.

20         And he also concealed his activities from the

21  government by paying Mr. Hoover in cash; sending money through

22  the mail to Mr. Hoover rather than what an ordinary person

23  would do in sending Venmo or Zelle or PayPal or any of the

24  number of other electronic payment -- instant payments that

25  could be sent for essentially no fee whatsoever.  Instead, he

1    was FedExing cash to Mr. Hoover.

2            THE COURT:  Or people like me that still write

3    hard-copy checks.

4            MS. TAYLOR:  Still slightly different than FedExing

5    cash, Your Honor.

6            But Mr. Ervin's intent in making these things was

7    not, as he said, free speech.  And that was clear from the

8    messaging that he put out, in particular, before he hooked up

9    with Mr. Hoover in this conspiracy.

10           He sent messages where he told his potential

11   purchasers, you know, "It's designed to be legal as-is, but

12   certain individuals may choose to use it in an illegal way in

13   the future under certain dire circumstances."

14           There was testimony at the trial about Mr. Ervin

15   being a prepper.  And it appears that his engagement in this

16   auto key cards conspiracy was part of that mindset that he had,

17   that the government is imminently going to fall and that once

18   that -- I guess at some point in that process that everybody's

19   going to be able to cut these things out and convert their

20   weapons into machine guns because there would be complete and

21   utter lawlessness.

22           But again, Mr. Ervin himself was telling his

23   customers, "You can choose to use it in a different way" -- in

24   other words, an illegal way, in other words, to use it to

25   convert your weapon into a machine gun -- "in the future."

1          Your Honor, there was a lot of argument about --

2    well, there's a lot of argument in particular in Mr. Hoover's

3    sentencing memo about this case being outside the heartland of

4    cases contemplated by the guidelines.  It's not clear exactly

5    what Mr. Hoover means by that except that he repeatedly

6    suggests that this case that he cites, I believe at least three

7    times in his sentencing memo, the *Vest* case, stated that the

8    NFA is intended to go after crime weapons and not tchotchkes.

9    The *Vest* case doesn't ever say the word "tchotchkes."  It

10   doesn't have anything to do with tchotchkes.

11          What the *Vest* case is about is a police officer who

12   apparently believed that he was lawfully purchasing a machine

13   gun under the authority of his police department and was

14   prosecuted for possessing an unregistered -- or an NFA weapon

15   that was not registered to him.

16          And so what the Court in *Vest* was saying was this

17   statute was not intended to go after law enforcement weapons.

18   That's actually what it says.  It's not minimizing that

19   tchotchkes are not really that important or in any way

20   suggesting that machine gun conversion devices are tchotchkes.

21   That's not part of the case.

22          But to the extent that this case is outside the

23   heartland or different from other cases that have been

24   prosecuted in this district, first off, it's clear from the

25   supplemental memo that the government filed that violations of

1   Section 5845 or Section 5861 relating to conversion devices are

2   happening in this district fairly regularly.  And they only

3   seem to be on the increase with 3D printing and Glock switches,

4   which are sort of the fad right now.  But there's really no

5   argument to be made that this is something that the government

6   ordinarily just turns a blind eye to and doesn't pursue.

7            The only way in which this case is outside the

8   heartland or different from those cases is the massive scale at

9   which Mr. Ervin and Mr. Hoover conducted their criminal

10  activity.  The other cases that are discussed in this

11  supplemental sentencing memorandum involved maybe up to dozens

12  of machine gun conversion devices.  Nothing where two men got

13  together, agreed to engage in illegal conduct over a term of

14  months, engaged an unwitting manufacturer to make the machine

15  gun conversion devices, and then advertised them on YouTube to

16  an audience of at least tens of thousands, leading to the sale

17  of, in this case, what the Court has credited -- and it -- the

18  fact in the PSR was not objected to, that the offense involved

19  at least 6,600 auto sears, which may be, actually, an

20  undercount, because as shown at the trial, there's at least one

21  other manufacturer that made the auto key card for Mr. Ervin

22  before he finally started working with Orange Park Machine.

23  But the amounts of those key cards that were manufactured at

24  that point is unknown at least to the government.

25           So the only way in which this case is outside of the

1    heartland or distinguishable from those other cases is that

2    this case involved a massive scale.  It involved the massive

3    online marketing of these things as exactly what they were,

4    which was machine gun conversion devices, and the encouragement

5    of purchasers to use them to convert their firearms into

6    machine guns.

7            As the government argued in its sentencing memo and

8    as Judge Merryday's opinion in *Aguilar-Espinosa* makes clear,

9    machine gun conversion devices are dangerous.  And that's so --

10   I mean, really whether or not we're looking at bump stocks,

11   which are -- Mr. Larosiere I think referred to at one point, or

12   maybe it's in their sentencing memo, that firearms regulations

13   are in flux.  Well, that -- the law about bump stocks certainly

14   is in flux, but the law about these is not.  Machine gun

15   conversion devices have been part of the NFA for decades.

16           And the definition that was used in this case by the

17   government to prosecute, that was presented to the jury in the

18   jury instructions, comes straight out of the statute.

19           There's nothing about the ATF doing rulemaking or,

20   you know, trying to slip something past the public that nobody

21   knew about in this case.  Not that I'm saying that happens in

22   other cases, but it's just that -- those arguments are

23   completely irrelevant to what happened in this case because the

24   device is a machine gun as defined under the statute, and

25   that's what the jury's verdict reflected.

1          Your Honor, Mr. Hoover argues that -- for one thing,

2    he argues that it serves 5K2.0's purpose to point out that

3    firearms law is in an incredible state of flux and a reasonable

4    person could be confused as to whether these things were

5    illegal.  Well, again, the law as to machine gun conversion

6    devices is not in flux.  It's not in question.  And it's also

7    clear that Mr. Hoover and Mr. Ervin both understood exactly

8    what the items were and what function they performed.  So

9    whether some other reasonable person could, perhaps, be

10   confused about whether or not they were firearms is really

11   beside the point.

12          But regardless of whether something is a hundred

13   percent within the statutory definition of a firearm, as the

14   auto key card was, or whether it's something like a bump stock,

15   which courts -- circuit courts are currently in disagreement

16   over whether it meets the definition or not, the point that the

17   government was making in its sentencing memo, and the point

18   that I make to you today, is that any kind of device that

19   causes the rapid fire of a firearm enables mass destruction.

20   It doesn't matter whether that thing -- whether it's a bump

21   stock that, again, courts can reasonably disagree about whether

22   or not it meets the definition of a machine gun or whether it's

23   the auto key card, which clearly does.  Either way, those are

24   both devices that are meant to convert a rifle to fire rapidly.

25   And it's that rapid firing that is what gives the auto key

1  card, any kind of auto sear, or a bump stock its destructive

2  power.

3        That's exactly what Judge Merryday was describing

4  when he described "brutally lethal capacity, the possession of

5  which imminently threatens the public" when describing auto

6  sears.

7        THE COURT:  I guess, Ms. Taylor, the concern I have

8  about the government's reliance on that -- and there's no doubt

9  that a machine gun is capable of mass destruction.  But in

10  terms of the level of danger of these particular devices, I

11  think the evidence at trial was that the only person who

12  successfully converted it was the agent.

13        But if these items are so very dangerous -- and they

14  absolutely fall within the definition of a machine gun based on

15  the jury's verdict.  But if they're so dangerous -- the

16  government certainly didn't prosecute any of the individual

17  purchasers, but the government also hasn't -- based on the

18  testimony at trial, hasn't made any effort to go get them off

19  the street.

20        And so I have a hard time reconciling in my mind how

21  these devices are so dangerous, yet the government has in its

22  possession names and addresses of over a thousand purchasers.

23  But unless it's changed since trial, there hasn't been -- and

24  I'm not suggesting that every purchaser should be prosecuted,

25  but a knock on the door to take back the device, similar to

1    what was done with the other individual purchasers, would seem

2    to be more reflective of this "brutally lethal capacity" that

3    you're arguing that I should enhance their sentences for, but

4    yet there's no effort to take them off the street.  I'm

5    struggling with that.

6           MS. TAYLOR:  Your Honor, what I would say in response

7    to that is with regard to the argument that I anticipate the

8    defendants likely will make, that no one else successfully

9    converted one of these things into -- or actually, you know,

10   cut it out and successfully installed it in a weapon, first

11   off, was what I was referencing earlier with regard to

12   Mr. Ervin's instructions to -- or intentions for how they be

13   used, you know:  Keep this and use it later, when essentially,

14   you know, the government falls and everything is in disarray.

15          So to the extent that that's how he was marketing, we

16   heard from Mr. Moya, he was one of the purchasers that

17   testified at trial, that he purchased four of them and put them

18   away, to have them for later, because he also believed that the

19   United States is about to devolve into chaos and lawlessness,

20   and that was when he intended to use them, at that later time.

21          So that's one potential reason why we haven't seen

22   somebody else successfully convert one.

23          Another reason why is, frankly, I believe there was

24   testimony about this at trial as well, but not all of the names

25   in that database are the names of the real person.

1          THE COURT:  Right.

2          MS. TAYLOR:  Some -- Mr. Hoover explicitly instructed

3    his viewers to "send it to your anti-gun relative."  And we

4    know that at least of our sample size that Mr. Osso and

5    Mr. Alderson did that in order to conceal who was really

6    possessing it.

7          And moreover, in large part, we're relying on what

8    people tell us when they say, "Oh, I cut it up into little

9    pieces and threw it in a ditch."  I don't have any way to

10   verify that that's true.  That was Mr. Roberts's testimony.

11         We had a sidebar at one point during the trial

12   about -- where it was suggested that we should have gotten a

13   search warrant and gone and searched the houses of every single

14   purchaser, and it was the Court's ruling that that was

15   something that we would obviously have staleness issues on.

16         So unless the people who purchased an auto key card

17   are willing to come to their door when ATF knocks, which is a

18   question unto itself, if they don't come to the door, ATF's

19   probably leaving a card there and asking them to call back.

20   And then when they do, all they have to do is just lie about it

21   and say, "No, I don't" -- "I never got that" or "I don't know

22   what you're talking about" or "I destroyed it" or "I threw it

23   away" or "I gave it to my friend Goose," which is what one of

24   the purchasers told the agent, which was a lie.

25         So ATF would be reliant upon thousands of people who

1    are viewers of Mr. Hoover and have been told by Mr. Hoover not

2    to talk to the ATF and that if ATF comes to the door they're

3    going to kill your dog.  So we're relying on these people to be

4    compliant with ATF coming and telling the truth to ATF, which

5    certainly was not our experience of what happened in the couple

6    of -- I think it was a couple of dozen purchasers that were

7    approached in the Jacksonville area as part of this

8    investigation.

9          So for all of those reasons, it is unfortunately

10   unrealistic that ATF is going to be able to achieve the goal of

11   doing a nationwide recovery of thousands of auto key cards in

12   this case and is also the reason that -- I think it assumes a

13   lot to say that nobody else has been able to use one to convert

14   their gun because there are maybe people out there who haven't

15   gotten around to cutting it yet.

16         There are probably -- we know from our interviews

17   that there are people out there who had it, intended to cut it

18   in the future, and then watched Mr. Hoover's videos about the

19   takedown and decided to get rid of it before they got the

20   chance to cut it.  I believe that included Mr. Alderson.  And

21   Mr. Stennes as well.  He had talked about trying to cut it.  He

22   had bought auto key cards and solvent traps.  He had tried to

23   cut the auto key cards, but it was making too many sparks so he

24   hid it in various places around his house -- or, sorry, I'm

25   thinking about Mr. -- I apologize, Your Honor, I have to go

1   back and look through the names.

2        But that was the testimony of one of the purchasers,

3   that he had been unable to cut it and then was keeping it

4   stored for later, when he might -- I guess might try again.

5   And then when ATF knocked on his door, he destroyed his auto

6   key cards and the solvent traps, presumably knowing that he

7   could get in trouble for having them.

8        So again, there's unfortunately no way for us to

9   know -- oh, sorry, that was Mr. Duty.

10       There's unfortunately not a good way for us to know

11  who did and did not successfully cut it out and use it to

12  convert a weapon.

13       Mr. Roberts also had testified at the trial that he

14  had heard automatic fire in the woods when he was out near his

15  home and went up and talked to the strange men in the woods who

16  had a cut-out auto key card.  And that was his testimony.

17  Again, I --

18       THE COURT:  We don't know that that was from

19  Mr. Ervin's, right?  I didn't think there was any evidence

20  about where that had come from.

21       MS. TAYLOR:  I don't believe that he would have been

22  able to say for sure whether that was from Mr. Ervin or

23  somebody else that might have been making a similar product.

24       So for all of those reasons, Your Honor,

25  unfortunately it's unrealistic for us to either know decisively

1   who -- whether anybody has or has not, and to the extent that

2   people have cut it out and used it to convert their weapons,

3   how many.

4           Again, there are people who may have it and still be

5   planning to use it later.  There are people who likely had it

6   and were intending to cut it out but then destroyed it or

7   discarded it because they did not want to get into trouble.

8           And furthermore, our problem here is the lack of

9   cooperation and truthfulness that ATF encountered when trying

10  to interview purchasers and recover the auto key cards, which,

11  in part, is due to the messaging that Mr. Hoover put out after

12  Mr. Ervin was arrested where he told people, "If ATF knocks on

13  your door," you know, "don't talk to them," and, frankly,

14  scared the -- many purchasers, or at least some of the

15  purchasers who testified, into believing that ATF was going to

16  kick down your door and shoot their dog if they came to your

17  house.

18          So obviously ATF is dealing with a portion of the

19  population that have been indoctrinated to believing these

20  things about the ATF, are hostile to the ATF, and are also

21  fearful of prosecution if they were to be truthful about having

22  purchased it and possessing it and/or what they did with it.

23          Your Honor, another point that I wanted to touch on

24  is with regard to Mr. Ervin.  It's apparent from his sentencing

25  memorandum that he's been an unlawful user of marijuana all

1  throughout the time of this conspiracy and apparently for the

2  last 20 years.  So he, additionally, is a prohibited person.

3        The investigation in this case revealed that all of

4  those ARs that Mr. Ervin purchased -- all or almost all of them

5  were purchased with the proceeds of this conspiracy.  And they

6  were purchased during the time frame of the conspiracy, which

7  means that Mr. Ervin was also lying on ATF 4473 forms about

8  whether he was an unlawful user when he made each of those

9  purchases.

10       I'm not -- the government's not seeking to enhance

11 his guidelines range based on those factors.  I personally do

12 not seek to hold people accountable for things that they

13 disclose to probation in terms of enhancing their guidelines,

14 but certainly it's been highlighted as being part of his

15 history and characteristics that he's been an unlawful user of

16 marijuana for 20 years.

17       And clearly he has committed other federal crimes in

18 the course of purchasing and possessing all of the firearms

19 that he was purchasing and possessing during the time frame of

20 the conspiracy as well.

21       Your Honor, I also want to touch on what Mr. Hoover

22 said in his sentencing memo and what was -- and I guess before

23 I get there, there were letters that were submitted on his

24 behalf to the Court.  I spoke with Mr. Larosiere before this

25 hearing today.  We had not received the letters until right

1    before court today.  They did provide me with a copy of them

2    and explain that they were trying to file them under seal and

3    that the motion hadn't been ruled on yet.

4              And I did get a chance to read them after I was

5    provided with them in court today.  And I spoke to

6    Mr. Larosiere about what I understood to be the ordinary

7    procedures, which is that letters of support are filed on the

8    public docket.  And so I just want -- I don't want to talk

9    about anything that's potentially under seal before I move into

10   this topic, but there is information in the letters that should

11   be redacted.

12             THE COURT:  There is information in the letters that

13   would need to be redacted if it was on the public docket.  The

14   truth is that letters come to the Court in a lot of different

15   ways.  Some people write to me directly; some people provide

16   them to the probation office and they're appended to the PSR so

17   they're not on the public docket; and then sometimes they are

18   filed on the public docket, though I don't think there's a

19   requirement that it be on the public docket.  There are

20   certainly names and dates of births of minors and some personal

21   information about Mrs. Hoover that probably doesn't belong on

22   the public docket.

23             So I don't know that those items need to be filed on

24   the public docket, but I also don't think that prohibits you

25   from talking about any matters that you think were relevant

1    from the letters.

2         MS. TAYLOR:  Yes, Your Honor.

3         And the point that I particularly want to talk about

4    is referenced separately in Mr. Hoover's sentencing memorandum,

5    which is this idea that's just thrown into the sentencing memo

6    that Mr. Hoover called the ATF and, you know, got the ATF to

7    tell him that the auto key card was legal.  And that's a --

8    that's something that is repeated in Mr. Hoover's father's

9    letter of support as well.  There is no record evidence that

10   that happened, Your Honor.  None at all.

11        Mr. Hoover apparently began making this claim shortly

12   after he was arrested.  And I know this because there was a

13   request to depose this -- this ATF employee, who is not an

14   agent.  He is a -- essentially an inspector for FFLs in

15   Wisconsin.  There was a request by Mr. Hoover's attorneys that

16   we allow that man to be deposed.  That's Mr. Ruiz.  Of course,

17   depositions are not ordinarily done in federal criminal cases.

18        And I -- but -- but Agent Hooker and I did

19   investigate this claim based on its *Brady* potential.  And we

20   interviewed Mr. Ruiz.  And in sum, Mr. Ruiz denied knowing

21   Mr. Hoover.  Stated that he had looked through his records and

22   saw that he had conducted a -- an inspection of Coloma Resale,

23   which was Mr. Hoover's shop -- Mr. Hoover's father's shop,

24   really -- and that he had conducted that inspection in 2015,

25   which is five years before this conspiracy commenced.  And he

1   did not remember anything about that interview.  And he would

2   only really remember it because -- if something remarkable had

3   happened.

4          Mr. Ruiz stated that he watched some of Mr. Hoover's

5   videos and he did not recognize Mr. Hoover, that he had

6   never -- did not recall ever having talked to Mr. Hoover.  And

7   he stated that if someone asked him a question about something

8   like a lightning link or auto sear or machine gun, he would

9   always refer that person to the proper authorities within ATF

10  that are responsible for those items, including the NFA branch

11  or the Firearms and Ammunition Technology Branch, which I

12  believe has been renamed, but essentially is where Officer Toy

13  works.  And stated that he -- Mr. Ruiz stated he's very

14  cautious about any items that may have a dimple, have been

15  drilled or have been cut, because it could be indicative of an

16  item that's been converted and may not be legal.

17         He stated that he viewed one of Mr. Hoover's

18  videos -- this was after we had requested the interview -- that

19  he viewed one of Mr. Hoover's videos with the auto key card in

20  it.  He could see that it had been cut in places and appeared

21  to have a lightning link drawn or etched on it.  And he felt

22  that the auto key card was a blueprint for making a lightning

23  link, and he would never suggest that something like that might

24  be legal.  And again, did not recall ever having discussed auto

25  key cards or lightning links with Mr. Hoover.

1          So we also had a year of phone records of

2    Mr. Hoover's and of his wife's cell phones.  Ms. Butler

3    performed a search of those records to see if there were any

4    records of phone calls between either of those numbers and

5    Mr. Ruiz, and there were not.

6          We had Mr. Ruiz search his ATF email account for

7    search terms "Matthew Hoover," "Hoover," "Coloma Resale," an

8    email address that was associated I believe with the FFL, and

9    an email address for Mr. Hoover, and he did not find any emails

10   from the period of 2018 to the time of the interview that

11   referred to any of those things.

12         He also reached out to the other industry operations

13   people in his office asking if anyone had had any prior contact

14   with Mr. Hoover and no one had.

15         In short, Your Honor, we investigated this claim.

16   Special Agent Hooker wrote a report about it.  I produced it in

17   discovery.  Mr. Hoover could have asked for a subpoena from

18   Mr. Ruiz in the trial if this had really happened.  Mr. Hoover

19   had the right to testify at trial and say that this happened.

20   His attorneys could have presented any other documentary

21   evidence that this happened.  But none of that happened because

22   there is no evidence that this ever happened except that

23   Mr. Hoover says it happened.

24         So even assuming that he did at some point have a

25   conversation with somebody at ATF about this, it's clear from

1    how he has described it, including up and through his

2    sentencing memo, that he wouldn't have said, "It's a piece of

3    metal with a lightning link etched on it and I'm going to tell

4    people that they should cut it out and use it to make a machine

5    gun.  Is that okay?"

6           Even now, he and his attorneys, in the sentencing

7    memo, are still saying he's convicted of talking about etchings

8    on a homogenous piece of steel.  They just refuse to describe

9    it in any sort of accurate way.

10          So, again, you know, if this were equivalent to like

11   an advice-of-counsel defense, he would have been required to

12   fully disclose all of the pertinent details of what he was

13   planning to do in order to rely on an opinion that he got.  So

14   even assuming that he did get an opinion -- and again, there's

15   no evidence of that -- we have no idea what he said to whoever

16   he may have talked to about what this thing was and what he was

17   planning on doing with it.  And all of the evidence in this

18   case suggests that he likely would have minimized what it was,

19   not described it accurately, in an attempt to veil its true

20   purpose.

21          And Your Honor, I just would ask the Court, frankly,

22   unless there's going to be some evidence that this happened and

23   what the conversation was and that he actually got an opinion

24   from ATF, that the Court should disregard these assertions in

25   coming up with an appropriate sentence because they're

 1    certainly not proof to a preponderance.  There's not even

 2    probable cause at this point that this happened.

 3          Your Honor, the auto key card was determined by a

 4    jury to be a machine gun conversion device, that it was a

 5    combination of parts designed and intended to convert a weapon

 6    into a machine gun.  They heard testimony from Officer Toy, who

 7    was able to -- his testimony was he had never cut one of these

 8    things out before.  He was using ordinary tools that are

 9    accessible to anyone.  He cut along the line.  And the pieces

10    that he cut out, he had to shave less than a millimeter off the

11    end of the paddle piece to get the firearm to close, but that

12    they functioned to convert the weapon into a machine gun.

13    That's what the jury credited.  That's what all of the evidence

14    in this case showed.

15          The evidence in this case also showed that the

16    purpose of these defendants in engaging in this conspiracy was

17    explicitly to subvert the laws of this country.  They knew what

18    they were doing.  They knew what the auto key card was.  They

19    knew what they were intending it to be used for.  And they sold

20    them at a massive scale to -- instructing buyers, you know, to

21    hide their purpose, to hide who they really are, and, of

22    course, not instructing anybody that it needs to be registered

23    on the National Firearms Registration and Transfer Record,

24    which Congress has determined is necessary for machine gun

25    conversion devices to be legally possessed.

1          Had these items been registered, then, of course, it

2     would be much easier for ATF to go knock on the doors of the

3     legally registered owner of the item and ask them questions.

4     But that's not what happened.  Instead, this was all done under

5     a veil of secrecy and misdirection in order to engage in

6     large-scale criminal conduct.

7          Your Honor, again, it's the government's request that

8     the Court should depart upward and/or vary upward because the

9     number-of-firearms enhancement that's in the guidelines is

10    vastly lower at its top end than the number of firearms that

11    were actually trafficked by Mr. Ervin and Mr. Hoover.  It is

12    necessary in this case to apply a sentence that reflects the

13    seriousness of this offense, that provides for deterrence,

14    which has not been provided for yet.

15         Again, the defendants, both of them, still entirely

16    reject any sort of responsibility for what they did; entirely

17    reject that what they did was criminal.

18         There's no indication that they have been deterred in

19    any way, shape, or form from engaging in this kind of conduct.

20         Your Honor, for all of those reasons the government

21    submits that there really is very little mitigation here.

22    Mr. Hoover talks about his family.  And as this Court knows,

23    it's a sad reality that a large portion of the defendants that

24    come before this Court have families that care for them,

25    families that depend on them, small children that need them.

1         Frankly, Mr. Ervin, you know, doesn't have small

2   children depending on him, really doesn't have anybody

3   depending on him.  He does have a family that loves him.  But

4   it would be -- it would be unjust to give Mr. Hoover a lighter

5   sentence based on the fact that he has a wife and children who

6   are financially dependent on him and Mr. Ervin does not.  That

7   would not -- that would not be appropriate in this case, Your

8   Honor.  And the guidelines instruct that a departure based on

9   family circumstances is only warranted in exceptional cases.

10  And this case, sadly, is not exceptional.

11        Your Honor, I would reserve any other comments that I

12  would have for rebuttal, but at this time there's very little

13  in the way of mitigation and little basis, the government

14  submits, for imposing a sentence that's below the guidelines.

15        And that's our request, Your Honor.

16        THE COURT:  Below the guidelines as departed upward.

17        MS. TAYLOR:  Our request is for the upward departure.

18  But assuming that the Court stays with what it was inclined to

19  do and does not issue a further upward departure, again, we

20  would be asking for an upward variance.  If the Court declines

21  that, then our third step would be the sentence should be

22  within the guidelines as the Court has previously ruled on them

23  earlier today.

24        THE COURT:  Thank you, Ms. Taylor.

25        It's a little after 12:30 and I suspect that we've

1   got a good bit left.  I don't think I should starve everybody,

2   so I think we'll take about an hour.  I'll ask us to be back at

3   1:30 to continue with the presentations.  I'll start with you,

4   Mr. King.

5          Mr. Ervin, I'm going to give you an opportunity to

6   speak if you wish to speak --

7          DEFENDANT ERVIN:  Yes, ma'am, I do.

8          THE COURT:  -- but you don't have to.  Okay.  That's

9   your right, and I'll hear from you then.

10          And then, Mr. Larosiere, I'll hear from you.

11          And Mr. Hoover, I'll give you an opportunity to speak

12   as well.

13          And if there are any witnesses either of you --

14   Mr. King or Mr. Larosiere, that you-all want to present, I'll

15   hear from them this afternoon.

16          MR. KING:  And Your Honor, just for the Court's

17   planning purposes, we have one witness to read a letter, but

18   otherwise we don't have any witnesses.

19          THE COURT:  Okay.  Mr. Larosiere, are you

20   anticipating calling any additional witnesses other than

21   perhaps Mr. Hoover?

22          MR. LAROSIERE:  Your Honor, should we take it that

23   our motion to file the letters under seal is granted and that

24   the Court has taken them into consideration?

25          THE COURT:  I think what I'm going to do is just

 1  strike the letters from the docket and treat them as if you had

 2  submitted them directly to me.

 3          MR. LAROSIERE:  Okay.  In that case, it would be a

 4  maximum of two witnesses, Your Honor.

 5          THE COURT:  Okay.  Can you go ahead and let us know

 6  who those witnesses would be?

 7          MR. LAROSIERE:  It would be Mr. Hoover's father and

 8  Mr. Hughes.

 9          THE COURT:  And Mr. King, who are we going to hear

10  from?

11          MR. KING:  Mr. Ervin, Mr. Ervin's father.

12          THE COURT:  Okay.  We're in recess till 1:30.

13          COURT SECURITY OFFICER:  All rise.

14      (Lunch recess, 12:35 p.m. to 1:34 p.m.)

15          COURT SECURITY OFFICER:  All rise.  This Honorable

16  Court is back in session.

17          Please be seated.

18          THE COURT:  All right, Mr. King.

19          MR. KING:  Your Honor, Mr. Ervin, Sr. has a statement

20  he'd like to read to the Court.

21          MR. KRIS ERVIN:  Right here?

22          MR. KING:  Yes, sir.

23          THE COURT:  Sir, I'm going to ask you to start by

24  telling my court reporter your full name, please.

25          MR. KRIS ERVIN:  Sure.  I'm Kris Anderson Ervin, and

1    I'm the father of Justin, who goes by "Justin."

2         THE COURT:  Go ahead, sir.

3         MR. KRIS ERVIN:  First of all, thank you for the

4    lunch break.  We were all very hungry.

5         I just thank you for the opportunity to talk with you

6    today and provide you some additional information about my son,

7    Justin.  And hopefully that will help you in your decision in

8    sentencing him.

9         I've got a great deal of respect for you, your job,

10   the things you've done.  You seem nothing but fair and

11   professional.  I've been in the court for a long time with you,

12   and I appreciate that.

13        Justin is good, hard-working, and passionate about

14   the things he believes in.  My wife and I raised all three of

15   my children with those attributes.  They're all strong

16   children.  Unfortunately, my wife passed away in 2017.

17        Your Honor, the last time I was in your courtroom,

18   you spoke of having respect for the rule of law.  And as you're

19   aware, in Justin's 40-plus years, he has been respectful of

20   authority and the law.  He's never been arrested prior to this

21   case that I know of.  He does cherish the rule of law,

22   fairness, our country, and the Constitution.

23        His grandfather, my dad, was in World War II, was

24   severely wounded in the Pacific.  His great uncle was shot down

25   in a B-17 bomber and killed while defending our freedom.  So

1  patriotism actually runs in his DNA.

2      Since you've heard so many unfavorable things that

3  were presented to you by the government, I thought it might be

4  helpful if I could bring up a couple of good things that Justin

5  has done.

6      He stayed at home with his mother while she was sick

7  when she became ill.  And what that did is that allowed me to

8  work and travel in my job to support my family.  And he did

9  that up until the time she passed away.

10      He provided mechanical services on his mother's car.

11  He provided it on his aunt, he provided it on neighbors and

12  anybody else that was in need.  At no charge.  That was merely

13  out of the kindness of his heart.

14      When our neighbor became blind, Justin took it upon

15  himself to take him to his appointments, doctor's appointments,

16  errands, all at no charge.  Just, once again, being very

17  helpful, as he has all of his life.

18      He worked on base at Naval Air Station on the Navy

19  Marine Corps internet project, which required him to pass their

20  background check, which was quite stringent.  He worked on IT

21  projects for Wounded Warrior.

22      And recently he helped a fellow inmate pass his GED

23  test with an A.  This inmate had failed the test several times

24  and Justin kind of took him under his wing, encouraged him to

25  do the best he can, became his teacher, and he was able to pass

1    his GED test.

2           And there are many, many other examples of Justin

3    doing good things for people.

4           A lady at the -- at Publix, her son was very sick and

5    Justin helped her.  She works behind the deli.  And Justin

6    helped her out with that.  Once again, just out of kindness.

7           I assure you Justin is a danger to no one.  Over the

8    course of his life there have been no victims, no acts of

9    violence, theft, harm in any way, no one's been hurt, no

10   restraining orders, no domestic violence, nothing.  And that's

11   how I raised my children.

12          He has had a concealed weapons permit for over

13   15 years with no issues.

14          I can also assure you he did not wake up one day and

15   decide to be a criminal.  And a very bad one at that.

16   Everything Justin did was in the light of day.  No concealment.

17   And that may have been something that kind of fooled all of us

18   into thinking this was just legitimate, because there was no

19   dark web, no meetings of the night.  Going straight to the

20   bank, the post office.  Everything was natural as you would be

21   running a business.

22          I -- Ms. Taylor brought up "knocks at the door."  I

23   said I wish I had been told about that, that we did receive in

24   January a knock at the door and a card at the door to say "call

25   me," because what would have happened, it would have stopped

1    this, and the items that were shipped from January to March

2    would never have been out in the public.

3          I feel very badly that I didn't recognize the

4    severity of this.  It bothers me as a father very, very badly.

5    And it bothers my daughter and my son because had we -- any of

6    us recognized that, we would not be here today.

7          As a parent I was proud of him during that time

8    because he was so excited about this idea.  And to me, it was

9    just -- to me, it was kind of like the pet rock.  He found an

10   internet niche and it was going to blossom and then die away.

11   He was so excited.  And it was the first time I'd seen a spark

12   in him since his mother passed away.

13         He bought land with the money.  Sure, he bought some

14   firearms, but he bought land.  He put a well on that land.  He

15   bulldozed that land.  He improved it.  He bought a bus to

16   convert to an RV with plans to park it out there until he could

17   get his home built.  He was working to build a good home and a

18   good life for himself.

19         My family has suffered greatly, Your Honor.  I have

20   suffered greatly.  This has taken a toll on my health.  And I

21   know how much Justin has suffered being in jail two and a half

22   years.  I talk to him every night.

23         I'm nearly 70 years old.  I ask for your compassion

24   and leniency.  Any sentence given to Justin may become a life

25   sentence for me.  Please allow my son to come home at the

1   earliest possible moment.  We'll make sure he follows all of

2   your rules and he shall never return here again.

3         Thank you.  And thank you for your consideration.

4   And if you have any questions, I'll be glad to answer them.

5         THE COURT:  I don't have any questions, sir.  Thank

6   you very much for taking the time to speak today.

7         MR. KRIS ERVIN:  Thank you for hearing me.

8         MR. KING:  And Your Honor, at this time Mr. Ervin

9   would like to address the Court.  And Your Honor, we had a

10  prepared statement, but Mr. Ervin said he wanted to speak from

11  the heart, so he's going to be . . .

12        DEFENDANT ERVIN:  I'm going to need a second, Your

13  Honor.

14        THE COURT:  Sure, of course.  You want to --

15        DEFENDANT ERVIN:  Get a drink of water?

16        THE COURT:  Yes, a good idea.

17        DEFENDANT ERVIN:  I love my dad very much, and my

18  family, all of them.

19        Thank you, sir.

20        THE COURT:  Take your time, sir.

21        It's okay.  I understand.

22        DEFENDANT ERVIN:  Your Honor, can you hear me?

23        THE COURT:  Yes, sir.

24        DEFENDANT ERVIN:  All right.  I remember ever since I

25  was young loving this country.  I remember being in elementary

1   school and saying "I pledge allegiance to the flag of the

2   United States of America and to the Republic for which it

3   stands, one nation under God, indivisible with liberty and

4   justice for all."  And I meant it in my heart.  No one can

5   question how much I love this nation and how much I respect the

6   rule of law.  I mean, I love all my fellow Americans.  I love

7   everyone in this courtroom and I want a future for everyone.

8          And this whole thing has hurt me very much.  It has

9   broken my heart.  And this is very difficult for me because as

10  much as I love this nation, and to think the government wants

11  to hurt me and my family, I mean, it -- I mean, it's turned

12  into a nightmare.  I've -- I mean, I can't even think of

13  everything I needed to say, but I'm going to do the best I can

14  here today.

15         But I remember being at the Naval Air Station

16  Jacksonville.  I've been to every air show for 20 years since I

17  was little until about age 20.  I remember seeing the Blue

18  Angels flying over Jacksonville, all around here.  And I was

19  just so proud of my country.  And I love the United States so

20  much.

21         And I love artwork, I love the First Amendment, I

22  love the Second Amendment, I love the U.S. Constitution.  I

23  know that miracles do not cluster in history.

24         And the founding of this nation is a miracle.  And we

25  can't let it go quietly into the night.

1        And it really made my heart feel good where -- one

2   little stitch to bring my heart back together, when at the

3   hearing, the last Friday ago, I heard you say that the First

4   Amendment, the Second Amendment, the U.S. Constitution is the

5   supreme law of the land and should be upheld.  I mean, that

6   really, really was a bright point in the last two and a half

7   years.

8        And I've been put under a lot of pressure, both by

9   these proceedings and by everything that I've been exposed to

10  being in detention.  I mean, I've seen people overdose; I've

11  seen people die; I've seen people get beat up.  I've been

12  exposed to all kinds of horrors, but I've focused on the

13  positive.

14       So I helped people learn how to read that couldn't

15  read.  I helped them write letters to their attorneys to help

16  them communicate their wishes.  I tried to turn a bad situation

17  into the best possible to show who I am, because you can put me

18  under pressure, you can try to make me break, but I'm still

19  going to be who I am and stand up for what is right.

20       And there are certain things that I can't stand by

21  and watch.  There's a couple gangs that had a war while I was

22  in there and they went to try to beat up the Mexican-Spanish

23  guys.  And there's only three of them in there.  In the other

24  dorm I was in I seen it happen before and I stopped it.  And

25  they said, "Nobody stands up to that guy, but you did."  You

1  know, because I couldn't stand there and watch someone else get

2  beat up again or their food stolen.  I mean, it's just horrible

3  what I've seen.

4        And a lot of those guys that are hardened and gang

5  members and stuff like that, I would teach them the message of

6  freedom and liberty and teach them how important the country is

7  and its values and standing up and doing the right thing.  And

8  some of them changed.  Other drug addicts turned back and went

9  home to their families.  A couple of them started businesses

10  and they're doing really good.  Another one stopped doing

11  drugs.  I told him he has a good family, go home to them.

12  Like, I have a good family, I want to go home to them, and you

13  can.  So I've sat there for so long it seems like, and everyone

14  gets to go home but me.  And some of them come back, and it's a

15  travesty.

16        And I've been put under great pressure.  And I'm

17  dressed like an orange today in this big orange suit, like an

18  adult baby.  And I don't like it.  But when you put an orange

19  under pressure, orange juice comes out.  So I've been put under

20  horrendous pressure, but my good has come out.  I've helped

21  many people.

22        I'm on a first-name basis with most of the guards

23  there.  I mean, my brother is a Jacksonville Sheriff's officer,

24  a sergeant.  I've been on police ride-alongs for citizen

25  oversight in everywhere you can see out here with JSO before

1   this.

2           I love the Second Amendment.  All my firearms are

3   legal.  There's no issues with my firearms collection, my

4   ammunition, or my body armor.  I mean, I go shooting with my

5   family on Thanksgiving.  And many of my friends are police

6   officers too that I played baseball with through high school

7   and college.

8           I'm a born champion and have a champion inside me.

9   And I was a champion in baseball, a district champion, and I

10  was a champion in swimming.  And I actually went to state.  In

11  1998 I was the twentieth fastest in the state of Florida.

12          I work hard.  I'm a serial entrepreneur.  And not all

13  my businesses succeed forever.  Some of them died.  Some of

14  them went on.  But I still continued to endure and go forward.

15          And failure is an event, it is not a person.  The

16  important thing about failure is that you learn from it so that

17  you can deal with what's coming in the future.  And with the

18  additional challenges, it takes courage to get up every single

19  day for me.  It takes courage to continue.  It takes courage to

20  admit when you've failed.

21          And my whole life I've enjoyed the First Amendment.

22  Whenever I started Auto Key Card -- I had a dream when I was

23  ten years old, and it was to cause debate in the public square.

24  A lot of this debate has occurred here today.  And I intended

25  it as a conversation piece.

1           And there was a year or two -- there's many years I

2    thought about it and I watched what was going on.  And I wanted

3    to cause a nationwide debate at a serious time in American

4    history because very few of us get to come to the defense of

5    the First Amendment when it is being extinguished across the

6    land.  And I enjoyed being a part of that process.

7           And you've seen the YouTube videos.  You've seen the

8    millions of Americans that me and Mr. Hoover represent.  And we

9    have great support from the people.  So it just -- it hurts my

10   heart so much everything that has happened.  And it is also a

11   great success, the amount of debate that has occurred.

12          And I don't seek to cause problems.  I don't seek to

13   destroy people or have -- be a danger.  I've never been a

14   danger.  I've saved over 30 people in my whole life, from

15   drowning, getting beat to death.  One guy almost got beat to

16   death by -- a bunch of guys were chasing him down the road with

17   a baseball bat and golf clubs and they cornered him on the

18   porch of this house, where he was boxed in.  And I got out of

19   my car, run up there, said, "Hey, man, what are y'all doing?"

20          "It was the guy that ran there."

21          And I didn't even know what was going on, okay.

22          And they said, "oh, okay," and they ran off.  And

23   that guy told me, "Thank you so much, sir.  I appreciate it.  I

24   thought they were going to kill me."

25          I said, "No problem, man," and I got in the car and

1    left because I don't need any glory.

2          I don't need to be known.  I don't seek to be known.

3    I help people and I don't need to say, "Hey, well, I saved that

4    person's life.  I saved them from drowning," you know, "I did

5    the right thing."

6          I don't need the recognition, but I do the right

7    thing no matter what.  And I believe I was sent here by God to

8    do the right thing.

9          And before I started my business, I had a card that I

10   made myself and I engraved myself.  And I went around to gun

11   shows talking to people and gun ranges talking to people.  And

12   there were people that said, "That's very interesting, like I

13   want one of those."

14         This is the market-research stage of my business.  I

15   talked to attorneys, I talked to law enforcement.  And

16   everybody said, "I don't even think you can be in trouble for a

17   picture."

18         And so I acted in good faith.  I even -- I even -- I

19   remember talking to -- they had a booth at the gun shows of the

20   ATF.  I remember talking to them, and they just laughed it off

21   and thought I was some stupid guy.  It was no big deal.  And no

22   one tried to arrest me.  I sold over 15 different unique pieces

23   of artwork with unique designs.  I mean, are 10 a crime?  Is 5

24   a crime?  Is it 3?  I mean, there was ways to mitigate and

25   prevent all of this from occurring and I never got the

1    opportunity to.

2         And I understand what the jury has decided.  I do not

3    agree with it.  I still maintain my innocence, not in --

4    against this Court and not in accepting responsibility for my

5    actions.  I accept responsibility for my actions, I just do not

6    believe that -- that -- that I committed a crime.  And I don't

7    want you to get mad and I don't want you to -- don't want you

8    to be angry at me maintaining my innocence.

9         And I don't want you to punish Mr. Hoover for me

10   telling him about my due diligence.  And we talked on the phone

11   and have text messages between us.  And my phone erased itself

12   and his disappeared?  Like, it's very disconcerting to me.  And

13   I don't know everything that occurred with it, but I think

14   there is a better way that all of this could have been handled.

15        And I have great faith.  And I'm willing to endure

16   whatever it takes to make it through this hard time, because

17   there's a great future ahead.

18        I am a very capable individual.  I am very good at

19   all kinds of internet things, computer software.  I've built

20   data centers.  I've worked for the U.S. military.  I mean,

21   everybody that comes in contact with me, most of the time, is

22   better off by me coming in contact with them.

23        There's times whenever I might have had an argument

24   or something, but we're all only human and I never hurt nobody.

25   And I don't seek to hurt anybody.  I don't seek the will to

1   dominate over anyone.

2          So with me being like an orange and under all this

3   pressure, love came out.  And I love my family.  I love my

4   friend Matt Hoover and his family.

5          I have my father and my six-year-old -- or, I'm

6   sorry, my five-year-old nephew at the time I was arrested is

7   eight now.  And I was a very, very integral part to his life.

8   And now it's -- to him it's like aliens came and abducted me

9   and I've disappeared.  And there are core developmental years

10  left that I need to be there for him.  My father, I need to be

11  there for him.  I'm willing to do whatever it takes to take

12  care of them in the future.

13         So this all has been very difficult for me, but the

14  only thing I can ask for is mercy, because it's the only way

15  out for any of us.

16         And I look behind you and see the great seal of the

17  United States District Court, and it has a symbol of freedom

18  and liberty and of justice.  And I am thirsty for justice.  And

19  I feel that if I was to say that that was a bald eagle and it

20  was a violation of the Endangered Species Act, that would be

21  disingenuous.

22         But I respect the rule of law, I just don't agree

23  with what has happened.  But I don't want to be extra punished

24  or hurt for doing the right thing, because I will always do the

25  right thing and I strive to do the right thing.  It's the moral

1    high ground.

2              You see, Archimedes said:  Give me a place to stand

3    and a lever long enough and I will move the world.

4              The world has been changed by people talking about

5    the auto key card.  But everybody focuses on the lever, the

6    second part, about leverage over someone.  What can you do to

7    them?  I focus on the first part, the most important, the place

8    to stand, because that's the moral high ground.  And that's

9    what was in my heart the whole time that I was running my

10   business.

11             And my little business is destroyed, you know.  I

12   made a hundred-some-thousand dollars, not even that much.  I

13   mean, it's gone.  Okay.  Fine.

14             Like, please, please have mercy, because a government

15   that has no mercy is not one that I want to be a part of.  And

16   it's a scary thing in the history of the world.

17             I love history.  There's a reason for the First

18   Amendment, because once they get rid of what you can say, then

19   they can take the weapons and they can -- and there's a great

20   history of genocide throughout all governments in the history

21   of the world, which is why the American Constitution, the

22   Second Amendment, and the First Amendment are so important.

23   And it made me feel so good when you said that those are

24   important.

25             And I don't seek to cause problems.  I want to be

1  part of the solution in the future, for freedom and liberty for

2  all, so that we can have prosperity, because if we don't have

3  freedom and liberty and prosperity, we have no future.

4      And there are many, many Americans that feel the same

5  way I do.  And they're my friends and they're my supporters.

6  They've donated money so I could have an attorney.  Otherwise,

7  I would be defenseless.  And they donated money so that

8  Mr. Hoover could have attorneys, so that we could have a

9  chance.  So we have great support among the American people.

10     And freedom of speech was my intention the entire

11 time.  But it just seems like that the auto key card is a

12 mirror, and it just shows who everybody is.  And I do the best

13 I can.

14     So I don't know what else to say, Your Honor, but I

15 did not seek to cause any problems or issues with this Court,

16 with anyone, any danger, or nothing at all.

17     And I've been through hell and back.  I mean, these

18 bags under my eyes, I never had this in my life.  I look at

19 myself in the mirror, I don't even recognize myself in the

20 morning.

21     And there's just an unending sea of the worst humans

22 that flow into that jail and just antagonize, you know, a good

23 person like me.  And I don't -- I have nothing against them.  I

24 have great hope for them.  I hope that they get their lives

25 together.

1        But that's what I was trying to do.  I wanted to

2   build a house.  I wanted to have a future.  I wanted to have a

3   business.  And I love everything that's American.

4        So that's pretty much it, Your Honor.  Thank you so

5   much for letting me speak.

6        I know I went a little extra on time, but I just want

7   to tell everyone here, I appreciate all of y'all, everyone, and

8   I love everybody.  And I only want a future for all of us.

9        Thank you very much.

10       THE COURT:  Thank you, Mr. Ervin.

11       Mr. King.

12       MR. KING:  Your Honor, we don't have any additional

13  witnesses or evidence.  I'm not sure if you'd like me to

14  proceed to argument or --

15       THE COURT:  Go ahead.

16       MR. KING:  Your Honor, could I have a moment?

17       THE COURT:  Sure.

18     (Pause in proceedings.)

19       THE COURT:  Go ahead.

20       MR. KING:  Thank you, Your Honor.

21       You know, the Court's in a unique position to have

22  sat through a lengthy trial and heard about some of the

23  conduct.  And what I'd like to address today is some of the

24  things that were not before the Court and some of Mr. Ervin's

25  background.

1         During the course of this case I've gotten to know

2    Mr. Ervin's family very well.  And I can honestly say his

3    father is probably one of the nicest human beings I've ever

4    met.  His sister is fantastic.  His brother has worked with a

5    lot of people I know at the Jacksonville Sheriff's Office.

6    They're a really good family.  And for this to happen to

7    Mr. Ervin, for him to find himself in this position, I don't

8    think is a reflection on them or their character.

9         And one of the things that I look for in situations

10   like this is:  How did we get here?

11        And in talking to Mr. Ervin's family and in talking

12   to Mr. Ervin, in 2017, but the two years prior, his mother was

13   suffering from alcoholism and wound up essentially drinking

14   herself to medical issues and having other medical issues.  And

15   because of where they were in their family, Justin Ervin was

16   the one who was there to take care of it and to watch it unfold

17   over the course of years.  It wasn't a sudden dramatic or

18   traumatic thing; it was something that built up over time.

19        In talking to them, it's very clear that the person

20   that he was before that happened and the person he was after

21   that happened were very different.

22        The probation interview I did with Ms. Anderson was

23   probably one of the most emotional ones -- it is, by far, the

24   most emotional one I've ever participated in.

25        It's clear that there is a lot of trauma that has not

1    been addressed with Mr. Ervin as a result of his mother's death

2    and living through that.  And, you know, one of the things

3    that's recommended, certainly, is mental health treatment as

4    part of the probation sentence.  I think that's needed.

5           One of the things that has happened is he started

6    abusing marijuana right after his mother's death.  Thankfully

7    he stopped using to that extent during the course of the times

8    alleged in the indictment, but he was -- he was struggling with

9    mental health and not getting the correct treatment.  And

10   unfortunately, what he turned to was the internet and

11   individuals who -- you know, he's certainly not blameless in

12   this, but individuals who put ideas in his head and individuals

13   that he put ideas in their head, and he was kind of off to the

14   races.

15          And unfortunately, he finds himself in a situation

16   where, you know, during the course of our conversations, I

17   think you heard some of that today, he truly believes that he

18   was making political statements and, you know, it was art and

19   protest and things like that.  I don't doubt his sincerity, but

20   I view that as a symptom of kind of where he is and what has

21   happened to him.

22          The 40-plus years that he lived on this earth before

23   getting into this situation he was law-abiding, he was

24   responsible, he worked, he took care of family, he took care of

25   friends.

1          I have little doubt that the specific deterrence for

2    him, you know, addressing the 3553 factors, is necessary.  I

3    have no concerns that he is going to re-offend or commit

4    offenses once he has completed his sentence here.  I don't fear

5    for the public for anything that he would do.

6          The rehabilitation part is a lot tougher because I

7    think a lot of the issues, you know, incarceration doesn't

8    address.  And one of the things I did want to address with the

9    Court is he's spent over two and a half years in the Baker

10   County Jail.  And time at the Baker County Jail is very

11   different from time spent at the Bureau of Prisons.  And I

12   would ask the Court to consider the difficulty of that time in

13   determining a fair and reasonable sentence because of the

14   conditions.

15         You know, he shared with me there was an inmate who

16   was overdosing and none of the guards in the area knew CPR, but

17   he did.  He tried to administer CPR and was pulled back and put

18   in a cell where he watched that individual pass away because

19   they did not get the life- -- you know, life-saving measures

20   that were needed.  And he's talked about that with me a lot.

21         One of the difficulties here is you have somebody

22   who's, you know, never been in trouble before, misguidedly but

23   genuinely believed that they were acting lawfully, but then you

24   have promotion for respect for the law.  And understanding that

25   that factor, you know, it's going to require an incarcerative

1    sentence of Mr. Ervin, you know.  Obviously whether you think a

2    political protest is important to you, there's ways to do it

3    and there's ways to not do it.  And this is clearly a way not

4    to do it.

5           THE COURT:  Well, I -- Mr. King, I don't think there

6    was anything about the evidence that was presented in this case

7    that supports that this was a -- simply a political protest,

8    that this was simply freedom-of-speech activity.

9           The evidence shows that Mr. Ervin was manufacturing

10   these devices that would convert an item into a firearm, that

11   he was selling them with videos and other propaganda that told

12   people exactly that.

13          So this case is not about the First Amendment.  This

14   case is not about political debate.  And respectfully,

15   Mr. Ervin, it's not about creating a forum for debate.  It's

16   about manufacturing devices that were put in the hands of other

17   people who could then use them to convert their firearm into an

18   exceedingly dangerous weapon.

19          So let's keep the arguments grounded in what this

20   case is actually about.  It really -- it's not about the First

21   Amendment.

22          MR. KING:  Your Honor, I agree with you.  And I think

23   my point, which I think I failed to make, is this is where

24   Mr. Ervin's head was at.  Because I agree with you, this is not

25   about the First Amendment, this is about somebody distributing

 1    dangerous items.

 2           And where he mentally went after his mother's death

 3    was a sincere belief that -- you know, I think the Court is

 4    right in everything you've said, but a sincere belief that this

 5    was how people protest.  And it's not.  It's the wrong way to

 6    handle things.

 7           So in terms of promoting respect for the law, the

 8    Court has to address that.  And, you know, like I said, I have

 9    very little concern that Mr. Ervin is going to re-offend.

10           You know, I think a recommendation to RDAP would be

11    appropriate given that he has had in the past issues with

12    needing to -- self-medicating with illegal drugs.  And given

13    his mental health issues, I think that would be an appropriate

14    thing.

15           The -- you know, looking at the guidelines, the --

16    you know, one of the questions the Court had of the government

17    was, you know, why were these things not collected.  I think

18    part of the answer is these were bad auto sears to some extent.

19    They were very difficult to work with and manufacture.

20           You know, I've been involved in cases with Glock

21    switches.  I fired a firearm I think once in my life.  And

22    those Glock switches, I could -- I could probably watch a

23    ten-minute YouTube video and do those.

24           These were inartfully done, you know.  And that

25    doesn't mitigate the danger that they create.  But I think

 1    that's a big part of it, is these were -- you know, to some

 2    extent these were poorly done.  They were not something that

 3    would -- somebody would be easily or readily able to convert.

 4    And as that ties to the guidelines, you know, certainly given

 5    the number of items, it's a very large number.  And it went out

 6    to I think every state in this country, at least one of those

 7    items.  You know, that's not lost upon me or Mr. Ervin.

 8          But the actual dangerousness of the item -- you know,

 9    again, the templates of these things are something freely

10    publicly available.  You can get them online.  Metal is readily

11    available.  Individuals who want to do this have shown time and

12    time again they can do this.  It's not like the Glock switches.

13          Again, not to say that it's not serious, but in terms

14    of relative seriousness of machine gun conversion devices,

15    these were, to some extent, very poor machine gun conversion

16    devices, very difficult for any of the individuals to use.  And

17    I think Officer Toy's testimony kind of bears that out, the

18    difficulty that he had in actually getting it to work with

19    various parts and how long it took him.

20          At the end of the day, you know, in order to promote

21    respect for the law, obviously this Court has a difficult task

22    ahead.  I know Mr. Ervin was very misguided in his beliefs in

23    terms of the political stance that he thought he was taking.

24    There's -- the Court is completely accurate that this is not a

25    political protest and that's not what it's really about, but in

1    Mr. Ervin's head it has been.

2            And so in terms of looking at the 3553 factors, this

3    is somebody who up until this point, who got this idea in his

4    head based on where his mental health was, has a great family

5    who's been -- like I said, his father is a wonderful person,

6    his brother and sister are truly wonderful people who are very

7    productive, very good individuals in our society.

8            And I'm hoping that the help that Mr. Ervin will get

9    through services and supervision after he's served his

10   incarcerative period will help him get to the point where he

11   realizes the gravity of the situation.  And based on that, and

12   my conversations with him, I don't think he's a danger to

13   commit new offenses or continue on this conduct once his

14   sentence has been completed.

15           May I just have a moment?

16           THE COURT:  Yes.

17     (Pause in proceedings.)

18           MR. KING:  Your Honor, I want to thank you for the

19   time and attention you've paid not only in this sentencing

20   hearing, but the trial as well.  And on behalf of Mr. Ervin,

21   thank you.

22           THE COURT:  All right.  Thank you, Mr. King.

23           Let me -- I'll give you an opportunity to respond

24   after I have heard from counsel for both defendants,

25   Ms. Taylor.

1           MS. TAYLOR:  Yes, Your Honor.

2           THE COURT:  Mr. Larosiere.  And you can proceed in

3    whatever order you choose.

4           MR. LAROSIERE:  Thank you, Your Honor.  And may it

5    please the Court.  We'd like to have my client, Mr. Hoover,

6    speak first.

7           THE COURT:  Okay.

8           DEFENDANT HOOVER:  Good afternoon, Your Honor.

9    Sorry.

10          MR. LAROSIERE:  Volume down.

11          DEFENDANT HOOVER:  I just talk loud because I have

12   excessive hearing damage.

13          THE COURT:  Okay.  Go ahead.

14          DEFENDANT HOOVER:  I apologize.

15          THE COURT:  That's okay.

16          DEFENDANT HOOVER:  Anyway, the only thing I'm really

17   hoping you take into consideration with this whole trial and

18   like how everything is going and my sentencing, I'm really

19   hoping you take into consideration like the chain of events

20   that led me right up to this point.

21          And it all started off with the COVID lockdowns.  My

22   truck-driving job got cut by about 30 or 40 percent.  Needless

23   to say, it got to the point where I wasn't going to be able to

24   make my bills.

25          Now, I believe in God.  I'm not saying, like, I'm the

1   perfect Christian.  I definitely swear too much and I should

2   probably go to some more church, I'm just saying that.  But

3   when I feel God's compelling me in a certain way, I go that

4   way, because I've read the story of Jonah and the whale.

5   That's just what I do.  And I've went through it personally.

6   Like I've been compelled to do something before, like help this

7   person out or something like that, and I didn't, and I wind up

8   getting forced to do that in a much more undesirable way.

9        Anyway, my truck-driving job got cut by like 30, 40

10  percent, as I was saying, and I'm freaking out.  I'm like, you

11  know, I don't know what to do.

12       THE COURT:  Mr. Hoover, my court reporter is giving

13  me the look that she gives me when --

14       DEFENDANT HOOVER:  I apologize.

15       THE COURT:  -- you're talking way too fast.

16       DEFENDANT HOOVER:  Let me know when I can go on.

17       THE COURT:  Just try to slow down a bit, okay?

18       DEFENDANT HOOVER:  Okay.

19       MR. LAROSIERE:  Breathe.

20       DEFENDANT HOOVER:  So I did some praying and I did

21  some crying, and a little bit more praying, because I thought I

22  was going to lose my house that we had just got, and then by

23  like the sleight of a hand, the flick of a switch, all of a

24  sudden I get this email from Mr. Ervin, "Hey, I'd like to

25  sponsor your channel.  I have this website called Auto Key Card

1    and I sell various products."

2         And I went to the website and I contact him back, I'm

3    like, "Everything looks good.  Nowhere in the NFA does it say

4    anything about the potential for" --

5         COURT REPORTER:  I'm sorry.  It's too fast.

6         MS. TAYLOR:  Your Honor, I'm going to object at this

7    point to the extent that Mr. Hoover is essentially testifying

8    as part of his allocution.  I think if he wants to testify

9    about things that are not in the record, then he needs to go on

10   the witness stand and be subject to cross-examination.

11        THE COURT:  Mr. Larosiere, can we maybe narrow the

12   scope of Mr. Hoover's --

13        MR. LAROSIERE:  Your Honor, can I have an aside with

14   my client for a --

15        THE COURT:  You may, of course.

16      (Mr. Larosiere confers with Defendant Hoover.)

17        THE COURT:  Go ahead, sir.

18        DEFENDANT HOOVER:  So essentially I was approached

19   with the contract.  And I was like, I need to do my due

20   diligence.  I'm a newly licensed machine gun manufacturer and

21   I'm on YouTube.  So I called up Miguel.  I'm like, "Hey,

22   Miguel, does" --

23        MS. TAYLOR:  Your Honor, I object to this.

24        DEFENDANT HOOVER:  I'm just making the point that I

25   truly believed in my heart what I was doing was lawful.  I

1  talked to the ATF.  They even cited opinion letters that I've

2  referenced --

3          THE COURT:  Mr. Larosiere, I'm a little concerned

4  about the comments about having talked to the ATF.  Unless

5  Mr. Hoover wants to go ahead and speak to that under oath, I am

6  a little -- to the extent that he's trying to mitigate by

7  saying that he was told these were lawful, I think arguably

8  that could be problematic under an obstruction consideration.

9  I don't think that's the path we want to tread down.

10          MR. LAROSIERE:  So I do think that the point is made

11  that he believed -- I think his belief is relevant and I --

12  would it be okay if we just moved beyond this particular point?

13          And I guess, Hoover, all you have to say is this was

14  your honest belief.  And I will actually address the things you

15  were talking about when I take argument.

16          DEFENDANT HOOVER:  So, yeah, it was my honest belief.

17  And I feel responsibile for Mr. Ervin, too, because he came to

18  me in good faith talking to a machine gun manufacturer, that if

19  there was some sort of problem, I would have instructed him.

20  And he had already done his due diligence, blah, blah, blah,

21  blah, blah.  I know if I would have been like, "Hey, there's

22  questions here in the law, like I'm not really sure about

23  this," he wouldn't have done it and I wouldn't have taken the

24  contract.  So I apologize for all the problems I caused.

25          I'm not saying, like, the jury did something wrong or

1  anything like that.  I totally accept responsibility for

2  everything and I'm just --

3          MR. LAROSIERE:  Slow.

4          DEFENDANT HOOVER:  I'm just really hoping you'll take

5  into consideration, like, I truly didn't believe I was breaking

6  the law.  Like, I really didn't.

7          And it sucks because I'm probably going to go away

8  for a long time and miss big parts of my little girls' --

9  anyway, Babe, I'm sorry that you're having to go through this.

10          I apologize.

11          THE COURT:  Take your time.  That's okay.  I

12  understand.

13          DEFENDANT HOOVER:  Because you've been through so

14  much and you don't deserve it.

15          I'm not trying to stall, I'm just a little emotional.

16          THE COURT:  It's understandable.

17          DEFENDANT HOOVER:  Not, like, trying to guilt-trip

18  you into a lesser sentence or anything like that, just please

19  take all that stuff into consideration.  Thank you.

20          THE COURT:  All right, sir.

21          DEFENDANT HOOVER:  Thank you for your time, too.

22          MR. LAROSIERE:  I would now like to hear some words

23  from Mr. Hoover's father, Mr. Hoover, Sr.

24          THE COURT:  Sir, I'm going to ask you to --

25          MR. MICHAEL HOOVER:  I'm not good at talking in front

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 118 of 144 PageID 6865
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 496 of 563

VOL 1 - PG 118

```
 1    of a crowd.

 2              THE COURT:  Okay.  Let me ask you before you start

 3    just to tell my court reporter your first and last name.

 4              MR. MICHAEL HOOVER:  Michael Hoover.  Michael J.

 5    Hoover.

 6              THE COURT:  And take your time, sir.

 7              MR. MICHAEL HOOVER:  Matt's always been there for me.

 8    He drove a truck for me for nine years hauling U.S. mail.  And,

 9    yeah, our hours got cut, so he had to do something different.

10    He started helping me in the store.  And I also have a store.

11              And he's always tried to do everything right.  Even

12    with my trucking, if I wasn't sure about rules, he'd research

13    it for me and always get back to me on it.

14              If he would have known that this thing was not legal,

15    he wouldn't have done it.

16              He -- I know it's been said it didn't happen, but he

17    did call the ATF and talk to the agent and describe what it was

18    and --

19              MS. TAYLOR:  Your Honor --

20              MR. MICHAEL HOOVER:  I know I --

21              THE COURT:  So --

22              MR. MICHAEL HOOVER:  Sorry.

23              THE COURT:  -- here's the thing.  Mr. Ervin and

24    Mr. Hoover went to trial and the evidence was presented.

25              MR. MICHAEL HOOVER:  Yeah.
```

1          THE COURT:  And the jury concluded that they did know

2     that this was -- that what they were doing was unlawful.  And I

3     have to sentence them based on that evidence that was presented

4     to the jury.

5          So you go --

6          MR. MICHAEL HOOVER:  I'm just asking for you to be

7     lenient or mercy or whatever.  And thank you for your time.

8          THE COURT:  Thank you, sir.  I know this is

9     difficult.

10         MR. MICHAEL HOOVER:  Okay.

11         MR. LAROSIERE:  Mr. Richard Hughes.

12         MR. HUGHES:  Your Honor, thank you for your time.

13         THE COURT:  Can you just give my court reporter your

14    full name -- your name, sir.

15         MR. HUGHES:  Sure.  Richard Hughes, Palm Beach,

16    Florida.

17         Judge, I've watched you through this.  You've been

18    very thoughtful, justice-seeking, and I admire your attention

19    to detail.

20         I became friends with Erica and Matt.  I do YouTube

21    videos.  And Matt and Erica, they reached out to help me with,

22    you know, thumbnails, titles, camera position, settings.  And

23    they've helped other YouTubers.

24         I'm just here to tell you that he's a good guy.  He

25    reaches out to people.  I've talked to Matt about, you know,

1    life issues.  We kind of have different paradigms.  He -- his

2    whole goal in life was just to do videos on YouTube, make

3    money, and be with his family, so that he could by noon be done

4    with all of his YouTube work and hang out with his wife and

5    kids.

6            He loves being a dad.  He loves his wife.  He would

7    get up in the morning, drive his daughter to school.  And his

8    whole life philosophy was just keeping his expenses low and

9    just being able to pay for everything by basically working half

10   a day doing YouTube and being a dad the rest of the time.

11           As far as YouTube goes and what this case has meant

12   to people like myself, like Matt, that do YouTube videos in the

13   firearms space, it really is a shot across the bow.  People in

14   our community have been paying very careful attention to this

15   case.  It's a very sobering and very chilling fact that we make

16   money by taking sponsorships for products, to advertise

17   products.  Myself not so much.  I have a regular day job that

18   this is just kind of a fun thing for me to do.  My day job, I'm

19   a cloud engineer, and I'm doing okay so I don't need to take

20   sponsorships.

21           The -- what's happened recently in the YouTube space

22   is we're more self-policing.  If I see somebody going in a

23   direction that's not -- that's going to actually end up like

24   Matt, I'm like, "Hey, you better look at what's going on.  You

25   don't want to even go in that direction."

1    So if the prosecution's case is like, "Hey, we need
2  to make an example," they already did.  It's well known.

3    I just really wanted to tell you that I have really
4  high regard for Matt.  Matt doesn't have a formal education.
5  He doesn't have a college degree.  I actually have an
6  associate's from a community college, but I do cloud
7  engineering, pretty much self-taught.

8    Matt's a brilliant guy.  His analytical ability, the
9  way he figures things out, you know, he would call me up, he's
10  like, "Hey, I did a new thumbnail for you.  You got the wrong
11  colors."

12    THE COURT:  I don't know what you mean when you're
13  talking about thumbnails.

14    MR. HUGHES:  So for a YouTube video, what you see is
15  a thumbnail.  And he knew the analytics on what colors worked
16  right, how to do the titling.  And he would, you know, freely
17  share.  I know other YouTubers in the same space and they've
18  never said boo to me about how to improve yourself, how to be
19  better at the YouTube space.

20    I'm sorry, I skipped a page here because I've been
21  taking notes in the court.

22    And I think -- I know Matt.  We've talked about the
23  situation, and I know Matt honestly didn't believe he was doing
24  anything wrong.

25    And we -- a couple of things were mentioned earlier

1    by the prosecution.  There's a joke in the YouTube 2A community

2    about shooting your dog because of Ruby Ridge, and there's

3    other incidents where the ATF has shot people's dogs.  So

4    that's kind of a common cliché.  I don't think that means a

5    whole lot.

6            The other thing about this is as much as YouTube is

7    kind of reality TV in your basement, there's a little bit of

8    the TV effect to it.  So, you know, you can't share your whole

9    personal life.  That's not a good thing.

10           The other thing is you may exaggerate some things to,

11   like, make something interesting, like a product to be more

12   marketable.  I've often said that if ABC, NBC, CBS were held to

13   the same standard in regards to something like Fen-Phen that

14   caused a bunch of deaths, we'd have a bunch of CEOs in jail

15   right now.

16           I'm just shocked personally that engaging in

17   advertising has ended up in somebody behind bars.  I think this

18   all could have been settled with a cease-and-desist letter

19   early on and both of the men involved would have just walked

20   away.

21           And thank you for your time.

22           THE COURT:  Thank you, sir.

23           Just a moment.

24       (Pause in proceedings.)

25           THE COURT:  Go ahead.

1          MR. LAROSIERE:  Your Honor, I'd just like to spend a

2     short moment talking about Matt Hoover, the man I know, and

3     then I will hard transition into the 3553 factors.

4          It might sometimes be looked at as a bad word in this

5     courtroom from earlier proceedings, but I will admit on the

6     record:  I am a YouTuber.

7          I met Matt Hoover --

8          THE COURT:  I wasn't the one that was offended by

9     being a YouTuber, it was Mr. --

10         MR. LAROSIERE:  Crump.

11         THE COURT:  -- Crump's lawyer that seemed -- I said I

12    didn't think it was a negative word.

13         MR. LAROSIERE:  I agree.

14         THE COURT:  But go ahead.

15         MR. LAROSIERE:  I met Matt Hoover because he was

16    responding to videos that I was making that he was concerned

17    were making fun of him.  And for the first time, I'm going to

18    tell y'all:  Matt, I lied.  I was making fun of you.

19         DEFENDANT HOOVER:  I knew you were.

20         MR. LAROSIERE:  But I reached out to Matt and said,

21    "Hey, I don't want to have beef."  Which was true, I didn't

22    want to have arguments, I just wanted to get away with making

23    fun of him.

24         And he was the kindest salt-of-the-earth person I had

25    ever interacted with.

1          This was an individual who knew I was making fun of

2    him in public, and the moment I indicated I wanted a

3    relationship with him, I'll echo what Mr. Hughes said, he fixed

4    my thumbnails.

5          In effect, throughout the trial, Mr. Hoover, apropos

6    of nothing, would generate thumbnails for my videos because he

7    wanted to see me succeed.  He wants to see everyone he

8    interacts with succeed.

9          His entire family has this intensely nurturing

10   instinct about all of them.  The moment Mr. Hoover met my

11   fiancée he wanted to know her favorite color, he wanted to know

12   everything about her.  And he remembers these things.  It's

13   a -- you know, sometimes you meet people and you feel it's fake

14   because you've read, you know, *How to Make Friends and*

15   *Influence People,* but given some of the other stuff that's on

16   the record, I'm aware Mr. Hoover didn't read that.  I'm aware

17   it all comes from his incredibly good and kind heart.

18          So let's talk about these factors.

19          The government said a lot of things, and it probably

20   won't surprise you that I'm going to quibble with them.  We

21   need to be a little careful here when we talk about certain

22   statements and conflate them with the actual convicted conduct.

23   So we need to be careful.

24          There is a lot of First-Amendment-protected conduct

25   in the overall underlying -- I don't want to say the charged

1    conduct, but you know what I'm saying, the entire course of

2    events.  There was a lot of obviously First-Amendment-protected

3    conduct excluding the auto key cards.

4            THE COURT:  Sure.  But what they're being sentenced

5    for is not First-Amendment conduct.

6            MR. LAROSIERE:  I'm concerned that the

7    First-Amendment-protected conduct that the government is

8    pointing to could improperly be used to exacerbate what is a

9    conviction under 5861, but is assuredly a fringe conviction.

10   That's not to say that -- it's not to doubt the finding.

11   That's to say:  we couldn't be further from the heartland.

12           THE COURT:  And what First-Amendment-protected

13   conduct is it that you think is being misused?

14           MR. LAROSIERE:  Anything Mr. Hoover said about his

15   trust for the government or what -- how individuals should

16   interact with government agents is certainly

17   First-Amendment-protected conduct.  The opinion "don't talk to

18   the cops" is often stated and is certainly First-Amendment

19   protected.

20           THE COURT:  All right.  Go on.

21           MR. LAROSIERE:  Insofar as our distance from the

22   heartland, of course -- and I understand the Court was not

23   doubting the conviction or doubting any of the underlying --

24   I'm not relitigating that.  But this Court observed that

25   whether defendants transferred a combination of parts may not

1   have been obvious in this particular case.  It's an edge case

2   at best, and certainly aberrant behavior under 5K2.20.

3          So let's talk about the nature and circumstances.

4   Yes, we have repeatedly said Mr. Hoover was convicted of

5   talking about this product, which in the brief we described as

6   lines on a piece of steel.  That doesn't mean that it wasn't

7   what the jury said it was.  It can both be lines on a

8   homogenous piece of steel and something that sustained a

9   conviction under 5861 because, well, that's where we are.  We

10  may make -- I expect to say very different things on appeal,

11  but that is where we are right now.  It is certainly relevant

12  to the underlying conduct.

13         As far as promoting respect for the rule of law, as

14  Mr. Hughes said, this has made waves.

15         And as far as the just punishment, Mr. Hoover's

16  entire source of income was as a firearms presenter.  Since

17  1992, that is something that cannot be recovered now.  There is

18  no way to federally restore your right to possess firearms

19  since 1992.  So he has a lifelong prohibition from touching or

20  even possessing the things that were the basis of his entire

21  livelihood.  I think that has to be taken into consideration.

22         In terms of adequate deterrence, I think it's very

23  well served.  People -- people are terrified.  Guideline

24  sentence.  This Court has already observed that if we follow

25  the guidelines as calculated, it's quite extreme relative to

1    the conduct, especially with respect to Mr. Hoover, who, as he

2    just indicated, had a -- the most tenuous connection to what

3    was being sent out and calculated behind the scenes.

4         The need to avoid unwarranted sentence disparities.

5    Well, these types of sentences are rare.  We don't see many

6    sentences where there are actual machine guns.  And I think any

7    disparities in this instant case would be warranted between the

8    defendants.  So I don't think we have an issue of unwarranted

9    sentence disparities.

10        As far as restitution, of course, there's no victim.

11   There's no identifiable victim.  And that should -- you know,

12   that factor should be very important in considering the overall

13   nature of the case.

14        The government, again, on its own, cited some

15   parallel litigation and said nothing about the ATF rulemaking,

16   that basically this case was not about ATF rulemaking or the

17   ATF sneaking something under the nose of the public.

18   Respectfully, I disagree.  The law is absolutely in flux with

19   respect to the very concern we have here.  And we'll --

20        THE COURT:  Mr. Larosiere, the definition of "machine

21   gun" has been in the statute for quite some time.  That's the

22   definition of "machine gun."  This isn't about ATF rulemaking.

23        MR. LAROSIERE:  I know, Your Honor.  If I may,

24   because the government brought up a parallel point, the bump

25   stock point, I would like to bring up a parallel point.  And

1    specifically --

2         THE COURT:  This case isn't about bump stocks.  I'll

3    let you make your record, but I'm deciding this case based on

4    the facts of this case and the law applicable to this case.

5    I'm not interested in what's going on with bump stocks and that

6    litigation.  Fortunately for me, I'm not one of the judges that

7    has one of those cases.

8         MR. LAROSIERE:  Right.

9         THE COURT:  I just said that, and tomorrow I'll get

10   one.  But for the moment, I'm trying to decide this case based

11   on what these gentlemen actually did, who each of them is as a

12   person, because I'm required to consider their history and

13   characteristics, the circumstances of their offense, the law

14   applicable to it.

15        MR. LAROSIERE:  Right.

16        THE COURT:  So you can go ahead, but at the end of

17   the day, bump stocks aren't going to carry me anywhere.

18        MR. LAROSIERE:  You'll be elated to know I'm not

19   talking about bump stocks.

20        The point was raised very early on in this litigation

21   that the definitions the government was using and did use and

22   are in the record as to why this item was a machine gun tracked

23   with -- and again, because the question is when does it become

24   a machine gun.  I think that's fair to say.  The jury said it's

25   become a machine gun.  That's fine.

1        The point is, relevant to 5K2.20, right before

2   Mr. Hoover was arrested, ATF had put in a rule specifically

3   relevant to this, which was:  When does a firearm cross that

4   threshold?  The language was the same as that -- and I had

5   brought this up earlier on.  The language was the same as that

6   invoked by the government.  That rule, using that language, was

7   just voided as unconstitutional.

8        So the only point I'm making is just to rebut the

9   government's saying it is absolutely not in flux.  It's

10  absolutely in flux.  The definition of when something does or

11  does not become a regulable firearm is a hundred percent in

12  flux.

13       And the danger here isn't subjective.  As Your Honor

14  was grappling with the government over how much danger these

15  actually pose, the government was speaking as though the danger

16  matters to what the individual had in their mind.  An

17  individual could think an acorn is a thermonuclear weapon, but

18  if it's not a thermonuclear weapon, I don't think they'd be

19  charged under that particular part of -- actually, the same

20  statute we're talking about.

21       THE COURT:  I don't think that argument is --

22  that's --

23       MR. LAROSIERE:  Well, for the purposes of sentencing,

24  we have to take a look at the factual record.  The factual

25  record was no one aside from the ATF agent got it to cause a

1    firearm to fire automatically.  And when he did -- this is in

2    the record, and I understand -- he did not cut along the line.

3    It's relevant in some way.  It's relevant as to why the

4    government didn't go around collecting them because Agent

5    Slosson testified that if this was an AK-47, you would have no

6    doubt that the ATF would go knocking on every single door, just

7    to rebut that point.

8            The nationwide -- an attempted nationwide recovery

9    would have shown that this is serious, but that didn't happen.

10   The evidence we have shows that it was just a couple guys from

11   the Jacksonville Field Office flying around to get a couple of

12   cards.  And even where they claimed that "oh, the obfuscation,"

13   the "send the order form somewhere else," they still brought

14   people here to court who had done that exact thing.

15           Finally, the government, interestingly, as we've gone

16   back and forth in this question of whether or not there was a

17   conversation with someone who claimed to be or was at the ATF

18   or was an IOI, the government brought up the evidence of that

19   when trying to suggest that Mr. Hoover's speech showed some

20   kind of bad intent.  They said that he had released a video

21   indicating that people should cut these up or whatever.

22           Well, that's not what he actually said.  If we review

23   that evidence, what Hoover said in that video was that -- you

24   know, he basically said to the extent -- to the -- to the

25   effect of, "Hey, guys.  Information I previously had suggested

 1  this was legal, but now something has changed.  That is not the
 2  case."
 3          MS. TAYLOR:  Your Honor, can I just -- I have -- I
 4  have no idea what Mr. Larosiere is referring to, like which
 5  video.  I don't -- this isn't sounding familiar to me.
 6          MR. LAROSIERE:  The video -- sorry.
 7          THE COURT:  Why don't you confer with Ms. Taylor and
 8  see if you can identify it.
 9      (Mr. Larosiere and Ms. Taylor confer.)
10          MR. LAROSIERE:  The point is there's certainly
11  support for a preponderance that he at least believed that the
12  conversation happened.  And to use his suggesting to the
13  audience, "Hey, this is no longer legal, get rid of it," I
14  think that looks more like a subsequent remedial measure than
15  anything else.
16          It seems more to me as, "Hey, guys.  I communicated
17  something to you.  I now know it's wrong," and he's trying to
18  fix it.  I think it would be -- we ought not punish him for
19  that, but it's --
20          THE COURT:  Mr. Larosiere, the jury concluded that he
21  did know it was unlawful.  That's what the jury verdict shows.
22          MR. LAROSIERE:  Yes.
23          THE COURT:  Arguing evidence contrary to the jury
24  verdict at sentencing isn't helpful because I'm going to -- I
25  have to impose a sentence based upon the jury's conclusion that

1   he -- knowing the unlawful purpose of the plan, that was, the

2   unlawful nature of machine gun conversion devices, that he

3   willfully joined in that conspiracy.

4          MR. LAROSIERE:  Right.

5          THE COURT:  So continuing to argue to me that there

6   is evidence that he didn't know or that he thought it was legal

7   when he was doing it, that's contrary to the jury's verdict.

8   And I'm not going to sentence him on a version of the facts

9   that is contrary to the jury's verdict.  That's not how this

10  works.

11         MR. LAROSIERE:  Fully understood, Your Honor, and

12  fully respected.  What I'm trying to communicate is the state

13  of flux in this area, how chaotic and wildly inequitable it is.

14  It does not require overturning any jury finding.  I'm simply

15  requesting that it be taken into account and explaining how

16  some statements that the government brought up in furtherance

17  of an upward departure might actually support a downward

18  departure or variance.  And I think that all of the -- all of

19  the 3553 factors counsel towards downward -- a downward

20  departure or a variance because they're -- frankly, the

21  guidelines would be far more than is necessary.

22         It seems to counsel that the permanent effects that

23  the conviction alone will have on Mr. Hoover and his family are

24  more than adequate to serve the purposes of the law.

25         THE COURT:  Mr. Larosiere, I understand your variance

1   request.  I want to make sure I know what specific guideline

2   you're relying upon for a downward departure.

3           MR. LAROSIERE:  I would stand on the memorandum for

4   that.

5           THE COURT:  Just a moment, because --

6           MR. LAROSIERE:  I believe the majority of the

7   departure is the heartland analysis.  The heartland factor

8   alone can justify a downward departure.

9           MS. TAYLOR:  Your Honor, may I have a moment?

10          THE COURT:  Go ahead.

11      (Ms. Taylor and Mr. Larosiere confer.)

12          MR. LAROSIERE:  It would be 5K2.0, Your Honor.

13          THE COURT:  Okay.  Just a moment.  I'm just looking

14  back here.

15          I see a reference to 5H1.6 for family

16  responsibilities.  I see a reference to 5K2.1 [verbatim] based

17  on aberrant behavior.  I think those are the only two.

18          MR. LAROSIERE:  Page five, we have 2.0.

19          THE COURT:  I said that.  I said 5K2.0 and 5H1.6 are

20  the only two I see referenced.

21          MR. LAROSIERE:  Yes, Your Honor.

22          THE COURT:  Is that correct?

23          MR. LAROSIERE:  Yes, Your Honor.

24          THE COURT:  Okay.  Go ahead.

25          MR. LAROSIERE:  Your Honor, we -- we believe that all

1    of the purposes of the laws have been satisfied, again, by the

2    time that Mr. Hoover has spent in this county detention

3    facility, which somebody really ought to do something about,

4    and the lifelong disabilities that he's going to suffer.  I

5    think there's no indication that Hoover would ever recommit,

6    and certainly not in the same way, unlike what happened in the

7    *Bixley* or *Hixley* case, where --

8          THE COURT:  *Hixson*, or --

9          MR. LAROSIERE:  *Hixson*, where it was, you know, quite

10   extreme.  The guy was on probation and was selling machine

11   guns.  That's kind of night-and-day from what we're dealing

12   with now.

13         THE COURT:  Of course, that involved only nine of

14   them and not several thousand.

15         MR. LAROSIERE:  And he was on probation, which is a

16   point of fact.  And also, as Mr. King brought up -- careful to

17   craft this in a way not to -- much more transparently machine

18   guns there, and in some cases, actual -- which I understand

19   this Court believes there is no distinction, but in some cases

20   they are actual whole machine guns, so . . .

21         I believe that is all I have.  Thank you so much for

22   your time, Your Honor.

23         THE COURT:  Thank you, Mr. Larosiere.

24         Ms. Taylor.

25         MS. TAYLOR:  Your Honor, I'm going to endeavor to be

Case 3:21-cr-00022-MMH-MCR   Document 329   Filed 09/14/23   Page 135 of 144 PageID 6882
USCA11 Case: 23-13062   Document: 39   Date Filed: 02/29/2024   Page: 513 of 563

VOL 1 - PG 135

 1   as succinct as possible.

 2         THE COURT:  That would be appreciated.

 3         MS. TAYLOR:  So when listening to Mr. Ervin's

 4   allocution -- Kristopher Justinboyer Ervin, just to distinguish

 5   him from his father -- it was clear that he views himself as a

 6   victim of this prosecution.

 7         One of the first things he says was that he thinks

 8   "the government wants to hurt me and my family."  He talked

 9   about being put under pressure in these proceedings.  And he

10   also talked about being sent here by God to do the right thing

11   and that he does not believe that he committed a crime.

12         He also suggested that there was some sort of

13   evidence tampering when discussing his phone, that the

14   testimony at trial was that it erased itself.

15         And he stated he's thirsty for justice.  And I don't

16   think I have the exact quote here because I couldn't keep up

17   with him, but something to the effect of that he respects the

18   rule of law, but he just doesn't agree with either this case or

19   this prosecution or how the law has been applied in this case.

20   And that he's taking the moral high ground.

21         And also suggested that he wouldn't have had an

22   attorney had his friends and family not contributed money,

23   which, of course, is not correct.  He had a public defender

24   that was appointed to him at the very outset of this case.  And

25   he has a right to an attorney under the Constitution, and so of

1    course he would have been represented.

2        Your Honor, he talked a lot about the First Amendment

3    and that that's what his purpose was.  I know the Court already

4    addressed that in part, but I also just want to bring this back

5    to the point that was made in trial and that I made earlier,

6    that Mr. Ervin, if he genuinely were interested in just

7    spurring conversation about the auto key card, he -- or about

8    lightning links and the NFA and his apparent disagreement with

9    it, he had a million different ways that he could have done

10   that that didn't involve making not-quite-finished auto sears

11   and then selling them in bulk at enormous profits.  Again, he

12   was paying 2 to $3 per card and selling them for about 60 to

13   $150 each.  His profit margins on these things was huge.

14       He also had available on his website gear, T-shirts

15   and beanie caps.  I believe he had at least a T-shirt that had

16   an image of the auto key card on it.  If really his goal was to

17   get people talking about this, why not just make the T-shirt?

18   And then somebody is walking around with your idea on it.  And

19   maybe that actually would spark a conversation, as opposed to

20   selling a device that Mr. Hoover then goes on YouTube and tells

21   people, you know, "Don't go on YouTube showing yourself using

22   this" and "use your anti-gun relative's address to get it sent

23   to so that the government doesn't know what you're doing."

24       So the idea that this was about freedom of speech or

25   a political protest is completely undermined by the actual

1   evidence in this case, which also includes one of Mr. Ervin's

2   text messages where he was talking about, "I just talked to a

3   YouTuber" who's going to advertise his cards, and relates that

4   the YouTuber said, "We're going to make a metric f-u-c-k ton of

5   money."  It was about the money.

6           And of course, you know, there's nothing wrong with

7   wanting to make a living.  There's nothing wrong with that.

8   But when you're making a living by thumbing your nose at the

9   law and essentially -- and Mr. Hoover articulated this in one

10  of the videos that was played at trial.  It's the video where

11  he talked about the Stamp Act and his desire to support Ervin.

12  And what Mr. Hoover says in that video was that Mr. Ervin was

13  the flag carrier or something, the flag bearer, I think, that

14  he was out there purposefully disobeying the NFA so that he

15  could foment mass resistance to the law.  And it appears that

16  the ultimate goal was they believed that they would undermine

17  the NFA to such an extent that the government was forced not to

18  enforce it any longer.  So that's what this case was about.

19          There was also a suggestion that these were bad

20  firearms.  Mr. King said he's only ever fired a gun one time

21  but represented that he believed that he could install a Glock

22  switch based upon watching a ten-minute video.  I mean, I don't

23  know where -- what that's based on.

24          And he also talked about templates being available

25  online for this.  And that's true, they are.  And those are not

 1    illegal.  Templates are also available, and 3D and printing

 2    instructions, for other kinds of auto sears online.  Not

 3    necessarily illegal, but that's not what we were dealing with

 4    here.  We're dealing with somebody who was having these

 5    manufactured at mass scale and selling them, and selling them

 6    with a person who was advocating for his viewers to use them

 7    for a particular purpose, and that purpose was to make a

 8    machine gun.

 9         And there was a suggestion made that -- I think it

10    was suggested that the facts proving that Mr. Hoover talked to

11    the ATF were that he said he believed it was legal.  Those two

12    things don't necessarily have anything to do with each other.

13    And in any event, Mr. Hoover clearly knew that it was not legal

14    when he made those videos.  He made a laundry list of

15    statements reflecting that he knew exactly what the auto key

16    card was and that he believed that at some point in the future

17    there would be prosecutions based upon the auto key card and

18    that ATF would view it as an NFA item.

19         And these things are not in dispute.  They were right

20    in black and white, shown to the jury at the trial.  The Court

21    has heard them.  We all heard them.  We all watched the same

22    videos.

23         And Your Honor, my goal here is just to refocus on

24    what the actual evidence was.

25         And finally, Your Honor, one thing that I wrote down

 1  that you said a few minutes ago was that you're not going to

 2  sentence the defendants based upon a version of facts that's

 3  contrary to the jury's verdict.  Well, the jury's verdict in

 4  this case included a finding that each of the auto key cards

 5  that was transferred as-is in the conspiracy, that those things

 6  were machine gun conversion devices under the law.

 7         I personally have not ever seen someone come into

 8  court and say that they were less culpable for illegally

 9  possessing a firearm because it was a crummy, low-quality,

10  rusty pistol instead of a nice, shiny, new, high-quality

11  pistol.

12         THE COURT:  Then you didn't sit through Judge

13  Corrigan's chickenhawk case --

14         MS. TAYLOR:  I did not.

15         THE COURT:  -- because I think that was precisely the

16  defense.

17         MS. TAYLOR:  Well, in any event, it's a firearm.

18  It's a firearm, it's a firearm, it's a firearm.  That's what

19  the jury's verdict was, and that's what we're asking the Court

20  to sentence the defendants based upon.

21         It's undisputed that 6,600 of these auto key cards,

22  which the jury determined were firearms and machine guns under

23  federal law, were transferred in this case.  And that is what

24  we're asking the Court to sentence these men on, is their

25  personal history and characteristics, which reflect, based on

1    their statements today, that they do not accept responsibility

2    for what they did.  They don't even accept -- the don't accept

3    the jury's verdict.  They don't accept that what they did was

4    wrong.

5            Mr. Hoover certainly -- he appears remorseful, or at

6    least tearful, in the sense that I am confident that he truly

7    does not want to be separated from his family and does not want

8    to go to prison, but that's not the same thing as accepting

9    responsibility.

10           And Your Honor, for all of those reasons, the United

11   States submits that a guideline sentence is the appropriate

12   sentence in this case, and that's what we're asking you to

13   impose.

14           THE COURT:  Thank you.

15           Give me a moment.

16       (Pause in proceedings.)

17           THE COURT:  Ms. Wiles, may I see you.

18       (The judge and the courtroom deputy confer.)

19           THE COURT:  Ms. Wiles and I are just looking at a

20   calendar because I'm -- I want to take some time to consider

21   the arguments that have been made.  And as the lawyers who are

22   here know, once the Court announces a sentence, there's no

23   opportunity for buyer's remorse.  You can't change your mind

24   once you say it out loud.  And so I want to make sure that I

25   have fully considered all of the positions of the parties, and

1  so I'm -- what I'd like to do is take the evening and reconvene

2  tomorrow to announce my sentence.

3         Mr. King, you and I are together in another case

4  tomorrow morning, but we could do this perhaps after that at

5  11:30.  I understand that before that 10 o'clock hearing would

6  be problematic for you.  Is there any reason why we couldn't

7  reconvene at 11:30, with the understanding that my intention

8  would be at 11:30 tomorrow to simply pronounce sentence?  There

9  would be no further argument as I have now -- I think I've

10 heard everything that anybody could possibly want to say at

11 this point.  Would 11:30 work?

12        MR. KING:  Yes, Your Honor.  And I was going to say,

13 the only thing in terms of what we did not discuss is we would

14 prefer a Coleman designation.

15        THE COURT:  Okay.  Mr. Larosiere, is there any reason

16 why we can't reconvene at 11:30 tomorrow?

17        MR. LAROSIERE:  No, Your Honor.

18        THE COURT:  All right.

19        Ms. Taylor?

20        MS. TAYLOR:  That works for Mr. Mesrobian and I, Your

21 Honor.

22        THE COURT:  Okay.  Then I'm going to -- I'm going to

23 just make a -- do a couple things so that the record is clear

24 and then we're going to recess and we'll reconvene at 11:30,

25 with the understanding that at 11:30 it will simply be the

1    imposition of sentence.

2          Mr. King, is there any bar to sentencing at this time

3    with respect to Mr. Hoover -- Ervin?

4          MR. KING:  No, Your Honor.

5          THE COURT:  Mr. Larosiere, is there any bar to

6    sentencing as to Mr. Hoover?

7          MR. LAROSIERE:  No, Your Honor.

8          THE COURT:  Ms. Taylor, any bar to sentencing as the

9    either of these gentlemen?

10         MS. TAYLOR:  No, Your Honor.

11         THE COURT:  All right.  Then with that, the arguments

12   are completed.  And I will take the parties's respective

13   positions under advisement and we will reconvene at 11:30

14   tomorrow morning.

15         And I apologize for those of you that traveled.  I

16   know that that's probably inconvenient, and I'm sorry about

17   that, but it is more important that I have the opportunity to

18   fully consider everybody's arguments than it is that I try to

19   move too quickly.  That is definitely one thing I've learned in

20   this job.  So I apologize to the extent that I'm

21   inconveniencing anybody, but I really do think I need the

22   additional time.

23         Mr. King, Mr. Ervin wants to say something.

24         DEFENDANT ERVIN:  Thank you for your diligence, Your

25   Honor.  I appreciate you.  I just wanted to tell you I

 1  appreciate you for taking this seriously.

 2          THE COURT:  All right.  We're in recess.

 3          COURT SECURITY OFFICER:  All rise.

 4      (Proceedings adjourned at 3:05 p.m., to be continued on

 5  Thursday, September 7, 2023, at 11:30 a.m.)

 6                        -    -    -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3   UNITED STATES DISTRICT COURT)

 4   MIDDLE DISTRICT OF FLORIDA )

 5

 6        I hereby certify that the foregoing transcript is a true

 7   and correct computer-aided transcription of my stenotype notes

 8   taken at the time and place indicated herein.

 9

10        DATED this 14th day of September, 2023.

11

12                      /s/ Katharine M. Healey
                        Katharine M. Healey, RMR, CRR, FPR-C
13                      Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2             JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA,      Case No. 3:21-cr-22(S4)-MMH-MCR

4        Plaintiff,               Thursday, September 7, 2023

5  v.                            11:37 a.m. - 12:44 p.m.

6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
   and MATTHEW RAYMOND HOOVER,
7
         Defendants.
8  _____

9
                        SENTENCING
10                     (VOLUME 2 of 2)

11
           BEFORE THE HONORABLE MARCIA MORALES HOWARD
12              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20    Katharine M. Healey, RMR, CRR, FPR-C
      PO Box 56814
21    Jacksonville, FL 32241
      Telephone: (904) 301-6843
22    KatharineHealey@bellsouth.net

23

24                          (Proceedings reported by stenography;
                            transcript produced by computer.)
25

1                    A P P E A R A N C E S

2

3      COUNSEL FOR THE GOVERNMENT:

4        **LAURA C. TAYLOR, ESQUIRE**
         **DAVID MESROBIAN, ESQUIRE**
         United States Attorney's Office
5        300 North Hogan Street, Suite 700
         Jacksonville, FL 32202
6

7
       COUNSEL FOR DEFENDANT ERVIN:
8
         **ALEX KING, ESQUIRE**
9        Monroe & King, P.A.
         1805 Copeland Street
10       Jacksonville, FL 32204

11

12     COUNSEL FOR DEFENDANT HOOVER:

13       **ZACHARY Z. ZERMAY, ESQUIRE**
         Zermay Law
14       1762 Windward Way
         Sanibel, FL 33957
15
       - A N D -
16
         **MATTHEW LAROSIERE, ESQUIRE**
17       6964 Houlton Circle
         Lake Worth, FL 33467
18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2    September 7, 2023                              11:37 a.m.

3                         -   -   -

4         COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Marcia Morales Howard presiding.

7              Please be seated.

8         THE COURT:  We are back on the record in Case Number

9    3:21-cr-22-MMH-MCR, United States of America vs. Kristopher

10   Justinboyer Ervin and Matthew Raymond Hoover.

11              Ms. Taylor and Mr. Mesrobian are here on behalf of

12   the United States, and returning with them here today are Agent

13   Hooker and Agent Slosson.

14              Mr. King is here with Mr. Ervin.

15              Mr. Larosiere and Mr. Zermay are here with Mr. Hoover

16   and with Ms. Katzenberger.

17              We're scheduled for the imposition of sentence,

18   having heard all of the arguments of the attorneys and having

19   heard from Mr. Hoover and Mr. Ervin, as well as individuals

20   speaking on their behalf yesterday.  And I appreciate

21   everyone's indulgence of giving me the evening to consider all

22   of those arguments.

23              And I'm going to do this a little bit backwards.  I'm

24   going to explain the reasons for my sentence and what it is

25   going to be, and then at the conclusion of the hearing I'll ask

1    Mr. Hoover and Mr. Ervin to come up to the podium and I will

2    formally impose the sentence.

3            In sentencing, the Court's obligation, and what the

4    Court is charged with, is fashioning a sentence that is

5    sufficient, but not greater than necessary, to serve -- to

6    satisfy the statutory purposes of sentencing.

7            And in determining what sentence is sufficient, but

8    not greater than necessary, to do that, the Court is advised by

9    the sentencing guidelines and has to consider the guidelines,

10   which as we all know, at this time the Court has determined are

11   121 to 151 months of incarceration.

12           And the Court has to look at the nature and the

13   circumstances of the offense and the history and

14   characteristics of the defendant, and then has to consider what

15   sentence will satisfy those statutory purposes of sentencing,

16   which include the need to promote respect for the law, the need

17   to reflect the seriousness of the offense, to provide just

18   punishment for the offense, to afford adequate deterrence not

19   just for Mr. Ervin and Mr. Hoover, but adequate deterrence for

20   others who would consider engaging in similar unlawful conduct.

21   The sentence has to protect the public from further crimes.

22   And the Court has to consider what sentences are available and

23   also has to endeavor to avoid any unwarranted sentencing

24   disparity.

25           And so those -- it's kind of a lot of moving parts,

1   but that's the backdrop and that's what the Court is required

2   to do.

3          Now, as I said, the guidelines in this case are 121

4   to 151 months.  But if the Court had rejected the government's

5   arguments and had accepted the calculation submitted by the

6   probation office, which was consistent with what the guidelines

7   would instruct if you rely on the commentary, then Mr. Ervin's

8   guidelines would have been 33 to 41 months and Mr. Hoover's

9   guidelines would have been 27 to 33 months.

10          Had the Court accepted that, then the government

11   argued that the Court should depart upward under 5K2.0(a)(2) or

12   (a)(3).

13          (a)(2) authorizes an upward departure where there

14   exists an aggravating circumstance not adequately taken into

15   consideration by the guidelines.  Specifically here, the

16   absence of an increase for the number of NFA devices.

17          (a)(3) provides for an upward departure for

18   circumstances that are taken into consideration under the

19   guidelines but the circumstance is present in the offense to a

20   degree substantially in excess of that ordinarily involved.

21   And the argument there, I think, being that even if there was

22   an enhancement for 200 firearms, 200 is a fraction of the 6,600

23   that were possessed.

24          And last, they argued under 2K2.1, Note 11, that

25   the -- that recognizes that it would be appropriate to depart

1   if the offense involved multiple NFA weapons.  And I note that

2   that says NFA "weapons," it doesn't say "firearms."

3         And I think if the guidelines -- if I had determined

4   that the guidelines were 33 to 41 for Mr. Ervin and 27 to 33

5   for Mr. Hoover, then an upward departure on any one of those

6   three grounds would have been appropriate; would have been

7   appropriate because the guidelines, as calculated, do not

8   reflect the sheer magnitude and scope of the defendants'

9   proliferation of the machine gun conversion devices.  That

10  simply is not accounted for in the guideline range, a guideline

11  range that is calculated with no increase at all for the number

12  of dangerous devices that the defendants conspired to transfer

13  without registering.

14        So the guidelines, as scored, strictly under the

15  black-and-white of what's in the guideline manual, would be

16  wholly inadequate.  And an upward departure would have been

17  warranted under any one of those three bases because they all

18  really account for the same thing in order to truly reflect the

19  seriousness of the offense conduct.  And we need to consider

20  the offense conduct.

21        Through the conspiracy the defendants filled over

22  1,500 orders for machine gun conversion devices.  I think it's

23  actually over 1,700; but conservatively over 1,500.  Many, if

24  not most, of those orders were for multiple devices.  And the

25  evidence showed the defendants conspired to sell these items,

1   knowing what they were, knowing how they could be used.

2          One really only has to look as far as Mr. Ervin's

3   machine gun fish video that we saw -- too many times during the

4   trial -- and it shows that Mr. Ervin knew what the devices

5   could be used for and what he was selling them to be used for.

6   And his other videos and his statements showed that.  And his

7   cagey responses to his customers's emails showed his knowledge

8   as well.

9          They showed Mr. Ervin carefully trying to walk a fine

10  line of selling and encouraging the purchase of devices,

11  knowing full well what he was selling them to be, but not

12  overtly acknowledging their use and purpose.  And the jury saw

13  through that.  The jury concluded that Mr. Ervin knew full well

14  what he was selling, even if he tried not to directly answer

15  the questions from his customers.

16          And the defendants sold these devices quite

17  recklessly, with no regard for who they might be selling the

18  devices to.  In fact, one of Mr. Hoover's videos specifically

19  encouraged prohibited persons, including convicted felons, to

20  purchase these illegal devices.  That's very serious offense

21  conduct.  It is offense conduct that is extremely dangerous,

22  placing these devices that have brutally lethal capacity in the

23  hands of hundreds of people without any regard for what those

24  people would use those devices for.

25          And again, I'll note that what we're talking about is

1   over 1,500 sales, and then the possession of over 6,000 of

2   these devices that would have been placed in commerce but for

3   the arrest.  And that is just not accounted for at all in the

4   guideline, which is calculated without regard to the number of

5   weapons.

6          But as I indicated, following the dictates of *Dupree*,

7   I determined that I wasn't permitted to rely on the commentary

8   definition of "firearm" because it was inconsistent with the

9   unambiguous guideline in 2K2.1.  And so I determined that the

10  guidelines are actually 121 to 151.

11         Mr. Hoover argues for a downward departure based on

12  his family circumstances under 5H1.6 and under 5K2.0, arguing

13  that his offense conduct reflects aberrant behavior.

14         The reality is that Mr. Hoover's family

15  responsibilities, while certainly very important, and while his

16  absence in the family home without question causes hardship,

17  that is not a circumstance that is present to an unusual degree

18  in this case.  It's not present in any way different than

19  almost every other individual who has a family that is here for

20  sentencing.  And so 5H1.6 would not authorize a downward

21  variance -- or a downward departure on that basis.

22         And a departure for aberrant conduct is warranted

23  where something is inconsistent with an individual's

24  personality.  It's a lapse of judgment.  It's a momentary

25  thing.

1          That's not what this conduct was.  This conduct that

2     Mr. Hoover engaged in was not aberrant, it was him expressing

3     his true beliefs.  And he doubled down even after Mr. Ervin's

4     arrest, indicating his belief in proceeding in the manner that

5     he did.  So it can't be described as aberrant.

6          And so to the extent Mr. Hoover requests a downward

7     departure on the basis of either 5H1.6 or 5K2.0, the Court

8     finds that no downward departure is appropriate, that is, no

9     downward guideline departure.  But I will consider the

10    arguments presented there with respect to a variance from the

11    guidelines.

12         Even with the guidelines at 121 to 151, the

13    government argues for an upward departure of six levels because

14    of the number of devices.  That would drive the guidelines from

15    121 to 151 to 235 to 293 months.  And I think that that

16    sentence would be far, far, far, greater than necessary.  And I

17    don't think that the upward departure is necessary or

18    warranted.  The guidelines of 121 to 151 months are more than

19    sufficient, in my mind, to capture the seriousness of the

20    offense conduct.

21         I recognize that the jury verdict means that each and

22    every one of the devices that were in those cards can

23    theoretically convert a firearm to a machine gun.  That's what

24    the jury reflects, and the Court accepts and respects the

25    jury's verdict.  But I don't think that a guideline that

1   assumes -- that treats each and every one of those as an actual

2   firearm is appropriate.  I don't know that if one had asked the

3   jury that they would have concluded that each one of those

4   cards would have successfully achieved conversion to a machine

5   gun or that they were even convinced that each purchaser really

6   would have tried.

7        Do the defendants get a pass because they made

8   marginally good machine gun conversion devices or because they

9   didn't make great machine gun conversion devices?  No, I don't

10  think they get a pass for that.  But I also don't think they

11  should be held accountable as if every item sold would and

12  truly could be used in the manner for which they were

13  advertised.  And I just -- I don't think that the evidence

14  presented and the facts of this case warrant treating them in

15  that way, and so I decline to depart upward.  I just don't

16  think it's necessary.

17       I think that to the extent the guidelines have to

18  take into consideration the actual offense conduct, I don't see

19  that an upward departure is necessary.  The aggravating

20  circumstances of the offense conduct I think are fully

21  accounted for with the guidelines as they are calculated.

22       So those, I think -- I think that addresses all of

23  the departure motions under the guidelines because the Court,

24  of course, has to start with the guidelines.  So we're back to

25  the guidelines are 121 to 151.

1        And as I indicated yesterday, I am still convinced

2   that a guideline sentence is more than what is necessary in

3   this case.  And I recognize that the government strongly

4   disagrees with that position, and I respect that, but I'm

5   firmly convinced that a guideline sentence is too high.

6        The difficult question, of course, then becomes:

7   What is an appropriate sentence?  What sentence will reflect

8   the seriousness of the offense?  And I've explained already

9   that I think this is a very serious offense.  And what sentence

10  will promote respect for the law?  What will accomplish just

11  punishment?  What will deter others from trying to find a

12  unique way to manufacture these devices and proliferate them

13  but avoid liability themselves?  Because that's what Mr. Ervin

14  and Mr. Hoover were doing.  That's the difficult question that

15  the Court has to answer.

16        In answering it, we have to remember what the case is

17  about and what the case is not about.  I said yesterday that

18  this case is not about the First Amendment.  Neither of these

19  defendants is charged or before the Court based upon their

20  speech.

21        I want to talk about a few of the things that

22  Mr. Ervin said yesterday.  Mr. Ervin, this case is not --

23        DEFENDANT ERVIN:  Your Honor, I was emotional after

24  watching my father speak.  I would like to communicate that --

25        THE COURT:  I understand.

```
 1                   DEFENDANT ERVIN:  -- just from my heart.

 2                   THE COURT:  No, I understand.  And please don't --

 3      please don't --

 4                   DEFENDANT ERVIN:  I just didn't want you to punish me

 5      for being emotional because of my father --

 6                   THE COURT:  I'm not.  And I'm --

 7                   DEFENDANT ERVIN:  -- because I love him very much.

 8                   THE COURT:  Of course you do.

 9                   DEFENDANT ERVIN:  So I just wanted to say that I --

10                   THE COURT:  And he loves you very much.

11                   DEFENDANT ERVIN:  -- was worked up a little bit and I

12      just -- I -- I understand.  I just wanted you to know that --

13                   THE COURT:  Okay.

14                   DEFENDANT ERVIN:  -- that was the situation.

15                   THE COURT:  I understand.  And I just want to talk to

16      you about some of the --

17                   DEFENDANT ERVIN:  Yes, ma'am.

18                   THE COURT:  -- beliefs that you expressed, because I

19      want -- I don't want you to misunderstand --

20                   DEFENDANT ERVIN:  I don't want to leave something out

21      that needs to be known either.

22                   THE COURT:  Okay.  Mr. Ervin, I'm going to stop,

23      okay.

24                   DEFENDANT ERVIN:  I understand.  I'm not trying to

25      interrupt you or stop you, I'm just saying, my emotional state
```

1   and my concern was that maybe I didn't say something that you

2   needed to know.  That was my concern, why I wanted to tell you

3   about me being worked up.

4              THE COURT:  Okay.

5              MR. KING:  Your Honor, I apologize.  Could I have a

6   moment with Mr. Ervin?

7              THE COURT:  Sure.

8     (Mr. King confers with Defendant Ervin.)

9              MR. KING:  Thank you, Your Honor.

10             THE COURT:  You talked yesterday about your passion

11  to cause debate in a public square, and that's great.  But this

12  case isn't about causing debate in a public square, and it's

13  not about wanting to initiate a nationwide debate.  You can

14  tell yourself that that's what this case is about, but it's

15  not.

16             The truth is that you don't need to manufacture a

17  functional, durable, metal auto sear that can actually be

18  converted -- that can actually be used to convert a firearm

19  into a machine gun to cause public debate on whether such an

20  item should be lawful.  You can print it on a T-shirt, you can

21  print it on a hat.  You can do all sorts of things, which I

22  know you did, but you don't -- what you don't have to do is

23  create a machine gun conversion device and sell it to over

24  1,700 people.  That's --

25             DEFENDANT ERVIN:  Your Honor --

```
 1          THE COURT:  No, Mr. Ervin.  At this point you're just
 2   going to have to listen, please.
 3          DEFENDANT ERVIN:  Ms. Taylor said it was a picture
 4   yesterday.  That's all it was.
 5          THE COURT:  Mr. Ervin, it's not a picture.
 6          DEFENDANT ERVIN:  I understand how you feel, but I
 7   disagree.
 8          THE COURT:  Mr. Ervin, no, this isn't how I feel,
 9   this is what the law says.
10          DEFENDANT ERVIN:  I understand.
11          THE COURT:  Mr. Ervin, I'm going to have to ask you
12   to stop.
13          DEFENDANT ERVIN:  Yes, ma'am.
14          THE COURT:  I'm going to have to ask you to listen.
15          DEFENDANT ERVIN:  Yes, ma'am.
16          THE COURT:  And you told me just a moment ago that
17   you didn't not want to say something that I would need to hear.
18          What would be helpful for you is if you could
19   acknowledge that perhaps you made a mistake and that what you
20   did was unlawful.  But you very clearly don't believe that,
21   which is one of the concerns that I have in imposing a sentence
22   at this time.
23          Don't talk, Mr. Ervin.
24          DEFENDANT ERVIN:  Yes, ma'am.
25          THE COURT:  Okay.  As I was saying, you don't have to
```

1   make a machine gun in order to initiate public debate about

2   whether one should be legal, just like you don't have to go out

3   and buy fentanyl to argue about its illegality.  And you don't

4   have to use any other illegal drug in order to promote that

5   drugs should be legal.  You don't have to break the law in

6   order to encourage a public debate on the law.  You can debate.

7   That's what words are for.

8           And as I said, you certainly don't have to sell over

9   1,500 of them without any regard to who is buying them and what

10  they might do with them to cause debate in the public square.

11          I understand that you may choose to rationalize your

12  actions by stating that that was your intention, but nothing,

13  and I mean nothing, in the evidence suggests that you were

14  fighting for the legitimacy of the auto sear.

15          To the contrary, you tried to distance yourself from

16  it.  You tried not to allow yourself to be convict- -- to be

17  connected to telling your clients or your customers how to

18  actually convert it to the auto sear.  That's a far cry from

19  suggesting that what you're doing was simply trying to cause

20  public debate.

21          You said yesterday that the government wants to hurt

22  you and your family.  This case is not about the government

23  wanting to hurt you or your lovely family.  They didn't go out

24  and pull Kristopher Ervin's -- Justin Ervin's name out of a

25  hat.  They didn't go on the internet and find you and think:

1  Oh, we need to find something to charge him with.  That's not

2  what happened here.

3           The reason that the government brought the charges is

4  to hold you accountable for the decision you made for your

5  actions.  Now, does that hurt your family?  And does it hurt

6  your family, Mr. Hoover?  Yes, it does.  And I'm sorry.  I

7  often say when I'm imposing sentence that the hardest thing

8  that a federal judge does is sentence people, because when you

9  sentence an individual, you're not just sentencing that person,

10  you're sentencing their mother, their father, their children,

11  their friends, everyone.  And that's very difficult.

12           But it's not the government's fault that the sentence

13  has to be imposed.  It is the individual who made the decision

14  to break the law that causes there to have to be a sentence.

15  And the sentence is a consequence of the actions.

16           You told me yesterday that you don't want to be in

17  trouble for a picture.  But you didn't just sell a picture.  It

18  wasn't a picture.  It wasn't art.  It wasn't a drawing.  And

19  your own statements reflect that you knew that the strong metal

20  card that you were selling had a purpose; that your customers

21  might want some day, you said perhaps only under dire

22  circumstances -- of course, there was nothing prohibiting

23  people from using it for any reason.  But it was sold for and

24  built for a purpose.  And that purpose was to convert a firearm

25  to a machine gun.  It wasn't a picture.  It wasn't a piece of

1    art.

2         You said yesterday that there were ways to mitigate

3    this and that you never had a chance.  And I think one of the

4    other witnesses expressed the view that there were better ways

5    for this to be handled.  And I assume that's a reference to

6    sending a stop-and-desist letter instead of arresting Mr. Ervin

7    and Mr. Hoover.  But the way to mitigate this was not to engage

8    in the criminal conduct to begin with.

9         I am quite certain that any number of defendants who

10   are charged with crimes in federal and state court would have

11   preferred that law enforcement just approach them and say,

12   "Hey, dude, cut it out."  I'm sure.  But that doesn't change

13   the fact that you had already made the decision to commit

14   federal crimes and had been doing so for a period of time.  And

15   there are consequences for that.

16        I heard from Mr. Ervin's father yesterday.  And sir,

17   thank you for speaking.  I know that was hard.  And I just

18   wanted to say that you can't blame yourself.  As parents, we

19   always want to take responsibility for our children's actions.

20   We can't help it.  We love them.  And of course you love your

21   son.  And nothing about this changes the fact that you love

22   him.  But you're not responsible for his decisions or for his

23   actions.  And Mr. Ervin, he chose his actions.  And you weren't

24   in a position to stop him.  And it's not your fault that you

25   did not see the flaw in his plan.

1        You said that Mr. Ervin didn't wake up and decide to

2   become a criminal.  And I'm sure that that is absolutely true.

3   But at some point he did decide that he would manufacture and

4   sell devices that could convert a firearm into a machine gun.

5   He just thought he found a way that he could do it where he

6   wouldn't get caught or he wouldn't be shown to be breaking the

7   law, even if his purchasers were clearly breaking the law.  And

8   he talked about that in one of his conversations.

9        I think, if my memory serves, it might have been in

10  text messages with Ms. Wolfe, where an acquaintance of hers had

11  asked about Mr. Ervin's responsibility if somebody did

12  something bad with the items.  And the evidence in this case,

13  Mr. Ervin's response was quite cavalier in his dismissal of

14  anybody's ability to prove his responsibility and his cavalier

15  attitude of what somebody might do or use his device for.

16       So Mr. Ervin didn't wake up and decide to be a

17  criminal, but he did decide to engage in criminal activity.  He

18  just thought he'd come up with a way to make a profit of it and

19  not be held responsible.

20       And Mr. Ervin, it was apparent yesterday, and even

21  more apparent here today, that you still don't believe that you

22  committed a crime.  You have expressed really no contrition

23  whatsoever.  You say that you don't want to be punished or hurt

24  for doing the right thing.  And you say that you will always do

25  the right thing, but you did not do the right thing here.  You

1  did not do the right thing when you mislead the folks at Orange

2  Park Machine to manufacture these devices for you.  And you saw

3  them testify.  They were quite terrified that that family

4  business was going to go out of business because you had

5  tricked them into manufacturing machine gun conversion devices.

6  I can't remember -- they testified about how many employees

7  they had.  But that wasn't doing the right thing, to trick them

8  into making these devices.

9       You weren't doing the right thing when you advertised

10  to sell these devices, when you advertised their capability to

11  fire bullets automatically.  You didn't do the right thing when

12  you told the people where to go on the internet to figure out

13  how to illegally use your device, how to make it work.  And you

14  didn't do the right thing when you sold these devices with no

15  regard to who the purchasers were or what they might be used

16  for.

17       None of that was you doing the right thing.  It was

18  you doing what you wanted to do to make money by doing

19  something you knew should not be done, but -- because you

20  thought you were clever enough to come up with a workaround so

21  that you wouldn't get in trouble, and that is a far cry from

22  doing the right thing.

23       You talked yesterday about having the moral high

24  ground.  And if there's one thing that you really need to

25  understand, sir, is that you do not have the moral high ground.

1    Not remotely.  What you did was illegal.

2            Mr. Hoover, a lot of what I have just said to

3    Mr. Ervin -- not the Orange Park Machine thing because you had

4    nothing to do with his decisions in that, but much of what I

5    have just said about Mr. Hoover's choices -- sorry, Mr. Ervin's

6    choices are equally applicable.  Your own videos clearly

7    reflect that you knew what you were doing was unlawful, yet you

8    chose to do it.

9            And again, to the extent that you continue to be of

10    the view that this case is about First Amendment rights and

11    political speech, it just isn't.  That's not what you were

12    charged with.

13            And the jury listened to the evidence very, very

14    carefully.  We had a jury that was -- they paid close attention

15    throughout the trial.  And those 12 fellow citizens concluded

16    that you knew what you were doing was unlawful.  And they made

17    that conclusion largely based on the words that came out of

18    your mouth that they saw on the videos, that those -- your

19    statements there and all of the suggestions that you use a

20    money order and send your -- use the address of your anti-gun

21    relative and all -- and the potential that the FBI would -- or

22    ATF would be in a courtroom arguing that these are firearms or

23    machine gun conversion devices, all of that evidence, and more,

24    convinced the jury beyond and to the exclusion of any

25    reasonable doubt that you knew that the actions you were

1        engaging in were unlawful.

2               Mr. Hughes spoke on your behalf yesterday, and

3        Mr. Hughes expressed his sadness that an individual engaging in

4        advertising ended up in jail.

5               And Mr. Hughes, I would simply say to that, again,

6        that Mr. Hoover is not going to jail because he was

7        advertising.  Mr. Hoover is being sentenced because he was

8        convicted of conspiring to transfer machine gun conversion

9        devices, in violation of the National Firearms Act.

10              You can't advertise the sale or purchase of an

11       unlawful firearm any more than you can advertise for help to

12       commit a robbery or a burglary or a murder-for-hire.

13              This isn't about holding somebody responsible for

14       advertising or for accepting a sponsorship, it's for what was

15       being advertised and what was being sponsored, and that is,

16       illegal firearms under the law.  That's what the jury found.

17              And I would simply note, Mr. Hughes, that I recognize

18       that Mr. Hoover is your friend.  And you are a good friend to

19       him.  You stand by him, and you should.  That's what friends do

20       for each other.  I fully recognize that.

21              But I don't think you do him or anybody else any

22       favors, and certainly not your listening population, who I

23       think respect you as a source of knowledge, I don't think you

24       do any of them any favors when you suggest that this

25       prosecution was improper because there wasn't a

1    cease-and-desist letter or because the First Amendment

2    protected his actions, because neither of those arguments will

3    prevail in the future any more than they prevailed here.  And I

4    fear that that will cause others to make the same mistake that

5    Mr. Ervin and Mr. Hoover did; that is, to skirt the edge of the

6    law to try to find some way to engage in similar conduct.

7         I need to address what was hinted at and what was

8    suggested, and that is that Mr. Hoover spoke to the ATF and was

9    told that the actions that he and Mr. Ervin would engage in

10   were not unlawful.  And there was also a statement, I think

11   Mr. Ervin may have said, that people said this couldn't be

12   illegal.  And I simply reject the contention that either

13   Mr. Ervin or Mr. Hoover spoke to anyone with the ATF, and that

14   after having been given an accurate description of what the

15   defendants intended to manufacture and sell, that any ATF agent

16   would have told them that that was okay.  There is just nothing

17   at all that supports that contention.  It's a good narrative.

18   I get that.  It's a good narrative to say "I was told these

19   were legal," but it's just not true.  And Mr. Hoover's own

20   videos show that that wasn't what he thought.  And certainly

21   Mr. Ervin's actions show that that was not what he thought.

22        And so the case is not about the First Amendment.

23   It's not about public debate.  It's not about advertising or

24   sponsorship.  And it's not about a good-faith belief that an

25   individual was operating within the law.  It's about what the

1    jury was asked to consider and what the jury found beyond a

2    reasonable doubt, and that is that both defendants conspired to

3    transfer machine gun conversion devices, that Mr. Ervin

4    possessed such devices, and that he engaged in structuring of

5    financial transactions.  And the Court has to determine an

6    appropriate sentence for that crime, not the other things that

7    people may want to say this case is about.  People don't get --

8    well, that's what this case is about.

9         With regard to the firearms, I have thought hard

10   about the relative culpability of Mr. Ervin and Mr. Hoover.

11   Initially I thought Mr. Ervin was far more culpable because

12   Mr. Hoover would never have ended up in this courtroom but for

13   meeting Mr. Ervin.  It was Mr. Ervin's idea.  Mr. Ervin

14   manufactured these items.

15        But as Mr. Ervin said, Mr. Hoover, you're quite a

16   salesman.  And you really set things on fire.  And but for your

17   involvement, there is no way Mr. Ervin would have been able to

18   sell 1,700 of these items.  There's no way he would have made

19   all the money that he made.  And there's no way that as many

20   people would have known about the devices.  They would not have

21   been proliferated to the extent that they were but for your

22   involvement.

23        And the chart that -- the graph, bar graph that was

24   shown in the trial shows that before your involvement,

25   Mr. Ervin was -- you know, had small numbers of sales, and then

1  when you would post a video, sales would skyrocket.

2         And so ultimately I think I became -- or I have

3  become convinced that you-all are largely equally culpable, but

4  Mr. Ervin slightly more, for two reasons:  one, for his actions

5  with regard to the manufacturing of the devices and his conduct

6  with Orange Park Machine, and his conviction for the

7  structuring offenses in addition to the firearms offense.

8         As I said, one of the things that the Court is

9  required to consider is the Court has to avoid any

10 unnecessary -- any unwarranted, pardon me, sentencing

11 disparity.  And so I considered the sentences that have been

12 imposed in similar cases in the Middle District of Florida.

13 And many of those ranged between 30 and 36 months'

14 imprisonment.  But in all of those cases the defendants pled

15 guilty, and so their guidelines were reduced because they

16 received a reduction for acceptance of responsibility.  And two

17 of those individuals -- in addition to a downward adjustment

18 for acceptance of responsibility, two of those individuals

19 cooperated with law enforcement and received the benefit of a

20 5K1 motion for downward departure.

21        I'll also note that all of them had substantially --

22 and if I were writing this, I would have to underline the word

23 "substantially" -- fewer firearms.  One had 69.  Well, sorry.

24 There was one with 69 cases, the others had 24.  And there was

25 one other; that one had I think a couple hundred.  His sentence

1    was 60 months, though.  He wasn't one of the ones that ended up

2    in a 30 to 36 months.

3        And I also noted that while the court in *Hixson* found

4    that the guidelines didn't increase the offense level due to

5    the number of devices because the devices did not fall within

6    the commentary's definition of a firearm, the judge in *Hixson*

7    varied upward to impose a sentence that was double the

8    guideline range, a significant upward variance, imposing a

9    sentence of 66 months to account for the seriousness of the

10   offense conduct.

11       So here I've considered the guidelines.  I've

12   considered the purposes of sentencing.  I've considered the

13   sentences imposed in other cases.  I am convinced that the

14   conduct of the defendants in this case is clearly unlawful,

15   dangerous, reckless, certainly posed a great potential danger

16   to public safety, but I'm not convinced that the evidence

17   presented warrants treating the sale of each and every device

18   with such severity as a guideline sentence would reflect.

19       And when I look at the overall history and

20   characteristics of the defendants, they paint a different

21   picture.  We don't see a history of disregard or disrespect for

22   the law.  Up to now, Mr. Ervin and Mr. Hoover have been

23   law-abiding citizens, except perhaps with the marijuana use,

24   but we won't talk about that.  They are loving members of their

25   family.  They take care of their family.  They are respected in

1    their communities.

2         It does appear that this foray into this business

3    endeavor was their brush with criminal activity.  And if you

4    look at it, it was a bad idea.  It was a terrible idea.  But

5    I'm not convinced that it reflects their true character.

6         One thing that if I didn't know it before, I've

7    certainly seen it time and again in the 17 years or so that

8    I've been doing this, and that is that good people make

9    mistakes all the time.  And we'll talk a little bit about that

10   later, but I think when one looks -- I hope that at some point

11   Mr. Ervin will look back on this and realize that it was a

12   mistake.  I hope that Mr. Hoover will as well.  I think more

13   likely Mr. Hoover will than Mr. Ervin, at least based on his

14   statements here today, but that will remain to be seen.

15        With no criminal history, with no suggestion of any

16   anti-social history at all, considering the history and

17   characteristics of the defendants, the sentences in other cases

18   involving similar devices, the seriousness of the offense

19   conduct, I'm convinced that a term of imprisonment of 60 months

20   for Mr. Hoover is necessary and a sentence of 68 months for

21   Mr. Ervin is necessary.  I think that sentence is sufficient to

22   satisfy all of those statutory purposes of sentencing.  And so

23   I'm varying downward from the guidelines to those sentences.

24        I'll note that these are two individuals who have

25   never been to prison before, and so a sentence of five years,

1   or five years plus, is a very significant sentence.  And I

2   don't think it can be discounted.  And I don't think it can be

3   described as a slap on the wrist or as a light sentence.  I

4   think it's a very serious sentence.  And I think it reflects

5   the seriousness of their offense conduct.  I think it

6   accomplishes just punishment.  And I think it accomplishes

7   deterrence.  If five years in federal prison isn't going to

8   deter someone, I am really challenged to believe that seven

9   years or ten years will.  I don't think someone is going to

10  look at this and say, "Oh, well, if I get caught, I'm only

11  going to get five years."  So I think that that sentence is

12  sufficient to accomplish the purposes of sentencing.

13          To Mr. Hoover and Mr. Ervin's family and friends, I

14  appreciate your presence here.  You love Mr. Hoover and

15  Mr. Ervin.  You have every right to.  As I said, good people

16  make mistakes all the time.  The mistakes don't define them.

17  It doesn't make them a bad person.

18          What does define an individual, though, is what they

19  do after they've made the mistake.  And that's what will remain

20  to be seen.  Whether Mr. Ervin and Mr. Hoover will accept

21  responsibility for the unlawfulness of their conducts and

22  change their behavior or not, that's what will ultimately

23  define them.

24          Mr. Hoover, you're a family man.  You love your wife,

25  you love your children, but you can't be there for them if you

1   break the law.  It's just a reality.  So you're going to

2   complete this term of imprisonment, and I see no reason why you

3   should ever have any future untoward encounter with law

4   enforcement.

5        I recognize you've lost the right to possess firearms

6   and that will be difficult for you, but that is a consequence

7   of the offense.  But you will complete your term of

8   imprisonment and you will go back to being the loving husband

9   and father that you -- that you were, you just won't be able to

10  have guns.

11       And Mr. Ervin, you are a young man.  You're an

12  entrepreneur.  You have a lot you can do with your future.  But

13  you're going to have to recognize that it was what you did,

14  that it was choices that you made, that caused this

15  prosecution, because what you did was illegal and you knew it

16  when you were doing it.  And if you continue throughout your

17  term of imprisonment to deny that it was your actions that

18  brought you here, then I fear that you will go down a very dark

19  road.  And I don't think that's what any person in this room

20  wants for you.

21       As I said earlier, nobody targeted you.  Nobody

22  sought to hurt your family or your friends.  The evidence

23  showed that you came before this Court because of your actions,

24  and that's -- and your knowledge of the illegality of your

25  actions was evident in your desire to distance yourself from

1   the devices.  It was a gamble.  It failed.  But your

2   incarceration is a consequence of that failed gamble.

3          As I said, viewed through the best lens, this was a

4   mistake, but it was a very serious mistake.  A mistake that may

5   well have consequences well into the future because we don't

6   know where 1,700 of these items are.  And that -- I hope we

7   never will know, because the only way we'll know is if

8   something terribly bad happens.

9          But my only hope is that you choose to accept that

10  this was a mistake, that it was wrong, that it was against the

11  law, and that you learn from it.  But that will be up to you.

12         For purposes of the record, before I impose sentence,

13  I'm going to make clear what I've done.

14         I had a guideline range of 121 to 151 months.  I

15  denied the government's motion for an upward departure from

16  that guideline range.  I denied Mr. Hoover's request for a

17  downward departure from that guideline range.

18         I varied downward based upon the history and

19  circumstances of these individuals and based upon my view that

20  a sentence of 121 to 151 months is simply more than necessary.

21  The guidelines in this case, I think, are greater than

22  necessary to accomplish the statutory purposes of sentencing.

23  And so I varied downward to a sentence of 60 months for

24  Mr. Hoover and 68 months for Mr. Ervin because in my view, that

25  term of imprisonment, which is a significant term of

1  imprisonment, accounts for their conduct, holds them

2  responsible, reflects the seriousness of the offense and

3  promotes respect for the law and accomplishes deterrence and is

4  certainly sufficient to protect the public.  And it also takes

5  into account similar sentences to individuals engaging in

6  similar conduct.

7       To the extent that the guidelines had been 33 to 41

8  for Mr. Hoover and 27 to 33 for -- sorry, 33 to 41 for

9  Mr. Ervin and 27 to 33 for Mr. Hoover, if those had been the

10 guidelines, if I had accepted the presentence report, then I

11 would have departed upward for the reasons stated earlier, or,

12 alternatively, varied upward to the same sentence that I'm

13 imposing today because the 33 to 41 months or 27 to 33 simply

14 did not take into account the seriousness of the offense

15 conduct, the sheer magnitude and scope of the proliferation of

16 the machine gun conversion devices that occurred in this case,

17 and doesn't differentiate Mr. Ervin and Mr. Hoover from other

18 individuals who received sentences in that range for offense

19 conduct that was significantly, significantly less egregious.

20      And so for purposes of the record, I'll just note

21 that if I was in error in determining that *Dupree* required me

22 to disregard the commentary guideline definition, I would have

23 arrived at the same sentence either based on the

24 guideline-authorized departures that I discussed earlier or an

25 upward variance for the same reasons.

1          So in sum, I have determined that the sentence that I

2    intend to impose here today is an appropriate sentence when I

3    look at these two human beings, when I look at their personal

4    history and characteristics, when I look at the circumstances

5    of their offense.  I am convinced that the sentences of 68 and

6    60 months are sufficient, but not greater than necessary.  I am

7    firmly convinced that any lesser sentence would be inadequate.

8    And so for those reasons, that is the sentence that I intend to

9    impose at this time.

10          At this time, Mr. Hoover and Mr. Ervin, if you will

11    please come up to the podium, along with your attorneys.

12          The Court has asked why judgment should not be

13    pronounced; I've been given no cause.  I've heard from counsel

14    and from the defendants and family and friends.  I've reviewed

15    the sentencing memoranda and the presentence report and all of

16    the materials that were presented.

17          Pursuant to Title 18, United States Code, Sections

18    3551 and 3553, it is the judgment of the Court that the

19    defendant Kristopher Justinboyer Ervin is hereby committed to

20    the custody of the Bureau of Prisons to be imprisoned for a

21    term of 68 months.  That term of imprisonment will consist of

22    the following:

23          A term of imprisonment of 60 months as to Count One,

24    a term of imprisonment of 68 months for Counts Two through

25    Twelve, with all such terms of imprisonment to run

1    concurrently.

2            Mr. Hoover, pursuant to Title 18, United States Code,

3    Sections 3551 and 3553, it is the judgment of the Court that

4    Matthew Raymond Hoover is committed to the custody of the

5    Bureau of Prisons to be imprisoned for a term of 60 months.

6    And that term of imprisonment consists of 60 months as to

7    Counts One through Three, Five, and Seven, with all such terms

8    to run concurrently.

9            Upon release from imprisonment both Mr. Ervin and

10   Mr. Hoover will be required to serve a term of supervised

11   release of three years.  During the term of that supervised

12   release you will be required to comply with the standard

13   conditions of release adopted in the Middle District of Florida

14   as well as certain special conditions.

15           Mr. Hoover, you'll have to participate -- pardon me.

16   Mr. Ervin, you will have to participate in a substance abuse

17   treatment program and submit to drug testing.

18           Both Mr. Ervin and Mr. Hoover will be required to

19   participate in a mental health treatment program.

20           Because these are firearms offenses, both Mr. Ervin

21   and Mr. Hoover will be required to submit to a search of their

22   person, their place of business, their residence, any vehicles

23   or storage units under their control.  You will have to advise

24   anyone with whom you share any of those items that you're

25   subject to that search condition.  And a refusal to submit to

1   the search would be a violation of the terms of your supervised

2   release.

3           You will also have to provide the probation officers

4   with any requested financial information.

5           Because you've been convicted of qualifying felony

6   offenses, you will have to submit to the collection of DNA.

7           You're ordered to refrain from any unlawful use of a

8   controlled substance.  And you'll have to submit to one drug

9   test within 15 days of beginning your supervised release and

10  then periodic drug tests thereafter.

11          Based on the financial circumstances of these

12  individuals, the Court waives the imposition of any fine.

13          And Ms. Taylor, I assume there's no forfeiture that I

14  have to consider at this point?

15          MS. TAYLOR:  Right, Your Honor.  We just request that

16  you mention the previously filed preliminary order of

17  forfeiture, but nothing beyond that, Your Honor.

18          THE COURT:  The Court incorporates the preliminary

19  order of forfeiture, Docket Number 316, into the judgment.

20          Mr. Ervin, because you were convicted on 12 separate

21  counts, there's a mandatory special assessment of $100 as to

22  each of them, so the Court is required to impose a $1,200

23  special assessment.

24          Mr. Hoover, you were convicted of five counts, so the

25  Court is required to impose a $500 special assessment.

1          (Courtroom deputy confers with the judge.)

2          THE COURT:  Ms. Wiles reminds me that for purposes of

3    the term of supervised release, for Mr. Ervin, that's a term of

4    supervised release of three years for each count, Counts One

5    through Twelve, to run concurrently.

6          For Mr. Hoover it is a term of three years for each

7    count, Counts One through Three, Five, and Seven, with all such

8    terms of supervised release to run concurrently.

9          Thank you, Ms. Wiles.

10          Ms. Taylor, does the government move to dismiss all

11   prior indictments at this time?

12          MS. TAYLOR:  Yes, Your Honor.

13          THE COURT:  The Court will dismiss all of the

14   previous indictments, that is, the original indictment, the

15   superseding indictment, and the second and third superseding

16   indictments on the motion of the government.

17          Mr. Ervin and Mr. Hoover will be remanded to the

18   custody of the marshal to await designation.

19          The Court will recommend designation for Mr. Ervin to

20   the facility closest to Jacksonville, Florida.  And the Court

21   will recommendation -- will recommend designation for

22   Mr. Hoover to the facility closest to Coloma, Washington.

23          DEFENDANT HOOVER:  Wisconsin.

24          THE COURT:  Sorry.  My apologies.  Coloma, Wisconsin.

25   I had "W" in my brain.

```
 1            DEFENDANT HOOVER:  Sorry, I didn't want to go to
 2    Washington.
 3            THE COURT:  No.  Thank you, sir.  That was my error.
 4        (Audio distortion.)
 5            THE COURT:  The microphone really likes you,
 6    Mr. Hoover.
 7            DEFENDANT HOOVER:  They all do.
 8            THE COURT:  Coloma, Wisconsin.
 9            The Court will recommend that both of these
10    individuals be permitted to participate in any mental health
11    treatment at the facility of designation as well as any
12    vocational programming available at the facility of
13    designation.
14            Mr. King, are there any additional recommendations
15    you would ask me to consider for Mr. Ervin?
16            MR. KING:  No, Your Honor.
17            THE COURT:  Mr. Larosiere, anything else you would
18    ask me to consider for Mr. Hoover?
19            MR. LAROSIERE:  No, Your Honor.
20            THE COURT:  All right.  Gentlemen, you both have the
21    right to appeal the judgment of conviction as well as the
22    Court's sentence.  And if you wish to pursue an appeal, you
23    have to file a Notice of Appeal within 14 days.  The government
24    also has the right to appeal.
25            You are entitled to be represented by an attorney in
```

1  any appeal that's taken, and if you can't afford one, the Court

2  will appoint one to represent you at no cost to you.

3  　　　　And if you wish to pursue an appeal and you can't

4  afford the filing fee, that's fine, you just submit the notice

5  and the Court will accept it without prepayment.

6  　　　　Mr. Ervin, do you understand what I've just

7  explained?

8  　　　　DEFENDANT ERVIN:  Yes, ma'am.  I'm very knowledgeable

9  about this.

10  　　　　THE COURT:  Okay.

11  　　　　Mr. Hoover, do you understand what I just explained?

12  　　　　DEFENDANT HOOVER:  To a point.  After we recess, can

13  you have it so I can talk to my lawyers for a little bit before

14  we get out of here?

15  　　　　THE COURT:  Yes.

16  　　　　Can they meet with them downstairs before they --

17  　　　　U.S. MARSHAL:  Yes.

18  　　　　THE COURT:  Okay.  Yes.

19  　　　　MR. LAROSIERE:  Thank you, Your Honor.

20  　　　　THE COURT:  All right.  Mr. Ervin, do you have any

21  questions for me at this time, sir?

22  　　　　DEFENDANT ERVIN:  No, ma'am, not at all.  I want to

23  really tell you thank you for doing the best you could.  But

24  I --

25  　　　　MR. KING:  Stop.

```
1            DEFENDANT ERVIN:  Thank you.

2            THE COURT:  All right.

3            Mr. Hoover, any questions, sir?

4            DEFENDANT HOOVER:  No, thank you.

5            THE COURT:  Mr. King --

6            MR. KING:  Yes, Your Honor.

7            THE COURT:  -- any objections to the sentence or the

8    manner in which it was imposed?

9            MR. KING:  Other than the previous objections that

10   the Court's already ruled on, no, Your Honor.

11           THE COURT:  And I understand the substantive

12   objections.

13           Let me just clarify.  Do you have any objection to

14   the procedure -- any procedural objections to the sentence?

15           MR. KING:  No, Your Honor.  I apologize.  I phrased

16   that poorly.

17           THE COURT:  Mr. Larosiere, any objections?

18           MR. LAROSIERE:  In addition to -- one in addition to

19   those previously raised is that it is the position of Hoover

20   that the character of the items were not accurately considered

21   in the sentence itself.

22           THE COURT:  Okay.  Well, I think that actually goes

23   to the judgment, but regardless, that objection is noted.

24           DEFENDANT ERVIN:  Your Honor, we would join that too,

25   just so you know.  I plan on appealing it.
```

```
 1              THE COURT:  I fully expect that.

 2              DEFENDANT ERVIN:  I don't want to get in the way of

 3    anything for that.  That's --

 4              THE COURT:  No, that objection is preserved.

 5              DEFENDANT ERVIN:  Yes, ma'am.

 6              THE COURT:  That has very clearly been the position

 7    of the parties throughout this case.  And I suspect that

 8    everybody's going to appeal and that nobody is really satisfied

 9    with what I've done today.  But I can promise every one of you

10    that I've tried to do what I think is right in this case.

11              Ms. -- I don't -- I guess it was -- I don't know

12    who's handling -- as to Mr. Ervin, any objection -- any

13    objection to the Court's sentence?

14              MS. TAYLOR:  Your Honor, as to both defendants, the

15    government objects to the substantive reasonableness of the

16    sentences.

17              THE COURT:  That objection is noted.  Ms. Taylor,

18    does the government have any procedural objections to the

19    manner in which sentence was imposed?

20              MS. TAYLOR:  No, Your Honor.

21              THE COURT:  All right.  I think that concludes

22    this -- oh, wait.

23         (Probation officer confers with the judge.)

24              THE COURT:  I need to correct my sentence as to

25    Mr. Ervin because the statutory maximum on Count Nine is
```

 1   60 months.  So it's 60 months -- I couldn't read my own

 2   writing, clearly -- 60 months as to Counts One and Count Nine

 3   for Mr. Ervin because the structuring count is a statutory max

 4   of five years and 68 months for Counts Two through Eight and

 5   Ten through Twelve.

 6            Ms. Taylor, any disagreement with that correction?

 7            MS. TAYLOR:  No, Your Honor.

 8            THE COURT:  Mr. King, not agreeing with the sentence,

 9   but any disagreement with my correcting that mistake on my

10   part?

11            MR. KING:  No, Your Honor.

12            DEFENDANT ERVIN:  Your Honor, has something changed

13   or it's still the same amount of time?

14            THE COURT:  It's the same amount of time.

15            DEFENDANT ERVIN:  Okay.  I just wanted to make sure.

16            THE COURT:  Your total sentence is 68 months.

17            DEFENDANT ERVIN:  Yes, ma'am.

18            THE COURT:  And you've already served the majority of

19   that, is the good news for you.

20            DEFENDANT ERVIN:  Yes, ma'am.

21            THE COURT:  And your total sentence, Mr. Hoover, is

22   60 months.  And the way it works in the federal prison -- in

23   the federal system is that as long as you behave while you're

24   incarcerated, which I fully expect that both of you will,

25   you'll serve 85 percent of that and then you'll be able to go

 1   home to your families and start your term of supervised

 2   release.

 3           And I probably won't see either one of you again, so

 4   I wish you both good luck.

 5           And I thank you all for being here.

 6           We're in recess.

 7           COURT SECURITY OFFICER:  All rise.

 8       (Proceedings concluded at 12:44 p.m.)

 9                         -     -     -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3    UNITED STATES DISTRICT COURT)

 4    MIDDLE DISTRICT OF FLORIDA )

 5

 6         I hereby certify that the foregoing transcript is a true

 7    and correct computer-aided transcription of my stenotype notes

 8    taken at the time and place indicated herein.

 9

10         DATED this 14th day of September, 2023.

11

12                        /s/ Katharine M. Healey
                          Katharine M. Healey, RMR, CRR, FPR-C
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```