THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-13062
DC DKT NO.: 3:12-cr-22-MMH-MCR-1

UNITED STATES OF AMERICA,
Appellee,

v.

KRISTOPHER JUSTINBOYER ERVIN,
Appellant.

**APPENDIX II**

Valarie Linnen, Esq.
Florida Bar No. 63291
841 Prudential Drive
12th Floor
Jacksonville, FL  32207
888.608.8814
vlinnen@live.com
Attorney for Appellant

1

## TABLE OF APPENDICES

### Appendix I

Docket ............................................................................................................D

Motion to Dismiss ..........................................................................................30

Transcripts – Hearing on Motion to Dismiss ..............................................48

Indictment Superseding - Fourth..................................................................204

USA Statement of the Case ...........................................................................226

Mr. Ervin's Statement of the Case ...............................................................230

Gov't Exhibit 33 – 3-in-1 Auto Key Card..................................................259-33

Motion for Judgment of Acquittal................................................................273

Motion for Judgment of Acquittal – Mr. Hoover........................................274

Order Denying Motions for Judgment of Acquittal ....................................310

Sentencing Memorandum ..............................................................................319

Judgment ........................................................................................................324

Statement of Reasons .....................................................................................325

### Appendix II

Direct Testimony of Agent Hooker................................................................277

Direct Testimony of Agent Hooker, Andrea Useche, Amy Sarkese.....................278

Direct Testimony of Richard Roberts ...........................................................282

Direct Testimony of Agent Toy .....................................................................283

**Appendix III**

Transcript – Sentencing I ..................................................................329

Transcript – Sentencing II .................................................................330

**SEALED**

Presentence Investigation Report FINAL ............................................311

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the following via electronic case mail delivery on this 22ND day of February 2024:

Sean Siekkinen, Esq., Assistant U.S. Attorney

Matthew Larosiere, Esq., Attorney for Mr. Hoover

Erik S. Jaffe, Esq. & Miranda Cherkas Sherrill, Esq., Attorneys for

Firearms Policy Coalition & FPC Action Foundation

**/s/ Valarie Linnen**
VALARIE LINNEN, ESQ.
Florida Bar No.: 63291
841 Prudential Drive
12th Floor
Jacksonville, FL 32207
888-608-8814
vlinnen@live.com
Attorney for Appellant

3

Ms. Wiles.

(The judge and the courtroom deputy confer.)

**SPECIAL AGENT JESSE HOOKER, GOVERNMENT WITNESS, SWORN,**

DIRECT EXAMINATION

BY MS. TAYLOR:

Q.   Special Agent Hooker, if you could please start with telling the jury your name and spell your last name for the court reporter.

A.   Jesse Hooker, H-o-o-k-e-r.

Q.   And where do you work?

A.   I work for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Q.   What's your job responsibilities for ATF?

A.   I investigate violations of federal law pertaining to arson, explosives, firearms, alcohol, tobacco, and narcotics.

Q.   And what's your title?

A.   Special Agent.

Q.   And what -- how long have you been an agent for ATF?

A.   A little over 21 years.

Q.   And did you have other law enforcement experience prior to joining ATF?

A.   Yes.  I worked for the Immigration and Naturalization Service for four years prior to joining ATF.

Q.   Did you receive any specialized training when you joined Immigration and Naturalization Service?

A.   Yes.   I attended the Immigration Officers' Basic Training Academy in Artesia, Mexico.

Q.   And when you became an ATF agent, did you receive additional specialized training?

A.   I did.

Q.   And what was that?

A.   The Criminal Investigators' Training Program in Brunswick, Georgia, as well as the ATF Agent Advanced Academy in Brunswick, Georgia.

Q.   And are you -- let's talk about the investigation of Mr. Ervin and Mr. Hoover.   What has been your role in that investigation?

A.   I was the case agent.

Q.   And what is the role -- what does it mean to be the case agent for a case?

A.   Typically the case agent is the agent that opens the investigation and they have the primary responsibility for conducting the entire investigation from the inception through the judicial process.

Q.   And is there a reason -- are you still the case agent on this case?

A.   I am not.

Q.   And what's the reason for that?

A.   I recently accepted another position within ATF that required me to be absent from the area for training for a

significant period of time.  And the case was transferred to a different agent.

Q.   Could you also just tell us what your educational background is in terms of do you have a college degree?

A.   Yes, ma'am.

Q.   And what is your college degree in?

A.   I have a master of science degree in criminal justice from the University of Central Florida.  I also have a graduate certificate in explosives and engineering technology from the Missouri University of Science and Technology.

Q.   Now, can you tell the jury, how did you come to be involved in the investigation of Mr. Ervin and Mr. Hoover?

A.   Yes.  On January 8th, 2021, I was contacted by a fraud investigator who worked for Community First Credit Union in Jacksonville, Florida.

Q.   And what was -- what was that initial contact regarding?

A.   The fraud investigator advised me that they had information they wanted to refer to ATF regarding potential criminal activity involving one of their customers.

Q.   And who was that customer?

A.   It was Kristopher Justinboyer Ervin.

Q.   And did they give you any information about what exactly their concern was?

A.   They briefly discussed --

        MR. KING:  Objection, hearsay.

MS. TAYLOR: Your Honor, it's intended to explain the steps that Special Agent Hooker took in beginning his investigation.

THE COURT: I'll allow it. Go ahead.

THE WITNESS: Yes, ma'am.

A. They advised me about unusual activity in Mr. Ervin's bank account. They also -- specifically, unusual deposits into a personal checking account that seemed to be business related. They also advised me about large cash withdrawals that were occurring from the account.

Q. Is it normal for a bank to contact ATF about unusual banking activity?

A. No.

Q. And why -- why were they contacting you in this particular instance?

A. The credit union had apparently located a website associated with Mr. Ervin. And the website was viewed by the fraud investigator, and they were concerned that the website was selling items that may be used to convert an AR-15 rifle into a machine gun.

Q. And after you received this initial information, did you attempt to verify any of that?

A. Yes, ma'am.

Q. How did you -- how did you do that?

A. I accessed the website that was provided to me.

Q.    And what was that website?

A.    Autokeycards.com.

MS. TAYLOR:  Your Honor, may I approach the witness?

THE COURT:  What number?

MS. TAYLOR:  I'm going to -- right now I'm going to be talking about Exhibit 114, but I was also going to go ahead and give him 18, 19, 21, 22, 23, and 24.

THE COURT:  All right.  Go ahead.

BY MS. TAYLOR:

Q.    Special Agent Hooker, could you look at Exhibit 114 and describe for the jury what that is.

A.    114 is screenshots of what I recognized when I viewed the website Autokeycards.com.

Q.    And does this largely appear to be how the website looked when you had viewed it as part of your investigation?

A.    Yes, ma'am.

MS. TAYLOR:  I would move for admission of Exhibit 114 at this time.

MR. KING:  Without objection on behalf of Mr. Ervin.

MR. ZERMAY:  Without objection.

THE COURT:  114 is admitted and you may publish if you wish.

MS. TAYLOR:  Yes, Your Honor.

(Government's Exhibit 114 admitted in evidence.)

BY MS. TAYLOR:

Q.    Looking at the --

MS. TAYLOR:  Ms. Ganoe, if you could focus on that top part of the website.

BY MS. TAYLOR:

Q.    Is this -- this is the -- essentially the front page of the website; is that correct?

A.    Yes, ma'am.

Q.    Looking at the top, what is depicted at the very top of that website?

A.    The words "AutoKeyCard.com" and there are three -- three drawings or diagrams of cards above it.

MS. TAYLOR:  Ms. Ganoe, could you focus specifically on that part.

BY MS. TAYLOR:

Q.    And those three diagrams that you referred to, do those look familiar from other parts of your investigation?

A.    Yes.

Q.    And what's depicted by those diagrams?

A.    Those are lightning link machine gun conversion devices.

Q.    So those outlines are?  Could you describe exactly what -- what would be part of the lightning link.

A.    It's a two-part machine gun conversion device.  These particular cards depict -- each card depicts three complete lightning link machine gun conversion devices consisting of a larger, longer piece as well as a small piece that would fit

in -- there's a little slot that it would fit in.  I'm sorry, I don't know how to describe it any better than that, but it is a two-piece machine gun conversion device.

Q.   So if I -- I'm going to draw on one of them.  Is that one of the pieces?

A.   Correct.

Q.   And it's the piece -- on the middle card it's the piece on the top left?

A.   Yes, with the red mark.

Q.   And now if I -- well, I apparently drew some dots on another piece.  Is that the second piece of the lightning link?

A.   Yes, with the two dots.

Q.   Okay.  And so -- so those two pieces combined together create what?

A.   A lightning link machine gun conversion device.

Q.   And that's not made out of paper, correct?

A.   The device?

Q.   Right.

A.   No, it would need to be made out of some type of metal.

Q.   Okay.  But that's what's depicted in that diagram?

A.   Yes.

Q.   And that diagram also is generally what the auto key card looked like?

A.   Correct.

Q.   Did you identify an address associated with Mr. Ervin?

A.   Yes.

Q.   And did you -- what was that address?

A.   2409 Kirkwall Court, Orange Park, Florida.

Q.   And did you attempt to identify who might be living at that address?

A.   Yes.

Q.   And who was that?

A.   My investigation revealed that Mr. Ervin lived there as well as his father.

Q.   Did you attempt to identify where -- where Mr. Ervin was actually operating the business from?

A.   Yes.

Q.   And did you also contact anyone from ATF -- elsewhere in ATF to get an opinion on whether you should open a full investigation?

A.   I did.

Q.   Who was that?

A.   Cody Toy.

Q.   And who is Cody Toy?

A.   He is a firearms enforcement officer with ATF located in Martinsburg, West Virginia.

Q.   And what's the reason why you consulted with Officer Toy?

A.   Our firearms experts are experts in identifying and testing items such as machine guns and silencers.

Q.   And so you wanted his opinion?

A.    I did.

Q.    Based upon what Officer Toy told you, did you proceed with opening a full investigation?

A.    I did.

Q.    And what did you need to do to get a more definitive idea on whether the auto key card could actually be used to make a machine gun?

A.    I needed to obtain one of the auto key cards and send it in for testing.

Q.    And did you -- did you do that?

A.    Yes, I did.

Q.    And how did you go about obtaining an auto key card?

A.    On January 15th, 2021, I obtained an undercover laptop computer as well as an undercover credit card.  I then drove to an establishment that had free public wifi.  I accessed the internet and went to the Auto Key Card's website.  I then placed an order for one auto key card; specifically, a 3 in 1 Pen Holder Edition with Bottle Opener.

Q.    And did you receive an order confirmation?

A.    Yes.

Q.    If you could please look at Exhibit 18.  It should be in front of you.

A.    Okay.

Q.    And describe what it is.

A.    This is an email to my email account from Autokeycards.com

containing an order confirmation as well as a shipping confirmation.

Q.    Is it addressed to you, Special Agent Hooker?

A.    It is not.

Q.    Who is it addressed to?

A.    John O'Leary.

Q.    And is that a name that you were using in your undercover capacity --

A.    Yes.

Q.    -- at this time?

        MS. TAYLOR:  At this time I would move for admission of Exhibit 18.

        MR. KING:  No objection.

        MR. ZERMAY:  No objection.

        THE COURT:  18 is admitted.  You may publish.

    (Government's Exhibit 18 admitted in evidence.)

        MS. TAYLOR:  And Ms. Ganoe has zoomed in on the top part of that email.  I think you might need to zoom in a little bit more.

BY MS. TAYLOR:

Q.    So you received an order confirmation number?

A.    Yes.

Q.    And what was that?

A.    2667.

Q.    And what was the address that -- or that sent this order

confirmation?

A.    Customerservice@autokeycards.com.

Q.    And what is the date stamped at the top of that order confirmation?

A.    January 15th, 2021.

MS. TAYLOR:  And if we could go down to the next part, Ms. Ganoe.

BY MS. TAYLOR:

Q.    Now we're in the part that says Order Summary, correct?

A.    Yes.

Q.    And what does that reflect?

A.    It reflects an order number, the date it was placed, the particular auto key card that I ordered, the cost, the shipping cost, the sales tax, and that it was paid for with a credit card.

Q.    And so was the price -- it was one item that you purchased?

A.    Correct.

Q.    And was the price $139?

A.    Yes.

Q.    And with the sales tax, the total was $148.73?

A.    Correct.

Q.    Ms. Ganoe is going to -- there's a little icon next to the item that you purchased, correct?  And we've zoomed in on it. It's a little bit blurry, isn't it?

A.    Yes.

Q.    But what's depicted here?

A.    That is -- appears to be a Pen Holder Edition auto key card.  I think it's going to be a 3 in 1.  I think there would be three lightning links on that.

Q.    And how do you know it's a Pen Holder Edition?

A.    It has a pen going through it.

MS. TAYLOR:  If we could move to the next page, Ms. Ganoe.

BY MS. TAYLOR:

Q.    The second page of your order indicated that it was shipping to John O'Leary at an address in Jacksonville Beach, correct?

A.    Yes.

Q.    And that address has been redacted off of this document, correct?

A.    Yes.

Q.    But is that an address that you were able to obtain mail from in an undercover capacity?

A.    Yes.

Q.    And at the very -- at the bottom of the part we're zoomed in on it indicates Auto Key Cards and an address in Orange Park, correct?

A.    Yes.

Q.    What's that address?

A.    950 Blanding Boulevard, Suite 23, PMB 335, Orange Park, United States.

Q.    You might be better off looking at the hard copy document.

A.    336, excuse me.

Q.    Okay.  And now did you receive a shipment confirmation at some point after you placed this order?

A.    I did.

          MS. TAYLOR:  Could we go to page 3, Ms. Ganoe.

BY MS. TAYLOR:

Q.    Is this the shipping confirmation that you received?

A.    Yes.

Q.    And what date -- did it provide a tracking number to you?

A.    It did.

Q.    And what date did you receive the shipping confirmation?

A.    On January 15th, 2021.

Q.    Was that the same date that you had placed the order?

A.    Yes.

Q.    And did you receive anything in the mail as a result of this purchase?

A.    I did.

Q.    And could you please look at Exhibit 19.  Should be in front of you.

A.    I have it.

Q.    Could you describe in general what's in Exhibit 19?

A.    It contains pictures of the envelope and a mailing label

that I received as well as additional pictures of the contents of the mailing envelope, which consists of a plastic bag containing an auto key card and a business card.

Q.   Are those the items that you received as a result of the order that we've been discussing?

A.   Yes.

        MS. TAYLOR:  I'd move for admission of Exhibit 19.

        THE COURT:  Any objection?

        MR. KING:  Without objection, Your Honor.

        MR. ZERMAY:  Without objection, Your Honor.

        THE COURT:  19 is admitted.  You may publish.

    (Government's Exhibit 19 admitted in evidence.)

        MS. TAYLOR:  Ms. Ganoe, if we could zoom in on that top photo on page one.

BY MS. TAYLOR:

Q.   Special Agent Hooker, that first photo on page 1, what is that photo?

A.   That is the packaging envelope that I received.

Q.   And is that how it looked when you received it?

A.   Correct.

Q.   Does it have that same tracking number that was in the email that we were just talking about?

A.   I would have to look back to see if it matches, but I believe it does.

        Yes, it's the same tracking number.

BY MS. TAYLOR:

Q.   Did you open this package?

A.   Yes, I did.

Q.   Did you need a search warrant to do that?

A.   I did not.

Q.   Why did you not need a search warrant?

A.   ATF purchased the item.

Q.   And so it belonged to ATF at that point?

A.   Correct.

     MS. TAYLOR:  Moving to the next page, Ms. Ganoe.

BY MS. TAYLOR:

Q.   What is depicted in that top picture of this second page of the exhibit?

A.   That's what I removed from the envelope consisting of a plastic bag:  an auto key card and a business card.

Q.   And the business card, what does it say on it?

A.   It says -- it has an image of an auto -- of an automobile. It says, "Please share on social media and tell your friends about us.  Thank you!  Thank you for your support of our all American freedom business.  Many more awesome products coming soon."

Q.   And does it also say "automatic" over the vehicle at the top of the card?

A.   Yes.

Q.   And looking at the next photo.

MS. TAYLOR:  Ms. Ganoe.

BY MS. TAYLOR:

Q.   What's -- what's the metal item that's depicted on this page?

A.   That is the auto key card after I removed it from the plastic envelope, or plastic packaging.

Q.   And could you describe -- Ms. Ganoe's zoomed in on that metal item that you said was the auto key card.  Could you describe what model this is?

A.   A 3 in 1 Pen Holder Edition with Bottle Opener.

Q.   What makes this a 3 in 1?

A.   It has three lightning links on the card.

Q.   So six total etched pieces, correct?

A.   Correct.

Q.   To combine together for three lightning links?

A.   Yes.

Q.   And then where's the bottle opener?

A.   Between the words "made in the U.S.A." and "patent pending."

Q.   And why is it a Pen Holder Edition?

A.   On the website he -- you know, there's pens depicted going through the cutouts on the card, and that's what it was called.

Q.   Were the ones that -- so which cutouts are you talking about?

A.   The larger cutouts that's somewhat round.

Q.   I'm going to draw -- are there three of them?

A.   There are three of them, yes.

Q.   Okay.  I'm drawing one, two, three?

A.   Correct.

Q.   Are they almost kind of like D shaped, a little tab on it?

A.   Yes.

Q.   And those are the cutouts that you're talking about?

A.   Yes.

Q.   And that's what makes it a Pen Holder Edition?

A.   Yes.

Q.   And there's three other little slits that are cut into that piece too?

A.   Correct.

Q.   And were those fully cut out as well on this version?

A.   Yes.

        MS. TAYLOR:  Your Honor, may I approach the witness with Exhibits 20 and 20A?

        THE COURT:  You may.

BY MS. TAYLOR:

Q.   Could you please describe what Exhibit 20 is?

A.   It is the packaging envelope I received from my order at Autokeycard.com.

Q.   Is it the same one that's depicted in the photo that we were just looking at?

A.   Yes.

Q.   And what's Exhibit 20A?

A.   20A is the auto key card 3 in 1 Pen Holder Edition that I ordered.

Q.   And is it in the same condition as when you received it?

A.   It is not.

Q.   Does it look the same as it looks in those photos we were just looking at?

A.   No.

Q.   What happened to it subsequently that it looks different?

A.   One of the lightning links was cut out.

Q.   Did you do that?

A.   I did not.

Q.   Who did that?

A.   Cody Toy.

Q.   Then did you receive it back with all of the pieces including the cutout bits?

A.   I did.

Q.   And did you place it back into evidence?

A.   I did.

        MS. TAYLOR:  I would move for admission of Exhibits 20 and 20A.

        MR. KING:  Can I take a look at it?

        MS. TAYLOR:  Mr. King is asking to go look at the exhibit.

        THE COURT:  You may.

Any objection?

MR. KING: No, Your Honor.

THE COURT: Mr. Zermay?

MR. ZERMAY: No, Your Honor.

THE COURT: 20 and 20A are admitted.

(Government's Exhibits 20 and 20A admitted in evidence.)

MS. TAYLOR: Your Honor, I'd ask to retrieve it now from Special Agent Hooker so I can put it on the projector.

THE COURT: Certainly.

BY MS. TAYLOR:

Q. Okay. So it's still in this bag here, right?

A. Yes.

Q. But -- but this is Exhibit 20A, correct?

A. Yes.

THE COURT: Can you pull that microphone a little closer to you while you're standing -- there you go. Thank you.

BY MS. TAYLOR:

Q. Okay. These two pieces that are cut out, are -- those are the two pieces that create a lightning link?

A. Correct.

Q. And then there's -- the remainder of it still has the other four etchings intact?

A. Yes.

Q. Now, you stated that it was Officer Toy that cut these two

pieces out of this exhibit?

A.   Yes.

Q.   And did he give you feedback on -- that was relevant to whether you continued your investigation?

A.   Yes.

Q.   And did you continue your investigation?

A.   I did.

Q.   Did you make another undercover purchase from Auto Key Cards?

A.   Yes.

Q.   And what was the date of that purchase?

A.   January 26, 2021.

Q.   And you should have in front of you Exhibit 21?

A.   I do.

Q.   Could you describe what Exhibit 21 is.

A.   Email correspondence between myself and customerservice@autokeycard.com.

Q.   Was that from your undercover e-mail account?

A.   Yes.

          MS. TAYLOR:  I'd move for admission of Exhibit 21.

          THE COURT:  Any objection?

          MR. KING:  No, Your Honor.

          MR. ZERMAY:  No, Your Honor.

          THE COURT:  21 is admitted.  You may publish.

     (Government's Exhibit 21 admitted in evidence.)

BY MS. TAYLOR:

Q.   All right.  If we could -- so this is an email chain, correct?

A.   Yes.

Q.   So let's move to the bottom of the email chain.  Why did you begin emailing with the Auto Key Card's website?

A.   I wanted to purchase two particular auto key cards, and the website, when I accessed it, indicated that both were out of stock.

Q.   And so what did you write in your email?  Well, what was the date of the email and what did you write?

A.   It was January 26th, 2021, at 1:57 p.m.

Q.   And what did you write?

A.   I wrote, "Hello.  I was wanting to buy a auto key card 1 in 1 or 2 in 1 Pen Holder Edition.  I wanted to do everything by mail with a money order to pay with.  Your website says they are sold out.  Will you be getting more in soon?  Should I just send in my order form and money order now and then you will ship it to me as soon as you get more?  I am just worried about sending the money order and the thing never coming back in stock.  Thanks."

Q.   And that email indicates that the sender was somebody named John Holbrook, correct?

A.   Yes.

Q.   Previously you had been using the undercover name John

O'Leary?

A.    Yes.

Q.    Who is John Holbrook?

A.    Another undercover name.

Q.    Another undercover name?

A.    Yes.

Q.    And you had control over this email account?

A.    I do.

        MS. TAYLOR:  Ms. Ganoe, could you move to the next email.

BY MS. TAYLOR:

Q.    Did you receive a response to that email?

A.    Yes.

Q.    And when was that?

A.    January 26th, 2021, at 2:09 p.m.

Q.    And what did Auto -- and what email address responded to your email?

A.    Customerservice@autokeycard.com.

Q.    And what did you -- what was the email?

A.    "Thank you for contacting us.  We always hold a few items back for mail-in order customers.  There is a mail-in order form on our website.  Please print and fill it out, then mail it to us.

        "If you already know which products and the amount you want, let us know and we can set those aside for you.  We

always take care of our great customers.

"Sincerely, Autokeycard.com."

BY MS. TAYLOR:

Q.   Did you respond again to this email?

A.   Yes.

Q.   And what did you indicate?

A.   I said, "Thank you for getting back to me.  I wanted to get two different cards.  A AKC" -- which I abbreviated for auto key card -- "2 in 1 for $80 and an AKC 2 in 1 Pen Holder Edition" -- "Pen Holder for $110.  After the mail-in order fee and taxes I came to a total of $214.  If you have those two cards in stock and that is the right price, I will put the money order in the mail by morning at the latest if you will hold them back for me.  Thanks."

Q.   And did you then have some further correspondence that day with the Auto Key Card email address related to your purchase?

A.   Yes.

Q.   Did you end up using a mail-in order form to complete this purchase?

A.   Yes.

Q.   Could you please look at what's been marked as Exhibit 22 in front of you.

A.   I have it.

Q.   And describe what that is.

A.   It is a mail-in order form that I printed from the

Case 3:21-cr-00022-MMH-MCR   Document 277   Filed 06/06/23   Page 262 of 285 PageID 4382
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 27 of 138

VOL 1 - PG 262

Autokeycards.com website.

MS. TAYLOR:  I'll move for admission of Exhibit 22.

THE COURT:  Any objection?

MR. KING:  Without objection.

MR. ZERMAY:  No objection, Judge.

THE COURT:  22 is admitted.

(Government's Exhibit 22 admitted in evidence.)

BY MS. TAYLOR:

Q.   Okay.  So this is the mail-in order form that you used for your second undercover purchase, correct?

A.   Yes.

Q.   And could you describe how you filled out the mail-in order form and what pieces you were ordering.

A.   Yes.  I -- for quantity I requested one auto key card Stainless Steel Business Card 2 in 1 for $80 as well as one auto key card Stainless Style Business Card 2 in 1 Pen Holder Edition for $110.

Q.   And looking -- and you have some math down kind of in the middle of this form, correct, for a total of $214?

A.   Yes.

MS. TAYLOR:  And if we can keep scrolling, Ms. Ganoe, to the bottom there.

By MS. TAYLOR:

Q.   You indicated that it was to be shipped to John Holbrook, correct?

A.    Yes.

Q.    And was that using that same mailing address that your first undercover order went to?

A.    It is.

Q.    And did it -- did the order form provide instructions for how to make out your payment?

A.    Yes.

Q.    And what was that?

A.    At the bottom left of the form it says, "Money orders are to be made payable to J. Ervin.  Mail completed accurate order to AutoKeyCard, hyphen, J. Ervin, 950 Blanding Boulevard, Suite 23, PMB, 336, Orange Park, Florida, 32065."

Q.    And is that how you made out your -- did you use the money order?

A.    I did.

Q.    And is that who you made it out to?

A.    I did.

Q.    And could you please look at Exhibit 23 in front of you.

A.    Okay.

Q.    What is that?

A.    That is a copy of the money order I obtained from the U.S. Postal Service.

Q.    So you took a photocopy of it before you put it in the mail?

A.    Yes.

MS. TAYLOR: And move for admission of Exhibit 23.

THE COURT: Any objection?

MR. KING: No, Your Honor.

MR. ZERMAY: No, Your Honor.

THE COURT: 23 is admitted. You may publish.

(Government's Exhibit 23 admitted in evidence.)

BY MS. TAYLOR:

Q. And who did you make this money order out to?

A. J period Ervin.

Q. And is that the same -- addressed to the same address at 950 Blanding Boulevard?

A. Yes.

Q. And to ship to John Holbrook?

A. Yes.

Q. Okay. I want to ask you now to look at Exhibit 24. Did you receive any information about where that money order was deposited?

A. Yes, I did.

Q. And could you look at Exhibit 24 and tell us what that is.

A. It is a copy of the Postal Money Order after it has been negotiated.

Q. And where did it indicate --

MS. TAYLOR: Well, I'll move for admission of Exhibit 24 now.

THE COURT: Any objection?

MR. KING:  Without -- no, Your Honor.

MR. ZERMAY:  No, Your Honor.

THE COURT:  All right.  24 is admitted.  You may publish.

(Government's Exhibit 24 admitted in evidence.)

BY MS. TAYLOR:

Q.   And where did it -- so this was after the money order was deposited into a bank?

A.   Yes.

Q.   And where did this document indicate that the money order was deposited?

A.   At Community First Credit Union of Florida.

Q.   And how did you -- how did you get this particular document?

A.   I was jointly working the investigation with a United States Postal Inspector named Keith Hannon.  And I provided him with a serial number of the Postal Money Order that I purchased, and he was able to obtain this and provide me with a copy.

Q.   And did you also -- as part of your investigation, you mentioned that CFCU, Community First Credit Union, had initially contacted ATF about Mr. Ervin, correct?

A.   Yes.

Q.   Did you receive banking records from Community First Credit Union as part of your investigation?

A.    Yes, I did.

MS. TAYLOR:  Your Honor, may I approach with Exhibits 95, 95A, 95B, 95C, 95D, 95E, as well as 93 and 94?

THE COURT:  You may.  And . . .

BY MS. TAYLOR:

Q.    First, looking at Exhibit 93, that's a disk, correct?

A.    Yes.

Q.    Are you able to recognize that as a disk that you previously reviewed the contents of?

A.    Yes.

Q.    How are you able to recognize it?

A.    I placed my initials on the outside of the compact disk.

Q.    And does that contain surveillance video footage that you obtained from Community First Credit Union?

A.    It does.

Q.    And Exhibit 94, if you could look at that one as well.

A.    Okay.

Q.    Is that also a disk?

A.    Yes.

Q.    And how do you recognize it?

A.    My initials are also on this disk.

Q.    Did you review the contents of the disk before you initialed it?

A.    I did.

Q.    And did it contain surveillance video footage also

obtained from Community First Credit Union?

A.    It did.

Q.    And I would also ask you to look at Exhibits 95 and then all of the sub exhibits, I think it was A through E.  And are those banking records that you obtained from Community First Credit Union?

A.    Yes.

         MS. TAYLOR:  Move for the admission of 93, 94, 95, and 95A through E.

         THE COURT:  Any objection?

         MR. KING:  No, Your Honor.

         MR. ZERMAY:  No, Your Honor.

         THE COURT:  All right.  93, 94, and 95A through E are admitted and you may publish as you wish.

    (Government's Exhibits 93, 94, 95, and 95A-95E admitted in evidence.)

         MS. TAYLOR:  Ms. Ganoe, would you please bring up Exhibit 95A.

BY MS. TAYLOR:

Q.    Looking at page 56, this is part of the banking records, correct?

A.    Yes.

Q.    And who's banking records are these?

A.    Kristopher Ervin.

Q.    And what's the date on this particular record --

A.      January --

Q.      -- or this page of the record?

A.      January 29th, 2021.

Q.      And does it have a time stamp on it?

A.      4:43 p.m.

Q.      And does it indicate that, "Check received, 214; check received, 110"?

A.      Yes.

Q.      And then does it also indicate that cash was dispensed -- it says, "Cash dispense clearing 1," correct?

A.      Yes.

Q.      And then, "Cash dispense clearing minus 325"?

A.      Yes.

        MS. TAYLOR:  If we could look at the next page, Ms. Ganoe.

        THE COURT:  And this is page?

        MS. TAYLOR:  This is page 57, Your Honor.

        The first two, please.

BY MS. TAYLOR:

Q.      We've zoomed in on the top two items, correct?

A.      Yes.

Q.      And the bottom one -- so I guess it's the middle one on page 57, but what's that one that's on the bottom of the part where we've zoomed in?

A.      That is the money order that I sent to Autokeycard.com.

Q.   And the same one that we were talking about a moment ago?

A.   Yes.

Q.   For $214?

A.   Yes.

Q.   And confirming that it was deposited to Community First Credit Union?

A.   Yes.

Q.   And the date of the deposit is January 29th, 2021?

A.   Yes.

Q.   And then another one that has the same date and time stamp on it, correct?

A.   Correct.

Q.   For $110?

A.   Correct.

Q.   Did you attempt to obtain video -- did you obtain video surveillance showing who was making transactions at Community First Credit Union at that time?

A.   I did.

        MS. TAYLOR:  Ms. Ganoe, could you please pull up Exhibit 93.

    (Video played.)

BY MS. TAYLOR:

Q.   And we're at the beginning of the video, correct?  Did a vehicle just pull into the parking lot?

A.   Yes.

Q.   Can you describe it?

A.   It's a silver Honda SUV.

Q.   And did a man just get out of the vehicle?

A.   Yes.

Q.   And what is he doing?

A.   Walking towards the entrance.

Q.   The entrance of Community First Credit Union?

A.   Yes.

Q.   And what is he doing now?

A.   He just walked inside the lobby.

Q.   And now it's at 4:42 and 52.  What is he doing?

A.   Just approached a teller.

Q.   And now what is he doing?

A.   He appears to be signing two items.

Q.   And then what did he do with the two items?

A.   Handed them to the teller.

Q.   You've watched this entire video before, correct?

A.   Yes.

Q.   And are you able to recognize who that man is that's handing the items to the teller?

A.   Yes.

Q.   Who is it?

A.   Mr. Ervin.

        MS. TAYLOR:  And we can skip forward to -- or, yeah, like maybe the last 30 seconds of the video.

(Video played.)

BY MS. TAYLOR:

Q.   We skipped forward to 4 minutes and 45 -- sorry, 4:45 and 08.  And what's he doing now?

A.   Exiting the lobby.

Q.   And at 4:45 and about 12 seconds did he walk close to a surveillance camera?

A.   Yes.

Q.   And could you clearly see his face?

A.   Yes.

Q.   And how are you able to recognize Mr. Ervin?

A.   Numerous ways.  During my investigation I conducted numerous surveillances of Mr. Ervin in his residence.  I obtained his Florida driver's license photograph.  I transported him to his initial court appearance after his arrest.  And I've attended numerous court hearings with him present.

Q.   And so you had several personal face-to-face, or close to it, interactions with Mr. Ervin?

A.   I have.

Q.   Did you also recognize that silver Honda that was in the surveillance video?

A.   Yes, I did.

Q.   How do you recognize that vehicle?

A.   I've seen that vehicle numerous times at Mr. Ervin's

residence.  I've run the tag from that vehicle.  I've seen Mr. Ervin in that vehicle on numerous surveillances.

Q.   So in other words, that's Mr. Ervin's vehicle?

A.   Yes.

Q.   After you made the second undercover purchase, did you receive anything in the mail as a result of that purchase?

A.   Yes, I did.

MS. TAYLOR:  Your Honor, may I approach with Exhibits 25, 25A, and 25B?

THE COURT:  You may.

BY MS. TAYLOR:

Q.   Could you describe what Exhibit 25 is.

A.   Exhibit 25 is the packaging, the exterior packaging, a white padded envelope.  It also contains two plastic Ziploc-type bags and two business cards.

Q.   And what's 25A?

A.   25A is an auto key card.

Q.   And what's 25B?

A.   It is also an auto key card.

Q.   Do those two auto key cards look the same as when you first received them?

A.   They do not.

Q.   And how are they different?

A.   They have been cut.

Q.   Both of them?

A.    Both of them, yes.

Q.    Who cut them?

A.    Cody Toy.

Q.    And then after Mr. Toy -- he did an examination of these items?

A.    Yes.

Q.    And did you then receive them back from him?

A.    I did.

Q.    And did you put them back in ATF evidence?

A.    Yes.

        MS. TAYLOR:  I'd move for admission of 25, 25A, and 25B at this time.

        THE COURT:  Any objection to --

        MR. KING:  Your Honor, if I could just approach.  I don't have digital copies of the physical items.

        THE COURT:  All right.

        MR. ZERMAY:  Same request, Your Honor.

        THE COURT:  Let's just inspect the evidence.

        Any objection to 25, 25A, or 25B?

        MR. KING:  No, Your Honor.

        MR. ZERMAY:  No, Your Honor.

        THE COURT:  Those are admitted.  You may publish.

    (Government's Exhibits 25, 25A, and 25B admitted in evidence.)

        MS. TAYLOR:  Your Honor, may I approach Agent Hooker?

THE COURT:  Yes.

BY MS. TAYLOR:

Q.   Okay.  So I've put 25 on the projector.  And you mentioned there are two little plastic baggies in here in addition to the mailing envelope?

A.   Yes.

Q.   And with a green business card?

A.   Yes.

Q.   Is that the same kind of green business card that you got with your first order?

A.   It is.

Q.   And then there's also the -- the bubble mailer, correct?

A.   Yes.

Q.   And is this the bubble mailer that you received the items in?

A.   It is.

Q.   And it's addressed to ship to John Holbrook?

A.   Yes.

Q.   And what's the return address?

A.   AKeyCard, 950 Blanding Boulevard, Suite 23, PMB 336, Orange Park, Florida, 32065.

Q.   Now, I'm going to put 25A on the projector.  And it's been cut into a number of pieces, correct?

A.   Yes.

Q.   It looks like there's one that's kind of -- one piece

that's a little bit torn up here?

A.    Yes.

Q.    And has a -- a spot where the link is broken?

A.    Yes.

Q.    And then another piece that's the main body of a link, correct?

A.    Correct.

Q.    As well as two of the smaller pieces?

A.    Yes.

Q.    And then the rest of this is all just leftover material?

A.    Right, from the card.

Q.    Okay.  And looking at 25 -- this is 25B, correct?

A.    Yes.

Q.    And this was -- this would be a 2 in 1, correct?

A.    Yes.

Q.    Because it has etchings for two lightning links?

A.    Correct.

Q.    But four total etchings?

A.    Yes.

Q.    And is this a Pen Holder Edition or not?

A.    It is not.

Q.    Because this piece -- the kind of D-shaped piece is not cut out on this one?

A.    Correct.

Q.    And then one of the two lightning links has been cut out

of this card as well, correct?  Bear with me.

A.    Yes.

MS. TAYLOR:  Your Honor, I would suggest that this may be a good stopping point for today.

THE COURT:  Yeah, I actually was going to suggest that we stop around 5:15 since the jury came in so early, so that's fine.

Ladies and gentlemen, we're going to go ahead and stop for the afternoon.  I'll ask you, as I said, to be back here at 9:45.  You'll leave your notepads only the chair.

COURTROOM DEPUTY:  Judge, sorry, you said 9:45.

THE COURT:  What is -- sorry about that.  No, you don't get an extra hour of sleep.  8:45.  8:45.

Thank you, Ms. Wiles.

We'll plan hopefully -- if everybody can be here on time, we'll plan to start no later than 9 a.m.

You'll leave your notepads on chairs.

I'll ask you to follow all of the instructions that I gave you earlier, and that is you must not talk to one another, your family, your friends, or anybody at all about the case. You can tell them information about your -- when you have to be at court and the fact that you've been selected as a juror, but you must not discuss the case in any way with anyone at all.

If anybody speaks to you or in your presence about the case, please stop them and notify the court security

the evidence?

THE WITNESS:  We did, Your Honor.

MR. KING:  Yes, Your Honor.

MR. ZERMAY:  Yes, Your Honor.

MS. TAYLOR:  Your Honor, should I stay here or go to the podium?

THE COURT:  You can go ahead, get yourself together at the podium.

COURT SECURITY OFFICER:  All rise for the jurors.

(Jury enters, 9:10 a.m.)

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  Good morning, ladies and gentlemen.  We are continuing this morning with the evidence in Case No. 3:21-cr-22(S4)-MMH-MCR.

Ms. Taylor, you may proceed.

MS. TAYLOR:  Yes, Your Honor.

Special Agent Hooker, you are still under oath.

THE COURT:  Pardon me.

You understand that you're still under oath, sir?

THE WITNESS:  Yes, ma'am.

THE COURT:  Go ahead.

MS. TAYLOR:  Thank you, Your Honor.

**SPECIAL AGENT JESSE HOOKER**, **GOVERNMENT WITNESS**,

**PREVIOUSLY SWORN**,

DIRECT EXAMINATION (CONTINUED)

BY MS. TAYLOR:

Q.   Yesterday we were talking about the second undercover purchase that you had made in this case related to auto key cards, correct?

A.   Yes.

Q.   And you also had mentioned that you were working with a postal inspector.  And what was his name?

A.   Keith Hannon.

Q.   And do you know whether he made an undercover purchase?

A.   Yes, he did.

Q.   And do you know how he paid for that undercover purchase?

A.   With a Postal Money Order.

          MS. TAYLOR:  Ms. Ganoe, if we could please have Exhibit 95A, page 75.

BY MS. TAYLOR:

Q.   Do you know whether Inspector Hannon was using an alias or an undercover name to make his purchase?

A.   Yes, he was.

Q.   And do you know what that name was?

A.   Richard Carter.

          MS. TAYLOR:  Ms. Ganoe, could we zoom in on the top part, top two.  Yes.

BY MS. TAYLOR:

Q.   And do you see anything on this page, which was Exhibit 95A, page 75, related to Inspector Hannon's purchase?

A.   I see a Postal Money Order in the amount of $230.  And it's a little blurry, but I think it says from R. Carter.

Q.   And does it have an address -- a shipping address in Savannah, Georgia?

A.   It does.  It's a P.O. Box.

Q.   And is that R. Carter -- that's the name Inspector Hannon was using?

A.   Yes.

Q.   And does it indicate that this Postal Money Order was deposited at any particular place?

A.   Community First Credit Union of Florida.

Q.   And does it indicate the date that it was deposited?

A.   February 3rd, 2021.

Q.   And time?

A.   4:09 p.m.

Q.   You previously, yesterday, testified about Exhibit 94, that that was a surveillance video that you had obtained from Community First Bank.  Correct?

A.   Yes.

     MS. TAYLOR:  And Ms. Ganoe, could we have Exhibit 94.

     (Video played.)

BY MS. TAYLOR:

Q.   And we started with -- the video is playing from the beginning.  Do you recognize any particular vehicle or person that's in this first part of the video?

Case 3:21-cr-00022-MMH-MCR   Document 278   Filed 06/06/23   Page 10 of 278 PageID 4415
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 45 of 138

VOL 2 - PG 10

A.   A silver Honda SUV.  Mr. Ervin is exiting the vehicle, walking towards the front door of the credit union.

Q.   And how do you recognize that as being Mr. Ervin?

A.   Based on my prior surveillances and interactions with him.

Q.   Did he have any particular item of attire that you observed him wearing repeatedly during your investigation?

A.   He wore a pair of sunglasses, white in color.

Q.   Is he wearing them in this video?

A.   Yes.

Q.   Was he also wearing them in Exhibit 93, which was the surveillance video from the deposit of your undercover money order?

A.   I believe so, yes.

       MS. TAYLOR:  And Ms. Ganoe, could you advance the video to 1 minute, 53 seconds.

     (Video played.)

MS. TAYLOR:

Q.   What's happening at this point in the video?

A.   Mr. Ervin is approaching a teller, removing items from his pocket.

Q.   And then what does he do?

A.   Signs what appears to be two items.

Q.   Are they -- do they appear to be paper?

A.   Yes.

Q.   And then what does he do with the two items?

A.   He's going to slide them to the teller.

MS. TAYLOR:   And if we could advance the video to 3 minutes and 30 seconds.

(Video played.)

BY MS. TAYLOR:

Q.   What's happening at this part of the video?

A.   He's awaiting, I believe, U.S. currency being provided to him by the teller.

MS. TAYLOR:   And if we can advance it to about 4 minutes.

(Video played.)

BY MS. TAYLOR:

Q.   What's happening at this point in the video?

A.   He's walking out of the lobby.

Q.   And what's the time stamp on the video now?

A.   4:40 and 54 seconds p.m.

Q.   And just before that time stamp, Mr. Ervin walked close to a surveillance camera, correct?

A.   Yes.

Q.   And you were able to recognize him?

A.   Yes.

Q.   Do you recognize Mr. Ervin in the courtroom today?

A.   Yes.

Q.   Could you please describe him.

A.   He is wearing I think a blue suit jacket and blue tie.

Q.   And is he sitting at a particular table in the courtroom?

A.   He's sitting at the first table with his attorneys.

MS. TAYLOR:  Your Honor, I would ask that the record reflect that Special Agent Hooker has identified Mr. Ervin.

MR. KING:  We would so stipulate, Your Honor.

THE COURT:  The record will so reflect.

BY MS. TAYLOR:

Q.   At some point in your investigation did you participate in any surveillance of Mr. Ervin?

A.   Yes, I did.

Q.   And what day was that?

A.   February 22nd, 2021.

Q.   And what did you observe on your surveillance?

A.   I observed Mr. Ervin's silver Honda SUV parked in the driveway of the 2409 Kirkwall Court residence.

Later in the surveillance I observed Mr. Ervin driving to the U.S. Post Office in Orange Park, Florida.  I observed him exit his vehicle with a cardboard box that contained numerous white padded mailing mailers and walk into the post office.

Q.   Were you able to tell whether those mailers appeared consistent with the two that you had received as a result of your undercover purchases?

A.   Yes, they appeared to the same type of envelope.

Q.   Why were you conducting surveillance of Mr. Ervin?

A.    We were trying to ascertain if he was manufacturing the devices at his residence and if he was the person mailing the devices.

Q.    And did there -- during the time that you were surveilling him, you said that he took some items into the post office?

A.    Correct.

Q.    And did he -- did you observe him leave the post office?

A.    He did.

Q.    And did he go anywhere else that was pertinent to your investigation?

A.    Yes.  Later in the day he drove to an area in Orange Park, an industrial area.  The road was call Industrial Loop.  We unfortunately lost surveillance of him in that area on that day.

Q.    And during the time that you surveilled Mr. Ervin on February 22nd, did it appear that anyone was assisting him?

A.    No.

Q.    Was there anyone who appeared to be with him?

A.    No.

Q.    You've mentioned that he -- he had departed from the 2409 Kirkwall Court address.  Did you obtain a warrant -- a federal warrant to search that residence?

A.    Yes.

Q.    Did you also obtain a federal warrant to search Mr. Ervin's vehicle?

Case 3:21-cr-00022-MMH-MCR   Document 278   Filed 06/06/23   Page 14 of 278 PageID 4419
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 49 of 138

VOL 2 - PG 14

A.    Yes.

Q.    Was that the same silver Honda SUV?

A.    Yes.

Q.    When were those warrants executed?

A.    On March 2nd, 2021.

Q.    And did you personally participate in any of those searches?

A.    Yes.  I was present at the residential search warrant.

Q.    Now, you have -- when you are going to execute a search warrant, you have an operational plan, correct?

A.    Yes, we do.

Q.    And did everything go according to what you expected in your operational plan that day?

A.    No.

Q.    And what was different than what you expected?

A.    We had intended to execute the warrant in the morning. And we had preoperational surveillance drive by Mr. Ervin's residence, and we noticed that his Honda was not present at the residence.  So it was our belief that he was not home.

Q.    And did -- what steps did you take next before executing the warrant?

A.    We ultimately received intelligence indicating that Mr. Ervin was on a rural piece of property in Lake City, Florida, doing work on it.  So we coordinated with the Columbia County Sheriff's Office and sent agents to that area.

Q.   And you did not personally go to that area in Columbia County?

A.   I did not.

Q.   After Mr. Warrant -- sorry.

     After Mr. Ervin was located in Columbia County, at some point after that did you execute the warrant at his residence?

A.   Yes.

Q.   And was anyone present at the residence at that time?

A.   No.

Q.   Did you find anything that was of evidentiary interest to your investigation during that search of the residence?

A.   Yes, we did.

Q.   I'm going to --

          MS. TAYLOR:  Your Honor, may I approach the witness?

          THE COURT:  What numbers?

          MS. TAYLOR:  Exhibit 48, Your Honor.

          THE COURT:  Yes.

BY MS. TAYLOR:

Q.   Agent Hooker, could you please identify in general what is in Exhibit 48.

A.   These are photographs that were taken during the execution of the search warrant at Mr. Ervin's residence.

          MS. TAYLOR:  I'd move for admission of Exhibit 48.

          MR. KING:  Without objection, Your Honor.

MR. ZERMAY:  Without objection.

THE COURT:  48 is admitted.  You may publish.

(Government's Exhibit 48 admitted in evidence.)

MS. TAYLOR:  Ms. Ganoe, if you could --

BY MS. TAYLOR:

Q.   Okay.  We have the first page of Exhibit 48 on the screen now, correct?

A.   Yes.

Q.   Could you tell the jury what's in this page.

A.   That is the front exterior of Mr. Ervin's residence.

Q.   What was the weather like at the time the warrant was executed?

A.   It was rainy.

Q.   Is that why there are white flecks all over the photo?

A.   Yes.

MS. TAYLOR:  Ms. Ganoe, page 2, please.

BY MS. TAYLOR:

Q.   This one's a little bit blurry, correct?

A.   Yes.

Q.   But what's depicted in this photo?

A.   There's the white bus that we had noticed on his -- at his property.

Q.   At the residence?

A.   At the residence, yes.

MS. TAYLOR:  Ms. Ganoe, page 3, please.

BY MS. TAYLOR:

Q.   What's depicted in this photo?

A.   This is a detached garage that is located in the back yard of Mr. Ervin's property.

        MS. TAYLOR:  Ms. Ganoe, page 4, please.

BY MS. TAYLOR:

Q.   What is this photo?

A.   The interior contents of the detached garage.

        MS. TAYLOR:  And Ms. Ganoe, page 20, please.

BY MS. TAYLOR:

Q.   What's depicted in this photo?

A.   This is a work bench within the -- within the detached garage.  It has different power tools on it as well as auto key cards that are in stacks.

        MS. TAYLOR:  Ms. Ganoe, page 21, please.

BY MS. TAYLOR:

Q.   Is this a close-up of some items on that work bench?

A.   Yes.  There's numerous auto key cards that are located on the bench.

Q.   And Ms. Ganoe is zooming in on the middle part of that photo.  Is that where you see the auto key cards?

A.   Yes.

Q.   And you mentioned that they are in stacks?

A.   Yes.

        MS. TAYLOR:  Ms. Ganoe, if we could go to page 22,

please.

BY MS. TAYLOR:

Q.   What are these items that are on page 22?

A.   Belt sanders.

Q.   How were these pertinent to your investigation?

A.   We believed that these belt sanders were being utilized to finish the auto key cards to put a high-gloss shine on them.

Q.   Prior to executing the search warrant, had you observed any photos that you believed were depicting a part of the manufacturing process for auto key cards?

A.   I have.

Q.   And what -- where did you observe those and what, in particular, did you observe?

A.   I observed those on the Instagram account, the Auto Key Card Instagram account.

Q.   Okay.  And what was depicted in the photos?

A.   There were numerous auto key cards that were laying or sitting on what looked like a bath towel and they were wet.

MS. TAYLOR:  Ms. Ganoe, could we have page 5, please.

BY MS. TAYLOR:

Q.   What's depicted in this photo?

A.   This is the living room of the residence, and I think they are specifically focusing on the computer that's on the table.

Q.   And so you're referring to there appear to be two monitors with some green and black displayed on them?

A.    Yes.

Q.    And there's a tower the left of those monitors?

A.    Correct.

Q.    Was there anything else that was in this room that we're going to talk about but that can't be seen in this particular photo?

A.    Yes.  There were auto key cards located on the computer desk and adjacent to it on a table.

Q.    Does there appear to be a mirror in the rear right corner?

A.    Yes.

Q.    Okay.  Is that where the -- generally where that table was located?

A.    Correct.

        MS. TAYLOR:  Okay.  Ms. Ganoe, if we could have page 6, please.

BY MS. TAYLOR:

Q.    Is this the whiteboard next to that computer?

A.    Yes.

Q.    Was there anything on the whiteboard that was of particular interest to you?

A.    Yes.  There were numerous website addresses as well as what appeared to be inventory of auto key cards that had been written on the board.

Q.    Those -- we've zoomed in on part of this picture of a whiteboard, correct?

Case 3:21-cr-00022-MMH-MCR   Document 278   Filed 06/06/23   Page 20 of 278 PageID 4425
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 55 of 138

VOL 2 - PG 20

A.    Yes.

Q.    There's one -- there's one URL that's got kind of a squiggly blue line around it, correct?

A.    Yes.

Q.    And what's that URL?

A.    Not -- excuse me, notagunpart.com.

Q.    And is that a URL that came up anywhere else in your investigation?

A.    Yes.

Q.    Where did that come up?

A.    It was provided to the owner of the company that manufactured the auto key cards.

Q.    By Mr. Ervin?

A.    Correct.

Q.    Below that does it have some more URLs?

A.    Yes.

Q.    Could you read the first two?

A.    Could you zoom in, ma'am?
        The first one appears to be notfullauto.com.

Q.    And then after that?

A.    NofullautoAR-15.com.

Q.    And there's another area just above where the notagunpart.com URL was, correct?

A.    Yes.

Q.    And Ms. Ganoe has zoomed in on this now.  So the first one

is getlitlightningunlimited.com, correct?

A.    Correct.

Q.    Getlitlightningnow.com?

A.    Correct.

Q.    Getlitlightningandmore.com?

A.    Yes.

Q.    And then I can't quite make out the next one in full, but it says getlitlightning, and then something that looks like "services," possibly, dot.com?

A.    Yes, possibly.

Q.    And then getlitlightningtoday.com?

A.    Yes.

Q.    Okay.  Ms. Ganoe has zoomed in on what looks like a table with some figures on it, correct?

A.    Yes.

Q.    How is this pertinent to your investigation?

A.    I recognize the 1 in 1, 2 in 1, 3 in 1 as models of the auto key card.  There appears to be numbers associated with it. We were under the assumption this may be some type of inventory of his current supplies.

        MS. TAYLOR:  If I could have just a minute, Your Honor.

BY MS. TAYLOR:

Q.    Were there -- in this -- on this whiteboard, were there additional URLs that referenced "auto," "AR-15," "firearms" and

terms like that?

A.   I believe so.

        MS. TAYLOR:   Ms. Ganoe, could we please have page 7.

BY MS. TAYLOR:

Q.   Is this a close-up of a computer desk?

A.   Yes.

Q.   And at this time it looks like maybe the computer's been woken up because the two monitors are displaying a blue graphic, correct?

A.   Yes.

Q.   And on this computer desk, did you locate anything that was of interest?

A.   Yes, we did.

Q.   And what did that include?

A.   There were numerous auto key cards on the desk.  There were -- I think there was a card that had -- in the monitor that had the name Matt -- I think "Hoover" might have been misspelled, but it had Matt Hoover and an email address on it.

Q.   Ms. Ganoe has zoomed in on the area that's just to the right of the computer tower, correct?

A.   Yes.

Q.   And is there anything in this photo that you recognize as being pertinent?

A.   There appear to be numerous stacks of auto key cards next to the tower.

Case 3:21-cr-00022-MMH-MCR   Document 278   Filed 06/06/23   Page 23 of 278 PageID 4428
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 58 of 138

VOL 2 - PG 23

MS. TAYLOR:  And if we could have, please, page 8.

BY MS. TAYLOR:

Q.   What's shown in this picture?

A.   Two documents; two or three documents.

Q.   And were these -- were these documents that were on that desk?

A.   Yes.

Q.   And does it have a document that says, "What is an auto key card?"

A.   Yes.  I think the line above it said that.

Q.   Okay.  Can you read what this part of the document says?

A.   "What is my first product?  The auto key card.  What is my intent in designing, marketing, and selling the product?

"From our terms of service, section 5, products or services.

"Products are a political sculpture, for conversation, a novelty, or as artwork only.  Products are not designed or intended to increase any rate, just to increase the rate at which people have conversations.  A form of creative, artistic, peaceful protest along with other common-use features, such as a bottle opener or a desktop pen holder. They are not sold or intended to be altered in any way.  Our products are a form of satire and 100 percent First Amendment activity.

"Nothing like this has existed before, because we

drew the art, designed the piece, and made it to keep the conversation going."

Q.   So on this page it states -- and you've seen these auto key cards advertised as being Pen Holder Editions, correct?

A.   Yes.

Q.   And that was the version that has those internal cutouts made?

A.   Correct.

Q.   And you recovered a lot of auto key cards from this home, correct?

A.   Yes.

Q.   Approximately how many?

A.   We -- we recovered approximately 1,550 machine gun conversion devices from the residence.

Q.   So when you say that, you mean that's the number of etchings for lightning links that were on the cards that were recovered?

A.   Correct.

        THE COURT:   I'm sorry, sir, can you repeat the number.

        THE WITNESS:   1,550, approximately.

BY MS. TAYLOR:

Q.   Were any of those auto key cards being used to hold pens?

A.   No.

Q.   Not a single one?

THE COURT:  Go ahead, Mr. Mesrobian.

MR. MESROBIAN:  Thank you, Your Honor.

**AMY SARKESE, GOVERNMENT WITNESS, SWORN,**

DIRECT EXAMINATION

BY MR. MESROBIAN:

Q.    Ma'am, where are you currently employed?

A.    JPMorgan Chase Bank.

Q.    And what is your current position?

A.    Mortgage processor.

Q.    How long have you been at Chase Bank?

A.    May of 2021.

Q.    Prior to Chase where were you employed?

A.    Community First Credit Union.

Q.    And how long did you work at CFCU?

A.    From 1996 to 2021.

Q.    And to your knowledge, is CFCU a federally insured financial restitution?

A.    It is.

Q.    So could you describe for the jury the positions you held at CFCU over that rather extended time there.

A.    Collections -- well, first was a teller, part-time teller, then full-time teller, then collections representative, member service representative, and then the last role was assistant branch manager.

Q.    And when you were assistant branch manager did you work at

a particular branch?

A.    The Orange Park location, 625 Blanding.

Q.    So during the 2020 to 2021 time frame, were you then working as the branch manager in Orange Park -- or assistant branch manager in Orange Park?

A.    Yes.

Q.    What were your duties and responsibilities in that role?

A.    Assist with audits; help the teller line if they needed assistance, if they were short staffed up there; help with the vault; help balancing the daily activities at the end of the day; waiting on customers or members; opening accounts; new loans.

      Kind of everything.

Q.    Through your employment at Community First, did you become familiar with an individual named Kristopher Justinboyer Ervin?

A.    I did.

Q.    And was he a client of the credit union?

A.    Yes.

Q.    How many times -- did he come to your branch in Orange Park?  I'm sorry, strike that.

      Did he come to conduct business at your branch in Orange Park?

A.    Yes.

Q.    Was he a regular customer?

A.    Yes.

Q.   How often, approximately, would you say?

A.   He was usually two to three times a week.

Q.   And Ms. Sarkese, do you recognize Mr. Ervin in the courtroom today?

A.   Yes.

Q.   And could you identify him and an article of clothing he's wearing?

A.   Blue suit, blue shirt.

Q.   And where is he seated?

A.   Over there on the right.

MR. MESROBIAN:  Your Honor, would the record reflect that the witness identified Mr. Ervin?

MR. KING:  We so stipulate, Your Honor.

THE COURT:  The record will so reflect.

BY MR. MESROBIAN:

Q.   So I believe you said a moment ago that he was coming a couple times a week into the branch in Orange Park?

A.   Correct.

Q.   And that was during the 2020 to 2021 time frame?

A.   Correct.

Q.   Do you recall ever discussing with him if he was in a particular business?

A.   Yes.

Q.   And what did he say about that?

A.   At one point he said he was making metal business cards.

Q.   So I'd like to talk about cash transactions for a moment. In terms of your role as a teller and an assistant bank manager or branch manager, what were your obligations in terms of tracking and reporting cash transactions?

A.   So I would handle, like, the cash orders, or if I was on the teller line doing actual transactions for members, you know, processing them, whether it be cash or checks into their account, depending on the transaction limit, it could have us do a form to report to the IRS.

Q.   So are you familiar with something called a Currency Transaction Report, or CTR?

A.   Yes.

Q.   And what is that?

A.   It's a form that we have to fill out if there's a withdrawal of a certain dollar amount or higher.

Do you want the dollar amount?

Q.   And what is that dollar amount?

A.   10,000 or more.

Q.   And is that true also with respect to cash deposits in addition to withdrawals?

A.   Yes.  It's in or out, cash in or out.

Q.   So if you were working as a teller or if you were supervising someone working as a teller, what were you supposed to do if someone deposited or withdrew more than $10,000 in cash?

A.   So we have to verify -- make a copy of their driver's license, verify the information in the system is correct, name, address, phone number, occupation, employment, or employer.  We have to make sure all that's correct because we have to fill that in on the form.

Q.   When you're doing that and gathering that information, do you advise the customer that you are filing a Currency Transaction Report?

A.   No.

Q.   And why don't you do that?

A.   It's not something that we are to disclose as a financial institution.  So whenever we are gathering that information, we're just basically letting them know, "Hey, we're updating the system," and then that's basically the end of the conversation.

Q.   Do you recall ever having a discussion with Mr. Ervin about what the threshold was to -- that the bank would report cash?

A.   Yes.

Q.   Could you tell the grand jury -- the jury about that.

A.   So it was asked to me at one point what that dollar amount is as far as reporting goes.  And obviously I didn't give that information because we're not allowed to.  But it was asked at one point, "Well, how much can I take out so it's not reported?"

Q.   Do you recall specifically when that conversation occurred?

A.   No, I don't remember the exact date.

Q.   And we're going to talk about -- in a few minutes about a series of -- or, rather, a cash withdrawal that occurred at your branch, but was it at some point prior to that cash withdrawal occurring?

A.   The withdrawal that we're going to talk about?

Q.   The $9,000 cash withdrawal.

A.   It was after that.

Q.   So first I'd like to direct you to July 20th, 2020.  Do you recall a visit by Mr. Ervin to the bank that day to discuss online banking access?

A.   I do.

        MR. MESROBIAN:  So Your Honor, may we publish Government Exhibit 95B, as in Bravo, page 2?

        THE COURT:  You may.

BY MR. MESROBIAN:

Q.   First, do you recognize what this document is?

A.   Uh-hmm.

Q.   And what --

        THE COURT:  I'm sorry, is that yes?

        THE WITNESS:  Yes, I'm sorry.

        MR. MESROBIAN:  Thank you, Your Honor.

BY MR. MESROBIAN:

Q.    And what is this document?

A.    It's our notes that we use in the -- it's called Symitar. So like on the client's account or the members's accounts, if we need to put notes, this is where it shows up and these are how the notes will appear.

Q.    So these are notes created by bank employees entered into the Symitar record of encounters --

A.    Correct.

Q.    -- with customers?

A.    Correct.

Q.    Here we see an account note dated July 20th, 2020, 9:58 a.m., and there's a user number there.  Whose user number is that?

A.    That was mine at the time.

Q.    And would you read the note that you wrote here?

      I take it if the user number is there, that means you entered this note?

A.    Correct.

Q.    And what did this -- what did you enter here?

A.    "Member came in to get into his online banking and when Taylor asked to verify his information with his ID and update" --

      THE COURT:  Excuse me.  Could you slow down?

      THE WITNESS:  I'm sorry.

      THE COURT:  Go ahead.

A.    "Member came in to get into his online banking and when Taylor" -- which was our teller at the time -- "asked to verify his info with his ID and update his employer, he lost" -- he got upset -- "saying why did it matter and that he didn't want to give that information to us to type in."

He told us to type in "strippers and cocaine" as his occupation.

"He refused and just kept saying the same thing.  I walked over to get the ID for him and he walked out stating he was just going to call it a day and that we were always causing problems.  Member stated he had a business account with us and also stated that he plans on running business funds through his personal account and that's why he wanted access to the online banking."

Q.    "OLB"?

A.    Is online banking.

Q.    That stands for online banking?

A.    (Nods head.)

Q.    So do you recall this incident?

A.    I do.

Q.    And generally, does it accord with your notes reflecting it?

A.    Yes.

Q.    And just to be clear, when Mr. Ervin -- Mr. Ervin advised that he didn't want to provide his business, and what did he

ask you to write down or ask you --

A. The occupation, it was -- he instructed us to put in "strippers and cocaine" as his occupation.

Q. And you did not do that, correct?

A. Correct.

Q. Ms. Sarkese, did Mr. Ervin, on the occasions when he came into your branch, complain about CFCU or the way he was being treated?

A. Correct.

Q. What would he say on those occasions?

A. Basically that we weren't giving him -- we weren't allowing him access to his money.

Q. Generally, to your recollection, did he use his personal account for transactions?

A. For transactions . . .

Q. When he came into the branch?

A. Yes.

Q. Do you recall him using a business account?

A. At some point, yes, when it was opened.

Q. So I'd like to move forward to Black Friday, approximately, of 2020, the Thanksgiving time period of 2020. Do you recall a visit by Mr. Ervin around that date?

A. (Nods head.)

Q. And what happened on that occasion?

A. So we had denied his debit card. Evidently it was trying

to be used at a Louis Vuitton for a purse purchase that we were told he was using to -- he was going to buy a purse for his boss's wife, and the debit card was declined.

Q.    So I'll stop you there.  Did Mr. Ervin come into the branch that day?

A.    Yes.

Q.    And this was on or about November 27th, 2020?

A.    Right.

Q.    And do you recall it to be around Black Friday of that year?

A.    Yes.

Q.    What did he say to you about a debit card transaction?

A.    He was upset that the debit card transaction had got declined.

Q.    Did he say where he had been that day?

A.    Louis Vuitton.

Q.    And where is -- the Louis Vuitton store, do you mean?

A.    Yes.

Q.    And to your knowledge, where is the Louis Vuitton store?

A.    In Town Center in Jacksonville, the Town Center mall.

Q.    Did that strike you in any particular way, that he had come to the Orange Park branch from the Town Center?

A.    Yes.  It's a good distance.

Q.    And what did he tell you about this particular transaction he was trying to engage in?

A.   That it had been declined for the purchase, and so he was upset and came in and said that, you know, why weren't we giving him access to his money.  It was his money, he can do what he wants to with it, that he was trying to purchase a purse for his boss's wife.

Q.   Did he give a particular amount of money that he thought this purse cost to your recollection?

A.   No, I don't -- he didn't say a specific amount at that time.

MR. MESROBIAN:   And Ms. Ganoe, if we could publish Exhibit 95 Bravo.  And go to the bottom, please.

BY MR. MESROBIAN:

Q.   Actually, first, the note on November 24 where it says, "Removing JT from account," do you know what that refers to?

A.   It would -- it's not from me, but it removes -- it means removing a joint person from the account.

Q.   So someone may have been a joint owner on this account and then was removed?

A.   Correct.

Q.   So above that, on November 25th, 2020, this is not your note, correct?

A.   Correct.

Q.   But what does this note indicate to you in terms of a card transaction?

A.   So he called in and the person that took the call

authorized the primary caller, which was him -- advised that they -- he advised that he had received an alert for his debit card.  Advised they responded -- he responded yes, was able to confirm that the purchase went through.  Advised the caller -- the employee advised the member that as long as they respond "yes," their transaction will auto override, meaning you're saying yes to the fraud alert.  Also verified card was not blocked and will be able to use the limit of 6,000 for a point-of-sale purchase.

Q.   And it was marked at the bottom "dash CS."  What does that mean?

A.   That's the person's initials that took the call, the 2104.

Q.   And so this appears to be about two days before Mr. Ervin came to the branch and talked about the Louis Vuitton purse?

A.   Right.

MR. MESROBIAN:  So Ms. Ganoe, if we can go up to the next note, please, the small one.

BY MR. MESROBIAN:

Q.   So do you recognize this note as being from November 27th, 2020?

A.   Correct.

Q.   And there's a lot of abbreviations in here, so you might have to translate this for the jury.  What does this signify?

A.   So it's -- again, it's a call-in.  He called in. Primary -- which is the "pri" -- calls in -- "ci" -- regarding

denied debit card transaction.  And the employee of the credit union, the user 1954, transferred the call to Fiserv, which is the fraud department for Visa, the debit card.

Q.   So essentially, does this reflect another call regarding a declined --

A.   Yes.

Q.   -- debit card transaction?

A.   Yes.

Q.   And transferring it to Fiserv.  What is Fiserv again?

A.   The fraud department that handles transactions for your Visa debit card or credit cards.  So if you're disputing or need your transaction to go through, that's who handles it.

Q.   To be clear, did you personally, or someone at your branch, deny his debit card transactions?

A.   No.

Q.   So I'd like to direct you now to December 28th, 2020.  Do you recall a visit by Mr. Ervin to your branch that day?

A.   Yes.

Q.   What business did Mr. Ervin initially have with your branch on that date?

A.   He wanted to deposit a $100 money order, but it was payable to "Auto Key Card," which was a product that he told us that he sells.  When we told him we couldn't take the check the way it was payable -- because he was trying to put it into a personal account and we don't allow that -- he got upset again,

said that we wouldn't be getting his business account, mortgages, loans, et cetera, and that he wanted to take all of his money out in cash.

We told him it would need to be a special order because of the amount and it wouldn't be available until the end of next week because we don't order every single day.

And then he continued to change the dollar amount of what we could give him.  I told him initially, you know, "We can give you 10,000."

He said "okay" and then said, "No, give me 9,000 and I'll just come back every day or try other branches until I get all my money."

I told him there's no guarantee at other branches that they will have it available.

Q.   And to be clear, user 310, that's your user number?

A.   Yes.

Q.   So break that down.  Mr. Ervin -- and you were interacting with Mr. Ervin on this date, correct?

A.   Correct.

Q.   When he came in, he initially wanted to deposit a money order payable to Auto Key Card?

A.   Correct.

Q.   And would the bank do that?

A.   No.

Q.   And why is that?

A.   Because at the time there was no business account.  It was only a personal account.  So we don't allow business transactions into a personal account.

Q.   Did Mr. Ervin become upset at that point?

A.   Yes.

Q.   Did he advise you that he wished to close his account or withdraw his account balance in cash?

A.   Yes.

Q.   And is that possible, normally, to --

A.   I mean, you can, it just depends on the amount.  But the amount at that time, we did not have.

Q.   Do you recall approximately how much cash was in his account at that time?

A.   60,000.

Q.   So you were not able to give him $60,000 in cash?

A.   No.

Q.   Do you recall if you offered him an alternative way of taking his money out?

A.   A certified check, cashier's check.

Q.   Did he accept that?

A.   No.

Q.   So what did you offer him first in terms of the cash you did have available?

A.   The 10,000.  I told him, you know, "We can do 10,000."

Q.   And did he accept that?

A.   At first the answer was, "Sure, give me the 10,000," but then changed his mind and said, "No, just give me 9."

Q.   And again, to be clear, what happens on the bank's side of the transaction -- of a cash transaction that exceeds $10,000?

A.   We have to do the Currency Transaction Report, the CTR.

Q.   And you or a teller would enter Mr. Ervin's information and then it would go to whom?

A.   The IRS.

MR. MESROBIAN:   Your Honor, may I have a moment, please?

THE COURT:   Yes.

(Government's counsel confer.)

BY MR. MESROBIAN:

Q.   So Ms. Sarkese, do you recall Mr. Ervin coming in after December 28th and making any other cash withdrawals?

A.   I don't recall, to be honest.

Q.   If he had made additional cash withdrawals every day, you know, not in the same 24-hour period, would that trigger a CTR if they exceeded $10,000?  Or -- I'll ask this another way.

If someone withdrew $9,000 every 24-hour period, would that exceed the threshold for a CTR?

A.   No.  If it's over the 24 hours -- if it's past 24 hours, no, it would not.  If it's within 24 hours, the same -- so like 10 a.m. to 10 a.m., then yes.

MR. MESROBIAN:   No further questions, Your Honor.

THE COURT:  Mr. Mesrobian.

MR. MESROBIAN:  United States calls Andrea Useche.

(Witness enters the courtroom.)

THE COURT:  If you'll come right up here and remain standing for just a moment.

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  If you can please raise your right hand.  Do you solemnly swear that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  You may have a seat.

THE WITNESS:  Thank you.

COURTROOM DEPUTY:  And if you could please state your name for the record and spell your last name.

THE WITNESS:  Andrea Useche, U-s-e-c-h-e.

**ANDREA USECHE, GOVERNMENT WITNESS, SWORN,**

DIRECT EXAMINATION

BY MR. MESROBIAN:

Q.   Ma'am, where are you employed?

A.   Community First Credit Union.

Q.   And what is your position?

A.   I am a fraud investigator.

Q.   What office do you work out of?

A.   Oh, well, we have a headquarters, so I'm in the

headquarters.

Q.   And how long have you been a fraud investigator at Community First?

A.   Just over three years.

Q.   And is Community First Credit Union also known as CFCU?

A.   Yes.

Q.   And is CFCU a federally insured credit union?

A.   Yes.

Q.   So Ms. Useche, where were you employed before CFCU?

A.   I was a fraud investigator for VyStar for about seven months.

Q.   And prior to that were you in law enforcement?

A.   Yes, sir.

Q.   And could you tell the jury about your law enforcement experience.

A.   I graduated the academy in 2003.  I worked for -- was hired by the Lake City Police Department and I worked there from 2003 until 2008, I believe.  I think it was '08 -- '07, 2007.  And then I left there and I went to the Columbia County Sheriff's Office.  I didn't go too far, but I went from blue to green.  And I was with the sheriff's office until 2019.

Q.   And what roles did you hold at the Columbia County Sheriff's Office?

A.   I was in patrol.  I worked for about a little over -- about a year and a half in the courthouse, and then in 2012 I

became a detective.  That was what I set out to do, was become a detective.

Q.    And what type of cases did you investigate as a detective?

A.    The first year was all cases.  Everything they gave me.  It was everything.  And then after that I decided to specialize in fraud, so I sort of began working with fraud cases, and I did that until I left.

Q.    Now, in your current role with CFCU, could you describe your role and responsibilities as a fraud investigator?

A.    Sure.  What I do is I -- what I'm tasked with doing is I'm protecting the credit union from financial loss and risk and I also protect our members from financial loss and risk.  And that's a balance that I do.

       And I do that by looking at the transactions that come in that might have been flagged by our system to look at to do a manual review to see if there's fraud going on.

       Also, we have members that call in and say, "Hey, this check hit my account.  I didn't write it," and that begins a fraud investigation.

Q.    And when law enforcement is seeking information relating to one of their investigations, who at CFCU is usually the point of contact?

A.    I am the law enforcement liaison because of my affiliation with law enforcement.  So, yes, I am the one that -- I have all contacts.  Everything would be funneled to me or through me

for -- to assist law enforcement.

Q.   And similarly, if -- in your role as a fraud investigator or if someone else at CFCU detects something to be reported to law enforcement, who handles that?

A.   That would be me, correct.  I would file -- I would look at the case, and then if it needed to be filed with law enforcement, I'm the one who would be filing.

Q.   Is there a team within your group at CFCU which is responsible for potential Bank Secrecy Act violations?

A.   Yeah, we have a BSA team.  All financial institution are required to have a BSA team, and we have one.

Q.   And what type of activities are covered or reviewed by those investigators?

A.   So the BSA team is responsible for monitoring accounts for any suspicious activity, such as money laundering or financial terrorism.  That's what we look at, so . . .

Q.   And is that team also responsible for filing documents with the government pursuant to the bank's obligations under the BSA?

A.   Yes, sir, that's correct.

Q.   So I'd like to talk about a few of those types of documents.

        Are you familiar with something called a Currency Transaction Report?

A.   Somewhat familiar, yes, sir.

Q.    And is that also known as a CTR?

A.    Yes, sir.

Q.    And are you aware, what is the CTR designed to report?

A.    If the transaction amount that is deposited or withdrawn, or a combination, within a 24-hour period -- but it really wouldn't be 24 hours because it would only be during business hours -- but within that 24-hour period, if the combination is over $10,000, then it has to be reported.

Q.    And that's a transaction in cash, correct?

A.    Correct.  That is correct.

Q.    Separately, are you familiar with something called a Suspicious Activity Report?

A.    Yes, sir, I am.

Q.    And what is a Suspicious Activity Report?

A.    It's a report that our BSA team makes to FinCEN.  It's a required report.  Anytime there's suspicious activity, we are required to report that.

Q.    And is there a particular threshold for reporting suspicious activity?

A.    There can be.  One instance where a report is required would be is if the transactions that occur, fraudulent or suspicious, is $5,000 or more and the person who is maybe the suspicious actor is known -- in other words, their name, we know who they are, they're able to be identified -- then that report has to be made and that information has to be given.

If the actor is unknown then the threshold moves up to 25,000.  So if it's $25,000 or more, then the report has to be given over to FinCEN.

Q.    And FinCEN is a United States government organization?

A.    Yes, sir.

Q.    And to be clear, both the CTR, the Currency Transaction Report, and the Suspicious Activity Report, the SAR, are both legally required for banks to track and file?

A.    That's correct, yes, sir.

Q.    Separately, are you familiar with something called a Suspicious Incident Report?

A.    Yes.

Q.    What is that?

A.    So a Suspicious Incident Report, or what we call a SIR, would be generated by actually anybody within the credit union who had a feeling that something untoward was going on or suspicious activity.  And it could be anything.  It could be the behavior of a member who forged, behavior of something going on, it could be a physical problem with, you know, "Somebody" -- "I think somebody maybe moved the camera."  Anything that is -- would, in your mind, create suspicion of a potential problem can be reported as suspicious activity -- a Suspicious Incident Report.

Those reports go to the BSA team.  The BSA team then determines whether or not that rises to a level of a SAR, or a

Suspicious Activity Report, or if that report needs to go to another department.

Q.   So that's -- the SIR is a way of people working in branches, for example, to report something that could be suspicious for the fraud team to look at?

A.   Correct.

Q.   Separately, does your team, the fraud investigation team, and the BSA team use computer programs or algorithms to evaluate activity in customer accounts?

A.   Correct, yes, we do.

Q.   And could you talk a little bit about that and what those programs use for.

A.   Right.  So we use a system that is -- we purchased the system, and it is a case management system where we keep all of our cases.

But the other thing that it does is it looks at the transactions and the patterns of your accounts, and it looks for anything that is out of pattern, suspicious.  For example, if you were to make a deposit that was well above what you would normally do as a pattern, that computer program would pick up on that and it would send an alert to our team for us to manually review, to see:  Well, what's going on with that?

Again, that's a balance between the risk of the credit union and the risk of our member being involved in fraud or being victimized.

Q.   And to be clear, it could be both unusual deposits or unusual withdrawals as a means of preventing loss to the accountholder?

A.   That's correct.  I was just using deposits as an example, but yes, sir.

Q.   Do you, as a fraud investigator, sometimes become involved when a client attempts to close a bank account?

A.   Under certain circumstances, yes.

Q.   And what would those circumstances be?

A.   Well, if somebody comes in and they are wanting to make a large withdrawal of most of their money or all of their money, typically what happens is that they're not going to encounter our department first, they're going to go to a branch.  And then the branch personnel, staff, would ask them, "Okay, well, what are the circumstances?"

And if there's anything that would trigger something, a concern, such as -- I'll give you an example.  If an elderly person came in with maybe a younger person and the elderly person said, "I want to withdraw all of my money," and the younger person with them was sort of guiding them and telling them what to do, that would create a suspicion under which they would call my department.

Q.   So Ms. Useche, through your work as a fraud investigator, did you become aware of a CFCU accountholder named Kristopher Justinboyer Ervin?

A.    Yes.

Q.    And was that in or around January 2021?

A.    That's correct.

Q.    Without going into what anyone may have said to you, did you receive -- specifically receive a referral to investigate Mr. Ervin and both his account activity and any business activity he was engaged in?

A.    Yes, sir.

Q.    To be clear, you've never met Mr. Ervin, correct?

A.    I have not.

Q.    Now, first, with respect just to his account activity, what steps did you take to look into this referral?

A.    So, of course, you know, we would look at the account transactional history to see what's occurring, to see if it matches the information that we got in.

       We would also begin looking at transactions, in other words, cash in or cash out, or automatic transfers or automatic deposits, known as ACHs, which stands for automatic clearinghouse.  I don't know why they named it that.  But it would be something like if you get a direct deposit, that comes into your account through ACH.

       So we would begin looking at that transactional history and activity to see whether or not the information we have is jibing with what we're seeing.

Q.    And do you use a particular program available to you in

your role to engage in that type of investigation?

A.    Our Core system.  Yes.  We have a Core system.  The Core system that we use, it would be a system that everybody in the credit union uses to keep track of the accounts.  We can make notes, you know.  We can see each other's notes, and we can see that transactional history.

Q.    And do you also have a program called Verafin?

A.    Yes.

Q.    And what's that?

A.    That was something that I described earlier.  That would be our case management program.  That's also the program that looks every day at the transactions that come in and then generates alerts based on what it thinks we might need to look at and review manually.

Q.    So with respect to Mr. Ervin, did you review his account, as we were just discussing, for any significant recent deposits?

A.    Yes.

Q.    And as well for significant cash withdrawals?

A.    Yes.

Q.    And do you recall responding -- or assisting with the response to a law enforcement subpoena regarding bank records for Mr. Ervin?

A.    Yes, sir, correct.

        MR. MESROBIAN:  And Your Honor, may we publish what

is already in evidence as Government Exhibit 95D, as in delta?

THE COURT: Madam Deputy, do you have 95D?

COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Okay. I missed it.

Go ahead.

BY MR. MESROBIAN:

Q. And Ms. Useche, do you recognize this to be an application for an account at Community First Bank?

A. Yes, I do, yes, sir.

Q. And if you can look, we've zoomed in on the middle portion underneath -- and the heading is Member Information. Who is the member or applicant here?

A. Kristopher Justinboyer Ervin.

Q. And the address provided is 2409 Kirkwall Court?

A. Yes, sir.

Q. And the cell phone provided is (904) 405-9878?

A. Yes, sir.

Q. And the email address provided is JustinErvin80@aol.com?

A. Yes, sir.

MR. MESROBIAN: And Ms. Ganoe, if you can go to the bottom part.

BY MR. MESROBIAN:

Q. Here, does this reflect that there's a joint owner in this account?

A. Yes, sir. It says "joint with right of survivorship," and

the box is checked.

Q.   And the name of this individual is Kris A. Ervin?

A.   Yes, sir.

MR. MESROBIAN:  And Ms. Ganoe, could we go to page 3 of this exhibit.

BY MR. MESROBIAN:

Q.   So if you could take a look at this top part there underneath "Subsequent Actions."  Is this a subsequent adjustment to this account in the account documents produced?

A.   Yes, sir.

Q.   And here it says "remove"?

A.   It does.

Q.   Remove a joint owner?

A.   Correct.

Q.   And if we go down to the bottom where it says "Joint Owner Number 1."  This reflects that Kris A. Ervin, that joint owner we were just looking at, was removed as a joint owner of this account?

A.   That's correct, yes, sir.

MR. MESROBIAN:  So now, Your Honor, may I publish Government Exhibit 95C?

THE COURT:  You may.

MR. MESROBIAN:  And Ms. Ganoe, if we can go to page 17 and zoom in on the top.  Yeah, down -- from "Kristopher Justinboyer Ervin" down.

BY MR. MESROBIAN:

Q.   So Ms. Useche, do you recognize this to be an account statement provided by Community First?

A.   Yes, it is.

Q.   And is this an account statement for -- looks like the middle name is short one letter, but it's Kristopher "Justinboye" Ervin at that same address we just looked at?

A.   Yes, sir.

Q.   With an account number ending in 3009?

A.   That's correct.

Q.   And the statement period for this statement is December 1st of 2020 through December 31st of 2020?

A.   Yes, sir.

Q.   So if we could go to next page.  I'd like to focus just on the top half of the screen here.  So I'd like to talk first about the deposits in this account.

        Looking at December 1st -- and I'll make -- I'm going to try to make marks as best I can next to them -- is there a deposit that says "ACH Stripe" in the amount of $1,814.69?

A.   Yes, sir, that's correct.

Q.   The next day, December 2nd, is there a deposit, ACH Stripe, for $6,717.02?

A.   Yes, sir.

Q.   Day after that, is there a deposit, ACH Stripe, in the amount of $3,734.82?

A.   Yes, sir.

Q.   Moving down.  The day after the last one we just looked at, this one is December 4th.  Is there a deposit line that says "ACH Stripe, $2,247.58"?

A.   Yes, sir.

Q.   And then going down to the bottom here, December 7th, deposit, ACH Stripe, in the amount of $1,463.05?

A.   Yes, sir.

     MR. MESROBIAN:  And if we could go to the next page, please, Ms. Ganoe.

BY MR. MESROBIAN:

Q.   The day after that, December 8th, it says "deposit, ACH Stripe, $2,340.31"?

A.   Yes, sir.

Q.   December 9th, the next day, deposit, ACH Stripe, $4,620.67?

A.   Yes, sir.

Q.   Then finally, the day after that, December 10th, deposit, ACH Stripe, $902.31?

A.   Yes, sir.

Q.   So I'll stop here.

     Are you familiar with what Stripe is?

A.   Somewhat familiar.

Q.   And what do you know it to be?

A.   I know it to be a payment platform, very similar to

Square. I personally have never paid a purchase with Stripe, but I've made a purchase with Square. And I understand it to be an online payment platform.

Q. And specifically, do you understand it to be a payment processor for various -- for a business, essentially?

A. Yes, sir, yes.

Q. Is it common to see proceeds from a business or proceeds from Stripe going into personal accounts at CFCU?

A. No, sir.

Q. And in your role as a fraud investigator, or general investigator of the bank, what does that signify to you?

A. So at Community First we do not allow business transactions to flow through a personal account. You have to have a business account.

So when we see business transactions flowing through a personal account, we typically will reach out and let the member know, "You have to stop." And if they don't stop, then we're probably going to exit the relationship, which is basically closing their account. We don't allow that.

MR. MESROBIAN: So now, Ms. Ganoe, if we could go to page 22.

BY MR. MESROBIAN:

Q. So here we have -- we're still in this December account statement on a subsequent page. And now I'd like to focus on the balance in the account and then some withdrawals. If we go

down -- actually, I'm sorry.  You're right in the right place.

So I'd like to focus on what the account balance was at the beginning of the day on December 28th.  So I guess that's -- the last transaction on December 27th, after that debit of $124 for Amazon, was the balance $59,683.06?

A.   Yes, sir.

MR. MESROBIAN:  And could we go down to the next half, please.

BY MR. MESROBIAN:

Q.   So starting on that same day, December 28th, does the account statement reflect a series of cash withdrawals?

A.   I do see a series of cash withdrawals on that day, yes, sir.

Q.   And these are denoted by the description "withdrawal by cash"?

A.   Correct.

Q.   So first, on December 28th, there's one for $9,000; is that right?

A.   That is the first cash withdrawal, yes.

Q.   And immediately below that on the same day, December 28th, there's a withdrawal for $5,000?

A.   Correct.

Q.   And towards the bottom of the screen, on December 29th, is there another cash withdrawal for $9,000?

A.   Correct.

MR. MESROBIAN:  If we could go to the next -- or -- correct.  Right there.

BY MR. MESROBIAN:

Q.   And on the next page of this document, on December -- well, there's another deposit on December 30th from Stripe of $6,083.71?

A.   Yes, sir.

Q.   And immediately below that, on December 30th there's another cash withdrawal of $9,000?

A.   Yes, sir, correct.

Q.   And then the next day after that, there -- on December 31st there is a deposit of Stripe -- from Stripe of $2,445.40?

A.   Yes, sir.

Q.   And then a withdrawal in cash of, again, $9,000; is that right?

A.   Yes, sir, correct.

MR. MESROBIAN:  And Ms. Ganoe, could we go to page 25.

BY MR. MESROBIAN:

Q.   And Ms. Useche, do you recognize this to be another account statement relating to this same account belonging to Kristopher Justinboyer Ervin?

A.   Yes, sir.  This is the January statement of 2021.

MR. MESROBIAN:  So if we could go further down to the

next page, please.

BY MR. MESROBIAN:

Q.   So the last transaction we saw was December 31st, New Year's Eve, I guess.

On January 2nd there's a withdrawal by cash again of $9,000, correct?

A.   Yes, sir.

Q.   And was there a -- does there appear to be a deposit by check that same day into the account?

A.   Yes.  I would say $100 deposit by check.

Q.   Then on January 5th, a little further down the screen, is there another cash withdrawal for $9,000?

A.   Yes, sir.

Q.   The day after that, on January 6th, is there another withdrawal of $9,000?

A.   Yes, sir.

Q.   Other than the second withdrawal we looked at on December 28th for $5,000, were all of these cash withdrawals we just looked at in the amount of $9,000?

A.   I believe so.

Q.   And the threshold you mentioned earlier for reporting cash transactions is $10,000; is that right?

A.   I believe it's $10,000 and one penny.

Q.   In your experience, are regular cash transactions just under the reporting threshold a red flag?

A.   If there's a series of them, if there's a -- potentially a statement made -- there's a couple of other things that go into it, but generally speaking, yes.

Q.   And again, how is that activity monitored at the bank, or at the credit union?  Is it manual or is it -- is there an algorithm that looks for activity like that?

A.   Actually, both.  So a Suspicious Incident Report could come through and -- to report, "Hey, this person has come in every day and is withdrawing $9,000," in this case.  Or it could actually be an algorithm through oUr Verafin system and come in as an alert.

Q.   So separately, ma'am, I believe you testified earlier that you were also asked to look into the nature of Mr. Ervin's business?

A.   Yes, sir.

Q.   And without getting into what other individuals may have said to you, did you become concerned that Mr. Ervin was involved in illegal activity?

A.   Yes, sir.

Q.   Subsequently, did you take any actions in terms of contacting law enforcement?

A.   Yes, sir.

Q.   And was that also in January of 2021?

A.   Yes, sir, that is correct.

Q.   Who did you reach out to?

A.    I reached out to Jeff Massie with the ATF.

Q.    And why did you reach out to ATF particularly?  Did -- I'll strike that.

Did you reach out to ATF because you believed Mr. Ervin was involved in some type of firearms activity?

A.    I wasn't a hundred percent sure, but I had a -- I had a suspicion that that was the case and I needed confirmation. And since I'm not -- even though I handled firearms for my whole career, I'm by no means a firearms expert, so I wanted an expert opinion.

Q.    So you reached out to Jeff Massie?

A.    Yes, sir.

Q.    And how did you know Jeff Massie?

A.    I worked with Jeff Massie through Columbia County for years as a detective when I was a detective.  He would help us out.  He would come in, we would work cases together.  I personally have never worked a case with Jeff, but I knew him from his -- our detective division is very small.  It's only nine of us.  So whenever he would come in, I would know who he was.  And I had a good rapport with Jeff.

Q.    And was he no longer in the Jacksonville area?

A.    Correct.  I didn't even know that.  He had been reassigned to Texas.  And he let me know that he was no longer in Columbia County, or in the North Florida area.  He had been reassigned to Texas.  So he gave me a referral.

Q.    And subsequently did you have contact with Special Agent Hooker from ATF about the investigation into Mr. Ervin?

A.    Correct.

Q.    After that, after that point, did you respond to ATF when it had requests for assistance from the bank?

A.    Yes, sir.

Q.    Did that include pulling surveillance video related to certain transactions at a physical bank location?

A.    Yes, sir.

Q.    And finally, I'd like to talk about the date of Mr. Ervin's arrest, March 2nd, 2021.  Were you in contact with ATF on that date?

A.    Yes, sir.

Q.    And what was the substance of that contact?

A.    I had received a message from Agent Hooker asking me if there had been any debit card activity.  And I looked into the account and I did see there was debit card activity at the Harbor Freight in Lake City, and I let him know that.

Q.    And was it your understanding that ATF was going to reach out to Columbia County Sheriff's Office to verify Mr. Ervin's location in Lake City?

A.    That's -- that's -- yes, he did communicate that with me, yes, sir.

            MR. MESROBIAN:  May I have one moment, Your Honor?

            THE COURT:  You may.

(Government's counsel confer.)

MR. MESROBIAN:  No further questions at this time.

THE COURT:  Mr. King.

MR. KING:  May it please the Court.

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. KING:

Q.   Good afternoon, Ms. Useche.

A.   Hello.

Q.   I wanted to go over just to clarify a couple things from you and make sure that I have an understanding.

There's the S-I-R-s, which is the SIR?

A.   Yes, sir, correct.

Q.   And that is -- is that something that's unique to Community First or is that shared with the federal government?

A.   It's unique to Community First.

Q.   All right.  And then there's the SAR?

A.   Correct.

Q.   And your department is responsible for generating those?

A.   No, sir.  I actually work in the fraud department.  Our BSA team, they are responsible for filing those.

Q.   And how familiar are you with the SARs?

How familiar are you with SARs?

A.   Well, that's kind of an in-depth question.  Can you be a little bit --

THE COURT: All right.

COURTROOM DEPUTY: If you can please state your name for the record and spell your last name.

THE WITNESS: Richard Jerome Roberts, R-o-b-e-r-t-s.

THE COURT: Go ahead, Mr. Mesrobian.

**RICHARD ROBERTS, GOVERNMENT WITNESS, SWORN**,

DIRECT EXAMINATION

BY MR. MESROBIAN:

Q.   Good morning, Mr. Roberts.

A.   Hi.

Q.   Could you tell the jury the city and state where you live.

A.   Quentin Township, Michigan.

Q.   And what do you do for a living?

A.   I'm into plastics.

Q.   And do you own your own company?

A.   Yes, I do.

Q.   And what type of work does your company do --

A.   Actually, the wife does --

Q.   -- in plastics?

A.   -- but we're in the plastics.

Q.   So Mr. Roberts, are you required to be here today pursuant to a subpoena?

A.   Yes, sir.

Q.   And prior to your testimony today, did the government provide you a letter setting forth terms of immunity?

A.    Yes, sir.

Q.    Did you -- well, you understand that you just took an oath to tell the truth today?

A.    Yes.

Q.    Is that your intention to do so?

A.    Oh, of course.

Q.    Mr. Roberts, do you own any firearms?

A.    Yes.

Q.    Is hunting or shooting firearms a hobby of yours?

A.    Yes, it is.

Q.    And what type of activities do you generally engage in?

A.    Hunting 90 percent of the time, with grandkids and my kids.

Q.    Are you familiar with an item called the auto key card?

A.    Yes.

Q.    How did you first hear about the auto key card?

A.    On a YouTube.

Q.    Do you recall the name of the video that you watched?

A.    No.  It's with a gentleman that's got a bunch of tattoos. I don't know his name.

Q.    Had you watched videos made by this particular person before?

A.    Before I --

Q.    Before you watched the one where you learned about the auto key card.

A.    I don't think so.

Q.    How did it -- how did you come to watch that video?

A.    It was just on there.  It's, you know, like shooting.  I'm always looking, because I reload, so I'm on there just to improve, to learn more about reloading.  And that's where I, you know, found it.

Q.    Do you recall the title of that video?

A.    No, sir, I don't.

Q.    During that video, do you recall the individual who made the video suggesting what someone could do with the auto key card?

A.    Yeah, it turns your gun into automatic.

Q.    And do you recall him using any particular terms with respect to converting the AR-15 into a fully automatic gun?

A.    No, sir.

Q.    Do you recall the term "lightning link" being used?

A.    Yeah, but I couldn't -- I thought that was, like, different than the auto key card.

Q.    Do you recall if he provided instructions in that video on how to use the auto key card to convert your AR-15 into a machine gun?

A.    Yeah, you cut it out and install it.

Q.    At the time you watched this video, did you own an AR-15-type rifle?

A.    Yes, sir.

Q.    How many?

A.    Four.

Q.    And so after you watched this video, did you purchase an auto key card?

A.    Yes.

Q.    Why did you buy it?

A.    Just to horse around.

Q.    And what --

A.    You know, just thought it would be neat just to --

Q.    And when you say "horse around," what do you mean?

A.    Shooting, you know.  In shooting, just --

Q.    Did you intend to use the auto key card to convert your -- an AR-15 to be fully automatic?

A.    Yes.

Q.    And horse around, as you said?

A.    And horse around, yes.

Q.    How did you make that purchase?

A.    I don't know.  I bought it off another gentleman's site, whoever sells it.

Q.    Do you recall there being different types or models of auto key cards to choose from?

A.    Yes.  I think there was like two or three different ones.

Q.    And do you recall which model you purchased?

A.    A can opener or something like that it's called.

Q.    Do you recall how many lightning links or conversion

devices were on the card that you bought?

A.    I think three.

Q.    And you understood that -- at the time that there were three of these devices engraved into this card?

A.    Yes, sir.

Q.    So did you make that purchase on or about January 13th, 2021?

A.    I don't know.  I'd have to look.

Q.    Ultimately, did you receive the auto key card that you purchased?

A.    Yes, sir.

         MR. MESROBIAN:  And Your Honor, I'd like to publish at this point what is already in evidence as Government's Exhibit 67AAA.

         THE COURT:  Go ahead.

         MR. MESROBIAN:  And if we could go down to page 2.

         THE WITNESS:  Oh, boy.

         MR. MESROBIAN:  And we'll focus on . . .

         THE WITNESS:  Oh, that helps.

BY MR. MESROBIAN:

Q.    So on page 2 --

A.    I'm sorry.

Q.    -- there's what appears to be an Order Summary; is that right?

A.    Oh, "bottle opener" it says.  Sorry.

Q.   So underneath Order Summary it says "Auto Key Card 3 in 1 with Bottle Opener, $99"; is that right?

A.   Yes, sir.

Q.   And do you recall that to be the item that you purchased?

A.   Yes, sir.

MR. MESROBIAN:  If we could zoom out, Ms. Ganoe. Actually . . .

BY MR. MESROBIAN:

Q.   And there, right beneath Order Summary, it says Order 2637 placed on January 13th, 2021.  Does that sound like approximately the date that you ordered the auto key card?

A.   Yeah, if that's mine, that's -- that's it.

MR. MESROBIAN:  If we could go to page 1, please.

BY MR. MESROBIAN:

Q.   The heading of that email is an -- it's from autokeycards.com and it's addressed to Rick Roberts on January 13th, 2021; is that right?

A.   Yes, sir.

MR. MESROBIAN:  If we can go to the email above that.

BY MR. MESROBIAN:

Q.   And on February 8th, 2021, there's an email above that where Rick Roberts wrote, "Hi.  Can you tell me when this was delivered?  Rick."

Did I read that right?

A.   Yes, but I -- I use the name "Rick."

Q.   And so do you recall sending this email inquiring about your delivery?

A.   I believe so, yeah.

MR. MESROBIAN:  Ms. Ganoe, could you go up to the next email.

BY MR. MESROBIAN:

Q.   And also on February 8th, 2021, customerservice@autokeycard replied to you, "Hi, Rick.  Thank you for your purchase and for contacting us.  We are sorry to hear you have not received your order yet.  I checked the tracking for your order and USPS shows it as still in transit.  It seems your order is lost.  We will send you a replacement order asap.  Thank you for your patience while we make this right.  Sincerely, Autokeycard.com."

Did I read that correctly?

A.   Yeah, yes.

Q.   Did you ultimately receive --

A.   Yeah.

Q.   -- the auto key card?

A.   Yes, sir.

Q.   And I'll just ask that you wait until I finish the question --

A.   Oh, I'm sorry.

Q.   -- just so the court reporter doesn't have any -- that's fine.

You did receive an auto key card ultimately?

A.   Yes.

MR. MESROBIAN:  Ms. Ganoe, can we go to the top email.

BY MR. MESROBIAN:

Q.   So this is an email reply from Rick Roberts, which is you; is that right?

A.   Yes, sir.

Q.   To Customer Service on February 19th, 2021, at 1:35 p.m., correct?

A.   Yes.

Q.   And you wrote, "Hi.  I cut the part out of your, quote, can opener, unquote, but it will not allow me to run automatic. I own a tooling shop, so I cut it right to your line.  It will allow me to shot [verbatim] one shell and it will load the next but not fire unless I release the trigger.  I'm using a S&W AR-15 Sport Two.  I tried it in two different AR-15s.  Am I doing something wrong?"  And it's signed "Rick."

Do you recall sending that email?

A.   Yes.

Q.   What happened prior to your sending this email?

A.   Well, my brother lives up in the Thumb area and I was at his place.  And guys were shooting automatic rifles down a desolate road.  And I -- when I left, I thought, wow, that's strange.  So I pulled in, talked to those guys about what they

were doing.  And they had what looked like the same thing and he said it wouldn't --

Q.   When you say it "looked like the same thing," what did it look like?

A.   That design, that cutout on that metal.

Q.   The lightning link on the auto key card?

A.   Yes.

So he said it wouldn't work in their guns and I could have it.

So I took it back.  And even though I didn't cut his out, I cut that out to match the line in that piece that I bought from him, and it still wouldn't work.

Q.   So you wrote in the first sentence here, "I cut the part out of your can opener but it will not allow me to run automatic."

Are you talking about the lightning link inside the auto key card?

A.   Yeah, that's where I got -- I messed up and said "can opener."  Bottle opener or something.

Q.   And then you stated, "I own a tooling shop so I cut it right to your line."

Did you cut it or did someone else cut it?

A.   No, it was already cut.  But then I thought, well, gee, maybe it's just not right.  So I filed it to match the one that's on that 3 in 1 or whatever you call it so that it

matched the lines.

Q.   And you then state a little bit later, "I'm using a S&W AR-15 Sport Two."

What is that?

A.   That's the AR-15.  A gun.

Q.   Did you attempt to install the lightning link into the S&W AR-15 Sport Two?

A.   Yes, sir.

Q.   And did it work or did it not?

A.   No.

Q.   How familiar were you or are you now with the internal parts of an AR-15?

A.   I'm not.

Q.   Do you know what an SP1 bolt carrier is?

A.   Not at all.

Q.   Do you know what a high shelf versus a low shelf is?

A.   No, not at all.

Q.   And to be clear, Mr. Roberts, did you ever cut a lightning link out of the auto key card that you purchased?

A.   No.

Q.   What did you do with your auto key card?

A.   Well, when I didn't get any response back for help, I then went back on the YouTube to see if I was doing something wrong, and that's when I learned that they were illegal.

Q.   When you say you went to learn if you were doing something

wrong, what do you mean?

A.   Well, I didn't know -- like maybe you had to bend it or round off a corner, sharpen an edge or something.

Q.   So you were looking for additional instructions --

A.   Sure, yeah.

Q.   -- on how to convert your AR-15?

A.   Yes.

Q.   So after you found out that the auto key card was purportedly illegal, what did you do?

A.   Well, before that I had sent a couple emails saying, "Could you help me," or like -- whatever, "Can you help me?"

     When I got nothing, I went on YouTube.  That's when I found out they were illegal.  That's when I sent him another email that says, "Don't call me back," or email me, something like that, "I found out they're illegal."  And I literally cut it up --

     JUROR:  (Sneezes.)

     THE WITNESS:  God bless you.

     JUROR:  Thank you.

A.   -- I literally cut it up and threw it out the window into a county ditch in little pieces.

Q.   Subsequently ATF agents came to your house, correct?

A.   Yes.

Q.   And did they interview you about the auto key card that you had purchased?

A.    Yes.

Q.    Did they take anything of yours when they left your house?

A.    Yes.

Q.    What was that?

A.    My gun.

Q.    Is that the AR-15 you attempted to convert?

A.    Yes, sir.

        MR. MESROBIAN:  May I have one moment, Your Honor?

        THE COURT:  You may.

BY MR. MESROBIAN:

Q.    Mr. Roberts, are you familiar with the process of how to register a firearm under the National Firearms Act?

A.    No.  Normally if I buy like a shotgun, you know, I buy it from a dealer who's, you know, been there forever by me.  And then we have to fill out the paperwork, he does background checks.

        And then the AR-15s I bought on a site -- I forget the name of the site, but then it's got to go to an FFL, I think they call them.

Q.    So I'm speaking specifically about an NFA firearm; as an example, a silencer or a machine gun or a machine gun conversion device.

A.    No, sir, I have no idea.

Q.    Have you ever owned one of those types of things?

A.    No, sir.

Q.   Did you register the auto key card with the ATF pursuant to the NFA?

A.   Oh, no.  I didn't know you had to.

MR. MESROBIAN:  Okay.  No further questions, Your Honor.

THE COURT:  Mr. Larosiere.

CROSS-EXAMINATION

BY MR. LAROSIERE:

Q.   Good morning, Mr. Roberts.  So is it accurate that you work in tool and die?

A.   Yes.  I've been in the injection mold building for 50 years.

Q.   That's a pretty high precision industry, injection molding, right?

A.   Yes, it is.

Q.   So when you looked at the auto key card, the single piece of steel, that line on there is pretty wide, right?  Maybe 40-thou?

A.   Yes.

Q.   That's thousandths of an inch?

A.   Yeah.

Your hair's about three-thousandths of an inch.

Q.   Right.  So it's like a -- in terms of thickness, that would be like about an eighth inch, so like a Sharpie line, something like that?

about to give before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  You may have a seat.  If you could please state your name for the record and spell your last name.

THE WITNESS:  My name is Cody James Toy, T-o-y.

THE COURT:  Go ahead, Ms. Taylor.

MS. TAYLOR:  Yes, Your Honor.

**OFFICER CODY JAMES TOY, GOVERNMENT WITNESS, SWORN,**

DIRECT EXAMINATION

BY MS. TAYLOR:

Q.   Officer Toy, could you please tell the jurors where you work.

A.   I work for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Q.   And what's your -- in what capacity?

A.   I'm a Firearms Enforcement Officer.  I am currently the Branch Chief of the Firearms Technology Criminal Branch.

Q.   And what does a Firearms Enforcement Officer do?

A.   We do multiple things in our office.  The two main things that we focus on is criminal evidence evaluations and industry evaluations.

Criminal evidence, we evaluate and classify evidence that is sent to us by agents all over the country and classify them -- the different items under federal law.

On the industry side, members of the industry, the firearms industry, can send us samples of weapons or other items that they intend to market and sell, and we can give them a classification of what those items are.

Q.   And in general, as a Firearms Enforcement Officer, do you personally review some of these items and evaluate them?

A.   Yes.

Q.   And is that for purposes of whether they may or may not be governed by the National Firearms Act?

A.   That is correct, as well as the Gun Control Act.

Q.   And in particular, do you have responsibility for evaluating items that may be machine guns?

A.   Yes, I do.

Q.   And what did you do -- how long have you been a Firearms Enforcement Officer?

A.   I've been a Firearms Enforcement Officer for about seven years now.

Q.   And what did you do prior to becoming a Firearms Enforcement Officer?

A.   Before I worked for the ATF I worked as a contractor for the FBI on the National Name Check Program, running backgrounds on individuals trying to get status for either jobs with the government or immigration status.  Before that I worked security at that location, armed physical security, where I had to maintain proficiency with a side arm on an annual basis.

Case 3:21-cr-00022-MMH-MCR   Document 283   Filed 06/07/23   Page 138 of 250 PageID 5842
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 113 of 138

VOL 7 - PG 138

And before that I was in the United States Marine Corps for four years, in the infantry, where I was trained on anything from a 9 millimeter pistol all the way up to heavy machine guns and certain explosives.

Q.   And what kind of educational background do you have?

A.   I joined the Marine Corps straight out of high school. And I've taken some classes in college.  But outside of that, I have a lot of training in the firearms field; multiple classes with different armorer groups, directly worked with manufacturers, as well as outside individuals that provide classes for certain types of weapons.  I have over ten different certifications on particular firearm groups.  I also have been to courses on silencer manufacturing, silencer design principles.

Within the ATF, for our training to become a Firearms Enforcement Officer we have over 800 hours of in-house training.  That's an OJT-style of training.  We have the National Reference Collection at our location, which houses roughly 15,000 different firearms, from pistols and rifles to machine guns, rocket-propelled grenades and things like that, as well as an expansive library that has periodicals as well as books that are written on firearms that we can go back to and see design history and how things function.

Q.   And you mentioned armorers.  What is an armorer?

A.   So an armorer is basically somebody who is trained on a

particular platform of weapon to be able to diagnose issues that that weapon is having as well as make repairs and change parts and things like that.

Q.   Are you an armorer?

A.   As a profession, no.  I am a certified armorer in multiple different weapons systems, but I am not an armorer.

Q.   Now, Officer Toy, at some point did Special Agent Hooker contact you regarding an investigation of suspected lightning links?

A.   Yes.

Q.   And around when was that?

A.   I believe that was January of 2021.

Q.   And did you have a conversation with Special Agent Hooker with regard to obtaining a sample for testing?

A.   Yes.  The way our process works is the agents will send it in to our office, we will get a workflow through the computer. Once we get that workflow, we then go pick up that piece of evidence from our evidence technician, make sure that the workflow has the correct information on it that is actually received with the package, and then we'll sign the evidence tags to make sure that we have chain of custody.

           MS. TAYLOR:  Your Honor, may I approach with Government's -- already in evidence is Exhibit 20A, 25A, and 25B?

           THE COURT:  Go ahead.

MS. TAYLOR: And then I would also like to approach with some exhibits that have not been admitted, which are Number 63, 64, 65, and 66.

THE COURT: Okay.

BY MS. TAYLOR:

Q. First, Officer Toy, if you could look at Exhibit 20A that's already in evidence. Is that one of -- is that an item that you received for examination?

A. Yes, it is.

Q. And is this an item that you received from Special Agent Hooker?

A. Yes, it is.

Q. And did you take photos of it as it came into your possession and as you tested it?

A. Yes, I did.

Q. Could you please look at Exhibit 64 and describe what is in Exhibit 64.

A. Exhibit 64 is a series of photographs that I took throughout the process of examining the evidence and cutting it and completing the device.

Q. So the item that's in the photos in Exhibit 64, is that item 20A -- Exhibit 20A?

A. Yes, it is.

MS. TAYLOR: I would move for admission of Exhibit 64, Your Honor.

MR. KING:  Without objection.

MR. ZERMAY:  Without objection.

THE COURT:  54 is admitted.

MS. TAYLOR:  Sorry, it's 64, Your Honor.  May we publish Exhibit 64?

THE COURT:  You may.

(Government's Exhibit 64 admitted in evidence.)

MS. TAYLOR:  If we could please have page 1.

BY MS. TAYLOR:

Q.   So this is a photo that you took?

A.   Yes, it is.

Q.   And what's depicted in this photo?

A.   What's in this photo is the image of the evidence as I received it in my office next to a ruler just to give it some size comparison.

MS. TAYLOR:  Could we have page 2, please.

BY MS. TAYLOR:

Q.   What's shown here?

A.   So this is a close-up view of what the actual device is: The picture -- the image on the piece of metal, the two parts that would be needed to make a lightning link.

Q.   So you said it's an image on the piece of metal.  Can you describe what the image appeared to be to you when you received this item.

A.   It appeared to me that this was a laser etching of a

lightning link, which is a machine gun conversion device.

Q.    And is the -- and so in this particular picture there's two outlines visible, correct?

A.    That is correct.

Q.    And are those the two pieces that are required to make a complete lightning link?

A.    That is correct.

Q.    And were you able to recognize the outlines as being outlines for a lightning link when you received this item?

A.    Yes, I did.  We have multiple items like this in the reference collection that I have seen and evaluated.

Q.    And you stated that it appeared that the outlines were made using a laser?

A.    It appears that they might have been manufactured using a laser etcher that would remove a small amount of material from the surface of the device to show the outline of the device.

Q.    So the outline is actually at some depth into the material as opposed to being on the surface of the material?

A.    That is correct.  The material has been removed or displaced to create this image.

Q.    Now, how are you -- how are you able to recognize this as being a potential lightning link?  Is that a new design or something you had seen before?

A.    No.  This is definitely something that's been around since, I believe, the early 1980s.  We have -- like I said, we

have some of these devices in our collection.  As well as part of our training to become an FEO, we go through multiple different machine gun conversion devices so that we can identify them when we go on field assists and when we get them into our office.

Q.   And I want to talk to you a little bit about how a lightning link works.

MS. TAYLOR:  If we could please, Ms. Ganoe, have Exhibit 2 at 4 minutes and 10 seconds.

We're good right here.  We're at 4 minutes and I think that said 17 seconds.

BY MS. TAYLOR:

Q.   This is a still shot from a video, correct?

A.   Correct.

Q.   And there's a diagram in the corner of that still shot?

A.   That is correct.

Q.   And in this still shot, what is the -- what's visible in the diagram?

A.   What you're looking at is the internal components of an AR-15-type firearm.  With those components, there's also a lightning link that is depicted in there.

Q.   I'm going to try to draw on this screen.

There's a flat line where I've indicated with a few dots; is that correct?

A.   That is correct.

Q.   And what is that flat line?

A.   That is the larger portion in that -- the close-up picture that I -- that you had up earlier of a lightning link.  We can refer to it sometimes as the body, the main body of the device.

Q.   And is that the part that has the two cutouts?

A.   That is correct.

Q.   And then -- this is not cooperating with me, but towards the right side of where the body is, is there another piece that's sticking up?

A.   That is correct.  Right there, where you just were able to get the line on there, that is the other device.  We sometimes refer to it as the paddle or the connector.

Q.   And that's the small, kind of rectangular piece?

A.   That is correct.

Q.   And so is this image -- is this image accurately depicting how a lightning link would fit into an AR-15?

A.   Yes, it is.

Q.   And can you tell the jurors a little bit about what the other parts are that interact with a lightning link when it's installed?

A.   So the big hook piece that you see on the image is the hammer of the firearm.  The hammer is held in place by what is referred to as the disconnector.  The disconnector is at the very front of that main body, and it's also a little hook shape.  The two hooks connect to each other.

Q.   This thing that I'm coloring on right now, which one is that?

A.   That's the hammer.

Q.   All right.  And where is the disconnector?

A.   The disconnector is underneath of the hammer at the front of the main body of the device.

Q.   Is it kind of shaped like a little wave?

A.   Yes.

Q.   And then what are the other key parts?

A.   So you also see the trigger, which is underneath the disconnector.  And those are your main fire control components of an AR.

Q.   So how does the lightning link work to cause automatic firing?

A.   The lightning link basically is -- what it does is when the bolt moves across the top of the paddle, it pushes the top of it forward, which pulls the bottom of it backwards using the lug, which is that little hole in front of the paddle that you can see up there.  There will be a pin that goes across there, and it uses that as a fulcrum to pull the bottom of that device backwards, which in turns pulls the disconnector back and releases the hammer to allow it to continue to strike the firing pin.

Q.   All right.  And Ms. Ganoe is attempting to help me with a laser pointer because my efforts at using the little drawing

tool are not working out very well.

But this area kind of along the top, is that where the bolt would be?

A.   That is correct.

Q.   And then this piece is what?

A.   That would be the hammer.

Q.   And this piece here, the little wavy shaped piece?

A.   That's the disconnector.

Q.   And then this piece down here?

A.   Would be your trigger.

Q.   And so the paddle is the part sticking straight up back here?

A.   That is correct.

Q.   That's the part of the lightning link?

A.   Yes.

Q.   Okay.  And you said that part does what?

A.   So the hole that's right in front of that paddle is the takedown pin for the device to -- or for the weapon to remove the upper portion and the lower portion from each other.

Q.   Am I generally indicating the hole that you're talking about?

A.   Yes, you are.

Q.   Okay.

A.   So the paddle then uses that as a fulcrum to press against.  So when the bolt hits the top of the paddle, it

pushes it forward, pulling the bottom of the device backward, or the body backwards, which pulls that hook, the disconnector, off of the hammer, which allows the hammer to then hit the firing pin.

Q.   And so when you pull -- if you pull the trigger with the lightning link installed in a properly configured AR-15, what's the result?

A.   If it's designed properly and everything works the way it's supposed to, the weapon will fire automatically.

Q.   And what would cause that weapon to stop firing automatically if it's working correctly?

A.   Run out of ammunition or a malfunction.

Q.   Or if you released the trigger, would it stop firing?

A.   Yes, and if you release the trigger, yes.

Q.   Could we go back to -- well, actually, first, let's talk about what you did with Exhibit -- Exhibit 20A is the auto key card that you received from Special Agent Hooker, correct?

A.   That is correct.

Q.   How did you proceed to test it?

A.   So I took it back to my work station.  And the first thing that I do is take pictures of the device to make sure that we accurately depict what it looks like when it comes to our office.

          Occasionally we get items in that are unsafe to fire or that during the process of firing they become damaged, so we

want to make sure that we take our pictures first so that we can see what they were.

With this particular device, we were requested to remove one of the items from it to see if we could get it to actually function in a weapon.

So we used -- or I used the most commonly available tool that I had that would do the job, which was a Dremel tool, and a rotary bit on there that is a cutoff wheel.  And then I traced the lines on the device and removed it from the card.

Q.   And could you please look at Exhibit 65 and tell us what that is.

A.   That is an image of my Dremel with the cutoff wheel and the Exhibit 20A on my work bench.

Q.   And is that Dremel the exact tool that you used to cut this lightning link out?

A.   Yes, it.

MS. TAYLOR:  I move for admission of Exhibit 65.

MR. KING:  Without objection.

MR. LAROSIERE:  Without objection.

THE COURT:  65 is admitted.

(Government's Exhibit 65 admitted in evidence.)

BY MS. TAYLOR:

Q.   And we're pulling up 65 on the screen.

MS. TAYLOR:  Ms. Ganoe, could you zoom in on the picture.

BY MS. TAYLOR:

Q.   So tell me which part -- okay.  You -- was this a standard, off-the-shelf Dremel tool?

A.   Yes, it is.

Q.   Did it have one accessory added to it?

A.   Yes.  I used an extension, which is the long cord off to the left there.

Q.   Am I indicating that with a laser pointer?

A.   That is correct.

Q.   And so where is the cutoff wheel?

A.   The cutoff wheel is toward the center of the picture, right there.

Q.   So it's sort of at the end of the smaller wand?

A.   That is correct.

Q.   And then -- and this Dremel, it's something that you could buy at -- where?

A.   You could buy it at a hardware store, Walmart, anywhere that sells tools such as this.  And they sell other ones, this is just the brand name, is Dremel.

Q.   And Officer Toy, are you a machinist?

A.   I am not.

Q.   Had you ever cut out a lightning link from a metal card like this before?

A.   I had never done that before.

Q.   This was the very first time?

A.    That is correct.

Q.    Do you have experience with metal working?

A.    The only experience I have in metal works was high school, in a shop class, about a year of welding, and that was it.

Q.    You're not a Dremeling expert?

A.    I am not.

Q.    Now, were you able to cut one of the lightning links out of Exhibit 20A?

A.    I was.

Q.    And how did you -- did you do that using the Dremel?

A.    I did.

Q.    Did you use any other tools?

A.    I used a hand file to clean up some of the burrs or little pieces of sharp metal that were left to make sure that it fit together properly.

Q.    And how long did it take you to cut that -- both pieces of that first lightning link out of that card?

A.    I believe that took approximately 37 minutes.

Q.    And this first card, the first lightning link that you cut out, did it have the internal cutouts already completed?

A.    The cutouts were already done, yes.

Q.    So you didn't -- did you do anything to modify those internal cutouts?

A.    I did not.

Q.    And you stated you just -- you cut along the line of the

outline?

A.    That is correct.

MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 64, page 3.

BY MS. TAYLOR:

Q.    And this is another photo that you took?

A.    Yes.  That is a photo of the device after I had removed it from the card.

MS. TAYLOR:  And could we have page 4, please.

BY MS. TAYLOR:

Q.    And what are we looking at here?

A.    That same device that I had removed from the card.

Q.    And the top part being the body and the bottom part being what you're calling the paddle?

A.    That is correct.

Q.    Did the -- did you have to bend it?

A.    No.

Q.    Did you do any thinning of it, sanding it to make it thinner?

A.    I do believe that I had to remove some of the material off of the paddle.  And I think I used a belt sander or a grinding wheel to remove some of the material because it was just a little bit too tall.

Different AR-type firearms from different manufacturers have different tolerances, and so they're not all

the same. So what would work in one firearm might not work in another one. It would have to be what we refer to as hand fitting to make sure that it works.

MS. TAYLOR: Your Honor, may I --

BY MS. TAYLOR:

Q. And did you have to bend it or anything like that?

A. No, I did not bend it.

MS. TAYLOR: Your Honor, may I approach and obtain back from Officer Toy Exhibit 20A?

THE COURT: 20A?

MS. TAYLOR: Yes.

THE COURT: Go ahead.

BY MS. TAYLOR:

Q. Officer Toy, I was asking you questions about whether the paddle piece fit through the precut hole.

MS. TAYLOR: Could we have Exhibit 64, page 5, please.

BY MS. TAYLOR:

Q. What is shown here?

A. That is the device assembled with the paddle through the hole.

MS. TAYLOR: And could we have page 6, please.

A. That is it, just turned upside down to show that it did fit through the hole.

MS. TAYLOR: And if we could have the ELMO, please.

BY MS. TAYLOR:

Q.   I'm just going to line up the cutout pieces with one of --
so there's still two lightning links that you did not cut out
on this card, correct?

A.   That is correct.

Q.   So I'm just going to place the cutout pieces over the --
one of the not-cut-out lightning links.

         And as you said, you cut to the line?

A.   That is correct.

Q.   I'm zooming in on the end of the paddle area.  Is there
a -- you mentioned that there was a small amount of material
that you removed from the end of the paddle?

A.   That is correct.

Q.   Does it appear to be about a millimeter or less?

A.   Yes, ma'am.

Q.   Otherwise, this cutout lightning link is to the line that
was engraved on the auto key card?

A.   That is correct.

Q.   After you cut out this lightning link, did you do any
testing of it to see whether it would function in a rifle?

A.   Yes.  I went to the National Reference Collection and I
pulled out an AR-type rifle, and I took it back to my work
station and installed the device and performed a function test.

Q.   What is a function test?

A.   A function test tells you how a firearm is functioning,

whether it's semiautomatic or fully automatic or if there is a potential malfunction happening with the weapon.

Q.   Is that something you do with ammunition in the firearm?

A.   No, this would be without ammunition.

Q.   And so -- but can you -- do you pull the trigger during the function test?

A.   Yes, you do, which is why we don't have ammunition in it.

Q.   Okay.  So did you learn anything from the function test that you did?

A.   Yes.  This device is typically used with a semiautomatic bolt carrier.  But whenever I used a semiautomatic bolt carrier, it wasn't reliably functioning the way it was supposed to, so I attempted to use a machine gun -- an M16 -- bolt carrier.  And the machine gun bolt carrier actually worked better than the semiautomatic one did.

Q.   And when you say "a semiautomatic bolt carrier," was it an SP1 bolt carrier that you --

A.   Yes, it was.

Q.   And when you said it didn't work how it was supposed to, what do you mean exactly?

A.   It wasn't causing the weapon to fire automatically reliably.  Once or twice it would function test as a machine gun, but I couldn't get it to do it consistently.  So at that point I just attempted another bolt.  And that machine gun -- the M16 -- bolt carrier actually worked better and it was more

consistent, allowing the weapon to appear to be firing automatically.

Q.   According to the function test?

A.   Correct.

Q.   And then did you also test fire the weapon -- and let's talk a little bit about the rifle that you got.  Who owned that rifle?

A.   That particular rifle was part of our collection at -- in Martinsburg at the reference collection.

Q.   And is it an AR-15 rifle?

A.   It is an AR-15 variant, yes.

Q.   Is it semiautomatic?

A.   Yes, it is.

Q.   Without having the auto key card installed, would that rifle fire automatically as a machine gun?

A.   No, it would not.

Q.   Did it have all off-the-shelf parts in it?

A.   Yes, it did.

Q.   And when you -- so you did test fire -- test fire the rifle with the auto key card?

A.   I did.

Q.   And what was the result?

A.   I was able to get the rifle to fire automatically more than once.  It wasn't perfect.  There was occasional times where it wouldn't fire automatically, but it was consistently

Case 3:21-cr-00022-MMH-MCR   Document 283   Filed 06/07/23   Page 156 of 250 PageID 5860
USCA11 Case: 23-13062   Document: 42-2   Date Filed: 03/11/2024   Page: 131 of 138

VOL 7 - PG 156

firing at least two to three rounds during the live fire.

Q.   And I want to ask you about the M16 bolt carrier.  Is that something that's commonly available?

A.   Yes, it is.

Q.   Is that a part that is illegal to possess without registering it?

A.   No, it is not.

Q.   Can anyone possess an M16 bolt carrier?

A.   Yes, they can.

Q.   Even a prohibited person?

A.   Yes.

Q.   And so just the design of the M16 bolt carrier for some reason just worked better?

A.   Yes.

Q.   Now, do you know whether the trigger assembly in that -- in the rifle that you tested the auto key card with, was it also a standard trigger assembly?

A.   Yes, it was a semiautomatic trigger assembly.

Q.   Semiautomatic?

A.   Uh-hmm.

Q.   Yes?

A.   Yes.

Q.   And do you know whether it had a high or low shelf?

A.   I believe it had a high shelf in it.

Q.   And what's the difference between a high shelf and a low

shelf?  What does that mean?

A.   In the rear of the receiver of AR-type firearms there's an area that is either higher or lower that was used to prevent certain conversion devices from being installed in that firearm.  But there's no requirement for that.  And again, it's all just dependent upon individual manufacturers, what the depth is at that rear area.

Q.   Are there different kinds of conversion devices that work better with a high shelf versus a low shelf?

A.   Yes.  So a lower shelf you could use something like a drop-in auto sear, which is another machine gun conversion device.  That particular type of conversion device requires more parts to be changed out.  You'd have to use M16 fire control components in that one.  So the hammer, trigger, selector, and disconnector need to be machine gun parts.

Where something like the lightning link, the only thing that you have to do is install it.  And typically a semiautomatic bolt carrier will work, and sometimes a machine gun bolt carrier will.

Q.   But to be clear, even with the drop-in auto sear, you said that it requires more machine gun parts:  trigger assembly, bolt carrier, et cetera?

A.   That is correct.

Q.   But the only thing that's the machine gun is the actual drop-in auto sear?

A.    That is correct.

Q.    And all of those machine gun parts, the trigger assembly, the bolt carrier, those are just available to anyone who wants them?

A.    Yes, they are.

Q.    In general, not capable of causing automatic fire on their own?

A.    If they're all installed on an AR firearm, there's a good likelihood that it will cause it to fire automatically, which is why the ATF doesn't suggest putting the machine gun components in a semiautomatic.  But there's nothing to say that somebody can't.  But once it does fire automatically, that constitutes a machine gun at that point.

Q.    Which would need to be registered?

A.    That is correct.

Q.    Did Special Agent Hooker send you any additional exhibits for examination?

A.    Yes.

Q.    Did he ask you to cut out one of the types of auto key cards that did not have the internal cutouts already made?

A.    Yes, he did.

Q.    Could you please -- you have Exhibit 25A in front of you, correct?

A.    Yes.

Q.    And do you recognize that as being another auto key card

that you tested?

A.    Yes, I do.

Q.    And could you please look at Exhibit 66 and describe what's in Exhibit 66.

A.    Exhibit 66 is more photographs that I took of Exhibit 25A.

          MS. TAYLOR:  I would move --

BY MS. TAYLOR:

Q.    And those were taken while you were conducting your examination?

A.    That is correct.

          MS. TAYLOR:  I would move for admittance of Exhibit 66.

          MR. KING:  Without objection, Your Honor.

          MR. LAROSIERE:  Without objection.

          THE COURT:  66 is admitted.

     (Government's Exhibit 66 admitted in evidence.)

          MS. TAYLOR:  Could we please have the first page?

          I think we need to switch over to the . . .

BY MS. TAYLOR:

Q.    So we're looking at the first page of Exhibit 66.  Is this a photo that you took of the next item that you tested for Special Agent Hooker?

A.    Yes, it is.

Q.    And this was -- no cutouts had been completed on this particular card, correct?

A.   That is correct.

Q.   And did you -- did you attempt to cut out the lightning links from this card?

A.   Yes, I did.

Q.   How did you go about doing that?

A.   I did it in the same manner as I did with the previous card, by using a Dremel tool.

Q.   Did you -- how did you try to cut out the internal cutouts?

A.   The internal cutouts I used a drill press to put roughly four holes into the cutout areas, and then I connected the holes by using the cutoff wheel.

Q.   Were you successful the first time you tried to cut out one of these?

A.   No, I was not.

Q.   What happened?

A.   I ended up accidentally cutting the side of the main body, putting a gap between the front of it.

          MS. TAYLOR:  Could we have the next page.

BY MS. TAYLOR:

Q.   Is that what's shown in this second page of Exhibit 66?

A.   Yes, it is.

          MS. TAYLOR:  And could we zoom in on that picture.

BY MS. TAYLOR:

Q.   So there's a little arrow pointing to the main body of the

lightning link, correct?

A.   Yes.

Q.   And so you accidentally nicked it there; is that what happened?

A.   Yes, I did.

Q.   And did you test this particular device to see whether it function tested as a fully automatic machine gun?

A.   I did attempt to, yes.

Q.   What happened when you function tested it?

A.   It function tested as if it was going to allow it to fire automatically, so at that point I took it to the range and attempted to actually live fire it.

     But when I got to the range and put live ammo in, it wouldn't function.  And I attributed that to that cut being there and allowing it to flex.  So whenever the main body were to pull back because of that cut, it allowed it to flex and wouldn't pull the disconnector off the hammer.

Q.   And did you then attempt to cut out the second lightning link from that card, Exhibit 25A?

A.   Yes, I did.

Q.   And were you successful that time?

A.   Yes, I was.

Q.   Did you go about that any differently?

A.   No.  I attempted to cut it out the exact same way as the previous one.

Q.    How long did it take you to cut out this second one?

A.    The second one I believe took 53 minutes, I believe.

Q.    And including cutting out the interior cutouts?

A.    Correct.  I took a little more time on this one so I didn't cut the side of it out, which is why it took longer.

Q.    And we're looking now at page 3 of Exhibit 66.  This is a -- is this showing -- I guess you had partially cut it out at that point?

A.    That is correct.

        MS. TAYLOR:  And could we have the next page.

BY MS. TAYLOR:

Q.    This is page 4.  It's still only partially -- the main body piece on the left is still only partially cut out, correct?

A.    That is correct.

Q.    How did you -- did you cut out that -- along the entire -- I guess the entire material that was etched on this one?

A.    Yes, I did.

Q.    Initially did you cut the entire material?

A.    On this one I cut just a portion of it out on the -- actually, on the other one I cut a portion of it out that didn't end up working out because it didn't allow the hammer to go down far enough, and so I ended up having to cut the whole area out.

        But on this one, I believe I cut everything out on

this particular one.

Q.   And did you -- once you finished cutting out the second lightning link from this particular auto key card, did you -- did you function test with it?

A.   I did.

Q.   And did it -- what was the result of the function test?

A.   The weapon fired automatically.

Q.   Sorry, it would or would not?

A.   It would, yes.

Q.   And then did you test fire it as well with ammunition?

A.   Yes.

Q.   And what was the result?

A.   It fired automatically.

Q.   And did it work perfectly or somewhat less than perfectly?

A.   It was occasional.  Just, again, because of tolerances and hand fitting, sometimes they don't always work reliably.  And because of using the machine gun bolt carrier, I was getting some hammer follow, which is where the hammer is not retained and it just follows the bolt back into the battery, which caused some of the test fire not to work.

Q.   Did you later conduct an additional test fire of the lightning link that you cut from Exhibit 20A?  That was the first one.

A.   I'm sorry, what was that?

Q.   Did you later conduct an additional test fire of the first