No. 23-13062-DD

In the
# United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KRISTOPHER JUSTINBOYER ERVIN AND
MATTHEW RAYMOND HOOVER,

*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:21-CR-22-MMH-MCR-1

## BRIEF OF THE UNITED STATES

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

May 23, 2024

*United States v. Kristopher Justinboyer Ervin and Matthew Raymond Hoover*
No. 23-13062-DD

## Certificate of Interested Persons and Corporate Disclosure Statement

In addition to the persons identified in the Certificate of Interested

Persons and Corporate Disclosure Statement in the appellants' principal briefs,

the following persons and entities have an interest in the outcome of this case:

1.    Firearms Policy Coalition, *amicus curiae*;

2.    FPC Action Coalition, *amicus curiae*;

3.    Jaffe, Erik S., Esq.; and

4.    Sherrill, Miranda Cherkas, Esq.

No publicly traded company or corporation has an interest in the

outcome of this appeal.

## Statement Regarding Oral Argument

The United States does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument ............................................................... i

Table of Contents ............................................................................................ ii

Table of Citations ........................................................................................... v

Statement of Jurisdiction ............................................................................... xi

Statement of the Issue..................................................................................... 1

Statement of the Case ..................................................................................... 1

    *Course of Proceedings* ............................................................................. 3

    *Statement of the Facts*.............................................................................. 4

    I.     Background ...................................................................................... 4

    II.    Ervin begins advertising and selling the AutoKeyCard................. 8

    III.   Orders explode when Hoover begins promoting the AutoKeyCard as a lightning link on YouTube ........................... 16

    IV.  Trial and Sentencing .................................................................... 22

    *Standard of Review* .............................................................................. 27

Summary of the Argument ........................................................................... 28

Argument and Citations of Authority .......................................................... 31

    I.     Evidence supports each conviction ............................................. 31

A.    The jury reasonably found that Ervin had possessed unregistered machinegun-conversion devices and that Ervin and Hoover had transferred unregistered machinegun-conversion devices ............................................ 31

    (1)    *The government established each element of the charged offenses* ......................................................... 32

       (a)    *A combination of parts* ............................. 36

       (b)    *Designed and intended as a machinegun-conversion device* .................................... 38

       (c)    *Ervin and Hoover knew of the AutoKeyCard's relevant characteristics* ............................. 42

    (2)    *The jury reasonably rejected Hoover's and Ervin's argument that the AutoKeyCard was a single "homogenous" part* ................................... 44

    (3)    *The rule of lenity has no bearing here* ........................... 50

B.    The jury reasonably found that Ervin and Hoover had conspired to transfer unregistered machinegun-conversion devices ............................................... 51

C.    The jury reasonably found that Ervin had structured financial transactions to evade currency-reporting requirements ........................................................ 53

II.    The district court did not abuse its discretion by declining to issue the superfluous and misleading jury instruction that Hoover requested ...................................................... 55

III.    The NFA restrictions on machinegun-conversion devices are constitutional ......................................................... 57

   A.    "Machinegun" is not unconstitutionally vague ...................... 57

iii

B.    The Second Amendment does not prohibit the government from regulating machinegun-conversion devices ................................................................................. 62

C.    The First Amendment does not prohibit the government from regulating machinegun-conversion devices ................... 66

IV.    The district court was not required to recite each "standard" condition of supervised release separately at sentencing. The court did not plainly err by failing to do so ................................ 69

Conclusion ................................................................................................ 75

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

iv

# Table of Citations

## Cases

*Akins v. United States,*
  312 F. App'x 197 (11th Cir. 2009) ............................................................ 60

*Alleyne v. United States,*
  570 U.S. 99 (2013) ................................................................................. 48

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) .................................................................. 65

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) .................................................................... 50

*Club Madonna, Inc. v. City of Miami Beach,*
  42 F.4th 1231 (11th Cir. 2022) ........................................................... 67–68

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................... 64, 66

*FCC v. Fox TV Stations, Inc.,*
  567 U.S. 239 (2012) ................................................................................ 61

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ................................................................................ 61

*Johnson v. United States,*
  576 U.S. 591 (2015) ........................................................................... 58–59

*McDonnell v. United States,*
  579 U.S. 550 (2016) ................................................................................ 48

*Morford v. Cattelan,*
  No. 21-20039-CIV, 2023 WL 3971968 (S.D. Fla. June 12, 2023) .............. 68

*Muscarello v. United States,*
  524 U.S. 125 (1998) ..................................................................... 50, 51, 54

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ............................................................................... 62–66

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024)........................................................ 65

*Posters 'N' Things, Ltd. v. United States*,
    511 U.S. 513 (1994) ................................................................. 58

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019)............................................................. 35

*Riel v. City of Bradford*,
    485 F.3d 736 (3d Cir. 2007)..................................................... 67

*S.W. Daniel, Inc. v. United States*,
    831 F.2d 253 (11th Cir. 1987)......................................... 38–39, 50

*Staples v. United States*,
    511 U.S. 600 (1994) ........................................... 33–34, 36, 42, 61

*United States v. Bird*,
    79 F.4th 1344 (11th Cir. 2023)............................................53–55

*United States v. Bonilla*,
    579 F.3d 1233 (11th Cir. 2009)................................................ 71

*United States v. Campbell*,
    427 F.2d 892 (5th Cir. 1970) ................................................... 60

*United States v. Cruz-Valdez*,
    773 F.2d 1541 (11th Cir. 1985)................................................ 48

*United States v. Davis*,
    854 F.3d 1276 (11th Cir. 2017)................................... 27, 35, 45

*United States v. Diggles*,
    957 F.3d 551 (5th Cir. 2020) ................................................... 74

*United States v. Dodson*,
    519 F. App'x 344 (11th Cir. 2013) ........................................... 50

*United States v. Drapeau*,
    644 F.3d 646 (8th Cir. 2011) ................................................... 74

*United States v. Flowers,*
  No. 8:93-cr-84-T-17TGW, 2019 WL 5533148 (M.D. Fla. Oct. 25, 2019) .... 70

*United States v. Gaudin,*
  515 U.S. 506 (1995) ...................................................................... 49

*United States v. Gonzalez,*
  719 F.2d 116 (11th Cir. 1983)................................................33–34

*United States v. Greer,*
  850 F.2d 1447 (11th Cir. 1988)...........................................47–48

*United States v. Harmas,*
  974 F.2d 1262 (11th Cir. 1992)...........................................51–52

*United States v. Horner,*
  853 F.3d 1201 (11th Cir. 2017).................................27–28, 55–56

*United States v. Jernigan,*
  341 F.3d 1273 (11th Cir. 2003) .................................................. 35

*United States v. Kohler,*
  No. 8:15-cr-425-CEH-CPT, 2022 WL 780951 (M.D. Fla. Mar. 15, 2022)..... 70

*United States v. Kudalis,*
  429 F. App'x 165 (3d Cir. 2011) .............................................. 42

*United States v. Kuzma,*
  967 F.3d 959 (9th Cir. 2020) .................................................... 60

*United States v. Mata,*
  311 F. App'x 280 (11th Cir 2009) .......................................33–34

*United States v. Mena,*
  No. 23-10144, 2023 WL 7314349 (5th Cir. Nov. 6, 2023),
  *cert. denied*, 144 S. Ct. 1048 (2024) .......................................... 66

*United States v. Miller,*
  693 F.2d 1051 (11th Cir. 1982)................................................ 52

*United States v. Moore,*
  253 F.3d 607 (11th Cir. 2001)................................................... 44

vii

*United States v. Oudomsine*,
    57 F.4th 1262 (11th Cir. 2023) ....................................... 28, 69, 74

*United States v. Owens*,
    103 F.3d 953 (11th Cir. 19997) ................................................. 49

*United States v. Robinson*,
    No. 3:89-cr-74-J-32MCR, 2018 WL 4323838 (M.D. Fla. Sep. 10, 2018) .... 70

*United States v. Rodriguez*,
    75 F.4th 1231 (11th Cir. 2023) ............................................. 71–74

*United States v. Rogers*,
    94 F.3d 1519 (11th Cir. 1996) .................................................. 48

*United States v. Roy*,
    855 F.3d 1133 (11th Cir. 2017) ................................................. 45

*United States v. Ruiz*,
    253 F.3d 634 (11th Cir. 2001) .................................................. 49

*United States v. Spoerke*,
    568 F.3d 1236 (11th Cir. 2009) ................................................. 42

*United States v. Vazquez*,
    53 F.3d 1216 (11th Cir. 1995) .................................................. 55

*United States v. Williams*,
    784 F. App'x 694 (11th Cir. 2019) ............................................. 44

*United States v. Wilson*,
    979 F.3d 889 (11th Cir. 2020) ......................................... 33, 60–61

*United States v. Wright*,
    607 F.3d 708 (11th Cir. 2010) ................................... 28, 57, 62, 66

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ................................................... 50

*Watchtower Bible & Tract Soc'y of N.Y. v. Village of Stratton*,
    536 U.S 150 (2002) ............................................................. 67

**Statutes**

18 U.S.C. § 2 ................................................................................................. 3

18 U.S.C. § 371 ........................................................................................ 3, 51

18 U.S.C. § 922(o) ........................................................................................ 32

18 U.S.C. § 924 ............................................................................................ 58

18 U.S.C. § 3231 ........................................................................................... xi

18 U.S.C. § 3583(d) ..................................................................................... 72

18 U.S.C. § 3742(a) ...................................................................................... xi

26 U.S.C. § 5801 ............................................................................................ 7

26 U.S.C. § 5812 .......................................................................................... 31

26 U.S.C. § 5841 ..................................................................................... 3, 31

26 U.S.C. § 5841(b) ..................................................................................... 31

26 U.S.C. § 5845 ..................................................................................... 3, 31

26 U.S.C. § 5845(a)(6) .......................................................................7, 23, 31

26 U.S.C. § 5845(a)(7) ................................................................................. 12

26 U.S.C. § 5845(b) ................. 7–8, 23–24, 31–32, 38–39, 51, 56, 58–59, 62, 66

26 U.S.C. § 5845(j) ...................................................................................... 31

26 U.S.C. § 5861 .....................................................................................62, 66

26 U.S.C. § 5861(d) ................................................................................ 3, 31–32

26 U.S.C. § 5861(e) ...........................................................3, 31, 33–34, 65

28 U.S.C. § 1291 ........................................................................................... xi

31 U.S.C. § 5313(a) ..................................................................................... 53

31 U.S.C. § 5324 .......................................................................................... 53

31 U.S.C. § 5324(a)(3) ............................................................... 3, 53

**Rules**

Fed. R. App. P. 4(b)(1)(A) ............................................................ xi

**Other Authorities**

USSG §5D1.3(c) .......................................................... 69–70, 73

USSG §5D1.3(c)(1)–(13)............................................................ 69

## Statement of Jurisdiction

This is a joint appeal from final judgments of the United States District Court for the Middle District of Florida in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered judgment against Kristopher Justinboyer Ervin and Matthew Raymond Hoover on September 14, 2023. *See* Docs. 324, 327. Ervin timely filed his notice of appeal on September 19, 2023. *See* Doc. 331; Fed. R. App. P. 4(b)(1)(A). Hoover timely filed his notice of appeal the next day. *See* Doc. 333. This Court has jurisdiction over this appeal, *see* 28 U.S.C. § 1291, and authority to examine Ervin's challenge to his sentence, *see* 18 U.S.C. § 3742(a).

.

## Statement of the Issues

I.    Whether sufficient evidence supports Hoover's and Ervin's convictions for possessing and transferring unregistered machinegun-conversion devices and for related offenses.

II.   Whether the district court reasonably exercised its discretion not to issue a requested jury instruction.

III.  Whether Hoover and Ervin identify any constitutional infirmity in the statutory restrictions on machineguns and machinegun-conversion devices.

IV.   Whether the district court plainly erred at sentencing by orally adopting the court's "standard" conditions of supervised release, then listing each condition in the written judgment.

## Statement of the Case

Hoover and Ervin teamed up to sell unregistered machinegun-conversion devices in violation of the National Firearms Act. The devices consisted of two flat metal pieces that could be connected and dropped into a semiautomatic weapon to generate automatic fire. Ervin had the parts engraved on stainless steel cards, which he advertised as novelties, business cards, artwork, pen holders, and bottle openers, while attempting to convey

1

their true purpose more or less discreetly through emails and videos. He thought the government could not prove criminal intent if he kept it to himself—but he didn't. He admitted his intentions to a concerned friend, telling her not to worry because they were "in [his] head" and "nobody can get inside [my] head and know what [my] intention is unless [I] tell them."

Ervin paid Hoover to advertise the cards on his firearms YouTube channel. Hoover was even less discreet. He told viewers that each card contained "machinegun parts" and was itself a "machinegun" under the law. But "chains have been broken" for those who give "zero fuck[s]" about the law, Hoover prodded, so "you can do whatever the hell you want with a gun"—"why not ... make a machinegun?" He explained step-by-step how to cut out, assemble, and install the parts to "scratch your full-auto itch," acknowledging that it was illegal to do so, and instructing viewers to pretend the cards were just "bottle openers" if anyone asked.

A jury convicted both men of having possessed or transferred a combination of parts designed and intended as a machinegun-conversion device, in violation of the NFA, and of related offenses. At sentencing, the court called their scheme to sell the faintly disguised devices a gamble that failed. Their primary defense at trial and on appeal: there was no "combination of parts" because customers had to cut out the pieces themselves.

2

*Course of Proceedings*

The grand jury returned a series of indictments, culminating in a March 2023 fourth superseding indictment that charged Ervin and Hoover with seven counts of transferring, or aiding and abetting the transfer of, unregistered machinegun-conversion devices "consisting of a combination of parts designed and intended for use in converting a weapon into a machinegun," in violation of 26 U.S.C. §§ 5841, 5845, 5861(e) and 18 U.S.C. § 2 (counts 2–8), and conspiracy, in violation of 18 U.S.C. § 371 (count 1). Doc. 204 at 1–14.

Ervin was also charged with structuring financial transactions to evade currency reporting requirements, in violation of 31 U.S.C. § 5324(a)(3) (count 9), and with three counts of possessing unregistered machinegun-conversion devices, as defined in the previous counts, in violation of 26 U.S.C. §§ 5841, 5845, and 5861(d) (counts 10–12). *See* Doc. 204 at 14–16.

A jury convicted both men following a nine-day trial, Ervin of all counts (1–12), Doc. 263, and Hoover of counts 1, 2, 3, 5, and 7 (conspiracy and illegal transfers), but not of counts 4, 6, and 8 (illegal transfers), Doc. 264.

The court calculated a guidelines range of 121 to 151 months' imprisonment for both men. Doc. 329 at 59. Finding the guidelines "greater than necessary to accomplish the statutory purposes of sentencing," however, the court varied downward substantially, sentencing Ervin to 68 months in

3

prison and Hoover to 60 months. Doc. 330 at 29–32. The court imposed three years of supervised release for each defendant. *Id.* at 32.

*Statement of the Facts*

## I.    Background.

Ervin is a 44-year-old salesman and entrepreneur with some college education and no previous criminal history. *See* Ervin's PSR at 4, 14–17. Hoover is a 40-year-old gun enthusiast and former truck driver with a high school diploma, two young children, and no previous criminal history. *See* Hoover's PSR at 4, 9, 17. Before his arrest, Hoover was a federally licensed firearms dealer with a popular YouTube channel called "CRS Firearms." *Id.* ¶ 23, 91. Hoover's videos would play a pivotal role in the duo's crimes.

Their legal troubles began in 2020 when they crossed paths online and joined forces to advertise and sell these components of stainless-steel L-shaped brackets:



Doc. 259-171 at 4–6 (Gov. Ex. 64). Nearly 2,000 of Hoover's viewers and

4

others purchased at least one set between November 2020 and February 2021. *See* Doc. 281 at 108; Doc. 259-345 (Gov. Ex. 117).

Firearms enthusiasts would recognize the brackets as "lightning links." *See* Doc. 277 at 244–45 (testimony of ATF agent). Their purpose: to allow certain semiautomatic rifles to fire automatically. *Id.* Ervin called them "AutoKeyCards" and sold them as flat metal cards, like this, on his website:



Doc. 259-171 at 1 (Gov. Ex. 64). The cards came in a variety of sizes and configurations. *See* Doc. 259-339 at 1–7 (Gov. Ex. 114). The one shown here contains parts for three lightning links and, at the other end, a cutout that could be used to open a bottle.

Ervin had the cards manufactured at a machine shop in Jacksonville. *See* Docs. 259-160–62 (Gov. Exs. 57A-C) (invoices). He paid Hoover to advertise them on YouTube. *See* Doc. 259-30 at 5 (Gov. Ex. 16A) (Hoover explaining that Ervin paid him to do commercials and "sponsored [his] channel"); Doc.

281 at 32–82 (ATF research specialist describing the pair's extensive relationship).

By cutting out the shapes printed on the card, connecting the pieces as shown above, and inserting the resulting bracket into a compatible semiautomatic rifle, anyone could create a fully-automatic machinegun:



Doc. 259-171 at 7–8 (Gov. Ex. 64); *see* Doc. 277 at 244–45 (testimony of ATF agent). An ATF agent confirmed the AutoKeyCard's functionality by cutting out the pieces with a rotary tool, inserting them in a semiautomatic rifle, and firing at least six rounds in less than a second with a single pull of the trigger. *See* Doc. 259-170 (Gov. Ex. 63) (video); Doc. 283 at 146–68, 222–23 (agent's testimony). He had to remove burrs with a file and "hand fit[]" the device, *id*. at 149–50, 192–94, but the AutoKeyCard successfully converted the semiautomatic weapon to a fully-automatic machinegun, *id*. at 146–68, 222–23.

Ervin had at first told the machine shop that the AutoKeyCard was a

6

"tool," Doc. 280 at 27, then "artwork," *id*. at 56–57; *see also id*. at 110–111. He ordered 3,500 cards in three batches between September 2020 and January 2021. *See* Docs. 259-160–62 (Gov. Exs. 57A-C) (invoices). The shop was under the impression that the shapes would need to be cut out for use and was confused when Ervin rejected the suggestion to "tab" the shapes instead so they could be punched out by hand. Doc. 280 at 109–111. The shop eventually became "suspicious" that Ervin "wasn't [being] truthful about what [they] were manufacturing." *Id*. at 48. The president of the company confronted Ervin but still "did not get a clear answer about what [the AutoKeyCard] was." *Id*. at 49. He conducted a Google search, found Ervin's website, and learned the purpose of the card. *Id*. at 51–59. He promptly had the final batch of cards destroyed, returned Ervin's deposit, and "cut ties" with him. *Id*. The company was not willing to manufacture gun parts. *Id*. at 57–58.

Some background: A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(a)(6), (b). The National Firearms Act (26 U.S.C. § 5801, *et seq.*) regulates the possession and transfer of machineguns themselves and machinegun-conversion devices, including (1) "any part designed and intended solely and exclusively ... for use in converting a weapon into a machinegun,"

and (2) "any combination of parts designed and intended"—exclusively or not—"for use in converting a weapon into a machinegun." § 5845(b).

Ervin did not advertise the AutoKeyCard as a "machinegun-conversion device," per se. And he did not tell his customers to cut the pieces out (at least not in so many words). But as set out below, he managed to get the point across. And Hoover drove the point home, instructing his viewers how to cut out and assemble the lightning-link pieces, install them in a compatible semiautomatic rifle, and create a machinegun.

## II.    Ervin begins advertising and selling the AutoKeyCard.

We begin with Ervin. His website described the AutoKeyCard as a "business card," a "novelty," a "conversation piece," and "artwork."  Doc. 259-339 at 2 (Gov. Ex. 114). It advised customers not to "cut or alter [the] artwork in any way." *Id.* Ervin included the same disclaimers and caveats in marketing emails. *See* Doc. 259-184 at 2 (Gov. Ex. 67J). And some keycards included cutouts ostensibly functioning as "bottle openers" or "pen holders" (images on next page):



Doc. 259-339 at 1 (Gov. Ex. 114).

Ervin advertised the cards as having "Full Auto laser engraved *to scale* graphic design." Doc. 259-181 at 2 (Gov. Ex. 67G) (emphasis added).[1] The cards were identified as "1in1," "2in1," "3in1," because they contained the pieces needed to assemble one, two, or three lightning links, respectively. *See* Doc. 259-339 at 1 (Gov. Ex. 114). The machine shop had charged Ervin only $2–$3 per card, Doc. 280 at 32–43, yet Ervin's customers were willing to pay anywhere from $59 to $149, Doc. 259-339 at 1 (Gov. Ex. 114)—a margin of 1800%–7300%. And they paid substantially more for cards with pre-cut interior holes (the so-called "pen holders") or with multiple sets of brackets

---

[1] He later modified these marketing emails to say, "Full Auto laser engraved to scale graphic artwork logo design." Doc. 259-184 at 2 (Gov. Ex. 67J).

(which could be used to convert multiple weapons). *Id.*

Ervin was cagey when customers asked questions. They often wanted to know how to cut the AutoKeyCard and whether it would work with certain types of guns. *See, e.g.*, Doc. 259-194 (Gov. Ex. 67T) ("I know that you direct people to not cut it or alter it in any way shape or form, but if I was to do so, [in] what way would you, not recommend, but suggest, I do it?"); Doc. 259-201 (Gov. Ex. 67AA) ("Just wanted to check what lowers and trigger assemblies this worked with before I went ahead and bought it. Any other mods needed for it to work? Just started to look into the auto world."); Doc. 259-213 (Gov. Ex. 67MM) ("If someone wanted to remove the excess material so the bottle opener would fit in your pocket better, what would be the best method for doing so?"); Doc. 259-223 (Gov. Ex. 67WW) ("How do u cut it out? Especially the part in the middle? And how to install?"); Doc. 259-224 (Gov. Ex. 67XX) ("Will your product fit the Smith & Wesson M&P 15?"); Doc. 259-225 (Gov. Ex. 67YY) ("I just received my card ... Any suggestions on how to cut it out?"). One customer told Ervin he had "cut the part out [of his AutoKeyCard] but it will not allow me to run automatic." Doc. 259-227 at 1 (Gov. Ex. 67AAA). He asked if he was "doing something wrong?" *Id.*

Sometimes Ervin did not respond. When he responded, he steered customers to the information they needed without saying so directly. On

10

August 24, 2020, a "former Ranger" sought instructions for the AutoKeyCard. Doc. 259-179 (Gov. Ex. 67E) ("I have searched you tube and saw videos, but none indicate the specific use of the card ..."). Ervin told him "all NFA rules apply" and "unfortunately we cannot provide instructions as per the NFA." *Id*. Ervin said the AutoKeyCard was "a gray market item and that is the line we cannot cross." *Id*. Yet he acknowledged people may use the AutoKeyCard "in a different way [than intended]," and he recommended specific search terms—including "Lightning" and "Link"—to find out how:

> I can point you in the right direction so you can find the information on your own at your own risk. Do a Google-image search for different combinations of the terms "Lightning," "swift," "coat-hanger test," "Link," and any terms you discover along the way. The image search will help you greatly find general available schematic information. It is not difficult to find.

> The Auto Key Card is a conversation piece as sold and as with many legal products, illegal use can occur. Think of brass knuckles sold as paperweights. Please be smart and careful and don't get in any trouble. It is intended to stay in the sold-as form. Individuals may make the choice to use it in a different way under certain dire circumstance in the future.

*Id*.

Three weeks later, Ervin provided the same response to another customer seeking instructions. *See* Doc. 259-180 (Gov. Ex. 67F).

Two weeks after that, Ervin told another customer, "[Y]ou either get it or you have to do more research." Doc. 259-182 (Gov. Ex. 67H). "It is a gray

market item," "like a solvent trap, but not one of those." *Id*. (Solvent traps are often used as makeshift silencers (silencers likewise are restricted by the NFA). *See* 26 U.S.C. § 5845(a)(7); Doc. 278 at 96.) "Check out our videos on YouTube or the one on our website," Ervin advised, repeating his usual disclaimers that the AutoKeyCard "is designed and sold as a metal business card, a novelty, or a conversation piece." Doc. 259-182 (Gov. Ex. 67H) (further informing his customer, "I take mine out of my wallet at the range to bring up interesting conversations with like-minded freedom loving individuals").

It is not clear which videos Ervin meant, but a friend testified that Ervin had created social-media advertisements with images of the card interspersed between loud bursts of automatic gunfire, suggesting the AutoKeyCard's purpose. *See* Doc. 280 at 205–06 (testimony); Docs. 259-121–24 (Gov. Exs. 49A-D) (videos from Ervin's phone). Some videos included the usual disclaimers ("DO NOT CUT!" "NOVELTY AND CONVERSATION PIECE ONLY!") while showing guns, automatic gunfire, and shell casings. *See, e.g.*, Doc. 259-122 (Gov. Ex. 49B) (29-second advertisement). But at least one video had no disclaimers—just 36 seconds of automatic gunfire and images of the AutoKeyCard (screen captures on next page):



Doc. 259-123 (Gov. Ex. 49C).

The same friend told Ervin that her teacher thought Ervin would "go to jail" for selling the AutoKeyCard. Doc. 280 at 219–220 (testimony); Doc. 259-167 at 10 (Gov. Ex. 59) (text messages). Ervin told her not to worry: "nobody can prove your intent because it's ... in your head," and "[n]obody can get inside your head and know what your intention is unless you tell them." Doc. 280 at 221; Doc. 259-167 at 11 (Gov. Ex. 59). Ervin claimed he would not be responsible if the ATF found a gun that had been converted with an AutoKeyCard because "they don't arrest car makers when someone gets run over." *Id.* at 11–12. "Rules followers will never understand," he told his friend. *Id.* at 13. "They believe in the tyrant's false authority." *Id.*

Ervin's friend was not the only one to warn him that he was walking a

dangerous line. In November 2020, the e-commerce platform Shopify informed Ervin he could no longer use their payment-processing system because the AutoKeyCard "and its intended use are not supportable through Shopify payments," and "potentially not on Shopify either." Doc. 259-175 at 1 (Gov. Ex. 67A) (flagging for further review by Shopify's legal department). A week later, Shopify determined that Ervin was "in violation of the Restricted Items section of Shopify's [authorized-use policy]"—specifically, the portion of the policy covering firearms and firearm parts—and shut down his store. Doc. 259-195 (Gov. Ex. 67U); Doc. 259-232 (Gov. Ex. 70).

When Ervin resumed sales on a new website, one of Hoover's YouTube viewers warned, "[H]ave fun when the ATF seizes your bank account and you have to hire a lawyer." Doc. 259-267 (Gov. Ex. 90F). In January 2021, a customer canceled an order, telling Ervin that "further reading and information from Google showed this to be a[n] item that should not be in possession of [*sic*]." Doc. 259-209 (Gov. Ex. 67II).

Ervin deposited proceeds from AutoKeyCard sales into a personal checking account at Community First Credit Union. *See* Doc. 279 at 145–52, 170. He withdrew $68,000 in seven transactions of $9,000 and one transaction of $5,000 on seven dates between December 28, 2020 and January 6, 2021. *See* Doc. 259-302 at 22–26 (Gov. Ex. 95C) (bank records); Doc. 204 at 15

(indictment). He had become upset on that first date because the credit union would not accept for deposit a check made out to "Auto Key Card." Doc. 279 at 170–71. He threatened to take his business elsewhere and demanded "to take all of his money out in cash." *Id.* There was about $60,000 in his account at the time. *See* Doc. 259-302 at 22 (Gov. Ex. 95C). The teller informed Ervin that, "because of the amount," he would need to submit a "special order" to schedule a withdrawal the following week. Doc. 279 at 171. Or, the teller eventually offered, "we can give you $10,000" today. *Id.*

Banks are required to report to the IRS cash transactions greater than $10,000. *See* Doc. 279 at 161, 188. Ervin had earlier asked "what the dollar amount is as far as reporting goes?" but the teller had not divulged it because she was "not allowed to." *Id.* at 162–63; *id.* at 197 (clarifying that Ervin had asked about the reporting threshold before the "incident" on December 28). Nevertheless, when the teller later said Ervin could withdraw $10,000, Ervin eventually decided, "No, give me $9,000 [and] I'll just come back every day or try other branches until I get all my money." *Id.* Ervin tried to withdraw $9,000 from another branch later the same day but settled for $5,000 because that branch did not have enough cash on hand. *Id.* at 206–07. He then returned to the first branch on December 29, December 30, December 31, January 2, January 5, and January 6 to make six more withdrawals of $9,000 each day.

15

*See* Doc. 259-302 at 22–26 (Gov. Ex. 95C).

### III.    Orders explode when Hoover begins promoting the AutoKeyCard as a lightning link on YouTube.

We turn next to Hoover's involvement. He began advertising the AutoKeyCard on his YouTube channel in November 2020. *See* Doc. 259-1 (Gov. Ex. 1) (video). He was less subtle than Ervin. His first sponsored video was entitled "Is this an ATF trap and how does it work?" *Id.*; *see* Doc. 259 at 1 (exhibit list). The video starts with Hoover flashing a handful of AutoKeyCards and announcing, "[I]f you clicked on this video, you're probably curious" (1) "is the lightning link an ATF trap?" and (2) "how does it work?" Doc. 259-1 (Gov. Ex. 1). He begins by identifying six ways to "experience full auto," holding up a whiteboard with the following list: (1) purchase a binary trigger; (2) purchase a transferrable machinegun; (3) become a "SOT" (a special occupational taxpayer, licensed to manufacture or deal in NFA firearms); (4) make your own trigger; (5) rent a machinegun; and (6) "zero fuck given." *Id.* The last option encompasses using coat hangers, swift links, lightning links, and drop-in auto sears. *Id.*

Hoover discusses pros and cons of the first five options, then explains that the sixth option—the "zero fuck given" one—means "your chains have been broken" and "you can do whatever the hell you want with a gun," so

16

"why not ... make a machinegun?" Doc. 259-1 (Gov. Ex. 1). He picks up an AutoKeyCard and shows it to the camera. *Id.* "These are an excellent conversation piece!" he says. *Id.* "They're cool. It's a novelty item." *Id.* "This particular one is actually a beer opener that has the designs on it." *Id.* (showing to camera). He assures his viewers it would be "ridiculous" for an "ATF agent walk into a courtroom and argue that this piece of metal with a drawing on it is a machinegun," though he predicts "they will probably do that at some point in time." *Id.*

Going on to explain how a coat hanger or swift link could be used to convert certain bolt carriers to fully automatic, Hoover then tells his viewers the AutoKeyCard will work with "the Colt original SP1" bolt carrier. Doc. 259-1 (Gov. Ex. 1).[2] "[Y]ou would cut this out, this piece right here," he says (pointing at one of the shapes on the AutoKeyCard), and it "would fit in this slot right here" (pointing at the other piece), indicating how to assemble the bracket. *Id.* He then demonstrates how to install the bracket, showing his viewers how it should fit over the bolt carrier, again calling it a lightning link. *Id.* And he explains how the lightning link interacts with the bolt and hammer

---

[2] The ATF agent who cut out and verified the AutoKeyCard tested it successfully with both an SP1 bolt carrier and an M16 bolt carrier, although it functioned less reliably with the SP1. *See* Doc. 283 at 146–68, 208–09, 222–23.

to generate automatic fire. *Id.*

After teaching his viewers how to create a machinegun with the AutoKeyCard, Hoover cautions them, "[I]f you're going to do this legally, [the AutoKeyCard] is just the bottle opener"—"a novelty." *Id.* He advises them to tell anyone who sees the AutoKeyCard, "[B]ecause laws are so ridiculous and so out of control, if I were to cut on these lines, I would become a felon—how ridiculous is that?" *Id.* Yet Hoover reiterates that the main benefit of the AutoKeyCard is its supposed ability to temporarily convert a semiautomatic firearm to fully automatic without turning the gun itself a machinegun; "this," he says, "is the only machinegun," pointing again to the AutoKeyCard. *Id.*

Hoover posted a second sponsored video a week later, this one entitled "The parts the ATF wishes never existed." *See* Gov. Ex. 259 at 1 (exhibit list); Gov. Ex. 259-3 (Gov. Ex. 2) (video). This video explains eight ways to create machineguns or silencers. *Id.* "Number one on the list" is the AutoKeyCard, which Hoover again calls "the lightning link." *Id.* He says the difference between the AutoKeyCard and "the old lightning link"—which had "caused problems"—is that the AutoKeyCard is "not cut out." *Id.* (displaying picture of older version with tabbed pieces, as Ervin's machine shop had suggested for the AutoKeyCard). All you had to do with the old lightning link, Hoover explains, was pop the pieces out, and "boom, you have a machinegun." *Id.*

18

The AutoKeyCard, by contrast, Hoover says, is "just a drawing on a piece of stainless steel"—"*you* have to manufacture it." *Id.* "One of the cool things about the lightning link," he brags, is "you can drop them in your receiver, scratch your full-auto itch, throw it away when you're done, [and] no one's the wiser." *Id.* But he warns viewers not to "go on the internet and upload videos with you using this." *Id.* At the beginning of this video, as a preface to his lecture on creating a machinegun with the AutoKeyCard, Hoover had encouraged his viewers to "openly def[y] the law," admonishing that "laws only work if we follow them," and that, "if there's zero compliance, they have to be removed because what's the point then," "kind of like, why dope's slowly becoming legal." *Id.*

A third sponsored video followed on December 4, 2020. In this one, Hoover explains that Ervin had had to change his payment processor and the domain name of his website because "there are a lot of people that believe strongly he should not be selling [these] things." *See* Gov. Ex. 259 at 1 (exhibit list); Gov. Ex. 259-5 (Gov. Ex. 3) (video); Gov. Ex. 259-6 (Gov. Ex. 3A) (transcript). Ervin had announced the new website a few days earlier in a comment on Hoover's previous video ("The parts the ATF wishes never existed"), posted under a screenshot captioned "homemade machine gun." Doc. 259-264 (Gov. Ex. 90C).

19

Hoover would go on to post eight more sponsored videos advertising the AutoKeyCard between December 4, 2020, and February 25, 2021. *See* Doc. 259-7 (Gov. Ex. 4); 259-9 (Gov. Ex. 5); 259-11 (Gov. Ex. 6); 259-13 (Gov. Ex 7); 259-15 (Gov. Ex. 8); 259-17 (Gov. Ex. 9); 259-19 (Gov. Ex. 10); 259-21 (Gov. Ex. 11). He directs his viewers to Ervin's website in each video. *Id.* Ervin had been selling the AutoKeyCard for about three months before he joined forces with Hoover. *See* Doc. 259-345 (Gov. Ex. 117). Sales skyrocketed starting with Hoover's first video—from a handful of orders per week to dozens per day. *Id.*

Meanwhile, ATF had begun to investigate Ervin following a tip from his credit union. *See* Doc. 277 at 241–42. The credit union's fraud investigator had discovered Ervin's website and was "concerned that [he] was selling items that may be used to convert an AR-15 rifle into a machinegun." *Id.* at 242. An undercover ATF agent purchased an AutoKeyCard and confirmed it functioned as a lightning link. *See* Doc. 277 at 246–58; Doc. 278 at 13–14; Doc. 283 at 158–68, 222–23. Agents arrested Ervin and searched his home on March 2, 2021. *See* Doc. 278 at 14; Doc. 279 at 97. He was indicted on March 11, 2021. *See* Doc. 17 (original indictment).

In between Ervin's arrest and indictment, Hoover posted another video, this one entitled "Auto Key Card got raided." Doc. 259-24 (Gov. Ex. 12A)

20

(transcript). "[T]he unthinkable happened," Hoover announces. *Id.* at 1. "I'll wait a second while you give me your 'I told you so's.'" *Id.* "The person that manufactures and distributes and sells the Auto Key Card, which would be Justin S. Ervin[,] ... got picked up Tuesday." *Id.* Hoover explains that he and Ervin "talk almost on a daily basis" but he "hadn't heard from him in awhile," so he asked around and someone told him Ervin had been arrested by ATF. *Id.* at 1–2. Hoover correctly surmises that Ervin's arrest must have had something to do with the AutoKeyCard, but he predicts it will be difficult to prove that Ervin "intended for people to cut out the [AutoKeyCard] and make lightning links"—despite Hoover's having said over and over in previous videos that the AutoKeyCard was exactly a lightning link. *Id.* at 2–3. Hoover admits that a lawyer advised him that his videos could be evidence of intent. *Id.* Still, he says it would be "next to impossible to prove" that he knew people were going to cut them out (as he had instructed them to do). *Id.* at 4. "I would most definitely go to jury trial," Hoover says, "and I would make a circus out of it." *Id.* at 5. Turning to his viewers and customers, Hoover warns, "[D]on't order any [AutoKeyCards] if you haven't already" and "shut your mouth" if the ATF shows up at your house—"[d]on't let them talk your way into getting arrested." *Id.* at 5–6.

Hoover followed up with another video on March 28, 2021, encouraging

viewers to donate to a fundraising campaign he had started for Ervin's legal expenses. *See* Doc. 259-26 at 3–4 (Gov. Ex. 14A). In that video, Hoover describes the AutoKeyCard as a great source of "machinegun parts" for SOT (special occupational taxpayer license) holders like himself.  *Id*. at 3.

Ervin called Hoover from jail on March 30, 2021. *See* Docs. 259-32, 34, 36 (Gov. Exs. 17.1A–3A) (transcripts). They discussed the progress of Hoover's fundraising campaign. *See* Doc. 259-32 at 2 (Gov. Ex. 17.1A); Doc. 259-34 at 1 –2 (Gov. Ex. 17.2A). Hoover told Ervin he was working on getting other content creators to make "positive videos" about the case. *Id.* at 3–4. Then, about ten months later, Hoover too was indicted. *See* Doc. 57; Hoover's PSR at 2.

### IV.   Trial and sentencing.

Ervin and Hoover moved unsuccessfully to dismiss the first, second, and third superseding indictments. *See* Docs. 30, 45, 95, 101, 132, 133, 141. A nine-day trial followed. *See* Docs. 277–85 (transcripts). Twenty-nine witnesses testified against them, including seven ATF agents, three postal inspectors, and eight customers who had purchased the AutoKeyCard. *Id*.  Ervin and Hoover called no witnesses and moved for judgment of acquittal, which the court took under advisement. *See* Doc. 283 at 229–38.

The jury instructions on the firearm counts were an issue. Instructions

#14 and #18 are relevant on appeal. *See* Doc. 254 at 18–19, 25–26 (issued instructions). They explained what a machinegun-conversion device is and set out the government's burden to prove that the defendants knowingly possessed or transferred such a device. *Id.*; *see* 26 U.S.C. § 5845(a)(6), (b). The parties largely agreed on the substance of both instructions. *See* Doc. 261 at 22–23, 29–30 (court's proposed instructions, closely tracking the issued instructions); Doc. 283 at 10–28, 34–38, 238–244 (charge conference). The main dispute concerned the statutory distinction between, on one hand, a singular part designed and intended "solely and exclusively" for automatic conversion, and, on the other hand, a "combination of parts" designed and intended for automatic conversion (exclusively or not). 26 U.S.C. § 5845(b). The central part of the court's proposed instructions stated that the defendants could be found guilty "only if all the following facts are proved beyond a reasonable doubt" for each offense:

(1)   Each defendant knowingly transferred, aided and abetted the transfer of, or possessed a "firearm."

(2)   The firearm was unregistered.

(3)   Each defendant "knew of the specific characteristics or features of the firearm that made it subject to registration ...."

Doc. 261 at 22–23, 29–30 (proposed instructions). The court intended to separately explain, earlier in instructions #14 and #18, that "firearm" includes

"a machinegun conversion device consisting of a *combination of parts* designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger"— tracking the language in the indictment and the "combination of parts" prong of section 5845(b). *Id.* (emphasis ours).

Ervin and Hoover did not object to any of this, but they requested an additional instruction expressly distinguishing the singular-part prong of section 5845(b). *See* Doc. 283 at 15–28, 242–243. They suggested instructing the jury, "[I]f you find that the defendant transferred a singular part rather than a combination of parts you should find the defendant not guilty," *id.* at 16, or "[T]o convict, you must find that ... each item alleged in the indictment was a combination of parts rather than a single part," *id.* at 25. They argued this was necessary because an ATF agent had testified that "a singular part can be a machine gun," although "the government has not traveled under that theory." *Id.* at 21; *see* Doc. 282 at 236–37 (relevant testimony and defendants' objections).

After extensive discussion, the court agreed that section 5845(b) presented a "binary choice" between conversion devices containing a singular part and those containing a combination of parts. Doc. 283 at 241–42. Nevertheless, the court declined to instruct the jury as defendants requested,

24

because their proposed instructions would be redundant and would

misleadingly suggest that a single AutoKeyCard could not be a "combination

of parts" under any circumstances:

> [T]he way ... that you've asked ... me to instruct the jury suggests that if it's a single item ... at the time of transfer, that that, by definition, cannot be a combination of parts. And that's what I think is misleading to the jury.

> And so my effort to clarify that is that in this instruction, both this—both in Jury Instruction No. 14 and in Jury Instruction No. 18, the jury is going to be told three separate times—that is, by the time I finish reading the instructions they're going to have been told six times—that it has to be a combination of parts.

> If you can't argue that it's not a single part from that, that's not a failure of the instructions ... They have been clearly instructed that the only way the defendants can be convicted in this case is if the government proves beyond a reasonable doubt that the item that was conspired to be transferred, that was transferred, or that was possessed is a combination of parts designed and intended for use in converting a weapon.

> So to the extent that you-all want the ... single part rather than a combination of parts [instruction], I decline to give that instruction.

Doc. 283 at 241–42. The court reminded the defendants, however, that they

were "free to argue ... that what the defendants transferred was not a

combination of parts; it was a single piece of metal steel." *Id*. And the court

addressed their concerns by reiterating three times in instruction #14 and three

more times in instruction #18 that the government had to prove that the

alleged machinegun-conversion device consisted of a "combination of parts"

(as stated in the indictment). *See* Doc. 254 at 18–19, 25–26. The issued

instructions repeated this requirement as part of the elements of each offense.

*Id*.

The jury found Ervin guilty on all counts (1–12). Doc. 263. It found

Hoover guilty on counts 1, 2, 3, 5, and 7 (conspiracy and four illegal transfers)

but acquitted him on counts 4, 6, and 8 (illegal transfers). Doc. 264. The court

then denied their motions for judgment of acquittal but invited them to file

renewed motions. Doc. 285 at 20–21. They did, Docs. 273–74, which the court

likewise denied, Doc. 310.

At sentencing, the court varied downward significantly, as stated above,

and also advised Hoover and Ervin that they "will be required to serve a term

of supervised release of three years," during which they "will be required to

comply with the standard conditions of release adopted in the Middle District

of Florida, as well as certain special conditions." Doc. 330 at 32. The written

judgments list 13 "standard conditions of supervision." *See* Doc. 324 at 6–7

(Ervin's judgment); Doc. 327 at 5–6 (Hoover's judgment).

Addressing complaints about the defendants' prosecutions, the court

acknowledged that Hoover is a "family man" who loves his wife and children,

but admonished, "[Y]ou can't be there for them if you break the law"; "it's just

a reality." Doc. 330 at 27–28. The court similarly advised Ervin, "[Y]ou are a

young man," an "entrepreneur," who can do "a lot ... with your future," but "you're going to have to recognize that it was what you did" and "choices you made" that "caused this prosecution," because "what you did was illegal and you knew it when you were doing it." *Id.* at 28. "[N]obody targeted you" and "[n]obody sought to hurt your family or your friends," the court explained. *Id.* "The evidence showed that you came before this Court because of your actions," and "your knowledge of the illegality of your actions was evident in your desire to distance yourself from the [AutoKeyCards]." *Id.* at 28–29. The court called the defendants' scheme to manufacture, advertise, and sell the faintly disguised devices "a gamble" that "failed." *Id.* at 29. "[Y]our incarceration," the court admonished, "is a consequence of that failed gamble," not of anything else. *Id.*

## Standard of Review

I.     This Court should review *de novo* whether the evidence was sufficient to sustain Ervin's and Hoover's convictions, "view[ing] the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility determinations in favor of the jury's verdict." *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017).

II.    This Court should review for abuse of discretion the district court's refusal to issue Hoover's requested jury instruction. *See United States v. Horner*,

853 F.3d 1201, 1208 (11th Cir. 2017).

III.    This Court should review *de novo* Ervin's and Hoover's

constitutional challenges. *See United States v. Wright*, 607 F.3d 708, 715 (11th

Cir. 2010).

IV.    This Court should review the "standard" conditions of supervised

release for plain error because Ervin raised no objection to the court's oral

pronouncement at sentencing that he would have to abide by those conditions.

*See United States v. Oudomsine*, 57 F.4th 1262, 1264 (11th Cir. 2023).

## Summary of the Argument

I.    Evidence supported each conviction. The jury reasonably

concluded from the evidence presented that the government had proven each

element of each offense beyond reasonable doubt. Hoover and Ervin do not

dispute that they possessed or transferred unregistered AutoKeyCards on the

alleged dates, as the evidence showed. Evidence further showed that the

AutoKeyCard was a machinegun-conversion device containing a combination

of parts designed and intended for use in converting a weapon into a

machinegun—that is, a weapon that shoots, or is designed to shoot,

automatically more than one shot, without manual reloading, by a single

function of the trigger. That Ervin had designed the pieces to be cut out by his

customers does not mean they were not a "combination of parts." At the very

28

least, the jury's finding that they were a combination of parts was not unreasonable under the deferential standard of appellate review. The cards themselves, Ervin's advertisements and his statements to customers, and Hoover's YouTube videos amply demonstrated a combination of parts designed and intended to convert semiautomatic weapons to fire automatically. Much of the same evidence reasonably supported Ervin's and Hoover's conspiracy convictions.  And the jury was entitled to infer from bank records and the teller's testimony that Ervin had structured eight cash withdrawals of $5,000–$9,000 each to evade the currency-reporting requirement for transactions exceeding $10,000.

II.    The district court did not abuse its discretion by declining to instruct the jury that it should acquit if it found that the AutoKeyCard was a "single part." The instruction was redundant because the court separately instructed the jury, six times, that it could not convict unless it found that Hoover and Ervin had transferred or possessed a machinegun-conversion device comprising a "combination of parts." Moreover, the requested instruction could have confused and misled the jury. A reasonable jury could have found both that the AutoKeyCard itself was a "single part" but also that it contained or included the requisite "combination of parts." It would have been wrong to suggest that the jury had to acquit in that circumstance.

29

III.    Hoover and Ervin identify no constitutional infirmity. First, the NFA's definition of "machinegun" is not unconstitutionally vague. It is reasonably clear and definite. An ordinary person of normal intelligence should understand what it means. The defendants identify no case in which this Court or any other has ever suggested that the machinegun definition or any other part of the NFA should be void for vagueness. Second, the Second Amendment does not prohibit the government from regulating the possession and transfer of "dangerous and unusual" weapons like machineguns and machinegun-conversion devices. Third, Hoover and Ervin do not explain how the machinegun restrictions implicate the First Amendment. To the extent that these restrictions may be thought to incidentally affect speech, Hoover and Ervin do not dispute that the restrictions are reasonably tailored to the substantial governmental interest of regulating dangerous and unusual weapons.

IV.    The district court did not err by collectively imposing at sentencing the "standard" conditions of supervised release in this district, then listing them separately in the written judgment. The standard conditions in the written judgment match the standard conditions routinely imposed in this district, which are codified in USSG §5D1.3(c). Ervin had notice and an opportunity to object or seek clarification if he was confused about which

30

conditions were "standard." The written judgment clarified, and did not contradict, the court's statement at sentencing.

## Argument and Citations of Authority

### I.    Evidence supports each conviction.

**A.    The jury reasonably found that Ervin had possessed unregistered machinegun-conversion devices and that Ervin and Hoover had transferred unregistered machinegun-conversion devices.**

The National Firearms Act (26 U.S.C. § 5801, *et seq.*) requires certain firearms, including some parts, to be registered in the National Firearms Registration and Transfer Record. *See* 26 U.S.C. §§ 5841, 5845. And it prohibits possessing an unregistered firearm covered by the Act. 26 U.S.C. § 5861(d). Section 5861(e) prohibits transferring a covered firearm "in violation of the provisions of this chapter." § 5861(e). Those provisions include a variety of tax and recordkeeping requirements, § 5812, one of which is that "[e]ach firearm transferred shall be registered to the transferee by the transferor," § 5841(b). "Transfer" includes "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of" a covered firearm. § 5845(j).

A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. §§ 5845(a)(6), 5845(b). The NFA covers machineguns themselves and machinegun-

conversion devices, including (1) "any part designed and intended solely and exclusively ... for use in converting a weapon into a machinegun," and (2) "any combination of parts designed and intended"—exclusively or not—"for use in converting a weapon into a machinegun." § 5845(b).[3]

Hoover says "no court has ever applied the National Firearms Act to a fact pattern like this one." Hoover's brief at 26. We do not know if any other court has addressed such brazen attempts to circumvent the NFA in precisely this way—by disguising a machinegun-conversion device as a "bottle opener" or "pen holder" and calling it "art." That much may be true.

The "combination of parts" requirement is the main issue on appeal. We address below the argument that the AutoKeyCard was a single part, and Hoover's and Ervin's other arguments. First, we will explain the elements of their offenses and the evidence of each element.

*(1)*     ***The government established each element of the charged offenses.***

Section 5861 specifies the elements of each offense. The Supreme Court has inferred an additional *mens rea* requirement for one element. In 1994, the Court noted that, although section 5861(d) "does not require proof of

---

[3]Machineguns and conversion devices manufactured after May 19, 1986, may be possessed or transferred only by "a government entity or ... someone who is engaged in the business of importing, dealing, or manufacturing NFA firearms." Doc. 282 at 234–35; *see* 18 U.S.C. § 922(o).

knowledge that a firearm is *unregistered*," that "suggests no conclusion concerning whether [the statute] requires the defendant to know of the features that make his weapon a statutory 'firearm.'" *Staples v. United States,* 511 U.S. 600, 609 (1994) (emphasis in original). *Staples* holds that, to obtain a conviction under section 5861(d), the government must prove that the defendant "knew of the features of his [firearm] that brought it within the scope of the Act." *Id.* at 618.

After *Staples*, the elements of section 5861(d) are: (1) that the defendant possessed a firearm covered by the NFA; (2) that the defendant knew the features of the firearm that brough it within the scope of the NFA; and (3) that the firearm was not registered to the defendant. *United States v. Wilson*, 979 F.3d 889, 903–04 (11th Cir. 2020). This constitutes illegal possession of a firearm under the NFA.

We have found no appellate case directly applying *Staples* to section 5861(e) (illegal transfer), but this Court has suggested that it applies with equal force. *See United States v. Mata*, 311 F. App'x 280, 285 (11th Cir 2009) (noting that earlier case, which had set out two elements for section 5861(e), was overruled in part by *Staples*); *United States v. Gonzalez*, 719 F.2d 116, 1522 (11th Cir. 1983) (earlier case stating that elements of section 5861(e) were "(1) that [the defendant], at or about the time and place charged in the indictment,

33

knowingly transferred an automatic weapon, and (2) that the automatic weapon was not then registered to [him]"). Taken together, *Staples*, *Gonzalez*, and *Mata* suggest the following elements for a section-5861(e) offense: (1) that the defendant knowingly transferred a covered weapon, (2) that the weapon was not then registered to him, and (3) that the defendant knew the features of the weapon that brought it within the scope of the NFA. This constitutes illegal transfer of an NFA firearm. That's how the court instructed the jury in this case. *See* Doc. 253 at 18–19.

The jury convicted Ervin of transferring or aiding and abetting the transfer of unregistered machinegun-conversion devices on seven occasions (counts 2–8) and possessing unregistered machinegun-conversion devices on three occasions (counts 10–12). *See* Doc. 263 at 1–5. The jury convicted Hoover of transferring or aiding and abetting the transfer of unregistered machinegun-conversion devices on four occasions. *See* Doc. 264 at 1–4 (counts 2, 3, 5, and 7).

Hoover and Ervin do not challenge the court's aiding-and-abetting instructions. *See* Doc. 253 at 21. And they do not dispute that they transferred (either directly or by aiding and abetting) or possessed unregistered AutoKeyCards on the alleged dates. Evidence showed that they did. *See, e.g.,* Doc. 278 at 212–222 (no relevant registrations); Doc. 281 at 32–82 (Hoover's

and Ervin's complicity); Doc. 282 at 38–214 (customers' testimony). They have implicitly conceded it at trial and in their appellate briefs. *See* Doc. 284 at 79–101 (Hoover's closing argument); *id*. at 107–166 (Ervin's closing argument); *see also* Ervin's and Hoover's briefs. Issues not raised in an appellant's opening brief are abandoned. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003), *abrogated on other grounds by Rehaif v. United States*, 139 S. Ct. 2191 (2019). The only question of proof regarding the firearms offenses, then, is whether the government presented adequate evidence from which the jury could have found that the AutoKeyCard is a machinegun-conversion device under the NFA. *See* Hoover's brief at 16–53; Ervin's brief at 34–39.

This Court reviews *de novo* whether the evidence was sufficient to sustain a conviction, "view[ing] the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility determinations in favor of the jury's verdict." *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017) (internal quotation marks omitted). The "ultimate question is whether a reasonable trier of fact could have found guilt beyond a reasonable doubt." *Id*. (internal quotation marks omitted).

This is not a close call under the deferential standard of appellate review. Unambiguous evidence showed what the AutoKeyCard was designed and

intended to do, notwithstanding Hoover's and Ervin's attempts to cloak its purpose. It was not unreasonable for the jury to find that it was a "combination of parts designed and intended for use in converting a weapon into a machinegun," 26 U.S.C. § 5845(b), as alleged in the indictment, and that Hoover and Ervin "knew of [its relevant] features"—that is, the ones that "brought [the AutoKeyCard] within the scope of the [NFA]," *see Staples*, 511 U.S. at 618.

*(a)    A combination of parts.*

First, the jury reasonably found that the AutoKeyCard contained or included a combination of parts. *See* Doc. 254 at 18–19, 25–26 (jury instructions repeating "combination of parts" requirement). Combination means "a number of things combined." Dictionary.com, *available at* http://dictionary.com/browse/combination (last visited May 23, 2024). An ATF agent cut and assembled a functional lightning link from an AutoKeyCard purchased from Ervin. *See* Doc. 283 at 146–68, 192–94, 208–09, 222–23 (explaining how he successfully tested the device with two different bolt carriers); Doc. 259-170 (Gov. Ex. 63) (video). The assembled device was an L-shaped bracket consisting of two parts (images on next page):



Doc. 259-171 at 4–6 (Gov. Ex. 64). Each piece was drawn to scale separately on the AutoKeyCard. *See, e.g., id.* at 1. The agent cut the discrete pieces with a Dremel tool by following the distinct outlines on the card, and then connected them. *See* Doc. 283 at 150–51.

Ervin labeled each AutoKeyCard to indicate how many sets of lightning-link pieces it contained. The "1in1" version contained one set (two pieces); the "2in1" version contained two sets (four pieces); and the "3in1" version contained three sets (six pieces). *See* Doc. 259-339 at 1 (Gov. Ex. 114).

Hoover taught his viewers how to cut and assemble the parts to make a lightning link, pointing out each piece and explaining how to connect them: "you would cut this out, this piece right here" (pointing at one piece) and it "would fit in this slot right here" (pointing at the other piece). Doc. 259-1 (Gov. Ex. 1). And he told his viewers the AutoKeyCard was a great source of "machinegun *parts*." Doc. 259-26 at 3–4 (Gov. Ex. 14A) (emphasis added).

That it took some work to accomplish this result doesn't change things.

For one thing, separating the parts (and then recombining them) was doable, in as little as 37 minutes, even by an ATF agent with no metalworking expertise who was attempting it for the first time. *See* Doc. 283 at 149–50, 192, 210. The defendants and their customers recognized this. And for another, this Court has already recognized that the jury may make this finding even if the conversion "would only be done in extreme cases and by skilled individuals" (which was not even the case here). *S.W. Daniel, Inc. v. United States*, 831 F.2d 253, 254 n.2 (11th Cir. 1987) ("this court finds that the frequency or likelihood of conversion is irrelevant under the fourth definition in section 5845(b)"). This jury reasonably found "a combination of parts"—that is, a number of parts combined—from the evidence presented.

*(b)    Designed and intended as a machinegun-conversion device.*

Second, the jury reasonably found that the AutoKeyCard was designed and intended, at least in part, to convert a semiautomatic firearm to a machinegun; not strictly as a business card, artwork, or anything else. *See* Doc. 254 at 18–19, 25–26 (jury instructions repeating "designed and intended" requirement). Nothing more needed to be shown about the purpose of the card. Congress defined "machinegun" to include either a single part designed and intended "solely and exclusively" for use in converting a weapon into a machinegun, *or a combination of parts designed and intended for that purpose to any*

*degree*. § 5845(b). The indictment alleged that Hoover and Ervin had illegally transferred machinegun-conversion devices consisting of a "combination of parts." *See* Doc. 204 (counts 2–8). So, it made no difference whether the AutoKeyCard served other purposes in addition to machinegun-conversion device.

Evidence showed the AutoKeyCard was designed and intended as a functional lightning link, even if it also functioned as a bottle opener, pen holder, or legitimate form of art or political statement (which is dubious). Ervin named his product the *Auto*KeyCard, suggesting its nature and purpose. *See* Doc. 259-339 at 1 (Gov. Ex. 114) (website). He advertised that it had "Full Auto" "*to scale* graphic design," implying that the assembled pieces would fit and function. Doc. 259-181 at 2 (Gov. Ex. 67G) (emphasis added). The card was made of "high strength," "durable" stainless steel, *id.*, capable of interfacing between the hammer and bolt of an AR-15 to produce automatic fire, as Hoover explained in one of his videos, *see* Doc. 259-1 (Gov. Ex. 1), and as ATF confirmed, *see* Doc. 259-170 (Gov. Ex. 63); Doc. 283 at 146–68, 222–23.

Ervin gave the machine shop the impression that his customers would cut the pieces out. *See* Doc. 280 at 109–111. He labeled the cards to indicate how many lightning links could be assembled from the parts in each one

("1in1," "2in1," 3in1"). *See* Doc. 259-339 at 1 (Gov. Ex. 114). And he

"point[ed] [his customers] in the right direction" when they requested

instructions. *See* Doc. 259-179 (Gov. Ex. 67E) (telling a customer that he may

choose "to use [the AutoKeyCard] in a different way" than intended, and that

online instructions were "not difficult to find" using search terms such as

"lightning" and "link"); Doc. 259-180 (Gov. Ex. 67F) (same response to

different customer); Doc. 259-182 (Gov. Ex. 67H) (telling another customer

the AutoKeyCard was a "gray market item" and "you either get it or you have

to do more research," such as by "check[ing] out our videos on YouTube or

the one on our website"). Ervin's social-media advertisements required little

inference or imagination. *See* Doc. 280 at 205–06 (friend's testimony); Docs.

259-121–24 (Gov. Exs. 49A-D) (videos). Images of the AutoKeyCard flashed

prominently between extended bursts of automatic gunfire:



Doc. 259-123 (Gov. Ex. 49C).

If there was any doubt about the AutoKeyCard's intended purpose, Hoover dispelled the illusion by telling his viewers the card was in fact a "lightning link," and itself a "machinegun," showing them step by step how to convert an AR-15, while reminding them—wink-wink, nudge-nudge—to treat the card like a "bottle opener," because its real purpose was illegal. *See* Docs. 259-1, 3, 5, 23 (Gov. Exs. 1–3, 12) (videos). If you give "zero fuck[s]" about the law, Hoover prodded, "your chains have been broken" and "you can do whatever the hell you want with a gun," so "why not ... make a machinegun?" Doc. 259-1 (Gov. Ex. 1).

Nearly 2,000 customers apparently got the message. *See* Doc. 281 at 108; Doc. 259-345 (Gov. Ex. 117). The prices they were willing to pay further showed that they expected more than a "novelty" or "conversation piece." *Compare* Doc. 280 at 32–43 ($2–$3 manufacturing cost) *with* Gov. Doc. 259-339 at 1 (Gov. Ex. 114) ($59–$149 retail price). A bottle can be opened for much less, and a pen can be set down for free.[4]

The jury reasonably found from this evidence that the AutoKeyCard was

---

[4]The jury certainly wasn't obligated to blind itself to the evidence and instead accept the fanciful view that the AutoKeyCard was "more likely just a bottle opener or curiosity with an aspirational artistic rendering of what possessors wish they could lawfully possess," Amicus brief at 5.

41

designed and intended to function as a machinegun-conversion device. *See United States v. Spoerke*, 568 F.3d 1236, 1246–48 (11th Cir. 2009) (evidence supported jury's finding that defendant's pipe bomb was designed as a destructive device under the NFA); *United States v. Kudalis*, 429 F. App'x 165 (3d Cir. 2011) (evidence supported jury's finding that device manufactured by defendant was designed and intended to convert an AR-15 to a machinegun).

(c)     *Ervin and Hoover knew of the AutoKeyCard's relevant characteristics.*

Finally, the jury reasonably found that Ervin and Hoover knew of the specific characteristics or features of the AutoKeyCard that made it subject to registration under the NFA (as *Staples* requires)—that is, that it was a combination of parts designed and intended as a machinegun-conversion device. *See* Doc. 254 at 19, 26 (third element in jury instructions). The evidence above amply demonstrates their knowledge and intent. The AutoKeyCard, Ervin's emails, and Hoover's videos speak for themselves. *Cf. Spoerke*, 568 F.3d at 1247 (11th Cir. 2009) ("[Defendant's] admissions alone established that his pipe bombs were designed as [NFA] weapons.").

Moreover, Ervin lied to the machine shop about the card's purpose. *See* Doc. 280 at 27–59). He ignored clear indications that customers intended to use the AutoKeyCard as a lightning link. *See* Docs. 259-194, 201, 213, 223–25, 227 (Gov. Exs. 67T, 67AA, 67MM, 67WW–YY, 67AAA). He blithely assured

42

a concerned friend he wouldn't go to jail because "nobody can prove your intent because it's ... in your head," and "[n]obody can get inside your head and know what your intention is unless you tell them." Doc. 280 at 221; Doc. 259-167 at 11 (Gov. Ex. 59). And he told the same friend, "Rules followers will never understand" because they "believe in the tyrant's false authority." *Id.* at 11–13. Hoover, for his part, admitted that his videos could be evidence of intent, as a lawyer had advised him. *See* Doc. 259-24 at 2–4 (Gov. Ex. 12A).

Hoover now claims "no reasonably intelligent person [would] foresee that the conduct charged in this case—talking about a card with a drawing on it—would be deemed criminal." Hoover's brief at 26. But these defendants were not charged with "talking about" a card. They were charged with possessing or transferring combinations of parts designed and intended as machinegun-conversion devices. In any event, almost *everyone* foresaw legal jeopardy—even Hoover and Ervin. Shopify shut down Ervin's store for selling "restricted" weapons, Doc. 259-195 (Gov. Ex. 67U); the machine shop cancelled Ervin's final order and "cut ties" with him, Doc. 280 at 48–58; Ervin's friend warned him that he might "go to jail," Doc. 280 at 219–20; a YouTube commenter warned Ervin that he would "have to hire a lawyer," Doc. 259-267 (Gov. Ex. 90F); a customer warned him that no one should possess the AutoKeyCard, Doc. 259-209 (Gov. Ex. 67II); Hoover himself told

43

viewers that the AutoKeyCard was a "lightning link," Docs. 259-1, 3 (Gov. Exs. 1–2), a "machinegun," Doc. 259-1 (Gov. Ex. 1), and a source of "machinegun parts," Doc. 259-26 at 3 (Gov. Ex. 14A), while cautioning them to pretend it was just a "bottle opener" because its real purpose was illegal, Doc. 259-1 (Gov. Ex. 1); and a lawyer warned Hoover that his videos could be evidence of criminal intent, Doc. 259-24 at 2–3 (Gov. Ex. 12A).

It was not unreasonable for the jury to conclude that Ervin and Hoover knew exactly what they were selling. *See United States v. Williams*, 784 F. App'x 694, 697–98 (11th Cir. 2019) (evidence supported jury's finding that defendant was not "ignorant of the purpose of [machinegun conversion device]"); *see generally United States v. Moore*, 253 F.3d 607, 610–611 (11th Cir. 2001) (jury could reasonably have inferred from circumstantial evidence that the defendant knew his device was a silencer restricted by the NFA). Thus, the evidence reasonably established each element of the firearms offenses, as the jury found.

**(2)    *The jury reasonably rejected Hoover's and Ervin's argument that the AutoKeyCard was a single "homogenous" part.***

Hoover's and Ervin's main argument on appeal is that the AutoKeyCard was a "single, homogenous piece of steel," not a "combination of parts." *See, e.g.*, Hoover's brief at 20; *see also* Ervin's brief at 37–38. We suppose the jury was free to draw that inference if it had thought so. Both men pushed that

44

argument at trial. *See* Doc. 284 at 80, 85, 96–97, 119–122, 128 (closing

arguments). And the jury was instructed six times that a "combination of

parts" was a necessary element of each firearm offense. *See* Doc. 254 at 18–19,

25–26. (This Court "must presume juries follow their instructions." *United*

*States v. Roy*, 855 F.3d 1133, 1186 (11th Cir. 2017) (en banc).) So the jury could

not have convicted Hoover or Ervin of possessing or transferring unregistered

firearms if it had any reasonable doubt that the AutoKeyCard was a

*combination of parts* designed and intended as a machinegun-conversion device.

An appellate court reviews the evidence supporting a criminal conviction

in the light most favorable to the government, drawing all reasonable

inferences in favor of the jury's verdict. *See Davis*, 854 F.3d at 1292. A

reasonable interpretation of this evidence, in that light, is that each

AutoKeyCard comprised two, four, or six distinct parts to create one, two, or

three lightning links (as Ervin labeled the cards—"1in1," "2in1," "3in1"), to be

cut out and connected as the "scale" drawings indicated, as Ervin coyly

insinuated, and as Hoover explicitly instructed. The distinct pieces of each

lightning link in the AutoKeyCard are a combination of parts by any

definition. It was not unreasonable for the jury to find a combination of parts

in these circumstances.

The question was not whether, "as a matter of law, a single piece of

homogenous steel [can] be a 'combination of parts,'" as Hoover suggests (his brief at 26). That puts the cart before the horse. The question was whether the AutoKeyCard met the statutory definition of a firearm—in this case, a machinegun-conversion device consisting of a combination of parts. To answer that question, the jury had to decide whether the AutoKeyCard was a single part with no constituent components (as Hoover and Ervin claimed) or, instead—as the jury reasonably found—either a combination of parts or something containing a combination of parts. The evidence reasonably supported the jury's view.

These rectangular wooden sheets undoubtedly contain a "combination of parts" for a 3D puzzle:



It makes no difference whether the parts are pushed out by hand or cut out

with scissors or anything else. The AutoKeyCard differed only in the sense that its parts could not be removed by hand or with scissors; a powered cutting tool was necessary. A reasonable jury might find that relevant, in certain circumstances, to be sure. But this jury reasonably found that the lightning-link pieces embedded in each AutoKeyCard were a combination of parts just the same.

Bear in mind, Ervin could have created a conversation piece, novelty, or artwork without implicating the NFA. If he had used less sturdy material such as paper or cardboard, or if he had not scaled the pieces to fit an AR-15, the parts could not have functioned as a lightning link. *See* Doc. 283 at 146–68, 192–94, 208–09, 222–23 (ATF agent explaining how he cut out and successfully tested the AutoKeyCard with two different bolt carriers); Doc. 259-170 (Gov. Ex. 63) (video). Had Ervin and Hoover not encouraged their customers and viewers to cut out the pieces, connect them, and install them in an AR-15, perhaps the jury would have thought differently about whether the AutoKeyCard was a combination of parts. But probably not, given the absurdity of ignoring what was right before their eyes and instead treating the AutoKeyCards as just expensive pieces of metal.

The jury's view of the AutoKeyCard turned on its characteristics and context—the material, markings, labels, dimensions, descriptions,

47

advertisements, and implicit and explicit instructions. The appellate court's "task is not to choose among competing constructions of the evidence." *United States v. Greer*, 850 F.2d 1447, 1452 (11th Cir. 1988). That was up to the jury. *See United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (jury free to choose among reasonable alternative interpretations of the evidence).

Yet Hoover argues the district court should have decided whether the AutoKeyCard met the statutory definition of a machinegun-conversion device. *See* Hoover's brief at 19–21, 27. But the Sixth Amendment and the Due Process Clause "require that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104 (2013). "'[E]lement[s]' or 'ingredient[s]' of the charged offense" "must be found by a jury," not by the court. *Id.* at 107. For instance, "[i]t is up to the jury, under the facts of the case, to determine whether a public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*" in a public corruption case. *McDonnell v. United States*, 579 U.S. 550, 572–73 (2016). "The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question." *Id.* at 573.

The jury's role is no different in a criminal prosecution for transferring or possessing firearms in violation of the NFA. *See United States v. Rogers*, 94 F.3d 1519, 1523–24 (11th Cir. 1996) (in reviewing defendant's conviction for having

48

illegally possessed a machinegun, noting that "guilt is determined by the jury, not the court," and "the Government bears the burden of proving beyond a reasonable doubt all elements of the crime charged"); *United States v. Owens*, 103 F.3d 953, 955–56 (11th Cir. 1997) (reviewing jury instructions in defendant's trial for having possessed an unregistered firearm); *United States v. Ruiz*, 253 F.3d 634, 637–39 (11th Cir. 2001) (reviewing jury instructions and sufficiency of the evidence supporting defendant's conviction for having possessed a firearm without a serial number).

A district court may remove the jury from the equation only when "the case for [an element of the charged offense] is so weak that no reasonable juror could credit it"—that is, where the prosecutor fails to produce even "minimal evidence" of a necessary element. *United States v. Gaudin*, 515 U.S. 506, 517 (1995). "[T]he case should not [then go] to the jury." *Id*. Otherwise, however— so long as the prosecutor has presented "minimal evidence" that could persuade a reasonable jury—it is up to the jury to find all relevant facts, apply the relevant law, and decide each element of each offense. *See id*. at 512–13 (district court violated the defendant's Fifth and Sixth Amendment rights when it determined as a matter of law that alleged perjurious statements had been material, improperly usurping that element from the jury). Here, there was more than enough evidence from which a reasonable jury could have found

49

that the AutoKeyCard included a combination of parts, and all other necessary elements, for the reasons above. The district court should not have taken that decision away from the jury, as Hoover mistakenly suggests.

Hoover cites two Administrative Procedure Act cases involving ATF classifications of specific firearms. *See VanDerStok v. Garland,* 86 F.4th 179 (5th Cir. 2023), *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 374. He also cites a case involving a sentencing-guidelines calculation, *see United States v. Dodson*, 519 F. App'x 344, 347–48 (11th Cir. 2013), and a case affirming jury instructions regarding the meaning of "machinegun," *S.W. Daniel*, 831 F.2d at 254–55. These cases do not suggest that the district court should have usurped the jury's role, in this criminal case, to find facts, apply the law, and determine whether the government had met its burden of proof for each element. The jury reasonably determined that it had.

*(3)    The rule of lenity has no bearing here.*

Hoover apparently argues that the rule of lenity required the district court or the jury to interpret section 5845(b) to specifically exclude the AutoKeyCard as a machinegun-conversion device. *See* Hoover's brief at 22–25. We have already explained that the court correctly instructed the jury on the elements of each offense and the jury reasonably found that the prosecutor had established each element based on the evidence presented. The rule of lenity

50

has no bearing here. It does not "automatically permit[] a defendant to win." *Muscarello v. United States*, 524 U.S. 125, 139 (1998). "The simple existence of some statutory ambiguity ... is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Id.* at 139. The rule applies only as a last resort when there is a "grievous ambiguity or uncertainty in the statute," such that "after seizing everything from which aid can be derived," the court can "make no more than a guess as to what Congress intended." *Id.* at 138–39. Section 5845(b) is not grievously ambiguous. It defines machinegun-conversion devices in plain and simple terms with no more ambiguity or uncertainty than most statutory provisions: a combination of parts designed and intended to convert a weapon to fire automatically. There is no basis to interpret that to categorically exclude the particular devices at issue in this case or, to put it differently, to categorically exclude the jury from doing its job. The district court correctly instructed the jury, and the jury reasonably followed those instructions based on the evidence presented.

**B.    The jury reasonably found that Ervin and Hoover had conspired to transfer unregistered machinegun-conversion devices.**

Sufficient evidence likewise supported the defendants' conspiracy convictions. "[T]o sustain a conviction under § 371, the government must show: (1) the existence of an agreement to achieve an unlawful objective; (2)

the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." *United States v. Harmas*, 974 F.2d 1262, 1267 (11th Cir. 1992). "There is rarely any direct evidence of an agreement to join a criminal conspiracy, and thus the defendant's assent can be inferred from acts which furthered the conspiracy's purpose." *United States v. Miller*, 693 F.2d 1051, 1053 (11th Cir. 1982).

Hoover himself explained that Ervin had paid him to do commercials and had "sponsored [his] channel." Doc. 250-30 at 5 (Gov. Ex. 16A). An ATF research specialist explained the pair's extensive cooperation with each other to market and sell AutoKeyCards. *See* Doc. 281 at 32–82. Hoover advertised the AutoKeyCard in at least 11 sponsored videos. *See* Docs. 259-1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21 (Gov. Exs. 1–11). He later explained his close relationship with Ervin and informed his viewers that Ervin had been arrested, Doc. 259-23 (Gov. Ex 12), and the pair discussed fundraising efforts and plotted their next moves in a jailhouse call, Docs. 259-32, 34, 36 (Gov. Exs. 17.1A–3A).

The jury could reasonably have inferred from all this that Hoover and Ervin had agreed to achieve an unlawful objective—marketing and selling machinegun-conversion devices. And it could reasonably have concluded that Hoover and Ervin knowingly and voluntarily participated in the conspiracy

52

and undertook overt acts in furtherance of it based on the evidence above that they had transferred and possessed the devices. Hoover and Ervin demonstrate no error in their conspiracy convictions.

**C.    The jury reasonably found that Ervin had structured financial transactions to evade currency-reporting requirements.**

When a U.S. bank is involved in a currency transaction over a specified threshold, the institution must "file a report on the transaction at the time and in the way the Secretary [of the Treasury] prescribes." 31 U.S.C. § 5313(a). Evading or interfering with the reporting requirements is a federal offense. *See generally* 31 U.S.C. § 5324. Ervin was charged with "structuring" transactions to evade reporting requirements, in violation of section 5324(a)(3). *See* Doc. 204 at 14–15. "Structuring" means "to break up a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement." *United States v. Bird*, 79 F.4th 1344, 1349 (11th Cir. 2023). "The two keys to a conviction ... are that a defendant (1) split into smaller increments a transaction that would have been for more than $10,000, and (2) fragmented the transaction for the purpose of avoiding the federal reporting requirements." *Id.* Intent may be inferred from circumstantial evidence. *Id.* Evidence established each element here.

The first element is not in dispute. Ervin announced his intention to split

53

up a $60,000 transaction into smaller increments and followed through with it. *See* Doc. 279 at 171 (rejecting offer to withdraw $10,000 and instructing the teller to instead "give me $9,000 I'll just come back every day or try other branches until I get all my money"); Doc. 259-302 at 22–26 (Gov. Ex. 95C) (coming back almost every day and getting the rest of his money in $5,000 and $9,000 increments). He clearly divided a transaction that otherwise would have exceeded $10,000, into smaller, less-than-$10,000 transactions.

As for the second element, the jury reasonably inferred from circumstantial evidence that Ervin had fragmented the transactions "for the purpose of avoiding" the reporting requirements. *Bird*, 79 F.4th at 1349. The bank teller testified that Ervin had asked how much money he could withdraw without triggering the reporting requirement and that, when she later suggested that he could withdraw $10,000, he said he would rather withdraw $9,000 a day for several days. *See* Doc. 279 at 162–63, 171, 197. That's exactly what he did.

The teller did not say that Ervin asked about the reporting threshold "well before the alleged December 28, 2020 withdrawal." Ervin's brief at 44. The teller did say it was "before" the December 28 "incident," Doc. 279 at 197, but she could not recall the date, *id.* at 163. In any event, it doesn't matter whether Ervin asked about the reporting requirement earlier the same day,

54

weeks earlier, or even months earlier. Nor does it matter that the teller did not immediately answer Ervin's question. The jury could reasonably have inferred that Ervin had inferred the threshold (correctly) when the teller told him he could withdraw up to $10,000 on December 28. This Court "must draw all reasonable inferences created by circumstantial evidence in favor of the verdict." *Bird*, 79 F.4th at 1349. Irregular patterns, verbal statements, and transactions themselves may establish intentional structuring to evade reporting requirements. *Id*. (citing *United States v. Vazquez*, 53 F.3d 1216, 1224–25 (11th Cir. 1995)). The obvious inference from Ervin's behavior is that he structured a series of withdrawals to avoid triggering the reporting requirements, as the jury reasonably found.

## II.   The district court did not abuse its discretion by declining to issue the superfluous and misleading jury instruction that Hoover requested.

Hoover challenges the jury instructions. *See* Hoover's brief at 21–22. He reiterates his objection that the court "refused to clarify that, as charged, should the jury find that the AutoKeyCard was only a single part, or not a part at all, they must acquit." *Id*. at 21.

This Court reviews the district court's refusal to issue an instruction for abuse of discretion. *United States v. Horner*, 853 F.3d 1201, 1208 (11th Cir. 2017). A court abuses its discretion only if (1) the requested instruction was

"substantially correct"; (2) the substance of the requested instruction "was not addressed in the charge actually given"; and (3) failure to issue the requested instruction "seriously impaired the defendant's ability to present an effective defense." *Id.*

Hoover identifies no abuse of discretion. First, the requested instruction was not "substantially correct." As we have explained, and as the district court recognized when it declined to issue the instruction, the jury could reasonably have concluded that the AutoKeyCard was a single part including or containing a combination of parts designed and intended for use in converting a weapon into a machinegun. *See* Doc. 283 at 241–42; § 5845(b). So, it would have been incorrect to instruct the jury that it "must acquit" if it found that the AutoKeyCard was a single part.

Second, any relevant or applicable substance in the requested instruction was "addressed in the charge actually given." Perhaps Hoover hoped to emphasize that a "combination of parts" was a necessary element of the charged offenses. It certainly was, but the issued instructions expressly conveyed that six times, as explained above. *See* Doc. 254 at 18–19, 25–26. Further, the proposed instruction wrongly implied that a single piece of metal could not qualify as a combination of parts. So it would have been at best redundant, and at worst misleading, to instruct that the jury must acquit if it

found "the AutoKeyCard was only a single part" (even if contained or included constituent parts).

Third, the defendants' ability to present an effective defense was not "seriously impaired" without the requested instruction. The court reminded the defendants they were free to argue that the government had not shown a combination of parts, and they did so repeatedly. *See* Doc. 283 at 241–42; Doc. 284 at 80, 85, 96–97, 119–122, 128. Hoover identifies no error in the instructions the court issued. He does not dispute that the court correctly instructed on each element of the charged offenses, even without the requested instruction. *See* Doc. 254 at 18–19, 25–26. He is entitled to no relief regarding the jury instructions.

## III.  The NFA restrictions on machinegun-conversion devices are constitutional.

### A.  "Machinegun" is not unconstitutionally vague.

Ervin argues that the NFA's definition of "machinegun" is unconstitutionally vague. *See* Ervin's brief at 26–33. He moved unsuccessfully to dismiss the indictment on this basis. *See* Doc. 30 at 8–10. This Court reviews preserved constitutional challenges *de novo*. *See United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).

"The void-for-vagueness doctrine requires that a penal statute define the

criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525 (1994) (internal quotation marks omitted). The NFA's definition of "machinegun" poses no such problems. The facts belie Ervin's professed confusion.

Here is a better example of vagueness: In 2015, the Supreme Court struck down a portion of the Armed Career Criminal Act that had specified increased statutory penalties for defendants with prior convictions adjudged retrospectively to have involved a "serious potential risk of physical injury to another," whatever that meant. *Johnson v. United States*, 576 U.S. 591, 594–97 (2015). The statute did not define "serious potential risk." *See* 18 U.S.C. § 924. The Court was "convinced that the indeterminacy of the wide-ranging inquiry required by [this] clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson*, 576 U.S. at 597.

That is the type of vagueness that may raise constitutional concerns. *Id.* at 595 (the government violates due process by punishing a defendant "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement"). The portion of the "machinegun" definition that Ervin challenges is

58

qualitatively different. It plainly and simply encompasses a "combination of parts designed and intended for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). Whatever disputes may arise at the margins, the definition provides "fair notice of the conduct it punishes." *Johnson*, 576 U.S. at 597. Determining from the evidence presented at trial whether a defendant possessed or transferred a combination of parts designed and intended to create a machinegun does not require the sort of wide-ranging and indeterminant inquiry that the Armed Career Criminal Act's residual clause problematically caused in attempting to retrospectively assess prior convictions.

Nevertheless, Ervin claims the definition is vague because it "does not unambiguously include potential precursors to parts, that are not themselves actual 'parts,' and thus not capable of 'use' or intended for 'use' in any weapon, much less capable of converting a semiautomatic rifle into a fully automatic machinegun." Ervin's brief at 27. But Ervin and Hoover were not convicted for "potential" or "precursor" parts. The court clearly instructed that Ervin and Hoover could be guilty of possessing or transferring a machinegun-conversion device only if there was a combination of "parts" designed and intended for use in converting a weapon to shoot automatically. Doc. 254 at 18–19, 25–26. The evidence provided ample support for the jury's verdict, as

59

explained above.

Binding precedent forecloses Ervin's vagueness challenge, regardless. This Court's predecessor rejected the argument that "'any combination of parts designed and intended for use in converting a weapon into a machinegun' is unconstitutionally vague," finding the language "sufficiently clear to put any person of reasonable intelligence on notice as to what is forbidden." *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970). More recently, this Court held that "[s]ection 5845(b) ... is not unconstitutionally vague," concluding that the statute defines "machinegun" in a way that "give[s] a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Akins v. United States*, 312 F. App'x 197, 200–01 (11th Cir. 2009). *Akins* focused on the statute's "[u]se of the word 'function' instead of 'pull' to reference the action taken by a gunman to commence the firing process." *Id*. at 201. That reference, *Akins* held, "is not so confusing that a man of common intelligence would have to guess at its meaning." *Id*. The Ninth Circuit recently agreed that the NFA's definition of "machinegun" is not unconstitutionally vague. *See United States v. Kuzma*, 967 F.3d 959, 967–72 (9th Cir. 2020) (focusing on the phrase "weapon which ... is designed to shoot ... automatically"). And this Court has similarly held that the NFA is not unconstitutionally vague as to covered rifles or shotguns (those with "short" barrels under certain specified

60

lengths). *See United States v. Wilson*, 979 F.3d 889, 907 (11th Cir. 2020). Ervin cites no case finding the definition of "machinegun" or any other aspect of the NFA void for vagueness. *See* Ervin's brief at 27–33.

"The void-for-vagueness doctrine asks whether 'it is unclear what fact must be proved,' not whether a particular fact might be difficult to prove." *Wilson*, 979 F.3d at 907 (NFA not unconstitutionally vague) (quoting *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012)). It is crystal clear what the government needed to prove here: a combination of parts designed and intended to convert a semiautomatic weapon to a fully-automatic machinegun. Moreover, "scienter requirements alleviate vagueness concerns" by "narrow[ing] the scope of [an] Act's prohibition" and "limit[ing] prosecutorial discretion." *Gonzales v. Carhart*, 550 U.S. 124, 149–50 (2007). *Staples* further bolstered those safeguards here.

Words are often susceptible to interpretation. There is a degree of vagueness and ambiguity in most language. Whatever uncertainty might exist at the margins, a person of ordinary intelligence should foresee that the distinct pieces of the lightning links that Ervin created and sold could reasonably be construed as a combination of parts designed and intended as a machinegun-conversion device, even though customers had to cut the parts out themselves. Hoover himself described the AutoKeyCard as a source of "machinegun parts"

61

(or an actual "machinegun"), and he told his viewers how to cut out, connect, and install the lightning links to create a machinegun. *See* Docs. 259-1, 3, 5, 23 (Gov. Exs. 1–3, 12) (videos). The cards themselves were labeled to indicate how many discrete lightning links they contained. *See* Doc. 259-339 at 1 (Gov. Ex. 114). And the defendants' customers even recognized the machinegun problem, as demonstrated by the questions and warnings described above. Ervin identifies no constitutionally significant vagueness in the statutory definition of "machinegun."

## B.    The Second Amendment does not prohibit the government from regulating machinegun-conversion devices.

Hoover argues that the Second Amendment bars the government from applying 26 U.S.C. §§ 5861 and 5845(b) to punish him for transferring or aiding and abetting the transfer of the AutoKeyCard. *See* Hoover's brief at 55–59 ("as-applied" challenge). He moved unsuccessfully to dismiss the indictment on Second Amendment grounds before trial. *See* Doc. 101; Doc. 133. This Court reviews preserved constitutional challenges *de novo*. *See Wright*, 607 F.3d at 715.

Two years ago, the Supreme Court held that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home" and prohibits the government from requiring "some additional special

need," beyond self-defense, for a handgun license. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8–10 (2022). In so ruling, the Court declared that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. Citing *Bruen*, Hoover argues that "if the AutoKeyCard is regulable under § 5845, there is no historical tradition of regulating designs or drawings that 'resemble' arms—or things that might someday, with material alteration—become arms, consistent with the Second Amendment." Hoover's brief at 59.

Hoover's Second Amendment challenge fails for two reasons.  First, it is based on the flawed premise that the AutoKeyCard was merely a "drawing" or a "design." Hoover does not claim that the Second Amendment or *Bruen* prevent the government from regulating machineguns or machinegun-conversion devices. Rather, he asserts that the AutoKeyCard cannot be regulated because it is neither of those things. *See* Hoover's brief at 58–59. But it is, as we explained above and as the jury found. The AutoKeyCard is more than just a drawing or design. ATF confirmed that the card's to-scale parts functioned as a lightning link, causing a semiautomatic rifle fire automatically and converting the weapon into a machinegun. *See* Doc. 283 at 146–68, 208–09, 222–23.

63

Second, *Bruen* makes clear that the Second Amendment does not protect machineguns as defined by the NFA. *Bruen* reiterated the Supreme Court's previous observation in *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) that there was a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" and that the Second Amendment protects only "weapons that are in common use at the time." *Bruen*, 597 U.S. at 21 (citing *Heller*). It would be "startling," the Court said in *Heller*, if its prior precedent was read to mean that the NFA's "restrictions on machineguns … might be unconstitutional." 554 U.S. at 624. Interpreting the Second Amendment to exclude dangerous and unusual "weapons that are most useful in [modern] military service" was consistent with the amendment's prefatory clause because "the conception of the militia at the time of … ratification was the body of all citizens capable of military service" who would bring with them "the sorts of lawful weapons that they possessed at home." *Id.* at 627. Modern developments understandably "limit[] the degree of fit between the prefatory clause and the protected right," the Court noted. *Id.* at 627–28. *Bruen* affirmed that colonial legislatures reasonably and appropriately prohibited "dangerous and unusual" weapons—"a fact we already acknowledged in *Heller*," the Court said. *Bruen*, 597 U.S. at 47. The handgun-licensing regime at issue in *Bruen* raised constitutional concerns because handguns—unlike machineguns—are

64

"indisputably in 'common use' for self-defense today" and therefore do not count as "dangerous and unusual" weapons, the likes of which have been historically and traditionally regulated or restricted. *Id.*

No appellate court has directly addressed the constitutionality of the NFA's machinegun restrictions after *Bruen*, but several appellate courts have suggested they still pass muster. The First Circuit held that a ban on large-capacity magazines (more than 10 rounds) likely remained constitutional after *Bruen*, affirming the denial of a preliminary injunction, because such regulation was consistent with our nation's historical tradition of restricting dangerous and unusual weapons—such as, the court noted, machineguns. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45–46 & 50–51 (1st Cir. 2024). The Seventh Circuit held that a more expansive ban on large-capacity magazines and certain semiautomatic weapons themselves was likely constitutional after *Bruen*, likewise rejecting preliminary injunctive relief, in part because semiautomatic weapons are "much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023) (citing *Bruen*). The court repeated its observation from an earlier case, that *Heller* had "deemed a ban on private possession of machineguns to be *obviously* valid," which the court found "consistent with the methodology

65

approved in *Bruen*." *Id*. at 1190–91 (emphasis added). And the Fifth Circuit

held that the NFA transfer restriction at issue here—26 U.S.C. § 5861(e)—is

not clearly or obviously unconstitutional as applied to machineguns, after

*Bruen*, on plain-error review. *See United States v. Mena*, No. 23-10144, 2023 WL

7314349 (5th Cir. Nov. 6, 2023), *cert. denied*, 144 S. Ct. 1048 (2024).

     *Heller* says dangerous and unusual weapons, including machineguns, do

not implicate the Second Amendment. *Bruen* generally affirms and reiterates

*Heller*. Hoover cites no case deeming machinegun restrictions unconstitutional

either before or after *Bruen*. The few courts to have recently touched on the

issue strongly suggest that *Bruen* casts no doubt on machinegun restrictions, as

*Heller* and *Bruen* indicate. And as the defendants' videos illustrate, *see* pages 12–

20 above, this conversion-device provision is just a specific application of the

registration requirement for machineguns. The Second Amendment does not

call into question sections 5861 or 5845(b), nor prohibit their application to the

transfer of unregistered AutoKeyCards.

## C.    The First Amendment does not prohibit the government from regulating machinegun-conversion devices.

     Hoover also raises a First Amendment challenge. *See* Hoover's brief at

53–55.  He moved unsuccessfully to dismiss the indictment on First

Amendment grounds before trial. *See* Doc. 30 at 10–12. This Court reviews

66

preserved constitutional challenges *de novo*. *See Wright*, 607 F.3d 7 at 715.

Hoover vaguely asserts that "[t]he AutoKeyCard is protected by the First Amendment" and "[m]ere possession or transfer of the AutoKeyCard may not be punished any more than the mere possession of a constitutionally protected material may be punished." Hoover's brief at 54–55 (citing *Riel v. City of Bradford*, 485 F.3d 736, 754 (3d Cir. 2007), citing, in turn, *Watchtower Bible & Tract Soc'y of N.Y. v. Village of Stratton*, 536 U.S 150, 165–66 (2002)). Yet he does not address how "constitutionally protected material may be punished" or regulated (particularly commercial products).

The Third Circuit case that Hoover cites held that city ordinances regulating the display of commercial and noncommercial signs on private property did not violate the First Amendment. *See Riel*, 485 F.3d at 740. The Supreme Court case that *Riel* cites held that an ordinance requiring a permit for door-to-door advocacy violated the First Amendment. *See Watchtower Bible*, 536 U.S. at 166–69. Hoover does not explain how either case is relevant here.

The "first task is to determine if the First Amendment is even implicated." *Club Madonna, Inc. v. City of Miami Beach*, 42 F.4th 1231, 1241 (11th Cir. 2022). "[N]ot all government action implicates the First Amendment." *Id*. The NFA provisions that Hoover challenges target machinegun-conversion devices, not speech. Nevertheless, we will assume for

67

the sake of argument that the statute targets "both speech and nonspeech elements." *Id.* at 1242. Even in that case, it should be upheld if (1) it is "grounded in a substantial government interest" and (2) the "incidental restriction on speech is no broader than necessary to further that interest." *Id.* Hoover addresses none of this. He ignores the government's undeniable interest in regulating dangerous and unusual weapons. And whatever incidental effect the NFA might have on speech, if any, Hoover makes no attempt to explain why the machinegun restrictions are "broader than necessary."

Hoover was not prosecuted for a drawing or speech. He was prosecuted for selling parts that illegally converted semiautomatic weapons to fire automatically. Cloaking the parts as "artwork" and "a conversation piece" no more circumvented the NFA than would etching a political slogan on the barrel of a machinegun or duct-taping the machinegun to a wall. *Cf. Morford v. Cattelan*, No. 21-20039-CIV, 2023 WL 3971968 (S.D. Fla. June 12, 2023) (copyright-infringement action over infamous banana duct-taped to wall at Art Basel Miami), appeal docketed, No. 23-12263 (11th Cir. July 11, 2023). The machinegun would still be a machinegun. The conversion parts are still conversion parts. Whatever expressive or artistic value the AutoKeyCard might

have had, Hoover and Ervin could have safely conveyed the same

message without using working conversion parts. Contrary to Hoover's

suggestion, a design file, blueprints, or book would not violate this

statute because they are not *parts*. This Court should reject Hoover's

oblique, meritless First Amendment challenge.

**IV.  The district court was not required to recite each
"standard" condition of supervised release separately
at sentencing. The court did not plainly err by failing
to do so.**

Finally, Ervin challenges the "standard" conditions of supervised release

that the district court imposed collectively at sentencing and listed separately in

the written judgment. *See* Ervin's brief at 47–54. But he did not object to the

court's recitation at sentencing, despite the court's invitation to do so. *See* Doc.

330 at 32–40. This Court's review is thus limited to plain error—that is, clear

and obvious error that affected Ervin's substantial rights and seriously affected

the fairness of the judicial proceedings. *See United States v. Oudomsine*, 57 F.4th

1262, 1265 (11th Cir. 2023). Again, Ervin identifies no error at all, much less

plain error.

Guideline 5D1.3(c) specifies thirteen "standard" (though discretionary)

conditions that the United States Sentencing Commission recommends for

supervised release. USSG §5D1.3(c)(1)–(13). They include, for example,

common-sense requirements that the defendant report to his probation officer as instructed, not knowingly leave the judicial district where he is allowed to reside, and answer truthfully the probation officer's questions. *See* USSG §5D1.3(c).

The conditions in guideline 5D1.3(c) are the "standard conditions" in the Middle District of Florida—that is, a definite set of conditions "adopted" and routinely imposed by courts in this district. *See* Doc. 330 at 32; *cf. United States v. Kohler*, No. 8:15-cr-425-CEH-CPT, 2022 WL 780951, at *5 (M.D. Fla. Mar. 15, 2022) (referencing "the … standard conditions of supervised release adopted by the Court in the Middle District of Florida"); *United States v. Flowers*, No. 8:93-cr-84-T-17TGW, 2019 WL 5533148, at *1 (M.D. Fla. Oct. 25, 2019) (referencing "the standard conditions of supervised release adopted in the Middle District of Florida"); *United States v. Robinson*, No. 3:89-cr-74-J-32MCR, 2018 WL 4323838, at *13 (M.D. Fla. Sept. 10, 2018) (referencing "the standard conditions adopted by this Court in the Middle District of Florida"). Ervin's counsel did not object when the court imposed the "standard" conditions. See Doc. 330 at 32–40. He did not indicate any confusion or doubt about what the standard conditions were, and he didn't ask the court to specify them. *Id.* The court did not err, plainly or otherwise, by adopting the standard conditions at sentencing, then listing them in the written

70

judgment. Even if this Court concludes that the district court's description was ambiguous ("the ... standard conditions of release adopted in the Middle District of Florida," Doc. 330 at 32), the written judgment does not "conflict" with it. *See United States v. Bonilla*, 579 F.3d 1233, 1245 (11th Cir. 2009). To the contrary, it resolves any arguable ambiguity. *See id*. If Ervin or his counsel had any doubt about the "standard" conditions, they could have—and should have—sought clarification, or objected, at sentencing.

This Court's recent decision in *United States v. Rodriguez*, 75 F.4th 1231 (11th Cir. 2023), reinforces that there was no error here. Rodriguez received a five-year term of supervised release but the court specified no conditions at all at sentencing, merely stating: "Upon release from imprisonment, you'll be placed on supervised release[.]" *Id.* at 1240. The court later issued a written judgment imposing thirteen discretionary conditions of supervised release that had been taken from a 1988 administrative order in the Southern District of Florida. *Id.* That order identified the conditions to be "'hereby imposed' whenever an individual was placed on supervised release 'unless altered or modified by special order.'" *Id.* (citation omitted). Only ten of those conditions closely tracked the guidelines' "standard conditions," and the other three were not standard conditions under the guidelines. *Id.*

On appeal, Rodriguez argued that district court had erred by including in

71

the written judgment conditions of supervised release that it had not pronounced at the sentencing hearing. *Rodriguez*, 75 F.4th at 1246. This Court agreed, finding that imposing discretionary terms of supervised release without identifying them in any way had deprived Rodriguez of notice and the opportunity to be heard. *Id*. at 1246–47. As a result, this Court vacated the discretionary conditions that the district court had failed to announce at the sentencing hearing and remanded so the district court could allow Rodriguez to be heard in reconsidering whether to impose each of the discretionary conditions. *Id*. at 1249.

In so holding, this Court emphasized that due process requires a district court to "pronounce at the defendant's sentencing hearing any discretionary conditions of supervised release" (*i.e.*, any condition of supervised release other than the mandatory conditions set forth in 18 U.S.C. § 3583(d)). *Rodriguez*, 75 F.4th at 1246. But, the Court clarified, a district court can "easily satisfy" that requirement by referencing a written list of supervised release conditions (such as conditions recommended in a PSR or in a standing administrative order), so that a defendant who is unfamiliar with the conditions has the opportunity to inquire about and challenge them. *Id*. Moreover, "a district court is not required to individually pronounce each discretionary condition of supervised release if at sentencing the court expressly incorporates a written list detailing

72

those conditions." *Id*. at 1249. The Court remanded, though, because the district court had failed to do that, or to "otherwise indicate that the court was adopting conditions of supervised release beyond those mandated by statute." *Id*.

This case is different. Unlike what happened in *Rodriguez*, the district court here told Ervin that he would "be required to comply with the standard conditions of release adopted in the Middle District of Florida." Doc. 330 at 32. The court thus notified Ervin that it intended to "adopt[] conditions ... beyond those mandated by statute," *Rodriguez*, 75 F.4th at 1249, and gave him the requisite opportunity to object or seek clarification. No more was required, according to *Rodriguez*. Moreover, the standard conditions imposed here come directly from guideline 5D1.3(c)—a "written list detailing those conditions," *id.*—which courts in this district routinely adopt at sentencing, as explained above. Under these circumstances, at a minimum, any error would not have been plain, as neither *Rodriguez* nor any other precedent of this Court directly invalidates the district court's approach at sentencing. *See Rodriguez*, 75 F.4th at 1241 ("there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it").

Notably, *Rodriguez* does not say a standing order is the only acceptable "written list." *Rodriguez*, 75 F.4th 1246–49. It does not even say a written list is

73

necessary in every case, so long as the court notifies the defendant that it intends to adopt conditions "beyond those mandated by statute." *Id*. The court so notified Ervin and his lawyer. *See Rodriguez*, 75 F.4th at 1246 (court can "easily satisfy" pronouncement requirement by referencing a written list of supervised release conditions so defendant can inquire about and challenge them); *see also United States v. Diggles*, 957 F.3d 551, 560 (5th Cir. 2020) (opportunity to object "exists when the court notifies the defendant at sentencing that conditions are being imposed"); *United States v. Drapeau*, 644 F.3d 646, 657 (8th Cir. 2011) (through court's order to "comply with the standard conditions that have been adopted by this court," defendant "had the opportunity to ask" court to specify which standard conditions applied). Because that notice satisfied the due process rights that this Court discussed in *Rodriguez*, the district court did not err by collectively imposing the standard conditions at sentencing and then listing them in the written judgment. Thus, Ervin has not met his heavy burden to demonstrate clear and obvious error, let alone one that affected his substantial rights and the integrity of the judicial proceedings. *See Oudomsine*, 57 F.4th at 1265. Nothing in the record suggests the conditions imposed would have been any different had the court recited them one by one at sentencing. This Court should affirm Ervin's sentence.

## Conclusion

This Court should affirm the judgments of conviction and sentences imposed.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:    *s/ Sean Siekkinen*
       SEAN SIEKKINEN
       Assistant United States Attorney
       Appellate Division
       USA No. 192
       400 N. Tampa St., Ste. 3200
       Tampa, FL 33602
       (813) 274-6000
       sean.siekkinen@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 16,563 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B) and the Court's May 22, 2024 order in this appeal, granting the United States up to 17,000 words.

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was sent by CM/ECF on May 23, 2024, to:

VALARIE LINNEN, ESQ.                    MATTHEW LAROSIERE, ESQ.
*Counsel for Kristopher Ervin*            *Counsel for Matthew Hoover*


*s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney

Gkpr/no/5-10-24

*b_Ervin, Kristopher et al_US response brief FNL.docx*