No. 23-13062-DD

In the

# United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KRISTOPHER JUSTINBOYER ERVIN AND
MATTHEW RAYMOND HOOVER,

*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:21-CR-22-MMH-MCR-1

## SUPPLEMENTAL APPENDIX
## Volume I of II

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
May 30, 2024                            (813) 274-6000

# Index of Appendix

## Volume I

District Court Docket Sheet.................................................................Docket

United States' Supplement to Proposed Jury Instruction ....................Doc. 253

Court's Proposed Jury Instructions .....................................................Doc. 261

Transcript of Jury Trial, Volume III (4/11/2023) ..............................Doc. 279

## Volume II

Transcript of Jury Trial, Volume V (4/14/2023) ...............................Doc. 281

Transcript of Jury Trial, Volume IX (4/21/2023)...............................Doc. 285

Certificate of Service

# DOCKET

## *3:21cr22, USA v. Ervin*

US District Court Criminal Docket

United States District Court, Florida Middle

(Jacksonville)

**This case was retrieved on 05/29/2024**

## Header

| | |
|---|---|
| **Date Filed:** 03/11/2021 | **Class Code:** Closed |
| **Other Docket:** Magistratejudgecasenumber: 3:21mj01127 | **Closed:** 09/14/2023 |

## Participants

### Defendant

| **Name** | **Attorneys** |
|---|---|
| Kristopher Justinboyer Ervin | Alex King |
| Appeals court case numbers: 22-12005-E USCA, 23-13062 | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| USCA Custody | 11/29/2023 |
| *TERMINATED: 09/14/2023* | First Coast Criminal Defense |
| | 1805 Copeland St. |
| | Jacksonville, FL 32204 |
| | USA |
| | Alex@MonroeKingLaw.com |
| | 904-355-7777 |
| | Fax: 904-720-2886 |
| | Designation: Retained |
| | |
| | Lisa Call |
| | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| | 06/04/2021 |
| | Federal Public Defender's Office |
| | Suite 1240 200 W Forsyth St |
| | Jacksonville, FL 32202 |
| | USA |
| | Lisa_Call@fd.org |
| | 904/232-3039 |
| | Fax: 904/232-1937 |
| | Designation: Public Defender or Community Defender Appointment |
| | |
| | Daniel Scott Monroe |
| | ATTORNEY TO BE NOTICED |
| | 11/29/2023 |
| | Scott Monroe Law, P.A. |
| | 200 E. Forsyth St. |
| | Jacksonville, FL 32202 |
| | USA |
| | scott@monroekinglaw.com |
| | 904/891-7362 |

Fax: 904-353-5801
Designation: Retained

Valarie Linnen
ATTORNEY TO BE NOTICED
Valarie Linnen, ESQ.
841 Prudential Drive 12th Floor
Jacksonville, FL 32207
USA
vlinnen@live.com
888-608-8814   Designation: CJA Appointment

## Charges                                              ## Disposition

**Complaints:** 26:5861D.F UNLAWFUL TO RECEIVE A
FIREARM NOT REGISTERED

| Charges | Disposition |
| --- | --- |
| **Pending:** CONSPIRACY TO DEFRAUD THE UNITED STATES(1ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(2ssss-8ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS(9ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED(10ssss-12ssss) | Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 |

**Offense Level (Opening):** Felony

| Charges | Disposition |
| --- | --- |
| **Terminated:** UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED(1) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS(1s-7s) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES(1ss) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES(1sss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(2ss-7ss) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN | Dismissed on Government's Motion |

3:21cr22, USA v. Ervin

VIOLATION(2sss-8sss)

| | |
|---|---|
| TRANSP./DELIVER/RECEIVE IN INTERSTATE COMMERCE-UNREGISTERED(8s) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS(8ss-14ss) | Dismissed on Government's Motion |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED(9s-14s) | Dismissed on Government's Motion |
| STRUCTURING TRANSACTIONS TO EVADE REPORTING REQUIREMENTS(9sss-15sss) | Dismissed on Government's Motion |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED(15ss-17ss) | Dismissed on Government's Motion |
| UNLAWFUL TO RECEIVE A FIREARM NOT REGISTERED(16sss-18sss) | Dismissed on Government's Motion |

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Marcia Morales Howard

**Case Referred To:** Magistrate Judge Monte C. Richardson

## Defendant

**Name**
Matthew Raymond Hoover
Appeals court case number: 23-13062-D USCA BOND
*TERMINATED: 09/14/2023*

**Attorneys**
Matthew Raymond Hoover
PRO SE
401 Chilewski Drive
Coloma, WI 54930
USA

Alex King
First Coast Criminal Defense
1805 Copeland St.
Jacksonville, FL 32204
USA
Alex@MonroeKingLaw.com
904-355-7777
Fax: 904-720-2886
Designation: Retained

Zachary Z. Zermay
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Zermay Law
1762 Windward Way
Sanibel, FL 33957
USA
zach@zermaylaw.com
239-699-3107
Designation: Retained

Matthew Larosiere
ATTORNEY TO BE NOTICED
6964 Houlton Circle
Lake Worth, FL 33467
USA
larosieremm@gmail.com
561-452-7575   Designation: Retained

## Charges

## Disposition

**Complaints:** none

| | |
|---|---|
| **Pending:** CONSPIRACY TO DEFRAUD THE UNITED STATES(1ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(2ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(3ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(5ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(7ss) | Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 |

**Offense Level (Opening):** Felony

| | |
|---|---|
| **Terminated:** CONSPIRACY TO DEFRAUD THE UNITED STATES(1) | Dismissed on Government's Motion |
| CONSPIRACY TO DEFRAUD THE UNITED STATES(1s) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(2-7) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(2s-8s) | Dismissed on Government's Motion |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(4ss) | |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(6ss) | |
| UNLAWFUL TO TRANSFER A FIREARM IN VIOLATION(8ss) | |

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Marcia Morales Howard

**Case Referred To:** Magistrate Judge Monte C. Richardson

# Defendant

| **Name** | **Attorneys** |
|---|---|

John Crump

Eric J. Friday
ATTORNEY TO BE NOTICED
Kingry & Friday, Esq.
1919 Atlantic Blvd.
Jacksonville, FL 32207
USA
efriday@kingryfriday.com
(904) 722-3333
Designation: Retained

James D Phillips , Jr
ATTORNEY TO BE NOTICED
Katz & Phillips, P.A.
509 West Colonial Drive
Orlando, FL 32804
USA
jphillips@thefirearmfirm.com
321-332-6864
Fax: 321-332-6864
Designation: Retained

Robert J Olson
PRO HAC VICE;ATTORNEY TO BE NOTICED;
William J. Olson, P.C.
370 Maple Ave W Suite 4
Vienna, VA 22180
USA
rob@wjopc.com
703-356-5070
Fax: 703-356-5085
Designation: Retained

Ronald J. Shook , II
PRO HAC VICE;ATTORNEY TO BE NOTICED;
The Law Offices of Ronald J. Shook
121 E. Main Ave.
Gastonia, NC 28052
USA
(704) 671-2390
Fax: (704) 671-4431
Designation: Retained

Stephen D Stamboulieh
PRO HAC VICE;ATTORNEY TO BE NOTICED;
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
USA
stephen@sdslaw.us
601-852-3440   Designation: Retained

## Charges

## Disposition

**Complaints:** John Crump

representedby

**Pending:** none

**Terminated:** none

**Case Assigned To:** Judge Marcia Morales Howard

## U.S. Attorneys

David B. Mesrobian

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

US Attorney's Office - FLM

Suite 700 300 N Hogan St

Jacksonville, FL 32202

USA

david.mesrobian@usdoj.gov

904/301-6300
Fax: 904/301-6310
Designation: Retained

Laura Cofer Taylor

LEAD ATTORNEY;ATTORNEY TO BE NOTICED

US Attorney's Office - FLM*

Suite 700 300 N Hogan St

Jacksonville, FL 32202

USA

Laura.C.Taylor@usdoj.gov

904-301-6249
Designation: Retained

Jennifer Michele Harrington

ATTORNEY TO BE NOTICED

United States Attorney's Office

400 W. Washington Street, Suite 3100

Orlando, FL 32801

USA

Jennifer.harrington2@usdoj.gov

407-648-7651
Fax: 407-648-7643
Designation: Retained

Mai Tran

ATTORNEY TO BE NOTICED

11/16/2023

United States Attorney's Office

Suite 700 300 N. Hogan Street

Jacksonville, FL 32202

USA

mai.tran2@usdoj.gov

904-301-6300
Fax: 904-301-6310
Designation: Retained

# Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/03/2021 | COMPLAINT as to Kristopher Justinboyer Ervin (filed in open court). (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) | |
| | 03/03/2021 | ARREST of Kristopher Justinboyer Ervin on 3/3/2021 (ASL) [3:21-mj-01127-PDB] (Entered: 03/04/2021) | |
| 3 | 03/03/2021 | MINUTE entry for in person proceedings held before Magistrate Judge Patricia D. Barksdale: initial appearance held on 3/3/2021. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) | |
| 4 | 03/03/2021 | ORAL MOTION for detention by USA. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) | |
| 5 | 03/03/2021 | JOINT MOTION to continue the detention hearing. (ASL) [3:21-mj-01127-PDB] (Entered: 03/05/2021) | |
| 6 | 03/03/2021 | ORDER OF TEMPORARY DETENTION granting 5 the joint oral motion to continue the detention hearing and scheduling the detention hearing for 3/5/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge Patricia D. Barksdale on 3/3/2021. (ASL)  [3:21-mj-01127-PDB] (Entered: 03/05/2021) | |
| 7 | 03/03/2021 | NOTICE OF HEARING: The preliminary hearing is scheduled for 3/17/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL)  [3:21-mj-01127-PDB] (Entered: 03/05/2021) | |
| 8 | 03/05/2021 | MINUTE entry for the in person status-of-counsel and detention hearings held on 3/5/2021 before Magistrate Judge Patricia D. Barksdale: The defendant moved for appointment of counsel and to continue the detention hearing. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 9 | 03/05/2021 | ORAL MOTION to appoint counsel by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 10 | 03/05/2021 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 11 | 03/05/2021 | ORDER granting 9 the defendant's oral motion to appoint counsel and appointing the Federal Defender's Office to represent him in this case. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)  [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 12 | 03/05/2021 | ORDER OF TEMPORARY DETENTION granting 10 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/9/2021 at 02:30 PM in Jacksonville Courtroom 5D before Magistrate Judge James R. Klindt. Signed by Magistrate Judge Patricia D. Barksdale on 3/5/2021. (ASL)  [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 13 | 03/08/2021 | STANDING ORDER as to Kristopher Justinboyer Ervin: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Timothy J. Corrigan on 12/1/2020. (KEM) [3:21-mj-01127-PDB] (Entered: 03/08/2021) | |
| 14 | 03/09/2021 | MINUTE entry for the in person detention hearing held on 3/9/2021 before Magistrate Judge James R. Klindt: The defendant moved to continue the detention hearing. Judge Klindt granted the motion and scheduled the detention hearing for 3/15/21 at 2:00 p.m. before Magistrate Judge Patricia Barksdale. (Digital) (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) | |
| 15 | 03/09/2021 | ORAL MOTION to continue the detention hearing by Kristopher Justinboyer Ervin. (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) | |
| 16 | 03/09/2021 | ORDER OF TEMPORARY DETENTION granting 15 the defendant's oral motion to continue the detention hearing and scheduling the detention hearing for 3/15/2021 at 02:00 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge James R. Klindt on 3/9/2021. (ASL) [3:21-mj-01127-PDB] (Entered: 03/10/2021) | |
| 17 | 03/11/2021 | INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1. (BGR) (Entered: 03/12/2021) | |
| 20 | 03/15/2021 | ORDER allowing a credentialed member of the press to bring a laptop computer or tablet to the 3/15/2021 detention hearing. Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL) (Entered: 03/15/2021) | |
| 21 | 03/15/2021 | MINUTE entry for the in person arraignment and detention hearings held on 3/15/2021 before Magistrate Judge Patricia D. Barksdale: The defendant entered a plea of not guilty to count one of the indictment and was remanded to the custody of the Attorney General to await trial. (Digital) (ASL) (Entered: 03/16/2021) | |
| 22 | 03/15/2021 | NOTICE of acceptance of general discovery by Kristopher Justinboyer Ervin (filed in open court). (ASL) (Entered: 03/16/2021) | |
| 23 | 03/25/2021 | ORDER OF DETENTION PENDING TRIAL as to Kristopher Justinboyer Ervin Signed by Magistrate Judge Patricia D. Barksdale on 3/15/2021. (ASL) (Entered: 03/15/2021) | |
| 24 | 03/25/2021 | SCHEDULING ORDER  as to Kristopher Justinboyer Ervin: A status conference is scheduled for 4/19/2021 at 03:00 PM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; the jury trial is scheduled for 5/3/2021 at 09:00 AM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; discovery, dispositive, and suppression motions are due by 4/12/2021. Signed by Deputy Clerk on 3/25/2021. (ASL) (Entered: 03/25/2021) | |
| 25 | 04/01/2021 | SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1s-7s, 8s, 9s-14s. (RH) Modified on 3/16/2023 to edit text (AET). (Entered: 04/01/2021) | |
| 27 | 04/02/2021 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Superseding Indictment set for 4/7/2021 at 10:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 04/02/2021) | |
| 28 | 04/05/2021 | MOTION to Withdraw as Attorney and Memorandum of Law by Lisa Call and Office of the Federal Public Defender. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 04/05/2021) | |
| 29 | 04/07/2021 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: denying 28 Motion to Withdraw as Attorney as to Kristopher Justinboyer Ervin (1); MOTION hearing as to Kristopher Justinboyer Ervin held on 4/7/2021 re 28 MOTION to Withdraw as Attorney and Memorandum of Law by Lisa Call and Office of the Federal Public Defender. filed by | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kristopher Justinboyer Ervin ; ARRAIGNMENT as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 8s, 9s-14s held on 4/7/2021 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 04/07/2021) | |
| 30 | 04/12/2021 | MOTION to Dismiss Superseding Indictment by Kristopher Justinboyer Ervin. (Call, Lisa) (Entered: 04/12/2021) | |
| 31 | 04/13/2021 | MOTION to Extend Time to Respond to Defendant's Motion to Dismiss by USA as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 04/13/2021) | |
| 32 | 04/15/2021 | NOTICE: The status conference set for April 19, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 04/15/2021) | |
| 33 | 04/16/2021 | ENDORSED ORDER granting 31 Government's Motion to Extend Time to Respond to Defendant's Motion to Dismiss. Counsel for the United States shall have up to and including May 7, 2021, to respond to Defendant's Motion to Dismiss. Signed by Judge Marcia Morales Howard on 4/16/2021. (JW) (Entered: 04/16/2021) | |
| 34 | 04/19/2021 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 4/19/2021. Status conference set for May 24, 2021, at 3:00 p.m. Jury trial set for trial term commencing on June 7, 2021, at 9:00 a.m. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 04/21/2021) | |
| | 04/22/2021 | Set/Reset Deadlines/Hearings as to Kristopher Justinboyer Ervin: Jury Trial set for trial term commencing on 6/7/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Status Conference set for 5/24/2021 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard (RH) (Entered: 04/22/2021) | |
| 35 | 05/07/2021 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 30 MOTION to Dismiss Superseding Indictment (Taylor, Laura) (Entered: 05/07/2021) | |
| 36 | 05/19/2021 | NOTICE: The status conference set for May 24, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 05/19/2021) | |
| 37 | 05/24/2021 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 5/24/2021. Status conference set for July 19, 2021, at 3:00 p.m. Jury trial set for trial term commencing on August 2, 2021, at 9:00 a.m. A hearing on the Motion to Dismiss will be set for July 7, 2021, at 2:00 p.m. or July 8, 2021, at 2:00 p.m., depending upon the availability of the case agent. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 05/25/2021) | |
| 38 | 05/25/2021 | NOTICE OF HEARING ON 30 Motion to Dismiss Superseding Indictment. Motion Hearing set for 7/8/2021 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 05/25/2021) | |
| 39 | 06/02/2021 | MOTION to Withdraw as Attorney by Lisa Call. by Kristopher Justinboyer Ervin. (Call, Lisa) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 06/02/2021) | |
| 40 | 06/04/2021 | NOTICE OF ATTORNEY APPEARANCE: Alex King appearing for Kristopher Justinboyer Ervin (King, Alex) (Entered: 06/04/2021) | |
| 41 | 06/04/2021 | ORDER granting 39 Motion to Withdraw as Attorney Lisa Call withdrawn from case. as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/4/2021. (SHS) (Entered: 06/04/2021) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 42 | 07/01/2021 | MOTION for Miscellaneous Relief, specifically to Adopt Motion to Dismiss (Doc. 30) re 30 MOTION to Dismiss Superseding Indictment by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 07/01/2021) | |
| 43 | 07/02/2021 | ENDORSED ORDER granting 42 Motion to Adopt Motion to Dismiss Superseding Indictment. Signed by Judge Marcia Morales Howard on 7/2/2021. (JW) (Entered: 07/02/2021) | |
| 44 | 07/08/2021 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 07/08/2021) | |
| 45 | 07/08/2021 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin held on 7/8/2021; denying 30 Motion to Dismiss as to Kristopher Justinboyer Ervin (1); granting 44 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference set for 9/20/2021 at 09:30 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendant is required to be present. Jury Trial set for trial term commencing on 10/4/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Plea deadline is September 27, 2021. The United States is directed to file a Bill of Particulars no later than July 16, 2021. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 07/08/2021) | |
| 46 | 07/16/2021 | BILL of particulars as to Kristopher Justinboyer Ervin. (Taylor, Laura) (Entered: 07/16/2021) | |
| 47 | 08/10/2021 | NOTICE OF ATTORNEY APPEARANCE Mai Tran appearing for USA. (Tran, Mai) (Entered: 08/10/2021) | |
| 48 | 08/12/2021 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin held on July 8, 2021 before Judge Marcia Morales Howard. Court Reporter/Transcriber Cindy Packevicz Jarriel, Telephone number 904-301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/2/2021 Redacted Transcript Deadline set for 9/13/2021 Release of Transcript Restriction set for 11/10/2021. (CLP) (Entered: 08/12/2021) | |
| 49 | 08/12/2021 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Cindy Packevicz Jarriel; cindyrprfcrr@gmail.com (CLP) (Entered: 08/12/2021) | |
| 50 | 09/20/2021 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin. (JW) (Entered: 09/20/2021) | |
| 51 | 09/20/2021 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 9/20/2021; granting 50 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Special Status Conference set for 11/22/2021 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendant is required to be present. Jury Trial set for trial term commencing on 12/6/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 09/20/2021) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 52 | 11/22/2021 | ORAL MOTION to Continue Trial by USA and Kristopher Justinboyer Ervin. (JW) (Entered: 11/23/2021) | |
| 53 | 11/22/2021 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin held on 11/22/2021; granting 52 Joint Oral Motion to Continue as to Kristopher Justinboyer Ervin (1). Status Conference and Motion Hearing set for 3/21/2022 at 01:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 4/4/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. The Court requests that the parties hold the weeks of April 11, April 18, and April 25, 2022 for trial. See Minutes for additional deadlines. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 11/23/2021) | |
| 54 | 12/15/2021 | ORDER SCHEDULING TRIAL. Jury selection shall commence on April 11, 2022, at 9:00 a.m. Opening statements and evidence will begin on April 12, 2022, at 9:00 a.m. Jury instructions, proposed Voir Dire, proposed brief statement of the case, and proposed verdict form due no later than February 18, 2022. Signed by Judge Marcia Morales Howard on 12/15/2021. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW) (Entered: 12/15/2021) | |
| 55 | 12/21/2021 | NOTICE of Disclosure of Summary of Expert Testimony in Compliance with Fed. R. Crim. P. 16(a)(1)(G) by USA as to Kristopher Justinboyer Ervin (Taylor, Laura) (Entered: 12/21/2021) | |
| 56 | 01/13/2022 | NOTICE of Disclosure of Summary Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) by Kristopher Justinboyer Ervin (Attachments: # 1 Exhibit A)(King, Alex) (Entered: 01/13/2022) | |
| 57 | 01/26/2022 | SECOND SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ss, 2ss-7ss, 8ss-14ss, 15ss-17ss, Matthew Raymond Hoover (2) count(s) 1, 2-7. (BGR) (Additional attachment(s) added on 1/27/2022: # 1 Restricted Unredacted Indictment) (BGR). Modified on 3/16/2023 to edit text (AET). (Entered: 01/27/2022) | |
| 58 | 01/26/2022 | MOTION for Arrest Warrant by USA as to Matthew Raymond Hoover. (BGR) (Entered: 01/27/2022) | |
| 59 | 01/26/2022 | ORDER granting 58 Motion for Arrest Warrant as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 1/26/2022. (BGR) (Entered: 01/27/2022) | |
| 63 | 01/27/2022 | Arrest Warrant Returned Executed on 1/27/2022 as to Matthew Raymond Hoover. (BGR) (Entered: 01/27/2022) | |
| 64 | 01/28/2022 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Initial Appearance on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) | |
| 65 | 01/28/2022 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin: Arraignment on the Second Superseding Indictment set for 2/2/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 01/28/2022) | |
| 66 | 01/31/2022 | ORDER as to Matthew Raymond Hoover: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (BGR)  (Entered: 01/31/2022) | |
| 68 | 01/31/2022 | Rule 5(c)(3) documents received from the Eastern District of Wisconsin as to Matthew Raymond Hoover which includes: Docket Sheet, Initial Appearance Minutes, Waiver of Rule 5 or 32.1 Hearings, Order of Detention, Order Setting Conditions of Release. (Attachments: # 1 Initial Appearance, # 2 Waiver of Rule 5 Hearings, # 3 Order of Temporary Detention and Order Scheduling a Detention Hearing, # 4 Detention Hearing, # 5 Order Setting Conditions of Release)(RH) (Entered: 02/01/2022) | |
| 69 | 02/02/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Second Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 2ss-7ss, 8s, 8ss-14ss, 9s-14s, 15ss-17ss held on 2/2/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 02/02/2022) | |
| 70 | 02/02/2022 | NOTICE OF HEARING as to Matthew Raymond Hoover: Initial Appearance and Arraignment set for 2/22/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 02/02/2022) | |
| 71 | 02/07/2022 | Consent MOTION for Miscellaneous Relief, specifically to Hold in Abeyance Previously Ordered Motion Deadline  by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 02/07/2022) | |
| 72 | 02/08/2022 | ORDER granting 71 Defendant Ervin's Consent Motion to Hold in Abeyance Previously Ordered Motion Deadline. The parties are relieved of the obligation of complying with the motions deadline of February 11, 2022, and the responses deadline of February 25, 2022. The hearing scheduled for March 21, 2022, at 1:30 p.m. remains set. Signed by Judge Marcia Morales Howard on 2/8/2022. (JW)  (Entered: 02/08/2022) | |
| | 02/11/2022 | Set/Reset Deadlines/Hearings as to Matthew Raymond Hoover: Initial Appearance set for 2/22/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (LRB) (Entered: 02/11/2022) | |
| 73 | 02/22/2022 | NOTICE OF ATTORNEY APPEARANCE: Zachary Z. Zermay appearing for Matthew Raymond Hoover  (Zermay, Zachary) (Entered: 02/22/2022) | |
| | 02/22/2022 | Arrest of Matthew Raymond Hoover on 1/27/2022 (SHS) (Entered: 02/22/2022) | |
| 74 | 02/22/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Initial Appearance and ARRAIGNMENT as to Matthew Raymond Hoover (2) Count 1, 2-7 held on 2/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 02/22/2022) | |
| 75 | 02/22/2022 | ORAL NOTICE OF ATTORNEY APPEARANCE: Zachary Z. Zermay and Matthew Larosiere appearing for Matthew Raymond Hoover (SHS)  (Entered: 02/22/2022) | |
| 76 | 02/22/2022 | NOTICE of acceptance of general discovery (FILED IN OPEN COURT) by Matthew Raymond Hoover (SHS)  (Entered: 02/22/2022) | |
| 77 | 02/22/2022 | SCHEDULING ORDER  as to Matthew Raymond Hoover Status Conference set for 4/18/2022 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard Jury Trial set for trial term commencing 5/2/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Discovery motions due by 3/8/2022 Dispositive motions due by 3/22/2022 Signed by Magistrate Judge Monte C. Richardson on 2/22/2022. (SHS)  (Entered: 02/22/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 78 | 03/04/2022 | JOINT MOTION to Hold Motions Deadlines in Abeyance and For a Status Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Modified on 3/4/2022, to edit text) (BGR). (Entered: 03/04/2022) | |
| 79 | 03/07/2022 | ORDER granting 78 Joint Motion to Hold Motions Deadlines in Abeyance and for a Status Hearing. The parties are relieved of the obligation of complying with the motions deadlines. The hearing scheduled for March 21, 2022, at 1:30 p.m. is cancelled. A status conference as to all parties is set for March 23, 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 3/7/2022. (JW) (Entered: 03/07/2022) | |
| 80 | 03/21/2022 | MOTION for Zachary Z. Zermay and Matthew Larosiere at the Status Conference of March 23, 2022 by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/21/2022) | |
| 81 | 03/21/2022 | ENDORSED ORDER granting 80 Motion to Appear Telephonically. Zachary Zermay and Matthew Larosiere are permitted to appear telephonically at the status conference set for March 23, 2022, at 1:30 p.m. The Courtroom Deputy Clerk will separately provide counsel with the call-in information for the hearing. Signed by Judge Marcia Morales Howard on 3/21/2022. (JW)  (Entered: 03/21/2022) | |
| 82 | 03/23/2022 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin and Matthew Raymond Hoover. (JW) (Entered: 03/23/2022) | |
| 83 | 03/23/2022 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 3/23/2022; granting 82 Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1) and Matthew Raymond Hoover (2). Special Status Conference set for 6/27/2022 at 02:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 7/5/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Shannon Bishop (JW) (Entered: 03/23/2022) | |
| 84 | 03/25/2022 | NOTICE OF ATTORNEY APPEARANCE David B. Mesrobian appearing for USA.  (Mesrobian, David) (Entered: 03/25/2022) | |
| 85 | 03/25/2022 | TRANSCRIPT of Digitally recorded arraignment and detention hearing as to Kristopher Justinboyer Ervin held on 3/15/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/15/2022 Redacted Transcript Deadline set for 4/25/2022 Release of Transcript Restriction set for 6/23/2022. (KMH) (Entered: 03/25/2022) | |
| 86 | 03/25/2022 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Kristopher Justinboyer Ervin. Court Reporter: Katharine Healey (904) 301-6843 (KMH)  (Entered: 03/25/2022) | |
| 87 | 04/27/2022 | MOTION for Reconsideration re 23 Order of Detention  by | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Kristopher Justinboyer Ervin. (King, Alex) (Entered: 04/27/2022) | |
| 88 | 05/02/2022 | ENDORSED ORDER directing to respond to 87 MOTION for Reconsideration re 23 Order of Detention as to Kristopher Justinboyer Ervin. Responses due by 5/13/2022 Signed by Magistrate Judge Monte C. Richardson on 5/2/2022. (SHS) Modified on 5/2/2022 (SHS). (Entered: 05/02/2022) | |
| 89 | 05/12/2022 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 87 MOTION for Reconsideration re 23 Order of Detention (Taylor, Laura) (Entered: 05/12/2022) | |
| 90 | 05/24/2022 | MOTION for Leave to File Document to Government's Response in Opposition to Defendant's Motion to Reconsider Detention of Defendant by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/24/2022) | |
| 91 | 06/01/2022 | ORDER denying 87 Motion for Reconsideration re 23 Order of Detention filed by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/1/2022. (SHS) (Entered: 06/01/2022) | |
| 92 | 06/02/2022 | ENDORSED ORDER denying 90 Motion for Leave to File as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 6/2/2022. (SHS) (Entered: 06/02/2022) | |
| 93 | 06/15/2022 | NOTICE of APPEAL by Kristopher Justinboyer Ervin re 91 Order on Motion for Reconsideration / Clarification. Filing fee paid $ 505, receipt number AFLMDC-19679305. (King, Alex) . (Entered: 06/15/2022) | |
| 94 | 06/16/2022 | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of Notice of appeal, order/judgment being appealed, and motion, if applicable to USCA re 93 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # 1 Notice of appeal, # 2 Order)(SJW) (Entered: 06/16/2022) | |
| 95 | 06/21/2022 | MOTION to Dismiss by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Request for Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) | |
| 96 | 06/21/2022 | MOTION to Change Venue / Transfer Case by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Zachary Z. Zermay, # 3 Request for an Evidentiary Hearing and Oral Argument)(Zermay, Zachary) (Entered: 06/21/2022) | |
| 97 | 06/21/2022 | MOTION to Sever Trial by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Request for Oral Argument)(Zermay, Zachary) (Modified on 6/22/2022, to edit text) (BGR). (Entered: 06/21/2022) | |
| | 06/21/2022 | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 22-12005-E for 93 Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 06/22/2022) | |
| 98 | 06/27/2022 | NOTICE of filing supplemental authority by Kristopher Justinboyer Ervin, Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 06/27/2022) | |
| 99 | 06/27/2022 | JOINT ORAL MOTION to Continue Trial as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (CKS) (Entered: 06/28/2022) | |
| 100 | 06/27/2022 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Justinboyer Ervin, Matthew Raymond Hoover held on 6/27/2022; granting 99 Joint Oral Motion to Continue Trial as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover(2). Jury Trial set for the November 2022 trial term, scheduled to commence on 11/1/2022 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Katharine Healey (CKS) (Entered: 06/29/2022) | |
| 101 | 07/01/2022 | SUPPLEMENT re 95 MOTION TO DISMISS & to Declare Unconstitutional the National Firearms Act of 1934 by Matthew Raymond Hoover (Zermay, Zachary) Modified on 7/7/2022 to edit text (AET). (Entered: 07/01/2022) | |
| 102 | 07/12/2022 | NOTICE Regarding Expert Disclosure by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 07/12/2022) | |
| 103 | 07/20/2022 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 95 MOTION to Dismiss and Supplement to Motion to Dismiss & To Declare Unconstitutional the National Firearms Act of 1934 (Doc. 101) (Taylor, Laura) (Entered: 07/20/2022) | |
| 104 | 07/20/2022 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 96 MOTION to Change Venue / Transfer Case (Taylor, Laura) (Entered: 07/20/2022) | |
| 105 | 07/20/2022 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 97 MOTION to Sever Defendant Matthew Raymond Hoover  (Taylor, Laura) (Entered: 07/20/2022) | |
| 106 | 08/01/2022 | NOTICE REGARDING JURY SELECTION by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary)  (Entered: 08/01/2022) | |
| 107 | 08/02/2022 | NOTICE REGARDING EXPERT DISCLOSURE by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary)  (Entered: 08/02/2022) | |
| 108 | 08/03/2022 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover: Motion Hearing/Status Conference set for 10/11/2022 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Defendants are required to be present. (JW)  (Entered: 08/03/2022) | |
| 109 | 08/04/2022 | ENDORSED ORDER regarding 107 Defendant Hoover's Notice Regarding Expert Disclosure, which, in this instance, the Court will construe as a motion for extension of time. The motion is granted only to the extent that Defendant Hoover must disclose his experts by August 12, 2022. Signed by Judge Marcia Morales Howard on 8/4/2022. (JW)  (Entered: 08/04/2022) | |
| 110 | 08/04/2022 | MOTION for Leave to File Reply to 103 Response in Opposition by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) | |
| 111 | 08/04/2022 | MOTION for Leave to File Reply to 105 Response in Opposition to Sever Defendant by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) | |
| 112 | 08/04/2022 | MOTION for Leave to File Reply to 104 Response in Opposition to Change Venue/Transfer Case by Matthew Raymond Hoover. Modified on 8/5/2022 to edit text (AET). (Entered: 08/04/2022) | |
| 113 | 08/04/2022 | NOTICE of filing supplemental authority by Matthew Raymond Hoover re: 95 MOTION to Dismiss filed by Matthew Raymond Hoover (Zermay, Zachary)  Modified on 8/5/2022 to edit text and to confirm with counsel page 3 is intentionally blank (AET). (Entered: 08/04/2022) | |
| | 08/05/2022 | Set/Reset Deadlines as to Matthew Raymond Hoover: Expert Witness List due by 8/12/2022. (AET) (Entered: 08/05/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 114 | 08/05/2022 | NOTICE OF RESCHEDULING HEARING: The Motion Hearing/Status Conference previously scheduled for October 11, 2022, at 10:00 a.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing date and time: Motion Hearing/Status Conference set for 10/12/2022 at 2:30 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW)  (Entered: 08/05/2022) | |
| 115 | 08/05/2022 | ORDER denying 110 Motion for Leave to File Reply to Opposition to Motion to Dismiss. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF) (Entered: 08/05/2022) | |
| 116 | 08/05/2022 | ORDER denying 112 Motion for Leave to File Reply to Opposition to Motion to Transfer Venue. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF)  (Entered: 08/05/2022) | |
| 117 | 08/05/2022 | ORDER denying 111 Motion for Leave to File Reply to Opposition to Motion to Sever Trial. Signed by Judge Marcia Morales Howard on 8/5/2022. (TMF)  (Entered: 08/05/2022) | |
| 118 | 08/23/2022 | MOTION in Limine by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 56 Notice of Disclosure of Summary Expert Testimony in compliance with Fed. R. Crim. P. 16(b)(1)(C) and 107 Notice Regarding Expert Disclosure. (Attachments: # 1 Exhibit A, video on disk filed separately, # 2 Exhibit B, # 3 Exhibit C)(AET) (Entered: 08/24/2022) | |
| 119 | 08/30/2022 | JOINT UNOPPOSED MOTION to Continue trial  by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 9/2/2022 to edit text (AET). (Entered: 08/30/2022) | |
| 120 | 08/31/2022 | THIRD SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1sss, 2sss-8sss, 9sss-15sss, 16sss-18sss, Matthew Raymond Hoover (2) count(s) 1s, 2s-8s. (Attachments: # 1 Restricted Unredacted Indictment) (AET) Modified on 3/16/2023 to edit text (AET). (Entered: 08/31/2022) | |
| 123 | 08/31/2022 | NOTICE OF HEARING ON 119 Joint and Unopposed Motion to Continue Trial. Motion Hearing set for September 6, 2022, at 3:00 p.m. before Judge Marcia Morales Howard. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. (JW)  (Entered: 08/31/2022) | |
| 124 | 09/01/2022 | USCA Order Dismissed as to Kristopher Justinboyer Ervin re 93 Notice of Appeal USCA number: 22-12005. Issued as mandate on 8/30/22. (SJW) (Entered: 09/01/2022) | |
| 125 | 09/02/2022 | ORDER denying 96 Motion to Transfer Venue and 97 Motion to Sever. Signed by Judge Marcia Morales Howard on 9/2/2022. (TMF)  (Entered: 09/02/2022) | |
| 126 | 09/07/2022 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 9/7/2022; granting 119 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2); denying, without prejudice, as moot 95 Defendant Hoover's Motion to Dismiss. Hoover's renewed motion to dismiss due September 22, 2022. Response due October 7, 2022. Motion hearing set for December 9, 2022, at 10:00 a.m. Jury Trial set for 1/9/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for additional deadlines. Court Reporter: Katharine Healey (JW) (Entered: 09/12/2022) | |
| 127 | 09/13/2022 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 120 Third Superseding Indictment,. Arraignment set for 9/22/2022 at 11:30 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 09/13/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 128 | 09/14/2022 | UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 9/15/2022 (AET). (Entered: 09/14/2022) | |
| 129 | 09/16/2022 | ENDORSED ORDER granting 128 UNOPPOSED MOTION for Zachary Z. Zermay; Matthew Larosiere and Defendant Matthew Hoover to appear telephonically as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 9/15/2022. (SHS)  (Entered: 09/16/2022) | |
| 130 | 09/16/2022 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover as to Matthew Raymond Hoover (Zermay, Zachary)  Modified on 9/19/2022 to edit text (AET). (Entered: 09/16/2022) | |
| 131 | 09/22/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Third Superseding Indictment as to Kristopher Justinboyer Ervin (1) Count 1, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, 15ss-17ss, 16sss-18sss, and Matthew Raymond Hoover (2) Count 1, 1s, 2-7, 2s-8s, held on 9/22/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 09/22/2022) | |
| 132 | 09/22/2022 | MOTION to Dismiss  by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Attachments: # 1 Request for Judicial Notice)(Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) | |
| 133 | 09/22/2022 | Second MOTION to Dismiss for First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934 by Matthew Raymond Hoover as to Matthew Raymond Hoover. (Zermay, Zachary) Modified text on 9/26/2022 (BD). (Entered: 09/22/2022) | |
| 134 | 09/28/2022 | MOTION to Extend Time to Filing Deadline  by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 09/28/2022) | |
| 135 | 09/28/2022 | ENDORSED ORDER granting 134 Defendant Ervin's Motion for Extension of Time of Filing Deadline. Defendant Ervin shall have up to and including October 7, 2022, to file his Daubert motion. The United States shall have up to and including October 24, 2022, to file a response. Signed by Judge Marcia Morales Howard on 9/28/2022. (JW)  (Entered: 09/28/2022) | |
| 136 | 09/28/2022 | MOTION in Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 09/28/2022) | |
| 137 | 10/07/2022 | MOTION for Hearing  by USA as to Matthew Raymond Hoover. (Mesrobian, David) (Entered: 10/07/2022) | |
| 138 | 10/07/2022 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 133 Second MOTION to Dismiss First And Second Amendment Violations & to Declare Unconstitutional The National Firearms Act Of 1934, 132 MOTION to Dismiss   (Taylor, Laura) Modified on 10/11/2022 to edit text (AET). (Entered: 10/07/2022) | |
| 139 | 10/07/2022 | Unopposed MOTION to Continue Daubert Motion Deadline  by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 10/07/2022) | |
| 140 | 10/11/2022 | ENDORSED ORDER granting 139 Unopposed Motion to Continue Daubert Deadline. Defendants shall have up to and including October 21, 2022, to file Daubert motions. The United States shall have up to and including November 7, 2022, to file responses. Signed by Judge Marcia Morales Howard on 10/11/2022. (JW)  (Entered: 10/11/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 141 | 10/18/2022 | ORDER denying 132 Motion to Dismiss as to Matthew Raymond Hoover (2); denying 133 Motion to Dismiss as to Matthew Raymond Hoover (2). Signed by Judge Marcia Morales Howard on 10/18/2022. (JW)  (Entered: 10/18/2022) | |
| 142 | 10/21/2022 | MOTION in Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses by Kristopher Justinboyer Ervin. (King, Alex)  (Entered: 10/21/2022) | |
| 143 | 10/27/2022 | Unopposed MOTION to Continue Motion in Limine Deadline by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 10/28/2022, to edit text) (BGR).  (Entered: 10/27/2022) | |
| 144 | 10/28/2022 | UNOPPOSED MOTION for Zachary Z Zermay, Matthew Larosiere, and Matthew Raymond Hoover to appear telephonically at the Garcia Hearing by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 10/31/2022 (AET).  (Entered: 10/28/2022) | |
| 145 | 10/28/2022 | ORDER granting 143 Motion to Continue Motion in Limine Deadline. Motions in limine due 11/10/2022. Responses due 11/28/2022. Signed by Judge Marcia Morales Howard on 10/28/2022. (JCM)  (Entered: 10/28/2022) | |
| 146 | 10/31/2022 | TRANSCRIPT of Digitally Recorded Initial Appearance and Arraignment Proceedings as to Matthew Raymond Hoover held on 02/22/2022 before Judge Monte C. Richardson. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/21/2022 Redacted Transcript Deadline set for 12/1/2022 Release of Transcript Restriction set for 1/30/2023. (KMH)  (Entered: 10/31/2022) | |
| 147 | 10/31/2022 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT (02/22/2022 Digitally Recorded Initial Appearance and Arraignment of Matthew Raymond Hoover). The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Matthew Raymond Hoover. Court Reporter: Katharine Healey (KMH)  (Entered: 10/31/2022) | |
| 148 | 11/01/2022 | ENDORSED ORDER granting 144 Unopposed Motion for Zachary Z. Zermany; Matthew Larosiere and Defendant Matthew Raymond Hoover to appear at the Garcia hearing telephonically as to Matthew Raymond Hoover. (2) Signed by Magistrate Judge Monte C. Richardson on 11/1/2022. (MDH)  (Entered: 11/01/2022) | |
| 149 | 11/07/2022 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 142 MOTION in Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses  (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Taylor, Laura)  (Entered: 11/07/2022) | |
| 150 | 11/08/2022 | ENDORSED ORDER granting 137 Motion for Hearing as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 11/8/2022. (SHS)  (Entered: 11/08/2022) | |
| 151 | 11/08/2022 | NOTICE OF HEARING as to Matthew Raymond Hoover: Garcia Hearing set for 11/17/2022 at 02:00 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 11/08/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 152 | 11/10/2022 | Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference  by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) (Entered: 11/10/2022) | |
| 153 | 11/10/2022 | RESPONSE to Motion re 152 Joint MOTION to Extend Time to Filing Deadline and Request for Status Conference  by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover  (Taylor, Laura) (Entered: 11/10/2022) | |
| 154 | 11/10/2022 | ENDORSED ORDER granting 152 Joint Emergency Motion for Extension of Time of Filing Deadline and Request for Status Conference. Motions in limine must be filed on or before November 18, 2022. A telephonic status conference is set for Thursday, November 17, 2022, at 1:00 p.m. The Courtroom Deputy Clerk will separately send participants the call-in information for the hearing. Absent a continuance of the trial, no further extensions of time will be granted. Signed by Judge Marcia Morales Howard on 11/10/2022. (JW)  (Entered: 11/10/2022) | |
| 155 | 11/16/2022 | RESPONSE in Opposition by Matthew Raymond Hoover re 137 MOTION for Hearing   (Zermay, Zachary) Modified on 11/17/2022 to redact and replace PDF due to personal identifiers (AET). (Entered: 11/16/2022) | |
| 156 | 11/17/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Garcia hearing held on 11/17/2022 as to Matthew Raymond Hoover. (Digital) (SHS) (Entered: 11/18/2022) | |
| 158 | 11/17/2022 | ORAL MOTION to Continue Trial by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 11/21/2022) | |
| 159 | 11/17/2022 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 11/17/2022; terminating 136 Government's Motion in Limine; granting 158 Oral Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). A Daubert hearing will be held on February 7, 2023. The time will be set at a later date. Jury Trial set for 4/10/2023 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. See Minutes for deadlines. The Court emphasized its expectation that the deadlines would be met and that the trial date is firm and will not change. Order Scheduling Trial to enter. Court Reporter: Katharine Healey (JW) (Entered: 11/21/2022) | |
| 157 | 11/18/2022 | NOTICE OF HEARING as to Matthew Raymond Hoover: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel set for 11/29/2022 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 11/18/2022) | |
| 160 | 11/21/2022 | ORDER appointing Jeremy Lasnetski, Esq. as to Erica Ibe Hoover. Signed by Magistrate Judge Monte C. Richardson on 11/21/2022. (SHS)  (Entered: 11/21/2022) | |
| 161 | 11/29/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel held on 11/29/2022 as to Matthew Raymond Hoover. (Shelli Kozachenko/Digital) (SHS) (Entered: 11/29/2022) | |
| 162 | 11/29/2022 | ORAL MOTION to Continue Hearing as to Erica Ibe Hoover by Jeremy Lasnetksi. (SHS) (Entered: 11/29/2022) | |
| 163 | 11/29/2022 | ORAL ORDER granting 162 Motion to Continue as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Richardson on 11/29/2022. (SHS) (Entered: 11/29/2022) | |
| 164 | 11/29/2022 | NOTICE OF HEARING as to Matthew Raymond Hoover: Hearing regarding informed consent and waiver of right to attorney/client privilege as to Mrs. Erica Ibe Hoover set for 12/13/2022 at 02:00 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. Defendant, Mrs. Hoover and defense counsel will appear via Zoom. The Courtroom Deputy will email Zoom information to parties. (SHS) (Entered: 11/29/2022) | |
| 165 | 12/09/2022 | NOTICE Amended of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) Testimony by Kristopher Justinboyer Ervin (King, Alex) (Entered: 12/09/2022) | |
| 166 | 12/13/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Hearing to question Mrs. Erica Ibe Hoover regarding informed consent and waiver of right to attorney/client privilege with defense counsel as to Matthew Raymond Hoover held on 12/13/2022. Court Reporter: Katharine Healey (Digital) (SHS) (Entered: 12/13/2022) | |
| 167 | 12/16/2022 | NOTICE of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover (Zermay, Zachary) Modified on 12/19/2022 to edit text (AET). (Entered: 12/16/2022) | |
| 168 | 12/22/2022 | ORDER on Conflict of Interest re: Counsel for Matthew Raymond Hoover. Signed by Magistrate Judge Monte C. Richardson on 12/21/2022. (MDH) (Entered: 12/22/2022) | |
| 169 | 01/03/2023 | ORDER SCHEDULING TRIAL. As previously directed, Daubert motions are due January 4, 2023, and responses are due January 18, 2023. A Daubert hearing is set for February 7, 2023, at 10:00 a.m. in Courtroom 10B. Motions in limine shall be filed by February 24, 2023, and responses are due March 10, 2023. Jury selection and trial shall commence on April 10, 2023, at 9:00 a.m. Trial documents due no later than April 3, 2023. Signed by Judge Marcia Morales Howard on 1/3/2023. (Attachments: # 1 Instructions Regarding Jury Selection, # 2 Instructions Regarding Premarking Exhibits)(JW) (Entered: 01/03/2023) | |
| | 01/04/2023 | Set/Reset Deadlines as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Exhibit List due by 4/10/2023. (AET) (Entered: 01/04/2023) | |
| 170 | 01/04/2023 | MOTION in Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 01/04/2023) | |
| 171 | 01/18/2023 | RESPONSE to Motion re 170 MOTION in Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 01/18/2023) | |
| 172 | 01/18/2023 | RESPONSE in Opposition by Matthew Raymond Hoover re 170 MOTION in Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses (Zermay, Zachary) (Entered: 01/18/2023) | |
| 173 | 01/20/2023 | JOINT MOTION for Status Conference by USA as to Matthew Raymond Hoover. (Taylor, Laura) Modified on 1/23/2023 (AET). (Entered: 01/20/2023) | |
| 174 | 01/20/2023 | ENDORSED ORDER granting 173 Joint Motion for Status Conference as to Matthew Raymond Hoover (2). A status conference is set for Tuesday, January 24, 2023, at 3:00 p.m. The hearing will be held via Zoom. The Courtroom Deputy Clerk will separately send participants the Zoom link. Signed by Judge Marcia Morales Howard on 1/20/2023. (JW) (Entered: 01/20/2023) | |
| 175 | 01/24/2023 | Minute Entry for Virtual proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Matthew Raymond | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Hoover held on 1/24/2023. On or before January 31, 2023, the parties shall either file the proposed stipulation of facts or a notice advising the Court of how they wish to proceed. Court Reporter: Katharine Healey (JW) (Entered: 01/25/2023) | |
| 176 | 01/31/2023 | NOTICE to the Court by Matthew Raymond Hoover (Zermay, Zachary) Modified on 2/1/2023 to edit text (AET). (Entered: 01/31/2023) | |
| 177 | 02/01/2023 | ORDER directing the parties to file a written proffer of each proposed expert witness's opinions by 12:00 noon on Monday, February 6, 2023. Signed by Judge Marcia Morales Howard on 2/1/2023. (JCM) (Entered: 02/01/2023) | |
| 178 | 02/03/2023 | NOTICE of Withdrawal of Notice of Disclosure of Expert Testimony in Compliance with Fed. R. Crim. P. 16(b)(1)(C) and Request for Relief from this Court's February 1, 2023 Order by Kristopher Justinboyer Ervin re 165 Notice (Other), 177 Order. (King, Alex) (Entered: 02/03/2023) | |
| 179 | 02/03/2023 | NOTICE of Withdrawal; re 167 Notice of Disclosure of Summary of Expert Testimony by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 2/6/2023, to edit text) (BGR). (Entered: 02/03/2023) | |
| 180 | 02/06/2023 | NOTICE of Filing Written Proffer of Testimony by Ernest Lintner in Anticipation of Trial by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) | |
| 181 | 02/06/2023 | NOTICE of Filing Written Proffer of Opinions of Cody Toy in Anticipation of Trial by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 02/06/2023) | |
| 182 | 02/06/2023 | NOTICE of Written Proffer of Testimony by Daniel O'Kelly in Anticipation of Trial by Kristopher Justinboyer Ervin re 177 Order. (King, Alex) (Entered: 02/06/2023) | |
| 183 | 02/06/2023 | NOTICE OF PROFFER by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 02/06/2023) | |
| 184 | 02/07/2023 | NOTICE of Filing by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A)(King, Alex) (Entered: 02/07/2023) | |
| 185 | 02/07/2023 | NOTICE of supplemental authority by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Attachment 1)(Mesrobian, David) (Entered: 02/07/2023) | |
| 186 | 02/07/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 2/7/2023; terminating as moot 118 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witness; denying without prejudice 142 Defendants' Motion In Limine to Exclude Trial Testimony of Government's Purported Expert Witnesses; denying as moot, in part, and withdrawing, in part, 170 Government's Motion In Limine to Exclude Trial Testimony of Defendants' Proposed Expert Witnesses. Proposed limiting instruction(s) due February 24, 2023. Court Reporter: Katharine Healey (JW) (Entered: 02/08/2023) | |
| 187 | 02/23/2023 | JOINT EMERGENCY MOTION to Extend Time to Filing Deadline by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/24/2023 to edit text (AET). (Entered: 02/23/2023) | |
| 188 | 02/23/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 187 Emergency MOTION to Extend Time to Filing Deadline -- Joint (Mesrobian, David) (Entered: 02/23/2023) | |
| 189 | 02/24/2023 | MOTION in Limine for Jury Instruction by USA as to Kristopher | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) | |
| 190 | 02/24/2023 | MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) Modified on 2/27/2023 to edit text (AET). (Entered: 02/24/2023) | |
| 191 | 02/24/2023 | ORDER granting in part and denying in part 187 Emergency Joint Motion for Extension of Filing Deadline. Motions in Limine due no later than 1:00 p.m. on Monday, February 27, 2023. See Order for details. Signed by Judge Marcia Morales Howard on 2/24/2023. (JCM) (Entered: 02/24/2023) | |
| 192 | 02/24/2023 | Proposed Jury Instructions by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 02/24/2023) | |
| 193 | 02/27/2023 | FIRST MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 194 | 02/27/2023 | SECOND MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 195 | 02/27/2023 | THIRD MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 196 | 02/27/2023 | FOURTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibit A)(King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 197 | 02/27/2023 | FIFTH MOTION in Limine by Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (King, Alex) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 198 | 02/27/2023 | FIRST MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 199 | 02/27/2023 | SECOND MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 200 | 02/27/2023 | THIRD MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 201 | 02/27/2023 | FOURTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 202 | 02/27/2023 | FIFTH MOTION in Limine by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 203 | 02/27/2023 | SIXTH MOTION in Limine by Matthew Raymond Hoover. (Zermay, Zachary) Modified on 2/28/2023 to edit text (AET). (Entered: 02/27/2023) | |
| 204 | 03/06/2023 | FOURTH SUPERSEDING INDICTMENT returned in open court as to Kristopher Justinboyer Ervin (1) count(s) 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Matthew Raymond Hoover (2) count(s) 1ss, 2ss-8ss. (Attachments: # 1 Restricted Unredacted Indictment) (BD) Modified on 3/16/2023 to edit text (AET). (Entered: 03/06/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 205 | 03/08/2023 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: re: 204 Fourth Superseding Indictment. Arraignment set for 3/14/2023 at 11:00 AM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 03/08/2023) | |
| 206 | 03/09/2023 | UNOPPOSED MOTION  to appear telephonically  by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 3/10/2023 to edit text (AET). (Entered: 03/09/2023) | |
| 207 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 198 FIRST MOTION in Limine , 193 FIRST MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 208 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 199 SECOND MOTION in Limine , 194 SECOND MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 209 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 200 THIRD MOTION in Limine , 195 THIRD MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 210 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 201 FOURTH MOTION in Limine , 196 FOURTH MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 211 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 197 FIFTH MOTION in Limine , 202 FIFTH MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 212 | 03/10/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 203 SIXTH MOTION in Limine   (Taylor, Laura) (Entered: 03/10/2023) | |
| 213 | 03/10/2023 | RESPONSE 189 MOTION in Limine for Jury Instruction by Kristopher Justinboyer Ervin  (King, Alex) (Entered: 03/10/2023) | |
| 214 | 03/10/2023 | RESPONSE 190 MOTION in Limine to exclude argument and evidence at trial that is contrary to the law by Kristopher Justinboyer Ervin  (King, Alex) (Entered: 03/10/2023) | |
| 215 | 03/10/2023 | RESPONSE in Opposition by Matthew Raymond Hoover re 190 MOTION in Limine to exclude argument and evidence at trial that is contrary to the law, 189 MOTION in Limine for Jury Instruction (Zermay, Zachary) (Entered: 03/10/2023) | |
| 216 | 03/13/2023 | ENDORSED ORDER granting 206 Unopposed Motion to appear telephonically. The Courtroom Deputy will separately provide counsel with the call-in information for the hearing. Signed by Magistrate Judge Monte C. Richardson on 3/13/2023. (SHS) (Entered: 03/13/2023) | |
| 217 | 03/14/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: ARRAIGNMENT on the Fourth Superseding Indictment as to Kristopher Justinboyer Ervin (1) Counts 1ssss through 12ssss and Matthew Raymond Hoover (2) Counts 1ss through 8ss, held on 3/14/2023 Defendant(s) pled not guilty. (Digital) (SHS) Modified on 3/16/2023 to edit text (AET). (Entered: 03/15/2023) | |
| 218 | 03/20/2023 | TRANSCRIPT of Motion Hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 02/07/2023 before Judge Marcia Morales Howard. Court Reporter: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/10/2023. Redacted Transcript Deadline set for 4/20/2023. Release of Transcript Restriction set for 6/20/2023. (KMH) (Entered: 03/20/2023) | |
| 219 | 03/22/2023 | TRIAL BRIEF by USA as to Kristopher Justinboyer Ervin (Tran, Mai) (Entered: 03/22/2023) | |
| 220 | 03/28/2023 | MOTION for Bill of Particulars by Matthew Raymond Hoover. (Zermay, Zachary) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/28/2023) | |
| 221 | 03/29/2023 | ENDORSED ORDER directing USA to respond to 220 MOTION for Bill of Particulars as to Matthew Raymond Hoover. Responses due by 4/5/2023 Signed by Magistrate Judge Monte C. Richardson on 3/29/2023. (SHS) (Entered: 03/29/2023) | |
| 222 | 03/30/2023 | Unopposed MOTION to Allow Electronic Equipment, specifically cell phone and laptop by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 03/30/2023) | |
| 223 | 03/30/2023 | ORDER granting in part and denying in part 189 Government's Motion in Limine for Jury Instruction; granting in part and denying in part 190 Government's Motion in Limine to Exclude Argument and Evidence; denying 193 Defendants' First Motion in Limine; denying 194 Defendants' Second Motion in Limine; denying 195 Defendants' Third Motion in Limine; denying 196 Defendants' Fourth Motion in Limine; denying 197 Defendants' Fifth Motion in Limine; denying 198 Defendants' First Motion in Limine; denying 199 Defendants' Second Motion in Limine; denying 200 Defendants' Third Motion in Limine; denying 201 Defendants' Fourth Motion in Limine; denying 202 Defendants' Fifth Motion in Limine; denying 203 Defendant Hoover's Sixth Motion in Limine. Signed by Judge Marcia Morales Howard on 3/30/2023. (JCM) (Entered: 03/30/2023) | |
| 224 | 03/31/2023 | ORDER granting 222 Motion to Allow Electronic Equipment as to Kristopher Justinboyer Ervin (1). Signed by Judge Marcia Morales Howard on 3/31/2023. (JW) (Entered: 03/31/2023) | |
| 225 | 04/03/2023 | Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) | |
| 226 | 04/03/2023 | STATEMENT of the case for trial by USA. (Taylor, Laura) (Entered: 04/03/2023) | |
| 227 | 04/03/2023 | PROPOSED verdict form filed by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) | |
| 228 | 04/03/2023 | PROPOSED Voir Dire by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/03/2023) | |
| 229 | 04/03/2023 | PROPOSED Voir Dire by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) | |
| 230 | 04/03/2023 | STATEMENT of the case for trial (King, Alex) (Entered: 04/03/2023) | |
| 231 | 04/03/2023 | PROPOSED verdict form filed by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) | |
| 232 | 04/03/2023 | Proposed Jury Instructions by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/03/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 233 | 04/03/2023 | PROPOSED Voir Dire by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/03/2023) | |
| 234 | 04/03/2023 | Proposed Jury Instructions by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/03/2023) | |
| 235 | 04/03/2023 | NOTICE of Adoption of 230 Statement of the Case for Trial and 231 Proposed Verdict Form by Matthew Raymond Hoover (Zermay, Zachary)  Modified on 4/4/2023 to edit text (AET). (Entered: 04/03/2023) | |
| 236 | 04/05/2023 | RESPONSE in Opposition by USA as to Matthew Raymond Hoover re 220 MOTION for Bill of Particulars   (Taylor, Laura) (Entered: 04/05/2023) | |
| 237 | 04/06/2023 | ORDER denying 220 Motion for Bill of Particulars as to Matthew Raymond Hoover (2). Signed by Magistrate Judge Monte C. Richardson on 4/6/2023. (SHS)  (Entered: 04/06/2023) | |
| 238 | 04/06/2023 | Unopposed MOTION to Allow Electronic Equipment, specifically by Matthew Raymond Hoover. (Zermay, Zachary) (Entered: 04/06/2023) | |
| 239 | 04/07/2023 | ORDER granting 238 Unopposed Motion for Assistant to Attend Trial With Electronic Equipment. Signed by Judge Marcia Morales Howard on 4/7/2023. (JW)  (Entered: 04/07/2023) | |
| 240 | 04/08/2023 | WITNESS LIST by Kristopher Justinboyer Ervin (King, Alex) Modified on 4/10/2023 to edit text (AET). (Entered: 04/08/2023) | |
| 241 | 04/10/2023 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) Modified on 4/11/2023 See Docket Entry 245 for corrected Exhibit List (AET). (Entered: 04/10/2023) | |
| 242 | 04/10/2023 | WITNESS LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) | |
| 243 | 04/10/2023 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/10/2023) | |
| 244 | 04/10/2023 | EXHIBIT LIST by Matthew Raymond Hoover as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Zermay, Zachary) (Entered: 04/10/2023) | |
| 245 | 04/10/2023 | EXHIBIT LIST by Kristopher Justinboyer Ervin (King, Alex) (Entered: 04/10/2023) | |
| 246 | 04/10/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY SELECTION AND TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/10/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/11/2023) | |
| 247 | 04/11/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/11/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/12/2023) | |
| 248 | 04/12/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/13/2023) | |
| 249 | 04/13/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/2023. Court Reporter: Shelli Kozachenko (JW) (Entered: 04/14/2023) | |
| 251 | 04/14/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/17/2023) | |
| 250 | 04/17/2023 | REQUEST for Judicial Notice by Kristopher Justinboyer Ervin (Attachments: # 1 Exhibit A)(King, Alex)  Modified on 4/18/2023 to edit text (AET). (Entered: 04/17/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 252 | 04/17/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/18/2023) | |
| 253 | 04/18/2023 | SUPPLEMENT re 225 Proposed Jury Instructions by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 04/18/2023) | |
| 254 | 04/19/2023 | COURT'S FINAL JURY INSTRUCTIONS as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/19/2023) | |
| 256 | 04/19/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/21/2023) | |
| 255 | 04/20/2023 | PARTIAL SEQUESTRATION ORDER. Signed by Judge Marcia Morales Howard on 4/20/2023. (JW) (Entered: 04/20/2023) | |
| 257 | 04/20/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023. Court Reporter: Katharine Healey (JW) (Entered: 04/24/2023) | |
| 258 | 04/21/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: JURY TRIAL as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023. Court Reporter: Katharine Healey (Attachments: # 1 Government's Exhibit 1 Regarding Remand, # 2 Government's Exhibit 2 Regarding Remand) (JW) (Entered: 04/24/2023) | |
| 259 | 04/21/2023 | EXHIBIT LIST by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Additional attachment(s) added on 4/26/2023: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 2, # 4 Exhibit 2A, # 5 Exhibit 3, # 6 Exhibit 3A, # 7 Exhibit 4, # 8 Exhibit 4A, # 9 Exhibit 5, # 10 Exhibit 5A, # 11 Exhibit 6, # 12 Exhibit 6A, # 13 Exhibit 7, # 14 Exhibit 7A, # 15 Exhibit 8, # 16 Exhibit 8A, # 17 Exhibit 9, # 18 Exhibit 9A, # 19 Exhibit 10, # 20 Exhibit 10A, # 21 Exhibit 11, # 22 Exhibit 11A, # 23 Exhibit 12, # 24 Exhibit 12A, # 25 Exhibit 14, # 26 Exhibit 14A, # 27 Exhibit 15, # 28 Exhibit 15A, # 29 Exhibit 16, # 30 Exhibit 16A, # 31 Exhibit 17.1, # 32 Exhibit 17.1A, # 33 Exhibit 17.2, # 34 Exhibit 17.2A, # 35 Exhibit 17.3, # 36 Exhibit 17.3A, # 37 Exhibit 18, # 38 Exhibit 19, # 39 Exhibit 20, # 40 Exhibit 20A, # 41 Exhibit 21, # 42 Exhibit 22, # 43 Exhibit 23, # 44 Exhibit 24, # 45 Exhibit 25, # 46 Exhibit 25A, # 47 Exhibit 25B, # 48 Exhibit 26) (JW). (Additional attachment(s) added on 4/26/2023: # 49 Exhibit 27A, # 50 Exhibit 27B, # 51 Exhibit 28, # 52 Exhibit 29, # 53 Exhibit 30, # 54 Exhibit 30A, # 55 Exhibit 30B, # 56 Exhibit 30C, # 57 Exhibit 30D, # 58 Exhibit 30E, # 59 Exhibit 30F, # 60 Exhibit 30G, # 61 Exhibit 30H, # 62 Exhibit 30I, # 63 Exhibit 30J, # 64 Exhibit 30K, # 65 Exhibit 30L, # 66 Exhibit 30M, # 67 Exhibit 30N, # 68 Exhibit 30O, # 69 Exhibit 30P, # 70 Exhibit 30Q, # 71 Exhibit 30R, # 72 Exhibit 30S, # 73 Exhibit 30T, # 74 Exhibit 30U, # 75 Exhibit 30V, # 76 Exhibit 31, # 77 Exhibit 32) (JW). (Additional attachment(s) added on 4/26/2023: # 78 Exhibit 33, # 79 Exhibit 33A, # 80 Exhibit 33B, # 81 Exhibit 33C, # 82 Exhibit 33D, # 83 Exhibit 33E, # 84 Exhibit 33F, # 85 Exhibit 33G, # 86 Exhibit 33H, # 87 Exhibit 33I, # 88 Exhibit 33J, # 89 Exhibit 33K, # 90 Exhibit 33L, # 91 Exhibit 33M, # 92 Exhibit 33N, # 93 Exhibit 33O, # 94 Exhibit 33P, # 95 Exhibit 33Q, # 96 Exhibit 33R, # 97 Exhibit 33S, # 98 Exhibit 33T, # 99 Exhibit 33U, # 100 Exhibit 33V, # 101 Exhibit 33W, # 102 Exhibit 33X, # 103 Exhibit 33Y, # 104 Exhibit 33Z, # 105 Exhibit 34, # 106 Exhibit 35, # 107 Exhibit 36, # 108 Exhibit 37, # 109 Exhibit 38, # 110 Exhibit 39, # 111 Exhibit 40, # 112 Exhibit | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 41, # 113 Exhibit 42, # 114 Exhibit 43, # 115 Exhibit 44, # 116 Exhibit 45, # 117 Exhibit 46, # 118 Exhibit 47, # 119 Exhibit 48, # 120 Exhibit 49) (JW). (Additional attachment(s) added on 4/26/2023: # 121 Exhibit 49A, # 122 Exhibit 49B, # 123 Exhibit 49C, # 124 Exhibit 49D, # 125 Exhibit 49E, # 126 Exhibit 49F, # 127 Exhibit 49G, # 128 Exhibit 49H, # 129 Exhibit 49I, # 130 Exhibit 49J, # 131 Exhibit 49K, # 132 Exhibit 49L, # 133 Exhibit 49M, # 134 Exhibit 49N, # 135 Exhibit 49O, # 136 Exhibit 49P, # 137 Exhibit 49Q, # 138 Exhibit 50A, # 139 Exhibit 50B, # 140 Exhibit 50C, # 141 Exhibit 50D, # 142 Exhibit 50E, # 143 Exhibit 50F, # 144 Exhibit 50G, # 145 Exhibit 50H, # 146 Exhibit 50I, # 147 Exhibit 50J, # 148 Exhibit 50K, # 149 Exhibit 50L, # 150 Exhibit 50M, # 151 Exhibit 50N, # 152 Exhibit 50O, # 153 Exhibit 50P, # 154 Exhibit 51, # 155 Exhibit 52, # 156 Exhibit 53, # 157 Exhibit 54, # 158 Exhibit 55, # 159 Exhibit 56) (JW). (Additional attachment(s) added on 4/26/2023: # 160 Exhibit 57A, # 161 Exhibit 57B, # 162 Exhibit 57C, # 163 Exhibit 58A, # 164 Exhibit 58B, # 165 Exhibit 58C, # 166 Exhibit 58D, # 167 Exhibit 59, # 168 Exhibit 60, # 169 Exhibit 61, # 170 Exhibit 63, # 171 Exhibit 64, # 172 Exhibit 65, # 173 Exhibit 66, # 174 Exhibit 67, # 175 Exhibit 67A, # 176 Exhibit 67B, # 177 Exhibit 67C, # 178 Exhibit 67D, # 179 Exhibit 67E, # 180 Exhibit 67F, # 181 Exhibit 67G, # 182 Exhibit 67H, # 183 Exhibit 67I, # 184 Exhibit 67J, # 185 Exhibit 67K, # 186 Exhibit 67L, # 187 Exhibit 67M, # 188 Exhibit 67N, # 189 Exhibit 67O, # 190 Exhibit 67P, # 191 Exhibit 67Q, # 192 Exhibit 67R, # 193 Exhibit 67S, # 194 Exhibit 67T, # 195 Exhibit 67U, # 196 Exhibit 67V, # 197 Exhibit 67W, # 198 Exhibit 67X, # 199 Exhibit 67Y, # 200 Exhibit 67Z) (JW). (Additional attachment(s) added on 4/26/2023: # 201 Exhibit 67AA, # 202 Exhibit 67BB, # 203 Exhibit 67CC, # 204 Exhibit 67DD, # 205 Exhibit 67EE, # 206 Exhibit 67FF, # 207 Exhibit 67GG, # 208 Exhibit 67HH, # 209 Exhibit 67II, # 210 Exhibit 67JJ, # 211 Exhibit 67KK, # 212 Exhibit 67LL, # 213 Exhibit 67MM, # 214 Exhibit 67NN, # 215 Exhibit 67OO, # 216 Exhibit 67PP, # 217 Exhibit 67QQ, # 218 Exhibit 67RR, # 219 Exhibit 67SS, # 220 Exhibit 67TT, # 221 Exhibit 67UU, # 222 Exhibit 67VV, # 223 Exhibit 67WW, # 224 Exhibit 67XX, # 225 Exhibit 67YY, # 226 Exhibit 67ZZ, # 227 Exhibit 67AAA, # 228 Exhibit 67BBB, # 229 Exhibit 67CCC, # 230 Exhibit 68, # 231 Exhibit 69, # 232 Exhibit 70, # 233 Exhibit 71, # 234 Exhibit 72, # 235 Exhibit 73, # 236 Exhibit 74, # 237 Exhibit 75, # 238 Exhibit 76, # 239 Exhibit 77, # 240 Exhibit 78, # 241 Exhibit 79, # 242 Exhibit 80, # 243 Exhibit 81, # 244 Exhibit 82, # 245 Exhibit 83, # 246 Exhibit 84, # 247 Exhibit 85, # 248 Exhibit 86, # 249 Exhibit 87, # 250 Exhibit 88, # 251 Exhibit 89) (JW). (Additional attachment(s) added on 4/26/2023: # 252 Exhibit 89A, # 253 Exhibit 89B, # 254 Exhibit 89C, # 255 Exhibit 89D, # 256 Exhibit 89E, # 257 Exhibit 89F, # 258 Exhibit 89G, # 259 Exhibit 89H, # 260 Exhibit 89I, # 261 Exhibit 90, # 262 Exhibit 90A, # 263 Exhibit 90B, # 264 Exhibit 90C, # 265 Exhibit 90D, # 266 Exhibit 90E, # 267 Exhibit 90F, # 268 Exhibit 90G, # 269 Exhibit 90H, # 270 Exhibit 91) (JW). (Additional attachment(s) added on 4/26/2023: # 271 Exhibit 91A, # 272 Exhibit 91B, # 273 Exhibit 91C, # 274 Exhibit 91D, # 275 Exhibit 91E, # 276 Exhibit 91F, # 277 Exhibit 91G, # 278 Exhibit 91H, # 279 Exhibit 91I, # 280 Exhibit 91J, # 281 Exhibit 91K, # 282 Exhibit 91L, # 283 Exhibit 91M, # 284 Exhibit 91N, # 285 Exhibit 92, # 286 Exhibit 92A, # 287 Exhibit 92B, # 288 Exhibit 92C, # 289 Exhibit 92D, # 290 Exhibit 92E, # 291 Exhibit 92F, # 292 Exhibit 92G, # 293 Exhibit 92H, # 294 Exhibit 92I, # 295 Exhibit 92J, # 296 Exhibit 92K, # 297 Exhibit 93, # 298 Exhibit 94, # 299 Exhibit 95, # 300 Exhibit 95A, # 301 Exhibit 95B, # 302 Exhibit 95C, # 303 Exhibit | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | 95D, # 304 Exhibit 95E) (JW). (Additional attachment(s) added on 4/26/2023: # 305 Exhibit 96, # 306 Exhibit 97, # 307 Exhibit 97A, # 308 Exhibit 97B, # 309 Exhibit 97C, # 310 Exhibit 97D, # 311 Exhibit 98, # 312 Exhibit 98A, # 313 Exhibit 98B, # 314 Exhibit 98C, # 315 Exhibit 98D, # 316 Exhibit 98E, # 317 Exhibit 99, # 318 Exhibit 99A, # 319 Exhibit 99B, # 320 Exhibit 99C, # 321 Exhibit 99D, # 322 Exhibit 100, # 323 Exhibit 101, # 324 Exhibit 101A) (JW). (Additional attachment(s) added on 4/26/2023: # 325 Exhibit 102, # 326 Exhibit 103, # 327 Exhibit 103A, # 328 Exhibit 104, # 329 Exhibit 105, # 330 Exhibit 105A, # 331 Exhibit 108, # 332 Exhibit 109A, # 333 Exhibit 109B, # 334 Exhibit 109C, # 335 Exhibit 109D, # 336 Exhibit 110) (JW). (Additional attachment(s) added on 4/27/2023: # 337 Exhibit 111, # 338 Exhibit 112, # 339 Exhibit 114, # 340 Exhibit 115, # 341 Exhibit 116A, # 342 Exhibit 116B, # 343 Exhibit 116C, # 344 Exhibit 116D, # 345 Exhibit 117, # 346 Exhibit 118, # 347 Exhibit 119, # 348 Exhibit 120, # 349 Exhibit 120A, # 350 Exhibit 120B, # 351 Exhibit 120C, # 352 Exhibit 120D, # 353 Exhibit 123, # 354 Exhibit 124, # 355 Exhibit 124.1, # 356 Exhibit 124.1A, # 357 Exhibit 124.2, # 358 Exhibit 124.3, # 359 Exhibit 124.3A, # 360 Exhibit 125, # 361 Exhibit 125A, # 362 Exhibit 126) (JW). (Entered: 04/24/2023) |  |
| 260 | 04/21/2023 | EXHIBIT LIST by Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Defendant Ervin's Exhibit 8, # 2 Defendant Ervin's Exhibit 26)(JW) (Entered: 04/24/2023) |  |
| 261 | 04/21/2023 | Court's Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |  |
| 262 | 04/21/2023 | Court's Revised Proposed Jury Instructions as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (FILED IN OPEN COURT). (JW) (Entered: 04/24/2023) |  |
| 263 | 04/21/2023 | JURY VERDICT as to Kristopher Justinboyer Ervin (FILED IN OPEN COURT). (Attachments: # 1 Restricted Unredacted Jury Verdict)(JW)(Entered: 04/24/2023) |  |
| 264 | 04/21/2023 | JURY VERDICT as to Matthew Raymond Hoover (2) (FILED IN OPEN COURT). (Attachments: # 1 Restricted Unredacted Jury Verdict)(JW)(Entered: 04/24/2023) |  |
| 266 | 04/21/2023 | Court Exhibits as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (JW) (Entered: 04/24/2023) |  |
| 267 | 04/24/2023 | NOTICE OF HEARING as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover: Sentencing set for July 31, 2023, at 9:30 a.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW)  (Entered: 04/24/2023) |  |
|  | 04/27/2023 | Remark: The flash drives containing the closing argument PowerPoint presentations by all counsel are stored with the exhibits in the trial exhibit storage room in the Clerk's Office. (JW) (Entered: 04/27/2023) |  |
| 268 | 04/28/2023 | Unopposed MOTION to Continue Deadline to File Motion for Judgment of Acquittal, and for Leave of Court to File a Motion in Excess of Twenty-Five Pages by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 4/28/2023, to edit text) (BGR). (Entered: 04/28/2023) |  |
| 269 | 05/01/2023 | ORDER granting 268 Unopposed Motion to Continue Deadline to File Motion for Judgment of Acquittal, and for Leave of Court to File a Motion in Excess of Twenty-Five Pages. Motion due May 19, 2023, and may not exceed 35 pages. Signed by Judge Marcia Morales Howard on 5/1/2023. (JW)  (Entered: 05/01/2023) |  |
| 270 | 05/03/2023 | Unopposed MOTION to Continue Deadline to File Motion for Judgment of Acquittal  by Kristopher Justinboyer Ervin. (King, Alex) (Entered: 05/03/2023) |  |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 271 | 05/04/2023 | ORDER granting 270 Unopposed Motion to Continue Deadline to File Motion for Judgment of Acquittal. Motion due May 19, 2023. Signed by Judge Marcia Morales Howard on 5/4/2023. (JW) (Entered: 05/04/2023) | |
| 272 | 05/05/2023 | TRANSCRIPT of Excerpt of Jury Trial Proceedings (remand arguments as to Hoover) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/26/2023. Redacted Transcript Deadline set for 6/5/2023. Release of Transcript Restriction set for 8/3/2023. (KMH) (Entered: 05/05/2023) | |
| 273 | 05/19/2023 | POST-VERDICT MOTION for Judgment of Acquittal by Kristopher Justinboyer Ervin. (King, Alex) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) | |
| 274 | 05/19/2023 | MOTION for Judgment of Acquittal by Matthew Raymond Hoover. (Zermay, Zachary) (Modified on 5/22/2023, to edit text) (BGR). (Entered: 05/19/2023) | |
| 275 | 05/25/2023 | MOTION to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 05/25/2023) | |
| 276 | 05/26/2023 | ENDORSED ORDER granting 275 Motion to Extend Time to Respond to Defendants' Motions for Judgment of Acquittal. The United States shall have up to and including June 16, 2023, to file its responses to Defendants' Motions for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 5/26/2023. (JW) (Entered: 05/26/2023) | |
| 277 | 06/06/2023 | TRANSCRIPT of Jury Selection and Trial (Volume 1 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/10/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/06/2023) | |
| 278 | 06/06/2023 | TRANSCRIPT of Jury Trial (Volume 2 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 04/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |  |
| 279 | 06/06/2023 | TRANSCRIPT of Jury Trial (Volume 3 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/12/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Modified on 6/6/2023, to edit text) (BGR). (Entered: 06/06/2023) |  |
| 280 | 06/06/2023 | TRANSCRIPT of Jury Trial (Volume 4 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/13/23 before Judge Howard. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (SMK) (Entered: 06/06/2023) |  |
| 281 | 06/07/2023 | TRANSCRIPT of Jury Trial (Volume 5 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/14/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction |  |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) | |
| 282 | 06/07/2023 | TRANSCRIPT of Jury Trial (Volume 6 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/17/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) | |
| 283 | 06/07/2023 | TRANSCRIPT of Jury Trial (Volume 7 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/19/23 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: 9043016843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) | |
| 284 | 06/07/2023 | TRANSCRIPT of Jury Trial (Volume 8 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/20/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) | |
| 285 | 06/07/2023 | TRANSCRIPT of Jury Trial (Volume 9 of 9) as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 4/21/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/28/2023. Redacted Transcript Deadline set for 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (KMH) (Entered: 06/07/2023) | |
| 286 | 06/12/2023 | MOTION to Continue Sentencing Hearing by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 06/12/2023) | |
| 287 | 06/13/2023 | MOTION for Forfeiture of a Preliminary Order for Involved-In Property and Substitute Assets by USA as to Kristopher Justinboyer Ervin. (Tran, Mai) (Entered: 06/13/2023) | |
| 288 | 06/13/2023 | ENDORSED ORDER as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover regarding 286 United States' Motion to Continue Sentencing Hearing. Defendants shall have up to and including June 20, 2023, to file responses to this motion. Signed by Judge Marcia Morales Howard on 6/13/2023. (JW) (Entered: 06/13/2023) | |
| 289 | 06/16/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover re 274 MOTION for Judgment of Acquittal (Taylor, Laura) (Entered: 06/16/2023) | |
| 290 | 06/16/2023 | RESPONSE in Opposition by USA as to Kristopher Justinboyer Ervin re 273 MOTION for Judgment of Acquittal (Taylor, Laura) (Modified on 6/20/2023, to edit text) (BGR). (Entered: 06/16/2023) | |
| 291 | 06/20/2023 | RESPONSE 286 MOTION to Continue Sentencing Hearing by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (King, Alex) (Entered: 06/20/2023) | |
| 292 | 06/20/2023 | NOTICE of Adoption by Matthew Raymond Hoover re 291 Response (Zermay, Zachary) (Modified on 6/21/2023, to edit text) (BGR). (Entered: 06/20/2023) | |
| 293 | 06/21/2023 | ORDER granting 286 Motion to Continue as to Kristopher Justinboyer Ervin (1), Matthew Raymond Hoover (2). Sentencing hearing continued to September 6, 2023, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 6/21/2023. (JW) (Entered: 06/21/2023) | |
| 296 | 08/07/2023 | MOTION for Miscellaneous Relief, specifically Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Taylor, Laura) (Entered: 08/07/2023) | |
| 297 | 08/08/2023 | ORDER taking under advisement 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. An IN PERSON hearing on the motion is set for Friday, August 11, 2023, at 2:00 p.m. in Courtroom 10B. Defendants and all counsel of record are required to be present. Signed by Judge Marcia Morales Howard on 8/8/2023. (JW) (Entered: 08/08/2023) | |
| 298 | 08/09/2023 | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Motion Hearing previously scheduled for August 11, 2023, at 2:00 p.m. is rescheduled as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. New hearing time: Motion Hearing set for August 11, 2023, at 1:30 p.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 08/09/2023) | |
| 299 | 08/09/2023 | JOHN CRUMP'S EMERGENCY MOTION to Intervene for the Limited Purpose of Responding to the United States' Motion for | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Order Prohibiting Dissemination of Presentence Investigation Report as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (MDC) (Entered: 08/09/2023) | |
| 300 | 08/09/2023 | First MOTION for Stephen D. Stramboulieh to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130611 for $150  by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) | |
| 301 | 08/09/2023 | First MOTION for Robert J. Olson to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-21130715 for $150  by John Crump as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Phillips, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/09/2023) | |
| 302 | 08/09/2023 | SUPPLEMENT to 296 Motion for Order Prohibiting Dissemination of Presentence Investigation Report by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (Attachments: # 1 Exhibits not scanned, filed separately)(MDC) (Entered: 08/09/2023) | |
| 303 | 08/10/2023 | ENDORSED ORDER granting 300 Motion for Special Admission by Stephen D. Stramboulieh, Esq. If Mr. Stramboulieh has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS)  Modified on 8/10/2023 (SHS). (Entered: 08/10/2023) | |
| 304 | 08/10/2023 | ENDORSED ORDER granting 301 Motion for Special Admission by Robert J. Olson, Esq. If Mr. Olson has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 8/9/2023. (SHS) (Entered: 08/10/2023) | |
| 305 | 08/10/2023 | ENDORSED ORDER taking under advisement 299 John Crump's Emergency Motion to Intervene. The Court intends to resolve the Motion at the August 11, 2023 Hearing. Signed by Judge Marcia Morales Howard on 8/10/2023. (MHM)  (Entered: 08/10/2023) | |
| 306 | 08/10/2023 | MOTION for Leave to File Amicus Curiae Brief and Brief Amicus Curiae of Eric Blandford, et al. in Support of 299 Emergency Motion by Eric J. Friday as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover. (BGR) (Entered: 08/11/2023) | |
| 307 | 08/11/2023 | ORDER permitting members of the press to enter the courthouse with laptop computers, tablets, and/or cell phones to attend the hearing set for today, August 11, 2023, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 8/11/2023. (JW)  (Entered: 08/11/2023) | |
| 308 | 08/11/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: MOTION hearing as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 8/11/2023; denying as moot 299 John Crump's Emergency Motion to Intervene; denying as moot 306 Motion for Leave to File Amicus Curiae Brief; withdrawing, in part, and denying, in part, 296 United States' Motion for Order Prohibiting Dissemination of Presentence Investigation Report. Court Reporter: Katharine Healey (JW) (Entered: 08/14/2023) | |
| 309 | 08/14/2023 | TRANSCRIPT of Motion as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover held on 08/11/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/14/2023. Release of Transcript Restriction set for 11/13/2023. (KMH) (Entered: 08/14/2023) | |
| 310 | 08/23/2023 | ORDER denying 273 Ervin's Motion for Judgment of Acquittal; denying 274 Hoover's Motion for Judgment of Acquittal. Signed by Judge Marcia Morales Howard on 8/23/2023. (JCM) (Entered: 08/23/2023) | |
| 313 | 08/30/2023 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 08/30/2023) | |
| 316 | 08/31/2023 | PRELIMINARY ORDER OF FORFEITURE (granting 287 Motion for Forfeiture of Property as to Kristopher Justinboyer Ervin (1)). Signed by Judge Marcia Morales Howard on 8/31/2023. (JW) (Entered: 08/31/2023) | |
| 318 | 09/01/2023 | SENTENCING MEMORANDUM by Matthew Raymond Hoover (Zermay, Zachary) (Entered: 09/01/2023) | |
| 319 | 09/01/2023 | SENTENCING MEMORANDUM by Kristopher Justinboyer Ervin as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Attachments: # 1 Exhibit A, # 2 Exhibit B)(King, Alex) (Entered: 09/01/2023) | |
| 320 | 09/02/2023 | SENTENCING MEMORANDUM by USA as to Kristopher Justinboyer Ervin, Matthew Raymond Hoover (Taylor, Laura) (Entered: 09/02/2023) | |
| 321 | 09/06/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/6/2023. The Court heard argument from counsel regarding the objections to the Presentence Investigation Report, resolved the objections, and announced the guidelines on the record. The parties made their presentations, and the Court heard from Defendants and their mitigation witnesses. The Court will pronounce sentence on September 7, 2023, at 11:30 a.m. Court Reporter: Katharine Healey (JW) (Entered: 09/08/2023) | |
| 322 | 09/06/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/6/2023. Defendant's Motion for Leave to File Letters in Support of Defendant Hoover Under Seal (Dkt. No. 317) is STRICKEN, and the Clerk of the Court is directed to remove this document from the Court record. The Court will consider the letters attached to the motion. The Court heard argument from counsel regarding the objections to the Presentence Investigation Report, resolved the objections, and announced the guidelines on the record. The parties made their presentations, and the Court heard from Defendants and their mitigation witnesses. The Court will pronounce sentence on September 7, 2023, at 11:30 a.m. Court Reporter: Katharine Healey (JW) (Entered: 09/08/2023) | |
| 323 | 09/07/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/7/2023 for Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00. Court Reporter: Katharine Healey (JW) (Entered: 09/14/2023) | |
| 326 | 09/07/2023 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 9/7/2023 for Matthew Raymond Hoover (2), Counts 1, 1s, 2-7, 2s-8s, Dismissed on Government's Motion; Counts 1ss, 2ss, 3ss, 5ss, 7ss, Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00. Court Reporter: Katharine Healey (JW) (Entered: 09/14/2023) | |
| 324 | 09/14/2023 | JUDGMENT as to Kristopher Justinboyer Ervin (1), Counts 1, 15ss-17ss, 16sss-18sss, 1s-7s, 1ss, 1sss, 2ss-7ss, 2sss-8sss, 8s, 8ss-14ss, 9s-14s, 9sss-15sss, Dismissed on Government's Motion; Counts 1ssss, 2ssss-8ssss, 9ssss, 10ssss-12ssss, Imprisonment: SIXTY-EIGHT (68) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One and Nine and SIXTY-EIGHT (68) MONTHS as to each Count Two through Eight and Ten through Twelve, all such terms to run concurrently; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Twelve, all such terms to run concurrently; Special Assessment: $1,200.00 Signed by Judge Marcia Morales Howard on 9/14/2023. (JW) (Entered: 09/14/2023) | |
| 327 | 09/14/2023 | JUDGMENT as to Matthew Raymond Hoover (2), Counts 1, 1s, 2-7, 2s-8s, Dismissed on Government's Motion; Counts 1ss, 2ss, 3ss, 5ss, 7ss, Imprisonment: SIXTY (60) MONTHS, consisting of SIXTY (60) MONTHS as to each Count One through Three, Five, and Seven, all such terms to run concurrently ; Supervised Release: THREE (3) YEARS, consisting of THREE (3) YEARS as to each Count One through Three, Five, and Seven, all such terms to run concurrently; Special Assessment: $500.00 Signed by Judge Marcia Morales Howard on 9/14/2023. (JW) (Entered: 09/14/2023) | |
| 329 | 09/14/2023 | TRANSCRIPT of Sentencing (Volume 1 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on 09/06/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) | |
| 330 | 09/14/2023 | TRANSCRIPT of Sentencing (Volume 2 of 2) as to Kristopher Justinboyer Ervin and Matthew Raymond Hoover held on | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 09/07/2023 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RMR, CRR, FPR-C. Email address: katharinehealey@bellsouth.net. Telephone number: (904) 301-6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (KMH) (Entered: 09/14/2023) | |
| 331 | 09/19/2023 | NOTICE OF APPEAL by Kristopher Justinboyer Ervin re 310 Order on Motion for Judgment of Acquittal, 324 Judgment. Filing fee paid $ 505, receipt number AFLMDC-21268505. (King, Alex) (Entered: 09/19/2023) | |
| 332 | 09/20/2023 | TRANSMITTAL of initial appeal package as to Kristopher Justinboyer Ervin to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 331 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (CTR) (Entered: 09/20/2023) | |
| 333 | 09/20/2023 | NOTICE OF APPEAL by Matthew Raymond Hoover re 310 Order on Motion for Judgment of Acquittal, 237 Order on Motion for Bill of Particulars, 141 Order on Motion to Dismiss, 327 Judgment 223 Order on Motion in Limine, 125 Order on Motion to Change Venue / Transfer Case, Order on Motion to Sever Defendant, 59 Order on Motion for Warrant. Filing fee paid $ 505, receipt number AFLMDC-21273895. (Larosiere, Matthew) (Entered: 09/20/2023) | |
| | 09/21/2023 | USCA Case Number as to Kristopher Justinboyer Ervin. USCA Number: 23-13062 for 331 Notice of Appeal filed by Kristopher Justinboyer Ervin. (SJW) (Entered: 09/22/2023) | |
| 334 | 09/25/2023 | TRANSMITTAL of initial appeal package as to Matthew Raymond Hoover to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 333 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (BCB) (Entered: 09/25/2023) | |
| | 09/27/2023 | USCA Case Number as to Matthew Raymond Hoover. USCA Number: 23-13062-D for 333 Notice of Appeal, filed by Matthew Raymond Hoover. (SJW) (Entered: 09/27/2023) | |
| 335 | 10/02/2023 | PROOF OF PUBLICATION as to Kristopher Justinboyer Ervin newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from September 2, 2023 through October 1, 2023. (Tran, Mai) (Entered: 10/02/2023) | |
| 336 | 10/10/2023 | TRANSCRIPT information form filed by Matthew Raymond Hoover re 333 Notice of Appeal. USCA number: 23-13062. No transcript(s) requested. (Larosiere, Matthew) (Entered: 10/10/2023) | |
| 337 | 10/20/2023 | Judgment Returned Executed as to Kristopher Justinboyer Ervin on 9/29/2023. Institution: FCI Jesup. (BD) (Entered: 10/20/2023) | |
| 338 | 10/25/2023 | MOTION to Withdraw as Attorney  by Alex King., MOTION to Appoint Counsel , MOTION to Extend Time to appeal filings deadline  by Kristopher Justinboyer Ervin. (King, Alex) Motions | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | referred to Magistrate Judge Monte C. Richardson. (Entered: 10/25/2023) | |
| 339 | 11/06/2023 | ORDER Setting Hearing on Motion to Withdraw as Counsel and denying 338 Motion to Extend Time as to Kristopher Justinboyer Ervin (1). Signed by Magistrate Judge Monte C. Richardson on 11/6/2023. (SHS) (Entered: 11/06/2023) | |
| 340 | 11/06/2023 | Writ of Habeas Corpus ad Testificandum Issued for Kristopher Justinboyer Ervin for an in camera ex parte hearing to be held on 11/29/2023 at 11:00 a.m. as to Kristopher Justinboyer Ervin. Signed by Judge Magistrate Judge Monte C. Richardson. (SHS) (Entered: 11/06/2023) | |
| 341 | 11/16/2023 | Notice of substitution of AUSA. Jennifer Michele Harrington substituting for Mai Tran. (Harrington, Jennifer) (Entered: 11/16/2023) | |
| 343 | 11/29/2023 | ***CJA 23 Financial Affidavit (FILED IN OPEN COURT) by Kristopher Justinboyer Ervin. (SHS) (Entered: 11/29/2023) | |
| 344 | 12/01/2023 | ORDER of Appointment of CJA Counsel as to Kristopher Justinboyer Ervin: Appointment of Attorney Valarie Linnen for Kristopher Justinboyer Ervin. Signed by Magistrate Judge Monte C. Richardson on 11/29/2023. (SHS) (Entered: 12/01/2023) | |
| | 01/26/2024 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for purposes of this appeal re: 331 Notice of Appeal as to Kristopher Justinboyer Ervin. All documents are imaged and available for the USCA to retrieve electronically. USCA number: 23-13062-JJ. (SJW) (Entered: 01/26/2024) | |
| 345 | 02/08/2024 | MOTION for Forfeiture of a Second Preliminary Order for Substitute Asset by USA as to Kristopher Justinboyer Ervin. (Harrington, Jennifer) (Entered: 02/08/2024) | |
| 346 | 02/23/2024 | SECOND PRELIMINARY ORDER OF FORFEITURE FOR SUBSTITUTE ASSET (granting 345 Motion for Forfeiture of Property as to Kristopher Justinboyer Ervin (1)). Signed by Judge Marcia Morales Howard on 2/23/2024. (JW) (Entered: 02/23/2024) | |
| 347 | 03/07/2024 | PROOF OF PUBLICATION as to Kristopher Justinboyer Ervin newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from February 6, 2024, through March 6, 2024. (Harrington, Jennifer) (Entered: 03/07/2024) | |
| 348 | 04/29/2024 | PROOF OF PUBLICATION as to Kristopher Justinboyer Ervin newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from March 13, 2024 through April 11, 2024. (Harrington, Jennifer) (Entered: 04/29/2024) | |
| 349 | 05/13/2024 | MOTION for Forfeiture of a Final Order for Substitute Assets by USA as to Kristopher Justinboyer Ervin. (Harrington, Jennifer) (Entered: 05/13/2024) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# Doc. 253

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

**UNITED STATES' SUPPLEMENT TO PROPOSED JURY INSTRUCTION**

      The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, requests that the following additional language be included in the Court's instruction to the jury regarding the Transfer of Unregistered Firearms under 26 U.S.C. § 5861(e) (*see* Requested Jury Instruction No. 19 in United States' Proposed Jury Instructions, Doc. 225 at 48-49):

> The Government does not have to prove that the item described in the indictment would have successfully converted a particular individual's weapon into a machinegun, or that the defendant or another individual possessed a fully assembled machinegun.  It is only necessary that it prove that the Defendant designed and intended the item to convert a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

This additional instruction is necessary due to testimony elicited by the defendants' counsel regarding the purported obsolescence or lack of availability of certain other parts supposedly needed to convert an AR-15 into a machinegun with the Auto Key Card.  The law is clear that a lack of an appropriate projectile or component part does not render a particular item not a firearm where it otherwise fits the definition under the statute.  *See, e.g.*, *United States v. Melancon*, 462 F.2d 82, 95-96 (5th Cir. 1972) (holding that defendant possessed a mortar which constituted a destructive device, that is, a firearm within the purview of 26 U.S.C. § 5861(d), even where the government could not prove the existence of a projectile to use in it because the mortar "was nevertheless a firearm (or destructive device) capable of being fired and was possessed in an unregistered state.  Within the plain words of the statute, the weapon was there.  A lack of appropriate ammunition could not and did not render the weapon non-existent."); *United States . McCauley*, 601 F.2d 336, 340-41 (8th Cir. 1979) (holding that a defendant still possessed a machinegun even where the gun lacked the magazine necessary for firing automatically because there was no evidence that it lacked an "irreplaceable" part making it "permanently incapable of automatic fire"); *United States v. Griley*, 814 F.2d 967, 975 (4th Cir. 1987) ("A machinegun which is capable of being restored to working order falls under the statutory definition."); *United States v. Kuzma*, 967 F.3d 959, 969-70 (9th Cir. 2020) (affirming one of two convictions for possession of an unregistered machinegun and noting that "because the design of an item turns on its *apparent* purpose as reflected in its particular configuration of structural features, a device remains 'designed' for a

particular use even though, due to a readily fixable defect, the device cannot at that moment be put to that use:  a car with a dead battery is still 'designed' to be driven.") (emphasis in original) (citation omitted).

The United States additionally requests that the Court advise counsel not to make an argument to the jury, premised on this testimony, which would be contrary to the law.  The Court has already ruled that the defendants cannot present a defense that is unsupported by the law in its Order regarding the motions *in limine*.  Doc. 223 at 11.  *See also United States v. Valdes-Guerra*, 758 F.2d 1411, 1416 (11th Cir. 1985) (holding that "[d]efense counsel may not argue incorrect or inapplicable theories of law to a jury"); *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) (affirming district court's limitations on defense arguments, noting that when "arguing the law

to the jury, counsel is confined to principles that will later be incorporated and charged to the jury").

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   s/ *Laura Cofer Taylor*
      LAURA COFER TAYLOR
      Assistant United States Attorney
      USA No. 170
      E-mail: Laura.C.Taylor@usdoj.gov

      DAVID B. MESROBIAN
      Assistant United States Attorney
      USA No. 188
      E-mail: David.Mesrobian@usdoj.gov

      300 N. Hogan Street, Suite 700
      Jacksonville, Florida 32202
      Telephone:   (904) 301-6300
      Facsimile:    (904) 301-6310

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2023, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

> Alex King, Esq.
> *Counsel for defendant KRISTOPHER JUSTINBOYER ERVIN*

> Zachary Z. Zermay
> Matthew Larosiere
> *Counsel for defendant MATTHEW RAYMOND HOOVER*

> *s/ Laura Cofer Taylor*
> LAURA COFER TAYLOR
> Assistant United States Attorney

# Doc. 261

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                    Case No.  3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER
_____

## COURT'S PROPOSED JURY INSTRUCTION NO. 1

Members of the Jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case.  After I have completed these instructions, you will hear the closing arguments of the attorneys and then you will go to the jury room and begin your discussions – what we call your deliberations.

You must decide whether the Government has proved the specific facts necessary to find each Defendant guilty beyond a reasonable doubt.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 1 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 2A

### The Duty to Follow Instructions
### And the Presumption of Innocence

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against any Defendant or the Government.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against a Defendant is not evidence of guilt. The law presumes every Defendant is innocent. A Defendant does not have to prove his innocence or produce any evidence at all. The Government must prove guilt beyond a reasonable doubt. If the Government fails to do so as to any Defendant on any charge, you must find that Defendant not guilty on that charge.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 2.1 (2022) (modified).

## <u>COURT'S PROPOSED JURY INSTRUCTION NO. 2B</u>

### The Duty to Follow Instructions and the Presumption of Innocence When a Defendant Does Not Testify

Your decision must be based only on the evidence presented during the trial.  You must not be influenced in any way by either sympathy for or prejudice against any Defendant or the Government.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole.  You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against a Defendant is not evidence of guilt.  The law presumes every Defendant is innocent.  A Defendant does not have to prove his innocence or produce any evidence at all.  A Defendant does not have to testify, and if either Defendant chose not to testify, you cannot consider that in any way while making your decision.  The Government must prove guilt beyond a reasonable doubt.  If it fails to do so as to any Defendant on any charge, you must find that Defendant not guilty on that charge.

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 2.2 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 3

### Definition of "Reasonable Doubt"

The Government's burden of proof is heavy, but it does not have to prove a Defendant's guilt beyond all <u>possible</u> doubt.  The Government's proof only has to exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you have carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs.  If you are convinced that a Defendant has been proved guilty beyond a reasonable doubt, say so.  If you are not convinced, say so.

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 3 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 4

### Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court

As I said before, you must consider only the evidence that I have admitted in the case.  Evidence includes the testimony of witnesses and the exhibits admitted.  But, anything the lawyers say is not evidence and is not binding on you.

You should not assume from anything I have said that I have any opinion about any factual issue in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions.  You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.  There is no legal

difference in the weight you may give to either direct or circumstantial

evidence.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 4 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 5

### Credibility of Witnesses

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome of the case?

- Did the witness seem to have a good memory?

- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

- Did the witness appear to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from other testimony or other evidence?

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 5 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 6A

**Impeachment of Witnesses Because of Inconsistent Statements**

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 6.1 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 6B

### Impeachment of Witnesses Because of
### Inconsistent Statements
### (Defendant with no Felony Conviction Testifies)

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact.  And ask whether there was evidence that at some other time a witness said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it.  People naturally tend to forget some things or remember them inaccurately.  So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

A defendant has a right not to testify.  But since [a Defendant or both Defendants] did testify, you should decide whether you believe that Defendant's testimony in the same way as you consider the testimony of any other witness.

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 6.3 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 7

### Testimony of Accomplice, Informer, or Witness with Immunity

You must consider the testimony of some witnesses with more caution than others.

For example, a witness who has been promised immunity from prosecution or a witness who hopes to gain more favorable treatment in his own case may have a reason to make a false statement in order to strike a good bargain with the Government.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Special Instruction 1.1 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 8

### Expert Witness

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 7 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 9

### Limiting Instruction

The Government has presented agents of the United States who have testified as to the meaning of certain terms, laws, and regulations pertaining to firearms.  In addition, witnesses may have referred to items as "firearms" or "machinegun conversion devices."  As with any evidence, you may give this testimony as much or as little weight and credit as you determine it deserves.

Remember you must follow my instructions on the law and decide for yourselves based on the evidence in this case and my instructions whether the Auto Key Card is a machinegun subject to firearm laws and regulations.

Source(s):
Maiz v. Virani, 253 F.3d 641, 667 (11th Cir. 2001); United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991); United States v. Schultz, No. 8:02-CR-111-T-17MAP, 2005 WL 8162669, at *1 (M.D. Fla. Feb. 24, 2005).

## COURT'S PROPOSED JURY INSTRUCTION NO. 10

### Transcript of Tape Recorded Conversation

You will recall that a number of exhibits were identified as typewritten transcripts of the oral conversations heard on audio and video recordings that were received in evidence. The transcripts also purport to identify the speakers engaged in the conversations.

I admitted the transcripts for the limited and secondary purpose of helping you follow the content of the conversations as you listen to the recordings, and also to help you identify the speakers.

But you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based on your own evaluation of any testimony you heard about the preparation of the transcripts, and from your own examination of the transcripts in relation to hearing and viewing the recordings themselves as the primary evidence of their own contents.

If you determine that any transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Trial Instruction 3 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 11

### Note-taking

You have been permitted to take notes during the trial.  Most of you – perhaps all of you – have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence.  And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Special Instruction 5 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 12

### Introduction to Offense Instructions

The indictment in this case charges the Defendants with committing a number of crimes which are set forth separately in what we refer to as "counts." Each count has a number. You will be given a copy of the indictment to refer to during your deliberations. I remind you that the indictment is <u>not</u> evidence of anything. It is simply the formal document that sets forth the charges.

In Count One of the indictment, the Defendants are not charged with committing a substantive offense. Instead, they are charged with conspiring to commit a substantive offense. Specifically, the Defendants are charged with knowingly and willfully conspiring to transfer unregistered machinegun conversion devices.

In the remaining Counts of the indictment, each Defendant is charged with committing certain "substantive offenses." Specifically, in Counts Two through Eight, Mr. Ervin and Mr. Hoover are each charged with knowingly transferring, and aiding and abetting the transfer of, unregistered machinegun conversion devices. In Count Nine, Mr. Ervin is charged with structuring cash withdrawals for the purpose of evading

currency-transaction reporting requirements.  And in Counts Ten, Eleven, and Twelve, Mr. Ervin is charged with possessing unregistered machinegun conversion devices on three separate dates.  I will explain the law governing those substantive offenses in a moment.

But first note that the Defendants are not charged in Count One with committing a substantive offense – they are charged with <u>conspiring</u> to commit a particular offense.  I will now give you specific instructions on the conspiracy charge.

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 8 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 13

### General Conspiracy Charge
### 18 U.S.C. § 371

As I previously stated, Count One charges the Defendants with conspiring to transfer machinegun conversion devices that were not registered in the National Firearms Registration and Transfer Record. It is a separate Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out.

A "conspiracy" is an agreement by two or more people to commit an unlawful act. In other words, it is a kind of "partnership" for criminal purposes. Every member of a conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement.

The Government does not have to prove that the members planned together <u>all</u> the details of the plan or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

The heart of a conspiracy is the making of the unlawful plan itself followed by the commission of any overt act. The Government does not have to prove that the conspirators succeeded in carrying out the plan.

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt as to him:

(1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

(2) the Defendant knew the unlawful purpose of the plan and willfully joined in it;

(3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

(4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An "overt act" is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If a Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in

the plan on at least one occasion, that is sufficient for you to find that Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests does not establish proof of a conspiracy. A person who does not know about a conspiracy but happens to act in a way that advances some purpose of one does not automatically become a conspirator.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 13.1 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 14

### Transfer of Unregistered Firearm
### 26 U.S.C. § 5861(e)

Counts Two through Eight charge the Defendants with transferring, and aiding and abetting the transfer of, machinegun conversion devices that were not registered in the National Firearms Registration and Transfer Record.  It is a Federal crime for anyone to transfer certain kinds of firearms that are not properly registered to him in the National Firearms Registration and Transfer Record.

A "firearm" includes a machinegun.  Under the law, a machinegun includes a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  A machinegun must be properly registered in the National Firearms Registration and Transfer Record.

To "transfer" a firearm means to deliver it to someone else.

A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly transferred, or aided and abetted the transfer of, a firearm;

(2) the firearm was not registered in the National Firearms Registration and Transfer Record; and

(3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration under the National Firearms Registration and Transfer Record.

The Government does not have to prove that the Defendant knew the item described in the indictment was a firearm that must be legally registered. The Government only has to prove beyond a reasonable doubt that the Defendant knew about the specific characteristics or features of the firearm that made it subject to registration, namely, that it was a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 106.1 (2022) (modified); see also 11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 34.2 (2022) (definition of "transfer").

## COURT'S PROPOSED JURY INSTRUCTION NO. 15

### Pinkerton Instruction
### [*Pinkerton v. U.S.*, 328 U.S. 640 (1946)]

During a conspiracy, if a conspirator commits a crime to advance the conspiracy toward its goals, then in some cases a coconspirator may be guilty of the crime even though the coconspirator did not participate directly in the crime.

So regarding Counts Two through Eight, if you have first found the Defendants guilty of the conspiracy charged in Count One, you may also find a Defendant guilty of any of the crimes charged in Counts Two through Eight even though the Defendant did not personally participate in the crime. To do so, you must find beyond a reasonable doubt that:

(1) during the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose;

(2) the Defendant was a knowing and willful member of the conspiracy when the crime was committed; and

(3) it was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 13.5 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 16

### Aiding and Abetting; Agency
### 18 U.S.C. § 2

You will note that, in Counts Two through Eight, the Defendants are also charged with aiding and abetting the commission of the alleged crimes. It is possible to prove a Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person, or "agent." Or it may be done by acting with or under the direction of others.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime.

A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person. A Defendant is also responsible if he willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the

Defendant was a willful participant and not merely a knowing spectator.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Special Instruction 7 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 17

### Evading a Currency-Transaction Reporting Requirement by Structuring Transaction
### 31 U.S.C. § 5324(a)(3)

Count Nine charges Mr. Ervin with structuring cash withdrawals for the purpose of evading currency-transaction reporting requirements. It is a Federal crime under certain circumstances for anyone to knowingly evade a currency-transaction reporting requirement.

Domestic financial institutions and banks (with specific exceptions) must file currency-transaction reports with the Government. They must list all deposits, withdrawals, transfers, or payments involving more than $10,000 in cash or currency.

Mr. Ervin can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly structured or helped to structure a currency transaction;

(2) the purpose of the structured transaction was to evade the transaction-reporting requirements; and

(3) the structured transaction involved one or more domestic financial institutions.

To "structure" a transaction means to deposit, withdraw, or otherwise participate in transferring a total of more than $10,000 in cash

or currency using a financial institution or bank by intentionally setting

up or arranging a series of separate transactions, each one involving less

than $10,000, in order to evade the currency-reporting requirement that

would have applied if fewer transactions had been made.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 112 (2022).

## <u>COURT'S PROPOSED JURY INSTRUCTION NO. 18</u>

### Possession of Unregistered Firearm
### 26 U.S.C. § 5861(d)

Counts Ten, Eleven, and Twelve charge Defendant Ervin with possessing unregistered machinegun conversion devices.  It is a Federal crime for anyone to possess certain kinds of firearms that are not properly registered to him in the National Firearms Registration and Transfer Record.

A "firearm" includes a machinegun.  Under the law, a machinegun includes a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  A machinegun must be properly registered in the National Firearms Registration and Transfer Record.

Defendant Ervin can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly possessed a firearm;

(2) the firearm was not registered to the Defendant in the National Firearms Registration and Transfer Record; and

(3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration

under the National Firearms Registration and Transfer Record.

The Government does not have to prove that the Defendant knew the item described in the indictment was a firearm that must be legally registered. The Government only has to prove beyond a reasonable doubt that the Defendant knew about the specific characteristics or features of the firearm that made it subject to registration, namely, that it was a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Offense Instruction 106.1 (2022) (modified).

## COURT'S PROPOSED JURY INSTRUCTION NO. 19

### Possession

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

"Actual possession" of a thing occurs if a person knowingly has direct physical control of it.

"Constructive possession" of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it later.

"Sole possession" of a thing occurs if a person is the only one to possess it.

"Joint possession" of a thing occurs if two or more people share possession of it.

The term "possession" includes actual, constructive, sole, and joint possession.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Special Instruction 6 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 20

### On or About; Knowingly; Willfully – Generally

You will see that the indictment charges that a crime was committed "on or about" a certain date. The Government does not have to prove that the crime occurred on an exact date. The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instructions 9.1A (2022).

## <u>COURT'S PROPOSED JURY INSTRUCTION NO. 21</u>

### Conjunctively Charged Counts

Where a statute specifies multiple alternative ways in which an offense may be committed, the <u>indictment</u> may allege the multiple ways in the conjunctive, that is, by using the word "and." If only <u>one</u> of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously as to that alternative.

<u>Source(s):</u>
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 8.1 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 22

### Caution: Punishment
### (Multiple Defendants, Multiple Counts)

Each count of the indictment charges a separate crime against one or both of the Defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each Defendant separately and individually. If you find a Defendant guilty of one crime, that must not affect your verdict for any other crime or any other Defendant.

I caution you that each Defendant is on trial <u>only</u> for the specific crimes charged in the indictment. You are here to determine from the evidence in this case whether each Defendant is guilty or not guilty of each of those specific crimes.

You must never consider punishment in any way to decide whether a Defendant is guilty. If you find a Defendant guilty, the punishment is for the Judge alone to decide later.

<u>Source(s)</u>:
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 10.4 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 23

### Duty to Deliberate

Your verdict, whether guilty or not guilty, must be unanimous – in other words, you must all agree.  Your deliberations are secret, and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another and try to reach an agreement.  While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong.  But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges – judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 11 (2022).

## COURT'S PROPOSED JURY INSTRUCTION NO. 24

### Verdict

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and will speak for you in court.

A verdict form has been prepared for your convenience for each Defendant.

[Explain verdict]

Take the verdict forms with you to the jury room. When you have all agreed on the verdict for each Defendant, your foreperson must fill in the verdict forms, sign them, date them, and carry them. Then you will return the verdict forms to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I will respond as promptly as possible – either in writing or by talking to you in the courtroom. But I caution you not to tell me how many jurors have voted one way or the other in any note you may send me.

Source(s):
11th Cir. Pattern Jury Instr. Criminal – Basic Instruction 12 (2022) (modified).

# Doc. 279

```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3  UNITED STATES OF AMERICA,      Case No. 3:21-cr-22(S4)-MMH-MCR

 4       Plaintiff,                April 12, 2023

 5  v.                             9:03 a.m. - 5:45 p.m.

 6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
    and MATTHEW RAYMOND HOOVER,
 7
 8       Defendants.
    _____

 9
                          JURY TRIAL
10                     (VOLUME 3 of 9)

11
          BEFORE THE HONORABLE MARCIA MORALES HOWARD
12                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20       Katharine M. Healey, RMR, CRR, FPR-C
         PO Box 56814
21       Jacksonville, FL 32241
         Telephone: (904) 301-6843
22       KatharineHealey@bellsouth.net

23

24                   (Proceedings reported by stenography;
                     transcript produced by computer.)
25
```

```
 1              A P P E A R A N C E S

 2

 3  COUNSEL FOR THE GOVERNMENT:

 4       LAURA C. TAYLOR, ESQUIRE
         DAVID MESROBIAN, ESQUIRE
 5       United States Attorney's Office
         300 North Hogan Street, Suite 700
 6       Jacksonville, FL 32202

 7

 8  COUNSEL FOR DEFENDANT ERVIN:

 9       ALEX KING, ESQUIRE
         Monroe & King, P.A.
10       1805 Copeland Street
         Jacksonville, FL 32204
11

12  COUNSEL FOR DEFENDANT HOOVER:

13
         ZACHARY Z. ZERMAY, ESQUIRE
14       Zermay Law
         1762 Windward Way
15       Sanibel, FL 33957

16  - A N D -

17       MATTHEW LAROSIERE, ESQUIRE
         6964 Houlton Circle
18       Lake Worth, FL 33467

19

20

21

22

23

24

25
```

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 85 of 230

I N D E X

                                                              PAGE

GOVERNMENT'S WITNESSES:

SPECIAL AGENT JESSE HOOKER

    REDIRECT EXAMINATION BY MS. TAYLOR................... 17

POSTAL INSPECTOR KEITH HANNON

    DIRECT EXAMINATION BY MS. TAYLOR.................... 28

    CROSS-EXAMINATION BY MR. LAROSIERE.................. 81

    CROSS-EXAMINATION BY MR. KING...................... 82

    REDIRECT EXAMINATION BY MS. TAYLOR................. 89

SPECIAL AGENT JOHN POWLEY

    DIRECT EXAMINATION BY MS. TAYLOR.................... 94

    CROSS-EXAMINATION BY MR. LAROSIERE................ 104

    CROSS-EXAMINATION BY MR. KING..................... 106

    REDIRECT EXAMINATION BY MS. TAYLOR................ 107

SPECIAL AGENT MICHAEL MEDLIN

    DIRECT EXAMINATION BY MS. TAYLOR................... 111

POSTAL INSPECTOR RICHARD BATCHELDER

    DIRECT EXAMINATION BY MS. TAYLOR................... 121

    CROSS-EXAMINATION BY MR. KING..................... 126

POSTAL INSPECTOR CHRISTOPHER MARTIN

    DIRECT EXAMINATION BY MS. TAYLOR................... 128

ANDREA USECHE

    DIRECT EXAMINATION BY MR. MESROBIAN............... 133

    CROSS-EXAMINATION BY MR. KING..................... 154

I N D E X

                                                              PAGE

GOVERNMENT'S WITNESSES:

AMY SARKESE

    DIRECT EXAMINATION BY MR. MESROBIAN................. 158

    CROSS-EXAMINATION BY MR. KING...................... 174

    REDIRECT EXAMINATION BY MR. MESROBIAN.............. 192

    RECROSS-EXAMINATION BY MR. KING.................... 197

MATTHEW LeVAY

    DIRECT EXAMINATION BY MR. MESROBIAN................. 204

    CROSS-EXAMINATION BY MR. KING...................... 217

    REDIRECT EXAMINATION BY MR. MESROBIAN.............. 219


JUROR NO. 11 RELEASED................................... 233


DEFENDANT HOOVER'S MOTION FOR MISTRIAL.................. 235

DEFENDANT ERVIN'S MOTION FOR MISTRIAL................... 238

DEFENDANTS'S MOTIONS FOR MISTRIAL DENIED................ 276

E X H I B I T S

ADMITTED IN EVIDENCE                                     PAGE

1   GOVERNMENT'S EXHIBIT 26................................ 43

2

3   GOVERNMENT'S EXHIBITS 27A and 27B..................... 47

4   GOVERNMENT'S EXHIBIT 28................................ 53

5   GOVERNMENT'S EXHIBIT 29................................ 58

6   GOVERNMENT'S EXHIBITS 30 and 30A-30V.................. 57

7   GOVERNMENT'S EXHIBIT 31................................ 53

8   GOVERNMENT'S EXHIBIT 32................................ 66

9   GOVERNMENT'S EXHIBIT 33................................ 65

10   GOVERNMENT'S EXHIBITS 34-47........................... 72

11   GOVERNMENT'S EXHIBIT 49............................... 104

12   GOVERNMENT'S EXHIBITS 49A-49Q........................ 120

13   GOVERNMENT'S EXHIBIT 72................................ 36

14   GOVERNMENT'S EXHIBITS 101 and 101A................... 74

15   GOVERNMENT'S EXHIBITS 105 and 105A................... 75

16   GOVERNMENT'S EXHIBITS 124, 124.1, 124.1A, 124.2,
      124.3, and 124.3A................................... 101

17   DEFENDANT ERVIN'S EXHIBIT 26.......................... 200

18   COURT'S EXHIBIT 1 (filed under seal)................. 224

---

P R O C E E D I N G S

1  April 12, 2023                                    9:03 a.m.

2                        -  -  -

3      (All parties present.  Jury not present.)

4      COURT SECURITY OFFICER:  All rise.  The United States

5  District Court in and for the Middle District of Florida is now

6  in session.  The Honorable Marcia Morales Howard is now

7  presiding.

8      Please be seated, everyone.

9      THE COURT:  All right.  We are back on the record in

10  Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America vs.

11  Kristin Justinboyer Ervin and Matthew Hoover.

12      Ms. Taylor and Mr. Mesrobian are here on behalf of

13  the United States, along with the case agent.

14      Mr. King and Mr. Ervin are in the courtroom.

15      Mr. Zermay and Mr. Larosiere are here, along with

16  Mr. Hoover.

17      I understand from Ms. Wiles that there are some

18  issues we need to address before we bring the jury in.  Who

19  will I be hearing from?

20      MR. MESROBIAN:  Your Honor, it's me.

21      There are two issues.  The first, and I've talked to

22  counsel about this, with resect to the discussion of the emails

23  and Ms. Wolfe yesterday, so Ms. Wolfe advised us during

24  previous interviews that while she was assisting Mr. Ervin with

1  his business when things got busy, he controlled the email
2  accounts and created the admin@autokeycard.com account for her
3  to use.  I think we saw emails yesterday where she wrote him an
4  email, signed it "Carolanne," and addressed it to Justin in
5  that way.
6          After court last night I reviewed her text messages
7  with Mr. Ervin, which go back a number of years and are
8  voluminous.  In the later stages of the conspiracy, in January,
9  February -- or the alleged conspiracy -- there are a couple
10  screenshots that they discussed of emails in the Customer
11  Service account.  And there are other -- Mr. Ervin instructs
12  her at one point, "Don't respond to this email," which is an
13  email we located that's in the Customer Service account.  We
14  did not specifically ask her about those.  She may not have
15  recalled being involved in that account when we spoke to her
16  before.
17          I don't think -- and I've talked to Mr. King about
18  this.  I don't think that this changes anything in terms of
19  whether this is hearsay or not in terms of its an account that
20  Mr. Ervin had access to.
21          And regardless, these are effect on the listener
22  whether or not -- and Mr. King has so far cross-examined, and I
23  imagine he would cross-examine Ms. Wolfe as well, about the
24  lack of direct evidence in terms of whether or not he actually
25  read these emails.

1          However, to the extent that I was not clear or I
2  didn't account for those text messages in my proffer yesterday
3  I just wanted to make that clear for the Court, and also to
4  counsel, of course.
5          THE COURT:  All right.  Is there anything further
6  that we need to address with regard to that matter?
7          MR. KING:  Not on behalf of Mr. Ervin, Your Honor.
8          THE COURT:  Okay.
9          Go ahead, sir.
10          MR. MESROBIAN:  The other issue was, Your Honor, at
11  some point we would like to discuss with the Court the jail
12  call, Exhibit 17, that we were talking about yesterday and just
13  clarity on the path forward, because there is a summary exhibit
14  for another witness who would likely be the one through whom we
15  would introduce that call if we were allowed to do so, beyond
16  the 17.2 that we already discussed.  It's not necessary to do
17  that now, Your Honor.  I just wanted to put that on your radar
18  so that we could address it down the line if necessary, or now
19  too.
20          THE COURT:  There was one other thing I wanted to
21  look at on that, and so I think we'll do it at the break.
22          MR. MESROBIAN:  Okay.  Thank you, Your Honor.
23          THE COURT:  Well, but with regard to that, Mr. --
24  you're bringing it up.  It was Ms. Taylor.  I don't know who I
25  need to hear from on this, but address for me the specific

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 88 of 230

1  probative value that you think the GoFundMe page and the 17
2  series items have.  I understand your position to be that it is
3  an overt act in that it is the evidence of Mr. Ervin and
4  Mr. Hoover's desire to continue the conspiracy in order --
5  well, to raise money for the purpose of continuing the
6  conspiracy to engage in the illegal conduct; that is, the
7  manufacture and sale of what the government alleges to be
8  machine gun conversion devices, right?
9        MR. MESROBIAN:  Yes, Your Honor.  And I'm happy to
10  address this.
11        THE COURT:  Okay.  And I guess one concern I have is
12  when I look at Government's Exhibit 73, there's certainly
13  evidence of a desire to help Mr. Ervin get out of jail.  That's
14  it.
15        And then in the 17 series -- what is it specifically
16  in the 17 series that suggests that the purpose of helping him
17  get out is to continue the alleged illegal manufacture and sale
18  of these devices?  Where in the calls -- what's --
19        MR. MESROBIAN:  Well, I mean, I think the most direct
20  evidence of that would be 17.1, page 5 to 6, which is
21  Mr. Hoover, you know, saying, "I wondered if the one case gets
22  thrown out, if you can go back into manufacturing them."  And
23  Mr. Ervin replies, "I don't know.  I was wondering about that.
24  That's one of the things with, um, you know, 'cause then we can
25  ramp that sucker up.  I'll sell it, then we'll pile all that

1  into the new project."
2        You know, Your Honor, I think --
3        THE COURT:  So can I just address that with you?  I
4  read that the exact opposite.  I read that as, "We're not doing
5  this unless the case gets thrown out.  And if the case gets
6  thrown out, it was because the conduct wasn't illegal and then
7  we can go back to it."
8        MR. MESROBIAN:  That's just one example, Your Honor.
9  There's other references where they discuss making videos both
10  now and in the future.  That's 17.1, bottom of page 2; also in
11  17.3, where Mr. Hoover references the previous video as,
12  "Your" -- addressing Mr. Ervin, "Your videos are so hot."
13        Your Honor, there's also discussions of "leveling up,
14  doing more cool things."
15        Your Honor, I think when we're talking about a
16  conspiracy where we have to prove that, among other things,
17  that two or more people agreed to accomplish an unlawful plan
18  and that they understood the unlawful purpose of the plan and
19  joined in it, it's relevant that they knew each other.  It's
20  relevant that Mr. Hoover knew that Mr. Ervin had recently been
21  arrested and called him in jail.  It's relevant that they were
22  friends with each other.  It's relevant that they talk about
23  making videos together both in the past and in the future.
24  It's relevant that they discussed getting Mr. Ervin out on bond
25  because, you know, I think just talking -- whether it's the

1  case getting thrown out or whether it's Mr. Ervin getting out
2  on bond, they're talking about, "Can we keep manufacturing
3  these items?"
4        I think when the United States is alleging that these
5  items are illegal, to put this in the Title 21 context, if
6  Coconspirator 1 calls Coconspirator 2 in jail and says, "I hope
7  you can get out on bond so that" -- "and maybe we can keep
8  manufacturing meth," I think that's a much clearer case here.
9        But that's -- so I was sort of sitting there
10 yesterday listening to the discussion about raising money to
11 get him out on bond and I didn't understand, necessarily, how
12 that implicated the Sixth Amendment right.  And so I was -- I
13 mean, fundamentally, Your Honor, this is a direct conversation
14 between the alleged conspirators where they talk about one
15 conspirator's recent arrest for the conspiracy, what they can
16 do to get him out on bond, and then talking about future plans.
17 Whether that's manufacturing, whether that's making videos,
18 whatever it is, I'm not sure how -- I think the probative value
19 is very strong.
20       And to the extent that there's something to be
21 mitigated in terms of Sixth Amendment concerns, we're happy to
22 do that, but we did excise a large amount of this to try and
23 address those concerns already.
24       The other solution I was going to propose, or
25 compromise, or however you want to phrase it, I think to the

1  extent that there are concerns about the nature of the
2  GoFundMe, I don't think that we would concede that there's a
3  Sixth Amendment right to a GoFundMe.  But we would probably say
4  we don't need to seek introduction of those records related to
5  the GoFundMe.
6        But the call is essential, Your Honor, in terms of
7  the prob- -- these are the conspirators talking to each other
8  after one of them was recently arrested, and they bring up the
9  alleged conspiracy and acts related to it.  I'm not sure how
10 there isn't probative value to that.
11       THE COURT:  All right.  And Mr. King, I was -- well,
12 I reread the GoFundMe documents from start to finish last
13 night, and I don't see how that implicates Mr. Ervin's Sixth
14 Amendment right.  In fact, the GoFundMe page really talks about
15 just helping Mr. Ervin get his life back.
16       So my question really was more related to relevance.
17 But I'm not sure I see any implication on the Sixth Amendment.
18 You'll have to tell me what it is, because I don't see that
19 with regard to the GoFundMe page at all.
20       MR. KING:  And Your Honor, part of it is, you know,
21 obviously don't know what the witnesses are going to testify to
22 with regard to that, but that's where the money went.  So to --
23 you know, and then that dovetails into the relevance thing.  If
24 the only place the money goes to is for him to obtain
25 counsel . . .

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 90 of 230

1            THE COURT:  Well, the government's not going to ask

2   what the money was used for, are you?

3            MR. MESROBIAN:  No, Your Honor.

4            THE COURT:  Well, I'm -- so if you want to ask that,

5   Mr. King, then you're bringing it up, but --

6            MR. KING:  I understand, Your Honor.  But then if the

7   only purpose of it is to raise funds for counsel, then what is

8   that relevant to whether or not there's a conspiracy?  And I

9   think it's more of a relevancy issue.  But if it is brought in

10  to show that he raised money for him to get an attorney, and if

11  that's not what we're getting into -- and I understand that a

12  lot's been excised and we're talking about getting away from

13  that because that's more of the conversations in the jail

14  calls.  But from what I saw was there's conversations in the

15  jail calls, "We're raising money for bail" -- which he doesn't

16  have cash bail -- "and for an attorney," the money goes to an

17  attorney, and then we bring the documents showing the GoFundMe

18  account to try to raise the money, and the only document,

19  evidence, or witness that I'm aware of is going to say is the

20  jail call where it says it's to go towards bail and an

21  attorney.

22          And, you know, we all know he is not eligible for a

23  cash bond, so that would be for an attorney.  So that's where

24  it gets into the Sixth Amendment, because there's no other

25  evidence as to where that's going in terms of witnesses or jail

1   calls or things of that nature.

2            THE COURT:  Why do you keep saying he's not eligible

3   for cash bail?

4            MR. KING:  He was detained, Your Honor.  I mean, it's

5   not like in state court, where if he can raise a hundred

6   thousand dollars he can --

7            THE COURT:  I don't know when the calls took place,

8   whether that was before or after.  So March 30th, was that

9   after he was detained?  And when you say we all know --

10           MR. KING:  In terms of -- in terms of us, not the

11  jury.  I think that's fair.

12           THE COURT:  Mr. Mesrobian.

13           MR. MESROBIAN:  Just to say that I'm not sure whether

14  Mr. Hoover would have been aware of that during this call.

15          But the second issue related to this is that there

16  are videos on the exhibit list made by Mr. Hoover, and we

17  talked to Mr. King about this last night, specifically,

18  Exhibits 13 and 14 and possibly another, where he talks at

19  length about the GoFundMe and raising money to support

20  Mr. Ervin.

21          My intent, Your Honor, when -- because I'll be the

22  one introducing those through the witness, was as much

23  as about -- a few of them I'm going to have to play in their

24  entirety, but where I can limit it, I was going to, and just

25  play the relevant portions.

1          I think Mr. Larosiere and Mr. Zermay indicated to us

2    that they wanted the entirety of the videos introduced, and

3    possibly published, either in my presentation of the evidence

4    through a completeness request or in their cross-examination

5    because they would be in evidence.  Then we get into a problem

6    I think a little bit where the cat's a little bit out of the

7    bag about the GoFundMe.  And I'm not sure what the -- you know,

8    how we could say the call isn't allowable where they're

9    discussing the GoFundMe but the videos where Mr. Hoover talks

10   about the GoFundMe are.  So that was the other issue I just

11   wanted to put out there.

12          THE COURT:  All right.  Do I have those videos?

13          MR. MESROBIAN:  Yes.  The transcripts are in the

14   binders.  It's Exhibits 13 and 14.  Those are the ones I think

15   where the GoFundMe is discussed the most.

16          THE COURT:  Okay.  All right.  I'm inclined to allow

17   these, although I may require an additional redaction.  But

18   we'll take it up over the -- either the break in the morning or

19   over the lunch recess.

20          MR. MESROBIAN:  Thank you, Your Honor.

21          THE COURT:  All right.  Anything else we need to

22   address before I bring in the jury, Ms. Taylor?

23          MS. TAYLOR:  No, Your Honor.

24          THE COURT:  Mr. King?

25          MR. KING:  No, Your Honor, just that I -- we can do

1    it outside the presence of the jury, but I'm going to tender

2    Agent Hooker for redirect.

3          THE COURT:  You mean you're done?

4          MR. KING:  I'm done with my examination.  So just to

5    save time, if we want to start with Ms. Taylor.

6          THE COURT:  Okay.  Sure.  Agent Hooker?  Can we get

7    him.

8          MR. MESROBIAN:  Sorry, Your Honor, I had asked him to

9    step out because --

10          THE COURT:  No, thank you.  I appreciate that.

11   (Ms. Taylor and Mr. King confer.)

12   (Witness enters the courtroom.)

13          THE COURT:  Ms. Taylor.

14          MS. TAYLOR:  We were just talking about whether he

15   was going to say he had no further questions in front of the

16   jury or --

17          THE COURT:  Yes.

18          MS. TAYLOR:  Okay.

19          THE COURT:  I think it's appropriate for the jury to

20   understand.

21          If you'll -- let's get the jury in.

22          And Agent Hooker, if you'll resume your . . .

23          COURT SECURITY OFFICER:  All rise for the jurors.

24   (Jury enters, 9:20 a.m.)

25          COURT SECURITY OFFICER:  Please be seated.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 92 of 230

1    THE COURT:  All right.  Agent Hooker, you understand
2  that you're still under oath, sir?
3    THE WITNESS:  Yes, ma'am.
4    THE COURT:  All right.  Mr. King.
5    MR. KING:  Your Honor, I tender the witness.
6    THE COURT:  All right.
7    Ms. Taylor, redirect.
8    MS. TAYLOR:  Yes, Your Honor.
9                REDIRECT EXAMINATION
10 BY MS. TAYLOR:
11 Q.   Agent Hooker, on cross-examination by Mr. Zermay you were
12 asked whether you immediately put the auto key card into a
13 firearm, correct?
14 A.   Yes.
15 Q.   Is that -- is it your role as essentially a Field Special
16 Agent to do that kind of testing on machine gun conversion
17 devices?
18 A.   No, it is not.
19 Q.   And whose role is that?
20 A.   We have individuals classified as Firearms Enforcement
21 Officers.  They're located in Martinsburg, West Virginia, at
22 our facility there.  And we send all such devices to them for
23 examination.
24 Q.   So even if you went on a search warrant and found an M16
25 rifle, machine gun, would it go to them for examination and

1  testing to determine -- to test it to see if it functioned
2  fully automatically?
3  A.   Yes, it would.
4  Q.   You were also asked some questions about the
5  certifications of the searches of the National Firearms
6  Registration and Transfer Record.  Do you remember that?
7  A.   Yes.
8  Q.   And in particular, with Mr. Stennes, that he had some
9  firearms that had been registered under a trust, and that trust
10 didn't come up when you just searched Mr. Stennes's name,
11 correct?
12 A.   Correct.
13 Q.   But when you searched the name of the trust that
14 Mr. Stennes had given to you, then you were able to find those
15 A.   Yes.
16 Q.   And is it the case that -- if you know, is it the case
17 that in order for a firearm to be registered in the National
18 Firearms Registration and Transfer Record it has to have a
19 serial number?
20 A.   Yes.
21 Q.   Did any of the hundreds of auto key cards that you have
22 seized and examined in your investigation have a serial number
23 on them?
24 A.   No.
25 Q.   You also were asked some questions about the belt sanders

1   and whether the purpose of those was to polish the auto key

2   cards to make them more aesthetically attractive, correct?

3   A.   Correct.

4   Q.   Agent Hooker, you own firearms, correct?

5   A.   I do.

6   Q.   And when you're purchasing a firearm, is one of the things

7   that you consider in making -- in deciding which firearm to

8   choose the aesthetics of the firearm?

9   A.   Yes.  I want it to look nice.

10   Q.   So even though it's a functional firearm, you'd still like

11   it to look nice?

12   A.   Sure.

13          MS. TAYLOR:  And -- Your Honor, may I have a sidebar?

14          THE COURT:  You may.

15      (Proceedings at sidebar:)

16          MS. TAYLOR:  There is another type of machine gun

17   conversion device that -- it's called a portable wall hanger,

18   but it's a two-piece thing.  It's like the auto key card except

19   it was plastic.  And if you just snap the back off of it, then

20   you were done with finishing the manufacturing.

21          And Mr. Ervin had a video on his phone where he had

22   three of these items and he melted them with a torch and then

23   burnt the shipping box, which was addressed to his father at

24   the Kirkwall Court address.

25          In my view, Mr. King's cross-examination of what was

1   found in the house and whether -- how many drop-in auto sears

2   were found in the house opened the door to me asking Agent

3   Hooker whether he had evidence of Mr. Ervin possessing the

4   drop-in auto sear at another time.  But before I go down that

5   road I wanted to address it at sidebar.

6          THE COURT:  Mr. King, I think it did, but I'll hear

7   from you.

8          MR. KING:  Your Honor, the question I asked is what

9   he recovered in the home, which he didn't recover any of this.

10   It's off a video.  It's been untested.  There's no evidence

11   that it works and it's not anything that he recovered in the

12   home.  I asked, "What did you view or recover in the home?"

13          These are videos at an unrelated time that may or may

14   not be machine gun conversion devices.  It's extraordinarily

15   prejudicial and not probative to whether or not any of --

16   either to, A, my question, which was what was recovered in the

17   house, not what he has done in his lifetime; and B, you know,

18   what -- you know, whether or not this particular -- you know,

19   the auto key card is a machine gun conversion device.

20          And more importantly, it's -- you know, it's not

21   evidence to support what is an extraordinarily prejudicial

22   allegation that he had other machine gun conversion devices

23   based on a video that -- of an untested, unknown device that

24   was not even part of the question I asked.  And I can't think

25   of anything more prejudicial than --

1          THE COURT:  Well, if it's probative, it may still be
2     prejudicial.
3          But Ms. Taylor, tell me again what the evidence is.
4          MS. TAYLOR:  On Mr. Ervin's phone, there is a video,
5     it's a couple of minutes long, where it's taken -- you can see
6     a hand in the video, which I believe to be Mr. Ervin's hand.
7     There's a shipping box.  You can clearly see the label.  And it
8     says "Portable Wall Hanger" is the return address.  And it's
9     addressed to Kris Ervin at 2409 Kirkwall Court, which is
10    Mr. Ervin's father.
11         We've asked Mr. Ervin's father about this.  He has
12    said he didn't order the portable wall hanger.  Mr. Ervin would
13    use his father's credit card.  There was nobody else who used
14    the credit cart.
15         And in the video you can see the hand dump these
16    three items out of the box.  Like I said, they're made of
17    plastic.  And then he picks up this blow torch and blow torches
18    the three plastic items until they melt into a puddle.  And
19    then he blow torches the box and lights it on fire.
20         This was -- the video timestamp, sort of
21    automatically-generated for the video, is from November 5th of
22    2020, which is, of course -- I think it's the day after
23    Mr. Hoover releases his first video about the auto key card.
24    So it's within the conspiracy period.
25         And the fact that Mr. Ervin was going to the -- going

1     through the process of melting these into a puddle is evidence
2     of his consciousness of guilt and that he knew what they were
3     and believed that -- at least believed that they could work,
4     so --
5          THE COURT:  Mr. King, I do think that your
6     questioning yesterday opened the door for this.  I'll be happy
7     to give a limiting instruction if you'd like to propose a
8     limiting instruction, but I think you asked a number of
9     questions about whether there were any firearms or other types
10    of devices.  And so I'm -- I'm going to allow it, but if you
11    want me to give an instruction, I'll hear from you now as to
12    what that instruction should be.
13         MR. KING:  No, Your Honor.
14         THE COURT:  Okay.
15         (Proceedings in open court:)
16    BY MS. TAYLOR:
17    Q.    Agent Hooker, yesterday Mr. King asked you a number of
18    questions related to items that you found in Mr. Ervin's home
19    during the search warrant.  Do you recall that?
20    A.    Yes.
21    Q.    And some of those questions were whether you had found any
22    cutup lightning links or auto key cards, and you said no?
23    A.    Correct.
24    Q.    And whether you had found any drop-in auto sears, correct?
25    A.    Yes.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 95 of 230

1   Q.   And a drop-in auto sear, what is that?
2   A.   It's just a different type of machine gun conversion
3   device.
4   Q.   And you were also asked if you found in the home any
5   firearms that needed to be registered in the National Firearms
6   Registration and Transfer Record, and your answer was no?
7   A.   Correct.
8   Q.   In your investigation did you find other evidence that
9   Mr. Ervin had possessed a type of machine gun conversion device
10  prior to your search of the home?
11          THE COURT:  Excuse me a moment, Ms. Taylor.
12          Are you all right, ma'am?
13          JUROR:  Yes.  I'm sneezing.
14          THE COURT:  Okay.  God bless you.  Go ahead.
15          MS. TAYLOR:  Sorry.
16  BY MS. TAYLOR:
17  Q.   I'll ask my question again.
18          During your investigation did you find evidence of
19  Mr. Ervin possessing a machine gun conversion device at some
20  time before you executed the search warrant?
21  A.   Yes.
22  Q.   And can you describe what that is and where you found that
23  evidence?
24  A.   Yes.  After his arrest Mr. Ervin's phone was seized, and I
25  subsequently shipped it to a forensic examiner for examination

1   of the phone and the contents of the phone.
2          The -- I guess within the SIM card on the phone were
3   numerous videos.  And in viewing one of the videos I observed a
4   person with a package, maybe eight inches by six inches, maybe
5   three or four inches thick.  It was from the U.S. Postal
6   Service.  It was addressed to Kris Ervin at 2409 Kirkwall Court
7   in Orange Park, Florida, and the return sender was Portable
8   Wall Hanger in West Virginia.
9   Q.   Are you familiar with portable wall hanger?
10  A.   Yes.
11  Q.   What is it?
12  A.   It is a type of drop-in auto sear.  I'm aware that the
13  individual in West Virginia was prosecuted for selling those
14  devices.
15  Q.   And why was it -- but it was called "portable wall
16  hanger"?
17  A.   Yes.  It -- I guess how it was initially marketed was it
18  could be hammered into a wall or inserted into a wall, and you
19  could theoretically hang a coat hanger from it or hang some
20  type of articles of clothing.  But it could also be separated
21  from -- from that and used to convert an AR-15 into a fully
22  automatic machine gun.
23  Q.   Are you aware of, generally, what type of material the
24  portable wall hanger was made out of?
25  A.   I think it was some type of plastic or resin.  Often -- I

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 96 of 230

1  believe I was under the understanding that they were often 3D
2  printed.
3  Q.   And so a piece of it had to be snapped off for it to work?
4  A.   Correct.  It was a two-piece design, I guess marketed
5  theoretically to hang on your hall or to be inserted through
6  the drywall in the wall, and then if you snapped it from that
7  part, you could drop it into your AR-15.
8  Q.   And let's go back to the video that you were describing.
9  You said that it was a package with the return address of
10  "Portable Wall Hanger"?
11  A.   Yes.
12  Q.   And what else did you observe in that video?
13  A.   The package was opened.  Three portable wall hangers were
14  removed from the package.  The person lit a portable torch,
15  which is just a Coleman propane canister, a small Coleman
16  propane canister with a little torch screwed into the top.
17  They lit that with a cigarette lighter, which caused the torch
18  to ignite, and then they began to melt all three machine gun
19  conversion devices, and they burned the packaging as well.
20  Q.   And when you say there were three machine gun conversion
21  devices, were they still connected to the second piece or not?
22  A.   Two were -- had already been separated from the piece and
23  one was still connected to the wall hanger portion.
24  Q.   And in the video, can you see anybody's face?
25  A.   No.

1  Q.   Can you hear anybody's voice?
2  A.   No.
3  Q.   What -- what can you see that is -- would have potentially
4  be identifying of who was burning these items?
5  A.   You can see the person's hand and a portion of their arm.
6  Q.   And you have reviewed records related to a Discover credit
7  card that is owned by Kris Ervin, correct?
8  A.   Yes.
9  Q.   And who is Kris Ervin?
10  A.   Mr. Ervin's father.
11  Q.   And did it show a purchase for --
12        MR. KING:  Objection, hearsay.
13        THE COURT:  Let me see counsel at sidebar for a
14  moment.
15    (Proceedings at sidebar:)
16        THE COURT:  You're talking about the credit card
17  statement, Ms. Taylor?
18        MS. TAYLOR:  Yes.
19        THE COURT:  Yeah, I mean, that -- I think that would
20  be hearsay, Ms. --
21        MS. TAYLOR:  It's fine.  I can move on.
22        THE COURT:  Okay.
23    (Proceedings in open court:)
24  BY MS. TAYLOR:
25  Q.   Special Agent Hooker, you've spoken on numerous occasions

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 97 of 230

1  with Kris Ervin, Mr. Ervin's father, correct?
2  A.   Yes.
3  Q.   Are the hands on the video consistent with his hands?
4  A.   No.
5  Q.   Are the hands in the video consistent with Justin Ervin's
6  hands?
7  A.   I believe so.
8           MS. TAYLOR:  I have no further questions, Your Honor.
9           THE COURT:  All right.  Mr. Zermay, anything further
10  from this witness?
11          MR. ZERMAY:  No, Your Honor.
12          THE COURT:  Mr. King?
13          MR. KING:  No, Your Honor.  Thank you.
14          THE COURT:  All right, sir.  You may step down.
15          The government's next witness?
16          MS. TAYLOR:  The United States calls Postal Inspector
17  Keith Hannon.
18          Your Honor, may Special Agent Hooker be released?  We
19  are releasing him.
20          THE COURT:  Okay.  Unless he's under subpoena by the
21  defense.
22          MR. KING:  No, Your Honor, he's free to go.
23          THE COURT:  Mr. Zermay?
24          MR. ZERMAY:  He's not under subpoena from us, Your
25  Honor.

1           THE COURT:  All right.  Thank you.  You're free to
2  go, sir.
3           THE WITNESS:  Thank you.
4      (Witness exits the courtroom.)
5      (Witness enters the courtroom.)
6           THE COURT:  Sir, if you'll come all the way up here,
7  please.
8           COURTROOM DEPUTY:  Please raise your right hand.  Do
9  you solemnly swear that the testimony you're about to give
10  before this Court will be the truth, the whole truth, and
11  nothing but the truth, so help you God?
12          THE WITNESS:  I do.
13          COURTROOM DEPUTY:  You may have a seat.
14          THE WITNESS:  Thank you.
15          COURTROOM DEPUTY:  And if you could please state your
16  name for the record and spell your last name.
17          THE WITNESS:  Keith Hannon, H-a-n-n-o-n.
18          THE COURT:  Go ahead.
19  **POSTAL INSPECTOR KEITH HANNON, GOVERNMENT WITNESS, SWORN,**
20              DIRECT EXAMINATION
21  BY MS. TAYLOR:
22  Q.   Good morning, Inspector Hannon.  Could you please let the
23  jury know where you work and what your job title is.
24  A.   Absolutely.
25          I'm a U.S. Postal Inspector with the U.S. Postal

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 98 of 230

1   Inspection Service.  Postal Inspectors are federal agents who

2   investigate crimes that utilize the mail.  Those crimes can

3   range anything from mail theft, identify theft, mail fraud,

4   narcotics trafficking, firearms trafficking, the mailing of

5   hazardous devices, such as bombs or chemical weapons.

6   Q.    And so if -- do you often work with other federal

7   agencies?

8   A.    Yes, I do.

9   Q.    For example, on a drug trafficking case, you might work

10  with DEA?

11  A.    Yes, correct.

12  Q.    And in this particular case related to Mr. Ervin and

13  Mr. Hoover what agency were you working with?

14  A.    In this case I was partnered with ATF.

15  Q.    And how were you -- who first contacted you to ask for

16  your assistance on this matter?

17  A.    ATF Special Agent Jesse Hooker.

18  Q.    And do you know the reason why Agent Hooker contacted you

19  to ask for assistance?

20  A.    Yes.  He requested assistance in a case where he had

21  intercepted or was made aware of an item called an auto key

22  card.  And he believed they were utilizing the U.S. Postal

23  Service to facilitate the mailing of these devices, so he

24  requested my assistance.

25  Q.    And could you tell me whether -- what steps -- what were

1   the first steps that you determined to take in your

2   investigation?

3   A.    Special Agent Hooker had made an undercover purchase of an

4   auto key card device.  He provided me with the tracking

5   information from the parcel that he received containing one of

6   those devices.  Based off information contained on the mailing

7   label, primarily the tracking number, I queried that in some

8   postal databases and determined that the postage was paid for

9   that using a postage meter.

10  Q.    And what -- can you describe what a postage meter is?

11  A.    A postage meter is a way a business or a person can print

12  U.S. postage at home or at a business.  It alleviates them from

13  having to go into a post office, wait in line to pay.  So it's

14  pretty much prepaid postage.  So you can pay the postage on an

15  envelope or a box or any size parcel and either just go into

16  the post office and leave it, leave it in a blue Postal Service

17  collection box, or hand it to your mailman for entry into the

18  mail stream.

19  Q.    Now, if -- if you -- like let's say I'm running a small

20  business selling things on eBay or Etsy or a website like that

21  would I have my own personal postage meter?

22  A.    Yes, you could.

23  Q.    If I'm using eBay to ship out the packages, I'm buying my

24  postage via eBay or Etsy, then would mine all be on one

25  individual postage meter that was specific to me?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 99 of 230

1   A.    Yes.  You could have a postage meter set up that way, yes.
2   Q.    Would it be possible also that eBay or Etsy would have
3   their own postage meter that was being used to ship -- ship
4   items for multiple eBay or Etsy users?
5   A.    Yes, that is possible.
6   Q.    Okay.  In this case -- sorry.  You identified a particular
7   postage meter that had been used to ship the undercover
8   purchased package to Special Agent Hooker?
9   A.    Yes, I did.
10        MS. TAYLOR:  Your Honor, may I approach with
11   Exhibit 72?
12        THE COURT:  You may.
13   BY MS. TAYLOR:
14   Q.    Could you tell the jurors what Exhibit 72 is?
15   A.    Yes.  Exhibit 72 is a document from my agency's
16   Intelligence Unit.  I submitted the documents and the
17   information I had discovered regarding the postage meter from
18   Special Agent Hooker's undercover purchase.  I submitted the
19   information to them.  From there they conducted database
20   searches and obtained the registered user information for that
21   meter as well as a mailing log of all the parcels associated
22   with that meter.
23   Q.    And is that what's reflected in there?
24   A.    Yes.
25   Q.    And so essentially it's just data related to each shipment

1   that was sent using that postage meter?
2   A.    Yes, correct.
3         MS. TAYLOR:  I move for admission of Exhibit 72.
4         MR. KING:  Your Honor, if we could approach sidebar.
5         THE COURT:  You may.
6   (Proceedings at sidebar:)
7         THE COURT:  Yes, Mr. King.
8         MR. KING:  Your Honor, we would object to this
9   exhibit on a couple of grounds.  One, there's not a business
10   records certification.  Two, the first page, if you read it,
11   towards the bottom, it makes it very clear that this was
12   prepared for litigation by law enforcement and only for law
13   enforcement purpose.  And three, the rest of it indicates that
14   it's for a Stamps.com account, not from the government.
15        This witness did not generate this and he's not
16   competent to testify to this, and it is otherwise hearsay
17   without an exception.  It's not a business record and it's not
18   a public record because it was created for litigation.  The
19   first page indicates that it was for the purposes of criminal
20   investigation.
21        MS. TAYLOR:  Your Honor, it's an export of data
22   maintained by the U.S. Postal Service.
23        THE COURT:  Hold on.  Does someone have a copy?
24        MR. LAROSIERE:  It's the very long one.
25        MS. TAYLOR:  I'd be fine with removing the first

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 100 of 230

1   page.

2          THE COURT:  Is this information maintained by the

3   Postal Service, Ms. Taylor?

4          MS. TAYLOR:  That's my understanding, Your Honor.  I

5   don't think -- Inspector Hannon did not, like, go to Stamps.com

6   and ask them for the mail meter.  It came from their internal

7   databases.  Because even if Stamps.com is selling the meter to

8   the end user, it's still going through the Postal Service to

9   create the labels.  It's maintained by the government.  So

10  there's no business records certification to go with that.  I

11  was entering it as public records.  It's maintained by a

12  government agency.

13         MR. KING:  And Your Honor, if I could respond to

14  that.

15         THE COURT:  Go ahead.

16         MR. KING:  It's not a public record because the first

17  page that says this was created for a criminal investigation

18  tells you it's not a public record.  It makes it very clear

19  that it's not a public record and it's only to be used for --

20  it's that tiny writing in the black bar.  We can -- we had to

21  blow it up on a computer to read it, but that is what it says,

22  that it's only to be used for law enforcement purpose.

23         THE COURT:  Ms. Taylor, I'm not sure that -- you're

24  going to have to explain to me how this qualifies as a public

25  record.

1          MS. TAYLOR:  It's data maintained by the U.S. Postal

2   Service that's been compiled -- just as if we subpoenaed

3   Verizon, they would compile -- you know, if we subpoenaed them

4   "We want toll records for this particular phone number," they

5   would compile that and send it to us in a spreadsheet similar

6   to this.

7          THE COURT:  Give me one moment.

8          Mr. King, why isn't this admissible under 803(6) as a

9   record of regularly conducted activity?  I know you're saying

10  business record, but it doesn't have to be a business.  It's a

11  record -- it's a compilation -- these -- the information in it

12  is -- well, Ms. Taylor, you may have to go through the

13  elements, but it seems that the information was kept in the

14  course of the regularly conducted activity of the -- of the

15  business, the Postal Service, that it's the regular practice,

16  there's nothing in it that would show that it lacks

17  trustworthiness.

18         MR. KING:  Your Honor, the two issues is the

19  government is -- one, this is the only one that didn't have a

20  business records certification for this, which we raised a few

21  weeks ago.  And two, that because of that, there were concerns

22  that these weren't Postal Service records, but Stamps.com

23  records.  And, you know, if there was a -- you know, and

24  because there was not a business records certification for

25  either Stamps.com or the Postal Service --

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 101 of 230

1          MS. TAYLOR:  It is not from Stamps.com.  It came from
2    the Postal Service, which is reflected by the front page.
3          THE COURT:  Okay.  The purpose of a business records
4    certification is to obviate the need of a witness to lay the
5    foundation.  If this witness --
6          Ms. Wiles, can you give the jurors some Kleenex or
7    something?
8          If the witness can lay the foundation, I think it
9    comes in as a record of regularly conducted activity.  But I do
10   think that first page needs to be removed.
11         MS. TAYLOR:  Yes, Your Honor.  I'll go to the witness
12   stand and tear off the first page before I go back to the
13   podium.
14         THE COURT:  Go ahead.
15         MR. KING:  Thank you, Your Honor.
16    (Proceedings in open court:)
17   BY MS. TAYLOR:
18   Q.   Special Agent Hannon, turning back to Exhibit Number 72,
19   could you tell us where you -- where you obtained this
20   information.
21   A.   Yes.  This information was based upon a request I made to
22   our Intelligence Unit.
23   Q.   And is this -- the information that is depicted in
24   Exhibit 72, is it transactional information?
25   A.   Yes.

1    Q.   Is it automatically generated?
2    A.   Yes.  It's captured by the Postal Service.
3    Q.   And this came from the Postal Service's own records?
4    A.   It's -- I believe it's information that's shared with the
5    Stamps.com with the Postal Service, and our Intelligence Unit
6    accesses it from Postal Service databases.
7    Q.   Okay.  So the database itself that contains this data in
8    Document 72, that's maintained by the United States Postal
9    Service?
10   A.   Yes, correct.
11   Q.   And is that data kept regularly by the Postal Service?
12   A.   Yes, it is.
13   Q.   And is it part of the Postal Service's normal business
14   activity to maintain records of shipments, the cost for
15   shipments, the return address, the "to" address, the tracking
16   number, and all of the other information that's reflected for
17   the shipments in that -- in that document?
18   A.   Yes, it is.
19         MS. TAYLOR:  Your Honor, I'd move for admission of
20   Exhibit 72.
21         MR. KING:  No objection, Your Honor.
22         MR. LAROSIERE:  Without objection, Your Honor.
23         THE COURT:  72 is admitted.
24    (Government's Exhibit 72 admitted in evidence.)
25   BY MS. TAYLOR:

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 102 of 230

1  Q.    Inspector Hannon, so if you could please look at what's
2  now the first page of that document.
3          MS. TAYLOR:  It will be page 2 on yours.
4          MS. GANOE:  (Nods head.)
5  BY MS. TAYLOR:
6  Q.    Could you please tell the jurors, is this information from
7  the database about -- well, first let's talk about the meter
8  number.  What's the meter number?
9  A.    The meter number is 13667139.
10 Q.    And is that the meter number that you had identified based
11 upon looking at the tracking for Special Agent Hooker's
12 package?
13 A.    Yes, it was.
14 Q.    So does all of this data in Document 72 relate to that
15 meter number?
16 A.    Yes, it was.
17 Q.    In this case, was this meter assigned to a particular
18 individual?
19 A.    Yes, it was.
20 Q.    And who was that?
21 A.    Kristopher Ervin.
22 Q.    And that's reflected at the top of the page there?
23 A.    Yes, that's correct.
24 Q.    And this page has a summary of the shipments made?
25 A.    Correct.

1  Q.    Could you please go over what -- what's reflected in that
2  summary.
3  A.    In that summary it appears the meter became active in
4  November of 2020.  And since November 2020 through March 2021 a
5  total of 1,334 parcels were sent out utilizing that -- that
6  meter, totaling amount in postage of $4,165.46.
7  Q.    And there's two sort of sets of columns for the cost of
8  the postage and the number of packages, correct?
9  A.    Correct.
10 Q.    One says "First Class" and the other says "Total"?
11 A.    Correct.
12 Q.    And are the figures in those two sets of columns the same?
13 A.    Yes, they are.
14 Q.    What does that indicate?
15 A.    That just indicates that the two numbers there are the
16 number of parcels that were mailed per month between November
17 of 2020 and March 2021 and the amount of postage spent in that
18 month.
19 Q.    Would it indicate that all of the parcels sent with this
20 mail meter were First Class parcels?
21 A.    Yes, it would.
22 Q.    And you stated -- if you look at, I think it's the very
23 last page of that -- of that document, it would show the first
24 shipment that was made using the -- using the mail meter,
25 correct?

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 103 of 230

1   A.   Correct.

2          MS. TAYLOR:  So Ms. Ganoe, if you could zoom in.

3   Yes, right there.

4   BY MS. TAYLOR:

5   Q.   And it indicates that --

6          I think we may be missing a page on the digital

7   version, but if you could look at your -- at the document that

8   you have in front of you, who was the last -- or the very first

9   shipment sent to?

10  A.   The very first one was sent on November 30th of 2020, was

11  addressed to Kristopher J. Ervin, 2409 Kirkwall Court, Orange

12  Park, Florida.

13  Q.   And so that was the very first package sent?

14  A.   Correct.

15  Q.   And what was the return address on that package?

16  A.   Return address was A Key Card, 950 Blanding Boulevard,

17  Suite 23, PMB 336, Orange Park, Florida.

18  Q.   And looking through the mail meter, on approximately

19  page -- well, two pages before that, is there another package

20  that's sent to Mr. Ervin?

21  A.   Yes, there is.

22  Q.   And what date was that package sent?

23  A.   That was also November 30th, 2020.

24  Q.   And then looking four pages back from that, is there a

25  package that was sent to Joel Moya?

1   A.   Yes, there was.

2   Q.   And I'm not going to have you go page by page because our

3   page numbers are a little off now, but previously you've

4   searched this mail meter and -- for specific parcels that we

5   spoke about, correct?

6   A.   Yes, correct.

7   Q.   Did that include that there's a package that was addressed

8   to Ronald Davis?

9   A.   Yes, correct.

10  Q.   And a package addressed to Steve Duty?

11  A.   Correct.

12  Q.   And a package addressed to I believe it's James, but the

13  last name is Acs, A-c-s?

14  A.   Yes.

15  Q.   And a package addressed to Richard Roberts?

16  A.   Correct.

17  Q.   And was there a package addressed to John O'Leary?

18  A.   Yes, there was.

19  Q.   And what's the significance of that package?

20  A.   The parcel addressed to John O'Leary was the name used on

21  the undercover purchase made by Special Agent Hooker.

22  Q.   And that -- was that the package -- the original tracking

23  number that you used to identify this mail meter?

24  A.   Yes, it was.

25  Q.   And is there also a package addressed to Randy Willis?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 104 of 230

1   A.    Yes, there was.

2   Q.    And is there a package addressed to John Holbrook?

3   A.    Yes.

4   Q.    And who is John Holbrook?

5   A.    That was also an alias used by Special Agent Hooker to

6   facilitate an undercover purchase from Auto Key Card.

7   Q.    And a package addressed A. Osso?

8   A.    Yes.

9   Q.    And a package addressed to Phil Wilson?

10  A.    Yes.

11  Q.    Now, you stated you also made an undercover purchase?

12  A.    I did.

13  Q.    And was that on February 2nd of 2021?

14  A.    Yes, it was.

15  Q.    Did you review the Auto Key Card's website prior to making

16  your purchase?

17  A.    I did.

18  Q.    And what --

19        MS. TAYLOR:  I want to bring up Exhibit 26, Your

20  Honor, if I may.

21        THE COURT:  Give me a moment.

22        Ms. Wiles.

23        THE COURT:  Oh, okay.  You want to approach the

24  witness?

25        MS. TAYLOR:  Yes, sorry.

1         THE COURT:  I thought you were asking Ms. Ganoe to

2   bring it up and it's not in evidence.

3         MS. TAYLOR:  I apologize, I meant to say approach the

4   witness.

5         THE COURT:  Yes, you may.

6         MS. TAYLOR:  And actually, I'm going to be bringing

7   up Exhibits 26, 27A and B.

8         MR. KING:  And Your Honor, some of those are physical

9   items.  We would just ask that they be brought up.

10        THE COURT:  Yes.

11        Ms. Taylor, if you could show those to opposing

12  counsel, please.

13        MS. TAYLOR:  For now I'm going to bring up 26, 29,

14  and 32, Your Honor.

15        THE COURT:  Go ahead.

16  BY MS. TAYLOR:

17  Q.    Inspector Hannon, could you please look at Exhibit 26 and

18  tell the jurors what it is.

19  A.    Item -- Exhibit 26 is my documentation from the undercover

20  purchase I made from the Auto Key Card's website.  It's a

21  summary of documents from the order form I completed, the

22  envelope I mailed in for the order, the money order I used to

23  make the purchase, as well as postal tracking records, a copy

24  of the negotiated money order, and pictures of the envelope

25  that I received in response to my order.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 105 of 230

1     MS. TAYLOR:  Your Honor, at this time I'd move for

2  admission of Exhibit 26.

3     MR. KING:  Without objection, Your Honor.

4     MR. LAROSIERE:  Without objection, Your Honor.

5     THE COURT:  26 is admitted.  You may publish.

6  (Government's Exhibit 26 admitted in evidence.)

7  BY MS. TAYLOR:

8  Q.  If you could, let's please look at Exhibit 26, page 5.

9  What's shown on this page?

10  A.  That is a copy of the money order that I had mailed in for

11  the order from Auto Key Cards pulled out of a database after it

12  was negotiated.

13  Q.  And if we could also look back at page 1.

14     Well, let me ask you, Inspector Hannon, how did you

15  go about making your purchase?  Did you order it on the website

16  or did you order it some other way?

17  A.  I mailed in a hard-copy order form.

18     MS. TAYLOR:  And could we have page 1, please.

19  BY MS. TAYLOR:

20  Q.  Were you using an alias to make this purchase?

21  A.  Yes, Richard Carter.

22  Q.  And is this your handwriting on the delivery address

23  showing Richard Carter, Savannah, Georgia?

24  A.  Yes, it is.

25  Q.  And could you tell us what items you ordered?

1  A.  Yes.  I ordered two Auto Key Card Stainless Steel Business

2  Cards 1 in 1 for $60 apiece and one Auto Key Card Stainless

3  Steel Business Card 3 in 1 with Bottle Opener at $100.

4  Q.  And you indicated on your -- on your form that your total

5  purchase price was $230?

6  A.  Yes, correct.

7  Q.  And you checked the box for "Approval required to order"?

8  A.  Yes, I did.

9  Q.  And did you make the money order payable as instructed on

10  the order form?

11  A.  I did.

12  Q.  And who was it payable to?

13  A.  J. Ervin.

14  Q.  And looking at page 2 of this exhibit, did you -- is this

15  a composite photo that you took?

16  A.  Yes, it is.

17  Q.  What's in the top right area of this exhibit?

18  A.  The top right is the order form I completed.

19  Q.  And then what is shown in the -- sort of underneath the

20  order form?

21  A.  In this picture currently displayed, the top left is the

22  money order I obtained to mail in for the undercover purchase,

23  and underneath that is the -- the envelope with the tracking

24  number I used to mail in the money order and order form.

25  Q.  And did you then -- did you track that package to see

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 106 of 230

1  where it went?

2  A.   I did.

3        MS. TAYLOR:   Could we look at page 3.

4  BY MS. TAYLOR:

5  Q.   And is this tracking information that you obtained from

6  the USPS website?

7  A.   Yes.  It's the internal tracking from the Postal Service.

8  Q.   So you -- as a postal inspector, you have additional

9  details that are not viewable to the public?

10 A.   Correct.

11 Q.   And did it indicate on page 4 of this document -- did the

12 tracking indicate to you that the -- that your outgoing package

13 with your order form had been delivered?

14 A.   Yes.  It indicated it was delivered on February 3rd, 2021.

15 Q.   And also, looking at page 5, that money order, did you

16 obtain information about whether the money order was deposited

17 or negotiated?

18 A.   I did.

19 Q.   And how did you obtain that information?

20 A.   That was a request made through an analyst in my office to

21 obtain a copy of the negotiated money order from a database

22 called Fed Image.

23 Q.   And where did that -- is that a government database as

24 well?

25 A.   Yes, it is.

1  Q.   And where did it indicate that this money was deposited?

2  A.   It indicated it was deposited at a Community First Credit

3  Union.

4  Q.   And did it have a date and time for that deposit?

5  A.   Yes, February 3rd, 2021, at 4:09 p.m.

6  Q.   And did you receive information that -- well, first let's

7  look at 95A, page 75.

8        MS. TAYLOR:   If we could zoom in on the two items on

9  the top.

10 BY MS. TAYLOR:

11 Q.   These are Mr. Ervin's banking records.  Is one of these

12 deposited money orders yours?

13 A.   Yes, the top one.

14 Q.   Okay.  And does it have the same date and time stamp for

15 the deposit?

16 A.   It does.

17 Q.   Now, looking back at Exhibit 26, did you receive anything

18 as a result of your purchase?

19 A.   I did.

20        MS. TAYLOR:   And Your Honor, if Mr. Mesrobian could

21 approach with Exhibits 27A and B at this point.

22 BY MS. TAYLOR:

23 Q.   Could you look at Exhibits 27A and B and tell the jurors

24 what they are.

25 A.   Exhibit 27A and 27B is a First -- 27A is a First Class

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 107 of 230

1   parcel that had received to an undercover P.O. Box in Savannah,

2   Georgia, where I instructed my undercover order to be sent to.

3           And Exhibit 27B are the three auto key cards that I

4   received in that envelope to that undercover P.O. Box in

5   Savannah, Georgia.

6           MS. TAYLOR:  Your Honor, I'd ask for admission of 27A

7   and B.

8           MR. KING:  Without objection, Your Honor.

9           MR. LAROSIERE:  Without objection, Your Honor.

10          THE COURT:  27A and B are admitted.  You may publish.

11   (Government's Exhibits 27A and 27B admitted in evidence.)

12          MS. TAYLOR:  Your Honor, may I retrieve them from the

13   witness?

14          THE COURT:  You may.

15          MS. TAYLOR:  And while I'm doing that, Mr. Mesrobian

16   is also going to bring up Exhibits 30 and 30A through V as well

17   as 33, 33A through Z, and 34 through 47, which are all physical

18   exhibits we will be going through with Inspector Hannon.

19          THE COURT:  Okay.  30 and 30A through V, as in

20   victor?

21          MS. TAYLOR:  Yes.

22          THE COURT:  And then 33 and 33A through what?

23          MS. TAYLOR:  Z, as in zebra.

24          THE COURT:  Okay.

25          MS. TAYLOR:  And then 34 through 47.

1           THE COURT:  Go ahead, Mr. Mesrobian.  And

2   Mr. Mesrobian, if you'll retrieve 27A and B.

3           MR. MESROBIAN:  Yes, Your Honor.

4   BY MS. TAYLOR:

5   Q.   Okay.  I'm going to put 27A on the projector.  And you can

6   see the exhibit tag says 27A, correct?

7   A.   Yes, correct.

8   Q.   And this is the -- this is the bubble mailer that you

9   received with your mailing?

10   A.   Yes, it is.

11   Q.   And it's addressed to Richard Carter?

12   A.   Yes, correct.

13   Q.   And what's the return address?

14   A.   A Key Card, 950 Blanding Boulevard, Suite 23, PMB 336,

15   Orange Park, Florida.

16   Q.   And zooming in, does it indicate a shipping date there?

17   A.   February 4th, 2021.

18   Q.   And did you open this package?

19   A.   I did.

20   Q.   Did you need a search warrant to do that?

21   A.   I did not.

22   Q.   Why is that?

23   A.   That was a parcel obtained through an undercover purchase

24   and that parcel was in control of the U.S. Postal Inspection

25   Service.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 108 of 230

1   Q.   I'm going to put 27B on the projector.  And inside you
2   stated there are three -- the three auto key cards that you
3   purchased?
4   A.   Yes, correct.
5   Q.   And what were they -- was there anything that was packaged
6   with them?
7   A.   They were packaged inside a clear Ziploc baggie and with a
8   green business card.
9   Q.   Each one was individually in a clear Ziploc with a
10  business card?
11  A.   Yes, correct.
12  Q.   Okay.  And you can see, I think here, that this one's the
13  Bottle Opener Edition?
14  A.   Yes, it is.
15  Q.   It's a little bit longer than this other one?
16  A.   Yes.
17  Q.   And there are three in here?
18  A.   Correct.
19  Q.   Okay.
20       MS. TAYLOR:  If we could have Exhibit 26 back up on
21  the screen, page 8.
22  BY MS. TAYLOR:
23  Q.   Are these photos that you took of the package?
24  A.   Yes, they are.
25  Q.   Is this how the package looked when you first received it?

1   A.   Yes, it is.
2   Q.   And if we could look at page 9.  What's here?
3   A.   That is a photograph I took depicting the opening and the
4   contents of that First Class envelope.
5   Q.   Okay.  So that shows the three different envelopes that
6   were inside, each containing an auto key card and a business
7   card?
8   A.   Correct.
9        MS. TAYLOR:  Next page, please.
10  BY MS. TAYLOR:
11  Q.   What's this?
12  A.   That is a picture of the auto key cards that were
13  contained in there.
14  Q.   Is it the back side?
15  A.   It's the back side, yes.  The front side was the business
16  card.  I flipped them over, took a -- this additional picture
17  from the back side, without the business card.  The business
18  cards are facing down in this picture.
19       MS. TAYLOR:  Page 11, please.
20  BY MS. TAYLOR:
21  Q.   What is this?
22  A.   That's the auto key cards removed from the Ziploc baggies.
23  Q.   And so all three of the ones that you ordered were not Pen
24  Holder Editions?
25  A.   No.

USGA 11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 109 of 230

1  Q.   Okay.  And so the only full cutout that was on the three

2  you ordered, was that the bottle opener?

3  A.   Correct.

4       MS. TAYLOR:  Next page, please.

5  BY MS. TAYLOR:

6  Q.   And what's this?

7  A.   This is the picture of the auto key card with the bottle

8  opener.

9  Q.   Looking at the -- at the mail meter -- that was

10 Exhibit 72, all that transactional data, right?

11 A.   Yes, ma'am.

12 Q.   Did you find your package in that mail meter?

13 A.   Yes, I did.

14 Q.   Addressed to Richard Carter?

15 A.   Correct.

16 Q.   And at some point did you participate in surveillance of

17 Mr. Ervin?

18 A.   Yes, I did.

19 Q.   And do you recall the day?

20 A.   The first day was February 22nd, 2021.

21 Q.   What did you observe during your surveillance?

22 A.   On that day during my surveillance I observed Mr. Ervin

23 leave his residence, get into a vehicle and drive to the

24 Ridgewood Post Office in Orange Park.

25 Q.   And where was his residence located?

1  A.   2409 Kirkwall Court, Orange Park, Florida.

2  Q.   Did you obtain any camera footage related to what happened

3  during your surveillance?

4  A.   Yes, I did.

5       MS. TAYLOR:  Your Honor, I'm going to approach with

6  20- -- not -- sorry, 28 and 31.

7       THE COURT:  Go ahead.

8  BY MS. TAYLOR:

9  Q.   Could you take a look at Exhibit 28 and tell the jurors

10 what it is.

11 A.   Exhibit 28 is a CD that depicts surveillance video

12 obtained from inside of the Ridgewood Post Office from

13 February 22nd.

14 Q.   How are you able to know that that's what's on that disk?

15 A.   My initials are on that disk.

16 Q.   Did you previously review that disk on a computer and

17 verify that that was what was on it?

18 A.   Yes, I did.

19 Q.   And I'm going to jump forward a little bit to the other

20 exhibit that I just brought you, which was 31, correct?

21 A.   Yes, correct.

22 Q.   What's on that disk?

23 A.   That disk contains surveillance video also obtained from

24 the Ridgewood Post Office on a later date, February 24th, 2021.

25 Q.   And --

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 110 of 230

1  A.   I recognize that disk from my initials being on it.

2  Q.   And you reviewed the contents of that disk previously?

3  A.   Yes, I did.

4  Q.   And that was Exhibit 31?

5  A.   Correct.

6        MS. TAYLOR:   Your Honor, I move for admission of

7  Exhibit 28 and Exhibit 31.

8        MR. KING:   Without objection, Your Honor.

9        MR. LAROSIERE:   Without objection.

10       THE COURT:   28 and 31 are admitted.

11  (Government's Exhibits 28 and 31 admitted in evidence.)

12  BY MS. TAYLOR:

13  Q.   So Mr. Ervin on that date, he went to the post office?

14  A.   Yes.

15  Q.   Were you able to visually identify him?

16  A.   Yes, I was.

17  Q.   How were you able to identify who he was?

18  A.   He was associated with that residence.  He entered a

19  vehicle that was registered to him.  And I also previously had

20  seen his picture from his Florida driver's license.

21       MS. TAYLOR:   Your Honor, may I publish Exhibit 28?

22       THE COURT:   You may.

23       Ms. Wiles, can you turn down the lights?

24  (Video played.)

25  BY MS. TAYLOR:

1  Q.   All right.  Inspector Hannon, could you -- there's four

2  different camera angles that are depicted within this video,

3  correct?

4  A.   Correct.

5  Q.   And what is the location that is depicted in these four

6  different camera angles?

7  A.   This is the customer lobby of the Ridgewood Post Office in

8  Orange Park.

9  Q.   Have you been there before?

10  A.   Yes, I have.

11  Q.   And you went there the day that this video was taken on

12  February 22nd?

13  A.   Yes, I did.

14       MS. TAYLOR:   Ms. Ganoe, could you please advance the

15  video to 11:23:20.

16  BY MS. TAYLOR:

17  Q.   The time stamp that's on the bottom, is that at least an

18  approximately accurate indication of what time of day this

19  video was captured?

20  A.   Yes, it is.

21  Q.   Bear with us.  The video is being a little bit jumpy.

22       It's currently -- okay.  Do you see anyone in the

23  video currently that you recognize?

24  A.   Yes, Mr. Ervin walking to the front customer counter

25  wearing the blue jeans and black T-shirt.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 111 of 230

1    Q.    And what is he doing now?
2    A.    He was dropping off a -- it was a cardboard box that had
3    briefly been opened and white padded envelopes can be seen
4    sticking out of them during the surveillance.  And he is
5    dropping that box with those envelopes on the customer
6    county -- I'm sorry, customer county -- customer counter in the
7    lobby for mailing.
8    Q.    And was he wearing a pair of sunglasses on his head?
9    A.    Yes.  They are white-rimmed or white-framed sunglasses.
10   Q.    And the video is continuing to play, correct?
11   A.    Correct.
12   Q.    And did anyone --
13          MS. TAYLOR:  If we could back it up, Ms. Ganoe, to
14   11:23 and about 55 seconds.
15   BY MS. TAYLOR:
16   Q.    Okay.  We're at 11:23 and 40 seconds now, correct?
17   A.    Correct.
18   Q.    And the video is playing.  And in that lower left-hand
19   corner, was that Mr. Ervin leaving the post office?
20   A.    Yes, it was.
21   Q.    Where were you at the time?  Did you go inside the post
22   office?
23   A.    I did not.  When he turned into the parking lot for the
24   post office, I continued driving.  We had other -- two other
25   postal inspectors who were in vehicles in the parking lot of

1    the post office.
2    Q.    And given how much trouble this video is giving us, I
3    think we'll just watch it for a minute.  But if you could
4    please let us know if around the 11:24 and 18 second mark, did
5    somebody else enter into the video?
6    A.    Yes, I just watched him on the video.  It's Postal
7    Inspector Richard Batchelder.
8    Q.    And is he the man that's wearing black that is now -- he's
9    visible in the bottom right-hand corner?
10   A.    Yes.  He's wearing a black polo shirt.
11   Q.    And you recognize him from working with him?
12   A.    Yes, I do.
13   Q.    And did he obtain anything from the post office that day
14   that was pertinent to your investigation?
15   A.    Yes.  He retrieved the opened cardboard box that contained
16   22 First Class envelopes of the white bubble mailers.
17   Q.    Could you please -- there's a large box next to you, and
18   it should have in it Exhibits 30 and 30A through V.
19          MS. TAYLOR:  And Ms. Ganoe, we can stop the video
20   now.
21       (Video stopped.)
22   BY MS. TAYLOR:
23   Q.    Could you describe first what Exhibit 30 is?  And I'm not
24   sure you have Exhibit 30.
25          Okay.  So Exhibit 30, what is that?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 112 of 230

1  A.   Exhibit 30 is a used Amazon box that had been opened.  And
2  this is the box that Postal Inspector Richard Batchelder
3  retrieved from the post office on the 22nd of February.
4  Q.   And what about Exhibits 30A through V?  And if you need to
5  take a minute to look through them, just let us know when
6  you're ready.
7  A.   These are the exhibits -- these are the mailings that were
8  contained within this used Amazon box that we recovered from
9  the post office on February 22nd, 2021.
10        MS. TAYLOR:  Your Honor, at this time I'd move for
11  admission of Exhibits 30 and 30A through V.
12        MR. KING:  Without objection, Your Honor.
13        MR. LAROSIERE:  No objection.
14        THE COURT:  30 and 30A through V, as in victor, are
15  admitted.
16    (Government's Exhibits 30 and 30A through 30V admitted in
17  evidence.)
18  BY MS. TAYLOR:
19  Q.   Inspector Hannon, how many packages were dropped off that
20  day?
21  A.   We recovered 22 packages that day.
22  Q.   And did you search each of those packages?
23  A.   I did.
24  Q.   And did you have to obtain a search warrant for those
25  packages?

1  A.   Yes, I obtained a search warrant for each one of these
2  parcels.
3  Q.   And why did you need a search warrant for these but not
4  for the one you purchased?
5  A.   I needed a search warrant for these parcels because it's
6  sealed U.S. mail.  In order to search U.S. mail, I either need
7  to obtain a federal search warrant or have consent of the
8  sender or receiver.
9  Q.   And what -- so without having to open up each of those
10  individual exhibits, did you also take pictures of those
11  packages and their contents?
12  A.   Yes, I did.
13  Q.   And could you look at Exhibit 29 that -- I believe that's
14  in front of you.  And what is Exhibit 29?
15  A.   Exhibit 29 contains photographs I took documenting the
16  opening of each one of those 22 parcels.
17        MS. TAYLOR:  I would move for admission of
18  Exhibit 29.
19        MR. KING:  Without objection, Your Honor.
20        MR. LAROSIERE:  Without objection, Your Honor.
21        THE COURT:  29 is admitted.
22    (Government's Exhibit 29 admitted in evidence.)
23        MS. TAYLOR:  May we publish 29, Your Honor?
24        THE COURT:  You may.
25  BY MS. TAYLOR:

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 113 of 230

1  Q.    Looking at the first page of Exhibit 29, this is the
2  package addressed to Blaine McCaleb, IV, correct?
3  A.    Correct.
4  Q.    And did it contain auto key cards?
5  A.    Yes, it did.
6  Q.    How many?
7  A.    Three.
8  Q.    And the next page, please.  Is this a package addressed to
9  Scott Register?
10 A.    Yes.
11 Q.    What did it contain?
12 A.    One auto key card.
13 Q.    And page 3.  Was this package addressed to Jeremy
14 Hendrickson?
15 A.    Yes, and that one also contained one auto key card.
16 Q.    And the next page, a package addressed to Matthew Worden?
17 A.    Yes, containing two auto key cards.
18 Q.    Next page.  A package addressed to Tyler Banicki?
19 A.    Yes, that contains one auto key card.
20 Q.    Next page, a package addressed to Nathan Shoemaker?
21 A.    Yes, correct, containing one auto key card.
22 Q.    Next page is a package addressed to Thomas Rathbone?
23 A.    Yes, containing two auto key cards.
24 Q.    And the next page, a package addressed to Wally Avalos?
25 A.    Yes, that contained one auto key card.

1  Q.    The next page, a package addressed to Michael Bohm?
2  A.    Yes, that contained one auto key card.
3  Q.    Next page, a package addressed to Donald Kleehamer?
4  A.    Yes, with one auto key card.
5  Q.    Next page, a package addressed to Hunter Hood?
6  A.    Yes, also containing one auto key card.
7  Q.    Next page, a package addressed to John Briggs?
8  A.    Yes, with one auto key card.
9  Q.    Next page, a package addressed to Paul W. Sewack, Jr.
10 Sewack [verbatim]?
11 A.    Yes, that contains one auto key card.
12 Q.    Next page, a package addressed to Charles Bennett?
13 A.    Yes, with one auto key card.
14 Q.    Next page, a package addressed to Chris Barton?
15 A.    Yes, with one auto key card.
16 Q.    Next page, a package addressed to Jose Cordova?
17 A.    Yes, with one auto key card.
18 Q.    Next page, package addressed to Hamilton McCaleb?
19 A.    Yes, with one auto key card.
20 Q.    Next page, a package addressed to Skylar Asiala?
21 A.    Yes, with one auto key card.
22 Q.    Next page, a package addressed to Cesar Luna?
23 A.    Yes, with one auto key card.
24 Q.    Next page, a package addressed to Patrick Thomas?
25 A.    Yes, with one auto key card.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 114 of 230

1   Q.    Next page, a package addressed to Chris Martinez?

2   A.    Yes, with one auto key card.

3   Q.    And the last one is a package addressed to Kurt Wagner?

4   A.    Yes, with one auto key card.

5   Q.    And there's one more page in this exhibit, correct?  I

6   believe it's -- is this your inventory of those items that you

7   searched?

8   A.    Yes.  Those are notes I took during the opening of those

9   22 parcels.

10  Q.    And did each one of those 22 parcels contain an auto key

11  card?

12  A.    Yes, they did.

13  Q.    How many auto key cards in total were contained in those

14  22 parcels?

15  A.    In all, total was 26 key cards.

16  Q.    And did any of those packages contain any other items of

17  merchandise other than an auto key card?

18  A.    No, they did not.

19  Q.    Did you also check Exhibit 72 -- that's the mail meter

20  information.  Did you check Exhibit 72 to see whether or not

21  all of those packages were shipped using that mail meter?

22  A.    Yes, I did.

23  Q.    Were they?

24  A.    Yes, they were listed on that mailing log.

25  Q.    During your time that you were conducting surveillance on

1   February 22nd, the day that these packages were seized, did you

2   observe anyone who appeared to be with Mr. Ervin?

3   A.    No, I did not.

4   Q.    Did you observe anyone who appeared to be helping him?

5   A.    No, I did not.

6   Q.    Did you obtain other packages from the post office on

7   another day?

8   A.    Yes, I did.

9   Q.    What day was that?

10  A.    That was February 24th, 2021.

11  Q.    Were you doing surveillance that day?

12  A.    I was not.

13  Q.    How did you find out about the packages?

14  A.    A supervisor from the post office, from the Ridgewood Post

15  Office in Orange Park, had contacted Postal Inspector Richard

16  Batchelder and said there was another -- I believe her exact

17  words were "drop of mailings" related to the mailings that we

18  intercepted on February 22nd, 2021.

19        Inspector Batchelder notified me, and I responded to

20  the Ridgewood Post Office and retrieved those mailings.

21  Q.    Could you -- we already reviewed Exhibit 31 and admitted

22  it, so I'd like to pull that up on the -- on the screen now.

23        MS. TAYLOR:  Exhibit 31, please, Ms. Ganoe.

24        (Video played.)

25  BY MS. TAYLOR:

1   Q.   Does this video -- where is it taken?

2   A.   That is surveillance video from the customer lobby of the

3   Ridgewood Post Office on February 24th, 2021.

4   Q.   And there's three different video feeds in this file,

5   correct?

6   A.   Correct.

7        MS. TAYLOR:  If you could attempt, Ms. Ganoe, to fast

8   forward to the time stamp of 9:33 and 20 seconds.  33 and

9   20 seconds.

10       (Video played.)

11  BY MS. TAYLOR:

12  Q.   We're at 9:33 and 7 seconds, and I think I'm not going to

13  push our luck anymore.  So if you could please let us know when

14  you see anything in this video that was pertinent to your

15  investigation.

16  A.   That is Mr. Ervin entering the post office carrying a

17  brown cardboard box wearing the jeans and the hooded

18  sweatshirt.

19  Q.   It is now at 9:33 and 43 seconds.  And what is Mr. Ervin

20  doing?

21  A.   He is at the customer counter, where he appears to drop

22  the mailings and linger for just a few seconds there.

23  Q.   In the previous surveillance video, Mr. Ervin, did he

24  leave immediately?

25  A.   Yes.  He was in the post office a very brief amount of

1   time.

2   Q.   What is Mr. Ervin doing now?  It's 9:34 and 13 seconds.

3   A.   He walks to the other side of the customer counter,

4   lingers a few seconds.

5   Q.   It's now 9:34 and 37 seconds.  What is Mr. Ervin doing?

6   A.   He is exiting the post office.

7   Q.   Is he wearing any article of clothing in this video that

8   he was also wearing in the other surveillance video?

9   A.   Yes, the white-framed sunglasses.

10  Q.   Did you secure these packages that were dropped off on

11  February 24th of 2021?

12  A.   I did.

13  Q.   And could you please look at Exhibits 33 and 33A through

14  Z.

15       Have you had time to look at those exhibits?

16  A.   Yes, I have.

17  Q.   What's Exhibit 33?

18  A.   Exhibit 33 is a used cardboard box that was -- top was

19  opened.  And when I recovered these 24 parcels on -- I'm sorry

20  the 26 parcels on February 24th, 2021, these were sitting

21  inside this cardboard box.

22  Q.   33 A through Z, are those the 26 parcels?

23  A.   Yes, they are.

24       MS. TAYLOR:  I'd move for admission of 33 and 33A

25  through Z.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 116 of 230

1          MR. KING:  Without objection, Your Honor.

2          MR. LAROSIERE:  Without objection, Your Honor.

3          THE COURT:  33 and 33A through Z are admitted.  You

4    may publish if you wish.

5          (Government's Exhibit 33 and 33A through 33Z admitted in

6    evidence.)

7    BY MS. TAYLOR:

8    Q.   Inspector Hannon, did you take photos of these parcels --

9    well, let me go back.

10          When you got these parcels, they were sealed,

11   correct?

12   A.   Correct.

13   Q.   Did you open them?

14   A.   I did not initially.  I obtained -- I did not open them

15   until I obtained a federal search warrant for each one of the

16   mailings.

17   Q.   Okay.  So you got the search warrant for each and every

18   mailing and then you opened the packages?

19   A.   Yes, correct.

20   Q.   After you opened the packages, did you photograph their

21   contents?

22   A.   Yes, I did.

23   Q.   Could you please look at Exhibit 32 in front of you and

24   tell the jurors what that is.

25          THE COURT:  I'm sorry, Ms. Taylor, did you say 32?

1          MS. TAYLOR:  32, Your Honor.

2          THE COURT:  Okay.

3    A.   Exhibit 32 is a compilation of photographs I took

4    documenting the opening of each of these 26 parcels.

5          MS. TAYLOR:  Move for admission of Exhibit 32.

6          MR. KING:  Without objection, Your Honor.

7          MR. LAROSIERE:  Without objection, Your Honor.

8          THE COURT:  32 is admitted.  You may publish.

9          (Government's Exhibit 32 admitted in evidence.)

10   BY MS. TAYLOR:

11   Q.   Looking at page 1 of Exhibit 32, is this a package

12   addressed to John Doe?

13   A.   Yes, it is.

14   Q.   And what's in it?

15   A.   One auto key card.

16   Q.   And the next page, a package addressed to Robert Fontes?

17   A.   Yes, containing four auto key cards.

18   Q.   Page 3, a package addressed to John Cahill?

19   A.   Yes, containing one auto key card.

20   Q.   Fourth page, a package addressed to Ole Shoota?

21   A.   Yes, also containing one auto key card.

22   Q.   Fifth page, a package addressed to Tom Peter?

23   A.   Yes, with one auto key card.

24   Q.   Sixth page, a package addressed to Joseph West?

25   A.   Yes, containing one auto key card.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 117 of 230

1   Q.   Seventh page, a package addressed to Jason Bazelyuk?

2   A.   Yes, also containing one auto key card.

3   Q.   Eighth page, a package addressed to Steven Costello?

4   A.   Yes, with one auto key card.

5   Q.   Ninth page, a package addressed to Clint Buzicka?

6   A.   Yes, with one auto key card.

7   Q.   Tenth page, a package addressed to David Hungerschafer?

8   A.   Yes, with one auto key card.

9   Q.   Eleventh page, another package addressed to David

10  Hungerschafer?

11  A.   Yes, this one contained one auto key card.

12  Q.   Twelfth page, a package addressed to Robert Anderson?

13  A.   Yes, containing one auto key card.

14  Q.   Thirteen, a package addressed to Gary Merrill?

15  A.   Yes, with one auto key card.

16  Q.   Fourteenth page, a package addressed to Bruce Behringer?

17  A.   Yes, with one auto key card.

18  Q.   Fifteenth page, a package addressed to Jonathan B.

19  Flemmer, II?

20  A.   Yes, with one auto key card.

21  Q.   Sixteenth page, a package addressed to Austin I. Fiffer?

22  A.   Yes, with one auto key card contained inside.

23  Q.   Seventeen, a package addressed to David Tucker?

24  A.   Yes, one auto key card.

25  Q.   Eighteenth page, a package addressed to Derek Von Haag?

1   A.   Yes, which contained one auto key card.

2   Q.   Nineteenth page, a package addressed to Roy Tangen?

3   A.   Yes, with one auto key card.

4   Q.   Twentieth page, a package addressed to Edward Morrell?

5   A.   Yes, with one auto key card inside.

6   Q.   Twenty-first page, a package addressed to Ronald Wilson?

7   A.   Yes, with one auto key card inside.

8   Q.   Twenty-second page, a package addressed to Adam Ayvazian?

9   A.   Yes, with one auto key card.

10  Q.   The twenty-third page is a package addressed to Paul

11  Sikorski, Jr.?

12  A.   Yes, with one auto key card.

13  Q.   Twenty-fourth page, a package addressed to David Woods?

14  A.   Yes, with one auto key card.

15  Q.   Twenty-fifth page, a package addressed to William Hendrix?

16  A.   Yes, also containing one auto key card.

17  Q.   And the twenty-sixth package, which is on the twenty-sixth

18  page, a package addressed to Jan Ostrowski?

19  A.   Yes.  This contained one auto key card.

20  Q.   And there's -- oh, sorry, one more.  Is a package

21  addressed --

22       MS. TAYLOR:  Could we move to the next page.

23  BY MS. TAYLOR:

24  Q.   -- to Robert Susag?

25  A.   Yes, containing one auto key card.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 118 of 230

1  Q.   And the next page.

2       I'm sorry, let me go back a little bit, because I

3  think we might have moved into -- into some other pictures of a

4  different exhibit.

5       So did you obtain any packages from the Ridgewood

6  Post Office on a third date?

7  A.   Yes, on March 1st, 2021, I obtained another 14 mailings

8  containing auto key cards.

9  Q.   How did you find out about those mailings being at the

10 post office?

11 A.   On that particular day I was attempting to conduct

12 surveillance of Mr. Ervin to try and see him go back into the

13 post office to mail additional parcels.

14      On that particular day I did not see him at his

15 residence or at the post office.

16      On that day, after the post office closed, I went

17 into the back area of the post office where outbound parcels

18 are processed, and I located 14 parcels linked to the

19 investigation.

20 Q.   So you didn't receive notification from anyone at the post

21 office that the parcels had been dropped?

22 A.   No, I did not.

23 Q.   And did you -- did you seize those parcels as potential

24 evidence in your case?

25 A.   Yes, I did.

1  Q.   And did you obtain search warrants for them as well?

2  A.   I did.

3  Q.   Could you please look at Exhibits 34 through 47 and tell

4  the jurors -- identify what those are, please.

5  A.   These are the 14 parcels I recovered from the Ridgewood

6  Post Office on March 1st, 2021.

7  Q.   Did you open those packages?

8  A.   I did.

9  Q.   After obtaining federal search warrants for each and every

10 one of them?

11 A.   Yes.

12 Q.   And so we were looking at Exhibit 32.  And does Exhibit 32

13 actually have pictures of both the February 24th and the

14 March 1st packages?

15 A.   Yes, it does.

16 Q.   Okay.  So let's continue going through Exhibit 32.

17      We were on page 28, which is a package addressed to

18 Max Williams?

19 A.   Yes.  That parcel contained one auto key card.

20 Q.   And page 29, a package addressed to Dennis Mills?

21 A.   Yes, with one auto key card.

22 Q.   And page 30, a package addressed to Neville Thornhill?

23 A.   Yes, with one auto key card.

24 Q.   And page 31, a package addressed to John Monaco?

25 A.   Yes, containing one auto key card.

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 119 of 230

1  Q.   And page 32, a package addressed to Michaela Thompson?
2  A.   Yes.  This one contained two auto key cards.
3  Q.   And page 33, a package addressed to Jordan Clayton?
4  A.   Yes, which contained one auto key card.
5  Q.   Page 34, a package addressed to John Raulerson?
6  A.   Yes, containing one auto key card.
7  Q.   Oh, sorry, Jason Raulerson.
8  A.   Yes, Jason.
9  Q.   Page 35, a package addressed to Jeff Parker?
10  A.   Yes, correct, with one auto key card.
11  Q.   Page 36, a package addressed to Victor Fuentes?
12  A.   Yes, correct, one auto key card.
13  Q.   Page 37, a package addressed to Gary Russell?
14  A.   Correct, with one auto key card.
15  Q.   Page 38, a package addressed to Ray Martinez?
16  A.   Yes, containing one auto key card.
17  Q.   And back up.  There is -- on this one there's a sticker on
18  the internal plastic baggie; is that accurate?
19  A.   Yes, correct.
20  Q.   And it says -- what does it say?
21  A.   It said, "Good news.  Your additional order items are
22  shipping from our manufacturing facility directly to you.
23  Thank you, Autokeycard.com."
24  Q.   Do you know what that additional item was?
25  A.   I do not.

1  Q.   But in -- but it also contained an auto key card?
2  A.   It did.
3  Q.   Next page.  A package addressed to Nick McClain?
4  A.   Yes, containing one auto key card.
5  Q.   Next page.  A package addressed to Albert Kaffenberger?
6  A.   Yes, containing one auto key card.
7  Q.   And the next page -- oh, that's it.  Okay.
8       So how many packages were there in total between
9  February 24th and March 1st that you searched?
10  A.   40 parcels.
11  Q.   And did each and every one of them contain an auto key
12  card?
13  A.   Yes.
14  Q.   Did any of them contain other merchandise besides an auto
15  key card?
16  A.   No, they did not.
17       MS. TAYLOR:  Your Honor, I move for admission of 34
18  through 47.  The physical exhibits, Your Honor.
19       THE COURT:  Any objection to 34 through 47?
20       MR. KING:  No objection, Your Honor.
21       MR. LAROSIERE:  No objection, Your Honor.
22       THE COURT:  All right.  34 through 47 are admitted.
23  (Government's Exhibit 34-47 admitted in evidence.)
24  BY MS. TAYLOR:
25  Q.   Inspector Hannon, other than the undercover purchase

1  packages, how many packages in total did you obtain from the
2  mail stream related to this investigation?
3  A.    62 parcels.
4  Q.    And how many of them contained auto key cards?
5  A.    They all did.
6  Q.    Did any of them contain any merchandise other than auto
7  key cards?
8  A.    No, they did not.
9  Q.    Were there any other packages that you seized that you
10  thought might be related to this investigation but didn't
11  contain an auto key card?
12  A.    No, there were not.
13  Q.    Did you also check Exhibit 72 -- that's the mail meter
14  log, correct?
15  A.    Yes.
16  Q.    Did you check Exhibit 72 for all of these packages that
17  were seized out of the mail stream?
18  A.    Yes, I did.
19  Q.    Did you verify -- what did you find?
20  A.    Each one of those parcels is listed on the mailing log.
21  Q.    Did you participate in any other search related to the
22  investigation of Mr. Ervin?
23  A.    I did.  On March 2nd, 2021, I participated in the search
24  warrant of his residence on Kirkwall Court in Orange Park.
25          MS. TAYLOR:  If I could have just a moment, Your

1  Honor.
2          Your Honor, may I approach with Exhibits 105 and
3  105 -- sorry, 101, 105, and 105A?
4          THE COURT:  101, 105, and 105A.  Go ahead.
5          MS. TAYLOR:  Also 101A, Your Honor.
6  BY MS. TAYLOR:
7  Q.    Could you first please look at Exhibit 101 and 101A and
8  tell the Court what those are.
9  A.    Exhibit 101 is a receipt for a UPS Store.
10  Q.    And what is 101A?
11  A.    101A is a picture of that receipt taken at the time of the
12  search warrant.
13  Q.    And is that receipt something that you -- that you've
14  recovered during the search?
15  A.    Yes, it is.
16          MS. TAYLOR:  Move for admission of 101 and 101A.
17          MR. KING:  Without objection, Your Honor.
18          MR. LAROSIERE:  Without objection, Your Honor.
19          THE COURT:  101 and 101A are admitted.
20      (Government's Exhibits 101 and 101A admitted in evidence.)
21  BY MS. TAYLOR:
22  Q.    Could you please look at 105 and 105A and describe what
23  they are.
24  A.    105 is a document, a spreadsheet type document, containing
25  a list of expenses, and Exhibit 105A is a photocopy of that

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 121 of 230

1   document.

2   Q.   And is that -- is 105 a document that you recovered during

3   the search of Mr. Ervin's residence?

4   A.   Yes, it is.

5        MS. TAYLOR:  Move for admission of 105 and 105A, Your

6   Honor.

7        MR. KING:  Without objection, Your Honor.

8        MR. LAROSIERE:  Without objection.

9        THE COURT:  105 and 105A are admitted.

10   (Government's Exhibit 105 and 105A admitted in evidence.)

11   BY MS. TAYLOR:

12   Q.   Inspector Hannon, when you were searching the residence of

13   Mr. Ervin, did you observe any auto key cards in the residence?

14   A.   Yes, I did.

15   Q.   A large number?

16   A.   Yes.  I would consider it a large number.  They were

17   scattered in multiple rooms within the residence.

18        MS. TAYLOR:  If we could have 101A on the screen,

19   please, Ms. Ganoe.  Could we zoom in on the top part of it.

20   BY MS. TAYLOR:

21   Q.   This is the photo, correct, of the receipt?

22   A.   Correct.

23   Q.   Actually, it's a little blurry.

24        MS. TAYLOR:  Your Honor, if I may approach and get

25   the original exhibit.

1        THE COURT:  Go ahead.

2        MS. TAYLOR:  And I'm going to go ahead and open it so

3   that we can see the full receipt on the projector.

4   BY MS. TAYLOR:

5   Q.   Are you able to see that receipt?

6   A.   Yes, I can.

7   Q.   And what is this receipt from?

8   A.   It's from a UPS Store located at 950 Blanding Boulevard,

9   Suite 23, Orange Park.

10   Q.   And in that mail meter and on your package that you

11   received and all the other packages that you searched, was

12   there a return address for Auto Key Card that was indicated?

13   A.   Yes, 950 Blanding Boulevard.

14   Q.   And so is this that same address?

15   A.   Yes, it is.

16   Q.   And it said PMB 336, I believe?

17   A.   Correct.

18   Q.   What does that mean to you based on your training and

19   experience?

20   A.   A UPS Store can operate as what's called a Commercial Mail

21   Receiving Agency.  They pretty much hold a contract with the

22   Postal Service to provide certain services that the post office

23   normally provides, such as postage and P.O. Box services.

24        So PMB stands for Private Mail Box.  So that's a P.O.

25   Box contained within the UPS Store that will accept delivery of

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 122 of 230

1    U.S. mail.

2    Q.   And so was this UPS Store operating in that way?

3    A.   Yes, it was.

4    Q.   And what's reflected on this receipt?  In particular, the

5    first item, if you know?

6    A.   Well, it says, "FS business, medium, quantity 12, for

7    $18."

8    Q.   And then the total is $216?

9    A.   Yes, correct.

10   Q.   And then here toward the bottom of the receipt it says,

11   "Mailbox services transaction," correct?

12   A.   Yes, it does.

13   Q.   And it has a mailbox number?

14   A.   It does, Box 336.

15   Q.   And does that appear to correspond with the return address

16   for Auto Key Card?

17   A.   Yes, it does.

18   Q.   And it says, "Customer, Kris Ervin"?

19   A.   Yes, it does.

20             MS. TAYLOR:  Ms. Ganoe, could we have 105A on the

21   screen.

22             THE COURT:  Ms. Taylor?

23             MS. TAYLOR:  Yes, Your Honor?

24             THE COURT:  Could we go ahead and take our morning

25   break?

1             MS. TAYLOR:  This will be the very last thing for

2    Inspector Hannon.

3             THE COURT:  Go ahead.

4             MS. TAYLOR:  From me.

5             THE COURT:  Understood.

6    BY MS. TAYLOR:

7    Q.   Okay.  Is this -- this is the other document, the expense

8    document, that you were talking about?

9    A.   Yes.

10   Q.   And zooming in --

11            MS. TAYLOR:  Yeah, let's just zoom in on the top

12   part.

13   BY MS. TAYLOR:

14   Q.   Does it list expenses, including some expenses for Pirate

15   Ship Postage?

16   A.   Yes, it does.

17   Q.   Expenses for Namecheap.com?

18   A.   Correct.

19   Q.   Expenses for what looks like Google Ads?

20   A.   Yes, it does.

21   Q.   And then more expenses from Namecheap as you scroll down

22   on November 16th, 2020?

23   A.   Yes.

24   Q.   And then does it have a section for American Express?

25   A.   It does.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 123 of 230

1   Q.   And under that it has expenses for Primary Arms?

2   A.   It does.

3   Q.   And two lines listed for Namecheap?

4   A.   Yes.

5   Q.   And then a line for Upwork?

6   A.   Yes.

7   Q.   A line for 3D Cart?

8   A.   Yes.

9   Q.   And then the next section is labeled CapitalOne?

10  A.   Yes.

11  Q.   And what is in that section?

12  A.   Expenses for Shopify and Test Run.

13  Q.   Okay.  Looking at the second page of this document --

14  we're zooming in on the top of the second page -- it has a

15  number of expenses listed, correct?

16  A.   It does.

17  Q.   They include multiple expenses for Namecheap?

18  A.   Yes.

19  Q.   Multiple expenses for Squarespace?

20  A.   Yes.

21       MS. TAYLOR:  Your Honor, I have no further questions

22  for Inspector Hannon.

23       THE COURT:  All right, ladies and gentlemen.  We'll

24  go ahead and take our morning break.  I'll ask you to be back

25  at 11:10.

1        Please remember not to discuss the case with one

2   another, your family, your friends, or anybody else.

3        Don't allow anybody to speak to you or in your

4   presence about the case.

5        Don't read, watch, or listen to any media reports.

6        Please don't conduct any independent research about

7   anything in any way relating to the case, including looking on

8   the internet in any way.  And remember not to form or express

9   any opinions until you've heard all the evidence.

10       We'll be in recess until 11:10.

11       COURT SECURITY OFFICER:  All rise for the jury.

12  (Jury exits, 10:53 a.m.)

13       COURT SECURITY OFFICER:  Please be seated.

14       THE COURT:  You may step down.

15       Is there anything we need to address?

16       MR. KING:  No, Your Honor.

17       MR. MESROBIAN:  No, Your Honor.

18       THE COURT:  All right.  We'll be in recess.

19  (Recess, 10:54 a.m. to 11:14 a.m.)

20  (All parties present.  Jury not present.)

21       COURT SECURITY OFFICER:  All rise.  This Honorable

22  Court is back in session.

23       THE COURT:  Who am I going to hear from first?

24       MR. LAROSIERE:  Counsel for Mr. Hoover, Your Honor.

25       THE COURT:  Okay.  Let's get the jury in.

1          And Mr. Larosiere, you can go ahead and get yourself
2   organized up there if you'd like.
3          MR. LAROSIERE:  Thank you.
4          COURT SECURITY OFFICER:  All rise for the jury.
5   (Jury enters, 11:15 a.m.)
6          COURT SECURITY OFFICER:  Please be seated.
7          THE COURT:  Go ahead, Mr. Larosiere.
8          MR. LAROSIERE:  Thank you kindly.
9                    CROSS-EXAMINATION
10  BY MR. LAROSIERE:
11  Q.   Mr. Hannon, thank you so much for your time and attention
12  in this matter today.  We truly appreciate it.  And I won't use
13  too much of your time.
14  A.   Absolutely.
15  Q.   You talked about doing a fairly substantial amount of
16  surveillance in this case, correct?
17  A.   Multiple days of surveillance, yes, sir.
18  Q.   Awesome.
19          In all of that surveillance, did you ever one time
20  see my client, Mr. Matthew Raymond Hoover, in Jacksonville?
21  A.   I did not.
22  Q.   Okay.  Do you know when Mr. Ervin and my client first met
23  in person?
24  A.   I do not.
25          MR. LAROSIERE:  Thank you so much.

1          I have nothing further, Your Honor.
2          THE COURT:  Mr. King.
3          MR. KING:  May it please the Court.
4          THE COURT:  Go ahead.
5                    CROSS-EXAMINATION
6   BY MR. KING:
7   Q.   Good morning, Postal Inspector Hannon.
8   A.   Good morning.
9   Q.   As a Postal Inspector, you're a sworn law enforcement
10  officer?
11  A.   Correct.
12  Q.   Badge and gun?
13  A.   Absolutely.
14  Q.   Arrest authority?
15  A.   Yes, sir.
16  Q.   I want to talk to you a little bit about some of the
17  things hopefully we can agree on.
18          During the course of your investigation, was it very
19  clear to you that Mr. Ervin was, if not solely, primarily
20  mailing auto key cards through the Ridgeview Post Office?
21  A.   Yes, correct.
22  Q.   And was that something that was difficult for you to
23  figure out or was that pretty obvious?
24  A.   Once I received the meter information, based upon the
25  undercover purchases, I can look -- and I obtained the mailing

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 125 of 230

1  logs and looked at the tracking, I can see that the mailings
2  were being conducted from the Ridgewood Post Office.
3  Q.   If you could turn your attention to Government's
4  Exhibit 72, the second page.  And Postal Inspector Hannon, the
5  Customer Information, the first name, that's Kristopher Ervin?
6  A.   Yes.
7  Q.   And that's the legal name of my client?
8  A.   Correct.
9       MR. KING:  Ms. Ganoe, if we could turn to the next
10 page.
11 BY MR. KING:
12 Q.   And the address on here, that's -- well, the name is
13 Kristopher J. Ervin.  That's my client's name?
14 A.   Yes.
15 Q.   And that's his address?
16 A.   Correct.
17 Q.   And you conducted surveillance.  And you, through other
18 records, know that that's his address?
19 A.   Correct.
20 Q.   And when you conducted your search, that's the address you
21 searched?
22 A.   Correct.
23 Q.   And through your investigation, that's his email address
24 and phone number?
25 A.   I didn't do any follow-up on the email or the phone

1  number, so I couldn't --
2  Q.   Okay.
3  A.   -- confirm that, but the address, yes.
4  Q.   Okay.  And is there anything that he did here to obfuscate
5  or hide who he was?
6  A.   No, he did not.
7       MR. KING:  Ms. Ganoe, if we could turn to Exhibit 26,
8  please.
9  BY MR. KING:
10 Q.   Postal Inspector Hannon, we're going to go to Exhibit 26.
11 If you'll recall, this is the order form.
12      MR. KING:  If we could do the bottom left-hand
13 corner.
14 BY MR. KING:
15 Q.   And Postal Inspector Hannon, the money order is made
16 payable to a "J. Ervin"?
17 A.   Yes.
18 Q.   And Mr. Ervin goes by "Justin"?
19 A.   Yes, he does.
20 Q.   And anything there about obfuscating or hiding his
21 identity?
22 A.   No, he did not.
23 Q.   And the --
24      MR. KING:  And if we could turn to page 3.  And
25 the -- I apologize, it's page 5.  I can't read my own

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 126 of 230

1  handwriting.  Thanks.
2  BY MR. KING:
3  Q.    And Postal Inspector Hannon, the money order that you did,
4  that was to "J. Ervin."
5         That's Justin Ervin?
6  A.    Yes.
7  Q.    The -- and you had your package that you ordered sent to
8  Savannah, Georgia?
9  A.    I did.
10 Q.    Was there a reason for that?  Because you're here locally,
11 right?
12 A.    I am.  I'm based here in Jacksonville.  A fellow Postal
13 Inspector who I work with quite frequently already had an
14 established undercover P.O. Box in Savannah.
15 Q.    So it was convenient -- there's nothing special or hidden
16 about that; it was just convenient?
17 A.    Correct.
18 Q.    Understood.
19        I want to talk to you a little bit about some of the
20 surveillance you conducted.  You said you conducted
21 surveillance on multiple occasions?
22 A.    On the 22nd of February, 2021, and then also on March 1st
23 of 2021.
24 Q.    Talking a little bit about February 22nd, you weren't
25 alone when you were conducting that surveillance?

1  A.    I was not.
2  Q.    Who else -- and maybe not just Postal Inspectors, but all
3  law enforcement agencies.  Who else was involved in that on
4  February 22nd?
5  A.    Additional Postal Inspectors and ATF agents.
6  Q.    Who was there?  How many people?
7  A.    I know it was myself, Postal Inspector Richard Batchelder,
8  Postal Inspector Chris Martin, Postal Inspector Jerry Moberg,
9  ATF Agent Jesse Hooker.  Who else was there from ATF, I don't
10 recall.
11 Q.    But there were multiple other ATF agents as well?
12 A.    I believe so, yes.
13 Q.    And when we say "surveillance," this was -- this was an
14 all-day thing?
15 A.    Yes.
16 Q.    And we've already kind of talked about I think we're in
17 agreement that Mr. Ervin was sending these mailings?
18 A.    Yes, correct.
19 Q.    And that -- by February 22nd, that was already pretty
20 clear to you?
21 A.    I don't know about "clear," but that was our suspicion.
22 And that was the intent of the surveillance, was to verify he
23 was conducting these mailings.
24 Q.    And we're talking about a whole day, eight, nine, ten
25 people, something in that range?

1    A.    All day?  I believe he went to the post office, you know,

2    mid morning or early afternoon.  So I wouldn't classify it "all

3    day," but yeah, we started that morning.

4    Q.    I want to turn to -- and on the March 1st surveillance,

5    was that you or was that also that big group of people?

6    A.    That was just myself and a task force officer from our

7    office just kind of conducting the periodical surveillance,

8    driving by his residence, driving by the post office, seeing if

9    we could locate him that day.

10   Q.    And I want to talk to you a little bit more about

11   Exhibit 72.  I don't think we need to bring it up, but that's a

12   list of -- and if I'm getting any of this wrong, please correct

13   me.  That is a list of every person that that postal meter sent

14   an auto key card to?

15   A.    That is everything that a postage label was created for on

16   that meter.

17   Q.    And going back a little bit, are you familiar with either

18   drop shipping or shipping that's kind of done by demand?

19   A.    With drop shipments, yes.  I'm not sure what you mean by

20   your second category there.

21   Q.    Sure.

22         MR. KING:  If we could, Ms. Ganoe, pull up 32.  I

23   think it's page 38.

24   BY MR. KING:

25   Q.    Postal Inspector Hannon, do you see the white card above

1    the green card?

2          MR. KING:  If we could zoom in on that.  I appreciate

3    it.

4    BY MR. KING:

5    Q.    Do you see that?

6    A.    Yes, I do.

7    Q.    Is it, in your experience with the Postal Service,

8    uncommon for certain manufacturers to directly fulfill customer

9    orders?

10   A.    Could you ask that one more time?  Sorry.

11   Q.    I sell T-shirts online, and instead of them being at my

12   house, the T-shirt company mails them out as they get ordered?

13   A.    Yeah, that occurs.

14   Q.    Do you know if that occurred here or do you not know?

15   A.    I do not know.

16   Q.    Turning back to Exhibit 72 -- and we don't need to bring

17   it up, thank you -- that's a list of -- and it's got addresses

18   for all of the people who got one of these auto key cards

19   mailed to them?

20   A.    Yes.

21   Q.    Got their names?

22   A.    Yes.

23   Q.    And it's about 931 parcels; is that . . .

24   A.    I believe the last count was somewhere roughly 1,300.

25   Q.    1,300?  And I want to make sure I'm being fair.  Two --

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 128 of 230

1    one of those was you?

2    A.    Correct.

3    Q.    And I think the first one was Mr. Ervin?

4    A.    Yes.

5    Q.    And two of those were Agent Hooker, I believe?

6    A.    Yes.

7    Q.    And he worked with you on that?

8    A.    Yes.

9    Q.    And then of the other 1,300 that ordered these, how many

10   of those did you investigate criminally or arrest for machine

11   gun violation laws?

12   A.    I did not.  I know ATF was doing some follow-up.  I was

13   not involved in any of those follow-up investigations.

14   Q.    So of those 1,300 addresses, that list that y'all had, you

15   personally did not arrest or do anything with any of those?

16   A.    I did not.

17            MR. KING:  Your Honor, I have no further questions.

18   Thank you.

19            Thank you.

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Ms. Taylor.

22            MS. TAYLOR:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MS. TAYLOR:

25   Q.    Inspector Hannon, your part of the investigation was

1    focused on the use of the mail in this case, correct?

2    A.    Yes, correct.

3    Q.    And once the search warrant was executed at Mr. Ervin's

4    residence, you continued to have some involvement in this case,

5    correct?

6    A.    Yes.

7    Q.    Did you -- did you do a lot of follow-up investigation,

8    write search warrants for social media or participate

9    substantively in the investigation as it moved from Mr. Ervin

10   to Mr. Hoover?

11   A.    No, I did not.

12   Q.    Okay.  And with regard to the surveillance that you

13   conducted on February 22nd and March 1st, there was a question

14   about whether it was clear that it was Mr. Ervin sending the

15   packages, correct?

16   A.    Yes, correct.

17   Q.    And while that may have been clear, did you know at that

18   time where he was manufacturing the auto key cards?

19   A.    I did not.

20   Q.    Was that part of the purpose of the surveillance, to try

21   and identify a location where they were being manufactured --

22   A.    Yes, it was.

23   Q.    -- or stored?

24   A.    Yes.

25   Q.    And that wasn't clear just from the fact that he was --

1  you knew he was mailing packages at the post office?

2  A.    Correct.

3  Q.    Now, additionally, as the investigation moved to the end

4  of February and you were -- you started seizing packages out of

5  the mail.  The first time on February 22nd, correct?

6  A.    Yes.

7  Q.    And you got search warrants for those packages, correct?

8  A.    I did.

9  Q.    You verified that every single one of them contained an

10  auto key card, correct?

11  A.    Yes, I did.

12  Q.    And at that point those packages were considered

13  contraband, right?

14  A.    Yes.

15  Q.    And so once you had identified that that is what Mr. Ervin

16  was mailing on his mail meter, by seizing those packages,

17  getting all those search warrants and examining the contents of

18  the packages, was there some urgency to prevent additional

19  contraband from being distributed across the country?

20  A.    Yes.  We wanted to intercept as many of these parcels as

21  we could.  We felt, in conjunction with the investigative team

22  and the U.S. Attorney's Office, that it would be irresponsible

23  of us to allow these auto key cards to continue being mailed

24  across the country.

25  Q.    Turning again to the mail meter information, I believe

1  that the number of packages that -- you reviewed that chart on

2  I think it's the first page, correct?

3  A.    Yes, correct.

4  Q.    It's a summary chart?

5  A.    Yes, it's on the first page.

6  Q.    And it shows that at least during the time that that mail

7  meter was used -- which was starting November 30th, 2022,

8  correct?

9  A.    Of 2021.

10  Q.    Sorry.  Actually, I think it was November 30th, 2020.

11  A.    If we go to November, yes, it was November 2020.

12  Q.    Okay.  It was November 2020 and then up until March of

13  2021 there were how many mailings?

14  A.    1,334 mailings.

15  Q.    Do you know whether there were other mailings that may

16  have been made through a different mail meter prior to the

17  November 30th date?

18  A.    Yes.  I believe he used a different meter that we do not

19  have the records for.

20  Q.    Okay.  You don't have the records?

21  A.    I don't have the records.

22  Q.    Okay.  Now, those 1,300 mailings, did they all go to the

23  Jacksonville area?

24  A.    No.  They were mailed across the country.

25  Q.    And in your capacity as a law enforcement officer, do you

1   enforce firearms laws directly?
2   A.   No, I do not.
3   Q.   What's your responsibility?
4   A.   In this investigation my responsibility was aiding ATF in
5   their firearms investigation.
6   Q.   And when you are conducting investigations -- like let's
7   say, for example, you were -- you were the agent investigating
8   somebody possessing an item illegally.  Would you be
9   investigating people here in the Jacksonville area?
10          In other words, you have an area of responsibility,
11  correct?
12  A.   I do.
13  Q.   And that's not nationwide, right?
14  A.   It is not.  Based out of our Jacksonville office, we cover
15  Northeast Florida.
16          MS. TAYLOR:  I have no other questions, Your Honor.
17          THE COURT:  Mr. Larosiere, anything else for this
18  witness?
19          MR. KING:  No, Your Honor.  Thank you.  Thank you.
20          MR. LAROSIERE:  No, Your Honor.
21          THE COURT:  All right.  You may step down, sir.
22          THE WITNESS:  Thank you.
23          THE COURT:  Who's your next witness?
24          MS. TAYLOR:  The United States calls Special Agent
25  John Powley.

1   (Witness exits the courtroom.)
2   (Witness enters the courtroom.)
3          THE COURT:  Sir, if you'll come right up here.
4          COURTROOM DEPUTY:  Please raise your right hand.  Do
5   you solemnly swear that the testimony you're about to give
6   before this Court will be the truth, the whole truth, and
7   nothing but the truth, so help you God?
8          THE WITNESS:  I do.
9          COURTROOM DEPUTY:  You may have a seat.  And if you
10  could please state your name for the record and spell your last
11  name.
12          THE WITNESS:  John Edward Powley, P-o-w-l-e-y.
13          THE COURT:  Whenever you're ready, Ms. Taylor.
14          MS. TAYLOR:  Yes, Your Honor.
15  **SPECIAL AGENT JOHN POWLEY, GOVERNMENT WITNESS, SWORN,**
16                  DIRECT EXAMINATION
17  BY MS. TAYLOR:
18  Q.   Special Agent Powley, where are you employed?
19  A.   I work for the Bureau of Alcohol, Tobacco and Firearms.
20  Q.   And what's your title?
21  A.   I'm a Special Agent.
22  Q.   What is your responsibility at ATF?
23  A.   ATF investigates crimes involving mostly, these days,
24  violations of arson, explosives, and firearms.
25  Q.   And how long have you been an ATF agent?

1   A.    Just short of 19 years.

2   Q.    How -- what kind of training did you go through to become

3   a federal agent?

4   A.    Well, first, initially you attend academy class at FLETC

5   in Georgia.  This is kind of a generalized class called CITP,

6   Criminal Investigator Training Program.  After that you attend

7   an academy specifically just for ATF concerning their laws and

8   policies and that kind of stuff.

9         Since then I've had continuing education as far as

10  other ancillary duties with ATF since then.

11  Q.    And did you have another career prior to becoming an ATF

12  agent?

13  A.    Yes.  I was a mechanical engineer for ten years prior to

14  coming with ATF and worked in private industry.

15  Q.    Now, how did you come to be involved in the investigation

16  of Mr. Ervin?

17  A.    Agent Hooker was -- applied for and received a search

18  warrant for Mr. Ervin's house and vehicle, and I was involved

19  in those -- that search warrant that day on March 2nd, 2021.

20  Q.    And was your role -- had you had a role in Mr. Hooker's

21  investigation prior to getting pulled in to help with the

22  search warrant?

23  A.    No, I had not.

24  Q.    And so you were not the case agent for any case related to

25  Mr. Ervin or Mr. Hoover?

1   A.    No, I was not.

2   Q.    Now, what was your -- what was it -- what was intended to

3   be your role with regard to the search warrant?

4   A.    Well, surveillance had been conducted of Mr. Ervin several

5   days prior to the warrant, and he had been observed leaving the

6   residence and going to places like the bank and the post

7   office.  So I believe the initial plan was for us to -- some

8   agents to sit on the house, some agents were sitting at the

9   post office, and then myself and a couple other agents were

10  sitting at the bank that he went to once in a while.

11        And our plan was for him to leave the residence and

12  do a traffic stop on him or make contact with him so that he

13  wasn't at the residence, and then basically secure him, find

14  out who was at the residence, maybe gain access, and then from

15  there execute the search warrant on the residence and the

16  vehicle.

17  Q.    And is that how things went?

18  A.    No.

19        We started very early morning, as far as I recall,

20  probably about a 6 a.m. brief.  We sat at our locations most of

21  the day.  It was late in the day, maybe 3 o'clock or so, that

22  somehow we received information that Mr. Ervin was in Lake

23  City.

24        And then it was decided -- someone called some

25  deputies in Lake City that we work with, and they went and

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 132 of 230

1  confirmed that Mr. Ervin was in Lake City.  And so it was
2  decided that two of us would go to Lake City.
3  Q.   And Agent Powley, so you went to Lake City with another
4  agent?
5  A.   Yes, Agent Chad Lifsey.
6  Q.   And where in particular in Lake City did you go?
7  A.   We actually didn't go to Lake City.  Mr. Ervin was
8  surveilled from Lake City to some rural property outside of
9  Lake City.  It's actually closer to Lake Butler, kind of out in
10 the boonies.  And so Agent Lifsey and I met the deputies there
11 and then proceeded to the rural property.
12 Q.   Was it -- was the property a piece of undeveloped land?
13 A.   It was.
14 Q.   And did you encounter Mr. Ervin there?
15 A.   We did.
16 Q.   Where was he?
17 A.   He was on the property, helping one of his friends clear
18 the property.  His friend was running a bobcat and Mr. Ervin
19 was running a chainsaw at the time cutting up a tree.
20 Q.   When you encountered Mr. Ervin, did you inform him who you
21 were and why you were there?
22 A.   Yes.  We initially took him into custody and secured him,
23 put him in handcuffs.  And then after frisking him we informed
24 him who we were, showed him our credentials, and explained why
25 we were there.

1  Q.   Was Mr. Ervin cooperative throughout?
2  A.   Yes, he was.
3  Q.   And did you search his person?
4  A.   Yes, we did.
5  Q.   Was there anything that you found on his person?
6  A.   Yes.  He had a 9-millimeter handgun in his front
7  waistband.
8  Q.   And did you have a warrant to search anything in
9  particular that was located at that property?
10 A.   We did.  His vehicle.
11      MS. TAYLOR:  And Your Honor, if I may approach
12 Special Agent Powley with Exhibits 124, 124.1A, 124.3A, 1 --
13 49, 124.1, 124.3, 124.2.
14      THE COURT:  Go ahead.
15 BY MS. TAYLOR:
16 Q.   Now, Special Agent Powley, was it Mr. Ervin's vehicle that
17 you had a warrant to search?
18 A.   Yes, it was.
19 Q.   And was the vehicle present at the -- at the undeveloped
20 piece of property where you located Mr. Ervin?
21 A.   It was.
22 Q.   What kind of vehicle was it?
23 A.   It was a Honda CRV.
24 Q.   And could you -- could you look at the exhibit marked 124.
25 What is that?

1    A.    That is a picture I took of Mr. Ervin's vehicle.

2    Q.    And is that the vehicle that you searched?

3    A.    It is.

4    Q.    And if you could please look at Exhibit 124.1.  And let us

5    know what that is.

6    A.    This is a photograph of two receipts that were in the

7    center console of the vehicle which I took as part of the

8    warrant.  The first one is a UPS Store receipt that was dated

9    for that same day.  Looks like something was shipped and

10   there's a tracking number.  And then the second item is a

11   receipt from Community First Bank.

12   Q.    And is that marked 124.1 or 124.1A?

13   A.    124.1A --

14   Q.    Okay.

15   A.    -- has the UPS receipt and half of the Community First

16   receipt.

17   Q.    And that's a photograph?

18   A.    Yes.  It's a photograph I took.

19   Q.    Okay.  Do you also have 124.1?  It should be a physical --

20   A.    Sorry, yes, 124.1.

21   Q.    So what's in 124.1?

22   A.    This is an envelope stating that it's a UPS receipt with a

23   tracking number with my date -- or my signature and a date of

24   3/2.

25   Q.    And is that something that you seized from Mr. Ervin's

---

1    vehicle on March 2nd?

2    A.    It is.

3    Q.    And if you could look at 124.2.  That should be a physical

4    exhibit.

5    A.    Okay.

6    Q.    What is that?

7    A.    This is $3,700 in U.S. currency that I seized from the

8    vehicle.

9    Q.    And 124.3?

10   A.    This is a receipt for Community First Bank dated 3/1.

11   Q.    And is that the actual physical receipt?

12   A.    It is.

13   Q.    And is that something you seized from the Honda?

14   A.    It is.

15   Q.    And 124.3A, please?

16   A.    124.3A?

17   Q.    Yes.

18   A.    This is a photograph of the Community First receipt that

19   took the day of the search warrant.

20         MS. TAYLOR:  Your Honor, at this time I would move

21   for admission of all of the 124 series exhibits.

22         MR. KING:  Without objection, Your Honor.

23         MR. LAROSIERE:  Without objection, Your Honor.

24         THE COURT:  So 124, 124.1, point 1A, point 2, point

25   3, and point 3A are admitted.

1          (Government's Exhibits 124, 124.1, 124.1A, 124.2, 124.3,
2     and 124.3 admitted in evidence.)
3     BY MS. TAYLOR:
4     Q.    Special Agent Powley, you testified that -- that you
5     encountered Mr. Ervin at that piece of property, correct?
6     A.    Yes.
7     Q.    And it was a face-to-face encounter?
8     A.    Yes.
9     Q.    And did you have at least some limited interactions with
10    him at that time?
11    A.    Yeah.  The only interaction -- well, I had no interaction
12    with him prior to that.  The only way I knew him was a
13    photograph from the -- that morning's briefing to know what he
14    looked like.
15    Q.    Okay.  But on the day that you executed this search
16    warrant, on March 2nd, 2021, you had face-to-face contact with
17    him then?
18    A.    I did, yes.
19    Q.    And are you able to identify Mr. Ervin in the courtroom?
20    A.    I am.
21    Q.    Could you please describe who he is.
22    A.    He's the individual on the far right with the blue jacket,
23    blue suit -- or blue tie -- or blue shirt, tie, short hair.
24    Q.    And was he raising his finger a moment ago?
25    A.    He was.

1          MS. TAYLOR:  I'd ask for the record to reflect that
2     Agent Powley has identified Mr. Ervin.
3          MR. KING:  We'd stipulate.
4          THE COURT:  The record will so reflect.
5          MS. TAYLOR:  Could we have 124 on the screen.
6     BY MS. TAYLOR:
7     Q.    Is this a picture of the vehicle that you searched?
8     A.    It is.
9     Q.    And is it a Honda SUV?
10    A.    It is.
11    Q.    Silver in color?
12    A.    It is.
13         MS. TAYLOR:  Could we have 124.1A.
14    BY MS. TAYLOR:
15    Q.    All right.  We're zooming in on the receipt to the
16    left-hand side.  That's a UPS Store receipt?
17    A.    It is.
18    Q.    And when is it dated?
19    A.    It's dated 3/2/21, the same day we did the warrant.
20    Q.    And it indicates a shipment was sent?
21    A.    Yes.  It appears so.  There's a receipt for 12.78, it says
22    Ground Residential and then gives a tracking number.
23         MS. TAYLOR:  And could we have 124.3A.
24    BY MS. TAYLOR:
25    Q.    And this is the other receipt from Community First Credit

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 135 of 230

1  Union?

2  A.   It is.

3  Q.   And who was the accountholder that this receipt is for?

4  A.   The receipt says it's Kristopher Ervin and it's dated

5  3/1/21.

6  Q.   And does it indicate -- what kind of transaction does it

7  indicate?

8  A.   It appears to be a cash withdrawal of $3,000.

9  Q.   And this was the day before you searched that vehicle?

10  A.   Yes.

11  Q.   And Exhibit 124.2, is -- that's cash in an envelope?

12  A.   It is.

13  Q.   And that's the actual cash that you seized from the

14  vehicle?

15  A.   It is.

16  Q.   If you could hold it up -- hold up the exhibit and just

17  show it to the jury, please.

18  A.   (Complies.)

19  Q.   Do you know what the amount of cash is that is in that

20  envelope in total?

21  A.   $3,700.

22       MS. TAYLOR:  I have no other questions for Special

23  Agent -- sorry.  Oh, I apologize, one more.

24  BY MS. TAYLOR:

25  Q.   You still have Exhibit 49 in front of you, correct?

1  A.   I do.

2  Q.   What is Exhibit 49?

3  A.   Exhibit 49 is a cell phone that was on the front passenger

4  seat of Mr. Ervin's car, which we determined was his cell phone

5  and we seized as part of the warrant.

6  Q.   And you didn't search inside of that cell phone

7  personally?

8  A.   No.

9  Q.   But did you put it into evidence?

10  A.   I did.

11       MS. TAYLOR:  Move for admission of 49, Your Honor.

12       MR. KING:  Without objection, Your Honor.

13       MR. LAROSIERE:  Without objection, Your Honor.

14       THE COURT:  49 is admitted.

15  (Government's Exhibit 49 admitted in evidence.)

16  BY MS. TAYLOR:

17  Q.   What kind of cell phone is it?

18  A.   I wrote on here "possibly a Samsung."  It was hard to

19  determine what brand it was.  It's in a case.  So I could just

20  tell that it wasn't an iPhone, it wasn't certain brands.

21       MS. TAYLOR:  Okay.  Now I have no further questions

22  for Special Agent Powley.

23       THE COURT:  All right.  Mr. Larosiere.

24       MR. LAROSIERE:  Yes, Your Honor.

25            CROSS-EXAMINATION

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 136 of 230

1  BY MR. LAROSIERE:

2  Q.   Hello, Special Agent Powley.  Thank you for your time

3  today.  Give me just one moment.

4       So you indicated you received information telling you

5  Mr. Ervin was out on this property?

6  A.   We did.

7  Q.   Okay.  How did you find out where that was?

8  A.   Honestly, I don't recall exactly.  Not being the case

9  agent, I'm not sure if he was caught on a license plate reader

10  or that his bank account was being monitored.  But somehow the

11  case agent received information and passed it along that

12  Mr. Ervin was at this bank in Lake City, and that's when some

13  of the deputies in Lake City that we use -- or work with were

14  called and asked about this to confirm he was there.

15  Q.   Okay.  And so in this -- what is it, a Honda CRV?

16  A.   Yes.

17  Q.   And this -- you searched that vehicle, correct?

18  A.   Yes, I did.

19  Q.   And this was part of Operation Lightning Strike?

20  A.   I believe that's the name of the case, yes.

21  Q.   Okay.  You recovered $3,700, correct?

22  A.   Correct.

23  Q.   Is that standard procedure, to take all the money you find

24  out of the vehicle?

25  A.   The warrant listed to take all money that was possible

1  proceeds, so yes, we took the money.

2  Q.   Okay.  Do you remember generating a report on March 2nd,

3  2021?  This would be ROI-12.

4  A.   I -- yes, I generated several reports -- two reports that

5  I recall in this case.

6  Q.   Do you recall saying that you took a piece of metal from

7  the car?

8  A.   Yes, I did.

9       MR. LAROSIERE:  Okay.  Thank you so much for your

10  time.  That's all I have for you.

11       THE COURT:  Mr. King.

12       MR. KING:  Thank you, Your Honor.

13       May it please the Court.

14       THE COURT:  Go ahead.

15            CROSS-EXAMINATION

16  BY MR. KING:

17  Q.   Special Agent Powley, one of your primary job

18  responsibilities is firearms-related investigations?

19  A.   It is.

20  Q.   And that's probably the bulk of your work?

21  A.   It is.

22  Q.   And how many auto key cards have you recovered during the

23  course of this case?

24  A.   Myself, none.

25  Q.   And of the 1,300 that may have gone out, what steps have

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 137 of 230

1 you taken to get any of these devices back?

2 A.   I haven't taken any.

3 Q.   And of all the people that may have possessed one, have

4 you, outside of Mr. Ervin, arrested any of them?

5 A.   No.

6         MR. KING:  Your Honor, I have no further questions.

7 Thank you.

8         THE COURT:  Ms. Taylor.

9              REDIRECT EXAMINATION

10 BY MS. TAYLOR:

11 Q.   Special Agent Powley, with regard to the question of

12 whether it's standard procedure to take all of somebody's

13 money, in this case you were not the agent who wrote the search

14 warrant, correct?

15 A.   No, I was not.

16 Q.   You've written search warrants before, correct?

17 A.   I have.

18 Q.   And when you write a search warrant, you have to write out

19 a list of things that you want to seize as evidence or

20 otherwise that could be contraband or proceeds of the crime

21 you're investigating?

22 A.   Yes, that's part of the -- one of the requirements of the

23 warrant, to specify exactly what you intend to seize.

24 Q.   And those basically are the three categories of kinds of

25 things that you can ask a judge to authorize you to seize?

1 A.   Yes.

2 Q.   And in this case -- and you don't just get whatever you

3 ask for, right?

4 A.   No.

5 Q.   A judge has to review your warrant?

6 A.   Yes.

7 Q.   And they have to determine that there's probable cause to

8 take every single thing that you say you want to take?

9 A.   Yes.

10 Q.   And if the judge says, "No, you can't take this," do you

11 take it anyway?

12 A.   No.

13 Q.   Okay.  So in this case, the warrant that you received

14 indicated that the judge who read the affidavit and signed the

15 warrant had authorized for the cash to be seized for some

16 reason, correct?

17 A.   Yes.

18 Q.   Okay.  And so it had to have been seized either because it

19 was proceeds --

20         MR. KING:  Your Honor, can we approach sidebar?

21         THE COURT:  You may.

22 (Proceedings at sidebar:)

23         THE COURT:  Yes, Mr. King.

24         MR. KING:  Your Honor, we'd object that this is

25 getting into putting the imprimatur of the Court in signing off

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 138 of 230

1   onto the actions of law enforcement.

2       And I understand that to some extent Mr. Larosiere

3   opened the door by his question, but -- which is why I didn't

4   object at first, but it's starting to get very detailed into,

5   you know, the Court essentially signing off and putting the

6   imprimatur of the Court on the action of law enforcement.  And

7   to that extent it's an imprimatur argument.

8       THE COURT:  Ms. Taylor, you've established that he

9   had authority to seize the money.  Do we need to go further

10  into this?

11      MS. TAYLOR:  No, Your Honor.  I just wanted to refute

12  the suggestion that law enforcement just goes and takes

13  people's stuff because they feel like it.

14      THE COURT:  I think you've covered that.

15      MS. TAYLOR:  Yes, Your Honor.

16      MR. LAROSIERE:  And to be fair, the simple suggestion

17  I was making is that there was not a tremendous amount of

18  relation between the acts and the money.  But I understand why

19  you would take it that way.

20      MS. TAYLOR:  We think there is a tremendous amount of

21  relationship.

22      MR. LAROSIERE:  I believe you --

23      THE COURT:  All right, all right.

24      MR. KING:  Thank you, Your Honor.

25      MR. LAROSIERE:  Thank you, Your Honor.

1       (Proceedings in open court:)

2   BY MS. TAYLOR:

3   Q.  And Special Agent Powley, you were also asked whether you

4   had seized a piece of what you described in your report as a

5   piece of metal?

6   A.  Yes, I did.

7   Q.  Do you recall exactly what that piece of metal was?

8   A.  Yes.  It was a piece of metal, maybe a little bit bigger

9   than a credit card size.  It had something cut out.  And I know

10  from the briefing in the case that was the type of material

11  that the auto key cards were being sold under or used.

12  Q.  Okay.  That piece of metal that you seized from the car,

13  did it have any lightning links on it?

14  A.  It did not.

15  Q.  Okay.  So it wasn't an auto key card?

16  A.  No.

17  Q.  Again, this case isn't your case, right?

18  A.  No, it's not.

19  Q.  So you were just there to assist with the search warrant?

20  A.  I was.

21  Q.  You don't have responsibility for any follow-up

22  investigation?

23  A.  I do not.

24      MS. TAYLOR:  No further questions, Your Honor.

25      THE COURT:  Anything further, gentlemen?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 139 of 230

1    MR. LAROSIERE:  No, thank you.  Your Honor.

2    MR. KING:  No, thank you.  Your Honor.

3    Thank you, Agent Powley.

4    THE COURT:  You may step down.

5    Who's your next witness?

6    MS. TAYLOR:  Your Honor, the United States would call

7  Mr. Medlin from ATF.

8    (Witness exits the courtroom.)

9    (Witness enters the courtroom.)

10    THE COURT:  Sir, if you'll come all the way up here

11  to the witness stand.

12    COURTROOM DEPUTY:  Please raise your right hand for

13  me.  Do you solemnly swear that the testimony you're about to

14  give before this Court will be the truth, the whole truth, and

15  nothing but the truth, so help you God?

16    THE WITNESS:  Do.

17    COURTROOM DEPUTY:  You may have a seat.  If you could

18  please state your name for the record and spell your last name.

19    THE WITNESS:  Sure.  Michael Medlin, M-e-d-l-i-n.

20  **SPECIAL AGENT MICHAEL MEDLIN, GOVERNMENT WITNESS, SWORN,**

21    DIRECT EXAMINATION

22  BY MS. TAYLOR:

23  Q.    Mr. Medlin, what -- where do you work?

24  A.    I'm a Special Agent, Digital Forensic Examiner, and I'm

25  stationed in Nashville, Tennessee.

1  Q.    And who's your employer?

2  A.    ATF.

3  Q.    How long have you been a Digital Forensic Examiner?

4  A.    15 years.

5  Q.    And how long have you been a Special Agent?

6  A.    19 years.

7  Q.    And what training did you have to undergo to become a

8  Special Agent for ATF?

9  A.    We have different certifications that we have to maintain.

10  I'm a Certified Computer Examiner.  That's about a year-long

11  program.  I'm a Cellebrite Physical Analyst and Logical

12  Operator.  That course takes a couple weeks.  We have to

13  maintain other certifications, like a Magnet Forensic Examiner,

14  A-plus Certifications.  It's lots of different certifications.

15  Takes about two years to go through our program.

16  Q.    And as part of your duties as a Digital Forensic Examiner,

17  do you sometimes assist other agents with essentially

18  downloading computers and phones and things like that?

19  A.    Yes, ma'am.

20  Q.    And in this case, was that what your role was, in the case

21  related to Mr. Ervin?

22  A.    Yes, ma'am.

23  Q.    Do you know who Mr. Ervin is outside of your --

24  A.    No.

25  Q.    -- downloading his phone?

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 140 of 230

1  A.   No, ma'am.

2  Q.   Okay.  Do you know who Mr. Hoover is?

3  A.   The agent?

4  Q.   Hoover, with a V.

5  A.   Oh, I'm sorry.  No, ma'am.

6  Q.   Did you perform any downloads of any devices that

7  pertained to or had been possessed by Mr. Hoover, or only

8  Mr. Ervin?

9  A.   I'd have to refer to my report, but I'm -- I do a couple

10 hundred cases a year for agents all over the country, so I

11 typically don't even know the defendants's names or what the

12 crimes are.  I just download the data and provide the data to

13 the field agent.  So I don't know which device belonged to

14 which person.

15 Q.   Okay.  And Special Agent Medlin, is Exhibit 49 still up on

16 the witness stand?

17 A.   I don't see anything.

18      THE COURT:  I don't think so.

19 BY MS. TAYLOR:

20 Q.   All right.  I think that the courtroom deputy is handing

21 it to you.

22 A.   Okay.  Thank you.

23      MS. TAYLOR:  And, Your Honor, may I also approach

24 with Exhibits 49A through Q?

25      THE COURT:  Yes.

1       THE WITNESS:  Thank you.

2  BY MS. TAYLOR:

3  Q.   Mr. Medlin, Number 49's already in evidence.  Do you need

4  to cut it open in order to be able to say whether it's a phone

5  you downloaded?

6  A.   No, it's a phone I attempted to download.

7  Q.   Okay.  Why do you say you attempted to download it?

8  A.   So when we get a mobile device, we -- we're trained to

9  extract the SIM card data first, and then if there's a micro SD

10 card inside the phone we do that next, and then we do the

11 device itself, the phone itself, last.

12      So I did the SIM card, no problems.  I downloaded the

13 micro SD card that was in the phone and there was no problems

14 with that.  But when I tried to extract the data from the phone

15 itself, it started wiping itself.  It started resetting.

16      MR. KING:  Your Honor, I apologize, can we approach

17 sidebar?

18      THE COURT:  You may.

19      (Proceedings at sidebar:)

20      THE COURT:  Yes, Mr. King.

21      MR. KING:  Your Honor, I believe this is expert

22 testimony, and he was not provided as part of the Rule 16

23 disclosure.  You know, I -- this is beyond, "I opened up the

24 phone, scrolled through it."  This is, "I'm a two-year

25 program-trained forensic expert and these are the steps I took

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 141 of 230

1    to conduct expert forensics on these electronic devices."

2            And he was not Rule-16 disclosed.  We would move to

3    exclude him.

4            MS. TAYLOR:  Your Honor, his testimony is not going

5    to be concerning, you know, doing any sort of analysis of the

6    phone beyond the fact that he got it, he downloaded the

7    contents of the SD card, and then identifying whether those

8    documents are documents that came off of the SD card.  I do not

9    view that as expert testimony.

10            But we also did provide Mr. Medlin's report as well

11    as his CV.  I think I just provided it yesterday, but counsel

12    does have his CV.

13            Given the -- I don't think it's expert testimony in

14    this case.  He's just saying what he did to get the photos off

15    the phone.  We could strike his testimony about any specialized

16    training and ask the jury to disregard it.

17            MR. KING:  Your Honor, if I could raise one other

18    issue.

19            THE COURT:  Sure.

20            MR. KING:  As I'm -- you know, we had Bates numbers,

21    but now as I'm looking through the description that should

22    be -- in the Court's exhibit list, it also says "deleted" in

23    there, which -- and again, I haven't talked to this witness.

24    I'm believing --

25            COURT REPORTER:  I can't hear you.

1            MR. KING:  Let me repeat that, Your Honor.

2            So looking at the Court's exhibit list, you know, as

3    we have it now, there seems to be the word "deleted" after a

4    lot of files he recovered.  I don't know exactly what his

5    testimony would be, but I have concerns that this isn't, "I

6    opened a phone, scrolled through it, and opened up his photos

7    and this is what I saw."  These are recovered photos using

8    forensic, you know, software, whatever forensic parts he went

9    through to recover deleted files, which is -- I would think

10    would clearly be expert testimony.  And I just don't know that

11    that's going to be his testimony, but I do have that concern

12    based on how the name of the file is described in the Court's

13    exhibit list, which, again, on the Bates numbers is not

14    something we can see when it's provided.

15            THE COURT:  Ms. Taylor.

16            MS. TAYLOR:  Well, they were listed that way on our

17    exhibit list with the Bates numbers from the outset.  The names

18    of the photos are exactly the same as they were when I produced

19    them I think over a year ago.  We could change the names and

20    just list them as like "Video 1, 2, 3."

21            THE COURT:  Well, the jury is not going to get the

22    exhibit list, so I'm not sure what the issue with -- I'm not --

23    your issue isn't with the titles of the exhibits, your issue is

24    your belief that he had to use some sort of expertise to

25    extract them?

1    MR. KING:  I don't know for a fact one way or

2  another, but that is my concern based on the title of the

3  documents.

4    THE COURT:  Excuse me.  Mr. King, I'm -- so your

5  premise is that because it took specialized training for him to

6  extract these things, that that makes him an expert witness,

7  even though he's just testified factually about what he did and

8  what he recovered?

9    MR. KING:  That it would be subject to Rule 16

10  because he's using his expertise to go through a non-common --

11  through a way that a layperson would not be able to testify

12  about techniques that he used to get information out of a phone

13  that a lay witness would not be able to get out of a phone.

14    MS. TAYLOR:  Your Honor, I think, frankly, any ATF

15  agent could plug a phone in to Cellebrite and hit "download."

16  It's not that complex of a process.

17    (Pause in proceedings.)

18    THE COURT:  Mr. King, I don't think this is expert

19  opinion testimony.  I think he's testifying factually about

20  what he retrieved from a phone.  The fact that it takes

21  expertise to do it I don't think renders it expert testimony.

22  So I'm going to overrule that objection.

23    MR. KING:  Thank you, Your Honor.

24    (Proceedings in open court:)

25  BY MS. TAYLOR:

1  Q.   Special Agent Medlin, could you describe what happened

2  when you plugged the actual physical phone in to try and

3  download it?

4  A.   So we use a program primarily called Cellebrite.  And it's

5  probably the most widely used third-party vendor in law

6  enforcement to download phones.  And so when you use

7  Cellebrite, it gives you a set of steps for each particular

8  device in order to extract it.  Some of them it's as simple as

9  just plugging it in and hitting "start," and some of them

10  they're a lot more complicated, where you have to hold certain

11  buttons down and put the phone into special modes and things

12  like that.

13    So I was following the directions from Cellebrite to

14  extract the phone, and then suddenly the phone just started

15  wiping, which it just erases all the data.  And I couldn't stop

16  it.  I couldn't turn the phone off.  And it was all wiped.  It

17  was gone.  So I was only able to get data from the SIM card and

18  from the micro SD card.

19  Q.   Have you ever had that happen before?

20  A.   No, ma'am.

21  Q.   With regard to the SIM card -- well, let's talk about the

22  micro SD card.  Did you find any photos or videos stored on the

23  micro SD card?

24  A.   Yes, ma'am.

25  Q.   And that's part of Exhibit 49, the micro SD card?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 143 of 230

1  A.    Yes, ma'am, it should be.

2  Q.    Because it was -- it was stored in that phone that was

3  Exhibit 49?

4  A.    Yes, ma'am.

5  Q.    If you could please look at Exhibits 49A through Q.  And

6  let's start with the first four:  A, B, C, and D.  If you could

7  say what those are and how you're able to recognize them.

8  A.    So 49A through D, as I recall, are all videos from the

9  micro SD card.

10  Q.    And how do you -- and those actual exhibits that you're

11  holding right now are disks, right?

12  A.    Yes, ma'am.

13  Q.    How are you able to determine that that's what's on that

14  disk?

15  A.    I reviewed the videos on these disks and verified that

16  they were the same videos from the micro SD card.

17  Q.    And how do you know that that's the same disk that you

18  looked at?

19  A.    I initialed them with my initials.

20  Q.    So those four disks, A, B, C, and D, each have your

21  initials on them?

22  A.    Yes, ma'am.

23  Q.    Okay.  If you could please look at the -- the remainder of

24  those sub exhibits are printouts, correct?

25  A.    Yes, ma'am.

1  Q.    Could you look through those and tell us what they are.

2  A.    They're pictures from the micro SD card.

3  Q.    And you verified that those are pictures that came from

4  the micro SD card stored in Exhibit 49?

5  A.    Yes, ma'am.

6        MS. TAYLOR:  Your Honor, at this time I would move

7  for admission of Exhibits 49A through Q.

8        MR. KING:  Without objection, Your Honor.

9        MR. LAROSIERE:  Without objection, Your Honor.

10       THE COURT:  49A through Q are admitted.

11  (Government's Exhibits 49A-49Q admitted in evidence.)

12       MS. TAYLOR:  Your Honor, I have no other questions

13  for Mr. Medlin -- Special Agent Medlin.

14       MR. KING:  Your Honor, I have no questions for the

15  Special Agent.

16       Thank you, sir.

17       THE COURT:  All right.

18       MR. LAROSIERE:  No questions, sir.  Thank you.

19       THE COURT:  All right, sir.  You may step down.

20       THE WITNESS:  Thank you.  Do I leave these here?

21       THE COURT:  Yes, sir.

22       Who's next, Ms. Taylor?

23       MS. TAYLOR:  I'll call Postal Inspector Richard

24  Batchelder.

25       (Witness exits the courtroom.)

1     (Witness enters the courtroom.)

2          THE COURT:  Sir, if you'll come all the way up here.

3     And remain standing to be sworn, please.

4          COURTROOM DEPUTY:  Please raise your right hand.  Do

5     you solemnly swear that the testimony you're about to give

6     before this Court will be the truth, the whole truth, and

7     nothing but the truth, so help you God?

8          THE WITNESS:  I do.

9          COURTROOM DEPUTY:  You may have a seat.  And if you

10    could please state your name for the record and spell your last

11    name.

12         THE WITNESS:  Name is Richard Batchelder, that's

13    B-a-t-c-h-e-l-d-e-r.

14    **POSTAL INSPECTOR RICHARD BATCHELDER, GOVERNMENT WITNESS, SWORN,**

15                        DIRECT EXAMINATION

16    BY MS. TAYLOR:

17    Q.   Inspector Batchelder, where do you work?

18    A.   I'm currently employed by the United States Postal

19    Inspection Service, Jacksonville Domicile.

20    Q.   And what's your current role?

21    A.   I currently work on miscellaneous teams:  violent crimes,

22    narcotics, and suspicious mail investigations.

23    Q.   Right.  And are you a Postal Inspector?

24    A.   Yes, ma'am.

25    Q.   And how long have you been a Postal Inspector?

1     A.   17 years.

2     Q.   How did you -- did you at some point come to be involved

3     in an investigation of Kristopher Justinboyer Ervin?

4     A.   I did, yes, ma'am.

5     Q.   And how did that come about?

6     A.   There was -- my partner, Inspector Keith Hannon, was

7     working with the ATF.  We did a surveillance on the subject.

8     Inspector Hannon gave us some direction of when the subject was

9     leaving his residence.  We were stationed at the Ridgewood Post

10    Office in Orange Park.  And the subject came to that Ridgewood

11    Post Office in a silver CRV and got out of his vehicle with a

12    parcel, dropped off that parcel, and then left the post office.

13    Q.   And was this surveillance on February 22nd of 2021?

14    A.   It was, yes, ma'am.

15    Q.   And where were you posted during the surveillance?

16    A.   I was posted right outside the Ridgewood Post Office

17    parked in a vehicle in the parking lot.

18    Q.   And at some point did you observe someone who you believed

19    to be Mr. Ervin enter the post office?

20    A.   I did, yes, ma'am.

21    Q.   And what -- did you wait for Mr. Ervin to leave the post

22    office?

23    A.   That's correct, yes, ma'am.  I observed him walking into

24    the post office holding a box.  And when he left a few moments

25    later he was not carrying that box that he had when he entered.

1  Q.   And then what did you do after you saw him leave without
2  the box?
3  A.   Once he left without the box he got back into his vehicle.
4  He left the parking lot.  And then I proceeded to go inside the
5  post office.  I secured the box that was dropped off by the
6  subject and then called Inspector Hannon over, and that's when
7  we reviewed some video and we took possession of the box.
8         MS. TAYLOR:  Ms. Ganoe, could you pull up Exhibit 28,
9  please, and attempt to advance it to 11:23.
10     (Video played.)
11 BY MS. TAYLOR:
12 Q.   And do you recognize -- Inspector Batchelder, do you
13 recognize the location that's depicted in this video?
14 A.   Yes, ma'am.
15 Q.   And what post office is that?
16 A.   It's going to be the Ridgewood Post Office off College
17 Drive.
18 Q.   In this part of the video, it's at 11:23 and 30 seconds,
19 do you see the man that you had seen enter the post office with
20 the box in this part of the video?
21 A.   Yes, ma'am.  He's just dropping off something at the
22 retail counter right now.
23 Q.   And now it's 11:23 and 45 seconds.  What is he doing?
24 A.   He's exiting.
25        MS. TAYLOR:  And let's leave the video running,

1  Ms. Ganoe.
2  BY MS. TAYLOR:
3  Q.   And if you see yourself in the video, please let us know.
4  A.   I entered right there at 11:24 and 20 seconds.
5  Q.   Are you the man wearing the black shirt and gray pants?
6  A.   Black shirt, gray pants, yes, ma'am.
7  Q.   And where are you going right now?  Are you visible in the
8  lower right-hand part of the video?
9  A.   I'm visible in the lower right and in the lower left.
10 I've approached a retail counter.
11 Q.   And at this point in the video what are you attempting to
12 do?
13 A.   Attempting to secure the box that was dropped off.
14 Q.   And did you secure that box?
15 A.   Yes, ma'am.
16 Q.   And did that -- what did that box contain?
17 A.   Contained numerous, I don't know the exact number off the
18 top of my head, of multiple mailings, white in color.
19        MS. TAYLOR:  We can pause the video now.
20     (Video stopped.)
21 BY MS. TAYLOR:
22 Q.   Did you -- and you said that you worked with Inspector
23 Hannon that day?
24 A.   Yes, ma'am.
25 Q.   And did Inspector Hannon thereafter handle the mailings?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 146 of 230

1  A.   That's correct, yes, ma'am.

2  Q.   So you -- you tendered them to him at some point?

3  A.   Yes, ma'am.

4  Q.   Would you be able to -- have you ever seen Mr. Ervin

5  face-to-face?

6  A.   No, ma'am.

7  Q.   You did observe him on surveillance, correct?

8  A.   Correct.

9  Q.   Did you review any -- any available documents that would

10 show what he looked like prior to this surveillance so you'd be

11 able to recognize him?

12 A.   Yes, ma'am.  I used the driver's license photo, and plus

13 going by the description of him that Inspector Hannon had given

14 us and what he was wearing that day.

15 Q.   Are you able to recognize Mr. Ervin in the courtroom

16 today?

17 A.   Yes, ma'am.

18 Q.   And could describe him?

19 A.   Be the gentleman wearing the blue shirt and -- is that

20 polka dots?  And a blue suit.

21      MS. TAYLOR:  I would ask for the record to reflect

22 that Inspector Batchelder identified Mr. Ervin.

23      MR. KING:  We'll stipulate to that, Your Honor.

24      THE COURT:  The record will so reflect.

25 BY MS. TAYLOR:

1  Q.   During your surveillance did you observe anyone who

2  appeared to be assisting Mr. Ervin?

3  A.   No, ma'am.

4  Q.   Did you observe anyone who appeared to be with Mr. Ervin?

5  A.   No, ma'am.

6  Q.   Did you receive information on another day about parcels

7  that might be related to Inspector Hannon's investigation of

8  Mr. Ervin?

9  A.   I did.  Just, I believe it was, a day after, possibly two

10 days after, I received a phone call from the manager of the

11 Ridgewood Post Office, who let me know that there was a very

12 similar box containing the same similar envelopes as was --

13 that we intercepted, you know, a few days prior.

14 Q.   And did you secure those packages or did someone else?

15 A.   I relayed that information to Inspector Hannon.  Inspector

16 Hannon then drove to the Ridgewood Post Office and secured

17 those, that package.

18      MS. TAYLOR:  I have no further questions for

19 Inspector Batchelder.

20      THE COURT:  Any questions?

21      MR. KING:  Very briefly, Your Honor.

22      CROSS-EXAMINATION

23 BY MR. KING:

24 Q.   Postal Inspector Batchelder, good afternoon.

25 A.   How you doing, sir?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 147 of 230

1  Q.   I just want to make sure I understand.  So you were part
2  of the surveillance team on February 22nd?
3  A.   Yes, sir.
4  Q.   Big group of all sorts of law enforcement agents?
5  A.   Yes, sir.  There was -- I was with myself and another
6  inspector who was in the vehicle.  That would be Inspector
7  Martin.
8  Q.   Okay.  And there were other law enforcement agents as
9  well?
10  A.   No, no, sir, not that I recall.
11  Q.   And so my understanding of your testimony is you saw
12  Mr. Ervin mail some stuff or put some stuff in the mail, and
13  you took it and then gave it to Inspector Hannon?
14  A.   Yes, sir.
15            MR. KING:  Your Honor, I have no further questions.
16            MR. LAROSIERE:  Nothing for this witness, Your Honor.
17            THE COURT:  Anything else, Ms. Taylor?
18            MS. TAYLOR:  No redirect, Your Honor.
19            THE COURT:  You may step down, sir.
20            THE WITNESS:  Thank you, Your Honor.
21            THE COURT:  Who would be your next witness,
22  Ms. Taylor?
23            MS. TAYLOR:  Our next witness would be Postal
24  Inspector Chris Martin, who will be about the same length of
25  testimony as Batchelder, Your Honor.

1            THE COURT:  Then let's go ahead with that before
2  lunch.
3       (Witness exits the room.)
4       (Witness enters the courtroom.)
5            COURTROOM DEPUTY:  Come right up to the witness
6  stand, please.  If you could please raise your right hand.  Do
7  you solemnly swear that the testimony you're about to give
8  before this Court will be the truth, the whole truth, and
9  nothing but the truth, so help you God?
10            THE WITNESS:  I do.
11            COURTROOM DEPUTY:  You may have a seat.
12            THE WITNESS:  Thank you.
13            COURTROOM DEPUTY:  And if you could please state your
14  full name for the record and spell your last name.
15            THE WITNESS:  My name is Christopher Martin,
16  M-a-r-t-i-n.
17  **POSTAL INSPECTOR CHRISTOPHER MARTIN, GOVERNMENT WITNESS, SWORN**
18                 DIRECT EXAMINATION
19  BY MS. TAYLOR:
20  Q.   Inspector Martin, where are you employed?
21  A.   I'm employed with the United States Postal Inspection
22  Service out of the Miami Division, Jacksonville Domicile.
23  Q.   And are you a Postal Inspector?
24  A.   Yes, I am.
25  Q.   What kinds of things do you do as a Postal Inspector?

1  A.   My job primarily -- I work a miscellaneous assignment,
2  which entails working various cases involving drugs, narcotics
3  through the mail, workplace violence, mail theft, mail fraud.
4  Q.   And how long have you been a Postal Inspector?
5  A.   I will have 20 years in as of April 19th.
6  Q.   Are you looking forward to that day?
7  A.   I am looking forward to that day.
8  Q.   How did you become involved in the investigation of
9  Mr. Ervin?
10 A.   One of the inspectors in our office, Inspector Keith
11 Hannon, was working the case and asked if I could help in
12 facilitating some surveillance with the case.
13 Q.   And did you participate in surveillance?
14 A.   Yes, I did.
15 Q.   Was that on February 22nd, 2021?
16 A.   Yes.
17 Q.   And what was your position during the surveillance?
18 A.   I was posted at the Ridgewood Post Office, looking for an
19 individual that could be possibly mailing some packages that
20 Keith thought were suspect -- suspicious packages.
21 Q.   And when you say "Keith," are you --
22 A.   I'm sorry, Inspector Hannon.
23 Q.   And were you inside or outside the post office?
24 A.   I was outside the post office in my work vehicle.
25 Q.   And did you observe anything pertinent to Inspector

1  Hannon's investigation?
2  A.   I did.
3  Q.   And what was that?
4  A.   On that day I observed a -- based on the operations plan,
5  I observed a vehicle that was suspected to be showing up there.
6  It came to the post office, and the individual that had been
7  identified exited the vehicle and entered the post office.
8  Q.   How were you able to identify that that was the person who
9  you were surveilling?
10 A.   We had information that the suspected individual drove
11 a -- I believe a Honda C- -- CRV, silver in color, and we had a
12 picture of the individual prior to the surveillance.
13 Q.   Were you able -- from your position, were you able to see
14 this individual, whether he was carrying anything?
15 A.   Yes.  When the individual exited the vehicle he was
16 carrying a box, a brown box that had, it looked like, various
17 mailings in it.
18 Q.   Were the mailings poking out of the top of the box?
19 A.   They were.
20 Q.   Approximately how many mailings did you believe were in
21 the box?
22 A.   I believe I reported to Keith 20 to 30.
23 Q.   And were they a particular color?
24 A.   Yeah, I believe they were white.
25 Q.   Did you do anything in terms of securing those packages?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 149 of 230

1    A.   I did not.  After the individual entered the post office,
2    a person that was with me, Inspector Richard Batchelder, was
3    sent in to retrieve those parcels.
4    Q.   Did you observe Inspector Batchelder do that?
5    A.   I observed Inspector Batchelder enter the post office.  I
6    remained outside, keeping surveillance on the vehicle and the
7    individual as he left.
8           MS. TAYLOR:  I have no further questions for
9    Inspector Martin.
10          THE COURT:  Mr. King?
11          MR. KING:  No, Your Honor, nothing.
12          THE COURT:  Mr. Larosiere?
13          MR. LAROSIERE:  No, Your Honor.
14          THE COURT:  You may step down, sir.
15          THE WITNESS:  Thank you very much.
16          THE COURT:  Would this be a good time for our lunch
17   break, Ms. Taylor?
18          MS. TAYLOR:  Yes, Your Honor.
19       (Witness exits the courtroom.)
20          THE COURT:  Then, ladies and gentlemen, it's about
21   12:20.  We'll take an hour and ten minutes.
22          I'll ask you to continue to follow all of the
23   instructions that I've been giving you about your contacts and
24   your communications and not conducting research or forming or
25   expressing any opinions.

1           We'll see you back at about 1:30.
2           COURT SECURITY OFFICER:  All rise for the jury.
3       (Jury exits, 12:22 p.m.)
4           COURT SECURITY OFFICER:  Please be seated.
5           THE COURT:  Anything we need to address at this time,
6    Ms. Taylor?
7           MS. TAYLOR:  I don't believe so, Your Honor.
8           THE COURT:  Mr. King?
9           MR. KING:  No, Your Honor.
10          THE COURT:  Mr. Larosiere?
11          MR. LAROSIERE:  No, Your Honor.
12          THE COURT:  All right.  I'll see you back at 1:30.
13          COURT SECURITY OFFICER:  All rise.
14      (Lunch recess, 12:23 p.m. to 1:39 p.m.)
15      (All parties present.  Jury not present.)
16          COURT SECURITY OFFICER:  All rise.  This Honorable
17   Court is back in session.
18          Please be seated.
19          THE COURT:  Who's the next witness going to be?
20          MR. MESROBIAN:  It will be Andrea Useche from the
21   bank, Your Honor.
22          THE COURT:  Okay.  Let's have the jury, please.
23          COURT SECURITY OFFICER:  All rise for the jury.
24      (Jury enters, 1:42 p.m.)
25          COURT SECURITY OFFICER:  Please be seated.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 150 of 230

1          THE COURT:  Mr. Mesrobian.

2          MR. MESROBIAN:  United States calls Andrea Useche.

3      (Witness enters the courtroom.)

4          THE COURT:  If you'll come right up here and remain

5      standing for just a moment.

6          THE WITNESS:  Yes, ma'am.

7          COURTROOM DEPUTY:  If you can please raise your right

8      hand.  Do you solemnly swear that the testimony you're about to

9      give before this Court will be the truth, the whole truth, and

10     nothing but the truth, so help you God?

11         THE WITNESS:  I do.

12         COURTROOM DEPUTY:  You may have a seat.

13         THE WITNESS:  Thank you.

14         COURTROOM DEPUTY:  And if you could please state your

15     name for the record and spell your last name.

16         THE WITNESS:  Andrea Useche, U-s-e-c-h-e.

17     **ANDREA USECHE, GOVERNMENT WITNESS, SWORN,**

18              DIRECT EXAMINATION

19     BY MR. MESROBIAN:

20     Q.  Ma'am, where are you employed?

21     A.  Community First Credit Union.

22     Q.  And what is your position?

23     A.  I am a fraud investigator.

24     Q.  What office do you work out of?

25     A.  Oh, well, we have a headquarters, so I'm in the

1      headquarters.

2      Q.  And how long have you been a fraud investigator at

3      Community First?

4      A.  Just over three years.

5      Q.  And is Community First Credit Union also known as CFCU?

6      A.  Yes.

7      Q.  And is CFCU a federally insured credit union?

8      A.  Yes.

9      Q.  So Ms. Useche, where were you employed before CFCU?

10     A.  I was a fraud investigator for VyStar for about seven

11     months.

12     Q.  And prior to that were you in law enforcement?

13     A.  Yes, sir.

14     Q.  And could you tell the jury about your law enforcement

15     experience.

16     A.  I graduated the academy in 2003.  I worked for -- was

17     hired by the Lake City Police Department and I worked there

18     from 2003 until 2008, I believe.  I think it was '08 -- '07,

19     2007.  And then I left there and I went to the Columbia County

20     Sheriff's Office.  I didn't go too far, but I went from blue to

21     green.  And I was with the sheriff's office until 2019.

22     Q.  And what roles did you hold at the Columbia County

23     Sheriff's Office?

24     A.  I was in patrol.  I worked for about a little over --

25     about a year and a half in the courthouse, and then in 2012 I

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 151 of 230

1  became a detective.  That was what I set out to do, was become
2  a detective.
3  Q.    And what type of cases did you investigate as a detective?
4  A.    The first year was all cases.  Everything they gave me.
5  It was everything.  And then after that I decided to specialize
6  in fraud, so I sort of began working with fraud cases, and I
7  did that until I left.
8  Q.    Now, in your current role with CFCU, could you describe
9  your role and responsibilities as a fraud investigator?
10  A.    Sure.  What I do is I -- what I'm tasked with doing is I'm
11  protecting the credit union from financial loss and risk and I
12  also protect our members from financial loss and risk.  And
13  that's a balance that I do.
14         And I do that by looking at the transactions that
15  come in that might have been flagged by our system to look at
16  to do a manual review to see if there's fraud going on.
17         Also, we have members that call in and say, "Hey,
18  this check hit my account.  I didn't write it," and that begins
19  a fraud investigation.
20  Q.    And when law enforcement is seeking information relating
21  to one of their investigations, who at CFCU is usually the
22  point of contact?
23  A.    I am the law enforcement liaison because of my affiliation
24  with law enforcement.  So, yes, I am the one that -- I have all
25  contacts.  Everything would be funneled to me or through me

1  for -- to assist law enforcement.
2  Q.    And similarly, if -- in your role as a fraud investigator
3  or if someone else at CFCU detects something to be reported to
4  law enforcement, who handles that?
5  A.    That would be me, correct.  I would file -- I would look
6  at the case, and then if it needed to be filed with law
7  enforcement, I'm the one who would be filing.
8  Q.    Is there a team within your group at CFCU which is
9  responsible for potential Bank Secrecy Act violations?
10  A.    Yeah, we have a BSA team.  All financial institution are
11  required to have a BSA team, and we have one.
12  Q.    And what type of activities are covered or reviewed by
13  those investigators?
14  A.    So the BSA team is responsible for monitoring accounts for
15  any suspicious activity, such as money laundering or financial
16  terrorism.  That's what we look at, so . . .
17  Q.    And is that team also responsible for filing documents
18  with the government pursuant to the bank's obligations under
19  the BSA?
20  A.    Yes, sir, that's correct.
21  Q.    So I'd like to talk about a few of those types of
22  documents.
23         Are you familiar with something called a Currency
24  Transaction Report?
25  A.    Somewhat familiar, yes, sir.

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 152 of 230

1   Q.   And is that also known as a CTR?

2   A.   Yes, sir.

3   Q.   And are you aware, what is the CTR designed to report?

4   A.   If the transaction amount that is deposited or withdrawn,

5   or a combination, within a 24-hour period -- but it really

6   wouldn't be 24 hours because it would only be during business

7   hours -- but within that 24-hour period, if the combination is

8   over $10,000, then it has to be reported.

9   Q.   And that's a transaction in cash, correct?

10  A.   Correct.  That is correct.

11  Q.   Separately, are you familiar with something called a

12  Suspicious Activity Report?

13  A.   Yes, sir, I am.

14  Q.   And what is a Suspicious Activity Report?

15  A.   It's a report that our BSA team makes to FinCEN.  It's a

16  required report.  Anytime there's suspicious activity, we are

17  required to report that.

18  Q.   And is there a particular threshold for reporting

19  suspicious activity?

20  A.   There can be.  One instance where a report is required

21  would be is if the transactions that occur, fraudulent or

22  suspicious, is $5,000 or more and the person who is maybe the

23  suspicious actor is known -- in other words, their name, we

24  know who they are, they're able to be identified -- then that

25  report has to be made and that information has to be given.

1        If the actor is unknown then the threshold moves up

2   to 25,000.  So if it's $25,000 or more, then the report has to

3   be given over to FinCEN.

4   Q.   And FinCEN is a United States government organization?

5   A.   Yes, sir.

6   Q.   And to be clear, both the CTR, the Currency Transaction

7   Report, and the Suspicious Activity Report, the SAR, are both

8   legally required for banks to track and file?

9   A.   That's correct, yes, sir.

10  Q.   Separately, are you familiar with something called a

11  Suspicious Incident Report?

12  A.   Yes.

13  Q.   What is that?

14  A.   So a Suspicious Incident Report, or what we call a SIR,

15  would be generated by actually anybody within the credit union

16  who had a feeling that something untoward was going on or

17  suspicious activity.  And it could be anything.  It could be

18  the behavior of a member who forged, behavior of something

19  going on, it could be a physical problem with, you know,

20  "Somebody" -- "I think somebody maybe moved the camera."

21  Anything that is -- would, in your mind, create suspicion of a

22  potential problem can be reported as suspicious activity -- a

23  Suspicious Incident Report.

24        Those reports go to the BSA team.  The BSA team then

25  determines whether or not that rises to a level of a SAR, or a

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 153 of 230

1   Suspicious Activity Report, or if that report needs to go to

2   another department.

3   Q.    So that's -- the SIR is a way of people working in

4   branches, for example, to report something that could be

5   suspicious for the fraud team to look at?

6   A.    Correct.

7   Q.    Separately, does your team, the fraud investigation team,

8   and the BSA team use computer programs or algorithms to

9   evaluate activity in customer accounts?

10  A.    Correct, yes, we do.

11  Q.    And could you talk a little bit about that and what those

12  programs use for.

13  A.    Right.  So we use a system that is -- we purchased the

14  system, and it is a case management system where we keep all of

15  our cases.

16        But the other thing that it does is it looks at the

17  transactions and the patterns of your accounts, and it looks

18  for anything that is out of pattern, suspicious.  For example,

19  if you were to make a deposit that was well above what you

20  would normally do as a pattern, that computer program would

21  pick up on that and it would send an alert to our team for us

22  to manually review, to see:  Well, what's going on with that?

23        Again, that's a balance between the risk of the

24  credit union and the risk of our member being involved in fraud

25  or being victimized.

1   Q.    And to be clear, it could be both unusual deposits or

2   unusual withdrawals as a means of preventing loss to the

3   accountholder?

4   A.    That's correct.  I was just using deposits as an example,

5   but yes, sir.

6   Q.    Do you, as a fraud investigator, sometimes become involved

7   when a client attempts to close a bank account?

8   A.    Under certain circumstances, yes.

9   Q.    And what would those circumstances be?

10  A.    Well, if somebody comes in and they are wanting to make a

11  large withdrawal of most of their money or all of their money,

12  typically what happens is that they're not going to encounter

13  our department first, they're going to go to a branch.  And

14  then the branch personnel, staff, would ask them, "Okay, well,

15  what are the circumstances?"

16        And if there's anything that would trigger something

17  a concern, such as -- I'll give you an example.  If an elderly

18  person came in with maybe a younger person and the elderly

19  person said, "I want to withdraw all of my money," and the

20  younger person with them was sort of guiding them and telling

21  them what to do, that would create a suspicion under which they

22  would call my department.

23  Q.    So Ms. Useche, through your work as a fraud investigator,

24  did you become aware of a CFCU accountholder named Kristopher

25  Justinboyer Ervin?

1   A.    Yes.

2   Q.    And was that in or around January 2021?

3   A.    That's correct.

4   Q.    Without going into what anyone may have said to you, did

5   you receive -- specifically receive a referral to investigate

6   Mr. Ervin and both his account activity and any business

7   activity he was engaged in?

8   A.    Yes, sir.

9   Q.    To be clear, you've never met Mr. Ervin, correct?

10  A.    I have not.

11  Q.    Now, first, with respect just to his account activity,

12  what steps did you take to look into this referral?

13  A.    So, of course, you know, we would look at the account

14  transactional history to see what's occurring, to see if it

15  matches the information that we got in.

16          We would also begin looking at transactions, in other

17  words, cash in or cash out, or automatic transfers or automatic

18  deposits, known as ACHs, which stands for automatic

19  clearinghouse.  I don't know why they named it that.  But it

20  would be something like if you get a direct deposit, that comes

21  into your account through ACH.

22          So we would begin looking at that transactional

23  history and activity to see whether or not the information we

24  have is jibing with what we're seeing.

25  Q.    And do you use a particular program available to you in

1   your role to engage in that type of investigation?

2   A.    Our Core system.  Yes.  We have a Core system.  The Core

3   system that we use, it would be a system that everybody in the

4   credit union uses to keep track of the accounts.  We can make

5   notes, you know.  We can see each other's notes, and we can see

6   that transactional history.

7   Q.    And do you also have a program called Verafin?

8   A.    Yes.

9   Q.    And what's that?

10  A.    That was something that I described earlier.  That would

11  be our case management program.  That's also the program that

12  looks every day at the transactions that come in and then

13  generates alerts based on what it thinks we might need to look

14  at and review manually.

15  Q.    So with respect to Mr. Ervin, did you review his account,

16  as we were just discussing, for any significant recent

17  deposits?

18  A.    Yes.

19  Q.    And as well for significant cash withdrawals?

20  A.    Yes.

21  Q.    And do you recall responding -- or assisting with the

22  response to a law enforcement subpoena regarding bank records

23  for Mr. Ervin?

24  A.    Yes, sir, correct.

25          MR. MESROBIAN:  And Your Honor, may we publish what

1    is already in evidence as Government Exhibit 95D, as in delta?

2              THE COURT:  Madam Deputy, do you have 95D?

3              COURTROOM DEPUTY:  Yes, Your Honor.

4              THE COURT:  Okay.  I missed it.

5              Go ahead.

6    BY MR. MESROBIAN:

7    Q.    And Ms. Useche, do you recognize this to be an application

8    for an account at Community First Bank?

9    A.    Yes, I do, yes, sir.

10   Q.    And if you can look, we've zoomed in on the middle portion

11   underneath -- and the heading is Member Information.  Who is

12   the member or applicant here?

13   A.    Kristopher Justinboyer Ervin.

14   Q.    And the address provided is 2409 Kirkwall Court?

15   A.    Yes, sir.

16   Q.    And the cell phone provided is (904) 405-9878?

17   A.    Yes, sir.

18   Q.    And the email address provided is JustinErvin80@aol.com?

19   A.    Yes, sir.

20             MR. MESROBIAN:  And Ms. Ganoe, if you can go to the

21   bottom part.

22   BY MR. MESROBIAN:

23   Q.    Here, does this reflect that there's a joint owner in this

24   account?

25   A.    Yes, sir.  It says "joint with right of survivorship," and

1    the box is checked.

2    Q.    And the name of this individual is Kris A. Ervin?

3    A.    Yes, sir.

4              MR. MESROBIAN:  And Ms. Ganoe, could we go to page 3

5    of this exhibit.

6    BY MR. MESROBIAN:

7    Q.    So if you could take a look at this top part there

8    underneath "Subsequent Actions."  Is this a subsequent

9    adjustment to this account in the account documents produced?

10   A.    Yes, sir.

11   Q.    And here it says "remove"?

12   A.    It does.

13   Q.    Remove a joint owner?

14   A.    Correct.

15   Q.    And if we go down to the bottom where it says "Joint Owner

16   Number 1."  This reflects that Kris A. Ervin, that joint owner

17   we were just looking at, was removed as a joint owner of this

18   account?

19   A.    That's correct, yes, sir.

20             MR. MESROBIAN:  So now, Your Honor, may I publish

21   Government Exhibit 95C?

22             THE COURT:  You may.

23             MR. MESROBIAN:  And Ms. Ganoe, if we can go to page

24   17 and zoom in on the top.  Yeah, down -- from "Kristopher

25   Justinboyer Ervin" down.

1    BY MR. MESROBIAN:

2    Q.    So Ms. Useche, do you recognize this to be an account

3    statement provided by Community First?

4    A.    Yes, it is.

5    Q.    And is this an account statement for -- looks like the

6    middle name is short one letter, but it's Kristopher

7    "Justinboye" Ervin at that same address we just looked at?

8    A.    Yes, sir.

9    Q.    With an account number ending in 3009?

10   A.    That's correct.

11   Q.    And the statement period for this statement is

12   December 1st of 2020 through December 31st of 2020?

13   A.    Yes, sir.

14   Q.    So if we could go to next page.  I'd like to focus just on

15   the top half of the screen here.  So I'd like to talk first

16   about the deposits in this account.

17         Looking at December 1st -- and I'll make -- I'm going

18   to try to make marks as best I can next to them -- is there a

19   deposit that says "ACH Stripe" in the amount of $1,814.69?

20   A.    Yes, sir, that's correct.

21   Q.    The next day, December 2nd, is there a deposit, ACH

22   Stripe, for $6,717.02?

23   A.    Yes, sir.

24   Q.    Day after that, is there a deposit, ACH Stripe, in the

25   amount of $3,734.82?

1    A.    Yes, sir.

2    Q.    Moving down.  The day after the last one we just looked

3    at, this one is December 4th.  Is there a deposit line that

4    says "ACH Stripe, $2,247.58"?

5    A.    Yes, sir.

6    Q.    And then going down to the bottom here, December 7th,

7    deposit, ACH Stripe, in the amount of $1,463.05?

8    A.    Yes, sir.

9          MR. MESROBIAN:  And if we could go to the next page,

10   please, Ms. Ganoe.

11   BY MR. MESROBIAN:

12   Q.    The day after that, December 8th, it says "deposit, ACH

13   Stripe, $2,340.31"?

14   A.    Yes, sir.

15   Q.    December 9th, the next day, deposit, ACH Stripe,

16   $4,620.67?

17   A.    Yes, sir.

18   Q.    Then finally, the day after that, December 10th, deposit,

19   ACH Stripe, $902.31?

20   A.    Yes, sir.

21   Q.    So I'll stop here.

22         Are you familiar with what Stripe is?

23   A.    Somewhat familiar.

24   Q.    And what do you know it to be?

25   A.    I know it to be a payment platform, very similar to

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 157 of 230

1   Square.  I personally have never paid a purchase with Stripe,

2   but I've made a purchase with Square.  And I understand it to

3   be an online payment platform.

4   Q.   And specifically, do you understand it to be a payment

5   processor for various -- for a business, essentially?

6   A.   Yes, sir, yes.

7   Q.   Is it common to see proceeds from a business or proceeds

8   from Stripe going into personal accounts at CFCU?

9   A.   No, sir.

10  Q.   And in your role as a fraud investigator, or general

11  investigator of the bank, what does that signify to you?

12  A.   So at Community First we do not allow business

13  transactions to flow through a personal account.  You have to

14  have a business account.

15          So when we see business transactions flowing through

16  a personal account, we typically will reach out and let the

17  member know, "You have to stop."  And if they don't stop, then

18  we're probably going to exit the relationship, which is

19  basically closing their account.  We don't allow that.

20          MR. MESROBIAN:  So now, Ms. Ganoe, if we could go to

21  page 22.

22  BY MR. MESROBIAN:

23  Q.   So here we have -- we're still in this December account

24  statement on a subsequent page.  And now I'd like to focus on

25  the balance in the account and then some withdrawals.  If we go

1   down -- actually, I'm sorry.  You're right in the right place.

2          So I'd like to focus on what the account balance was

3   at the beginning of the day on December 28th.  So I guess

4   that's -- the last transaction on December 27th, after that

5   debit of $124 for Amazon, was the balance $59,683.06?

6   A.   Yes, sir.

7          MR. MESROBIAN:  And could we go down to the next

8   half, please.

9   BY MR. MESROBIAN:

10  Q.   So starting on that same day, December 28th, does the

11  account statement reflect a series of cash withdrawals?

12  A.   I do see a series of cash withdrawals on that day, yes,

13  sir.

14  Q.   And these are denoted by the description "withdrawal by

15  cash"?

16  A.   Correct.

17  Q.   So first, on December 28th, there's one for $9,000; is

18  that right?

19  A.   That is the first cash withdrawal, yes.

20  Q.   And immediately below that on the same day, December 28th

21  there's a withdrawal for $5,000?

22  A.   Correct.

23  Q.   And towards the bottom of the screen, on December 29th, i

24  there another cash withdrawal for $9,000?

25  A.   Correct.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 158 of 230

1              MR. MESROBIAN:  If we could go to the next -- or --

2      correct.  Right there.

3      BY MR. MESROBIAN:

4      Q.    And on the next page of this document, on December --

5      well, there's another deposit on December 30th from Stripe of

6      $6,083.71?

7      A.    Yes, sir.

8      Q.    And immediately below that, on December 30th there's

9      another cash withdrawal of $9,000?

10     A.    Yes, sir, correct.

11     Q.    And then the next day after that, there -- on

12     December 31st there is a deposit of Stripe -- from Stripe of

13     $2,445.40?

14     A.    Yes, sir.

15     Q.    And then a withdrawal in cash of, again, $9,000; is that

16     right?

17     A.    Yes, sir, correct.

18             MR. MESROBIAN:  And Ms. Ganoe, could we go to page

19     25.

20     BY MR. MESROBIAN:

21     Q.    And Ms. Useche, do you recognize this to be another

22     account statement relating to this same account belonging to

23     Kristopher Justinboyer Ervin?

24     A.    Yes, sir.  This is the January statement of 2021.

25             MR. MESROBIAN:  So if we could go further down to the

1      next page, please.

2      BY MR. MESROBIAN:

3      Q.    So the last transaction we saw was December 31st, New

4      Year's Eve, I guess.

5             On January 2nd there's a withdrawal by cash again of

6      $9,000, correct?

7      A.    Yes, sir.

8      Q.    And was there a -- does there appear to be a deposit by

9      check that same day into the account?

10     A.    Yes.  I would say $100 deposit by check.

11     Q.    Then on January 5th, a little further down the screen, is

12     there another cash withdrawal for $9,000?

13     A.    Yes, sir.

14     Q.    The day after that, on January 6th, is there another

15     withdrawal of $9,000?

16     A.    Yes, sir.

17     Q.    Other than the second withdrawal we looked at on

18     December 28th for $5,000, were all of these cash withdrawals we

19     just looked at in the amount of $9,000?

20     A.    I believe so.

21     Q.    And the threshold you mentioned earlier for reporting cash

22     transactions is $10,000; is that right?

23     A.    I believe it's $10,000 and one penny.

24     Q.    In your experience, are regular cash transactions just

25     under the reporting threshold a red flag?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 159 of 230

1  A.   If there's a series of them, if there's a -- potentially a
2  statement made -- there's a couple of other things that go into
3  it, but generally speaking, yes.
4  Q.   And again, how is that activity monitored at the bank, or
5  at the credit union?  Is it manual or is it -- is there an
6  algorithm that looks for activity like that?
7  A.   Actually, both.  So a Suspicious Incident Report could
8  come through and -- to report, "Hey, this person has come in
9  every day and is withdrawing $9,000," in this case.  Or it
10 could actually be an algorithm through oUr Verafin system and
11 come in as an alert.
12 Q.   So separately, ma'am, I believe you testified earlier that
13 you were also asked to look into the nature of Mr. Ervin's
14 business?
15 A.   Yes, sir.
16 Q.   And without getting into what other individuals may have
17 said to you, did you become concerned that Mr. Ervin was
18 involved in illegal activity?
19 A.   Yes, sir.
20 Q.   Subsequently, did you take any actions in terms of
21 contacting law enforcement?
22 A.   Yes, sir.
23 Q.   And was that also in January of 2021?
24 A.   Yes, sir, that is correct.
25 Q.   Who did you reach out to?

1  A.   I reached out to Jeff Massie with the ATF.
2  Q.   And why did you reach out to ATF particularly?  Did --
3  I'll strike that.
4       Did you reach out to ATF because you believed
5  Mr. Ervin was involved in some type of firearms activity?
6  A.   I wasn't a hundred percent sure, but I had a -- I had a
7  suspicion that that was the case and I needed confirmation.
8  And since I'm not -- even though I handled firearms for my
9  whole career, I'm by no means a firearms expert, so I wanted an
10 expert opinion.
11 Q.   So you reached out to Jeff Massie?
12 A.   Yes, sir.
13 Q.   And how did you know Jeff Massie?
14 A.   I worked with Jeff Massie through Columbia County for
15 years as a detective when I was a detective.  He would help us
16 out.  He would come in, we would work cases together.  I
17 personally have never worked a case with Jeff, but I knew him
18 from his -- our detective division is very small.  It's only
19 nine of us.  So whenever he would come in, I would know who he
20 was.  And I had a good rapport with Jeff.
21 Q.   And was he no longer in the Jacksonville area?
22 A.   Correct.  I didn't even know that.  He had been reassigned
23 to Texas.  And he let me know that he was no longer in Columbia
24 County, or in the North Florida area.  He had been reassigned
25 to Texas.  So he gave me a referral.

1    Q.    And subsequently did you have contact with Special Agent
2    Hooker from ATF about the investigation into Mr. Ervin?
3    A.    Correct.
4    Q.    After that, after that point, did you respond to ATF when
5    it had requests for assistance from the bank?
6    A.    Yes, sir.
7    Q.    Did that include pulling surveillance video related to
8    certain transactions at a physical bank location?
9    A.    Yes, sir.
10   Q.    And finally, I'd like to talk about the date of
11   Mr. Ervin's arrest, March 2nd, 2021.  Were you in contact with
12   ATF on that date?
13   A.    Yes, sir.
14   Q.    And what was the substance of that contact?
15   A.    I had received a message from Agent Hooker asking me if
16   there had been any debit card activity.  And I looked into the
17   account and I did see there was debit card activity at the
18   Harbor Freight in Lake City, and I let him know that.
19   Q.    And was it your understanding that ATF was going to reach
20   out to Columbia County Sheriff's Office to verify Mr. Ervin's
21   location in Lake City?
22   A.    That's -- that's -- yes, he did communicate that with me,
23   yes, sir.
24              MR. MESROBIAN:  May I have one moment, Your Honor?
25              THE COURT:  You may.

1         (Government's counsel confer.)
2              MR. MESROBIAN:  No further questions at this time.
3              THE COURT:  Mr. King.
4              MR. KING:  May it please the Court.
5              THE COURT:  Go ahead.
6                   CROSS-EXAMINATION
7    BY MR. KING:
8    Q.    Good afternoon, Ms. Useche.
9    A.    Hello.
10   Q.    I wanted to go over just to clarify a couple things from
11   you and make sure that I have an understanding.
12         There's the S-I-R-s, which is the SIR?
13   A.    Yes, sir, correct.
14   Q.    And that is -- is that something that's unique to
15   Community First or is that shared with the federal government?
16   A.    It's unique to Community First.
17   Q.    All right.  And then there's the SAR?
18   A.    Correct.
19   Q.    And your department is responsible for generating those?
20   A.    No, sir.  I actually work in the fraud department.  Our
21   BSA team, they are responsible for filing those.
22   Q.    And how familiar are you with the SARs?
23         How familiar are you with SARs?
24   A.    Well, that's kind of an in-depth question.  Can you be a
25   little bit --

1  Q.    Sure.  Let me ask it this way:  A very large number of

2  SARs are generated compared to law enforcement action

3  investigations; is that fair to say?

4  A.    I would think so.

5  Q.    And so generating an S-A-R is something a bank's obligated

6  to do, but it doesn't mean somebody's committed a crime.  It's

7  just part of their regulatory process?

8  A.    Correct.

9  Q.    And many SARs are generated compared to -- so if this is

10 the universe of SARs, the actual criminal activity is

11 significantly smaller than that?

12 A.    I actually wouldn't know.

13 Q.    Okay.  And if you don't know, that's fine too.

14       I also wanted to clarify just something about how

15 your bank works to make sure that we're not confusing kind of

16 the laws versus how Community First works.

17       So most people who own a business that you've dealt

18 with, those are typically PAs, LLCs, incorporated business

19 entities?  Is that fair?

20 A.    I mean, a lot of them are, but not all of them.

21 Q.    And it is the bank's policy, but not a federal government

22 or a law, that requires to separate out personal and business

23 bankings, correct?

24 A.    I really don't know the answer to that question.  I know

25 it is our policy.  I can't speak to whether it's a law or not.

1  Q.    And that's -- and like I said, if there's something you

2  don't know, I'm not -- it's not TV.  I'm not trying to trip you

3  up or anything.

4        But most businesses that are bigger, professionally

5  run, those are separate legal entities with their own bank

6  accounts; is that fair?

7  A.    Yes.  Typically, yes, sir.

8  Q.    And smaller, less sophisticated operations may do it as

9  kind of a sole proprietorship through their personal stuff?

10 A.    No.

11 Q.    Not with -- not with Community First, but there's no legal

12 requirement that somebody has to have a legal entity to run a

13 business, correct?

14 A.    Oh, I see what you're saying.

15       Correct.  Yes, sir.

16 Q.    And I just want to make sure that we're being clear that

17 there's nothing illegal that you're reporting to law

18 enforcement about somebody doing business accounts out of a

19 personal account, but your bank doesn't allow it and requires

20 people to separate those out?

21 A.    Yes, sir.

22       MR. KING:  That was it.  Thank you, ma'am.  I

23 appreciate your time.

24       THE WITNESS:  You're welcome.

25       MR. LAROSIERE:  Nothing for this witness, Your Honor.

1           THE COURT:  Mr. Mesrobian, anything else?

2           MR. MESROBIAN:  No, Your Honor.

3           THE COURT:  All right.  You may step down.  Thank

4    you.

5           Next witness.

6           MR. MESROBIAN:  Your Honor, the United States calls

7    Amy Sarkese.

8           THE COURT:  You're free to go.

9           THE WITNESS:  Your Honor, am I dismissed?

10          THE COURT:  Is the witness excused?

11          MR. MESROBIAN:  Yes, Your Honor.

12          MR. KING:  Yes, Your Honor, I believe so.

13          MR. MESROBIAN:  Yes, Your Honor.

14          THE COURT:  You're free to go.

15     (Witness exits the courtroom.)

16     (Witness enters the courtroom.)

17          COURTROOM DEPUTY:  If you could please raise your

18   right hand.  Do you solemnly swear that the testimony you're

19   about to give before this Court will be the truth, the whole

20   truth, and nothing but the truth, so help you God?

21          THE WITNESS:  Yes.

22          COURTROOM DEPUTY:  You may have a seat.  And if you

23   could please state your full name for the record and spell your

24   last name.

25          THE WITNESS:  It's Amy Sarkese, S-a-r-k-e-s-e.

1           THE COURT:  Go ahead, Mr. Mesrobian.

2           MR. MESROBIAN:  Thank you, Your Honor.

3           **AMY SARKESE**, GOVERNMENT WITNESS, SWORN,

4                DIRECT EXAMINATION

5    BY MR. MESROBIAN:

6    Q.   Ma'am, where are you currently employed?

7    A.   JPMorgan Chase Bank.

8    Q.   And what is your current position?

9    A.   Mortgage processor.

10   Q.   How long have you been at Chase Bank?

11   A.   May of 2021.

12   Q.   Prior to Chase where were you employed?

13   A.   Community First Credit Union.

14   Q.   And how long did you work at CFCU?

15   A.   From 1996 to 2021.

16   Q.   And to your knowledge, is CFCU a federally insured

17   financial restitution?

18   A.   It is.

19   Q.   So could you describe for the jury the positions you held

20   at CFCU over that rather extended time there.

21   A.   Collections -- well, first was a teller, part-time teller,

22   then full-time teller, then collections representative, member

23   service representative, and then the last role was assistant

24   branch manager.

25   Q.   And when you were assistant branch manager did you work at

1 a particular branch?

2 A.   The Orange Park location, 625 Blanding.

3 Q.   So during the 2020 to 2021 time frame, were you then

4 working as the branch manager in Orange Park -- or assistant

5 branch manager in Orange Park?

6 A.   Yes.

7 Q.   What were your duties and responsibilities in that role?

8 A.   Assist with audits; help the teller line if they needed

9 assistance, if they were short staffed up there; help with the

10 vault; help balancing the daily activities at the end of the

11 day; waiting on customers or members; opening accounts; new

12 loans.

13       Kind of everything.

14 Q.   Through your employment at Community First, did you become

15 familiar with an individual named Kristopher Justinboyer Ervin?

16 A.   I did.

17 Q.   And was he a client of the credit union?

18 A.   Yes.

19 Q.   How many times -- did he come to your branch in Orange

20 Park?  I'm sorry, strike that.

21       Did he come to conduct business at your branch in

22 Orange Park?

23 A.   Yes.

24 Q.   Was he a regular customer?

25 A.   Yes.

1 Q.   How often, approximately, would you say?

2 A.   He was usually two to three times a week.

3 Q.   And Ms. Sarkese, do you recognize Mr. Ervin in the

4 courtroom today?

5 A.   Yes.

6 Q.   And could you identify him and an article of clothing he's

7 wearing?

8 A.   Blue suit, blue shirt.

9 Q.   And where is he seated?

10 A.   Over there on the right.

11       MR. MESROBIAN:  Your Honor, would the record reflect

12 that the witness identified Mr. Ervin?

13       MR. KING:  We so stipulate, Your Honor.

14       THE COURT:  The record will so reflect.

15 BY MR. MESROBIAN:

16 Q.   So I believe you said a moment ago that he was coming a

17 couple times a week into the branch in Orange Park?

18 A.   Correct.

19 Q.   And that was during the 2020 to 2021 time frame?

20 A.   Correct.

21 Q.   Do you recall ever discussing with him if he was in a

22 particular business?

23 A.   Yes.

24 Q.   And what did he say about that?

25 A.   At one point he said he was making metal business cards.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 164 of 230

1  Q.   So I'd like to talk about cash transactions for a moment.
2  In terms of your role as a teller and an assistant bank manager
3  or branch manager, what were your obligations in terms of
4  tracking and reporting cash transactions?
5  A.   So I would handle, like, the cash orders, or if I was on
6  the teller line doing actual transactions for members, you
7  know, processing them, whether it be cash or checks into their
8  account, depending on the transaction limit, it could have us
9  do a form to report to the IRS.
10 Q.   So are you familiar with something called a Currency
11 Transaction Report, or CTR?
12 A.   Yes.
13 Q.   And what is that?
14 A.   It's a form that we have to fill out if there's a
15 withdrawal of a certain dollar amount or higher.
16       Do you want the dollar amount?
17 Q.   And what is that dollar amount?
18 A.   10,000 or more.
19 Q.   And is that true also with respect to cash deposits in
20 addition to withdrawals?
21 A.   Yes.  It's in or out, cash in or out.
22 Q.   So if you were working as a teller or if you were
23 supervising someone working as a teller, what were you supposed
24 to do if someone deposited or withdrew more than $10,000 in
25 cash?

1  A.   So we have to verify -- make a copy of their driver's
2  license, verify the information in the system is correct, name,
3  address, phone number, occupation, employment, or employer.  We
4  have to make sure all that's correct because we have to fill
5  that in on the form.
6  Q.   When you're doing that and gathering that information, do
7  you advise the customer that you are filing a Currency
8  Transaction Report?
9  A.   No.
10 Q.   And why don't you do that?
11 A.   It's not something that we are to disclose as a financial
12 institution.  So whenever we are gathering that information,
13 we're just basically letting them know, "Hey, we're updating
14 the system," and then that's basically the end of the
15 conversation.
16 Q.   Do you recall ever having a discussion with Mr. Ervin
17 about what the threshold was to -- that the bank would report
18 cash?
19 A.   Yes.
20 Q.   Could you tell the grand jury -- the jury about that.
21 A.   So it was asked to me at one point what that dollar amount
22 is as far as reporting goes.  And obviously I didn't give that
23 information because we're not allowed to.  But it was asked at
24 one point, "Well, how much can I take out so it's not
25 reported?"

1   Q.   Do you recall specifically when that conversation

2   occurred?

3   A.   No, I don't remember the exact date.

4   Q.   And we're going to talk about -- in a few minutes about a

5   series of -- or, rather, a cash withdrawal that occurred at

6   your branch, but was it at some point prior to that cash

7   withdrawal occurring?

8   A.   The withdrawal that we're going to talk about?

9   Q.   The $9,000 cash withdrawal.

10  A.   It was after that.

11  Q.   So first I'd like to direct you to July 20th, 2020.  Do

12  you recall a visit by Mr. Ervin to the bank that day to discuss

13  online banking access?

14  A.   I do.

15          MR. MESROBIAN:  So Your Honor, may we publish

16  Government Exhibit 95B, as in Bravo, page 2?

17          THE COURT:  You may.

18  BY MR. MESROBIAN:

19  Q.   First, do you recognize what this document is?

20  A.   Uh-hmm.

21  Q.   And what --

22          THE COURT:  I'm sorry, is that yes?

23          THE WITNESS:  Yes, I'm sorry.

24          MR. MESROBIAN:  Thank you, Your Honor.

25  BY MR. MESROBIAN:

1   Q.   And what is this document?

2   A.   It's our notes that we use in the -- it's called Symitar.

3   So like on the client's account or the members's accounts, if

4   we need to put notes, this is where it shows up and these are

5   how the notes will appear.

6   Q.   So these are notes created by bank employees entered into

7   the Symitar record of encounters --

8   A.   Correct.

9   Q.   -- with customers?

10  A.   Correct.

11  Q.   Here we see an account note dated July 20th, 2020, 9:58

12  a.m., and there's a user number there.  Whose user number is

13  that?

14  A.   That was mine at the time.

15  Q.   And would you read the note that you wrote here?

16          I take it if the user number is there, that means you

17  entered this note?

18  A.   Correct.

19  Q.   And what did this -- what did you enter here?

20  A.   "Member came in to get into his online banking and when

21  Taylor asked to verify his information with his ID and

22  update" --

23          THE COURT:  Excuse me.  Could you slow down?

24          THE WITNESS:  I'm sorry.

25          THE COURT:  Go ahead.

1  A.   "Member came in to get into his online banking and when

2  Taylor" -- which was our teller at the time -- "asked to verify

3  his info with his ID and update his employer, he lost" -- he

4  got upset -- "saying why did it matter and that he didn't want

5  to give that information to us to type in."

6        He told us to type in "strippers and cocaine" as his

7  occupation.

8        "He refused and just kept saying the same thing.  I

9  walked over to get the ID for him and he walked out stating he

10 was just going to call it a day and that we were always causing

11 problems.  Member stated he had a business account with us and

12 also stated that he plans on running business funds through his

13 personal account and that's why he wanted access to the online

14 banking."

15 Q.   "OLB"?

16 A.   Is online banking.

17 Q.   That stands for online banking?

18 A.   (Nods head.)

19 Q.   So do you recall this incident?

20 A.   I do.

21 Q.   And generally, does it accord with your notes reflecting

22 it?

23 A.   Yes.

24 Q.   And just to be clear, when Mr. Ervin -- Mr. Ervin advised

25 that he didn't want to provide his business, and what did he

1  ask you to write down or ask you --

2  A.   The occupation, it was -- he instructed us to put in

3  "strippers and cocaine" as his occupation.

4  Q.   And you did not do that, correct?

5  A.   Correct.

6  Q.   Ms. Sarkese, did Mr. Ervin, on the occasions when he came

7  into your branch, complain about CFCU or the way he was being

8  treated?

9  A.   Correct.

10 Q.   What would he say on those occasions?

11 A.   Basically that we weren't giving him -- we weren't

12 allowing him access to his money.

13 Q.   Generally, to your recollection, did he use his personal

14 account for transactions?

15 A.   For transactions . . .

16 Q.   When he came into the branch?

17 A.   Yes.

18 Q.   Do you recall him using a business account?

19 A.   At some point, yes, when it was opened.

20 Q.   So I'd like to move forward to Black Friday,

21 approximately, of 2020, the Thanksgiving time period of 2020.

22 Do you recall a visit by Mr. Ervin around that date?

23 A.   (Nods head.)

24 Q.   And what happened on that occasion?

25 A.   So we had denied his debit card.  Evidently it was trying

1  to be used at a Louis Vuitton for a purse purchase that we were

2  told he was using to -- he was going to buy a purse for his

3  boss's wife, and the debit card was declined.

4  Q.   So I'll stop you there.  Did Mr. Ervin come into the

5  branch that day?

6  A.   Yes.

7  Q.   And this was on or about November 27th, 2020?

8  A.   Right.

9  Q.   And do you recall it to be around Black Friday of that

10 year?

11 A.   Yes.

12 Q.   What did he say to you about a debit card transaction?

13 A.   He was upset that the debit card transaction had got

14 declined.

15 Q.   Did he say where he had been that day?

16 A.   Louis Vuitton.

17 Q.   And where is -- the Louis Vuitton store, do you mean?

18 A.   Yes.

19 Q.   And to your knowledge, where is the Louis Vuitton store?

20 A.   In Town Center in Jacksonville, the Town Center mall.

21 Q.   Did that strike you in any particular way, that he had

22 come to the Orange Park branch from the Town Center?

23 A.   Yes.  It's a good distance.

24 Q.   And what did he tell you about this particular transaction

25 he was trying to engage in?

1  A.   That it had been declined for the purchase, and so he was

2  upset and came in and said that, you know, why weren't we

3  giving him access to his money.  It was his money, he can do

4  what he wants to with it, that he was trying to purchase a

5  purse for his boss's wife.

6  Q.   Did he give a particular amount of money that he thought

7  this purse cost to your recollection?

8  A.   No, I don't -- he didn't say a specific amount at that

9  time.

10       MR. MESROBIAN:  And Ms. Ganoe, if we could publish

11 Exhibit 95 Bravo.  And go to the bottom, please.

12 BY MR. MESROBIAN:

13 Q.   Actually, first, the note on November 24 where it says,

14 "Removing JT from account," do you know what that refers to?

15 A.   It would -- it's not from me, but it removes -- it means

16 removing a joint person from the account.

17 Q.   So someone may have been a joint owner on this account and

18 then was removed?

19 A.   Correct.

20 Q.   So above that, on November 25th, 2020, this is not your

21 note, correct?

22 A.   Correct.

23 Q.   But what does this note indicate to you in terms of a card

24 transaction?

25 A.   So he called in and the person that took the call

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 168 of 230

1   authorized the primary caller, which was him -- advised that
2   they -- he advised that he had received an alert for his debit
3   card.  Advised they responded -- he responded yes, was able to
4   confirm that the purchase went through.  Advised the caller --
5   the employee advised the member that as long as they respond
6   "yes," their transaction will auto override, meaning you're
7   saying yes to the fraud alert.  Also verified card was not
8   blocked and will be able to use the limit of 6,000 for a
9   point-of-sale purchase.
10  Q.   And it was marked at the bottom "dash CS."  What does that
11  mean?
12  A.   That's the person's initials that took the call, the 2104.
13  Q.   And so this appears to be about two days before Mr. Ervin
14  came to the branch and talked about the Louis Vuitton purse?
15  A.   Right.
16        MR. MESROBIAN:  So Ms. Ganoe, if we can go up to the
17  next note, please, the small one.
18  BY MR. MESROBIAN:
19  Q.   So do you recognize this note as being from November 27th,
20  2020?
21  A.   Correct.
22  Q.   And there's a lot of abbreviations in here, so you might
23  have to translate this for the jury.  What does this signify?
24  A.   So it's -- again, it's a call-in.  He called in.
25  Primary -- which is the "pri" -- calls in -- "ci" -- regarding

1   denied debit card transaction.  And the employee of the credit
2   union, the user 1954, transferred the call to Fiserv, which is
3   the fraud department for Visa, the debit card.
4   Q.   So essentially, does this reflect another call regarding a
5   declined --
6   A.   Yes.
7   Q.   -- debit card transaction?
8   A.   Yes.
9   Q.   And transferring it to Fiserv.  What is Fiserv again?
10  A.   The fraud department that handles transactions for your
11  Visa debit card or credit cards.  So if you're disputing or
12  need your transaction to go through, that's who handles it.
13  Q.   To be clear, did you personally, or someone at your
14  branch, deny his debit card transactions?
15  A.   No.
16  Q.   So I'd like to direct you now to December 28th, 2020.  Do
17  you recall a visit by Mr. Ervin to your branch that day?
18  A.   Yes.
19  Q.   What business did Mr. Ervin initially have with your
20  branch on that date?
21  A.   He wanted to deposit a $100 money order, but it was
22  payable to "Auto Key Card," which was a product that he told us
23  that he sells.  When we told him we couldn't take the check the
24  way it was payable -- because he was trying to put it into a
25  personal account and we don't allow that -- he got upset again

1    said that we wouldn't be getting his business account,
2    mortgages, loans, et cetera, and that he wanted to take all of
3    his money out in cash.
4         We told him it would need to be a special order
5    because of the amount and it wouldn't be available until the
6    end of next week because we don't order every single day.
7         And then he continued to change the dollar amount of
8    what we could give him.  I told him initially, you know, "We
9    can give you 10,000."
10        He said "okay" and then said, "No, give me 9,000 and
11   I'll just come back every day or try other branches until I get
12   all my money."
13        I told him there's no guarantee at other branches
14   that they will have it available.
15   Q.   And to be clear, user 310, that's your user number?
16   A.   Yes.
17   Q.   So break that down.  Mr. Ervin -- and you were interacting
18   with Mr. Ervin on this date, correct?
19   A.   Correct.
20   Q.   When he came in, he initially wanted to deposit a money
21   order payable to Auto Key Card?
22   A.   Correct.
23   Q.   And would the bank do that?
24   A.   No.
25   Q.   And why is that?

1    A.   Because at the time there was no business account.  It was
2    only a personal account.  So we don't allow business
3    transactions into a personal account.
4    Q.   Did Mr. Ervin become upset at that point?
5    A.   Yes.
6    Q.   Did he advise you that he wished to close his account or
7    withdraw his account balance in cash?
8    A.   Yes.
9    Q.   And is that possible, normally, to --
10   A.   I mean, you can, it just depends on the amount.  But the
11   amount at that time, we did not have.
12   Q.   Do you recall approximately how much cash was in his
13   account at that time?
14   A.   60,000.
15   Q.   So you were not able to give him $60,000 in cash?
16   A.   No.
17   Q.   Do you recall if you offered him an alternative way of
18   taking his money out?
19   A.   A certified check, cashier's check.
20   Q.   Did he accept that?
21   A.   No.
22   Q.   So what did you offer him first in terms of the cash you
23   did have available?
24   A.   The 10,000.  I told him, you know, "We can do 10,000."
25   Q.   And did he accept that?

1   A.    At first the answer was, "Sure, give me the 10,000," but

2   then changed his mind and said, "No, just give me 9."

3   Q.    And again, to be clear, what happens on the bank's side of

4   the transaction -- of a cash transaction that exceeds $10,000?

5   A.    We have to do the Currency Transaction Report, the CTR.

6   Q.    And you or a teller would enter Mr. Ervin's information

7   and then it would go to whom?

8   A.    The IRS.

9           MR. MESROBIAN:  Your Honor, may I have a moment,

10  please?

11          THE COURT:  Yes.

12      (Government's counsel confer.)

13  BY MR. MESROBIAN:

14  Q.    So Ms. Sarkese, do you recall Mr. Ervin coming in after

15  December 28th and making any other cash withdrawals?

16  A.    I don't recall, to be honest.

17  Q.    If he had made additional cash withdrawals every day, you

18  know, not in the same 24-hour period, would that trigger a CTR

19  if they exceeded $10,000?  Or -- I'll ask this another way.

20          If someone withdrew $9,000 every 24-hour period,

21  would that exceed the threshold for a CTR?

22  A.    No.  If it's over the 24 hours -- if it's past 24 hours,

23  no, it would not.  If it's within 24 hours, the same -- so like

24  10 a.m. to 10 a.m., then yes.

25          MR. MESROBIAN:  No further questions, Your Honor.

1           THE COURT:  Mr. King.

2                    CROSS-EXAMINATION

3   BY MR. KING:

4   Q.    Good afternoon, ma'am.

5   A.    Hi.

6   Q.    My name's Alex King.  I represent Justin Ervin in this.

7   And I just want to go over a couple things.

8           If there's a question I ask -- because sometimes it's

9   very clear in my head, and when I say it out loud people look

10  at me strangely because it doesn't make sense to them, just let

11  me know and I'll ask it a different way.  If I go too fast,

12  before Madam Court Reporter gets onto me, if you need me to

13  repeat something, I'm not trying to trip you up.  This is not

14  like TV, okay?

15  A.    Okay.

16  Q.    I see you nodding your head.  One of the other things is

17  we do have a court reporter.  So if I ask a question, I

18  understand if you're nodding your head and "uh-hmms" and

19  "unh-unhs," but for our court reporter, it's very difficult to

20  take down.  So I just want to make sure that we're being clear.

21  A.    Okay.

22  Q.    And again, I'm not trying to trip you up.  So if you don't

23  agree with something or you don't understand a question, would

24  you please speak up, and we'll go through it until you're happy

25  and I'm happy that we're on the same page?  Is that fair?

1  A.    Okay.

2  Q.    And again, it's not like TV.  I'm not going to yell at

3  you, I'm not going to interrupt you.  I just want to make sure

4  that I understand exactly what's going on and everybody else

5  here does.

6         Is that fair?

7  A.    Fair.

8  Q.    Prior to coming here today, did you discuss your

9  testimony, or what your testimony would be, with the U.S.

10  Attorney's Office?

11  A.    Yes.

12  Q.    And y'all discussed what you would say when you came to

13  court?

14  A.    Yes.

15  Q.    And this is the first time we've had an opportunity to

16  speak ever?

17  A.    Right.

18  Q.    The -- kind of going through some of this stuff, I want to

19  make sure that I understand kind of two different things, which

20  is some of the factual things and then some of the

21  relationships with Mr. Ervin.

22         So let me start with Mr. Ervin.  And this is where I

23  want to be very careful, because I do not want to put words in

24  your mouth.

25         Would you describe Mr. Ervin as somebody that was

1  easy to get along with you for you and the employees of

2  Community First?

3  A.    No.

4  Q.    We have looked at a couple of kind of status notes in the

5  bank.  And it says -- and the first one I think you read, you

6  said "he lost it"?

7  A.    (Nods head.)

8  Q.    Is that -- I see you nodding your head.  Is that a yes?

9  A.    Correct, yes.

10  Q.    And another one he called in upset?

11  A.    Correct.

12  Q.    And I think you described his whole attitude changing

13  right before the end of the year of -- end of December 2020?

14  A.    Correct.

15  Q.    And would it be fair to say that he was very difficult

16  with you?

17  A.    Yes.

18  Q.    And would it be fair to say that he was very difficult

19  with other tellers and other employees of the bank?

20  A.    Yes.

21  Q.    And he would become upset over relatively small things?

22  A.    Yes.

23  Q.    The -- I want to go back --

24         MR. KING:  Ms. Ganoe, if we could pull up 95B, page

25  2.  And pull up the first -- actually, if we can go back.

1    BY MR. KING:
2    Q.    And Ms. Sarkese, I just want to -- am I pronouncing your
3    name correctly?
4    A.    Sarkese.
5    Q.    Sarkese.  I see that there's a user 806 and it's got your
6    name.  Is that one of the --
7    A.    That's a system number, system-generated user number.
8    It's not an actual person.
9    Q.    Okay.  And I was trying to clarify.
10         So that you're able to understand who generally would
11   put in these notes?
12   A.    Yes.
13   Q.    And if there is -- and we've got some more pages of these
14   notes.  This is just anytime something happens, this is a place
15   to document it for the bank?
16   A.    Correct.
17   Q.    And that's not necessarily that, "Hey, this law has been
18   broken or something really bad happened."  Just anything that's
19   really kind of noteworthy that you want to document goes in
20   there?
21   A.    Correct.
22   Q.    And it's something that you as the assistant manager, the
23   other tellers, the manager, all of you, would put notes in
24   there?
25   A.    Yes.

1    Q.    And if anybody said or did anything unusual, that would
2    be -- that would go in the system?
3    A.    Correct.
4    Q.    And is it also fair to say that the number of times
5    Mr. Ervin got upset is not accurately reflected in the notes
6    here?
7    A.    Say it again.
8    Q.    I appreciate that.
9         So Mr. Ervin became upset more than three or four
10   times over the course of your experience with him?
11   A.    Correct.
12   Q.    But not all of that made it into these notes?
13   A.    Correct.
14         MR. KING:  Ms. Ganoe, if we could talk -- if we could
15   highlight the first . . .
16   BY MR. KING:
17   Q.    I want to talk a little bit about this.  Was this --
18   this -- so just for the record purposes, this is Exhibit 95B,
19   and it's the second page and this is the top note.
20         Is this a note that you entered?
21   A.    It is.
22   Q.    How do you know this is a note you entered as opposed to
23   somebody else's notes?
24   A.    Because that 310.  Everybody has an individual number,
25   it's called a teller number, and that was my number.

1  Q.    Okay.  I was assuming that's what it was, but I didn't

2  want to assume anything.

3         The interaction you had here, was -- in addition to

4  being a little aggressive sometimes, was he sarcastic with you?

5  A.    Yes.

6  Q.    Once or more than once?

7  A.    More than once for sure.

8  Q.    And in terms of putting "strippers and cocaine" for his

9  profession, did you think that's where the money was coming

10 from or did you think he was being sarcastic and --

11 A.    Sarcastic and not wanting to give us information.

12 Q.    And was it uncommon for him to be difficult with things

13 that would be just kind of normal day-to-day banking processes?

14 A.    Was it uncommon?  No.

15 Q.    So frequent -- you know, just kind of general day-to-day

16 requests he would fight and argue and give you a hard time

17 about; is that fair?

18 A.    If it wasn't what he wanted, yes.

19 Q.    And I'm looking -- and I'm fast-forwarding a little bit to

20 that December date.  That seems -- when I read that, it reads

21 to me like a temper tantrum?

22 A.    Correct.

23 Q.    Is that what you -- if I say that, am I putting words in

24 your mouth or is that a fair way to describe that?

25 A.    It was -- the interaction escalated very quickly.  It was,

1  you know, hollering and yelling loud for everybody to hear, you

2  know, to get his point across.

3         But yes, it's basically a fit of unsatisfactory, you

4  know, with us, and not -- saying we're not giving him his

5  money.

6  Q.    And that's -- was that the worst one that had happened?

7  A.    I would say yes.

8  Q.    But there were others?

9  A.    Yes.

10 Q.    And in terms of this interaction, he said that he was

11 putting business money into a personal account?

12 A.    Yes.

13 Q.    And he told you that?

14 A.    Yes.

15 Q.    And my understanding -- it would be my understanding -- if

16 I'm wrong, please correct me -- that the policy of Community

17 First is to not do that and to encourage a member to establish

18 a separate business account?

19 A.    Correct.

20 Q.    But that wasn't done here.  He just said he still wanted

21 to do it through a personal account?

22 A.    Right.  We didn't open anything at that time.

23 Q.    Okay.  But he expressed to you back in July of 2020 that

24 that was his intention?

25 A.    To . . .

USGA 11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 174 of 230

1    Q.    Use his personal account for business funds.

2    A.    Correct.

3    Q.    And no business account was created at that time?

4    A.    Right.

5          MR. KING:  Ms. Ganoe, if we could go to the first

6    page again.  And the number two and three from the bottom,

7    so -- yes, ma'am.  Thank you so much.

8    BY MR. KING:

9    Q.    And Ms. Sarkese, I'm taking you back to page 1 of these

10   notes.  And these are kind of in reverse time order.  So the

11   older ones, and this is the newer stuff, fair?

12   A.    Fair.

13   Q.    And this was a series of interactions regarding him trying

14   to put something on his debit card --

15   A.    Correct.

16   Q.    -- from Louis Vuitton?

17   A.    Correct.

18   Q.    And ultimately he paid for that in cash?

19   A.    I mean, he took the money out whenever he came in that

20   day.  I don't know what he did with it after that, but he said

21   he was taking the money out to just go pay cash for it.

22   Q.    Did he seem very upset with the bank about not being able

23   to use his debit card to make that purchase?

24   A.    Yes.

25   Q.    And over the course of two or more days he had tried to

1    make a purchase with the debit card and was unsuccessful?

2    A.    Correct.

3    Q.    Came to the branch?

4    A.    Yes.

5    Q.    I imagine he was not the most pleasant to deal with?

6    A.    Correct.

7    Q.    And then took out the money to ultimately make the

8    purchase?

9    A.    Right.

10   Q.    And I'm trying to think of a way to ask this, so I'm

11   probably going to mess it up the first time, but maybe I'll

12   take a second stab at it.

13         But let me try this.  His patience with the bank and

14   his, kind of, attitude, was it getting better, getting worse,

15   or staying the same?

16   A.    Worse throughout, through time.

17   Q.    Certainly.  And he was very upset at the end of November?

18   A.    Yes.

19   Q.    And you know that because of the way he was talking and

20   acting?

21   A.    Yes.  I was there and witnessed the whole interaction with

22   the lady at the desk, the --

23   Q.    And I think you -- and let me ask you this way:  His

24   behavior got to the point where you would make sure you were

25   around the tellers?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 175 of 230

1   A.   Correct.

2   Q.   Can you explain that?

3   A.   As supervising them, it was uncomfortable when he would

4   come in because we never knew if it was going to escalate.

5        So if I saw him come in and go to the teller line, I

6   would be sure that I was near, either just kind of hanging back

7   and observing or just kind of walk up to that teller and just

8   kind of be right there in case the situation escalated, as a

9   manager.

10       So yes, if I was in the branch, I would make sure

11  that I was near or with them during the transaction.

12  Q.   And kind of two follow-up questions to that.  One is:

13  You're doing that to look out for your employees?

14  A.   Correct.

15  Q.   And the second question, which I probably should have

16  asked first, is:  Is that the entire time he's been coming to

17  this bank --

18  A.   No.

19  Q.   -- or is that just towards this time period we're talking

20  about, that November/December?

21  A.   No, it was before November, because there was -- like I

22  said, there was other interactions prior to that.  But like I

23  said before, it just had got -- escalated, or the behavior just

24  got worse as time went on.  So no, it wasn't every single

25  interaction.  It was towards the end.

1   Q.   Okay.  And thank you for clearing that up for me.

2        MR. KING:  Ms. Ganoe, can we go to the big entry, I

3   guess the second one down.

4   BY MR. KING:

5   Q.   Now, I know we have an entry here, but you distinctly

6   remember this.  This isn't something you're having to read --

7   A.   Right.

8   Q.   -- this is from your memory?

9   A.   Right, correct.

10  Q.   Let me walk you through just so I make sure I have an

11  understanding.

12       What in that interaction set him off?  What made him

13  angry?

14  A.   Because I wouldn't -- I said no to depositing the money

15  order for the $100.  That was it.

16  Q.   And the part I want to make sure I understand is when you

17  say you, is this like the bank "me" or is this you personally?

18  A.   Me.  Me-me, because, I mean, that's our procedure.  But I

19  happened to be doing his transactions that particular day and

20  keying everything in.  And then when the money order was

21  presented to me and it said "Auto Key Card," we had to have

22  that conversation, "We can't put this in a personal account."

23  And then it just escalated from there.

24  Q.   And the reason I'm asking is because I want to make sure

25  that this was you personally --

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 176 of 230

1  A.    Yes.

2  Q.    -- not something you're telling somebody else to do.

3  A.    No, this is me.

4  Q.    I thought so, but I like to make sure we're on the same

5  page.

6        The -- you said his whole demeanor changed in this

7  note.

8  A.    Uh-hmm, correct.

9  Q.    Sorry.

10  A.    Correct, sorry.

11  Q.    No, no, it's -- you're doing really well.  I appreciate

12  it.

13        And so when you say his whole demeanor changed, he

14  went from being fine to -- I mean, what are we talking about

15  here?  If you could kind of describe --

16  A.    Just, I mean, the voice, of course, was raised and it was

17  just kind of an aggravated -- I don't know what you want to

18  call it -- aggression, I guess you could say.  The voice

19  elevated, "Why can't I deposit this in my personal account?"

20        And then when I said, "No," you know, "you need to

21  have a business account," then it was just, "Fine, then I'll

22  just take out all my money."

23  Q.    And it was a little bit more to the anger.  He basically

24  said he wasn't going to do any business with your bank?

25  A.    Correct.  We weren't going to have any of his -- he wasn't

1  going to take a mortgage with us, wasn't going to do a business

2  account with us, any loans with us, you know, just naming all

3  of the things that we weren't going to get from him because we

4  wouldn't allow him -- or I wouldn't allow him to deposit this

5  check into his personal account, so then therefore, we weren't

6  going to get any further business --

7  Q.    And did it feel --

8  A.    -- of his.

9  Q.    And, I'm sorry, I didn't mean to interrupt.

10        Did it feel kind of personal?

11  A.    I'm sorry?

12  Q.    Did it feel kind of personal the way he was saying it?

13  A.    No.

14  Q.    He was just mad at the bank?

15  A.    Correct.

16  Q.    And he expressed to you that he wanted to have no further

17  business with the bank?

18  A.    Correct.

19  Q.    And he wanted all of his money immediately?

20  A.    Yes.

21  Q.    And you told him it would be, you know, not a day or two,

22  but it would be the end of next week?

23  A.    Correct.

24  Q.    And --

25  A.    Because it would be a special order.

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 177 of 230

1  Q.    Yeah.  And do you have any reason to believe that he knew

2  that before y'all started that conversation?

3  A.    No.

4  Q.    Do you have any reason to believe that he didn't know that

5  if he asked for all of his cash, that that's not something

6  you'd be able to do?

7  A.    Did I think that he would know that?  No.

8  Q.    And have you ever had -- prior to this date had y'all ever

9  had a conversation that would -- that you know for a fact he

10  would have any reason to know that?

11  A.    That we had that much available or not available?

12  Q.    Correct.

13  A.    No.

14  Q.    Is there anything that you have personal knowledge or know

15  that he would know that his request for all of his money right

16  then and there would not be fulfilled?

17        I'm sorry?

18  A.    No.

19  Q.    And so when he made that request, he expected it to

20  happen?

21  A.    Correct.

22  Q.    And became more, less, or the same amount of angry when

23  you told him that that wasn't going to happen?

24  A.    More upset, because, you know, again, we're, quote,

25  denying his money.  Which I wasn't denying it; I didn't have it

1  available to give in one lump sum.

2  Q.    And did he ask just straight away for 9,000 or did he say

3  "Give me 55,000," "Give me 50,000"?  Did that part of it

4  happen?

5  A.    No, because after the initial, you know, request for the

6  whole amount I said, "Well, I can give you 10."  And then at

7  first he said, "Okay, fine, do the 10," but then changed his

8  mind to say 9,000.

9  Q.    And my understanding, and correct me if I'm wrong, is a

10  Currency -- a CTR -- are you familiar with that term?

11  A.    Correct.

12  Q.    And I'm going to get it wrong.  Currency Transaction --

13  A.    Report.

14  Q.    -- Report.  So a CTR is done when the cash amount within

15  24 hours is more than $10,000?

16  A.    Correct, 10,000 and one penny and above.

17  Q.    So if he had done exactly as you had asked -- and ignoring

18  all of the other fights and arguments you had before, but if he

19  had said, "I'll take the $10,000," you would not have had to

20  generate a CTR --

21  A.    Correct.

22  Q.    -- because it was under $10,000 and one penny?

23  A.    Correct.

24  Q.    And he told -- and the -- let me ask it this way:  He told

25  you at that point that he was going to come back every day

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 178 of 230

1  until his money was out?

2  A.   Correct.

3  Q.   And outside of New Year's Day and weekends, it looks like

4  that's what happened?

5  A.   I don't recall like the amount of -- I don't recall the

6  withdrawals after that, but that's what he stated he was going

7  to do.

8  Q.   Okay.  And this was still while he was very upset?

9  A.   Correct.

10 Q.   Now, are you aware that he did a CTR that day?

11 A.   I wasn't aware until later on.

12      MR. KING:  Ms. Ganoe, can we pull up 95E.

13      Your Honor, this has already been admitted.

14      THE COURT:  Yeah, go ahead.

15 BY MR. KING:

16 Q.   And Ms. Sarkese, do you recognize this document generally?

17 A.   It's blurry, but yes.

18 Q.   Okay.

19      MR. KING:  Ms. Ganoe, could we go to page 2 of that.

20 And can we highlight the -- the name first.

21 BY MR. KING:

22 Q.   And Ms. Sarkese, you recognize that name?

23 A.   I do.

24 Q.   And that's Mr. Ervin sitting over here?

25 A.   Correct.

1       MR. KING:  If we could go, Ms. Ganoe, a little bit

2  below to where it says employer and address.

3  BY MR. KING:

4  Q.   What does it say the occupation or business type that he

5  has is for this?

6  A.   "Owner of auto key card."

7  Q.   And the address, do you recognize this address or do you

8  not recognize the address?

9  A.   I recognize it from being in the system.

10 Q.   And that's the address that you know?

11 A.   Correct.

12 Q.   I mean, you probably haven't been to his house --

13 A.   No.

14 Q.   -- based on the interactions y'all have had, but you do

15 recognize this as his address?

16 A.   Correct.

17 Q.   Let me ask you this:  If he had come to the bank every day

18 and taken 10,000 instead of 9,000, would that have generated a

19 Currency Transaction Report?

20 A.   It would depend on the time of day.

21 Q.   But not the amount?

22      Let me ask you this way.  See, I told I was going to

23 ask a bad question.

24      So if -- is there any difference between if he had

25 taken out 9 or $10,000 today and he came at -- and if he took

1  another 9 or 10,000 out tomorrow, does it matter whether it's 9

2  or 10, or just whether it's within a 24-hour period?

3  A.    24 hours.  Cumulatively it has to go over 10,000 in

4  24 hours.

5  Q.    And if he had -- and let me ask this one final question.

6  If you had all of the money in cash in your branch, would you

7  have given it to him?

8  A.    No.  I would have asked for the branch manager first,

9  because then if we did that, then that's shorting --

10  Q.    Everybody else?

11  A.    -- everybody else if they need cash.  I mean, that has to

12  last like a whole week.

13  Q.    And once again, I've asked a very poor question, so let me

14  take another stab at it if it's okay with you.

15        If there wasn't an issue with the amount of physical

16  currency the bank had, was there any reason you could not have

17  processed the request and just given him that money?

18  A.    If there wasn't . . .

19  Q.    If there wasn't a limitation on the physical currency.

20  A.    Oh.  So in other words, if we had an abundance of cash?

21  Q.    Correct.

22  A.    I mean, we could, yes.  We could give it to him.

23  Q.    Okay.  And then you would have filled out a CTR?

24  A.    Correct.

25  Q.    Just like this one?

1  A.    Correct.

2  Q.    And that would have been the end of it?

3  A.    Yes.

4        MR. KING:  Your Honor, I have no further questions.

5  Thank you.

6        THE COURT:  Any questions?

7        MR. LAROSIERE:  No, Your Honor.

8        THE COURT:  Mr. Mesrobian, any other questions?

9        MR. MESROBIAN:  Yes, Your Honor.

10            REDIRECT EXAMINATION

11  BY MR. MESROBIAN:

12  Q.    Ma'am, I just wanted to ask you, if someone wants to close

13  their bank account -- or while you were working at CFCU, if an

14  accountholder wanted to close their account, did they have

15  options on how to get their money?

16  A.    Yes.

17  Q.    And -- for example, could someone get a certified check or

18  a cashier's check for their account balance?

19  A.    Yes.

20  Q.    And would there have been any difficulty in providing

21  Mr. Ervin, on the date he said he wanted to close his account,

22  with a cashier's check or a certified check?

23  A.    We could have done that, yes.

24  Q.    On the spot?

25  A.    Yes.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 180 of 230

1   Q.   Also, could someone request all their money in cash and

2   have you obtain that for them?

3   A.   Yes.

4   Q.   And how does that happen?

5   A.   They would tell us, you know, if they are making --

6   planning on a large withdrawal, "Hey, I need to withdraw

7   50,000," we will let them know, you know, "Typically we have to

8   order that," and then it would be available by the end of the

9   following week.

10          We can't -- we're not supposed to say like a specific

11  day because that's too much information, but we would say, you

12  know, "We could arrange it for you on Thursday or Friday of

13  next week."

14  Q.   So essentially within a week --

15  A.   Yes.

16  Q.   -- or a little over a week someone wanting to close their

17  account but receive everything in cash could do that in one

18  visit?

19  A.   Yes.

20  Q.   Mr. King asked you some questions about Mr. Ervin wanting

21  to close this account.  To your knowledge, did Mr. Ervin

22  actually close his account?

23  A.   I do not believe so, no.

24          MR. MESROBIAN:  So Ms. Ganoe, could we please publish

25  Exhibit 95C.  And start on page 25.  I'd like to focus on the

1   top half.  Yeah, exactly.

2   BY MR. MESROBIAN:

3   Q.   Do you recognize this to be an account statement for CFCU

4   for Mr. Ervin --

5   A.   Correct.

6   Q.   -- for -- and this is for the statement period

7   January 1st, 2021, to January 31st, 2021?

8   A.   Yes.

9          MR. MESROBIAN:  So Ms. Ganoe, if we could go to the

10  next page.  And just focus on the top half of the transactions

11  here.

12  BY MR. MESROBIAN:

13  Q.   The transactions listed here are between January 1st and

14  January 7th, correct?

15  A.   Correct.

16  Q.   And so these all occurred about -- approximately a week

17  after this interaction on December 28th, correct?

18  A.   Correct.

19  Q.   And there are a few cash withdrawals here in the amount of

20  $9,000 on January 2nd, January 5th, and January 6th, correct?

21  A.   Correct.

22  Q.   Are there also deposits on this page?

23  A.   There are, yes.

24  Q.   It looks like there's a check deposit on January 2nd for

25  $100?

1    A.    Yes.
2    Q.    And then several Stripe deposits, each in an amount
3    exceeding $1,000, correct?
4    A.    Correct.
5    Q.    So I --
6            MR. MESROBIAN:  We can go three pages more.
7            THE COURT:  What page is that?
8            MR. MESROBIAN:  That is page 29, Your Honor.
9    Actually, we'll go to page 30.  Just go to the end of the
10   month.  Can you focus on the transactions there?
11   BY MR. MESROBIAN:
12   Q.    So now we've moved ahead to January 27th through the end
13   of the month.  Are there deposits on these days as well?
14   A.    January -- yes, January 27th, 28th, and 28th.
15   Q.    And these appear to be -- well, I guess two of those are
16   adjustments for debit card transactions, it appears?
17   A.    On the 27th, the 199, that's an adjustment, and then the
18   28th for the 340.99 is also an adjustment.  So probably a
19   return is usually what that means.
20   Q.    And going back to page 95C -- or, excuse me, Exhibit 95C,
21   page 25, and the section underneath "Summary of Account" in the
22   middle there.  Do you see a line there -- and there are two
23   numbers -- two account numbers there, 00 Share and 80 Advantage
24   Checking?
25   A.    Yes.

1    Q.    And the 80 Advantage Checking is where all the transaction
2    activity appears to be?
3    A.    Correct.
4    Q.    And this is the account that Mr. Ervin wanted to close?
5    A.    Correct.
6    Q.    And he said he wanted to close his account on
7    December 28th of 2020?
8    A.    Correct.
9    Q.    So in that next month, in January 2021, how many deposits
10   did he make, according to this summary here?
11   A.    $8,110.26.
12   Q.    Or is that the ending balance in the account?
13   A.    That is the ending -- well, no, total of deposit balances.
14   Q.    Before that, in the column Credit Amount.
15   A.    Oh, sorry.  $38,581.68.
16   Q.    And then before that it says Total Credits of 24?
17   A.    Where?
18   Q.    In the next column to the left of Credit Amount.
19   A.    Oh, yes.
20   Q.    So does that mean that during January 2021 Mr. Ervin --
21   there are 24 deposits into this account in an amount exceeding
22   $38,000?
23   A.    Correct.
24   Q.    And again, to your knowledge, did Mr. Ervin actually close
25   his account with Community First?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 182 of 230

1  A.   No.
2  Q.   Finally, to be clear, you testified on direct that
3  Mr. Ervin at one point asked you about what the cash reporting
4  threshold was?
5  A.   Correct.
6  Q.   Do you recall when in relation to this December 28th
7  incident that was?
8  A.   Before.
9  Q.   And to be clear, did you tell him what the threshold was?
10  A.   No.
11  Q.   And why not?
12  A.   We're not allowed to.
13  Q.   Is that information available on the internet or anywhere,
14  to your knowledge?
15  A.   I'm sure that it is.
16        MR. MESROBIAN:  Your Honor, I have no further
17  questions.
18        THE COURT:  Mr. King?
19        MR. KING:  If I could, Your Honor.
20              RECROSS-EXAMINATION
21  BY MR. KING:
22  Q.   Ms. Sarkese, I just wanted to follow up on a couple of
23  questions that I wanted to clarify.
24        My recollection of your testimony on direct as to
25  that last question in terms of if he asked, you know, what the

1  reporting requirement was --
2  A.   Yes.
3  Q.   -- my understanding is that was after all of this took
4  place, but you're saying now it was before?
5  A.   Before -- okay, what?  I'm sorry.
6  Q.   The question that he asked regarding the report -- you
7  know, "When would you have to report me to the," whatever he
8  said.
9  A.   Before December?
10  Q.   Yeah.
11  A.   I believe it was before December.
12  Q.   Okay.  Do you recall saying that it was after on direct
13  testimony or --
14  A.   No.
15  Q.   Okay.
16  A.   I don't remember, sorry.
17  Q.   Did you make a note of that anywhere in the account, in
18  the account notes?
19  A.   I don't recall.
20  Q.   Is that something you would normally note in the account
21  notes?
22  A.   Yes.
23  Q.   Okay.  So if it's not in the account notes that we have,
24  is it likely because it's not in this time frame?
25  A.   It's possible.

1      MR. KING:  Your Honor, may I approach with
2  Defendant's Exhibit 26?
3          THE COURT:  You may.
4          MR. KING:  Did I ask if I can approach?
5          THE COURT:  You did.
6          MR. KING:  Okay.
7          THE COURT:  Go ahead.
8  BY MR. KING:
9  Q.   Ms. Sarkese, if you could just take a look at that and
10  just look up at me when you're done going through all that.
11  A.   Okay.
12  Q.   Ms. Sarkese, what do you recognize that to be?
13  A.   The account notes from when I opened the account in 2019.
14  Q.   Okay.  And the -- the notes that you have in front of
15  you -- I know we discussed two of the pages.  Is that the
16  complete account notes with every single page from the history
17  of that account?
18  A.   Unless it was anything after -- I can't tell the date on
19  this one.  Unless it was anything after the top note.
20  Q.   And let me ask it -- once again, I've asked a question
21  that now that I'm thinking about it I could ask a better way.
22      Does that have every single account note that you
23  would have made, or anybody at Community First, prior to that
24  December 28th incident?
25  A.   Yes.  That would be all the account notes that are in the

1  system, yes.
2  Q.   And you said before it would be your practice -- if
3  somebody asked about, you know, how much they could take out
4  with one trip, that it would be your practice to put that in
5  the account notes?
6  A.   I mean, typically, yes, we would put that in the account
7  notes.
8  Q.   Have you had a chance to go through the entirety of that
9  account and read through it?
10  A.   From here, yes.
11  Q.   Yes, ma'am.  Anywhere in there does it say that the --
12  that he asked you that question --
13  A.   No.
14  Q.   -- before that December 28th date?
15  A.   No.
16      MR. KING:  And Your Honor, I'd move that in under FRE
17  803(6).
18          THE COURT:  Any objection?
19          MR. MESROBIAN:  No, Your Honor.
20          THE COURT:  And that was Defendant's 26?
21          MR. KING:  Yes, thank you.  I believe so, Your Honor.
22  Thank you.
23          THE COURT:  Defendant's 26 is admitted.
24      (Defendant Ervin's Exhibit 26 admitted in evidence.)
25  BY MR. KING:

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 184 of 230

1    Q.    And Ms. Sarkese, I know we went through the January -- let
2    me ask one question in follow up.  Would it be uncommon for him
3    to come in, throw a temper tantrum, get upset, and then come in
4    a couple days later as if nothing happened?
5    A.    That happened often, yes.
6    Q.    So he would blow up at you?
7    A.    Correct.
8    Q.    And then a week or two goes by, you see him, and it's as
9    if that had not occurred?
10   A.    Correct.
11   Q.    Was it unusual to you that he didn't follow through on his
12   threats to close out his account and never come back and never
13   do any business with you?
14   A.    Was it unusual that he didn't close it?
15   Q.    Was that surprising to you?
16   A.    No.
17   Q.    And did you take that as a -- I mean, did it seem like an
18   upset threat, or did it seem like he had actually planned on
19   coming in that day to close the account?
20   A.    It more seemed like an upset threat.
21   Q.    And we talked a little bit about the deposits in January.
22   Did you have a -- as we went through those, would it be fair to
23   say those were mostly automated deposits rather than actual --
24   A.    Correct.
25   Q.    -- checks or cash that he was putting in the bank?

1    A.    Correct.
2    Q.    And those were almost all entirely automated?
3    A.    Correct.
4          MR. KING:  Your Honor, I have nothing further.  Thank
5    you.
6          THE COURT:  All right.
7          MR. KING:  Thank you, Ms. Sarkese.
8          THE COURT:  You may step down.
9          MR. MESROBIAN:  Your Honor, may we approach?
10         THE COURT:  Yes.
11   (Proceedings at sidebar:)
12         MR. MESROBIAN:  So Your Honor, there's one more
13   witness from the bank, Mr. LeVay.  I think he'll be relatively
14   brief.  I didn't know when the Court wanted to take the
15   morning -- the break for the afternoon.  We have Special Agent
16   Slosson who can testify as well.  We actually don't -- we
17   attempted to get Mr. Ervin's father -- at the break we tried to
18   get Mr. Ervin's father to come in case we could get to him.  It
19   didn't seem like he could be here.
20         I just want the Court to know about the schedule and
21   whether this would be the right time for the break.
22         THE COURT:  It's way too early to break.  Usually --
23   remember, I try to have them not sit more than an hour and
24   45 minutes.  That means usually we would break around
25   3:45ish -- between 3:30 and 3:45.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 185 of 230

1    MR. MESROBIAN:  I was just maintaining the schedule.
2    We hadn't mentioned Mr. Ervin, I think, as a potential witness
3    today, so I just wanted to make --
4        MR. KING:  I think we're ahead of schedule, and no
5    complaints about that.
6        THE COURT:  Okay.  Let me say to all defense counsel,
7    stop -- stop introducing yourselves to the witness and the
8    pleasantries.  Just get to the questions.
9        MR. KING:  Okay.
10       THE COURT:  That's not necessary, okay?
11       MR. KING:  Yes, ma'am.
12       THE COURT:  Thank you.
13   (Proceedings in open court:)
14       THE COURT:  Next witness.
15       MR. MESROBIAN:  Your Honor, the United States calls
16   Matthew LeVay.
17   (Witness enters the courtroom.)
18       THE COURT:  Sir, I'll ask you to come all the way up
19   here to the witness stand, and if you'll remain standing.
20       COURTROOM DEPUTY:  If you could please raise your
21   right hand.  Do you solemnly swear that the testimony you're
22   about to give before this Court will be the truth, the whole
23   truth, and nothing but the truth, so help you God?
24       THE WITNESS:  I swear.
25       COURTROOM DEPUTY:  You may have a seat.  And if you

1    could please state your name for the record and spell your last
2    name.
3        THE WITNESS:  My name is Matthew LeVay, L-e-V-a-y.
4        **MATTHEW LeVAY, GOVERNMENT WITNESS, SWORN,**
5            DIRECT EXAMINATION
6    BY MR. MESROBIAN:
7    Q.   Sir, where are you currently employed?
8    A.   I'm currently employed by Fanatics.
9    Q.   And what is your current position?
10   A.   My current position is social media supervisor.
11   Q.   Prior to Fanatics -- when did you start working at
12   Fanatics?
13   A.   In April of 2021.  So officially two years now.
14   Q.   So prior to Fanatics where were you employed?
15   A.   I was employed by Community First Credit Union.
16   Q.   How long did you work at Community First?
17   A.   I worked at Community First from October of 2019 to -- it
18   would have been January -- or, sorry, March of 2021.  So a year
19   and five months, year and six months.
20   Q.   And could you describe what positions you held at CFCU?
21   A.   Absolutely.  I was a Member Solutions Representative at
22   one of our branches in Fleming Island.  And then for a few
23   short months as well I was also a Commercial Lending Support
24   Specialist in the Commercial Lending Department.
25   Q.   So during December of 2020, what was your particular role

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 186 of 230

1   A.   I was a Member Solutions Representative at Fleming Island,

2   our Fleming Island branch.

3   Q.   And for those members of the jury who may not know

4   geography south of Jacksonville, where is Fleming Island?

5   A.   Yes, no, of course.  Fleming Island is south -- basically

6   south of Jacksonville.  Yeah, it's in Clay County, the county

7   basically to the south and west of Jacksonville.

8   Q.   And is it near Orange Park?

9   A.   Yes.  Yeah, it's near Orange Park.

10  Q.   So what were your duties and responsibilities as a Member

11  Solutions -- in your Member Solutions role?

12  A.   Yeah, so it was a mixed role.  Part of it involves just

13  being on the teller line, as well as kind of like the banker

14  side, where you open accounts, you do loan applications, things

15  of that nature.  So really just a mixture of teller

16  responsibilities and banking responsibilities as far as loans,

17  things like that.

18            THE COURT:  Sir, I'm going to ask you to pull that

19  microphone a little bit further back from you.

20            THE WITNESS:  Sorry.

21            THE COURT:  No, that's okay.

22            THE WITNESS:  Sorry.  It's a good problem to have.

23            THE COURT:  We usually have the opposite problem.

24            THE WITNESS:  There we go.

25            THE COURT:  Go ahead.

1   BY MR. MESROBIAN:

2   Q.   So Mr. LeVay, I just want to direct you to December 28th

3   of 2020.  Do you recall a visit by an individual named

4   Kristopher Justinboyer Ervin to the Fleming Island branch on

5   that day?

6   A.   Yes.

7   Q.   Had you ever met Mr. Ervin before?

8   A.   No, not to my knowledge, unh-unh.  I did not recognize him

9   or have any interaction before that.

10  Q.   Did you interact with him on that day?

11  A.   Yes.

12  Q.   Did you ever interact with him to your recollection

13  afterwards?

14  A.   No.

15  Q.   So on that date were you working as a teller in your

16  Member Solutions capacity?

17  A.   Yes.  At that moment in time on that day I was at

18  basically the front of the teller line, yep, just right in the

19  middle when you walk in the branch.

20  Q.   And approximately when on December 28th did this occur?

21  A.   This occurred later in the day.  It was pretty close to

22  our closing time from the branch.  I'd say it had to have been

23  probably in the 4 o'clock hour, shortly before we closed.  We

24  closed at 5 p.m., so kind of the afternoon, slash, getting

25  close to evening time.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 187 of 230

1  Q.   Did you have an initial impression of Mr. Ervin when he
2  first approached you?
3  A.   Not in particular, no.
4  Q.   Did he tell you anything about having had previous
5  business with another CFCU branch that day?
6  A.   Yes.  I do remember he mentioned that he had been at the
7  Orange Park location, which is also close by, probably about
8  maybe 15 minutes away, 10, 15 minutes away from our location.
9  Q.   What did Mr. Ervin want to do that day at your branch?
10  A.   Yes.  I remember he wanted to make a cash withdrawal as
11  well as deposit a check.
12  Q.   So first, with respect to the withdrawal, do you recall
13  how much he asked to withdraw in cash?
14  A.   So I do not remember the exact amount, but I know that we
15  did not have available the full amount that he wanted at first.
16        So no, I do not recall that.
17  Q.   How much were you able to give him?
18  A.   We were able to give him $5,000 in a mixture of bills.
19  Q.   Did he request a particular type of bill?
20  A.   Yes, larger bills.
21  Q.   So the amount that he requested, you don't remember
22  exactly what it was?
23  A.   I don't remember exactly the amount, no.
24  Q.   But it was some amount greater than $5,000 --
25  A.   Yes.

1  Q.   -- that you could give him?
2  A.   Yes, it was.
3  Q.   Do you recall receiving any alerts on your system in
4  connection with that withdrawal?
5  A.   Yes.
6  Q.   And what was that?
7  A.   That was a Currency Transaction Report.
8  Q.   What happens on your system when you receive that alert?
9  A.   Yeah.  So when we receive a Currency Transaction Report,
10  basically, you know, a message will appear on our screen that
11  we have to complete this form.  And then we will be prompted to
12  basically input information about the person, the most
13  up-to-date information about their name, address, things of
14  that nature.
15  Q.   Why does that alert exist, to your knowledge?
16  A.   That alert exists, to my knowledge, because if a person
17  were to withdraw more than $10,000 in cash, I believe in one
18  day, that is then what would trigger that report.
19  Q.   So when you received that alert, what do you have to do?
20  A.   I have to input the most up-to-date information for that
21  person.  So I believe, to my knowledge, I remember you had to
22  fill out the name, their most current address.  I think you
23  also have to obtain, like, their employer, things of that
24  nature.  Just the most recent updated contact information for
25  that individual.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 188 of 230

1  Q.   How do you handle asking customers those questions in this
2  circumstance?
3  A.   In those, I usually do not get very, you know, in depth
4  about what I'm doing.  Obviously I don't tell the customer, the
5  individual, what I'm doing.  I'll just basically say, "Hey,"
6  you know, "we have to just update your account.  I see there's
7  a few things that need updating.  Is this still your good
8  address?"  Things like that.
9          So I never say exactly, like, "We have to do this."
10  Just always ask open-ended questions to just say, "Oh, we have
11  to," you know, "update your account information."
12  Q.   To be clear, you would not advise a customer that their
13  withdrawal exceeded the reporting threshold?
14  A.   No.
15  Q.   Do you recall if you discussed Mr. Ervin's business with
16  him?
17  A.   No.  I remember he mentioned that he had a business, but I
18  do not recall, like, getting in depth at all about the business
19  in and of itself.
20  Q.   Do you recall if Mr. Ervin had any other transactions that
21  day?
22  A.   Yes.  Not to my knowledge any more currency transactions,
23  but we did have a -- he wanted to deposit a check that day.
24  Q.   And do you recall who the check was made out to?
25  A.   I don't remember the exact company, but I do know that it

1  was made out to a company that was not on his account that day
2  or one that had an account with us.  So it wasn't a business or
3  a person that had an account with us at the time.
4  Q.   So he was trying to deposit this item made out to a
5  business into his personal account?
6  A.   Yes.
7  Q.   And what happened with that check or money order?
8  A.   Absolutely.  So we did initially deposit it into his
9  account and then shortly after that realized that the check was
10  actually made out to, you know, the business that was not on
11  his account.  So he could not technically -- you know, compared
12  to what we know at the credit union, we're not allowed to
13  deposit checks from a business into a personal account,
14  especially if it's not -- you know, if it's not that -- that
15  business doesn't have a relationship with us.  So I couldn't
16  just put, you know, a McDonald's check into a Burger King
17  check, something along those lines.  It would have to match
18  what we have on file.
19  Q.   So what happened after you realized there was an issue
20  with this item?
21  A.   Yeah.  So we did end up having to call Mr. Ervin just to
22  let him know that, "Hey, we made a mistake of depositing this
23  check into your account."  We asked him to come back to the
24  branch to give him the check back.
25  Q.   And did he do that?

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 189 of 230

1    A.    Yes.

2    Q.    So tell the jury about what happened with that.

3    A.    Yeah.  So I remember I did have to call Mr. Ervin that day

4    just to let him know the mistake that we had made in depositing

5    the check into his account and asked him if he could return.

6          So he did ultimately return, you know, probably 10 to

7    15 minutes later.  And it was -- we may have been closed at the

8    time.  It was right around that closing time.  So once he

9    returned I went out and met him basically in the entryway to

10   our branch to give him the check, and that was it.

11   Q.    Did he appear to be upset with you for his issue?

12   A.    No, not upset.  I don't recall him being upset.

13         MR. MESROBIAN:  Finally, Ms. Ganoe, could we publish

14   Government Exhibit 95E, page 1.

15         THE COURT:  Go ahead.

16         MR. MESROBIAN:  And if we could focus on the top,

17   please.

18   BY MR. MESROBIAN:

19   Q.    So Mr. LeVay, do you recognize this type of document?

20   A.    Yes.

21   Q.    And what is it?

22   A.    It is a Currency Transaction Report.

23   Q.    Is this how it looks to you when you're looking on the

24   teller line, or does it look -- are you looking at something

25   different?

1    A.    That -- that, I believe, is pretty much how it looks.  You

2    know, I -- it's been a couple years since I've been doing it,

3    so I don't remember exactly.  But it would definitely be

4    exactly like this how it would appear on our screens.

5          MR. MESROBIAN:  If we could go to the next page,

6    please.

7    BY MR. MESROBIAN:

8    Q.    So at the top, the very top section there, there's a

9    heading that says "Part I, Person Involved in Transaction."

10   And under that it says -- there's a check mark next to "Person

11   conducting transaction on own behalf" and "Multiple

12   Transactions," right?

13         We can make that bigger if you need.

14   A.    Maybe just a little bit.  I'm so sorry.

15   Q.    No, it's fine.

16   A.    Yes, I see those two boxes checked.

17   Q.    And what does "Multiple Transactions" mean?

18   A.    I do not exactly recall.  I would assume that that means

19   they had tried -- it's because -- this report is triggered

20   because this person had conducted multiple transactions

21   throughout the day, which would then trigger the report,

22   because, again, at the 10,000 mark -- if he were to come in

23   and, you know, take out $11,000, that would trigger the report

24   on my end.  But if he were to go take out a certain amount at

25   one bank, come to another bank, take out another amount, it

USCA11 Case: 23-13062    Document: 49-1    Date Filed: 05/30/2024    Page: 190 of 230

1   would then trigger this, to where this is, I believe, what it's
2   referencing, multiple transactions to get to the CTR.  Multiple
3   transactions led to the CTR.
4          MR. MESROBIAN:  If we could go further down.
5   Actually just --
6   BY MR. MESROBIAN:
7   Q.   So in the second section here we're highlighting towards
8   the top middle of the page.  The name of the individual about
9   whom this CTR was filed is Kristopher "Justinboye" Ervin?
10  A.   Yes.
11  Q.   And next to occupation it says "owner of Auto Key Card."
12  Would you have entered that information?
13  A.   Yes.  I would have -- if I was filling it out, I would
14  have entered that information, yes.
15  Q.   And do you recall how you got that information?
16  A.   That would have been me just asking, as part of the CTR
17  process, again, those questions of, "What is your most
18  up-to-date employer?  What is your most up-to-date address?"
19          Whatever his answer would have been during that point
20  in time, that's what I would have inputted.
21  Q.   And when you're asking those questions, again, you don't
22  say, "This is for the purposes of a Currency Transaction
23  Report"?
24  A.   Exactly.  I would never say that.  It would just be
25  simple -- you know, if I were talking to any individual, you

1   know, "Hey, we're just trying to know your most up-to-date
2   information.  Where are you employed right now?"
3          MR. MESROBIAN:  And Ms. Ganoe, could we go to the
4   bottom of this page, please.
5   BY MR. MESROBIAN:
6   Q.   And here there is an additional contact information
7   entered, phone number and email address; is that right?
8   A.   Yes.
9   Q.   And at the bottom, in line 22 it says, "Cash out amount,
10  $14,000."  Is that right?
11  A.   Yes.
12  Q.   And only $5,000 -- he had only withdrawn $5,000 in his
13  transaction with you, correct?
14  A.   Yes.
15          MR. MESROBIAN:  Ms. Ganoe, if we could publish page
16  4, please.
17  BY MR. MESROBIAN:
18  Q.   So here we are under the heading Transaction Location.
19  And it says "depository institution."  What does that refer to
20  next to "type of financial institution"?
21  A.   I would assume that's just referring to that we are a
22  place where you can deposit -- as we are a financial
23  institution, you can deposit, you know, funds into the credit
24  union.
25  Q.   Are some of these boxes auto-filled for you when this pops

1   up, or do you have to enter everything as you're going through?
2   A.   I'll be honest, I do not exactly recall that part, but I
3   do believe that there is some information that will populate as
4   part of the process.
5   Q.   In Box 29 it says -- next to "primary federal regulator"
6   it "National Credit Union Administration."  Is that the
7   regulator and insurer of federal credit unions?
8   A.   Yes.
9   Q.   And further down this page it lists Community First Credit
10  Union of Florida, and there's an address in Fleming Island.
11  Was that the branch where you worked?
12  A.   That's the branch, yes.
13  Q.   And then at the bottom of the page, in the box at the
14  bottom, Box 42, it says, "Cash out amount for transaction
15  location, $5,000"?
16  A.   Yes.
17  Q.   And that reflects the cash withdrawal that Mr. Ervin made
18  with you?
19  A.   Yes.
20          MR. MESROBIAN:  And Ms. Ganoe, if we can go to the
21  next page.  And we'll just focus on the bottom -- on the bottom
22  part of this page.  I'm sorry, a little bit higher than that.
23  BY MR. MESROBIAN:
24  Q.   And here, I think that's the next --
25          MR. MESROBIAN:  The next two pages.  The previous

1   page.  There we go.
2   BY MR. MESROBIAN:
3   Q.   So here on this page, is this a similar type of reporting
4   page to the one we were just looking at?
5   A.   Yes.
6   Q.   But on this page the address of Community First Credit
7   Union of Florida is listed as 625 Blanding Boulevard in Orange
8   Park?
9   A.   Yes.
10  Q.   And is that the Orange Park branch we were discussing --
11  or that you referenced a few minutes ago?
12  A.   Yes.
13  Q.   And at the very bottom, next to Box 42, for this one it
14  says, "Cash out amount for transaction location, $9,000"?
15  A.   Yes.
16  Q.   Do you recall filling out this section of the form?
17  A.   I don't recall, no, sir.
18  Q.   To be clear, you would not have been involved in this
19  transaction, right?
20  A.   I would not have been involved in the transaction for
21  $9,000, no.
22  Q.   And just to be clear, we were talking about when Mr. Ervin
23  came back to pick up the check from you after you called him
24  earlier.  But at any point during your interactions with him on
25  that day did he seem overly upset or aggressive with you?

1  A.   I would say just at the beginning he was upset because of
2  an issue at the Orange Park branch.  I know he did not go into
3  detail.  So that's all.
4       But neither here nor there.  I did not -- throughout
5  the whole conversation it was not that I felt Mr. Ervin was
6  upset or anything like that at us, no.
7            MR. MESROBIAN:  May I have one moment, Your Honor?
8            THE COURT:  You may.
9       (Government's counsel confer.)
10           MR. MESROBIAN:  No further questions, Your Honor.
11           THE COURT:  Mr. King.
12                    CROSS-EXAMINATION
13 BY MR. KING:
14 Q.   Good afternoon, Mr. LeVay.
15 A.   Good afternoon.
16 Q.   From your review of that CTR, it's your understanding that
17 the transaction at the Orange Park branch was for $9,000?
18 A.   Yes.  That is my understanding of that yes, sir.
19 Q.   And if somebody were to ask for more than a thousand
20 dollars that day at another branch, you would have to fill out
21 a CTR, and that's, in fact, what happened?
22 A.   Yes.  So if someone -- if a certain person took out
23 $9,000, let's say, at the Orange Park branch that day, if they
24 were to go to another location, whether it be our location in
25 Fleming Island or another location, and that cash withdrawal

1  would be more than a thousand dollars, that report would be
2  triggered.
3  Q.   And did Mr. Ervin at any time he was with you express any
4  concern about taking out more than a thousand dollars?
5  A.   I do not vividly recall, no.  I do not recall that.
6  Q.   And, in fact, he actually asked for significantly more
7  than the 5,000 that you ultimately gave him?
8  A.   Yes, he did ask for a larger amount.  I do not remember
9  the exact amount, but I know it was more than what we could
10 give since it was later in the day and we -- you know, at
11 branches there are sometimes issues with the amount of cash we
12 have on hand.  So I know we did not have the amount to give him
13 what he initially wanted.
14 Q.   And he asked for an amount that would have -- independent
15 of what happened at the Orange Park branch, the amount he was
16 asking for, can we agree, was more than 10,000, would have
17 triggered a CTR by itself?
18 A.   Yes, if it was more than 10,000, that in and of itself
19 would have triggered a CTR.  And then obviously with the
20 addition of what he had taken out, that also would have
21 triggered the CTR.
22 Q.   And he was asking for more than 10,000 from you
23 originally?
24 A.   I do not remember the exact amount, no.  I do not remember
25 the exact amount that he asked for.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 193 of 230

1   Q.   Okay.  So you don't know if it was -- it was more than
2   5,000?
3   A.   Yes.
4   Q.   And you said "significantly more," but the details you
5   don't remember?
6   A.   I don't remember that.  I would say probably close to
7   double that.  But again, I do not remember the exact amount.
8   Q.   At any time that he was with you did he express any
9   concern about a CTR or trying to keep an amount under the
10  reporting amount, or was he just trying to get as much money as
11  he could from you?
12  A.   I can't recall that in particular.
13           MR. KING:  I appreciate your time, sir.  Thank you.
14           THE WITNESS:  Yes, sir.
15           THE COURT:  Anything else, Mr. Mesrobian?
16           COURTROOM DEPUTY:  Mr. Larosiere.
17           THE COURT:  Oh, I'm sorry.
18           MR. LAROSIERE:  Nothing, Your Honor.
19           MR. MESROBIAN:  May I have one moment, Your Honor?
20           THE COURT:  Yes.
21           MR. MESROBIAN:  One question, Your Honor.
22                   REDIRECT EXAMINATION
23  BY MR. MESROBIAN:
24  Q.   So Mr. LeVay, Mr. King asked you some questions about
25  Mr. Ervin's cash request to you?

1   A.   Yes.
2   Q.   Do you recall whether Mr. Ervin asked you for an amount
3   just under $10,000?  Strike that.
4        You said that you thought it was perhaps twice the
5   amount of -- that he actually got?
6   A.   Sure.
7   Q.   So do you recall if he asked you for an amount just under
8   $10,000?
9   A.   I don't recall the exact amount, but I know it would have
10  been -- you know, it was more than the 5,000, I know, because
11  we had to come back down to, "We do have 5,000 that we could
12  give you."
13       So I don't remember the exact amount.
14           MR. MESROBIAN:  No further questions.
15           MR. KING:  Nothing further, Your Honor.
16           THE COURT:  All right.  You may step down, sir.
17       And ladies and gentlemen, it's 3:30.  We'll go ahead
18  and take our afternoon break.  We'll take -- you're free to go
19  sir.
20           THE WITNESS:  Thank you.
21       (Witness exits the courtroom.)
22           THE COURT:  We'll take 15 minutes.  I'll ask you to
23  please be back in the jury room ready to continue with the
24  evidence at 3:45.
25       Please remember to continue following my instructions

1   about not talking to one another or anybody else about this
2   case, not letting anyone talk to you or in your presence about
3   it.
4           Don't conduct any independent research in any way,
5   including with the internet.
6           Don't read, watch, or listen to any media reports.
7           And remember that you must not form or express any
8   opinions.
9           We'll see you back in about 15 minutes.
10          COURT SECURITY OFFICER:  All rise for the jury.
11      (Jury exits, 3:31 p.m.)
12          COURT SECURITY OFFICER:  Please be seated.
13          THE COURT:  Mr. Mesrobian, can you tell me the next
14  witness, just -- oh, Ms. Taylor.
15          MS. TAYLOR:  Your Honor, I think it will be Special
16  Agent Slosson.
17          THE COURT:  And Mr. Larosiere, because those last
18  witnesses didn't relate to the charges against your client is
19  why I wasn't focusing.  It didn't seem that you would be
20  addressing -- because they related only to charges against
21  Mr. Ervin.
22          MR. LAROSIERE:  Yeah, no, I understand.  And I was
23  almost like not wanting to even stand up because it was so
24  obvious, but . . .
25          THE COURT:  Okay.  All right.  So we'll be in recess

1   for about 15 minutes and then we'll continue with the evidence.
2           MR. KING:  Your Honor, I apologize.  There is
3   something.  Just as we were going through the presentation of
4   the evidence, Government's Exhibit 95D, we noticed on page 3
5   has Mr. Ervin, Sr.'s full Social Security, driver's license,
6   and date of birth.  And I just wanted to make sure that that
7   doesn't accidentally get uploaded into CM/ECF.
8           THE COURT:  Okay.
9           MR. MESROBIAN:  And Your Honor, I know Ms. Wiles and
10  I both keep track of when we see PII in the exhibits, because
11  we try and redact as best we can, but we also keep an eye on
12  them as they're coming into evidence.  So we'll be sure to
13  redact those before we provide copies for the Court to enter on
14  the docket.
15          THE COURT:  Okay.  And can you also redact what goes
16  back to the jury?  Because the jury really shouldn't get his
17  Social Security number and date of birth either.
18          MR. MESROBIAN:  Yes, Your Honor.
19          THE COURT:  All right.  Thank you.
20          Thank you, Mr. King.
21      (Recess, 3:33 p.m. to 3:50 p.m.)
22      (Mr. King and Mr. Larosiere not present.  Jury not
23  present.)
24          COURT SECURITY OFFICER:  All rise.  This Honorable
25  Court is now in session.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 195 of 230

1          THE COURT:  We're missing people.

2          COURT SECURITY OFFICER:  Please be seated.

3          MS. TAYLOR:  Your Honor, should I go check for

4   Mr. King and Mr. Larosiere?

5          THE COURT:  That would be lovely.

6   (Mr. King and Mr. Larosiere enter the courtroom.)

7          MR. KING:  I'm sorry, Your Honor.  We went to another

8   floor so we weren't near the jurors.

9          THE COURT:  No worries.

10         But we do have a matter we need to address.  One of

11  the jurors expressed a concern to the court security officer.

12  I asked her to separate that juror from the remaining jurors

13  and ask him to write down the concern.

14         And so I have a note, which I'm going to mark Court's

15  Exhibit 1, but I'm going to direct that it be filed under seal

16  so the Court note's not on the public docket.

17         This is from Juror No. 11.  He's the fourth one from

18  the left on the back row.  And he says, "When we were

19  interviewed, I said I work at Duval Schools maintenance.  There

20  are three buildings.  I am concerned about retaliation if

21  guilty from followers."  It's spelled f-o-w-o-l-e-r-s, but I

22  think he means "followers."

23         And I say that in part because what he verbally

24  expressed to the court security officer was that he was

25  concerned that if there was a guilty verdict, there would be

1   retaliation at Duval County Public Schools.

2          And when she asked him to write the note, she said

3   she observed that he was shaking and he expressed that he was

4   fearful.  So that's Court's Exhibit Number 1.

5   (Court's Exhibit 1 filed under seal.)

6          THE COURT:  In my view we don't have a choice but to

7   dismiss this juror, because he clearly is influenced by

8   thoughts other than the -- by concerns other than the evidence

9   But I will hear from you-all.

10         He expressed to the court security officer that he

11  had not discussed this with any of the other jurors, and

12  that's, in part, why I had him immediately separated from the

13  other jurors.

14         But Ms. Taylor, let me hear your thoughts.

15         MS. TAYLOR:  Your Honor, given the description of hi

16  physical demeanor and that he seems genuinely fearful and

17  intimidated to the point of exhibiting physical indications of

18  that, I think there's a serious concern that he would not

19  render a fair verdict in this case.  And I would concur with

20  the Court's judgment that he needs to be dismissed.

21         THE COURT:  Mr. King?

22         MR. KING:  Your Honor, I tend to agree.  I don't

23  think we have much of a choice.

24         My -- my only caveat or suggestion would be I think

25  it would be appropriate -- I know he mentioned to the court

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 196 of 230

1   security officer that he hasn't talked or mentioned it or had

2   any conversations with the other jurors, but I think it would

3   be -- just for record purposes, make sure that has not caused

4   any issues with any of the other jurors.

5        And, you know, certainly whatever -- I'm not sure how

6   the Court is going to fashion an explanation to the rest of the

7   jury, we can figure that out, but that would be my only

8   concern.  But otherwise, I agree with both of you, I don't

9   think we really have much of a choice.

10       THE COURT:  Okay.  I don't know who wants to address

11  this on behalf of Mr. Hoover.

12       Mr. Larosiere.

13       MR. LAROSIERE:  Yes, Your Honor.  We'll follow

14  basically in tow with what Mr. King said.  Even to the extent

15  that the concerns might not be extremely reasonable, if they

16  are physically manifested in such a way, it's problematic.

17       THE COURT:  Okay.  All right.  So then I think what I

18  would propose that we do is that with the agreement of all

19  parties, I would dismiss Juror No. 11, which would move Juror

20  33 -- sorry, Juror 15 -- no, no, no.  Wait.

21       MR. LAROSIERE:  Is it not 35?

22       THE COURT:  No, 35 was the last alternate.

23       (The judge and the courtroom deputy confer.)

24       THE COURT:  I see.  Yes, yes.  I'm sorry, we're --

25  I'm misreading the chart.  Yes, 35 would now be one of the

1   jurors.  And the remaining alternates would be 36 and 41.

2        But I think consistent with Mr. King's concern, what

3   I should do is bring Juror No. 11 in, let him know that we've

4   received his note, that we appreciate his concern, that we're

5   going to go ahead and dismiss him, but before doing so, I need

6   to inquire about whether he expressed this concern or any other

7   concern to any of the other jurors.  And we'll have to flow

8   from there.

9        Is that acceptable, Ms. Taylor?

10       MS. TAYLOR:  Yes.  And Your Honor, he's -- is he

11  Juror 9?

12       THE COURT:  He's Juror 11.  He was 29 in selection.

13       MS. TAYLOR:  Okay.  All right.  That's -- that's --

14  that's who I thought we were talking about.  Previous 29.  Got

15  it.

16       THE COURT:  Okay.  All right.

17       Mr. King, is my proposal acceptable?

18       MR. KING:  Yes, Your Honor.

19       THE COURT:  And Mr. Larosiere?

20       MR. LAROSIERE:  Yes, Your Honor.

21       THE COURT:  Okay.  So can we have Juror No. 11 only

22  brought in?  Thank you.

23       And what I would intend to do is when we bring the

24  rest in, just tell them that Juror No. 11 had a personal matter

25  that prevents him from being able to continue to participate in

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 197 of 230

1   the trial but that doesn't affect our ability to proceed.

2           Is that okay, Mr. King?

3           MR. KING:  Your Honor, I assumed you'd do a better

4   job than I would coming up with that.  I think that's perfect,

5   thank you.

6           THE COURT:  And Mr. Larosiere?

7           MR. LAROSIERE:  Sounds fantastic, Your Honor.  Thank

8   you.

9           THE COURT:  Ms. Taylor?

10          MS. TAYLOR:  Yes, Your Honor.

11      (Juror No. 11 enters the courtroom.)

12          THE COURT:  All right, sir.  I'm going to ask you to

13  come up to that podium right there.  You can just stand right

14  there.  I need you in front of that microphone just for a

15  moment.

16          JUROR:  Yes, ma'am.

17          THE COURT:  First of all, thank you for your note.

18  We appreciate your candor and we understand your concern, and

19  so we're going to go ahead and let you go.  And that won't --

20  that won't affect us being able to continue the trial.  But we

21  won't require you to continue with your jury service, okay?

22          JUROR:  Yes, ma'am.

23          THE COURT:  Okay.  I do need to ask you, though, have

24  you expressed any of these concerns to any of the other jurors

25  in any way?

1           JUROR:  No, no.  Not really, no.

2           THE COURT:  Well, "not really" is different than "no,

3   not at all."  I just --

4           JUROR:  I mean, I just said -- well, I would rather

5   tell you in private.

6           THE COURT:  Tell me in private what you said to the

7   other jurors?

8           JUROR:  Just one possibly, yeah.  I mean, it's

9   nothing big.

10          THE COURT:  Okay.  Well, I'll tell you what, I'm

11  going to let the juror come up to sidebar and talk to me

12  briefly and then I'll come back to you-all.

13          So, sir, can you just walk right over here?

14          JUROR:  Yes, ma'am.

15      (At sidebar with the Juror No. 11 only:)

16          JUROR:  I did tell one guy.

17          THE COURT:  I need you to --

18          JUROR:  I did tell one person that I just felt that

19  was concerned if this goes south what can happen then, because

20  I said that I live in Duval -- or I work in Duval County, and

21  he said, "Well, don't worry about it."

22          THE COURT:  Okay.  Can you tell me who that was if I

23  show you the juror chart?

24          JUROR:  He's -- I'm 11 and he's 12.

25          THE COURT:  He's 12.

1           JUROR:  I'm sorry, but I was just -- my vivid
2  imagination gets to me and I just get overexcited and anxious.
3           THE COURT:  Okay.  Are you certain you didn't say it
4  to anyone other than --
5           JUROR:  Yes, ma'am, yes, ma'am.
6           THE COURT:  Just No. 12?
7           JUROR:  Yes, ma'am.  I'm sorry I said something, but
8  I -- I don't want to lie.
9           THE COURT:  It's okay.
10          JUROR:  No, it's not.  I feel bad because I want to
11 finish this, I really do.
12          THE COURT:  Yeah, but you understand that we can't
13 let you finish if you're worried about that?
14          JUROR:  Yes, ma'am.  I'm sorry.  I'm sorry.
15          THE COURT:  No, no, it's okay.  No, no, it's all
16 right, sir.  Sir, please don't be upset.  Honestly.  I've had
17 worse things happen in trials.  So please --
18          JUROR:  I don't want to lie.
19          THE COURT:  No, you don't.  What I'm going to ask you
20 to do is step outside and let me talk to the lawyers and see if
21 there's anything else I need to ask you.  I don't think there
22 will be, but I just want to make sure.
23          JUROR:  Yes, ma'am.
24          THE COURT:  Okay.  Don't worry, you're good.
25          JUROR:  You just want me to --

1  (Proceedings in open court:)
2           THE COURT:  Jodi, he needs a piece of chocolate.
3           JUROR:  No, I don't need chocolate.  I need something
4  stronger than that.
5           THE COURT:  Just stand right outside that door for
6  me.
7           JUROR:  On the inside or outside?
8           THE COURT:  Just step right outside.
9  (Juror No. 11 exits the courtroom.)
10          THE COURT:  So first of all, there's no doubt that we
11 have to excuse him.  He's terrified.  He's visibly shaking.
12 His hand is shaking.  His voice is shaking.  He's almost
13 tearful.
14          But he says that he did say something -- and I need
15 to scroll back.  He said he didn't want to lie, which I very
16 much appreciate.  And because of -- I'm confident that he was
17 telling the truth.  Let me find it.
18          He says, "I did tell one guy.  I need to" -- I
19 think -- my recollection is he said, "I need to tell the truth.
20 I did tell one person that I just felt that I was concerned
21 that if this goes south what can happen then, because I said
22 that I live in Duval -- or I work in Duval County, and he said,
23 'Well, don't worry about it.'"
24          So that's what we have.  This time I'll ask you-all
25 what your thoughts are.

1          MR. KING:  Your Honor, can I -- can we take maybe a

2     couple of minutes?  I'm still trying to -- I -- I --

3          THE COURT:  Sure.

4          MR. KING:  I'm struggling to finish a sentence to you

5     to say that I need time to think about this, which tells me I'm

6     not really prepared to answer that question.

7          THE COURT:  All right.

8          And Mr. Larosiere?

9          MR. LAROSIERE:  I may be too prepared to answer that

10    question, so maybe King and I should confer a little bit.

11         THE COURT:  Okay.  So let me throw out a couple of

12    ideas.  We could just bring the juror in and ask him if the

13    other juror made any comments and if he had any concern about

14    that and if it was going to influence his verdict.

15         But I'll -- I'll let you-all -- it's four o'clock.

16    Why don't I give you about five minutes to -- to think about

17    it.  Well, I'm going to stay here.  There's no -- you guys can

18    confer for a moment and we'll come up with a plan.

19         Oh, can I -- Ms. Healey, this is on the record.  I

20    just want to point out that Juror 12 is currently an alternate.

21    He's not actually on the jury right now.  So to the extent that

22    affects your thoughts.

23         MR. LAROSIERE:  Was it not 11?

24         THE COURT:  No, 11 is gone.  The person he spoke to

25    is 12, who was 41 in the selection process, which means he's

1     currently the last alternate.

2          (Pause in proceedings.)

3          THE COURT:  I need that door closed.

4          Is there any reason why I can't go ahead and let

5     Juror No. 11 go?  I don't want to increase his anxiety by

6     making him sit out there.  Is there any -- do you-all want me

7     to ask him anything else?

8          MR. KING:  Your Honor, I can't think of anything that

9     he can add that we don't already know, because if he was able

10    to identify the -- who he spoke to --

11         THE COURT:  I need you at a microphone.

12         MR. KING:  He did identify the juror that he spoke

13    to.

14         THE COURT:  Yes.

15         MR. KING:  Then I don't think there's anything else

16    he can add.

17         THE COURT:  Okay.  And he did assure me that there

18    wasn't anybody else.

19         Mr. Larosiere, anything else I need to do with him

20    before I let him go?

21         MR. LAROSIERE:  Not with him.

22         THE COURT:  Okay.  And Ms. Taylor?

23         MS. TAYLOR:  No, Your Honor.

24         THE COURT:  Okay.

25         All right.  Let's have Juror 11, please.

1        (Juror No. 11 enters the courtroom.)

2            THE COURT:  All right, sir.  You're going to be free

3    to go.  You're fine.  You haven't done anything wrong.  We are

4    very grateful to you for your willingness to serve as a juror.

5    And I know you told me you wanted to finish the case out, but

6    you understand why that really wasn't possible?

7            JUROR:  Yes, ma'am.

8            THE COURT:  But you did participate in your jury

9    service, so you won't get called again for jury duty for three

10   years at least for the federal court.  Now, the state court may

11   call you.

12           But you just need to go down and see the jury

13   administrator.  Do you have any stuff that you need to get out

14   of the jury room?

15           JUROR:  (Shakes head.)

16           THE COURT:  No?  It's okay.  You're fine.  Just go

17   down to see the jury administrator.  He's going to give you a

18   Challenge coin from the Court to thank you for your service.

19   But you're free to go, all right?

20           JUROR:  Yes, ma'am.

21           THE COURT:  All right.  Thank you very much.  And

22   I'll ask you to go out the front door.  Okay.

23       (Juror No. 11 released from duty and exits the courtroom.)

24           THE COURT:  Y'all see what I mean?

25           Counsel is all nodding in agreement at the distress

---

1    exhibited by the juror.

2            I'll give y'all a few minutes to confer and I'll be

3    right back out.

4            MR. KING:  Thank you, Your Honor.

5            COURT SECURITY OFFICER:  All rise.

6        (Recess, 4:06 p.m. to 4:13 p.m.)

7        (All parties present.  Jury not present.)

8            COURT SECURITY OFFICER:  All rise.

9            MR. KING:  Your Honor, I apologize, could I have two

10   seconds with my client?

11           THE COURT:  Yes.

12           MR. KING:  Thank you, Your Honor.

13           THE COURT:  Before you-all give me your thoughts,

14   I'll mention something that one of my law clerks brought up

15   that we hadn't talked about, which is the concern that even if

16   we -- even if Juror No. 12 suggested that he could continue,

17   there is a concern that he might have expressed to the other

18   jurors why Juror No. 11 had to leave.  And I'm not sure how we

19   could police that.

20           But Mr. King, did you have a thought as to what we

21   should do with Juror 12?

22           MR. KING:  Your Honor, I think -- if I could defer to

23   Mr. Hoover's counsel for now, I think they wanted to --

24           COURT REPORTER:  I'm sorry, "Defer to Mr. Hoover's

25   counsel..."

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 201 of 230

1          MR. KING:  That they had something they wanted to
2    address with the Court.
3          THE COURT:  Okay.
4          MR. LAROSIERE:  Your Honor, very unfortunately, as
5    the record clearly reflects, Previous Juror 11 was visibly
6    shaking.  I think it was manifest before he even came in and
7    started talking.  I wonder how that demeanor alone wouldn't
8    possibly contaminate the jury pool.  Understanding even if we
9    were to eliminate 11 and 12 -- which counsel for Hoover isn't
10   necessarily suggesting we eliminate 12 as well -- we feel that
11   there's a substantial possibility that the jury pool has been
12   contaminated, and for that reason we must respectfully move for
13   a mistrial.
14         THE COURT:  All right.  Well, I'll hear from you,
15   from Ms. Taylor, on that in a moment, but I will say,
16   Mr. Larosiere, that when he was sitting in the jury box, I
17   didn't see any of this in his demeanor.  I think it wasn't
18   until he said it out loud to the court security officer.  And
19   she did immediately separate him from the other jurors.  So I
20   don't know that we have a record that would suggest that the
21   other jurors have observed anything.
22         And before I grant a mistrial, I think I would have
23   to have some greater basis than just that speculation, because
24   again, as I said, before he expressed this I had not -- I
25   certainly had not seen him visibly showing any concern.

1          But let me -- Ms. Taylor, let me hear from you.
2          MS. TAYLOR:  Your Honor, I think where we come out is
3    that the risk of bringing the other jurors in to inquire with
4    them about this is more likely to harm than do good.
5          I am reluctant to release the third alternate given
6    that we still have quite a bit of trial to go.
7          But I think that if we were to take additional steps
8    that that might be the reasonable step to take at this point to
9    ensure that this idea has not spread beyond sort of its
10   original source in the one person that Juror 11 -- I think it
11   was 11 -- had shared it with.
12         I do agree with the Court that it is entirely
13   speculative at this point to assume that every member of the
14   jury feels the same way that the one juror did.
15         Your Honor, I --
16         THE COURT:  I don't think that's what Mr. Larosiere
17   said.  I think what Mr. Larosiere was saying was not that they
18   all feel that way, but that they -- he fears -- or he's arguing
19   that the other jurors may have seen Juror 11's anxiety, and
20   that that would influence them.
21         Did I understand your argument correctly?
22         MR. LAROSIERE:  Yes, Your Honor.
23         And the one other bit that I neglected to mention at
24   first was the use of the phrase "going south."  It -- when
25   that's communicated to another juror, it kind of seemed like

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 202 of 230

1  that may have been a flavor of the room, right.  It's odd to
2  suggest something is "going south" when there is not a
3  consensus.
4        But that -- I think you understand my argument, yes,
5  Your Honor.
6        THE COURT:  Yeah, the clear import of his comment of
7  "going south" was if it went south for the defendants.  So it
8  didn't suggest that there was any flavor of the room in terms
9  of the jury.
10       I don't think, though -- so are you in agreement,
11 Mr. Larosiere, that we would need to -- that we should dismiss
12 the second alternate, Juror 12?
13       I mean, let me put it this way:  I don't know how you
14 can consistently argue that we should keep that juror yet we
15 should -- yet I should grant a mistrial because the comment was
16 communicated to the entire jury, but I'll hear from you.
17       MR. LAROSIERE:  It -- respectfully, I don't think I
18 want to say a position on Juror 12 without some inquiry just
19 because of the way Juror 11 talked about him.  You know,
20 there's just a lot of -- there's a lot of risk and moving
21 parts.  And I think there's independent issues with 11 and 12.
22 And I think that perhaps 12's might be curable, if that's -- if
23 that kind of makes sense.
24       THE COURT:  I'm going to be honest and say I'm not
25 sure it does, but I think that regardless of what we do, we

1  would have to inquire of Juror 12 to make sure that Juror 12
2  did not repeat any comment that he heard from Juror 11.
3        And I know I haven't heard from you yet, Mr. King.
4  will in a moment.
5        Ms. Taylor, what is your thought as to me bringing
6  Juror No. 12 in and asking him his recollection of what Juror
7  11 said to him, whether he repeated it, and then inquiring of
8  whether that would influence his verdict in any way?
9        MS. TAYLOR:  I don't oppose that, Your Honor.
10       THE COURT:  All right.  And then we can decide what
11 we do with him after that.
12       Mr. King, is that acceptable to you?
13       MR. KING:  Your Honor, I think just for record
14 purposes, if it -- you know, there is a motion for mistrial,
15 and I think I would join that.  I understand the Court's
16 inclination is not to grant that.
17       My proposal would be to do as the Court has suggested
18 and also make sure that Juror No. 12 has not discussed or
19 speculated with the jurors why we are in a delay or why Juror
20 11 was separated out or brought in.  I think that additional
21 part is very important as well.
22       And then my suggestion would be bring Juror 12 in,
23 have that conversation, segregate him from the rest of the jury
24 pool, unfortunately, discuss what answers he's given.  And my
25 inclination -- you know, I don't like going down to one

1    alternate either, but I -- I think the danger of him

2    discussing, repeating, or -- with the rest of the jury pool,

3    given that he is the last alternate, is significantly more

4    problematic than us only having one alternate.

5            And, you know, unless I -- my guess is that there's

6    not really an answer he can provide where I'm not going to ask

7    him to be segregated from the rest of the jury and then excused

8    before we seat the rest of the jury and resume testimony.

9            THE COURT:  All right.  Give me a moment.

10    (Pause in proceedings.)

11            THE COURT:  All right.  So based on some additional

12    comments by Mr. King, we would bring Juror 12 in here, we would

13    ask him if he recalls Juror No. 11 making any comment to him

14    that related to the case or its outcome, ask him what he

15    recalls about that, ask him whether he repeated it to any other

16    juror, ask him whether he has speculated as to the reason for

17    the delay or the segregation of -- separation of -- of No. 11

18    during this time, and then ask him whether it would influence

19    his verdict.

20            Mr. King, have I covered the subject matter areas

21    that you thought?

22            MR. KING:  Yes, Your Honor.  Thank you.  And thank

23    you for giving us the time to mull this over.  I appreciate it.

24            THE COURT:  Mr. Larosiere, is that -- did I cover the

25    waterfront?

1            MR. LAROSIERE:  Yes, Your Honor.

2            THE COURT:  All right.  Ms. Taylor, are you in

3    agreement with that?

4            MS. TAYLOR:  Yes, Your Honor.

5            THE COURT:  All right.  May we have Juror 12, please.

6    (Juror No. 12 enters the courtroom.)

7            THE COURT:  Juror No. 12, may I ask you to come up to

8    that microphone right there.

9            JUROR:  Yes, ma'am.

10            THE COURT:  Juror No. 12, do you recall Juror 11, the

11    gentleman seated to your --

12            JUROR:  To my right, yes, Your Honor.

13            THE COURT:  Do you recall him making any comment to

14    you about the case or its outcome?

15            JUROR:  No.  He just -- he was concerned about

16    himself, if that helps.  I don't even know if I need to

17    clarify, but . . .

18            THE COURT:  Can you tell --

19            JUROR:  Can I -- I don't know if that needs to be

20    private.

21            THE COURT:  Counsel, do you have any objection with

22    me speaking to him privately at sidebar?

23            MR. KING:  No, Your Honor.

24            MR. LAROSIERE:  No, Your Honor.

25            THE COURT:  Okay.  If you'll -- now you'll come up to

1    sidebar.

2        (At sidebar with Juror No. 12 only:)

3            JUROR:  So on one of the breaks he was concerned

4    because it was a federal case that somebody from the defense

5    was going to like retaliate against him.  So I just tried to

6    tell him -- because he asked, like, "Should I say something?"

7    And I said, "Well, I mean, that's up to you," I said.  But I'm

8    like, "I don't think anybody would" -- you know, I said -- you

9    know, I said, "Why don't you wait," you know, "and see how it

10   ends," is what I had said.  I mean --

11           THE COURT:  Okay.

12           JUROR:  So I think he was concerned.  So there wasn't

13   a talk about the outcome of the case, but he was worried about

14   I guess, like, his personal well-being.

15           THE COURT:  Okay.  So there's some other questions

16   that I have to ask you.

17           JUROR:  Okay.

18           THE COURT:  That I need to ask you with everybody

19   else.

20           JUROR:  Okay, yes.

21           THE COURT:  And I'm just -- but again, if in

22   answering -- well, let me ask you this.  I'm going to ask you

23   in front of them as well, but before I do, did you repeat to

24   any of the jurors -- did you talk to any of the other jurors

25   about Juror 11's concerns?

1            JUROR:  No, but there was one other juror sitting

2    right next to me at the time during that conversation.  I don't

3    know her name.  I'm here at the table and she's literally right

4    there (indicating).

5            THE COURT:  And you think she heard you?

6            JUROR:  Yeah.

7            THE COURT:  All right.  I'm going to have to ask you

8    that in front of them, but are you okay going back up to the

9    microphone?

10           JUROR:  Yes.  Yes, Your Honor, yep.

11       (Proceedings in open court:)

12           THE COURT:  So Counsel, Juror No. 12 has described to

13   me that -- what Juror 11 said to him.  And it's entirely

14   consistent with what Juror 11 told us that he said.

15           Can you -- Juror No. 12, have you told any of the

16   other jurors what Juror 11 said to you?

17           JUROR:  No, Your Honor, I did not tell any other

18   jurors, no.

19           THE COURT:  Were any of the other jurors in proximity

20   such that they would have heard Juror 11's comments?

21           JUROR:  Yes, Your Honor.  There was one juror next to

22   me at the head of the table that, I mean, I'm almost certain

23   had heard, yes.

24           THE COURT:  And when you say "at the head of the

25   table," was this over lunch or --

1          JUROR:  It was -- I believe it -- it was either lunch
2   or it might have been the first break, and I'm not -- I can't
3   honestly recall, but it was one of the -- it was one of the
4   breaks today, this morning, so . . .
5          THE COURT:  Okay.  Are you able to identify by chair
6   what juror that was?
7          JUROR:  There's no one sitting in the first chair,
8   correct?  And then I'm the fifth chair.  So it's either Chair 3
9   or 4.
10          THE COURT:  So the juror in Chair 4 has very long
11   blonde hair.
12          JUROR:  No, so not that one.  The description of the
13   person to the right of her?  Can you recall?
14          THE COURT:  Ms. Wiles, may I see you a moment.
15          JUROR:  And I could get the side -- it might not be
16   the left, it might be the right.
17          THE COURT:  Well, on the other side of Juror 4, Juror
18   5 is a male, so --
19          JUROR:  So then it's definitely to the right then.
20          THE COURT:  So Juror 3 . . .
21      (The judge and the courtroom deputy confer.)
22          THE COURT:  Counsel, Ms. Wiles's recollection of
23   Juror 3 is that she has long brown hair.
24          JUROR:  Yes, I believe that is her, correct?
25          THE COURT:  Just a moment.

1          Ms. Wiles.
2      (The judge and the courtroom deputy confer.)
3          THE COURT:  All right.  Do you -- was there any
4   speculation or discussion in the jury room about why Juror
5   No. 11 had been separated from everyone else?
6          JUROR:  No.  But being honest, we were kind of
7   figuring that's why we're not coming back in; we -- you know,
8   that's what the delay is about.  But there's not been any
9   speculation, no, ma'am.
10          THE COURT:  So the delay is about the fact that he
11   hasn't come back?
12          JUROR:  Exactly, yes, Your Honor.
13          THE COURT:  Is there any discussion about why that
14   would be happening?
15          JUROR:  No, Your Honor.
16          THE COURT:  You told me at sidebar what Mr. -- what
17   Juror 11 said to you.  Did that cause you any concerns?
18          JUROR:  Personally, me, I did not have any concerns,
19   no.
20          THE COURT:  And would the comments that he made -- do
21   you think those would influence your verdict in this case?
22          JUROR:  My verdict?  No, ma'am.
23          THE COURT:  Would you be able to set aside the -- and
24   let me ask you, did -- when he spoke to you, did he seem
25   nervous?

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 206 of 230

1          JUROR:  Yes.  He was -- I mean, from day one he was
2     nervous.  I was one of the first people up into the jury room,
3     and you could just see that he was very -- I mean, he was very,
4     like, shaking.  He was very nervous.
5          THE COURT:  From the beginning of the trial?
6          JUROR:  From the beginning, yes, Your Honor.  But he
7     was nervous when we had the -- when he had the conversation,
8     yes, Your Honor.
9          THE COURT:  And would that cause you to be
10    uncomfortable to continue as a juror?
11         JUROR:  No, Your Honor.  Like I said, I don't -- I'm
12    not worried at all.
13         THE COURT:  Let me see counsel at sidebar.
14    (Proceedings at sidebar:)
15         THE COURT:  Thoughts.
16         MS. TAYLOR:  I am not concerned about this juror.
17         MR. LAROSIERE:  I think Juror 12 seems to either be
18    unaffected or rehabilitated.
19         MS. TAYLOR:  And it also seems to me that the juror
20    who was dismissed was just -- may be just have -- has an
21    anxious personality and was just affected by this in an
22    outsized way that was not normal.  So I don't think there are
23    grounds for a mistrial at this point.
24         MR. LAROSIERE:  There's still the question of -- I
25    don't know what her number is.

1          THE COURT:  Yeah.  If you-all are in agreement that
2     we can let Juror 12 continue, I think what we could do is bring
3     in Juror 3 and ask what she heard and go from there.
4          MR. LAROSIERE:  Similar sort of questions?
5          THE COURT:  Is that acceptable, Mr. Larosiere?
6          MR. LAROSIERE:  Yes, Your Honor.
7          THE COURT:  Mr. King?
8          MR. KING:  Yes, Your Honor.  I think if there might
9     be a way to have Juror 12 confirm that the -- if there might be
10    a way to have Juror 12 confirm it's Juror 3, because he didn't
11    seem very confident.  The other thing is to make -- and I'm
12    sure the Court has language on doing this, but I would be
13    remiss to not say instruct Juror 12 not to discuss anything
14    that happened in the court and not any speculation about Juror
15    11.
16         MR. LAROSIERE:  Individually, I will state that on
17    behalf of Hoover, Juror 12 seems very trustworthy and able to
18    act consistently with court orders.
19         THE COURT:  And I will say that even at sidebar what
20    he said -- what the gentleman said, and entirely consistent
21    with what 11 said, he also was sort of dismissive to him,
22    telling him -- you know, seeming not at all concerned about it.
23         So I -- so with the agreement of all, we're going
24    to -- I'm going to instruct him not to talk to anybody else.
25    I'm going to -- Mr. King has very sneakily suggested something

1  really smart, have him confirm that Juror -- to the court
2  security officer that it was Juror No. 3, and we'll go from
3  there.
4          Is that acceptable, Mr. Larosiere?
5          MR. LAROSIERE:  Yes, Your Honor.
6          THE COURT:  Mr. King?
7          MR. KING:  Yes, Your Honor.
8          THE COURT:  Ms. Taylor?
9          MS. TAYLOR:  Yes, Your Honor.
10         THE COURT:  Okay.  Thank you.
11         MR. LAROSIERE:  And I apologize for my last name.
12         THE COURT:  What, am I getting it wrong?
13         MR. LAROSIERE:  No, you do it great, but you're
14  squinting every time.
15         THE COURT:  No, it's because I've got to remember
16  who's talking.
17     (Proceedings in open court:)
18         JUROR:  Your Honor, can I add a comment too?
19         THE COURT:  Absolutely.
20         JUROR:  Like I said, I know my recollection of the
21  time, whether it was the first break or lunch -- but, I mean,
22  it wasn't like the room was completely full either.  I can't
23  tell you exactly how many were there, but, I mean, there might
24  have been four or five of us in there, to my knowledge.  And
25  again, I can't be a hundred percent sure.

1          THE COURT:  What was -- do --
2          JUROR:  I just remember him and then the person at
3  the head of the table and then me where I was sitting across.
4  I mean, that was really, you know, at the time when I was
5  focusing, but --
6          THE COURT:  And was he speaking loudly or just in
7  normal conversation?
8          JUROR:  No, normal.  It wasn't loud or anything like
9  that, no.
10         THE COURT:  Okay.  All right.  So first of all, I'm
11  going to let you go back out and rejoin the other jurors.
12         JUROR:  Yes.
13         THE COURT:  It is of paramount importance that you
14  not talk to them about this discussion.
15         JUROR:  Yes, Your Honor.
16         THE COURT:  And that you not talk to anybody or
17  repeat anything about what Juror No. 11 said to you or about
18  this discussion.  Can you do that?
19         JUROR:  Yes, Your Honor.
20         THE COURT:  Okay.  And I'm going to ask you to just
21  con- -- when -- the court security officer is going to go in
22  with you, and she's going to ask Juror No. 3 to come talk to
23  us.
24         JUROR:  Yes, Your Honor.
25         THE COURT:  When Juror No. 3 gets up to walk in here,

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 208 of 230

1   if you realize that's not who you meant --

2        JUROR:  Yeah, then say something?

3        THE COURT:  Just let the court security -- just --

4   just look at the court security officer and shake your head at

5   her.

6        And I'll ask you not to bring the juror in and just

7   to bring this gentleman back out.

8        COURT SECURITY OFFICER:  Yes, ma'am.

9        JUROR:  Thank you.

10       THE COURT:  And the last thing I'm going to ask you

11  to do is -- so you've assured me that you're not going to talk

12  about this any further.  And to the extent there's any

13  speculation, just tell your colleagues that you can't discuss

14  it, the Court ordered you not to.

15       JUROR:  Yes.

16       THE COURT:  But later, if as the trial progresses you

17  hear someone talking and realize that they heard this comment,

18  I need you to write a note to the court security officer.

19       JUROR:  Yes, Your Honor.

20       THE COURT:  Don't say anything, just write the court

21  security officer a note, okay?

22       JUROR:  Yes, Your Honor.

23       THE COURT:  Okay.  All right.  So I'll let you go and

24  we'll take it from there.  Thank you very much for your candor.

25       JUROR:  You're welcome.

1        (Juror No. 12 exits the courtroom.)

2        THE COURT:  Only in my courtroom.

3        (Juror No. 3 enters the courtroom.)

4        THE COURT:  Juror No. 3, if you could come up to that

5   podium.  And don't worry, you're not in trouble or anything, I

6   just need to ask you a question.

7        JUROR:  Yes, ma'am.

8        THE COURT:  Over one of the breaks did you by any

9   chance hear Juror No. 11 make any comment about the case or its

10  outcome?

11       JUROR:  Juror No. 11?

12       THE COURT:  Yes.

13       JUROR:  No, ma'am.

14       THE COURT:  Have you heard anybody talk about the

15  case or the outcome of the case?

16       JUROR:  No, ma'am, I have not.

17       THE COURT:  I can't hear you.

18       JUROR:  No, ma'am, I have not.

19       THE COURT:  And when you-all have been waiting here,

20  has there been any speculation about what the delay is?

21       JUROR:  From back there?  We were just -- we didn't

22  know if we were in trouble, the ones that were being called in

23  here.

24       THE COURT:  Nobody's in trouble.  Nobody's in

25  trouble.  So -- all right.  Give me one minute with the

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 209 of 230

1   attorneys and then I'll be right back with you.

2          Ms. Wiles, can you share some chocolate with her?

3          COURTROOM DEPUTY:  I'm the chocolate fairy today.

4          THE COURT:  May I see counsel.

5          COURTROOM DEPUTY:  But I can't push the button and

6   take chocolate at the same time.

7      (Proceedings at sidebar:)

8          THE COURT:  Okay.  Mr. Larosiere, are you comfortable

9   proceeding with Juror No. 3 on the jury?

10         MR. LAROSIERE:  I -- so this is a two-part thing.  At

11  the direction of my client, I'm not going to be able to

12  withdraw my motion.  Does that speak for itself?

13         THE COURT:  All right.  So let's say -- assuming that

14  I deny the motion for mistrial, to the extent that you sought a

15  mistrial entirely, do you see any basis for excusing Juror

16  No. 3?

17         MR. LAROSIERE:  Frankly, given the candor of the

18  previous two witnesses -- I'm sorry, the previous two jurors,

19  it seemed that Juror 12 indicated that there was no way she

20  couldn't have heard.  It seems -- the response seems odd.  So I

21  think that there might be an excuse -- or a reason to excuse

22  Juror No. 3.  And I think that would be safer.

23         MS. TAYLOR:  Can I respond?

24         THE COURT:  Yes.

25         MS. TAYLOR:  She did not seem evasive to me at all.

1   It's certainly possible she just wasn't paying attention to

2   what the conversation was even if she was proximate, or maybe

3   it has so little impact on her that even if she did hear it,

4   she doesn't remember.

5          But in any event, the thing that we were trying to

6   get at is has the jury pool been tainted such that other --

7   this idea of being fearful might be spreading amongst the

8   jurors, and she has not expressed that she has fear about it.

9          THE COURT:  Why don't I ask her a couple more

10  questions.

11         MR. LAROSIERE:  Thank you.

12         THE COURT:  Okay.

13     (Proceedings in open court:)

14         THE COURT:  So Juror No. 3, Juror No. 11 advised me

15  that he had made a comment that he had relating to some concern

16  he may have about the outcome of the case.  And the comment

17  that -- was apparently made when Juror No. 11 was seated close

18  to you.  And so it's really important for me to know whether

19  you heard anything that Juror 11 may have said about that.

20         JUROR:  So I do recall a comment that he did make.

21  He was concerned, I guess -- I don't even know how to put it.

22  He was concerned maybe for his safety after the fact of the

23  case --

24         THE COURT:  Okay.

25         JUROR:  -- due to there's only so many buildings

1   where he works or something.  I don't remember the exact
2   conversation, but something to do with where he works and
3   there's only so many buildings, so it would be easy to find him
4   out there.  I don't know.
5           THE COURT:  And did that cause you personally any
6   concern?
7           JUROR:  No, ma'am.
8           THE COURT:  Do you know if anybody else heard him?
9           JUROR:  There was me, the two gentlemen that have
10  already been pulled, and No. -- you called 10 and 11 back,
11  correct?
12          THE COURT:  I've spoken to No. 11 and No. 12.
13          JUROR:  Okay.  So then it was Juror No. 10 as well.
14  He sits on the same corner as we do.  I'm not sure if anyone
15  else heard the conversation that was going on or not, but I
16  know he was on the other -- in between me and the gentleman
17  that made the comment.  He sits at the end of that table.
18          THE COURT:  Just a moment.
19          So the only -- so at most you think Juror No. 10
20  might have heard it?
21          JUROR:  Yes, ma'am.
22          THE COURT:  Now, would the comment that Juror No. 11
23  made -- does that cause you any concern about your safety?
24          JUROR:  No, ma'am.  No, ma'am.
25          THE COURT:  Does it -- do you think it would

1   influence your verdict in this case?
2           JUROR:  No, ma'am.
3           THE COURT:  Can you put it out of your mind and
4   decide this case based solely on the evidence and my
5   instructions on the law?
6           JUROR:  Pretty much what goes on in that room, I kind
7   of -- that's why when you at first asked me about it, I was
8   like -- but then when you said something about the
9   conversation -- I can bring pieces back up if I need to, but I
10  try to brush them away unless . . .
11          THE COURT:  Okay.  And you might have just answered
12  this, but did you repeat to any of the other jurors what you
13  recalled -- or what Juror No. 11 said?
14          JUROR:  No, ma'am.  The only time I've heard that
15  conversation was when it was brought up and there was the -- I
16  think there was four of us at the end of the table, or five,
17  however many of us were sitting there.  That's all I've heard
18  anything be said about it.
19          THE COURT:  Okay.  All right.  Let me see counsel
20  again.
21      (Proceedings at sidebar:)
22          THE COURT:  Mr. Larosiere, assuming that I do not
23  grant a mistrial entirely, are you satisfied with Juror No. 3
24  at this time?
25          MR. LAROSIERE:  Can I have 30 seconds with Mr. King?

1    THE COURT:  Yes.

2    MR. LAROSIERE:  Thank you.

3    MR. KING:  Thank you, Your Honor.

4    (Defense counsel confer.)

5    THE COURT:  Yes, sir.

6    MR. LAROSIERE:  So my concern arises from the

7    statements she made when she indicated, "Well, obviously it was

8    about those two guys," right, and then she recalled.  So my

9    concern is the flip-flop from saying, "No, I didn't hear

10   anything about those two men" -- that obviously everyone is

11   speculating about -- to, "oh, now I remember hearing that

12   thing," right.

13   So I do have a concern with Juror No. 3, and I

14   think -- and now she said there's five people.  So the plot

15   is -- this is like a mystery novel that's getting way too

16   thick.  I -- what my hope is, is that excluding her, and

17   talking to that last person, getting a straight answer, would

18   be curative.  That's my hope.

19   THE COURT:  Ms. Taylor.

20   MS. TAYLOR:  I didn't sense that this juror was being

21   evasive in her answer at all so much as she just had brushed it

22   out of her mind, which is what she explained.  And when the

23   Court asked her more pointed, specific questions, she knew what

24   the Court was referring to and answered.

25   THE COURT:  Yeah, I mean, that is my recollection.  I

1    didn't see it as a flip-flop.  When I gave a more specific

2    question, she very readily --

3    MR. LAROSIERE:  Right.

4    THE COURT:  -- answered the question.

5    MR. LAROSIERE:  I understand that.  My concern is the

6    preface, right, which was talking about how, "We knew it was to

7    do with those two guys."

8    Do you understand what I'm saying?

9    THE COURT:  I can't say that I do.

10   MR. LAROSIERE:  Okay.  So the only reason that I have

11   doubts about -- honestly, I would have felt better if she had

12   just continued to say, "No, I didn't hear anything about it."

13   But when she --

14   THE COURT:  Well, she was being honest.

15   MR. LAROSIERE:  Well, no, for sure.  When the change

16   happened she started by saying of course they're speculating

17   that it had something to do with those guys.  And so if she had

18   that in her mind, right, and remembered it was those two guys,

19   it just seems odd that she --

20   THE COURT:  Well --

21   MR. LAROSIERE:  I understand I'm not -- you know, I'm

22   not a mystery novel writer, right.

23   THE COURT:  I guess if once I was more specific about

24   Juror No. 11 saying he had expressed a concern, then that -- it

25   bears to reason that she would then immediately focus on Juror

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 212 of 230

1  No. 11 and the person she heard Juror No. 11 speaking to.  So

2  that's why her saying "those two guys" doesn't --

3          MR. LAROSIERE:  Yeah, I understand what you're saying

4  though.  You're saying because at first it was brought as "the

5  outcome of the case" and -- yeah.

6          THE COURT:  And at first it was just, "Did you hear

7  anybody, any comment."  And then when we brought -- when we

8  went back more specifically, I identified the juror and I

9  identified as vaguely as I could the content.

10          MR. LAROSIERE:  Right.

11          THE COURT:  And when I did that, she immediately

12  acknowledged who it was and what she understood it to be.  And

13  I think she was very candid in her discussion of what he said.

14  So I don't see a basis to disbelieve her answers,

15  Mr. Larosiere.

16          MR. LAROSIERE:  I understand.

17          THE COURT:  Okay.

18          Mr. King, what's your position?

19          MR. KING:  Your Honor, I see it as I believe the

20  Court does.

21          The only thing I would ask is to just inquire of her

22  further if she's heard other people discussing the conversation

23  or any other -- anything unrelated to discussions about what

24  may be going on in court or that specific conversation with any

25  other jurors.  And then I would suggest we repeat this with

1  No. 10.  And then -- and then it will probably be 5:30 by that

2  time.  But otherwise, I think that's -- that would be our

3  position.

4          THE COURT:  Okay.  And all of you are in agreement

5  with that?

6          MS. TAYLOR:  Yes.

7          MR. LAROSIERE:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. KING:  Thank you, Your Honor.

10          MR. LAROSIERE:  Thank you, Your Honor.

11          (Proceedings in open court:)

12          THE COURT:  Okay.  So Juror No. 3, thank you.  Thank

13  you for your candor and for answering our questions.

14          I'm going to ask you, first of all, not to discuss

15  with your fellow jurors anything that we talked about.  They're

16  going to ask you what we wanted.  Please tell them that the

17  Court ordered you not to talk about it.

18          JUROR:  Yes, ma'am.

19          THE COURT:  Did you hear anybody else talking about

20  or commenting on Juror No. 11 or any concerns that he raised?

21          JUROR:  No, ma'am.  Like I said, there was only the

22  four of us kind of at -- and then there was a gap, and then

23  they had a conversation at the other end of the table.  I'm not

24  sure what they were discussing.

25          THE COURT:  Okay.

1    JUROR:  But I know the only people involved in that
2  conversation were the two you guys called in, the other juror
3  number, and myself.
4    THE COURT:  Okay.  All right.  The only other thing
5  I'm going to ask you to do is if in the remainder of the trial
6  you should hear anyone talking about that comment by Juror No.
7  11 --
8    JUROR:  Yes, ma'am.
9    THE COURT:  -- if you would please write a note and
10  give it to the court security officer.
11    JUROR:  Yes, ma'am.
12    THE COURT:  All right.  Counsel, anything else I need
13  to address?
14    MR. KING:  Can we very briefly approach?
15    THE COURT:  Sure.
16  (Proceedings at sidebar:)
17    THE COURT:  What did I forget?
18    MR. KING:  Just to inquire if she's heard any
19  conversations, but -- she focused on the actual conversation,
20  but has she overheard anybody else discussing it subsequent to
21  the conversation.
22    THE COURT:  I thought I asked that.
23    MR. KING:  I think you did, but I think she
24  misinterpreted your question based on her response because her
25  response focused entirely on who was at the table.

1    THE COURT:  Well, I understood that as her saying
2  that's the only thing she heard, but I will follow up.
3    Yes, Mr. Larosiere.
4    MR. LAROSIERE:  And I would just like to, just for
5  certainty's sake, maybe give a physical description of No. 10
6  to make sure she doesn't get the numbers mixed up.
7    THE COURT:  Have you committed to memory what all of
8  the jurors look like?  Because I don't know that I can give a
9  physical description.  I'll ask her to do the same sneaky move
10  that we had -- that Mr. King suggested last time, how's that?
11    MR. LAROSIERE:  Wonderful.
12    MR. KING:  Batting a thousand so far.
13    MR. LAROSIERE:  Fantastic.  Thank you.
14    THE COURT:  Okay.
15  (Proceedings in open court:)
16    THE COURT:  I'm sorry, so just two more things.  I
17  want to make sure that I understood your answer earlier.
18    You heard the conversation that you heard, and you've
19  told me about that.  After that, have you heard anybody else on
20  the jury talk about that conversation?
21    JUROR:  No, ma'am.  And it wasn't even brought up
22  amongst the other gentlemen that I heard.  I haven't been
23  around them the entire time, but that's just where I sit at the
24  table.
25    THE COURT:  Okay.  So here's -- just to make sure

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 214 of 230

1  that we have the right person, the court security officer is
2  going to go back in there and she's going to ask Juror No. 10
3  to come in.  Do you remember Juror No. 10's first name?
4          JUROR:  I don't remember any of their first names to
5  be honest with you, sorry.
6          THE COURT:  That's fair.  When she calls Juror
7  No. 10, if the person that stands up is not the other person
8  that was at the table, if it turns out that you weren't right
9  about the number, can you just look at the court security
10  officer and shake your head, and she'll bring you back in and
11  we'll try again to figure out who the right person is?
12          JUROR:  Yes, ma'am.
13          THE COURT:  Counsel, anything else?  Did I miss
14  anything?
15          MR. KING:  No, Your Honor.
16          MS. TAYLOR:  No, Your Honor.
17          MR. LAROSIERE:  No, Your Honor.
18          JUROR:  I'm almost positive that's him because he
19  said, "Well, I sit on the other side of the first one that they
20  called in," so that's why I asked about numbers.
21          THE COURT:  And remember, there's going to be
22  speculation about why you were called in, and you shouldn't
23  discuss it at all, okay?
24          JUROR:  Yes, ma'am.
25          THE COURT:  All right.  Thank you.

1          (Juror No. 3 exits the courtroom.)
2          (Juror No. 10 enters the courtroom.)
3          THE COURT:  Hello, Juror No. 10.  I'm sorry about the
4  delay.
5          Do you -- did you hear any of the jurors make any
6  comment about the outcome of the case today?
7          JUROR:  No.
8          THE COURT:  So Juror No. 11 has told us that he
9  personally expressed a concern about the case or its outcome to
10  one of the other jurors, and it seems that you may have been in
11  proximity to them when that conversation was had.  Did you hear
12  it?
13          JUROR:  I heard nothing.
14          THE COURT:  And have you heard anybody talk about why
15  we've had this somewhat lengthy delay this afternoon?
16          JUROR:  No.  Well, I know 11 just came back in and he
17  said he couldn't talk.
18          THE COURT:  So 11 -- oh, No. 12 just came back in?
19          JUROR:  12, 11, 10, I don't know.  I lost count.
20          THE COURT:  Well, you're No. 10.
21          JUROR:  And 3 just walked in before me, so . . .
22          THE COURT:  All right.  So here's the thing.  It's
23  important for me to know whether there's any possibility that
24  you heard Juror No. 11 express a concern about either himself
25  or about the outcome of the case.

1      JUROR:  No, I haven't heard anything.

2      THE COURT:  All right.  And can you assure me that

3  there isn't anything that Juror No. 11 said that would

4  influence your verdict in any way?

5      JUROR:  Absolutely not.

6      THE COURT:  All right.  And -- well, I have a double

7  negative so I'm going to ask my question again.

8      Is there anything that Juror No. 11 has said that you

9  believe would influence your verdict even in the slightest?

10      JUROR:  No.

11      THE COURT:  Can you assure us that you can decide

12  this case based solely on the evidence presented in the

13  courtroom --

14      JUROR:  Yes, ma'am.

15      THE COURT:  -- and my instructions on the law?

16      JUROR:  Yes.

17      THE COURT:  Let me see counsel at sidebar.

18      And Mr. McCroskey, may I see you a moment?

19   (Proceedings at sidebar:)

20      THE COURT:  Mr. Larosiere, any concerns about Juror

21  No. 10?

22      MR. LAROSIERE:  I don't think there could be a

23  sweeter, more straightforward-seeming man, so no, candidly.

24      THE COURT:  All right.  Is he acceptable -- is

25  continuing with him acceptable to Mr. Ervin?

1      MR. KING:  Yes, Your Honor, just with the cautionary

2  instruction you've given the rest of the jurors.

3      THE COURT:  Ms. Taylor?

4      MS. TAYLOR:  No concerns.

5      THE COURT:  Okay.  So what I think I should do is

6  I'll give him the same instruction.  And then I think we should

7  bring all of them back in, and I think I need to say that, "As

8  it turns out, Juror No. 11 realized that he had personal

9  beliefs that would not make him an appropriate juror and he was

10  honest with us and told us that and he's been relieved."

11      And I think what I should say to them is to the

12  extent any of them heard -- heard him, they should let the

13  court security officer know, and that way we'll have a more

14  clear record that nobody else was tainted by him, and also get

15  them to reaffirm their oath to decide the case based solely on

16  the evidence.

17      Is that acceptable, Mr. Larosiere?

18      MR. LAROSIERE:  And perhaps assure them that they

19  wouldn't see a consequence for now coming and saying it?

20      THE COURT:  Okay.

21      Ms. Taylor?

22      MS. TAYLOR:  That sounds fine to me, Your Honor.

23      MR. KING:  Yes, Your Honor.

24      THE COURT:  Okay.  Was there anything else?

25      MR. LAROSIERE:  I'm instructed to make sure my motion

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 216 of 230

1  is ruled on.

2       THE COURT:  Yes.  And I think that --

3       MR. LAROSIERE:  I understand, Your Honor.

4       THE COURT:  I think when I hear from everybody I

5  think your motion is likely to be denied, but I'm going to keep

6  an open mind until we've finished.

7       MR. KING:  Just for scheduling purposes, Your Honor,

8  is the Court's intention to continue with the presentation?

9       THE COURT:  No.

10      MR. LAROSIERE:  That may be the most curative

11  instruction to do.

12      THE COURT:  We're going to bring them in, talk to

13  them, and we're going to send everybody home.

14      MR. KING:  Thank you, Your Honor.

15   (Proceedings in open court:)

16      THE COURT:  All right.  So Juror No. 10, a couple

17  things.  Number one, I'm going to return you to the rest of the

18  jury, although I'm going to bring everybody out together in

19  just a moment.

20       I need you to assure me that you won't discuss with

21  the other jurors anything that we talked about here in the

22  courtroom.  Can you do that?

23      JUROR:  Yes.

24      THE COURT:  And if they ask you, you need to tell

25  them that I ordered you not to talk about it.  Can you do that?

1       JUROR:  Easily.

2       THE COURT:  And once again, can you assure me that

3  you're going to decide this case based solely on the evidence?

4       JUROR:  Yes.

5       THE COURT:  All right.  And if later in the trial you

6  should hear any of the other jurors talking about having heard

7  something that Juror No. 11 said, would you please write a note

8  to the court security officer?

9       JUROR:  Okay.

10      THE COURT:  All right then.  I'm going to let you go

11  back.

12       And if you'll please bring out the jury.

13      COURT SECURITY OFFICER:  Yes.

14      THE COURT:  Although, if you'll give me like three

15  minutes.

16      COURT SECURITY OFFICER:  Yes.

17   (Juror No. 10 exits the courtroom.)

18   (Pause in proceedings.)

19      THE COURT:  So let me tell y'all what I'm thinking

20  about saying.  Something to the effect of, "Ladies and

21  gentlemen, you've seen we've had some delay.  Juror No. 11

22  realized that matters personal" -- "there were matters personal

23  to himself that made him not a suitable juror for this

24  particular case, and to his credit, he told me about it.  And

25  I've decided to release him from his jury service.  And that's

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 217 of 230

1  fine, we can continue the case.  And he absolutely isn't in
2  trouble and he did the right thing because all of the parties
3  to this case are guaranteed, and must have, a fair and
4  impartial jury.  There was concern that No. 11's feelings might
5  have influenced other jurors, and so we took some time to look
6  into that.  We're confident that it didn't."
7       I think at that point I can ask if there's anyone --
8  to just raise your hand if there's anyone that I haven't spoken
9  to that heard or observed anything regarding Juror No. 11 that
10 would influence their verdict.
11      Mr. Larosiere, is that acceptable?
12      MR. LAROSIERE:  Sounds fantastic, Your Honor.
13      THE COURT:  Mr. King?
14      MR. KING:  Yes, Your Honor.  I would also ask the
15 Court to kind of, as you've done with the individual jurors
16 that we've spoken to -- and I'm not sure if the Court is going
17 to address that later, but in terms of the statement, that's
18 perfect, Your Honor.  Thank you.
19      THE COURT:  We hadn't talked about me asking the
20 venire generally a question, and so that's what I was inquiring
21 about now.
22      So Ms. Taylor, if I ask them to raise their hand if
23 any of them that we haven't already spoken to heard or observed
24 anything about Juror No. 11 that they believe would influence
25 their verdict in any way, is that acceptable?

1       MS. TAYLOR:  Yes, Your Honor.
2       THE COURT:  And then I think after that what I would
3  do is ask them to recommit themselves to their juror oath of
4  deciding the case based solely on the evidence, my
5  instructions -- on the evidence and my instructions and to
6  advise me if they hear or observe any outside influence.
7       Is that -- will that suffice, Mr. Larosiere?
8       MR. LAROSIERE:  Yes, Your Honor.
9       THE COURT:  Mr. King?
10      MR. KING:  Yes, Your Honor.
11      THE COURT:  Ms. Taylor?
12      MS. TAYLOR:  Yes, Your Honor.
13      THE COURT:  Let's have the jury.
14      COURT SECURITY OFFICER:  All rise for the jury.
15 (Jury enters, 5:11 p.m.)
16      COURT SECURITY OFFICER:  Please be seated.
17      THE COURT:  All right.  Ladies and gentlemen,
18 obviously we've been a little delayed this afternoon, and I
19 apologize for that.
20      Juror No. 11 realized that there were matters
21 personal to himself that made him just not a suitable juror for
22 this particular case.  And to his credit, he told me that.  And
23 I've decided to release him from his jury service, so he's no
24 longer with you.  And that's fine.  We can continue the trial.
25 And he absolutely is not in trouble and he absolutely did the

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 218 of 230

1  right thing because all of the parties here are entitled to a

2  fair and impartial jury.  That's what the Constitution

3  guarantees, and that's what we are committed to providing.

4        But there was also some concern that Juror No. 11's

5  feelings might have influenced certain other jurors based upon

6  what he reported to us, and so we've taken some time to look

7  into that, and we -- I say "we" collectively because the

8  lawyers have been in these discussions -- we are confident that

9  Juror No. 11's feelings have not influenced the other jurors

10  with whom we spoke.

11       I do need to ask those that we didn't speak to, if

12  you could raise your hand if you heard or observed anything

13  about Juror No. 11's conduct or comments that would influence

14  your verdict in any way.

15       (No response.)

16       THE COURT:  All right.  And for purposes of the

17  record, none of the jurors have raised their hand.

18       I'm going to ask you not to speculate about what

19  Juror 11's comments were or what Juror 11's concerns were.

20  That's completely irrelevant.  The only thing that matters is

21  the evidence that's presented in this courtroom.

22       At the beginning of the trial you took an oath in

23  which you swore that you would well and truly try the case now

24  before the Court and render a true verdict according to the

25  law, evidence, and instructions of this Court, so help you God.

1        Can all of you assure me that you can continue to

2  follow that oath?

3        JURY:  (Affirmative head nods.)

4        THE COURT:  Can I hear you out loud?

5        JURY:  Yes.

6        THE COURT:  Is there anyone here who believes that

7  they would be influenced by anything outside of the evidence

8  presented in this courtroom, my instructions, and the arguments

9  presented?  Are you going to be influenced by anything other

10  than those three things in deciding your verdict?

11       JURY:  No.

12       THE COURT:  And I'm going to just ask this once

13  again.  Can all of you assure me that you can render a fair and

14  impartial verdict based solely on the evidence presented and my

15  instructions on the law?

16       JURY:  Yes.

17       THE COURT:  Okay.  So what we're going to do is we're

18  going to send you home.  And I apologize for the delay this

19  afternoon.  But we are on track, so please don't be concerned

20  about that.

21       And I will ask you to continue to follow all of the

22  instructions that I've given you throughout the trial.  They

23  are extremely important.  This exercise that we just went

24  through probably shows you why it's so important that even in

25  talking to one another that you not discuss the case in any way

1  and that you not form or express any opinions about the case

2  until you are back there deliberating on your verdict with all

3  of the evidence, my instructions, and the arguments of the

4  attorneys.

5         So don't conduct any research; don't read, watch any

6  media reports; don't let anybody talk to you or in your

7  presence, and have a lovely evening.

8         Be back at 8:45 and we will continue.

9         COURT SECURITY OFFICER:  All rise --

10        THE COURT:  Oh, actually, you know what, I'm sorry,

11 let me just confirm with counsel that I did everything I

12 promised to do.

13        Counsel, may I see you at sidebar.

14   (Proceedings at sidebar:)

15        THE COURT:  Did I --

16        MR. LAROSIERE:  Did you assure them that if they came

17 back and let you know something that they --

18        THE COURT:  Oh, I'll do that.  If they remember later

19 that they heard something, that they should let me know.

20        MR. LAROSIERE:  Yeah.

21        THE COURT:  Okay.  I'll do that.

22        MR. LAROSIERE:  Thank you, Your Honor.

23        THE COURT:  Anything else, Ms. Taylor?

24        MS. TAYLOR:  No, Your Honor.  I'm assured that these

25 jurors are able to follow the law and the evidence and that

1  they have confidently reassured the Court of that.  And I have

2  no concerns about the remaining jurors.

3         THE COURT:  All right.

4         Mr. King, do you disagree with that?

5         MR. KING:  No, Your Honor, I was just -- no, Your

6  Honor.

7         THE COURT:  Okay.  And Mr. Larosiere, other than --

8  other than asking me --

9         MR. LAROSIERE:  It's a hard needle to thread.

10        THE COURT:  Other than asking me -- other than me

11 asking the jurors that last question, do you have any

12 disagreement with Ms. Taylor's assessment?

13        MR. LAROSIERE:  I --

14        THE COURT:  Let me do it differently.  Is there

15 anything else that you need me to ask them?

16        MR. LAROSIERE:  No, Your Honor.

17        THE COURT:  And without waiving your motion for

18 mistrial, can you identify factually any -- any behavior or

19 comment by the jury that is inconsistent with Ms. Taylor's

20 description?

21        MR. LAROSIERE:  Not at this time.

22        THE COURT:  Okay.  And I guess my point is I think

23 Ms. Taylor's description was exactly what I witnessed, and that

24 is, that nobody raised their hand and they all confidently and

25 without hesitation assured me that they could follow the law

USCA11 Case: 23-13062  Document: 49-1  Date Filed: 05/30/2024  Page: 220 of 230

1   and were not influenced by Juror No. 11.

2          And so I was giving you the opportunity that if you

3   saw something that I missed -- but what I'm hearing from you is

4   that you're unable to identify anything at this time; is that

5   right?

6          MR. LAROSIERE:  Yes, Your Honor.

7          THE COURT:  Okay.  All right.  Let me just ask that

8   last question.

9          MR. LAROSIERE:  Thank you, Your Honor.

10   (Proceedings in open court:)

11          THE COURT:  All right, ladies and gentlemen.  The

12   only other thing that I need to say to you before you go is if,

13   you know, later tonight or even during the trial, if you

14   realize that there was something that you heard or a concern

15   that you had, I want you to not hesitate in bringing that to my

16   attention.  Just give the court security officer a note.  And

17   you certainly won't be in trouble.  That's what we would

18   absolutely ask you to do, because as I said, the most critical

19   thing in any jury trial is you; it's a fair and impartial jury.

20   That is what is required.  And it's my job to make sure that

21   these folks get exactly that.  And if there's a problem with

22   that, then we'll take care of that.  And nobody will be in

23   trouble.  But that's of the utmost importance.

24          So with that I'm really going to let you go home and

25   we'll see you at 8:45 tomorrow morning.

1          COURT SECURITY OFFICER:  All rise for the jury.

2   (Jury exits, 5:19 p.m.)

3          COURT SECURITY OFFICER:  Please be seated.

4          THE COURT:  Okay.  I think that that last inquiry we

5   did resolves the motion for mistrial because the motion for

6   mistrial was based on the concern that the other jurors had

7   observed Juror No. 11's discomfort and agitation and that that

8   might somehow influence their verdict.

9          And I specifically asked them to raise their hand if

10   there was anything about Juror No. 11's -- anything they

11   observed or heard about his conduct or comments that would

12   influence their verdict, and they all -- well, and none of them

13   raised their hand.  So I don't think there's a basis to grant

14   the motion for mistrial.

15          Yes?

16          MR. LAROSIERE:  Sorry.  Mr. Zermay identified for me

17   and I agree, a somber look on Juror No. 3, and I just wanted

18   that reflected, when you asked about a factual basis, for body

19   language.

20          THE COURT:  A somber look on the face of Juror No. 3

21   the juror that we individually spoke to?

22          MR. LAROSIERE:  Yes, ma'am.

23          THE COURT:  Okay.  Well, given the fact that we

24   individually spoke to her and she assured us that she could

25   render a fair and impartial verdict and was not concerned --

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 221 of 230

1   and, gosh, I certainly didn't see a somber look on her face.

2         And Mr. Zermay, I don't know why you wouldn't have

3   brought that to our attention at sidebar.

4         MR. ZERMAY:  Your Honor, if I may briefly address

5   that.  We're trying to abide by the one-at-a-time rule,

6   respectfully.

7         THE COURT:  Mr. Zermay, you were whispering in

8   Mr. Larosiere's ear at sidebar at that very moment.  So I'm

9   going to reject that as basis for it not being brought up at

10  sidebar because you were speaking to him, so -- you-all have

11  loosely abided by the one person, and I'm allowing the

12  whispering, and that's fine, but we're not going to turn that

13  around and suggest that that was the reason for why it wasn't

14  brought up at sidebar, so -- in fact, there's even on the

15  record Mr. Larosiere advising the Court that you -- that you

16  had just whispered and reminded him to renew the motion for

17  mistrial.

18        All right.  So -- but on this record there's simply

19  no basis to grant a mistrial.

20        It is not pretty.  Juror No. 11 certainly created a

21  difficult situation, but I am confident that the jurors that

22  are left assured the Court that they would render a fair and

23  impartial verdict, that they were not influenced -- most -- the

24  overall majority of them neither observed nor heard anything

25  reflecting Juror No. 11's concerns.

1         Those that did assured the Court unequivocally that

2   the concerns did not influence them or their thoughts and would

3   not influence their verdict.  And so the motion for mistrial is

4   denied.

5         Ms. Taylor, what do you have in stock for us

6   tomorrow?

7         MS. TAYLOR:  Your Honor, before we hit this bump in

8   the road we were actually on track to be ahead of schedule.

9   Now I think we're essentially where Mr. Mesrobian and I had

10  anticipated when we kind of plotted this out where we would be

11  at the end of the day.

12        Tomorrow we're anticipating testimony from David

13  Bane; John Palmer Clarkson, III; Joncarlos Ruiz; and Patrick

14  Breslend.

15        Mr. Bane is a machine shop owner in town and then

16  Mr. Clarkson, Mr. Ruiz, and Mr. Breslend all work for Orange

17  Park Machine, which was the main machine shop manufacturing the

18  auto key cards.

19        And then we have several witnesses -- well, I still

20  need to put on Special Agent Slosson.  He can essentially, I

21  think, testify at any time.  He may testify tomorrow.  But I've

22  been kind of saving him in reserves for if we run out of

23  witnesses, we can put him on.

24        But then I think after that would be Carolanne Wolfe,

25  Kristin Ervin, Kris Ervin, and Jonathan Monger.

1           And if we get through all of that, then we would be
2   moving on to Lyndsey Butler, who is the ATF Intelligence
3   Research Specialist.  And we were anticipating her taking most
4   of the day.  She has a lot to get through.  So if we can get to
5   her tomorrow, I think she's on tap to be here and start
6   tomorrow afternoon.
7           THE COURT:  Okay.  I was hoping to make sure not to
8   stop -- tomorrow's the -- that awards thing, right?
9           MS. TAYLOR:  Yes, it starts at 1:30, Your Honor.
10          THE COURT:  So here's a little bit of a hiccup that
11  we ran into with that.  I was planning to make sure not to
12  break before 12:30 so that you could just be a little bit late.
13  Unfortunately, one of the jurors has told us that she has an
14  injection that she's required to take, and it has to be taken
15  in a time window.  And that time window is between 12 and
16  12:30.  So I think I'm going to have to break at 12:15 to make
17  sure that that can be accomplished.
18          I'll probably still plan to take about an hour or 10
19  or even an hour and 15 minutes.  I don't mind you being absent
20  for 15 minutes.  There's nothing under the law that prohibits
21  that, but I just wanted to let you know that that's why I'm
22  going to break a little bit early, because I have to
23  accommodate the medical condition of the juror.
24          MS. TAYLOR:  Yes, Your Honor, I certainly understand
25  that, and we will play it by ear.  Mr. Mesrobian has a few

1   witnesses for tomorrow, so hopefully while those witnesses are
2   on the stand it will work for me to be absent for a short
3   period of time.  And otherwise, I know that the office has
4   contingency plans for giving out those awards.
5           I think the only other thing we wanted to raise
6   again, Your Honor, was Exhibit 17, back to the GoFundMe
7   materials.  I think we still needed to come to ground on that.
8           And then one thing that Mr. Mesrobian and I had
9   discussed yesterday after the end of court and that we called
10  Mr. King about was the fact that the GoFundMe is discussed at
11  length in some of the videos that we're intending to introduce
12  that are --
13          THE COURT:  That's 13 and 14 that Mr. Mesrobian
14  mentioned this morning?
15          MS. TAYLOR:  Yes.  There may be others, but I think
16  certainly those discussed it in fair detail.  And so I think in
17  light of that, I'm not sure that being laser focused on the
18  small amount of the mention of the GoFundMe in Exhibit 17 makes
19  a lot of sense without addressing what's in those videos as
20  well, if the concern is the mention of the GoFundMe.
21          THE COURT:  I thought you were going in one
22  direction, and then I think I missed it.
23          But I did have a question about that, because over
24  the lunch hour I tried reading through 13 and 14.  But I
25  remembered Mr. Mesrobian saying that you-all only intended to

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 223 of 230

1   introduce certain parts of 13 and 14, and that it might be the

2   defense's position that more of that should be introduced.  And

3   I think that would influence my decision, to know what parts of

4   13 and 14 the government was seeking.  And if the defendant was

5   then insisting on introduction of the GoFund- -- of other

6   parts.  So can you give me clarity on that?

7          MS. TAYLOR:  Sure, Your Honor.  So how we had

8   intended to proceed was for all of the videos, we just have the

9   whole video on a disk as an exhibit.  We were only intending to

10  play for the jury certain parts.  And frankly, I'd have to have

11  Mr. Mesrobian address whether those parts include the GoFundMe,

12  because those are his exhibits.

13         But when we were exchanging exhibit lists prior to

14  trial, Mr. Hoover's attorney had indicated that their exhibits

15  were going to be all of the videos of Mr. Hoover's that we play

16  at trial and that they wanted the entire thing played.  And

17  that seemed to be an across-the-board request.

18         I don't have any more specificity on what their

19  request is other than that.

20         THE COURT:  Okay.  Well, you may have just clarified

21  for me.  So you're intending to introduce into evidence the

22  entirety of the video, you just weren't intending to publish to

23  the jury the entirety?

24         MS. TAYLOR:  Correct.  We were only intending to

25  publish the parts that we thought were pertinent.

1          THE COURT:  But you're introducing the entire

2   exhibit -- the entire video?

3          MS. TAYLOR:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  Mr. Mesrobian, because

5   that's actually your evidence, is there any -- do you have

6   any -- is that consistent with your understanding?

7          MR. MESROBIAN:  Yes, Your Honor.  And I don't have

8   that outline in front of me to tell you which precise portions

9   of 13 and 14 I plan to play, but the entire exhibit would be

10  introduced.  I just -- in the interest of brevity, I was not

11  going to be publishing the entire thing.  And that is true with

12  respect to several of these videos, but it doesn't -- -

13         THE COURT:  If the whole thing is in evidence --

14         MR. MESROBIAN:  Right.

15         THE COURT:  -- then that's the distinction that I

16  misunderstood.  I think I -- I misunderstood that you were only

17  planning to introduce a portion.  But if the whole thing is

18  being introduced, it matters very little that only part --

19         MR. MESROBIAN:  Apologies, Your Honor.

20         THE COURT:  No, I'm sure that was my

21  misunderstanding.

22         All right.  Well, I'll finish my review of those this

23  evening.

24         I'm trying to think.  I felt like there was something

25  else we needed to address.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 224 of 230

1          I do -- let me just say this out loud.  Where is the
2   GoFundMe stuff?  In the event that exhibit -- that I admit
3   Exhibit 73, I do think I would -- I do think a couple of
4   redactions would be appropriate.  If you look at page 2 above
5   the paragraph that starts, "Hi, my name is Erica," and it says
6   "lawyer, bail, expert witness," I don't see any reason why we
7   need to include that.
8          And then at the bottom of page 23 and continuing on
9   to page 24 there is an exchange between Mr. Hoover and Jade of
10  the GoFundMe that says, "Really, I think he is stalling until
11  the lawyer is ready to go and then have the lawyer get the
12  money and run everything.  I tried to explain to him that was a
13  stupid idea because if you pay the lawyer in full before the
14  job is done instead of by the hour as needed, the lawyer will
15  most likely just make a bill for 100 percent of the money and
16  say he needs more or just push Kris into taking a plea so he
17  don't have to do any more work," et cetera, I don't see any
18  reason why that needs to remain if I admit the exhibit.
19          Do you disagree with those redactions, assuming it's
20  admissible, Ms. Taylor?
21          MS. TAYLOR:  No, Your Honor.  I'm, frankly, fine with
22  heavily redacting 73.  And, really, the point that we wanted to
23  make with 73 was just to show that -- that Matt Hoover and
24  Erica Ibe were the ones that were actually running the GoFundMe
25  for the benefit of Mr. Ervin.  So I will take a look at giving

1   it a heavy chop.
2          THE COURT:  Okay.  And then with regard to the 17
3   series, I don't think it's possible -- I think it's highly
4   unlikely that anybody would know who "Matt from Fudd Busters"
5   is.  But it seems, just in an abundance of caution, that we
6   should redact that and maybe just make it say "M asterisk
7   asterisk asterisk asterisk."
8          MS. TAYLOR:  Your Honor, Ms. Ganoe performed some
9   sort of --
10          THE COURT:  Magic?
11          MS. TAYLOR:  -- magic and was able to redact that
12  out, and -- yes, so now at the bottom of -- so on clip two, the
13  last line of page 1 it just says, "Yeah, hopefully we'll have
14  enough to cover bail and then," and then there's just a blank
15  line and it says, "And hopefully they can get the case
16  dismissed."
17          And you redacted it out of the audio, correct?
18          MS. GANOE:  Correct.
19          THE COURT:  I'm sorry, can you tell me which one you
20  were just looking at?
21          MS. TAYLOR:  So that would be 17.2A, clip two.
22          THE COURT:  All right.  It also appears in 17.1A on
23  page 2, line 8.  And so if we can remove it from there as well.
24          And then the only other spot, I think -- and I'm
25  still going to look at this over the evening, but when you look

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 225 of 230

1   at lines 21 through 24, the only possible comment on an

2   attorney I see, the line currently reads, "You know, all we got

3   to do is get the ball rolling.  And then once I -- my plan

4   is -- once we get a attorney secured, get them to work on

5   getting me a bond hearing and get me out."

6        It seemed that if we redacted from the word "and

7   then" up to the word "work" so that it would just be, "You

8   know, all we got to do is get the ball rolling on getting me a

9   bond hearing and get me out," that would remove any reference

10  to the GoFundMe for purposes of counsel.

11       Any objection to that redaction, Ms. Taylor?

12       MS. TAYLOR:  No, Your Honor.

13       THE COURT:  And with that, Mr. King, I don't -- I

14  don't know that I saw anything else in this that could possibly

15  be interpreted as -- and I think I'm probably being overly

16  cautious in the redaction.  I don't think I see it implicating

17  the right to counsel.  And if it doesn't implicate the right to

18  counsel, I don't see a basis to exclude it.

19       It is relevant in that it is probative of the ongoing

20  conspiracy and the relationship between Mr. Ervin and

21  Mr. Hoover and also Mr. Hoover's wife, and a desire to continue

22  that allegedly unlawful business relationship.  So I'm inclined

23  to allow it.

24       Is there any other specific redaction or comment that

25  you would want to make on that?

1        MR. KING:  No, Your Honor.

2        THE COURT:  All right.  So I think with that -- oh,

3   the one thing I will say out loud, though, is I'm allowing this

4   in, but -- I don't know which one of you will be actually

5   handling the witnesses on this, but the United States needs to

6   tread very carefully.  You should not in any way suggest to the

7   jury that Mr. Hoover was raising -- was trying to get Mr. Ervin

8   a lawyer, was trying to buy him a lawyer, was trying to -- I

9   mean, you need to stay away from that.

10       Do you understand that?

11       MR. MESROBIAN:  Absolutely, Your Honor.

12       And the way that this is going to end up happening is

13  that -- oh, sorry -- Ms. Butler is going to be now -- we're

14  going to be playing this through her.  She's not a case agent.

15  She, you know, collated a lot of the documentary evidence in

16  this case and has created a summary timeline, a chart, a

17  demonstrative for the purposes of her testimony.

18       So as we're going through that timeline, rather than

19  just simply referencing the occurrence of the jail call, we'll

20  play it.  I don't think she'll have any comment on it because

21  she doesn't really know anything about it.  It's already been

22  authenticated and so on and so forth.

23       So I guess in some ways we ended up in a place where

24  it's going to be a cleaner testimony, purely playing it, and

25  there isn't anything else to ask her.

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 226 of 230

1    THE COURT:  Okay.  All right.  And -- yes?

2    MS. TAYLOR:  I'm sorry, because we're now

3 tag-teaming.  But I know we talked before about there's no

4 objection to authenticity of 17 and its sub parts.

5    I think it's necessary for there to be a stipulation

6 or for us to understand that we can represent that the voices

7 on that call are as represented on the transcript; that it's

8 Mr. Hoover, it's Mr. Ervin, and it's Erica Ibe.

9    Special Agent Hooker was prepared to testify to that

10 based upon his personal interactions with the defendants and

11 Ms. Ibe and having listened to their voices on the call.  I

12 don't think that there's any dispute about that, but I think

13 that to streamline this, when we introduce it, fairly, we

14 should be able to represent that those are who the voices are.

15    THE COURT:  Is there any objection to that, Mr. King?

16    MR. KING:  No, Your Honor.  I think that makes a lot

17 of sense, frankly.  And certainly I can say on behalf of

18 Mr. Ervin we won't make any argument that the government hasn't

19 demonstrated who it really is or anything like that.  There

20 won't be any argument or a cross-examination with the

21 witnesses.

22    THE COURT:  Mr. -- I don't know who.  Mr. Larosiere.

23    MR. LAROSIERE:  No objection, Your Honor.

24    THE COURT:  So you'll just have to remember to do

25 that, Ms. Taylor.

1    MS. TAYLOR:  Yes, Your Honor.

2    THE COURT:  Yes, Mr. King?

3    MR. KING:  Your Honor, there was one other matter,

4 and I just want to bring it to everybody's attention because

5 I'm not sure where I am on it.

6    There was some testimony from Agent Hooker on

7 redirect this morning regarding the coat hanger case, and then

8 the video where he alleged Mr. Ervin was melting some -- I'd

9 say coat hanger, but I'm not very familiar with this, but --

10    THE COURT:  I think it was -- go ahead.

11    MR. KING:  But there was a plastic device --

12    THE COURT:  Wall hanger I think.

13    MR. KING:  Wall hanger.  I knew I was getting it

14 wrong but I wasn't sure where.

15    And during the course of the testimony, Agent Hooker

16 did say that the individual involved in that was prosecuted.

17 And I'm still doing some research, but I believe the government

18 ultimately dismissed those charges.  And given the fact that

19 unsolicited Agent Hooker did say that individual was

20 prosecuted, I think it's -- and I'm not sure how I intend on

21 getting into this, but I do think it's misleading to suggest

22 that he was prosecuted, because it suggests he was successfully

23 prosecuted ultimately.

24    And again, this is -- I'm still -- I've been trying

25 to do this during a break, so I'm not a hundred percent

1  confident on this, I just wanted to bring it to everybody's

2  attention.  My understanding is he was arrested on several

3  charges, pled to one charge, and the government ultimately

4  dismissed all of the charges related to the portable wall

5  hanger.  I think I have that right.

6          So I -- I don't say that -- I don't have a motion or

7  anything I'm asking the Court to do, I just want to bring that

8  to everybody's attention that that's something I'm going to be

9  looking into and -- so that everybody has an opportunity to

10  fairly look into that issue, because I'm not sure how I want to

11  address that, but I did want to bring it to everybody's

12  attention.

13          THE COURT:  Okay.  Well, certainly if the charges

14  were dismissed that probably does leave the jury with an

15  incorrect impression.  If that's the case, Ms. Taylor -- well,

16  let me hear from you.

17          MS. TAYLOR:  I do not know what the outcome of that

18  case was.  There was no objection lodged at the time, which I

19  think it probably could have been fair to make a hearsay

20  objection to the extent that Mr. -- that Agent Hooker was

21  testifying about --

22          THE COURT:  Well, but, yeah, I mean, your witness is

23  the one that brought it up, unsolicited.  I will admit at the

24  time I was a little surprised to hear that, and I was surprised

25  that I didn't hear an objection at the time because I probably

1  would have directed the jury to disregard it.

2          MS. TAYLOR:  I think the Court can just give a

3  limiting instruction in that regard, Your Honor.

4          THE COURT:  Well, so Mr. King -- well, a limiting

5  instruction in terms of telling the jury that they heard

6  yesterday somebody was prosecuted for the wall hanger and I'm

7  going to direct them to disregard that comment?

8          MS. TAYLOR:  I think that's sufficient, Your Honor.

9          THE COURT:  All right.  Mr. King, is that sufficient?

10          MR. KING:  I would like some time to look into this.

11  So I'm not asking the Court to do anything, I just wanted to

12  bring that to everybody's attention.

13          You know, I may ultimately ask to introduce, you

14  know, the judgment and sentence in that case.  I'm not sure

15  yet.

16          THE COURT:  Well, I don't know how you're going to

17  have a judgment and sentence if the charges were dismissed.

18          MR. KING:  He entered a plea to -- and again, I'm

19  very much catching up.  And I'm sorry for interrupting.  It's

20  been a little bit of a long day.

21          My understanding is that he pled to an unrelated

22  count on a silencer case, and it looks like -- and just so --

23  and I can go ahead and let everybody know, it's the United

24  States vs. Timothy John Watson.  It's CR -- it's 3:20-cr-42,

25  and I believe it looks like it's the Northern District of West

USCA11 Case: 23-13062   Document: 49-1   Date Filed: 05/30/2024   Page: 228 of 230

1    Virginia.  I'm still trying to confirm that that's that case

2    and that individual, and -- but it looks like he pled to

3    possession of a silencer unrelated to the portable wall hanger

4    and the government dismissed the charges in the portable wall

5    hanger case.

6            THE COURT:  All right.  Well, I don't know how much

7    we're going to get into the specifics of that, but I'll let

8    you -- I'll let you look at it and you can bring it up

9    tomorrow.  But at a minimum I'm prepared to tell the jury to

10   disregard any comment about the prosecution for the portable

11   wall hanger.

12           And Ms. Wiles, if you would -- if you wouldn't mind

13   leaving me a note up here so I don't forget to do that if it's

14   not brought up.  But I won't do it without first conferring

15   with you-all about whether that's what we're going to do.

16           All right.  Anything else?  I'm going to stop asking.

17           MS. TAYLOR:  I'm sorry, I wish I didn't have anything

18   else.  We have a couple of witnesses coming up who are family

19   members of the defendants.  And I think that they would fairly

20   be characterized as hostile witnesses and we would be entitled

21   to ask leading questions.

22           I'm not intending to be aggressively leading with

23   these witnesses, but I wanted to bring that up outside of the

24   presence of the jury because I would rather not have a -- you

25   know, a request to treat a witness as hostile made in front of

1    the jury.

2            THE COURT:  Well, you'll come to sidebar.

3            MS. TAYLOR:  Okay.  Yes, Your Honor.

4            THE COURT:  Okay.  Anything else?

5            MR. KING:  No, Your Honor, I promise.

6            THE COURT:  I'm already late for Inns of Court as it

7    is.

8            Mr. Larosiere?  You've been -- you've had most of the

9    day.  Anything further for Mr. Hoover?

10           MR. LAROSIERE:  I'll happily hold my tongue, Your

11   Honor.  Nothing further.

12           THE COURT:  All right.  We're in recess.  I'll see

13   you all at 8:45 tomorrow morning.

14           COURT SECURITY OFFICER:  All rise.

15      (Proceedings adjourned at 5:45, to be continued on

16   Thursday, April 13, 2023.)

17                       -   -   -

USCA11 Case: 23-13062     Document: 49-1     Date Filed: 05/30/2024     Page: 230 of 230



```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3   UNITED STATES DISTRICT COURT)

 4   MIDDLE DISTRICT OF FLORIDA )

 5

 6        I hereby certify that the foregoing transcript is a true

 7   and correct computer-aided transcription of my stenotype notes

 8   taken at the time and place indicated herein.

 9

10        DATED this 5th day of June, 2023.

11

12                    /s/ Katharine M. Healey
                      Katharine M. Healey, RMR, CRR, FPR-C
13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```