# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

**Kristopher Justinboyer Ervin,** *et al.*,

                ***Appellants,***

**v.**

                                      №: 23-13062

**United States of America,**

                ***Appellee.***

_____

## APPEAL OF A CRIMINAL CASE FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA DISTRICT COURT CASE NO. 3:21-CR-00022

---

## SUPPLEMENTAL BRIEFING OF APPELLANT MATTHEW RAYMOND HOOVER

---

Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*
*Matthew Raymond Hoover*

*USA v. Kristopher Ervin, et al*, Appeal No. 23-13062

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

Pursuant to 11th Cir. R. 26.1-1(a), Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement. The following are all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party known to the undersigned.

1. Barksdale, Hon. Patricia D., United States Magistrate Judge

2. Call, Lisa, Federal Public Defender's Office

3. Corrigan, Hon. Timothy J., United States District Judge

4. Ervin, Kristopher Justinboyer (Defendant)

5. Handberg, Roger B., United States Attorney

6. Hoover, Erica (Defendant's Wife)

7. Hoover, Matthew Raymond (Defendant)

8. Hoppmann, Karin, former Acting United States Attorney

9. Howard, Marcia Morales (Trial Judge)

i

10. King, Alex, Esq.

11. Klindt, Hon. James R., United States Magistrate Judge

12. Larosiere, Matthew (Defendant-Appellant's attorney)

13. Lopez, Maria Chapa, former United States Attorney

14. Mesrobian, David B., Assistant United States Attorney

15. Monroe, Daniel S., Esq.

16. Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division

17. Richardson, Montgomery (Magistrate)

18. Siekkinen, Sean, Assistant United States Attorney

19. Taylor, Laura Cofer, Assistant United States Attorney

20. Tran, Mai, Assistant United States Attorney

21. Zermay, Zachary (Defendant's attorney)

22. Zermay-Larosiere Law Group

23. Linnen, Valarie, Esq. (Appellant's attorney)

24. Jaffe, Erik S., Esq. ; and

25. Sherill, Miranda Cherkas, Esq.

No publicly traded company or corporation has an interest in the outcome of this appeal to the undersigned's knowledge.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)** ............................................................. i

**TABLE OF AUTHORITIES** ............................................................... iv

**ARGUMENT** ................................................................................ 1

**I. THE DISTRICT COURT, AND THE GOVERNMENT, TREATED "AUTOMATICALLY" AS SURPLUSAGE** ................................. 2

**A.** *Cargill* **and "Automatically" as an Independent Element** ........... 2

**B. The Government's Admitted Malfunction Was Not "Automatic"** 5

**C. The Government's Logic Suggests Every Single AR15 in America is a Machinegun Under §5845(b)** ..................................... 18

**II. THE DISTRICT COURT MISAPPLIED THIS CIRCUIT'S CASELAW ON THE TAX AND SPEND CLAUSE** ..................................... 19

**CERTIFICATE OF COMPLIANCE** ............................................. 25

**CERTIFICATE OF SERVICE** ...................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Bond v. U.S.*, 572 U.S. 844 (2014) ............................................................ 19

*Bronsozian v. United States*, 140 S. Ct. 2663 (2020) .............................. 23

*Cohens v. State of Virginia*, 19 U.S. 264 (1821) ..................................... 19

*Garland v. Cargill*, 602 U.S. 406 (2024) .............................................. 2, 4

*NFIB v. Sebelius*, 567 U.S. 519 (2012) .................................................... 20

*U.S. v. Bournes*, 339 F.3d 396 (6th Cir. 2003) ........................................ 23

*U.S. v. Gambill*, 912 F. Supp. 287 (S.D. Ohio 1996), aff'd, 129 F.3d 1265 (6th Cir. 1997) ......................................................................................... 23

*U.S. v. Jones*, 976 F.2d 176 (4th Cir. 1992) ............................................ 22

*U.S. v. Kirk*, No. 91-8418 (5th Cir. April 28, 1992) ................................ 23

*U.S. v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009) .................................... 21

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................ 23

*United States v. Rivera*, 58 F.3d 600 (11th Cir. 1995) ............................ 22

*United States v. Staples*, 971 F.2d 608 (10th Cir. 1992), rev'd, 511 U.S. 600 (1994), and vacated, 30 F.3d 108 (10th Cir. 1994) ......................... 4

## Statutes

18 U.S.C. § 922(o) ........................................................................ 20, 22, 23

26 U.S.C. § 5845 ..................................................................................... 3, 19

26 U.S.C. § 5861 ............................................................. 1, 20, 21, 22, 23

## Other Authorities

9-63.516 Charging Machinegun Offenses Under 18 U.S.C.A. § 922(o), Instead of Under the National Firearms Act,

United States Attorneys' Manual .................................................. 21, 23

O'Neil, Aaron, "Annual Share of AR-15 assault rifles in the total
number of firearms manufactured in the United States from 1990 to
2020," STATISTA, https://www.statista.com/statistics/1388010/
(Jul 4, 2024)........................................................................................14

OXFORD ENGLISH DICTIONARY (1933)...............................................3

Stevens, B. R. and Ezell, E. C., "The Black Rifle M16 Retrospective,"
Collector Grade Publications (2004).......................................................5

Stoner, E. M.; Automatic trigger mechanism with three sears and a
rotatable control member. U.S. Patent 3,045,555A,
December 22, 1959 ................................................................................5

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed.1934)......3

**Regulations**

27 C.F.R. § 479.11 .................................................................................3

**Constitutional Provisions**

U.S. Const., Art. I, § 8, cl. 1................................................................20

## ARGUMENT

New Supreme Court precedent makes clear that the case made by the government suggesting the Auto Key Card was a machinegun is inconsistent with the statutory definition. It cannot be the case that a malfunction, inherent in the design of one of the most common semi-automatic rifles in America, results in a weapon that shoots "automatically," more than one shot. As explained *infra*, if the government's theory here can support a conviction, it must mean that every single AR15 in America contains the receiver of a machinegun, and that the possession of any post-1986 semiautomatic AR15 violates § 5861(b).

Review of the record inspired by new precedent also revealed an issue in the district court's holding with regard to its constitutional analysis in denying the motion to dismiss the indictment for Due Process concerns, which appellant briefly discusses *infra*-Part II.

1

## I.   THE DISTRICT COURT, AND THE GOVERNMENT, TREATED "AUTOMATICALLY" AS SURPLUSAGE

The evidence relied upon most heavily by the district court in denying the motion for judgment of acquittal was the testimony of ATF Firearms Enforcement Officer Cody Toy. (Doc. 310) at 7-10. No evidence was put forth that the device manufactured by FEO Toy caused a semiautomatic firearm to fire "automatically" as opposed to simply "more than one shot," but FEO Toy admitted his creation induced a "hammer follow" malfunction, a malfunction that would be identical if a single part of any ordinary semiautomatic AR15 was removed, worn down, or malfunctioned. (Doc. 283 at 185, 192-193).

A. *Cargill* and "Automatically" as an Independent Element

*Garland v. Cargill*, was a case of statutory interpretation much like the instant one. 602 U.S. 406 (2024). *Cargill* examined the functional language of § 5845(b): that a machinegun conversion device must "automatically" cause a weapon to fire "more than one shot" through "a single function of the trigger." *Cargill*, 602 U.S. at 424. Giving due weight to each word in the statute, *Cargill* held that it is not enough that a weapon fire more than one shot by a single function of the trigger, it must do so "automatically." *Id*. at 424.

2

Based on dictionary definitions existing at the time of the NFA's passage, automatically, as an adverb, means "having a self-acting or self-regulating mechanism."[1] Beyond that, the government's own interpretation, beginning March 26, 2019 defines "'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' [as] functioning as the result of a self-acting or self-regulating mechanism[.]" 27 C.F.R. § 479.11.

Giving full effect to the words of the statute, the word "automatically" must mean that a firearm that shoots more than one shot by something other than a self-acting or self-regulating mechanism, or which happens to or incidentally fires more than one shot as a result of a malfunction, is not a "machinegun" as defined by § 5845(b).

Few cases have dealt with the bifurcate analysis of whether "more than one shot" came "automatically," but the common meaning of terms

---

[1] A leading dictionary from 1934 tells us that "automatically" is the adverbial form of "automatic." WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed.1934). The adjectival form of "automatic" is relevantly defined by that dictionary as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Id*. Another contemporaneous dictionary similarly describes "automatic" as "[s]elf-acting under conditions fixed for it, going of itself." OXFORD ENGLISH DICTIONARY 574 (1933).

and earlier cases provide insights. *U.S. v. Staples* ultimately resulted in a landmark Supreme Court ruling on *mens rea*, but the courts below dealt with an AR15 without an automatic sear, where the government was able to induce hammer-follow. *United States v. Staples*, 971 F.2d 608, 609 (10th Cir. 1992), rev'd, 511 U.S. 600 (1994), and vacated, 30 F.3d 108 (10th Cir. 1994).

In *Staples*, the ATF oiled the firearm, changed its bolt carrier, and loaded it with "soft-primer" ammunition to encourage the hammer-follow malfunction to result in the discharge of multiple shots. *Staples* 971 F.2d at 609. Additionally, the government rested on the firing of multiple shots, without providing evidence of any automatic function, over Defendant-Appellant's objections. *Id.* at 613-14. The Tenth Circuit's analysis in *Staples*, later reversed by the Supreme Court, enabled it to avoid "the broader question of whether a weapon that malfunctions can constitute a firearm under the NFA." *Id.* at 614. However, the Supreme Court's ultimate decision in *Staples* makes clear that actual knowledge of the characteristics of a firearm making it subject to the Act is required to sustain a conviction, and *Cargill*'s clarification that "automatically" and "more than one shot" are not redundant, but are actually separate

4

elements, it is necessary that the government plead and prove that the device induce more than one shot *automatically* by way of a single function of the trigger. Here, the only evidence provided admits something created by a government witness induced a malfunction. A firearm which incidentally or accidentally fires more than one shot, cannot rationally be said to be firing "automatically."

B. The Government's Admitted Malfunction Was Not "Automatic"

The malfunction caused by FEO Toy's creation is best understood against the backdrop of how an AR15 is designed to function "automatically."[2]

---

[2] Stoner, E. M.; Automatic trigger mechanism with three sears and a rotatable control member. U.S. Patent 3,045,555A, December 22, 1959. This patent outlines the function of the fire control mechanism in virtually every AR15, including the Colt AR15 model 604, ultimately adopted as the U.S. M16 service rifle. Stevens, B. R. and Ezell, E. C., "The Black Rifle M16 Retrospective," collector grade publications (2004).

The below image reflects the fire control group components and moving parts of the action of a fully automatic AR15, such as an M16, in locked position[3], ready to fire. These parts of the action and fire control group are critical to the function of the rifle and are responsible for the firing sequence.[4]



---

[3] The AR15 fires from a locked breech, and the breech is locked when the bolt carrier group is at its foremost position. If the AR15 fires when the breech is unlocked, it carries the potential of the weapon exploding.

[4] Appellant would be remiss not to remind this Honorable Court that this entire discussion does not and cannot relate to the Auto Key Card as it was sold, advertised, transferred, or possessed. Indeed, in its original form, the Card could not even fit inside a gun. Rather, this analysis explains the result of something alleged to be created *from* a Card by "material alteration" by FEO Toy, and still didn't work the way the government asserted it would.

Pulling the trigger releases the hammer from the sear on the front of the trigger, allowing the hammer to release its stored energy and strike the firing pin.



As the ammunition cartridge fires, pressure causes the bolt carrier group to travel rearward, unlocking the action. As the bolt carrier group travels rearward, it releases pressure from the automatic sear and re-cocks the hammer.



Bolt (unlocked position)

As the bolt carrier group nears the end of its rearward travel, the automatic sear clips over the hammer, retaining the hammer and preventing it from rotating forward, despite the user continuing to hold the trigger to the rear.



Critically, the automatic sear restrains the hammer for the duration of the bolt carrier group's forward travel, such that the hammer

stays held to the rear and can only strike the firing pin when the action returns to the locked position.



Once the carrier group has reached the end of its travel and the bolt is locked, the tail of the bolt carrier group trips the automatic sear, releasing the hammer and allowing it to strike the firing pin with its full energy again, re-starting the cycle, and continuing until the trigger is released or the weapon consumes all ammunition.





Drop-in-auto sears, such as those the government alleged the Auto Key Card to "contain" or "depict," imitate the function of an automatic sear shown above. As the government's witness testified, the timing of the automatic sear with the tail of the bolt carrier group is "critical for [a drop-in auto sear] to function the way the original designer intended it to." (Doc. 283 at 184). However, that was not what happened with Mr. Toy's creation. Rather, Mr. Toy induced "hammer follow." (Doc. 283 at 163) ("It [firing more than one shot] was occasional…I was getting some hammer follow…which caused some of the test fire not to work."). Mr.

10

Toy further testified that the "hammer follow" he induced was identical to how an ordinary semiautomatic AR15 would function if the disconnector were removed or damaged. (Doc. 283 at 185).

To illustrate, the following depicts a typical semiautomatic AR15 functioning, beginning with the bolt locked and ready to fire.



11



As the bolt carrier group travels rearward, re-cocking the hammer, the disconnector retains the hammer in its rearmost position until the bolt is locked and the trigger is released, ready to fire another cartridge when pulled again.





The above reflects the functionality of each of the 20-plus-million semiautomatic AR15 rifles estimated to be in American hands.[5]

The "hammer-follow" induced by FEO Toy is the equivalent of removing or disabling the AR15 disconnector, which would require either the part's failure or "drifting one pin" on any semiautomatic AR15, which Toy testified "depending on skill level" would take "a matter of minutes." (Doc. 283 at 185). A "hammer follow" malfunction is depicted below:



---

[5] O'Neil, Aaron, "Annual Share of AR-15 assault rifles in the total number of firearms manufactured in the United States from 1990 to 2020," STATISTA, https://www.statista.com/statistics/1388010/ (Jul 4, 2024).



Critically, and antithetically to function as either a semi-automatic or automatic weapon, nothing retains the hammer while a firearm is experiencing a "hammer follow" malfunction. As Mr. Toy testified, in a "hammer follow situation," as the bolt carrier group travels forward, the hammer "follows" it, expending energy as the bolt closes and resting on the firing pin while the bolt is still unlocked, rather than striking it after

the action locks, rendering an additional shot an unpredictable malfunction, carrying with it the possibility of the firearm exploding. (Doc 283 155; 185-189).[6]



---

[6] As Mr. Toy testified, firing a cartridge while the bolt is unlocked results in an out-of-battery detonation, which could cause venting of hot gas into the operator's eyes, ejection of shrapnel into the surrounding area, expulsion of the magazine, catastrophic failure to the surrounding metal components resulting in a dangerous shrapnel explosion.



Appellant submits that it cannot be the case that a malfunction—which FEO Toy testified would cause a weapon to fire more than one shot "occasionally"—that is possible in the event of a failure of a small metal part present on every single semiautomatic AR15 in this country, equates to a weapon which shoots "more than one shot" "automatically." (Doc. 283 at 163).

C. The Government's Logic Suggests Every Single AR15 in America is a Machinegun Under §5845(b)

As explained *supra*, the basis of the government's theory is that a hammer-follow malfunction results in a machinegun. As FEO Toy testified, the device he created simply defeated the disconnector, it did not function the way an auto sear or lightning link is designed to function; (Doc. 283 at 188-189) was identical to the simple removal of the disconnector (*Id.* at 185); and that removal of the disconnector would "require [an AR15] to be regulated just like any other machinegun." (*Id.* at 186).

As discussed *supra*, Part-I(B), and as FEO Toy testified, a disconnector failure requires only the drifting of a single pin, or the breakage or wearing of a single part. In contrast to the actual functioning of an auto-sear, drop-in-auto-sear, or other machinegun conversion device for the AR15, a hammer-follow malfunction does not require any additional part or "combination of parts" to exist. An ordinary AR15, with the simple removal or failure of one part, without any modification to the receiver, results in a hammer-follow malfunction. Thus, if the government is correct that hammer-follow makes a machinegun, it

18

follows that every single semiautomatic AR15 ever made contains "the frame or receiver" of a machinegun under § 5845(b).

Appellant submits that cannot possibly be the case. A weapon which fires more than one shot "occasionally," "sometimes," "accidentally," or as a result of a malfunction, cannot rationally be said to be shooting more than one shot "automatically." Clearly, in drafting § 5845(b), Congress qualified "more than one shot, without manual reloading" with the adverb "automatically" for a reason. It avoids the application of gross criminal penalties to otherwise lawful, yet malfunctioning firearms. This compounds with the vagueness and lenity issues raised in Appellants' and *Amici*'s principal briefs.

## II. THE DISTRICT COURT MISAPPLIED THIS CIRCUIT'S CASELAW ON THE TAX AND SPEND CLAUSE

"Congress cannot punish felonies generally." *Cohens v. State of Virginia*, 19 U.S. 264, 428 (1821). Accordingly, every criminal penalty it enacts "must have some relation to the execution of a power of Congress" (*Bond v. U.S.*, 572 U.S. 844, 844 (2014)), like the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const.,

Art. I, § 8, cl. 1. A law which attaches consequences "beyond requiring a payment to the IRS" is a penalty—not a tax. *NFIB v. Sebelius*, 567 U.S. 519 at 567-68 (2012).

The National Firearms Act, through which §5861(e) came, was passed and has been upheld by the Courts expressly under Congress' taxing power. However, 18 U.S.C. § 922(o) prohibits the possession or transfer of machineguns—however defined—not registered by May of 1986. As such, the United States refuses to register or accept tax payments for the transfer of machineguns made after 1986. Necessarily, as it relates to machineguns, §922(o) either implicitly repealed §5861(e), or § 5861(e)'s application to the transfer of machineguns made after 1986 violates Due Process. Even the United States Attorneys' Manual recognizes this constitutional shortcoming:

> Section 922(o) of Title 18 makes it unlawful to transfer or possess a machinegun made after May 19, 1986. In addition, under the NFA, it is unlawful to manufacture or possess a machinegun without first registering it with the Secretary of the Treasury and paying applicable taxes. 26 U.S.C.A. §§ 5822, 5861. As a result of the enactment of 18 U.S.C.A. § 922(o), the Secretary of the Treasury no longer will register or accept any tax payments to make or transfer a machinegun made after May 19, 1986. Accordingly, **because it is impossible to comply with the registration and taxation provisions in the NFA, prosecutors should charge the**

**unlawful possession or transfer of a machinegun made after May 19, 1986 under § 922(o)**.

9-63.516 Charging Machinegun Offenses Under 18 U.S.C.A. § 922(o), Instead of Under the National Firearms Act, United States Attorneys' Manual. Despite this, the government here insisted on pursuing Appellant under § 5861 (e).

Appellant Hoover moved to dismiss the indictment, among other things, because his prosecution under 26 U.S.C. § 5861(e) was not a valid exercise of the power of Congress to tax consistent with the Due Process clause. (Doc. 277, 24-25). The district court denied this motion, citing *U.S. v. Spoerke* as foreclosing the argument. (Doc. 141 at 28) (citing 568 F.3d 1236, 1246 (11th Cir. 2009)). But this was a misreading of *Spoerke*.

In *Spoerke*, Defendant-Appellant was charged with making and possessing a pipe bomb without registration in violation of § 5861(f) and (d). *Spoerke*, 568 F.3d at 1242. *Spoerke* argued that compliance with § 5861 was impossible, but this Court recognized this to be "based on a false premise: 'No federal statute completely outlaws the possession of pipe bombs[]; therefore, their registration is not legally impossible.'" *Spoerke*, 568 F.3d at 1246.

21

This case presents the opposite of the *Spoerke* situation: 18 U.S.C. § 922(o) *does* completely outlaw the private possession of a machinegun made after 1986, and thus—regardless of whether or not an individual is a felon—compliance with §5861 *is actually* impossible. This Court has not squarely addressed the issue of § 5861(e) as an exercise of any enumerated power as applied to a post-1986 machinegun. The 1995 case of *United States v. Rivera* was the closest examination, but that was dicta and concerned a question not before the court. 58 F.3d 600, 602 (11th Cir. 1995) (citing cases from the Fourth, Sixth, and Seventh circuits engaging with this issue).

Circuits holding the application of §5861 to the possession or transfer of post-1986 machineguns to be unconstitutional are in the majority, and much more developed than the minority approach, whose decisions are rooted in the Fourth Circuit case of *U.S. v. Jones*, 976 F.2d 176, 182–84 (4th Cir. 1992). Indeed, even the Department of Justice has expressed agreement with the line of cases holding §5861 to be unconstitutional as applied to post-1986 machineguns, and continues to

counsel away from its use in the United States Attorneys' Manual.[7] Additionally, substantial developments have occurred in taxing clause analysis, which support Appellant's argument. These are reflected in the much more modern cases affirming §5861's unconstitutionality as a tax on machineguns made after 1986. *Bronsozian v. United States*, 140 S. Ct. 2663 (2020) (voluntarily dismissed after cert petition); *United States v. Cox*, 906 F.3d 1170, 1182 (10th Cir. 2018); *U.S. v. Bournes*, 339 F.3d 396 (6th Cir. 2003)) (holding the NFA provisions no longer sustainable under the tax power); *U.S. v. Gambill*, 912 F. Supp. 287, 289–90 (S.D. Ohio 1996), aff'd, 129 F.3d 1265 (6th Cir. 1997) ("It is hard to understand how any circuit could find such a conviction permissible when the provisions of the NFA have been totally eclipsed by section 922(o).").

To the extent the government may argue § 5861 may be complied with by completely avoiding machineguns, that does not save the statute's application here as a legitimate exercise of the taxing power. The United States can instead choose to follow its own manual and

---

[7] "The United States agrees that [*U.S. v. Dalton* and *U.S. v. Rock Island Armory, Inc.*] are persuasive and should control the disposition of this appeal, and [defendant's] conviction under 26 U.S.C. § 5861(d) should be vacated." Joint Motion for Remand, *U.S. v. Kirk*, No. 91-8418, motion granted (5th Cir. April 28, 1992).

charge under § 922(o) in cases concerning post-1986 machineguns. Accordingly, the district court erred in denying the motion to dismiss and this Honorable Court should reverse the judgment and sentences in this case.

Dated September 15, 2024

Respectfully submitted,

*/s/Matthew Larosiere*
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*
*Matthew Raymond Hoover*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies, pursuant to 11th Cir. Rule 28-1, that this brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure (32)(a) because it contains 3,022 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements and type style requirements for Rule 32(a) because it has been prepared with Microsoft Word 2023 in 14 point, Century Schoolbook font.

<u>/s/ Matthew Larosiere</u>
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant Matthew Raymond Hoover*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was sent by CM/ECF on September 15, 2024, and notice of this filing was electronically served on all parties there registered for service, including:

VALARIE LINNEN, ESQ.
*Counsel for Kristopher Ervin*

SEAN SIEKKINEN
*Assistant United States Attorney*

I further certify that four hard copies of the foregoing brief are being furnished to the Clerk of this Court by mail.

*/s/ Matthew Larosiere*
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*
*Matthew Raymond Hoover*

26